Ian McIntosh
Mac Morris
CROWLEY FLECK PLLP
1915 South 19th Avenue
P.O. Box 10969
Bozeman, MT 59719-0969
Telephone: (406) 556-1430
Facsimile: (406) 556-1433

*Attorneys for Big Sky Resort*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JOHN MEYER,<br><br>     Plaintiff,<br><br>vs.<br><br>BIG SKY RESORT and SALEWA<br>USA LLC,<br><br>     Defendants. | CV-18-02-BU-BMM<br><br>**BIG SKY RESORT'S BRIEF IN<br>SUPPORT OF MOTION FOR<br>SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

UNDISPUTED FACTS ..........................................................................1

LEGAL STANDARD.............................................................................12

ARGUMENT ..........................................................................................13

A.    Meyer's claims fail because his injuries result from the inherent dangers and risks of skiing...............................................................13

B.    Even if the Court examines the reasonableness of Big Sky's conduct, summary judgment is warranted. .........................................19

C.    Meyer's allegations concerning ski patrol supplies, working conditions and closed areas are both groundless and irrelevant. ..................................................21

    1.    Meyer's allegation regarding adequate supplies is baseless and irrelevant. ...............................................................21

    2.    Meyer's allegation concerning ski patrol working conditions is groundless and irrelevant. ...............................................24

    3.    Meyer's allegation regarding marking areas as closed is irrelevant........25

CONCLUSION ........................................................................................26

CERTIFICATE OF COMPLIANCE ......................................................27

# TABLE OF AUTHORITIES

**Cases**

*Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179 (9th Cir. 1988)........................24

*Brewer v. Ski-Lift, Inc.*, 762 P.2d 226 (Mont. 1988) ................................17

*Hammond v. City of Junction City, Kansas*, 167 F.Supp.2d 1271
    (D. Kan. 2001) ............................................................23

*Intel Corp. v. Hartford Accident & Ind. Co.*, 952 F.2d 1551 (9th Cir. 1991) .........13

*Kopeikin v. Moonlight Basin Mgmt., LLC*, 90 F.Supp.3d 1103
    (D. Mont. 2015)................................................... 8, 19, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986) .....13

*Mead v. M.S.B., Inc.*, 872 P.2d 782 (Mont. 1994) ........................... 16, 17

*Mont. Sports Shooting Ass'n, Inc. v. St., Mont. Dep't of Fish, Wildlife, & Parks,* 344
    Mont. 1, 185 P.3d 1003 (2008)....................................... 14, 16, 17, 19

*Scanton Prod. Inc. v Bobrick Washroom Equip. Inc.*, 190 F.Supp.3d 419
    (M.D. Pa. 2016) ...........................................................23

*Small v. Bd. of Trustees, Glacier Cnty. Sch. Dist. No. 9,* 306 Mont. 199, 31 P.3d
    358 (2001).............................................. 14, 16, 17

*U.S. v. Sierra Pac. Ind.*, 857 F.Supp.2d 975 (E.D. Cal. 2011) ................................23

*Waschle ex rel Birkhold-Waschle v. Winter Sports, Inc.*, 144 F.Supp.3d 1174
    (D. Mont. 2015) ........................................... passim

**Statutes**

Fed. R. Civ. P. 56 ........................................... 12, 24

Fed. R. Evid. 401 ...........................................22

Fed. R. Evid. 402 ...........................................22

Fed. R. Evid. 802 ...........................................22

Mont. Code Ann. § 1–2–101 ........................... 14, 16, 17

Mont. Code Ann. § 23-2-702 ........................... passim

Mont. Code Ann. § 23-2-731 ...........................19

Mont. Code Ann. § 23-2-733 ...........................16

Mont. Code Ann. § 23-2-736........................... passim

**Rules**

ABA Model Rule of Pro. Cond. 4.2.........................................................................23

Montana Rule of Professional Conduct 4.2 ............................................................22

## EXHIBIT LIST

[Exhibits Attached to Statement of Undisputed Facts]

Exhibit 1 – J. Meyer Deposition

Exhibit 2 – M. Unruh Affidavit with attachments

Exhibit 3 – A. Eggert Deposition

Exhibit 4 – Deposition Exhibit 57 (Eggert letter to Meyer dated 12/17/15)

Exhibit 5 – Deposition Exhibit 16 (Photo Loop Road/BRT Road from Challenger)

Exhibit 6 – Deposition Exhibits 11-13 (Catwalk photos)

Exhibit 7 – Big Sky's Responses to Plaintiff's Second Discovery Requests (excerpt)

Exhibit 8 – Meyer Internet Forum Post dated November 17, 2017

Exhibit 9 – R. Ayres Affidavit

Exhibit 10 – Deposition Exhibit 29 (Photo Transition Highway to Loop Road)

