## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

JOHN MEYER,

    Plaintiff,

    vs.    Cause No. 18-CV-00002-BMM

BIG SKY RESORT; SALEWA USA,

INC.,

    Defendants.

_____

DEPOSITION UPON ORAL EXAMINATION OF

AMANDA EGGERT

_____

BE IT REMEMBERED, that the deposition upon oral examination of AMANDA EGGERT, appearing at the instance of Defendants, was taken at the offices of Crowley Fleck, PLLP, 1915 South 19th Avenue, Bozeman, Montana 59718 on the 28th day of May 2019, beginning at the hour of 10:00 a.m. pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

## Page 2

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFF, JOHN MEYER:

    Ms. Nadine O. Nadow, Esq.
    nnadow@gmail.com
    (978) 501-7045

ATTORNEYS APPEARING ON BEHALF OF THE DEFENDANT, BIG SKY RESORT:

    Mr. Ian McIntosh, Esq.
    Mr. Mac Morris, Esq.
    CROWLEY FLECK PLLP
    1915 South 19th Avenue
    P.O. Box 10969
    Bozeman, MT 59719-0969
    (406) 556-1430

ATTORNEY APPEARING ON BEHALF OF THE DEFENDANT, SALEWA USA, INC.:

    Mr. Brad Condra, Esq.
    Milodragovich, Dale & Steinbrenner, P.C.
    P.O. Box 4947
    Missoula, MT 59806-4947
    (406) 728-1455

ALSO PRESENT:

    Mike Unruh

## Page 3

I N D E X

EXAMINATION OF AMANDA EGGERT BY    PAGE
  Mr. Ian McIntosh, Esq...............4, 135
  Mr. Brad Condra, Esq..............129

E X H I B I T S  R E F E R R E D  T O:
Exhibit 2.............................36
Exhibit 4.............................35
Exhibit 10...........................38
Exhibit 11...........................39
Exhibit 13...........................39
Exhibit 14.........................43-44
Exhibit 16........................46, 60
Exhibit 17...........................47
Exhibit 18...........................47
Exhibit 20...........................48
Exhibit 21........................56-57
Exhibit 22...........................56
Exhibit 23........................62-63
Exhibit 24.......49, 58-60, 63, 72, 84, 101
Exhibit 25...........................50
Exhibit 26.......................99, 107

DEPOSITION EXHIBITS:
Exhibit 57  Amanda's letter to
    John Meyer, dated Thursday,
    December 17, 2015.40-41, 44, 55 80-82
Exhibit 58  Trail Map entitled "The
    Biggest Skiing in America".........53

Exhibit 59  Colored Photograph with
    Red markings.......65-66, 69, 71, 73
Exhibit 60  Colored Photograph with
    Blue markings..67-69, 71, 73-75, 135

Exhibit 61  Big Sky Ski Patrol Witness
    Statement, dated 12/11/15......77-79
Exhibit 62  Amanda Eggert's Resignation
    Letter.................108-109, 123

Exhibit 63  Explore Big Sky Newspaper article
    written by Sarah Gianelli, dated
    December 22, 2017 - January 4,
    2018.........................124-125
Exhibit 64  Facebook correspondence between
    Amanda Eggert and Carol
    Van Valkenburg................126-127

## Page 4

WHEREUPON, the following proceedings were had and testimony taken, to-wit:

\* \* \* \* \*

AMANDA EGGERT,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. McINTOSH:

    **Q.** Can you please state your name.

    A. Amanda Eggert.

    **Q.** And what is your address, Ms. Eggert?

    A. 416 North Wallace Ave, Bozeman, Montana.

    **Q.** Your telephone number, please?

    A. (406) 370-4936.

    **Q.** Thank you.

    Have you ever had your deposition taken before?

    A. Once before. About a month ago.

    **Q.** Why were you deposed about a month ago?

    A. I was involved in a car accident I was in in May of 2015. The insurance companies couldn't reach a settlement, so there's a lawsuit

AMANDA EGGERT

Page 5

1  still in progress.
2      Q.  Did you file that lawsuit or did
3  somebody sue you?
4      A.  Somebody sued me.
5      Q.  Who was the person that sued you?
6      A.  Judy Larson -- or sorry, that's
7  incorrect.  It was the two passengers in the other
8  vehicle; Judy Harned and Larry Larson.
9      Q.  And is that a lawsuit that is pending in
10  Gallatin county here?
11     A.  No, it's Missoula county.
12     Q.  The accident took place in Missoula?
13     A.  Just outside.
14     Q.  Do you have an attorney in that case?
15     A.  Yes.
16     Q.  Who's your attorney?
17     A.  It is Amanda Duman.
18     Q.  What is the last name again, Duman?
19     A.  Uh-huh.
20     Q.  Can you spell that, please?
21     A.  D-U-M-A-N.
22     Q.  Where does Ms. Duman work if you know?
23     A.  Williams Law Firm I believe is the name.
24     Q.  Okay.  And do you know the name of the
25  attorney that took your deposition?

Page 6

1      A.  I do not.
2      Q.  Do you know the status of that lawsuit?
3  MS. NADOW:  Objection.
4      You can answer.
5  THE WITNESS:  They're still trying to work
6  out a settlement I think.
7  BY MR. McINTOSH:
8      Q.  Okay.  And is that the only time you've
9  ever had your deposition taken?
10     A.  Yes.
11     Q.  So even though you were just deposed a
12  month ago, do you feel like you are familiar with
13  the process now since you just went through it?
14     A.  Relatively.
15     Q.  Okay.  Well, just to make sure, I'll go
16  through the rules real quickly, make sure we're on
17  the same page.
18         So, of course, we need to talk one at a
19  time.  So even if you know exactly what I'm going
20  to ask you, please let me finish my question.  Will
21  you do that, please?
22     A.  Yes.
23     Q.  And you need to answer out loud, say yes
24  or no.  Don't just nod your head because, of
25  course, we have a court reporter taking down all of

Page 7

1  your words and my questions and we need to make a
2  clean record, okay?
3      A.  Yes.
4      Q.  And if you are answering a question and
5  if I cut you off and you were not done with your
6  answer, will you please let me know and I'll let
7  you finish your answer?
8      A.  Yes.
9      Q.  Okay.  If I ask you a question that you
10  do not understand, will you please let me know?
11     A.  Yes.
12     Q.  So then, if you answer a question that
13  will mean that you have understood the question; is
14  that right?
15     A.  That's correct.
16     Q.  And is there any reason to believe that
17  you cannot give truthful and accurate testimony
18  here today?
19     A.  Nope.
20     Q.  Okay.
21     A.  No.
22     Q.  Are you on any sort of medications that
23  would affect your memory?
24     A.  No.
25     Q.  Good.  Let's talk a little bit about

Page 8

1  your background.  First of all, tell me where you
2  grew up?
3      A.  I grew up in Billings, Montana.
4      Q.  And where did you go to high school?
5      A.  Senior High.
6      Q.  When did you graduate?
7      A.  2004.
8      Q.  What did you do after high school?
9      A.  I went to college at Lewis and Clark
10  College in Portland, Oregon for my freshman year.
11  I took a year off and lived in New Zealand for most
12  of the year and then I transferred to the
13  University of Montana.
14     Q.  So you did not graduate from Lewis and
15  Clark, correct?
16     A.  Correct.
17     Q.  And then you moved to Missoula for a
18  year?  Or, excuse me, I'm sorry.  Then you moved to
19  New Zealand then for a year?
20     A.  Yep, most of the year.
21     Q.  What were you doing in New Zealand?
22     A.  Working and traveling.
23     Q.  What type of work were you doing?
24     A.  I guided canoe trips.  I worked in a
25  cafe.

2  (Pages 5 to 8)

AMANDA EGGERT

Page 9

1    Q.  What type of canoe trips did you guide?
2    A.  Multi-day on the Whanganui River.
3    Q.  Was it white water?
4    A.  No.
5    Q.  Just flat part --
6    A.  Yes.
7    Q.  -- basically?
8        Do you have any sort of medical
9    training?
10    A.  A little bit.  I was a volunteer ski
11    patrol my senior year of high school.  I've taken
12    Wilderness First Responder courses through the
13    Forest Service when I worked for them.
14    Q.  You said wilderness first responder?
15    A.  Uh-huh.
16    Q.  Yes?
17    A.  Yes.
18    Q.  And where were you a volunteer ski
19    patroller?
20    A.  Red Lodge Mountain.
21    Q.  You're not an EMT; is that correct?
22    A.  That's correct.
23    Q.  Have you ever been an EMT?
24    A.  I have not.
25    Q.  Have you ever worked as a professional

Page 10

1    ski patroller?
2    A.  I have not.
3    Q.  Have you ever been in the military?
4    A.  I have not.
5    Q.  And so you spent a year in New Zealand
6    and then you moved back to Missoula?
7    A.  Yes.
8    Q.  And then did you go to school
9    continuously until you graduated?
10    A.  Yes.
11    Q.  Did you get a degree?
12    A.  Yes.
13    Q.  What was your degree in?
14    A.  Printed journalism.
15    Q.  Print journalism?
16    A.  Uh-huh, yes.
17    Q.  Yes?  Thank you.
18        And what year did you graduate?
19    A.  2009, in December.
20    Q.  And were you going to school -- so was
21    it about 2006 when you moved back to Missoula?
22    A.  I enrolled at the University of Montana
23    August of 2006.
24    Q.  And graduated in May of '09?
25    A.  December of 2009.

Page 11

1    Q.  December.
2        Were you going to school full time from
3    August of '06 through December of '09?
4    A.  All but the last semester.  My last
5    semester of school I was working part time --
6    Q.  Where were you working part time?
7    A.  -- attending part time.
8        I had a variety of positions throughout
9    college.  I worked at Finn and Porter at the time
10    and I was also working for the Outdoor Writers
11    Association of America.
12    Q.  Did you have any other -- Finn and
13    Porter and working for the Outdoor Writers
14    Association, did you have any other jobs while you
15    were in school in Missoula?
16    A.  I worked at Snowbowl as a ski instructor
17    for two seasons.  I also worked for the student
18    newspaper.
19    Q.  What two seasons did you work as a ski
20    instructor at Snowbowl?
21    A.  2006 to 2007 and 2007 to 2008, if my
22    memory serves me correctly.
23    Q.  Just those two seasons?
24    A.  Yes.
25    Q.  Is that the only time you've worked for

Page 12

1    a ski resort?
2    A.  Yes.
3    Q.  Did you work just part time?
4    A.  Yes.
5    Q.  And did you ever become certified as a
6    ski instructor?
7    A.  I received PSIA Level 1 certification.
8    Q.  And as a level one instructor you were
9    qualified to teach beginners; is that correct?
10    A.  Yes.
11    Q.  Is that who you taught, beginners?
12    A.  Yes.
13    Q.  Was it primarily little kids?
14    A.  Mostly kids.  Occasionally, I would
15    teach intermediate skiers.
16    Q.  And how often -- when you were working
17    at Snowbowl, how often were you teaching; like once
18    a week, does that sound about accurate?
19    A.  It was usually two to three days per
20    week, half days typically.
21    Q.  Two to three half days per week for two
22    seasons; is that right?
23    A.  Yes.
24    Q.  And you did not work on the ski patrol
25    at Snowbowl, correct?

AMANDA EGGERT

Page 13

1    A.  Correct.
2    Q.  Was any part of your job at Snowbowl to
3    mark runs or hazards?
4    A.  No.
5    Q.  Do you claim to be an expert in ski
6    mountain operations?
7    A.  No.
8    Q.  And tell me what you've done since you
9    graduated from the University of Montana in
10   December of 2009?
11   A.  I've had a variety of jobs.  I was a
12   raft guide on the Stillwater and Clark Fork and
13   Blackfoot Rivers.
14   Q.  Who were you working for as a raft
15   guide?
16   A.  10,000 Waves in Missoula, the University
17   Outdoor Program, also in Missoula, and Absaroka
18   River Adventures in Absarokee.
19   Q.  What other jobs have you had since
20   you've graduated in 2009?
21   A.  I worked for the Forest Service for four
22   seasons on wildland fire crews.
23   Q.  When did you work as a raft guide?
24   A.  I started working as a raft guide the
25   summer before my junior year of high school.  That

Page 14

1    would have been 2002.  Then I worked intermittently
2    until 2011, was my last season I believe.
3    Q.  And what years were you working for the
4    Forest Service?
5    A.  I started May of 2010 and my last season
6    was -- sorry, I started May of 2011 and my last
7    season ended the fall of 2014.
8    Q.  And what were you doing for the Forest
9    Service?
10   A.  Working on wildland fire crews, two
11   years on hand crews, on a 10-person hand crew, one
12   year on a helitack crew and one year on a 20-person
13   hand crew.
14   Q.  And what other jobs have you had since
15   you graduated from college?
16   A.  I took a six-month fellowship with
17   Outside Magazine in Santa Fe.  That started October
18   of 2014.  In November of 2015 I started work at
19   Outlaw Partners in Big Sky, Montana.
20   Q.  How long did you work for Outlaw
21   Partners?
22   A.  Just over two years.
23   Q.  Until?
24   A.  December of 2017.
25   Q.  And where have you worked since December

Page 15

1    of 2017?
2    A.  I've been self-employed as a freelance
3    writer and editor.
4    Q.  And that's what you're currently doing?
5    A.  Yes.
6    Q.  Have you had any other jobs since
7    college that you haven't told me about?
8    A.  Yes, working seasonally.  I had several
9    jobs in the food and beverage industry, restaurant
10   industry.  I worked at Clark's Fork for part of a
11   winter.  I worked in Alaska at a heli ski lodge for
12   a spring.  I've done stagehand work in the last
13   year for MSU and for other event production
14   companies.
15   Q.  What was the Alaska heli ski operation
16   you worked for?
17   A.  I was an employee of the Tsaina Lodge,
18   T-S-A-I-N-A.  And the operation that was based out
19   of the Tsaina Lodge was Valdez Heli-Ski Guides.
20   Q.  How long did you work there?
21   A.  About three months.
22   Q.  Did you ever get to go heli skiing?
23   A.  Yes.
24   Q.  How many days or how many runs I should
25   probably say?

Page 16

1    A.  Three half days.
2    Q.  Who runs Valdez Heli Guides, if you
3    know?
4    A.  At the time it was Scott Raynor,
5    R-A-Y-N-O-R.  I don't know if he's still operating
6    it.
7    Q.  Who was your supervisor?
8    A.  Meredith Monson, M-O-N-S-O-N.
9    Q.  And were you able to successfully heli
10   ski without hurting yourself?
11   A.  Yes.
12   Q.  Did you wreck and get injured at all?
13   A.  No.
14   Q.  Did you live in Big Sky when you went to
15   work for Outlaw Partners?
16   A.  Yes.
17   Q.  And so did you move to Big Sky in
18   approximately November of 2015?
19   A.  Yes.
20   Q.  And how long did you live in Big Sky?
21   A.  A little over a year.
22   Q.  And where did you move after living in
23   Big Sky?
24   A.  We moved to a house in Bozeman.
25   Q.  Who's "we"?

4 (Pages 13 to 16)

AMANDA EGGERT

Page 17

1    A.  John Meyer and I.
2    Q.  Was Mr. Meyer living with you in Big Sky
3 at any time?
4    A.  Yes, for approximately six months.
5    Q.  When?  Starting when?
6    A.  He moved to Big Sky the spring of 2016,
7 and we moved to Bozeman in, I believe it was,
8 January of 2017.
9    Q.  What did you do for Outlaw Partners?
10 That's who it was, correct?
11    A.  Yes.
12    Q.  Who you worked for, okay.
13       What did you do for Outlaw Partners?
14    A.  I was hired as a staff writer.  I was
15 promoted to associate editor and then senior
16 editor.
17    Q.  Did you ever write any articles about
18 Mr. Meyer's lawsuit, this lawsuit that we're here
19 talking about today or his ski accident?
20    A.  No.
21    Q.  Did anyone else at Outlaw Partners ever
22 write any articles about Mr. Meyer's ski accident
23 or ski wreck and this lawsuit?
24    A.  Yes.
25    Q.  Who?

Page 18

1    A.  Sarah Gianelli, G-I-A-N-E-L-L-I, wrote a
2 story that was pulled from publication.
3    Q.  Do you have a copy of that story?
4    A.  Yes.
5    Q.  Did you bring that with you today?
6    A.  Yes.
7    Q.  Can I have that, since she's pointing at
8 you?
9    MS. NADOW:  Um, yeah.
10 BY MR. McINTOSH:
11    Q.  And you were served with a subpoena
12 requiring you to appear and produce documents,
13 correct?
14    A.  Yes.
15    Q.  And did you -- did the document that you
16 just handed us, is that one of the documents that
17 you had in your possession and that you are
18 producing in response to the subpoena?
19    A.  Yes.
20    Q.  Did you bring any other documents in
21 response to the subpoena?
22    A.  Yes.  One is a letter I wrote to
23 John Meyer when he was in the hospital regarding
24 his accident, one is my resignation letter to
25 Outlaw Partners, and one is correspondence I had

Page 19

1 with two colleagues regarding the publication of
2 that article that was pulled.
3    Q.  Is that everything that you have in your
4 possession, custody and control regarding John
5 Meyer's ski wreck on December 11, 2015?
6    A.  Yes.
7    Q.  Okay.  We haven't been going very long.
8 We'll only take a short break so we can look at
9 these documents that you brought.
10    A.  Okay.
11    Q.  You can help yourself to some coffee or
12 grab some water or something like that.  Thank you.
13    (Whereupon, a brief
14     recess was taken.)
15 BY MR. McINTOSH:
16    Q.  Okay.  We are back on the record.  Do
17 you understand you're still under oath?
18    A.  Yes.
19    Q.  Okay.  Have you ever worked for Big Sky
20 Resort?
21    A.  I have not.
22    Q.  Tell me what you did, if anything, to
23 prepare for this deposition?
24    A.  Yes.  I spoke with my attorney here and
25 she told me to answer as truthfully as possible.

Page 20

1    Q.  Anything else?
2    A.  I reviewed the documents that I
3 submitted to you.
4    Q.  The documents that you just brought in
5 response to the subpoena?
6    A.  Yes.
7    Q.  Anything else?
8    A.  No.
9    Q.  Did you speak with John Meyer?
10    A.  We've been talking about his lawsuit
11 basically since it was filed.  It comes up in
12 conversation.
13    Q.  And what have you discussed about his
14 lawsuit with Mr. Meyer?
15    A.  He gives me status updates.
16    MS. NADOW:  Objection; privilege, spousal
17 privilege.
18 BY MR. McINTOSH:
19    Q.  When did you and Mr. Meyer get married?
20    A.  September of 2018.
21    Q.  And you talked with Mr. Meyer about the
22 lawsuit long before you were married, correct?
23    A.  Yes.
24    Q.  Okay.  Can you please tell me about your
25 conversations with Mr. Meyer about the lawsuit

5 (Pages 17 to 20)

AMANDA EGGERT

Page 21

1  before you were married for now?
2     A.  There have been so many.  It's hard to
3  recall them in detail.  We've talked about it
4  extensively.
5     Q.  If you can just do the best you can,
6  please.
7     A.  Can you be more specific in your
8  question?
9     Q.  I just want you to give me the best
10  recollection that you can of what you've talked
11  about with Mr. Meyer about this lawsuit.
12     A.  Before he filed it we spoke about his
13  plans to file it.  We talked about the impact to my
14  job being that Big Sky is such a small community.
15  And since the lawsuit was filed we've talked about
16  where it is in status, in addition to logistical
17  things, like the trip to Butte I made this past
18  winter for the procedural hearing.
19     Q.  Anything else that you can remember?
20     A.  As his spouse, the lawsuit has a lot of
21  bearing on me, so.  Since we've been married we've
22  also talked about the impact for our relationship
23  and we've talked about it with a counselor a little
24  bit as well.
25     Q.  Earlier you said you spoke with

Page 22

1  Ms. Nadow?  Did I pronounce that --
2     MS. NADOW:  Nadow.
3  BY MR. McINTOSH:
4     Q.  Nadow, excuse me.  Ms. Nadow, to prepare
5  yourself for the deposition; is that correct?
6     A.  Yes.
7     Q.  And I think you referred to her as your
8  attorney, is that --
9     A.  I did.  That was probably an error.
10     Q.  Okay.  So she represents Mr. Meyer,
11  correct?
12     A.  Yes.
13     Q.  What's your understanding?
14     A.  That's my understanding.
15     Q.  Okay.  Is it your understanding that she
16  represents you personally?
17     A.  No, I'm not a plaintiff on this lawsuit.
18     Q.  Okay.  Is there anything else that you
19  discussed with Ms. Nadow?
20     A.  Just general procedural stuff for what
21  to expect for today.
22     Q.  Such as?
23     A.  Format, kinds of questions I might be
24  asked.  Um, the documents that I presented earlier
25  she's also seen.

Page 23

1     Q.  Anything else that you discussed with
2  Ms. Nadow?
3     A.  No.
4     Q.  How do you know Ms. Nadow?
5     A.  She's a colleague of my husband's.
6     Q.  A colleague where?
7     A.  She lives in Colorado now, but they know
8  each other through John's work with Cottonwood
9  Environmental Law Center years back.
10     Q.  And when did Ms. Nadow start becoming
11  involved in this litigation to your knowledge?
12     A.  Last week to my recollection.
13     Q.  And have you spoken with anyone other
14  than Ms. Nadow and Mr. Meyer about this deposition?
15     A.  Close friends and family know that this
16  is happening today.  A few friends familiar with
17  the lawsuit have asked for status updates, so they
18  know I'm being deposed today.
19     Q.  Who are those people?
20     A.  My parents, Jeff Eggert and Cindy
21  Eggert; my twin sister, Tawny Eggert; my older
22  sister, Chandra Eggert.  I imagine I've told all
23  four of them about it.  Another friend named Buzz
24  Davis that I'm working with is also aware that I am
25  participating in a deposition.  Other friends I

Page 24

1  might have had a conversation with include Melody
2  Tribble, Tyler Allen, and Robbin Goldblatt.
3     Q.  I'm sorry, what was the last name?
4     A.  Robbin Goldblatt, G-O-L-D-B-L-A-T-T.
5     Q.  Is there anyone else you've spoken to
6  about this deposition that you can recall?
7     A.  Not to my knowledge.
8     Q.  Let's talk about your skiing background.
9  How long have you been skiing?
10     A.  Since I was about five years old.
11     Q.  And where did you grow up skiing?
12     A.  Red Lodge Mountain.
13     Q.  Can you describe your skiing ability?
14     A.  I ski expert runs typically without
15  problem.
16     Q.  Do you -- say before this lawsuit was
17  filed, if you were skiing at Big Sky on a day and
18  it was, you know, decent conditions, where would
19  you ski?
20     A.  Headwaters, Liberty Bowl, Challenger
21  lift, the triple chair.
22     Q.  Do you ski Big Couloir often?
23     A.  I have never skied the Big Couloir.
24     Q.  How about North Summit Snowfield?
25     A.  I have not.

6  (Pages 21 to 24)

AMANDA EGGERT

Page 25

1    Q.  How about the Dictator Chutes?
2    A.  I have not.
3    Q.  Gullies?
4    A.  I have not.
5    Q.  Lenin, Marx?
6    A.  Nope.  No.
7    Q.  Have you ever been injured when skiing?
8    A.  Nothing that required care from a ski
9    patrol or hospital care.
10   Q.  Maybe just some minor injuries then?
11   A.  I'm sure I have.  None come to mind.
12   Q.  Like falling, getting a bruise or
13   something like that?
14   A.  Yes.
15   Q.  You've never received medical care as a
16   result of a ski accident though or a ski wreck?
17   A.  No.
18   Q.  Do you -- when you're skiing, do you try
19   to maintain control of your speed?
20   A.  Yes.
21   Q.  Why?
22   A.  To prevent injury.
23   Q.  Do you try to maintain control of your
24   direction of travel?
25   A.  Yes.

Page 26

1    Q.  And do you do that to prevent injury as
2    well?
3    A.  Yes.
4    Q.  You had a free season ski pass at Big
5    Sky for the '15, '16 ski season, correct?
6    A.  Yes, it was a media pass.
7    Q.  That you received through your work?
8    A.  Yes.
9    Q.  And prior to that ski season, how much
10   experience did you have skiing at Big Sky?
11   A.  If I were to guess I would say somewhere
12   between five and ten days skiing from when I was in
13   junior high school.
14   Q.  I'm sorry, how many days did you say
15   again?
16   A.  I would guess five to ten days in the
17   two decades before I took the position at Outlaw.
18   Q.  And how many days had you skied -- if
19   you can recall, how many days had you skied at Big
20   Sky during the 2015/2016 ski season before December
21   11, 2015?
22   A.  There's probably data on my pass, but I
23   would say that was my second or third day of the
24   season.
25   Q.  Okay.  And you had never had a ski pass

Page 27

1    at Big Sky before that '15, '16 season?
2    A.  That's correct.
3    Q.  And you know that December 11, 2015 is
4    the day that Mr. Meyer wrecked and was injured when
5    you were skiing with him, correct?
6    A.  Yes.
7    Q.  How many days have you skied at Big Sky
8    since December 11, 2015?
9    A.  Fewer than 20.
10   Q.  A couple times Mr. Meyer -- well, I
11   shouldn't say "a couple."  At least one, maybe more
12   times, Mr. Meyer came to Big Sky and thanked the
13   ski patrol for saving his life, are you aware of
14   that?
15   A.  Yes.
16   Q.  Were you with him when Mr. Meyer came to
17   Big Sky and thanked the ski patrol for saving his
18   life?
19   A.  Yes.
20   Q.  Was that just one occasion or multiple
21   occasions?
22   A.  Just one comes to mind.
23   Q.  And when was that, if you recall?
24   A.  Toward the end of the season 2016.
25   Q.  What do you remember Mr. Meyer saying to

Page 28

1    the ski patrol?
2    A.  Someone gave an introduction to John to
3    explain who he was and why he was speaking with the
4    patrol.  I don't recall if that person also gave an
5    overview of the accident or if John explained what
6    had happened in the accident.  Primarily he
7    expressed his gratitude to the ski patrol for
8    responding so quickly and effectively.
9    Q.  What did he explain happened in the
10   accident?
11   A.  I don't recall if he gave that
12   description or if it came from the patroller who
13   introduced him.
14   Q.  Okay.  Did Mr. Meyer, when he was
15   thanking the ski patrol for saving his life, did he
16   say that this area should have been marked?
17   A.  I don't believe he said anything about
18   signs during that meeting.
19   Q.  Did he make any criticism of the ski
20   patrol during that meeting?
21   A.  Not that I recall.
22   Q.  Now you understand from your work as a
23   ski instructor, that the group of people that make
24   the decision about where and when to put up signs
25   is the ski patrol, right?

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

AMANDA EGGERT

Page 29

1     A.  I understand that signage is typically
2  handled by ski patrol.
3     Q.  Can you -- this is a book in front of
4  you of deposition exhibits.  Can you just turn real
5  quick to Exhibit 24?
6     A.  (Witness Complies.)
7     Q.  Do you have Exhibit 24 in front of you?
8     A.  I do.
9     Q.  Do you recognize what's shown in
10 Exhibit 24?
11    A.  It looks like a ski run.  I couldn't say
12 which one exactly it is or from what vantage it was
13 taken.
14    Q.  Okay.  We'll come back to that in just a
15 little bit.
16       On December 11, 2015 you were not
17 wearing a helmet; is that correct?
18    A.  That is correct.
19    Q.  Why were you not wearing a helmet?
20    A.  Given that I had had so few injuries, I
21 didn't feel it was necessary.  And I recalled when
22 I was a volunteer ski patrol one of my mentors
23 there saying "The best thing to protect your bean
24 is your bean."  So that was something that I had
25 considered.

Page 30

1     Q.  What did that saying mean to you, "The
2  best thing to protect your bean is your bean"?
3     A.  To me that means be intentional when you
4  ski and you can generally avoid injury.
5     Q.  By maintaining control of your speed and
6  course, correct?
7     A.  By skiing in control.
8     Q.  Not running into plainly obvious
9  hazards, right?
10    A.  That's part of skiing in control.
11    Q.  For example, if someone just runs into a
12 plainly obvious tree, that would be the skier's
13 responsibility, correct?
14    A.  That gets a little bit muddy.  There are
15 other things to consider, including a sudden change
16 in snow quality, gear malfunctions, perhaps another
17 skier cuts you off.  There are other factors that
18 play at times.
19    Q.  And those are all things you have to be
20 aware of as a skier, right?
21    A.  It certainly helps.
22    Q.  You have to be aware of changing snow
23 conditions, right?
24    A.  Ideally, yes.
25    Q.  You have to be aware of other skiers,

Page 31

1  correct?
2     A.  To the best of your ability.  None of us
3  has 360 degrees of vision.
4     Q.  What type of equipment were you skiing
5  on in December 11, 2015?
6     A.  It was a back country setup.  Black
7  Diamond skis and Marker binders, Black Diamond
8  boots.
9     Q.  Marker bindings?
10    A.  Yes.
11    Q.  What type of Marker bindings?
12    A.  I think the model name is Duke.  They
13 allow for uphill and downhill travel.
14    Q.  Had you ever skied with John Meyer
15 before December 11, 2015?
16    A.  No.
17    Q.  Were you and Mr. Meyer dating prior to
18 December 11, 2015?
19    A.  We were friends, but I wouldn't say we
20 were dating at that time.
21    Q.  When did you -- in your view when did
22 you start dating Mr. Meyer?
23    A.  Late January or early February of 2016.
24    Q.  Can you describe Mr. Meyer's skiing
25 ability when you started skiing with him on

Page 32

1  December 11, 2015?
2     A.  I would say he was an intermediate
3  skier.
4     Q.  Did he appear to know his way around Big
5  Sky?
6     A.  I think he had skied there before, but
7  he didn't seem particularly familiar with the
8  mountain.
9     Q.  Mr. Meyer testified that he always skied
10 fast, would you agree with that?
11    A.  That day he was consistently skiing
12 fast.
13    Q.  Faster than you?
14    A.  At times.  I don't recall that either
15 one of us was arriving at the base of the chairlift
16 consistently before the other.
17    Q.  And on December 11, 2015 you were living
18 in Big Sky; is that correct?
19    A.  Yes.
20    Q.  Where were you living?
21    A.  Off of Gallatin Road, approximately
22 eleven miles south of the turnoff to Big Sky from
23 Highway 191.
24    Q.  Were you living with anyone else?
25    A.  No.

