Ian McIntosh
Mac Morris
CROWLEY FLECK PLLP
1915 South 19th Avenue
P.O. Box 10969
Bozeman, MT 59719-0969
Telephone: (406) 556-1430
Facsimile: (406) 556-1433

*Attorneys for Big Sky Resort*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JOHN MEYER,<br><br>                   Plaintiff,<br><br>vs.<br><br>BIG SKY RESORT; DYNAFIT<br>NORTH AMERICA,<br><br>                   Defendants. | CV-18-2-BU-BMM<br><br>**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF BIG SKY RESORT'S SECOND MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1, Defendant Big Sky Resort ("Big Sky") submits this Statement of Undisputed Facts in support of its Second Motion for Summary Judgment.

**STATEMENT OF UNDISPUTED FACTS**

1.      On December 11, 2015, Meyer met his then friend, now wife, Amanda Eggert, at Big Sky for a day of skiing.  *See* Doc. 3, ¶¶ 4-5; Exhibit 1, Deposition Transcript of John Meyer ("Meyer Depo.") at 52:3-25, 72:18-20.

2.      A charity event allowed Meyer to trade 20 cans of food for a ticket. (Meyer Depo. at 60:15-18; Doc. 3, ¶ 4).

3.      Posted at the ticket window was Montana Code Annotated § 23-2-736, which sets forth, among other duties, the skier's duty to "safely ski within the limits of [the skier's] ability" and to "maintain control of speed and course so as to prevent injury to the skier or others."  (Exhibit 2, Affidavit of Mike Unruh ("Unruh Affidavit") at ¶¶ 3-5; Ex. 1, Meyer Depo. at 65:14-70:5:11).

4.      Also posted at the ticket window was the skier Responsibility Code, which sets forth a skier's obligation to "Always Stay In Control and Be Able to Stop or Avoid Other People or Objects."  (Ex. 2, Unruh Affidavit at ¶ 6; Ex. 1, Meyer Depo. at 65:14-69:11).

5.      Another sign posted near the ticket window on December 11, 2015 warned: "Caution!  Early Season Conditions Exist!"  (Ex. 2, Unruh Affidavit at ¶ 7; Ex. 1, Meyer Depo. at 70:9-71:19).

6.      Just days before December 11, 2015, Meyer characterized himself as an intermediate skier when he took his skis in to be tuned.  (Ex. 1, Meyer Depo. at 332:19-335:20).

7.      Eggert agrees that Meyer is an intermediate skier. (Exhibit 3, Deposition Transcript of Amanda Eggert ("Eggert Depo.") at 31:24-32:3).

8.      Meyer told Eggert that 2015 was only his second full season on skis. (Exhibit 4, Deposition Exhibit 57 at 1 (Eggert letter to Meyer dated 12/17/15).

9.      At 9:30 am, Meyer and Eggert boarded the Swiftcurrent chairlift at the base of Big Sky.  (Ex. 1, Meyer Depo. at 75:21-78:18; Ex. 3, Eggert Depo. at 35:17-36:12).

10.      Multiple white signs posted in the lift house at the loading area of Swiftcurrent warned:  "**!<u>CAUTION</u>!: Early Season Conditions Exists**."  (Ex. 2, Unruh Affidavit at ¶ 8; Ex. 1, Meyer Depo. at 79:4-23).

11.      A yellow sign placed at the top of the Swiftcurrent chairlift on December 11, 2015 again warned: "⚠ **CAUTION** EARLY SEASON CONDITIONS EXIST".  (Ex. 2, Unruh Affidavit at ¶ 9; Ex. 1, Meyer Depo. at 80:15-81:16).

12.      Multiple yellow signs placed throughout the resort on December 11, 2015 warned:  "⚠ **CAUTION** UNMARKED OBSTACLES".  (Ex. 2, Unruh Affidavit at ¶ 10).

13.      Meyer admits that these signs mean "be careful," "caution," and that "there will be unmarked obstacles."  (Ex. 1, Meyer Depo. at 71:20-72:17; 81:21-83:2).

14.      Meyer and Eggert soon made their way to the loading area for the Challenger chairlift.  (Ex. 3, Eggert Depo. at 34:19-35:6, 37:25-38:5).

