

**Mark St. J. Petrozzi, ARM**
61 Timber Lane
Gilford, NH 03249
mark@alpenrisk.com

November 7, 2019

Ian McIntosh
Crowley Fleck, PLLP
P.O. Box 10969
Bozeman, MT 59719-0969

Re: John Meyer v. Big Sky Resort
D/A: December 11, 2015
Cause No. CV-18-2-BU-BMM

Dear Attorney McIntosh:

Pursuant to your request, I have reviewed certain aspects of the above-referenced matter in order to develop opinions based on the reviewed materials and prepare a report on those opinions. My specific areas of expertise include ski area operations, risk management, and respective ski area and skier responsibilities and conduct.

The following report provides a review of the facts and circumstances surrounding the above-captioned matter derived from materials provided by your office and reviewed by the undersigned. At your direction, included in this report are my observations, analysis, opinions and conclusions drawn from this review.

Respectfully Submitted,

Mark St. J. Petrozzi, ARM

1

**EXHIBIT D**



**AlpenRisk**
**Safety Advisors, LLC**

<u>John Meyer v. Big Sky Resort</u>
United State District Court
For the District of Montana
Case No.: CV-18-2-BU-BMM
Date of Incident: December 11, 2015



# Report of November 7, 2019

**Mark St. J. Petrozzi, ARM**
61 Timber Lane
Gilford, NH  03249
+1 603.524.4980
mark@alpenrisk.com

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | QUALIFICATIONS | 4 |
| 2.0 | DOCUMENTATION | 5 |
| 3.0 | THE INCIDENT | 6 |
| 4.0 | THE INCIDENT SITE | 6 |
| 5.0 | BIG SKY TRAIL MAP | 8 |
| 6.0 | WEATHER AND SNOW CONDITIONS | 8 |
| 7.0 | MR. MEYERS SKIING EXPERIENCE AND ABILITY | 8 |
| 8.0 | ISSUES FOR CONSIDERATION | 8 |
| 9.0 | WARNINGS | 11 |
| 10.0 | INHERENT RISKS OF SKIING | 12 |
| 11.0 | DUTIES OF SKIERS | 13 |
| 11.1 | THE RESPONSIBILITY CODE | 14 |
| 12.0 | BIG SKY RESORT'S CONDUCT | 16 |
| 12.1 | DUTIES OF SKI AREA OPERATORS | 16 |
| 13.0 | WRITTEN STANDARDS | 17 |
| 14.0 | OBSERVATIONS | 17 |
| 14.1 | THE CATWALK DID NOT CONSTITUTE A HAZARD | 17 |
| 14.2 | NO OBLIGATION TO MARK OR ROPE OFF LOCATION OF THE PLAINTIFF'S INCIDENT | 17 |
| 15.0 | OPINIONS AND ANLYSIS | 18 |
| 16.0 | CONCLUSIONS | 20 |

## 1.0   QUALIFICATIONS

My qualifications to conduct this review and offer the opinions contained herein include a 40+ year career in the ski and risk management industries, primarily in senior management capacities.  For 15 years, I served as Vice President of Risk Management for Booth Creek Resort Properties, LLC (formerly Booth Creek Ski Holdings, Inc.), an owner and operator of a number of geographically diverse ski and mountain lifestyle resorts.   My time was allocated to various risk management, safety and regulatory compliance activities, as well as strategic direction of the operations of all on-mountain and base area facilities and the development and implementation of plans, policies, guidelines and procedures for all mountain and base area operations and services departments.

From 2004 through 2011, I also served as Vice President of Snow Park Technologies, LLC, (SPT) the premier provider of consulting services to the snow sports industry, providing design, construction, maintenance and operational services to resorts and organizers of terrain parks and competition venues, as well as snowboard and ski events throughout the world, with primary responsibilities of risk management, safety and operations.  I continue to serve as SPT's risk management, safety and operations consultant.

In addition to the above, I am the founder and principal of AlpenRisk Safety Advisors, LLC, providing safety and risk management consulting services to the resort, recreation, hospitality and general industry sectors since 2003 (in a part-time capacity) and since 2011 (in a full-time capacity).   During my career, I have served in various front-line positions as well as senior management positions.  In those roles, I have been involved in all aspects of the daily operation of ski resorts including ski patrol, snow surfaces (snowmaking and grooming), terrain park operations, lift operations and base area operations.  In the course of my roles in the ski and risk management industries, I have acted as a resource to resort companies and ski industry associations throughout the United States and Canada.

During my 10-year tenure with Willis of New Hampshire (1988-1998), I personally traveled to, and worked with over 130 different ski resorts throughout North America, providing risk management, loss control and operational training and services.  I have been a speaker and trainer on those same subjects to the ski industry (at large) since 1989 through the present, speaking and providing training at virtually hundreds of meetings, seminars, conferences and conventions.  At the present time, I have skied at and worked with a total of over 200 ski resorts worldwide, located in 5 countries, 25 states and 5 Canadian provinces.

I have served since 1996 as a member of the National Ski Areas Association's (NSAA's) Risk Management and Education Committee, and its Chair since 1999.  The NSAA Risk Management and Education Committee has been responsible for all guest-facing and industry-facing educational initiatives developed and released addressing numerous safety and operational topics.  I have served as the primary author and editor of many of these documents and resources.

I am a (current) fully certified ski patroller by both the National Ski Patrol System (NSPS) and the Professional Ski Patrol Association (PSPA), the highest level to be attained in those organizations. I also continue to be a certified instructor in a variety of ski patrolling disciplines.  I recently completed a six-year tenure as a member of and Chair of the National Ski Patrol's National Safety Team, a group of 6 highly-experienced ski patrollers working on safety initiatives for distribution throughout the U.S., addressing various educational and operational topics including terrain parks, lifts and downhill skiing as well as medical response, ski patrol operations and incident investigation.

4

Since 2002, I have served as a board member and have just recently been appointed as Chairman of the Tramway Safety Board of the State of New Hampshire (the state in which I reside), appointed by the Governor of the State of New Hampshire. This board has jurisdiction over regulatory and safety matters affecting passenger tramways, lifts and conveyances. As a board member, I have worked extensively with multiple editions of the ANSI B77.1 code, as well as various ASTM standards and numerous statutes and regulations, including performing analyses and making the appropriate application of the codes and regulations to specific circumstances and situations.

I have a broad understanding of North American ski resorts' operations, practices and standards through extensive work within the industry (typically on-snow between 50 and 80 days per year), as well as continued attendance, operational review and skiing at numerous resorts in North America (United States and Canada), and occasionally internationally (Europe, Australia, New Zealand). I continue to participate regularly as a faculty member, lecturer and presenter at numerous mountain resort industry meetings and conferences.

## 2.0 DOCUMENTATION

In reviewing this matter and preparing this report, I have relied on the following documents, materials, information and sources.

1. Plaintiff's First Amended Complaint and Jury Demand, dated August 1, 2018;
2. Defendant Big Sky Resort's Answer, Affirmative Defenses Counterclaim and Demand for Jury Trial, dated March 30, 2018;
3. Big Sky Resort's Rule 26 Initial disclosures, dated April 6, 2018;
4. Big Sky Resort's Responses to Plaintiff's Second Discovery Requests, dated March 28, 2019;
5. Big Sky Resort's Supplemental Responses to Plaintiff's Second Discovery Requests, dated May 10, 2019;
6. Plaintiff's Initial Rule 26 Disclosures, dated June 27, 2018;
7. Plaintiff's First Supplemental Rule 26 Disclosures;
8. Plaintiff's Discovery Responses – Bates 000001 through 004228;
9. Plaintiff's Updated and Supplemental Discovery Response with Bates Numbering, dated August 24, 2018;
10. Big Sky Resort's Motion for Summary Judgment, dated August 23, 2019;
11. Big Sky Resort's Brief in Support of Motion for Summary Judgment, dated June 23, 2014;
12. Big Sky Resort's Statement of Undisputed Facts is Support of Motion for Summary Judgment, dated August 23, 2019;
13. Plaintiff's Response to Big Sky Resort's Motion for Summary Judgment, dated October 4, 2019;
14. Plaintiff's Statement of Disputed Facts, dated October 4, 2019;
15. Big Sky Resort's Reply Brief in Support of Motion for Summary Judgment, dated August 8, 2014;
16. Deposition Transcripts and Exhibits of:
    a. Plaintiff, John Meyer – April 9, 2019;
    b. Amanda Eggert – May 28, 2019;
17. Big Sky Resort Incident Report of John Meyer, dated December 11, 2015;
18. Patroller Comments of:
    a. Ryan Hygon;
    b. Steve Emerson;
    c. Robert Wood;

       d.  Jason Vander Welt;
       e.  Amanda M. Cox;
19. Big Sky Ski Patrol Photo Log;
20. Color Copies of 4 Photographs taken by Ryan Hygon on December 11, 2015;
21. 118 Additional Color Photographs produced by Big Sky Resort;
22. 130 Color Photographs produced by Plaintiff;
23. Incident Diagram drawn by Ryan Hygon;
24. Ticket Exemplar from 2015-16 Winter Season (both sides);
25. Big Sky Winter Trail Map from website;
26. Montana Code Annotated – Title 23, Chapter 2, 2011 (MCA §23-2-701 - 736);
27. Big Sky Resort website – www.bigskyresort.com

## 3.0 THE INCIDENT

The incident which gives rise to the above-captioned litigation occurred on December 11, 2015, at approximately 10:51 (10:51 AM) at Big Sky Resort. Based upon my review and understanding of the materials listed above, it is apparent that the plaintiff, John Meyer, accompanied by his then-girlfriend, Amanda Eggert, while skiing down the Highway trail, a black-diamond (most difficult) rated trail, skied over a variation (or change) in terrain, onto an open, obvious and plainly visible catwalk, lost control and fell sustaining serious injuries. Mr. Meyer was treated by the Big Sky ski patrol and transported to the bottom of the mountain, where he was transferred to the care of Big Sky Fire Department and Summit Air.

## 4.0  THE INCIDENT SITE

The injuries sustained by the plaintiff, John Meyer, occurred on December 11, 2015 at approximately 10:51 AM. Mr. Meyer was skiing the Highway trail which ends at Loop Road at the so-called "catwalk". His incident occurred as he skied over the variation in terrain whereupon he lost control, finally coming to rest in an area referred to colloquially as "Bermuda Triangle". This open area is characterized by "early season conditions", meaning that there are myriad rocks, scrub vegetation and other forest debris visible leading to a variation in terrain; a gradual transition of the Highway trail as it approaches Loop Road into a slightly flattened section (the catwalk), which then transitions back into the continuing slope of the Lower Morningstar trail. There are no obstructions to impede one's view while descending the Highway trail and on the day of this incident with clear visibility, the rocks and vegetation, as well as this variation in terrain may be seen from literally hundreds of feet uphill, as seen on the following photo; showing a profile view of Highway Trail and Loop Road/BRT Road Continuing onto Lower Morningstar with the plaintiff's point of rest (POR) indicated by the ⬅.





