```
       IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MONTANA
                BUTTE DIVISION
_____
JOHN MEYER,

        Plaintiff,
     vs.              Cause No. 18-CV-0002-BMM
BIG SKY RESORT,

        Defendant.
_____
   VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
                    BOB DIXON
_____
```

    BE IT REMEMBERED, that the videotaped deposition upon oral examination of BOB DIXON, appearing at the instance of Plaintiff, was taken at the offices of Crowley Fleck, PLLP, 1915 South 19th Avenue, Bozeman, Montana, 59718, on the 5th day of February 2020, beginning at the hour of 9:30 a.m., pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

**EXHIBIT B**

## Page 2

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFF, JOHN MEYER:

    Ms. Breean Walas, Esq.
    Walas Law Firm
    P.O. Box 4591
    Bozeman, Montana 59772
    breean@walaslawfirm.com
    (501) 246-1067

ATTORNEY APPEARING ON BEHALF OF THE DEFENDANT, BIG SKY RESORT:

    Mr. Ian McIntosh, Esq.
    CROWLEY FLECK PLLP
    1915 South 19th Avenue
    P.O. Box 10969
    Bozeman, MT 59719-0969
    imcintosh@crowleyfleck.com
    (406) 556-1430

ALSO PRESENT:
    Mike Unruh

## Page 3

I N D E X

EXAMINATION OF BOB DIXON BY     PAGE
  Ms. Breean Walas, Esq.....................5

E X H I B I T S  R E F E R R E D  T O:
Exhibit 10......................................16
Exhibit 11..................................17, 20
Exhibit 13..................................19, 22
Exhibit 18......................................21
Exhibit 20......................................23
Exhibit 21......................................24
Exhibit 24......................................25
Exhibit 25..................................27, 32
Exhibit 68......................................29

DEPOSITION EXHIBITS:

Exhibit 75   Colored Photograph
    with writing......................32

Exhibit 76   Colored Photograph
    with writing...................33-35

Exhibit 77   Document entitled "Patroller
    Comments".......................39-40

Exhibit 78   Document entitled "Big Sky
    Resort, Professional Ski
    Patrol Manual, 2015"...........44, 50

## Page 4

    WHEREUPON, the following proceedings were had and testimony taken, to-wit:

    \* \* \* \* \*

    VIDEO TECHNICIAN: This is the time and place set for the video deposition of Bob Dixon in the case of John Meyer, plaintiff, versus Big Sky Resort, defendant.
    It is Cause Number 18-CV-0002-BMM in the United States District Court for the district of Montana, Butte Division.
    This video deposition is being held at the offices of Crowley and Fleck located at 1915 19th Avenue in Bozeman, Montana.
    Today's date is February 5th, 2020. The time is 9:33 a.m. The court reporter is Marla Jeske with Bridger Court Reporting. I'm Mark Brown, the videographer.
    Will the attorneys please identify themselves for the record.
    MS. WALAS: Breean Walas for the plaintiff.
    MR. McINTOSH: Ian McIntosh for the defendant.
    VIDEO TECHNICIAN: Will the witness now

## Page 5

please be sworn in.

    \* \* \* \* \*

    BOB DIXON,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

    EXAMINATION
BY MS. WALAS:
    Q. All right. Good morning. Do you understand why you're here today?
    A. I do.
    Q. Okay. And have you given a deposition before?
    A. Yes.
    Q. How many have you given?
    A. Somewhere between five and ten.
    Q. And what -- was that in your employment with Big Sky?
    A. Yes.
    Q. All of them?
    A. I think so, yes.
    Q. And what types of cases were they?
    A. Um, basically there was a suit about an

## Page 6

avalanche closure. There was a suit involving terrain analysis by a skier. There was one about skiing off the summit and the person walking across a rock field to ski a patch of snow and hitting a rock, those kind of things.

Q. Okay. And I'm just going to go over a couple of the ground rules just to give you a reminder.

You understand that all of your answers need to be out loud so that she can take them down?

A. Correct.

Q. And is there anything going on that would impair your ability to give truthful answers today?

A. No.

Q. You haven't taken any drugs this morning?

A. Prilosec.

Q. Okay. Haven't had any drinks?

A. No.

Q. All right.

A. Except Mountain Dew.

Q. Well, you know, everybody needs a little caffeine.

A. Yes.

## Page 7

Q. So if you need any breaks at any point, if I'm in the middle of a question, if you don't mind answering it and then we'll go ahead and take a break as you need it.

A. Okay.

Q. And do you agree to be honest with me today?

A. Yes.

Q. All right. Now, what have you done to prepare for your deposition?

A. Um, basically went over the actual accident investigation and pretty much just got my memory back as to the incident.

Q. Okay. And we'll talk about the accident incident report a little bit later but, first, I just want to get some background information on you.

A. Uh-huh.

Q. What's your full name?

A. Robert Charles Dixon.

Q. And have you gone by any other names?

A. Basically, the ski patroller uses my number 20 which I answer to quite easily.

Q. Okay.

A. They also call me Boss Hog, Red Duck

## Page 8

Leader. Basically, some people use my name that I use for my pin name on my account, which is Cindy or Sherri. Okay?

Q. Okay. And is it okay if I call you Bob today?

A. Yes.

Q. Okay. And what's your marital status?

A. Divorced.

Q. Okay. And does your ex live in the area?

A. She does.

Q. And what is her name?

A. Evi Dixon.

Q. Okay. And do you have any children?

A. No.

Q. Where do you live?

A. On Baxter over by La Tinga, Baxter Lane.

Q. Is that in Bozeman?

A. Uh-huh.

Q. Okay.

MR. McINTOSH: Say yes. Just remember to say yes instead of uh-huh.

THE WITNESS: Okay.

MR. McINTOSH: Or else Marla is going to get mad at both of us.

## Page 9

MS. WALAS: Right. And we all say uh-huh as well, so it's a good reminder for all of us.

THE WITNESS: Okay.