Exhibit 11 – Deposition Exhibit 47 (Call Minutes 4/27/16 Meyer – Dynafit)

Exhibit 12 – Email chain between Meyer and Dynafit dated May 5-8, 2016

Exhibit 13 – A. Nettles Affidavit

Exhibit 14 – Email Chain between Meyer and McIntosh dated December 2-11, 2016

## I.  <u>INTRODUCTION</u>

On December 11, 2015, Plaintiff John Meyer, an intermediate skier in only his second year on skis, was skiing fast and out of control on terrain clearly marked as "Experts Only" at Big Sky Resort.  Despite dozens of warnings, Meyer skied over a variation in terrain onto a plainly visible catwalk and wrecked, seriously injuring himself.  Both "variations in steepness or terrain" and catwalks are part of the sport of skiing and are expressly within the statutory definition of "inherent dangers and risks of skiing." Pursuant to the plain language of Mont. Code Ann. § 23-2-736(4), Meyer must "accept all legal responsibility" for his injuries and Big Sky is entitled to summary judgment as a matter of law.

## II.  <u>UNDISPUTED FACTS</u>

On December 11, 2015, Meyer met his then girlfriend, now wife, Amanda Eggert, at Big Sky for a day of skiing.  (SUF ¶ 1.)  A charity event allowed Meyer to trade 20 cans of food for a ticket.  (SUF ¶ 2.)  Posted at the ticket window was Montana Code Annotated § 23-2-736, which sets forth, among other duties, the skier's duty to "safely ski within the limits of [the skier's] ability" and to "maintain control of speed and course so as to prevent injury to the skier or others."  (SUF ¶ 3.)  Also posted at the ticket window was the skier Responsibility Code, which sets forth a skier's obligation to "Always Stay In Control and Be Able to Stop or Avoid Other People or Objects." (SUF ¶ 4.)  Another sign posted near the ticket

window on December 11, 2015 warned Meyer: "Caution!  Early Season

Conditions Exist!".  (SUF ¶ 5.)

    Just days before, Meyer characterized himself as an intermediate skier when

he took his skis in to be tuned.  (SUF ¶ 6.)  Eggert agrees that Meyer was an

intermediate skier. (SUF ¶ 7.)  Meyer told Eggert that 2015 was only his second

full season on skis.  (SUF ¶ 8.)  Meyer had his ski helmet with him in his truck but

decided not to wear it.  (SUF ¶ 66.)

    At 9:30 am, Meyer and Eggert boarded the Swiftcurrent chairlift at the base

of Big Sky.  (SUF ¶ 9.)  Multiple white signs posted in the lift house at the loading

area of Swiftcurrent warned Meyer:   "**!<u>CAUTION</u>!: Early Season Conditions**

**Exists**."  (SUF ¶ 10.)  A yellow sign placed at the top of the Swiftcurrent chairlift

on December 11, 2015 again warned Meyer: "⚠ **CAUTION** EARLY SEASON

CONDITIONS EXIST".  (SUF ¶ 11.)  Multiple yellow signs placed throughout the

resort on December 11, 2015 warned Meyer:  "⚠ **CAUTION** UNMARKED

OBSTACLES".  (SUF ¶ 12.)  Meyer admits that these signs mean "be careful,"

"caution," and that "there will be unmarked obstacles."  (SUF ¶ 13.)

    Meyer and Eggert soon made their way to the Challenger chairlift.  (SUF ¶

14.)  A sign posted at the loading area of the Challenger chairlift warned Meyer

that the Challenger lift services only Black Diamond, **Most Difficult** terrain, and

Double-Black Diamond, **Experts Only** terrain.  (SUF ¶ 15.)  As shown in the

photo below, another sign posted at the loading area of Challenger emphasized the

severity and difficulty of the terrain accessed by Challenger, warning Meyer:

"AVALANCHES AND MOVING SNOW ARE INHERENT RISKS ON AND

BELOW TERRAIN ACCESSED BY THIS LIFT."



(SUF ¶ 15.)  Despite being only an intermediate skier, Meyer ignored these

warnings and boarded the Challenger chairlift.  (SUF ¶ 16.)

A white sign posted in the lift house at the loading area of the Challenger

chairlift on December 11, 2015 again warned Meyer:  "**!CAUTION! Early**

**Season Conditions Exists**".  (SUF ¶ 17.)

On the lift ride up Challenger, Meyer rode directly over Loop Road/BRT
Road, which is a lower portion of the catwalk Meyer on which Meyer ultimately
wrecked.  (SUF ¶ 18.)  A person riding the Challenger chairlift can see that there
are no signs or other markings on either the uphill or downhill side of the catwalk.
(SUF ¶ 19.)  Also, as shown in the photo below, on the lift ride up Challenger,
Meyer was afforded a clear view of the Highway run, on which Meyer was skiing
before his wreck, and the very area of Loop Road where his ski wreck occurred:



(SUF ¶ 20.)