8  (Pages 29 to 32)

AMANDA EGGERT

Page 33

1    Q.  Was there -- did you own or rent?
2    A.  Rent.
3    Q.  And who were you renting from?
4    A.  A contractor named Scott.
5    Q.  Do you remember his last name?
6    A.  I can check my phone.  It's probably in
7  there.
8    Q.  We'll do that on a break.
9    A.  Okay.
10    Q.  Do you remember what you did the night
11  before on December 10th?
12    A.  I don't.
13    Q.  Do you remember if on the 11th you were
14  hung over or anything like that?
15    A.  I was not.
16    Q.  How do you know that you were not?
17    A.  I remember being pretty clear headed the
18  day of the accident.  And being that I planned to
19  work the afternoon of December 11th, it would have
20  been uncharacteristic of me to be irresponsible the
21  night before.
22    Q.  What time did you plan to work in the
23  afternoon of the 11th?
24    A.  I don't believe my boss and I agreed to
25  a specific time, just that I would come to the

Page 34

1  office in the afternoon.
2    Q.  Tell me how it was that you and
3  Mr. Meyer came to be skiing together on December
4  11, 2015?
5    A.  We'd met earlier that year at a writing
6  conference and we had stayed in touch since.
7    Q.  Where was the writing conference?
8    A.  It was held at Chico Hot Springs.
9    Q.  So how did you make plans to go skiing
10  on December 11th?
11    A.  We coordinated via technology since he
12  was living in Missoula at the time.  That might
13  have been e-mail, phone or text.
14    Q.  Was it your idea to go skiing on the
15  11th or was it his?
16    A.  I think I brought up the promotion for a
17  discounted lift ticket in conversation to him and
18  he decided to come up from Missoula.
19    Q.  Okay.  So let's just start off that
20  morning.  What I want you to do is just
21  describe -- starting the morning of December 11,
22  2015, describe what happened in as much detail as
23  you can and I'll probably ask you a few questions
24  as we go.
25    A.  Okay.  John and I drove to the ski area

Page 35

1  separately.  I think I parked around 9:30 a.m. and
2  we met near the ticket window.  We took one or two
3  runs on Swift Current.  I texted a colleague of
4  mine at Outlaw Partners for recommendations of
5  where to ski.  He said he'd heard there was good
6  skiing under the Challenger lift.
7    Q.  Let me ask you a couple questions -- a
8  couple detailed questions there.  First, can you
9  look at Exhibit 4 there?
10    A.  (Witness complies.)
11    Q.  I think you're looking at 3.  Can you go
12  one more?
13    A.  Yep.
14    Q.  Do you see at the top left this has your
15  name?
16    A.  Yes.
17    Q.  And then under December 11 it
18  says -- December 11, 2015 it says 11:30 a.m.?
19    A.  Yes.
20    Q.  And I'll tell you that the evidence in
21  this case will show that's actually eastern time,
22  so that would be 9:30 a.m.?
23    A.  Okay.
24    Q.  Does that comport with your memory?  In
25  other words, do you remember loading the Swift

Page 36

1  Current chairlift at 9:30 a.m. on December 11,
2  2015?
3    A.  Pretty close to 9:30 a.m., within maybe
4  15 minutes.
5    Q.  With Mr. Meyer?
6    A.  Yes.
7    Q.  Did you take any runs before that?
8    A.  No.
9    Q.  So if your pass was scanned at 9:30 a.m.
10  on Swift Current, it's your belief that that would
11  have been your first run of the day?
12    A.  Yes.
13    Q.  Okay.  Where did you meet Mr. Meyer
14  again?
15    A.  Near the ticket window.
16    Q.  Look back at Exhibit 2.
17    A.  (Witness complies.)
18    Q.  Do you recognize Exhibit 2 as being the
19  ticket window at the base of Big Sky?
20    A.  Yes.
21    Q.  And is that nearby where you met
22  Mr. Meyer?
23    A.  Within 30 or 40 feet I would say.
24    Q.  Okay.  Where was it where, if you can
25  recall, where he was exchanging cans of food for a

9  (Pages 33 to 36)

AMANDA EGGERT

Page 37

1    lift ticket?
2        A.  He had already obtained his lift ticket
3    when I met him, so I'm not certain where he got it.
4        Q.  Okay.  You just know that you met him
5    somewhere near this ticket window; is that right?
6        A.  Yes.
7        Q.  Did you do anything after you met him
8    before you started skiing?
9        A.  Not that I recall.
10       Q.  Okay.  And then I think you said you
11   took one or two runs on Swift Current to start off?
12       A.  Yes.
13       Q.  Do you remember where you skied on Swift
14   Current?
15       A.  I don't.
16       Q.  Do you remember what the conditions were
17   like that day?
18       A.  It was early season.  So there were lots
19   of rocks and little trees.
20       Q.  Do you remember signs being up warning
21   people of early season conditions?
22       A.  I don't specifically remember them.
23       Q.  Do you deny that they were up?
24       A.  No, they very well could have been.
25       Q.  Okay.  And do you remember where you

Page 38

1    skied from approximately 9:30 until -- let's just
2    say for the first hour?
3        A.  First we skied Swift Current and then we
4    moved to Challenger.  All of the runs we skied that
5    day were accessed off of one of those two lifts.
6        Q.  And so please look at Exhibit 10.
7        A.  (Witness complies.)
8        Q.  Do you have exhibit -- that's 9.  Go one
9    more, please.
10           Do you have Exhibit 10 in front of you?
11       A.  Yes.
12       Q.  And is what is shown in Exhibit 10 the
13   path you took to get from the top of Swift Current
14   over to the base of Challenger or at least part of
15   the path?
16       A.  It might be.  We would have unloaded
17   from Swift Current and taken our right, heading off
18   the hill toward the Challenger lift.  But I don't
19   recall precisely which run we took to get to
20   Challenger.
21       Q.  Well, look at Exhibit 11, please, the
22   next exhibit.
23       A.  (Witness complies.)
24       Q.  You would have taken this cat track to
25   get over the Challenger lift, correct?

Page 39

1        A.  Perhaps.  Do you have a trail map I
2    could confirm?
3        Q.  Well, I'll ask you a different way.
4    Other than taking this cat track that is shown in
5    Exhibit 11, how else would you have gotten from the
6    top of Swift Current over to the Challenger lift
7    considering the early season conditions?
8        A.  I'm not familiar enough with the
9    mountain to say if there was another route that was
10   open at that time.
11       Q.  Okay.  Do you remember skiing what is
12   shown in Exhibit 11 prior to Mr. Meyer's ski wreck?
13       A.  I don't recall skiing this, but I might
14   have.
15       Q.  Okay.  Please look at Exhibit 13.
16       A.  (Witness Complies.)
17       Q.  Do you recognize what's shown in Exhibit
18   13?
19       A.  It looks like a run but I couldn't say
20   offhand which one it is.
21       Q.  Okay.  Do you remember skiing by the
22   area shown in Exhibit 13 prior to the time
23   Mr. Meyer wrecked?
24       A.  I don't recall if I did or not.
25       Q.  Okay.  Among the documents you produced

Page 40

1    in response to the subpoena today, is one
2    document -- it's a typed out document.  It says
3    "Thursday, December 17, 2015" at the top; is that
4    correct?
5        A.  Yes.
6        Q.  I'm going to mark that as the next
7    exhibit, which I believe is 57.
8            (Whereupon, Deposition
9            Exhibit Number 57 was
10           marked for identification.)
11   BY MR. McINTOSH:
12       Q.  I'm handing you Exhibit 57.  Do you have
13   that in front of you now?
14       A.  I do.
15       Q.  Can you please describe to me what
16   Exhibit 57 is?
17       A.  This is a letter I wrote to John when he
18   was still in the hospital regarding the day of his
19   accident.
20       Q.  And it's dated December 17th, 2015;
21   correct?
22       A.  Yes.
23       Q.  Is that when you wrote it?
24       A.  Yes.
25       Q.  And did you speak with Mr. Meyer before

10 (Pages 37 to 40)

AMANDA EGGERT

Page 41

1    December 11 -- excuse me, before December 17, 2015?
2        A.  I don't think John was speaking at that
3    point.  He was either still intubated or not
4    mentally present enough to speak or his throat hurt
5    too much, but he wasn't talking at that point.
6        Q.  Okay.  So you had not spoken with
7    Mr. Meyer from the time of his ski wreck until you
8    wrote what is now marked as Exhibit 57; is that
9    correct?
10       A.  To the best of my recollection.  It
11   could depend on when he was first able to talk
12   after the breathing tube was removed, but to the
13   best of my recollection that happened after
14   December 17th.
15       Q.  Okay.  So in the first paragraph you say
16   "I promised I would, so I will.  I'm going to write
17   about the hours preceding your arrival at the
18   Billings Clinic, a stretch of hours you may never
19   remember."  Did I read the first paragraph
20   correctly?
21       A.  Yes.
22       Q.  So you said "I promised I would."  Who
23   did you promise that you would?
24       A.  John.
25       Q.  But you told me that you hadn't spoken

Page 42

1    with him from the time of the accident until you
2    wrote this?
3        A.  That's correct.  I -- this is one of a
4    series of letters that I wrote to him when he was
5    in the hospital.
6        Q.  But who did you promise that you would?
7        A.  In an earlier letter I think I
8    referenced that I would write about what happened
9    the day of his ski accident.
10       Q.  So you did write him earlier letters?
11       A.  Yes.
12       Q.  Where are those letters?
13       A.  They're on my computer.  I think he
14   might have them as well.
15       Q.  Okay.  You haven't -- you didn't produce
16   those?
17       A.  No.  They're more personal and they
18   pertain more to his hospital stay than they do to
19   the actual accident preceding the hospital stay.
20       Q.  Okay.  But they deal with his hospital
21   stay?
22       A.  They do.
23       Q.  Okay.  Will you produce those letters?
24       A.  Yeah.  Yes.  They're quite personal, but
25   yes.

Page 43

1        Q.  So as I understand it, I think you said
2    earlier that you texted a colleague about skiing on
3    Challenger?
4        A.  Yes.
5        Q.  And he said it was good skiing?
6        A.  Yeah, that was his understanding, is
7    skiing was good that day on Challenger.
8        Q.  So was it your suggestion to go to
9    Challenger?
10       A.  It likely was my suggestion.
11       Q.  And you knew in making that suggestion
12   that Challenger serves expert terrain, right?
13       A.  Intermediates and experts, yes.
14       Q.  Well, let's look at Exhibit 14, please.
15       A.  (Witness complies.)
16       Q.  Do you recognize Exhibit 14?
17       A.  It looks like the sign at the unloading
18   area for the top of the Challenger lift.  It might
19   be at the bottom of Challenger lift.
20       Q.  Do you recognize this sign as being at
21   the bottom of Challenger lift?  Do you see how it
22   says "Welcome to Challenger lift" top left of the
23   sign?
24       A.  I do see that.
25       Q.  Would that make much sense to you that

Page 44

1    that would be at the top of the chairlift?
2        A.  It would be more beneficial at the
3    bottom.
4        Q.  Do you recall seeing this sign before
5    you and Mr. Meyer boarded the Challenger chairlift
6    on December 11, 2015?
7        A.  I don't specifically recall, but it was
8    three and a half years ago now.
9        Q.  This sign shown in Exhibit 14 states
10   that Challenger lift expert -- or, excuse me, the
11   Challenger lift serves most difficult, experts only
12   terrain, correct?
13       A.  Yes.
14       Q.  Did you know that before you took the
15   Challenger chairlift with Mr. Meyer?
16       A.  I can't remember if this was the first
17   time I had skied Challenger that season.  So it's
18   likely -- it's possible that I was already familiar
19   with the terrain Challenger serves.  But I can't
20   recall for certain if this was my very first run on
21   Challenger for the 2015 season or if I'd skied it
22   prior to that.
23       Q.  And in Exhibit 57 you describe what you
24   remember happening before Mr. Meyer's ski wreck; is
25   that right?

AMANDA EGGERT

---

Page 45

1    A.  Yes.
2         Q.  And based on what you wrote here, it
3    looks like Mr. Meyer was -- Mr. Meyer wrecked and
4    was injured on your third lift on the Challenger
5    run that day; is that correct?
6         A.  That's what I recalled when I wrote the
7    letter.
8         Q.  Okay.  So let's talk about the first run
9    that you took on Challenger on December 11, 2015.
10   Do you recall where you came down the first time?
11        A.  I don't.
12        Q.  Do you recall seeing signs at the top of
13   Challenger that said "Warning, unmarked obstacles"?
14        A.  I don't specifically recall seeing them.
15        Q.  What would a sign that says, "Warning,
16   unmarked obstacles" mean to you?
17        A.  Just that, that obstacles exist on the
18   runs that are not flagged or signed.
19        Q.  And you, of course, already knew that
20   though as a ski patroller, correct?
21        A.  Knew what?
22        Q.  Excuse me -- strike that.
23           You knew as a ski instructor that there
24   are unmarked obstacles on ski runs, correct?
25        A.  I know that it's common.

---

Page 46

1         Q.  But you don't recall where you went down
2    your first run on Challenger with Mr. Meyer?
3         A.  I don't.  One of the runs that we took
4    on Challenger we took on skier's left.  And to the
5    best of my recollection, all of the runs we skied
6    on Challenger that day were accessed from the left
7    as you unload the chairlift.
8         Q.  Okay.
9         A.  But beyond that, I can't recall with
10   specificity.
11        Q.  So on your left as you're coming up the
12   chairlift?
13        A.  Yes.
14        Q.  Okay.
15        A.  Looker's left.
16        Q.  Yeah.  So look at -- where is that?
17   Well, let's start with Exhibit 16.  Can you turn to
18   Exhibit 16?
19        A.  (Witness Complies.)
20        Q.  You have Exhibit 16 in front of you?
21        A.  I do.
22        Q.  Do you recognize what is shown in
23   Exhibit 16?
24        A.  Again, it looks like a ski run.  I
25   couldn't say which one.

---

Page 47

1         Q.  Do you recognize this as being the
2    Challenger chairlift?
3         A.  Without more context I couldn't say.
4         Q.  Okay.  Turn to Exhibit 17.
5         A.  (Witness complies.)
6         Q.  Do you have Exhibit 17 in front of you?
7         A.  I do.
8         Q.  Do you recognize what's shown in Exhibit
9    17 as being the top of the Challenger chairlift?
10        A.  That looks consistent with my memory.
11        Q.  And does this look like an area you
12   would want to ski, what is shown in Exhibit 17?
13        A.  No.
14        Q.  And I don't see any ski tracks in
15   Exhibit 17, do you?
16        A.  I do not.
17        Q.  Turn to Exhibit 18, please.
18        A.  (Witness complies.)
19        Q.  Do you recognize what's shown in Exhibit
20   18?
21        A.  This looks like the very top of the ski
22   lift.
23        Q.  Okay.  So would you agree that what's
24   shown in Exhibit 18 is what you see taking a left
25   off the top of the Challenger chairlift?

---

Page 48

1         A.  It's hard to say where the chairlift is
2    in relation to the sign.  It looks like there might
3    be part of a bull wheel.  I can't tell from this
4    photo.
5         Q.  Okay.  Please look at Exhibit 20.
6         A.  (Witness complies.)
7         Q.  Do you recognize what's shown in Exhibit
8    20?
9         A.  Another ski run, though I couldn't name
10   it just from this photo alone.
11        Q.  Okay.  Is what is shown in Exhibit 20
12   the area you and Mr. Meyer's skied on each of your
13   runs down Challenger on December 11, 2015?
14        A.  It depends on where it is in relation to
15   the lift.  If it's to the looker's left of the lift
16   toward the very top, this could be what we had
17   skied.
18        Q.  Okay.  So just off to the left as you're
19   coming up near the top of the chairlift, correct?
20        A.  Yes.
21        Q.  And so the -- you said each of the times
22   you skied with Mr. Meyer off the Challenger
23   chairlift, you skied that area.  Do you remember
24   where you went the first time?
25        A.  I don't.

---

12  (Pages 45 to 48)

AMANDA EGGERT

Page 49

1    Q.  Okay.  Please look at Exhibit 24.
2    A.  (Witness complies.)
3    Q.  Do you recognize what's shown in Exhibit
4  24?
5    A.  This appears to be the run that John was
6  injured on.
7    Q.  Okay.  Did you ski this run either your
8  first or second time down the Challenger chairlift?
9    A.  We might have skied part of it, though
10  it's unlikely we would have skied the same exact
11  run twice in a row.
12    Q.  Okay.  Which part of it do you think you
13  skied before Mr. Meyer wrecked?
14    A.  And the run prior to his accident, is
15  that what you're asking?
16    Q.  Yes, BS.  In either of the runs.  So you
17  took two runs on Challenger before he wrecked and
18  was injured, and so I want to -- in either of those
19  first two runs where did you ski on exhibit -- what
20  is shown in Exhibit 24?
21    A.  I can't recall with certainty.
22    Q.  Okay.  But you think that you would have
23  skied at least a part of the run that is shown in
24  Exhibit 24?
25    A.  Not exactly what's depicted though.

Page 50

1  Actually, do you have a trail map I can reference?
2  That would help.
3    Q.  We'll get one on the break.  We'll take
4  a break pretty soon and then we'll get one, okay?
5    A.  Okay.
6    Q.  Look at Exhibit 25.  Do you recognize
7  what's shown in Exhibit 25?
8    A.  This looks like the area immediately
9  uphill like it was -- let me start over.
10    It looks like it was taken by someone
11  who is immediately uphill of where John's accident
12  took place.
13    Q.  Okay.  And did you ski anything -- any
14  of the areas shown in Exhibit 25 on either of the
15  runs before Mr. Meyer was injured?
16    A.  I can't recall with certainty.
17    Q.  Okay.  Do you remember anything else
18  about your first run on Challenger?
19    A.  There were definitely some rocks prior
20  to the run in which John wrecked on the cat track.
21  He had one other fall at least that I remember.
22    Q.  Where else did he fall prior to the time
23  he was injured?
24    A.  Some -- a run underneath Challenger,
25  though I couldn't say which one it was.

Page 51

1    Q.  Was he injured in that fall?
2    A.  No, maybe a bruise.
3    Q.  Did he complain and say the area should
4  have been marked in his prior fall?
5    A.  Not that I recall.
6    Q.  Why don't we take a break now and I'll
7  grab that trail map, okay?
8    A.  Okay.
9    (Whereupon, a brief
10    recess was taken.)
11  BY MR. McINTOSH:
12    Q.  Okay.  We ready to go back on record,
13  Ms. Eggert?  You ready?
14    A.  I am.
15    MR. McINTOSH:  Okay.  First of all,
16  Counselor, are you recording this?
17    MS. NADOW:  Yes, I am.
18    MR. McINTOSH:  And have you been recording
19  from the beginning?
20    THE WITNESS:  Yes, I have.
21    MR. McINTOSH:  And you didn't tell any of us
22  that you were recording, did you?
23    MS. NADOW:  I did mention it, yes.
24    MR. McINTOSH:  You did mention it?
25    MS. NADOW:  I did.  But I mentioned it when I

Page 52

1  walked in, yes.  But I did not -- I guess I did not
2  get an affirmative response from you.
3    MR. McINTOSH:  Okay.  Did you get an
4  affirmative response from anyone?
5    MS. NADOW:  I told the court reporter.  I
6  informed the court reporter that I was going to
7  record, yes.
8    MR. McINTOSH:  Okay.  Well, I'm going to
9  object to recording.  I think it's a violation of
10  Montana law to record people without their consent
11  and I was not aware we were being recorded here.
12    MR. CONDRA:  And just so the record's clear,
13  this is Brad Condra for Defendant Salewa, I was not
14  aware that you were recording as well.
15    MS. NADOW:  Okay.  Sorry, at this point may I
16  start recording the rest of the deposition, please?
17    MR. McINTOSH:  Well, I would object to it
18  because now -- I mean I didn't know I was being
19  recorded at the beginning.
20    MS. NADOW:  Okay.
21    MR. McINTOSH:  So it would be incomplete.  So
22  I would object to it.
23    MS. NADOW:  Okay.  And for you?
24    MR. CONDRA:  I would object as well.
25    MS. NADOW:  Okay, thank you.

13 (Pages 49 to 52)

AMANDA EGGERT

Page 53

```
 1          (Whereupon, Deposition
 2        Exhibit Number 58 was
 3        marked for identification.)
 4   BY MR. McINTOSH:
 5        Q.  Ms. Eggert, you now have before you what
 6   has been marked as Exhibit 58; is that correct?
 7        A.  Yes.
 8        Q.  And do you recognize Exhibit 58 as a Big
 9   Sky trail map?
10        A.  I do.
11        Q.  And I will represent to you this is a
12   trail map from the 2015/2016 season.  Do you have
13   any reason to dispute that?
14        A.  No.
15        Q.  And having looked at this trail map,
16   does this refresh your recollection about where you
17   skied on your first run down Challenger with
18   Mr. Meyer?
19        A.  I couldn't say which one it was
20   specifically, but given how few options there are
21   it looks like we would have taken at least part of
22   Highway.
23        Q.  And Highway was the run that you were
24   skiing right before Mr. Meyer was injured; is that
25   correct?
```

Page 54

```
 1        A.  It appears to be so, yes.
 2        Q.  And did Mr. Meyer wreck on his first run
 3   down Challenger?
 4        A.  I don't recall if it was his first or
 5   second.  It was one of the runs preceding his
 6   accident on Challenger.
 7        Q.  Do you remember where it was that
 8   Mr. Meyer wrecked?
 9        A.  To the best of my recollection it was
10   the upper half of the run.
11        Q.  The upper half of Highway or the open
12   area to the left of the chairlift?
13        A.  It could have been either.  It was
14   fairly open.  It wasn't a run that was surrounded
15   by trees on either side to clearly delineate.
16        Q.  So it was a pretty open area?
17        A.  Yes.
18        Q.  And do you remember what caused him to
19   wreck?
20        A.  He came to a group of rocks and to avoid
21   going through the rocks, he tried an abrupt turn
22   and ended up falling.
23        Q.  Okay.  Do you remember anything else
24   about your first run down Challenger on December
25   11, 2015?
```

Page 55

```
 1        A.  Again, I'm not sure the exact sequence
 2   but at some point prior to the run that we skied
 3   that John was injured on, we had an interaction
 4   with a ski patroller.
 5        Q.  And according to your Exhibit 57, this
 6   interaction with the ski patroller was on your
 7   second run down Challenger, correct?
 8        A.  Yes.
 9        Q.  Okay.  So we'll get to that in just a
10   second.  But is there anything else that you can
11   remember about the first run down Challenger?
12        A.  Again, the sequence is not coming into
13   sharp clarity, but I definitely recall that John
14   had wrecked at least once before and that we had
15   interaction with the ski patroller.
16        Q.  Okay.  And do you remember if Mr. Meyer
17   had wrecked anywhere else when you were skiing on
18   the morning of December 11, 2015 other than this
19   wreck that you told us about on Challenger?
20        A.  Not that I recall.
21        Q.  Okay.  So let's talk about the second
22   run on Challenger.  Did you ski the same open area
23   off to the left as you're coming up the chairlift
24   to start?
25        A.  Yes, somewhere in that open area.
```

Page 56

```
 1        Q.  And then where did you go from there?
 2        A.  We worked our way down the fall line.
 3   At some point the open area became closed, but
 4   neither John nor I saw signs indicating it was
 5   closed.
 6        Q.  How did you know it became closed?
 7        A.  There was a ski patroller below us
 8   waving his poles, getting our attention and
 9   obviously wanting to speak with us.  So after he
10   started flagging our attention, someone on the ski
11   lift yelled "run."  But I skied down to him.  John
12   also skied down to him and he said "That area's
13   closed."
14        Q.  Look at Exhibit 22, please.
15        A.  Okay.
16        Q.  Do you recognize what's shown in Exhibit
17   22?
18        A.  I don't.
19        Q.  Is the area shown in Exhibit 22 the
20   closed area that you and Mr. Meyer claim you skied
21   into on your second run on Challenger?
22        A.  I couldn't say for certain.
23        Q.  Go back one Exhibit to 21.  Do you
24   recognize what's shown in Exhibit 21?
25        A.  Again, it that looks like a ski run.  I
```

14 (Pages 53 to 56)

AMANDA EGGERT

Page 57

1  couldn't say exactly which one it is.
2     Q.  And does Exhibit 21 show the closed area
3  that you and Mr. Meyer skied into?
4     A.  I couldn't say for certain based on this
5  photo.
6     Q.  Where was it -- where was this closed
7  area that you and Mr. Meyer claim you skied into on
8  your second run on Challenger?
9     A.  Somewhere to the looker's left of the
10  top of the Challenger lift, though I couldn't say
11  precisely where it was.
12     Q.  So to the left as you're coming off the
13  chairlift?
14     A.  Correct.
15     Q.  Okay.  And where did you -- you said
16  someone yelled from the chairlift to you?
17     A.  Yes.
18     Q.  Where did that -- where were you when
19  that happened?
20     A.  Must have been somewhere in sight of the
21  chairlift, but I couldn't say where exactly.
22     Q.  And where was the ski patroller located?
23     A.  He was below us.
24     Q.  Can you be any more specific?
25     A.  Oh, according to the letter I wrote, it

Page 58

1  was about 80 feet below us on a cat track.
2     Q.  Okay.  Look at Exhibit 24, please.
3     A.  (Witness complies.)
4     Q.  Can you see the cat track pictured in
5  Exhibit 24?
6     A.  Yes.
7     Q.  Was the ski patroller on that cat track
8  when he yelled to you and Mr. Meyer?
9     A.  This -- it doesn't look quite like what
10  I recall.
11     Q.  What looks different than from your
12  recollection?
13     A.  It looks like it has more skier traffic
14  based on the tracks and something about the
15  position of the vegetation isn't consistent with my
16  memory.
17     Q.  What does that mean?
18     A.  Just that it looks like a different
19  slope or fall line from what I recall.
20     Q.  Okay.  Do you recall that what is shown
21  in Exhibit 24, does this look like the run Highway
22  right before Mr. Meyer was injured?
23     A.  Um, it could be.  With these
24  representations it's hard to get a sense for slope
25  angle and other aspects, but it could be.

Page 59

1     Q.  Okay.  So going back to my prior
2  question about where the ski patroller was, you
3  said you thought the ski patroller was on a cat
4  track, right?
5     A.  Yes.
6     Q.  But you don't know where he was on the
7  cat track?
8     A.  Correct.
9     Q.  And you don't know if he was standing
10  anywhere shown in Exhibit 24?
11     A.  Correct.  I don't believe our
12  interaction with the ski patroller happened on this
13  slope.  It just doesn't look consistent with my
14  memory.
15     Q.  Okay.  Do you see the trees on the
16  left-hand side of Exhibit 24?
17     A.  Toward the bottom?
18     Q.  Correct.
19     A.  I do.
20     Q.  Were you on the other side of those
21  trees when you had the interaction with the ski
22  patrollers; in other words, further to skier's
23  left?
24     A.  I can't say for certain.
25     Q.  Okay.

Page 60

1     A.  It was a generally open area.  I feel
2  like this is maybe a little bit lower down on the
3  run than our interaction with the ski patroller
4  happened.
5     Q.  Okay.  Well, look at exhibit -- well,
6  two things:  First of all, if people from Big Sky
7  were to testify that there are no cat tracks
8  further up than the cat tracks shown in Exhibit 24,
9  would that change your recollection?
10     A.  Well, recollection shouldn't be
11  malleable like that, but it's possible that there
12  are no other cat tracks.
13     Q.  Look back at Exhibit 16, please.
14     A.  (Witness Complies.)
15     Q.  Do you recall if you were skiing the
16  area shown in Exhibit 16 when you skied into the
17  closed area?
18     A.  It's possible, though I don't think it
19  was quite so close to the ski lift itself.
20     Q.  Was the ski patroller standing on the
21  cat track shown in Exhibit 16?
22     A.  I don't recall.
23     Q.  Did you have a conversation with the ski
24  patroller?
25     A.  I did.

15  (Pages 57 to 60)

AMANDA EGGERT

Page 61

1    Q.  What did the -- or describe that
2  conversation in as much detail as you can, please?
3    A.  It was fairly straightforward.  He said,
4  "This area is closed."
5    I said something to the effect of we
6  weren't aware.  And then he said something like get
7  back in the open area, and that was about the
8  extent of it.
9    Q.  Okay.  Do you recall him saying anything
10  else to you?
11    A.  I do not.
12    Q.  Okay.  And then you and Mr. Meyer skied
13  down to -- from speaking with ski patrol, you skied
14  down to the bottom of the Challenger chairlift,
15  correct?
16    A.  Yes.
17    Q.  Do you remember anything else about your
18  run after speaking with the ski patrol until you
19  got down at the bottom of Challenger chairlift?
20    A.  Just that John and I laughed a little
21  bit about the interaction with the patroller and we
22  discussed very briefly that neither of us had seen
23  signs indicating that we skied into a closed area.
24    Q.  Okay.  Anything else?
25    A.  Not that I recall.