15.     A sign posted at the loading area of the Challenger chairlift warned that the Challenger lift services only Black Diamond, **Most Difficult** terrain, and Double-Black Diamond, **Experts Only** terrain. Another sign posted at the loading area of Challenger emphasized the severity and difficulty of the terrain accessed by Challenger, warning Meyer: "AVALANCHES AND MOVING SNOW ARE INHERENT RISKS ON AND BELOW TERRAIN ACCESSED BY THIS LIFT." (Ex. 2, Unruh Affidavit at ¶¶ 11-12; *see also* Ex. 1 Meyer Depo. at 99:5-25).

16.     Meyer boarded the Challenger chairlift.  (Ex. 1, Meyer Depo. at 332:19-335:20; Ex. 3, Eggert Depo. at 31:24-32:3, 34:19-35:6, 37:25-38:5).

17.     A white sign posted in the lift house at the loading area of the Challenger chairlift on December 11, 2015 again warned:  "**!CAUTION! Early Season Conditions Exists**".  (Ex. 2, Unruh Affidavit at ¶ 13).

18.     On the lift ride up Challenger, Meyer rode directly over Loop Road/BRT Road, which is a lower portion of the catwalk Meyer on which Meyer ultimately wrecked.  (Ex. 2, Unruh Affidavit at ¶ 17).

19.     A person riding the Challenger chairlift can see that there are no signs or other markings on either the uphill or downhill side of the catwalk.  (Ex. 1, Meyer Depo. at 104:4-105:24; *see also* Ex. 3, Eggert Depo. at 63:17-22).

20.     The Highway run and the portion of Loop Road at the base of

Highway are visible from the Challenger chairlift.  (Ex. 2, Unruh Affidavit at ¶

18).

21.     The photo below was taken from the Challenger chairlift on

December 12, 2015 under conditions substantially similar to those as existed at the

time of Meyer's ski wreck on December 11, 2015 and depicts the Highway run and

Loop Road from the Challenger chairlift:



(Ex. 2, Unruh Affidavit at ¶¶ 3, 18.)

22.     Multiple yellow signs placed at the top of the Challenger chairlift on December 11, 2015 again warned:  "⚠ **CAUTION** UNMARKED OBSTACLES". (Ex. 2, Unruh Affidavit at ¶ 14; Ex. 1, Meyer Depo. at 109:3-112:11).

23.     Early season conditions and unmarked obstacles were evident on December 11, 2015, including on terrain accessed by the Challenger chairlift and on the Highway run. (Ex. 2, Unruh Affidavit at ¶ 15; *see also* Ex. 1, Meyer Depo. at 89:24:3-92:8; 95:3-98:25; Ex. 3, Eggert Depo. at 37:16-19, 62:8-11, 69:18-22).

24.     Meyer and Eggert took two runs on Challenger prior to his wreck. (Ex. 3, Eggert Depo. 44:23-45:7, 55:21-25; *see also* Ex. 4, Deposition Exhibit 57).

25.     Meyer wrecked on he and Eggert's third run off Challenger.  (*See* Ex. 3, Eggert Depo. at 55:1-8, 55:21-56:13; 61:1-62:21.)

26.     Eggert believes she and Meyer skied "at least part of Highway" on their first run off Challenger.  (Ex. 3, Eggert Depo. at 49:3-11; 53:15-22).

27.     Highway is a black diamond run.  (Ex. 5, Big Sky's Resp. to Meyer's Second Disc. Reqs. at p. 6 (Answer to Interrog. No.2 (sic 4)).

28.     After their second run on Challenger, Meyer and Eggert returned to the base of Challenger for their third run.  (Ex. 3, Eggert Depo. at 61:12-16).

29.     For their third run off Challenger, Meyer and Eggert skied Highway. (Ex. 3, Eggert Depo. at 62:1-21).

30.    Meyer agrees that a "cat track" and "catwalk" are the same thing. (Ex. 1, Meyer Depo. at 51:21-23).

31.    Catwalks, like Loop Road, are used for a variety of reasons critical to Big Sky's operations, including for grooming operations, providing skier access to lifts and other terrain, and transporting necessary equipment around the mountain. (Ex. 2, Unruh Affidavit at ¶ 20).