View of POR from Lower Edge of Loop Road/BRT Road



Diagram of Incident Scene

7

## 5.0   BIG SKY TRAIL MAP



Approximate Location of Incident Indicated by ⇐

## 6.0   WEATHER AND SNOW CONDITIONS

On January 11, 2015, (the date of the plaintiff's incident) according to the Big Sky Resort Winter Incident Report form completed for Mr. Meyer's incident, the weather conditions at Big Sky were as follows: clear visibility with a temperature between 0 and 32 degrees and calm (winds). Snow conditions on the trails were documented as being primarily ungroomed, uncompacted and "variable", with "early season conditions" prevailing.   Amanda Cox, one of the responding patrollers indicated that the "run conditions on the Highway trail consisted of a "hard layer with an inch or two of new snow on top".

## 7.0   MR. MEYER'S SKIING EXPERIENCE AND ABILITY

Mr. Meyer in his deposition testified that, upon bringing his skis to be serviced just days prior to his injury, he identified his skiing ability to the technician at LB Snow in Missoula as being a "Type II" skier, which he characterized as being "intermediate".   When questioned further, he testified that he would have identified himself as "more between a two and three", therefore between an "intermediate" and an "expert".   Notwithstanding Mr. Meyer's self-described skiing ability, it should be noted that Mr.  Meyer told Ms. Eggert that 2015 was "only his second full season on skis" (Eggert letter to Meyer dated 12/17/15), clearly indicating relatively minimal overall skiing experience.

## 8.0   ISSUES FOR CONSIDERATION

1. Big Sky Resort was the operator of the ski resort on December 11, 2015.
2. Mr. Meyer owned a ski helmet.  While Mr. Meyer had the helmet in his vehicle at Big Sky on the day he was injured, he declined to wear it as Ms. Eggert was not wearing a helmet.
3. Mr. Meyer started his ski day at approximately 09:30 AM and boarded the Swiftcurrent chairlift out of the base area of Big Sky.  They then proceeded to the Challenger lift, intending to ski the terrain serviced by that lift.

8

4. At the base terminal of the Challenger lift, Big Sky has posted a permanent sign that indicates that the lift services black-diamond/most-difficult and double black-diamond/experts only terrain.

5. Big Sky had also posted in the window of the operator's building at the bottom of the Challenger lift a sign that stated "! Caution ! Early Season Conditions Exist". Multiple other similar signs were posted near the ticket windows, as well as at the other lifts, including those the plaintiff rode prior to his injury. Big Sky also conspicuously posted numerous bright yellow signs that stated, "Caution Early Season Conditions Exist" and "Caution Unmarked Obstacles". Mr. Meyer testified that he knew these signs meant "be careful," "caution," and that "there will be unmarked obstacles".

6. Mr. Meyer and Ms. Eggert proceeded to take two runs on terrain serviced by the Challenger lift and while neither have a specific recollection, it is likely that they had skied portions of the Highway trail prior to the run on which Mr. Meyer was injured.

7. Mr. Meyer, on each of the three occasions while riding the Challenger chairlift was afforded an aerial view of the Highway trail and the specific area where he fell and was injured. As such, Mr. Meyer had ample opportunity to observe the open, obvious and visible snow conditions, as well as the countless rocks, trees, forest growth and other obstacles protruding from the snow throughout the skiing terrain and specifically uphill of and at the location of his incident.

8. The portion of the Highway trail that Mr. Meyer was skiing just prior to his injury was ungroomed. The surface conditions on the day of the plaintiff's injury according to the responding ski patrollers were ungroomed with "uncompacted," "variable," "unconsolidated snow" that "consisted of a hard layer with an inch or two of new snow on top". The plaintiff acknowledges that on the day of his injury, there were numerous plainly visible rocks, trees and other forest growth that was protruding through the snow surface.

9. The incident occurred at an area on the lower portion of the Highway trail where it is bisected by Loop Road/BRT Road (the catwalk) at the beginning of the Lower Morningstar trail in an area colloquially referred to by ski patrollers as "Bermuda Triangle". The Highway trail is designated as a black-diamond/most-difficult rated trail. Lower Morningstar is designated as a green circle/easier rated trail. This area is characterized by Loop Road/BRT Road bisecting the trail and exhibiting what can best be referred to as a variation in terrain or a gradual transition of the descending slope of Highway trail as it approaches Loop Road slightly flattening with another transition rolling back into the shallower slope of the Lower Morningstar trail.

10. Mr. Meyer, after disembarking from his third ride up the Challenger chairlift, descended the Highway trail "skiing fast" with Ms. Eggert some distance behind him (approximately 50 yards). He testified that he "hit the catwalk, tried to turn and 'blew out'." Ms. Eggert, while she did not actually witness Mr. Meyer's fall, testified in her deposition that she believes that Mr. Meyer lost control "uphill of the cat track – possibly by hitting a tree or a rock – and hit the downhill lip of the cat track with some speed". Regardless of whether Mr. Meyer lost control uphill of, at or on the catwalk, upon losing control he ultimately continued on to his POR against a partially snow-covered log, 44 feet, 10 inches from the lower edge of the catwalk.

11. Independent of Mr. Meyer and Ms. Eggert, another skier, Tom McMakin witnessed the incident. According to the Big Sky Ski Patrol Witness Statement he completed shortly after the incident, he indicated that he was on the Loop Road when Mr. Meyer "came down from Highway and hit rocks as he was about to jump off of (loop road) morning star road. Both skis ejected and he rotated head-first and landed on a log with the back of his head and neck." Therefore, according to Mr. McMakin, the sole eyewitness to the actual incident, Mr. Meyer appeared to be "about to jump off of" Loop Road (the catwalk) when he "hit rocks

9

and ejected out of his skis", thereupon losing control, becoming airborne and rotating head first and landing on a log sustaining his injuries. (underlining – my emphasis).

12. Mr. Meyer testified that "I just always ski fast" and that "on the day of my accident, I was skiing fast – no question about it." Ms. Eggert testified that "There were times he was skiing faster than I would have been given the conditions." (Eggert, P69, L6-19). This is notable, as Ms. Eggert was actually the more accomplished and experienced of the two, literally beginning skiing at age 5 and serving stints as a volunteer ski patroller as well as a ski instructor over the years.

13. The "catwalk" at issue in this matter is the Loop Road/BRT Road, which is a trail that allows both the skiing public and employees to access lifts and facilities, as well as other areas of Big Sky more easily. These catwalks are also necessary as they are used during snow grooming operations and transporting personnel and equipment around the mountain.

14. Mr. Meyer testified that the "catwalk" (Loop Road/BRT Road) in the location of his fall and injury was "obvious" and that a skier descending the Highway trail "can obviously see it". (Meyer, P123, L11 through P126, L18). Ms. Eggert testified, "I definitely saw it (the catwalk)" (Eggert, P113, L1-4).

15. Mr. Meyer testified that he knew that catwalks are common at ski resorts and he has seen them at "every resort" that he had been to.

16. More generally, Mr. Meyer also testified that "things that are obvious don't need to be marked" and that "if a skier runs into a plainly visible hazard, it is the skier's fault." (Meyer, P159, L25 to P160, L2 and P160, L12-14).

17. The Skiers Responsibility Code, (aka "Your Responsibility Code") as referenced by MCA §23-2-733 and MCA §23-2-736, was posted in numerous places throughout Big Sky Resort, as well as being printed on the 2015-16 trail map which was made available free of charge to all skiers.

18. Big Sky Resort made available to all of its guests printed trail maps that included a map of the trail network and lifts, a map legend, safety information, including the Skiers Responsibility Code, as well as a variety of other information.

19. At the time of the plaintiff's injury, Big Sky Resort had posted a number of signs, including at the ticket windows and elsewhere that contained the Skiers Responsibility Code, as well as the Montana required language (MCA Section 23-2-702 – Definitions, and Section 23-2-736 – Duties of Skiers).

20. The Big Sky Resort ski patrol, upon being notified, immediately responded to provide emergency medical care to the plaintiff, John Meyer. The ski patrollers evaluated the plaintiff's injuries, provided emergency treatment and transported him to the base of the mountain where care was transferred to Big Sky Fire Department and Summit Air.

21. Following the emergency treatment and transport of Mr. Meyer, Big Sky performed an incident investigation consistent with the circumstances surrounding the incident and their established procedures, that included completion of the incident report form, taking representative photos of the scene of the incident, producing a diagram and obtaining statements from various parties.

22. There had been no prior injuries recorded in the area of Mr. Meyer's fall.

23. The State of Montana has enacted (and updated as recently as 2011) Montana Code Annotated – Title 23, Chapter 2, (MCA §23-2-701) for the purpose of "defining the inherent dangers and risks of skiing and establishing the duties of skiers and ski area operators". In so doing, the State has identified that given the nature of the sport, the environment in which it is pursued and how skiers participate in the sport, it has parsed those duties/responsibilities accordingly between the parties (skier and ski area operator).

24. MCA §23-2-702. Definitions, defines and enumerates under (2) the "Inherent dangers and risks of skiing" means those dangers or conditions that are part of the sport of skiing,

including: (f) variations in steepness or terrain, whether natural or the result of slope design, snowmaking, or snow grooming operations, including but not limited to roads, freestyle terrain, ski jumps, catwalks and other terrain modifications (underlining – my emphasis).

25. MCA §23-2-733, Duties of operator regarding ski areas, outlines (in part), "(1) Consistent with the duty of reasonable care owed by a ski area operator to a skier, a ski area operator shall perform a number of tasks, most of which relate to the posting of various signs and warnings, including those having to do with grooming and snowmaking equipment, trail signs, trail boards denoting open and closed terrain, the Skiers Responsibility Code, a copy of MCA §23-2-736 and freestyle terrain. There is no evidence to suggest that Big Sky was not in compliance with all of these requirements on the day of the plaintiff's injury.

26. Likewise, MCA §23-2-736, Duties of skier, outlines the duties that the Montana legislature determined are the responsibility of the skier. These duties include (in part) that a skier:
   a. Has the duty to ski at all times in a manner that avoids injury to the skier and others and to be aware of the inherent dangers and risks of skiing;
   b. Shall know the range of the skier's ability and safely ski within the limits of that ability;
   c. Shall maintain control of speed and course so as to prevent injury to the skier or others;
   d. Shall abide by the requirements of the skier responsibility code;
   e. Shall obey all posted or other warnings and instructions;
   f. Shall read the ski area trail map and must be aware of its contents.

## 9.0  WARNINGS

On the day of his injury, the plaintiff would have seen and had the opportunity to read numerous signs and trail boards (warning, educational and informational) posted throughout the resort, in the buildings (points of sale, rental shop, cafeteria), outside on signboards and at the base and top of the lifts and he either was or should have been familiar with the contents of those signs. These signs were similar to those used at resorts throughout the United States and would have been observed by the plaintiff at other resorts that he had visited in the past.

In addition to these general safety signs, Big Sky also posted numerous signs warning, "Caution, Early Season Conditions Exist" as well as "Caution, Unmarked Obstacles", all of which should have put the plaintiff on notice that he should be skiing at a reduced speed and applying greater caution.