BY MS. WALAS:

Q. Does anyone live with you at your residence?

A. No.

Q. And what's your educational background starting with high school?

A. Went to high school in Colorado Springs, then went to college, got a professional degree in physics from MSU.

Q. And when you say MSU, which one is that?

A. It's Montana State University.

Q. All right. And you said that's a professional degree in --

A. Right.

Q. -- physics?

A. Yes.

Q. What is a professional degree?

A. It's basically four years and some graduate courses but not quite a master's.

Q. And any other post-graduate work?

A. I worked in GIS but those are just courses I took. I didn't get a degree.

**Page 10**

Q. Okay. And do you have a bachelor's degree from Montana State?
A. It's the same thing as professional.
Q. Okay. And let's talk a little bit about your employment history. What would you consider your profession?
A. Ski patrol.
Q. And how long have you been a ski patroller?
A. 40 years.
Q. You're going to make me do some math. So you started in about 1980?
A. A little before that.
Q. Okay. And where was your first job as a ski patroller?
A. Park City.
Q. And how long were you at Park City?
A. One year.
Q. Do you recall what your title was?
A. Just a line ski patroller.
Q. And where did you go after Park City?
A. Park West.
Q. And where's Park West?
A. It's in Park City, now called The Canyons.

**Page 11**

Q. How long did you stay there?
A. Two years.
Q. And what did you do there?
A. Line patrol.
Q. After Park West, where did you go?
A. Big Sky.
Q. Okay. So what year did you join Big Sky?
A. '82.
Q. What -- before we go into your employment at Big Sky, what were your duties as a line patrol?
A. Basically avalanche mitigation, medical response, rope lines, things like that.
Q. And when you joined Big Sky in '82, what was your title, job title?
A. When I joined them, was line patroller.
Q. How long did you -- how long were you a line patroller?
A. Two months.
Q. What did you do after line patrol?
A. Assistant director.
Q. Assistant director of what?
A. Ski patrol.
Q. Okay. Didn't want to put you in the

**Page 12**

kitchen and be wrong.
So you were promoted to the assistant director in '82?
A. Yes.
Q. Okay. And how long were you the assistant director of ski patrol?
A. Ten years.
Q. And what were your responsibilities and duties as that assistant director?
A. Pretty much the day-to-day operations, direction for the pole patrol. There was a small volunteer patrol but they weren't under my auspices.
Q. And in '92, what was your -- what did your role change to?
A. Patrol director.
Q. And what does a patrol director do?
A. Basically supervises the day-to-day operation of the ski patrol, also is in charge of investigation, accident investigation, basically human resource activities, dealing with the management team of Big Sky.
Q. Okay. And how long were you the patrol director?
A. Let's see, I just retired last June so

**Page 13**

that is -- if we can do the math. It's probably 26 years about.
Q. And why did you retire?
A. I'm 70.
Q. That's a pretty good reason.
Now, have you ever given testimony as an expert witness?
A. No.
Q. Okay. And how long have you been a skier?
A. Since I was four.
Q. And what level of skier do you rate yourself?
A. An expert.
Q. And do you recall -- strike that.
So I'm assuming, but I don't want to make an assumption, are you knowledgeable about the mountain at Big Sky?
A. Yes.
Q. Okay. So if I talk to you about, you know, the trails and the terrain and use names, you'll have a general understanding of what I'm talking about?
A. Yes.
Q. And if I show you pictures, do you feel

**Page 14**

1  like you can recognize the ski areas on the
2  mountain?
3      A.  Yes.
4      MR. McINTOSH:  Objection, speculation.
5  BY MS. WALAS:
6      Q.  Okay.  How often are you on the mountain
7  as the ski patrol director?
8      A.  Pretty much every day.
9      Q.  Okay.  And do you go out and assist the
10 professional ski patrollers in their job?
11     A.  Yes.  I got an avalanche route that I do
12 every day.  We do avalanche control.  And yes, I'm
13 on the mountain.
14     Q.  Okay.  And how about skiing for fun, how
15 often do you go out on the mountain at Big Sky?
16     A.  This year I've been out ten times.
17     Q.  How about when you work there?
18     A.  None.
19     Q.  Did you say none?
20     A.  None.
21     Q.  Okay.  Now, at Big Sky are you familiar
22 with what's been referred to within this litigation
23 as the Bermuda Triangle?
24     A.  Yes.
25     Q.  Okay.  And why is it called the Bermuda

**Page 15**

1  Triangle?
2      MR. McINTOSH:  Objection, foundation.
3          Go ahead.
4      THE WITNESS:  Basically, it's some ski
5  patroller decided to call it that.  I do not know
6  why.
7  BY MS. WALAS:
8      Q.  Can you tell me where the Bermuda
9  Triangle is on the mountain?
10     A.  It is below the Loop Road, below Highway
11 and above lower Morning Star.
12     Q.  And is it your understanding that
13 Mr. Meyer's ski wreck on December 11th, 2015,
14 occurred in the Bermuda Triangle area?
15     A.  Yes.
16     Q.  Okay.  And do you know if you can see
17 this Bermuda Triangle from any of the ski lifts?
18     A.  Yes.
19     Q.  Which one?
20     A.  Definitely Challenger, you can actually
21 see it from Swift Current.
22     Q.  I'm going to go ahead and hand you the
23 binder of exhibits that have been introduced so far
24 so that you can use those for your reference.  And
25 I'll ask you to go ahead and turn to what's been

**Page 16**

1  marked as Exhibit 10.
2      A.  (Witness complies.)
3      Q.  Now, have you seen this picture before?
4      A.  I believe so.
5      Q.  And can you identify where this is on
6  the mountain?
7      A.  This is -- let me take a good look at
8  this.  Yeah, this is right up above the soup shack
9  coming off the Jay Walk.
10     Q.  And would this be considered a
11 transition point on the mountain?
12     MR. McINTOSH:  Objection, vague.
13     THE WITNESS:  Yeah.  Define "transition
14 point."
15 BY MS. WALAS:
16     Q.  Is this an area where more than one
17 trail come together?
18     A.  Yes.
19     Q.  And there's some what I would call
20 fences on there.
21     A.  Right.
22     Q.  And do you know what the purpose of
23 those fences are?
24     A.  To collect snow.
25     Q.  To collect snow?