Multiple yellow signs placed at the top of the Challenger chairlift on December 11, 2015 again warned Meyer:  "⚠ **CAUTION** UNMARKED OBSTACLES".   (SUF ¶ 21.)  In addition to the warning signs Big Sky had posted, early season conditions and unmarked obstacles, including catwalks, protruding rocks, and trees, were easily observed and evident on December 11, 2015, including on the terrain accessed by the Challenger chairlift and on the Highway run.  (SUF ¶ 22.)

Meyer and Eggert took two runs on Challenger prior to his wreck.  (SUF ¶ 23.)  On both of their first two runs off Challenger, Meyer and Eggert skied some portion of Highway, the same run Meyer was skiing prior to his wreck.  (SUF ¶ 24.)  Highway is a black diamond run.  (SUF ¶ 25.)

Even though Meyer was an intermediate skier skiing expert terrain, Eggert testified that, "That day [Meyer] was consistently skiing fast."  (SUF ¶ 26.)  Meyer likewise testified: "I just always ski fast."  (SUF ¶ 27.)  On an internet forum, Meyer wrote, "on the day of my accident, I was skiing fast—no question about it." (SUF ¶ 28.)  When Eggert was asked if Meyer appeared to be skiing in control immediately before his wreck, Eggert demurred, answering only: "There were times he was skiing faster than I would have been given the conditions." (SUF ¶ 29.)

After their second run on Challenger, Meyer and Eggert returned to the base of Challenger for their third run.  (SUF ¶ 30.)  For the third time that day, on the way up Challenger, Meyer rode the chairlift over the catwalk he eventually wrecked on and was afforded yet another clear view of both the Highway run and Loop Road, including the area of Loop Road where he eventually wrecked.  *See* SUF ¶¶ 18-20, 30.  Thus, prior to his wreck, Meyer encountered the catwalk—whether skiing on it, riding over it, or riding on a lift in clear view of it—numerous times.  *See id.*

For their third run, Meyer and Eggert skied Highway.  (SUF ¶ 31.)  Meyer admits that from the Highway run, the catwalk at issue is "obvious" and that a skier on Highway "can obviously see" the catwalk.  (SUF ¶ 33.)

Indeed, a skier on the Highway run in conditions as existed on December 11, 2015 has an exceptional view of the catwalk at the base of Highway:

//



(SUF ¶ 34.)

As Eggert testified, "I definitely saw [the catwalk]."  (SUF ¶ 35.)  In addition to admitting the catwalk is "obvious," Meyer admits that "things that are obvious don't need be marked" and that if a skier runs into a plainly visible hazard it is the skier's fault.  (SUF ¶¶ 33, 36-37.)

Meyer's memory of his ski wreck is spotty at best.  For months he didn't even remember it.  (SUF ¶ 38.)  Meyer still cannot describe the sequence of events in any detail, nor can he describe his path down Highway onto the catwalk.  (SUF ¶ 39.)  Meyer can only state that he was skiing fast, he hit the catwalk, tried to turn,

and "blew out."  (SUF ¶¶ 40-41.)  Eggert agrees that immediately prior to his
wreck, Meyer was skiing "pretty fast."  (SUF ¶ 42.)

Ms. Eggert, however, believes that Meyer "lost control *uphill* of the cat track
– possibly by hitting a tree or a rock – and hit the downhill lip of the cat track with
some speed."  (SUF ¶ 43.)[1]  Although Eggert did not witness the instant that Meyer
wrecked, she was with skiing within shouting distance of him and saw him just
seconds before he wrecked.  (SUF ¶ 44.) In other words, Meyer's own wife does
not believe that the catwalk, or the transition from Highway onto the catwalk,
caused Meyer's wreck.  Instead, Eggert agrees that "Meyer's actions contributed to
his ski wreck."  (SUF ¶ 45.)

Catwalks, like Loop Road, are used for a variety of reasons critical to Big
Sky's operations, including for grooming operations, providing skier access to lifts
and other terrain, and transporting necessary equipment around the mountain.
(SUF ¶ 46.)  Meyer admits that catwalks are common at ski resorts and that every
ski resort he has been to has catwalks.  (SUF ¶ 47.)  The area of Loop Road where
Meyer wrecked was not marked on December 11, 2015 because Big Sky ski patrol
determined that marking it was unnecessary.  (SUF ¶ 48.)  There were no prior

---

[1] Meyer agrees the terms "cat track" and "catwalk" are synonymous.  (SUF ¶ 32.); s*ee also*
*Kopeikin v. Moonlight Basin Mgmt., LLC*, 90 F.Supp.3d 1103, 1106 n.4 (D. Mont. 2015)

similar reported incidents at or near Meyer's ski wreck in the last ten years.  (SUF ¶¶ 49-50.)