Page 62

1    Q.  Okay.  Let's talk about your third run
2  on Challenger with Mr. Meyer.  Do you remember
3  anything about going up the chairlift on the third
4  run?
5    A.  Yes.  We talked about helmets and the
6  fact that we should both be wearing helmets.  And I
7  think we also talked about health insurance.
8    Q.  Why did you conclude that you should
9  both be wearing helmets?
10    A.  Early season conditions, um, it's
11  generally a good practice.
12    Q.  Okay.  And on your third run off
13  Challenger you skied again to the area to looker's
14  left as you're coming up the chairlift or at least
15  you started out there, correct?
16    A.  Yes.
17    Q.  And then where did you ski from there?
18    A.  Just generally down.  It was likely
19  Highway.  I think the accident report said the
20  accident took place on Lower Morningstar, so
21  presumably we took Highway to Lower Morningstar.
22    Q.  Look at Exhibit 23, please.
23    A.  (Witness complies.)
24    Q.  After you skied the area to looker's
25  left immediately off of the Challenger lift, did

Page 63

1  you ski down and sort of take a left-hand turn into
2  the area shown in Exhibit 23?
3    A.  Can you ask again?
4    Q.  Sure.
5    You said on your third run down
6  Challenger, you and Mr. Meyer got off the chairlift
7  and skied to the open area to the looker's left,
8  correct?
9    A.  Yes.
10    Q.  And then you said I think you just
11  remember skiing down, right?
12    A.  Yes.
13    Q.  Did you ski down and then take a
14  left-hand turn into the area shown in Exhibit 23?
15    A.  We were likely somewhere on this slope
16  depicted in the upper left quadrant of the photo.
17  Where exactly we were, I can't say.  I think the
18  accident might have happened within view of the
19  chairlift because I remember thinking the ski
20  patrol response was fast and perhaps that's why
21  they arrived at the scene so quickly because maybe
22  someone had reported it from the lift.
23    Q.  Okay.  And look at Exhibit 24.  We've
24  looked at that exhibit before.
25    A.  (Witness complies.)

Page 64

1    Q.  Did you and Mr. Meyer ski down the area
2  shown in Exhibit 24 to get to the area where he
3  wrecked and was injured?
4    A.  It looks pretty consistent with my
5  recollection given the amount of trees kind of in
6  the middle of the run, short young trees that
7  aren't covered in snow.
8    Q.  Let me back up and ask you a couple more
9  questions about the conversation you had with the
10  ski patroller.  Was this ski patroller male or
11  female?
12    A.  Male.
13    Q.  How tall?
14    A.  I don't recall him being either overly
15  tall or overly short.  I would estimate around six
16  foot.
17    Q.  Do you remember who it was?
18    A.  He didn't give his name to my
19  recollection.
20    Q.  And you didn't know him?
21    A.  I mean he was in ski gear with helmet
22  and goggles so I don't think I would have
23  recognized him.
24    Q.  Do you remember anything else
25  descriptive about him that you can tell us?

16 (Pages 61 to 64)

AMANDA EGGERT

Page 65

1    A.  Oh, as I recall in addition to the
2    standard ski patrol red vest or jacket, he was
3    wearing a black helmet and mirrored goggles.
4        Q.  What I would like to do now is hand you
5    a new exhibit which I'm going to mark as Exhibit
6    59.
7            (Whereupon, Deposition
8            Exhibit Number 59 was
9            marked for identification.)
10   BY MR. McINTOSH:
11       Q.  You now have in front of you Exhibit 59;
12   is that correct?
13       A.  Yes.
14       Q.  And what I would like you to do on
15   Exhibit 59 is draw in red where you skied down the
16   run Highway shortly before Mr. Meyer was injured?
17       A.  Sure.  Do you -- when were these taken?
18       Q.  The evidence in this case will establish
19   that these pictured were taken within 24 hours of
20   Mr. Meyer's accident.
21       A.  Okay.  That helps to gauge conditions.
22   The best of my knowledge I probably skied something
23   like this, (indicating).
24       Q.  Can I see that, please?
25       A.  Sure.

Page 66

1        Q.  And then you stopped before -- your red
2    line stops before the cat track, correct?
3        A.  Correct.
4        Q.  Why did you stop your red line before
5    the cat track?
6        A.  I had caught my ski on a small tree that
7    was poking out of the snow, so I fell and it took
8    me quite awhile to find my ski.
9        Q.  Okay.  Can you put -- so that's where
10   you wrecked?
11       A.  Where the line ends?
12       Q.  Yes.
13       A.  Approximately.
14       Q.  Can you put an X where you wrecked,
15   please, on Exhibit 59?
16       A.  Again, kind of hard to say with this
17   recollection because there could be rollovers and
18   stuff that aren't depicted, but this is the best I
19   can do.
20       Q.  I understand.
21           And then can you write your name on the
22   bottom left-hand corner on that?
23       A.  (Witness complies.)
24       Q.  And was Mr. Meyer skiing ahead of you?
25       A.  Yes.

Page 67

1        Q.  Okay.  I will hand you a blue pen and
2    can you draw in blue where Mr. Meyer skied ahead of
3    you?
4        A.  Oh.
5        Q.  To the best of your recollection.
6        A.  Um, I don't remember the path he took
7    down exactly, just approximately where I found him
8    in relation to where I had wrecked.  So I couldn't
9    say with any kind of certainty which way he took
10   down.
11       Q.  Was he skiing near you?
12       A.  Yeah, I think we were probably within
13   shouting distance.
14       Q.  Okay.
15           (Whereupon, Deposition
16           Exhibit Number 60 was
17           marked for identification.)
18   BY MR. McINTOSH:
19       Q.  Next I'm going to hand you what I have
20   marked as Exhibit 60.  And do you recognize that as
21   being a photograph taken further downhill on the
22   run Highway?
23       A.  That looks right.
24       Q.  And can you see the area where Mr. Meyer
25   ended up after he wrecked?

Page 68

1        A.  At this scale it's hard to say.  I do
2    recall there was a weathered log really close to
3    where he ended up.  So I'm going to guess it's
4    somewhere around here, if this is the log I'm
5    thinking of.
6        Q.  Can you circle where you
7    believe -- where you're looking?
8        A.  Yeah.
9        Q.  And have you now circled in blue on
10   Exhibit 60 where you believe Mr. Meyer came to
11   rest?
12       A.  It's the same circle.  I made one circle
13   for where I think he ended up.
14       Q.  Okay.  Can I see that, please?
15       A.  Yes.
16       Q.  Okay.  And can you tell me where
17   Mr. Meyer skied to get to the blue circle that you
18   put on Exhibit 60?
19       A.  I didn't see him come down immediately
20   before his accident so I couldn't say for certain.
21       Q.  Okay.  Do you have any idea where
22   Mr. Meyer transitioned from the run Highway onto
23   the cat track?
24       A.  I don't.
25       Q.  Okay.  And why is it that you didn't see

17 (Pages 65 to 68)

AMANDA EGGERT

Page 69

1  where Mr. Meyer -- see Mr. Meyer skiing immediately
2  before he wrecked?
3      A.  I was trying to locate my ski and then
4  it took awhile to get it back on and I was dealing
5  with my own wreck, so I saw none of his.
6      Q.  Describe for me how Mr. Meyer was skiing
7  before his wreck where he was injured.
8      A.  He was --
9      Q.  Immediately before.
10     A.  Probably the same as he had been skiing
11  the previous runs, pretty fast.
12     Q.  Can you describe in any more detail
13  other than saying "pretty fast"?
14     A.  What kind of detail are you looking for?
15     Q.  Any additional detail that you can
16  provide.
17         Did he appear to be in control?
18     A.  There were times he was skiing faster
19  than I would have been given the conditions, but.
20     Q.  What do you mean when you say "given the
21  conditions"?
22     A.  Given rocks and trees.
23     Q.  And it's more important when you have as
24  many rocks and trees as is shown in Exhibit 59 and
25  60 in front of you, to ski more cautiously,

Page 70

1  correct?
2      A.  I would say it's advisable.
3      Q.  And Mr. Meyer was obviously ahead of you
4  so he was skiing faster than you, correct?
5      A.  Maybe.  We didn't ski a run top to
6  bottom without stopping, so there was a little bit
7  of leapfrogging that happened.
8      Q.  Were you trying to keep up with him when
9  you wrecked?
10     A.  Not that I recall specifically.  I think
11  I was just skiing the way I usually ski.
12     Q.  And how far away from Mr. Meyer were you
13  when you wrecked?
14     A.  It's hard to say exactly the distance
15  between where I wrecked and where he wrecked.  I
16  would guess somewhere between 30 and 40 yards.
17     Q.  You don't blame Big Sky for your wreck,
18  do you?
19     A.  I will say I very rarely crash.  It
20  happens maybe four or five times a season where I
21  lose a ski.  It was not my call, but it's obviously
22  really early season conditions the exhibits
23  we've looked at and I think there was definitely
24  probably some gray area in terms of whether or not
25  that lift had opened at that date.  There might

Page 71

1  have been others who felt like it was still too
2  early, the coverage was too thin.
3      Q.  But, of course, this was your third
4  lift, third run on this chairlift, correct?
5      A.  Yes.  My recollection, yes.
6      Q.  So despite knowing the conditions, you
7  kept coming back and skiing that area again,
8  correct?
9      A.  Yes, that's true.
10     Q.  And --
11     A.  Also once you ski Challenger it is a
12  little bit more difficult to access other parts of
13  the ski area.
14     Q.  Well --
15     A.  And sort of funnels back into
16  Challenger, but.
17     Q.  Well, you can actually ski right to the
18  base area from Lower Morningstar as shown in
19  Exhibit 59 and 60, correct?
20     A.  Yes.
21     Q.  So if you were concerned the Challenger
22  should not have been opened or there were too many
23  unmarked hazards, you could have made the choice to
24  avoid that after your first run and ski back to the
25  base area, correct?

Page 72

1      A.  We had options to access other lifts.
2      Q.  And you chose to keep coming back to
3  this area, correct?
4      A.  Yes.
5      Q.  And it's plain looking at Exhibit 24
6  that there are small trees and shrubs that are not
7  covered by snow, correct?
8      A.  Yes.
9      Q.  And it's plain that these are not
10  marked, correct?
11     A.  Yes.
12     Q.  It's certainly not your contention that
13  every single one of these trees and shrubs need to
14  be marked, is it?
15     A.  No.
16     Q.  So what happened -- describe for me if
17  you can in as much detail what happened after you
18  wrecked and you went and got your ski, put your ski
19  back on, what happened from there?
20     A.  I started looking around for John.  I
21  didn't see him.  I considered just skiing to the
22  bottom of the lift to see if he was there.  But
23  there was a clump of people to skier's right of
24  where I was and I thought before I skied all the
25  way back down to the bottom of the lift, it would

18 (Pages 69 to 72)

AMANDA EGGERT

Page 73

1    be worth seeing if he was either among the clump of
2    people or the source of the activity to my right.
3        Q.  And was the area to your right, is that
4    where you circled on Exhibit 60?
5        A.  Somewhere near there, yes.
6        Q.  Where did you ski -- from the X that you
7    wrote on Exhibit 59, where did you ski from that
8    area to the circle that's shown in Exhibit 60?  In
9    other words, what path did you follow to get from
10   one location to the other?
11       A.  Do you want me -- which exhibit?
12       Q.  Why don't you draw it on Exhibit 60,
13   please, in blue.
14       A.  Blue.
15       Q.  First of all, put an X on Exhibit 60
16   where you believe you wrecked.
17       A.  Okay.  Probably somewhere around here,
18   (indicating).
19       Q.  Can I just see where you put the X,
20   please?
21       A.  Sure.
22       Q.  Okay.  And then can you draw a path from
23   the X to the O?
24       A.  Sure.  I skied down to the cat track
25   probably the most direct way possible, not seeing

Page 74

1    John I started kind of skiing up the cat track.
2        Q.  Can I look at that, please?
3        A.  Sure.
4        Q.  And you've just -- you drew a line on
5    Exhibit 60 from the area where you wrecked to the
6    area where the crowd of people was, correct?
7        A.  Correct, to the best of my recollection.
8        Q.  And so you skied the transition from the
9    Highway onto the cat track, correct?
10       A.  Yes.
11       Q.  And you did so without wrecking and
12   injuring yourself, correct?
13       A.  Yes.  That transition, I did not wreck
14   on that transition.
15       Q.  And you didn't wreck because you were
16   skiing in control, correct?
17       A.  Yep.
18       Q.  Can you describe the transition from the
19   run Highway onto the cat track where you skied it
20   on December 11, 2015?
21       A.  It's pretty abrupt.  I don't know the
22   exact slope angle, but it's significant.  And it
23   goes from the slope straight into a flat plane and
24   then back into the slope.
25       Q.  And what happened when you got over to

Page 75

1    the crowd of people near the circle that you drew
2    on Exhibit 60?
3        A.  I observed several ski patrollers, I
4    think five or six, and some onlookers.  As I got
5    closer I saw that there was a patient and patient
6    was wearing the coat that I remember John wearing.
7    So I realized it was John they were treating as I
8    got closer.
9        Q.  And did you speak with anybody at that
10   location?
11       A.  Most of my interaction on that day was
12   with a ski patroller named Scott Patch who was
13   skiing down to the ski patrol base area with me and
14   helped me collect the belongings John lost in the
15   accident.  So primarily I spoke with one man, Scott
16   Patch.
17       Q.  Do you remember speaking with anyone
18   other than Scott Patch?
19       A.  One of the patrollers asked me if I knew
20   the patient and I said yes.  That might have been
21   Scott, that might have been a different patroller.
22       Q.  You don't recall who it was?
23       A.  I don't recall.
24       Q.  What do you remember discussing with
25   Scott Patch?

Page 76

1        A.  He asked if I was his friend or perhaps
2    if we'd been skiing together and I said yes, we'd
3    been skiing together.  I think he probably asked if
4    I was okay and then we started gathering like
5    John's goggles and he probably gave me just general
6    updates on what they were doing with his care.
7        Q.  Do you remember anything else that you
8    said to Mr. Patch or he said to you?
9        A.  We continued talking after we got to the
10   base area.  He helped me charge my phone so I could
11   make calls to John's employer and later his dad.
12   So we interacted probably over the course of a half
13   an hour, maybe an hour.
14       Q.  Did you ski together down to the base
15   area?
16       A.  Yes.
17       Q.  And did you ski to the first aid room?
18       A.  I think just outside of it.
19       Q.  At some point you filled out a witness
20   statement card; is that right?
21       A.  Yes.
22       Q.  Where was it when you -- where you
23   filled out the witness statement?
24       A.  That happened somewhere near the ski
25   patrol base area.

19 (Pages 73 to 76)

AMANDA EGGERT

Page 77

1  Q. Okay. And how did you fill out the
2  witness statement?
3  A. With an ink pen.
4  Q. So Mr. Patch handed it to you and just
5  said "Will you please fill this out"?
6  A. Yes.
7  (Whereupon, Deposition
8  Exhibit Number 61 was
9  marked for identification.)
10 BY MR. McINTOSH:
11 Q. I'm going to hand you what has now been
12 marked as Exhibit 61. Do you recognize Exhibit 61?
13 A. Yes.
14 Q. And is that the witness statement that
15 you completed?
16 A. Yes.
17 Q. And that's a two-sided document,
18 correct?
19 A. Yes.
20 Q. And this writing in blue, this lighter
21 blue, is that all your writing?
22 A. Yes.
23 Q. How about on the bottom of the second
24 page where it says Scott Patch and then has a
25 signature and a date and John -- and it says John

Page 78

1  Meyer, is that your writing or Mr. Patch's?
2  A. The writing in black is Mr. Patch's or
3  at least it's not mine.
4  Q. And were you honest when you were
5  completing this witness statement?
6  A. Yes.
7  Q. And were you trying to be as truthful
8  and accurate as you could being?
9  A. Yes.
10 Q. And is that your signature on the second
11 page of Exhibit 61?
12 A. Yes.
13 Q. And you wrote down 11:15 a.m., 12-11-15;
14 is that correct?
15 A. Yes.
16 Q. Is that what time you completed the
17 witness statement?
18 A. Presumably so. I can't think of any
19 reason I would have misrepresented the time.
20 Q. Under -- on the first page it says "Any
21 irregularities of the scene noted" and you wrote
22 "goggles broken," is that right?
23 A. Yes.
24 Q. What did you mean by goggles broken?
25 A. Just that in that -- I think what I

Page 79

1  meant was in that early stage of the day before I
2  really knew the extent to his injuries, it was
3  clear I was concerned that it had been significant
4  force because his goggles were in two pieces and
5  they were pretty far from where he was being
6  treated so I assumed there had been some force.
7  Q. And then on the next line it says
8  "Describe the trail/snow conditions at the scene"
9  and you wrote in "Rocks"?
10 A. Yes.
11 Q. Why did you write rocks?
12 A. Um, well, presumably because there were
13 rocks at the scene and though I didn't hit any
14 rocks that I recall that day, they were definitely
15 in abundance in the terrain around the Challenger
16 lift.
17 Q. That's pretty common for early season
18 Challenger at Big Sky, correct?
19 A. Yes.
20 Q. Do you contend that the rocks near the
21 scene that you're describing in Exhibit 61 had
22 anything to do with Mr. Meyer's ski wreck?
23 A. I didn't see it so I couldn't say. But
24 in the letter that I wrote to him I said "I think
25 that you lost control uphill of the cat track -

Page 80

1  possibly by hitting a tree or rock - and hit the
2  downhill lip of the cat track with some speed."
3  Q. What you're referring to is Exhibit 57?
4  A. Yes.
5  Q. And where did you write that in Exhibit
6  57?
7  A. That is the second paragraph of the
8  third page.
9  Q. And that's the paragraph that starts out
10 with "This is what I think"?
11 A. Yes.
12 Q. And then you wrote "I think you lost
13 control uphill of the cat track - possibly by
14 hitting a tree or rock," correct?
15 A. Yes, I wrote that.
16 Q. Why did you think that? Why did you
17 think that Mr. Meyer lost control uphill of the cat
18 track?
19 A. Because given his position below the cat
20 track and the injuries he sustained, I think he
21 probably was traveling fast and I think his skis
22 likely lost contact with the snow. Given the
23 terrain, I think all of those things worked
24 together.
25 Q. And you wrote Exhibit 57 six days after

20 (Pages 77 to 80)

AMANDA EGGERT

Page 81

1    Mr. Meyer wrecked and was injured, correct?
2        A.  Yes.
3        Q.  First of all, do you still have the
4    electronic file that you wrote 57 on?
5        A.  Yes.
6        Q.  In other words, is it like in a Word
7    document already on your computer?
8        A.  Yes.
9        Q.  And are you willing to produce that in a
10   native format?
11       A.  Meaning?
12       Q.  Meaning just give us the electronic file
13   instead of just printing it out?
14       A.  I'd like to speak with Nadine more about
15   that.  It's quite personal and not all of it has
16   bearing to the case.
17       Q.  I understand, but you agree that Exhibit
18   57 is directly relevant to the case, correct?
19       A.  Yes, this entry is.
20       Q.  And that's why you produced it to us,
21   correct?
22       A.  Yes.
23       Q.  And can you give us this, the electronic
24   version of this entry?
25       A.  Yes.

Page 82

1        Q.  We can talk about the rest on a break,
2    okay?
3        A.  Okay.
4        Q.  So going back to the second full
5    paragraph on page 3 of Exhibit 57 where you say
6    "This is what I think," is this still what you
7    believe happened, what you wrote in this paragraph?
8        A.  No.  I've learned more since then.  I
9    don't think that he necessarily hit the log.  He
10   might have but I -- I think that perhaps he was
11   repositioned during his treatment or somehow moved
12   that might have changed the log's relationship to
13   his crash.  So to answer your question, I don't
14   know that the log was involved, that it impacted
15   the log.
16       Q.  Okay.  I guess I should have been more
17   specific with my question.  Your description that
18   you have right here of how Mr. Meyer came to wreck,
19   you say "I think that you lost control uphill of
20   the cat track - possibly by hitting a tree or
21   rock - and hit the downhill lip of the cat track
22   with some speed.  Once you hit that lip, you
23   probably turned ass-over-teakettle in the air, and
24   landed right on the fucking log."  Other than the
25   log portion, is this still what you believe

Page 83

1    happened in Mr. Meyer's ski wreck?
2        A.  Yes.
3        Q.  Let's go off the record for just a
4    second.
5            (Whereupon, a lunch
6            recess was taken.)
7        MS. NADOW:  So to begin with, I wanted to
8    apologize for recording without your permission.
9    That was unintentional.  I thought I had mentioned
10   it and then when you had called me out on it I
11   realized that I had only mentioned it to her.  So I
12   apologize, and I'd like that to be on the record.
13       Secondly, about the documents that you
14   asked for, I was unaware of them.  And having seen
15   them, I want to do my due diligence and look over
16   them.  So I'm not going to provide them to you
17   today, but I will get them to you as soon as I look
18   at them and see if they're appropriate for the
19   case.
20       MR. McINTOSH:  Okay.  And just to be clear
21   though, you don't represent Ms. Eggert, you
22   represent Mr. Meyer, correct?
23       MS. NADOW:  Yes, but I would still like to
24   see the documents.
25       MR. McINTOSH:  Okay.  Well, you know,

Page 84

1    obviously we requested them for today and so we'll
2    just reserve the right to, if we need to, reopen
3    the deposition.
4        MS. NADOW:  And we accept that, thank you.
5        MR. McINTOSH:  Okay.
6    BY MR. McINTOSH:
7        Q.  Okay.  Ms. Eggert, you ready to keep
8    going?
9        A.  I am.
10       Q.  You understand, of course, that you're
11   still under oath, right?
12       A.  Yes.
13       Q.  Okay.  So a couple -- just one area to
14   clean up real quick, can you look at Exhibit 24
15   again?  You still have that in front of you?
16       A.  Yes.
17       Q.  And Exhibit 24, you know, we've been
18   using the terms "looker's" right and "skier's
19   right."  If we're looking at this picture, this
20   is looking downhill on the Highway -- or excuse me,
21   the run Highway, correct?
22       A.  Correct.
23       Q.  And if we're talking about skier's
24   right, that would be on the right-hand side of this
25   photograph, correct?

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

AMANDA EGGERT

Page 85

1      A.  Correct.
2      Q.  And then if you're talking about
3   looker's left, looker's left would be skier's
4   right, correct?
5      A.  Correct.
6      Q.  Okay.  So I think we left off, you were
7   telling us that you went down to the base area with
8   Scott Patch and that's when you filled out your
9   witness statement, correct?
10      A.  Yes.
11      Q.  What happened after that?
12      A.  I started making calls.
13      Q.  And first of all, did you know Scott
14   Patch before this incident?
15      A.  No.
16      Q.  Okay.  Who did you start calling?
17      A.  I wanted to make contact with his father
18   but I had no idea how to reach him.  I knew the
19   name of his employer, so I searched for Wild Earth
20   Guardians in Missoula and I spoke with his coworker
21   Bethany there.  She tracked down his emergency
22   contact information and then I called his father.
23      Q.  How did you know to call his father?
24      A.  His mom died many years prior to that
25   and it seemed the appropriate thing to do.

Page 86

1      Q.  Okay.  And so his employer gave you the
2   contact information for his father; is that right?
3      A.  Yes.
4      Q.  And you called his father?
5      A.  Yes.
6      Q.  And what did you say to his father?
7      A.  That his son had been in a ski accident,
8   that it was very serious and he was in transit to
9   either the Bozeman hospital or the Billings
10   hospital, that they would likely decide that
11   in-flight, that he should think about booking a
12   ticket to Montana.
13      Q.  Anything else that you told him?
14      A.  Just basic orienting details, that I had
15   been skiing with him that day, that it looked very
16   serious.
17      Q.  Did you tell him how the ski wreck
18   occurred?
19      A.  I don't think I did in any detail.
20      Q.  Okay.  And then what else did you do
21   during that day?
22      A.  I called my twin sister and at some
23   point I talked to her.  It was probably when I was
24   still on the mountain.  I called my boss and
25   Joe O'Connor at Outlaw and told him that there had

Page 87

1   been an accident and I was pretty shaken up.  I
2   think he offered to just let me have the afternoon
3   off.  I can't recall if I asked or if he offered to
4   give me the afternoon off work, but we decided that
5   I wasn't going to work that afternoon.
6      Q.  That you were not going to work?
7      A.  Correct.
8      Q.  Okay.
9      A.  And then I think I also had a
10   conversation with Steve Emerson, the medical
11   director of the patrol.  He was most familiar with
12   John's condition and the likely care he would
13   receive.  So we stayed in contact for the next
14   several days.  I think he offered to find me a ride
15   to my house or maybe even all the way to Billings
16   just knowing that I was upset.
17      Q.  How did you -- how were you in touch
18   with Steve Emerson over the next few days?
19      A.  I think it was all over text and phone
20   call.  It might have just been phone call.
21      Q.  Do you still have those texts?
22      A.  I don't think I do.  I looked for him
23   the other day in my phone and he didn't pop up as a
24   contact, so I don't think I do.  I can look.
25      Q.  Could you just check real quick, please?

Page 88

1      MS. NADOW:  Can we do that during a break
2   rather than now?  We can come back to that.
3      MR. McINTOSH:  If it won't take too long, I'd
4   rather just get it done.
5      MS. NADOW:  Why don't we wait until the break
6   and we'll do that.
7      MR. McINTOSH:  No, I mean since we're on the
8   subject.
9      MS. NADOW:  We'll come back to the subject
10   later.  Let's just -- or maybe we take a break now.
11      MR. McINTOSH:  Okay.  If you'd like to take a
12   break now and do it, go ahead.
13      MS. NADOW:  Okay.  Let's do that.
14      (Whereupon, a brief
15      recess was taken.)
16   BY MR. McINTOSH:
17      Q.  Ms. Eggert, we're back on the record.
18   You understand you're still under oath?
19      A.  Yes.
20      Q.  And did you check your phone during the
21   short break we just had?
22      A.  I did.
23      Q.  And did you find any messages you had
24   with Steve Emerson?
25      A.  I did.

22  (Pages 85 to 88)

AMANDA EGGERT

Page 89

1    Q.  Can you receive those?
2        MS. NADOW:  Can I request that -- there's a
3    few messages on there and I didn't have time to
4    look at them all.  And if we can submit that again
5    with the other information as soon as possible when
6    we've reviewed it.
7        MR. McINTOSH:  Well, no, I object to that
8    because I mean this is specifically part of the
9    subpoena and it's actually messages that she has
10   had with an employee of my client.  So this is my
11   opportunity to -- the information is here right now
12   and we are entitled to the information per the
13   subpoena.
14       MS. NADOW:  Would it be easier though if we
15   printed it for you so that you could have a hard
16   copy of it rather than her reading through whatever
17   many text messages that there were?
18       MR. McINTOSH:  No, not really.  It would be
19   easier if we could just look at the messages right
20   now and go through them.
21       MS. NADOW:  You want her to read through all
22   of the messages?
23       MR. McINTOSH:  Between her and Steve Emerson,
24   yes.
25       MS. NADOW:  I would like to request that we

Page 90

1    have an opportunity to print them out and hand them
2    to you.
3        MR. McINTOSH:  I understand that and I'm
4    saying we've subpoenaed it, we're here, I want to
5    ask her about them now, so.  And in addition, it's
6    inappropriate for you to instruct a third-party
7    witness what to do because you don't represent the
8    witness.  So we are entitled to this information.
9    And you're interfering with the subpoena by saying
10   you won't provide this information right now.
11       MS. NADOW:  Okay.  Why -- could you ask her
12   questions about what she remembers from it and
13   after her reviewing it more carefully and supplying
14   you the information, we can have a second
15   deposition in which you can discuss it further?
16       MR. McINTOSH:  No, I really just want to have
17   her go through what did Steve Emerson say to you,
18   what did you say back.  Why can't she just read the
19   texts into the record?  This is conversations with
20   an employee that I represent.  There's clearly no
21   privilege.  There's no reason that it just can't be
22   read into the record.
23       MS. NADOW:  Okay.
24       THE WITNESS:  Most of these communications
25   are from several months afterwards.

Page 91

1    BY MR. McINTOSH:
2        Q.  Could you just show me what you're --
3        A.  I am.
4        Q.  When do these communications
5    that -- well, first of all, let me clear up the
6    record.  What you're showing me now are text
7    messages that you have back and forth with Steve
8    Emerson; is that correct?
9        A.  Yes.
10       Q.  And are these all of the communications
11   you had with Steve Emerson or just some of them?
12       A.  These are all of the recorded
13   communications.  He and I interacted via phone.
14       Q.  Okay.  And when did your interactions
15   start?
16       A.  Well, we spoke over phone in the weeks
17   after John's accidents -- accident.  I gave him
18   progress reports.  And these text messages began
19   February 4th, 2016.
20       Q.  Okay.  And there's a green message that
21   starts on your text or your phone; is that correct?
22       A.  Yes.
23       Q.  Is that you or is that Steve Emerson?
24       A.  That is me.
25       Q.  Okay.  What did you say?