32.    Meyer admits that cat tracks are common at ski resorts and that every ski resort he has been to has cat tracks.  (Ex. 1, Meyer Depo. at 51:1-4, 51:24-52:2).

33.    Meyer admits that prior to December 11, 2015, he "must have" skied ski runs that had cat tracks going across them. (Ex.1, Meyer Depo. at 50:20-51:4.)

34.    Meyer testified a skier can "clearly see the Cat track at the bottom" of Highway, as depicted in photos taken on the Highway run.  (Ex. 1, Meyer Depo. at 125:5-7.)

35.    Meyer admits "that someone [] standing at the top of Highway as is shown in [the below photograph], can obviously see the Cat track."



(Ex. 1, Meyer Depo. at 126:15-18; Ex. 6 (Depo. Exhibit 24).)

36.   When asked if Loop Road was obvious, Meyer testified: **"Is it obvious? Yeah. Sure. It's obvious."** (Meyer Depo. at 125:5-10.)

37.   Meyer further testified:

> **Q:   So you agree that someone [] standing at the top of Highway as is shown in Exhibit 24, can obviously see the Cat track. Correct?**
>
> A:    Sure.  Yeah.

(Ex. 1, Meyer Depo. at 126:15-18.)

38.     A skier on the Highway run in conditions as existed on December 11, 2015 has a clear view of the Loop Road at the base of Highway. (*See* Ex. 2, Unruh Aff. at ¶ 19.)

39.     Ms. Eggert was asked the following question and gave the following answer:

**Q:     Well, do you claim that you couldn't see the cat track as you were skiing down Highway on December 11, 2015?**

A:     I definitely saw it. It was directly below my position after I had located my ski and stepped back into it.

(Ex. 3, Eggert Depo. at 113:1-4.)

40.     Tom McMakin testified that the cat track at issue was "obvious." (Ex. 7, Deposition Tran. of Tom McMakin at 9:21-10:10.)

41.     Tom McMakin testified that "it was obvious that the cat track was in front of [Meyer]." (Ex. 7, McMakin Depo. at 15:2-8.)

42.     Meyer's retained expert, Evi Dixon, testified that on December 11, 2015, "Loop Road was obvious to anyone skiing down the Highway run." (Ex. 8, E. Dixon Depo. at 46:21-23.)

43.     Meyer's retained expert, Evi Dixon, testified that "if Mr. Meyer would have looked downhill, the road would have been obvious." (Ex. 8, E. Dixon Depo. at 48:20-23.)

44.    Meyer's retained expert, Evi Dixon, agrees that "if [Meyer] had been looking ahead, he certainly could have seen the Loop Road." (Ex. 8, E. Dixon Depo. at 57:11-14.)

45.    The photograph below was taken from the Highway run under conditions substantially similar to those that existed on December 11, 2015 and shows the Loop Road at the base of Highway:



(Ex. 2, Unruh Affidavit at ¶¶ 4, 19.)

46.     Meyer's retained expert, Evi Dixon, admits "there was not a steep transition from Highway onto the Loop Road" on December 11, 2015. (Ex. 8, E. Dixon Depo. at 53:7-54:1.)

47.     Meyer's retained expert, Evi Dixon, admits that there "was not a drop-off, no road cut" at the transition from Highway onto Loop Road. (Ex. 8, E. Dixon Depo. at 64:17-22.)

48.     In the specific area where Meyer skied from Highway onto Loop Road, Meyer's retained expert, Evi Dixon, admits that there was "not a steep and significant transition." (Ex. 8, E. Dixon Depo. at 88:9-89:6.)

49.     The photo below, designated Deposition Exhibit 29, was taken shortly after Meyer's wreck and shows the area of Meyer's wreck where he skied from Highway onto Loop Road:



(Ex. 1 Meyer Depo. at 173:7-9; Ex. 2, Unruh Affidavit at ¶¶ 25-26; Ex. 7,

McMakin Depo. at 11:13-21, 13:9-13; Ex. 8, E. Dixon Depo. at 88:9-89:6; Ex. 9,

E. Dixon Depo. II at 68:2-69:1; Ex. 10, Depo. Ex. 29.)

     50.    Meyer admits that from where Deposition Exhibit 29 was taken a

skier can see the Cat track and contends that only a "part of it" is hidden.  (Ex. 1,

Meyer Depo. at 173:17-174:7.)