The plaintiff testified that he was skiing on a single session lift ticket that he obtained by donating a number of cans of food. It is reasonable to assume the ticket he obtained was affixed to his person on the day of his injury, (in order for him to access the lifts and trails). It contained warning and informational language. Located on the back of the ticket was language, not only warning the plaintiff of the risks he would encounter during his skiing session, but also outlining his responsibilities while skiing. An exemplar of the lift ticket (from the 2015-16 season) with this language follows:

**NOTICE OF RISKS OF SNOW SPORTS - PLEASE READ**

The holder of a ticket understands and agrees that snow sports are dangerous and include inherent risks that cannot be eliminated by the Ski Area Operator and that the ticket holder may experience bodily injury death or property damage as a result of these inherent risks

Ticket holder shall abide by the Skier Responsibility Code and the Montana Skier Statute and shall obey all instructions printed on the Trail Maps, available at the ticket office. Those not following directions of the ski area may have a ticket removed without refund

No refunds  A ticket is valid only for individual making purchase and for date(s) purchased  Reselling or transferring this ticket to another individual invalidates the ticket and is a crime punishable under Montana law MCA 45-6-305

**In consideration for a ticket and the use of the facilities and ski lifts authorized by a ticket, you may be waiving your legal right to a jury trial to hold the provider legally responsible for any injuries or damages resulting from risks inherent in the sport or recreational opportunity or for any injuries or damages you may suffer due to the provider's ordinary negligence that are the result of the provider's failure to exercise reasonable care.**

BOYNE RESORTS                                  bigskyresort.com

The lift ticket includes the following language (in part), "The holder of a ticket understands and agrees that snow sports are dangerous and include inherent risks that cannot be eliminated by the Ski Area Operator and that the ticket holder may experience bodily injury, death or property damage as a result of these inherent risks. Ticket holder shall abide by the Skier Responsibility Code and the Montana Skier Statute and shall obey all instructions printed on the Trail Maps, available at the ticket office." (underlining – my emphasis).   Clearly, the ticket the plaintiff possessed at the time of his injury warned that 1. Skiing was "dangerous", 2. That participation in the sport "included inherent risks that cannot be eliminated by the Ski Area Operator", 3. That the ticket holder may be injured as a result of the inherent risks of the sport, 4. That the ticket holder shall abide by the Skier Responsibility Code and the Montana Skier Statute and 5. That skiers shall also obey all instructions on the trail map; ALL of which apply to the plaintiff's decision-making and conduct as it relates to the cause of his injuries.  The plaintiff testified in effect that he knew that skiing was hazardous and that he could fall or be injured while skiing.  However, in practice, on the day of his injury, he clearly skied at some point beyond his ability (intermediate), when skiing at a chosen rate of speed ("fast") on an ungroomed, black diamond trail and encountering the open, obvious and visible catwalk (variation in terrain) that he admitted was visible, he lost control, was ejected out of both bindings, becoming airborne, unable to stop or turn and impacting the ground and/or the log, sustaining his injuries.  Mr. Meyer's injuries were caused and/or contributed to by his failure to ski in control when he skied over the variation in terrain (catwalk) and/or the snow conditions and/or the rocks or forest growth; all inherent risks of the sport of skiing.

## 10.0  INHERENT RISKS IN SKIING

There are inherent risks in skiing that include injury through loss of control and falling, as well as collisions with other skiers, man-made and natural objects and the ground.  These risks are clearly identified and warned about in the language on signs posted throughout the resort, on trail maps, their website and on the lift ticket.

Skiing at an advanced/expert ability level, at higher rates of speed, involves constant decision-making and the successful navigation of varied and sometimes complex, challenging and ever-changing terrain, often with numerous unmarked hazards and obstacles and in a great variety of weather, visibility, snow and surface conditions.  These factors are enhanced when skiing on ungroomed, black-diamond (most-difficult) terrain.  Skiers must rely on their own knowledge, ability/skill, judgment and attentiveness in order to successfully participate in the sport and in this challenging environment and only the individual skier can make the decisions necessary for

his/her own safety.

The inherent risks associated with skiing and snowboarding are well known to both the public-at-large and to participants in the sport. In my opinion and experience, a skier with even the limited experience of Mr. Meyer would be or ought to have been fully aware of them. The plaintiff in his April 9, 2019 deposition testified that he was aware of the risks involved in the sport of skiing and that he was aware of his responsibilities under Montana law that include the basic concepts covered under the Skier's Responsibility Code, and when asked if he had the responsibility to ski in control and avoid visible obstacles", he replied that he did. Clearly, Mr. Meyer knew or should have known it was his responsibility to ski in control, and that if he skied "out of control", that he could be hurt.

Changing weather, visibility, surface and terrain conditions, as well as numerous unmarked obstacles and hazards are common occurrences at ski areas throughout the Western United States and something to be expected by skiers especially those skiing on ungroomed, black-diamond terrain and that those obstacles and hazards are inherent risks of the sport. Mr. Meyer also knew or should have known that, as a skier it was his responsibility to keep a proper lookout for these changing conditions, variations in terrain and the presence of obstacles and hazards, and to maintain control and adjust his speed and course accordingly, dependent upon these changing conditions, variations in terrain and obstacles and hazards, such that he could successfully navigate and/or avoid them, especially when skiing an ungroomed, black-diamond run under "early season conditions".

Mr. Meyer also knew that unmarked obstacles and hazards existed (generally) on ungroomed black-diamond trails and more specifically that there were innumerable obstacles and hazards present on the terrain he was skiing just prior to and at the time of his injury that included open, obvious and visible variations in terrain, trees, rocks and forest growth. The plaintiff also knew that variations in terrain are commonplace at ski areas and could be expected at any time and that the variation in terrain he encountered at the Loop Road/BRT Road catwalk was common and should not have been unexpected. As such, Mr. Meyer knew, or should have known that it was his responsibility to keep a proper lookout while maintaining control of his speed and course such that he could successfully navigate the black-diamond terrain on his chosen path of travel and more particularly the variation in terrain he encountered at the catwalk. Clearly, the variation in terrain that Mr. Meyer encountered was an inherent risk of the sport of skiing.

## 11.0   DUTIES OF SKIERS

The duties of skiers are clearly identified under Montana law, specifically MCA §23-2-736, Duties of skiers. However, prior to examining those duties, the definition of "skier" should be reviewed. MCA §23-2-702 (7), defines a skier as "a person who is using any ski area facility for the purpose of skiing, including but not limited to ski slopes and trails." Clearly, Mr. Meyer was a skier under the statute.

MCA §23-2-736, Duties of Skiers then states (in part):

(1) A skier has the duty to ski at all times in a manner that avoids injury to the skier and others and to be aware of the inherent dangers and risks of skiing.

(2) A skier;

(a) Shall know the range of the skier's ability and safely ski within the limits of that ability and the   skier's equipment so as to negotiate any section of terrain or ski slope and trail and safely and without injury or damage.  A skier shall know that the skier's ability may vary because of ski slope and trail changes caused by weather, grooming changes or skier use;

(b) Shall maintain control of speed and course so as to prevent injury to the skier or others;
(c) Shall abide by the requirements of the skier responsibility code that is published by the national ski areas association and that is posted as provided in 23-2-733;
(d) Shall obey all posted or other warnings and instructions of the ski area operator; and
(e) Shall read the ski area trail map and must be aware of its contents.

The statute then states:

(4) A skier shall accept all legal responsibility for injury or damage of any kind to the extent that the injury or damage results from inherent dangers and risks of skiing.

Per MCA §23-2-736, the legal obligation for maintaining control of one's "speed and course" is clearly and solely that of the "skier". The statute also indicates that it is the skier's legal responsibility to "know the range of the skier's (own) ability so as to negotiate any section of terrain or ski slope and trail safely and without injury or damage, and that the skier's ability may vary because of ski slope and trail changes caused by weather, grooming changes or skier use". The skier shall have the duty to "be aware of the inherent dangers and risks of skiing", such as…changes/variations in weather, terrain and snow surface conditions (which would include the open, obvious and visible catwalk that the plaintiff encountered when he descended the lower section of the Highway trail at Loop Road/BRT Road) and shall assume the risk of injury or damage caused by such inherent risks.

## 11.1  THE RESPONSIBILITY CODE

The Skiers Responsibility Code, also known as "Your Responsibility Code" is widely promoted and publicized at mountain resorts in Montana and throughout North America. The Code sets out the required standards of conduct for participants in snow sports and provides warnings, information and advice that can minimize risk of injury. Inserted below is an exemplar of the Code, as taken verbatim from the Big Sky trail map. This trail map was available to every guest of Big sky, including the plaintiff, as well as posted on signs and signboards and contained within other collateral material and posted on its website.

The Skiers Responsibility Code includes in the preface, that skiers are to "be aware that there are elements of risk in skiing that common sense and personal awareness can help reduce." The code then further enumerates the following:

1.  Always stay in control and be able to stop or avoid other people or objects.
2.  People ahead of you have the right of way. It is your responsibility to avoid them.
3.  You must not stop where you obstruct a trail or are not visible from above.
4.  Whenever starting downhill or merging into a trail, look uphill and yield to others.
5.  Always use devices to help prevent runaway equipment.
6.  Observe all posted signs and warnings. Keep off closed trails and out of closed areas.
7.  Prior to using any lift, you must have the knowledge and ability to load, ride, and unload safely.

Skiers are exposed to the Responsibility Code on an ongoing and continual basis at ski resorts throughout the United States, including Big Sky. It is promoted in trail maps, brochures and other collateral material, as well as on websites and posted on conspicuously located, highly visible signs in buildings, at ticket offices, on signboards, lifts, and in many other locations. Every skier or snowboarder with even minimal experience at alpine snow resorts ought to be familiar with the Code, and its components.

Clause 1 of the Code states: "Always stay in control and be able to stop or avoid other people or objects." It is imperative that all skiers conduct themselves in a manner that allows them to remain under control at all times. Without adherence to this basic principal, a participant exposes oneself to potential serious injury. When a skier does lose control at any speed, and on any type of terrain, they are at risk of injury through impacts with natural and man-made objects, other skiers/snowboarders, or even the ground.

Therefore, in applying this clause to the circumstances surrounding this litigation, IF one is skiing in such a manner (under control), AND is keeping a proper lookout as to WHAT they are approaching, that object or area, (in this case, the presence of the variation in terrain of the catwalk), will represent no hazard whatsoever to a person skiing under control. But that same object or area may very well represent a hazard to a skier that is NOT skiing in such a manner and is NOT keeping a proper lookout as to what is in his path. It is clear by the deposition testimony of the plaintiff that he knew or should have known that:

(1) The Highway trail was a black-diamond (most difficult) trail, per the trail sign at the top and the Big Sky trail map;
(2) On black-diamond trails, obstacles and hazards may not be marked;
(3) As he was an intermediate skier with limited experience skiing on ungroomed black-diamond terrain, he should ski more slowly and cautiously;
(4) Variations in terrain, the snow surface, rocks and other obstacles and hazards could occur anywhere;
(5) Extensive rocks, trees and forest growth were "plainly visible" to the plaintiff both while he rode the Challenger lift and while he skied the terrain on the two runs serviced by the Challenger lift prior to the injury, and that he should be "on notice" of their presence;
(6) He should apply this "notice" (of the presence of the myriad obstacles and variations in terrain and snow surface) to both the speed and manner he skied on the morning of December 11, 2015, meaning more slowly and cautiously;
(7) Directly downhill in the Mr. Meyer's chosen path of travel in the area where he was injured was the open, obvious and visible catwalk; and
(8) If one were to choose to ski in the direction of the open, obvious and plainly visible catwalk that one should apply greater caution and proceed more slowly, or in the alternative, choose another path of travel away from the catwalk.