**Page 17**

1          Do they have anything to do with
2  directing skiers?
3      A.  No.
4      Q.  Okay.  And do you have any idea when
5  this picture was taken?
6      A.  I do not.
7      Q.  And you said that it was above the soup
8  shack in coming off the Jay Walk?
9      A.  Right.
10     Q.  For those of us that are unfamiliar with
11 Big Sky, are there any specific trail names right
12 there?
13     A.  You're on the Jay Walk.
14     Q.  You're on the Jay Walk, okay.
15     A.  Yes.
16     Q.  And if you'll go ahead and turn to
17 Exhibit 11.
18     A.  (Witness complies.)
19     Q.  And have you seen this photo before?
20     A.  Not that I recall.
21     Q.  Looking at the photo are you familiar
22 with the area that it depicts?
23     A.  Yes.
24     Q.  Okay.  And what is that area?
25     A.  Um, you're at the intersection of Mr. K

**Page 18**

and the lower Morning Star Road, catwalk.
Q. And what is the skill level for that lower Morning Star catwalk?
A. Green.
Q. And do you see where the skiers are in that photo?
A. Yes.
Q. And what's the trail name of what I would consider the uphill slope above them?
A. Right above them?
Q. Yes.
A. That is not a trail.
Q. What is that?
A. It's just an open snow field.
Q. Okay. Is that an open skiing area?
A. Not until we get enough snow. But basically it's just kind of off -- off the trail a bit.
Q. And the part of the trail that the skiers are on, did you say that was the lower Morning Star cat track?
A. Yes.
Q. Okay. And the signs that are on the part of the slope above the skiers, what is the purpose of those signs?

**Page 19**

A. Are you referring to the orange sign?
Q. Yes.
A. That is to close that when we're doing avalanche mitigation, to close it.
Q. And there's another sign that's yellow, what is that sign's purpose?
A. Basically to caution you that there may be obstacles, rocks. It's early season conditions.
Q. Okay. And when you say early season conditions, what does that mean to you?
A. Thin snow pack.
Q. Did you say thin snow pack?
A. Yes.
Q. Okay. And where does this lower Morning Star cat track lead to?
A. To lower Morning Star.
Q. If you'll go ahead and turn to Exhibit 13.
A. (Witness complies.)
Q. And have you seen this photo before?
A. Possibly. I've seen some similar, not this one.
Q. And are you familiar with the area that is depicted?
A. Yes.

**Page 20**

Q. Okay. And what is that showing in that picture?
A. At the top of lower Morning Star you're looking on the right side at Bermuda Triangle, you're looking at the Loop cat track and then you're looking at Highway on the left side of the photo.
Q. And so when you say "Highway on the left side of the photo," that would be the steeper --
A. Uh-huh.
Q. -- part of the hill?
A. Yeah. It's everything above the cat track.
Q. And then this cat track that you're discussing here, is that the same cat track that was the lower Morning Star cat track in the previous exhibit that we talked about, Exhibit 11?
A. It does continue across, yes.
Q. And I just forgot what the top trail was on the left. What's the name of that trail again?
A. Highway.
Q. Highway. And what skill level is Highway?
A. Black diamond.
Q. And so Highway crosses over the cat

**Page 21**

track and then continues down?
A. To the Bermuda Triangle.
Q. Okay. And what's the skill level after you cross over the cat track?
A. Um, it's basically continuation of Highway. So it would be black diamond.
Q. Now, do you know if this area has ever been marked with any safety signs by the ski patrollers?
MR. McINTOSH: Objection; vague, foundation.
THE WITNESS: Yeah, more details. Which area are you talking there?
BY MS. WALAS:
Q. So looking at this picture, the Bermuda Triangle there, has that area, the Bermuda Triangle itself, ever been marked with safety signage or anything that the ski patrollers used to advise skiers of hazards?
MR. McINTOSH: Same objections.
THE WITNESS: Um, no.
BY MS. WALAS:
Q. And go ahead and turn to Exhibit 18.
A. (Witness complies.)
Q. Where is this on the mountain?
A. This is the top of Challenger.

6 (Pages 18 to 21)

BOB DIXON

```
 1      Q.  Okay.  And I forgot to ask you
 2  beforehand, that you're familiar with what's
 3  depicted in this photo?
 4      A.  Yes.
 5      Q.  Okay.  And what's the purpose of those
 6  ropes that we see in the photo?
 7      A.  It's basically a closure.
 8      Q.  And what's the purpose of the closure?
 9      A.  The closure is to keep people from
10  hiking up into the terrain above it.
11      Q.  And was that closed due to early season
12  conditions?
13      A.  Yes.
14      Q.  So similar to the first photo we looked
15  at, it may change on another later date when you
16  get more snow up there?
17      A.  Correct.
18      Q.  Okay.  And do you know if this photo and
19  the previous photo Exhibit 13, do you know when
20  those were taken?
21      A.  No, not really.
22      Q.  Now you said that's the top of Highway,
23  correct?
24      A.  Yes.
25      Q.  And --
                        22
```

```
 1      Q.  And there's -- it looks like there's
 2  some ropes and signs again in this photo, whose
 3  decision is it to put those up?
 4      A.  Supervisor.
 5      Q.  You as the supervisor?
 6      A.  No, each hill has a supervisor.
 7      Q.  Okay.  And so there would be a specific
 8  supervisor assigned to an area on the hill?
 9      A.  Uh-huh.
10      Q.  Okay.  Do you know who was assigned to
11  the Challenger area on December 11th, 2015?
12      A.  Not for sure.
13      Q.  Okay.  If you'll go ahead and turn to
14  the next exhibit, Exhibit 21.
15      A.  (Witness complies.)
16      Q.  And what area of the mountain is this?
17      A.  This is the skier's left of Country Club
18  and is the traverse above the LRT area.
19      Q.  And where's this in relation to Highway?
20      A.  It is to the skier's right of Highway.
21      Q.  In looking at this photo, are there any
22  warnings that have been put up for skiers?
23      A.  All I see is the bamboo fence and that's
24  closure.
25      Q.  And what's the purpose of the bamboo
                        24
```

```
 1          MR. McINTOSH:  I'm sorry, I got
 2  to -- misstates his testimony.
 3              Go ahead.
 4  BY MS. WALAS:
 5      Q.  So on Exhibit 18 where is that at?
 6      A.  It's at the top of Challenger.
 7      Q.  Top of Challenger.  Sorry, I struggle to
 8  keep the trail names straight.
 9          And is that right where you get off the
10  chairlift?
11      A.  Yes.
12      Q.  Okay.  If you'll turn to Exhibit 20.
13      A.  (Witness complies.)
14      Q.  And are you familiar with the area
15  depicted in this photo?
16      A.  Yes.
17      Q.  And where is that on the mountain?
18      A.  That is Country Club.
19      Q.  And where's Country Club in relation to
20  Highway?
21      A.  It is over on the skier's right up
22  Highway.
23      Q.  And do you have to take Country Club to
24  get to Highway from the Challenger lift?
25      A.  No, not necessarily.
                        23
```

```
 1  fence?
 2      A.  To close that area.
 3      Q.  Is it to keep skiers safe?
 4      A.  Yes.
 5          MR. McINTOSH:  Objection, foundation.
 6              Go ahead.
 7          THE WITNESS:  Yes.
 8  BY MS. WALAS:
 9      Q.  Why would a i patroller close an area?
10      A.  Cliff bands exposed down there below it.
11      Q.  And is that to keep skiers away from the
12  cliff bands?
13      A.  Uh-huh, yes.
14      Q.  All right.  If I can ask you to turn to
15  Exhibit 24.
16      A.  (Witness complies.)
17      Q.  And are you familiar with this photo?
18      A.  Yes, I am.
19      Q.  And do you know when this photo was
20  taken?
21      A.  I do not.
22      Q.  And what area of the mountain is this?
23      A.  This is lower Highway.
24      Q.  And from the vantage point of the
25  photographer, where they're standing, can you see
                        25
```