The decision not to mark the area of Loop Road where Meyer wrecked had nothing to do with a lack of available signage.  (SUF ¶ 51.)  Big Sky did not run out of signs, gates, fences or other safety equipment on December 11, 2015.  (SUF ¶ 52.)  In fact, Big Sky did not run out of such equipment at any time in the three years prior to Meyer's wreck.  (SUF ¶ 52.)

The transition from Highway onto Loop Road does not present a steep or "blind" drop off as Meyer has alleged.  The variations in terrain at issue—from the base of the Highway run onto Loop Road, and from Loop Road into Bermuda Triangle where Meyer came to rest—as existed on December 15, 2011 are depicted below, and show a gradual transition from the base of the black diamond ski run on to the large catwalk:

//



(SUF ¶ 53.)

//

A skier on the Highway run just above Meyer's wreck has a clear view of Loop Road, as shown in the photo below taken almost immediately after Meyer's ski wreck:



(SUF ¶ 54.)

The response to Meyer's ski wreck by Big Sky ski patrol was swift and life-saving.  (SUF ¶ 55.)  There were approximately 50 professional ski patrollers working on December 11, 2015, and there were more than enough ski patrollers working in the Challenger area on December 11, 2015.  (SUF ¶ 56.)  The Challenger ski lift shack was heated by propane on December 11, 2015, and no ski

patroller declined or refused to go to the Challenger lift ski shack during the three years prior to December 11, 2015 because the ski shack was not heated.  (SUF ¶ 57.)  For the three years prior to December 11, 2015, no ski patroller complained about inadequate training in or regarding the Challenger lift ski area.  (SUF ¶ 58.)

Notably, Meyer did not initially blame Big Sky for his wreck.  Instead, Meyer blamed his ski bindings.  (SUF ¶ 59.)  After his wreck, Eggert contacted a Big Sky ski patroller to inquire about getting Meyer's accident report, not because Meyer believed the catwalk needed to be marked, but because "John thinks his tech bindings might have pre-released."  (SUF ¶ 60.)  Only after Dynafit refused Meyer's multi-million dollar demands did Meyer begin to concoct his claims against Big Sky.  (SUF ¶ 61.)

On November 17, 2017, Meyer floated the idea for this lawsuit on an internet forum, conceding that on "[t]he day of my accident I was skiing fast—no question about it," but argued that "when you are given lemons you have to make lemonade."  (SUF ¶ 62.)  Meyer wrote, "Of course I might lose the case, but I'd only be out some time."  (SUF ¶ 62.)

### III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, (1986).  The

opposition must present significant probative evidence tending to support its claim.

*Intel Corp. v. Hartford Accident & Ind. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

## IV.   <u>ARGUMENT</u>

### A. Meyer's claims fail because his injuries result from the inherent dangers and risks of skiing.

Pursuant to Montana statute, a skier must "accept all legal responsibility for

injury or damage of any kind" that results from the inherent dangers and risks of

skiing.  Mont. Code Ann. § 23-2-736(4).  "Inherent dangers and risks of skiing" are

defined as "those dangers or conditions that are part of the sport of skiing,

including … **variations in steepness or terrain**, whether natural or the result of

slope design, snowmaking, or snow grooming operations, including but not limited

to **roads**, freestyle terrain, ski jumps, **catwalks**, and other terrain modifications."

*Id.* at § 23-2-702(2)(f).

In addition, "the failure of a skier to ski within that skier's ability" is an

inherent danger and risk of skiing.  *Id.* at -702(2)(i).  Pursuant to Montana law, a

skier is obligated to "know the range of the skier's ability and safely ski within the

limits of that ability … so as to negotiate any section of terrain or ski slope and

trail safely and without injury," and to "maintain control of speed and course so as

to prevent injury to the skier."  *Id.* at -736(2).

It is well-established under Montana law that when a statute is clear and unambiguous, the court must simply apply the plain language of the statute.  As Judge Molloy recently reiterated in *Waschle ex rel Birkhold-Waschle v. Winter Sports, Inc.*, 144 F.Supp.3d 1174 (D. Mont. 2015):

> "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted."  *Small v. Bd. of Trustees, Glacier Cnty. Sch. Dist. No. 9,* 306 Mont. 199, 31 P.3d 358, 362 (2001) (internal quotation marks and alteration omitted); *See also* Mont. Code Ann. § 1–2–101. "Under Montana law, courts first interpret a statute by looking at its plain meaning, and, if the language is clear and unambiguous, no further interpretation is required." *Mont. Sports Shooting Ass'n, Inc. v. St., Mont. Dep't of Fish, Wildlife, & Parks,* 344 Mont. 1, 185 P.3d 1003, 1006 (2008).