Page 92

1        A.  "Hi, Steve, Amanda Eggert here.  I went
2    to Missoula last weekend to visit John and he asked
3    that I bring you some treats.  Are you about on the
4    mountain this afternoon or tomorrow around
5    lunchtime?"
6        Q.  And did he respond?
7        A.  He said, "Hi.  I am on the summit at the
8    moment.  Back in first aid room around 2.  Thanks."
9        Q.  And did you respond to that?
10       A.  I said, "Ok, I'll come in a half hour or
11   so."
12       Q.  Was there another message after that?
13       A.  Yes, that was the end of our
14   correspondence for February 4th.
15           March 18th I texted him again, "Hi
16   Steve.  I got John back to Big Sky.  He said he'd
17   like to swing by the mountain and meet you guys.
18   Is there a good time today to come by and say hi to
19   the patrollers who helped him out?  Hope you're
20   doing well."
21       Q.  Did he respond?
22       A.  March 18th -- yes.  Later that day he
23   said, "Hi.  Tomorrow work?  If so, I have a plan."
24           I responded, "We're actually headed out
25   of town in a bit here but he'll probably be back

AMANDA EGGERT

Page 93

1 before the season ends.
2      Also, still March 18th, "Sorry. I was
3 out of our resort boundary this afternoon and
4 didn't get your message. Hope it works out before
5 the season is over. I would like to meet John and
6 introduce you both to the patrol."
7      I replied, "No worries. He would like
8 to meet you guys too. I'll try to give you more of
9 a heads up next time, we'll figure it out."
10      He replied, "Sounds good. Thank you."
11      Next correspondence starts April 7th,
12 "Hi Steve, John and I were planning to come and say
13 hello to you guys tomorrow. You all gather at 8 at
14 the first aid room, yes? Does that work for you?"
15      He replied, "Our meeting is in the
16 mammoth room upstairs in the mountain mall at 8.
17 That works. Look forward to introducing you both
18 to the crew."
19      I replied, "Likewise. See you there
20 tomorrow."
21      Also April 7th wrote, "Please come a
22 little early. The meeting starts right at 8. 7:45
23 or 7:50 is great."
24      I replied, "Yes, we'll do."
25      April 8th, this was the day after we met

Page 94

1 the patrollers. "Very cool to see John this
2 morning." Must have been the day of, okay. He
3 wrote, "Very cool to see John this morning. Great
4 to finally meet him in person. A couple patrollers
5 who missed the meeting would like to meet him
6 sometime." He also wrote, "Congratulations. Very
7 happy for you both. See you at the race. If John
8 needs a lift ticket I will bring one for him."
9      **Q. Do you know what he was saying**
10 **congratulations for?**
11      A. Yes, we recently became engaged and I
12 think John shared that news when he met with the
13 patrollers.
14      **Q. Thank you. Is that all of the messages**
15 **with Steve Emerson?**
16      A. No, there's a few more.
17      This is also April 8th. My reply,
18 "Thank you! Yes, great to come by and say thank
19 you. Thank you much for helping with the lift
20 ticket -- that would be great. It would be good to
21 catch the other couple patrollers and say thanks in
22 person, too."
23      April 22nd, "Hi Steve, hope you are
24 doing well and getting a bit of a break after a
25 busy season. Thanks for helping with access to

Page 95

1 Shedhorn. Good race, good day on the mountain.
2 The story's up online and in this week's Explore
3 Big Sky. I emailed Casey and Noah some photos that
4 John and I took." There's a link to the story I
5 wrote. Then it says, "John thinks his tech
6 bindings might have pre-released and he's trying to
7 track down the accident report. I met the woman
8 with patrol who prepared it but can't remember her
9 name. Do you have her contact info or a copy of
10 the report you can send to John?"
11      May 4th I wrote, "Hi Steve, hope you're
12 doing well. Any luck tracking down that accident
13 report?"
14      May 4th wrote, "Hi. Am traveling.
15 Back to work next Wednesday and will follow up."
16      May 10th he wrote, "Any progress?"
17      May 10th I replied, "Not yet -- shall I
18 have John give you a call Wednesday? Thursday?"
19      May 10th he replied, "Going up tomorrow.
20 I will see what I can find and call you with how to
21 proceed."
22      I replied, "Sounds good. Thanks much."
23      Next communication starts August 3rd,
24 2016. "Hi Amanda. Hope summer is treating you
25 well. Apparently Outlaw was loaned some of our

Page 96

1 patrol radios for PBR. Can you help me get them
2 back? Thanks, Steve."
3      I replied, "Yes, we can certainly figure
4 that out. We're seeing who's available to run them
5 up the mountain today. The editorial team goes to
6 press today, so we're tracking down our event and
7 distribution guys to see if they can do it. Hope
8 your summer is going well, too."
9      He wrote, "Perfect. Yes, lots of great
10 mountain biking and Stillwater trips this summer.
11 Thanks for your help. Probably see you here for
12 the Rut events."
13      I replied, "Sounds like Ersin is
14 coordinating with Bob Dixon to get those back to
15 you guys. Glad you've been able to get out on the
16 water and trails."
17      He replied, "Bob handed it to me on his
18 way out yesterday evening. He is gone for a few
19 days."
20      I said, "Ok, I'll pass along your
21 contact info to Ersin."
22      He said, "Thank you." And that is the
23 end of our correspondence.
24      **Q. And could I just look at that real quick**
25 **to make sure that that was read correctly?**

24 (Pages 93 to 96)

AMANDA EGGERT

Page 97

```
 1      A.  Yes.
 2      Q.  And what you just read was all of your
 3  texts back and forth with Steve Emerson?
 4      A.  Yes.
 5      Q.  Do you have any text communications with
 6  any other Big Sky ski patrollers?
 7      A.  I can -- I might with Evi Dixon, but I'm
 8  not certain.  Yes, just a short series of
 9  communications with Evi Dixon.
10      Q.  Can you read those in the record as
11  well?
12      A.  Yeah.
13      Q.  Starting from the first one.  Can you
14  just, the way you did before, give us the date and
15  the back and forth?  Thank you.
16      A.  September 6th, 2016.  "Hi Evi, Amanda
17  Eggert here.  Are you available for a cranio-sacral
18  session tomorrow afternoon?  I'm headed into
19  Bozeman after a late morning meeting wraps up."
20          She replied, "I am sorry Amanda but I am
21  going to the Big Sky Farmers Market every Wednesday
22  with my Alpaca booth."
23          I said, "That's right, I forgot about
24  that.  No worries, we'll figure out another time."
25          She replied, "And please remember that I
```

Page 98

```
 1  will be gone next week.  Should be back by
 2  Saturday."
 3          On October 1st, 2016 an address "3180
 4  Curtis Lane, Manhattan, Montana."
 5          I replied, "Great, see you tomorrow at
 6  3."
 7      Q.  Is that -- that's Ms. Dixon's address,
 8  is that your understanding?
 9      A.  Yes.
10      Q.  And did you go to her house?
11      A.  Yes.
12      Q.  With Mr. Meyer?
13      A.  No, I don't think he was there.  I think
14  it was just me.
15      Q.  And why were you going to Ms. Dixon's
16  house?
17      A.  She does a form of therapy called
18  cranio-sacral therapy.  It's like a massage.  I was
19  receiving a treatment.
20      Q.  Okay.  And those are the only text
21  communications you've had with any Big Sky ski
22  patrollers?
23      A.  Correct.
24      Q.  Have you had e-mail communication with
25  any Big Sky ski patrollers?
```

Page 99

```
 1      A.  For work I communicated with the Rut
 2  event -- or, sorry, the -- not the Rut.  It's the
 3  winter race.
 4      Q.  Shedmo?
 5      A.  Shedhorn, right.  The Shedhorn Skimo.
 6  Yeah, for work I communicated with the organizers
 7  of the Shedhorn Skimo race via e-mail.  That was
 8  all through my Outlaw e-mail account that I don't
 9  have access to anymore.
10      Q.  Have you had any other communications
11  with any ski patrollers in, no matter what the
12  medium is, about John Meyer's accident or his
13  recovery or anything at all related to his
14  injuries?
15      A.  John has a couple friends who are former
16  patrollers who he's spoken with about the accident.
17  I don't think I've had any conversations with those
18  people though.
19      Q.  Okay.  Can you look at Exhibit 26 there
20  in front of you?
21      A.  (Witness complies.)
22      Q.  And do you see the paragraph that's
23  highlighted near the bottom, it starts with "A law
24  professor once told me"?
25      A.  Uh-huh.
```

Page 100

```
 1      Q.  Is that a yes?
 2      A.  Yes, I see it.
 3      Q.  And do you understand that this is an
 4  e-mail written by John Meyer?
 5      A.  Yes.
 6      Q.  And Mr. Meyer says, "The day of my
 7  accident I was skiing fast, no question about it.
 8  But if there had been a fence or markers in front
 9  of the cat track I hit, I never would have been
10  skiing that fast."  Did I read that correctly?
11      A.  Yes.
12      Q.  And have you seen this e-mail before?
13      A.  I don't think so.
14      Q.  Do you agree that if Mr. Meyer had not
15  been skiing so fast his accident would not have
16  occurred?
17      A.  I can't say for certain how fast he was
18  skiing immediately before the accident.  So I
19  can't --
20      Q.  You don't know one way or the other?
21      A.  -- say definitively.
22      Q.  Do you agree that skiers have to accept
23  personal responsibility for their actions on the
24  ski hill?
25      A.  I think that's accurate within bounds.
```

25 (Pages 97 to 100)

AMANDA EGGERT

Page 101

1   For instance, if a poorly maintained ski lift
2   breaks down and injures people skiing below it, for
3   instance, I don't think that falls on the skier.  I
4   think that would fall on the resort.
5       Q.  Do you agree that if a skier runs into a
6   plainly visible hazard, that it is the skier's
7   fault?
8       A.  I think there's more nuance to it than
9   that.  For instance, if I ski into a tree but
10  somebody ran into me before I hit the tree, I
11  wouldn't still say it's my fault.
12      Q.  Okay, understood.  Look at Exhibit 24 in
13  front of you.
14      A.  (Witness complies.)
15      Q.  Down near the bottom of this slope just
16  above the cat track there are a number of large
17  bushes, do you see those?
18      A.  Sorry, where are you indicating?
19      Q.  The bushes above the cat track.
20      A.  I do see those.
21      Q.  There's like sort of three larger clumps
22  of bushes, right?
23      A.  Yes.
24      Q.  Now if there were no other skiers on the
25  slope and a skier just runs into those, you would

Page 102

1   agree that's the skier's fault, right?
2       A.  Yes, with caveats.  There are other
3   things that could be at play, equipment
4   malfunctions.  I don't think it's that black and
5   white.
6       Q.  What else could there be that would not
7   make it the fault of the skier?  You mentioned
8   equipment malfunction, is there anything else you
9   can think of?
10      A.  Just generally uncontrollable variables
11  like other skiers on the mountain, outside of ones
12  direct control.
13      Q.  Okay.  Do you agree that Mr. Meyer's
14  actions contributed to his ski wreck?
15      A.  Yes.
16      Q.  Do you agree that Mr. Meyer's negligence
17  contributed to his ski wreck?
18      A.  I think we'd have to be specific about
19  what you mean by negligence.
20      Q.  Well, what does it mean to you?
21      A.  I would define it as something like an
22  outright disregard for one's personal health and
23  safety or the personal health and safety of
24  another.
25      Q.  Okay.  Using that definition, do you

Page 103

1   agree that Mr. Meyer's negligence contributed to
2   his ski wreck?
3       MS. NADOW:  Objection, conclusions of law.
4       MR. McINTOSH:  Go ahead, you can answer.
5       MS. NADOW:  You can answer.
6       THE WITNESS:  No.  When I described the ski
7   accident to friends and family afterward, I didn't
8   say he was skiing negligently.  I acknowledged he
9   was skiing fast but I didn't indicate that he was
10  negligent in his actions that day.
11  BY MR. McINTOSH:
12      Q.  What else did you say when describing
13  this accident to friends and family other than
14  Mr. Meyer was skiing fast?
15      A.  Mostly I described his injuries.  I
16  talked about some of the weird coincidences
17  involved, for instance, the fact that we had been
18  talking about helmets and health care immediately
19  prior to the accident.  That was about the extent
20  of it.
21      Q.  Okay.  So you would just tell friends
22  and family that Mr. Meyer was skiing fast and he
23  wrecked and he was seriously injured?
24      A.  In some conversations I didn't even
25  mention that he was skiing fast, just that he was

Page 104

1   in a very serious ski accident.
2       Q.  Did you say anything else about the
3   cause of the accident to friends and family that
4   you can recall?
5       A.  I was asked about specifics pretty
6   frequently and I almost always said I didn't see
7   the actual accident so I'm not the best source of
8   information about what exactly led to him landing
9   in a heap at the bottom of the slope.
10      Q.  Did you ever blame Big Sky when
11  describing the cause of the accident?
12      A.  Not initially.  Later as I came to think
13  about it more and the lawsuit progressed, I did
14  start thinking a little bit more critically about
15  the role of a more than mile long cat track carved
16  out of the middle of a mountain.  But initially, I
17  did not.
18      Q.  So let me just see if I understand this
19  correctly.  So before this lawsuit was filed you
20  never blamed Big Sky when describing the cause of
21  the accident to friends and family; is that right?
22      A.  That's correct.  Though I would --
23      Q.  And you said -- I'm sorry, go ahead.
24      A.  -- also say early season conditions came
25  up frequently in my conversations.

26 (Pages 101 to 104)

AMANDA EGGERT

Page 105

1        Q.  And what do you mean when you say "early
2   season conditions came up"?
3        A.  Rocks, lack of cover, trees.
4        Q.  Do you think Big Sky should just close
5   the mountain when there's early season conditions?
6        A.  I don't think they should close the
7   whole mountain.  I think it's appropriate to open
8   the areas that are suitable for skiing.  I think
9   that's standard practice among ski areas in the
10  state.
11       Q.  And you obviously thought this area was
12  suitable for skiing because you went there three
13  times in a row, right?
14       A.  What's the question?
15       Q.  You obviously thought this area was
16  suitable for skiing because you went there three
17  times in a row, correct?
18       A.  I could see how it could be interpreted
19  that way.
20       Q.  You agree that Mr. Meyer could have
21  skied slower as he approached the cat track,
22  correct?
23       A.  I don't know how fast he was skiing so I
24  can't really answer that.
25       Q.  Well, you did see him skiing shortly

Page 106

1   before the accident, correct?
2        A.  I did.
3        Q.  And you said he was skiing fast, right?
4        A.  Yes.
5        Q.  And he could have been skiing slower,
6   right?
7        A.  Presumably, so.  But again, I -- I
8   didn't see if he made turns prior to hitting the
9   cat track.  I don't know if he was trying to slow.
10  I just can't say.
11       Q.  The speed at which he was skiing, that
12  was his choice, correct?
13       A.  Yes.
14       Q.  Did you talk to Mr. Meyer about filing
15  this lawsuit before it was filed?
16       A.  Yes.
17       Q.  And what specifically did you discuss
18  with Mr. Meyer about filing the lawsuit?
19       A.  We talked about the fact that it would
20  complicate my professional life given how small Big
21  Sky is.
22       Q.  Anything else?
23       A.  We talked about his plan for a
24  settlement, if it was made what would happen with
25  the award amount and we talked about his

Page 107

1   conversations with Taylor Middleton prior to filing
2   the lawsuit.
3        Q.  Can you provide any more details about
4   those things that you just mentioned?
5        A.  From the beginning I think he had a
6   clear understanding that if he was awarded any
7   money as a result of this lawsuit it would be set
8   aside for ski patrollers to receive health care.
9   Um, regarding his conversations with Taylor
10  Middleton, I was aware that they had coffee in
11  Bozeman and discussed health care for employees.
12  That's about the extent of what I recall from his
13  conversations with Taylor Middleton.
14       Q.  Before he filed the lawsuit, did you
15  ever discuss with John Meyer his chances of winning
16  the lawsuit?
17       A.  I don't know if we ever talked about it
18  directly.
19       Q.  Go back to Exhibit 26, please.
20       A.  (Witness complies.)
21       Q.  This message that John Meyer wrote on
22  November 17 at 12:30 p.m. -- first of all, did you
23  help him prepare this message?
24       A.  No.
25       Q.  Did you read it before he sent it?

Page 108

1        A.  I don't think I did.
2        Q.  In the last sentence of the entire
3   e-mail or post, whatever it is, he says, "Of
4   course, I might lose the case but I'd only be out
5   some time," do you see that?
6        A.  I do.
7        Q.  Did you discuss with Mr. Meyer that he
8   might lose this case?
9        A.  Since he devoted so much time to it, I
10  would be surprised if we didn't discuss potential
11  outcomes because he's put significant resources
12  into it.  But I can't recall specific conversations
13  we've had around it.
14       Q.  Okay.  Did you discuss with Mr. Meyer
15  him using his position as an attorney and the
16  threat of litigation to get health insurance for
17  employees that he did not represent?
18       A.  When he was speaking with Taylor
19  Middleton I knew he had discussed health care for
20  the employees.  I don't think I knew that barring
21  Mr. Middleton's agreement to move in that direction
22  he would pursue a lawsuit.
23            (Whereupon, Deposition
24            Exhibit Number 62 was
25            marked for identification.)

27 (Pages 105 to 108)

Page 109

1 BY MR. McINTOSH:
2    Q. I want to hand you what I've now marked
3 as Exhibit 62. Well, first of all, just tell me
4 what is Exhibit 62?
5    A. This is my resignation letter to Outlaw
6 Partners.
7    Q. And it says "Dear Eric," who is Eric?
8    A. He is the CEO of Outlaw Partners and the
9 publisher of Explorer Big Sky newspaper.
10    Q. What is his last name?
11    A. Ladd, L-A-D-D.
12    Q. And about three quarters of the way down
13 that first page I highlighted a paragraph for you,
14 correct?
15    A. Yes.
16    Q. In the first sentence of that paragraph
17 you say, "John's decision after his accident to
18 chase down Big Sky Resort is not one I would have
19 made." Is that correct?
20    A. Yes.
21    Q. First of all, when did you write this
22 letter to Mr. Ladd?
23    A. This would have been December 22nd,
24 2017.
25    Q. So right after John Meyer filed a

Page 110

1 lawsuit?
2    A. Within one or two weeks.
3    Q. And what did you mean when you said
4 "John's decision after his accident to chase down
5 Big Sky Resort is not one I would have made"?
6    A. Just that if I were in his position I
7 probably wouldn't have filed a lawsuit.
8    Q. Why?
9    A. Oh, I don't enjoy confrontation.
10 Lawsuits are long, drawn out, unpleasant things and
11 I know that the skier responsibility code or
12 something to that effect would make for a
13 challenging lawsuit.
14    Q. And Mr. Meyer knew that before he filed
15 the lawsuit, correct?
16    A. Maybe.
17    Q. Did you -- I'll say, did you discuss
18 that with Mr. Meyer, that Montana law would make
19 his lawsuit challenging at best?
20    A. That's probably something he actually
21 was more aware of than I, but it's likely we
22 discussed it.
23    Q. In the last sentence of that paragraph
24 that I highlighted you said, "But I have never, not
25 for a single second, doubted that the entirety of

Page 111

1 any award or settlement he gets -- if there is
2 one -- would go toward the people who saved his
3 life." Do you see that?
4    A. I do.
5    Q. And are you aware that Mr. Meyer has
6 made demands on both of the defendants in this case
7 for money that would go directly to him?
8    A. I am aware that though the way John and
9 I have talked about it has more to do with a
10 countersuit filed by Crowley Fleck and his suit
11 against the countersuit, if I'm using the correct
12 terminology. In his mind it's bifurcated.
13    Q. Were you done?
14    A. Uh-huh.
15    Q. Is that a yes?
16    A. Yes.
17    Q. But that's not true though, is it? Even
18 before he filed the lawsuit he was making demands
19 to Dynafit that they pay him money personally?
20    A. I can't say. I'm less familiar with the
21 Dynafit lawsuit.
22    Q. Okay. Do you claim that this cat track
23 that Mr. Meyer -- either he wrecked above it or he
24 wrecked when he hit it or he wrecked below it, the
25 cat track that Meyer wrecked near, do you claim

Page 112

1 that that cat track should have been marked?
2    A. I'm not an expert on mountain safety but
3 I do believe had it been marked or somehow slowed,
4 orange signage, a way to funnel people to slow
5 down, he probably would have hit it at a slower
6 rate of speed.
7    Q. So then do you agree that if he just
8 wouldn't have been skiing so fast this accident
9 would not have occurred?
10    A. No, I think there's too many variables
11 to paint it so black and white.
12    Q. Please look at Exhibit 25.
13    A. (Witness Complies.)
14    Q. Do you have that photograph in front of
15 you?
16    A. I do.
17    Q. And you agree that's a photograph
18 looking downhill from the Highway ski run towards
19 the area of where Mr. Meyer was found after his ski
20 wreck, correct?
21    A. Yes.
22    Q. And you agree that the cat track is
23 plainly obvious, right?
24    A. From this vantage it is. But again,
25 this is a 2D representation of a 3D mountain.

28 (Pages 109 to 112)

AMANDA EGGERT

Page 113

```
 1        Q.  Well, do you claim that you couldn't see
 2   the cat track as you were skiing down Highway on
 3   December 11, 2015?
 4        A.  I definitely saw it.  It was directly
 5   below my position after I had located my ski and
 6   stepped back into it.
 7        Q.  Was Mr. Meyer going off any jumps before
 8   he wrecked on December 11, 2015?
 9        A.  No, not that I remember.
10        Q.  Have you ever discussed Mr. Meyer's
11   allegation that this cat track should have been
12   marked with any expert?
13        A.  I have not.
14        Q.  Do you know if Mr. Meyer has?
15        A.  I don't know if he has.
16        Q.  Have you ever seen that cat track marked
17   when skiing at Big Sky?
18        A.  Not to my recollection.
19        Q.  And before this lawsuit was filed, did
20   you ever tell Big Sky that that cat track should be
21   marked?
22        A.  No.
23        Q.  Do you recall -- strike that.
24            How many people were around Mr. Meyer
25   when you skied down to him?
```

Page 114

```
 1        A.  There was five or six patrollers and
 2   maybe a handful of bystanders.
 3        Q.  And did you talk to any of those
 4   bystanders?
 5        A.  No.
 6        Q.  It's been reported that a witness named
 7   Tom McMakin witnessed the crash.  Have you ever
 8   spoken with Mr. McMakin?
 9        A.  I have not.
10        Q.  Do you believe -- as we sit here today
11   do you believe that Mr. Meyer even remembers his
12   ski wreck?
13        A.  That's a better question for Mr. Meyer.
14   I can't speak to another person's memory.  It's
15   such an unpredictable thing sometimes, memory.  And
16   I know TBI's can play a big role in how and when
17   and where people remember things.
18        Q.  You agree though that for a long time
19   after December 11, 2015 Mr. Meyer did not remember
20   the ski wreck, right?
21        A.  To my recollection he had little memory
22   of that whole day until months after he got out of
23   the hospital.  I think it came back over time.
24        Q.  And how do you know what came back to
25   him is actually what he remembers versus what
```

Page 115

```
 1   people just told him?
 2        A.  I'm not an expert in memory.  I can't
 3   say how accurate what he knows now or things he
 4   knows now is.
 5        Q.  Okay.  Let's talk a little bit about
 6   your relationship with Mr. Meyer.  Now, the two of
 7   you were not living together in December of 2015,
 8   correct?
 9        A.  Correct.
10        Q.  Tell me how your relationship developed
11   from there?
12        A.  From after the ski accident?
13        Q.  Yes, please.  Because at the time of the
14   ski accident you two weren't even dating, correct?
15        A.  Correct.
16        Q.  Okay.  So how did you go from the date
17   of the ski accident to being married today?
18        A.  I visited him several times at the
19   hospital in Billings and then when he was
20   transferred to the hospital in Missoula for
21   inpatient rehab, I visited him at least once there
22   as well.  I think prior to the accident we both
23   recognized there was a connection so much so that
24   someone we met at the writing conference assumed
25   that we had been dating for years at the time we
```

Page 116

```
 1   had met.
 2            After the ski accident I spent time with
 3   him as a friend invested in his recovery and
 4   eventually it became romantic and we got engaged.
 5        Q.  When did it become romantic?
 6        A.  Like January or early February of 2016.
 7        Q.  And what was Mr. Meyer's condition at
 8   that time?
 9        A.  Physically he was in much better shape.
10   He'd had several surgeries on various specifics
11   from the injury.  He had recovered reasonably well
12   in terms of being able to get out and walk and move
13   around.  Mentally he was still struggling a lot
14   with bouts of being emotional.  He was struggling
15   with his memory.  He became exhausted very easily
16   and felt like his whole mental condition was just
17   sluggish relative to what it had been before the
18   accident.  He had a hard time speaking at length
19   and he couldn't use the vocabulary he had enjoyed
20   prior to the accident for quite awhile after.
21        Q.  When did the two of you start living
22   together?
23        A.  That would have been late spring, either
24   March or April of 2016.
25        Q.  And where were the two of you living
```

29 (Pages 113 to 116)

AMANDA EGGERT

Page 117

1    together?
2        A.  At the residence south of Big Sky, 37315
3    Gallatin Road.
4        Q.  And have you been living together ever
5    since then?
6        A.  Yes.
7        Q.  And how well did you know Mr. Meyer
8    before the accident?  Let me ask it differently.
9    Was the only time that you had spent time with
10   Mr. Meyer prior to the accident at this writers
11   conference that you described?
12       A.  No, we had communicated via text and
13   perhaps also e-mail prior to the December 11th
14   accident.  We had also gone out for dinner once in
15   Bozeman and once in Missoula.
16       Q.  Okay.  So the times that you had been
17   actually physically together prior to December 11,
18   2015 were at this writers conference and then once
19   in dinner in Bozeman and once in dinner in
20   Missoula?
21       A.  There was also a day trip we took to a
22   hot springs outside of Missoula.
23       Q.  Okay.  Any other times you were
24   physically in the same location with Mr. Meyer
25   before December 11, 2015?

Page 118

1        A.  Not that I recall.
2        Q.  Okay.  From your perspective has
3    Mr. Meyer fully recovered from the injuries from
4    his ski wreck?
5        A.  No.
6        Q.  Okay.  Tell me how you believe he has
7    not fully recovered?
8        A.  His lungs still bother him sometimes.
9    He feels like his cardiovascular capacity has
10   diminished.  Right now he still struggles with
11   confidence for things, for sports that before were
12   quite natural for him and came quite easily.  Much
13   of his erratic behavior, especially in the year or
14   two immediately afterward, could be attributed to
15   the ski accident.  I didn't know him as well as his
16   family members but his family has told me that in
17   the years after John did act differently.
18       Q.  Has the erratic behavior subsided or
19   gone away now?
20       A.  It's lessened.  I don't know that it's
21   entirely absolved.
22       Q.  Okay.  So you've told me that
23   Mr. Meyer's lungs still bother him some, that he
24   struggles with confidence with sports, and that he
25   has some erratic behavior although it has lessened.

Page 119

1    Have you told me all of the ways that, from your
2    perspective, he has not fully recovered from his
3    injuries?
4        A.  It was a traumatic injury.  I think
5    there's a lot that comes with being in ICU for so
6    long and having such extensive medical
7    intervention.  So I imagine that's impacted in ways
8    that might not be immediately obvious to me.  I
9    think he still feels like he was a sharper, more
10   psychologically adept lawyer prior to his accident.
11       Q.  Do you believe that the ski wreck is
12   still mentally impairing Mr. Meyer?
13       A.  He still brings it up with me maybe once
14   or twice a month.  He still says he just doesn't
15   think as quickly as he used to.  Since I never seen
16   him in action with his law practice prior to the
17   accident, I can't say for certain how much that has
18   changed.
19       Q.  Okay.  Mr. Meyer still skis and mountain
20   bikes and climbs, correct?
21       A.  He still does all those things.
22       Q.  Do you climb with him?
23       A.  On occasion I do.
24       Q.  Indoors or outdoors?
25       A.  Mostly indoors, a couple times outside.

Page 120

1        Q.  What grade can Mr. Meyer climb?  And I
2    mean currently?
3        A.  Yeah.  Inside he can climb 5.11 minus.
4    Outside he's probably closer to 5.10 minus.
5        Q.  Is that -- well, had you ever climbed
6    with him prior to the accident?
7        A.  I had not.
8        Q.  So do you know if his climbing has been
9    impacted at all by this ski accident?
10       A.  I know that the plate in his arm has
11   bothered him on and off as well as the plate in his
12   collar bone in terms of impacting his stamina or
13   his strength or perceived strength.
14       Q.  What other --
15       A.  He's more --
16       Q.  I'm sorry, go ahead.
17       A.  -- reluctant to really weight his left
18   arm the way he did before I think.
19       Q.  Okay.  What other activities,
20   recreational activities does Mr. Meyer's engage in
21   other than what we've talked about?
22       A.  He runs and hikes.  Very occasionally he
23   ice climbs.
24       Q.  I think I asked you this before, so I
25   apologize if this is a repeat but, you don't know

AMANDA EGGERT

Page 121

1    exactly where Mr. Meyer skied from the run Highway
2    onto the cat track, do you?
3        A.  I don't.
4        Q.  Are you aware of any facts to support
5    Mr. Meyer's claim that Big Sky ski patrol runs out
6    of signs?
7        A.  I recall him talking about an e-mail he
8    received from a patroller indicating as much.
9        Q.  Okay.  Anything else?
10       A.  No.
11       Q.  Do you know any ski patrollers or
12   professional -- or any current or former ski
13   patrollers at Big Sky personally?
14       A.  I have a friend who's a former patroller
15   and an acquaintance who's also a former patroller.
16       Q.  Who are those people?
17       A.  Emily Stifler Wolfe and Pete Harned.
18       Q.  Have you ever spoken with Emily Stifler
19   Wolfe or Pete Harned about Mr. Meyer's ski wreck?
20       A.  I don't think we've talked about it at
21   length, but I'm sure it's come up just because of
22   the large role it's played in my life and our life
23   together, our lives together rather.
24       Q.  Can you provide any more details about
25   the conversations you would have had with either

Page 122

1    Ms. Stifler Wolfe or Pete Harned?
2        A.  I don't think I've ever talked with Pete
3    about John's accident.  John and Pete have
4    definitely spoken about it.  With Emily, I first
5    met her probably four months after the accident, so
6    I imagine I probably just gave her some context and
7    painted a general picture of the extent of his
8    injuries.
9        Q.  Anything else?
10       A.  John and I happen to see her at the
11   airport when we were flying back into the Bozeman
12   airport.  This would have been probably about a
13   year ago.  And I think John mentioned something
14   about his accident then, though I don't recall the
15   details of what they discussed.  It was a brief
16   conversation as we were walking to our car.
17       Q.  Do you remember anything that she said?
18       A.  She had also been injured at Big Sky
19   Resort and she said something to the effect of "I
20   was lucky it happened while I was working otherwise
21   I don't know how I would have afforded the care
22   that followed."  I believe she was referencing some
23   sort of knee injury.
24       Q.  Do you remember anything else that she
25   said?