     51.    Meyer admits that "things that are obvious don't need be marked."

(Ex. 1, Meyer Depo. at 159:25-160:2).

52.     Meyer admits that if a skier runs into a plainly visible hazard it is the skier's fault.  (Ex. 1, Meyer Depo. at 160:12-14).

53.     Meyer's retained expert, Evi Dixon, testified that "a skier has an obligation not to run into plainly obvious obstacles" (Ex. 8, E. Dixon Depo. at 51:15-17.)

54.     Meyer' retained expert, Evi Dixon, testified that "if a skier hits something that the skier fails to see in front of him, it is the skier's responsibility." (Ex. 8, E. Dixon Depo. at 51:5-8.)

55.     Meyer' retained expert, Evi Dixon, testified that "Mr. Meyer as a skier [had] an obligation to look and see what [was] in front of him." (Ex. 8, E. Dixon Depo. at 50:6-9.)

56.     Meyer' retained expert, Evi Dixon, testified that "if Mr. Meyer was fulfilling [his] obligation [to look and see what was in front of him] he would have seen the Loop Road." (Ex. 8, E. Dixon Depo. at 50:6-16.)

57.     Meyer's retained expert, Evi Dixon, testified that because there was no road cut between Highway and Loop Road, i.e. a vertical drop-off from the run to the road, "there was no obligation to mark this run." (Ex. 8, E. Dixon Depo. 73:24-74:21.)

58.     Meyer's retained expert, Evi Dixon, testified that it is "the industry standard" *not* to mark a cat track when there is no road cut. (Ex. 8, E. Dixon 89:7-15.)

59.     For months after his wreck, Meyer did not remember it. (Ex. 1, Meyer Depo. at 199:7-10; 201:9-13; 206:25-207:3).

60.     On the day of his ski wreck, Meyer was consistently skiing fast.  (Ex. 3, Eggert Depo. at 32:9-12).

61.     Meyer testified: "I just always ski fast."  (Ex. 1, Meyer Depo. at 52:21-25).

62.     On an internet forum, Meyer wrote, "on the day of my accident, I was skiing fast—no question about it."  (Ex. 1, Meyer Depo. at 133:2-7; *see also* Exhibit 12, Internet forum post of Meyer dated 11/17/17).

63.     When Eggert was asked if Meyer appeared to be skiing in control immediately before his wreck, Eggert answered: "There were times he was skiing faster than I would have been given the conditions."  (Ex. 3, Eggert Depo. at 69:6-19).

64.     Meyer was skiing fast immediately before his wreck. (Ex. 1, Meyer Depo. at 133:2-4.)

65.     Meyer testified all he remembers about his wreck was that he was skiing fast, "no question about it," he hit the catwalk, tried to turn, and "blew out." (Ex. 1, Meyer Depo. at 130:22-131:14; 132:24-133:4; 197:14-24).

66.     Meyer testified: "[I] tried to push my shins into my boots and turn left and just like blew me out."  (Ex. 1, Meyer Depo.  197:14-24).

67.     Eggert agrees that "Meyer's actions contributed to his ski wreck." (Ex. 3, Eggert Depo. at 102:13-15).

68.     Tom McMakin witnessed Meyer's wreck from approximately 10 feet away. (Ex. 7, McMakin Depo. at 17:19-24.)

69.     McMakin skied "basically…the same path" that Meyer skied, stopped on the cat track, and was looking uphill as Meyer skied down Highway. (Ex. 7, McMakin Depo. at 13:9-13; *see also id.* at 8:14-12:12.)

70.     McMakin testified that Meyer "was bombing down the slope…at a high speed." (Ex. 7, McMakin Depo. at 12:13-18.)

71.     By "bombing," McMakin means that instead of carving his way through the moguls on Highway, Meyer was "bumping straight down with no curves at all." (Ex. 7, McMakin Depo. at 12:19-13:5.)