Further, Mr. Meyer knew or should have known that it was solely his responsibility to maintain control of his speed and course (direction) such that he could navigate the catwalk. BUT, in making the decision to intentionally ski into this area, or as it appeared to Mr. McMakin, (the lone eyewitness that actually observed the incident) intentionally attempt to "jump off" the catwalk, he became unbalanced, ejected from his skis, becoming airborne, rotated head first and landing on the partially snow-covered log, sustaining his injuries. In other words, Mr. Meyer was UNABLE TO MAINTAIN CONTROL of his speed and course when he skied over the catwalk at his chosen speed ("fast"), becoming airborne and impacting the snow surface and the log and sustaining his injuries.

To any skier and specifically the plaintiff, what that should translate to in terms of decision-making and actions, is upon making the voluntary decision to ski at the speed ("fast") and manner that he was descending the Highway trail and as there were previously acknowledged "early season conditions" that made the potential for variable snow and terrain conditions, rocks, trees, forest growth and other obstacles and hazards more prevalent (a condition that the plaintiff was well aware of), that as he approached the locus of his injury, seeing the open, obvious and visible catwalk, he should have reduced his speed and the manner in which he was skiing accordingly (skied slower and with greater caution and/or changed his path of travel), especially taking into

consideration he was an intermediate skier. It was solely his obligation to be able to successfully navigate his descent of the trail, the variations in terrain and the presence of ungroomed, variable snow, rocks, trees, forest growth and other obstacles and hazards. Mr. Meyer was obligated when approaching the plainly visible catwalk (variation in terrain) to either stop or turn, so as to avoid it, or to slow so as to successfully negotiate it. In this case however, the plaintiff, upon descending the trail in his chosen path of travel, at his chosen rate of speed was unable to maintain control when he skied over the catwalk. I can only conclude that once he encountered the catwalk, he was unable to maintain control due to his chosen speed and/or limitations in his ability and/or he lost control when he struck a rock or encountered variable snow or some other obstacle, as Ms. Eggert testified.

It should also be noted that the sixth component of the Skiers Responsibility Code is "Observe all posted signs and warnings." It is clear, that although the Highway trail was clearly marked as a black-diamond (most difficult) run, and that Mr. Meyer knew that not all obstacles and hazards are marked on black-diamond runs, and in particular on the day of his injury he knew through his observations while riding the Challenger chairlift and skiing on previous runs that innumerable unmarked obstacles and hazards existed due to the "early season conditions", he should ski more slowly and with greater caution on black-diamond runs particularly as he was an intermediate skier. He clearly either ignored or disregarded this information.

The Responsibility Code sets out "the rules of the road" for skiers and promotes the safe use of snow resorts by all participants. It is impossible, in spite of all best efforts to ensure that the Code is universally observed, obeyed and respected by all skiers and snowboarders. When there are transgressions of the Code, they are the responsibility of the individual participant. No ski area can monitor and control the activities of individual participants at any given moment. Accordingly, the very existence of the sport and the commercial infrastructure that makes it possible, depends in large measure upon the self-regulation of participants through common sense and adherence to the Responsibility Code.

## 12.0  BIG SKY RESORT'S CONDUCT
GENERAL:
Big Sky Resort has undertaken to develop and implement extensive plans, policies, guidelines and procedures, applying to all aspects of its operations in order to define and execute its operations and conduct its business. As one component of these guidelines, Big Sky Resort plans and procedures that provided guidance for various aspects of the ski patrol operations at the resort. The resort employed a comprehensive system of hiring, training and managing its employees, so that the communicated plans, policies, guidelines and procedures are executed. Many of Big Sky's employees enjoy long tenure, including numerous members of its ski patrol, who are primarily charged with the responsibilities at issue in this matter.

SPECIFIC:
Big Sky Resort, through its policies, guidelines and procedures and primarily through the efforts of the ski patrol, maintains a regular process of identifying and marking various hazards that are in, or on the trails. It does this in a variety of ways, including the initial morning opening runs down the trails, dispatched runs down specific trails and the regular cycling of runs throughout the trail network by the ski patrol staff. There are no statutorily imposed responsibilities placed on Montana ski area operators with respect to the identification of and warning of hazards. However, there are generally accepted industry practices which may be considered with respect to hazard identification and marking, which will be discussed later.

## 12.1  DUTIES OF SKI AREA OPERATORS

As with skiers, the state of Montana has also established certain required duties of ski area operators.  These are enumerated in MCA §23-2-733 – Duties of Operator Regarding Ski Areas. I have only identified those sections that pertain specifically to this matter.  The section begins by stating:

(1) Consistent with the reasonable duty of care owed by a ski area operator to a skier, a ski area operator shall:

> (c) Maintain one or more trailboards at prominent locations at each ski area displaying a map of that area's network of ski slopes and trails, the boundaries of the ski area, and the relative degree of difficulty of the ski slopes and trails at that area;
>
> (e) Designate at the start of each day, by trailboard or otherwise, which ski slopes and trails are open or closed and amend those designations as openings and closures occur during the day;
>
> (f) Post in a conspicuous location the current skier responsibility code as published by the national ski areas association; and
>
> (g) Post a copy of 23-2-736 in a conspicuous location.

At all times and in all respects, the evidence indicates that Big Sky Resort fully complied with all the requirements of MCA §23-2-733 prior to, and on the day of the plaintiff's injury.

## 13.0  WRITTEN STANDARDS

In my opinion and based upon my experience, there are no written standards employed in the North American ski industry, relating to the identification and marking of hazards located at ski areas, and more specifically the variation in terrain (the catwalk) located at the point where the lower section of the Highway trail is bisected by the Loop Road/BRT Road.  It should be noted however, that there are generally accepted practices and principles that are employed by knowledgeable resorts throughout the industry, which clearly indicate that:

- A hazard has to be identified in order to be considered for marking;
- An open, obvious and visible variation in terrain (the catwalk), that could be seen by skiers skiing in control and keeping a proper lookout (as to what was in their path of travel) from a distance far enough uphill that they could slow, stop or avoid it would NOT have been identified as a hazard to be marked;
- Plainly visible objects are not marked;
- Unmarked obstacles and hazards regularly exist on black-diamond trails;

In every instance, Big Sky Resort was consistent with these practices and principles.

## 14.0  OBSERVATIONS

## 14.1  THE CATWALK AND TRANSITION DID NOT CONSTITUTE A "HAZARD"

The area that the plaintiff skied into where he encountered the catwalk, lost control, became airborne and was injured did NOT constitute a "hazard".  Given the configuration of the topography presenting itself to skiers descending the lower portion of the Highway trail, where it was bisected by the Loop Road/BRT Road, a skier keeping a proper lookout was able to maintain an unimpeded field of view (sightline) of literally hundreds of feet, meaning that the catwalk was open, obvious and visible and therefore an "obstacle" (to be avoided) and NOT a "hazard" (to even arguably be marked).  Furthermore, the variation in terrain itself was gradual (and not abrupt), occurring over many feet and as such did not constitute a hazard to skiers, knowing and staying within their limits and skiing at a reasonable and appropriate speed and in such a manner for the prevailing terrain and conditions that they may successfully navigate it.  As long as one is keeping a proper lookout and skiing in such a manner as to maintain control of their speed and course at all times and at a

reasonable rate of speed while encountering variations in terrain, snow surface conditions and the presence of plainly visible rocks, trees and forest growth, the area where the plaintiff was injured did not pose any type of danger or hazard. However, the very same area may very well represent a hazard to a skier, if one did NOT know the limits of their ability, was NOT keeping a proper lookout and was NOT in control of their speed and course WHEN ENCOUNTERING the variation in terrain configuration, snow surface and the presence of rocks, trees and other obstacles and hazards.

## 14.2   NO OBLIGATION TO MARK OR ROPE OFF THE AREA IN THE LOCATION OF THE PLAINTIFF'S INCIDENT

Clearly, there is no statutory or code obligation of a ski area operator in the State of Montana to mark any "hazard" at a ski area. It should also be noted that not only is it NOT required through statute and/or code, it is also consistent with the ski industry's generally-accepted practices to NOT mark hazards that are located on black-diamond terrain, which the area of the catwalk that the plaintiff skied over certainly was. As such, Big Sky was reasonable in not marking and/or erecting a rope line at the catwalk. The decision not to mark (or erect a rope line) was appropriate and consistent with the generally accepted and applied practices of the ski industry.

Finally, it should be noted that Big Sky Resort developed and made available to their guests a comprehensive system of education, information and warnings relating to the risks inherent in snow sports, skiing safety, and the rules for conduct while skiing. This messaging was and is accomplished through the use of signs, signboards, trail maps, printed snow reports, snow phone messaging, language on ticket stock and other collateral material, as well as on Big Sky's website. Their efforts in this area meet and/or exceed the generally accepted practices employed throughout the ski industry.

## 15.0   OPINIONS AND ANALYSIS

1. Big Sky Resort operates various facilities, equipment and premises, offering recreational activities to its guests in a mountain environment, including skiing, snowboarding and other winter sports activities. As an operator of various slopes and trails, as well as passenger ropeways and conveyances, Big Sky is required by the Montana Code Annotated, MCA §23-2-733 to comply with certain requirements.
2. Big Sky Resort fully complied with all aspects of MCA §23-2-733, in all respects, and as it relates to the subject litigation.
3. The Plaintiff, John Meyer likewise, was required as a participant in the sport of skiing under MCA §23-2-736, Duties of skier to:
   a.   Ski at all times in a manner that avoids injury to the skier or others;
   b.   Know the range of the skier's ability and safely ski within the limits of that ability and the skiers' equipment, so as to negotiate any section of terrain or ski slope and trail safely;
   c.   Know that the skier's ability may vary because of the ski slope and trail changes caused by weather, grooming changes, or skier use;
   d.   Maintain control of speed and course so as to prevent injury to the skier…;
   e.   Obey all posted or other warnings and instructions;
   f.   Abide by the requirements of the skier responsibility code;
   g.   Read the ski area trail map and be aware of its contents.
4. Mr. Meyer, at the time of his injury and immediately preceding it, did not comply with his obligations and duties under MCA §23-2-736, in that he:

    *a.* Did not ski in a manner so as to avoid injury to himself; being an intermediate skier skiing on ungroomed, black-diamond terrain at a "fast" speed and not applying an appropriate degree of caution;

    *b.* Either did not know the range of his ability, or did not ski within the range of his ability so as to negotiate the section of terrain located on the Highway trail in the vicinity of the Loop Road/BRT Road catwalk;

    *c.* Either did not know, or did not heed the knowledge that his ability may vary because of the ski slope (variation in terrain) and trail changes caused by weather, grooming changes, or skier use;

    *d.* Did not maintain control of his speed and course so as to prevent his injury;

    *e.* Did not obey posted or other warnings and instructions and particularly with respect to those warning of "unmarked hazards" and "early season conditions";

    *f.* Did not abide by the responsibilities of the skier responsibility code; and

    *g.* Did not read the ski area trail map and/or was not aware of its contents, such that he should have known the general configuration of the area in which his injury occurred and adjusted accordingly the speed and manner of his skiing.

5. The evidence clearly indicates, as one descends the lower portion of the Highway trail that the area containing the catwalk, as well as the innumerable rocks and forest growth protruding from the snow was open, obvious and visible for hundreds of feet uphill. In other words, it was Mr. Meyer's sole duty "to see what was to be seen". Mr. Meyer, descending along his chosen path of travel would have had clear, unobstructed lines of sight and the uncompromised opportunity to see the variation in terrain (catwalk) and the "plainly visible" rocks forest growth had he been keeping a proper lookout.