7 (Pages 22 to 25)

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

BOB DIXON

**Page 26**

1  the angle of the transition to the cat track in
2  this photo?
3      MR. McINTOSH: Objection, vague.
4      THE WITNESS: Um, yes.
5  BY MS. WALAS:
6      Q. And can you describe that angle to me?
7      MR. McINTOSH: Same objection.
8      THE WITNESS: Um, it looks to me to be pretty
9  much a smooth transition.
10 BY MS. WALAS:
11     Q. And have you skied this lower Highway
12 before?
13     A. Oh, yes.
14     Q. I had to ask because, you know, you said
15 you never went skiing for fun when you were working
16 there.
17        Now, do you know how far away from the
18 cat track this picture was taken?
19     A. That would be speculation.
20     Q. Okay. Do you know why this photo was
21 taken?
22     A. I would assume to show the terrain and
23 the vantage point from the skier, uphill skier.
24     Q. But you personally were not involved in
25 taking this photo?

**Page 27**

1      A. No.
2      Q. What's the skier level of this trail?
3      A. Black diamond.
4      Q. And there's a lot of brush in the photo,
5  correct?
6      A. Correct.
7      Q. And are those -- is that brush an area
8  that you would consider a hazard?
9      A. Um, not really. That brush gives away
10 quite easily when you're skiing through it.
11     Q. And how steep is lower Highway?
12     A. Again, I don't have those figures here.
13     Q. If you'll go ahead and turn to Exhibit
14 25.
15     A. (Witness complies.)
16     Q. And are you familiar with this picture?
17     A. Yes.
18     Q. And where is this photo on the mountain?
19     A. It is lower Highway.
20     Q. And do you see the three people standing
21 on the cat track?
22     A. I do.
23     Q. And do you see a drop-off from where the
24 skiers are standing?
25     MR. McINTOSH: Objection, vague.

**Page 28**

1      MS. WALAS: I'll go ahead and rephrase that.
2  That was a horrible question.
3  BY MS. WALAS:
4      Q. Do you see where the skiers are at the
5  uphill part of the cat track? Do you see that
6  area?
7      A. Yes.
8      Q. And does it appear that there's a
9  drop-off at the point where they're standing on
10 that uphill transition?
11     A. No, there does not.
12     Q. Can you see the lower legs of the skier
13 closest to the uphill portion?
14     A. I can see most of it, yes.
15     Q. And there aren't any safety warnings
16 that have been put up in this area, correct?
17     A. At this time?
18     Q. Yes, at this time.
19     A. No.
20     Q. And do we know -- do you know, not we.
21 Do you know when this picture was taken?
22     A. I do not.
23     Q. Do you know if it's representative of
24 the mountain on December 11th, 2015?
25     A. I can't say for sure since I don't know

**Page 29**

1  when it's taken.
2      Q. And did you go out to Mr. Meyer's -- the
3  location of Mr. Meyer's ski wreck on December 11th?
4      A. The following day.
5      Q. The following day?
6      A. Yeah.
7      Q. And if you'll go ahead and turn to
8  what's been marked as Exhibit 68, which I believe
9  we have the original in here.
10     A. (Witness complies.)
11     Q. Now are you familiar with this photo?
12     A. I am not.
13     Q. You are not. Okay. Well, then we will
14 just not talk about that one.
15     A. Okay.
16     Q. Now looking at where that skier is
17 standing.
18     A. In 68?
19     Q. In 68, yeah. Are you familiar with that
20 area of the mountain?
21     A. Yes.
22     Q. Okay. And would you consider that the
23 downhill transition from Loop Road to the rest of
24 Highway?
25     MR. McINTOSH: I'm sorry. Objection, vague.

8 (Pages 26 to 29)

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**Page 30**

1 THE WITNESS: Say that again.
2 BY MS. WALAS:
3 Q. Looking at where the skier is standing,
4 what would you -- how would you describe that
5 location where he is standing or she?
6 A. The person standing on the cat track.
7 Q. Okay. And immediately after the cat
8 track does it continue to go downhill?
9 A. The cat track itself or where -- below
10 the skier?
11 Q. Below the skier, does it transition back
12 into a steep slope?
13 A. It transitions into a slope, yes.
14 Q. But you would not consider that a steep
15 slope?
16 A. Not particularly, no.
17 Q. And do you know if any photos were taken
18 during the investigation of a skier standing on the
19 other side of the cat track closer to where it goes
20 uphill on Highway?
21 A. I don't recall that.
22 Q. And from your knowledge of this area,
23 how would you describe the transition from upper
24 Highway to the cat track?
25 A. Mellow.