*Id.* at 1179.

Meyer alleges his ski wreck occurred when he "skied over a steep slope and hit a blind and unmarked 'cat walk.'" (Doc. 27 at ¶ 4.)  Meyer's allegations fail on their face.  "Variations in terrain," "roads," and "catwalks" are all specifically enumerated as "inherent dangers and risks of skiing."  Mont. Code Ann. § 23-2-702(2)(f).  Because Meyer's own allegations reveal that Meyer's ski wreck resulted from specifically enumerated inherent dangers and risks of skiing, Meyer must accept all legal responsibility for his injuries pursuant to Montana law.  *See*

*id.* at § 23-2-736(4).  As Judge Molloy recognized in *Waschle*, "no further interpretation is required."  *See* 144 F.Supp.3d at 1179.

Furthermore, the undisputed evidence establishes that Meyer was skiing fast and beyond his ability at the time of his wreck despite multiple warnings from Big Sky of unmarked obstacles, early season conditions, and the difficulty and severity of the ski terrain Meyer chose to ski.  *See* SUF ¶¶ 6-16, 25-29, 40-45. Meyer was skiing fast on Black Diamond terrain even though he was, by his own admission, only an intermediate skier.  (SUF ¶¶ 6-8, 25-29.)  According to Meyer, his wreck occurred as he skied fast on a black diamond run on to a catwalk then "tried to push [his] shins into [his] boots and turn left and just like blew [] out."  (SUF ¶¶ 40-41.)  Failing to ski within one's ability is a specifically enumerated inherent danger and risk of skiing.  Mont. Code Ann. § 23-2-702(2)(i).  Meyer's own description of his ski wreck makes clear that he wrecked because he failed to ski within his ability.  For this reason too, Meyer must accept all legal responsibility for his injuries pursuant to Montana law.  *See id.* at § 23-2-736(4).

The plain language of Montana statute forecloses Meyer's claims.  Meyer's injury was indisputably caused by the inherent dangers and risks of skiing: skiing fast, out of control, and beyond his ability; skiing over a variation in terrain; and skiing on to a catwalk or road.  *See supra* at § II.  Montana law is well-settled that this Court's duty is simply to apply the plain and unambiguous language of the

applicable Montana statutes.  *See Small*, 31 P.3d at 362; Mont. Code Ann. § 1–2–101; *Mont. Sports Shooting Ass'n, Inc.*, 185 P.3d at 1006.  The plain language of the applicable Montana statutes mandate summary judgment in favor of Big Sky. *See* Mont. Code Ann. §§ 23-2-702(2); -736(4).

The Montana Supreme Court has at times probed the reasonableness of a ski area operator's conduct, but only when there is a question as to whether the skier was injured by an inherent danger or risk of skiing.  For instance, in *Mead v. M.S.B., Inc.*, 872 P.2d 782 (Mont. 1994), the Montana Supreme Court held that a question of fact existed as to whether the plaintiff's injury was caused by an inherent risk of skiing.  *Id.* at 789.  In *Mead*, however, the ski resort contended that regardless of whether the plaintiff's injuries were caused by an inherent risk of skiing, its only duties were those specifically enumerated in Mont. Code Ann. § 23-2-733.  *Id.* at 786.  The Court rejected this argument because the plain language of the statute did not so limit a ski resort's duties and because such an interpretation would immunize ski resorts "from liability for its negligent or intentional acts if not itemized in that section."  *Id.* at 788.

The Court, however, made clear that when a skier's injuries are indisputably caused by the inherent dangers and risks of skiing, the ski area operator *is* entitled to summary judgment because "inherent risks in the sport of skiing … are essentially impossible to eliminate by the ski area operator."  *Id.* at 787 (quoting

*Brewer v. Ski-Lift, Inc.*, 762 P.2d 226, 230 (Mont. 1988).  *Mead* specifically

endorsed Montana law that the "Court's role in statutory construction is simply to

'ascertain and declare what is in terms or substance contained therein, not to insert

what has been omitted."  *Id.* at 788 (quoting Mont. Code Ann. § 1-2-101.)

Accordingly, *Mead* stands for the proposition that if an injury is caused by

something that is *not* an inherent danger and risk of skiing, then the court or jury

must determine if the ski resort acted with reasonable case.  For example, if a skier

is injured in an avalanche on a machine groomed run—i.e. an injury not caused by

an enumerated inherent danger and risk of skiing—the court and jury must

determine if the ski resort acted consistent with its duty of reasonable care.  *See*

Mont. Code Ann. § 23-2-702(c).  However, when, as here, a skier's injury was

indisputably caused by specifically enumerated inherent dangers and risks of

skiing, there is no need to probe the reasonableness of ski area's conduct and

Court's only duty is to apply the plain language of the statute.  *See Mead*, 872 P.2d

at 788; *Small*, 31 P.3d at 362; Mont. Code Ann. § 1–2–101; *Mont. Sports Shooting

Ass'n, Inc.*, 185 P.3d at 1006.