Page 123

1        A.  I think John might have been trying to
2    gauge her interest in writing a story about the
3    accident and the lawsuit and she politely indicated
4    that she was not interested in writing anything.
5        Q.  Have you ever spoken with any current or
6    former ski patroller about whether or not this area
7    should have been marked?
8        A.  I personally have not.
9        Q.  Has Mr. Meyer, to your knowledge?
10       A.  I don't know if he has or not.
11       Q.  Okay.
12       A.  I'm not sure.
13       Q.  Have you ever discussed with any current
14   or former ski patroller the allegation that Big Sky
15   runs out of signs?
16       A.  I personally have not.
17       Q.  Have you written any articles about
18   Mr. Meyer's ski wreck or his lawsuit?
19       A.  No.
20       Q.  Did you help Mr. Meyer prepare his press
21   release about the lawsuit?
22       A.  No.
23       Q.  So going back to Exhibit 62, did you
24   actually resign from Outlaw or were you fired or
25   how did that separation come about?  Or how would

Page 124

1    you characterize it, is probably the better
2    question?
3        A.  After this story that Sarah Gianelli
4    wrote was pulled, Eric Ladd, the CEO called for a
5    meeting between the editorial team and the
6    executive team the following day.  During that
7    meeting our exchange got to be quite heated and in
8    the course of that meeting I told Eric that I quit.
9        Q.  Why were your interactions becoming
10   heated?
11       A.  I think Eric made the discussion much
12   more personal than it needed to be.  I think he was
13   irresponsible in how he handled the conversation
14   and I think I lost a lot of respect for him as an
15   employee to the point that I no longer wanted to
16   work for him.
17           (Whereupon, Deposition
18            Exhibit Number 63 was
19            marked for identification.)
20   BY MR. McINTOSH:
21       Q.  I'm handing you what has been marked as
22   Exhibit 63.  Is Exhibit 63 a copy of the article
23   written by Sarah Gianelli that you just referenced?
24       A.  Yes.
25       Q.  And just so we're clear, this article

31 (Pages 121 to 124)

AMANDA EGGERT

---

Page 125

1    was never published; is that correct?
2       A.  That's correct.
3       Q.  And you were going to publish it and
4    then Mr. Ladd pulled the article; is that correct?
5       A.  The ultimate call went to my superior
6    Tyler Allen, who was at the time the lead employee
7    of the editorial team.
8       Q.  You said Tyler, what was the last name,
9    Allen?
10      A.  Yes, A-L-L-E-N.
11      Q.  Is that the same person who suggested
12   that you ski the Challenger area on December 11,
13   2015?
14      A.  Yes.
15      Q.  In the second to last paragraph of this
16   article that's now been marked Exhibit 63, there's
17   a quotation from Mr. Meyer and it says, "I was
18   skiing fast the day of the accident but I was in
19   control.  If the ski patrol had been given adequate
20   materials to mark the areas," et cetera, do you see
21   that paragraph?
22      A.  I do.
23      Q.  Do you know where Ms. Gianelli obtained
24   that quotation from Mr. Meyer?
25      A.  She interviewed him.

---

Page 126

1       Q.  Did you put her in touch with him for
2    the interview?
3       A.  I think I gave her his contact
4    information.
5       Q.  How did she conduct the interview if you
6    know?
7       A.  I can't recall.  It was either in person
8    or over the phone.
9           (Whereupon, Deposition
10          Exhibit Number 64 was
11          marked for identification.)
12   BY MR. McINTOSH:
13      Q.  I'm now going to hand you what's been
14   marked as Exhibit 64.  Can you describe to me what
15   Exhibit 64 is?
16      A.  It's a correspondence between myself and
17   two mentors in the journalism industry.
18      Q.  Who are they?
19      A.  Carol Van Valkenburg is a professor of
20   journalism at the University of Montana.  She led
21   my senior, sort of, thesis class and is well versed
22   in journalism ethics.  John Adams is now the
23   publisher and founder of Montana Free Press.
24      Q.  And is John Adams a friend of yours?
25      A.  Yes.

---

Page 127

1       Q.  Is he a friend of Mr. Meyer's as well?
2       A.  They don't know each other very well.
3       Q.  Did you help put Mr. Meyer in touch with
4    John Adams so that the Montana Free Press could
5    publish an article about his lawsuit?
6       A.  No.  To my -- well, to my recollection
7    they've never interacted about the lawsuit.  When
8    John filed for congress, they might have spoken
9    about an interview, but I don't think they ever had
10   any correspondence about the lawsuit.
11      Q.  And just so we're clear, on Exhibit 64
12   all of -- where it says Amanda and then these
13   messages or words below that, that's what you
14   wrote; is that correct?
15      A.  Yes.
16      Q.  And this was on Facebook messages
17   apparently?
18      A.  Yes.
19      Q.  Mr. Meyer has claimed that a -- that
20   when he was talking to a ski patroller the ski
21   patroller encouraged him to file a -- this lawsuit
22   to help them obtain health care benefits, are you
23   aware of that?
24      A.  He mentioned in passing one day a
25   conversation he had with a patroller at a grocery

---

Page 128

1    store in Bozeman.  But I'm not certain if that's
2    the conversation you're referencing.
3       Q.  Have you ever been with Mr. Meyer when a
4    ski patroller allegedly told him that I wouldn't
5    mind if you filed this lawsuit to get us health
6    care benefits or something like that?
7       A.  I have not been present for that
8    conversation, no.
9       Q.  And have you helped Mr. Meyer promote
10   this lawsuit in any way?
11      A.  No.
12      Q.  Have you helped Mr. Meyer with this
13   lawsuit in any other way?
14      A.  As his spouse I'm sometimes his sounding
15   board.  But in terms of the logistical details of
16   the lawsuit, I have not assisted him.
17      Q.  Have you helped Mr. Meyer write any
18   articles or proof read any articles that he has
19   written about this lawsuit?
20      A.  I don't think he's written any, not to
21   my recollection.  So, no.
22      Q.  Is there anything else about this
23   lawsuit or about Mr. Meyer's ski wreck or his
24   injuries that we haven't discussed here today that
25   you believe is important?

AMANDA EGGERT

Page 129

1      A.  I would just like to say that I knew it
2  would be challenging for me as an editor at Outlaw
3  Partners when he decided to file the lawsuit and
4  that I tried to approach the matter with as much
5  ethical integrity as possible.  I don't think it
6  would have been responsible to ignore it entirely
7  and I tried to minimize my role in how it was
8  reported.
9      Q.  Okay.  Anything else?
10     A.  No.
11     Q.  Thank you, Ms. Eggert.  I think that's
12  all the questions I have right now.  Mr. Condra may
13  have some questions for you.
14     A.  May I take a break?
15     Q.  Of course, yes.
16         (Whereupon, a brief
17          recess was taken.)
18             EXAMINATION
19  BY MR. CONDRA:
20     Q.  Are we ready to go back on the record?
21     A.  Yes.
22     Q.  Okay.  Ms. Eggert, my name is Brad
23  Condra and I represent Salewa USA, LLC.  For
24  purposes of making our record more clear than it
25  might otherwise be, I'm going to refer to Salewa as

Page 130

1  Dynafit; is that fair?
2      A.  Yes.
3      Q.  You understand that Dynafit is the
4  manufacturer of the bindings that your now husband
5  was using on the date of his accident?
6      A.  Yes.
7      Q.  Okay.  And how do you have that
8  understanding?
9      A.  Well, we lived in the same house, so his
10  skis lived where my skis lived and I had a look at
11  them several times.
12     Q.  Okay.  Have you ever spoken with anyone
13  in Dynafit after Mr. Meyer's accident regarding his
14  ski bindings?
15     A.  No, not that I recall.
16     Q.  Have you ever spoken with a man named
17  Drew Sanders?
18     A.  Doesn't ring any bells.
19     Q.  Have you ever spoken with a man named
20  Scott Knight?
21     A.  Not that I recall.
22     Q.  Okay.  When this matter goes to trial,
23  do you intend to hold yourself out to the jury in
24  this case as an expert in ski binding design,
25  maintenance or manufacture?

Page 131

1      A.  No.
2      Q.  Okay.  Prior to your marriage to
3  Mr. Meyer, what did he tell you about his belief
4  that his ski bindings, his Dynafit ski bindings
5  somehow played a role in his accident?
6      A.  We discussed the possibility that they
7  prereleased playing a role in the accident.
8      Q.  If you could, add a little more context
9  to me -- or for me about that discussion.  What did
10  you discuss about the possibility of a prerelease
11  scenario?
12     A.  Can you word it a different way?
13     Q.  Yeah, it's a poor question.
14         Tell me about your conversation with
15  Mr. Meyer about the possibility -- possibility that
16  his bindings prereleased?
17     A.  We talked about the possibility of him
18  ejecting out of his ski with little or no force in
19  a way that would have caused him to lose control.
20     Q.  Did he tell you that he thought he had
21  ejected from his ski using little to no force or
22  was it just probabilities and possibilities that
23  you were talking about?
24     A.  I don't think he knows for certain, so.
25  So I don't think he ever came to a definitive

Page 132

1  conclusion about it.
2      Q.  Are you aware of any facts to support
3  the contention that Mr. Meyer's bindings somehow
4  caused his accident?
5      A.  Yes.  In the last two years maybe I've
6  talked to other skiers who ski Dynafit bindings who
7  have mentioned an unexpected prerelease of the
8  binding.  And I'm also aware of a blog post that
9  was put up by Wildsnow referencing some upgrades
10  that happened to that particular model of binding.
11  John was in contact with the author of that post,
12  but I don't recall the gist of it really.
13     Q.  Anything else?
14     A.  The question one more time?
15     Q.  Sure.  Are you aware of any facts to
16  support the contention that Mr. Meyer's bindings,
17  the specific bindings he was using on the day of
18  his accident, somehow caused the accident?
19     A.  Nothing beyond what I just stated.
20     Q.  Okay.  And so to summarize what I think
21  you just told me, there's a Wildsnow blog post,
22  correct?
23     A.  Yes.
24     Q.  And then you have also had conversations
25  with skiers on other Dynafit bindings who

33 (Pages 129 to 132)

AMANDA EGGERT

Page 133

1    experienced prereleases, correct?
2        A.  Yes.  I'm not sure which models exactly
3    those other skiers were skiing.
4        Q.  Okay.  And for those other skiers, do
5    you know whether the heel or the toe prereleased on
6    their bindings?
7        A.  I don't know.
8        Q.  No.  Do you know their names?
9        A.  John would know the last name of a man
10   he's met recently named Zack, but I can't -- I
11   don't know his last name.
12       Q.  Okay.  Do you know Zack personally?
13       A.  Yes, we've skied together.
14       Q.  Okay.  But as you sit here today you do
15   not know Zack's last name?
16       A.  Correct.
17       Q.  Are you aware of any testing which has
18   been performed on the specific bindings that
19   Mr. Meyer was using on the date of his accident
20   that would tend to demonstrate that that set of
21   bindings has potential to prerelease?
22       A.  I'm aware that John had his bindings
23   sent in to be tested.  My understanding is that
24   based on Dynafit's internal testing, they didn't
25   find fault with those bindings.

Page 134

1        Q.  Do you know where the skis and bindings
2    that Mr. Meyer was skiing on the date of his
3    accident are located currently?
4        A.  I think both are in storage at our
5    house.
6        Q.  Mr. Meyer testified that he had
7    separated the bindings from the skis, do you have
8    any knowledge about that?
9        A.  As I think about it today, the Black
10   Diamond Verdict skis he was wearing on the day of
11   the accident don't have bindings, so I think
12   they've been removed.
13       Q.  Do you have any idea why Mr. Meyer or
14   someone else removed the bindings from those Black
15   Diamond Verdict skis?
16       A.  I don't know why precisely.  Might have
17   had something to do with the testing, might have
18   been that he just didn't feel safe skiing them
19   anymore.
20       Q.  You just don't know, correct?
21       A.  Correct.
22       Q.  Have you found out what you would like
23   to see as an outcome in this litigation?
24       A.  I've tried not to think too much about
25   it because it's very far outside the realm of my

Page 135

1    control.  John is his own person and I'm a sounding
2    board but I've tried not to become very invested in
3    the outcome.
4        Q.  Would you like to see this litigation
5    conclude?
6        A.  I think we would both be greatly
7    relieved of substantial stress if we didn't have to
8    continue thinking about it so regularly.
9        Q.  I'll reserve the remaining questions I
10   have at the time of trial.  Thank you.
11       MR. McINTOSH:  Just a couple follow-ups or
12   clarifications.
13
14            REEXAMINATION
15   BY MR. McINTOSH:
16       Q.  Can you get Exhibit 60 in front of you?
17   That's the one where you drew your path down,
18   correct?
19       A.  Uh-huh.
20       Q.  Is that a yes?
21       A.  Yes.
22       Q.  Can you please write your name on that,
23   just over by the exhibit sticker so we remember
24   that it's...
25       A.  (Witness complies.)

Page 136

1        Q.  Thank you.
2            And then -- you know, Mr. Condra's
3    questions made me think, why is it that you're not
4    helping Mr. Meyer with this lawsuit?
5        A.  I'm not a legal expert.  I don't know
6    how much help I can be of to him for one thing.
7    What do you mean by "help"?
8        Q.  What does it mean to you?
9        A.  I help insofar as I provide emotional
10   support and grounding, but civil law is not
11   something I particularly enjoy and I prefer not to
12   become overly personally invested.
13       Q.  I think that's all the questions I have.
14   I just want to make clear that -- just so we
15   understand each other, so you're going to -- the
16   two of you are going to look at those other
17   messages or letters that Ms. Eggert wrote to
18   Mr. Meyer and then --
19       MS. NADOW:  If they're relevant we'll hand
20   them over to you and I'm happy to have her
21   print -- ask her to print the text messages just so
22   you have a copy of both of those sets of text
23   messages.
24       MR. McINTOSH:  Okay.  So we'll reserve.  If
25   necessary, we'll reserve any questions on those

34 (Pages 133 to 136)

AMANDA EGGERT

Page 137

1  other things.  That's all I have for you today,
2  Ms. Eggert.  You have an opportunity to read and
3  sign the deposition transcript or you can -- I
4  think you can waive that as well.  It's up to you.
5  So I'll let you make arrangements with the court
6  reporter to do that.
7       MS. NADOW:  And we can take this with us?
8       MR. McINTOSH:  No, that's the original.
9       MS. NADOW:  Oh, do you have a copy which I
10  can take?
11       MR. McINTOSH:  Do I have a copy of the
12  deposition exhibits?
13       MS. NADOW:  Yeah, could you make me a copy of
14  the deposition exhibits?
15       MR. McINTOSH:  Yeah, she'll give you the copy
16  of these ones.  Do you mean these ones or the old
17  ones?
18       MS. NADOW:  The whole binder of exhibits that
19  we used.
20       MR. McINTOSH:  I think Mr. Meyer should have
21  a copy of it.
22       MS. NADOW:  I'm not sure that you passed that
23  on to him quite yet.
24       MR. McINTOSH:  He should have got it from the
25  court reporter.

Page 138

1       MR. CONDRA:  Yeah, he's got to get it from
2  the court reporter.  We can go off the record if
3  you want?
4       MR. McINTOSH:  Yeah, we can go off the
5  record.
6
7            (Whereupon, the taking
8            of this deposition was
9            concluded at 3:16 p.m.)
10
11       SIGNATURE RESERVED
12
13       * * * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 139

1            DEPONENT'S CERTIFICATE
2  PAGE     LINE        CORRECTION
3
4
5
6
7
8
9
10
11
12
13
14       I, AMANDA EGGERT, the deponent in the
15  foregoing deposition, DO HEREBY CERTIFY, that I
16  have read the foregoing -139- pages of typewritten
17  material and that the same is, with any corrections
18  thereon made in ink on the correction sheet and
19  signed by me, a full, true and correct transcript
20  of my oral deposition given at the time and place
21  hereinbefore mentioned.
22       DATED this_____day of_____, 2019.
23
24       _____
25            AMANDA EGGERT

Page 140

1            C E R T I F I C A T E
2  STATE OF MONTANA    )
3                      ) ss.
4  COUNTY OF GALLATIN  )
5       I, Marla Jeske, Court Reporter - Notary
6  Public, CSR, in and for the County of Gallatin,
7  State of Montana, do hereby certify:
8       That the witness in the foregoing
9  deposition was by me first duly sworn to testify
10  the truth, the whole truth and nothing but the
11  truth in the foregoing cause; that the deposition
12  was then taken before me at the time and place
13  herein named; that the deposition was reported by
14  me in shorthand and later transcribed into
15  typewriting under my direction, and the foregoing
16  pages contain a true record of the testimony of the
17  witness, all done to the best of my skill and
18  ability.
19       IN WITNESS WHEREOF, I have hereunto set
20  my hand and affixed my notarial seal this ____ day
21  of _____, 2019.
22       _____
23       Notary Public for the State of Montana
24       residing at: Bozeman
25       My commission expires: February 04, 2023

35 (Pages 137 to 140)

**A**

**A-L-L-E-N**
125:10
**a.m** 1:19 35:1,18
35:22 36:1,3,9
78:13
**ability** 24:13
31:2,25 140:18
**able** 16:9 41:11
96:15 116:12
**abrupt** 54:21
74:21
**Absaroka** 13:17
**Absarokee**
13:18
**absolved** 118:21
**abundance**
79:15
**accept** 84:4
100:22
**access** 71:12
72:1 94:25
99:9
**accessed** 38:5
46:6
**accident** 4:23
5:12 17:19,22
18:24 25:16
28:5,6,10
33:18 40:19
42:1,9,19
49:14 50:11
54:6 62:19,20
63:18 65:20
68:20 75:15
86:7 87:1
91:17 95:7,12
99:12,16 100:7
100:15,18
103:7,13,19
104:1,3,7,11
104:21 106:1
109:17 110:4
112:8 115:12
115:14,17,22

116:2,18,20
117:8,10,14
118:15 119:10
119:17 120:6,9
122:3,5,14
123:3 125:18
130:5,13 131:5
131:7 132:4,18
132:18 133:19
134:3,11
**accidents** 91:17
**account** 99:8
**accurate** 7:17
12:18 78:8
100:25 115:3
**acknowledged**
103:8
**acquaintance**
121:15
**act** 118:17
**action** 119:16
**actions** 100:23
102:14 103:10
**activities** 120:19
120:20
**activity** 73:2
**actual** 42:19
104:7
**Adams** 126:22
126:24 127:4
**add** 131:8
**addition** 21:16
65:1 90:5
**additional** 69:15
**address** 4:14
98:3,7
**adept** 119:10
**adequate** 125:19
**Adventures**
13:18
**advisable** 70:2
**affect** 7:23
**affirmative** 52:2
52:4
**affixed** 140:20
**afforded** 122:21

**afternoon** 33:19
33:23 34:1
87:2,4,5 92:4
93:3 97:18
**afterward** 103:7
118:14
**ago** 4:21,22 6:12
44:8 122:13
**agree** 32:10
47:23 81:17
100:14,22
101:5 102:1,13
102:16 103:1
105:20 112:7
112:17,22
114:18
**agreed** 33:24
**agreement**
108:21
**ahead** 66:24
67:2 70:3
88:12 103:4
104:23 120:16
**aid** 76:17 92:8
93:14
**air** 82:23
**airport** 122:11
122:12
**Alaska** 15:11,15
**allegation**
113:11 123:14
**allegedly** 128:4
**Allen** 24:2 125:6
125:9
**allow** 31:13
**Alpaca** 97:22
**Amanda** 1:12,15
3:1,20,24 4:6
4:13 5:17 92:1
95:24 97:16,20
127:12 139:14
139:25
**Amanda's** 3:12
**America** 3:14
11:11
**amount** 64:5

106:25
**angle** 58:25
74:22
**answer** 6:4,23
7:6,7,12 19:25
82:13 103:4,5
105:24
**answering** 7:4
**anybody** 75:9
**anymore** 99:9
134:19
**apologize** 83:8
83:12 120:25
**apparently**
95:25 127:17
**appear** 18:12
32:4 69:17
**APPEARAN...**
2:1
**appearing** 1:15
2:2,7,13
**appears** 49:5
54:1
**approach** 129:4
**approached**
105:21
**appropriate**
83:18 85:25
105:7
**approximately**
16:18 17:4
32:21 38:1
66:13 67:7
**April** 93:11,21
93:25 94:17,23
116:24
**area** 28:16 34:25
39:22 43:18
47:11 48:12,23
50:8 51:3
54:12,16 55:22
55:25 56:3,19
56:20 57:2,7
60:1,16,17
61:4,7,23
62:13,24 63:2

63:7,14 64:1,2
67:24 70:24
71:7,13,18,25
72:3 73:3,8
74:5,6 75:13
76:10,15,25
84:13 85:7
105:11,15
112:19 123:6
125:12
**area's** 56:12
**areas** 50:14
105:8,9 125:20
**arm** 120:10,18
**arrangements**
137:5
**arrival** 41:17
**arrived** 63:21
**arriving** 32:15
**article** 3:21 19:2
124:22,25
125:4,16 127:5
**articles** 17:17,22
123:17 128:18
128:18
**aside** 107:8
**asked** 22:24
23:17 75:19
76:1,3 83:14
87:3 92:2
104:5 120:24
**asking** 49:15
**aspects** 58:25
**ass-over-teake...**
82:23
**assisted** 128:16
**associate** 17:15
**Association**
11:11,14
**assumed** 79:6
115:24
**attending** 11:7
**attention** 56:8
56:10
**attorney** 2:2,13
5:14,16,25

19:24 22:8
108:15
**ATTORNEYS**
2:7
**attributed**
118:14
**August** 10:23
11:3 95:23
**author** 132:11
**available** 96:4
97:17
**Ave** 4:15
**Avenue** 1:17
2:10
**avoid** 30:4 54:20
71:24
**award** 106:25
111:1
**awarded** 107:6
**aware** 23:24
27:13 30:20,22
30:25 52:11,14
61:6 107:10
110:21 111:5,8
121:4 127:23
132:2,8,15
133:17,22
**awhile** 66:8 69:4
116:20

---

**B**

**B** 3:3
**back** 10:6,21
19:16 23:9
29:14 31:6
36:16 51:12
56:23 59:1
60:13 61:7
64:8 69:4 71:7
71:15,24 72:2
72:19,25 74:24
82:4 88:2,9,17
90:18 91:7
92:8,16,25
95:15 96:2,14
97:3,15 98:1

107:19 113:6
114:23,24
122:11 123:23
129:20
**background** 8:1
24:8
**barring** 108:20
**base** 32:15 36:19
38:14 71:18,25
75:13 76:10,14
76:25 85:7
**based** 15:18
45:2 57:4
58:14 133:24
**basic** 86:14
**basically** 9:7
20:11
**bean** 29:23,24
30:2,2
**bearing** 21:21
81:16
**becoming** 23:10
124:9
**began** 91:18
**beginners** 12:9
12:11
**beginning** 1:19
51:19 52:19
107:5
**BEHALF** 2:2,7
2:13
**behavior** 118:13
118:18,25
**belief** 36:10
131:3
**believe** 5:23
7:16 14:2 17:7
28:17 33:24
40:7 59:11
68:7,10 73:16
82:7,25 112:3
114:10,11
118:6 119:11
122:22 128:25
**bells** 130:18
**belongings**

75:14
**beneficial** 44:2
**benefits** 127:22
128:6
**best** 21:5,9
29:23 30:2
31:2 41:10,13
46:5 54:9
65:22 66:18
67:5 74:7
104:7 110:19
140:17
**Bethany** 85:21
**better** 114:13
116:9 124:1
**beverage** 15:9
**beyond** 46:9
132:19
**bifurcated**
111:12
**big** 1:8 2:7 3:18
3:21 14:19
16:14,17,20,23
17:2,6 19:19
21:14 24:17,22
24:23 26:4,10
26:19 27:1,7
27:12,17 32:4
32:18,22 36:19
53:8 60:6
70:17 79:18
92:16 95:3
97:6,21 98:21
98:25 104:10
104:20 105:4
106:20 109:9
109:18 110:5
113:17,20
114:16 117:2
121:5,13
122:18 123:14
**Biggest** 3:14
**bikes** 119:20
**biking** 96:10
**Billings** 8:3
41:18 86:9

87:15 115:19
**binder** 137:18
**binders** 31:7
**binding** 130:24
132:8,10
**bindings** 31:9,11
95:6 130:4,14
131:4,4,16
132:3,6,16,17
132:25 133:6
133:18,21,22
133:25 134:1,7
134:11,14
**bit** 7:25 9:10
21:24 29:15
30:14 60:2
61:21 70:6
71:12 92:25
94:24 104:14
115:5
**black** 31:6,7
65:3 78:2
102:4 112:11
134:9,14
**Blackfoot** 13:13
**blame** 70:17
104:10
**blamed** 104:20
**blog** 132:8,21
**blue** 3:17 67:1,2
68:9,17 73:13
73:14 77:20,21
**board** 128:15
135:2
**boarded** 44:5
**Bob** 96:14,17
**bone** 120:12
**book** 29:3
**booking** 86:11
**booth** 97:22
**boots** 31:8
**boss** 33:24 86:24
**bother** 118:8,23
**bothered** 120:11
**bottom** 43:19,21
44:3 59:17