72.     McMakin testified that Meyer was skiing "very fast," "[a]bsolutely faster than an intermediate skier," and "a lot faster than anyone skied the run that [he] saw." (Ex. 7, McMakin Depo. at 13:14-14:11.)

73.     McMakin testified that Meyer's speed "absolutely" contributed to his wreck. (Ex. 7, McMakin Depo. at 18:19-21.)

74.     McMakin testified that Meyer "safely ski[ed] onto the cat track" but wrecked as he tried to jump off the downhill edge of the cat track. (Ex. 7, McMakin Depo. at 14:15-17, 15:20-16:2.)

75.     McMakin testified that "if [Meyer] had been going at a lower rate of speed, nothing would have prevented him" from stopping on the cat track. (Ex. 7, McMakin Depo. at 15:6-17.)

76.     According to McMakin, Meyer wrecked because he was "hotdogging down the slope at a high rate of speed…and…was going to use the cat track as a jump." (Ex. 7, McMakin Depo. at 14:23-15:1.)

77.     Meyer's retained expert, Evi Dixon, agrees that skiers "should slow down before rollers." (Ex. 8, E. Dixon Depo. at 80:18-22.)

78.     Meyer's retained expert, Evi Dixon, agrees that "skiers should slow down before cat tracks." (Ex. 8, E. Dixon Depo. at 80:23-25.)

79.     Meyer's retained expert, Evi Dixon, agrees that if Meyer would have slowed down before Loop Road, "this accident would not have occurred." (Ex. 8, E. Dixon Depo. at 80:23-81:7.)

80.     Meyer's retained expert, Evi Dixon, agrees that Meyer "certainly could have slowed down before the cat track" and "it was his choice not to do so." (Ex. 8, E. Dixon Depo. at 81:8-19.)

81.     Meyer's retained expert, Evi Dixon, agrees that "Meyer's ski wreck was caused by a variation of steepness or terrain."  (Ex. 8, E. Dixon Depo. at 45:9-11.)

82.     Meyer's retained expert, Evi Dixon, agrees that variations and steepness in terrain are an inherent danger and risk of skiing. (Ex. 8, E. Dixon Depo. at 43:23-44:1.)

83.     Meyer's retained expert, Evi Dixon, agrees that catwalks and roads are inherent dangers and risks of skiing. (Ex. 8, E. Dixon Depo. at 44:2-11.)

84.     Meyer's retained expert, Evi Dixon, agrees that a skier has an obligation to maintain control of speed and course so as to prevent injury to the skier and others. (Ex. 8, E. Dixon Depo. at 45:1-4.)

85.     Meyer's retained expert, Evi Dixon, agrees that "Mr. Meyer failed to ski within control of his course and speed so as to prevent injury to himself." (Ex. 8, E. Dixon Depo. at 45:5-8.)

86.     Meyer's retained expert, Evi Dixon, was asked the following questions and gave the following answers:

**Q: Exhibit 29 is a photograph taken on December 11, 2015, right?**

A: Yep.

**Q:  And that's taken shortly after Mr. Meyer's accident, correct?**

A: Correct.

**Q: And this photograph shows, just like the photograph that Trina sent you, that the Loop Road is visible from up close, correct?**

A: Yep.

**Q: And so Mr. Meyer, if he came down anywhere in the area shown in Exhibit 29, his ski wreck was entirely his fault, isn't that true?**

A: I would say so, yes.

**Q: And, in fact, you know looking at Exhibit 29 that that is where Mr. Meyer came down because you can see the log where he ended up, right?**

A: Correct.

**Q: And so, to get to the log shown on Exhibit 29 he had to have come down from Highway somewhere within Exhibit 29, correct?**

A: Yeah.

(Ex. 9, E. Dixon Depo. II at 68:2-69:1.)

87.     From the 2007/2008 to the 2015/2016 ski season, Big Sky had

approximately 3,024,000 skier visits. (Ex. 12, Affidavit of T. Middleton at ¶ 3.)

88.     There were no prior similar reported incidents at or near Meyer's ski

wreck in the last ten years.  (Ex. 2, Unruh Affidavit at ¶ 21).