6. In the vicinity of the plaintiff's injury, it is conceivable that a part or parts of the catwalk, at a certain point or points in time, while descending along his chosen path of travel, may have been momentarily obstructed by the terrain. However, this is very common and occurs countless times as one skis. As such, Mr. Meyer, skiing on an ungroomed, black-diamond trail, if skiing in a prudent and reasonable manner, should have proceeded into the area while keeping a proper lookout, at a slower rate of speed and applying greater caution. He did not.

7. That being said, even if certain segments of the catwalk may have been obstructed as he descended the Highway trail, he still should have been on notice of the variation in terrain based on those segments he could see, as he approached from uphill. This notice should have been sufficient to cause him to ski at a slower speed and applying greater caution. It did not.

8. Mr. Meyer, while descending the upper portion of the ungroomed, black-diamond Highway trail was skiing at a rate of speed and in such a manner such that he was not able to stop, avoid, or successfully negotiate the terrain, snow conditions, and/or the presence of rocks, forest growth and other obstacles and hazards, whereupon he lost control and was injured. Based upon these factors, it is clear that the plaintiff breached his duties as a skier under Montana law, in that he didn't "obey all posted or other warnings and instructions (the black-diamond designation), didn't "maintain control of his speed and course so as to prevent injury to himself. He was unable to maintain control when he either encountered the catwalk and/or snow conditions and/or struck rocks and/or forest growth and proceeded to become airborne, sustaining his injuries. Collectively, as a participant in the sport of skiing in Montana, Mr. Meyer was obligated to adhere to the rules contained within the Skier Responsibility code and he did not.

9. It has been alleged that the catwalk that Mr. Meyer struck somehow created a danger or hazard and that this danger or hazard should have been identified and mitigated in some fashion, e.g. marked or roped off by Big Sky. This apparently was concluded, simply

19

because the plaintiff allegedly was caused to lose control when he skied through the slope transition, ejected from his skis, became airborne and was injured upon impacting the ground and/or the log. However, the plaintiff has admitted that the catwalk was visible (from both the ground and overhead, when riding the Challenger chairlift) and if one were to know the unmarked, yet open, obvious and visible catwalk was there, he should have skied more slowly and with greater caution. This area did not constitute a danger or hazard and therefore did not warrant any type of marking or control as it was open, obvious and visible and therefore was simply an obstacle to be avoided by skiers keeping a proper lookout and maintaining control over their speed and course.

10. There are no written ski industry standards pertaining to the identification and marking of dangers and hazards. Based upon their specific experience, observations and guidelines at their individual resort, ski area operators routinely undertake to identify and mark such dangers and hazards. The practices employed by Big Sky Resort, with respect to the identification and marking of dangers and hazards were consistent with the generally-accepted practices and principles that are employed throughout the industry, namely being that objects, that are open, obvious and visible do not require the ski area to mark it. Specifically in this case, the evidence is clear that on the day of the plaintiff's injury, the catwalk was open, obvious and visible from a significant distance uphill and therefore did not require that it be marked, as it was simply an obstacle to be avoided, or in the alternative, it required that a skier who desired to ski over it, adjust their speed and manner of skiing so as to do so successfully.

11. Given the configuration of the entire area in the vicinity of the plaintiff's injury, including the open, obvious and visible catwalk, the presence of innumerable plainly visible rocks and forest growth protruding from the snow surface on an ungroomed, black-diamond trail and the fact that there had been no prior injuries in this area it was not necessary to provide any additional warnings, markings or controls in this area, as it did not constitute a hazard at the time of the plaintiff's injury.

## 16.0 CONCLUSIONS

After carefully reviewing all of the evidence contained within the documents and materials identified at the beginning of this report, and in full consideration of the information and insights developed during my review of the file materials and based upon my education, knowledge and experience, it is the undersigned's professional opinion that for the reasons elaborated within this report:

1. Big Sky Resort was reasonable in all aspects of its operations with respect to:
   - Designation of the Highway trail as a black-diamond trail and marking it accordingly on the trail sign and trail boards;
   - Creating and implementing appropriate operational plans, policies, guidelines and procedures with respect to hazard identification and marking that were reasonable and appropriate;
   - Complying with those plans, policies, guidelines and procedures with respect to its operations;
   - Not identifying the area of the plaintiff's injury as a danger or hazard;
   - Not marking or roping off the area of the plaintiff's injury as a danger or hazard;
2. Big Sky Resort was compliant with all duties imposed on ski area operators by the State of Montana with respect to MCA §23-2-733 and was reasonable and consistent with common and generally accepted practices in the ski industry in its approach to the identification and marking of dangers and hazards. Big Sky Resort was reasonable in making the determination, based on all available factors and virtually hundreds of

observations over the years, that the area in the vicinity of the plaintiff's injury did not constitute a danger or hazard. There was no need to apply any form of marking or control, such as bamboo or other marking devices and/or rope lines in this vicinity.

3. John Meyer was solely responsible for his injuries and that the cause of those injuries are as follows:

- His failure to adequately familiarize himself with the layout and configuration of the terrain uphill of and in the vicinity of his injury;
- His failure to heed the self-evident "warning" constituted by the open, obvious and clearly visible presence of the catwalk, rocks and forest growth uphill of, in the vicinity of and literally surrounding the location of his injury;
- His failure to heed and apply the information implied by the Highway trail sign denoting it as a black-diamond (most difficult) trail;
- His failure to ski at a reduced speed and proceed more cautiously, given that it was an ungroomed, black diamond rated trail, especially as he was an intermediate skier with limited experience;
- His failure to maintain control of his speed and course when skiing through the slope transition (variation in terrain) of the catwalk and/or the snow conditions and/or the rocks and forest growth protruding through the snow surface (either through lack of ability and/or due to the speed and manner in which he descended);
- His failure to know the extent of his experience, ability and/or skills in skiing into this area and more specifically when skiing over the variation in terrain at the catwalk;
- His failure to (potentially) mitigate his injuries when making the conscious decision at the beginning of his ski day to NOT wear the snow sport specific helmet he owned and had in his vehicle, and;
- His sole and conscious decision to ski at a speed and in a manner down an ungroomed, black-diamond trail and to choose a path of travel that took him directly over the open, obvious and visible catwalk that he saw or should have seen and in an area of innumerable rocks, forest growth and other obstacles and hazards (either as he descended the Highway trail and/or as he rode the Challenger chairlift on three occasions prior to his injury), such that he was unable to maintain control, ejecting from both skis, becoming airborne and impacting the ground and/or the log, sustaining his injuries.

Given the above, I conclude that these failures, which were solely Mr. Meyer's, were the direct cause of his injuries. I further conclude that the defendant was reasonable in all aspects of its operations, did not act unreasonably, did comply with all requirements imposed by MCA §23-2-733, as well as all generally-accepted ski industry practices, and as a result did not expose its guests, and in particular the plaintiff, John Meyer, to unreasonable risks.

This report was prepared at the request of attorneys for the defendant, Big Sky Resort. I am being compensated at a rate of $250 per hour. A copy of my curriculum vitae and a listing of cases that I have provided deposition and/or trial testimony have been provided as separate documents.

The opinions and conclusions contained within this report are based upon the previously listed materials and information reviewed. Although I have skied at Big Sky on a number of occasions, it is the intent of this writer to perform a site inspection in early December and as such this report may be subject to revision if additional observations, insights and/or opinions are developed or additional information becomes available. The undersigned is solely responsible for all opinions contained within this report.

Respectfully Submitted:

Mark St. J. Petrozzi, ARM

Mark St. J. Petrozzi, ARM - Expert Witness Case Listing - Trial or Deposition Testimony Since 2014

| Case Caption | Court and Jurisdiction | Docket Number | Deposition Testimony Given | Trial Testimony Given |
|---|---|---|---|---|
| Hetzler v. Sunday River Skiway Corp. | Oxford County, Maine Superior Court | CV-12-06 | Yes | No |
| Paulus v. Holimont, Inc. | U.S. District Court for the Western District of New York | 12-CV-0055 (S) | Yes | No |
| Molloy v. State of New York (Belleayre Ski Center) | New York State Court of Claims | Claim # 121709 | No | Yes |
| DiFrancesco v. Win Sum Corporation (Holiday Valley) | U.S. District Court for the Western District of New York | 13-CV1485 | Yes | No |
| Flowers v. Okemo Limited Liability Company | Windsor Unit, Vermont Superior Court | Docket No. 18-1-14 Wrcv | Yes | No |
| Raithel v. Saddleback, Inc. | Superior Court of Androscoggin County, Maine | Civil Action Docket No. CV-2014-45 | Yes | No |
| Brust v. State of New York (Gore Mountain) | New York State Court of Claims | Claim #124011 | No | Yes |
| Dwyer v. Boyne, USA, Inc. | Circuit Court for Charlevoix County, MI | Case No. 15-0138-25-NO | Yes | No |
| Neathery v. Peak Resorts, Inc. | Court of Common Pleas Cuyahoga County, OH | Case No. CV-15-840452 | Yes | No |
| O'Mara v. Thunder Ridge Ski Area, LLC | State of NY Supreme Court County of Putnam | Index No. 1294/2014 | No | Yes |
| Nanni v. Ski Sundown, Inc. | Superior Court, Judicial District of Hartford, CT | Docket No: HHD-CV15-6057939-S | Yes | No |
| Graham v. Snowshoe Mountain, Inc. | Circuit Court of Pocahontas County, WV | Civil Action No. 15-C-14 | Yes | No |
| Carrion v. Mountain Creek Resort, Inc. et al | Superior Court of NJ Law Division - Sussex County | Docket No.: L-315-14 | Yes | Yes |
| Lipton v. Mountain Creek Resort, Inc. et al | United States District Court for the District of New Jersey | Civil Action No. 2:13-cv-04866-KM-MAH | Yes | Not Yet |
| Trepanier v. Ober Gatlinburg, Inc. | Sevier County Circuit Court, TN | Civil Action No. 2014-CV-505 | No | Yes |
| McKusick v. L.B.O. Holding, Inc. | Caroll County Superior Court, NH | Case No. 212-2016-CV-00154 | No | Yes |
| Casey v. State of New York (Whiteface Mountain) | New York State Court of Claims | Claim # 126115 | No | Yes |
| Doyle v. Snow King Holdings, LLC | District Court of the Ninth Judicial District, Teton County, W | Civil Action No.: 17523 | Yes | Not Yet |
| Rivard-Pedigo v. Okemo Limited Liability Company | United States District Court for the District of Connecticut | Civil Action No.: 3:17-cv-00568-WWE | No | Yes |
| Madsen v. Catamount Ski Area Inc. | Supreme Court of the State of New York, County of New Y | Index No. 157038/15 | No | Yes |
| Chase v. Ober Gatlinburg, Inc. | Sevier County Circuit Court, TN | No. 2012-0063-III | No | Yes |
| Eshraghi v. Troser Management d/b/a Bristol Mountain | State of NY Supreme Court: County of Ontario | Index No. 113408-2015 | No | Yes |