**Page 31**

1 Q. What do you mean by "mellow"?
2 A. Um, very gentle.
3 Q. And is that across the entire cat track
4 from the transition from upper Highway to the cat
5 track? And what I mean by "across" is like the
6 full length of the cat track.
7 A. I'd call that gentle. Excuse me,
8 gentle.
9 Q. Okay. And are you aware of any photos
10 taken of the approach from upper Highway to the
11 Loop Road?
12 A. Um, I believe I've seen some pictures of
13 that.
14 Q. And was that part of the accident
15 investigation?
16 A. Yes.
17 Q. And do you know if any videos have been
18 taken of that approach or this transition area from
19 Highway to the cat track?
20 A. I do not recall any.
21 Q. As part of your responsibilities as the
22 supervisor of the accident investigation team, do
23 you know if videos are taken during accident
24 investigations?
25 A. Rarely.

**Page 32**

1 Q. What would be an occasion for taking a
2 video?
3 MR. McINTOSH: Objection, speculation.
4 THE WITNESS: On maybe two occasions we did a
5 video just to show how somebody approached an area,
6 an accident site.
7 MS. WALAS: Okay.
8 (Whereupon, Deposition
9 Exhibit Number 75 was
10 marked for identification.)
11 BY MS. WALAS:
12 Q. I'm going to hand you what I've marked
13 as Exhibit 75. And are you familiar with this
14 area?
15 A. Yes.
16 Q. Okay. And would you agree that
17 the -- that this picture is similar to Exhibit 25?
18 You can take the time to compare them.
19 A. Yeah. I don't want to rip these.
20 I'd say the light, just the shade is a
21 little bit different.
22 Q. Okay. And if you'll go ahead and take
23 this red marker, and can you identify on Exhibit 75
24 where the Bermuda Triangle is?
25 A. (Witness complies.)

**Page 33**

1 Q. Thank you.
2 In looking at this photo, do you know
3 where Mr. Meyer --
4 A. Where he landed?
5 Q. -- wrecked? Where he landed, yes.
6 A. No, I do not know exactly.
7 Q. And do you know the path that Mr. Meyer
8 took down Highway to the cat track?
9 A. I do not.
10 Q. And can you show me where the Challenger
11 ski lift is in this photo?
12 A. It's way uphill.
13 Q. It's way uphill?
14 A. Yeah. It's way back up here
15 (indicating).
16 Q. Okay. So if you'll make a little X when
17 you -- because you're pointing over your shoulder.
18 And will you make a little X of where the -- with
19 an arrow pointing towards where the Challenger lift
20 is?
21 A. Like that.
22 (Whereupon, Deposition
23 Exhibit Number 76 was
24 marked for identification.)
25 ///

**Page 34**

BY MS. WALAS:
Q. And I'm going to hand you what I've marked as Exhibit 76. And are you familiar with this area?
A. I am.
Q. And where is this on the mountain?
A. Lower Highway.
Q. Okay. And are there any elevation changes that you can see in this photo?
A. Define elevation changes.
Q. Are there any places where it slopes down and then up slopes again?
A. There is this little bit of depression right there on this skier's right.
Q. Will you mark that for me, please?
A. (Witness complies.)
Q. And from your knowledge of the mountain, if a skier is in that depression can they see the Loop Road?
MR. McINTOSH: Objection, speculation.
THE WITNESS: It depends on snow cover, how much fills in that or not. I would say honestly most of the time, if not all the time, yes.
BY MS. WALAS:
Q. Okay. And looking at Exhibit 76, do you

**Page 35**

know when this photo was taken?
A. I do not.
Q. Okay. And do you know if it's representative of December 11, 2015?
A. I cannot -- that would be speculation.
Q. Okay. And so if the pictures that we've looked at besides the picture that was date stamped, do you know if these pictures are representative of the transition from Morning Star to Loop Road on December 11, 2015?
A. Since I do not know when they were taken, I can't. That'd be speculation.
Q. Okay. Let's go ahead and take a break real quick.
A. Okay.
VIDEO TECHNICIAN: This ends Disc Number 1. We're off the record. The time is 10:13.
(Whereupon, a brief recess was taken.)
VIDEO TECHNICIAN: This starts Disc Number 2. We're back on the record. The time is 10:21.
BY MS. WALAS:
Q. Bob, before we move on, I want to take a look back at Exhibit 76.
A. Okay.

**Page 36**

Q. And I'm going to hand you a -- wait, let me see which one it is.
A. 76 is --
Q. 75, my apologies. And I've given you a green marker and I believe earlier you testified that you could see the Bermuda Triangle from the Swift Current lift as well?
A. Yes.
Q. Okay. If you'll mark with an X and an arrow where the Swift Current lift is in relation to Bermuda Triangle. Is that working?
A. Sort of.
MR. McINTOSH: He could just use the red, couldn't he?
THE WITNESS: Yeah, the red is --
MS. WALAS: Yeah, go ahead and just use the red and put a SC near it. I thought that was a Hi-Liter, apparently it's a crayon.
BY MS. WALAS:
Q. SC by the X, please.
A. Okay, SC.
Q. All right, thank you.
A. Uh-huh.
Q. So I'd like to talk to you a little bit about the accident investigation process.

**Page 37**

Now you said as the director of the ski patrol, you're the supervisor of the accident investigation; is that correct?
A. I am the overall director of it.
Q. Okay.
A. There is a supervisor.
Q. Okay. And so as the overall director, what are your duties with respect to the accident investigation?
A. To make sure that it occurs, then to review the findings once the investigators have summarized the incident and to make sure they have the tools to investigate and make sure they are educated properly on how to do an investigation.
Q. Okay. And so the accident investigation team does the investigation?
A. Correct.
Q. And then you are given the report to review?
A. Yes.
Q. And then what do you do with the report?
A. Then I pass it on to Mike Unruh and to Ian McIntosh.
Q. Okay. And do you sign off on the accident report? Like, do you have to sign them or

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**Page 38**

1  make any indication that you've reviewed them?
2      A.  No.
3      Q.  Okay.  And are the ski patrollers or the
4  investigators, are they required to sign any of the
5  notes they generate as part of the accident
6  investigation?
7      A.  Yes.
8      Q.  And how does that signature work?
9      A.  It's just -- you know, they got a
10 document, they write it or we do have a
11 computerized document.  And there is actually a
12 device that they can sign on the computer.
13     Q.  Okay.  And do they also date it?
14     A.  Yes.
15     Q.  And are the ski patroller
16 investigators -- is that the correct term to use
17 for the people as part of the accident
18 investigation team?
19     A.  Yes.
20     Q.  Okay.  Now, do they render opinions
21 about the cause of the ski wreck?
22     A.  No.
23     Q.  Do you render opinions about the cause
24 of the ski wreck as the director?
25     A.  No.