Judge Molloy applied this analytical framework in *Waschle*.  In *Waschle*,

Judge Molloy held that a question of fact existed as to whether the tree well which

caused the skier's death was an inherent danger and risk of skiing under the statute.

*Waschle*, 144 F.Supp.3d at 1178-79.  At the time of Waschle's accident, tree wells

were not specifically listed among the inherent dangers and risks of skiing. *See id.*
The Montana legislature amended the statute to specifically list tree wells after
Waschle's accident. *Id.*

Accordingly, because courts "must presume that the Legislature would not
pass useless or meaningless legislation," Judge Molloy held that at the time of
Waschle's accident tree wells were not among the inherent dangers and risks of
skiing. *Id.* at 1179.  In light of this ruling, Judge Molloy went on to examine
whether the ski area had complied with its duty of reasonable care. *Id.* at 1181-83.
This analysis was required only because the Court held that Waschle's injury was
not caused by an inherent danger and risk of skiing. *See id.*  Indeed, as the
Montana Supreme Court did in *Mead*, Judge Molloy reiterated that Montana law
requires courts to apply the plain language of statutes when they are clear and
unambiguous. *Id.* at 1179.

As explained above, Meyer's injuries were clearly caused by the inherent
dangers and risks of skiing.  Meyer was skiing fast and beyond his ability.  (SUF
¶¶ 6-8, 25-29.)  He skied over a variation in terrain and onto a catwalk that he
admits was obvious from above on the run.  (SUF ¶¶ 33, 40-41.)  He then "blew
out" and was injured. *Id.*  Every aspect of this sequence of events involves
specifically enumerated inherent dangers and risks of skiing. *See* Mont. Code Ann.
§§ 23-2-702(2)(f)-(i).

As Judge Molloy held in *Waschle*, this Court cannot presume that the Montana legislature committed an idle act in passing legislation.  *Waschle*, 144 F.Supp.3d at 1179.  The plain language of the Montana Skier Responsibility Act mandates summary judgment in favor of Big Sky.  *See* Mont. Code Ann. §§ 23-2-736(4); -702(2).  To conclude otherwise, would be to deem the statute effectively meaningless, in violation of the rule that courts "must presume the Legislature would not pass useless or meaningless legislation."  *See Mont. Sports Shooting Ass'n, Inc.*, 185 P.3d at 1006.  Indeed, the express purpose of the statute is to immunize ski area operators resorts from liability for injuries, like Meyer's, caused by the inherent dangers and risks of skiing and to "discourage[e] claims based on damages resulting from the inherent dangers and risks of skiing."  *See* Mont. Code Ann. § 23-2-731; -736(4).  Accordingly, pursuant to the plain language of Montana statute, Meyer must accept all responsibility for his injuries and Big Sky is entitled to judgment as a matter of law.

**B. Even if the Court examines the reasonableness of Big Sky's conduct, summary judgment is warranted.**

Even if the Court analyzes whether Big Sky acted reasonably, Big Sky is still entitled to summary judgment.  Chief Judge Christensen recently granted summary judgment to a ski area operator in a case with similar facts.  *See Kopeikin v. Moonlight Basin Management, LLC*, 90 F.Supp.3d 1103 (D. Mont. 2015) *aff'd* 691 Fed.Appx. 355 (9th Cir. 2017) (unpublished).  In *Kopeikin*, Kopeikin wrecked

when he encountered a cat track that he alleged obscured the terrain below, including a group of unmarked rocks.  *Id.* at 1105.  Kopeikin alleged that he skied over the cat track then landed in the unmarked rocks which caused him to wreck. *Id.*  The Court held that "Kopeikin's injuries resulted from the inherent dangers and risks of skiing."  *Id.* at 1107.  Though gratuitous in light of the plain language of the statute, the Court further held that the ski resort acted with reasonable care because it "warned generally of unmarked hazards," warned skiers that the run was designated a black diamond or "most difficult" run, and it had no other reports of similar accidents in that location.  *Id.* at 1108.  In granting summary judgment to the ski resort, Judge Christensen noted that "[a] ski area operator cannot be expected to expend all of its resources making every hazard or potential hazard safe, assuming such an end is even possible," and therefore "a skier bears much of the responsibility for avoiding injury to himself."  *Id.*