61:14,19 66:22
70:6 72:22,25
77:23 99:23
101:15 104:9
**boundary** 93:3
**bounds** 100:25
**bouts** 116:14
**Bowl** 24:20
**Box** 2:10,16
**Bozeman** 1:18
2:11 4:15
16:24 17:7
86:9 97:19
107:11 117:15
117:19 122:11
128:1 140:24
**Brad** 2:15 3:2
52:13 129:22
**break** 19:8 33:8
50:3,4 51:6
82:1 88:1,5,10
88:12,21 94:24
129:14
**breaks** 101:2
**breathing** 41:12
**brief** 19:13 51:9
88:14 122:15
129:16
**briefly** 61:22
**bring** 18:5,20
92:3 94:8
**brings** 119:13
**broken** 78:22,24
**brought** 19:9
20:4 34:16
**bruise** 25:12
51:2
**BS** 49:16
**bull** 48:3
**bushes** 101:17
101:19,22
**busy** 94:25
**Butte** 1:3 21:17
**Buzz** 23:23
**bystanders**
114:2,4

| **C** | 106:9 111:22 | 71:4 | 68:17 73:8 | **coffee** 19:11 |
|---|---|---|---|---|
| **C** 140:1,1 | 111:25 112:1 | **Challenger** | 75:1 | 107:10 |
| **cafe** 8:25 | 112:22 113:2 | 24:20 35:6 | **circled** 68:9 73:4 | **coincidences** |
| **call** 70:21 85:23 | 113:11,16,20 | 38:4,14,18,20 | **civil** 1:20 136:10 | 103:16 |
| 87:20,20 95:18 | 121:2 | 38:25 39:6 | **claim** 13:5 56:20 | **collar** 120:12 |
| 95:20 125:5 | **catch** 94:21 | 43:3,7,9,12,18 | 57:7 111:22,25 | **colleague** 23:5,6 |
| **called** 4:7 83:10 | **caught** 66:6 | 43:19,21,22 | 113:1 121:5 | 35:3 43:2 |
| 85:22 86:4,22 | **cause** 1:7 104:3 | 44:5,10,11,15 | **claimed** 127:19 | **colleagues** 19:1 |
| 86:24 98:17 | 104:11,20 | 44:17,19,21 | **clarifications** | **collect** 75:14 |
| 124:4 | 140:11 | 45:4,9,13 46:2 | 135:12 | **college** 8:9,10 |
| **calling** 85:16 | **caused** 54:18 | 46:4,6 47:2,9 | **clarity** 55:13 | 11:9 14:15 |
| **calls** 76:11 85:12 | 131:19 132:4 | 47:25 48:13,22 | **Clark** 8:9,15 | 15:7 |
| **canoe** 8:24 9:1 | 132:18 | 49:8,17 50:18 | 13:12 | **Colorado** 23:7 |
| **cans** 36:25 | **cautiously** 69:25 | 50:24 53:17 | **Clark's** 15:10 | **Colored** 3:15,17 |
| **capacity** 118:9 | **caveats** 102:2 | 54:3,6,24 55:7 | **class** 126:21 | **come** 25:11 |
| **car** 4:23 122:16 | **Center** 23:9 | 55:11,19,22 | **clean** 7:2 84:14 | 29:14 33:25 |
| **card** 76:20 | **CEO** 109:8 | 56:21 57:8,10 | **clear** 33:17 | 34:18 68:19 |
| **cardiovascular** | 124:4 | 61:14,19 62:2 | 52:12 79:3 | 88:2,9 92:10 |
| 118:9 | **certain** 37:3 | 62:13,25 63:6 | 83:20 91:5 | 92:18 93:12,21 |
| **care** 25:8,9,15 | 44:20 56:22 | 71:11,16,21 | 107:6 124:25 | 94:18 121:21 |
| 76:6 87:12 | 57:4 59:24 | 79:15,18 | 127:11 129:24 | 123:25 |
| 103:18 107:8 | 68:20 97:8 | 125:12 | 136:14 | **comes** 20:11 |
| 107:11 108:19 | 100:17 119:17 | **challenging** | **clearly** 54:15 | 27:22 119:5 |
| 122:21 127:22 | 128:1 131:24 | 110:13,19 | 90:20 | **coming** 46:11 |
| 128:6 | **certainly** 30:21 | 129:2 | **client** 89:10 | 48:19 55:12,23 |
| **carefully** 90:13 | 72:12 96:3 | **chances** 107:15 | **climb** 119:22 | 57:12 62:14 |
| **Carol** 3:24 | **certainty** 49:21 | **Chandra** 23:22 | 120:1,3 | 71:7 72:2 |
| 126:19 | 50:16 67:9 | **change** 30:15 | **climbed** 120:5 | **commission** |
| **carved** 104:15 | **CERTIFICA...** | 60:9 | **climbing** 120:8 | 140:25 |
| **case** 5:14 35:21 | 139:1 | **changed** 82:12 | **climbs** 119:20 | **common** 45:25 |
| 65:18 81:16,18 | **certification** | 119:18 | 120:23 | 79:17 |
| 83:19 108:4,8 | 12:7 | **changing** 30:22 | **Clinic** 41:18 | **communicated** |
| 111:6 130:24 | **certified** 12:5 | **characterize** | **close** 23:15 36:3 | 99:1,6 117:12 |
| **Casey** 95:3 | **certify** 139:15 | 124:1 | 60:19 68:2 | **communication** |
| **cat** 38:24 39:4 | 140:7 | **charge** 76:10 | 105:4,6 | 95:23 98:24 |
| 50:20 58:1,4,7 | **cetera** 125:20 | **chase** 109:18 | **closed** 56:3,5,6 | **communicatio...** |
| 59:3,7 60:7,8 | **chair** 24:21 | 110:4 | 56:13,20 57:2 | 90:24 91:4,10 |
| 60:12,21 66:2 | **chairlift** 32:15 | **check** 33:6 | 57:6 60:17 | 91:13 97:5,9 |
| 66:5 68:23 | 36:1 44:1,5,15 | 87:25 88:20 | 61:4,23 | 98:21 99:10 |
| 73:24 74:1,9 | 46:7,12 47:2,9 | **Chico** 34:8 | **closer** 75:5,8 | **community** |
| 74:19 79:25 | 47:25 48:1,19 | **choice** 71:23 | 120:4 | 21:14 |
| 80:2,13,17,19 | 48:23 49:8 | 106:12 | **clump** 72:23 | **companies** 4:24 |
| 82:20,21 100:9 | 54:12 55:23 | **chose** 72:2 | 73:1 | 15:14 |
| 101:16,19 | 57:13,16,21 | **Chutes** 25:1 | **clumps** 101:21 | **complain** 51:3 |
| 104:15 105:21 | 61:14,19 62:3 | **Cindy** 23:20 | **coat** 75:6 | **completed** 77:15 |
| | 62:14 63:6,19 | **circle** 68:6,12,12 | **code** 110:11 | 78:16 |

completing 78:5
complicate
106:20
complies 29:6
35:10 36:17
38:7,23 39:16
43:15 46:19
47:5,18 48:6
49:2 58:3
60:14 62:23
63:25 66:23
99:21 101:14
107:20 112:13
135:25
comport 35:24
computer 42:13
81:7
concerned 71:21
79:3
conclude 62:8
135:5
concluded 138:9
conclusion
132:1
conclusions
103:3
condition 87:12
116:7,16
conditions 24:18
30:23 37:16,21
39:7 62:10
65:21 69:19,21
70:22 71:6
79:8 104:24
105:2,5
Condra 2:15 3:2
52:12,13,24
129:12,19,23
138:1
Condra's 136:2
conduct 126:5
conference 34:6
34:7 115:24
117:11,18
confidence
118:11,24

confirm 39:2
confrontation
110:9
congratulations
94:6,10
congress 127:8
connection
115:23
consent 52:10
consider 30:15
considered
29:25 72:21
considering
39:7
consistent 47:10
58:15 59:13
64:4
consistently
32:11,16
contact 80:22
85:17,22 86:2
87:13,24 95:9
96:21 126:3
132:11
contain 140:16
contend 79:20
contention
72:12 132:3,16
context 47:3
122:6 131:8
continue 135:8
continued 76:9
continuously
10:9
contractor 33:4
contributed
102:14,17
103:1
control 19:4
25:19,23 30:5
30:7,10 69:17
74:16 79:25
80:13,17 82:19
102:12 125:19
131:19 135:1
conversation

20:12 24:1
34:17 60:23
61:2 64:9
87:10 122:16
124:13 127:25
128:2,8 131:14
conversations
20:25 90:19
99:17 103:24
104:25 107:1,9
107:13 108:12
121:25 132:24
cool 94:1,3
coordinated
34:11
coordinating
96:14
copy 18:3 89:16
95:9 124:22
136:22 137:9
137:11,13,15
137:21
corner 66:22
correct 7:15
8:15,16 9:21
9:22 12:9,25
13:1 17:10
18:13 20:22
22:5,11 26:5
27:2,5 29:17
29:18 30:6,13
31:1 32:18
38:25 40:4,21
41:9 42:3
44:12 45:5,20
45:24 48:19
53:6,25 55:7
57:14 59:8,11
59:18 61:15
62:15 63:8
65:12 66:2,3
70:1,4 71:4,8
71:19,25 72:3
72:7,10 74:6,7
74:9,12,16
77:18 78:14

79:18 80:14
81:1,18,21
83:22 84:21,22
84:25 85:1,4,5
85:9 87:7 91:8
91:21 98:23
104:22 105:17
105:22 106:1
106:12 109:14
109:19 110:15
111:11 112:20
115:8,9,14,15
119:20 125:1,2
125:4 127:14
132:22 133:1
133:16 134:20
134:21 135:18
139:19
correction 139:2
139:18
corrections
139:17
correctly 11:22
41:20 96:25
100:10 104:19
correspondence
3:24 18:25
92:14 93:11
96:23 126:16
127:10
Cottonwood
23:8
Couloir 24:22
24:23
counselor 21:23
51:16
countersuit
111:10,11
country 31:6
county 5:10,11
140:4,6
couple 27:10,11
35:7,8 64:8
84:13 94:4,21
99:15 119:25
135:11

course 6:18,25
30:6 45:19
71:3 76:12
84:10 108:4
124:8 129:15
courses 9:12
court 1:1,21
6:25 52:5,6
137:5,25 138:2
140:5
cover 105:3
coverage 71:2
covered 64:7
72:7
coworker 85:20
cranio-sacral
97:17 98:18
crash 70:19
82:13 114:7
crew 14:11,12
14:13 93:18
crews 13:22
14:10,11
critically 104:14
criticism 28:19
crowd 74:6 75:1
Crowley 1:17
2:9 111:10
CSR 1:21 140:6
current 35:3
36:1,10 37:11
37:14 38:3,13
38:17 39:6
121:12 123:5
123:13
currently 15:4
120:2 134:3
Curtis 98:4
custody 19:4
cut 7:5
cuts 30:17

_____

**D**

D 3:1,3
D-U-M-A-N
5:21

**dad** 76:11
**Dale** 2:15
**data** 26:22
**date** 70:25 77:25
   97:14 115:16
   130:5 133:19
   134:2
**dated** 3:12,19,22
   40:20 139:22
**dating** 31:17,20
   31:22 115:14
   115:25
**Davis** 23:24
**day** 1:18 24:17
   26:23 27:4
   32:11 33:18
   36:11 37:17
   38:5 40:18
   42:9 43:7 45:5
   46:6 75:11
   79:1,14 86:15
   86:21 87:23
   92:22 93:25
   94:2 95:1
   100:6 103:10
   114:22 117:21
   124:6 125:18
   127:24 132:17
   134:10 139:22
   140:20
**days** 12:19,20
   12:21 15:24
   16:1 26:12,14
   26:16,18,19
   27:7 80:25
   87:14,18 96:19
**deal** 42:20
**dealing** 69:4
**Dear** 109:7
**decades** 26:17
**December** 3:13
   3:22 10:19,25
   11:1,3 13:10
   14:24,25 19:5
   26:20 27:3,8
   29:16 31:5,15

31:18 32:1,17
   33:11,19 34:3
   34:10,21 35:17
   35:18 36:1
   40:3,20 41:1,1
   41:14 44:6
   45:9 48:13
   54:24 55:18
   74:20 109:23
   113:3,8 114:19
   115:7 117:13
   117:17,25
   125:12
**decent** 24:18
**decide** 86:10
**decided** 34:18
   87:4 129:3
**decision** 28:24
   109:17 110:4
**Defendant** 2:7
   2:13 52:13
**defendants** 1:9
   1:16 111:6
**define** 102:21
**definitely** 50:19
   55:13 70:23
   79:14 113:4
   122:4
**definition**
   102:25
**definitive**
   131:25
**definitively**
   100:21
**degree** 10:11,13
**degrees** 31:3
**delineate** 54:15
**demands** 111:6
   111:18
**demonstrate**
   133:20
**deny** 37:23
**depend** 41:11
**depends** 48:14
**depicted** 49:25
   63:16 66:18

**deponent**
   139:14
**DEPONENT'S**
   139:1
**deposed** 4:22
   6:11 23:18
**deposition** 1:11
   1:14 3:11 4:19
   5:25 6:9 19:23
   22:5 23:14,25
   24:6 29:4 40:8
   52:16 53:1
   65:7 67:15
   77:7 84:3
   90:15 108:23
   124:17 126:9
   137:3,12,14
   138:8 139:15
   139:20 140:9
   140:11,13
**describe** 24:13
   31:24 34:21,22
   40:15 44:23
   61:1 69:6,12
   72:16 74:18
   79:8 126:14
**described** 103:6
   103:15 117:11
**describing**
   79:21 103:12
   104:11,20
**description**
   28:12 82:17
**descriptive**
   64:25
**design** 130:24
**despite** 71:6
**detail** 21:3 34:22
   61:2 69:12,14
   69:15 72:17
   86:19
**detailed** 35:8
**details** 86:14
   107:3 121:24
   122:15 128:15
**developed**

115:10
**devoted** 108:9
**Diamond** 31:7,7
   134:10,15
**Dictator** 25:1
**died** 85:24
**different** 39:3
   58:11,18 75:21
   131:12
**differently**
   117:8 118:17
**difficult** 44:11
   71:12
**diligence** 83:15
**diminished**
   118:10
**dinner** 117:14
   117:19,19
**direct** 73:25
   102:12
**direction** 25:24
   108:21 140:15
**directly** 81:18
   107:18 111:7
   113:4
**director** 87:11
**discounted**
   34:17
**discuss** 90:15
   106:17 107:15
   108:7,10,14
   110:17 131:10
**discussed** 20:13
   22:19 23:1
   61:22 107:11
   108:19 110:22
   113:10 122:15
   123:13 128:24
   131:6
**discussing** 75:24
**discussion**
   124:11 131:9
**dispute** 53:13
**disregard**
   102:22
**distance** 67:13

70:14
**distribution**
   96:7
**DISTRICT** 1:1
   1:2
**DIVISION** 1:3
**Dixon** 96:14
   97:7,9
**Dixon's** 98:7,15
**document** 18:15
   40:2,2 77:17
   81:7
**documents**
   18:12,16,20
   19:9 20:2,4
   22:24 39:25
   83:13,24
**doing** 8:21,23
   14:8 15:4 76:6
   92:20 94:24
   95:12
**doubted** 110:25
**downhill** 31:13
   67:21 80:2
   82:21 84:20
   112:18
**draw** 65:15 67:2
   73:12,22
**drawn** 110:10
**drew** 74:4 75:1
   130:17 135:17
**drove** 34:25
**due** 83:15
**Duke** 31:12
**duly** 4:7 140:9
**Duman** 5:17,18
   5:22
**Dynafit** 111:19
   111:21 130:1,3
   130:13 131:4
   132:6,25
**Dynafit's** 133:24

---
**E**
---
**E** 3:1,3,3,3,3
   140:1,1

e-mail 34:13
  98:24 99:7,8
  100:4,12 108:3
  117:13 121:7
earlier 21:25
  22:24 34:5
  42:7,10 43:2
early 31:23
  37:18,21 39:7
  62:10 70:22
  71:2 79:1,17
  93:22 104:24
  105:1,5 116:6
Earth 85:19
easier 89:14,19
easily 116:15
  118:12
eastern 35:21
editor 15:3
  17:15,16 129:2
editorial 96:5
  124:5 125:7
effect 61:5
  110:12 122:19
effectively 28:8
Eggert 1:12,15
  3:1,24 4:6,13
  4:14 23:20,21
  23:21,22 51:13
  53:5 83:21
  84:7 88:17
  92:1 97:17
  129:11,22
  136:17 137:2
  139:14,25
Eggert's 3:20
either 32:14
  41:3 49:7,16
  49:18 50:14
  54:13,15 64:14
  73:1 86:9
  111:23 116:23
  121:25 126:7
ejected 131:21
ejecting 131:18
electronic 81:4

81:12,23
eleven 32:22
emailed 95:3
emergency
  85:21
Emerson 87:10
  87:18 88:24
  89:23 90:17
  91:8,11,23
  94:15 97:3
Emily 121:17,18
  122:4
emotional
  116:14 136:9
employee 15:17
  89:10 90:20
  124:15 125:6
employees
  107:11 108:17
  108:20
employer 76:11
  85:19 86:1
EMT 9:21,23
encouraged
  127:21
ended 14:7
  54:22 67:25
  68:3,13
ends 66:11 93:1
engage 120:20
engaged 94:11
  116:4
enjoy 110:9
  136:11
enjoyed 116:19
enrolled 10:22
entire 108:2
entirely 118:21
  129:6
entirety 110:25
entitled 3:14
  89:12 90:8
entry 81:19,24
Environmental
  23:9
equipment 31:4

102:3,8
Eric 109:7,7
  124:4,8,11
erratic 118:13
  118:18,25
error 22:9
Ersin 96:13,21
especially
  118:13
Esq 2:4,8,9,15
  3:2,2
establish 65:18
estimate 64:15
et 125:20
ethical 129:5
ethics 126:22
evening 96:18
event 15:13 96:6
  99:2
events 96:12
eventually 116:4
Evi 97:7,9,16
evidence 35:20
  65:18
exact 49:10 55:1
  74:22
exactly 6:19
  29:12 49:25
  57:1,21 63:17
  67:7 70:14
  104:8 121:1
  133:2
examination
  1:11,15 3:1
  4:10 129:18
examined 4:8
example 30:11
exchange 124:7
exchanging
  36:25
excuse 8:18 22:4
  41:1 44:10
  45:22 84:20
executive 124:6
exhausted
  116:15

exhibit 3:3,4,4,5
  3:5,6,6,7,7,8,8
  3:9,9,10,10,11
  3:12,14,15,17
  3:18,20,21,24
  29:5,7,10 35:9
  36:16,18 38:6
  38:8,10,12,21
  38:22 39:5,12
  39:15,17,22
  40:7,9,12,16
  41:8 43:14,16
  44:9,23 46:17
  46:18,20,23
  47:4,6,8,12,15
  47:17,19,24
  48:5,7,11 49:1
  49:3,19,20,24
  50:6,7,14 53:2
  53:6,8 55:5
  56:14,16,19,23
  56:24 57:2
  58:2,5,21
  59:10,16 60:5
  60:8,13,16,21
  62:22 63:2,14
  63:23,24 64:2
  65:5,5,8,11,15
  66:15 67:16,20
  68:10,18 69:24
  71:19 72:5
  73:4,7,8,11,12
  73:15 74:5
  75:2 77:8,12
  77:12 78:11
  79:21 80:3,5
  80:25 81:17
  82:5 84:14,17
  99:19 101:12
  107:19 108:24
  109:3,4 112:12
  123:23 124:18
  124:22,22
  125:16 126:10
  126:14,15
  127:11 135:16

135:23
exhibits 3:11
  29:4 70:22
  137:12,14,18
exist 45:17
expect 22:21
experience
  26:10
experienced
  133:1
expert 13:5
  24:14 43:12
  44:10 112:2
  113:12 115:2
  130:24 136:5
experts 43:13
  44:11
expires 140:25
explain 28:3,9
explained 28:5
Explore 3:21
  95:2
Explorer 109:9
expressed 28:7
extensive 119:6
extensively 21:4
extent 61:8 79:2
  103:19 107:12
  122:7

---

**F**

F 3:3 140:1
Facebook 3:24
  127:16
fact 62:6 103:17
  106:19
factors 30:17
facts 121:4
  132:2,15
fair 130:1
fairly 54:14 61:3
fall 14:7 50:21
  50:22 51:1,4
  56:2 58:19
  101:4
falling 25:12

54:22
**falls** 101:3
**familiar** 6:12
23:16 32:7
39:8 44:18
87:11 111:20
**family** 23:15
103:7,13,22
104:3,21
118:16,16
**far** 70:12 79:5
134:25
**Farmers** 97:21
**fast** 32:10,12
63:20 69:11,13
80:21 100:7,10
100:15,17
103:9,14,22,25
105:23 106:3
112:8 125:18
**faster** 32:13
69:18 70:4
**father** 85:17,22
85:23 86:2,4,6
**fault** 101:7,11
102:1,7 133:25
**Fe** 14:17
**February** 31:23
91:19 92:14
116:6 140:25
**Federal** 1:20
**feel** 6:12 29:21
60:1 134:18
**feels** 118:9 119:9
**feet** 36:23 58:1
**fell** 66:7
**fellowship** 14:16
**felt** 71:1 116:16
**female** 64:11
**fence** 100:8
**Fewer** 27:9
**figure** 93:9 96:3
97:24
**file** 5:2 21:13
81:4,12 127:21
129:3

**filed** 20:11 21:12
21:15 24:17
104:19 106:15
107:14 109:25
110:7,14
111:10,18
113:19 127:8
128:5
**filing** 106:14,18
107:1
**fill** 77:1,5
**filled** 76:19,23
85:8
**finally** 94:4
**find** 66:8 87:14
88:23 95:20
133:25
**finish** 6:20 7:7
**Finn** 11:9,12
**fire** 13:22 14:10
**fired** 123:24
**Firm** 5:23
**first** 4:7 8:1 9:12
9:14 35:8
36:11 38:2,3
41:11,15,19
44:16,20 45:8
45:10 46:2
48:24 49:8,19
50:18 51:15
53:17 54:2,4
54:24 55:11
60:6 71:24
73:15 76:17
78:20 81:3
85:13 91:5
92:8 93:14
97:13 107:22
109:3,13,16,21
122:4 140:9
**five** 24:10 26:12
26:16 70:20
75:4 114:1
**flagged** 45:18
**flagging** 56:10
**flat** 9:5 74:23

**Fleck** 1:17 2:9
111:10
**flying** 122:11
**follow** 73:9
95:15
**follow-ups**
135:11
**followed** 122:22
**following** 4:1
124:6
**follows** 4:8
**food** 15:9 36:25
**foot** 64:16
**force** 79:4,6
131:18,21
**foregoing**
139:15,16
140:8,11,15
**Forest** 9:13
13:21 14:4,8
**forgot** 97:23
**Fork** 13:12
15:10
**form** 98:17
**format** 22:23
81:10
**former** 99:15
121:12,14,15
123:6,14
**forth** 91:7 97:3
97:15
**forward** 93:17
**found** 67:7
112:19 134:22
**founder** 126:23
**four** 13:21 23:23
70:20 122:5
**free** 26:4 126:23
127:4
**freelance** 15:2
**frequently**
104:6,25
**freshman** 8:10
**friend** 23:23
76:1 116:3
121:14 126:24

127:1
**friends** 23:15,16
23:25 31:19
99:15 103:7,13
103:21 104:3
104:21
**front** 29:3,7
38:10 40:13
46:20 47:6
65:11 69:25
84:15 99:20
100:8 101:13
112:14 135:16
**fucking** 82:24
**full** 11:2 82:4
139:19
**fully** 118:3,7
119:2
**funnel** 112:4
**funnels** 71:15
**further** 59:22
60:8 67:21
90:15

**G**

**G-I-A-N-E-L-...**
18:1
**G-O-L-D-B-L...**
24:4
**Gallatin** 5:10
32:21 117:3
140:4,6
**gather** 93:13
**gathering** 76:4
**gauge** 65:21
123:2
**gear** 30:16 64:21
**general** 22:20
76:5 122:7
**generally** 30:4
60:1 62:11,18
102:10
**getting** 25:12
56:8 94:24
**Gianelli** 3:22
18:1 124:3,23

125:23
**gist** 132:12
**give** 7:17 21:9
64:18 81:12,23
87:4 93:8
95:18 97:14
137:15
**given** 29:20
53:20 64:5
69:19,20,22
80:19,22
106:20 125:19
139:20
**gives** 20:15
**Glad** 96:15
**go** 6:15 8:4 10:8
15:22 34:9,14
34:24 35:11
38:8 43:8
51:12 56:1,23
83:3 88:12
89:20 90:17
98:10 103:4
104:23 107:19
111:2,7 115:16
120:16 129:20
138:2,4
**goes** 74:23 96:5
130:22
**goggles** 64:22
65:3 76:5
78:22,24 79:4
**going** 6:19 10:20
11:2 19:7 40:6
41:16 52:6,8
54:21 59:1
62:3 65:5
67:19 68:3
77:11 82:4
83:16 84:8
87:5,6 95:19
96:8 97:21
98:15 113:7
123:23 125:3
126:13 129:25
136:15,16

Goldblatt 24:2,4
good 7:25 35:5
  43:5,7 62:11
  92:18 93:10
  94:20 95:1,1
  95:22
gotten 39:5
grab 19:12 51:7
grade 120:1
graduate 8:6,14
  10:18
graduated 10:9
  10:24 13:9,20
  14:15
gratitude 28:7
gray 70:24
great 93:23 94:3
  94:18,20 96:9
  98:5
greatly 135:6
green 91:20
grew 8:2,3
grocery 127:25
grounding
  136:10
group 28:23
  54:20
grow 24:11
Guardians
  85:20
guess 26:11,16
  52:1 68:3
  70:16 82:16
guide 9:1 13:12
  13:15,23,24
guided 8:24
Guides 15:19
  16:2
Gullies 25:3
guys 92:17 93:8
  93:13 96:7,15

────────
H

H 3:3
half 12:20,21
  16:1 44:8

54:10,11 76:12
  92:10
hand 14:11,11
  14:13 65:4
  67:1,19 77:11
  90:1 109:2
  126:13 136:19
  140:20
handed 18:16
  77:4 96:17
handful 114:2
handing 40:12
  124:21
handled 29:2
  124:13
happen 106:24
  122:10
happened 28:6,9
  34:22 41:13
  42:8 57:19
  59:12 60:4
  63:18 70:7
  72:16,17,19
  74:25 76:24
  82:7 83:1
  85:11 122:20
  132:10
happening
  23:16 44:24
happens 70:20
happy 94:7
  92:10
hard 21:2 48:1
  58:24 66:16
  68:1 70:14
  89:15 116:18
Harned 5:8
  121:17,19
  122:1
hazard 101:6
hazards 13:3
  30:9 71:23
he'll 92:25
head 6:24
headed 33:17
  92:24 97:18

heading 38:17
heads 93:9
Headwaters
  24:20
health 62:7
  102:22,23
  103:18 107:8
  107:11 108:16
  108:19 127:22
  128:5
heap 104:9
heard 35:5
hearing 21:18
heated 124:7,10
heel 133:5
held 34:8
heli 15:11,15,22
  16:2,9
Heli-Ski 15:19
helitack 14:12
hello 93:13
helmet 29:17,19
  64:21 65:3
helmets 62:5,6,9
  103:18
help 19:11 50:2
  96:1,11 107:23
  123:20 127:3
  127:22 136:6,7
  136:9
helped 75:14
  76:10 92:19
  128:9,12,17
helping 94:19,25
  136:4
helps 30:21
  65:21
hereinbefore
  139:21
hereunto 140:19
hi 92:1,7,15,18
  92:23 93:12
  94:23 95:11,14
  95:24 97:16
high 8:4,5,8 9:11
  13:25 26:13

highlighted
  99:23 109:13
  110:24
Highway 32:23
  53:22,23 54:11
  58:21 62:19,21
  65:16 67:22
  68:22 74:9,19
  84:20,21
  112:18 113:2
  121:1
hikes 120:22
hill 38:18 100:24
hired 17:14
hit 79:13 80:1
  82:9,21,22
  100:9 101:10
  111:24 112:5
hitting 80:1,14
  82:20 106:8
hold 130:23
honest 78:4
hope 92:19 93:4
  94:23 95:11,24
  96:7
hospital 18:23
  25:9 40:18
  42:5,18,19,20
  86:9,10 114:23
  115:19,20
hot 34:8 117:22
hour 1:19 38:2
  76:13,13 92:10
hours 41:17,18
  65:19
house 16:24
  87:15 98:10,16
  130:9 134:5
hung 33:14
hurt 41:4
hurting 16:10
husband 130:4
husband's 23:5

────────
I

Ian 2:8 3:2

ice 120:23
ICU 119:5
idea 34:14 68:21
  85:18 134:13
Ideally 30:24
identification
  40:10 53:3
  65:9 67:17
  77:9 108:25
  124:19 126:11
ignore 129:6
imagine 23:22
  119:7 122:6
immediately
  50:8,11 62:25
  68:19 69:1,9
  100:18 103:18
  118:14 119:8
impact 21:13,22
impacted 82:14
  119:7 120:9
impacting
  120:12
impairing
  119:12
important 69:23
  128:25
in-flight 86:11
inappropriate
  90:6
incident 85:14
include 24:1
including 30:15
incomplete
  52:21
incorrect 5:7
indicate 103:9
indicated 123:3
indicating 56:4
  61:23 65:23
  73:18 101:18
  121:8
indoors 119:24
  119:25
industry 15:9,10
  126:17

AMANDA EGGERT

**info** 95:9 96:21
**information**
  85:22 86:2
  89:5,11,12
  90:8,10,14
  104:8 126:4
**informed** 52:6
**initially** 104:12
  104:16
**injured** 16:12
  25:7 27:4 45:4
  49:6,18 50:15
  50:23 51:1
  53:24 55:3
  58:22 64:3
  65:16 69:7
  81:1 103:23
  122:18
**injures** 101:2
**injuries** 25:10
  29:20 79:2
  80:20 99:14
  103:15 118:3
  119:3 122:8
  128:24
**injuring** 74:12
**injury** 25:22
  26:1 30:4
  116:11 119:4
  122:23
**ink** 77:3 139:18
**inpatient** 115:21
**Inside** 120:3
**insofar** 136:9
**instance** 1:16
  101:1,3,9
  103:17
**instruct** 90:6
**instructor** 11:16
  11:20 12:6,8
  28:23 45:23
**insurance** 4:24
  62:7 108:16
**integrity** 129:5
**intend** 130:23
**intentional** 30:3

**interacted** 76:12
  91:13 127:7
**interaction** 55:3
  55:6,15 59:12
  59:21 60:3
  61:21 75:11
**interactions**
  91:14 124:9
**interest** 123:2
**interested** 123:4
**interfering** 90:9
**intermediate**
  12:15 32:2
**Intermediates**
  43:13
**intermittently**
  14:1
**internal** 133:24
**interpreted**
  105:18
**intervention**
  119:7
**interview** 126:2
  126:5 127:9
**interviewed**
  125:25
**introduce** 93:6
**introduced**
  28:13
**introducing**
  93:17
**introduction**
  28:2
**intubated** 41:3
**invested** 116:3
  135:2 136:12
**involved** 4:23
  23:11 82:14
  103:17
**irregularities**
  78:21
**irresponsible**
  33:20 124:13

**J**

**jacket** 65:2

**January** 3:22
  17:8 31:23
  116:6
**Jeff** 23:20
**Jeske** 1:21 140:5
**job** 13:2 21:14
**jobs** 11:14 13:11
  13:19 14:14
  15:6,9
**Joe** 86:25
**John** 1:5 2:3
  3:12 17:1
  18:23 19:4
  20:9 28:2,5
  31:14 34:25
  40:17 41:2,24
  49:5 50:20
  55:3,13 56:4
  56:11 61:20
  72:20 74:1
  75:6,7,14
  77:25,25 92:2
  92:16 93:5,12
  94:1,3,7,12
  95:4,5,10,18
  99:12,15 100:4
  107:15,21
  109:25 111:8
  118:17 122:3
  122:10,13
  123:1 126:22
  126:24 127:4,8
  132:11 133:9
  133:22 135:1
**John's** 23:8
  50:11 76:5,11
  87:12 91:17
  109:17 110:4
  122:3
**journalism**
  10:14,15
  126:17,20,22
**Judy** 5:6,8
**jumps** 113:7
**junior** 13:25
  26:13

**jury** 130:23

**K**

**keep** 70:8 72:2
  84:7
**kept** 71:7
**kids** 12:13,14
**kind** 64:5 66:16
  67:9 69:14
  74:1
**kinds** 22:23
**knee** 122:23
**knew** 43:11
  45:19,21,23
  75:19 79:2
  85:18 108:19
  108:20 110:14
  129:1
**Knight** 130:20
**know** 5:22,24
  6:2,19 7:6,10
  16:3,5 23:4,7
  23:15,18 24:18
  27:3 32:4
  33:16 37:4
  44:14 45:25
  52:18 56:6
  59:6,9 64:20
  74:21 82:14
  83:25 84:17
  85:13,23 94:9
  100:20 105:23
  106:9 107:17
  110:11 113:14
  113:15 114:16
  114:24 117:7
  118:15,20
  120:8,10,25
  121:11 122:21
  123:10 125:23
  126:6 127:2
  133:5,7,8,9,11
  133:12,15
  134:1,16,20
  136:2,5
**knowing** 71:6

  87:16
**knowledge**
  23:11 24:7
  65:22 123:9
  134:8
**knows** 115:3,4
  131:24