89.     The only prior reported ski wreck in the area near Meyer's ski wreck

occurred in March of 2011.  The skier involved in the March 2011 incident

reported: "[I] followed my son, I stopped, went backwards couple feet downhill, fell backwards." The skier made no mention of the catwalk at issue nor did she allege that the catwalk at issue caused or contributed to her wreck. (Ex. 2, Unruh Affidavit at ¶ 22).

90. The area of Loop Road where Meyer wrecked was not marked on December 11, 2015 because Big Sky ski patrol determined that marking it was unnecessary. (Ex. 2, Unruh Affidavit at ¶ 23).

91. The decision not to mark the area of Loop Road where Meyer wrecked had nothing to do with a lack of available signage. (Ex. 2, Unruh Affidavit at ¶ 24).

92. Big Sky did not run out of signs, gates, fences or other safety equipment on December 11, 2015. (Exhibit 14, Affidavit of Ryan Ayres, ¶ 4; *see also* Ex. 14, Depo. Tran. of Bob Dixon at 49:15-24.).

93. Big Sky did not run out of such equipment at any time in the three years prior to Meyer's wreck. (Exhibit 14, Affidavit of Ryan Ayres, ¶ 4; *see also* Ex. 14, B. Dixon Depo. at 49:15-24.).

94. The variations in terrain at issue—from the base of the Highway run onto Loop Road, and from Loop Road into Bermuda Triangle where Meyer came to rest—under conditions similar to those as existed on December 11, 2015 are depicted below:



(Ex. 2, Unruh Affidavit at ¶ 16; *see also* Ex. 1, Meyer Depo. at 95:3-96:1.)

95.    The response to Meyer's ski wreck by Big Sky ski patrol was swift and life-saving.  (Ex. 1, Meyer Depo. at 169:18-22; *see also* Ex. 3, Eggert Depo. at 27:10-28:8, 63:17-22; Ex. 11, Internet forum post of Meyer dated 11/17/17.)

96.    There were approximately 50 professional ski patrollers working on December 11, 2015, and there were more than enough ski patrollers working in the Challenger area on December 11, 2015.  (Exhibit 14, Affidavit of Ryan Ayres at ¶ 6).

97.     The Challenger ski lift shack was heated by propane on December 11, 2015, and no ski patroller declined or refused to go to the Challenger lift ski shack during the three years prior to December 11, 2015 because the ski shack was not heated.  (Ex. 13, Affidavit of Ryan Ayres at ¶ 5).

98.     For the three years prior to December 11, 2015, no ski patroller complained about inadequate training in or regarding the Challenger lift ski area.  (Ex. 13, Affidavit of Ryan Ayres at ¶ 7).

99.     After Meyer's wreck, on April 22, 2016, Eggert contacted a Big Sky ski patroller to inquire about getting Meyer's accident report because "John thinks his tech bindings might have pre-released."  (Ex. 3, Eggert Depo. at 87:9-22, 94:14-95:22.)

100.    Ashley Nettles' statement that "sometimes we run out of signs" was not related in any way to Mr. Meyer's ski accident.  (Ex. 15, Affidavit of Ashley Nettles, ¶ 6.)

101.    In November 2017, Meyer knew that Big Sky was represented by counsel with respect to his ski wreck because Meyer had specifically corresponded with counsel regarding his ski wreck.  (*See* Ex. 16, Email chain between Meyer and McIntosh dated December 2-11, 2016.)

102.    Meyer had his ski helmet with him in his truck but decided not to wear it.  (Ex. 1, Meyer Depo. at 46:7-18.)

DATED this 19th day of March 2020.

CROWLEY FLECK PLLP

By /s/ Ian McIntosh
    Ian McIntosh
    P.O. Box 10969
    Bozeman, MT 59719-0969

    *Attorneys for Big Sky Resort*

# <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was served upon the following counsel of record by the means designated below this 19th day of March, 2020.

[ ] U.S. Mail          Breean Walas
[ ] Hand Delivery     Walas Law Firm
[ ] Facsimile         P.O. Box 4591
[ ] FedEx            Bozeman, MT 59772
[x] ECF             *Counsel for Plaintiff*

/s/ Ian McIntosh
Ian McIntosh