Rev. July 22, 2019

EXHIBIT
B
tabbies®

# CURRICULUM VITAE

## Mark St. J. Petrozzi, ARM

61 Timber Lane
Gilford, NH 03246
Tel: (603) 524-4980
Email: mark@alpenrisk.com



EXHIBIT

C

### Synopsis of Experience

Mr. Petrozzi has worked at various levels of the mountain resort business and has been involved for more than a quarter-century providing direct and consulting services relating to risk management, safety, loss control and resort operations within the snow sports and hospitality industries. Working out of offices in New Hampshire, Salt Lake City, Utah, Lake Tahoe, California and Vail, Colorado, he has been a strong influence in the development and emphasis on ski area operations, risk management, skier safety and education throughout North America. He is known and respected by ski area operators throughout North America. Mr. Petrozzi has been a member of the National Ski Patrol (NSP) since 1978, securing Senior status in 1983, Certified status in 1986 and the NSP National Appointment award in 1988. Mr. Petrozzi has held many of the top elected and appointed positions at regional, divisional and national levels of the NSP. He is also a fully certified member of the Professional Ski Patrol Association. He serves on the ASTM F-27 Committee on Snow Skiing. Mr. Petrozzi also serves as the Chairman of the National Ski Areas Association (NSAA) Risk Management and Education Committee. Mr. Petrozzi has been actively involved in training ski area operators and their employees throughout the United States and Canada, through presentations at national and regional ski industry association seminars and conferences on various topics including: skier/rider safety, freestyle terrain operations, ski patrol operations, emergency medical response, search and rescue, lift operations, mountain bike operations, workplace safety and loss control, regulatory compliance and winter and summer operational systems and processes. He has also provided direct hands-on training sessions at numerous ski resorts throughout the country, training employees working in virtually every aspect of ski area operations and management. Mr. Petrozzi also serves as a member of the New Hampshire Tramway Safety Board, responsible for passenger tramway and lift safety and compliance with regulatory requirements. From January of 1998 through February of 2012, Mr. Petrozzi served as Vice President of Risk Management for Booth Creek Resort Properties, LLC, operating a family of geographically diverse mountain resorts located throughout the United States. Presently, embarking upon the next chapter in his career, Mr. Petrozzi is the founder and principal of AlpenRisk Safety Advisors, LLC, a risk management and safety consulting practice, providing analytical, advisory, operational, training and educational services to the winter sports, summer recreation and hospitality industries.

### Professional Experience

Principal: AlpenRisk Safety Advisors, LLC, Gilford, NH. Responsible for providing risk management, safety, regulatory compliance and operational consulting services to resorts, service providers and associations in the snow sports, summer recreation and hospitality industries, as well as to attorneys involved in snow sports and other sports and summer recreational litigation. Primary responsibilities include the assessment and evaluation of operations, and the development of plans, policies, procedures, guidelines and programs to assist resorts in the areas of guest and employee risk management, operational, premises and workplace safety, operations management and process, emergency response, crisis communications, regulatory compliance and other pre and post-loss activities.
Part Time: September 2002 through February 2012, Full Time: February 2012 – Present

Vice President of Risk Management: Booth Creek Resort Properties, LLC, Vail, CO. Responsible for all facets of risk management (safety, loss control, risk transfer, employment practices, OSHA and other regulatory agency compliance), and operations for ski resorts located throughout the U.S. Primary responsibilities include developing company-wide risk management, safety and operating criteria and programs for all mountain and base facilities departments. Other major responsibilities include: development and priority phase-in of operational plans, procedures, guidelines and manuals, responsibility for development of company-wide risk management, safety and loss control programs, implementation and oversight of environmental regulatory compliance, conception and implementation of capital expenditure plans for safety and risk mitigation activities and purchases, input into strategic capital budgeting process, management of direct reports (resort risk managers, financial analysts, events staff) and oversight and direction of all claims, lawsuits and risk-related financial concerns. January 1998 – February 2012

Vice President: Snow Park Technologies, LLC, Truckee, CA. Responsible for safety, loss control, operational and contractual aspects of consulting services company providing design, construction and operational services to resorts, manufacturers, promotional companies and organizations specifically in the areas of terrain parks and ski and snowboard events and competitions. Primary responsibilities include developing operational and risk management guidelines for the consulting services provided to clients.

Clients include USASA, Burton Snowboards, ESPN, PepsiCo, Aspen Skiing Company and Intrawest Resorts. Additional responsibilities include the oversight and direction of all claims, lawsuits and risk related financial concerns.
October 2002 – December 2010

Risk Management Consultant: Booth Creek Management Corporation, Vail, CO. Responsible for all aspects of risk management for a diverse portfolio of private companies, including professional sports teams, automobile dealerships, meat-processing, natural and organic foods production, processing and distribution, real estate development and leisure (lodging and guide services). September 2008 – Present

Assistant Vice President: Willis of New Hampshire, Recreation Division, Rochester, NH. Responsible for building new service unit to conceptualize, develop and implement operations and risk management consulting services and training to the snow sports and mountain resort industry, including all pre and post-loss goal-setting, activities and analysis. Secured contracts with all major multi-location resort companies including American Skiing Company, Intrawest Resort Group and Vail Resorts. Also provided services for numerous additional independent resorts throughout the U.S.   1996 – 1998

Account Executive: Willis of New Hampshire, Recreation Division, Rochester, NH. Overall sales and account responsibility for Insurance and Risk Management services for ski areas throughout the Northeast and Mid-Western United States. Direct responsibility for forty plus resorts' assessment of operations, and conception and implementation of programs to address insurance and risk-related fiduciary needs.   1994 – 1996

Senior Claims and Risk Management Representative: Willis of New Hampshire, Recreation Division, Rochester, NH and Salt Lake City, UT. Responsible for handling claims and providing risk management services to ski areas in New England, the Mid-West, Rockies, Far West and Eastern Canada. Provided these services to over 130 resorts in the U.S. and Canada.   1990 - 1994

Claims Representative: Willis of New Hampshire, Recreation Division, Rochester, NH. Handled claims and provided risk management services for northern New England ski areas.   1988 - 1990

Director of Safety Services and Risk Management: Gunstock Recreation Area, Gilford, NH. Directly responsible for all facets of risk management and safety for all operational departments relating to both guest and employee safety, including directing ski patrol for ski area of 200,000 annual skier visits. 1986 - 1988

Director of Ski Patrol: Gunstock Recreation Area, Gilford, NH. Responsible for direction of professional and volunteer ski patrol of sixty-plus members.   1985 - 1986

Assistant Director of Ski Patrol: Gunstock Recreation Area, Gilford, NH. Assisted Patrol Director in direction of ski patrol. Directly responsible for dispatch duties and hill safety activities.   1984 – 1985

Director of Functions and Programs: Gunstock Recreation Area, Gilford, NH. Oversaw all corporate functions, community recreation programs and events numbering up to three thousand participants. Responsible for planning, directing, life safety, security and all support services.   1985 - 1988

Skier Services Representative/ Professional Patroller: Mt. Snow, Ltd.   West Dover, VT. Assisted injured skiers and provided support services for public relations office in snow reporting. Also provided limited snow grooming.   1981 - 1982

Ski Patroller 3/ Training Officer/ Incident Investigator: Gunstock Recreation Area, Gilford, NH.   1988 - Present

Ski Patroller/ Incident Investigator: Loon Mountain Recreation Corporation, Lincoln, NH.   1992 - 1993

Ski Patroller: Butternut Basin Ski Area, Great Barrington, MA.   1978 - 1981, 1982 – 1984

**Related Experience**

Executive Director: Dalton Y.M.C.A.  Dalton, MA.   Responsible for developing, implementing and expanding programs for a 600+ member Y.M.C.A. facility. Working under a twelve-member Board of Directors, directed a paid and volunteer staff of 60+. Refined budgeting process and implemented new accounting practices for not-for-profit organizations. During tenure, increased membership by 20% and consistently operated within or under budget. 1982 - 1984

Assistant Director of Parks: Town of Dalton, Dalton, MA.    Oversaw all phases of summer parks, playgrounds and pool operations.  Increased offerings of town-wide summer programs and activities. Directed all town-wide youth sports leagues (over 3000 participants total) including:  soccer, basketball, baseball, softball and T-ball.  1982 - 1984

Environmental Educator/ Interpreter:  NEED Program, National Park Service, Cape Cod National Seashore, Truro, MA.    1980 - 1981

Lifeguard:  Cape Cod National Seashore, Wellfleet, MA.    1981 - 1982

Lifeguard/ Water Safety Instructor:  Churchill Park, Mill Pond Park, Newington, CT.    1978 - 1981

## Certifications

National Registry of Emergency Medical Technicians: (NREMT-A), Ambulance/MAST, Cert.  # A258032
American Red Cross:
  Advanced First Aid Instructor/Trainer
  Cardio-Pulmonary Resuscitation Instructor
  Advanced First Aid and Emergency Care
  Cardio-Pulmonary Resuscitation- BLS
  Water Safety Instructor
  Advanced Lifesaving
American Heart Association: Cardio-Pulmonary Resuscitation- BLS/AED
Professional Ski Patrol Association:
  Certified Ski Patrolman, Certification # C- 8608
  Ski and Toboggan/ First Aid Examiner
National Ski Patrol System:
  Senior Ski Patroller
  Senior Ski and Toboggan/ First Aid Examiner
  Certified Alpine Patroller, Certification # 253
  Certified Examiner in Hill Safety/ Risk Management, Patrol Management and Lift Evacuation
  Mountaineering Certification, Certification # E- 1677
  Avalanche Certification, Certification # E- 2864
  Instructor Training Certification, Phase I and II
  Outdoor Emergency Care Instructor
New Hampshire Certified Ambulance Attendant
Insurance Institute of America: Associate in Risk Management, (ARM) Professional Designation
Critical Incident Stress Debriefing (C.I.S.D.) Peer Facilitator NFPA Certification - Level 1

## Professional Associations

National Ski Patrol System, (NSPS)
Professional Ski Patrol Association, (PSPA)
National Ski Areas Association, (NSAA)
Cross Country Ski Areas Association, (CCSAA) Associate Member
American Society for Tests and Measurements, (ASTM) Member F-27 Committee on Snow Skiing
National Off-Road Bicycle Association, Racing License (NORBA)
International Mountain Bicycling Association, (IMBA)
National Recreation and Parks Association, (NRPA)
Northern New England Safety and Health Council
Risk and Insurance Management Society (RIMS)
International Society for Skiing Safety (ISSS)

Positions Held:
National Ski Areas Association (NSAA)
  Risk Management and Education Committee, Member 1996 – Present, Chair 2000 – Present
  PSIA/AASI Terrain Park Instruction Task Force 2003-2004
  Freestyle Terrain Task Force – 2007 – Present
NSPS:  New Hampshire Region Risk Management Advisor - 1989 - 1999
  New Hampshire Region Lift Evacuation Advisor - 1990 - 1997
  New Hampshire Region Professional Patrol Advisor - 1986 - 1989
  New Hampshire Region Certified Program Advisor - 1990 - 1996
  New Hampshire Region Assistant Regional Director - 1991 - 1994
  Eastern Division Risk Management Advisor - 1991 - 1995
  Eastern Division Professional Advisor - 1986 - 1989