**Page 39**

1      Q.  And did you review the accident report
2  for Mr. Meyer's December 11th, 2015 wreck prior to
3  your preparation for the depo today?
4      A.  Yes.
5      Q.  Okay.  And did you do that as part of
6  your function as the director of the ski patrol?
7      A.  Yes.
8          (Whereupon, Deposition
9           Exhibit Number 77 was
10          marked for identification.)
11 BY MS. WALAS:
12     Q.  I'm going to hand you what I've marked
13 as Exhibit 77.  And I apologize for it not being in
14 color.  But I printed it and it cut things off in
15 the color version, so.
16         Now is Exhibit 77 the accident report
17 for Mr. Meyer's depo -- or not depo, Mr. Meyer's
18 ski accident?
19     A.  No, it is not.  It is not.
20     Q.  That is not the one for John Meyer's ski
21 wreck?
22     A.  This is -- at least the top page is
23 patroller comments.
24     Q.  And what are the -- what's the purpose
25 of the patroller comments?

**Page 40**

1      A.  Just to get basically a view of what
2  they saw and a description of the scene and what
3  they did.
4      Q.  And looking at Exhibit 77, is there an
5  accident report contained in there?
6          MR. McINTOSH:  Objection, vague.
7          MS. WALAS:  I'll rephrase it.
8  BY MS. WALAS:
9      Q.  Can you identify in Exhibit 77 the
10 accident investigation report?
11     A.  Um, this whole document -- okay.  This
12 whole document is the accident investigation
13 report.
14     Q.  Okay.
15     A.  So -- and there is medical in here.
16     Q.  And you said there's medical in here?
17     A.  Yep.
18     Q.  Okay.
19     A.  Yes, sorry.
20     Q.  And if you'll go ahead and look
21 at -- it's page 16.
22     A.  (Witness complies.)
23     Q.  And can you identify what this page is?
24     A.  Looks to be a statement from Amanda Cox.
25     Q.  And who's Amanda Cox?

**Page 41**

1      A.  She is a line ski patroller.
2      Q.  And was she part of the accident
3  investigation team?
4      A.  No.
5      Q.  Did -- strike that.
6          If you know, why would this statement be
7  included in the accident investigation report?
8      A.  Because line patrollers were involved in
9  the scene or in the area at that time.
10     Q.  Okay.  And do statements like these need
11 to be signed?
12     A.  Yes.
13     Q.  Okay.  And is this -- is Amanda's
14 name -- do you consider that a signature for
15 purposes of the accident investigation report at
16 Big Sky?
17         MR. McINTOSH:  Objection, vague.
18         THE WITNESS:  Um, that's hard to say.  I
19 don't -- I don't know.
20 BY MS. WALAS:
21     Q.  Well, if you'll go ahead and go to the
22 next page, exhibit -- or page 17.
23     A.  Yes.
24     Q.  What does this page represent?
25     A.  A statement from Jason Vander Weit.

```
 1      Q.  And do you consider this statement
 2   signed?
 3      A.  I do.
 4      Q.  And in your review of an accident
 5   investigation report, have you ever sent any
 6   statements back to obtain a signature?
 7      A.  I don't recall doing that because that
 8   is -- I don't recall doing it, no.
 9      Q.  And looking at page 16, and as your
10   capacity of the reviewer of these before setting
11   them up, do you accept Ms. Cox's statement as being
12   signed for purposes of the investigation?
13      MR. McINTOSH:  Objection, vague.
14      THE WITNESS:  Again, that's not something
15   that I'm an expert on, whether it's signed or not.
16   BY MS. WALAS:
17      Q.  And will you go ahead and read the last
18   line of Ms. Cox's statement out loud?
19      A.  Being -- excuse me.  "Being that the
20   visibility was clear, there was no issue seeing the
21   transition from Highway to Lower Morning Star via
22   the Loop Road."
23      Q.  And do you consider that an opinion
24   being made by Ms. Cox?
25      MR. McINTOSH:  Objection, vague.
                         42
```

```
 1      THE WITNESS:  Again, I'm not an expert on
 2   making those kind of judgments.
 3   BY MS. WALAS:
 4      Q.  Well, as the director of the ski patrol,
 5   you said that the ski patrollers are not allowed
 6   to --
 7      A.  Right.
 8      Q.  -- express opinions, correct?
 9      A.  Correct.
10      Q.  And when you receive a statement, if it
11   contains something that you considered to be an
12   opinion, would you visit with that ski patroller
13   and have them redo the report?
14      A.  No, because once they have written the
15   report, that's their report.  I'm not going to tell
16   them what to say.
17      Q.  Okay.  Now, as the director of ski
18   patrol, are you aware of any other wrecks that have
19   occurred from -- at the transition point from
20   lower -- or from upper Highway to the cat track?
21      A.  No.
22      Q.  Are you aware of any ski wrecks that
23   have occurred in the Bermuda Triangle area itself?
24      A.  Not that I recall.
25      Q.  Are you aware of -- and again, in your
                         43
```

```
 1   capacity as the director of the ski patrol, are you
 2   aware of any incidents or wrecks that have occurred
 3   on the mountain itself in a transition from a black
 4   diamond to a cat track?
 5      A.  Not right off the top of my head.
 6      Q.  Now, as the ski patrol director, are you
 7   familiar with the Big Sky Resort Professional Ski
 8   Patrol Manual?
 9      A.  Yes.
10      Q.  And was a manual -- was that manual in
11   effect on December 11, 2015?
12      A.  It should have a date on the top of it.
13      Q.  And I'll have what I've marked as
14   Exhibit 78.
15         (Whereupon, Deposition
16          Exhibit Number 78 was
17          marked for identification.)
18   BY MS. WALAS:
19      Q.  Is that the ski patrol manual that was
20   in effect on December 11th, 2015?
21      A.  Yes.
22      Q.  And what's the purpose of this manual?
23      A.  Basically a job description and what the
24   ski patrol does as part of their duties.
25      Q.  And did you write this?
                         44
```

```
 1      A.  I contributed, yes.
 2      Q.  Who else wrote it with you?
 3      A.  Ody Larsen, Tom Anderson way back when.
 4   It's been an evolving document.
 5      Q.  Okay.  Do you all revisit it every year
 6   and make updates?
 7      A.  We do.
 8      Q.  Or if there are no updates to be made
 9   you just put a new date on it?
10      A.  If there's no updates, but that's rare.
11      Q.  Okay.  And you're familiar with its
12   contents, correct?
13      A.  Yes.
14      Q.  And do you personally use this manual to
15   train the Big Sky ski patrollers?
16      A.  We do.
17      Q.  And let's look at your job description
18   as the ski patrol director.  I think it starts on
19   page 3.
20      A.  (Witness complies.)
21      Q.  And what is your primary job description
22   as the director?
23      A.  My primary?  Because it involves all
24   these different aspects as listed.
25      Q.  Okay.  If you'll take a look at page 4
                         45
```