The same is true here. Big Sky warned Meyer repeatedly to use caution, of unmarked obstacles, of early season conditions, and that the Challenger chairlift accesses expert only terrain, emphasizing the severity and difficulty of the terrain accessed by the Challenger chairlift.  (SUF ¶¶ 3-5, 10-13, 15, 17, 21.)  The catwalk that allegedly caused Meyer's wreck was obvious and plainly visible from above. (SUF ¶¶ 18, 20, 33-35.)  In fact, the catwalk was plainly visible from the Challenger lift, from far above it on the Highway run, and from just above where

Meyer wrecked. (SUF ¶¶ 20, 33-35.)  Meyer rode over the catwalk three times and was afforded a clear view of it from the Challenger chairlift each time.  *See* SUF ¶¶ 18-20, 31.  Furthermore, there were no prior similar reported incidents at or near Meyer's ski wreck in the area of Meyer's wreck in the last ten years.  (SUF ¶¶ 49-50.)  Meyer was also skiing fast and out of control on expert terrain even though he was only an intermediate skier.  (SUF ¶¶ 6-16, 25-29, 40-45.)  Meyer admits that things that are obvious do not need to be marked.  (SUF ¶ 36.)  Under these undisputed facts, Meyer's negligence claim against Big Sky fails as a matter of law even if the Court considers whether Big Sky acted reasonably with respect to the inherent dangers and risks of skiing that caused Meyer's wreck.

### C. Meyer's allegations concerning ski patrol supplies, working conditions and closed areas are both groundless and irrelevant.

In addition to his allegation concerning the catwalk where he wrecked, Meyer alleges that Big Sky breached its duty of reasonable care by (1) failing to supply ski patrol with adequate supplies, including signs and fences to mark hazards; (2) failing to supply ski patrol with acceptable working conditions; and (3) failing to mark areas as closed.  *Id.* at ¶ 51.  Each of these allegations is groundless and irrelevant to Meyer's ski wreck.

### 1. Meyer's allegation regarding adequate supplies is baseless and irrelevant.

Meyer's allegation that Big Sky failed to supply ski patrol with adequate

supplies is both unsupported and immaterial.  The undisputed facts establish that

Big Sky did not run out of signs, gates, fences or other safety equipment on

December 11, 2015.  (SUF ¶ 52.)  In fact, Big Sky did not run out of such

equipment at any time in the three years prior to Meyer's wreck.  (SUF ¶ 52.)

Big Sky did not mark Loop Road in the area of Meyer's wreck because it

determined doing so was unnecessary.  (SUF ¶ 48.)  Big Sky's decision had

nothing to do with the number of available signs.  (SUF ¶ 51.)  Thus, the number

of available signs has nothing whatsoever to do with Meyer's wreck.  As Meyer

admits, Loop Road was obvious and plainly visible to skiers on Highway.  (SUF ¶¶

33-34.) As Meyer further admits, things that are obvious and plainly visible

hazards do not need to be marked.  (SUF ¶ 36.)

Meyer has tried mightily to use his uncounseled hearsay communications

about this case with a volunteer ski patroller to his advantage.  *See e.g.* Doc. 17 at

3.  On an internet forum, a volunteer ski patroller, Ashley Nettles, wrote to Meyer

"[s]ometimes we run out of signs."  *See id.*  As Ms. Nettles has since attested,

however, this statement "was not related in any way to Mr. Meyer's ski accident."

(SUF ¶ 63.)  Ms. Nettles statement is inadmissible because it is irrelevant and

hearsay.  *See* Fed. R. Evid. 401, 402, and 802.

Furthermore, Ms. Nettles statement was obtained in violation of Montana

Rule of Professional Conduct 4.2.  Rule 4.2 prohibits a lawyer from

communicating about the subject of litigation with a person the lawyer knows to be

represented by another lawyer in the matter.  Mont. R. Pro. Cond. 4.2.  Rule 4.2 is

designed to protect against "the uncounseled disclosure of information relating to

the representation."  *See* ABA Model Rule of Pro. Cond. 4.2, comment 1.  In

November 2017, Meyer knew that Big Sky was represented by the undersigned

with respect to his ski wreck because Meyer had specifically corresponded with

undersigned regarding his ski wreck.  (SUF ¶ 64.)

Meyer should not profit from his violation of the rules of professional

conduct and Ms. Nettles' uncounseled statement should be deemed inadmissible

for this reason alone.  *See e.g. Scanton Prod. Inc. v Bobrick Washroom Equip. Inc.*,

190 F.Supp.3d 419, 434 (M.D. Pa. 2016) ("Courts routinely preclude use of

evidence obtained in violation of ethical rules in order to appropriately remedy that

violation.") (citing cases); *U.S. v. Sierra Pac. Ind.*, 857 F.Supp.2d 975, 984 (E.D.