**L**

**L-A-D-D** 109:11
**lack** 105:3
**Ladd** 109:11,22
  124:4 125:4
**landed** 82:24
**landing** 104:8
**Lane** 98:4
**large** 101:16
  121:22
**larger** 101:21
**Larry** 5:8
**Larson** 5:6,8
**late** 31:23 97:19
  116:23
**laughed** 61:20
**law** 5:23 23:9
  52:10 99:23
  103:3 110:18
  119:16 136:10
**lawsuit** 4:25 5:2
  5:9 6:2 17:18
  17:18,23 20:10
  20:14,22,25
  21:11,15,20
  22:17 23:17
  24:16 104:13
  104:19 106:15
  106:18 107:2,7
  107:14,16
  108:22 110:1,7
  110:13,15,19
  111:18,21
  113:19 123:3
  123:18,21
  127:5,7,10,21
  128:5,10,13,16
  128:19,23

129:3 136:4
**Lawsuits** 110:10
**lawyer** 119:10
**lead** 125:6
**leapfrogging**
70:7
**learned** 82:8
**led** 104:8 126:20
**left** 35:14 43:22
46:4,6,11,15
47:24 48:15,18
54:12 55:23
57:9,12 59:23
62:14,25 63:7
63:16 85:3,3,6
120:17
**left-hand** 59:16
63:1,14 66:22
**legal** 136:5
**length** 116:18
121:21
**Lenin** 25:5
**lessened** 118:20
118:25
**let's** 7:25 24:8
34:19 38:1
43:14 45:8
46:17 55:21
62:1 83:3
88:10,13 115:5
**letter** 3:12,20
18:22,24 40:17
42:7 45:7
57:25 79:24
109:5,22
**letters** 42:4,10
42:12,23
136:17
**level** 12:7,8
**Lewis** 8:9,14
**Liberty** 24:20
**life** 27:13,18
28:15 106:20
111:3 121:22
121:22
**lift** 24:21 34:17

35:6 37:1,2
38:18,25 39:6
43:18,19,21,22
44:10,11 45:4
47:22 48:15,15
56:11 57:10
60:19 62:25
63:22 70:25
71:4 72:22,25
79:16 94:8,19
101:1
**lifts** 38:5 72:1
**lighter** 77:20
**Likewise** 93:19
**line** 56:2 58:19
66:2,4,11 74:4
79:7 139:2
**link** 95:4
**lip** 80:2 82:21,22
**litigation** 23:11
108:16 134:23
135:4
**little** 7:25 9:10
12:13 16:21
21:23 29:15
30:14 37:19
60:2 61:20
70:6 71:12
93:22 104:14
114:21 115:5
131:8,18,21
**live** 16:14,20
**lived** 8:11 130:9
130:10,10
**lives** 23:7 121:23
**living** 16:22 17:2
32:17,20,24
34:12 115:7
116:21,25
117:4
**LLC** 129:23
**loading** 35:25
**loaned** 95:25
**locate** 69:3
**located** 57:22
113:5 134:3

**location** 73:10
75:10 117:24
**lodge** 9:20 15:11
15:17,19 24:12
**log** 68:2,4 82:9
82:14,15,24,25
**log's** 82:12
**logistical** 21:16
128:15
**long** 14:20 15:20
16:20 19:7
20:22 24:9
88:3 104:15
110:10 114:18
119:6
**longer** 124:15
**look** 19:8 35:9
36:16 38:6,21
39:15 43:14
46:16 47:11
48:5 49:1 50:6
56:14 58:2,9
58:21 59:13
60:5,13 62:22
63:23 74:2
83:15,17 84:14
87:24 89:4,19
93:17 96:24
99:19 101:12
112:12 130:10
136:16
**looked** 53:15
63:24 70:23
86:15 87:22
**looker's** 46:15
48:15 57:9
62:13,24 63:7
84:18 85:3,3
**looking** 35:11
68:7 69:14
72:5,20 84:19
84:20 112:18
**looks** 29:11
39:19 43:17
45:3 46:24
47:10,21 48:2

50:8,10 53:21
56:25 58:11,13
58:18 64:4
67:23
**lose** 70:21 108:4
108:8 131:19
**lost** 75:14 79:25
80:12,17,22
82:19 124:14
**lot** 21:20 116:13
119:5 124:14
**lots** 37:18 96:9
**loud** 6:23
**lower** 60:2 62:20
62:21 71:18
**luck** 95:12
**lucky** 122:20
**lunch** 83:5
**lunchtime** 92:5
**lungs** 118:8,23

**M**

**M-O-N-S-O-N**
16:8
**Mac** 2:9
**Magazine** 14:17
**maintain** 25:19
25:23
**maintained**
101:1
**maintaining**
30:5
**maintenance**
130:25
**making** 43:11
85:12 111:18
129:24
**male** 64:10,12
**malfunction**
102:8
**malfunctions**
30:16 102:4
**mall** 93:16
**malleable** 60:11
**mammoth** 93:16
**man** 75:15

130:16,19
133:9
**Manhattan** 98:4
**manufacture**
130:25
**manufacturer**
130:4
**map** 3:14 39:1
50:1 51:7 53:9
53:12,15
**March** 92:15,22
93:2 116:24
**mark** 13:3 40:6
65:5 125:20
**marked** 28:16
40:10 41:8
51:4 53:3,6
65:9 67:17,20
72:10,14 77:9
77:12 108:25
109:2 112:1,3
113:12,16,21
123:7 124:19
124:21 125:16
126:11,14
**Marker** 31:7,9
31:11
**markers** 100:8
**Market** 97:21
**markings** 3:16
3:17
**Marla** 1:20
140:5
**marriage** 131:2
**married** 20:19
20:22 21:1,21
115:17
**Marx** 25:5
**massage** 98:18
**material** 139:17
**materials**
125:20
**matter** 99:11
129:4 130:22
**McIntosh** 2:8
3:2 4:11 6:7

18:10 19:15
20:18 22:3
40:11 51:11,15
51:18,21,24
52:3,8,17,21
53:4 65:10
67:18 77:10
83:20,25 84:5
84:6 88:3,7,11
88:16 89:7,18
89:23 90:3,16
91:1 103:4,11
109:1 124:20
126:12 135:11
135:15 136:24
137:8,11,15,20
137:24 138:4
**McMakin** 114:7
114:8
**mean** 7:13 30:1
45:16 52:18
58:17 64:21
69:20 78:24
88:7 89:8
102:19,20
105:1 110:3
120:2 136:7,8
137:16
**Meaning** 81:11
81:12
**means** 30:3
**meant** 79:1
**media** 26:6
**medical** 9:8
25:15 87:10
119:6
**medications**
7:22
**medium** 99:12
**meet** 36:13
92:17 93:5,8
94:4,5
**meeting** 28:18
28:20 93:15,22
94:5 97:19
124:5,7,8

**Melody** 24:1
**members**
118:16
**memory** 7:23
11:22 35:24
47:10 58:16
59:14 114:14
114:15,21
115:2 116:15
**mental** 116:16
**mentally** 41:4
116:13 119:12
**mention** 51:23
51:24 103:25
**mentioned**
51:25 83:9,11
102:7 107:4
122:13 127:24
132:7 139:21
**mentors** 29:22
126:17
**Meredith** 16:8
**message** 91:20
92:12 93:4
107:21,23
**messages** 88:23
89:3,9,17,19
89:22 91:7,18
94:14 127:13
127:16 136:17
136:21,23
**met** 34:5 35:2
36:21 37:3,4,7
93:25 94:12
95:7 115:24
116:1 122:5
133:10
**Meyer** 1:5 2:3
3:12 17:1,2
18:23 20:9,14
20:19,21,25
21:11 22:10
23:14 27:4,10
27:12,16,25
28:14 31:14,17
31:22 32:9

34:3 36:5,13
36:22 39:23
40:25 41:7
44:5,15 45:3,3
46:2 48:22
49:13 50:15
53:18,24 54:2
54:8 55:16
56:20 57:3,7
58:8,22 61:12
62:2 63:6 64:1
65:16 66:24
67:2,24 68:10
68:17,22 69:1
69:1,6 70:3,12
78:1 80:17
81:1 82:18
83:22 98:12
100:4,6,14
103:14,22
105:20 106:14
106:18 107:15
107:21 108:7
108:14 109:25
110:14,18
111:5,23,25
112:19 113:7
113:14,24
114:11,13,19
115:6 117:7,10
117:24 118:3
119:12,19
120:1 121:1
123:9,20
125:17,24
127:3,19 128:3
128:9,12,17
131:3,15
133:19 134:2,6
134:13 136:4
136:18 137:20
**Meyer's** 17:18
17:22 19:5
31:24 39:12
44:24 48:12
65:20 79:22

83:1 99:12
102:13,16
103:1 113:10
116:7 118:23
120:20 121:5
121:19 123:18
127:1 128:23
130:13 132:3
132:16
**middle** 64:6
104:16
**Middleton**
107:1,10,13
108:19
**Middleton's**
108:21
**Mike** 2:19
**mile** 104:15
**miles** 32:22
**military** 10:3
**Milodragovich**
2:15
**mind** 25:11
27:22 111:12
128:5
**mine** 35:4 78:3
**minimize** 129:7
**minor** 25:10
**minus** 120:3,4
**minutes** 36:4
**mirrored** 65:3
**misrepresented**
78:19
**missed** 94:5
**Missoula** 2:16
5:11,12 8:17
10:6,21 11:15
13:16,17 34:12
34:18 85:20
92:2 115:20
117:15,20,22
**model** 31:12
132:10
**models** 133:2
**mom** 85:24
**moment** 92:8

**money** 107:7
111:7,19
**Monson** 16:8
**Montana** 1:2,18
4:15 8:3,13
10:22 13:9
14:19 52:10
86:12 98:4
110:18 126:20
126:23 127:4
140:2,7,23
**month** 4:21,22
6:12 119:14
**months** 15:21
17:4 90:25
114:22 122:5
**morning** 34:20
34:21 55:18
94:2,3 97:19
**Morningstar**
62:20,21 71:18
**Morris** 2:9
**mountain** 9:20
13:6 24:12
32:8 39:9
86:24 92:4,17
93:16 95:1
96:5,10 102:11
104:16 105:5,7
112:2,25
119:19
**move** 16:17,22
108:21 116:12
**moved** 8:17,18
10:6,21 16:24
17:6,7 38:4
82:11
**MSU** 15:13
**MT** 2:11,16
**muddy** 30:14
**Multi-day** 9:2
**multiple** 27:20

_____
**N**
_____
**N** 3:1
**Nadine** 2:4

81:14
**Nadow** 2:4 6:3
  18:9 20:16
  22:1,2,2,4,4,19
  23:2,4,10,14
  51:17,23,25
  52:5,15,20,23
  52:25 83:7,23
  84:4 88:1,5,9
  88:13 89:2,14
  89:21,25 90:11
  90:23 103:3,5
  136:19 137:7,9
  137:13,18,22
**name** 4:12 5:18
  5:23,24 24:3
  31:12 33:5
  35:15 48:9
  64:18 66:21
  85:19 95:9
  109:10 125:8
  129:22 133:9
  133:11,15
  135:22
**named** 23:23
  33:4 75:12
  114:6 130:16
  130:19 133:10
  140:13
**names** 133:8
**native** 81:10
**natural** 118:12
**near** 35:2 36:15
  37:5 48:19
  67:11 73:5
  75:1 76:24
  79:20 99:23
  101:15 111:25
**nearby** 36:21
**necessarily** 82:9
**necessary** 29:21
  136:25
**need** 6:18,23 7:1
  72:13 84:2
**needed** 124:12
**needs** 94:8

**negligence**
  102:16,19
  103:1
**negligent** 103:10
**negligently**
  103:8
**neither** 56:4
  61:22
**never** 24:23
  25:15 26:25
  41:18 100:9
  104:20 110:24
  119:15 125:1
  127:7
**new** 8:11,19,21
  10:5 65:5
**news** 94:12
**newspaper** 3:21
  11:18 109:9
**night** 33:10,21
**nnadow@gma...**
  2:5
**Noah** 95:3
**nod** 6:24
**Nope** 7:19 25:6
**North** 4:15
  24:24
**notarial** 140:20
**Notary** 1:21
  140:5,23
**noted** 78:21
**November**
  14:18 16:18
  107:22
**nuance** 101:8
**number** 4:16
  40:9 53:2 65:8
  67:16 77:8
  101:16 108:24
  124:18 126:10

――――――
**O**
――――――
**O** 2:4 3:3 73:23
**O'Connor** 86:25
**oath** 19:17 84:11
  88:18

**object** 52:9,17
  52:22,24 89:7
**Objection** 6:3
  20:10 103:3
**observed** 75:3
**obstacles** 45:13
  45:16,17,24
**obtain** 127:22
**obtained** 37:2
  125:23
**obvious** 30:8,12
  112:23 119:8
**obviously** 56:9
  70:3,21 84:1
  105:11,15
**occasion** 27:20
  119:23
**occasionally**
  12:14 120:22
**occasions** 27:21
**occurred** 86:18
  100:16 112:9
**October** 14:17
  98:3
**offered** 87:2,3
  87:14
**offhand** 39:20
**office** 34:1
**offices** 1:16
**Oh** 57:25 65:1
  67:4 110:9
  137:9
**Ok** 92:10 96:20
**okay** 5:24 6:8,15
  7:2,9,20 17:12
  19:7,10,16,19
  20:24 22:10,15
  22:18 26:25
  28:14 29:14
  33:9 34:19,25
  35:23 36:13,24
  37:4,10,25
  39:11,15,21,25
  41:6,15 42:15
  42:20,23 45:8
  46:8,14 47:4

47:23 48:5,11
  48:18 49:1,7
  49:12,22 50:4
  50:5,13,17
  51:7,8,12,15
  52:3,8,15,20
  52:23,25 54:23
  55:9,16,21
  56:15 57:15
  58:2,20 59:1
  59:15,25 60:5
  61:9,12,24
  62:1,12 63:23
  65:21 66:9
  67:1,14 68:14
  68:16,21,25
  73:17,22 76:4
  77:1 82:2,3,16
  83:20,25 84:5
  84:7,13 85:6
  85:16 86:1,20
  87:8 88:11,13
  90:11,23 91:14
  91:20,25 94:2
  98:20 99:19
  101:12 102:13
  102:25 103:21
  108:14 111:22
  115:5,16
  117:16,23
  118:2,6,22
  119:19 120:19
  121:9 123:11
  129:9,22 130:7
  130:12,22
  131:2 132:20
  133:4,12,14
  136:24
**old** 24:10 137:16
**older** 23:21
**once** 4:21 12:17
  55:14 71:11
  82:22 99:24
  115:21 117:14
  117:15,18,19
  119:13

**one's** 102:22
**ones** 102:11
  137:16,16,17
**online** 95:2
**onlookers** 75:4
**open** 39:10
  54:11,14,16
  55:22,25 56:3
  60:1 61:7 63:7
  105:7
**opened** 70:25
  71:22
**operating** 16:5
**operation** 15:15
  15:18
**operations** 13:6
**opportunity**
  89:11 90:1
  137:2
**options** 53:20
  72:1
**oral** 1:11,14
  139:20
**orange** 112:4
**Oregon** 8:10
**organizers** 99:6
**orienting** 86:14
**original** 137:8
**outcome** 134:23
  135:3
**outcomes**
  108:11
**Outdoor** 11:10
  11:13 13:17
**outdoors** 119:24
**Outlaw** 14:19,20
  16:15 17:9,13
  17:21 18:25
  26:17 35:4
  86:25 95:25
  99:8 109:5,8
  123:24 129:2
**outright** 102:22
**outside** 5:13
  14:17 76:18
  102:11 117:22

119:25 120:4
134:25
**overly** 64:14,15
136:12
**overview** 28:5

───────

**P**

**P.C** 2:15
**p.m** 107:22
138:9
**P.O** 2:10,16
**page** 3:1 6:17
77:24 78:11,20
80:8 82:5
109:13 139:2
**pages** 139:16
140:16
**paint** 112:11
**painted** 122:7
**paragraph**
41:15,19 80:7
80:9 82:5,7
99:22 109:13
109:16 110:23
125:15,21
**parents** 23:20
**parked** 35:1
**part** 9:5 11:5,6,7
12:3 13:2
15:10 30:10
38:14 48:3
49:9,12,23
53:21 89:8
**participating**
23:25
**particular**
132:10
**particularly**
32:7 136:11
**Partners** 14:19
14:21 16:15
17:9,13,21
18:25 35:4
109:6,8 129:3
**parts** 71:12
**pass** 26:4,6,22

26:25 36:9
96:20
**passed** 137:22
**passengers** 5:7
**passing** 127:24
**Patch** 75:12,16
75:18,25 76:8
77:4,24 85:8
85:14
**Patch's** 78:1,2
**path** 38:13,15
67:6 73:9,22
135:17
**patient** 75:5,5
75:20
**patrol** 3:18 9:11
12:24 25:9
27:13,17 28:1
28:4,7,15,20
28:25 29:2,22
61:13,18 63:20
65:2 75:13
76:25 87:11
93:6 95:8 96:1
121:5 125:19
**patroller** 9:19
10:1 28:12
45:20 55:4,6
55:15 56:7
57:22 58:7
59:2,3,12 60:3
60:20,24 61:21
64:10,10 75:12
75:21 121:8,14
121:15 123:6
123:14 127:20
127:21,25
128:4
**patrollers** 59:22
75:3,19 92:19
94:1,4,13,21
97:6 98:22,25
99:11,16 107:8
114:1 121:11
121:13
**pay** 111:19

**PBR** 96:1
**pen** 67:1 77:3
**pending** 5:9
**people** 23:19
28:23 37:21
52:10 60:6
72:23 73:2
74:6 75:1
99:18 101:2
111:2 112:4
113:24 114:17
115:1 121:16
**perceived**
120:13
**Perfect** 96:9
**performed**
133:18
**permission** 83:8
**person** 5:5 28:4
94:4,22 125:11
126:7 135:1
**person's** 114:14
**personal** 42:17
42:24 81:15
100:23 102:22
102:23 124:12
**personally**
22:16 111:19
121:13 123:8
123:16 133:12
136:12
**perspective**
118:2 119:2
**pertain** 42:18
**Pete** 121:17,19
122:1,2,3
**phone** 33:6
34:13 76:10
87:19,20,23
88:20 91:13,16
91:21 126:8
**photo** 48:4,10
57:5 63:16
**photograph**
3:15,17 67:21
84:25 112:14

112:17
**photos** 95:3
**physically** 116:9
117:17,24
**picture** 84:19
122:7
**pictured** 58:4
65:19
**pieces** 79:4
**place** 5:12 50:12
62:20 139:20
140:12
**plain** 72:5,9
**plainly** 30:8,12
101:6 112:23
**plaintiff** 1:6 2:3
22:17
**plan** 33:22 92:23
106:23
**plane** 74:23
**planned** 33:18
**planning** 93:12
**plans** 21:13 34:9
**plate** 120:10,11
**play** 30:18 102:3
114:16
**played** 121:22
131:5
**playing** 131:7
**please** 4:12,16
5:20 6:20,21
7:6,10 20:24
21:6 38:6,9,21
39:15 40:15
43:14 47:17
48:5 49:1
52:16 56:14
58:2 60:13
61:2 62:22
65:24 66:15
68:14 73:13,20
74:2 77:5
87:25 93:21
97:25 107:19
112:12 115:13
135:22

**PLLP** 1:17 2:9
**point** 41:3,5
52:15 55:2
56:3 76:19
86:23 124:15
**pointing** 18:7
**poking** 66:7
**poles** 56:8
**politely** 123:3
**poor** 131:13
**poorly** 101:1
**pop** 87:23
**Porter** 11:9,13
**portion** 82:25
**Portland** 8:10
**position** 26:17
58:15 80:19
108:15 110:6
113:5
**positions** 11:8
**possession** 18:17
19:4
**possibilities**
131:22
**possibility** 131:6
131:10,15,15
131:17
**possible** 19:25
44:18 60:11,18
73:25 89:5
129:5
**possibly** 80:1,13
82:20
**post** 108:3 132:8
132:11,21
**potential** 108:10
133:21
**practice** 62:11
105:9 119:16
**pre-released**
95:6
**preceding** 41:17
42:19 54:5
**precisely** 38:19
57:11 134:16
**prefer** 136:11

prepare 19:23 22:4 107:23 123:20
prepared 95:8
prerelease 131:10 132:7 133:21
prereleased 131:7,16 133:5
prereleases 133:1
present 2:18 41:4 128:7
presented 22:24
press 96:6 123:20 126:23 127:4
presumably 62:21 78:18 79:12 106:7
pretty 33:17 36:3 50:4 54:16 64:4 69:11,13 74:21 79:5,17 87:1 104:5
prevent 25:22 26:1
previous 69:11
primarily 12:13 28:6 75:15
print 10:15 90:1 136:21,21
printed 10:14 89:15
printing 81:13
prior 26:9 31:17 39:12,22 44:22 49:14 50:19,22 51:4 55:2 59:1 85:24 103:19 106:8 107:1 115:22 116:20 117:10,13,17 119:10,16 120:6 131:2

privilege 20:16 20:17 90:21
probabilities 131:22
probably 15:25 22:9 26:22 33:6 34:23 65:22 67:12 69:10 70:24 73:17,25 76:3 76:5,12 80:21 82:23 86:23 92:25 96:11 110:7,20 112:5 120:4 122:5,6 122:12 124:1
problem 24:15
procedural 21:18 22:20
Procedure 1:20
proceed 95:21
proceedings 4:1
process 6:13
produce 18:12 42:15,23 81:9
produced 39:25 81:20
producing 18:18
production 15:13
professional 9:25 106:20 121:12
professor 99:24 126:19
Program 13:17
progress 5:1 91:18 95:16
progressed 104:13
promise 41:23 42:6
promised 41:16 41:22
promote 128:9
promoted 17:15

promotion 34:16
pronounce 22:1
proof 128:18
protect 29:23 30:2
provide 69:16 83:16 90:10 107:3 121:24 136:9
PSIA 12:7
psychologically 119:10
Public 1:21 140:6,23
publication 18:2 19:1
publish 125:3 127:5
published 125:1
publisher 109:9 126:23
pulled 18:2 19:2 124:4 125:4
purposes 129:24
pursuant 1:19
pursue 108:22
put 28:24 66:9 66:14 68:18 72:18 73:15,19 108:11 126:1 127:3 132:9

### Q

quadrant 63:16
qualified 12:9
quality 30:16
quarters 109:12
question 6:20 7:4,9,12,13 21:8 59:2 82:13,17 100:7 105:14 114:13 124:2 131:13 132:14
questions 7:1

22:23 34:23 35:7,8 64:9 90:12 129:12 129:13 135:9 136:3,13,25
quick 29:5 84:14 87:25 96:24
quickly 6:16 28:8 63:21 119:15
quit 124:8
quite 42:24 58:9 60:19 66:8 81:15 116:20 118:12,12 124:7 137:23
quotation 125:17,24

### R

R 3:3,3,3 140:1
R-A-Y-N-O-R 16:5
race 94:7 95:1 99:3,7
radios 96:1
raft 13:12,14,23 13:24
ran 101:10
rarely 70:19
rate 112:6
Raynor 16:4
reach 4:25 85:18
read 41:19 89:21 90:18,22 96:25 97:2,10 100:10 107:25 128:18 137:2 139:16
reading 89:16
ready 51:12,13 84:7 129:20
real 6:16 29:4 84:14 87:25 96:24
realized 75:7

83:11
really 68:2 70:22 79:2 89:18 90:16 105:24 120:17 132:12
realm 134:25
reason 7:16 53:13 78:19 90:21
reasonably 116:11
recall 21:3 24:6 26:19 27:23 28:4,11,21 32:14 36:25 37:9 38:19 39:13,24 44:4 44:7,20 45:10 45:12,14 46:1 46:9 49:21 50:16 51:5 54:4 55:13,20 58:10,19,20 60:15,22 61:9 61:25 64:14 65:1 68:2 70:10 75:22,23 79:14 87:3 104:4 107:12 108:12 113:23 118:1 121:7 122:14 126:7 130:15,21 132:12
recalled 29:21 45:6
receive 87:13 89:1 107:8
received 12:7 25:15 26:7 121:8
receiving 98:19
recess 19:14 51:10 83:6 88:15 129:17

recognize 29:9
36:18 39:17
43:16,20 46:22
47:1,8,19 48:7
49:3 50:6 53:8
56:16,24 67:20
77:12
recognized
64:23 115:23
recollection
21:10 23:12
41:10,13 46:5
53:16 54:9
58:12 60:9,10
64:5,19 66:17
67:5 71:5 74:7
113:18 114:21
127:6 128:21
recommendat...
35:4
record 7:2 19:16
51:12 52:7,10
83:3,12 88:17
90:19,22 91:6
97:10 129:20
129:24 138:2,5
140:16
record's 52:12
recorded 52:11
52:19 91:12
recording 51:16
51:18,22 52:9
52:14,16 83:8
recovered
116:11 118:3,7
119:2
recovery 99:13
116:3
recreational
120:20
red 3:16 9:20
24:12 65:2,15
66:1,4
REEXAMIN...
135:14
refer 129:25

reference 50:1
referenced 42:8
124:23
referencing
122:22 128:2
132:9
referred 22:7
referring 80:3
refresh 53:16
regarding 18:23
19:1,4 40:18
107:9 130:13
regularly 135:8
rehab 115:21
related 99:13
relation 48:2,14
67:8
relationship
21:22 82:12
115:6,10
relative 116:17
Relatively 6:14
release 123:21
relevant 81:18
136:19
relieved 135:7
reluctant 120:17
remaining 135:9
remember
21:19 27:25
33:5,10,13,17
35:25 37:13,16
37:20,22,25
39:11,21 41:19
44:16,24 48:23
50:17,21 54:7
54:18,23 55:11
55:16 61:17
62:2 63:11,19
64:17,24 67:6
75:6,17,24
76:7 95:8
97:25 113:9
114:17,19
122:17,24
135:23

REMEMBER...
1:14
remembers
90:12 114:11
114:25
removed 41:12
134:12,14
rent 33:1,2
renting 33:3
reopen 84:2
repeat 120:25
replied 93:7,10
93:15,19,24
95:17,19,22
96:3,13,17
97:20,25 98:5
reply 94:17
report 62:19
95:7,10,13
reported 63:22
114:6 129:8
140:13
reporter 1:21
6:25 52:5,6
137:6,25 138:2
140:5
reports 91:18
repositioned
82:11
represent 53:11
83:21,22 90:7
90:20 108:17
129:23
representation
112:25
representations
58:24
represents
22:10,16
request 89:2,25
requested 84:1
required 25:8
requiring 18:12
reserve 84:2
135:9 136:24
136:25

RESERVED
138:11
residence 117:2
residing 140:24
resign 123:24
resignation 3:20
18:24 109:5
resort 1:8 2:7
12:1 19:20
93:3 101:4
109:18 110:5
122:19
resources
108:11
respect 124:14
respond 92:6,9
92:21
responded
92:24
responder 9:12
9:14
responding 28:8
response 18:18
18:21 20:5
40:1 52:2,4
63:20
responsibility
30:13 100:23
110:11
responsible
129:6
rest 52:16 68:11
82:1
restaurant 15:9
result 25:16
107:7
reviewed 20:2
89:6
reviewing 90:13
ride 87:14
right 7:14 12:22
28:25 30:9,20
30:23 37:5
38:17 43:12
44:25 53:24
58:22 59:4

63:11 67:23
71:17 72:23
73:2,3 76:20
78:22 82:18,24
84:2,11,18,19
84:24 85:4
86:2 89:11,19
90:10 93:22
97:23 99:5
101:22 102:1
104:21 105:13
106:3,6 109:25
112:23 114:20
118:10 129:12
right-hand
84:24
ring 130:18
River 9:2 13:18
Rivers 13:13
Road 32:21
117:3
Robbin 24:2,4
rock 80:1,14
82:21
rocks 37:19
50:19 54:20,21
69:22,24 79:9
79:11,13,14,20
105:3
role 104:15
114:16 121:22
129:7 131:5,7
rollovers 66:17
romantic 116:4
116:5
room 76:17 92:8
93:14,16
route 39:9
row 49:11
105:13,17
rules 1:20 6:16
run 29:11 36:11
38:19 39:19
44:20 45:5,8
46:2,24 48:9
49:5,7,11,14

49:23 50:18,20
50:24 53:17,23
54:2,10,14,24
55:2,7,11,22
56:11,21,25
57:8 58:21
60:3 61:18
62:1,4,12 63:5
64:6 65:16
67:22 68:22
70:5 71:4,24
74:19 84:21
96:4 112:18
121:1
**running** 30:8
**runs** 13:3 15:24
16:2 24:14
30:11 35:3
36:7 37:11
38:4 45:18,24
46:3,5 48:13
49:16,17,19
50:15 54:5
69:11 101:5,25
120:22 121:5
123:15
**Rut** 96:12 99:1,2

— **S** —

**S** 3:3
**safe** 134:18
**safety** 102:23,23
112:2
**Salewa** 1:8 2:13
52:13 129:23
129:25
**Sanders** 130:17
**Santa** 14:17
**Sarah** 3:22 18:1
124:3,23
**Saturday** 98:2
**saved** 111:2
**saving** 27:13,17
28:15
**saw** 56:4 69:5
75:5 113:4

**saying** 27:25
29:23 30:1
61:9 69:13
90:4,9 94:9
**says** 35:18,18
40:2 43:22
45:15 77:24,25
78:20 79:7
95:5 100:6
108:3 109:7
119:14 125:17
127:12
**scale** 68:1
**scanned** 36:9
**scenario** 131:11
**scene** 63:21
78:21 79:8,13
79:21
**school** 8:4,8
9:11 10:8,20
11:2,5,15
13:25 26:13
**Scott** 16:4 33:4
75:12,15,18,21
75:25 77:24
85:8,13 130:20
**seal** 140:20
**searched** 85:19
**season** 14:2,5,7
26:4,5,9,20,24
27:1,24 37:18
37:21 39:7
44:17,21 53:12
62:10 70:20,22
79:17 93:1,5
94:25 104:24
105:2,5
**seasonally** 15:8
**seasons** 11:17,19
11:23 12:22
13:22
**second** 26:23
49:8 54:5 55:7
55:10,21 56:21
57:8 77:23
78:10 80:7