Eastern Division Lift Evacuation Advisor - 1988 - 1989
Professional Division- Eastern Delegate - 1986 - 1988
National Lift Evacuation Manual Rewrite Committee - 1989
National Certified Program Manual Rewrite Committee- Risk Management/Hill Safety 1994-1995
National Certified Program Evaluator/Examiner – Risk Management/Hill Safety 2011
National Safety Team – 2008 – Present, Chairman, 2011 - Present
PSPA:  Board of Directors - 1989 – 1993
Risk Management and Insurance Advisor
New Hampshire Ski Areas Association- Safety and Education Committee - 1985 - 1994
New Hampshire Professional Ski Patrol Directors Association (Founding Member) - 1985 - 1989
Central New Hampshire Emergency Medical Services, Region IV- Board of Directors – 1985-1988
New Hampshire Emergency Medical System Statute Rewrite Task Force, Ski Patrol
Representative - 1986 - 1987
Gilford, NH Fire Department- Firefighter /EMT- A - 1986 - 1990
ASTM F-27 Committee on Snow Skiing – Committee Voting Member - 1991 – 2000 and 2011 – Present
CCSAA Intercontinental Conference Planning Committee - 1994
Salomon Technical Testing Team - 1985 – 1994
ISSS – Biennial Congress Session Moderator - 2019

## Education/Professional Courses

Springfield College: Springfield, MA Bachelor of Science Degree in Recreation and Parks Management, Concentrations in Outdoor Recreation and Resource Management and Business - 1981

Insurance Institute of America: Associate in Risk Management, (ARM), Courses of Study Including: ARM- 54, ARM- 55, and ARM- 56, Fundamentals of the Risk Management Process, Risk Control, and Risk Financing, 1989 - 1991

Department of Transportation, EMS: Critical Incident Management Development Program: Level 1 - 1992

New Hampshire Firefighter 1: High Angle Rescue Segment - 1987

Advanced Technical Rope Rescue Training (High Angle and Low Angle):  International Mountain Equipment School - 1986

Massachusetts Surf Rescue School:  National Seashore Surf Rescue Training - 1981

## Honors and Awards

Springfield College:
Magna Cum Laude Graduate (GPA 3.87) - 1981
Kappa Delta Pi National Honor Society - 1981

National Ski Areas Association:
Grand Award of Excellence in Skier Safety – 1986
Outstanding Contributions to the Ski Industry in Safety and Risk Management – 2005

Ski Area Management Magazine
Recipient of the SAMMY Award for Contributions to the North American Ski Industry - 2006

National Ski Patrol System:
New Hampshire Region Outstanding Ski Patrol - 1986
New Hampshire Region Outstanding Professional Ski Patroller - 1987
National Appointment Award # 6939 - 1988
Recipient of the Eastern Division John J. Clair Sr. Memorial Ski Safety
Award for Outstanding Contributions to Skier Safety in Eastern Skiing – 1992
Appointment to the NSPS National Safety Team – 2008 – 2014
Safety Team Chair – 2010-2012

Waterville Valley F.I.S. World Cup:
Invitational Ski Patrol - 1986, 1988, 1989, 1991

*Faculty Member/Presenter*

New Hampshire Bureau of Tramway Safety: New Hampshire Lift Operators and Lift Evacuators Training Seminar- "Risk Management and Documentation in Lift Operations" Gunstock, NH - 1989

New Hampshire Ski Areas Association:
    Annual Safety Seminars:
        "Confrontational Techniques and the Reckless Skier"      Gunstock - 1987
                "Safety and Risk Management Issues"
Waterville Valley - 1989
        "Risk Management in Ski Area Operations"      Waterville Valley - 1992
        "Workers Compensation Issues and Training"      Loon Mountain - 1993

National Ski Patrol System:
    EVAC '90, Ski Lift Evacuation Seminar - Loon Mountain, NH - 1990
    EVAC '91, Ski Lift Evacuation Seminar - Windham Mountain, NY - 1991
    Eastern Pennsylvania Region Fall Safety Seminar - "Ski Area Risk Management;
    Pre-Loss and Post-Loss Goals and Objectives" (Paper Presented)
    Camelback Resort, PA - 1992
    Maine Region, Sugarloaf USA First Annual Safety Symposium - Sugarloaf, ME - 1989
    Eastern Division On-Hill Risk Management Seminar - Wachusett Mountain, MA - 1992
    Eastern Division Fall Leadership Training Seminar:
        "Risk Management Training for Patrol Officers" and
        "Legal Issues Affecting Ski Areas with Mock Trial" Albany, NY - 1993
    Central Division, Wisconsin Regional Fall Ski Safety Workshop-
        "Ski Area Safety for the Patroller" Alpine Valley Ski Area, WI - 1993
    Eastern Division Ski Patroller's School - Faculty Member, Hunter Mountain, NY - 1992, 1993
    Maine Region, Saddleback Resort, ME – Incident Investigation Workshop – 2007
    NSP Local and National Update – NSAA Mid-Winter Trade Show, Mt. Snow, VT – 2009
    NSP National Patroller Educational Conference – Snowbird Resort, UT – 2009
        "On Hill Risk Management Evaluation"
    NSP National Patroller Educational Conference – Snowbird Resort, UT – 2010
        "Emergency Action/Response Plans…Are you Ready?"
    NSP National Patroller Educational Conference – Copper Mountain, CO – 2012
        "Risk Management Assessment, Auditing and Evaluating Your Exposures"
    NSP Eastern Division Spring Officers Meeting – Albany, NY
        "The NSP and Ski Area Operators…Is There a Disconnect?"
    NSP Eastern Division Certified Program Boot Camp – Harrison, ME
        "Post Incident Investigation: The Process, Tools, Tips and Tricks"
        Practical Application: Lift Incident and Mountain Bike Park Incident

Massachusetts Tramway Board:
    Annual Lift Maintenance Seminars:
    LMS '91, "Lift Evacuation Legal Issues"      Butternut Basin, MA - 1991
    LMS '92, "Lift Evacuation Legal Issues Update"      Butternut Basin, MA - 1992
    LMS '93, "Lift Operator Safety Training and Recordkeeping"      Butternut Basin, MA - 1993
    LMS '94, "Lift Loading and Unloading Safety Issues"      Butternut Basin, MA - 1994
    LMS '96  "Update on Legal Trends and Lift Related Claims"      Butternut Basin, MA - 1996
    LMS '00  "Lift Operations Legal Update"      Butternut Basin, MA - 2000
    LMS '02  "Terrain Park Operations"      Butternut Basin, MA – 2002
    LMS '04  "Terrain Park Operations Update, Pre and Post-Loss"      Butternut Basin, MA – 2004
    LMS '19  Keynote: "From Tragedy to Triumph: How One Family's
        Loss Led to a Paradigm Shift in Chairlift Operations"      Jiminy Peak Resort, MA - 2019

Cross Country Ski Areas Association:
    Eastern Regional Fall Meeting and Conferences:
        "Assessing Your Risks" Stowe, VT - 1990
        "Cross Country Incident Investigation" Jackson, NH - 1991
        "Cross Country Worker's Compensation Issues" Woodstock, VT - 1995
    North American Intercontinental Conferences:
        "Cross Country Incident Response Planning"  Jasper, Alberta, Canada - 1991
        "Incident Investigation"  Whitefish, MT - 1992
        "Cross Country Risk Management Issues"  Sunday River, ME - 1993
        "Regulations and Training Affecting Cross County Operators"  Winthrop, WA - 1994

"Developing a Comprehensive Employee Safety Program"  Bear Valley, CA - 1995
"Litigation:  It's Not a Pretty Picture"    Silverstar Resort, British Columbia, Canada – 1996


Professional Ski Patrol Association:
PSPA Annual Meeting, "Ski Area Risk Management in Patrol Operations"
White River Junction, VT - 1989

Eastern Professional Patrol Directors Association:
Annual Meeting, "Snowboard Risk Management, The Skier/Snowboarder Compatibility
Issue"   Stowe, VT - 1995

New England Ski Industry Fall Meeting and Trade Show:
"Disaster Planning and Crisis Communications" (Paper Presented) and
"Risk Management in Area Operations, What's Been Learned Through Litigation"
Sunday River, ME - 1993

National Ski Areas Association:
National Convention and Tradeshow: Savannah, GA 2004
"Risk Management Forum: Workers' Compensation and Ski Area Operations"
National Convention and Tradeshow: Scottsdale, AZ 2005
"Risk Management and Insurance Forum: Observations and Perspectives"
National Convention and Tradeshow: Marco Island, FL 2006
Collision Course: Trends in Ski Area Accidents and Liability
National Convention and Trade Show: Palm Springs, CA 2013
"Resorts in the Crosshairs: Litigation and Legal Update"
National Convention and Trade Show: Savannah, GA 2014
"Connecting with the Millennial Market, The Future of Freestyle Terrain"
National Convention and Trade Show: Nashville, TN
"A Spotlight on Your GL Policy"
Mid-Winter Seminar and Trade Show: Mt. Snow, VT - 1998
"Crisis Communications, Dealing with the Aftermath"
Co-Presenter and Facilitator with Chris A. Goddard, CPR – 1999
Mid-Winter Seminar and Trade Show: Mt. Snow, VT
"Turning the Tide on Rising Claims and Litigation Costs" – 2003
Mid-Winter Seminar and Trade Show: Mt. Snow, VT and Vail, CO
"Incident Investigation, Updates and Advancements" – 2004
Day long classroom and practical sessions, Moderator and Lead Instructor
Mid-Winter Seminar and Trade Show: Killington, VT and Snowbird, UT
"On Hill Risk Management Assessment and Practicum" – 2005
Mid-Winter Seminar and Trade Show: Killington, VT and Squaw Valley USA, CA 2006
"On Hill Risk Management Assessment and Practicum, Part 2"
"Designed for Success: Freestyle Teaching Parks and Programs"
"Safety and Snow Sports"
Mid-Winter Seminar and Trade Show: Vail, CO and Mt. Snow, VT – 2007
"On Hill Risk Management Assessment and Practicum, Part 3"
Mid-Winter Seminar and Trade Show: Snowbird, UT and Mt. Snow, VT – 2008
"Freestyle Terrain Task Force Update and Practicum"
Mid-Winter Seminar and Trade Show: Killington, VT – 2011
"Lessons Learned from Terrain Park Litigation"
Mid-Winter Seminar and Trade Show: Killington, VT – 2012
"Terrain Park Update"
"Backcountry and Side-country Issues and Solutions"
Mid-Winter Seminar and Trade Show: Killington, VT – 2015
"How Drone Technology Will Change Resort Operations"
"Freestyle Terrain Resources Update and New Deliverables"
Mid-Winter Seminar and Trade Show: Squaw Valley, CA and Killington, VT – 2016
"Incident Investigation: Updates and New Tools"
"Terrain Park Design: Building a Park for your Guests, Not your Staff"
"Jump Measurement Procedure Training Session"
"Terrain Parks: What Gets Measured, Gets Done"
Mid-Winter Seminar and Trade Show: Steamboat, CO and Mt. Snow, VT – 2017
"Modern Incident Investigation – Tools of the Trade"