BOB DIXON

```
 1   on the top.
 2       A.  (Witness complies.)
 3       Q.  What does the phrase "Duties Include
 4   (with safety first)" mean to you as the director?
 5       A.  It means basically with safety for our
 6   guests and for our patrollers.
 7       Q.  And so would you consider safety to be
 8   your primary objective as the director of ski
 9   patrol?
10       MR. McINTOSH:  Objection, vague.
11       THE WITNESS:  It is one of the primary
12   objectives.
13   BY MS. WALAS:
14       Q.  And looking at this, would it be safe to
15   say that you kind of have a hand in all the things
16   that the ski patrol does?
17       A.  Definitely.
18       Q.  And looking at the bullet point
19   "Mountain Signage," and that's on page 3.
20       A.  Okay.
21       Q.  What is mountain signage?
22       A.  That involves everything from the trail
23   signs to basically the like trails merge signs,
24   things like that; basically, anything to give
25   information to our guests.
                        46
```

```
 1       Q.  Okay.  Would that include hazard signs?
 2       A.  Yes.
 3       Q.  Does that include those ropes and the
 4   posts we were looking at in some of the photos
 5   earlier?
 6       A.  Yes.
 7       Q.  Okay.  And the barriers that get put up?
 8       A.  Correct.
 9       Q.  Okay.  And so what do you
10   specifically do as the director with respect to the
11   sign -- mountain signage?
12       MR. McINTOSH:  Objection; vague, too broad.
13       MS. WALAS:  You can answer, if you know.
14       THE WITNESS:  I basically am on the ski hill
15   looking to make sure the signage is there.  I deem
16   it necessary, make sure it's up straight, looks
17   good and is doing its job.
18   BY MS. WALAS:
19       Q.  And correct me if I'm wrong but, earlier
20   you testified that there's a supervisor for each
21   area of the mountain?
22       A.  Correct.
23       Q.  And is the supervisor in charge for
24   the -- in charge of putting up the signs in that
25   specific area?
                        47
```

```
 1       A.  The line patrollers also put signs up
 2   and things like that.  They do have other judgments
 3   also taken into consideration but, the supervisor
 4   is overall responsible.
 5       Q.  Okay.  And do you follow up or do spot
 6   checks on the areas to see where the signs are and
 7   to make sure that it's safe?
 8       A.  Yes.
 9       Q.  Okay.  And if you saw something that you
10   felt should be marked, would you put a sign up
11   there?
12       A.  If I had one available or I would call
13   the supervisor to do it.
14       Q.  Okay.  And when you say "call the
15   supervisor," do you guys use walkies or cell
16   phones?
17       A.  We use phones and radios.
18       Q.  Okay.  Now, as part of your duties as
19   the ski patrol director, are you responsible for
20   ensuring that the preseason ordering and
21   maintenance of all the ski patrol materials has
22   been taken care of?
23       A.  Yes.
24       Q.  Okay.  And what does that entail?
25       A.  That means that we have all the supplies
                        48
```

```
 1   we need for when we open and for the winter.  That
 2   can be anything from explosives to signage to rope
 3   to whatever, just make sure we have the materials
 4   to do our job.
 5       Q.  Okay.  And at the end of the season
 6   you're responsible for removing and storing and
 7   inventorying all those materials?
 8       A.  Correct.
 9       Q.  And during the course of the season, do
10   you ever need to order more signs?
11       A.  Yes.
12       Q.  Okay.  And do you know if you had to do
13   that in 2015?
14       A.  I do not recall.
15       Q.  And have you ever run out of safety
16   signs during a season?
17       A.  We have never run out of warning signs,
18   no.
19       Q.  Have you run out of fencing?
20       A.  No.
21       Q.  Or rope?
22       A.  No.
23       Q.  Or any other sort of safety material?
24       A.  No.
25       Q.  And who was the mountain maintenance
                        49
```

13 (Pages 46 to 49)