Cal. 2011) ("The proper remedy [for violation Rule of prohibiting ex-parte contact]

is to exclude all evidence or information obtained through the improper

contacts."); *Hammond v. City of Junction City, Kansas*, 167 F.Supp.2d 1271, 1293

(D. Kan. 2001).

Ms. Nettles' uncounseled hearsay statement is also irrelevant and

inadmissible for the reasons set forth above: (1) Loop Road was not marked

because ski patrol determined that doing so was unnecessary; (2) the decision not

to mark Loop Road on December 11, 2015 had nothing to do with a lack of available signs; (3) Big Sky did not run out of signs, gates, fences or other safety equipment on December 11, 2015; and (4) Big Sky had not run out of such equipment at any time in the three years prior to Meyer's wreck.

Though Meyer is clearly fixated on the issue, Ms. Nettles' uncounseled hearsay statement that Big Sky "sometimes" runs out of signs is totally irrelevant to this case and inadmissible.  Such inadmissible evidence cannot serve to defeat summary judgment.  *See* Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988) ("It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.").  In short, Meyer's allegation concerning ski patrol supplies is groundless and irrelevant.

## 2. Meyer's allegation concerning ski patrol working conditions is groundless and irrelevant.

Meyer's allegation that Big Sky failed to supply ski patrol with "acceptable working conditions," is equally groundless and irrelevant.  Big Sky ski patrol's response to Meyer's ski wreck was swift and life-saving, as Meyer admits.  (SUF ¶ 55.)  There were approximately 50 professional ski patrollers working on December 11, 2015, and there were more than enough ski patrollers working in the Challenger area on December 11, 2015.  (SUF ¶ 56.)  The Challenger ski lift shack was heated on December 11, 2015, and no ski patroller declined or refused to go to

the Challenger lift ski shack during the three years prior to December 11, 2015 because the ski shack was not heated. (SUF ¶ 57.) Also, for the three years prior to December 11, 2015, no ski patroller complained about inadequate training in or regarding the Challenger lift ski area. (SUF ¶ 58.) Meyer's allegation that Big Sky failed to supply ski patrol with "acceptable working conditions" is false. Ski patrol's working conditions also had nothing to do with Meyer's ski wreck or Meyer's decision to ski fast and out of control on terrain beyond his ability in violation of Montana law.

### 3. Meyer's allegation regarding marking areas as closed is irrelevant.

Finally, Meyer's allegation that Big Sky failed to "mark areas as closed" has nothing to do with his wreck. Meyer was not skiing in a closed area at the time of his wreck. *See e.g.* SUF ¶¶ 31, 53. Meyer may have skied into a closed area on his second run off Challenger, but Meyer wrecked on his third run in an open area. (SUF ¶ 65.) Whether Big Sky marked or didn't mark closed areas is completely unrelated to Meyer's ski wreck and injuries. Accordingly, this allegation is irrelevant and unavailing.

//

//

//

//

## **CONCLUSION**

For all of the reasons explained, Big Sky's Motion for Summary Judgment should be granted.

DATED this 23rd day of August 2019.

CROWLEY FLECK PLLP


By /s/ Ian McIntosh
    Ian McIntosh
    P.O. Box 10969
    Bozeman, MT 59719-0969

    Attorneys for Big Sky Resort

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(d)(2)(E), I certify that this brief is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count, calculated by Microsoft Office Word 2007, is 5,220 words long, excluding the Caption and the Certificates of Service and Compliance.

Dated this 23rd day of August, 2019.

CROWLEY FLECK PLLP


By /s/ Ian McIntosh
  Ian McIntosh
  P.O. Box 10969
  Bozeman, MT 59719-0969

  Attorneys for Big Sky Resort

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was served upon the following counsel of record by the means designated below this 23rd day of August, 2019.

[ ] U.S. Mail          John Meyer
[ ] Hand Delivery    P.O. Box 412
[ ] Facsimile        Bozeman, MT 59771
[ ] FedEx           john@cottonwoodlaw.org
[x] ECF             *Attorney for Plaintiff*

[ ] U.S. Mail          Brad Condra
[ ] Hand Delivery    Milodragovich, Dale & Steinbrenner, P.C.
[ ] Facsimile        P.O. Box 4947
[ ] FedEx           Missoula, MT 59806-4947
[x] ECF             bcongra@bigskylawyers.com
                         *Attorney for Salewa USA, LLC*

[ ] U.S. Mail          Nadine O. Nadow
[ ] Hand Delivery    601 Cheyenne St., #2020
[ ] Facsimile        Golden, CO 80403
[ ] FedEx           nnadow@gmail.com
[x] ECF             *Co-Counsel for Plaintiff*

/s/ Ian McIntosh
Ian McIntosh