82:4 83:4
90:14 110:25
125:15
**Secondly** 83:13
**see** 35:14 43:21
43:24 47:14,24
58:4 59:15
65:24 67:24
68:14,19,25
69:1 72:21,22
73:19 79:23
83:18,24 93:19
94:1,3,7 95:20
96:7,11 98:5
99:22 100:2
101:17,20
104:6,18
105:18,25
106:8 108:5
111:3 113:1
122:10 125:20
134:23 135:4
**seeing** 44:4
45:12,14 73:1
73:25 96:4
**seen** 22:25 61:22
83:14 100:12
113:16 119:15
**self-employed**
15:2
**semester** 11:4,5
**send** 95:10
**senior** 8:5 9:11
17:15 126:21
**sense** 43:25
58:24
**sent** 107:25
133:23
**sentence** 108:2
109:16 110:23
**separated** 134:7
**separately** 35:1
**separation**
123:25
**September**
20:20 97:16

**sequence** 55:1
55:12
**series** 42:4 97:8
**serious** 86:8,16
104:1
**seriously** 103:23
**served** 18:11
**serves** 11:22
43:12 44:11,19
**Service** 9:13
13:21 14:4,9
**session** 97:18
**set** 107:7 133:20
140:19
**sets** 136:22
**settlement** 4:25
6:6 106:24
111:1
**setup** 31:6
**shaken** 87:1
**shape** 116:9
**shared** 94:12
**sharp** 55:13
**sharper** 119:9
**she'll** 137:15
**Shedhorn** 95:1
99:5,5,7
**Shedmo** 99:4
**sheet** 139:18
**short** 19:8 64:6
64:15 88:21
97:8
**shorthand**
140:14
**shortly** 65:16
105:25
**shouting** 67:13
**show** 35:21 57:2
91:2
**showing** 91:6
**shown** 29:9
38:12 39:4,12
39:17,22 44:9
46:22 47:8,12
47:19,24 48:7
48:11 49:3,20

49:23 50:7,14
56:16,19,24
58:20 59:10
60:8,16,21
63:2,14 64:2
69:24 71:18
73:8
**shrubs** 72:6,13
**side** 54:15 59:16
59:20 84:24
**sight** 57:20
**sign** 43:17,20,23
44:4,9 45:15
48:2 137:3
**signage** 29:1
112:4
**signature** 77:25
78:10 138:11
**signed** 45:18
139:19
**significant**
74:22 79:3
108:11
**signs** 28:18,24
37:20 45:12
56:4 61:23
121:6 123:15
**single** 72:13
110:25
**sister** 23:21,22
86:22
**sit** 114:10
133:14
**six** 17:4 64:15
75:4 80:25
114:1
**six-month** 14:16
**ski** 3:18 9:10,18
10:1 11:16,19
12:1,6,24 13:5
15:11,15 16:10
17:19,22,23
19:5 24:14,19
24:22 25:8,16
25:16 26:4,5,9
26:20,25 27:13

27:17 28:1,7
28:15,19,23,25
29:2,11,22
30:4 34:25
35:5 39:12
41:7 42:9
44:24 45:20,23
45:24 46:24
47:12,14,21
48:9 49:7,19
50:13 55:4,6
55:15,22 56:7
56:10,25 57:22
58:7 59:2,3,12
59:21 60:3,19
60:20,23 61:13
61:18 62:17
63:1,13,19
64:1,10,10,21
65:2 66:6,8
69:3,25 70:5
70:11,21 71:11
71:13,17,24
72:18,18 73:6
73:7 75:3,12
75:13 76:14,17
76:24 79:22
83:1 86:7,17
97:6 98:21,25
99:11 100:24
101:1,9 102:14
102:17 103:2,6
104:1 105:9
107:8 112:18
112:19 113:5
114:12,20
115:12,14,17
116:2 118:4,15
119:11 120:9
121:5,11,12,19
123:6,14,18
125:12,19
127:20,20
128:4,23
130:14,24
131:4,4,18,21

132:6
**skied** 24:23
26:18,19 27:7
31:14 32:6,9
37:13 38:1,3,4
44:17,21 46:5
48:12,17,22,23
49:9,10,13,23
53:17 55:2
56:11,12,20
57:3,7 60:16
61:12,13,23
62:13,24 63:7
65:15,22 67:2
68:17 72:24
73:24 74:8,19
105:21 113:25
121:1 133:13
**skier** 30:17,20
32:3 58:13
101:3,5,25
102:7 110:11
**skier's** 30:12
46:4 59:22
72:23 84:18,23
85:3 101:6
102:1
**skiers** 12:15
30:25 100:22
101:24 102:11
132:6,25 133:3
133:4
**skiing** 3:14
15:22 24:8,9
24:11,13,17
25:7,18 26:10
26:12 27:5
30:7,10 31:4
31:24,25 32:11
34:3,9,14 35:6
37:8 39:11,13
39:21 43:2,5,7
53:24 55:17
60:15 63:11
66:24 67:11
69:1,6,10,18

70:4,11 71:7
72:21 74:1,16
75:13 76:2,3
86:15 100:7,10
100:15,18
101:2 103:8,9
103:14,22,25
105:8,12,16,23
105:25 106:3,5
106:11 112:8
113:2,17
125:18 133:3
134:2,18
**skill** 140:17
**Skimo** 99:5,7
**skis** 31:7 80:21
119:19 130:10
130:10 134:1,7
134:10,15
**Sky** 1:8 2:7 3:18
3:21 14:19
16:14,17,20,23
17:2,6 19:19
21:14 24:17
26:5,10,20
27:1,7,12,17
32:5,18,22
36:19 53:9
60:6 70:17
79:18 92:16
95:3 97:6,21
98:21,25
104:10,20
105:4 106:21
109:9,18 110:5
113:17,20
117:2 121:5,13
122:18 123:14
**slope** 58:19,24
59:13 63:15
74:22,23,24
101:15,25
104:9
**slow** 106:9 112:4
**slowed** 112:3
**slower** 105:21

106:5 112:5
**sluggish** 116:17
**small** 21:14 66:6
72:6 106:20
**snow** 30:16,22
64:7 66:7 72:7
80:22
**Snowbowl** 11:16
11:20 12:17,25
13:2
**Snowfield** 24:24
**somebody** 5:3,4
101:10
**son** 86:7
**soon** 50:4 83:17
89:5
**sorry** 5:6 8:18
14:6 24:3
26:14 52:15
93:2 97:20
99:2 101:18
104:23 120:16
**sort** 7:22 9:8
63:1 71:15
101:21 122:23
126:21
**sound** 12:18
**sounding** 128:14
135:1
**Sounds** 93:10
95:22 96:13
**source** 73:2
104:7
**south** 1:17 2:10
32:22 117:2
**speak** 20:9
40:25 41:4
56:9 75:9
81:14 114:14
**speaking** 28:3
41:2 61:13,18
75:17 108:18
116:18
**specific** 21:7
33:25 57:24
82:17 102:18

106:5 112:5
**specifically**
37:22 44:7
45:14 53:20
70:10 89:8
106:17
**specificity** 46:10
**specifics** 104:5
116:10
**speed** 25:19 30:5
80:2 82:22
106:11 112:6
**spell** 5:20
**spent** 10:5 116:2
117:9
**spoke** 19:24
21:12,25 75:15
85:20 91:16
**spoken** 23:13
24:5 41:6,25
99:16 114:8
121:18 122:4
123:5 127:8
130:12,16,19
**sports** 118:11,24
**spousal** 20:16
**spouse** 21:20
128:14
**spring** 15:12
17:6 116:23
**springs** 34:8
117:22
**ss** 140:3
**staff** 17:14
**stage** 79:1
**stagehand** 15:12
**stamina** 120:12
**standard** 65:2
105:9
**standing** 59:9
60:20
**start** 23:10
31:22 34:19
37:11 46:17
50:9 52:16

55:24 85:16
91:15 104:14
116:21
started 13:24
14:5,6,17,18
31:25 37:8
56:10 62:15
72:20 74:1
76:4 85:12
starting 17:5
34:21 97:13
starts 80:9 91:21
93:11,22 95:23
99:23
state 4:12
105:10 140:2,7
140:23
stated 132:19
statement 3:19
76:20,23 77:2
77:14 78:5,17
85:9
states 1:1 44:9
status 6:2 20:15
21:16 23:17
stay 42:18,19,21
stayed 34:6
87:13
Steinbrenner
2:15
stepped 113:6
Steve 87:10,18
88:24 89:23
90:17 91:7,11
91:23 92:1,16
93:12 94:15,23
95:11 96:2
97:3
sticker 135:23
Stifler 121:17,18
122:1
Stillwater 13:12
96:10
stop 66:4
stopped 66:1
stopping 70:6

stops 66:2
storage 134:4
store 128:1
story 18:2,3
95:4 123:2
124:3
story's 95:2
straight 74:23
straightforward
61:3
strength 120:13
120:13
stress 135:7
stretch 41:18
strike 45:22
113:23
struggles 118:10
118:24
struggling
116:13,14
student 11:17
stuff 22:20
66:18
subject 88:8,9
submit 89:4
submitted 20:3
subpoena 18:11
18:18,21 20:5
40:1 89:9,13
90:9
subpoenaed
90:4
subsided 118:18
substantial
135:7
successfully
16:9
sudden 30:15
sue 5:3
sued 5:4,5
suggested
125:11
suggestion 43:8
43:10,11
suit 111:10
suitable 105:8

105:12,16
summarize
132:20
summer 13:25
95:24 96:8,10
summit 24:24
92:7
superior 125:5
supervisor 16:7
supplying 90:13
support 121:4
132:2,16
136:10
sure 6:15,16
25:11 55:1
63:4 65:17,25
73:21,24 74:3
96:25 121:21
123:12 132:15
133:2 137:22
surgeries 116:10
surprised
108:10
surrounded
54:14
sustained 80:20
Swift 35:3,25
36:10 37:11,13
38:3,13,17
39:6
swing 92:17
sworn 4:8 140:9

──────────
T
──────────
T 3:3,3 140:1,1
T-S-A-I-N-A
15:18
take 19:8 36:7
50:3 51:6 63:1
63:13 88:3,10
88:11 129:14
137:7,10
taken 1:16 4:2
4:19 6:9 9:11
19:14 29:13
38:17,24 50:10

51:10 53:21
65:17,19 67:21
83:6 88:15
129:17 140:12
talk 6:18 7:25
24:8 41:11
45:8 55:21
62:1 82:1
106:14 114:3
115:5
talked 20:21
21:3,10,13,15
21:22,23 62:5
62:7 86:23
103:16 106:19
106:23,25
107:17 111:9
120:21 121:20
122:2 131:17
132:6
talking 17:19
20:10 41:5
76:9 84:23
85:2 103:18
121:7 127:20
131:23
tall 64:13,15
taught 12:11
Tawny 23:21
Taylor 107:1,9
107:13 108:18
TBI's 114:16
teach 12:9,15
teaching 12:17
team 96:5 124:5
124:6 125:7
tech 95:5
technology
34:11
telephone 4:16
tell 8:1 13:8
19:22 20:24
34:2 35:20
48:3 51:21
64:25 68:16
86:17 103:21

109:3 113:20
115:10 118:6
131:3,14,20
telling 85:7
ten 26:12,16
tend 133:20
terminology
111:12
terms 70:24
84:18 116:12
120:12 128:15
terrain 43:12
44:12,19 79:15
80:23
tested 133:23
testified 4:8 32:9
134:6
testify 60:7
140:9
testimony 4:2
7:17 140:16
testing 133:17
133:24 134:17
text 34:13 87:19
89:17 91:6,18
91:21 97:5
98:20 117:12
136:21,22
texted 35:3 43:2
92:15
texts 87:21
90:19 97:3
thank 4:18
10:17 19:12
52:25 84:4
93:10 94:14,18
94:18,19 96:22
97:15 129:11
135:10 136:1
thanked 27:12
27:17
thanking 28:15
thanks 92:8
94:21,25 95:22
96:2,11
therapy 98:17

98:18
**thereon** 139:18
**thesis** 126:21
**thin** 71:2
**thing** 29:23 30:2
85:25 114:15
136:6
**things** 21:17
30:15,19 60:6
80:23 102:3
107:4 110:10
114:17 115:3
118:11 119:21
137:1
**think** 6:6 22:7
31:12 32:6
34:16 35:1,11
37:10 41:2
42:7,13 43:1
49:12,22 52:9
60:18 62:7,19
63:10,17 64:22
67:12 68:13
70:10,23 75:4
76:3,18 78:18
78:25 79:24
80:10,12,16,17
80:20,21,23
82:6,9,10,19
85:6 86:11,19
87:2,9,14,19
87:22,24 94:12
98:13,13 99:17
100:13,25
101:3,4,8
102:4,9,18
104:12 105:4,6
105:7,8 107:5
108:1,20
112:10 114:23
115:22 119:4,9
119:15 120:18
120:24 121:20
122:2,13 123:1
124:11,12,14
126:3 127:9

128:20 129:5
129:11 131:24
131:25 132:20
134:4,9,11,24
135:6 136:3,13
137:4,20
**thinking** 63:19
68:5 104:14
135:8
**thinks** 95:5
**third** 26:23 45:4
62:1,3,12 63:5
71:3,4 80:8
**third-party** 90:6
**thought** 59:3
72:24 83:9
105:11,15
131:20
**threat** 108:16
**three** 12:19,21
15:21 16:1
44:8 101:21
105:12,16
109:12
**throat** 41:4
**Thursday** 3:12
40:3 95:18
**ticket** 34:17 35:2
36:15,19 37:1
37:2,5 86:12
94:8,20
**time** 6:8,19 11:2
11:5,6,7,9,25
12:3 16:4 17:3
31:20 33:22,25
34:12 35:21
39:10,22 41:7
42:1 44:17
45:10 48:24
49:8 50:22
78:16,19 89:3
92:18 93:9
97:24 108:5,9
114:18,23
115:13,25
116:2,8,18

117:9,9 125:6
132:14 135:10
139:20 140:12
**times** 27:10,12
30:18 32:14
48:21 69:18
70:20 105:13
105:17 115:18
117:16,23
119:25 130:11
**to-wit** 4:2
**today** 7:18 17:19
18:5 22:21
23:16,18 40:1
83:17 84:1
92:18 96:5,6
114:10 115:17
128:24 133:14
134:9 137:1
**toe** 133:5
**told** 15:7 19:25
23:22 41:25
52:5 55:19
86:13,25 99:24
115:1 118:16
118:22 119:1
124:8 128:4
132:21
**Tom** 114:7
**tomorrow** 92:4
92:23 93:13,20
95:19 97:18
98:5
**top** 35:14 38:13
39:6 40:3
43:18,22 44:1
45:12 47:9,21
47:25 48:16,19
57:10 70:5
**touch** 34:6 87:17
126:1 127:3
**town** 92:25
**track** 38:24 39:4
50:20 58:1,4,7
59:4,7 60:21
66:2,5 68:23

73:24 74:1,9
74:19 79:25
80:2,13,18,20
82:20,21 95:7
100:9 101:16
101:19 104:15
105:21 106:9
111:22,25
112:1,22 113:2
113:11,16,20
121:2
**tracked** 85:21
**tracking** 95:12
96:6
**tracks** 47:14
58:14 60:7,8
60:12
**traffic** 58:13
**trail** 3:14 39:1
50:1 51:7 53:9
53:12,15
**trail/snow** 79:8
**trails** 96:16
**training** 9:9
**transcribed**
140:14
**transcript** 137:3
139:19
**transferred** 8:12
115:20
**transit** 86:8
**transition** 74:8
74:13,14,18
**transitioned**
68:22
**traumatic** 119:4
**travel** 25:24
31:13
**traveling** 8:22
80:21 95:14
**treated** 79:6
**treating** 75:7
95:24
**treatment** 82:11
98:19
**treats** 92:3

**tree** 30:12 66:6
80:1,14 82:20
101:9,10
**trees** 37:19
54:15 59:15,21
64:5,6 69:22
69:24 72:6,13
105:3
**trial** 130:22
135:10
**Tribble** 24:2
**tried** 54:21
129:4,7 134:24
135:2
**trip** 21:17
117:21
**triple** 24:21
**trips** 8:24 9:1
96:10
**true** 71:9 111:17
139:19 140:16
**truth** 140:10,10
140:11
**truthful** 7:17
78:7
**truthfully** 19:25
**try** 25:18,23
93:8
**trying** 6:5 69:3
70:8 78:7 95:6
106:9 123:1
**Tsaina** 15:17,19
**tube** 41:12
**turn** 29:4 46:17
47:4,17 54:21
63:1,14
**turned** 82:23
**turnoff** 32:22
**turns** 106:8
**twice** 49:11
119:14
**twin** 23:21 86:22
**two** 5:7 11:17,19
11:23 12:19,21
12:21 14:10,22
19:1 26:17

35:2 37:11
38:5 49:17,19
60:6 79:4
110:2 115:6,14
116:21,25
118:14 126:17
132:5 136:16
**two-sided** 77:17
**Tyler** 24:2 125:6
125:8
**type** 8:23 9:1
31:4,11
**typed** 40:2
**typewriting**
140:15
**typewritten**
139:16
**typically** 12:20
24:14 29:1

### U

**Uh-huh** 5:19
9:15 10:16
99:25 111:14
135:19
**ultimate** 125:5
**um** 18:9 22:24
58:23 62:10
67:6 79:12
107:9
**unaware** 83:14
**uncharacteris...**
33:20
**uncontrollable**
102:10
**underneath**
50:24
**understand** 7:10
19:17 28:22
29:1 43:1
66:20 81:17
84:10 88:18
90:3 100:3
104:18 130:3
136:15
**understanding**

22:13,14,15
43:6 98:8
107:6 130:8
133:23
**understood** 7:13
101:12
**unexpected**
132:7
**unintentional**
83:9
**UNITED** 1:1
**University** 8:13
10:22 13:9,16
126:20
**unload** 46:7
**unloaded** 38:16
**unloading** 43:17
**unmarked**
45:13,16,24
71:23
**unpleasant**
110:10
**unpredictable**
114:15
**Unruh** 2:19
**updates** 20:15
23:17 76:6
**upgrades** 132:9
**uphill** 31:13
50:9,11 79:25
80:13,17 82:19
**upper** 54:10,11
63:16
**upset** 87:16
**upstairs** 93:16
**USA** 1:8 2:13
129:23
**use** 116:19
**usually** 12:19
70:11

### V

**Valdez** 15:19
16:2
**Valkenburg**
3:25 126:19

**Van** 3:25 126:19
**vantage** 29:12
112:24
**variables** 102:10
112:10
**variety** 11:8
13:11
**various** 116:10
**vegetation** 58:15
**vehicle** 5:8
**Verdict** 134:10
134:15
**versed** 126:21
**version** 81:24
**versus** 114:25
**vest** 65:2
**view** 31:21
63:18
**violation** 52:9
**visible** 101:6
**vision** 31:3
**visit** 92:2
**visited** 115:18
115:21
**vocabulary**
116:19
**volunteer** 9:10
9:18 29:22
**vs** 1:7

### W

**wait** 88:5
**waive** 137:4
**walk** 116:12
**walked** 52:1
**walking** 122:16
**Wallace** 4:15
**want** 21:9 34:20
47:12 49:18
73:11 83:15
89:21 90:4,16
109:2 136:14
138:3
**wanted** 83:7
85:17 124:15
**wanting** 56:9

**warning** 37:20
45:13,15
**wasn't** 41:5
54:14 87:5
**water** 9:3 19:12
96:16
**Waves** 13:16
**waving** 56:8
**way** 32:4 39:3
56:2 67:9
70:11 72:25
73:25 87:15
96:18 97:14
100:20 105:19
109:12 111:8
112:4 120:18
128:10,13
131:12,19
**ways** 119:1,7
**we'll** 19:8 29:14
33:8 50:3,3,4
55:9 84:1 88:6
88:9 93:9,24
97:24 136:19
136:24,25
**we're** 6:16 17:18
84:19,23 88:7
88:17 90:4
92:24 96:4,6
124:25 127:11
**we've** 20:10 21:3
21:15,21,21,23
63:23 70:23
84:17 89:6
90:4 108:13
120:21 121:20
133:13
**wearing** 29:17
29:19 62:6,9
65:3 75:6,6
134:10
**weathered** 68:2
**Wednesday**
95:15,18 97:21
**week** 12:18,20
12:21 23:12

98:1
**week's** 95:2
**weekend** 92:2
**weeks** 91:16
110:2
**weight** 120:17
**weird** 103:16
**Welcome** 43:22
**went** 6:13 8:9
16:14 46:1
48:24 72:18
85:7 92:1
105:12,16
125:5
**weren't** 61:6
115:14
**Whanganui** 9:2
**wheel** 48:3
**WHEREOF**
140:19
**white** 9:3 102:5
112:11
**Wild** 85:19
**wilderness** 9:12
9:14
**wildland** 13:22
14:10
**Wildsnow** 132:9
132:21
**Williams** 5:23
**willing** 81:9
**window** 35:2
36:15,19 37:5
**winning** 107:15
**winter** 15:11
21:18 99:3
**witness** 3:18 4:7
6:5 29:6 35:10
36:17 38:7,23
39:16 43:15
46:19 47:5,18
48:6 49:2
51:20 58:3
60:14 62:23
63:25 66:23
76:19,23 77:2

77:14 78:5,17
85:9 90:7,8,24
99:21 101:14
103:6 107:20
112:13 114:6
135:25 140:8
140:17,19
**witnessed** 114:7
**Wolfe** 121:17,19
122:1
**woman** 95:7
**word** 81:6
131:12
**words** 7:1 35:25
59:22 73:9
81:6 127:13
**work** 5:22 6:5
8:23 11:19
12:3,24 13:23
14:18,20 15:12
15:20 16:15
23:8 26:7
28:22 33:19,22
87:4,5,6 92:23
93:14 95:15
99:1,6 124:16
**worked** 8:24
9:13,25 11:9
11:16,17,25
13:21 14:1,25
15:10,11,16
17:12 19:19
56:2 80:23
**working** 8:22
11:5,6,10,13
12:16 13:14,24
14:3,10 15:8
23:24 122:20
**works** 93:4,17
**worries** 93:7
97:24
**worth** 73:1
**wouldn't** 31:19
101:11 110:7
112:8 128:4
**wraps** 97:19

**wreck** 16:12
17:23 19:5
25:16 39:12
41:7 44:24
54:2,19 55:19
69:5,7 70:17
74:13,15 79:22
82:18 83:1
86:17 102:14
102:17 103:2
112:20 114:12
114:20 118:4
119:11 121:19
123:18 128:23
**wrecked** 27:4
39:23 45:3
49:13,17 50:20
54:8 55:14,17
64:3 66:10,14
67:8,25 69:2
70:9,13,15,15
72:18 73:16
74:5 81:1
103:23 111:23
111:24,24,25
113:8
**wrecking** 74:11
**write** 17:17,22
41:16 42:8,10
66:21 79:11
80:5 109:21
128:17 135:22
**writer** 15:3
17:14
**writers** 11:10,13
117:10,18
**writing** 34:5,7
77:20,21 78:1
78:2 115:24
123:2,4
**written** 3:22
100:4 123:17
124:23 128:19
128:20
**wrote** 18:1,22
40:17,23 41:8

42:2,4 45:2,6
57:25 73:7
78:13,21 79:9
79:24 80:12,15
80:25 81:4
82:7 93:21
94:3,6 95:5,11
95:14,16 96:9
107:21 124:4
127:14 136:17

---

**X**

**X** 3:1,3 66:14
73:6,15,19,23

---

**Y**

**yards** 70:16
**yeah** 18:9 42:24
43:6 46:16
67:12 68:8
97:12 99:6
120:3 131:13
137:13,15
138:1,4
**year** 8:10,11,12
8:18,19,20
9:11 10:5,18
13:25 14:12,12
15:13 16:21
34:5 118:13
122:13
**years** 14:3,11,22
23:9 24:10
44:8 85:24
115:25 118:17
132:5
**yelled** 56:11
57:16 58:8
**Yep** 8:20 35:13
74:17
**yesterday** 96:18
**young** 64:6

---

**Z**

**Zack** 133:10,12
**Zack's** 133:15

**Zealand** 8:11,19
8:21 10:5

---

**0**

**04** 140:25
**06** 11:3
**09** 10:24 11:3

---

**1**

**1** 12:7
**10** 3:4 38:6,10
38:12
**10-person** 14:11
**10,000** 13:16
**10:00** 1:19
**101** 3:10
**107** 3:11
**108-109** 3:20
**10969** 2:10
**10th** 33:11 95:16
95:17,19
**11** 3:5 19:5
26:21 27:3,8
29:16 31:5,15
31:18 32:1,17
34:4,21 35:17
35:18 36:1
38:21 39:5,12
41:1 44:6 45:9
48:13 54:25
55:18 74:20
113:3,8 114:19
117:17,25
125:12
**11:15** 78:13
**11:30** 35:18
**11th** 33:13,19,23
34:10,15
117:13
**12-11-15** 78:13
**12/11/15** 3:19
**12:30** 107:22
**123** 3:20
**124-125** 3:23
**126-127** 3:25
**129** 3:2

**13** 3:5 39:15,18
39:22
**135** 3:2,17
**139-** 139:16
**14** 3:6 43:14,16
44:9
**15** 26:5 27:1
36:4
**16** 3:6 26:5 27:1
46:17,18,20,23
60:13,16,21
**17** 3:7,13 40:3
41:1 47:4,6,9
47:12,15
107:22
**17th** 40:20 41:14
**18** 3:7 47:17,20
47:24
**18-CV-00002-...**
1:7
**18th** 92:15,22
93:2
**191** 32:23
**1915** 1:17 2:10
**19th** 1:17 2:10
**1st** 98:3

---

**2**

**2** 3:3 36:16,18
92:8
**20** 3:8 27:9 48:5
48:8,11
**20-person** 14:12
**2002** 14:1
**2004** 8:7
**2006** 10:21,23
11:21
**2007** 11:21,21
**2008** 11:21
**2009** 10:19,25
13:10,20
**2010** 14:5
**2011** 14:2,6
**2014** 14:7,18
**2015** 4:24 14:18
16:18 19:5

AMANDA EGGERT

26:21 27:3,8
29:16 31:5,15
31:18 32:1,17
34:4,22 35:18
36:2 40:3,20
41:1 44:6,21
45:9 48:13
54:25 55:18
74:20 113:3,8
114:19 115:7
117:18,25
125:13
**2015.40-41** 3:13
**2015/2016** 26:20
53:12
**2016** 17:6 27:24
31:23 91:19
95:24 97:16
98:3 116:6,24
**2017** 3:22 14:24
15:1 17:8
109:24
**2018** 3:23 20:20
**2019** 1:18
139:22 140:21
**2023** 140:25
**21** 3:8 56:23,24
57:2
**22** 3:9,22 56:14
56:17,19
**22nd** 94:23
109:23
**23** 3:9 62:22
63:2,14
**24** 3:10 29:5,7
29:10 49:1,4
49:20,24 58:2
58:5,21 59:10
59:16 60:8
63:23 64:2
65:19 72:5
84:14,17
101:12
**25** 3:10 50:6,7
50:14 112:12
**26** 3:11 99:19

107:19
**28th** 1:18
**2D** 112:25

---
**3**

**3** 35:11 82:5
98:6
**3:16** 138:9
**30** 36:23 70:16
**3180** 98:3
**35** 3:4
**36** 3:3
**360** 31:3
**370-4936** 4:17
**37315** 117:2
**38** 3:4
**39** 3:5,5
**3D** 112:25
**3rd** 95:23

---
**4**

**4** 3:2,4,22 35:9
**40** 36:23 70:16
**406** 2:11,17 4:17
**416** 4:15
**43-44** 3:6
**44** 3:13
**46** 3:6
**47** 3:7,7
**48** 3:8
**49** 3:10
**4947** 2:16
**4th** 91:19 92:14
95:11,14

---
**5**

**5.10** 120:4
**5.11** 120:3
**50** 3:10
**501-7045** 2:5
**53** 3:14
**55** 3:13
**556-1430** 2:11
**56** 3:9
**56-57** 3:8
**57** 3:12 40:7,9

40:12,16 41:8
44:23 55:5
80:3,6,25 81:4
81:18 82:5
**58** 3:14 53:2,6,8
**58-60** 3:10
**59** 3:15 65:6,8
65:11,15 66:15
69:24 71:19
73:7
**59718** 1:18
**59719-0969** 2:11
**59806-4947** 2:16

---
**6**

**60** 3:6,17 67:16
67:20 68:10,18
69:25 71:19
73:4,8,12,15
74:5 75:2
135:16
**61** 3:18 77:8,12
77:12 78:11
79:21
**62** 3:20 108:24
109:3,4 123:23
**62-63** 3:9
**63** 3:10,21
124:18,22,22
125:16
**64** 3:24 126:10
126:14,15
127:11
**65-66** 3:16
**67-69** 3:17
**69** 3:16
**6th** 97:16

---
**7**

**7:45** 93:22
**7:50** 93:23
**71** 3:16,17
**72** 3:10
**728-1455** 2:17
**73** 3:16
**73-75** 3:17

**77-79** 3:19
**7th** 93:11,21

---
**8**

**8** 93:13,16,22
**80** 58:1
**80-82** 3:13
**84** 3:10
**8th** 93:25 94:17

---
**9**

**9** 38:8
**9:30** 35:1,22
36:1,3,9 38:1
**978** 2:5
**99** 3:11