"Terrain Park Documentation and Data – What to Track and Keep and What to Toss"
"Lift Maintenance Programs – Introducing Quality While Keeping Flexibility"
Mid-Winter Seminar and Trade Show: Snowbird, UT and Killington, VT – 2019
"NSAA Freestyle Terrain Resource Guide Update, Expanding the Body of Knowledge"
Annual Fall Educational Seminars:
"Strategies for Reducing Liability Exposures at Your Ski Areas",
"Ski School Liability Issues" and
"Incident Investigation Training and Techniques: The Double I Process"
(Paper Presented)
1994 Locations: Sunday River, ME   Snowshoe Resort, WV   Welch Village, MN
Portland, OR   Northstar-at-Tahoe, CA
Annual Fall Educational Seminars:
"Trials and Tribulations of the Legal System, Love it Because You
Can't Leave It", and
"We Have a Problem...Disaster by Design"
1995 Locations: Sunday River, ME   Snowshoe Resort, WV   Holiday Valley, NY
Shanty Creek, Resort, MI   Northstar-at-Tahoe, CA   Portland, OR
Salt Lake City, UT   Santa Fe, NM
Annual Fall Educational Seminar:
"Incident Investigation: Tools, Tips and Techniques for the 90's and Beyond"
1996 Location:   Sunday River, ME, in conjunction with the New England Ski Industry
Meeting and Trade Show
Annual Fall Educational Seminars:
"Lessons Learned from a Landmark Lawsuit" and
"Strategies for Risk Management in the Ski School Operation"
1997 Locations: Sunday River, ME Lake Placid Olympic Center, NY Copper Mountain, CO
Annual Fall Educational Seminars:
"Terrain Park Incident Investigation"
2001 Location: Mt. Attitash, NH
Annual Fall Educational Seminars:
"Terrain Park Risk Mitigation Techniques" and
"Helmet Rental Program and Operations Update"
2002 Location: Mt. Washington Hotel, Bretton Woods, NH
Annual Fall Education Seminars:
"Terrain Park Incident Investigation"
2004 Location: Mt. Washington Hotel, Bretton Woods, NH
Annual Fall Education Seminars:
"Old School v. New School...How to Embrace Change in Risk Management"
and "How to Apply New School Thinking to Slope Vehicle Safety"
2005 Locations: Bretton Woods Ski Resorts, NH, Holiday Valley, NY, Granlibakken, Lake
Tahoe, CA, Copper Mountain, CO
Annual Fall Education Seminars:
"Terrain Park Risk Management, Updates and Advancements"
"Crisis Communications",
2007 Locations: Bretton Woods, NH and Northstar at Tahoe, CA
Annual Fall Educational Seminars:
"Freestyle Terrain Notebook, Bringing it to Life"
2008 Locations: Boyne Mountain Resort, MI, Bretton Woods, NH and
Northstar at Tahoe, CA
Annual Fall Educational Seminars:
"Cues and Clues, Controlling Workers' Compensation Costs"
2013 Locations: Bretton Woods, NH and Holiday Valley, NY
Annual Fall Educational Seminars:
"Predictive Modeling Through Root Cause Analysis" and
"The Nuts and Bolts of Post-Incident Investigation"
2014 Location: Hunter Mountain, NY
Annual Fall Educational Seminars:
"Occupational Safety Management, v. 2.0, or What do we do now?"
"Freestyle Terrain Deliverables and ASTM Update"
2015 Locations: Lake Placid, NY and Squaw Valley, CA
Annual Fall Educational Seminars:
"Insurance Buying 101"

"Post-Loss Occupational Safety Management: Incident Investigation and Root Cause Analysis"
2016 Location: Holiday Valley, NY

Annual Fall Educational Seminars:
"Collision Course: A Renewed Focus to Help Protect Guests and Resorts"
"The Case for Safe Mountain Work Environments"
"Message Control: How Mainstream and Social Media Can Impact Your Operations"
2017 Location: Sunday River, ME


National Downhill Bike Park Summit:
"Incident Investigation – The Challenges of Summer Incidents"
"Legal Review of Bike Park-Related Litigation"
2015 Location: Winter Park Resort, CO

National Downhill Bike Park Summit:
"Extraction – Best Practices for Getting Guests Off The Hill"
"All Things Lifts – what You Need to Know About Summer Lift Operations"
"Bike Park Signage"
"Mountain Bike Operations Legal Update"
"MTB Post – Incident Investigation"
2016 Location: Windham Mountain Resort, NY

National Downhill Bike Park Summit:
Mountain Biker's Responsibility Code and Signage
Guest Education: Using An Integrated Systems Approach
Bike Park Incident Mock Trial
Summer Activities Legal Update
2017 Location: Northstar California Resort

National Downhill Bike Park Summit:
Bike Park Operations: Planning: The Buckets, The 12-Month and A Day in the Life"
MTB Post-Incident Investigation
2018 Location: Angelfire Resort, NM

Northeast Medical Association:
39th Annual Meeting:
"Ski Area Safety in the 90's, A Risk Managers Perspective"
Snowmass/Aspen Resort, Colorado – 1996

43rd Annual Meeting:
"Claims and Legal Trends Update"
Sunday River Ski Resort, Maine - 2000

Canada West Ski Areas Association:
Annual Fall Risk Management Seminar:
"Lessons Learned from a Landmark Lawsuit" The Kelly v. Sierra-at-Tahoe Case
Banff Resort Hotel, Banff, Alberta, Canada – 1997

Transworld Snowboarding:
International Conference: Aleyeska Mountain Resort, Alaska
"Terrain Park Operations and Issues" – April, 2002
International Conference: Whistler/Blackcomb Resort, British Columbia
"Terrain Park Operations and Liability" – April, 2003

National Ski Industry "Cutters Camp":
Inaugural Conference on Terrain Park Issues: Timberline Lodge, Mt. Hood, OR
"Risk Management and Legal Considerations for Terrain Park Design, Construction and Maintenance" and;
"Terrain Park Operational Issues Confronting Resorts" May, 2003

Cutters' Camp, Timberline Lodge, Mt. Hood, OR
"Incident Investigation of Terrain Park Incidents"
"Terrain Park Operations: Where We've Been, Where We Are and Where We're Going"
May 2005

Cutter's Camp, Timberline Lodge, Mt. Hood, OR
"Terrain Park Operations, What's Important"
"Risk Management in Terrain Park Operations"
May 2007

Cutter's Camp, Timberline Lodge, Mt. Hood, OR
    "Freestyle Terrain Operations and FTRG Update" – 2 Sessions
    May 2008
Cutter's Camp, Mt. Snow, VT
    "Terrain Park Incident Investigation Update"
    "Risk Management in the Park Setting"
    April 2009
Cutter's Camp, Mt. Snow, VT
    "Terrain Park Incident Investigation Update"
    "Freestyle Terrain Risk/Legal Update – A Case Study"
    April 2010
Cutter's Camp, Mt. Snow, VT
    "Freestyle Terrain Risk Management"
    "What To Do When the Sh*t Hits the Fan, A Post-Incident Response Primer"
    April 2011
Cutter's Camp, Timberline Lodge, OR
    "Freestyle Terrain Risk Management"
    "What To Do When the Sh*t Hits the Fan, A Post-Incident Response Primer"
    May 2011
Cutter's Camp, Mt. Snow, VT
    "Terrain Park Risk Management Highlights 2012"
    "Impact of the Written Word"
    April 2012
Cutter's Camp, Mt. Snow, VT
    "Terrain Park Risk Management Update 2013"
    "Incident Investigation, The 4 P's"
    "Terrain Feature Measuring Tool and Its Applications"
    April 2013
Cutter's Camp, Mt. Snow, VT
    "2014 FTN Deliverables Presentation"
    April 2014
Cutter's Camp, Timberline Lodge, OR
    "2014 FTN Deliverables Presentation"
    "Legal and Risk Management Update 2014"

Summer Ops Camp - 2017
    "Mountain Biking Responsibility Code and Trail Signage"
    "Guest Education – How to Communicate Effectively with Guests"
    Killington, VT

International Tourism Symposium
    13th International Tourism Symposium, Zermatt, Switzerland
        "Ski Area Risk Management and Safety"
        September 2011

Ontario Snow Resorts Association
    Annual General Meeting, Conference and Trade Show, Hockley Valley, Ontario
        "Freestyle Terrain: Design, Construction, Operations and Education"
        May 2013
    Fall Educational Seminar, Blue Mountain Resort, Ontario
        "Freestyle Terrain Resources and ASTM Update"
        September 2015

Pacific Northwest Ski Areas Association
    Spring Conference and Leadership Summit, Hood River, OR
        "Workers' Compensation Employee Injury Reduction Initiative"
        April 2013

Ski New Hampshire
    Annual Meeting and Conference, King Pine Ski Area, NH
        "Workers' Compensation and Employee Injury Reduction Initiative"
        June 2013
New England Winter Sports Summit

Fall Conference
"Cues and Clues, Controlling Workers' Compensation Costs"
Sunday River, ME   September 2013

Terrain Park Operations Industry Webinars
Fall Session
"NSAA Freestyle Terrain Resources Content Update"
December 2015
Spring Session
"Freestyle Terrain Risk/Legal Update"
May 2016
Ski Areas of New York (SANY)
"Pre and Post-Loss Risk Management in the Terrain Park, Park Practices and Principles"
"Post-Incident Investigation: The Process, Tools, Tips and Tricks"
Hunter Mountain, NY and Holiday Valley, NY   December 2018
International Society for Skiing Safety (ISSS)
"An Objective, Systematic, Criteria-Driven Approach to On-Slope Risk Management in the
Mountain Resort Setting"         Squaw Valley, CA         April 2019

***Publications***
National Ski Areas Association:
NSAA News - Quarterly Publication for NSAA Members,
"Common Law Assumption of Risk Ruling in California"  Fall 1989 Ed.
"Jury Returns Verdict Based on Statutory Assumption of Risk in Colorado" Fall 1989 Ed.

NSAA Journal - Quarterly Publication for NSAA Members
"Event Management: What to Know, Before You Put on the Show"
Spring 2002, Ed.
NSAA Journal - Quarterly Publication for NSAA Members
"Snowmobiles…Blessing or Curse? Questions and Considerations"
Fall 2003, Ed.
NSAA Journal – Quarterly Publication for NSAA Members,
"Terrain Park Design – Avoiding a Risky Business" (Sidebar)
Convention Issue, 2016 Ed.

"Incident Investigation, The Double I Process", Ski Industry Incident Investigation Manual,
Published NSAA:  Spring 1996
"Terrain Park Resource Guide" Published NSAA 2000
"Freestyle Terrain Resource Guide" Published NSAA 2004
"Snowmobile Operations Resource Guide" Published NSAA 2005
"Freestyle Terrain Notebook" – Editor and Contributing Author, Published NSAA: August 2008
"Freestyle Terrain Update" – Editor and Contributing Author, Published NSAA – November 2014
"Incident Investigation Resource Guide – Editor and Contributing Author, Published NSAA –
January 2016

National Ski Patrol System:
Tips and Tales- Official Publication of New Hampshire Region NSPS
"Documentation: The Key to Success in the Courtroom"  Fall 1994 Ed.
"Series of Steps Needed in Risk Management Planning"  Winter 1995 Ed.

Cross Country Ski Areas Association:
Nordic Network- The Official Publication of the CCSAA
"Pre-Season Preparation: A Key to Accident Reduction" Fall 1993 Ed.

Future Snowboarding Magazine
"Ask the Expert – Lift Ticket Language…What does it mean?"
January 2006, Vol. 1, Issue 2

Adventure Park Insider Magazine
"Managing Risk: An Overview of Pre and Post-Loss Concepts" – Inaugural Issue, February 2015
"Communicating with Guests, Singing the Same Tune" – Winter Issue 2018

Ski Area Management Magazine
"Incident Investigation Goes High Tech" – July 2019