BOB DIXON

```
 1   supervisor on December 11th, 2015?
 2        A.  The mountain maintenance supervisor?
 3        Q.  Yes.
 4        MR. McINTOSH:  Objection, vague.
 5        THE WITNESS:  Yeah, we -- I mean we basically
 6   had supervisor's and director's office.  We don't
 7   have a maintenance supervisor.
 8   BY MS. WALAS:
 9        Q.  Okay.  If you'll turn to page 10 of
10   Exhibit 78.
11        A.  That basically mountain maintenance
12   supervisor is an assistant director.
13        Q.  Is an assistant director?
14        A.  Yes.
15        Q.  And so who was the assistant director of
16   the ski patrol on December 11th, 2015?
17        A.  There's two of them.  Dave Benes and
18   Jim Humphries.
19        Q.  And what was Dave's last name?
20        A.  Benes.
21        Q.  Benes with a B?
22        A.  Yeah.
23        Q.  Okay.  And so the mountain maintenance
24   supervisor that's described here on page 10, those
25   duties were assigned to the assistant director?
                           50
```

```
 1   the same as beginner trails in marking for safety?
 2        A.  No.
 3        Q.  What's the difference between marking a
 4   beginner trail and a black diamond trail?
 5        MR. McINTOSH:  Objection, too broad.
 6        THE WITNESS:  Yeah, that's kind of vague.
 7   But there is a difference based on the skier's
 8   capabilities.
 9   BY MS. WALAS:
10        Q.  So what makes a trail a black diamond?
11        A.  There is no definition directly.  NSAA
12   has not put out a definition.  It's just a judgment
13   call with experience.
14        Q.  As the director of ski patrol, do you
15   have a say or play a role in assigning a skill
16   level to the different trails?
17        A.  I do.
18        Q.  Okay.  And were you involved in marking
19   the ski level for Highway?
20        A.  Yes.
21        Q.  Do you recall when it was made a black
22   diamond?
23        A.  Probably like when Challenger was -- the
24   Challenger lift was built.
25        Q.  Do you recall what year that was?
                           52
```

```
 1        A.  Yes.
 2        Q.  Okay.  Now as the ski patrol director,
 3   do you believe that safety matters for all skiers
 4   regardless of ski level?
 5        MR. McINTOSH:  Objection; vague, contrary to
 6   Montana law, calls for a legal conclusion.
 7        THE WITNESS:  Repeat that, please.
 8   BY MS. WALAS:
 9        Q.  As the ski patroller director, do you
10   believe that safety matters for all skiers
11   regardless of ski level?
12        MR. McINTOSH:  Same objections.
13            Go ahead.
14        THE WITNESS:  I think safety matters for
15   sure.
16   BY MS. WALAS:
17        Q.  And do black diamond trails get the same
18   level of review for the need of safety warnings as
19   intermediate trails?
20        MR. McINTOSH:  Objection, vague.
21        THE WITNESS:  Do they get the same review?
22        MS. WALAS:  Yes.
23        THE WITNESS:  Yes.
24   BY MS. WALAS:
25        Q.  And do you look at black diamond trails
                           51
```

```
 1        A.  '88.
 2        Q.  And is lower Highway -- what skill level
 3   is that?
 4        A.  Lower Highway, it's all black diamond.
 5        Q.  It's all black diamond.  And what skill
 6   level is the cat track?
 7        A.  The cat track is actually green.
 8        Q.  Okay.  And let me clarify that.  The
 9   Morning Star cat track.
10        A.  Right, the one that's going underneath.
11   That's green.
12        Q.  Okay.  And what are the characteristics
13   of a cat track?
14        A.  Relatively flat most of the time and
15   it's a track because it's designated for CATS to
16   use for grooming.
17        Q.  And Loop Road was a cat track, correct?
18        A.  Correct.
19        Q.  And it's flat?
20        A.  Relatively flat.
21        Q.  Okay.  And do you agree that Highway is
22   a steep trail?
23        MR. McINTOSH:  Objection, vague as to
24   location.
25        THE WITNESS:  Yeah, what part of Highway are
                           53
```

**Page 54**

   you talking about? It varies.
BY MS. WALAS:
   Q. Okay. Well, let's break it down. So there's upper Highway?
   A. Right.
   Q. And on a -- how would you describe the steepness of upper Highway?
   A. Um, it's black diamond. It's moderately steep maybe.
   Q. And how about the lower Highway, how would you describe the steepness there?
   A. It's moderate.
   Q. And would you agree that the transition from Highway -- strike that.
       When you're coming down from upper Highway it's -- and you approach the cat track?
   A. Uh-huh.
   Q. Describe how the terrain moves or transitions?
   A. The transition was very smooth from lower Highway onto the cat track. It was pretty much just a continuous transition.
   Q. And do rocks get flagged with safety signs?
   MR. McINTOSH: Objection, vague.

**Page 55**

   THE WITNESS: There's basically caution signs warning that there are rocks all over that mountain.
BY MS. WALAS:
   Q. And for purposes of warning skiers about hazards on the mountain, is that a judgment call made by the ski patrollers?
   A. Yes.
   Q. We can go off the record real quick.
   VIDEO TECHNICIAN: We are off the record. The time is 10:47.
       (Whereupon, a brief
        recess was taken.)
   VIDEO TECHNICIAN: We're back on the record. The time is 10:48.
   MS. WALAS: I have no further questions for you at this time. I'll go ahead and let Mr. McIntosh ask you some.
   MR. McINTOSH: We will reserve our questions until trial.
   THE WITNESS: All right.
   MR. McINTOSH: Thank you, Mr. Dixon.
   THE WITNESS: Thank you.
   MS. WALAS: Thank you. Thanks for coming in today.

**Page 56**

   THE WITNESS: No problem.
   VIDEO TECHNICIAN: This now ends the deposition. The time is 10:48.

       (Whereupon, the taking
        of this videotaped deposition
        was concluded at 10:48 a.m.)


       SIGNATURE RESERVED

       * * * * * * * *

**Page 57**

       DEPONENT'S CERTIFICATE
PAGE      LINE       CORRECTION












       I, BOB DIXON, the deponent in the foregoing deposition, DO HEREBY CERTIFY, that I have read the foregoing -57- pages of typewritten material and that the same is, with any corrections thereon made in ink on the correction sheet and signed by me, a full, true and correct transcript of my oral deposition given at the time and place hereinbefore mentioned.
       DATED this_____day of_____, 2020.

       _____
       BOB DIXON

15 (Pages 54 to 57)

```
 1              C E R T I F I C A T E
 2      STATE OF MONTANA    )
 3                          ) ss.
 4      COUNTY OF GALLATIN  )
 5             I, Marla Jeske, Court Reporter - Notary
 6      Public, CSR, in and for the County of Gallatin,
 7      State of Montana, do hereby certify:
 8             That the witness in the foregoing
 9      deposition was by me first duly sworn to testify
10      the truth, the whole truth and nothing but the
11      truth in the foregoing cause; that the deposition
12      was then taken before me at the time and place
13      herein named; that the deposition was reported by
14      me in shorthand and later transcribed into
15      typewriting under my direction, and the foregoing
16      pages contain a true record of the testimony of the
17      witness, all done to the best of my skill and
18      ability.
19             IN WITNESS WHEREOF, I have hereunto set
20      my hand and affixed my notarial seal this ____ day
21      of _____, 2020.
22             _____
23             Notary Public for the State of Montana
24             residing at: Bozeman
25             My commission expires: February 04, 2023
```

                                58

                                                    16 (Page 58)