John Meyer

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MONTANA

3                       BUTTE DIVISION

4    _____

5    JOHN MEYER,

6              Plaintiff,
                                        Cause Number
7         V.                            18-CV-00002-BMM

8    BIG SKY RESORT; DYNAFIT
     NORTH AMERICA,
9
              Defendants.
10   _____

11      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

12                       JOHN MEYER

13   _____

14

15           BE IT REMEMBERED, that the videotaped

16   deposition upon oral examination of JOHN MEYER,

17   appearing at the instance of Defendants, was taken at

18   the offices of Crowley Fleck, 1915 South 19th Avenue,

19   Bozeman, Montana, on Tuesday, April 9th, 2019,

20   beginning at the hour of 10:00 a.m., pursuant to the

21   Federal Rules of Civil Procedure, before Deborah L.

22   Fabritz, Court Reporter - Notary Public.

23

24                    * * * * * * * *

25
                                                          1

John Meyer

```
 1                     APPEARANCES
 2        ATTORNEY APPEARING ON BEHALF OF THE
 3        PLAINTIFF, JOHN MEYER:
 4              Mr. John Meyer, Esq.
 5              PO Box 412
 6              Bozeman, MT  59771
 7                    and
 8        ATTORNEYS APPEARING ON BEHALF OF THE
 9        DEFENDANT, BIG SKY RESORT:
10              Mr. Ian McIntosh, Esq. and
11              Mr. Mac Morris, Esq.
12              Crowley Fleck PLLP
13              1915 South 19th Avenue
14              Bozeman, MT  59719-0969
15                    and
16        ATTORNEY APPEARING ON BEHALF OF THE
17        DEFENDANT, DYNAFIT NORTH AMERICA:
18              Mr. P. Brad Condra, Esq.
19              Milodragovich Dale & Steinbrenner
20              PO Box 4947
21              Missoula, MT  59806
22
23        ALSO PRESENT:
24              Brandon Clements, videographer, and
25              Mike Unruh
```
2

John Meyer

```
 1                    I N D E X

 2

 3   EXAMINATION OF JOHN MEYER                    PAGE

 4        Mr. Ian McIntosh........................   9

 5        Mr. P. Brad Condra...................... 272

 6        Mr. Ian McIntosh........................ 346

 7

 8                    E X H I B I T S

 9   DEPOSITION EXHIBIT NUMBER                    PAGE

10   Exhibit 1          Facebook page with

11                      photograph..................  26

12   Exhibit 2          "Your responsibility code"...  61

13   Exhibit 3          Sign - "Welcome to Big Sky

14                      Resort" - lift rates for

15                      Friday, December 11, 2015....  70

16   Exhibit 4          Pass Card Usage Detail Report

17                      for Amanda Eggert...........  73

18   Exhibit 5          Photograph of Swift Current

19                      lift........................  79

20   Exhibit 6          Photograph of sign - "Caution!

21                      Early Season Conditions

22                      Exists".....................  79

23   Exhibit 7          Photograph with caution

24                      sign........................  80

25   Exhibit 8          Close-up of caution sign.....  81
```

3

**John Meyer**

```
1   (Exhibits continued)

2   Exhibit 9          Photograph of skiers by hut..  83

3   Exhibit 10         Photograph with orange

4                      fences......................  87

5   Exhibit 11         Photograph with run signs....  89

6   Exhibit 12         Photograph of groomed run....  90

7   Exhibit 13         Photograph of runs...........  94

8   Exhibit 14         Photograph of Challenger Lift

9                      with warning signs...........  99

10  Exhibit 15         Close-up of Caution - Early

11                     Season Conditions Exists in

12                     window...................... 103

13  Exhibit 16         Photograph.................. 104

14  Exhibit 17         Photograph with rocks showing

15                     in snow..................... 106

16  Exhibit 18         Photograph of rocks in snow

17                     and fencing and caution

18                     sign........................ 108

19  Exhibit 19         Close-up of caution sign by

20                     fenced off area............. 110

21  Exhibit 20         Photograph of roped-off

22                     area........................ 111

23  Exhibit 21         Photograph of side of

24                     mountain.................... 112

25  //////////
```

4

**John Meyer**

```
 1   (Exhibits continued)

 2   Exhibit 22        Photograph of roped-off

 3                     area........................ 113

 4   Exhibit 23        Photograph of lone skier..... 122

 5   Exhibit 24        Photograph.................. 123

 6   Exhibit 25        Photograph of ski run........ 126

 7   Exhibit 26        E-mail from John Meyer dated

 8                     11/17/17.................... 133

 9   Exhibit 27        Affidavit of Ryan Ayres...... 142

10   Exhibit 28        E-mail from Green Defense to

11                     Scott Knight - Re:  John

12                     Meyer....................... 163

13   Exhibit 29        Photograph of skiers......... 172

14   Exhibit 30        Photograph of skiers......... 176

15   Exhibit 31        History and Physical report

16                     dated 12/11/15, Billings

17                     Clinic...................... 196

18   Exhibit 32        Facebook page - -1/28/16..... 199

19   Exhibit 33        Facebook page - 5/11/16...... 202

20   Exhibit 34        Hospital Progress Notes...... 203

21   Exhibit 35        Facebook page - 12/11/16..... 224

22   Exhibit 36        Facebook page - 8/8/16.......225

23   Exhibit 37        Facebook page - 9/28/16...... 225

24   Exhibit 38        Facebook page - 4/23/17...... 226

25   Exhibit 39        Facebook page - 5/4/17....... 226
```

5

**John Meyer**

```
 1   (Exhibits continued)

 2   Exhibit 40        Facebook page - 7/10/18...... 228

 3   Exhibit 41        Facebook page - 8/13/18...... 228

 4   Exhibit 42        Facebook page - 2/12 at

 5                     12:06........................ 229

 6   Exhibit 43        Meyer for Montana post -

 7                     4/19/18...................... 242

 8   Exhibit 44        Facebook page - 2/9 at

 9                     8:06 pm...................... 244

10   Exhibit 45        Facebook page - 12/6/18...... 249

11   Exhibit 46        "Good morning Big Sky Ski

12                     Patrol" from John Meyer -

13                     12/15/17..................... 258

14   Exhibit 47        John Meyer call minutes

15                     9:00am-9:30am, 4/27/16 to

16                     Salewa....................... 260

17   Exhibit 48        Wild Snow - Lou Dawson's Sky

18                     Touring Blog................. 291

19   Exhibit 49        Second Amended Complaint and

20                     Jury Demand.................. 299

21   Exhibit 50        E-mail string between John

22                     Meyer and Scott Knight....... 306

23   Exhibit 51        E-mail string

24                     Salewa 005-015............... 306

25   //////////
```

6

**John Meyer**

1    (Exhibits continued)

2   Exhibit 52        E-mail string between John

3                     Meyer and Drew Saunders -

4                     5/10/16..................... 320

5   Exhibit 53        Claim test report........... 324

6   Exhibit 54        Receipt - 12/10/15.......... 332

7   Exhibit 55        Handwritten document........ 336

8   Exhibit 56        Photographs of Mr. Meyer's

9                     skies....................... 338

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

John Meyer

```
 1            WHEREUPON, the following proceedings were
 2   had and testimony taken, to-wit:
 3                      * * * * * * *
 4            THE VIDEOGRAPHER:  This is the video
 5   deposition of John Meyer taken in the United States
 6   District Court for the District of Montana, Butte
 7   Division, Cause Number 18-CV-00002-BMM.  John Meyer
 8   versus Big Sky Resort, Dynafit North America.
 9            Today is April 9th, 2019.  The time is
10   9:59 a.m.  We are present at the offices of Crowley
11   Fleck, 1915 South 19th Avenue, Bozeman, Montana
12   59718.
13            The court reporter is Deb Fabritz, and the
14   video operator is Brandon Clements of Fisher Court
15   Reporting.  The deposition is being taken pursuant to
16   notice.
17            I would now ask the attorneys to identify
18   themselves, who they represent, and whoever else is
19   present, beginning with the party noticing this
20   deposition.
21            MR. McINTOSH:  Ian McIntosh and Mac Morris
22   for Big Sky Resort, and with us today is Mike Unruh.
23            MR. CONDRA:  Brad Condra for Salewa USA,
24   LLC, also known as Dynafit North America.
25            THE VIDEOGRAPHER:  The court reporter will
```
8

**John Meyer**

```
 1   now administer the oath.
 2                        JOHN MEYER,
 3   called as a witness, having been first duly sworn was
 4   examined and testified as follows:
 5                        EXAMINATION
 6   BY MR. McINTOSH:
 7        Q.    Can you please state your name?
 8        A.    My name is John Meyer.
 9        Q.    What is your address, Mr. Meyer?
10        A.    PO Box 412, Bozeman, Montana 59771.
11        Q.    Do you have a physical address?
12        A.    I do.
13        Q.    What is that physical address?
14        A.    It's -- what the heck is it?  We're on
15   North Wallace, 400 North Wallace, 415, something like
16   that.
17        Q.    What is your phone number, Mr. Meyer?
18        A.    (406) 546-0149.
19        Q.    Have you ever had your deposition taken
20   before?
21        A.    No.
22        Q.    Have you ever taken any depositions?
23        A.    No.
24        Q.    Have you ever defended any depositions?
25        A.    So let me slow down.  When I was in -- I
```

9

**John Meyer**

1    had a clerkship with a law firm in town.  And I

2    didn't participate, but I sat through a deposition.

3         Q.    Who did you have a clerkship with, what

4    law firm in town?

5         A.    Earth Justice.

6         Q.    And there was a deposition taken in a case

7    that you were working on?

8         A.    Yes.

9         Q.    And you sat through that?

10        A.    Yes.

11        Q.    So do you have some general familiarity

12   with how a deposition works?

13        A.    No.  Not really.

14        Q.    Do you understand that you're under oath

15   right now?

16        A.    Yes.

17        Q.    And you understand that you're -- if you

18   say something different today at the time -- than you

19   do at the time of trial, we may point that out to the

20   judge and the jury?

21        A.    Uh-huh.

22        Q.    Do you understand you need to answer out

23   loud?  You need to say yes or no or whatever the

24   answer is rather than just saying uh-huh.

25        A.    Yes.

10

**John Meyer**

1       Q.      And will you answer out loud?  Will you

2  answer orally?

3       A.      Yes.

4       Q.      Will you let me finish a question?

5       A.      Yes.

6       Q.      We also need to -- for the court

7  reporter's benefit, we need to talk one at a time.

8  So even if you know exactly what I'm going to ask

9  you, please let me finish the question before you

10  answer.  Will you do that?

11       A.      Yes.

12       Q.      And if you have not finished your answer

13  and I cut you off with a new question, will you

14  please just let me know that you had not finished the

15  answer?  Will you do that?

16       A.      Sure.  Yes.

17       Q.      Will you also let me know if I ask you a

18  question and you do not understand what I'm asking

19  you?

20       A.      Yes.

21       Q.      Will you agree not to answer a question

22  that you do not understand?

23       A.      Yes.

24       Q.      Is there any reason that you believe that

25  you cannot give accurate and truthful testimony

                                                       11

**John Meyer**

```
 1    today?
 2         A.    No.  I don't think so.
 3         Q.    Will you answer the questions that are
 4    asked of you today?
 5         A.    I should, yes.  I haven't heard them yet,
 6    so I can't promise I'll answer every question you
 7    ask.
 8         Q.    Let's talk about your background.  Tell me
 9    where you grew up.
10         A.    I was born in the Midwest.
11         Q.    So where did you grow up?
12         A.    I lived in -- I was born in northwest
13    Indiana.  Then I moved to the suburbs of St. Louis,
14    suburbs of Chicago.  Then I lived in Dayton, Ohio.
15    So I was in Dayton, Ohio for a while.
16         Q.    Where did you graduate from high school?
17         A.    Centerville High School.
18         Q.    Where is that?
19         A.    Centerville.
20         Q.    Ohio?  Centerville, Ohio?
21         A.    Uh-huh.
22         Q.    Is that a yes?
23         A.    Yes.  I graduated from Centerville High
24    School.
25         Q.    What year?
                                                        12
```

**John Meyer**

```
 1        A.     1999.
 2        Q.     And what did you do after you graduated
 3   from high school?
 4        A.     Like day by day?  Year by year?  What are
 5   you --
 6        Q.     Did you start college that next fall?
 7        A.     I did, yeah.
 8        Q.     And where did you start college?
 9        A.     Wright State University.
10        Q.     Had you ever been in the military?
11        A.     No.
12        Q.     What year did you start at Wright State?
13        A.     1999.
14        Q.     And how long did you go to Wright State?
15        A.     Until -- I had one semester -- one
16   trimester.
17        Q.     And why did stop going to Wright State
18   after one trimester?
19        A.     It just wasn't for me.
20        Q.     Okay.  What did you do after that?
21        A.     I moved to Missoula and attended the
22   University of Montana.
23        Q.     And did you graduate from the University
24   of Montana?
25        A.     I did.
```

John Meyer

1        Q.      What was your degree in?

2        A.      I got a double degree in biology and

3    Spanish.

4        Q.      What year did you graduate?

5        A.      2003.

6        Q.      What was your GPA if you know?

7        A.      It wasn't very good, 2.6, 2.7.

8        Q.      And then what did you do after graduating

9    from the University of Montana?

10       A.      I had an internship in Costa Rica with a

11   conservation organization called Ecology Project

12   International.  We did sea turtle biology.  It was an

13   incredible job.

14              You had to go walk along the beach, and we

15   would look for sea turtles, because they would come

16   up on the beach to lay their eggs.  They would dig

17   these huge nests.  And then right before they start

18   laying their eggs, we put a bag underneath the

19   turtle.

20              And as she laid all her eggs right before

21   she started burying her nest, we grabbed the bag of

22   eggs and pulled them out.  And she would cover the

23   nest and go back in the ocean.  And we would walk

24   like half a mile, quarter mile down the beach and dig

25   a new nest and put the eggs in that nest and then

14

**John Meyer**

1    bury it and take breaks and cover it, because these

2    poachers would come and drive boats along the ocean

3    shore and just look for lines where turtles had

4    crawled up, and they would go and -- they's go -- run

5    up the beach and dig up the nest and sell the eggs as

6    an aphrodisiac in a local bar.  So it was our way of

7    stopping some of the poaching.

8              And then we would take the high school

9    students from Missoula and all over Montana, I think

10   now, paid to come down to Costa Rica.  And so we'd

11   take that money that the students paid, the high

12   school students, and pay to bring Costa Rican high

13   school students to learn about sea turtle biology.

14   Because what we found is that when you get high

15   school students touching animals, they're much less

16   likely to poach them as adults.

17        Q.    How long did you have that job?

18        A.    Three -- three months, four months,

19   something like that.

20        Q.    You eventually went to law school.

21   Correct?

22        A.    Yeah.

23        Q.    What year did you start law school?

24        A.    I graduated in 2000 -- 2006, I guess.

25        Q.    Other than your job in Costa Rica, did you

15

**John Meyer**

```
 1   have any other jobs before you started law school?
 2        A.    Yeah.
 3        Q.    What were they?
 4        A.    I worked for the U.S. Forest Service
 5   seasonally.  I was a -- do you want to know what I
 6   did exactly?
 7        Q.    Just briefly.
 8        A.    So I was a field biologist.
 9        Q.    Okay.
10        A.    So survey for rare and threatened plants.
11              THE REPORTER:  Rare and --
12              THE WITNESS:  Threatened.
13              THE REPORTER:  Thank you.
14              THE WITNESS:  Yeah.  And so if we found
15   those plants, then the forest service wouldn't cut
16   down the trees in that area.  And ultimately I was
17   hiking one day and looking at -- for these rare
18   plant.  And I was in a burned area.  It was a really
19   bad burn.
20              And so there was this tree that burned
21   down, but it was already dead before.  And so this
22   baby fawn was right inside of this burned-out tree,
23   and it still had its spots on it.  It was the most
24   amazing thing.
25              And I remember thinking -- at that time
```

16

John Meyer

```
 1    there was a U.S. senator -- I believe it was Conrad
 2    Burns.  And he was saying we need to cut down these
 3    trees.  We need to salvage log this area.  These
 4    forests are going to go bad if we don't cut down
 5    these trees.
 6              I remember looking at a baby fawn, the
 7    spots on it, and I thought this is going to go to
 8    waste.  This is not going to go bad if we don't cut
 9    down these trees.  This is a good habitat.  And so
10    that's one reason why I ultimately decided to go to
11    law school, to, yeah, chase down the forest service
12    and try and get them to do the right thing.
13         Q.   Have you ever worked for a ski area?
14         A.   Huh-uh.
15         Q.   Is that a no?
16         A.   No.
17         Q.   You started law school in 2006, you said.
18    Correct?
19         A.   Yes.
20         Q.   And did you graduate in 2009?
21         A.   Yes.
22         Q.   Where -- where did you go to law school?
23         A.   Vermont Law School.
24         Q.   Did you apply to the law school at the
25    University of Montana?
```

                                                        17

**John Meyer**

```
 1        A.      Uh-huh.

 2        Q.      Is that a yes?

 3        A.      Yes.

 4        Q.      You didn't get in?

 5        A.      No.  I didn't get in.

 6        Q.      What was your class rank at the University

 7   of Vermont?

 8        A.      I can't remember.  I was -- I did pretty

 9   well.  I thought I could have graduated magna cum

10   laude, but I had my last semester at University of

11   California-Hastings.  I was a semester exchange, and

12   so that didn't count towards my GPA graduating

13   overall.

14        Q.      Have you -- and then have you been in

15   practice as a lawyer since 2009?

16        A.      No.  I took the -- well, no.  I actually

17   did not pass the bar.  I missed by half a point on

18   the one part of the bar exam.  So I had to retake the

19   bar, and then I -- I passed in 2010.

20        Q.      I'm sorry.  What was that?

21        A.      I passed the bar in 2010.  So I started

22   practicing immediately thereafter.

23        Q.      So is it correct, then, in -- in the fall

24   of 2009, did you move back to Montana?

25        A.      In the summer -- summer 2009, something
```

**John Meyer**

```
 1    like that, yeah.  Yeah.
 2         Q.    But then you took the --
 3         A.    Hold on.  So no.  I was in -- where was I?
 4    Yeah.  I was.  It was in the -- in the summer of
 5    2009, yeah.
 6         Q.    And then you took the bar exam in Montana
 7    in the fall of 2009?
 8         A.    I believe so.
 9         Q.    And you didn't pass then?
10         A.    I don't think so.
11         Q.    But then you took it again in 2010 and
12    passed?
13         A.    Yes.
14         Q.    Okay.  And you've been --
15         A.    So --
16         Q.    You've been working as a lawyer since
17    2010?
18         A.    Yes.
19         Q.    Have you ever had a claim or been sued for
20    malpractice?
21         A.    No.
22         Q.    Where -- have you been working at
23    Cottonwood Law since 2010?
24         A.    Yes.
25         Q.    Where is Cottonwood Law located?
```
                                                            19

**John Meyer**

```
 1        A.    I like to give flippant response sometimes
 2   that Cottonwood Law is right up here.
 3        Q.    Is there a physical location to it?
 4        A.    We do have an office.  It's on North
 5   Wallace.
 6        Q.    Does Cottonwood own or rent the building?
 7        A.    We rent.
 8        Q.    Does Cottonwood have other employees,
 9   other than you?
10        A.    No.  We have in the past.
11        Q.    But you don't currently?
12        A.    No.
13        Q.    You're the only lawyer that works for
14   Cottonwood?
15        A.    Yeah.
16        Q.    Is there any staff that works for
17   Cottonwood?
18        A.    Like paid staff?  We have contractors and
19   things like that.
20        Q.    What type of contractors?
21        A.    Well, we have some -- in the past we've
22   had legal contractors, people who -- yeah.  We have
23   accountants, things like that.
24        Q.    Okay.  Do you have like -- like, for
25   example, a paralegal or an assistant?
```

20

**John Meyer**

```
 1        A.    No.
 2        Q.    Okay.  Who owns the building that
 3   Cottonwood rents?
 4        A.    I don't know.  We sublet.
 5        Q.    Who do you sublet from?
 6        A.    Ethos Geological I think it's called.
 7   Yeah.  Ethos, I think.
 8        Q.    Does Cottonwood have any insurance?
 9        A.    No.
10        Q.    Do you personally own or rent your house?
11        A.    I rent.
12        Q.    Do you have any assets that you own?
13        A.    No.  I'm paying on my truck.  I still owe
14   5, $6,000 on my truck.  I have student loans.  I have
15   medical bills.
16              I don't own much.  I mean, I have clothes.
17        Q.    Do you have a trust fund?
18        A.    No.  I wish.
19        Q.    You have said earlier in this case that
20   your -- your mother was killed in an accident.
21   Correct?
22        A.    Uh-huh.
23        Q.    Was there a lawsuit as a result of that?
24        A.    Uh-huh.
25        Q.    Yes?
```
                                                        21

**John Meyer**

```
 1        A.    Yes.
 2        Q.    And did you receive any of the proceeds of
 3   that lawsuit?
 4        A.    My family settled the lawsuit, I believe,
 5   for like $120,000.  My brother, sister, and I each
 6   received $40,000.
 7        Q.    What year was that?
 8        A.    39 -- 38, 40,000.
 9              Right about 2009, 2010.
10        Q.    Did your mother have any life insurance
11   proceeds that went to you?
12        A.    No.  Not that I'm aware of.
13        Q.    Have you ever had any ethical complaints
14   made to the state board governing lawyers regarding
15   your conduct?
16        A.    Not that I'm aware of.
17        Q.    Have you ever been charged with a crime?
18        A.    Yeah.  Probably.
19        Q.    What crimes have you been charged with?
20        A.    Well, when I was 17, I got a minor in
21   possession in Missoula.  Let's see.  When I was 20, I
22   got a public drunkenness in New Orleans on New Year's
23   Eve.  On Halloween of 2000 -- five or six years ago,
24   I got a -- it was some sort of public drunkenness or
25   something like that, yeah.  Can I also add that I've
```
22

John Meyer

```
1   been completely sober for four and a half years.
2        Q.    So there are two different times you got
3   cited for public drunkenness?
4        A.    I believe so.
5        Q.    Where was the second one?
6        A.    In Bozeman.  It had to do with alcohol on
7   Halloween evening.
8        Q.    Have you been arrested for lewd conduct?
9        A.    It might have been.  I don't -- I was
10  urinating in public, and so I can't remember if he
11  cited me for urinating in public or lewd conduct or
12  something like that.
13       Q.    Was that in Bozeman or New Orleans?
14       A.    That was in New Orleans.
15       Q.    What year was that?
16       A.    It was -- I was 20 years old.
17       Q.    Okay.  Have you been arrested for
18  kidnapping before?
19       A.    No.
20       Q.    You mentioned that you're -- you've been
21  sober now for four years.  Is that right?
22       A.    Four and a half, thereabouts, yeah.
23       Q.    Prior to that, you were an alcoholic?
24       A.    Alcoholism is such an interesting term of
25  art.  I could go -- like I went a year and a half in
```

23

**John Meyer**

1    law school without drinking, and so I could go a long

2    time without drinking.  And so the only thing that I

3    define myself as an alcoholic is that when I'm not

4    drinking and I'm not going to alcohol recovery

5    meetings, I start thinking about alcohol.

6              Because I can go a year, two years, five

7    years, ten years without drinking.  But when I'm

8    sitting at a table with friends having dinner and I

9    see that they're drinking and I'm not taking care of

10   myself, I start thinking about alcohol.  I don't like

11   that about myself, and so now I go to alcohol

12   recovery meetings, and I don't have to think about

13   alcohol.  And that is such an amazing gift.

14        Q.    Were you addicted to recreational drugs as

15   well?

16        A.    When?

17        Q.    At any time.

18        A.    Sure.  Yeah.

19        Q.    When were you using recreational drugs?

20        A.    Undergraduate.

21        Q.    What type of drugs were you using?

22        A.    Oh, what did we take?  The usual, like

23   marijuana, things like that.

24        Q.    Were you using psychedelic drugs as well?

25        A.    I did, yeah.

24

**John Meyer**

```
 1         Q.     What type of psychedelic drugs?

 2         A.     They were like 2C-B, 5-MeO-EiPT, designer.

 3         Q.     Do you have a history of depression?

 4         A.     No.

 5         Q.     Anxiety?

 6         A.     No.

 7         Q.     You ever been -- ever been diagnosed with

 8   depression or anxiety before December 11, 2015?

 9         A.     No.

10         Q.     So are you the one that started Cottonwood

11   Law Center in 2010?

12         A.     With a law partner, yeah.

13         Q.     Who was the law partner?

14         A.     Name is Purcie Bennett, P-U-R-C-I-E,

15   B-E-N-N-E-T-T.

16         Q.     Had Purcie Bennett been practicing law for

17   some period of time before that?

18         A.     Yep.

19         Q.     How long had Purcie Bennett been

20   practicing?

21         A.     I'm guessing five-plus years.  I'm not

22   quite sure.

23         Q.     When did Purcie Bennett stop being

24   involved with Cottonwood Law?

25         A.     Maybe three or four years after we started
```
25

John Meyer

1  it.

2      Q.    Do you know why Purcie Bennett stopped

3  being involved with Cottonwood Law?

4      A.    No.  You would have to ask her.

5      Q.    Now, you started working for WildEarth

6  Guardians in October -- approximately October of

7  2015.  Correct?

8      A.    Yes.  Uh-huh.

9      Q.    And I'm going to hand you what is -- I'm

10  going to mark as Exhibit Number 1 in this case.

11                          (Whereupon, Exhibit 1 was

12                          marked for identification.)

13  BY MR. McINTOSH:

14      Q.    Is that a photograph of you from your

15  Facebook page?

16      A.    Yeah.  Well, I'm guessing yeah.  That's a

17  photo of me.

18      Q.    And which one is you in -- in Exhibit 1?

19      A.    It's on the right-hand side.

20      Q.    And that -- this is shortly after you

21  joined WildEarth Guardians?

22      A.    Yes.

23      Q.    And the date of that is October 16, 2015.

24  Correct?

25      A.    I'm not sure what the date of it is.

26

**John Meyer**

```
 1    That's what it says October -- well, I don't know

 2    what -- yeah.  Probably thereabouts, yeah.

 3         Q.    And this is from your Facebook page.

 4    Correct?

 5         A.    Probably.

 6         Q.    Well, it says John Meyer, and then it has

 7    a picture of you in the upper left.  Right?

 8         A.    Yes.

 9         Q.    So does that lead you to believe it's from

10    your Facebook page?

11         A.    Yeah.

12         Q.    Does anyone else have authorization to

13    post on your Facebook page?

14         A.    On my personal one, no.

15         Q.    Okay.  So if there's a post on your

16    Facebook page, then you would have made that post?

17         A.    On my personal one, yes.

18         Q.    Why -- why did you start the job with

19    WildEarth Guardians or why did you take that job?

20         A.    I was -- I was tired of fundraising.

21         Q.    Okay.

22         A.    Yeah.

23         Q.    Was it stressful running the Cottonwood

24    Law by yourself?

25         A.    No.  I felt like I was doing a really good
```
27

**John Meyer**

```
 1    job.  I was winning cases.  I was just tired of
 2    fundraising.
 3         Q.    Where -- where was your job with WildEarth
 4    Guardians?
 5         A.    Like physical location?
 6         Q.    Yeah.
 7         A.    Missoula.
 8         Q.    Did you move to Missoula?
 9         A.    I did.
10         Q.    When did you move to Missoula?
11         A.    Well, it must have been -- I guess
12    October, beginning of October.
13         Q.    Of 2015?
14         A.    Uh-huh.
15         Q.    And how long did you live in -- in
16    Missoula where you had that job?
17         A.    Say again.
18         Q.    I'll say it differently.  When did you --
19    did you move from Missoula back to Bozeman?
20         A.    I moved from Bozeman to Missoula for the
21    job.
22         Q.    Right.
23         A.    Yeah.
24         Q.    And then at some point did you move
25    back --
```
                                                      28

**John Meyer**

```
 1        A.    I live in -- I live in Bozeman now, yeah.
 2   So --
 3        Q.    Right.  So when did you move back from
 4   Missoula to Bozeman?
 5        A.    Oh, well, I moved from Missoula to Big Sky
 6   after I was fired from WildEarth Guardians.
 7        Q.    Okay.  When was that?
 8        A.    2016.
 9        Q.    Why were you fired from WildEarth
10   Guardians?
11        A.    They said I was unmanageable.
12        Q.    Who was your supervisor at WildEarth
13   Guardians?
14        A.    Her name is Sara McMillen.  She's the
15   middle gal in the photo here.
16        Q.    Did she say anything else when you were
17   fired other than that you were unmanageable?
18        A.    I got a notice of termination letter.
19        Q.    Do you still have that letter?
20        A.    I think so, yeah.
21        Q.    Do you recall anything else that it said
22   other than that you were unmanageable?
23        A.    No.
24        Q.    Do you recall when in 2016 it was that you
25   were terminated?
```
                                                         29

**John Meyer**

```
 1        A.    At the beginning sometime.  In the first
 2   half year, I'm guessing, yeah.
 3        Q.    And then did you start running Cottonwood
 4   Law Center again after you were fired from WildEarth
 5   Guardians?
 6        A.    Yes.
 7        Q.    Were you running Cottonwood Law Center
 8   while you were working for WildEarth Guardians?
 9        A.    We had a couple cases we were trying to
10   finish up.  I had one case that I won in district
11   court and then one in the ninth circuit.  And we were
12   working on the certiorari in the U.S. Supreme Court.
13        Q.    You said you -- you said you won at the
14   ninth circuit?
15        A.    Yes.
16        Q.    So why were you working on a writ of
17   certiorari and advancing to the Supreme Court?
18        A.    Because the U.S. Forest Service General
19   petitioned us from court to take the case up.
20        Q.    What case was that?
21        A.    It was Cottonwood Environmental Law Center
22   versus U.S. Forest Service.
23        Q.    What does Cottonwood Environmental Law
24   Center do?
25        A.    Cause trouble.
```
                                                          30

**John Meyer**

```
 1        Q.    Okay.  Anything else?
 2        A.    It's a -- it's a broad -- it's a broad
 3   scene that covers pretty much everything we do.  Like
 4   are you looking for the day-to-day operations?  Are
 5   you looking for what cases we handle?
 6        Q.    Describe -- so you're the only lawyer at
 7   Cottonwood Law Center.  Correct?
 8        A.    I'm the only full-time employed lawyer at
 9   Cottonwood, yes.
10        Q.    Are there part-time lawyers employed by
11   Cottonwood?
12        A.    No.  Not right now.
13        Q.    Okay.  Are -- and are you currently
14   handling any cases?
15        A.    I am.
16        Q.    What are the cases you're currently
17   handling?
18        A.    I have a case -- what is it called?
19   Gallatin Wildlife Association versus U.S. Forest
20   Service.  What else do we have?  We have a case
21   called Cottonwood Environmental Law Center versus
22   U.S. Sheep Experiment Station.  What else do we have?
23   Oh, we have a case Cottonwood Environmental Law
24   Center versus Public Service Commission.
25        Q.    Public Service Commission?
```
31

John Meyer

```
 1           A.     Uh-huh.   I think there's a couple others.
 2           Q.     Okay.   In the first case, I think you said
 3    Gallatin Wildlife versus U.S. Forest Service?
 4           A.     Uh-huh.
 5           Q.     Who are you representing in that case?
 6           A.     Gallatin Wildlife Association and
 7    Yellowstone Buffalo Foundation.
 8           Q.     In the second case Cottonwood versus --
 9    what did you say?   Something about sheep?
10           A.     U.S. Sheep Experiment Station.
11           Q.     And who are you representing in that case?
12           A.     Cottonwood Environmental Law Center,
13    Gallatin Wildlife Association, Yellowstone Buffalo
14    Foundation.
15           Q.     What is the Gallatin -- what did you say?
16    Gallatin Wildlife Association?
17           A.     Uh-huh.
18           Q.     Is that a yes?
19           A.     Yes.
20           Q.     What is that?
21           A.     They -- it's a nonprofit association based
22    in Bozeman.
23           Q.     Then the buffalo association?
24           A.     Yellowstone Buffalo Foundation.
25           Q.     And what is that?
```
                                                              32

**John Meyer**

```
 1        A.     It's another nonprofit, yes.
 2        Q.     And you represent both of those
 3   organizations currently?
 4        A.     Yes.
 5        Q.     And are you paid for your representation
 6   of them?
 7        A.     No.
 8        Q.     You also represent -- or the other lawsuit
 9   you said is Cottonwood versus PSC?
10        A.     Public Service Commission, yes.
11        Q.     And who do you represent in that case?
12        A.     Cottonwood Environmental Law Center and
13   Gallatin Wildlife Association.
14        Q.     Do you have any other clients that you
15   represent that you haven't mentioned in these three
16   lawsuits?
17        A.     Probably.  And I have other cases.  I just
18   can't remember them offhand.
19        Q.     How do you -- if you're not getting paid,
20   how do you fund these lawsuits?
21        A.     We apply for grants.
22        Q.     From who?
23        A.     Various foundations.
24        Q.     How else do you raise funds for the
25   Cottonwood Law Center?
```
                                                        33

**John Meyer**

```
1        A.    Well, private individuals can donate.

2        Q.    Does Cottonwood Law Center have a bank

3   account?

4        A.    We do.

5        Q.    What bank is that at?

6        A.    First Interstate Bank.

7        Q.    You said Cottonwood does not have any

8   insurance?

9        A.    No.

10       Q.    Are you using any of the funds raised by

11  Cottonwood to pay the costs in this case?

12       A.    No.

13       Q.    How are you paying the costs in this case

14  then?

15       A.    Well, in terms of filing fee, I took it

16  out of my personal bank account.

17       Q.    Then I think you ordered a transcript

18  also?

19       A.    Yeah.  I took that out of my personal bank

20  account.

21       Q.    So are all the funds in this case coming

22  out of your personal bank account?

23       A.    Yes.

24       Q.    Okay.  Are you using Cottonwood funds to

25  pay for anything in this lawsuit?
```

34

**John Meyer**

```
 1        A.    Am I using like money of Cottonwood's?
 2   No.  Not really.
 3        Q.    Are you using any resources of
 4   Cottonwood's to do your work in this case?
 5        A.    So yes.  I am actually.  Like I submitted
 6   and typed the briefs on a computer that's owned by
 7   Cottonwood.
 8        Q.    And do you use, for example, like the
 9   Cottonwood Westlaw account?
10        A.    Yes.
11        Q.    There were previously other attorneys that
12   were working at Cottonwood.  Correct?
13        A.    Yes.
14        Q.    And who was the most recent attorney that
15   was working there other than yourself?
16        A.    His name is Keaton Williams.
17        Q.    And when did Mr. Williams stop working at
18   Cottonwood?
19        A.    2017, 2018.
20        Q.    Why did Mr. Williams stop working at
21   Cottonwood if you know?
22        A.    You would have to ask him.
23        Q.    You don't know?
24        A.    You would have to ask him.
25        Q.    What did he tell you?
```
                                                        35

**John Meyer**

```
 1        A.    I can't remember what he said exactly.
 2        Q.    Do you remember generally what he said?
 3        A.    He said he had a job in -- with -- he went
 4   down to Arizona to work for a tribe.
 5        Q.    What did you do to prepare for this
 6   deposition, if anything?
 7        A.    What did I do?  I -- I read the complaint,
 8   and I looked at the discovery that Big Sky provided.
 9        Q.    Anything else?
10        A.    No.
11        Q.    Did you speak with anyone to prepare for
12   this?
13        A.    No.
14        Q.    Did you speak with Amanda Eggert about
15   this deposition?
16        A.    I told her that I had it today, yes.
17        Q.    Did you talk about the accident with
18   Ms. Eggert?
19        A.    No.  Not really -- well, actually, I did,
20   yeah.
21        Q.    What did you two discuss?
22        A.    We talked about Big Sky discovery response
23   page 25 and 26.  A Big Sky ski patrol report talks
24   about there being some rocks on the Cat track which I
25   hadn't realized before.
                                                         36
```

**John Meyer**

1      Q.     Okay.   That's what you discussed with

2  Ms. Eggert?

3      A.     Yeah.

4      Q.     Anything else?

5      A.     I don't think so.

6      Q.     Have you spoken with -- or well, strike

7  that.

8             Are you still trying to retain an attorney

9  to represent you in this case?

10     A.     I've given up on that now.

11     Q.     Okay.   And why have you given up?

12     A.     Because I just -- I don't think it's going

13 to be fruitful given that Big Sky has filed a

14 counterclaim against me.

15     Q.     What attorneys have you spoken with about

16 representing you in this case?

17     A.     I had a list, but I didn't bring the list.

18     Q.     Can you tell me who they are?

19     A.     There was at least 15, if not more.

20     Q.     You don't remember the names of any of

21 them?

22     A.     Some of them, sure.

23     Q.     Which ones do you remember?

24     A.     What the hell was that guy's name?   There

25 was one guy in particular that stands out because he

37

**John Meyer**

```
1    does product liability and personal injury, and I
2    can't remember his name.  I've talked to Western
3    Justice Associates.  I talked to -- what the hell was
4    that guy's name?  I talked to -- I'm blanking.
5    Sorry.  What in the world -- I can come back with a
6    list if you would like.
7         Q.    You have a list, though?
8         A.    I started one, yeah.  It's not complete,
9    but I started one.
10        Q.    Okay.  And you're willing to just give us
11   the list?
12        A.    Sure.
13        Q.    Okay.  Let's talk about your skiing
14   background.  Well, actually before we -- before we
15   get to your skiing background, why -- these various
16   attorneys that you've -- that you've talked to that
17   have turned down the case, why have they told you
18   they've turned down the case, if they've given you
19   reasons?
20        A.    Some of them said they're too busy.  Some
21   of them said we know you.  We're friends.  Some of
22   them said we're not sold on the liability yet.
23        Q.    Anything else you can recall?
24        A.    (Moving head side to side.)
25        Q.    Is that a no?
```

                                                                    38

**John Meyer**

```
1          A.     No.

2          Q.     Okay.  Let's get to your skiing

3   background.  When did you start skiing?

4          A.     Oh, maybe five or six years ago.

5          Q.     Have you ever competed in any skiing

6   events?

7          A.     No.  Not yet.

8          Q.     Have you ever ski raced?

9          A.     Not yet.

10         Q.     Where did you learn to ski?

11         A.     I took lessons at -- what was the name of

12  that place on the Montana-Idaho border?  Lookout

13  Pass, about trail -- Lost Trail.

14         Q.     How many lessons did you take if you can

15  recall?

16         A.     Just three.

17         Q.     Can you describe your skiing ability?

18         A.     I'm a competent skier.

19         Q.     Okay.  How -- you said you've only been

20  skiing for five or six years.  How many days per year

21  have you been skiing?

22         A.     I got -- tomorrow is going to be day 50

23  for me.

24         Q.     And is that -- so you have skied 50 days

25  in the 2018, dash, '19 ski season.  Is that right?
```

**John Meyer**

```
1        A.    Uh-huh.

2        Q.    Yes?

3        A.    Yes.

4        Q.    And is -- has that been approximately how

5   many days you have skied for each since you started

6   skiing five or six days years ago?

7        A.    No.  I skied less -- last -- after the

8   accident I skied less.

9        Q.    But -- but before the accident.

10       A.    I didn't really keep track.  I try to ski

11  as much as I can.  It was like the most amazing thing

12  ever.

13       Q.    Okay.  So you would have only started to

14  ski, what, maybe three years before your accident in

15  December of 2015?

16       A.    Something like that, yes.

17       Q.    And do you think you were skiing

18  approximately 50 days a year before that?

19       A.    I'm guessing less.

20       Q.    Okay.

21       A.    Yeah.

22       Q.    How much less?  Can you provide an

23  estimate?

24       A.    No.  I don't know.  I mean, it could be

25  more.  I skied as much as I could.  I -- I remember
```

40

**John Meyer**

1   posting my Facebook page or I found the post saying I

2   think I might love skiing more than lawyering.  It

3   was like the most amazing thing ever.

4           Q.    How many -- or excuse me.  Where did you

5   ski prior to December 11, 2015?

6           A.    What do you mean?

7           Q.    Where -- where did you go skiing?

8           A.    Oh, well, we skied -- we've skied -- where

9   did we ski?  We skied all over Missoula, around --

10  where else did we ski?  We -- my first -- first or --

11  I think my first season we did Mount Republic, which

12  is an amazing huge mountain overlooking Cooke City.

13  Have you been on it?

14          Q.    I'm not familiar with it, but --

15          A.    It's called The Fin.  It's an amazing

16  route.  It only comes in some years because of snow.

17          Q.    Let me ask the question differently.  What

18  -- what ski areas have you skied at, first of all?

19          A.    Like -- well, I've -- I grew up

20  snowboarding, but you're only wanting to know about

21  skiing.

22          Q.    Well, okay.  Let's -- let's start with

23  snowboarding.

24          A.    Okay.

25          Q.    You grew up -- you grew up -- so up until

41

**John Meyer**

```
1    five or six years ago you snowboarded?
2         A.    Uh-huh.
3         Q.    Is that a yes?
4         A.    Yes.
5         Q.    Okay.  And did you snowboard at Snow Bowl,
6    for example, throughout law school?
7         A.    Yes.
8         Q.    Or excuse me.
9         A.    Yes.
10        Q.    Throughout undergrad?
11        A.    Yes.  Yes.
12        Q.    Did you have a pass there?
13        A.    Yeah.  I believe so.  One or two seasons,
14   I think.
15        Q.    And did you ski or snowboard in Vermont
16   when you were in law school?
17        A.    No.  I couldn't bring myself to snowboard
18   on the East Coast.  It's like crappy snow.  Why would
19   I pay that much money to ski on ice.
20        Q.    So you didn't ski or snowboard when you
21   were in law school?
22        A.    No.  I ice climbed and ran.
23        Q.    And so since you moved back to Montana in
24   2009 or 2010, where -- what areas have you been
25   skiing or snowboarding at?
```
                                                        42

**John Meyer**

```
 1          A.     Since I moved to Montana, 2009 and 2010,
 2    where have I skied?  Specific resorts?
 3          Q.     Yes.
 4          A.     Well, before that, I skied at Big Sky once
 5    or twice -- snowboarded at Big Sky once or twice.
 6    Where else?  Snow Bowl, Lookout.  We backcountry
 7    skied as much as we could.
 8          Q.     Okay.  I'll get to the backcountry skiing
 9    in just a minute.  But before December -- between
10    2009 --
11          A.     Uh-huh.
12          Q.     -- when you moved back to Montana --
13          A.     Uh-huh.
14          Q.     -- and your accident on December 11, 2015,
15    what areas did you ski or snowboard at?  You said --
16    I think you said Lookout?
17          A.     Uh-huh.
18          Q.     And you said Big Sky.  Correct?
19          A.     And Bridger.  Oh, yeah.  Bridger, yeah.
20          Q.     Any others?
21          A.     No.  I don't think so.
22          Q.     Okay.
23          A.     No.
24          Q.     Did you ever have a pass at Lookout or at
25    Bridger?
                                                          43
```

**John Meyer**

```
1          A.     I had a pass at Bridger.

2          Q.     When did you have a pass at Bridger?

3          A.     Oh, 2013, '14, '12 maybe.  I'm not sure.

4          Q.     So a few years?

5          A.     I think so.

6          Q.     And then you -- and in addition to skiing

7    at Bridger and -- Bridger, Lookout, and Big Sky prior

8    to December 11, 2015, you also skied in the

9    backcountry as much as you could?

10         A.     Yes.

11         Q.     What backcountry areas --

12         A.     Oh.

13         Q.     -- do you go to to ski?

14         A.     Where did we go?  We went -- is it Lookout

15   Pass?  Yeah.  Lookout Pass.  And then where else did

16   we go?  There's -- you know, as you're headed south

17   down -- what highway is that -- Brooks turns into

18   whatever highway that is, and it goes down into

19   Idaho.  We skied that.

20              And then Brooks takes a -- heads west down

21   Lochsa.  We skied down there a bunch.  We skied --

22   geez, where else?  We went up -- did I ski Blackmore?

23   We may have skied Blackmore a few times.  Just

24   everywhere.

25         Q.     And prior to December 11, 2015, you -- you
```
44

**John Meyer**

```
 1   said you had skied Big Sky.  What -- what did you
 2   say?  Two or three times?  Is that --
 3        A.    Prior to my ski accident, I had never
 4   skied at Big Sky.  I had snowboarded.
 5        Q.    Okay.  But how many times?
 6        A.    Two, maybe three.  Probably two.  Maybe
 7   even just one.  I remember snowboarding the A to Z
 8   Chute, I think it's called.  That's one --
 9        Q.    Okay.
10        A.    -- one line that I skied at Big Sky I
11   remember.
12        Q.    So you -- so prior to December 11, 2015,
13   you had snowboarded the A to Z Chutes?
14        A.    Yeah.  And that was like -- when was it --
15   that was 2006 maybe, '7, something like that.
16        Q.    And to get to the A to Z Chutes then, you
17   -- you took the Challenger chairlift up.  Correct?
18        A.    I can't remember.
19        Q.    Okay.  What else do you remember --
20        A.    No.  I can't remember.  I don't remember.
21   I don't -- all I remember is skiing that, bombing
22   that, beelining that line and feeling really good.
23        Q.    Okay.  Had you ever skied at Moonlight ski
24   area prior to December 11, 2015?
25        A.    Huh-uh.  No.
                                                    45
```

**John Meyer**

```
1        Q.    Do you know how many times you had skied
2   the Challenger chairlift prior to December 11, 2015?
3        A.    None that I'm aware of.
4        Q.    Had you ever skied on the Headwaters
5   chairlift prior to December 11, 2015?
6        A.    I don't know.  Maybe.
7        Q.    You were not wearing a ski helmet on
8   December 11, 2015.  Correct?
9        A.    Correct.
10        Q.    And why were you not wearing a helmet?
11        A.    I remember meeting my now wife in the
12   parking lot.  And I had the back of my truck open,
13   and I looked right at my helmet.  And I looked at her
14   and I thought, she's not wearing a helmet, so I don't
15   need one.
16        Q.    That was your choice not to wear the
17   helmet.  Correct?
18        A.    Correct.
19        Q.    And sometimes you go mountain biking
20   without a helmet.  Correct?
21        A.    No.  Not anymore.
22        Q.    You used to?
23        A.    One time I did that and that's because I
24   forgot it.  We were doing some reconnaissance in the
25   Gravelly Mountains, and I completely forgot my
```

46

**John Meyer**

```
 1    helmet.  But we kept it mellow all day.  It was flat.
 2    There was no -- nothing serious down there.
 3         Q.    Why do you wear a mountain -- why do you
 4    wear a helmet when you mountain bike?
 5         A.    Oh, so that I don't go into a coma.
 6              THE REPORTER:  Go what?
 7              THE WITNESS:  Go into a coma.
 8              THE REPORTER:  Oh.
 9              THE WITNESS:  I got into a coma.  We
10    haven't gotten there yet.
11    BY MR. McINTOSH:
12         Q.    So prior to December 11, 2015, you
13    normally wore on helmet when you were skiing.
14    Correct?
15         A.    No.  Actually, I didn't.  I didn't, no.  I
16    almost never wore a helmet.  Yeah.  I didn't wear a
17    helmet.
18         Q.    Why did you not wear a helmet regularly
19    before December 11, 2015?
20         A.    Didn't seem like a big deal.
21         Q.    Now, on December 11, 2015, at Big Sky, you
22    were skiing inbounds.  Correct?
23         A.    I guess.  We ran into -- a patroller came
24    and said, hey, you guys are in a closed area.
25         Q.    You weren't skiing in the backcountry on
```

47

**John Meyer**

1    December 11, 2015.  Correct?

2         A.    Not that I'm aware of.

3         Q.    Did you ski in to ski at all on

4    December 11, 2015?

5         A.    No.

6         Q.    But you were on tech gear on

7    December 11, 2015.  Correct?

8         A.    Yeah.

9         Q.    And what is the difference between tech

10   gear and Alpine ski gear?

11        A.    I don't know, because I started out on

12   tech gear.

13        Q.    Okay.  Do you have any Alpine ski gear?

14        A.    All I have is tech gear.

15        Q.    Do you have -- have you ever done any

16   research about Alpine ski gear?

17        A.    No.  All I have is tech gear.

18        Q.    Have you ever been told that Alpine ski

19   gear is better suited for skiing inbounds?

20        A.    No.

21        Q.    Have you ever been told that Alpine gear

22   and Alpine bindings are better for skiing moguls and

23   other hard snow?

24        A.    Can you say that again?  Have I ever been

25   told that skiing moguls and other --

48

**John Meyer**

```
 1        Q.    Hard snow --
 2        A.    Uh-huh.
 3        Q.    -- is better on Alpine gear versus tech
 4   gear.
 5        A.    Could you please stop.  That's kind of
 6   getting --
 7        Q.    Okay.  Can you answer the question,
 8   please?
 9        A.    Yeah.  No.  Can you repeat it?
10        Q.    Sure.
11              MR. McINTOSH:  If you could read that
12   back, please.
13                        (Whereupon, the requested
14                         record was read.)
15              THE WITNESS:  Have I been told that?
16   Maybe.
17   BY MR. McINTOSH:
18        Q.    You don't remember?
19        A.    No.  I don't remember.
20        Q.    Have you ever been told that Alpine
21   bindings have more elasticity than tech bindings?
22        A.    No.  I don't know what that means.  I just
23   assume that -- I've always assumed that if Dynafit or
24   whatever tech company is selling bindings and they
25   say it's okay to ski inbounds, that's what I'm going
```
49

John Meyer

1   to ski, because it's light and I want to go ski

2   mountaineer.  I want to get high.  I want to be free

3   in the wild.

4        Q.    Did you have the toe locked on your tech

5   bindings at the time of your wreck on December 11,

6   2015?

7        A.    No.  I don't think so.

8        Q.    What does that mean to lock your toe on

9   your tech gear?

10       A.    You can pull the toe piece up.

11       Q.    And what does that do?

12       A.    It essentially locks in your -- clamps

13  down -- there's two pins on the side of the front toe

14  piece and it will lock them in tighter.

15       Q.    And what -- and what does that do to lock

16  them in tighter?

17       A.    I think -- I think it draws the pins in

18  tighter, puts more pressure on the tech fitting in

19  the boot.

20       Q.    Prior to December 11, 2015, you had skied

21  runs -- ski runs that had Cat tracks going across

22  them.  Correct?

23       A.    Yeah.  I must have.

24       Q.    Ski or snowboard?

25       A.    I must have.

50

**John Meyer**

1      Q.    You -- you say you must have because you
2  know that Cat tracks are common at ski resorts.
3  Right?
4      A.    Cat tracks are on ski resorts, yeah.
5      Q.    And they're common at ski resorts.  Right?
6      A.    Sure.  If you say so.
7      Q.    Well, they're necessary to get equipment
8  around the mountain, aren't they?
9      A.    I think you can probably get equipment
10  around a mountain without Cat tracks.
11      Q.    So you think Sno-Cats can get around the
12  mountain without Cat tracks?
13      A.    What is a Sno-Cat?
14      Q.    You don't know?
15      A.    No.
16      Q.    Do you know what a -- you agree, though,
17  that --
18      A.    Wait.  So what is a Sno-Cat?
19      Q.    If you could please just answer the
20  questions.
21           You agree that a Cat track and catwalk are
22  the same thing.  Correct?
23      A.    A Cat track and -- yeah.  Yeah.
24      Q.    And you agree that every ski area that
25  you've been at has Cat tracks.  Right?

                                                    51

**John Meyer**

```
 1        A.    That every ski area I've been to has Cat
 2   tracks, yeah.
 3        Q.    Had you ever skied with Amanda Eggert
 4   before December 11, 2015?
 5        A.    No.
 6        Q.    That was your first day skiing with her?
 7        A.    Uh-huh.
 8        Q.    As of December 11, 2015, can you describe
 9   her skiing ability?
10        A.    My understanding is that she's a pretty
11   good skier.
12        Q.    Well, you actually watched her skiing, at
13   least some, on December 11,  2015.  Right?
14        A.    Yeah.
15        Q.    So can you describe her ability from what
16   you saw?
17        A.    She was a pretty good skier.  I didn't
18   actually -- that's -- that's kind of a lie.  I didn't
19   see a whole lot of her out skiing.  She was behind
20   me.
21        Q.    Were you trying to show off for her on
22   your first date?
23        A.    No.  I just ski fast always.
24        Q.    What's that?
25        A.    I just always ski fast.
```
                                                                    52

**John Meyer**

```
 1          Q.     Prior to December 11, 2015, you said you
 2   had a pass at Bridger Bowl.  Correct?
 3          A.     Uh-huh.
 4          Q.     Yes?
 5          A.     I believe so, yes.
 6          Q.     Had -- had you ever had a pass at any
 7   other ski area?
 8          A.     To ski?
 9          Q.     Ski or snowboard.
10          A.     I had a pass, what the hell was it -- Snow
11   Bowl, I believe.  We just talked about that.
12          Q.     Anywhere other than -- than Bridger Bowl
13   or Snow Bowl that you had a pass?
14          A.     No.  I don't think so.
15          Q.     Have you had a season's pass since
16   December 11, 2015, at anyplace?
17          A.     Yes.
18          Q.     Where do you have a -- or where have you
19   had a ski pass since December 11, 2015?
20          A.     I had a pass at Bridger this year.
21          Q.     And you said you were -- you're
22   approaching 50 days skiing for the 2018-2019 ski
23   season?
24          A.     Uh-huh.
25          Q.     Yes?
                                                          53
```

**John Meyer**

```
 1        A.    Yes.

 2        Q.    And how many of those days have been at

 3   Bridger Bowl approximately?

 4        A.    Maybe ten, maybe.

 5        Q.    And the rest have been in the backcountry?

 6        A.    Uh-huh.

 7        Q.    Yes?

 8        A.    Yes.

 9        Q.    So you've had roughly 40 days in the

10   backcountry this year?

11        A.    Yeah.

12        Q.    Where have you been skiing in the

13   backcountry this ski season?

14        A.    I didn't keep a list.  I skied at Brackett

15   Creek quite a bit, just north of Bridger.  Skied Lake

16   Creek in Hyalite.  Where else?  Oh, we skied -- what

17   the hell is that -- Spanish Peaks over in there, just

18   north of Big Sky area.  Where else have we gone?

19   Pretty much everywhere we could find.

20        Q.    Do you wear a helmet now when you ski at

21   Bridger Bowl?

22        A.    Yes.

23        Q.    What are your favorite runs at Bridger

24   Bowl?

25        A.    I like the Alpine lift chairlift there
```

54

**John Meyer**

1    because there's far less crowds, and you can -- it's

2    like 100 yards -- when you get off the ski lift, you

3    can go right 100 yards, skier's right.  No.  Excuse

4    me.  Looker's right.  And there's a gate you can put

5    on your skins and go tour up.  And it's like instant

6    amazing backcountry access.  There's not too many

7    people.

8          Q.    Do you hike the Ridge?

9          A.    No.  Not anymore.

10         Q.    Do you ride the Schlasman's chairlift?

11         A.    Not anymore.

12         Q.    You just use Bridger to access

13   backcountry?

14         A.    I use the Bridger -- I take the Bridger

15   and then go up the Alpine lift, and there's much more

16   mellow backcountry.

17         Q.    Okay.

18         A.    I'm actually kind of -- this whole ski

19   accident has just -- it's really wrecked my

20   confidence and -- yeah.  I'm just really shaken by

21   skiing since that accident, because I used to ski

22   Schlasman's, and we'd go have fun.  And we just don't

23   do that anymore.

24         Q.    Describe for the jury what backcountry

25   skiing is briefly, please.

                                                    55

**John Meyer**

```
 1        A.     It's just a way to -- how would you
 2  describe it?  Like you're free to go wherever you
 3  want because you get to put on a pair of skins, which
 4  are like -- it's like you can walk up the mountain.
 5  You don't have to ride a lift.  You can walk wherever
 6  you want on snow.  It's like the most amazing thing
 7  ever.
 8        Q.     Are hazards in the backcountry marked?
 9        A.     No.
10        Q.     Are -- are there signs that mark cliffs
11  when you're skiing in the backcountry?
12        A.     No.
13        Q.     Are there signs that mark rocks in the
14  backcountry?
15        A.     No.
16        Q.     Are there signs that mark variations in
17  terrain when you're skiing in the backcountry?
18        A.     No.
19        Q.     How then are you able to ski in the
20  backcountry without injuring yourself?
21        A.     I don't know how we -- I don't know.  We
22  just do it.  You just do it.  You never really think
23  consciously -- well, actually, that's not true.  We
24  -- we do look for objective hazards, yeah.  Yeah.
25        Q.     Do you need hazards to be marked to be
```

56

**John Meyer**

```
 1   able to ski without injuring yourself?
 2        A.    That's an odd question.  Can you rephrase
 3   it?
 4              MR. McINTOSH:  Can you read it back,
 5   please?
 6                         (Whereupon, the requested
 7                          record was read.)
 8              THE WITNESS:  That's such a weird
 9   question.  Do I need hazards to be marked so I don't
10   hurt myself?
11   BY MR. McINTOSH:
12        Q.    Correct.
13        A.    In the backcountry?  No.  If I did, I
14   would never ski in the backcountry.
15        Q.    Okay.  Do you avoid injuring yourself by
16   skiing within the range of your ability?
17        A.    Can you say that again?
18        Q.    Do you avoid injuring yourself when skiing
19   in the backcountry --
20        A.    Yeah.
21        Q.    -- by skiing within your ability?
22        A.    Yeah.
23        Q.    Do you maintain control of your speed when
24   you're skiing in the backcountry?
25        A.    Yeah.
```
57

John Meyer

```
 1        Q.     Have you wrecked and injured yourself when
 2   skiing in the backcountry?
 3        A.     Have I wrecked and injured myself?
 4   Probably.  I don't remember any specific instance,
 5   but it's certainly possible.
 6        Q.     You can't recall any injuries, though?
 7        A.     So ski or snowboard or what?
 8        Q.     Either one.
 9        A.     Well, snowboard I went up in the Missions.
10   Have you guys been in the Missions?  It's incredible
11   skiing.  And we were snowboarding to go up Gray Wolf
12   Peak.
13               THE REPORTER:  Where?
14               THE WITNESS:  Gray Wolf Peak.
15               THE REPORTER:  Gray Wolf.
16               THE WITNESS:  In the Mission Mountains.
17   It's like this 2,000-, 1500-foot shot.  It's like
18   straight up.  I mean, you're like -- you got ice axes
19   and your cramp-ons to climb up this thing.  And on
20   the way to the approach, it was super icy.  We didn't
21   realize it.  And I fell and just nailed my face, and
22   I was voiding pretty bad.  And so that is -- that
23   should have been on the Facebook page, I think.  Put
24   it up years ago.  That was 10 or 15 years ago.
25   BY MR. McINTOSH:
```

58

**John Meyer**

1      Q.     Okay.  Any other times that you've injured
2  yourself in the backcountry?
3      A.     That's the most memorable one.
4      Q.     And why did that accident occur?
5      A.     Why did that accident occur?  Because it
6  wasn't marked.  I'm just kidding.  Why did that
7  injury occur?
8      Q.     What -- I mean, what did you hit when you
9  were snowboarding in the Missions?
10     A.     It was ice, yeah.  Just --
11     Q.     You just hit ice?
12     A.     Yeah.  It was pure ice, yeah.
13     Q.     And it wasn't marked?
14     A.     No.  It wasn't marked.
15     Q.     Did you blame someone other than yourself
16  for that?
17     A.     No.
18     Q.     Do you -- do you agree that that was your
19  fault, that wreck?
20     A.     Sure.  I mean, if I had chosen not to be
21  there, I wouldn't have gotten in that accident.
22     Q.     Let's talk about your accident on
23  December 11th, 2015.  You slept at someone's house
24  near Bozeman the night before.  Is that correct?
25     A.     That's correct.

                                                      59

**John Meyer**

```
 1        Q.     Who is that?
 2        A.     His name is Tom Thornton.  He's like my
 3   dad.  He taught me how to hunt for real and clean
 4   animals, cut animals.  We skin raccoons, badgers.
 5   He's an amazing person.
 6        Q.     And you didn't use any drugs or alcohol
 7   that evening of December 10?
 8        A.     No.  I've been sober for four and a half
 9   years.
10        Q.     And you were living in Missoula on
11   December 10, 2015.  Is that right?
12        A.     Uh-huh.
13        Q.     Is that a yes?
14        A.     Yes.
15        Q.     And you went skiing at Big Sky on
16   December 11, 2015, because you could obtain a lift
17   ticket in exchange for cans of food.  Correct?
18        A.     That's correct.
19        Q.     And you bought 20 cans of food at Roxy's?
20        A.     I think so, yeah.
21        Q.     How much did that cost you?
22        A.     $20 or so, where -- there must -- is there
23   sales tax in Big Sky?
24        Q.     So approximately $20?
25        A.     Yes.
                                                      60
```

John Meyer

```
1         Q.    And you exchanged those cans of food for a

2    lift ticket.  Correct?

3         A.    Yes.

4         Q.    And where -- where do you recall making

5    that exchange to get -- picking up the lift ticket?

6         A.    In front of the ticket window.  They have

7    like tents, I think.

8         Q.    Okay.  And that was -- it was on the Big

9    Sky side of the resort.  Correct?

10        A.    Yes.

11        Q.    The main entrance?

12        A.    Yes.

13        Q.    I'm going to hand you what I'm marking as

14   Exhibit 2.

15                        (Whereupon, Exhibit 2 was

16                         marked for identification.)

17             THE WITNESS:  And before we go there, I'm

18   -- I'm just thinking about a question that you asked

19   awhile back, and I'm not quite sure that I was clear

20   or even accurate.  I'm struggling to remember what

21   the question was.  Can we -- could we go back and

22   revisit one of the questions that you asked?

23   BY MR. McINTOSH:

24        Q.    If you tell me which one.

25        A.    It was probably 10, 12 questions ago.
```

61

**John Meyer**

```
1        Q.    What was the question, though?

2        A.    I can't remember, but something about it

3   is just not quite sitting right with me.

4        Q.    So I don't understand what you want to do?

5        A.    So can you -- can you tell me what you

6   asked like 10 questions ago?

7        Q.    No.  I don't know what I asked 10

8   questions ago.

9        A.    Do you have a list?

10       Q.    No.  I have an outline.

11       A.    Okay.  So -- okay.

12       Q.    Do you want to go off the record, and you

13  can have the court reporter go back 10 questions?

14       A.    Can we do it on the record?  Does it

15  matter?

16       Q.    Well, I don't want to take up time or

17  taking -- doing this.  But if you want to take a

18  break and you can have the -- you can ask the court

19  reporter to go back 10 questions, then you can do

20  that.

21       A.    Okay.

22            MR. McINTOSH:  Okay.  We'll take a short

23  break and you can do that.

24            THE VIDEOGRAPHER:  We're going off the

25  record.  It's 10:55.
                                                        62
```

John Meyer

```
 1                    (Whereupon, a break was then

 2                     taken.)

 3              THE VIDEOGRAPHER:  We're back on the

 4    record.  It's 11:02.

 5    BY MR. McINTOSH:

 6         Q.    Mr. Meyer, we're back on the record.

 7    First of all, do you understand you're still under

 8    oath?

 9         A.    Yes.

10         Q.    And you're not recording this, are you?

11         A.    No.

12         Q.    There was a question that you wanted to --

13    to revisit.  Is that right?

14         A.    Yes, please.

15              MR. McINTOSH:  If the court reporter could

16    please read -- read that question back.

17                    (Whereupon, the requested

18                     record was read.)

19              THE WITNESS:  And so it seems like Alpine

20    ski gear is what the entire ski industry started

21    with, and so they've had how many -- 50, 100, 200

22    years of experience using that.  And so in some sense

23    it seems like -- common sense seems like it would be

24    trusted -- tried more, trusted more.

25              And so I don't ever remember anyone saying
```

63

**John Meyer**

```
1    this is -- Alpine gear is better for skiing inbounds
2    than tech gear.  But from what you read and things
3    like that and from what I've experienced now, I would
4    say Alpine gear is probably maybe safer for skiing
5    inbounds.
6    BY MR. McINTOSH:
7         Q.    That would just be common sense to you?
8         A.    Seems like it, yeah.
9         Q.    Okay.  A couple of questions I missed
10   earlier.  First of all, do you have any skiing
11   partners, people that you regularly ski with, before
12   December 11, 2015?
13        A.    Yeah.  Yeah.
14        Q.    Who?
15        A.    His name is Trevor Lowell.
16        Q.    I'm sorry.  Could you say that again.
17        A.    Trevor Lowell, L-O-W-E-L-L.  And I skied
18   with Sara's brother in Missoula, and I've forgotten
19   his name.  We went at least once, yeah.
20        Q.    Have you received any training to safely
21   ski in the backcountry without injuring yourself?
22        A.    No.  No.  I mean, we went through
23   avalanche training, so -- well, no.  I did it on
24   snowboard.  No.
25        Q.    Skiing or snowboarding.
```
                                                            64

**John Meyer**

```
 1        A.    Backcountry ski trained?  So we -- yeah.
 2   The second day of my ski class I had him focus on,
 3   yeah, skiing powder.  Yeah.
 4        Q.    And what training did you receive about
 5   safely skiing powder in the backcountry?
 6        A.    It wasn't so much about safely skiing as
 7   much as it was about kind of different -- how you ski
 8   differently in powder versus like a groomed run.
 9        Q.    So it was just how to ski powder?
10        A.    Yes.  Essentially.
11        Q.    Okay.  I'm going to hand you what I have
12   marked as Exhibit 2.
13        A.    Uh-huh.
14        Q.    Do you recognize that as a photograph of
15   the ticket area at Big Sky Resort as it looked on
16   December 11, 2015?
17        A.    Uh-huh.
18        Q.    Yes?
19        A.    Yeah.  I'm -- I don't remember much from
20   that day.  I don't remember looking at this sign.  I
21   believe you that the sign was at the ticket window
22   the day I got my ticket.
23        Q.    On December 11, 2015?
24        A.    Yes.
25        Q.    And this sign is a posting of the -- your
```
65

**John Meyer**

```
 1    responsibility code.  Correct?
 2         A.    Yes.  That's what it says.
 3         Q.    And did you read your responsibility code
 4    prior to skiing on December 11, 2015?
 5         A.    I don't remember.
 6         Q.    You were -- this -- this sign warns skiers
 7    of Big Sky to always ski in control.  Correct?
 8         A.    That's what it says, yes.
 9         Q.    And the sign at the ticket booth at Big
10    Sky on December 11, 2015, also contains a
11    notification of Montana state law.  Correct?
12         A.    Yes.
13         Q.    And it spells out the duties of a skier.
14    Correct?
15         A.    I haven't read it.  I'm guessing it does.
16         Q.    Well, it says right there duties of a
17    skier.  Do you see that?
18         A.    Yeah.
19         Q.    And that was -- do you dispute that that
20    was posted on December 11, 2015?
21         A.    I don't remember.  And, again, going back
22    to what I said when we started, I didn't get my
23    ticket at the ticket window.  There was a tent.
24         Q.    Excuse me?
25         A.    There was like a tent where you trade cans
```

66

**John Meyer**

```
 1   for the ticket.
 2        Q.    And that was right in front of this ticket
 3   window, wasn't it?
 4        A.    It was to the side, I'm guessing.
 5        Q.    And you had to walk right by this sign to
 6   get to the chairlifts.  Correct?
 7        A.    Maybe.  I don't remember.
 8        Q.    But you don't recall reading the posting
 9   about Montana state law on December 11, 2015?
10        A.    I may have.  I don't remember.
11        Q.    Okay.  Do you remember being warned that
12   it is your duty to ski within the limits of your
13   ability?
14        A.    No.
15        Q.    That -- this sign in Exhibit 2 contains
16   that warning, does it not?
17        A.    It says "Always stay in control and be
18   able to stop or avoid other people or objects."
19        Q.    And then below that where it states
20   Montana state law --
21        A.    Uh-huh.
22        Q.    -- it states that it is your duty to ski
23   within the limits of your ability.  Correct?
24        A.    It might.  I can't read it.
25        Q.    Okay.  You're familiar with Montana law on
```
67

**John Meyer**

```
 1    skiing.   Correct?

 2         A.      Yeah.

 3         Q.      This sign also warns you that you had a

 4    duty to maintain control of your speed and course so

 5    as to prevent injury to yourself.   Correct?

 6         A.      Say that again.

 7         Q.      This sign warns you that you had a duty to

 8    maintain control of your speed and course so as to

 9    prevent injury to yourself.   Correct?

10         A.     I can't read that sign, but yeah.   If you

11    say that's what that sign says, that's probably what

12    it says.

13         Q.      Okay.   The sign warns you that it is your

14    duty to ski within the limits of your equipment.

15    Correct?

16         A.      Probably.   Again, I can't read the sign.

17         Q.      You don't dispute that it says that, do

18    you?

19         A.      I can't read the sign.

20         Q.      But my question is, do you dispute that

21    the sign says that?

22         A.      I have to because I can't read it.

23         Q.      Okay.   Well, doesn't Montana Code

24    Annotated 23-2-736 say that?

25         A.      That's different than what the sign says
```

68

**John Meyer**

```
1    or maybe it doesn't say.  I don't know.
2         Q.    It's not actually.  Can you see right
3    there under Montana state law it says Section
4    23-2-736 MCA --
5         A.    Uh-huh.
6         Q.    -- duties of a skier.
7         A.    Yeah.
8         Q.    So do you understand that this is a
9    posting of that statute of the Montana Code
10   Annotated?
11        A.    Yes.
12        Q.    And that statute warns you that a skier
13   shall accept all legal responsibility for injury or
14   damage of any kind to the extent that the injury or
15   damage results from inherent risks and danger of
16   skiing.  Correct?
17        A.    Can you say that again?
18        Q.    This sign warns you that in Montana --
19        A.    Uh-huh.
20        Q.    -- a skier shall accept all legal
21   responsibility for injury or damage of any kind to
22   the extent that the injury or damage results from
23   inherent dangers and risks of skiing.  Correct?
24        A.    If -- I believe that's what the -- part of
25   what the statute says.
```
                                                            69

**John Meyer**

1       Q.    And you could have read all of those

2  warnings if you wanted to on December 11, 2015.

3  Correct?

4       A.    I may have.  And there are some other

5  things that aren't listed on this sign.

6                          (Whereupon, Exhibit 3 was

7                           marked for identification.)

8  BY MR. McINTOSH:

9       Q.    I've handed you what has been marked as

10  Exhibit 3.  Exhibit 3, would you agree, is a close-up

11  of a sign that states lift rates for Friday,

12  December 11, 2015?

13       A.    If that's what you say it is, that's what

14  it is.

15       Q.    Well, does -- does it say lift rates for

16  Friday, December 11, 2015, at the top?

17       A.    That's what it says, yes.

18       Q.    And can you see by looking at Exhibit 2

19  that this is a close-up of a sign that is --

20       A.    Yeah.

21       Q.    -- in between the ticket windows?

22       A.    Yes.

23       Q.    And this sign -- well, first of all, do

24  you dispute that this was posted at the ticket window

25  on December 11, 2015?

70

**John Meyer**

```
 1        A.    I don't remember, and I don't remember
 2  going to this ticket window to get my ticket.
 3        Q.    You could have and you could have read
 4  this warning, though.  Correct?
 5        A.    Well, where I got my ticket was over here,
 6  not over here.
 7        Q.    I understand that.  But you could have
 8  read this warning at the ticket window.  Correct?
 9        A.    But I didn't get my ticket at the window.
10        Q.    That's not the question I asked you.  You
11  could have walked over there and read this.  Correct?
12        A.    I can walk anywhere.
13        Q.    So my question is, you could have read
14  this warning on December 11, 2015.  Correct?
15        A.    Sure.  Yeah.  Correct.
16        Q.    And this states:  "Caution, exclamation
17  point.  Early season conditions exist."  Do you see
18  that?
19        A.    No -- oh, yes.  Now I do, yeah.
20        Q.    What -- what does that mean to you when
21  you are warned, quote, caution, exclamation point,
22  early season conditions exist, exclamation point, end
23  quote?
24        A.    It means be careful.  Early season
25  conditions exist.
```
                                                     71

**John Meyer**

1    Q.    Does it mean that more hazards will be

2    exposed because there's not enough snow to you?

3    A.    It could.

4    Q.    Well, what does it mean to you?  That's

5    what I'm asking.

6    A.    What did you just say?

7    Q.    I mean, what does it mean to you?

8    A.    No.  Before that, what did you say?

9    Q.    I don't remember.  Can you just answer the

10   question, please?

11   A.    It means be careful.  Early season

12   conditions exist.  That to me means you're not going

13   to get a lower day.  You're not going to get four

14   feet of powder today.

15   Q.    Does it mean to you that there will be

16   unmarked obstacles?

17   A.    Yeah.  Sure.  Yeah.

18   Q.    And where did you meet Amanda Eggert to

19   ski or -- on December 11, 2015?

20   A.    Over by -- I believe it was by the tent.

21   Q.    Where you got your lift ticket?

22   A.    Yeah.

23   Q.    And Ms. Eggert had a season pass in 2015.

24   Correct?

25   A.    I think so.

72

John Meyer

```
1        Q.    And was it a season pass -- do you recall
2   -- that she received for free?
3        A.    I don't -- probably, yeah.
4        Q.    And why do you say probably?
5        A.    Because she was working for the newspaper.
6   I think they gave them passes for working at the
7   newspaper.
8        Q.    I'm going to hand you what I have marked
9   as Exhibit 4.
10                      (Whereupon, Exhibit 4 was
11                       marked for identification.)
12              THE WITNESS:  Yeah.
13   BY MR. McINTOSH:
14        Q.    And it has Amanda Eggert's name in the top
15   left.  Correct?
16        A.    Yep.
17        Q.    That's who you met to ski on December 11,
18   2015.  Correct?
19        A.    Yeah.
20        Q.    And it says on the right pass media.  Do
21   you see that?
22        A.    This is in the right.
23        Q.    Upper right.
24        A.    Pass card usage detail.
25        Q.    Just below that.
```
                                                            73

**John Meyer**

```
 1        A.    Pass media, yep.
 2        Q.    And would that be consistent with what you
 3   just told me, that she worked for the local
 4   newspapers or local publication?
 5        A.    Yeah.  Is this all in our record?
 6        Q.    What?
 7        A.    Is this all in our record that you
 8   provided?
 9        Q.    I don't know what you mean.
10        A.    Like in the discovery, is all this stuff
11   in here?
12        Q.    So let's just answer the questions.  So --
13        A.    Well, I'm -- like have you already given
14   me all this stuff before this?
15        Q.    I just gave this to you.
16        A.    Before just now.
17        Q.    I'm not under oath today, Mr. Meyer.  This
18   is your time to answer these questions.
19        A.    So you're giving me new documents that you
20   guys are producing as we go through this.  Is that
21   right?
22        Q.    Mr. Meyer, this is your time to answer the
23   questions.
24        A.    Okay.
25        Q.    Do you see under December 11, 2015, it
```
74

**John Meyer**

```
 1   says 11:30 a.m. at Swift Current?

 2        A.    Yep.  I see it.

 3        Q.    And I'll represent to you these are on

 4   Eastern time, so that's actually 9:30 a.m.

 5        A.    Can I slow us down?  During the initial

 6   disclosure, aren't you supposed to provide me with

 7   all the documents that you plan to use?

 8        Q.    Mr. Meyer, this is not -- this is the time

 9   for you to answer the questions under oath.  Okay?

10        A.    Okay.

11        Q.    If you have some sort of discovery issue,

12   you can raise it with the court.  Okay?

13        A.    Are you going to put any more documents in

14   front of me that you haven't already given me?

15   Because you've already done that once, didn't you?

16        Q.    Mr. Meyer, please just answer the

17   questions.  This is the time for me to ask you

18   questions.  I have a limited amount of time, so

19   please answer the questions under oath.  Okay?

20        A.    Well, you have seven hours.

21        Q.    Mr. Meyer, do you see where it states

22   11:30 a.m. Swift Current lift?

23        A.    Yeah.  Yeah.

24        Q.    And I'm telling -- I'll represent to you

25   that that's Eastern time, so it's really 9:30 Montana
```

75

**John Meyer**

```
1    time.  Okay?  Do you understand that?

2         A.    Yes.

3         Q.    Does that comport with your recollection?

4    In other words, is that what you -- you remember

5    getting on the Swift Current chairlift with Amanda

6    Eggert on December 11, 2015?

7         A.    We got on a chairlift.  I don't remember

8    what it was called.

9         Q.    And you don't -- do you remember skiing at

10   all before 9:30 a.m. on December 11, 2015?

11        A.    I don't remember.

12        Q.    You don't remember one way or the other?

13        A.    No.

14        Q.    Okay.  Do you dispute that you got on the

15   Swift Current chairlift with Amanda Eggert at 9:30

16   a.m.?

17        A.    I don't remember.

18        Q.    Okay.  My question is do you dispute that?

19        A.    Do I dispute what?  How can I dispute

20   something I don't remember.

21        Q.    Do you dispute that you did not --

22        A.    Yeah.

23        Q.    -- that you got on the chairlift at 9:30

24   a.m. on December 11, 2015?

25        A.    Again, I don't remember.
```
                                                              76

**John Meyer**

```
 1        Q.    I understand that.

 2        A.    Okay.

 3        Q.    You've said you don't remember.

 4        A.    Okay.

 5        Q.    And what I'm saying is are you going to

 6   say -- at the time we get into trial, are you going

 7   to say I don't remember, but I know that is not

 8   correct?  That would be disputing it.  Do you

 9   understand?

10        A.    I'm going to say I don't remember.

11        Q.    Okay.  So you don't remember one way or

12   the other?

13        A.    I don't remember one way or the other.

14        Q.    And you're not going to dispute it?

15        A.    I'm not going to dispute what?

16        Q.    That you got on the Swift Current

17   chairlift with Amanda Eggert at 9:30 a.m. on

18   December 11.

19        A.    I don't remember.

20        Q.    Do you understand the distinction between

21   the questions I'm asking?

22        A.    No.

23        Q.    There's a question about whether you

24   remember it, and you've clearly said you don't

25   remember it.
```

                                                      77

**John Meyer**

```
 1        A.     Uh-huh.
 2        Q.     And then do you know what the word dispute
 3   means?
 4        A.     Well, it means -- no.  I -- well, I mean,
 5   if you say the sky is blue and I say the sky is red,
 6   I would dispute that you think that you -- no.  I
 7   don't -- I don't quite understand what we're trying
 8   to do here.
 9        Q.     Okay.  I'm just trying to ask are you
10   going to come in at the time of trial --
11        A.     Yeah.
12        Q.     -- and say I did not get on the Swift
13   Current chairlift with Amanda Eggert at 9:30 a.m.?
14        A.     If -- when I get on -- before the jury,
15   I'm going to say I don't remember.
16        Q.     Okay.  And that's it?  That's all you're
17   going to say about it?
18        A.     What else do you want me to say?
19        Q.     Did you ski at all before 9:30?  I think I
20   might have asked you that.
21        A.     I don't remember.
22        Q.     Okay.  Where did you ski between 9:30 and
23   the time of your wreck at 10:51?  You don't remember?
24        A.     No.
25        Q.     Okay.
```

                                                          78

**John Meyer**

```
 1                         (Whereupon, Exhibit 5 was
 2                          marked for identification.)
 3    BY MR. McINTOSH:
 4         Q.    I'm handing you what has been marked as
 5    Exhibit 5.  Do you recognize what is pictured in
 6    Exhibit 5?
 7         A.    It says welcome to Swift Current.  It
 8    looks like a lift.
 9         Q.    A chairlift at Big Sky?
10         A.    Yes.
11         Q.    And can you see the warning signs in the
12    window?
13         A.    No.
14         Q.    Do you recall that this is how the Swift
15    Current chairlift looked when you loaded it on
16    December 11, 2015?
17         A.    No.  I don't remember.
18         Q.    You don't remember one way or the other?
19         A.    I don't remember seeing any signs on the
20    Swift Current chairlift, no.  I don't remember.
21         Q.    Do you dispute that those signs were
22    there?
23         A.    They could have been.
24         Q.    Okay.
25                         (Whereupon, Exhibit 6 was
```

79

John Meyer

```
 1                              marked for identification.)
 2    BY MR. McINTOSH:
 3         Q.    I'm handing you what has been marked as
 4    Exhibit 6, which is a close-up of those same signs.
 5    What do the signs shown in the window at the Swift
 6    Current chairlift say?
 7         A.    That sign right there says "Caution.
 8    Early season conditions exist."
 9         Q.    And you previously told us what that means
10    to you.  Correct?
11         A.    Yes.
12                         (Whereupon, Exhibit 7 was
13                          marked for identification.)
14    BY MR. McINTOSH:
15         Q.    Next I'll hand you what has been marked as
16    Exhibit 7.  Do you recognize that as being a
17    photograph taken at the top of the Swift Current
18    chairlift?
19         A.    No.  I don't recognize that as being a
20    photograph that was taken at the top of the
21    chairlift.  I do recognize this photo from the
22    discovery that you provided, and I don't remember
23    this photo being in the discovery, this photo, or
24    this Boyne Resorts pass card usage detail report.
25         Q.    So do you remember -- what is shown in
```

80

John Meyer

```
 1   Exhibit 7, do you recall that that is how the top of
 2   Swift Current looked or was -- is substantially
 3   similar to how the top of Swift Current looked on
 4   December 11, 2015?
 5        A.    I don't remember.
 6        Q.    Don't remember one way or the other?
 7        A.    No.
 8        Q.    Do you recall seeing that warning sign as
 9   shown in Exhibit 7 at the top of Swift Current?
10        A.    No.  I don't remember.
11        Q.    So if someone from Big Sky comes in and
12   says this is how the top of Swift Current looked on
13   December 11, 2015, and that warning sign was posted
14   there, you're not going to dispute that.  Correct?
15        A.    I'm going to say it might have been there.
16   I don't remember.
17        Q.    Okay.
18                       (Whereupon, Exhibit 8 was
19                        marked for identification.)
20   BY MR. McINTOSH:
21        Q.    I'm now handing you Exhibit 8, which is a
22   close-up of that warning sign that was shown in
23   Exhibit 7.  And that warning sign states: " Caution.
24   Early season conditions exist."  Correct?
25        A.    That's what it says, yes.
```
81

**John Meyer**

```
 1          Q.    And what would that warn you of when you

 2    saw that sign?

 3          A.    There's not going to be five feet of

 4    blowup powder.

 5          Q.    Anything else?

 6          A.    Caution.  Early season -- yeah.  Sure.  I

 7    mean, yeah.  Just not going to be amazing powder day.

 8          Q.    Might have more rocks exposed because

 9    they're not covered by snow.  Correct?

10          A.    Is that what you think?

11          Q.    That's the question I just asked you.  Can

12    you please answer the questions?

13          A.    What did you ask?

14          Q.    When it says early season conditions

15    exist --

16          A.    Uh-huh.

17          Q.    -- that means that more rocks may be

18    exposed because they're not covered by snow.

19    Correct?

20          A.    Maybe, sure.  Yeah.

21          Q.    More unmarked obstacles.  Correct?

22          A.    Maybe.

23          Q.    That's what that warning sign tells you.

24    Right?

25          A.    Uh-huh.
```
                                                          82

**John Meyer**

```
 1        Q.     Yes?

 2        A.     Yes.

 3                           (Whereupon, Exhibit 9 was

 4                           marked for identification.)

 5   BY MR. McINTOSH:

 6        Q.     I'm now handing you what has been marked

 7   as Exhibit 9.  Do you recognize the photograph of

 8   what is shown in Exhibit 9?

 9        A.     No.  Well, I recognize it from the

10   discovery that you previously provided.

11        Q.     Do you agree that this is -- this picture

12   shows conditions that were substantially similar to

13   the conditions at Big Sky on December 11th, 2015?

14        A.     Can you say that again?

15        Q.     Do you agree that what is shown in Exhibit

16   9 is substantially similar to the conditions that

17   existed at Big Sky on December 11, 2015?

18        A.     I don't think it's fair to make sort of a

19   blanket stereotype the whole mountain looks like this

20   photo.

21        Q.     Okay.  Well, I'll ask you differently.

22   What is different in Exhibit 9 from the conditions

23   that existed on December 11, 2015?

24        A.     I don't know what the conditions were

25   across the whole mountain.
```

**John Meyer**

```
 1        Q.    I'm not asking about the whole mountain.
 2   I'm asking about what is shown in Exhibit 9.
 3        A.    Uh-huh.  I don't know.
 4        Q.    Okay.  So if someone from Big Sky comes in
 5   and says --
 6        A.    Uh-huh.
 7        Q.    -- this photograph, Exhibit 9, accurately
 8   depicts the conditions on December 11, 2015 --
 9        A.    Uh-huh.
10        Q.    -- you are not going to dispute that.
11   Right?
12        A.    I don't think so.  I mean, this is just
13   one photo.  It doesn't really show the whole thing.
14   Right?  I mean, you can't say this one photo is like
15   -- covers the whole area.  It's not fair to say that.
16        Q.    No --
17        A.    This one photo might cover this one small
18   area.  Sure.
19        Q.    And -- and nobody said the whole area.
20        A.    Okay.
21        Q.    I'm saying this --
22        A.    I thought that's what you said the first
23   question you asked.
24        Q.    If someone from Big Sky comes in and says
25   this photograph --
```
                                                        84

**John Meyer**

```
 1        A.    Uh-huh.

 2        Q.    -- accurately depicts this area shown in

 3   the photograph --

 4        A.    Yeah.

 5        Q.    -- on December 11, 2015 --

 6        A.    Sure.

 7        Q.    -- you would agree with that?

 8        A.    I -- yeah.  Provided the photos taken on

 9   December 11, 2015, yes.

10        Q.    That's -- that's not what the question

11   was.  Okay.

12        A.    I guess I don't understand the question.

13        Q.    Okay.  If someone from Big Sky comes in

14   and says this photograph accurately represents --

15        A.    Uh-huh.

16        Q.    -- the conditions --

17        A.    Yeah.

18        Q.    -- as shown in this area --

19        A.    Yeah.

20        Q.    -- as they existed on December 11, 2015 --

21        A.    Uh-huh.

22        Q.    -- are you going to say no, that is

23   incorrect?

24        A.    If somebody took the photo of this area,

25   then that represents the area.  Right.
```
                                                        85

**John Meyer**

1      Q.    And you can see in Exhibit 9 that there
2  are exposed rocks on the downhill side of the Cat
3  track.  Correct?
4      A.    Yes.  Over here?  Yeah.  On the right-hand
5  side, yes.
6      Q.    And you could --
7           THE REPORTER:  On the what side?
8           THE WITNESS:  The right-hand side.
9           THE REPORTER:  Oh, the right side.  Sorry.
10 BY MR. McINTOSH:
11     Q.    And you could see that those rocks on the
12 downhill side of the Cat track are not marked.
13 Correct?
14     A.    They don't look to be marked, no.
15     Q.    And anybody that is looking at that can
16 see that.  Correct?
17     A.    From this angle, yes.
18     Q.    It's obvious.  Right?
19     A.    From this angle, yes.
20     Q.    And you could see a warning sign on a post
21 straight ahead in the middle of this photograph.
22 Correct?
23     A.    I would never have seen that unless you
24 pointed it out.
25     Q.    If you looked, you could see it.  Correct?

**John Meyer**

```
 1        A.    I still am not convinced it's a warning
 2   sign.
 3        Q.    What do you think it is?
 4        A.    I don't know.  I didn't even know it was
 5   there until you pointed it out.
 6        Q.    Now I'm going to hand you what has been
 7   marked as Exhibit 10.
 8                        (Whereupon, Exhibit 10 was
 9                         marked for identification.)
10   BY MR. McINTOSH:
11        Q.    Do you recognize what is shown in Exhibit
12   10?
13        A.    No.
14        Q.    Do you recognize this as being the area at
15   Big Sky that is just around the corner from what was
16   shown in Exhibit 9?
17        A.    No.
18        Q.    Do you agree that this photograph shown in
19   Exhibit 10 accurately depicts the conditions in this
20   area as they existed on December 11, 2015?
21        A.    Yes.
22        Q.    And you can see in this -- in this
23   photograph, Exhibit 10, a Cat track going across the
24   top of the photograph in the sun.  Correct?
25        A.    No.  I don't see what you're talking
```

87

John Meyer

```
 1   about.
 2        Q.    You don't see the Cat track going across
 3   the top --
 4        A.    No.
 5        Q.    -- third of the picture in the sun?
 6        A.    What?  Way up here?
 7        Q.    Yes.  What you just put your finger on.
 8        A.    Yes.  I see -- yes.
 9        Q.    That Cat track is not marked on either the
10   uphill or downhill side, is it?
11        A.    I can't see that far.  I mean, probably
12   not.  It could be.  I don't know.
13        Q.    Do you see any markings in this
14   photograph?
15        A.    Right next to the skiers -- the two skiers
16   on the left side of the photo, those are just signs.
17   Those aren't markings, per se.
18        Q.    Do you see any markings on the Cat track
19   shown in Exhibit 10?
20        A.    Again, I can't see that far.  I can't -- I
21   can't see or read what this sign says.  So if there
22   were signs over here, I wouldn't be able to see or
23   read those signs.
24        Q.    Well, that's not the question.
25        A.    Okay.
```
                                                                    88

**John Meyer**

1     Q.   The question is do you see any markings on

2  the Cat track shown in Exhibit 10?

3     A.   I don't see any signs on the Cat track

4  marked on Exhibit 10.

5     Q.   Okay.  And you -- if you would have looked

6  at that on December 11, 2015, you could have seen the

7  same thing.  Correct?

8     A.   If you say so.

9     Q.   Do you dispute that?

10     A.   I don't remember.

11     Q.   You don't remember one way or the other?

12     A.   I don't remember.

13     Q.   There's a chairlift shown in Exhibit 10.

14  That is the triple chairlift that skis in the bowl at

15  Big Sky.  Do you remember skiing that chairlift prior

16  to your injury on December 11, 2015?

17     A.   No.

18     Q.   Do you remember if you did or did not, or

19  you just don't remember?

20     A.   I just don't remember.

21                   (Whereupon, Exhibit 11 was

22                    marked for identification.)

23  BY MR. McINTOSH:

24     Q.   Next I'm going to hand you what I have

25  marked as Exhibit 11.  Do you see there's a number of

89

John Meyer

1  ski runs named in Exhibit 11?  Do you see that

2  photograph?

3        A.    Yes.

4        Q.    And there's a sign pointing towards the

5  Challenger lift.  Correct?

6        A.    Yes.  There's one.

7        Q.    And is that the route that you took to get

8  to the Challenger chairlift on December 11, 2015?

9        A.    I don't remember.

10       Q.    How -- other than taking the route shown

11  in Exhibit 11, how else would you have got to the

12  Challenger chairlift?

13       A.    That was the first time I had skied there

14  in over 10 years.  I don't remember.  I don't know.

15       Q.    But my question is how else would you have

16  gotten there?

17       A.    I don't know.

18       Q.    And you can see that the Cat track shown

19  in Exhibit 11 is not marked on either the uphill or

20  downhill edge.  Correct?

21       A.    Cat track in Exhibit 11 is marked on both

22  the right side and the left side.

23       Q.    That's not marking the Cat track, but I'll

24  show you another photograph.

25                        (Whereupon, Exhibit 12 was

                                                    90

**John Meyer**

```
 1                              marked for identification.)
 2   BY MR. McINTOSH:
 3        Q.     That's Exhibit 12 I just handed you.   Do
 4   you see that?  Do you recognize that -- what is shown
 5   in Exhibit 12 to be the same Cat track?
 6        A.     I -- I don't know.  It might be.  It might
 7   not.  I have no idea.
 8        Q.     Okay.  Going back to Exhibit 11, doesn't
 9   the sign on the left simply say open?
10        A.     Looks like open.  I don't know what it
11   says underneath.
12        Q.     And the sign on the right says caution,
13   unmarked obstacles.  Correct?
14        A.     Yeah.  Probably.
15        Q.     Do you contend either of those are -- were
16   put there to mark the Cat track?
17        A.     It may have been.  I don't know.
18        Q.     The Cat track shown in Exhibit 12 does not
19   contain any markings on the uphill or downhill side,
20   does it?
21        A.     The Cat track on Exhibit 12 does not -- I
22   didn't catch the last part of what you said.
23        Q.     Does not contain any markings on the
24   uphill or the downhill side, does it?
25        A.     Doesn't look like it.
                                                      91
```

**John Meyer**

```
1        Q.    So if someone was skiing down that slope

2   on -- shown on the left-hand portion of Exhibit 12 --

3        A.    Uh-huh.

4        Q.    -- there would not be anything to --

5   there's no specific marking of the Cat track that

6   they would encounter.   Correct?

7        A.    If I were skiing down this slope here and

8   I hit this Cat track, there would be no marking, no.

9        Q.    Okay.  And that would be obvious to anyone

10  that was skiing across this Cat track.   Right?

11       A.    What do you mean?

12       Q.    If you're skiing this direction, the

13  direction shown in Exhibit 12, it would be obvious

14  that there's no markings on the uphill or downhill

15  side.

16       A.    Yeah.  But if you said this is the same

17  Cat track in 11 and 12 and you got markings on 11,

18  you could put the same markings on 12.

19       Q.    So you contain that a -- you contend that

20  an open marking is sufficient?

21       A.    No.  I didn't say that.

22       Q.    Do you contend that the open mark -- open

23  sign in Exhibit 12 is a -- is a hazard one?

24       A.    I'm saying on 12 -- in 11 it says caution,

25  and it's on the Cat track.   And so if there was a
```

92

John Meyer

```
 1   caution sign on the Cat track, above the Cat track,
 2   it would mark caution.
 3        Q.    If someone was skiing down a portion shown
 4   on the left-hand side of Exhibit 12 onto the Cat
 5   track --
 6        A.    Right.
 7        Q.    -- would that person see the unmarked
 8   obstacle sign shown on Exhibit 11?
 9        A.    I don't know.
10        Q.    Well --
11        A.    Like I said, if you can't see it anywhere
12   in 12, then I guess you probably wouldn't see it.
13   Right?  You could see it in 11, and I am guessing
14   that 11 -- if this is the same Cat track, you're
15   going to see it on the right-hand side as you're
16   going down the Cat track, but you're not going to see
17   it on your right-hand side farther down the Cat
18   track.
19        Q.    And do you agree that you skied this Cat
20   track shown on Exhibit 12 to get to the Challenger
21   chairlift?
22        A.    I don't remember.
23        Q.    If you didn't ski the Cat track show on
24   Exhibit 12 to get to the Challenger chairlift, how
25   did you get there?
```

93

**John Meyer**

1      A.    I feel like we -- this is like deja vu.   I
2  swear we just went over this.
3      Q.    If you could please just answer the
4  question, Mr. Meyer.
5      A.    Can you tell me the question again?
6      Q.    If you did not ski the Cat track shown in
7  Exhibit 12 to get to --
8      A.    How did I get --
9      Q.    Please let me finish the question.   If you
10  did not ski the Cat track shown in Exhibit 12 to get
11  to the Challenger chairlift --
12      A.    Uh-huh.
13      Q.    -- how did you get there?
14      A.    I think I said my first time -- I know I
15  said it the first time I answered the same question I
16  don't remember because I've only skied here once in
17  the last 10 years.
18      Q.    Mr. Meyer, see, it wasn't the same
19  question, though, because I was asking about
20  different areas.
21      A.    Oh, okay.   Ian, thank you for helping me
22  with my patience.
23      Q.    I have now handed you what has been marked
24  as Exhibit 13.
25                        (Whereupon, Exhibit 13 was

94

**John Meyer**

```
 1                          marked for identification.)
 2   BY MR. McINTOSH:
 3        Q.    Do you recognize what is shown in Exhibit
 4   13?
 5        A.    No.
 6        Q.    Do you recognize this as being the area
 7   just a little bit further beyond the Cat track that
 8   was shown in Exhibit 12?
 9        A.    Do I recognize this area being -- I don't
10   recognize this area, so I wouldn't recognize this
11   area being beyond or apart from or the same as 12.
12        Q.    Do you see the Cat track shown in the
13   middle of Exhibit 13?
14        A.    I see the Cat track in the middle of 13,
15   yes.
16        Q.    And you can see that that Cat track is not
17   marked from the run above it transitioning onto the
18   Cat track.  Correct?
19        A.    I can see that this ski run is not marked
20   before the Cat track.  Correct.
21        Q.    And you can also see that the transition
22   from the run onto -- the ski run onto the Cat track
23   is not a steep transition.  Correct?
24        A.    I don't know.  I mean, if you -- if you
25   take the photo from a different angle, it might be
```

95

**John Meyer**

```
 1    very steep.
 2         Q.    Okay.  Do you contend that's a steep
 3    transition from the ski run onto the Cat track shown
 4    in Exhibit 13?
 5         A.    From right here it doesn't look terribly
 6    steep, but there are other photos you provided that
 7    show it's very steep.
 8         Q.    Okay.  So now you do recognize this as
 9    being the area of your accident?
10         A.    No.  I didn't say that.
11         Q.    Well, then how can say that other
12    photographs show it as being very steep if you don't
13    recognize what's shown in Exhibit 13?
14         A.    Because I looked at the discovery
15    provided.
16         Q.    You can see on the right-hand side rocks.
17    Correct?
18         A.    Down here?
19         Q.    Correct.  The ones you're pointing -- no.
20    Right here, bottom right-hand corner of the
21    photograph, you can see rocks?
22         A.    Yeah.  Yeah.
23         Q.    Those rocks are not marked.  Correct?
24         A.    No, they're not.
25         Q.    And anyone that was standing right here
```

96

**John Meyer**

```
 1    could see that.  Correct?
 2         A.    I know that standing like taking this
 3    photo, yeah.  You could probably see the rocks, yeah.
 4         Q.    And do you agree this accurately depicts
 5    the conditions as they existed on December 11, 2015,
 6    in this area?
 7         A.    If you say so.  Now I'm just starting to
 8    realize, like so it's the Cat track.  But does this
 9    Cat track come around here?  Is that what that is?
10    Isn't that what that is essentially?
11         Q.    I don't even know what you're asking, but
12    -- but --
13         A.    I'm trying to --
14         Q.    This is not for you --
15         A.    I'm trying to understand --
16         Q.    Okay.
17               MR. McINTOSH:  Can you reread my last
18    question, please?
19                         (Whereupon, the requested
20                          record was read.)
21               THE WITNESS:  Can we go back three
22    questions that you asked?
23    BY MR. McINTOSH:
24         Q.    No.  I'd like you to answer the question
25    that I just asked, please.
```

97

**John Meyer**

1      A.     I'm starting to realize what you're asking

2  from three questions ago.

3      Q.     Can you please just answer the question as

4  asked?

5      A.     So I think that this photo is deceiving,

6  that you can't see the Cat track.  And so it might be

7  very steep going over here because you can't see it.

8      Q.     Okay.  What do you -- you just pointed out

9  the Cat track, and it's clearly visible in the middle

10  of this photograph.

11      A.     But I'm asking you, does it go -- where

12  does it go?  Like I see it coming out in the middle

13  of the photo.  But does it go to the right?  Does it

14  go to the left?  Where does the Cat track go?

15      Q.     Okay.  Mr. Meyer, if you would like to

16  take some depositions in this case, then you can, but

17  now is not the time for us to answer your questions

18  under oath.  So can you please answer the question I

19  asked you, which is --

20      A.     I'm just trying to understand like what

21  question you asked four questions ago.

22      Q.     The question is, do you agree that Exhibit

23  13 accurately depicts the conditions as they existed

24  on December 11, 2015, at the time of your accident?

25      A.     In this area, yes.

                                                    98

**John Meyer**

```
 1        Q.     Okay.

 2                           (Whereupon, Exhibit 14 was

 3                           marked for identification.)

 4   BY MR. McINTOSH:

 5        Q.     I'm now handing you what has been marked

 6   as Exhibit 14.  Do you recognize Exhibit 14 as being

 7   a sign from the bottom of the Challenger chairlift?

 8        A.     No.  But I believe you.

 9        Q.     Do you agree that that's how -- that's how

10   that sign looked at the bottom of the Challenger

11   chairlift on December 11, 2015?

12        A.     I don't remember, but I believe you.

13        Q.     And that -- this sign states:  "Most

14   difficult.  Experts only."  Do you see that?

15        A.     I see where it says "avalanches and moving

16   snow are inherent risks."

17        Q.     And do you see where it says most

18   difficult, experts only?

19        A.     Yeah.

20        Q.     What does that mean to you?

21        A.     Expert skiers.

22        Q.     Are you an expert skier -- or I should say

23   -- let me strike that.

24               On December 11, 2015, were you an expert

25   skier?
                                                          99
```

**John Meyer**

1      A.    I was comfortable riding black diamond,

2  yeah.

3      Q.    Does, when a sign says it's most

4  difficult, experts only, does that indicate to you

5  that the terrain will be marked less heavily than

6  beginner terrain?

7      A.    No.  Not necessarily.

8      Q.    Let me say it differently.  Do you expect

9  -- when you're skiing expert terrain, do you expect

10  there to be as many hazards marked on expert terrain

11  as there is on beginner terrain?

12      A.    No.  Not necessarily.

13      Q.    Okay.  So you agree that less hazards are

14  marked in expert terrain?

15      A.    Not necessarily.

16      Q.    Well --

17      A.    Well what?

18      Q.    You said -- you said you don't -- I mean,

19  which is it?  Do you expect more or less markings on

20  expert terrain as compared to beginner terrain?

21      A.    I think it depends on a lot of things.

22      Q.    Such as?

23      A.    Depends on the ski patrol, what they want

24  to do, what they think.

25      Q.    Where -- where are you getting this belief

100

**John Meyer**

```
 1   from?

 2       A.    I don't know.

 3       Q.    How many days total -- on December 11,

 4   2015, how many days total had you skied or

 5   snowboarded inbounds at a ski area?

 6       A.    Can you repeat the question?

 7           MR. McINTOSH:  If you could read it back,

 8   please.

 9                        (Whereupon, the requested

10                         record was read.)

11           THE WITNESS:  I don't quite understand the

12   question.  Like how many days before December 11th

13   had I skied inbounds?

14   BY MR. McINTOSH:

15       Q.    Yes.  It sounds like you do understand the

16   question.

17       A.    I had a pass to Snow Bowl.  I had a pass

18   at Bridger.  I don't -- I can't quantify a lot.  As

19   much as I could.  I love skiing.  It's like my

20   favorite thing.

21       Q.    And that most difficult, experts only,

22   it's your testimony that meant nothing to you about

23   how heavily or how many -- how many hazards would be

24   marked?

25       A.    To me, black diamonds don't necessarily
```
101

**John Meyer**

```
 1    indicate how many hazards are going to be marked.  It
 2    just means the terrain is more difficult.
 3         Q.    Do you expect moguls to be marked?
 4         A.    Yeah.  When I go to -- well, what do you
 5    mean by marked?  Like when I go to Bridger, ski at
 6    Bridger, they have a huge mogul field then.  They
 7    have a sign that says black diamond, so it's marked
 8    in that sense.
 9         Q.    And do you expect anything other than a
10    sign saying black diamond to mark those hazards,
11    being the moguls?
12         A.    I don't think of a mogul as a hazard.
13         Q.    Okay.  You don't think -- and why do you
14    say that?  Why do you say a mogul is not a hazard?
15         A.    Because it's fun.
16         Q.    Excuse me?
17         A.    It's fun.  They're fun.
18         Q.    Okay.  So that variation in terrain you do
19    not expect to be marked?
20         A.    Not on moguls, no.
21         Q.    You could safely navigate a mogul, which
22    is a hump of snow.  Correct?
23         A.    Yeah.  Yeah.  I'm okay.  I'm not great at
24    it, but yeah.
25         Q.    And on the backside of a mogul, you're
```

102

**John Meyer**

1   going from an area that's higher to an area that's

2   lower.  Correct?

3           A.    Uh-huh.

4           Q.    Is that a yes?

5           A.    Yes.

6                             (Whereupon, Exhibit 15 was

7                              marked for identification.)

8   BY MR. McINTOSH:

9           Q.    I'm now handing you what's been marked as

10  Exhibit 15.  Do you recognize that photograph from

11  the Challenger lift shack on December 11, 2015?

12          A.    I'm going to answer your question by

13  giving you an answer that's probably not

14  satisfactory.  Mike, do you ski?

15          Q.    You don't get to ask questions now.

16  Please just answer the question.

17          A.    So do you remember what socks you were

18  wearing two weeks ago?

19          Q.    Please just answer the question.

20          A.    How am I supposed to remember if a ski

21  shack had this sign up on whatever day?

22          Q.    So you don't remember whether that sign

23  was up on December 11, 2015, or not?

24          A.    No.  I don't remember.

25          Q.    Okay.

                                                    103

**John Meyer**

```
 1                        (Whereupon, Exhibit 16 was
 2                        marked for identification.)
 3   BY MR. McINTOSH:
 4        Q.    I'm now handing you what has been marked
 5   as Exhibit 16.  Do you recognize what's shown in
 6   Exhibit 16?
 7        A.    I recognize this as a photograph that you
 8   put in discovery, yes.
 9        Q.    Do you recognize this as being a
10   photograph going up the Challenger chairlift?
11        A.    No.
12        Q.    Do you recognize these conditions that
13   existed on December 11, 2015?
14        A.    If you say so.
15        Q.    Do you see the Cat tracks shown in Exhibit
16   16?
17        A.    In the middle of the photo?
18        Q.    Correct.
19        A.    Barely.  I wouldn't call that a Cat track
20   if I were -- if you hadn't said that, I wouldn't have
21   labeled that as a Cat track.
22        Q.    What would you label it as?
23        A.    I don't know.
24        Q.    Do you see the exposed rocks on the
25   downhill side of the Cat track?
                                                      104
```

**John Meyer**

1        A.     On the right-hand side?

2        Q.     Pretty much all across.  There's more on

3    the right-hand side but pretty much all across.

4        A.     I don't see exposed rocks all across.  I

5    do see rocks or logs or something on the right-hand

6    side.

7        Q.     And you can see that the rocks on the

8    downhill side of the Cat track are not marked.

9    Correct?

10       A.     Yes.

11       Q.     And you can see there's no marking coming

12   from the ski run onto the Cat track on the uphill

13   side.  Correct?

14       A.     You can see there's no marking from the

15   ski run -- I don't see any marking at all in this

16   photo.  I see no marking.

17       Q.     Okay.  So my question is correct.  There

18   are no markings coming from the ski run onto the Cat

19   track.  Correct?

20       A.     That is correct.

21       Q.     And you could -- if you looked at that,

22   you could see that when riding up the Challenger

23   chairlift.  Correct?

24       A.     Yes.

25                          (Whereupon, Exhibit 17 was

                                                      105

John Meyer

```
1                             marked for identification.)
2    BY MR. McINTOSH:
3         Q.    Next I'm going to hand you what I've
4    marked as Exhibit 17.  Do you recognize what is shown
5    in Exhibit 17?
6         A.    That looks like some spicy skiing.
7         Q.    What do you mean by that, some spicy
8    skiing?
9         A.    I mean it's not deep blower pow.  That is
10   -- that's spicy skiing, meaning yeah.
11        Q.    There are a lot of exposed rocks in
12   Exhibit 17.  Correct?
13        A.    Correct.
14        Q.    And do you agree that this is how the top
15   of Challenger looked on December 11, 2015?
16        A.    No.  I don't remember.
17        Q.    Okay.  You would agree, though, that
18   looking at this photograph, it's plainly obvious that
19   these are early season conditions.  Correct?
20        A.    Or late season.
21        Q.    A lot of rocks exposed.  Correct?
22        A.    Yeah.
23        Q.    And those rocks are not marked
24   individually, are they?
25        A.    No.  There is this fence here, though.
```

106

**John Meyer**

1      Q.    Do you contend that fence -- the purpose

2   of that fence is to mark the rocks?

3      A.    If I were up here and I saw a fence, I

4   wouldn't be skiing towards the fence.

5      Q.    I'm sorry.  Say that again.

6      A.    If I were above and I saw a fence, I

7   probably wouldn't ski towards a fence.

8      Q.    Well, look at the gap in the fence.  Is

9   that where you would probably ski to if you were up

10  above?

11     A.    I'd think about it.  Absolutely.

12     Q.    And there are rocks in that gap that are

13  not marked.  Correct?

14     A.    Yes.

15     Q.    And you could tell all of these things

16  simply by looking down when riding the Challenger

17  chairlift.  Correct?

18     A.    I don't know.

19     Q.    Well, do you deny that you can see all

20  those things from this photograph?

21     A.    Well, was this photograph taken from the

22  Challenger chairlift?

23     Q.    Do you -- do you dispute that it is?

24     A.    Are you saying it is?

25     Q.    Yeah.

                                                    107

**John Meyer**

1     A.    You're saying this photo was taken from --

2  while someone was riding the Challenger chairlift?

3     Q.    Yes.   I said that at the beginning.   I

4  said this is a photograph --

5     A.    Uh-huh.

6     Q.    -- showing near the top of the Challenger

7  chairlift.

8     A.    That's different than saying it was taken

9  while on the Challenger chairlift.

10    Q.    What's the difference?

11    A.    You're telling me that there's no

12  difference?

13    Q.    Mr. Meyer, if you're standing -- if you're

14  either riding the Challenger chairlift or standing

15  below where this photograph may have been taken from,

16  anyone could see all of these rocks.   Correct?

17    A.    Yeah.

18    Q.    That would be plainly obvious to someone

19  approaching this area from below.   Right?

20    A.    If -- whoever took this photo can see

21  these rocks.   We can agree on that, yeah.

22  Absolutely.

23    Q.    That -- they're obvious?

24    A.    Yeah.

25                    (Whereupon, Exhibit 18 was

108

John Meyer

```
 1                           marked for identification.)
 2   BY MR. McINTOSH:
 3        Q.    Next I'm handing you what's been marked as
 4   Exhibit 18.  Do you recognize that as being a
 5   photograph at the -- taken at the top of the
 6   Challenger chairlift?
 7        A.    No, I don't.
 8        Q.    Do you agree that this shows the
 9   conditions as they existed on December 11, 2015?
10        A.    Well, I answered your first question no, I
11   don't.  So, again, if you say it is, then it must be.
12   Right?
13        Q.    Do you agree that that sign -- that hazard
14   sign in the middle of Exhibit 18 was present on
15   December 11, 2018 -- excuse me -- 2015?
16        A.    I don't remember.
17        Q.    You don't remember one way or the other?
18        A.    No.  I don't remember.
19        Q.    Can you read what that sign says?
20        A.    Which one?  The yellow one?
21        Q.    The yellow one right in the middle of the
22   photograph.
23        A.    It says caution.
24        Q.    What else does it say?
25        A.    I can't read it.
```

109

**John Meyer**

```
 1                      (Whereupon, Exhibit 19 was
 2                       marked for identification.)
 3    BY MR. McINTOSH:
 4         Q.    I'll hand you a close-up photograph of
 5    that sign.  Can you read it now?
 6         A.    "Caution.  Unmarked obstacles."
 7         Q.    Do you remember skiing by that sign on
 8    December 11, 2015?
 9         A.    No.  I don't remember.
10         Q.    Do you dispute that you skied by it?
11         A.    I don't remember.
12         Q.    That sign is obvious from the vantage --
13    strike that.
14               That sign is obvious.  Correct?
15         A.    What do you mean?  From right here, from
16    -- whoever took the photo obviously took a photo of a
17    caution sign, yes.
18         Q.    And -- and from that vantage point that
19    sign is obvious.  Right?
20         A.    Yeah.  Seems like it.
21         Q.    And what does that mean to you?  If you --
22    if you get off a chairlift --
23         A.    Uh-huh.
24         Q.    -- and you see a sign that says caution,
25    exclamation point, unmarked obstacles, what does that
```
110

**John Meyer**

```
 1   mean to you?
 2        A.    It means be careful because there's shit
 3   that's popping out of the snow.
 4        Q.    Anything else?
 5        A.    Be careful.
 6        Q.    Did you ski the Challenger chairlift at
 7   all on December 11, 2015, before your wreck when you
 8   were injured?
 9        A.    I think we might have.
10        Q.    Okay.  So you skied -- how many times did
11   you ski the Challenger chairlift on December 11,
12   2015, before you were injured?
13        A.    I'm not 100 percent sure.  I think maybe
14   once.
15                            (Whereupon, Exhibit 20 was
16                             marked for identification.)
17   BY MR. McINTOSH:
18        Q.    Now I'll hand you what is marked -- has
19   been marked Exhibit 20.  Do you recognize what is
20   shown in Exhibit 20?
21        A.    No.
22        Q.    Do you agree that that's another caution
23   sign that states caution, unmarked obstacles?
24        A.    Uh-huh.
25        Q.    Is that a yes?
```

**John Meyer**

1          A.     Yes.

2          Q.     And do you recognize this as being the

3     area where you start to -- start to ski down off the

4     Challenger chairlift?

5          A.     I don't remember.

6          Q.     Okay.  Do you -- do you agree that this

7     accurately depicts the conditions as they existed in

8     this area on December 11, 2015?

9          A.     If you say so.

10         Q.     You don't remember?

11         A.     I don't remember.

12         Q.     Okay.  Now, you said in your discovery

13    responses that shortly before your injury, you skied

14    into a closed area.  Correct?

15         A.     Yeah.  Uh-huh.

16         Q.     I'm going to hand you what I have marked

17    as Exhibit 21.

18                          (Whereupon, Exhibit 21 was

19                           marked for identification.)

20    BY MR. McINTOSH:

21         Q.     Do you see the rope line on the right-hand

22    side of that photograph?

23         A.     Yep.

24         Q.     All right.  Now --

25         A.     That looks like those were quite a ways. 112

**John Meyer**

1      Q.    I'll hand you -- at the same time I'll

2  hand you Exhibit 22.

3                        (Whereupon, Exhibit 22 was

4                         marked for identification.)

5  BY MR. McINTOSH:

6      Q.    Okay.  You now have in front of you

7  Exhibits 21 and 22.

8      A.    Uh-huh.

9      Q.    Is that a yes?

10      A.    Yes.

11      Q.    And there's a rope line shown in those two

12  photographs.  Correct?

13      A.    Yes.

14      Q.    Is that the -- does that rope line show

15  the out-of-bounds area that you skied into on

16  December 11, 2015?

17      A.    I don't remember.

18      Q.    Okay.  How -- this closed area, how was it

19  marked as closed?

20      A.    It wasn't.

21      Q.    It wasn't marked at all?

22      A.    I don't think so, no.

23      Q.    Nothing?

24      A.    No.

25      Q.    Then how did you know it was closed?

                                                   113

**John Meyer**

```
 1        A.    Ski patroller came and told us.
 2        Q.    What -- what did the ski patroller say?
 3        A.    I don't remember exactly, but it was
 4   something -- he said this area is closed or we're
 5   closing or --
 6        Q.    So they may have been in the process of
 7   closing it?
 8        A.    Sure.
 9        Q.    Okay.  Who -- did you -- were there one or
10   two ski patrollers?
11        A.    I thought there were two, but Amanda says
12   there was one that she remembered.
13        Q.    Who was the ski patroller?
14        A.    I didn't ask his name.  I don't remember.
15        Q.    A man or a woman?
16        A.    Amanda thinks that it was a man, and I
17   thought it was a man and a woman.
18        Q.    Which of -- which of the ski patroller,
19   man or woman, do you claim told you we are closing
20   this area?
21        A.    That's not quite right.  How the hell did
22   that work?  So we -- we ski.  We get into an area and
23   they -- the two patrollers that I remember said this
24   area is closed.  And I thought the woman -- the guy,
25   I thought, pointed us to skier's left saying you need
```

114

**John Meyer**

1    to go back into an open area.  And I thought the

2    woman on the uphill side of him said we didn't have

3    signs.  But that doesn't quite make sense because

4    they're trying to close the area.  So I'm not quite

5    sure how that works.

6        Q.   Well, let's -- let's back up so I make

7    sure I understand.

8        A.   Yeah.

9        Q.   Why don't you start describing everything

10   that you remember from the time you got off the

11   Challenger chairlift --

12       A.   Yeah.

13       Q.   -- shortly before you were injured in

14   as much detail as you possibly can.

15       A.   The only thing I can -- the only thing I

16   can see in my mind's eye is -- fuck, nothing.  I

17   can't see a thing.  All I see is there's a male and

18   female, and I am --

19       Q.   Well, I want to back up further to -- to

20   right when you got off the chairlift.  Do you

21   remember getting off the Challenger chairlift before

22   you were injured?

23       A.   No, no, I don't.

24       Q.   Do you remember if you were sitting on the

25   right or left?

                                                   115

**John Meyer**

```
 1          A.    I don't remember.
 2          Q.    Do you remember the path that you took to
 3    get down to this area that you claim was closed or
 4    being closed?
 5          A.    No.
 6          Q.    Okay.  Do you remember how many warning
 7    signs you passed getting down to the area that was
 8    closed or being closed?
 9          A.    I thought that when we got off the
10    chairlift, we -- I can't remember.
11          Q.    Okay.  No recollection at all?
12          A.    I told you when we were at the discovery
13    hearing what I remembered.
14          Q.    Mr. Meyer, this is your opportunity to
15    testify under oath.  So can you please testify under
16    oath and tell me what you remember from the time you
17    got off the chairlift until the time that you reached
18    this area that you say was closed or being closed or
19    whatever was going on?
20          A.    For whatever reason, I seem to think that
21    we went left off the chairlift.  And I don't know why
22    I say that.
23          Q.    Skier's left or looker's left?
24          A.    Well, as soon as you get off the
25    chairlift, you're headed left on your skis, I
```

116

John Meyer

1    thought.

2        Q.    Okay.  And where did you go from there?

3        A.    Down.  I don't -- I -- yeah.  I don't

4    know.

5        Q.    Did you ski by these warning signs shown

6    in Exhibit 19 and 20?

7        A.    Not that I remember.

8        Q.    Well, do you dispute that you did or you

9    just don't remember?

10       A.    I don't remember.

11       Q.    Okay.  Is this the area that was closed or

12   being closed shown in Exhibits 21 and 22?

13       A.    Could be.  I don't know.  Maybe you guys

14   took the photos after.  I have no idea.

15       Q.    Okay.  No.  You just don't know?

16       A.    I don't know.

17       Q.    Okay.  Then what do you remember about --

18   you said you spoke to some ski patrollers on the run.

19       A.    Yeah.

20       Q.    What do you remember about that

21   conversation?

22       A.    They said something to the effect of this

23   area is closed.

24       Q.    Do you remember anything else that those

25   one or more ski patrollers allegedly said to you on

117

John Meyer

1    that day?

2        A.    I thought there was a female patroller

3    that said we've run out of signs or we had run out of

4    signs, something to that effect.

5        Q.    You think that she -- the female patroller

6    said we've run out of signs -- we ran out of signs?

7        A.    I think I -- yes.  I thought that we got

8    into an area.  Ski patrol came and found us and said

9    this area is closed.  We have run out of signs.  The

10   female said that to me.

11       Q.    But your wife, Amanda --

12       A.    Yes.

13       Q.    -- thinks that that female wasn't there?

14       A.    Yes.

15       Q.    Okay.  Do you think you're just -- is it

16   possible you're just making this up?

17       A.    When I was in the hospital, they said that

18   people with head injuries can do what's called

19   confabulation.  It's when you just make things up to

20   a -- because you get asked a question and you want to

21   provide a response.

22       Q.    And so do you agree that this -- what you

23   remember this ski patroller saying to you on

24   December 11, 2015, might be something that you're

25   just confabulating?

                                                    118

**John Meyer**

```
 1        A.     No.

 2        Q.     So you do think it's true?

 3        A.     I do think it's true.

 4        Q.     Okay.  Then how do you explain the fact

 5   that your wife, Amanda, doesn't remember that ski

 6   patroller being there?

 7        A.     Maybe she doesn't remember her being

 8   there.

 9        Q.     What did the ski patroller look like?

10        A.     I've skied how many days since that?

11   Every ski patroller wears red.  She was wearing red.

12   She had a helmet on.

13        Q.     What color was the helmet?

14        A.     Probably black.  I don't know.

15        Q.     You don't know?

16        A.     How would I remember what color a ski

17   patroller's helmet was three years ago?

18        Q.     So the answer is you don't remember?

19        A.     I don't know.  I don't know what any ski

20   patroller's helmet color is at Bridger Bowl.

21        Q.     How tall was she?

22        A.     She wasn't huge.  Like Amanda is six foot.

23   She was shorter than Amanda.

24        Q.     Okay.  How much shorter?

25        A.     I don't know.
                                                      119
```

**John Meyer**

```
 1        Q.    Was she --
 2        A.    She's not four foot tall.  Somewhere
 3   between -- I don't know.  Fuck.  I don't know.  How
 4   tall was that gal?  5'4" to 5'9".
 5        Q.    So are you just throwing out the numbers
 6   that include the majority of the population of
 7   females in the United States?
 8        A.    No.
 9        Q.    Do you actually remember her being between
10   5'4" and 5'9" or are you just making that up?
11        A.    Well, I remember her not being terribly
12   short and not being terribly tall.
13        Q.    What color was her hair?
14        A.    I don't remember.
15        Q.    Was she heavy or thin or how can you
16   describe her build?
17        A.    She was -- she was athletic.  Most
18   patrollers are.  Right?
19        Q.    Are you saying that because you just think
20   most patrollers are, or do you remember that?
21        A.    No.  I'm saying it because I think that
22   she was relatively athletic.
23        Q.    Okay.  Can you provide any more of a
24   description of her?
25        A.    No.
```
                                                    120

**John Meyer**

```
 1        Q.    What kind of backpack was she wearing, if
 2    any?
 3        A.    I don't know.
 4        Q.    Do you remember if she was even wearing a
 5    backpack?
 6        A.    I don't remember.
 7        Q.    What did the male ski patroller -- what
 8    did he look like?
 9        A.    I don't remember.
10        Q.    Was he tall or short?
11        A.    I don't remember.
12        Q.    Heavy or thin?
13        A.    He was probably -- how tall was he -- I
14    don't remember.  Fuck, I don't know.  I don't
15    remember him being terribly short.  He must have been
16    six-foot ballpark.
17        Q.    Was he wearing a helmet?
18        A.    I don't remember.  Probably.  They all
19    wear helmets, don't they?
20        Q.    Was she wearing a helmet?
21        A.    They all wear helmets.
22        Q.    So you think they were both wearing
23    helmets?
24        A.    I think they were.
25        Q.    And then it's your testimony that those
```
121

**John Meyer**

1   ski patrollers pointed you out and said go over to

2   the left?

3        A.    Yeah.

4                    (Whereupon, Exhibit 23 was

5                      marked for identification.)

6   BY MR. McINTOSH:

7        Q.    I'm handing what you has been marked as

8   Exhibit 23.  Is Exhibit 23 -- is that the area to the

9   left that they pointed you towards and told you to go

10  towards?

11       A.    Could have been.

12       Q.    You don't remember?

13       A.    No.  I don't remember.

14       Q.    You can see the black diamond marking on

15  the tree.  Correct?

16       A.    I see that, yeah.

17       Q.    But you don't remember them telling you to

18  go this way as shown in Exhibit 23?

19       A.    I don't know the terrain.  I -- again,

20  I've skied Big Sky once in the last 10 years or so,

21  twice now, because after the accident either -- but I

22  don't remember how -- what the -- I don't remember --

23  like, you know, sometimes you ski a run a few times,

24  and you know like go ski Bridger.  Well, the -- yeah.

25  I mean, if you say this -- this leads to this, I have

122

John Meyer

```
 1    to believe you, I guess.
 2         Q.    Well, do you dispute that what is shown in
 3    Exhibit 23 is the area to the left of the areas that
 4    we just looked at in -- in Exhibits 21 and 22?
 5         A.    It looks like it's the same photo, because
 6    you can see these black and white and the black and
 7    white.  So yeah.  With -- yeah.  So must be the same.
 8                             (Whereupon, Exhibit 24 was
 9                             marked for identification.)
10    BY MR. McINTOSH:
11         Q.    I'll hand you what I have marked as
12    Exhibit 24.  Exhibit 24 is how the ski run looks
13    looking down when you are in approximately the same
14    area as the skier shown in Exhibit 23.  Correct?
15         A.    I don't know.  Yeah.  Sure.
16         Q.    Well, do you dispute that?
17         A.    I -- I don't dispute it.  I just don't
18    know.
19         Q.    Okay.  Do you agree that Exhibit 24
20    accurately depicts the conditions as they existed on
21    December 11, 2015?
22         A.    Can we slow down?  I'm trying to reorient
23    myself here to this photo.  In 23, what is that dark
24    -- is it a shadow?  What is above that guy skiing?
25         Q.    I don't know what you're talking about,
```

123

John Meyer

```
 1   Mr. Meyer.
 2        A.    In Exhibit 23 there is some -- some --
 3   something black above this guy.  Do you see that,
 4   darker?
 5        Q.    Looks like a path where skiers ski.
 6        A.    Okay.  You think that's a Cat track?
 7        Q.    That's not what I said.  But please just
 8   answer the question, Mr. Meyer.
 9        A.    I'm just trying to -- you're saying --
10   you're trying to go from you skied from 23 to 24.
11   Right?  And I am saying I'm trying to figure out how
12   23 and 24 come together.
13        Q.    Exhibit 24 accurately depicts the Highway
14   ski run as it existed on December 11, 2015.  Do you
15   agree?
16        A.    No.  Not really.
17        Q.    Okay.  Tell me what's different from
18   Exhibit 24 to the conditions as they existed on
19   Highway on December 11, 2015?
20        A.    You said it accurately depicts, but this
21   is a two-dimensional -- like this is not -- doesn't
22   actually capture the whole thing.
23        Q.    Okay.  Other than the fact that this is
24   two-dimensional and this is three-dimensional --
25        A.    Uh-huh.
```
                                                        124

**John Meyer**

1      Q.      -- is there anything different about what

2   is shown in Exhibit 24 different than the conditions

3   as they existed on December 11, 2015?

4      A.      I don't know.

5      Q.      Okay.  And you can clearly see the Cat

6   track at the bottom of Exhibit 24.  Correct?

7      A.      Yes.

8      Q.      It's obvious.  Right?

9      A.      Not overwhelming.  Is it obvious?  Yeah.

10  Sure.  It's obvious.  We'll go with that.

11     Q.      It's not hidden.  Right?

12     A.      You know what's hidden is the roll.

13  Because when you cited to the court, you basically

14  said, hey, this is an obvious Cat track that he

15  missed.  But when you look at the photo that you

16  provided the court -- do you have it here?

17     Q.      Mr. Meyer, please just answer the

18  question.

19     A.      So there's people -- no.  It's not

20  obvious.  It's not obvious at all.  Because if there

21  were skiers on here, you'd see the skis, depending on

22  where they are in the Cat track.  So the Cat track is

23  not obvious.

24     Q.      Mr. Meyer, looking at Exhibit 24, is it

25  your testimony that the Cat track shown in Exhibit 24

125

John Meyer

```
 1    is hidden?
 2         A.    Part of it, yes.
 3         Q.    Which part of it?
 4         A.    The part closer to me.
 5         Q.    Mr. Meyer, a skier standing on the Highway
 6    as shown in Exhibit 24 looking down can obviously see
 7    that there is a Cat track at the bottom of the run.
 8    Correct?
 9         A.    They wouldn't see the whole Cat track.
10         Q.    But they can see there is a Cat track
11    there.  Correct?
12         A.    You're providing photos that don't
13    actually -- okay.  You want to -- okay.  Yeah.  Sure.
14    Yeah.
15         Q.    Okay.  So you agree that someone is
16    standing at the top of Highway as is shown in Exhibit
17    24, can obviously see the Cat track.  Correct?
18         A.    Sure.  Yeah.
19         Q.    Next I'm going to hand you what has been
20    marked as Exhibit 25.
21                        (Whereupon, Exhibit 25 was
22                         marked for identification.)
23    BY MR. McINTOSH:
24         Q.    And that is another photograph taken on
25    the Highway ski run looking down at the Cat track.
```

126

**John Meyer**

```
 1    Correct?
 2         A.    Uh-huh.  This is getting close to the one
 3    that you provided to the court.
 4         Q.    And you agree that Exhibit 25 accurately
 5    depicts the conditions as they existed on
 6    December 11, 2015.  Correct?
 7         A.    If you say so, yes.
 8         Q.    Okay.  And, again, the Cat track is
 9    obvious in Exhibit 25.  Correct?
10         A.    Not the whole thing.
11         Q.    That's not the question I asked.
12         A.    That's the answer I gave.
13         Q.    It's -- it's obvious looking down this
14    photograph that there is a Cat track shown at the --
15    at -- strike that.
16               It's obvious from Exhibit 25 looking
17    downhill that there's a Cat track below.  Correct?
18         A.    No.  It's not obvious.
19         Q.    You don't think that Cat track is obvious?
20         A.    No.  I -- you're missing a whole part of
21    the Cat track.  You can't even see the guy's skis.
22         Q.    That's not the question I asked, Mr.
23    Meyer.  I asked is it obvious that there is a Cat
24    track there?
25         A.    No.  It's not obvious.
```

127

John Meyer

1    Q.    Okay.  So it's your testimony that that

2  Cat track is hidden?

3    A.    Yes.  Part of that Cat track is hidden.

4    Q.    Okay.  Mr. Meyer, what I'd like to have

5  you do is draw your path down the ski run on Exhibit

6  25 to your accident site?

7    A.    I don't remember.

8    Q.    Okay.  So you don't remember where it was

9  on the Highway ski run that you -- where you

10  transitioned from the Highway onto the Cat track?

11    A.    No.

12    Q.    Okay.  So you can't draw your path?

13    A.    No.

14    Q.    Okay.  Going back to 24, could you please

15  get that in front of you.

16    A.    Yeah.

17    Q.    How far do you think that is from where

18  the photograph is taken down to the Cat track shown

19  in Exhibit 24?

20    A.    Can you ask the question again?

21    Q.    Do you think that's a quarter mile -- you

22  think that photograph is taken a quarter mile above

23  the Cat track?

24    A.    Can -- so do I think this photo is taken a

25  quarter -- I have no idea.

                                                    128

**John Meyer**

1      Q.    You have no estimate of how far that is?

2      A.    No.

3      Q.    How about Exhibit 25?  How far is it from

4  where that photograph is taken down to the Cat track?

5      A.    I don't know.  I -- I don't -- I don't

6  estimate things like that, like --

7      Q.    Would you agree it's at least 100 yards?

8      A.    I don't estimate -- I don't know.  Could

9  be.  Could be less.

10      Q.    But, again, you don't know where you were

11  skiing on the Highway run?

12      A.    I didn't even know I was on the Highway

13  run until you just told me.

14      Q.    And you don't know where you came from the

15  Highway run onto the Cat track?

16      A.    We got told you're in a closed area.  Go

17  out of here.  And then we went down.  I come over a

18  huge rollover, hit a Cat track, tried to stay on my

19  skis.  I'm turning left.  I'm pushing into my skis to

20  stay left.  The next thing you know I blow out.

21      Q.    Okay.  That wasn't my question, Mr. Meyer.

22  My question was where --

23      A.    Do you mind if I go -- do you mind if I go

24  to the bathroom?

25      Q.    Okay.  As soon as we finish this question 129

**John Meyer**

```
 1    then we can do that.  Okay?
 2         A.    Can I go to the bathroom now?
 3         Q.    So you're not going to answer the question
 4    as asked?
 5         A.    Can I go to the bathroom?
 6         Q.    You're refusing to answer the question as
 7    it has been asked of you?
 8         A.    Can I go to the bathroom?
 9         Q.    As soon as you can answer this question --
10         A.    I'm going to the bathroom.
11         Q.    Okay.
12               THE VIDEOGRAPHER:  Do you want to go off
13    record?
14               MR. McINTOSH:  Sure.
15               THE VIDEOGRAPHER:  We're going off the
16    record.  It's 12:16.
17                         (Whereupon, a break was then
18                          taken.)
19               THE VIDEOGRAPHER:  We're back on the
20    record.  It's 12:25.
21    BY MR. McINTOSH:
22         Q.    Okay.  Mr. Meyer, we're back on the
23    record.  And I believe I was asking you where you
24    skied from the Highway run onto the Cat track, and I
25    think you said you don't know.  Is that right?
                                                         130
```

**John Meyer**

```
 1        A.    Yeah.  By looking at this photo, I can't
 2   tell you where exactly I ran into the Cat track.
 3        Q.    But even -- even -- even setting aside the
 4   photo, can you tell me where you skied on the ski run
 5   onto the Cat track?
 6        A.    All I remember is going over a rollover
 7   and hitting a Cat track.
 8        Q.    Okay.  And -- and you don't know -- and
 9   you don't know where that occurred?
10        A.    In Big Sky.
11        Q.    That's as close as you can come?
12        A.    Uh-huh.
13        Q.    Is that a yes?
14        A.    Yes.
15        Q.    Okay.  Earlier we were talking about the
16   closed area that was shown on Exhibits 21, 22.  Do
17   you recall that discussion?
18        A.    Can you refresh my memory?
19        Q.    Do you recall you said that you skied into
20   an area that was either closed or being closed?  Do
21   you remember that?
22        A.    We were skiing down and patrol came and
23   said this area is closed and you have to go that way.
24        Q.    To the left?
25        A.    Yes.
                                                    131
```

**John Meyer**

```
 1        Q.    Did you duck a rope to get into that
 2   closed area?
 3        A.    No.
 4        Q.    Was the rope shown in Exhibit 22 up on
 5   December 11, 2015?
 6        A.    I don't remember seeing this rope.
 7        Q.    Okay.
 8        A.    We were told the area was closed.
 9        Q.    Do you know whether the rope was up or
10   not?
11        A.    If the rope was up we wouldn't have skied
12   under it.  So it must not have been up if you're
13   saying we were in this area.
14        Q.    I don't know where you were.  I'm asking
15   you.
16        A.    I'm telling you that patrol came, said
17   this area is closed.  Pointed us to the right way.
18   There's some documents in discovery that you provided
19   that talk about patrol running into skiers and then
20   pointing them in the right direction.
21        Q.    But it's your testimony you did not duck a
22   rope to get onto --
23        A.    No, absolutely not, no.
24        Q.    Okay.  And you cannot draw your path down
25   the Highway ski run as shown in Exhibit 25.  Correct?
```

132

**John Meyer**

```
1        A.    Correct.

2        Q.    You do agree, though, that you were skiing

3  fast.  No question about it.  Right?

4        A.    Right.

5        Q.    And you actually wrote that on a public

6  Internet forum.  Correct?

7        A.    I did, yes.

8                            (Whereupon, Exhibit 26 was

9                             marked for identification.)

10  BY MR. McINTOSH:

11       Q.    I'm going to hand you what I've marked as

12  Exhibit 26.  And the bottom two posts shown on

13  Exhibit 26 are posts that you made on a public

14  Internet forum.  Correct?

15       A.    Can we read the whole thing?

16       Q.    Sure.

17       A.    Can we read it out loud?

18       Q.    No.

19       A.    Okay.

20       Q.    So you posted, as shown in Exhibit 26, two

21  posts onto a public Internet forum, one on

22  November 17, 2017, at 12:30 p.m. and another on the

23  same day at 2:55 p.m.  Correct?

24       A.    I see one post at 2:55.

25       Q.    Then there's a second post shown below --
```

**John Meyer**

```
 1          A.     Oh, okay.  Yeah.  Yeah.  Yep.  Yep.  Yep.

 2          Q.     So at 12:30 on November 17, 2017, you said

 3     -- in part you said, "During the spring of 2016, I

 4     went back to Big Sky and met the entire ski patrol

 5     and thanked them for saving my life."  Is that

 6     correct?

 7          A.     Is that before or after the part -- the

 8     seasonal employee, so that employees do not receive

 9     health care.  The same day I rode a lift that was

10     being heated by a bubble dome.  Is that above that?

11          Q.     Would you like me to highlight it for you?

12          A.     Yeah, please.

13          Q.     I highlighted several sections of that

14     exhibit that I'm going to ask you about.  First of

15     all, the top highlighting, you said, "During the

16     spring of 2016, I went back to Big Sky and met the

17     entire ski patrol and thanked them for saving my

18     life."

19          A.     Uh-huh.

20          Q.     Is that correct?

21          A.     Yeah.  That's what I say, yeah.

22          Q.     Did you do -- did you, in fact, do that?

23          A.     Yeah.

24          Q.     You thanked them for saving your life?

25          A.     Yeah.
```

John Meyer

```
1        Q.    Did you tell them that you were going to
2   file a lawsuit and blame them for your accident?
3        A.    No.
4        Q.    Why didn't you tell them that you were
5   going to blame them for your accident?
6        A.    I wasn't -- I am not blaming the ski
7   patrol for my accident.
8        Q.    Who do you think makes the decisions about
9   whether or not to mark terrain?
10       A.    Well, I think if they had been given
11  enough signs or maybe if the terrain hadn't been --
12  like in this case here, I'm not blaming the ski
13  resort.  I'm not blaming the -- excuse me.  I'm not
14  blaming the ski patrol.
15       Q.    Okay.  So you agree, then, that the Big
16  Sky ski patrol did not do anything that contributed
17  to your ski accident and injuries.  Is that right?
18       A.    Can I tell you what I blame for my ski
19  accident?
20       Q.    No.  I'd like you to answer the question,
21  please.
22       A.    No.  I'm not going to answer your
23  question.  You're trying to box me in.
24       Q.    Mr. -- Mr. Meyer --
25       A.    We had the same conversation with the
```

135

John Meyer

```
 1   judge.
 2        Q.    Mr. Meyer --
 3        A.    You're trying to box me in yes, no.  I'm
 4   not --
 5        Q.    Mr. Meyer, the way that this works --
 6        A.    Yeah.
 7        Q.    -- is the deposition where I get to ask
 8   you questions.
 9        A.    Yeah.  Yeah.
10        Q.    Will you please -- and -- and you're
11   required to answer the questions.
12        A.    Yeah.
13             MR. McINTOSH:  Would you please read that
14   question back?
15                       (Whereupon, the requested
16                        record was read.)
17             THE WITNESS:  Mu.
18             THE REPORTER:  I'm sorry?
19             THE WITNESS:  Mu, M-U.  It's Chinese.  It
20   means the context of the question isn't big enough
21   for the answer.
22   BY MR. McINTOSH:
23        Q.    Can you please answer the question,
24   Mr. Meyer?
25        A.    I just did.
                                                    136
```

**John Meyer**

 1      Q.    So your answer is mu?

 2      A.    Yeah.

 3      Q.    We'll try it this way.  Can you please

 4  answer the question in English?

 5      A.    The context of the question is not big

 6  enough for an answer.

 7      Q.    What does that mean?

 8      A.    It means the day I was skiing I came over

 9  a rollover.  Hit a Cat track.  Couldn't see -- from

10  right here you can't see this Cat track.  Can't see

11  the steep transition.

12      Q.    Let me try it a different way, Mr. Meyer,

13  since you're --

14      A.    You're trying to ask the same thing 10

15  times, and I keep giving you the same answer.

16      Q.    No, you're not answering the question,

17  Mr. Meyer.  That's the problem.

18      A.    I'm answering it, not in the way you don't

19  want me to answer.  Right?

20      Q.    Do you contend that the ski patrol did

21  anything to contribute to your accident on

22  December 11, 2015?

23      A.    Mu.

24      Q.    So you're not -- you're refusing to answer

25  the question?

                                              137

**John Meyer**

```
 1        A.    I just answered.  I just don't -- you
 2   don't like the way I answered the question.
 3        Q.    You think that mu is an appropriate
 4   response to that question?
 5        A.    I think an appropriate response to the
 6   question is the context of the question isn't big
 7   enough for an answer.
 8        Q.    What does that mean, Mr. Meyer?
 9        A.    It means you can't just -- does your wife
10   know that you cheated on her?
11        Q.    Can you please answer the question,
12   Mr. Meyer?
13        A.    Does your wife know that you've cheated on
14   her?
15        Q.    Please answer the question, Mr. Meyer.
16        A.    Yes or no.  Just asked a simple question.
17   Yes or no?
18        Q.    Mr. Meyer, this is not your opportunity to
19   ask me questions.  Okay?  This is where you are
20   required to answer questions under oath.
21        A.    Okay.
22        Q.    So do you contend that the ski patrol at
23   Big Sky did anything wrong that contributed to your
24   accident on December 11, 2015?
25        A.    I think the context of the question isn't
```
138

John Meyer

```
 1   big enough for an answer.
 2        Q.    Why can you not answer that question,
 3   Mr. Meyer?
 4        A.    I just did.
 5        Q.    No, you did not.
 6        A.    I didn't answer it the way you want me to
 7   answer it.
 8             MR. McINTOSH:  Why don't we just take a
 9   short break.  We'll go off the record.
10             THE VIDEOGRAPHER:  We're going off the
11   record.  It is 12:36.
12                       (Whereupon, a break was then
13                        taken.)
14             THE VIDEOGRAPHER:  We're back on the
15   record.  It's 1:21.
16   BY MR. McINTOSH:
17        Q.    Mr. Meyer, we're back on the record.  Do
18   you understand you're still under oath?
19        A.    Yes.
20        Q.    Okay.  And you're not recording this?
21        A.    No.  Can I?  Can I record this?
22        Q.    Mr. Meyer, please just answer the
23   questions.  Okay?
24        A.    Can I record this?
25        Q.    Mr. Meyer, this is not the time for you to
```

139

John Meyer

 1   ask me -- ask me questions.  This is the time for you

 2   to answer questions.

 3        A.    So you're not going to tell me whether I

 4   can -- okay.  Go ahead.

 5        Q.    Mr. Meyer, if the ski patrol made the

 6   decision not to mark the area of your accident, do

 7   you blame the ski patrol for your accident?

 8        A.    I think that is ultimately a question for

 9   a jury.

10        Q.    But I'm asking what your position is.

11        A.    My position is that I got into a pretty

12   serious accident, and Big Sky Resort is partly at

13   fault.  That's --

14        Q.    And if the ski patrol --

15        A.    Uh-huh.

16        Q.    -- made the decision not to mark this

17   area --

18        A.    Are you recording this --

19        Q.    -- you're interrupting -- just let me

20   finish the question.

21        A.    Okay.

22        Q.    If the ski patrol made the decision not to

23   mark this area, then you are blaming the ski patrol

24   for your accident.  Right?

25        A.    Big Sky Resort is partly responsible for

140

**John Meyer**

1    my accident.

2        Q.    That's not the question I asked you,

3    Mr. Meyer.  The question I asked you was if the ski

4    patrol --

5        A.    I didn't sue the ski patrol.  I -- I sued

6    Big Sky Resort.

7        Q.    I understand that.

8        A.    Okay.

9        Q.    And you understand that a corporate entity

10   like Big Sky can only act through people.  Right?

11       A.    No -- well, no.  Because you guys sued me

12   personally.  Big Sky Resort sued me personally.

13       Q.    You understand that someone at Big Sky had

14   to make the decision not to mark this area?

15       A.    No.  I won't agree with that.

16       Q.    You -- you think it just --

17       A.    Run out of signs?  Sure.  Maybe.

18       Q.    Well, okay.  Ryan Ayres testified in an

19   affidavit --

20       A.    Uh-huh.

21       Q.    -- that on December 11, 2015, Big Sky did

22   not run out of signs.

23       A.    Uh-huh.  And I haven't had a chance to

24   talk with Ryan yet in a deposition.  I do know that

25   in other cases some things that were submitted were   141

**John Meyer**

```
 1   actually false or wrong.

 2                           (Whereupon, Exhibit 27 was

 3                           marked for identification.)

 4   BY MR. McINTOSH:

 5       Q.    I'm handing you what I have marked as

 6   Exhibit 27.

 7       A.    Uh-huh.

 8       Q.    In paragraph 4, Mr. Ayres states:  "Big

 9   Sky ski patrol did not run out of signs, gates,

10   fences, or other safety equipment on December 11,

11   2015."  Do you see that?

12       A.    Paragraph 4?

13       Q.    Yes.

14       A.    Yes.  Yep.

15       Q.    Do you have any facts to suggest or

16   dispute that statement -- strike that.

17             Do you have any facts to dispute that

18   statement in paragraph 4 that Big Sky ski patrol did

19   not run out of signs, gates, fences, or other safety

20   equipment on December 11, 2015?

21       A.    I have the e-mail from the ski patroller

22   saying we run out of safety signs even though we have

23   heated ski lifts.

24       Q.    And is that a professional or volunteer

25   ski patroller?
```

**John Meyer**

1      A.    It's a volunteer, which actually goes more

2   to their credibility because they had nothing to win

3   or lose.

4      Q.    And did that person -- was that person

5   speaking to the conditions on December 11, 2015?

6      A.    I don't know that.

7      Q.    If that person signs an affidavit saying I

8   have no idea if there was or was not enough signs on

9   December 11, 2015, do you have any facts to dispute

10   that?

11      A.    If the ski patroller submits an affidavit

12   saying I don't know if we had enough signs that day,

13   do I have any facts to dispute that you don't have

14   enough signs?

15      Q.    If she says in her e-mail to you had

16   nothing to do with December 11, 2015 --

17      A.    Yeah.

18      Q.    -- do you have any facts to dispute that?

19      A.    That they ran out of signs?

20      Q.    No.   That they didn't run out of signs,

21   that there were enough signs on December 11, 2015.

22      A.    Oh.   Oh.   That's what I have.

23      Q.    Okay.   So the statement right here "Big

24   Sky did not run out of signs, gates, fences, or other

25   safety equipment on December 11, 2015," the only

                                                    143

John Meyer

```
 1   thing that you are aware of to dispute that is this
 2   e-mail you have from a volunteer ski patroller.
 3          A.     No.
 4          Q.     Is that correct?
 5          A.     No, sir.
 6          Q.     Okay.  Then what else?
 7          A.     Well, I think that I can -- I can show
 8   that you have withheld discovery in the past and that
 9   could potentially upturn some other documents, yeah.
10          Q.     Mr. Meyer, this is a simple question.  As
11   we sit here today --
12          A.     Uh-huh.
13          Q.     -- other than the e-mail from the
14   volunteer ski patroller --
15          A.     I haven't had a chance to talk --
16          Q.     Mr. Meyer, let me finish the question.
17          A.     Okay.
18          Q.     Mr. Meyer --
19          A.     Yeah.
20          Q.     -- other than the e-mail from the
21   volunteer ski patroller --
22          A.     Uh-huh.
23          Q.     -- are you aware of any facts to dispute
24   the statement in Mr. Ayres' affidavit that Big Sky
25   ski patrol did not run out of signs, gates, fences,
```

144

**John Meyer**

1   or other safety equipment on December 11, 2015?

2       A.    Besides the woman that told me that we

3   were out of an area that was closed?  Is that what

4   you're referring to?

5       Q.    Do you need the question read back to you?

6       A.    I just gave you an answer.  We skied into

7   a closed area and were informed that it was closed,

8   and they ran out of signs.

9       Q.    And you -- you claim a ski patroller told

10  you that on --

11      A.    Yes.

12      Q.    -- the ski run?

13      A.    Yes.

14      Q.    But you don't know what she looks like?

15  You don't know who she was?

16      A.    No.

17      Q.    Okay.  And those are the only two facts

18  that you're aware of to dispute the statement that

19  Big Sky ski patrol did not run out of signs, gates,

20  fences, or other safety equipment on December 11,

21  2015?

22      A.    Again, I haven't had a chance to depose

23  this patroller.

24      Q.    As we sit here today, those two facts, the

25  e-mail from the volunteer patroller and the statement

145

**John Meyer**

1   that you claim was made to you on December 11, 2015,

2   those are the only two facts that you're aware of to

3   dispute the statement that Big Sky ski patrol did not

4   run out of signs, gates, fences, or other safety

5   equipment on December 11, 2015.  Right?

6        A.    That's correct.

7        Q.    And if the ski patrol testifies -- or if

8   someone from the ski patrol testifies that ski patrol

9   made the decision not to mark this Cat track --

10       A.    Uh-huh.

11       Q.    -- are you blaming the ski patrol for your

12  accident?

13       A.    No.  I'm blaming the whole resort.  Ski

14  patrol -- what you didn't say when we went through

15  the signs earlier at the very beginning of the day,

16  when you go to the ticket window, it gives the

17  Montana code.  And you're essentially trying to shift

18  all the blame for any accident onto the skier.  And

19  the Montana skier code has been interpreted to say

20  the resort itself has a responsibility to maintain

21  the resort in a reasonable manner.

22       Q.    Okay.

23       A.    And so ultimately that's a question for

24  the jury, whether or not that Cat track that you

25  couldn't see as you come over the blind rollover,

                                                    146

**John Meyer**

1    whether or not that area was reasonably maintained.

2         Q.    I'm going to move to strike that answer

3    because it was not responsive to the question I

4    asked, Mr. Meyer.

5              Go back to Exhibit 26, please.  You have

6    that -- should have that there in front of you.

7         A.    Okay.

8         Q.    You sent this -- these e-mails from -- or

9    made these posts from something at your e-mail

10   address John@cottonwoodlaw.org.

11        A.    Yes.

12        Q.    Correct?

13        A.    Yes.

14        Q.    What other e-mails have you used since

15   December 11, 2015?

16        A.    My other, like, e-mail addresses?

17        Q.    Correct.

18        A.    Greendefense@gmail.com.

19        Q.    Anything else?

20        A.    Meyerformontana.com maybe.

21        Q.    Anything else?

22        A.    I don't think so.

23        Q.    If there were enough signs and ski patrol

24   just made the decision not to mark this area, do you

25   agree that your lawsuit should be dismissed?

                                              147

**John Meyer**

```
1        A.    If there were enough signs and ski patrol
2  agreed not to mark the area, do I agree that my
3  lawsuit should be dismissed?  No.
4        Q.    Why not?
5        A.    I think whether or not the lawsuit should
6  be dismissed is up to the court.
7        Q.    But I'm asking you what your position is.
8        A.    Yeah.  I think our position is that we're
9  going forward with the lawsuit.
10       Q.    If the ski patrol --
11       A.    Yeah.
12       Q.    Or excuse me.  Strike that.
13             If there were enough signs on December 11,
14  2015 --
15       A.    I wouldn't dismiss the lawsuit.
16       Q.    Just hold -- hold on.  Let me finish the
17  question.
18       A.    Okay.
19       Q.    If there were enough signs --
20       A.    Uh-huh.
21       Q.    -- on December 11, 2015 --
22       A.    Uh-huh.
23       Q.    -- and ski patrol simply made the decision
24  that this area does not need to be marked --
25       A.    Uh-huh.
```

148

John Meyer

```
 1        Q.      -- then do you accept all responsibility
 2   for your accident?
 3        A.      No.
 4        Q.      Why not?
 5        A.      Because I think that the Big Sky Resort
 6   negligently maintained the terrain.
 7        Q.      And how are you -- how do you claim Big
 8   Sky Resort negligently maintained the terrain?
 9        A.      Well, one, by lack of signs, and, two, I
10   think -- well, we'll have to see whether or not a
11   jury -- a jury thinks a reasonable resort would
12   maintain the rollover -- blind rollover that leads
13   into the Cat track.
14        Q.      Okay.  So your two -- the two ways you
15   contend Big Sky negligently maintained the terrain --
16        A.      Hold on one moment.  Sorry.  Keep going.
17               THE REPORTER:  Maintained the --
18               MR. McINTOSH:  Terrain.
19               THE REPORTER:  Oh.
20   BY MR. McINTOSH:
21        Q.      -- maintained the terrain are lack of
22   signs, blind rollover.  And you wanted to add
23   something?
24        A.      Yeah.  So there are --
25        Q.      Go ahead.
```

149

**John Meyer**

```
 1        A.    Well, there are potentially more as we
 2   continue with discovery.  But on the Big Sky ski
 3   patrollers' witness statement, they said that there
 4   were rocks on the Cat track.
 5        Q.    Well, do you claim you hit a rock and
 6   that's what caused you to wreck?
 7        A.    That's what the witness claims.
 8        Q.    That's not the question I asked.  Do you
 9   claim that you hit a rock and that's what caused you
10   to wreck?
11        A.    That's what the witness claims.
12        Q.    I'm not asking you what the witness said.
13        A.    Uh-huh.
14        Q.    I'm asking what you claim.  Do -- did you
15   hit a rock and did that rock cause you to wreck?
16        A.    I skied over a rollover and the Cat track
17   was there.  Come over it.  Hit the Cat track.  It was
18   like this.  Ski over it, boom.  Try to stay upright.
19   I'm turning left into my boots as hard as I can, and
20   I peel out.  There may have been rocks there.  I
21   don't remember.
22        Q.    So you don't remember hitting any rocks?
23        A.    I don't remember.  From what I read in the
24   witness statement prepared by Big Sky ski patrol
25   there were rocks on the Cat track.
```
                                                    150

**John Meyer**

```
1        Q.    But you don't remember hitting a rock.
2   Right?
3        A.    I may have.
4        Q.    That's not the question I asked.  I didn't
5   ask if you may have.  I asked do you remember hitting
6   a rock?
7        A.    You don't have to get upset.
8        Q.    Mr. Meyer, please answer the question.  Do
9   you remember hitting a rock?
10       A.    No.  I don't remember hitting a rock.
11       Q.    Okay.  In Exhibit 26, on the second to
12  last paragraph, you say, "The day of my accident I
13  was skiing fast.  No question about it."
14       A.    Uh-huh.
15       Q.    Did I read that sentence correctly?
16       A.    Probably.
17       Q.    The next sentence you say, "But if there
18  had been a fence or markers in front of the Cat track
19  I hit" --
20       A.    Yeah.
21       Q.    -- "I never would have been skiing that
22  fast."
23       A.    Uh-huh.
24       Q.    Correct?
25       A.    Uh-huh.
                                                    151
```

**John Meyer**

```
 1        Q.    Is that a yes?

 2        A.    Yes.

 3        Q.    So you admit that if you had been skiing

 4   slower, you would not have wrecked.  Correct?

 5        A.    Not necessarily.  I don't know.  I mean, I

 6   can't go back and we can't redo it.

 7        Q.    Do you admit that your accident was caused

 8   by skiing too fast?

 9        A.    No.

10        Q.    What do you think caused your accident?

11   Can you answer the question, please?

12        A.    Yeah.  I'm just comporting myself.  What

13   caused my accident?  Is that the question?

14        Q.    I think that was the question, yeah.

15        A.    Okay.

16        Q.    What do you claim caused your accident?

17        A.    Lack of signs, the rollover that led to an

18   unmarked Cat track, rocks, ski bindings.

19              THE REPORTER:  Ski what?

20              THE WITNESS:  Bindings.

21   BY MR. McINTOSH:

22        Q.    Do you agree you could have safely

23   navigated over this variation of -- in terrain onto

24   the Cat track if you had been skiing slower?

25        A.    No.  Not necessarily.  I don't know.
```

                                                                152

**John Meyer**

```
 1          Q.     Didn't Amanda Eggert ski this very same
 2   area immediately after you without wrecking?
 3          A.     No.  I don't -- I don't think so.
 4          Q.     Well, how did she get down to the area
 5   where you were being treated by the ski patrol?
 6          A.     I don't know if she came over that blind
 7   Cat track.  I don't know if she hit any rocks in the
 8   Cat track.
 9          Q.     What could you have done differently to
10   avoid wrecking?
11          A.     I could have not gone to Big Sky Resort.
12          Q.     That's it?
13          A.     Yeah.
14          Q.     That's the only way you could have done
15   it?
16          A.     Yeah.
17          Q.     You couldn't have skied slower?
18          A.     No.
19          Q.     You couldn't have stopped above the Cat
20   track?
21          A.     No.
22          Q.     None of -- those things would not have
23   ruined your --
24          A.     Naw.
25          Q.     Do you understand what it means to swear
```
153

**John Meyer**

```
 1    to tell the truth?

 2         A.    Yeah.

 3         Q.    And are -- do -- are you claiming that

 4    you're telling the truth right now?

 5         A.    Yeah.

 6         Q.    So it's your testimony under oath that

 7    stopping above the Cat track would not have prevented

 8    your accident?

 9         A.    So why would you ask me that question?

10         Q.    Please just answer the question,

11    Mr. Meyer.

12         A.    Yeah.  If I had stopped above the Cat

13    track, I wouldn't have hit the Cat track.  Right?

14         Q.    So you agree that if you would have

15    stopped above the Cat track, you would not have

16    wrecked?

17         A.    And if I hadn't gone to Big Sky that day,

18    I wouldn't have wrecked either.

19         Q.    That -- Mr. Meyer, that wasn't the

20    question.  Do you agree that if you would have

21    stopped above the Cat track, you would not have

22    wrecked?

23         A.    Why would I have stopped?

24         Q.    Mr. Meyer, please simply answer the

25    question.
```
                                                    154

**John Meyer**

```
 1        A.    If I come to a dead stop, I would have
 2   never hit the Cat track.  Correct.
 3        Q.    Okay.  So you agree that you could have
 4   stopped above the Cat track, and that would have
 5   prevented your accident?
 6        A.    If I would have come to a complete stop
 7   above the Cat track, yes.
 8        Q.    And if you would have been skiing slower,
 9   you could have prevented your accident.  Correct?
10        A.    No.
11        Q.    Why could you have not navigated this
12   variation in terrain by simply going slower?
13        A.    It wouldn't have mattered.
14        Q.    How fast were you going before you
15   wrecked?
16        A.    I didn't have a speedometer.
17        Q.    Can you estimate it?
18        A.    No.
19        Q.    And no matter how slow you would have been
20   going -- let's say you would have been going two
21   miles an hour.  You claim that the accident still
22   would have occurred if you were going two miles an
23   hour?
24        A.    I think I would have been injured going
25   two miles an hour over that rollover.
```

                                                      155

**John Meyer**

1      Q.    Okay.  Now, you have no expertise in ski
2   patrol operations.  Correct?
3      A.    How do you define -- no.  Not really.  I
4   mean, I've helped with evacuations before.
5      Q.    You never worked as a ski patroller?
6      A.    I have worked alongside ski patrollers.
7      Q.    That's not the question I asked you.  Have
8   you ever work as a ski patroller?
9      A.    No.
10      Q.    In fact, you have never worked for ski
11   resort.  Correct?
12      A.    No.  But I've helped a ski resort evacuate
13   people.
14      Q.    Okay.  Has some expert ever told you that
15   this area should be marked?
16      A.    I haven't retained an expert yet.
17      Q.    Has any person with expertise in skiing
18   told you that this area should have been marked?
19      A.    I haven't asked anybody.
20      Q.    That's not the question I asked you,
21   Mr. Meyer.  Has any person with expertise told you
22   that this area should have been marked?
23      A.    No.
24      Q.    So you're just relying on your own
25   personal belief that the area should have been

156

**John Meyer**

```
 1    marked?

 2         A.    No.

 3         Q.    What are you relying on to contend that

 4    this area should have been marked other than your own

 5    personal belief?

 6         A.    Lack of signs.

 7         Q.    That doesn't answer the question,

 8    Mr. Meyer.  Do you understand that?

 9         A.    No.

10         Q.    What -- other than your own personal

11    belief --

12         A.    Uh-huh.

13         Q.    -- what are you relying on --

14         A.    Uh-huh.

15         Q.    -- to contend that there should have been

16    signs there?

17         A.    E-mail from the patroller.

18         Q.    So now you're saying the patroller said

19    that this area should have been marked?

20         A.    No.  I didn't say that.

21         Q.    So what -- so what are you talking about?

22    The e-mail from the patroller, what are you talking

23    about?

24         A.    The patroller said that they were out of

25    signs.
```
                                                    157

**John Meyer**

```
1        Q.    And what does that have to do with your
2   accident on December 11, 2015?
3        A.    I guess it's up to a jury to decide
4   whether or not it was reasonable to not mark a steep
5   rollover.
6        Q.    And I'm asking you --
7        A.    Yeah.
8        Q.    -- what are you relying on other than your
9   own personal opinion --
10       A.    Uh-huh.
11       Q.    -- that this area should have been marked?
12       A.    Well, besides the patroller -- well, she
13  didn't actually say this area should have been
14  marked.  Yeah.  I mean, go over -- when you ski over
15  a rollover and don't know there's a Cat track there,
16  yeah.  You would expect that there would be some
17  signage, I suppose.
18       Q.    So just your personal opinion that you're
19  relying on?
20       A.    In terms of this one specific area, yes.
21       Q.    Okay.  Do you claim that trees need to be
22  marked?
23       A.    No.
24       Q.    Why?  Why don't trees need to be marked?
25       A.    Well, I suppose if -- if there's a
```

158

**John Meyer**

1    dangerous tree that's been causing accidents for

2    people.

3          Q.    Look at the trees shown in Exhibit 25.

4          A.    I've lost Exhibit 25.  Okay.  Got it.

5          Q.    Do you see the ski -- the trees to the

6    right of those three skiers standing on the Cat track

7    downhill and to the right?

8          A.    Yeah.

9          Q.    Do you claim those trees should have been

10   marked?

11         A.    That's up to the discretion of the ski

12   patrol.

13         Q.    I'm -- I'm asking what you contend.

14         A.    I contend that it's up to the discretion

15   of the ski patrol.

16         Q.    And if the ski patrol determines --

17   decides not to mark them, you would not question

18   their decision, would you?

19         A.    Maybe.

20         Q.    Well, what do you claim, Mr. Meyer?  Do

21   you claim --

22         A.    You're asking me to -- you're asking me to

23   assert opinion on a hypothetical situation which I am

24   not going to do.

25         Q.    Do you agree that things that are obvious

159

**John Meyer**

```
 1    don't need to be marked?
 2         A.    Yeah.  I guess so.
 3         Q.    So buildings, for example, you don't need
 4    to put a fence around a building.  Right?
 5         A.    Probably not unless it -- unless you have
 6    like a rollover and there's a building right
 7    underneath.
 8         Q.    Do you agree that skiers have to accept
 9    personal responsibility for their actions on the ski
10    hill?
11         A.    Yes.
12         Q.    Do you agree that if a skier runs into a
13    plainly visible hazard, it's the skier's fault?
14         A.    Yes.
15         Q.    Do you agree that your negligence
16    contributed to your ski wreck?
17         A.    No.
18         Q.    Do you accept any responsibility for your
19    ski wreck?
20         A.    No.
21         Q.    So you think it's one -- you don't think
22    you bear any fault whatsoever?
23         A.    No.
24         Q.    Okay.  In this Exhibit 26, your Internet
25    posting, you said, "If there had been a fence or
```

160

**John Meyer**

1    markers in front of the Cat track I hit, I never

2    would have been skiing that fast."

3          A.    Uh-huh.

4          Q.    What do you mean -- what did you mean?

5          A.    I wouldn't have been there.

6          Q.    What does that mean, you wouldn't have

7    been there?

8          A.    It means I would have seen the signs or

9    whatever, and I wouldn't have been there.

10         Q.    But you could see the Cat track coming

11   down the ski run.

12         A.    No, I couldn't.

13         Q.    Right?

14         A.    No.

15         Q.    So -- so you can't see the Cat track in

16   Exhibit 25?

17         A.    You're taking one photo totally out of

18   context.  There's other photos in the discovery where

19   you can't really see the Cat track.  You haven't

20   shown those.

21         Q.    The next thing -- or one of the next

22   things you say in Exhibit 26 is you say, "What do you

23   think about me filing a lawsuit against Big Sky?"

24   Correct?

25         A.    Uh-huh.

                                                161

**John Meyer**

1     Q.    Why were you asking that question?

2     A.    Because I like to give my -- I like to get

3 a second opinion and third opinion.

4     Q.    Did you get any responses?

5     A.    Yeah, I did.

6     Q.    What responses did you receive?

7     A.    I thought I gave them all to you in

8 discovery, didn't I?

9     Q.    Just -- if you can just answer the

10 question please, Mr. Meyer.

11     A.    I don't have them offhand.  I don't

12 remember.  I think -- was it when -- was the

13 volunteer ski patroller -- did she respond to that

14 maybe?  There was one other guy that said he thought

15 it's bullshit that Big Sky can provide the heated ski

16 lifts but not health care, but he still didn't think

17 that my lawsuit was the right way to move forward.

18     Q.    You said also in Exhibit 26 that you would

19 put all money from a settlement or court award

20 towards health insurance for the employees.  Correct?

21     A.    Yeah.  And maybe a pay raise for ski

22 patrollers, something like that.

23     Q.    Okay.  But you -- but in a settlement

24 demand to Dynafit, you requested 1.1 million for

25 yourself personally and 500,000 for your law firm,

                                                    162

**John Meyer**

```
 1   didn't you?
 2        A.    The thing that's missing is that before I
 3   made those offers, demands you might call them,
 4   whatever, I asked them several times on the telephone
 5   that day to file a nationwide recall notice, and they
 6   said they wouldn't.  And that's when I started
 7   crying.  That's what the notes don't actually, yeah,
 8   reflect.
 9        Q.    I'm going to --
10        A.    Now, is Brad going to ask the same thing?
11   How are we going to do this?
12        Q.    I'm going to hand you Exhibit 27.
13                         (Whereupon, Exhibit 28 was
14                          marked for identification.)
15              THE WITNESS:  Brad, are you going to ask
16   me the same questions?
17              MR. CONDRA:  I'm not going to testify at
18   this point.
19   BY MR. McINTOSH:
20        Q.    Mr. Meyer --
21        A.    Uh-huh.
22        Q.    -- Exhibit 27 includes in part an e-mail
23   that you sent to scottknight@salewa.com.  Correct?
24        A.    Yes.
25              MR. CONDRA:  Counsel, I believe we're on
```

163

**John Meyer**

```
 1   Exhibit 28.
 2             MR. McINTOSH:  28.  I'm sorry.  Excuse me.
 3   BY MR. McINTOSH:
 4        Q.    Could you hand that back to me --
 5        A.    Sure.
 6        Q.    -- Mr. Meyer?  Now corrected that, on
 7   Exhibit 28 that's an e-mail from you to
 8   scottknight@salewa.com.  Correct?
 9        A.    Correct.
10        Q.    And that's a settlement demand that you
11   made.  Correct?
12        A.    After I made the initial offer.
13        Q.    And in that settlement demand you
14   requested a $500,000 donation to Cottonwood
15   Environmental Law Center.  Correct?
16        A.    Correct.
17        Q.    You also demanded 1.1 million to yourself
18   personally.  Correct?
19        A.    After I asked them to issue a nationwide
20   recall notice.
21        Q.    Did you demand $1.1 million to be paid
22   personally to yourself?
23        A.    After I asked them several times on the
24   telephone to issue a nationwide recall notice.
25        Q.    You agree this states 1.1 million USD to
```

164

**John Meyer**

```
 1   John Meyer.  Right?
 2        A.    Yes.
 3        Q.    And that was before -- that was -- the
 4   date of that was May 8, 2016.  Correct?
 5        A.    Yep.  May 8th, yeah.
 6        Q.    So why in November of 2017 did you not
 7   tell the ski patrollers you were demanding
 8   $1.6 million to be paid to you and your law firm?
 9        A.    This is the part where it gets fun.  So
10   should I start from the beginning?
11        Q.    Mr. Meyer, I want you to answer the
12   question.
13        A.    Well, I want to give it context --
14        Q.    No.  You don't --
15        A.    -- because I just don't want my answer to
16   be taken out of context.
17        Q.    No.  Mr. Meyer, this is not the time for
18   you to provide context.  Can you tell me what you're
19   doing with your purse there?
20        A.    I put it in my hands.
21        Q.    What?
22        A.    Put it in my hands.
23        Q.    Why?
24        A.    Because it dropped to the ground.
25        Q.    Okay.  Mr. Meyer, this is not the time for
```

165

**John Meyer**

1  you just to make speeches.  This is the time for you

2  to answer questions.

3      A.    Uh-huh.

4      Q.    So the question is, why did you represent

5  that all money from a settlement or court award would

6  go toward health insurance for employees when you had

7  already demanded 1.6 million for you and your law

8  firm?

9      A.    Well, actually, how it went was I got on

10  the phone with -- telephone with Dynafit, and they

11  said what do you need?  I said I need for you to guys

12  to issue a nationwide recall notice so no one else

13  gets hurt.  They said we're not going to do that.

14  What do you need?  That's when I immediately started

15  crying in the parking lot of Explore Big Sky.

16          And I said I don't want to put a price on

17  my life, because I thought that I had just lost my

18  whole law degree.  I thought I had lost everything.

19  I didn't know if I'd ever be able to practice again.

20  So I felt like I couldn't -- I wouldn't be able to do

21  anything.  And for Dynafit to say how much money do

22  you want to go away was them asking me to put value

23  on my entire career and my life.  And so they say

24  we're not --

25      Q.    Hold on.

                                                    166

**John Meyer**

```
 1          A.     They say we're not --
 2          Q.     I'm going to strike this.  You're not
 3    answering the question.
 4          A.     I am.  Let me finish, please.
 5          Q.     No.  No.
 6          A.     Please let me -- we agreed that you would
 7    let me finish my questions and I'll let you finish
 8    yours.
 9          Q.     If you would answer the question I --
10          A.     I am.
11          Q.     No, you're not.
12          A.     It's a long question.  It's a long answer.
13          Q.     Okay.  Then strike it.  We'll move on to
14    the next question.
15                 In the next sentence you say, "Of course I
16    might lose the case."  Do you see that in Exhibit 26?
17          A.     I see Exhibit 28.  Should have order these
18    in number order.  It would be much better.  27.  You
19    know, I don't see it.
20          Q.     I'm confident it's there in front of you.
21          A.     What's that?
22          Q.     I'm pretty confident it's in that pile
23    someplace.
24          A.     This one?
25          Q.     No.  Exhibit 26.
```

167

**John Meyer**

```
 1        A.    Oh, here.

 2        Q.    In the last sentence of that e-mail --

 3        A.    Uh-huh.

 4        Q.    -- the Internet post --

 5        A.    Yeah.

 6        Q.    -- you say, "Of course I might lose the

 7   case."

 8        A.    Okay.

 9        Q.    Correct?  You said that?

10        A.    On the last line.  "Of course I might lose

11   the case, but I would only be out some time.  I

12   already owe that to the ski patrollers."

13        Q.    Why did you say "Of course I might lose

14   the case"?

15        A.    Because there's never any -- I've filed

16   several lawsuits that were like dead ringers and

17   still lost.

18        Q.    Okay.  What made you recognize you might

19   lose this case?

20        A.    There's never any guarantee you're ever

21   going to win any case.

22        Q.    After that you said, "I would only be out

23   some time."

24        A.    Yeah.

25        Q.    And you said that because as an attorney,
```
168

**John Meyer**

```
 1   you can file a lawsuit and represent yourself.
 2   Right?
 3        A.    Why did I say it?  Of course I don't --
 4   yeah.  Yeah.
 5        Q.    So you have an advantage that a
 6   nonattorney does not have when it comes to lawsuits.
 7   Right?
 8        A.    In terms of the ability to file?
 9        Q.    Yes.
10        A.    Yeah.
11        Q.    So you recognize that you might lose, but
12   because you're an attorney, losing would only cost
13   you your time.  Right?
14        A.    And the filing fee.  And I didn't realize
15   you guys were going to sue me because now it's going
16   to get a lot worse because I'm going to have to file
17   for bankruptcy and everything else.
18        Q.    Then you say, "I already owe that to the
19   ski patrollers."  Do you see that?
20        A.    Yep.
21        Q.    What did you mean by that?
22        A.    They saved my life.
23        Q.    Why didn't you tell the ski patrollers
24   that you were going to blame them for your wreck?
25        A.    I'm not blaming them.
```
                                                            169

**John Meyer**

```
1          Q.    Okay.  So do you agree that the ski
2    patrollers didn't do anything wrong?
3          A.    No.
4          Q.    If you're not blaming the ski patrol, who
5    are you blaming for your wreck?
6          A.    Big Sky Resort.
7          Q.    The next e-mail in Exhibit 26 which is at
8    the top right there, it says "One important addition.
9    The ski patroller I rode the lift up with said he
10   wouldn't mind if I filed suit to get them health
11   care."
12         A.    Yeah.
13         Q.    Do you see that?
14         A.    Yeah.
15         Q.    Who was that ski patroller?
16         A.    He was a seasonal.
17         Q.    Was he a professional or volunteer
18   patroller?
19         A.    He was -- he worked at Big Sky.
20         Q.    I know.  I'm asking if he was a
21   professional or volunteer.
22         A.    I don't know.  He's a seasonal.
23         Q.    You said you don't know?
24         A.    He was a seasonal.
25         Q.    Do you know whether he was a professional
```

170

**John Meyer**

```
 1   or a volunteer patroller?

 2        A.    I don't know.  He was a seasonal volunteer

 3   patroller.  I don't even know if he was --

 4        Q.    Was it a man or a woman?

 5        A.    He worked there.  So he's a seasonal.  He

 6   was a man.

 7        Q.    How old?

 8        A.    30-ish.

 9        Q.    What did he look like?

10        A.    I don't know.  How do I describe, I talked

11   -- I don't know.

12        Q.    Did he have facial hair?

13        A.    I can't remember.

14        Q.    How tall was he?

15        A.    How tall was the guy?  5'10", 5'11".

16        Q.    What was his hair color?

17        A.    He was wearing a helmet.

18        Q.    What was he build -- what was his build?

19   Was he thin?  Heavy?

20        A.    Relatively thin.

21        Q.    What kind of helmet was he wearing?

22        A.    I don't remember.

23        Q.    Was he wearing a helmet?

24        A.    Yes.

25        Q.    When did this conversation occur?
```

                                                          171

John Meyer

```
 1        A.    It was on the lift.

 2        Q.    Which lift?

 3        A.    I can't remember.

 4        Q.    When though?  What day?  What was the

 5   date?

 6        A.    Taylor Middleton gave me some passes, and

 7   I used one of the passes.  So maybe you can look it

 8   up in the records.

 9              THE REPORTER:  Did you say Tina?

10              MR. McINTOSH:  Taylor.

11              THE WITNESS:  Taylor.

12              THE REPORTER:  Taylor.

13              THE WITNESS:  Middleton.

14   BY MR. McINTOSH:

15        Q.    What time of day was it?

16        A.    I don't know.  Big Sky was open.  It was

17   probably between 10:00 and 12:00.

18        Q.    This ski patroller that you claim told you

19   that he wouldn't mind if I filed suit to get them

20   health care --

21        A.    Uh-huh.

22        Q.    -- did you tell him you were going to

23   blame ski patrol for the -- for your wreck?

24        A.    I don't remember.

25                        (Whereupon, Exhibit 29 was
```

172

**John Meyer**

```
 1                      marked for identification.)
 2    BY MR. McINTOSH:
 3         Q.    I'm handing you what has been marked as
 4    Exhibit 29.  Do you recognize that photograph?
 5         A.    No.  I don't recall this being in
 6    discovery.
 7         Q.    Is -- is this the area of your accident?
 8         A.    From what everyone has told me, it looks
 9    like most likely.
10         Q.    Okay.  Can you draw your path of where you
11    skied through this area until the time you wrecked?
12         A.    No.
13         Q.    Do you contend that this photograph shows
14    a blind rollover?
15         A.    I don't understand how it could show a
16    blind rollover.
17         Q.    Well, from where this picture is taken,
18    you can see the Cat track.  Right?
19         A.    Uh-huh.
20         Q.    Is that a yes?
21         A.    Yes.
22         Q.    So because you can see the Cat track, it
23    was not blind.  Right?
24         A.    Part of it is blind, yes.
25         Q.    You -- so you -- so now you do think this
```

173

**John Meyer**

```
 1    shows a blind rollover.  Is that what you're saying?
 2         A.    No.
 3         Q.    Okay.  So you agree the Cat track is
 4    obvious here?
 5         A.    No.  Not all of it.
 6         Q.    Do you think this Cat track is hidden?
 7         A.    Part of it, yes.
 8         Q.    Which part of this Cat track do you
 9    contend is hidden?
10         A.    The part you can't see.
11         Q.    Where -- where?  Where is the part you
12    can't see?
13         A.    On the backside of the rollover.  Can you
14    even see the rollover?  No, you can't.  That's the
15    problem.
16              Ian, do you mind if I go pee real quick?
17              MR. McINTOSH:  Sure.  Go ahead.
18              THE WITNESS:  Thanks.
19              MR. McINTOSH:  Let's go off.
20              THE VIDEOGRAPHER:  We're going off the
21    record.  It's 1:58.
22                        (Whereupon, a break was then
23                         taken.)
24              THE VIDEOGRAPHER:  We're back on the
25    record.  The time is 2:02.
                                                     174
```

John Meyer

```
 1    BY MR. McINTOSH:
 2         Q.    Mr. Meyer, we're back on the record.  Do
 3    you understand you're still under oath?
 4         A.    Yes.
 5         Q.    So looking back at Exhibit 29 --
 6         A.    Uh-huh.
 7         Q.    -- still have that in front of you?
 8         A.    Yes.
 9         Q.    And you cannot draw your path where you
10    skied on that exhibit.  Correct?
11         A.    Can I explain why I can't draw the path?
12         Q.    Sure.
13         A.    Well, part of the reason is because Big
14    Sky ski patrol took a witness statement that says I
15    skied over rocks, and so I don't see any rocks on
16    this path here.
17         Q.    Is that the only reason?
18         A.    It's a start.
19         Q.    Well, are there other reasons you can't
20    draw your path?
21         A.    I don't remember if I went to the left or
22    the right of the guy.
23         Q.    And you contend, though, that there's a
24    blind rollover in Exhibit 29?
25         A.    I contend that I skied over a rollover and
```

175

John Meyer

```
 1   hit a Cat track.
 2        Q.    Okay.  And where did that occur?
 3        A.    At Big Sky Resort.
 4        Q.    I know.  Where -- where on the Highway run
 5   onto the Cat track?
 6        A.    I don't know.
 7                        (Whereupon, Exhibit 30 was
 8                         marked for identification.)
 9   BY MR. McINTOSH:
10        Q.    Sir, I'll hand you Exhibit 30.  Do you
11   agree that Exhibit 30 is an accurate photograph of
12   the conditions as they existed on December 11, 2015?
13        A.    In this area, yeah.  It must be.
14        Q.    And right behind the ski patroller's skis,
15   you can see the transition from the Highway run onto
16   the Cat track.  Correct?
17        A.    Right -- say that again.  Right behind
18   the --
19        Q.    Ski patroller's skis --
20        A.    Yeah.
21        Q.    -- you can see the transition from the run
22   Highway onto the Cat track.  Correct?
23        A.    If this is the Highway run, yes.
24        Q.    Do you contend that is a blind rollover?
25        A.    No.  It doesn't appear to be.  But that's
```

176

**John Meyer**

1    different than Exhibit 25 where you can't see the

2    person's skis or knees.  I don't see any rocks in

3    this photo of the transition.

4         Q.   Go back to Exhibit 13, please.

5         A.   You want to do this slowly, then.  Exhibit

6    13?

7         Q.   Yes.

8         A.   Okay.

9         Q.   Where on Exhibit 13 did your accident

10   occur?

11        A.   I don't know.

12        Q.   Where is there a blind rollover shown on

13   Exhibit 13?

14        A.   Well, if it was blind, it wouldn't be

15   shown.

16        Q.   There's not any blind rollover shown on

17   Exhibit 13, is there?

18        A.   I don't see any rocks in the Cat track

19   either.

20        Q.   That wasn't the question, Mr. Meyer.  The

21   question was, there is not a blind rollover anywhere

22   shown on Exhibit 13, is there?

23        A.    If there is, I can't see it.

24        Q.   Okay.  So you agree that the transition

25   from Highway onto the Cat track as shown in Exhibit

177

**John Meyer**

 1    13 is not blind in any location.  Right?

 2         A.    No.  I don't agree with that at all.

 3         Q.    Okay.  Then where do you contend the

 4    transition from Highway to the Cat track is blind as

 5    shown on Exhibit 13?

 6         A.    Well, it's shown on Exhibit 25.  You can

 7    see it's pretty obvious.  Right here.  See these

 8    guys?  See those two people skiing?  You can't see

 9    their skis.  You can't even see their knees.  But

10    here you can see their skis no problem.  So if it was

11    a smooth transition, you'll see everything.  But you

12    can't see a thing because there's a rollover.

13         Q.    Or because you're a couple hundred yards

14    ahead -- right -- above that.  Let me see it.

15    Exhibit 25, can you see things that are not in the

16    photograph?

17         A.    Can you see things that are not in the

18    photograph?

19         Q.    Right.

20         A.    Seems like a trick question.  I don't

21    know.  Can you?

22         Q.    Things that aren't in the photograph you

23    can't see by looking at the photograph.  Right?

24         A.    Right.

25         Q.    Does that mean it's a blind rollover

                                                      178

John Meyer

```
 1    there?
 2         A.    Potentially.  If you can see -- if you
 3    can't see the person's knees, how else would you be
 4    able to see -- why wouldn't you be able to see their
 5    skis if there was a subtle transition?
 6         Q.    Because you can see it as you approach the
 7    Cat track.  The only reason you can't see their skis
 8    is -- from that angle is because you're hundreds of
 9    yards ahead of it --
10         A.    It's a rollover.
11         Q.    -- above it.  So look at -- so look at
12    Exhibit 13 and show me where you contend that blind
13    rollover is.
14         A.    So now you're telling me that 13 is the
15    same as 25.
16         Q.    Right.
17         A.    From a different angle.  Because I asked
18    you this earlier and we couldn't go back and you
19    wouldn't explain.
20         Q.    Where is the blind rollover that you
21    contend exists on Exhibit 13?
22         A.    I don't know how -- I don't know the
23    angles from where these were taken.  I can't tell
24    you.
25         Q.    It doesn't matter.  Show me where you
```

**John Meyer**

```
 1   contend there's a blind rollover?  Because the -- one
 2   doesn't exist.
 3        A.    Some things this right here, because you
 4   can't see the person's knees.
 5        Q.    You can see they're on a Cat track.
 6   Right?
 7        A.    Yeah.  But you wouldn't know there was a
 8   blind rollover unless -- you wouldn't know unless
 9   this photo right here.
10        Q.    Okay.  So if you're skiing at a
11   building --
12        A.    Yeah.
13        Q.    -- do you need to see 100 percent of the
14   building to know not to run into it?
15        A.    So now we're gone far off.  I don't know
16   what we're talking about.
17        Q.    Answer the question, Mr. Meyer.
18        A.    What are we talking about?
19        Q.    If you're skiing towards a building, do
20   you need to see 100 percent of the building to know
21   not to run into it?
22        A.    Yeah.  Potentially.  I mean, you could --
23        Q.    Okay.
24        A.    -- potentially hit the building.
25        Q.    So if you're skiing towards a building and
```

180

**John Meyer**

```
 1   you can see 95 percent of it and you run into it --
 2        A.    So now you're changing --
 3        Q.    -- and someone --
 4        A.    Now you're changing the whole --
 5        Q.    Mr. Meyer, please don't interrupt.
 6        A.    Okay.
 7        Q.    Let me ask the question.  If you're skiing
 8   towards a building and you can clearly see the
 9   building and then-- but you can't see 100 percent of
10   it -- let's say you can see 95 percent of it.
11        A.    Uh-huh.
12        Q.    But there's one part you can't see --
13        A.    Yeah.
14        Q.    -- because it's buried in snow or
15   something.
16        A.    Uh-huh.
17        Q.    But you run into the building.  Then
18   that's someone's else's fault?  That's your
19   testimony?
20        A.    I don't know because I don't ski at
21   buildings.
22        Q.    Because you're plainly obvious.  Right?
23        A.    I don't ski towards buildings.
24        Q.    Why?  Why don't you ski right towards
25   buildings?
```

181

**John Meyer**

```
 1        A.    Because it seems like a bad idea.

 2        Q.    Why does it seem like a bad idea to ski

 3   directly towards a building?

 4        A.    Because you could get hurt.

 5        Q.    Right.

 6        A.    You could go into a coma.

 7        Q.    You agree that skiing fast affects the

 8   severity of the incident?

 9        A.    Potentially.

10        Q.    In other words, if you're -- if you wreck

11   when you're going two miles an hour, it's going to

12   hurt a lot less than wrecking at 20 miles an hour.

13   Right?

14        A.    You could still get pretty hurt if you go

15   two miles an hour.

16        Q.    Do you agree that speed affects the

17   severity of the incident?

18        A.    I just said not necessarily.

19        Q.    Do you agree with me that high speed you

20   were skiing at affected the severity of your

21   incident?

22        A.    Possibly, yeah.

23        Q.    Probably.  Right?

24        A.    I said possibly, yeah.

25        Q.    What happens when you skied from the run
```

**John Meyer**

```
 1   Highway onto the Cat track?
 2        A.    I -- evidently you skied over this
 3   blind --
 4        Q.    Well, I don't want evidently.  I want to
 5   know what you remember.
 6        A.    I remember skiing over a rollover.  I've
 7   said that several times.
 8        Q.    And then what happened when you got on the
 9   Cat track?
10        A.    I've said that too.
11        Q.    Please answer the question, Mr. Meyer.
12   What happened when you got on the Cat track?
13        A.    I tried to turn left to stay on the Cat
14   track.
15        Q.    Okay.  So when you got onto -- from the
16   run Highway onto the Cat track, both skis were still
17   on your feet.  Correct?
18        A.    Yes.
19        Q.    You hadn't wreck yet.  Correct?
20        A.    No.
21        Q.    Okay.  So what caused you to wreck?
22        A.    If the rollover hadn't been there, it had
23   been a transition, I wouldn't have wrecked.  If I
24   hadn't had to turn so hard left trying to stay on my
25   skis, I don't know that I would have been ejected
```
                                                          183

**John Meyer**

```
1   from my bindings.
2        Q.    So, again --
3        A.    Yeah.
4        Q.    -- you made it from the run onto the Cat
5   track.  Right?
6        A.    So we are going over the same thing I just
7   said.
8        Q.    Because you're not answering the question.
9        A.    I did.
10       Q.    No, you did not.
11       A.    I answered the question.  You're just
12  trying to ask it --
13       Q.    You made it --
14       A.    -- a different way.
15       Q.    You made it from the Highway onto the Cat
16  track.  Right?  Is that right?  Did -- did you wreck
17  on the rollover?
18       A.    The terrain leading up to the Cat track
19  caused -- is partly responsible for my accident.
20       Q.    That wasn't the question I asked you.
21       A.    Yes.
22       Q.    Did you wreck on the rollover?
23       A.    No.
24       Q.    Okay.  So you made it onto the Cat track
25  with both skis still on your feet?
                                                    184
```

**John Meyer**

```
 1          A.     I believe so.
 2          Q.     So then what caused you to wreck?
 3          A.     The transition onto the Cat track, the
 4    rollover.
 5          Q.     From -- and what -- why did that rollover
 6    cause you to wreck?  Why do you claim that?
 7          A.     Because it was blind.
 8          Q.     I know, but what caused you to actually
 9    wreck?  What caused you to actually fall over and
10    come out of your skis?
11          A.     I just told you.  I told you five times.
12          Q.     No, you haven't.
13          A.     You're asking me same question.  I keep
14    telling you the same answer.
15          Q.     No.  If you get onto a Cat track and your
16    skis are still on --
17          A.     Maybe for you, but that's not my
18    experience.  You can go tell the judge whatever you
19    want, and I'm telling you my experience.
20          Q.     Right.  But you're not answering the
21    question.  What --
22          A.     I just did.
23          Q.     What caused your skis to release from your
24    bindings -- or excuse me.  I said that wrong.  What
25    caused your boots to release from the bindings?
```
                                                         185

**John Meyer**

1     A.    What caused my boots to release from my
2  bindings?
3     Q.    Yes.
4     A.    The bindings.
5     Q.    And what about the bindings caused your
6  boots to release from them?
7     A.    Now we're getting into the design of the
8  bindings.  Correct?  Is that what you're asking me?
9     Q.    Can you please just answer the question?
10    A.    I'm just trying to understand the
11 question.
12    Q.    Do you need it read back to you?
13    A.    You're asking me what's wrong with the
14 design of the bindings.
15    Q.    No.  That's not what I asked you.  I asked
16 what caused your bindings to release -- excuse me --
17 your boots to release from your bindings?
18    A.    The bindings.
19    Q.    Okay.
20    A.    Yeah.
21    Q.    So what about the bindings caused your
22 boot to release that particular time?
23    A.    I'm not sure.
24    Q.    Do you contend they should not have
25 released at that time?

                                                    186

**John Meyer**

```
 1        A.    No.  I don't think they should have
 2   released, although -- well, so let's say -- maybe
 3   they should have released.
 4        Q.    Okay.  So you agree that your bindings
 5   should have released?
 6        A.    No.  I didn't say that.
 7        Q.    Well --
 8        A.    I said maybe they should have.  I don't
 9   know.
10        Q.    I'm asking what your contention is,
11   Mr. Meyer.  Do you claim your bindings should or
12   should not have released when they did?
13        A.    I don't know.
14        Q.    Do you contend they released prematurely?
15        A.    Potentially, yeah.
16        Q.    I'm asking what you contend, what you are
17   alleging in this case.
18        A.    Yeah.
19        Q.    Do you allege in this case --
20        A.    Yeah.
21        Q.    -- that your ski bindings released
22   prematurely?
23        A.    Potentially, yeah.
24        Q.    No.  Not potentially.  Yes or no.  Do you
25   allege that or not?
```

                                                        187

**John Meyer**

```
 1        A.     Potentially, yes.
 2        Q.     Mr. Meyer, why can you not answer that
 3   question?  It's a simple -- it's a question of what
 4   you allege in the lawsuit.
 5        A.     I didn't allege -- I don't think I alleged
 6   they prereleased early, did I?
 7        Q.     I'm asking you the question now.  Do you
 8   allege that they prematurely released or do you not?
 9        A.     Potentially they did prerelease on us.
10        Q.     Well, are you making the claim in this
11   case that they prereleased?
12        A.     Maybe.  I don't know.
13        Q.     As we sit here today, do you claim your
14   bindings prematurely released?
15        A.     I'm not sure.
16        Q.     You don't have any evidence to suggest
17   that they did, do you?
18        A.     Well, yeah.  I think so.  Now I'm certain
19   I understand what's going on.  Yeah.
20        Q.     Yeah what?  Yes, you agree your bindings
21   released prematurely?
22        A.     No.  I thought we were moving on to the
23   next question.
24        Q.     Well, you haven't answered the last one.
25        A.     What's the last question?
                                                      188
```

**John Meyer**

```
 1        Q.    Do you or do you not --
 2        A.    I said I don't know.
 3        Q.    Just let me finish.
 4        A.    Okay.
 5        Q.    Do you or do you not --
 6        A.    Uh-huh.
 7        Q.    -- claim that your bindings released
 8   prematurely?
 9        A.    I don't know.
10        Q.    Would you have wrecked if your bindings
11   would not have released?
12        A.    I don't know.
13        Q.    You claim that the bindings should not
14   have released in your pleadings, don't you?
15        A.    I don't -- maybe.  Did I?
16        Q.    Do you claim that the bindings are
17   defective?
18        A.    Yeah.  I claim product liability in the
19   complaint.
20        Q.    How do you claim the Dynafit bindings
21   caused your injuries?
22        A.    How do I claim the Dynafit bindings caused
23   my injuries?  I think they are -- I think that the
24   bindings -- the integrity of them was not as solid as
25   it should have been.
```

John Meyer

```
1        Q.    And how do you claim that contributed to
2   your injuries?
3        A.    I think that the integrity of the bindings
4   wasn't what it should have been.
5        Q.    Yes.  You already said that.  And the
6   question is how do you claim that --
7        A.    That's my answer.
8        Q.    -- contributed to your injuries?
9        A.    Do you want me to hire an expert right
10  now?  I'm not the expert.
11       Q.    I want you to answer the question.  How do
12  you claim the bindings --
13       A.    I just said --
14       Q.    -- contributed to your injuries?
15       A.    I just told you several times.
16       Q.    In your complaint that you wrote, you
17  claim Dynafit -- the bindings substantially
18  contributed to your injuries.
19       A.    Okay.
20       Q.    What is -- what is the basis in fact for
21  that allegation?
22       A.    What is the basis in fact for that
23  allegation?  Well, there was some sort of soft recall
24  notice on the bindings.
25       Q.    Let me ask it differently.  What do you
```

190

**John Meyer**

1    think the bindings did on December 11, 2015, that

2    they should not have done?

3         A.    I don't know.

4         Q.    Okay.  So do you contend that they

5    performed exactly like they were supposed to?

6         A.    No.

7         Q.    Okay.  Then if you don't contend they

8    performed exactly like they were supposed to do, what

9    did they do that they weren't supposed to do?

10        A.    Well, that's what I asked Dynafit, and

11   that's when they took my bindings without my

12   permission.

13        Q.    Mr. Meyer, I'm asking you what you claim

14   the bindings did that was incorrect.

15        A.    I asked them because they're the -- you

16   know, they're the manufacturer.

17        Q.    So you can't -- you have no idea if the

18   bindings did or didn't perform incorrectly --

19   correctly or incorrectly?

20        A.    I know there was a volunteer recall.  I

21   know that after --

22        Q.    That's not the question I asked you.

23        A.    Have you seen the --

24        Q.    Strike this.  This is not the question I

25   asked you.  I did not ask you if there was a

                                                      191

**John Meyer**

```
 1   voluntary recall.
 2        A.    Okay.
 3        Q.    I'm asking from your -- you --
 4        A.    Yeah.
 5        Q.    -- you personally --
 6        A.    Uh-huh.
 7        Q.    -- what do you think the bindings did
 8   wrong on December 11, 2015?
 9        A.    Well, if you look at the bindings in the
10   video, it shows them moving.
11        Q.    But what do you think they did wrong?
12   You're not answering the question.
13        A.    I just did.
14        Q.    No.  You -- no.  I said what did they do
15   wrong, and you said the video shows them moving.  Did
16   I ask you what the video shows?
17        A.    You don't have to yell at me.
18        Q.    Please answer the question.  It's a very
19   simple direct question.  What do you claim --
20        A.    Yeah.
21        Q.    -- the bindings did wrong on December 11,
22   2015?
23        A.    I think their integrity was compromised.
24        Q.    And what did that cause them to do
25   incorrectly?
```

192

**John Meyer**

```
1        A.    As I said, in the video they were moving.
2   The whole binding was moving.
3        Q.    And what do you claim that movement caused
4   the bindings to do that was wrong?
5        A.    Fall.
6        Q.    Fall?
7        A.    Yeah.  Fall.
8        Q.    Caused the bindings to fall?
9        A.    No.  You said what did that --
10            THE WITNESS:  Can you read the question
11   again, please?
12                     (Whereupon, the requested
13                       record was read.)
14            THE WITNESS:  Yeah.  Caused me to fall.
15   BY MR. McINTOSH:
16        Q.    Okay.  So you claim the movement of the
17   bindings caused you to fall?
18        A.    Potentially.  I'm not the expert.  When I
19   asked Dynafit if they could look at them, they took
20   them without even --
21        Q.    So what do you claim caused you to fall,
22   the bindings or the variation in terrain?
23        A.    It doesn't have to be an either/or answer.
24   It would be C, all of the above.
25        Q.    So you contend they both caused you to
```
193

**John Meyer**

```
 1   fall?

 2        A.     Yeah.

 3        Q.     So do you claim the bindings released

 4   prematurely?

 5        A.     I don't know.  I think probably.

 6        Q.     But I'm asking what you claim, what you

 7   remember.  To your memory, did the bindings release

 8   prematurely?

 9        A.     I told you several times.

10        Q.     Please answer the question.

11        A.     Can you ask me the question again?

12        Q.     In your memory --

13        A.     Uh-huh.

14        Q.     -- did the bindings release prematurely?

15        A.     All I understand is that the bindings were

16   moving in a way they shouldn't have been moving.

17        Q.     This area that you claim as a blind

18   rollover, do you claim there was a drop-off -- a

19   straight drop-off from Highway onto the Cat track?

20        A.     It wasn't a cliff.

21        Q.     That's not what I asked you.  Do you claim

22   there was a straight drop-off from Highway onto the

23   Cat track?

24        A.     I think of straight drop-offs as cliffs.

25        Q.     So if there's a one-foot drop-off, you
```

194

**John Meyer**

1  call that a cliff?

2       A.    No.  I guess not.

3       Q.    Okay.  So back to my question.  Do you

4  claim there was a straight drop-off from Highway onto

5  the Cat track?

6       A.    It was -- no.  It wasn't like 90 degrees,

7  no.  It wasn't 90.

8       Q.    Okay.  What angle do you think it was?

9       A.    Maybe -- I don't know -- 45 to 60.

10      Q.    Okay.  And how -- what was the length of

11 this angle you claim was 45 to 60 degrees?

12      A.    I don't know.

13      Q.    Give me your best estimate.

14      A.    No.  I don't want to -- I don't want to

15 give you a wild guess.

16      Q.    Do you claim it was 100 yards?

17      A.    No.

18      Q.    Do you claim it was a foot?

19      A.    It was -- I don't know.  Like -- it was

20 most if not a little bit more than a ski length.

21      Q.    Okay.  So three feet?

22      A.    What's a ski length?  Six feet?  Yeah.  So

23 a little more than that maybe.

24      Q.    Okay.  So you claim there's a 6-foot

25 section of 45- to 60-degree drop-off?

                                                      195

**John Meyer**

```
 1          A.     Again, I don't like guessing on numbers.

 2          Q.     Did you try to go off a jump?

 3          A.     No.

 4          Q.     Did you tell your doctors you went off a

 5   jump?

 6          A.     I don't think so.

 7          Q.     I show you Exhibit 31.

 8                            (Whereupon, Exhibit 31 was

 9                             marked for identification.)

10          THE WITNESS:  This is a back flip, and I'm

11   scared to death of back flips, so I would never do

12   that.

13   BY MR. McINTOSH:

14          Q.     Okay.  Let me ask the question first.

15          A.     Okay.

16          Q.     Do you agree this is one of your medical

17   records, Mr. Meyer?

18          A.     Might be.

19          Q.     One of the medical records that you

20   produced in this case.  Correct?

21          A.     Sure.

22          Q.     And this states that unhelmeted skiing

23   accident in which he went over a jump, did a back

24   flip, and lost consciousness.  Correct?

25          A.     That's what it says.
```
                                                          196

**John Meyer**

```
 1        Q.    Did you tell anybody you were going off a
 2   jump when you wrecked?
 3        A.    When I wrecked?  Like after -- like before
 4   or after?  What?
 5        Q.    At any time after your accident, did you
 6   tell someone you wrecked because you went off a jump?
 7        A.    I don't remember.  Maybe.  I don't think
 8   so.  I -- I remember reading the discovery in which
 9   Gene Femberson said he didn't think that I was trying
10   to go off a ski jump or anything like that.
11        Q.    Did you go off a jump?
12        A.    No.  Well, it turned into a jump when I
13   hit that Cat track.
14        Q.    So what happened when you hit the Cat
15   track?
16        A.    Tried to turn into my -- push my -- tried
17   to push my shins into my boots and turn left and just
18   like blew me out.
19        Q.    What do you mean, blew you out?
20        A.    It blew me out.
21        Q.    And I said what do you mean.  What does
22   that mean?
23        A.    It means I tried to stay, drive hard into
24   my boots and turn left and got blown out.
25        Q.    How did you release from your skis?
```

197

**John Meyer**

```
 1        A.    I didn't see it.  I don't remember.
 2        Q.    How did your body move when you blew out,
 3   as you said?
 4        A.    Well, maybe I did a flip.
 5        Q.    Well, I'm asking what you remember.  I'm
 6   not asking maybe.  I'm asking what you remember.
 7        A.    The last thing I remember is being in the
 8   air.
 9        Q.    Okay.  And do you remember how you got in
10   the air?
11        A.    No -- well, I remember trying to drive
12   hard into my skis as I'm turning left.  And the last
13   thing I remember is I'm in the air.
14        Q.    And what was your body movement as you
15   went into the air?
16        A.    I have no idea.
17        Q.    Did one or both skis release?
18        A.    I have no idea.
19        Q.    How do you know that what you are telling
20   us about the accident now is even the truth?
21        A.    The truth is relative, I guess.
22        Q.    So you might not be telling us the truth
23   here today?
24        A.    I'm telling you my truth, just like my
25   truth is relative to yours.  Because even if I win
```

198

**John Meyer**

```
 1  this case, you're going to still say he's a liar.
 2  That's what you're going to think to yourself.
 3       Q.    How do you know that what you're telling
 4  us, though, is even true?
 5       A.    It's my truth because I pray to God every
 6  day.
 7       Q.    Didn't you tell numerous people for months
 8  after the accident that you don't remember the
 9  accident at all?
10       A.    I did, yeah.
11       Q.    I'm going to hand you what has been marked
12  as Exhibit 32.
13                        (Whereupon, Exhibit 32 was
14                         marked for identification.)
15  BY MR. McINTOSH:
16       Q.    This is a post from your Facebook page.
17  Exhibit 32 is.  Correct?
18       A.    Uh-huh.
19       Q.    Is that a yes?
20       A.    Yes.
21       Q.    And in this -- under the first part -- the
22  post up top, January 28, 2016.  Correct?
23       A.    Yes.
24       Q.    That's the date of the post?
25       A.    Uh-huh.
                                                      199
```

**John Meyer**

```
 1        Q.    That's the date when you started it.
 2   Right?
 3        A.    That's what it looks like.
 4        Q.    Is that correct?
 5        A.    That's what it looks like.
 6        Q.    Well, do you dispute that?
 7        A.    No.
 8        Q.    Okay.  And you made this post.  Correct?
 9        A.    Yes.
10        Q.    And then down below a person named Tracey
11   Lewis made a comment, and then you responded to her.
12   Right?
13        A.    Uh-huh.
14        Q.    Is that a yes?
15        A.    A person named Tracey.  Yeah John.  So
16   glad you're on the mend.  What happened?  A lot of us
17   were worried.  I went skiing and the snow won.  I
18   woke up from a coma with several broken ribs and a
19   broken arm.  I don't even remember the hospital --
20   helicopter ride.
21        Q.    You wrote that.  Correct?
22        A.    Yes.
23        Q.    So January 28, 2016, you didn't even
24   remember the helicopter ride.  Right?
25        A.    Correct.  I still don't.
```

                                                    200

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**John Meyer**

1    Q.    So are you claiming that you did remember

2  the accident on January 28, 2016, and just not the

3  helicopter ride?

4    A.    Correct.

5    Q.    Didn't you tell numerous doctors and

6  others that you didn't have any clue what happened

7  later on?

8    A.    Yes.

9    Q.    So you -- you're claiming you remembered

10  what happened on January 28, 2016, but then you

11  forgot it later on?

12    A.    No.  I'm claiming on January 28th I didn't

13  remember, and I have since remembered.  That's pretty

14  common with people with head injuries.  Tom Thornton,

15  the guy whose house I stayed at, got kicked in the

16  head by a horse, and his skull was fractured.  He had

17  a pretty bad brain injury, and now he remembers.  But

18  he didn't remember what happened then.

19    Q.    Move to strike the nonresponsive portion

20  of that answer.

21          You've now been handed Exhibit 33.  This

22  is another post from your Facebook page.  Correct?

23    A.    So before we go there on the strike, can

24  we have the judge look at that and then decide

25  whether or not it can be stricken?

                                                        201

**John Meyer**

1        Q.    Yeah, that's how it works.

2        A.    Okay.

3                        (Whereupon, Exhibit 33 was

4                        marked for identification.)

5    BY MR. McINTOSH:

6        Q.    You've now been handed Exhibit 33.  This

7    is another exhibit from your Facebook page.  Correct?

8        A.    Yep.

9        Q.    On Exhibit 33, down towards the bottom of

10   the page, you made a post, and you say, "Every day

11   gets a little better which means an awful lot when

12   you wake up and have no clue where you are or what

13   happened."

14       A.    Uh-huh.

15       Q.    Right?

16       A.    Yeah.

17       Q.    That's what you posted?

18       A.    Yeah.

19       Q.    So as of May 11, 2016, you had no clue

20   what happened.  Right?

21       A.    No.  I didn't say that.

22       Q.    Well, you said no clue what happened.

23   Right?

24       A.    Uh-huh.

25       Q.    Is that right?

                                                    202

**John Meyer**

```
 1        A.    It says -- yeah.  Which means an awful
 2   when you wake up and have no clue where you are or
 3   what happened, yeah.
 4        Q.    So as of May 11, 2016, you were posting on
 5   Facebook that you had no clue what happened?
 6        A.    Five months after, yeah.
 7        Q.    And about that same time you were telling
 8   your doctors that the last thing you remembered was
 9   riding on the chairlift.  Right?
10        A.    No.  I don't think so.  I don't know.  If
11   you tell me that's what I said, I guess that's what I
12   said.  Right?
13        Q.    So if you were -- if more than five months
14   after the accident -- well, strike that.
15                         (Whereupon, Exhibit 34 was
16                          marked for identification.)
17   BY MR. McINTOSH:
18        Q.    I'm going to hand you what has been marked
19   as Exhibit 34.  Excuse me.  And that's a medical
20   record of yours from December 21st, 2015.  Correct?
21        A.    December 21st, so where does it say that?
22        Q.    Well, it says electronically signed on
23   December 21, 2015, at the bottom.  Do you see that?
24   Do you want me to highlight it for you?
25        A.    No.  I see which I signed, yeah.  Okay.
```
203

John Meyer

```
 1   see it.
 2        Q.    And in the first paragraph it says "When
 3   asked why he is here, he states I was having too much
 4   fun with my snowboard.  Tells me he does not actually
 5   remember the accident, just what people have told
 6   him."  Did I read that correctly?
 7        A.    Yeah, you did.
 8        Q.    So at least at this point in time, you
 9   were telling your doctors you didn't remember the
10   accident, only what people had told you.  Right?
11        A.    I was telling doctors I was on a
12   snowboard.  My understanding is I was on skis.
13        Q.    That's not the question I asked you.
14        A.    That's the answer I gave.
15        Q.    Okay.  But do you understand you have to
16   answer the question that is asked not just say
17   whatever you want?
18        A.    Yeah.
19        Q.    Okay.  So you were telling the doctor at
20   this time that you didn't actually remember the
21   accident, just what people have told you.  Right?
22        A.    I told the doctor I didn't remember the
23   snowboard accident.
24        Q.    Just what people had told you.  Right?
25        A.    I told the doctor I didn't remember the
```

204

John Meyer

```
 1   snowboard accident.
 2        Q.    That's not the question I asked you,
 3   Mr. Meyer.  Did you tell the doctor that you don't
 4   remember the accident, just what people have told me?
 5        A.    I told the doctor I don't remember my
 6   snowboard accident.
 7        Q.    Mr. Meyer, that's not the -- can you
 8   please answer the question.  Do you understand the
 9   distinction?  See, you're just being obstructionist
10   here.
11        A.    No.  I've seen what you do, and I've seen
12   how you work.
13        Q.    Well --
14        A.    You take things out of context, and then
15   you withdraw, you withhold discovery, and then when
16   you dump all this stuff.  I saw it happen.
17        Q.    Sure you did, Mr. Meyer.
18              So, Mr. Meyer, did you tell the doctor
19   that you didn't remember the accident, just what
20   people had told you?
21        A.    I told the doctor I don't remember my
22   snowboard accident.
23        Q.    That's not the part I asked you about.
24        A.    Well, that's the part I'm giving.
25        Q.    Did you tell him that you don't remember
```
205

**John Meyer**

```
 1   the accident, just what people --
 2        A.    Do you want to call Judge Morris?
 3        Q.    Answer the question, please.
 4        A.    Let's call Judge Morris.
 5        Q.    Please answer the question.
 6        A.    Let's -- let's call Judge Morris.
 7        Q.    Answer the question.
 8        A.    Let's call Judge Morris.
 9        Q.    That's probably going to be necessary at
10   some point, but please just answer the question,
11   Mr. Meyer.
12        A.    Okay.
13        Q.    Did you tell the doctor that you --
14        A.    I told the doctor I don't remember my
15   snowboard accident.
16        Q.    Please don't interrupt.  My God.
17        A.    Okay.
18        Q.    See, you're purposely not trying to answer
19   the question, aren't you?
20        A.    Uh-huh.
21        Q.    Yes, you are?
22        A.    No.
23        Q.    Okay.
24        A.    I'm trying to give the whole context.
25        Q.    So in fact, up to six months after this
```

**John Meyer**

```
 1    accident, you didn't even remember it.  Right?
 2         A.    Up to six months after the accident, I
 3    didn't remember, yes.
 4         Q.    Okay.  So how do we know that what you are
 5    telling us here today --
 6         A.    Uh-huh.
 7         Q.    -- is actually what happened and is not
 8    just a -- something that you made up?
 9         A.    Confabulation?  Right?  Confabulation?
10         Q.    Please answer the question.
11         A.    How do we know that what I'm saying today
12    is not a confabulation?  We have to piece it all
13    together with the ski patroller witness that says he
14    hit some rocks, if other people who saw, which makes
15    me wonder, whatever happened to some Cacking guy's
16    report?  I haven't seen that.  I asked for it, and I
17    never saw it.
18         Q.    Yeah, you did, Mr. Meyer.  It's been
19    produced in discovery.  You -- you keep just making
20    things up.  I mean, do you have a problem with
21    honesty?
22         A.    No, I don't.
23         Q.    It's been produced in discovery.
24         A.    What page?
25         Q.    I don't know what page.
```

207

**John Meyer**

```
 1            MR. McINTOSH:  But you know what, Mac?
 2   Why don't you give --
 3   BY MR. McINTOSH:
 4        Q.    How -- how about this?
 5        A.    Okay.
 6        Q.    Will you admit if we show you his
 7   statement right now that you have lied on the record?
 8        A.    No, I won't.
 9        Q.    Okay.
10        A.    Because I don't remember seeing the
11   document.
12        Q.    Okay.  So back to the question.  How do we
13   know that what you're telling us here today is the
14   truth?
15        A.    I pray to God every day.  I pray to be a
16   good person.  I pray to be kind.  I pray to be
17   honest.  What else do you want?  How can I prove that
18   the sky is blue?  Look at the sky.  It's blue.
19        Q.    So you're just trying to piece together
20   what happened from the documents that we have given
21   you.  Is that what you're telling me?
22        A.    No.
23        Q.    Okay.  So other than the documents that we
24   have given you, how do we know that what you're
25   telling us is true?
```

208

**John Meyer**

```
 1        A.    Other than the documents you have given
 2   me, how do you know what I'm saying is true?
 3        Q.    Right.
 4        A.    I guess it's up to a jury.  I mean, you're
 5   not going to believe a thing I say.  Right?  You
 6   don't ever believe anything I say.  You think I'm a
 7   liar about everything.
 8        Q.    Well, you did just say that we hadn't
 9   produced a statement which I can prove to you that
10   we've produced.
11        A.    I haven't seen it.  I said can you please
12   provide the statement.  I haven't seen it.
13        Q.    All right.  Yeah.
14        A.    I can also prove that you withheld
15   discovery.
16        Q.    Okay.  Okay.
17        A.    Do you want to talk about that?  Because
18   we can talk about that.  You withheld discovery.  You
19   tried to dismiss my case, saying, oh Meyer is talking
20   to the media.  He's talking to the media.  Dismiss
21   him, judge.  Dismiss him.  Then you didn't even give
22   me your own communications until after I filed my
23   motion to compel.
24        Q.    The motion to compel was denied.  Right?
25        A.    Because you already gave me the documents
```

209

**John Meyer**

```
 1   after I filed it, not until.  You said I'm not going
 2   to supplement anything before 2017.  And then in
 3   response you filed documents after --
 4        Q.    Mr. Meyer, just stop.  Stop.
 5        A.    Because you're looking back.  Because
 6   you're looking back.
 7        Q.    No.  Because you're dishonest.  Okay.  And
 8   because this is the time for you to --
 9        A.    Here we go.  Here we go.  Here we go.  You
10   just did a quid pro quo.  You just did a quid pro
11   quo.  Like if you find the documents --
12             MR. McINTOSH:  Let's go off the record.
13   This is just --
14             THE VIDEOGRAPHER:  We're going off the
15   record.  The time 2:37.
16                       (Whereupon, a break was then
17                        taken.)
18             THE VIDEOGRAPHER:  We're back on the
19   record.  It's 2:44.
20   BY MR. McINTOSH:
21        Q.    Mr. Meyer, I'm going to hand you two
22   documents that are numbered BSAI 18 and BSAI 25 and
23   26.  And those are statements -- or one is a
24   statement from Tom McMakin, and one is notes of a
25   telephone conversation with Tom McMakin.  Correct?
```

                                                              210

**John Meyer**

1      A.    This is -- so this is the Big Sky ski

2  patrol taking McMakin's statement.  This isn't

3  actually a statement.  Is that right?

4      Q.    What?

5      A.    This is not his statement.  It's the ski

6  patrol statement.

7      Q.    It's a Big Sky ski patrol witness

8  statement.

9      A.    Yeah.  So --

10      Q.    Signed by Tom McMakin.

11      A.    No.  It says Tom was standing below the

12  patient.  So Tom didn't write it.  Basically a ski

13  patrol wrote it.

14      Q.    Tom McMakin, it's his statements.  That --

15  that is what he reported to the ski patrol.

16      A.    But it's not his actual -- the patroller

17  wrote this.  Right?  That's what I was getting at.

18      Q.    Both of these documents were provided to

19  you before this litigation was even filed, weren't

20  they?

21      A.    No.  I don't remember this.

22      Q.    Okay.  Well, we'll let the record stand

23  for what it is because they were.

24          Do you have any evidence to suggest that

25  Mr. McMakin gave some other statement that hasn't

                                                      211

John Meyer

```
 1    been provided to you?
 2         A.    No.  That's what I was asking you about.
 3         Q.    Okay.  You weren't asking about it.  You
 4    accused us of not giving it to you when in fact we
 5    did give it to you before you even filed litigation,
 6    and it is now in your hands.  Right?
 7         A.    I think we have a misunderstanding.
 8         Q.    Perhaps you do.  What is your
 9    misunderstanding?
10         A.    I asked for McMakin's documents that he
11    wrote down, and this is evidently the ski patrol's
12    version of what happened.
13         Q.    And the question is, do you have any facts
14    to suggest that some other statement exists from
15    Mr. McMakin?
16         A.    I never --
17         Q.    Right.  Are you still seeing any health
18    care providers as a result of your December 11, 2015,
19    ski accident?
20         A.    Yeah.
21         Q.    Who?
22         A.    I see a psychologist.  I've had to go to
23    rehab for my knee.  I can't afford to go -- I went to
24    a doctor about my lungs.
25         Q.    When is the last time you saw the
```

212

**John Meyer**

1    psychologist?

2         A.    It's been most of the month.

3         Q.    And you haven't produced those records,

4    have you?

5         A.    I think I have given you pretty much

6    everything that we have.

7         Q.    You haven't produced any psychologist's

8    records from a month ago.

9         A.    When was the last time I produced records?

10        Q.    I don't recall.

11        A.    How do you know?

12        Q.    What?

13        A.    So how do you know?

14        Q.    Because we don't have any records from a

15   month ago.

16        A.    Okay.

17        Q.    So why haven't you produced the most

18   recent psychologist records?

19        A.    Because I'm busy producing everything else

20   you guys are asking for.

21        Q.    When is the last time you saw a doctor for

22   your knee?

23        A.    Bridger Orthopedic.

24        Q.    I said when is the last time you saw a

25   doctor for your knee?

                                                          213

**John Meyer**

```
 1        A.    And I said I went to Bridger Orthopedic.
 2   The date -- I don't have like the exact date.
 3        Q.    Can you give me an approximation?
 4        A.    Maybe a year ago.
 5        Q.    And are you still seeing doctors at
 6   Bridger Orthopedic for your knee?
 7        A.    I can't afford it.
 8        Q.    Do you claim that your knee was injured in
 9   this accident?
10        A.    Yes.
11        Q.    Didn't you actually hurt your knee skiing
12   the Beartooth Pass the summer after your accident?
13        A.    That certainly didn't help.
14        Q.    So you were skiing the Beartooth Pass the
15   summer after your ski accident.  Correct?
16        A.    Yes.
17        Q.    When is the last time you saw a doctor for
18   your lungs?
19        A.    I went to Bozeman Deaconess or Health or
20   whatever the heck.  They put me in some sort of
21   chamber and did a bunch of tests.
22        Q.    When?
23        A.    Like a year ago sometime.
24        Q.    So you saw a doctor for your knee more
25   than a year ago.  You saw a doctor for your lungs
```

214

**John Meyer**

```
1   more than a year ago?

2        A.    Uh-huh.

3        Q.    Is that -- both those are correct?

4        A.    Yeah.

5        Q.    And you haven't -- you're not seeing any

6   doctors more recently for your knee or your lungs.

7   Right?

8        A.    I don't have any money.

9        Q.    Do you have health insurance still?

10       A.    I just got health insurance.

11       Q.    What is your health insurance through?

12       A.    BlueCross BlueShield.

13       Q.    Have you fully recovered from your

14  injuries from the ski wreck?

15       A.    No.

16       Q.    How do you claim that you have not fully

17  recovered?

18       A.    My knee is still -- it hurts.  My knee

19  hurts.  My arm, when I climb, it feels like bones

20  separating apart.  I have seriously been -- well,

21  I --

22             THE WITNESS:  Brad, do you have the -- the

23  discovery response I provided you?  I had this

24  written down, and I didn't want to miss anything.

25  BY MR. McINTOSH:
```

215

**John Meyer**

```
 1          Q.     You mentioned your knee and your arm.

 2          A.     There's pages.  There's pages.

 3          Q.     As we sit here today --

 4          A.     Yeah.

 5          Q.     -- what else is it that you claim you have

 6     not fully -- or what else still hurts you from the --

 7     the accident on December 11, 2015?

 8          A.     My lungs aren't the same.  Mentally, I

 9     mean, when I have somebody constantly bombarding me,

10     calling me a liar, it's difficult and -- it's been

11     extremely difficult.

12          Q.     Do you claim you suffered a mental

13     impairment as a result of the accident on

14     December 11, 2015?

15          A.     I think for a while I was thinking slower.

16          Q.     Okay.  Do you claim that you have fully

17     recovered from your brain injury -- or your -- excuse

18     me.  Strike that.

19               Do you claim you have fully recovered from

20     any mental injury you suffered on December 11, 2015?

21          A.     I don't know if anyone ever fully recovers

22     from a brain injury.

23          Q.     But I'm asking you if you contend you're

24     still impaired by your mental injuries that occurred

25     on December 11, 2015.
```

216

**John Meyer**

```
 1        A.    Given how combative I've been with you
 2   today, I would say I still suffer from brain injury.
 3        Q.    Okay.  And how do you claim your brain
 4   injury still impairs you?
 5        A.    I'm irritable and combative.
 6        Q.    And do you contend that materially -- your
 7   brain injury materially impairs you?
 8        A.    I don't know what that means.
 9        Q.    You don't know what the word materially
10   means?
11        A.    No.  Not in the sense of brain injury.
12   Like money?  Material money?  Can you explain what
13   you mean?
14        Q.    Did you tell the judge that you were
15   unable to answer portions of Big Sky's counterclaim
16   due to your brain injury?
17        A.    I think so, yeah, during the hearing.
18        Q.    So do you agree that -- or do you claim
19   that your brain injury affects you -- your ability to
20   practice law?
21        A.    No.  I wouldn't necessarily say that.
22   It's different now.
23        Q.    Okay.  So your brain injury does not
24   affect your ability to practice law?
25        A.    It's different.
```

217

**John Meyer**

```
1         Q.    But you're still able to practice law?

2         A.    Differently.

3         Q.    You were insured by United Health Care on

4   December 11, 2015?

5         A.    Yes.

6         Q.    Did you have to pay any money

7   out-of-pocket for your injuries as a result of your

8   ski wreck?

9         A.    Yes.

10        Q.    How much?

11        A.    I got -- my max out-of-pocket for in

12  network was 6,000.  My max out-of-pocket for out of

13  network was 10.  But then that was 2015 and 2016.  I

14  was in the hospital beginning of 2016, so yeah.  In

15  theory I owe up to $32,000.

16        Q.    You still owe that money?

17        A.    I still owe that money.  I'm still paying

18  on my credit card.

19        Q.    Has United Health Care claimed any

20  interest in this litigation?

21        A.    No, I don't -- well, I don't even know if

22  they know about it.  Well, they must know about it.

23  Yeah.  They -- what do you mean, claimed interest?

24        Q.    For example, have they said if you receive

25  any money from Big Sky or Salewa, you have to give
```
218

**John Meyer**

```
 1   that money to us, United Health Care?
 2        A.    No, they haven't said that.
 3        Q.    You also sued Billings Clinic.  Correct?
 4        A.    No, I have not.
 5        Q.    You've not sued Billings Clinic?
 6        A.    No.
 7        Q.    You've made claims against Billings
 8   Clinic?
 9        A.    I have made a medical malpractice claim.
10        Q.    And what is the status of that claim?
11        A.    The medical malpractice panel said that
12   the Billings Clinic was -- I don't -- I'm not
13   comfortable talking about this because your law firm
14   is representing the Billings Clinic, number one.
15   And, number two, there are settlement offers, and if
16   we -- if we want to talk about this, I mean, I'm
17   concerned you would be disqualified.  Is there any
18   sort of conflict of interest?
19        Q.    Please.  I asked you what the status of
20   your claim is against Billings Clinic.
21        A.    And I was going to start talking about all
22   that stuff, but I'm concerned you're not going to --
23        Q.    Can you please just answer the question?
24        A.    Am I -- what is the status of --
25        Q.    Yeah.  What is the status of your claim
```

219

**John Meyer**

1    against Billings Clinic?  Have you sued them yet?

2         A.    No.

3         Q.    Are you going to?

4         A.    I'm planning on it.

5         Q.    When?

6         A.    I have a hearing in front of Judge

7    Christensen on Thursday to talk about my case against

8    United Health Care.

9         Q.    Okay.  What does that have to do with your

10   claim against Billings Clinic?

11        A.    Well, Billings Clinic not only committed

12   medical malpractice, but they were the ones that were

13   responsible for my lawsuit against United Health Care

14   in part.

15        Q.    How?

16        A.    Because Billings Clinic -- now we're

17   getting into the merits.  Okay.  So I go to the

18   hospital at Billings Clinic.  Right?  I'm in a coma

19   for a while.  I come out of the coma.  I'm

20   complaining about my arm.  I'm complaining about my

21   arm.  Dr. Settergren (phonetically) responded it's

22   reference pain.  I say, no, my arm hurts.  Go back

23   into the coma.  Come out.  They discharged me a few

24   days later.

25             Take me to the Missoula hospital.  I'm

                                                      220

**John Meyer**

```
 1    complaining about my arm to the Missoula hospital.
 2    They finally say, okay, stop crying.  We're going to
 3    take an X-ray.  They said, huh.  His arm is broken
 4    right in half.  It's cracked right in half.  Billings
 5    Clinic probably should have found that.
 6              And then -- so the anesthesiologist from
 7    Missoula clinic is not in network.  All the work they
 8    did in Billings was all in network.  So I got charged
 9    extra for medical malpractice.  Not only that, but
10    the Billings Clinic then charged me over my max
11    out-of-pocket deductible.
12         Q.   The summer after your ski wreck at Big
13    Sky, you were skiing on the Beartooth Pass the summer
14    of 2016.  Is that right?
15         A.   Uh-huh.
16         Q.   Is that a yes?
17         A.   Yes.
18         Q.   And you hurt your knee at that time?
19         A.   Yes.
20         Q.   When did you first ski after your accident
21    on December 11, 2015?
22         A.   I can't remember.
23         Q.   When did you first start mountain biking
24    again?
25         A.   I can't remember the exact date.  I don't
```

221

**John Meyer**

```
 1   remember.  It would have been that summer.
 2        Q.    The summer of 2016?
 3        A.    Yeah.  Probably.
 4        Q.    When did you start rock climbing again
 5   after your December 11, 2015, accident?
 6        A.    I tried to get out -- probably the summer
 7   of 2016 I tried.
 8        Q.    What other recreational activities do you
 9   engage in besides skiing, mountain biking, and rock
10   climbing?
11        A.    Those are my main three.
12        Q.    Okay.  Is there anything that you claim
13   you can't do now that you could do before the
14   accident?
15        A.    In terms of recreational activity?
16        Q.    We can start with that, yeah.
17        A.    Yeah.  My climbing is just -- it's not
18   what it was.  And I -- I go to a climbing coach at
19   the gym, and I was just explaining.  Like this plate
20   in my arm, it just feels like anytime I try and do
21   anything, it's like my arm is pulling apart.
22        Q.    So you claim you can't climb as well?
23        A.    Yeah.
24        Q.    Is there anything else you claim you can't
25   do now that you could do before the accident?
```

222

**John Meyer**

```
1        A.    My fine motor skills are not nearly what
2   they used to be.  I'm like shaky.  Sometimes I'll
3   just try and walk into a room, and I will shake.  And
4   I get really self-conscious because I'm a recovering
5   alcoholic, and I think people are going to think,
6   God, this guy is fucking drunk.  It's like no.  It's
7   just like, you know, it -- so --
8        Q.    Is that improving?
9        A.    Yeah.  I would say so.
10       Q.    Your fine motor skills?
11       A.    Yeah.  It's getting better.
12       Q.    Anything else that you claim you can't do
13  now that you could do before the accident?
14       A.    Multitask.
15       Q.    Okay.  Is there anything else that you
16  claim that you can't do now that you could do before
17  the accident?
18       A.    I've got some of this written down.  I
19  don't have that document here.
20       Q.    That's all you can think of as we sit here
21  today.  Is that right?
22       A.    I've got this written down.
23       Q.    I know.  But my question was, is that all
24  you can think of as we sit here today?
25       A.    Yeah.  I'm nervous.  It's not a nervous. 223
```

**John Meyer**

```
 1    I don't know what -- it's a weird feeling I've never
 2    gotten before.  It's -- you know what it is?  You
 3    know what I feel?  I feel paranoia.  I've got this
 4    constant sense of paranoia that I never had before.
 5    It's a horrible feeling.  It's a horrible feeling.
 6         Q.    You have a Facebook page.  Correct?
 7         A.    Yeah.
 8         Q.    And you said earlier you're the only one
 9    that posts on your page.  Right?
10         A.    Yeah.  For my personal page, I believe so.
11         Q.    And so if we see posts like the ones we
12    looked at earlier that say John Meyer and they're
13    from your Facebook post, we know you posted those.
14    Right?
15         A.    Yeah.
16                         (Whereupon, Exhibit 35 was
17                          marked for identification.)
18    BY MR. McINTOSH:
19         Q.    I'm going to hand you Exhibit 35.  That's
20    something that you posted on Facebook.  Correct?
21         A.    Uh-huh.  Yeah.
22         Q.    So within a year after your accident, you
23    were back to backcountry skiing.  Correct?
24         A.    Sooner than that.
25         Q.    And that's -- Exhibit 35 is a post about
```

224

John Meyer

```
 1   your backcountry skiing.  Correct?
 2        A.    Exhibit 35, yeah.  Yeah.  It looks I was
 3   backcountry skiing.
 4        Q.    And Exhibit 36 is a Facebook post you made
 5   dated August 8th, 2016, talking about mountain biking
 6   Leverich.  Correct?
 7        A.    Uh-huh.  Yeah.
 8                         (Whereupon, Exhibit 36 was
 9                          marked for identification.)
10   BY MR. McINTOSH:
11        Q.    And you were actually even mountain biking
12   sooner than August 8, 2016.  Right?
13        A.    I don't know.  Probably, yeah.
14        Q.    Describe Leverich for the jury.
15        A.    It's steep.
16        Q.    It's a hard mountain bike ride?
17        A.    It is absolutely.  I used to be able to
18   climb that thing two times in a row without stopping,
19   and now I couldn't even get halfway up.
20                         (Whereupon, Exhibit 37 was
21                          marked for identification.)
22   BY MR. McINTOSH:
23        Q.    Exhibit 37 is another one of your Facebook
24   posts.  Correct?
25        A.    Uh-huh.
```

225

**John Meyer**

```
 1        Q.    Is that a yes?

 2        A.    Yes.  Looks like it.

 3        Q.    And Exhibit 37 you're talking -- in

 4  September of 2016, you're talking about doing the

 5  22-day push-up challenge.  Correct?

 6        A.    Yeah.  For vets to raise -- 22 days to

 7  raise awareness for combat veterans.  Says 22 vets a

 8  day commit suicide.  This is a small way to raise

 9  awareness for that issue in the U.S.

10        Q.    Exhibit 38 is a Facebook page about your

11  mountain biking.  Correct?

12        A.    It's my honeymoon, yeah.

13                          (Whereupon, Exhibit 38 was

14                            marked for identification.)

15  BY MR. McINTOSH:

16        Q.    Where were you mountain biking in these

17  photographs that are marked as Exhibit 38?

18        A.    This is Red Rocks and this is Red Rocks,

19  Moab, somewhere like that.  It really bothered me

20  when you guys tried to do this during my honeymoon.

21        Q.    Move to strike.

22                          (Whereupon, Exhibit 39 was

23                            marked for identification.)

24  BY MR. McINTOSH:

25        Q.    Exhibit 39, that's another one of your
```

226

**John Meyer**

 1    Facebook page posts.   Correct?

 2         A.    Yeah.   It was probably the -- one of the

 3    very first days I climbed again, yeah.

 4         Q.    Is that -- are these pictures of you rock

 5    climbing?

 6         A.    No.

 7         Q.    Who -- who -- who are in these photos?

 8         A.    That's my old neighbor.

 9         Q.    Are you the one that took the photos?

10         A.    I am, yeah.

11         Q.    Did you go up the rock first?

12         A.    I took an easier route.   I -- the first

13    pitch was -- I must have led the first pitch, and

14    then Evan led the second pitch.

15         Q.    This is Evan?

16         A.    Yeah.

17         Q.    So you led this pitch that's shown in

18    these photographs?

19         A.    Probably.

20         Q.    What does that mean to -- you lead climb

21    up a pitch?

22         A.    It means you use -- this is -- I could

23    spend a whole day talking about this.   You use gear.

24    You plug it into the rock and climb up the rock.

25         Q.    And if you're the first one up, there's no

                                                         227

**John Meyer**

```
 1   -- there's no rope up above you.  Right?
 2        A.    Correct.
 3                         (Whereupon, Exhibit 40 was
 4                         marked for identification.)
 5   BY MR. McINTOSH:
 6        Q.    Exhibit 40 is another Facebook post of
 7   yours.  Correct?
 8        A.    Yeah.
 9        Q.    And in Exhibit 40 you're talking about
10   going water skiing.  Correct?
11        A.    Yep.  Got my face dragged through the
12   water.
13                         (Whereupon, Exhibit 41 was
14                         marked for identification.)
15   BY MR. McINTOSH:
16        Q.    Exhibit 41 is another Facebook post of
17   yours.  Correct?
18        A.    Yeah.  This was my bachelor party that you
19   guys tried to depose me on.
20        Q.    Objection.  Move to strike.
21        A.    I nearly got hurt in this one because I
22   just didn't have the confidence.  I used to -- this
23   used to be no problem skiing.  Now I just don't have
24   confidence.
25        Q.    Exhibit 41 you're talking about skiing,
```

**John Meyer**

1  swimming at Glacier Lake and having a relatively

2  close encounter with a grizzled bear in Glacier

3  National Park.  Correct?

4       A.    Yeah.

5                          (Whereupon, Exhibit 42 was

6                           marked for identification.)

7  BY MR. McINTOSH:

8       Q.    Exhibit 42 is another one of your Facebook

9  posts.  Correct?

10       A.    Yeah.  This is just February this year,

11  yeah.

12       Q.    And you were talking about in February

13  going skiing at Bridger Bowl, hitting jumps, getting

14  on a rail and skiing backwards.  Correct?

15       A.    Correct.

16       Q.    Did you do all those things?

17       A.    One on the list is I hit some jumps, yes,

18  tiny ones.  Tried to ride a rail and tried to ski

19  backwards, yeah.  Yeah.

20       Q.    So you -- so since this accident, you are

21  -- you rock climb.  You mountain bike.  You water

22  ski.  You ski and go off jumps.  You ski backwards.

23  Hit rails.  Ski in the back country.  You still

24  practice law.

25                 So how do you claim that this incident has

229

**John Meyer**

1   negatively affected you?

2        A.    So much of skiing is -- for me is being

3   confident on what I'm about to ski, and I have

4   completely lost my confidence.  And that has negative

5   impact -- negatively impacted my ability to ski.

6        Q.    Okay.  Anything else?

7        A.    Can you repeat the question?

8                         (Whereupon, the requested

9                         record was read.)

10            THE WITNESS:  Yeah.  So just -- I mean,

11  besides the recreational stuff that I just explained,

12  that my fine motor skills are not what they used to

13  be.  I have trouble skiing.  In terms of climbing,

14  I'll get to the top of a pitch and be a little

15  lightheaded, where this never happened before.

16            In terms of -- what else we got?  Rock

17  climbing, skiing, backcountry skiing.  I'm just

18  scared to get on the same things I used to get on.

19  It's like, man, I don't want to cross-country ski.  I

20  want to backcountry ski, and I just feel like I can't

21  get after it the way I used to be able to.

22  BY MR. McINTOSH:

23       Q.    Do you have a Twitter account?

24       A.    I think so, yeah.

25       Q.    What is your Twitter account?

                                                    230

**John Meyer**

```
 1        A.     It -- well, there's the one I think when I
 2   was running for public office Meyer for Montana, and
 3   then I don't know what the other one is.  I don't
 4   know that I have like a separate Twitter account.  I
 5   think I just had the political account.
 6        Q.     What other social media accounts do you
 7   have?  You mentioned your Facebook page, your Meyer
 8   for Montana Twitter account.  What other social media
 9   accounts do you have?
10        A.     What else is there?
11        Q.     I don't know.
12        A.     Yeah.  I got Facebook.  I got -- oh, no.
13   I don't -- no.  I think that's it.
14        Q.     Just the Twitter and the Facebook?
15        A.     I think so.
16        Q.     I want to ask you about some allegations
17   that you made in your complaint.
18        A.     Okay.
19        Q.     In paragraph 4 of your complaint, after
20   leaving -- you say after leaving the unmarked and
21   closed area.
22        A.     Uh-huh.
23        Q.     First of all, before we move on, what is
24   the unmarked and closed area that you contend you
25   skied into?  What does that have to do with your
```

231

John Meyer

```
 1   accident?
 2        A.    Well, if it had been marked and closed, I
 3   wouldn't have been there.
 4        Q.    Yeah.  But this area you were in --
 5        A.    Yeah.
 6        Q.    -- you claim you were in this closed area.
 7   The ski patrol told you.
 8        A.    Yeah.
 9        Q.    You then went out to an open area.  Right?
10        A.    Uh-huh.
11        Q.    Right?
12        A.    Yeah.
13        Q.    And then you skied in an open area.
14        A.    Yeah.
15        Q.    And the area where you claim your accident
16   occurred was an open area.  Right?
17        A.    Yeah.
18        Q.    So what does -- the closed area that you
19   claim you went into, what does that have to do with
20   your accident?
21        A.    We might not have been skiing that open
22   area if the closed area had been marked.
23        Q.    Where else would you have gone down?
24        A.    I don't know.  But if it was closed, we
25   wouldn't have gone down that same ride, that same
```

232

**John Meyer**

1    shot.

2         Q.    But there was no place else to go.

3         A.    What do you mean?

4         Q.    There was -- there was no place else to go

5    other than where the ski patrol told you to go, off

6    to the left.

7         A.    Yeah.  And if it had been marked as

8    closed, we wouldn't have gone there.

9         Q.    But then you skied several hundred yards

10   until you had your ski accident where you were

11   injured.  Right?

12        A.    I don't know how far it was.

13        Q.    You skied -- well, you would agree with me

14   you skied at least 100 yards.  Right?

15        A.    Probably.  I don't know how far it was.

16        Q.    Okay.  So if you skied at least 100 yards

17   from this area you're -- closed area until the time

18   of your ski accident, what does the closed area have

19   to do with your accident?

20        A.    If the area had been marked as closed as

21   it should have been, we wouldn't have skied anywhere

22   near that area, and as a result we would have never

23   skied down the hill.  And I wouldn't have skied over

24   the rollover.

25        Q.    Right.  But if they wouldn't have been

233

John Meyer

```
 1    having turkey-for-a-ticket day, you wouldn't have
 2    been skiing at Big Sky.  Right.  So is it the
 3    turkey-for-a-ticket day's fault too?  Is it?
 4         A.    I like your sense of humor.
 5         Q.    So you agree that a turkey-for-a-ticket
 6    has nothing to do with your accident?
 7         A.    It's actually the turkey's fault.
 8         Q.    Okay.
 9         A.    Yeah. I'm going to blame it on the
10    turkey.
11         Q.    Okay.  You skied several hundred yards,
12    though, from the alleged closed area to the area of
13    your accident.  Right?
14         A.    I don't know how far I skied.
15         Q.    Quite a ways, though.  Right?
16         A.    I don't know.
17         Q.    Aren't you a bow hunter?  Aren't you
18    supposed to be good at measuring distances?
19         A.    I have never actually killed an animal.
20         Q.    So you're not good at measuring distances?
21         A.    Evidently not.
22         Q.    Paragraph 14 of your complaint, "After the
23    accident, a ski patroller at Big Sky Resort informed
24    Meyer that the ski patrol runs out of signs and
25    fences to mark hazards."
```
                                                      234

**John Meyer**

```
 1              Are you there just referring to an e-mail
 2   from the volunteer ski patroller, Ashley Nettles?
 3        A.    We're on 27?
 4        Q.    No.  I'm on paragraph 14 of your
 5   complaint.
 6        A.    Can you --
 7        Q.    You should have a copy of it.
 8        A.    So can you provide me with a copy?
 9        Q.    I'll just read it to you.  You say after
10   the accident, a ski patroller at Big Sky Resort
11   informed Meyer that the ski patrol runs out of signs
12   and fences to mark the accident.  So my question is,
13   for that allegation, are you only relying on the
14   e-mail from Ashley Nettles?
15        A.    Can you please read that one more time?
16        Q.    After the accident --
17        A.    Uh-huh.
18        Q.    -- a ski patroller at Big Sky Resort --
19        A.    Uh-huh.
20        Q.    -- informed Meyer that the ski patrol runs
21   out of signs and fences to mark hazards.
22        A.    No.  I'm not only relying on the e-mail
23   from Ashley Nettles.
24        Q.    What are you relying on other than the
25   e-mail from Ashley Nettles?
```

                                                        235

**John Meyer**

```
 1        A.    The ski patroller that we encountered that
 2   told us the area was closed.
 3        Q.    Did that happen after the accident?
 4        A.    No, it didn't.
 5        Q.    This says after the accident.
 6        A.    Okay.
 7        Q.    Doesn't it?
 8        A.    Yeah, it does.
 9        Q.    Okay.  So back to my question.
10        A.    Okay.
11        Q.    For the allegations in paragraph 14 --
12        A.    Uh-huh.
13        Q.    -- where you say, "After the accident a
14   ski patroller at Big Sky Resort informed Meyer that
15   you ski patrol runs out of signs and fences to mark
16   hazards."  Are you relying only on the e-mail from
17   Ashley Nettles?
18        A.    Yeah.
19        Q.    Okay.  In paragraph 27 you say, "A ski
20   patroller responded with an e-mail, stating the
21   resort runs out of signs, and the patrollers are
22   expected to work in poor conditions."
23        A.    Uh-huh.
24        Q.    Are you again referring to the e-mail from
25   Ashley Nettles?
```
236

John Meyer

```
1          A.    Yes.

2          Q.    Are you referring to anything else other

3    than the e-mail from Ashley Nettles?

4          A.    In theory, you'd be talking about having

5    patrollers drive down 191 dangerous conditions.

6          Q.    I'm not talking about in theory.  I'm

7    talking about what you are relying on for the

8    allegation you made in paragraph 27 of your first

9    amended complaint and jury demand.

10         A.    Okay.

11         Q.    Are you relying on anything other than the

12   e-mail from Ashley Nettles for that allegation?

13         A.    What is the allegation again?

14         Q.    The resort runs out of signs but

15   patrollers are expected to work in poor conditions.

16         A.    Poor conditions I would say are having to

17   drive down 191.

18         Q.    So is -- is that now part of your

19   allegations in this case, that -- that you're

20   complaining about patrollers having to drive down

21   191?  Can you answer the question, please?  Is that

22   part of your case now?

23         A.    It's -- it says what it says.

24         Q.    Right.  Exactly.  And I'm trying to ask

25   you the simple question.
```
                                                      237

John Meyer

```
 1          A.     Yeah.

 2          Q.     Is Ashley Nettles' e-mail the only thing

 3   you are relying on for the allegation you have in

 4   paragraph 27 of your first amended complaint?

 5          A.     I don't have the complaint in front of me.

 6          Q.     I just read it to you.

 7          A.     Okay.  Can I have a copy?

 8          Q.     This sentence that I have highlighted

 9   right here.  "The resort runs out of signs, and the

10   patrollers are expected to work in poor conditions."

11          A.     Uh-huh.

12          Q.     Do you see that?

13          A.     Yes.

14          Q.     Are you relying on anything other than

15   Ashley Nettles' e-mail for those allegations?

16          A.     Poor conditions entails not only not

17   having heat in your shack but also having to drive

18   down 191 every day.  You're asking these guys to put

19   their lives at risk to drive down 191 every day to

20   save people's lives.  And they don't get health care,

21   but you have heated ski lifts?  It just -- something

22   is not quite right.  It's poor condition if you ask

23   me.

24                 THE WITNESS:  What do you think, Mike?

25   BY MR. McINTOSH:
```

                                                        238

**John Meyer**

1    Q.    Mr. Meyer, please stop harassing my

2  client.

3          Do you even know how many ski patrollers

4  live in Big Sky versus have to drive 191?

5    A.    No.

6    Q.    Do you even know if the ski patrollers

7  that were working on December 11, 2015, in the

8  Challenger area live in Big Sky or they have to drive

9  191?

10   A.    No.  Doesn't matter.  Because with any

11 settlement I'd provide health care for all those

12 guys.

13   Q.    Except for the 3.6 million you want for

14 yourself.  Right?

15   A.    No.  I don't want any money for myself.

16   Q.    Then why did you make a demand where you

17 asked for 2 million for yourself?

18   A.    No.  See, I didn't make a demand for

19 2 million for myself.

20   Q.    You didn't?

21   A.    Not against Big Sky.  I asked it about you

22 and your law firm.

23   Q.    Okay.

24   A.    That's why I filed a separate suit action.

25   Q.    Okay.

                                                    239

**John Meyer**

```
 1        A.    Because I wanted to keep the money totally
 2   separate.  Because what you guys are doing, suing me,
 3   is called a slap suit.  It's a strategic lawsuit
 4   against public participation.  Hey, John, we want to
 5   depose you right before your wedding.  Hey, John, we
 6   want to depose you during your honeymoon.
 7        Q.    Move to strike all this.  Mr. Meyer,
 8   you're not asking any question.
 9        A.    I just did.  I explained --
10        Q.    No.
11        A.    -- why I asked for 2 million separate from
12   the Big Sky.
13        Q.    So are you -- are you refusing to tell me
14   if you're relying on anything other than Ms. Nettles'
15   e-mails -- Ms. Nettles' e-mail for the allegation the
16   resort runs out of signs and the patrollers are
17   expected to work in poor conditions?
18        A.    We just went over this, didn't we?
19        Q.    Yeah.
20        A.    Okay.
21        Q.    I'll say it this way.  Other than
22   Ms. Nettles' e-mails, what are you relying on for
23   that allegation in paragraph --
24        A.    The icy road on 191, the dangerous
25   conditions.
```

240

**John Meyer**

```
 1        Q.    In paragraph 33 you said, "Plaintiff John
 2   Meyer suffered physical harm as a result of using the
 3   unreasonably dangerous Dynafit bindings."  Do you see
 4   that?
 5        A.    No, I don't.  Paragraph 33?
 6        Q.    Yes.
 7        A.    Yes.
 8        Q.    How do you contend that John Meyer
 9   suffered physical harm as a result of using the
10   unreasonably dangerous Dynafit bindings?
11        A.    Because I got into a ski accident as a
12   result of using those bindings.
13        Q.    In paragraph 51 you claim that defendant
14   breached its duty to supply the ski patrol with
15   adequate supplies.  What facts are you relying on for
16   that allegation?
17        A.    The e-mail from Ashley Nettles.
18        Q.    Anything else?
19        A.    The fact that that unmarked Cat track
20   wasn't -- wasn't signed.
21        Q.    Okay.  Is that all?
22              You also say that the ski patrol breached
23   its duty to supply ski patrol with acceptable working
24   conditions.
25        A.    Uh-huh.
```

241

**John Meyer**

```
 1      Q.    What facts are you relying on for that

 2   allegation?

 3      A.    Can I see that complaint?

 4      Q.    Can you just answer the question, please,

 5   Mr. Meyer?

 6      A.    Can I read that?  Can I have a copy of the

 7   complaint?

 8      Q.    Can you please just answer the question

 9   about what facts --

10      A.    I can't remember them all.

11      Q.    No.  I'm not going to give you the

12   complaint because then you're going to -- you're

13   going to try and make another speech, and it's just

14   going to be ridiculous.  And we're going to waste

15   more time.

16          I simply want to know what facts are you

17   relying on to support your allegation that defendant

18   breached its duty of reasonable care by failing to

19   supply ski patrol with acceptable working conditions?

20      A.    Yeah.  The e-mail from Ashley Nettles.

21          MR. McINTOSH:  What number are we on?

22          THE REPORTER:  42.

23          MR. McINTOSH:  I'm sorry.  What was that?

24          THE REPORTER:  42.

25                          (Whereupon, Exhibit 43 was
```

242

**John Meyer**

```
 1                         marked for identification.)
 2    BY MR. McINTOSH:
 3         Q.    Next, Mr. Meyer, I'm going to hand you
 4    what I have marked as Exhibit 42.  That exhibit is a
 5    -- I'm sorry -- Exhibit 43.  Thank you,  Mr. Meyer.
 6              I'm handing you what has been marked as
 7    Exhibit 43.  Exhibit 43 is -- is that a page from
 8    your Twitter account or your Facebook page?
 9         A.    I have no idea.  Probably a Facebook page.
10         Q.    Okay.  So did you have a Facebook page
11    that was Meyer for Montana?
12         A.    I still do, yeah.
13         Q.    You still do now?
14         A.    Uh-huh.
15         Q.    And on that Facebook page you posted a
16    picture of your resort [sic] against Big Sky Resort
17    and said, quote, here is one way I'm working to
18    secure health care for Montanans, end of quote.
19    Correct?
20         A.    Yes.
21         Q.    When you filed your lawsuit, you knew that
22    Big Sky could not be compelled as part of the lawsuit
23    to provide health insurance for seasonal employees.
24    Correct?
25         A.    Correct.
                                                        243
```

**John Meyer**

1      Q.    Before filing this lawsuit you told Taylor
2  Middleton that you were going to seek $50 million in
3  damages.  Correct?
4      A.    Yeah.  Probably.
5      Q.    You knew it would be expensive for Big Sky
6  to defend this lawsuit.  Correct?
7      A.    No.
8      Q.    You knew Big Sky would have to hire
9  lawyers to defend itself.  Correct?
10      A.    I guess, yeah.
11      Q.    But you knew that you would be able to
12  proceed with the lawsuit on your own because you are
13  a lawyer.  Right?
14      A.    Yeah.
15      Q.    And your Meyer for Montana Facebook page,
16  that was a Facebook page you used to promote your
17  candidacy for U.S. Congress.  Correct?
18      A.    Yes.  I'm not going to ask if you voted
19  for me.
20      Q.    Exhibit 44 I have just handed to you.
21      A.    Uh-huh.
22                        (Whereupon, Exhibit 44 was
23                         marked for identification.)
24  BY MR. McINTOSH:
25      Q.    Is that a picture of you?

                                                    244

**John Meyer**

```
 1        A.    No.
 2        Q.    Who is that in the picture?
 3        A.    It's a friend.
 4        Q.    Who is the friend?
 5        A.    His name is Steve.
 6        Q.    Steve what?
 7        A.    I'm not going to tell you.
 8        Q.    So you're refusing to answer the question
 9  to say who that is?
10        A.    Yeah.
11        Q.    Why?  On what basis?
12        A.    Because the basis is that he actually skis
13  at Big Sky, and I am concerned you guys are going to
14  blacklist him and say he can't ski there again.
15        Q.    Okay.  Is that it?  That's the only
16  reason?
17        A.    That's the only reason.
18        Q.    And you refuse to answer the question to
19  tell us his last name?
20        A.    I think I told him that I wouldn't tell
21  anyone his last name.
22        Q.    What does that sign say that he's holding?
23        A.    Oh, looks like it says heated lifts but no
24  health care, question mark.
25        Q.    And you sent this picture to Lamar
```

245

**John Meyer**

```
 1   Advertising and tried to get this posted on a
 2   billboard.  Is that correct?
 3        A.    That's correct.
 4        Q.    On the way to Big Sky?
 5        A.    Yes.
 6        Q.    And did you do that or when did you do
 7   that?
 8        A.    I can't remember.
 9        Q.    Was that part of your campaign for
10   Congress?
11        A.    No.
12        Q.    You were just doing it on your own?
13        A.    I think so.
14        Q.    And in this -- this is from your own
15   Facebook page.  Correct?
16        A.    Looks like it.
17        Q.    When was that picture taken?  Do you know?
18        A.    I don't know.
19        Q.    In your Facebook page you say, "I'm
20   starting to collect names and stories of people who
21   have worked for Big Sky Resort in the past and were
22   fired and then rehired to avoid being treated as
23   permanent and receiving health care insurance."
24        A.    Uh-huh.
25        Q.    Correct?
```

**John Meyer**

```
 1        A.    Yes.
 2        Q.    What facts do you have to support that
 3   allegation?
 4        A.    I have a friend who used to be ski patrol
 5   at Big Sky that told me he was fired and then told to
 6   reapply so that he would be hired again as full-time.
 7        Q.    Who's that friend?
 8        A.    His name is Peter.
 9        Q.    Peter what?
10        A.    Harned, H-A-R-N-E-D.
11        Q.    When did Mr. Harned tell you that?
12        A.    A few months ago.
13        Q.    Okay.  And in this post you say, "If you
14   or someone you know had this happen, please get ahold
15   of me."  Correct?
16        A.    Yeah.
17        Q.    Has anyone gotten ahold of you?
18        A.    No.
19        Q.    And you say, "Your info will be kept
20   confidential."  Correct?
21        A.    Yes.
22        Q.    So you were soliciting employees at Big
23   Sky to contact you.  Right?
24        A.    No.
25        Q.    What were you asking them to do if you
```

247

John Meyer

```
 1   didn't want them to contact you?
 2        A.    I'm starting to collect names, sources of
 3   people who have worked for Big Sky in the past who
 4   were fired and then rehired in the past.
 5        Q.    Fired and then rehired?
 6        A.    In the past.
 7        Q.    Okay.  So you were just -- you were just
 8   looking to contact past Big Sky employees?
 9        A.    That's what it looks like.
10        Q.    You posted this on February 9, 2019.
11   Correct?
12        A.    Yes.  Looks like it.
13        Q.    Have any current or former Big Sky
14   employees contacted you about this, about this
15   Facebook post?
16        A.    Besides Peter, no.
17        Q.    Do you contend that your mental condition
18   materially impairs your ability to practice law?
19        A.    No.  As I said half an hour ago, it's
20   different.
21             THE WITNESS:  Do you mind if I go pee
22   while you're --
23             MR. McINTOSH:  No.
24             THE WITNESS:  -- marking this?
25             THE VIDEOGRAPHER:  Do you want to -- we're
```

248

**John Meyer**

```
 1    going off the record.  It's 3:25.
 2                        (Whereupon, a break was then
 3                          taken.)
 4             THE VIDEOGRAPHER:  We're back on the
 5    record.  It's 3:27.
 6    BY MR. McINTOSH:
 7        Q.    Mr. Meyer, you understand you're still
 8    under oath?
 9        A.    Yes.
10        Q.    Okay.  I have placed before you Exhibit
11    45.
12                        (Whereupon, Exhibit 45 was
13                          marked for identification.)
14    BY MR. McINTOSH:
15        Q.    Do you recognize Exhibit 45 as being a
16    post from your Facebook page?
17        A.    Yes.
18        Q.    You posted that on December 6th of 2018.
19    Correct?
20        A.    Yes.
21        Q.    And in that -- the very first post on page
22    1, you said you were trying to get a law firm willing
23    to go to trial to get health care for approximately
24    1,000 people.  Correct?
25        A.    Is that what it says?  If you know of a
```
249

**John Meyer**

```
 1   big law firm in New York City, Chicago, DC, Denver,

 2   et cetera, that is willing to go to trail, to get

 3   health care for approximately 1,000 people, please

 4   help -- please let me know.

 5          Q.     That's what you wrote?

 6          A.     Yeah.

 7          Q.     On December 6, 2018?

 8          A.     Yeah.

 9          Q.     On the second page near the bottom --

10          A.     Okay.

11          Q.     -- you wrote:  "If Big Sky doesn't want to

12   mark any ski terrain or provide any ski patrol at

13   all, then I am fine with assuming all

14   responsibility."  That's the first sentence you

15   wrote.  Correct?

16          A.     Correct.

17          Q.     The second sentence in that post you

18   wrote:  "But when Big Sky does not provide its

19   employees with the tools they need to do their jobs,

20   that is simply reckless and irresponsible."  Correct?

21          A.     I do believe that is correct.

22          Q.     That's what you wrote in those two

23   sentences.  Right?

24          A.     Yes.

25          Q.     And if the Big Sky ski patrol testifies
```

250

**John Meyer**

```
 1    and establishes that they have the tools they need to
 2    do their job, then will you accept responsibility for
 3    your ski wreck?
 4         A.    No.
 5         Q.    Why not?
 6         A.    Because there's more to it than that.
 7         Q.    What else is there to it?
 8         A.    There's the unmarked Cat track.
 9         Q.    And what if ski patrol says we --
10         A.    You see --
11         Q.    Hold on.  Hold on.  What if ski patrol
12    says we had the tools to mark that, we simply made
13    the choice not to?  Then will you accept
14    responsibility for your accident?
15         A.    No.
16         Q.    Why not?
17         A.    Because the Montana skier code says not
18    only do skiers have to accept responsibility, but ski
19    resorts do also.
20         Q.    So --
21         A.    To the extent the -- Big Sky Resort
22    negligently maintained terrain, I think that the
23    resort has to -- has to accept liability.
24         Q.    And what do you mean when you say
25    negligently maintained terrain?  Are you just talking
```

251

**John Meyer**

1    about the marking, or are you -- are you talking

2    about something else?

3        A.    Talking about the whole transition, yeah.

4        Q.    So is it the transition or the marking or

5    both?

6        A.    Didn't we already go over this?

7        Q.    Please just answer the question,

8    Mr. Meyer.

9        A.    My answer is didn't we already go over

10   this?

11       Q.    Please answer the question, Mr. Meyer.

12       A.    Why do you keep asking me the same

13   question five times in a row?

14       Q.    Mr. Meyer, please just answer the

15   question.

16       A.    You're tired of asking the same question.

17   I'm tired of answering the same question.  Can we

18   please move on?

19       Q.    No, Mr. Meyer.

20            MR. McINTOSH:  Can you please go back to

21   the question and reread it?

22                     (Whereupon, the requested

23                      record was read.)

24            THE WITNESS:  It's the potential ski

25   shacks aren't heated which makes the patrollers

                                                    252

John Meyer

```
 1   decide we don't want to be anywhere in this area.
 2   It's the lack of signs.  It's the transitions.  It's
 3   the bindings.  What else?  We have already covered
 4   all of this.
 5   BY MR. McINTOSH:
 6       Q.    Go on to page 4 of Exhibit 45.  Near the
 7   bottom of that page, you have a post.  And the first
 8   sentence of your post says "Everybody knows that if
 9   you want more access, you can duck a rope, and if you
10   fall, the liability is on you."  You wrote that in
11   the first sentence.  Correct?
12       A.    Correct.
13       Q.    Do you believe that?
14       A.    Everyone knows that if you want -- yeah.
15   I mean, in theory it's -- shouldn't duck ropes
16   because you're -- you know, yeah.  It's on you if you
17   duck a rope.
18       Q.    And did you duck a rope on December 11,
19   2015?
20       A.    No.
21       Q.    Here you say the second sentence of that
22   post, you say, "But if Big Sky is going to put up
23   signs, they should at least provide enough to mark
24   hazardous terrain."  Correct?
25       A.    That's what it says, yes.
```

                                                    253

**John Meyer**

1    Q.    And do you have any facts to suggest that

2  Big Sky did not have enough signs to mark hazardous

3  terrain on December 11, 2015?

4    A.    Yeah.

5    Q.    What?

6    A.    E-mail from Ashley Nettles.

7    Q.    Okay.  Anything else?

8    A.    The fact that I got into a ski accident.

9    Q.    Okay.  On page 6, in the middle of the

10  page, you have a post.  And did you say "What if the

11  patrol said they didn't receive enough signs or have

12  enough patrollers to put up the signs?"

13    A.    Uh-huh.

14    Q.    Is that a yes?

15    A.    I'm looking at this post where I reply to

16  Adam Talley.  It says "What if the patrol said they

17  didn't receive enough signs or have enough patrollers

18  to put up signs?"

19    Q.    That's what you wrote?

20    A.    Yes.

21    Q.    And what was the date that you wrote that?

22    A.    December 6, 2018.  So when you scroll

23  down, it says you are going to -- you are going to

24  have to tell me who is the patrol.  Some 21-year-old

25  doing his first and last year patrolling.  That

254

John Meyer

```
 1    wasn't the case.
 2         Q.    I'm going to --
 3         A.    It was a -- it was a ski patroller with
 4    nine years.
 5         Q.    I'm going to move to -- to strike because
 6    nobody has asked you a question.  So you're not
 7    answering a question.
 8         A.    Okay.
 9         Q.    So -- and, again, the facts that you're
10    relying on for your allegation that ski patrol didn't
11    receive enough signs or have enough patrollers,
12    that's Ashley Nettles' e-mail?
13         A.    Uh-huh.
14         Q.    Is that a yes?
15         A.    Yes.
16         Q.    On page 7, Mr. Talley asked you "how many
17    signs would have been enough to protect you from
18    yourself" in that big long post at the bottom.  Do
19    you see that?
20         A.    I see the big long post here.
21         Q.    It's right in the middle of it.
22         A.    Okay.
23         Q.    Did you read that post?
24         A.    I did, yeah.
25         Q.    So how many signs would have been enough
```
                                                      255

**John Meyer**

```
 1    to protect you from yourself on December 11, 2015?
 2         A.    I answered that question in my very next
 3    response.  It says regardless of how much money a
 4    resort has, if its ski patrol says they run out of
 5    signs, should that matter?  If it has enough signs
 6    but if its ski patrol says we need more patrollers,
 7    should that matter?  Do resorts have any
 8    responsibility at all to customers?  That's my
 9    question.
10         Q.    I understand that's what you wrote.
11         A.    Yeah.
12         Q.    And like you just said, that is a
13    question.
14         A.    Yeah.
15         Q.    I'm asking you for an answer, because this
16    is the time where you have to answer questions under
17    oath.
18         A.    Yeah.
19         Q.    So how many signs would it have taken to
20    protect you from yourself on December 11, 2018?
21         A.    Mu.
22         Q.    So you're not going to answer?
23         A.    No.  I just did.
24         Q.    Mu?
25         A.    Yeah.
                                                        256
```

**John Meyer**

1        Q.    That's your answer?

2        A.    Yeah.  The context of the question isn't

3    big enough for the answer.  Because -- you want me to

4    rephrase my answer?  The ski resort has some

5    responsibility, and I have alleged the ski resort was

6    negligent in maintaining the resort.

7        Q.    How many signs would it have taken to

8    properly warn you on December 11, 2015, Mr. Meyer?

9        A.    That's up for a jury to decide.

10       Q.    You can't tell me how many?

11       A.    If I tell you, then I'm acting like the

12   expert, and I'm not the expert.

13       Q.    Right.

14       A.    It's up to the jury to decide.

15       Q.    Because you're not an expert?

16       A.    No, I'm not.

17       Q.    You haven't spoken with any expert that

18   told you this should have been marked?

19       A.    No.

20       Q.    It's just your personal opinion?

21       A.    Yeah.

22       Q.    What number was that, Mr. Meyer?

23       A.    That was 45.

24       Q.    Thank you.  I'm handing you what has been

25   marked as Exhibit 46.

                                                    257

**John Meyer**

```
 1                        (Whereupon, Exhibit 46 was
 2                        marked for identification.)
 3    BY MR. McINTOSH:
 4         Q.    Exhibit 46 is an e-mail that you sent to
 5    the Big Sky ski patrol.  Correct?
 6         A.    Looks like it.
 7         Q.    And you sent that on December 15, 2017.
 8    Correct?
 9         A.    That's correct.
10         Q.    And that was an e-mail directly to
11    approximately 100 Big Sky ski patrollers.  Correct?
12         A.    Correct.
13         Q.    You knew at that time that Big Sky was
14    represented.  Correct?
15         A.    No.
16         Q.    So even though I had sent you a letter
17    saying I represented Big Sky, you didn't know Big Sky
18    was represented?
19         A.    You sent me a letter informing me not to
20    talk to any employees at Big Sky about the accident
21    after this date.
22         Q.    Okay.  I disagree with that, but we'll let
23    the record stand for itself.
24               So how -- how did you get the e-mails of
25    all these ski patrollers shown in Exhibit 46?
                                                        258
```

**John Meyer**

```
 1        A.     I think it was Evi Dixon.

 2        Q.     She gave you all their e-mails?

 3        A.     I believe so.

 4        Q.     How did she do that?

 5        A.     She forwarded to me for a pro form.

 6        Q.     I'm sorry.  She what?

 7        A.     Forwarded me the addresses through a pro

 8   form.

 9        Q.     And did -- did you tell her that you were

10   going to contact all the ski patrollers?

11        A.     I don't remember.

12        Q.     Okay.  Were you just trying to get in on

13   the pro form order?

14        A.     No.

15        Q.     Okay.  Did you specifically tell her that

16   -- did you specifically ask her for all of the e-mail

17   addresses?

18        A.     I must have.

19        Q.     I think you recently said -- I believe it

20   was in response to Salewa's discovery that your wife,

21   Amanda Eggert, recently remembered that she did

22   submit an article to -- was it the Outlaw?

23        A.     Say again.

24        Q.     Who -- what was the publication that

25   Amanda Eggert worked for in Big Sky?
```

259

**John Meyer**

1      A.     Explore Big Sky, which is owned by same
2  owner that owns the Outlaw, Montana law -- Mountain
3  Outlaw.
4      Q.     Didn't you -- didn't you say in some of
5  your recent discovery responses that Ms. Eggert did
6  submit an article about your accident to Explore Big
7  Sky?
8      A.     No.
9      Q.     You did not?
10      A.     No.
11      Q.     Did -- did she submit an article?
12      A.     No.  I don't think so.
13      Q.     Did you prepare a press release about this
14  lawsuit when you filed it?
15      A.     Yeah.
16      Q.     And who did you provide the press release
17  to?
18      A.     I can't remember.
19      Q.     You haven't provided that press release to
20  us in this case, have you?
21      A.     I don't know.
22      Q.     You don't recall?
23      A.     I don't recall.
24      Q.     If -- if you haven't produced it, will you
25  produce the press release to us?

John Meyer

```
 1        A.    Of course, yeah.
 2                        (Whereupon, Exhibit 47 was
 3                         marked for identification.)
 4   BY MR. McINTOSH:
 5        Q.    I'm going to hand you what I have marked
 6   as Exhibit 47.  Please take a minute to review that.
 7        A.    Okay.
 8        Q.    Do you agree that that's an accurate --
 9   accurate description or accurate notes regarding your
10   conversation with Salewa or -- or Dynafit North
11   America?
12        A.    No.
13        Q.    And why do you say it's not accurate?
14        A.    Because as I've said several times, I
15   started the entire conversation with I'd like you
16   guys to issue a nationwide recall.
17        Q.    Okay.  Down towards the bottom, they have
18   a question -- questions and answers typed out.  Do
19   you see that, bottom of -- bottom of the first page
20   Exhibit 47?
21        A.    Bottom of the first -- so where are you at
22   here?
23        Q.    The bottom of the first page of Exhibit
24   47.
25        A.    Okay.  I'm looking at the bottom.
```
                                                      261

**John Meyer**

```
1        Q.     Did -- did Salewa North America ask you to
2    send your boots in for testing?
3        A.     Yes.
4        Q.     And in response you told them to go fuck
5    themselves?
6        A.     No.  I don't think so.
7        Q.     So do you deny they -- they asked you are
8    you willing to send in your boots for testing, do you
9    deny that you said, "What you are saying is that it
10   is the boots not the bindings' fault.  Go fuck
11   yourself.  No.  I will not provide my boots"?
12       A.     That's totally different than what you
13   just asked.
14       Q.     Did you tell --
15       A.     What you are saying -- what you're saying,
16   Salewa, is that it's the boots' fault, not the
17   bindings.  And you can go fuck yourself.
18       Q.     Yeah.  I'm asking you a simple question.
19       A.     Yeah.
20       Q.     When Salewa North America --
21       A.     Yeah.
22       Q.     -- asked you are you willing to send in
23   your boots for testing --
24       A.     Yeah.
25       Q.     -- in response to that, did you say --
```
                                                        262

**John Meyer**

```
 1        A.      Yeah.
 2        Q.      -- what you are saying is that it is the
 3   boots' not the bindings' fault, go fuck yourself"?
 4        A.      Yeah.   I was trying to understand what
 5   they were saying.
 6        Q.      "No.   I will not provide my boots."
 7        A.      Yeah.   Because they already took my --
 8        Q.      You told them that?
 9        A.      They took my skis without permission.
10        Q.      Okay.   So --
11        A.      So I wouldn't give my boots without
12   permission as well.
13        Q.      So this -- this is accurate.   This is what
14   you said?
15        A.      What you are saying is that it is the
16   boots' not the bindings' fault.   You can go fuck
17   yourself.   That's basically what they're telling me.
18        Q.      I don't know what you're saying, Mr.
19   Meyer.  Did you or did you not --
20        A.      It says what you're saying is you can go
21   fuck yourself.   It's what he's saying to me.   That's
22   what the guy is saying to me.   Go fuck yourself.
23   That's what -- is that what you're saying to me?
24        Q.      I'm trying to make this real simple,
25   Mr. Meyer.  Did you say to the person from Salewa
```

263

**John Meyer**

```
 1   North America go fuck yourself?
 2        A.    No.
 3        Q.    You did not say that?
 4        A.    No.
 5        Q.    So you're saying he said that to you?
 6        A.    Yeah.  I'm saying you're telling me to go
 7   -- I'm asking a question.  Are you telling me to go
 8   fuck myself?  Is that what you're saying to me?
 9   That's why I said -- that's why I said what you are
10   saying is that it's not the -- it's the boots' not
11   the bindings' fault.
12        Q.    Okay.  Do you see what is typed in the
13   last two lines of --
14        A.    Yeah.  But there's an ellipsis.
15        Q.    Hold on.  Just let me ask -- ask the
16   question.
17        A.    Okay.
18        Q.    Do you see what is typed in the final two
19   sentences on the first page of Exhibit 47?
20        A.    Yes.
21        Q.    Did you use those words when speaking to
22   Salewa North America?
23        A.    I have no idea.  But I would say there's
24   an ellipsis right there.  So it's being taken out of
25   context.
                                                    264
```

**John Meyer**

```
 1        Q.    Have you spoken with any past or present
 2   ski patrollers from Big Sky about anything in any way
 3   related to this lawsuit?
 4        A.    Have I talked to any past patrollers?
 5        Q.    Past or present --
 6        A.    Yeah.
 7        Q.    -- ski patrollers --
 8        A.    Yeah.
 9        Q.    -- from Big Sky --
10        A.    Yeah.
11        Q.    -- about anything that is in any way
12   related to this lawsuit?
13        A.    Past patrollers, yes.
14        Q.    Who?
15        A.    Named Peter Harned.
16        Q.    Okay.  Anyone else?
17        A.    No.
18        Q.    So --
19        A.    Not that I think -- no.  Not that I
20   remember.
21        Q.    Is Peter Harned a professional or
22   volunteer patroller?
23        A.    He doesn't work there anymore.
24        Q.    Was Peter Harned a professional or
25   volunteer patroller?
```

                                                          265

**John Meyer**

```
 1        A.     He was a professional, I believe.

 2        Q.     When?

 3        A.     15 years ago, 20 years ago.

 4        Q.     So he did not work there on

 5   December 15, 2011 [sic]?

 6        A.     No.

 7        Q.     Have you spoken with any other current or

 8   former ski patrollers from Big Sky about anything

 9   related to your lawsuit?

10        A.     Not that I'm aware of.

11        Q.     Have you ever spoken with Evi Dixon about

12   your lawsuit?

13               THE REPORTER:  What was the first name?

14               MR. McINTOSH:  Evi, E-V-I.

15               THE REPORTER:  Thank you.

16               THE WITNESS:  We haven't talked about this

17   lawsuit after I filed it.

18   BY MR. McINTOSH:

19        Q.     Did you talk about this lawsuit with Evi

20   Dixon before you filed it?

21        A.     I can't remember.  I must have -- did I?

22   Yeah, I did.  I must have, because I sent the e-mail

23   that says good afternoon patrollers and please don't

24   contact me because I'm going to file a lawsuit.

25        Q.     What -- what did you and Evi discuss about
```
266

**John Meyer**

```
 1    this lawsuit before you filed it?
 2        A.    Nothing.  All we talked about was the idea
 3    -- I don't even know if we talked about -- I think I
 4    -- I can't remember.  We didn't talk about the Cat
 5    track or any of that stuff.
 6        Q.    Okay.  Other than Evi Dixon and Peter
 7    Harned, have you spoken with any -- any other current
 8    or past Big Sky ski patrollers?
 9        A.    I don't think so.
10        Q.    Did I give you earlier the -- yes.  The
11    affidavit of Ryan Ayres.  Can you open that up again?
12    Do you have that in front of you, Mr. Meyer?
13        A.    I do.
14        Q.    In paragraph 5, Mr. Ayres states that the
15    Challenger ski lift shack was heated by propane on
16    December 11, 2015.
17        A.    Uh-huh.
18        Q.    Do you have any facts to dispute that?
19        A.    No.  I haven't been able to depose him
20    yet.
21        Q.    Okay.  So as you sit here today, you're
22    not aware of any facts to dispute what Mr. Ayres says
23    in paragraph 5 of his affidavit?
24        A.    No.
25        Q.    Mr. Ayres also says in paragraph 6 that
```

267

**John Meyer**

1   there were approximately 50 professional ski

2   patrollers working on December 11, 2015, and there

3   were more than enough ski patrollers working in the

4   Challenger area on December 11, 2015.  Do you see

5   that?

6        A.    Uh-huh.

7        Q.    Is that a yes?

8        A.    Yes.

9        Q.    Do you have any facts as we sit here today

10  to dispute what Mr. Ayres says in paragraph 6 of his

11  affidavit?

12       A.    No.  But I haven't deposed him.

13       Q.    Paragraph 7 of his affidavit, Mr. Ayres

14  states that for three years prior to December 11,

15  2015, no ski patroller complained about inadequate

16  training in or regarding the Challenger ski lift

17  area.  Do you see that?

18       A.    Yes.

19       Q.    Do you have any facts to dispute what is

20  set forth in paragraph 7 of Mr. Ayres' affidavit?

21       A.    No.  But I haven't deposed him.

22            MR. McINTOSH:  Let's take a short break,

23  Mr. Meyer.  I might be done with questions.  I want

24  to take a little break, review my notes, and I might

25  turn it over to Mr. Condra.  Okay?

                                                    268

**John Meyer**

```
 1              THE VIDEOGRAPHER:  We're going off the
 2    record.  It's 3:48.
 3                        (Whereupon, a break was then
 4                    taken.)
 5              THE VIDEOGRAPHER:  We're back on the
 6    record.  It's 3:59.
 7    BY MR. McINTOSH:
 8        Q.    Okay.  Mr. Meyer, just a few more
 9    questions for you.  First of all, I think I misspoke
10    about one thing.  You said Peter Harned had not
11    worked at Big Sky for 15 to 20 years.  Correct?
12        A.    I think it's been between 10 and 20 years
13    since he worked there.
14        Q.    Okay.  But he -- he was not working on
15    December 11, 2015.  Correct?
16        A.    Correct.
17        Q.    How do you know Peter Harned?
18        A.    Oh, we signed up for a -- a race we're
19    trying to run.  It's called the Devil's Backbone.
20        Q.    And were you friends with him before your
21    accident on December 11, 2015?
22        A.    Yeah.
23        Q.    And how about Evi Dixon?  How do you know
24    her?
25        A.    How do I know Evi?  I met her after the
```
269

**John Meyer**

1    accident.

2         Q.    Okay.  You didn't know her before?

3         A.    I don't think so.

4         Q.    Did you know her -- do you still

5    communicate with Ms. Dixon?

6         A.    No.  I've -- I got a craniosacral massage

7    for my head after the accident.  I've tried to get

8    another one, but just the timing hasn't worked out.

9         Q.    So are you saying that she gave you a --

10        A.    Yeah.

11        Q.    -- head massage?

12        A.    Yeah.

13        Q.    When did she give you a head -- head

14   massage?

15        A.    Oh, I can't remember.  It was after the

16   accident.  Six months, eight months, a year, I can't

17   remember.

18        Q.    Okay.  So, Mr. Meyer, you've described in

19   detail the last couple seconds before you wrecked.

20   Right?

21        A.    Uh-huh.

22        Q.    Is that a yes?

23        A.    Yes.

24        Q.    But everything else I've asked you about

25   December 11, 2015, you basically say you have no

                                                    270

**John Meyer**

1   memory of.  Right?

2        A.    No.  I remember looking at my truck and

3   looking at Amanda and thinking she's not going to

4   wear a helmet, so I'm not going to either.

5        Q.    How is it that you have so little memory

6   of everything on December 11, 2015, other than the

7   couple seconds right before you wrecked skiing?

8        A.    I don't know, man.

9        Q.    How do you know what you are remembering

10  is even what really happened?

11       A.    Yeah.  Maybe nothing happened.  Maybe I

12  never went into a coma.  Right?  Is that what you're

13  saying?

14       Q.    That's not at all what anybody said,

15  Mr. Meyer.

16       A.    Well, that's what you just were inferring.

17       Q.    No.  I wasn't at all.

18       A.    Okay.

19       Q.    I was asking a simple question.

20       A.    Okay.

21       Q.    How do you know what you are remembering

22  or what you have described as having had happened a

23  couple seconds before you wrecked, how do you know

24  that that is the truth?

25       A.    I'm under oath.  I'm telling you what I

271

John Meyer

```
 1    know.
 2         Q.    Okay.
 3              MR. McINTOSH:  I will reserve all further
 4    questions until after Mr. Condra is done and any that
 5    we have to raise with the courts due to your failure
 6    to answer questions.
 7              THE WITNESS:  Okay.
 8              MR. CONDRA:  Yeah.  Go off the record for
 9    a minute.
10              THE VIDEOGRAPHER:  We're going off the
11    record.  It's 4:01.
12                        (Whereupon, a break was then
13                         taken.)
14              THE VIDEOGRAPHER:  We're now back on the
15    record.  It's 4:03.
16                        EXAMINATION
17    BY MR. CONDRA:
18         Q.    All right.  Good afternoon, Mr. Meyer.  We
19    previously met today.  My name is Brad Condra, and I
20    represent Salewa USA, LLC.  Do you understand that?
21         A.    Yes.
22         Q.    For purposes of keeping our record
23    relatively clear today, I'm going to refer to Salewa
24    USA, LLC, as Dynafit.  Is that fair?
25         A.    Yes.
```

**John Meyer**

```
 1        Q.    Okay.  I'm doing that because we
 2   previously referred to it as Dynafit.
 3        A.    Uh-huh.
 4        Q.    Okay.  But I mean Salewa USA when I say
 5   Dynafit.
 6        A.    Okay.
 7        Q.    Okay?  I am batting cleanup, which means I
 8   will be jumping around.
 9        A.    Okay.
10        Q.    My purpose is not to confuse you with my
11   questions --
12        A.    Okay.
13        Q.    -- but rather just to fill in the gaps.
14        A.    Okay.
15        Q.    If I ask a confusing question, I would ask
16   that you let me know that I've asked a confusing
17   question and ask me to clarify it or rephrase it.  Is
18   that fair?
19        A.    Yeah.
20        Q.    Okay.  You're still under oath.  Do you
21   understand that?
22        A.    Yes.
23        Q.    Okay.  With respect to the moments before
24   your accident --
25        A.    Uh-huh.
```
                                                      273

**John Meyer**

```
 1        Q.      -- do you recall right before you went
 2   over the -- what I'll call the rollover --
 3        A.      Uh-huh.
 4        Q.      -- what your body positioning was relative
 5   to your skis?
 6        A.      Huh-uh.
 7        Q.      No memory of that?  Is that a no?
 8        A.      No.  I don't remember.
 9        Q.      Okay.  Do you remember if your shins were
10   pressing forward into your boots as you went over
11   that rollover?
12        A.      I don't remember.
13        Q.      Okay.  Do you remember if your skis were
14   parallel as you went over that rollover?
15        A.      No.  They were -- they were at an angle,
16   because I was trying to go over it, and it surprised
17   me.  I'm trying to turn left and -- I'm trying to
18   turn left as I'm going down the rollover onto the Cat
19   track.
20        Q.      Okay.  And help me because I think I asked
21   a poor question.
22        A.      Uh-huh.
23        Q.      As you were coming over the rollover --
24        A.      Uh-huh.
25        Q.      -- do you visualize the -- the Cat track?
```
274

**John Meyer**

```
 1        A.     Say again.
 2        Q.     As you're coming over the rollover, do you
 3   visualize the Cat track?  Can you see the Cat track?
 4        A.     No.  I didn't -- I had -- it was like --
 5   it was -- it took me completely by surprise.
 6        Q.     Okay.  As you're coming over the rollover,
 7   using the Cat track as our reference point, are your
 8   skis perpendicular to the Cat track, or are they at
 9   an angle to the Cat track?
10        A.     I always try to stay on the edge when I'm
11   skiing.  I don't know what the angle was, but I was
12   -- I always try to stay on the edge as safety, you
13   know.  That's how you ski.  That's how I ski.
14        Q.     Were you in a left-hand turn at the time
15   you went over the rollover?
16        A.     Yeah.  Yeah.
17        Q.     Okay.  With respect to your injuries from
18   the accident, did you sustain any injury to your
19   neck?
20        A.     At first the docs thought maybe I did, and
21   I think they decided no, I hadn't.  I'm not -- I
22   don't -- yeah.
23        Q.     Okay.  So no injury to your neck?
24        A.     I don't think so.
25        Q.     So I think you testified that as you came
```

275

**John Meyer**

1   over the rollover, you hit the Cat track.

2        A.    Uh-huh.

3        Q.    Correct?

4        A.    Yeah.

5        Q.    Okay.  You're in a left-hand turn.

6   Correct?

7        A.    Yeah.

8        Q.    And let's just break it down.  I know

9   you've talked about it today, but I want you to break

10  it down memory by memory to make sure I -- I

11  completely have it.

12       A.    Uh-huh.

13       Q.    Walk me through it.  You're in a left-hand

14  turn.  You're on the Cat track.  Did your ski tips

15  hit first, did your tails hit first, or did you hit

16  flat on the Cat track, or do you remember?

17       A.    I don't really remember.

18       Q.    Okay.  So walk me through.  Where were

19  you --

20       A.    I'm guessing that -- I'm guessing that my

21  tips hit first because, you know, they're always the

22  first to go down the hill.  So I'm guessing as I'm

23  coming over the rollover in a left turn, my tips hit

24  the Cat track first.

25       Q.    But because you're telling me you --

                                                    276

**John Meyer**

```
 1   you're guessing, you really don't know.  Is that
 2   correct?
 3        A.    Well, I can't -- well, yeah.  I'm not --
 4   I'm not 100 percent sure.
 5        Q.    Sure.  Not a memory contest or a guessing
 6   game.  We just want to know the extent of your memory
 7   so that I do not hear something new before the jury.
 8        A.    Yeah.
 9        Q.    Is that fair?
10        A.    Yeah.
11        Q.    Okay.  How about this?  At what point in
12   the sequence while you're -- while you're skiing
13   before you're flying through the air, do your
14   bindings release?
15        A.    At what point in the sequence before
16   you're flying in the air do your bindings release?
17   For some reason I thought that they had released --
18   like I don't think that I -- I have no idea, some
19   sort of flip, and I don't think that my skis were
20   still on when I did the flip.
21        Q.    Do you know to a certainty whether your
22   skis were attached to your feet or not --
23        A.    I'm not positive.
24        Q.    -- when you did your --
25        A.    I'm not positive.
```

277

**John Meyer**

```
 1        Q.    We'll have to be careful not to talk over
 2   each other.  Let me ask my question and then you can
 3   give me the same answer again.
 4             Do you know whether your skis were still
 5   attached to your boots when you started the sequence
 6   of your flip?
 7        A.    No.  I'm not sure.
 8        Q.    You just have no memory of it?
 9        A.    I have no memory.
10        Q.    Do you know where you were on the Cat
11   track?  Were you closer to the rollover, or were you
12   closer to the edge of the Cat track when you began
13   your flip?
14        A.    I thought that I was ejected from the
15   bindings about halfway through the Cat track, and
16   then I started doing the flip towards the outside
17   edge of the Cat track.
18        Q.    But, again, we -- you're telling me that
19   you think.  Do you know?
20        A.    No, I don't.
21        Q.    You don't know?
22        A.    No.
23        Q.    Okay.  And you do not know what other
24   trails you had skied that day in Big Sky before your
25   accident.  Correct?
```

278

**John Meyer**

```
 1        A.    Correct.

 2        Q.    Just so our record is clear, what bindings

 3   were you using the day of your accident?

 4        A.    Dynafit Radical TLTs.

 5        Q.    Where did you purchase them?

 6        A.    I believe I got them from a friend through

 7   a pro form.

 8        Q.    Okay.  So were they new when you purchased

 9   them?

10        A.    Yeah.  They were brand-new.

11        Q.    Did they come in a box?

12        A.    Yeah.

13        Q.    Did the box have instructions?

14        A.    It must -- I'm sure it did.

15        Q.    Did you read the instructions?

16        A.    I can't remember if I did or not.

17        Q.    Was this your first pair of tech bindings?

18        A.    Yeah.

19        Q.    Okay.

20        A.    Uh-huh.

21        Q.    Approximately what year did you purchase

22   those bindings?

23        A.    Oh, 2011 maybe.

24        Q.    Okay.

25        A.    '12, something like that.
```

**John Meyer**

1      Q.    What pro form did you use to acquire --
2  acquire the bindings that you were using on the day
3  of your accident?
4      A.    I can't remember.  It was from a friend.
5      Q.    Who was the friend?
6            THE REPORTER:  It was -- oh.
7            THE WITNESS:  It was through a friend.
8  His name is Jeff -- what is his last name?  Jeff
9  moved down to Moab.  I just saw him a month ago.
10 Jeff, what is your last name?  I can see your -- I
11 can't remember his last name.  I can get it to you,
12 though.
13 BY MR. CONDRA:
14     Q.    That would be good.  I'll send you --
15     A.    Yeah.
16     Q.    -- a request in discovery.  Okay?
17     A.    Okay.  Yeah.
18     Q.    How long did you have the bindings before
19 you had them mounted on skis?
20     A.    Not very long.  I mean, it was the very
21 first pair of bindings I ever owned, so I got
22 bindings -- got skis and I was skiing.
23     Q.    So were you still a beginner skier when
24 you bought these bindings?
25     A.    Yeah.

280

**John Meyer**

```
 1        Q.     Okay.  So you were just learning to ski?
 2        A.     Uh-huh.  Learned how to ski on those
 3   bindings.
 4        Q.     Okay.  What skis did you mount the
 5   bindings to?
 6        A.     A pair of Black Diamond Zealots.
 7        Q.     Were they -- were those skis new when --
 8   when you had your bindings mounted?
 9        A.     Yes.
10        Q.     Okay.  Where did you purchase those?
11        A.     Where I did -- it might have been Northern
12   Lights maybe.  I can't remember exactly.
13        Q.     They were new when you purchased them?
14        A.     They were brand-new.
15        Q.     Okay.  And who mounted the bindings to the
16   skis?
17        A.     I can't remember.  I'm guessing maybe
18   Northern Lights.
19        Q.     Okay.  And I think you've been clear, but
20   let me ask this.  Did the Black Diamond Zealots that
21   you purchased -- had they ever had another binding
22   mounted on them?
23        A.     No.  They were brand-new.
24        Q.     In your mind what is the purpose of the
25   ski binding?  What are the purposes of a ski binding?
```

281

**John Meyer**

1      A.     To let you ski.

2      Q.     Okay.  Any other purposes?

3      A.     No.  To ski.  It's -- when I think of

4  skiing, it's like -- yeah.  You got to have bindings

5  to go ski.

6      Q.     Do you understand a binding -- that

7  bindings also provide a protective mechanism for the

8  skier?

9      A.     How so?

10     Q.     Do you understand that the binding is

11 designed to release at certain points?

12     A.     Sure.  Yeah.

13     Q.     And you understand the bindings that you

14 were using on the day of your accident are designed

15 to release to protect you as a skier?

16     A.     Bindings if -- yeah.  If you get enough

17 pressure on them, they're designed to release, yeah.

18     Q.     Okay.  And you understand that they can

19 release at the toe or the heel.  Correct?

20     A.     Uh-huh.

21     Q.     Do you know which released during your

22 accident sequence?

23     A.     No, I don't.

24     Q.     You don't know whether it was the toe.

25 Correct?

                                                    282

**John Meyer**

1        A.     Correct.

2        Q.     And you do not know whether it was the

3    heel?

4        A.     Correct.

5        Q.     Did your bindings break at all during your

6    accident sequence?

7        A.     When I brought the bindings into the ski

8    shop, they showed -- they took a video of the

9    bindings moving.  And I'm not talking about the top

10   plate that moved.  I'm talking about the entire

11   binding.  So that's a long way of saying yeah.  I

12   guess they did break.

13       Q.     Okay.  Have you skied those bindings since

14   the date of your accident?

15       A.     After Dynafit took the bindings, sent them

16   back, I did ski them.

17       Q.     Okay.  And approximately how many days

18   would you estimate you have skied on that set of

19   bindings -- that pair of bindings since your

20   accident?

21       A.     Maybe five and then I say I don't feel

22   good about this whole thing.  So I took the bindings

23   off the skis, and now I've got them in a box.

24       Q.     Okay.  So you separated the bindings at

25   issue in this litigation from the skis.  Correct?

                                                    283

**John Meyer**

```
 1        A.     After they were given back from Dynafit,
 2   yes.
 3        Q.     Do you still possess the skis that you
 4   were skiing on the date of your accident?
 5        A.     Uh-huh.
 6        Q.     Is that a yes?
 7        A.     Yes.
 8        Q.     Okay.  Is there another set of bindings on
 9   those skis today?
10        A.     No.
11        Q.     Okay.  Well, if the bindings are in a box
12   and the skis haven't been remounted, why did you
13   separate the bindings from the skis?
14        A.     I had put a different pair of bindings on
15   those skis, and then I decided, you know, I just
16   don't want to -- time for new skis.  These things
17   have been through some -- some heavy action, so it's
18   time to purchase a new pair of skis.
19        Q.     When did you separate the bindings -- the
20   -- the Dynafit bindings at issue in this case from
21   the skis that you were skiing on the date of your
22   accident?
23        A.     It's been awhile.  This is a random guess.
24   Maybe a year, something like that, maybe more.
25        Q.     At some point in time in 2018 then?
```
284

**John Meyer**

```
 1        A.      Maybe 2017.
 2        Q.      Before or after you filed the complaint
 3   against Big Sky?
 4        A.      After.  I believe after.
 5        Q.      Before or after you filed your amended
 6   complaint naming Dynafit?
 7        A.      Probably after.
 8        Q.      Did it occur to you that Dynafit might
 9   want to retest those bindings and skis before you
10   separated the bindings and skis?
11        A.      No.  Not really.  I mean, I figured you
12   guys already did all the testing.
13        Q.      Okay.  But you knew that those bindings
14   were going to be at issue in the lawsuit you filed
15   against Dynafit.  Correct?
16        A.      Uh-huh.
17        Q.      Is that a yes?
18        A.      Yes.
19        Q.      Okay.  With respect to ski bindings that
20   release, if you skied over a rock with the Dynafit
21   bindings or let's just say a scree field.  Let's say
22   something pretty extraordinary.
23        A.      Okay.
24        Q.      If you skied over a -- a scree field --
25        A.      Uh-huh.
```
                                                        285

**John Meyer**

```
 1        Q.     -- would you hope that those bindings
 2   would release?
 3        A.     Over a scree field?  There's a lot of
 4   variables in that.  Like if it's a -- depends on
 5   speed.  It depends on all sorts of things.
 6        Q.     Let's go at it this way.  Aside from your
 7   knee, what lower extremity injuries did you sustain
 8   in this accident?
 9        A.     Fortunately, I -- I think that's it, just
10   my knee.
11        Q.     Okay.
12        A.     And that's it.
13        Q.     And there is some evidence in this case,
14   you would agree, that you may have injured your knee
15   skiing approximately a year after the accident.
16   Correct?
17        A.     Uh-huh.
18        Q.     Is that a yes?
19        A.     Yes.
20        Q.     Okay.  And I'm not trying to be rude with
21   you.  I just want to make sure our record is clear.
22        A.     Yeah.  Absolutely.
23        Q.     Okay.  Well, let's just get down to the
24   basics of your case here.  Can you tell me as clearly
25   as you are able what defect exists in the Dynafit
```

286

John Meyer

```
 1   bindings you were skiing on the date of your accident

 2   that caused injury to you?

 3        A.    I think that the integrity of the binding

 4   was at issue, I said, because there were some -- I

 5   think of Dynafit -- these bindings at issue three

 6   generations, like the first generation, second, and

 7   third.

 8             The first generation have one plate, and

 9   there is sort of a -- I don't -- I don't want to call

10   it -- you guys don't call it recall.  I don't know

11   what it's called, but it's like a notice, saying,

12   hey, if you have these first version bindings, send

13   them back, and we'll put a plate in them -- put an

14   extra plate in them.

15             Then there's a second version which

16   doesn't have that plate, and there's been no sort of

17   voluntary recall on those or whatever.  Then the

18   third version has the plate.

19             So you guys are saying in the first

20   version we're going to put a plate in, and the third

21   version comes with a plate right out of the store.

22   And so the second version, which I either had the

23   first or the second version, there is no plate.  And

24   I think that impacted the integrity of the binding.

25             Because when you look at -- when you look
```

287

**John Meyer**

1    at the video, the entire binding is shaking, which is

2    -- I've never seen that.  And skis were tuned and

3    waxed up the day before the accident.  So it just --

4    these guys handled the skis.  They handle skis every

5    single day.  And I'm guessing that -- I know for a

6    fact the bindings were not like that the day of the

7    accident before the accident.

8        Q.    Okay.  You said a lot there.

9        A.    Yeah.

10       Q.    So let's unpack that a little bit.

11       A.    Okay.

12       Q.    What I did not hear in your answer --

13       A.    Uh-huh.

14       Q.    -- was any specific defect that you've

15    identified that is causally related to your accident.

16       A.    Okay.

17       Q.    Am I correct?

18       A.    No.

19       Q.    You have not identified a specific defect

20    in the Dynafit bindings that caused your accident as

21    you sit here today.  Correct?

22       A.    No.  I think that the integrity of the

23    bindings was in play because it didn't have that

24    plate.

25       Q.    Okay.  And by the plate, you mean the

288

John Meyer

1    plate between the binding and the ski itself.

2    Correct?

3         A.    No.   The plate in the actual binding.

4         Q.    Have you produced anything in discovery to

5    demonstrate to me or my client what plate you were

6    referring to?

7         A.    I produced that in the initial discovery

8    and that it was my understanding that Big Sky

9    provided that all to you.

10         Q.    Okay.   Have you spoken with any expert who

11    has advised you that the plate you are eferring to

12    was a causative factor in your accident?

13         A.    No.

14         Q.    Okay.   Are you an expert in ski binding

15    design?

16         A.    No.

17         Q.    No.   Are you aware as you sit here today

18    that your bindings are in fact not subject to the

19    technical upgrade?

20         A.    I -- if you say so, because I've been

21    under the impression they were.

22         Q.    Okay.   It's your impression that they are.

23         A.    Uh-huh.

24         Q.    And this is the first time you're hearing

25    that they are not.   Correct?

                                                    289

John Meyer

 1          A.     Yeah.

 2          Q.     And so it would be a surprise to you if --

 3    if your bindings are not subject to the technical

 4    upgrade?

 5          A.     In the last week or so, we talked about

 6    this actually over e-mail.  Because I had another

 7    pair of bindings and bought about the same time that

 8    didn't have the plate, and you said those are fine.

 9    And so that's when I put in, oh, these other ones are

10    supposedly fine as well.

11          Q.     Well, let me -- let me ask it this way.

12          A.     Uh-huh.

13          Q.     If employees from Dynafit testify that

14    your bindings --

15          A.     Uh-huh.

16          Q.     -- are not subject to a technical

17    upgrade --

18          A.     Uh-huh.

19          Q.     -- would you have any evidence to dispute

20    that?

21          A.     Well, I would retain an expert.

22          Q.     Okay.  It would be subject to expert

23    testimony, though.  Correct?

24          A.     I suppose because I don't design -- I

25    don't design bindings for a living.

                                                        290

**John Meyer**

1    Q.    Right.  You, John Meyer, do not have any

2  idea whether your binding is subject to a technical

3  upgrade.  Correct?

4    A.    Well, except that when I look at your --

5  when I look at the website, it says first generation

6  missing a plate.  Send them in.  We'll put the plate

7  in.  Third generation has a plate already.  So why is

8  it the second generation doesn't have that plate?

9    Q.    Do you have the technical expertise to

10  understand any of that that you just explained to me

11  about whether there's a plate and whether it's

12  necessary, screws, any of it?  Do you understand any

13  -- any of the design aspects of the heel of your

14  binding?

15    A.    I've read it.  I've read it online.

16    Q.    The Wild Snow article you supplied to us,

17  is that --

18    A.    Yeah.

19    Q.    -- what you're referring to?

20    A.    Yeah.

21    Q.    Let's go ahead and make that exhibit so

22  that we have it.

23                        (Whereupon, Exhibit 48 was

24                         marked for identification.)

25  BY MR. CONDRA:

                                                    291

**John Meyer**

1     Q.    Handing you what has been marked Exhibit

2   48.  I'll give you a moment to look that.  Is that

3   the article that you were referring to where you

4   believe you obtained information to educate yourself

5   regarding the design of the Dynafit bindings?

6     A.    Yes.

7     Q.    Okay.  I have not seen anything else in

8   your discovery responses which would delve into the

9   subject matter that you've been testifying about at

10  all.  Is there anything else that you believe

11  supports your position that your binding may be

12  subject to a technical upgrade?

13    A.    No.

14    Q.    Okay.  Do you have any understanding with

15  respect to whether the technical upgrade for this

16  binding has any effect upon the release values of the

17  binding?

18    A.    I don't know that.

19    Q.    You just don't know?

20    A.    Can you ask your question one more time?

21    Q.    Does the technical upgrade --

22    A.    Uh-huh.

23    Q.    -- have any effect upon the release values

24  in the binding?

25    A.    Potentially.

                                            292

**John Meyer**

1    Q.    Potentially.  Do you know one way or the

2  other whether it has any effect upon the release

3  values of the heel or the toe?

4    A.    Can I answer more than yes or no?  So when

5  you look at the binding after the accident, when you

6  look at the video, the whole binding is shaking.

7  It's moving.  And I'd like to -- so that's why I'm

8  saying I think that lack of plate makes it so that

9  the whole binding would move more easily, and as a

10  result, it would allow a skier to be discharged off

11  of the binding.

12    Q.    Okay.  And that's your conjecture, your

13  speculation.  Correct?

14    A.    Yeah.  We have to hire experts.

15    Q.    Correct.  And you did just testify

16  earlier, I think, very clearly that the binding did

17  not have that motion -- that play prior to your

18  accident.  Correct?

19    A.    Correct.

20    Q.    Okay.  And you do not know as you're

21  sitting here today whether the binding was damaged in

22  some regard during the accident sequence, do you?

23    A.    I can never know that because you guys

24  took the bindings and tested them and then gave them

25  back, so I -- there's no way to know.

                                                      293

**John Meyer**

1      Q.    Okay.  We'll get into that in a minute.

2      A.    Okay.

3      Q.    In any event, after the accident, the

4   bindings were in the condition to allow you to at

5   least ski them on a number of other days

6   postaccident.  Correct?

7      A.    After you guys did the testing.  I'm

8   guessing you took them apart to do whatever and then

9   sent it back, yeah.

10      Q.    Okay.

11      A.    After there was no more play in there.

12      Q.    And you have now had an opportunity to

13   review Dynafit's discovery responses.  Correct?

14      A.    You sent them yesterday afternoon.

15      Q.    That's when they were due.

16      A.    Yeah.  So I've not really looked at them

17   very closely.

18      Q.    Well, when you review those responses, you

19   will see that Dynafit denies that it modified your

20   bindings in any way.

21      A.    Okay.

22      Q.    Do you have any evidence to suggest that

23   they did modify your bindings beyond your belief that

24   Dynafit modified your bindings?

25      A.    They must have been modified because you

294

John Meyer

```
 1   took them apart.  You tested them.  When I got them
 2   back, they don't move anymore.  They didn't move.
 3        Q.    Okay.  Well, Dynafit says it didn't take
 4   the bindings apart.  Aside from your belief as to the
 5   way the bindings function is there anything else that
 6   supports your belief that Dynafit took them apart?
 7        A.    No.
 8        Q.    Okay.
 9        A.    They must have been modified.  Because
10   when I sent them to you guys, they moved.  When I got
11   them back, they didn't move.
12        Q.    Okay.  Anything else?
13        A.    There's a top plate that moves, and that
14   top plate seems like it's been modified as well.
15        Q.    How so?
16        A.    I can't remember if it's like -- it just
17   doesn't quite move all the way that it used to, I
18   don't think.
19        Q.    It's going to be tough for us to tell now
20   because you have separated the bindings from the
21   skis.  Correct?
22        A.    Well, regardless, it should still be
23   there.  Yeah.
24        Q.    But they're not in the condition that they
25   were received by Dynafit.  Correct?
```

295

**John Meyer**

```
1        A.    Well, you guys have taken them.  You've --
2   and then I took them back after you gave them back
3   and skied them.  So they're not in the exact same
4   condition, no.
5        Q.    What design differences do you contend
6   would have prevented your accident and the injuries
7   that followed?
8        A.    Again, the plate and the integrity of the
9   binding.
10        Q.    The plate and the integrity of the
11   binding?
12        A.    Yeah.
13        Q.    And you believe that even though you do
14   not know whether the heel piece or the toe released.
15   Correct?
16        A.    Correct.
17        Q.    So you don't know if you -- if you
18   released from your bindings due to a twisting motion
19   or a forward release.  Correct?
20        A.    Correct.
21        Q.    You just have no memory of the accident
22   sequence.  Correct?
23        A.    Well, I remember being on the Cat track.
24        Q.    Aside from that, which I think you
25   previously testified to?
```

**John Meyer**

```
 1        A.    Correct.

 2        Q.    And the only motion that you were talking

 3  about is in the heel piece.  Correct?

 4        A.    Correct.

 5        Q.    One or both skis?

 6        A.    I can't remember.  The video -- we have

 7  the video.

 8        Q.    Who took the video?

 9        A.    Summit Ski and Bike.

10        Q.    Still got that?

11        A.    Yeah.

12        Q.    Okay.  Do you mark your skis left and

13  right?

14        A.    I think so.

15        Q.    Okay.  So we should be able to see in the

16  video whether it was the left or right ski that you

17  believe has this additional motion?

18        A.    Uh-huh.

19        Q.    What boots were you using on the day of

20  your accident?

21        A.    Scott Cosmos.

22        Q.    Did you modify those boots in any regard?

23        A.    No.

24        Q.    Would you agree with me that you refused

25  to supply those boots to Dynafit when they requested
```

297

**John Meyer**

```
 1   them for their testing?
 2        A.    Yes.
 3        Q.    Okay.  What was your reason for refusing
 4   to provide Dynafit your boots?
 5        A.    I thought to myself I've already given you
 6   -- well, I haven't given you.  I thought to myself
 7   you guys already have my skis.  You have my bindings.
 8   I do not want to give you all the evidence here.
 9        Q.    Okay.  Do you still possess the boots that
10   you were skiing on the day of your accident?
11        A.    I do.
12        Q.    Did it occur to you when you refused to
13   give Dynafit the boot that they wanted it so they had
14   the exact boot that was being used on the day of the
15   accident so they got accurate test results?
16        A.    No.  That wasn't what I believe.
17        Q.    Okay.  What do you believe they wanted the
18   boot for?
19        A.    Well, I didn't know, but I was paranoid
20   that all of a sudden my skis and my boots disappear.
21        Q.    Right.  But you got your skis back.
22   Correct?
23        A.    I did.
24        Q.    Complete with the bindings?
25        A.    Yep.
```

298

**John Meyer**

```
 1        Q.    In your first complaint in this case that
 2   you filed solely against Big Sky, there are no
 3   allegations regarding your ski bindings.  Would you
 4   agree with me?
 5        A.    Uh-huh.
 6        Q.    And you filed that complaint, I believe,
 7   on December 15th of 2017.  Does that sound about
 8   accurate?
 9        A.    Yes.
10        Q.    Okay.  Now, you eventually filed a second
11   amended complaint.
12             THE REPORTER:  49.
13             MR. CONDRA:  Thank you.
14                     (Whereupon, Exhibit 49 was
15                      marked for identification.)
16   BY MR. CONDRA:
17        Q.    Handing you a copy of your second amended
18   complaint which has been marked as Exhibit 49.  I
19   don't intend to belabor the point on this, but I have
20   a few questions.
21        A.    Okay.
22        Q.    First of all, do you recognize the
23   document that I have just handed you?
24        A.    Yeah.  Second amended complaint, yeah.
25        Q.    Okay.  And does it appear to be a true and
```
299

John Meyer

1   accurate copy of the complaint you filed on actually

2   January 3rd, 2019?

3        A.    Yeah.

4        Q.    Okay.  I'd like to direct your attention

5   to paragraph 29 briefly.

6        A.    So was this -- was this second amended

7   complaint the one that was -- I filed this with the

8   court, but I don't know if the court has accepted it,

9   because it contains motions, claims against Ian

10  McIntosh and Crowley Fleck.  And I think the court is

11  still waiting to decide whether to grant the motion

12  to amend the complaint to include this.

13       Q.    You know, it's a fair clarification.  This

14  is Exhibit 3 to document 54.

15       A.    Okay.

16       Q.    It has not been -- the court has not

17  ordered --

18       A.    Okay.

19       Q.    -- that it be filed yet.  I'm more

20  concerned about the allegations that are in it.

21       A.    Yeah.  Yeah.

22       Q.    That's fair, but I appreciate your

23  clarification.

24       A.    Yeah.

25       Q.    Would you agree with me that you drafted   300

John Meyer

1   this document?

2        A.    Yes.

3        Q.    Okay.  With respect to paragraph 29 --

4        A.    Okay.

5        Q.    -- can you explain for me how this

6   allegation is significant to your claims in this case

7   regarding Dynafit?

8        A.    So paragraph 29, "Before the accident

9   Defendant Salewa USA, LLC, Dynafit quietly began

10  issuing notices of a return program that replaced

11  parts and installed additional parts on the ski

12  bindings that Meyer was using on the day of his

13  accident."

14           So Salewa USA has issued notices to people

15  that we have these bindings, and if you have them,

16  you can send them to us and we will replace parts.

17       Q.    Okay.  What parts do you believe Salewa

18  should have replaced that would have prevented your

19  accident?

20       A.    At the time of the accident -- or excuse

21  me.  At the time of the drafting of this complaint,

22  it was the missing plate.

23       Q.    That's it?

24       A.    Potentially.  And sounds as if is there

25  were some different length screws, yeah.

                                                        301

**John Meyer**

1      Q.    Okay.  Did the screws break during your

2  accident sequence?

3      A.    I don't think so.

4      Q.    Okay.  Did the heel -- did any portion of

5  the heel piece break during your accident sequence?

6      A.    They may have broken and that's why they

7  were shifting.  I don't --

8      Q.    You just don't know?

9      A.    I don't know.

10     Q.    You don't know even whether the heel piece

11  released or the toe piece released during your

12  accident sequence.  Correct?

13     A.    Correct.

14     Q.    But yet paragraph 29 is based upon a

15  technical upgrade related solely to heel pieces.  You

16  understand that.  Correct?

17     A.    Uh-huh.

18     Q.    Okay.  Paragraph 30 you allege that Meyer,

19  you, had his skis tuned in a local ski shop that was

20  not a certified Dynafit dealer.

21     A.    Uh-huh.

22     Q.    Why is that significant in this case?

23     A.    My understanding is that this -- what did

24  you -- service upgrade, my understanding is a service

25  upgrade notice was issued to certified dealers, not    302

**John Meyer**

 1    to noncertified dealers.

 2         Q.    Okay.  So because you used a noncertified

 3    dealer --

 4         A.    Uh-huh.

 5         Q.    -- you had no notice of the service

 6    upgrade.  Is that the allegation basically?

 7         A.    Yes.

 8         Q.    And you don't know whether the service

 9    upgrade had any causative -- causative -- what's --

10    you do not know -- strike my question.

11              You do not know whether the service

12    upgrade was a cause of your accident, do you --

13         A.    Well --

14         Q.    -- as you sit here today?

15         A.    -- given the fact that it's missing a

16    plate, I would say that it is.

17         Q.    That's based on your speculation and

18    conjecture.  Correct?

19         A.    That's based on what you guys posted

20    online.

21         Q.    Well, what additional postings online

22    aside from the postings in Exhibit 48 are you

23    referring to?

24         A.    That's just it.  That's it.

25         Q.    Just Exhibit 48?

                                                      303

**John Meyer**

```
1          A.     I think so, yeah.

2          Q.     Theses are just blog posts online.

3    Correct?

4          A.     And so when I briefly looked at your

5    discovery last night, there was some sort of notice

6    that was sent out.

7          Q.     So with the exception of the notice sent

8    to Dynafit certified dealers and -- and the items

9    discussed in Exhibit 48, is there anything else

10   you're relying upon?

11         A.     No.

12         Q.     At the end of the day, it's a matter for

13   expert testimony.  Correct?

14         A.     Uh-huh.

15         Q.     Paragraph 37 --

16         A.     Unless it's -- unless you guys have -- can

17   I go back to the last question?

18         Q.     Go ahead.

19         A.     It may not be expert -- it may not be an

20   expert question if you guys have issued some sort of

21   technical upgrade and these bindings are part of that

22   technical upgrade notice.  Then it just seems like

23   the -- the shop that -- the shop that tuned my skis

24   should have gotten that upgrade.

25         Q.     And if your bindings are not subject to
```

John Meyer

```
 1    the technical upgrade --

 2          A.     Uh-huh.   Then it becomes a --

 3          Q.     Moot point.   Correct?

 4          A.     Well, it becomes a question of fact for an

 5    expert.

 6          Q.     Correct.

 7          A.     Okay.

 8          Q.     Paragraph 37.

 9          A.     Yes.

10          Q.     "Dynafit immediately came and took the

11    bindings and skis from the local ski shop for testing

12    and most likely without obtaining Meyer's

13    permission."  Do you see where I read that?

14          A.     Uh-huh.

15          Q.     Did I read that correctly?

16          A.     Yes.

17          Q.     Why do you believe that Dynafit took your

18    bindings without permission?

19          A.     Because I don't ever remember giving

20    Dynafit permission to take my bindings.

21          Q.     Do you remember giving Steve Appel

22    permission to mail your bindings to Dynafit?

23          A.     No.

24          Q.     Have you reviewed the e-mails discussing

25    the facts that you and Steve Appel did mail the
```

305

**John Meyer**

```
 1    bindings to Dynafit in Boulder?
 2         A.    We didn't mail them-- I didn't mail
 3    anything to Dynafit.
 4         Q.    You were in the hospital.  Correct?
 5         A.    No.  I was out of the hospital.
 6         Q.    Okay.  And you have no memory of -- of
 7    giving Steve Appel permission to mail them to
 8    Dynafit?
 9         A.    No.
10         Q.    Do you think Dynafit came in under cover
11    of night and took them from Steve's shop?
12         A.    I'm not that paranoid anymore.
13         Q.    Right.  Right.  So more likely than not
14    Steve mailed them to Boulder.  Correct?
15         A.    No.  My understanding is that Dynafit came
16    and picked them up.
17         Q.    Okay.  We'll get there in a minute.
18               I'm going to hand you two exhibits.  Okay.
19         A.    Uh-huh.
20         Q.    I hand you Exhibit 50.
21                             (Whereupon, Exhibit 50 was
22                              marked for identification.)
23    BY MR. CONDRA:
24         Q.    And then I'll hand you Exhibit 51 in a
25    moment.
                                                     306
```

**John Meyer**

```
 1                      (Whereupon, Exhibit 51 was
 2                        marked for identification.)
 3   BY MR. CONDRA:
 4        Q.    This is Exhibit 51.  Starting first with
 5   Exhibit 50 --
 6        A.    Uh-huh.
 7        Q.    -- Exhibit 50 is an e-mail that you
 8   produced during discovery.  This is the best version
 9   I have of it.
10        A.    Uh-huh.
11        Q.    Appears that the sender is cut off.
12        A.    Yeah.
13        Q.    It appears to have been sent by you.
14   Would agree with -- would you agree with me that the
15   e-mail that begins on page 113 and appears to
16   actually end on that same page was sent by you to
17   Scott Knight?
18        A.    Oh, probably.
19        Q.    Okay.  The date on that e-mail is what?
20        A.    April 22nd, 2016.
21        Q.    Okay.  You can put that exhibit aside.  We
22   just had the actual senders and the recipient.  Then
23   I'll direct your attention to Exhibit 51.  If we go
24   down to the third paragraph, can you go ahead and
25   read that into the record?
                                                        307
```

**John Meyer**

1        A.      "I'm not going to beat around the bush"?

2        Q.      Correct?

3        A.      "I'm not going to beat around the bush.

4    I'm concerned Dynafit bindings are defective.  I'd

5    like to see a recall if they are.  I'm not just

6    referring to the bindings Steve and I sent you.  I

7    know there are other Dynafit bindings that are

8    releasing at the toes during tours even with the toe

9    lever pulled up."

10       Q.      Okay.  So a couple of things.  Would you

11   agree with me that you wrote that -- that paragraph

12   that you just read into the record?

13       A.      Yeah.  Probably.

14       Q.      Did you write it or not?

15       A.      I wrote this, yeah.  I'm --

16       Q.      Okay.

17       A.      -- pretty sure I wrote the e-mail.

18       Q.      Okay.  At this point, which I think we've

19   established is April 22nd of 2016, you write that you

20   are concerned that Dynafit bindings are defective.

21       A.      Yes.

22       Q.      What were your concerns based upon other

23   than the fact that you got into an accident?

24       A.      This right here.

25       Q.      This being Exhibit 48 which is the Wild

308

**John Meyer**

1    Snow article?

2        A.    Yes.

3        Q.    And that was the sum total of your

4    knowledge about -- strike that.

5            That was the sole basis for your concern

6    about Dynafit bindings being defective.  Correct?

7        A.    Yes.

8        Q.    Okay.  And then you go down to the second

9    sentence to say, "I'm not just referring to the

10   bindings Steve and I sent you."

11       A.    Uh-huh.

12       Q.    Who is Steve?

13       A.    Steve Appel, I'm guessing.

14       Q.    Okay.  Now, I read that -- that sentence

15   to simply say that you and Steve sent the bindings to

16   Dynafit.  Do you read that sentence differently?

17       A.    I did not send Dynafit bindings.  I didn't

18   send them my skis.  I didn't give you guys

19   permission.  And I believe there's maybe some other

20   e-mails between Steve and I or Steve and you guys,

21   like -- Steve and I have talked about this, and I do

22   not ever remember giving permission for the skis to

23   be taken.

24       Q.    Okay.  You don't remember, but you may

25   have.  Correct?

                                                    309

**John Meyer**

1      A.    Yeah.  Anything is possible.

2      Q.    And you wrote that sentence that says "I'm

3  not just referring to the binding Steve and I sent

4  you."  You wrote that.  Correct?

5      A.    So I asked you guys if there was a -- if

6  you would -- now -- I'm sorry.  I don't remember.  I

7  asked -- I -- I took my skis in to Steve at Summit

8  Ski and Bike.  Said, hey, look at these?  What do you

9  think?  He took the video.  He contacted you guys and

10 he didn't hear back.

11           So then I contacted you guys and said,

12 hey, what's the story on these bindings.  Are they

13 warranty?  Are they defective?  What?  Because I got

14 into an accident from them.  The next thing I know,

15 the bindings are gone from the shop.  I didn't give

16 permission, and so that is where that came from.

17     Q.    That doesn't make any sense to me.  You

18 wrote "I'm not just referring to the bindings Steve

19 and I sent you."

20     A.    Yeah.

21     Q.    What does that mean?

22     A.    I asked Dynafit if they were going to

23 warranty or if they were going to look at my

24 bindings.

25     Q.    That's not what that sentence says, is it

John Meyer

```
 1    John?
 2        A.    It says -- I see what the sentence says.
 3    I see what you're saying.
 4        Q.    Yeah.  I'm just trying to figure it out.
 5        A.    Yeah.
 6        Q.    I'm not playing word games with you.
 7        A.    Yeah.  I know.
 8        Q.    So let's -- let's -- let's -- maybe this
 9    will help us.  Okay?
10        A.    Yeah.
11        Q.    Let's go to Salewa 009.  Okay?
12        A.    Yeah.
13        Q.    And I want to focus on the e-mail that
14    starts Tuesday, April 19, 2016.  It says "Scott and I
15    wrote."
16        A.    Uh-huh.
17        Q.    It begins "Hello, John."  Do you see where
18    I'm at?
19        A.    Hello, John, yeah.
20        Q.    Okay.  If we go down to the second
21    paragraph --
22        A.    Uh-huh.
23        Q.    -- and we go down to the last two lines of
24    the second paragraph, I'll read them.  You tell me
25    whether I read them correctly.  "Since you have
```

311

**John Meyer**

1  reached out to us directly, I set up a return UPS

2  label to have Steve send us the skis and bindings in

3  Boulder."  Did I read that correctly?

4      A.    Yes.

5      Q.    Okay.  Does that help jog your memory as

6  to whether Dynafit sent a UPS label to Steve Appel so

7  that Steve Appel could send the bindings and skis to

8  Dynafit?

9      A.    Yeah.  And what I'm getting at here is --

10  yeah.  Anytime I have read about people complaining

11  about their bindings with Dynafit, Dynafit has never

12  come to someone's house or picked them up.  And so I

13  do not ever remember giving Dynafit permission.  I

14  said, what's the story.  Is there a warranty?  Are

15  they defective?  What's going on here?  And then all

16  of a sudden, Steve says they came and picked them up.

17  They're gone.

18      Q.    So you don't remember giving permission.

19  Sounds like I need to take Steve's deposition.

20      A.    Yeah.

21      Q.    Is that correct?

22      A.    Yes.

23      Q.    Okay.  If Dynafit says that they picked

24  them up with your permission, you just don't know, do

25  you?

                                                312

**John Meyer**

```
 1        A.    I didn't give Dynafit permission to take

 2   my bindings.

 3        Q.    If they got permission from Steve Appel,

 4   would that have been reasonable in your mind?

 5        A.    Sure.  I guess.  I asked Steve to look at

 6   my bindings, then the next thing I know the bindings

 7   are gone.  The skis are gone.  It seems odd

 8   considering all these other people complained about

 9   their bindings and Dynafit never picks any of them

10   up.

11        Q.    Can I direct your attention briefly to

12   Exhibit 47, please?

13        A.    And I would add that -- can I?

14        Q.    Go ahead.

15        A.    Can I say --

16        Q.    It's your testimony.

17        A.    This -- this 47 here never once talks

18   about me asking Dynafit to issue a recall nationwide.

19   It doesn't say that once.  And I asked them at least

20   once, if not twice, and that's why I started crying

21   because they said no, we're not going to issue a

22   recall.

23        Q.    And why is that -- why did you feel the

24   need to share that with me?

25        A.    Just now?  Because I felt like these notes
```

313

John Meyer

```
 1    don't accurately capture the conversation.
 2         Q.    Okay.  And my -- my sole question really
 3    is -- and it's just so I'm clear.  I don't
 4    particularly like to cuss on the record?
 5         A.    Yeah.
 6         Q.    But I want to know whether you told the
 7    individuals from Dynafit on this call to go fuck
 8    yourself?
 9         A.    No.
10         Q.    You didn't say those words?
11         A.    No.  I said that's -- no.  That's not -- I
12    said basically you're telling me to go fuck yourself.
13         Q.    Okay.  Got it.
14         A.    Does that make sense?
15         Q.    Now it makes sense.  I just want to be
16    clear --
17         A.    Yeah.
18         Q.    -- so that I understand the context of the
19    conversation.
20         A.    Yeah.
21         Q.    Okay.  That's all I need with Exhibit 47.
22               Can I direct your attention to Exhibit 33,
23    please?  Are you there?
24         A.    Yes.
25         Q.    Okay.  Like I said, I'm coming up batting
```

314

John Meyer

```
 1   so I have limited questions about each exhibit.

 2        A.    Uh-huh.

 3        Q.    Top of Exhibit 33, can you go ahead and

 4   just read that first paragraph above the John Meyer

 5   header into the record, please?

 6        A.    Below it?

 7        Q.    Immediately below it and above the picture

 8   at the bottom.

 9        A.    Yeah.  Immediately below it says "Looks

10   like the ski bindings I was using when I got into my

11   accident/coma may have been recalled.  If you know

12   someone that has been injured using this brand of ski

13   bindings, please have them contact me.  More

14   importantly, have a good day.  You never know when it

15   will be your last."

16        Q.    Okay.  And the picture you posted is

17   actually of a broken heel piece.  Correct?

18        A.    I don't know that.  It could have just

19   been unscrewed.

20        Q.    What does that look like to you?

21        A.    Looks like it's just unscrewed.

22        Q.    Looks like it's unscrewed.  Okay.  And

23   actually I said picture.  That wasn't correct.  It's

24   a link.  Correct?  You posted a link to this Wild

25   Snow article that's Exhibit 48.
```

                                                             315

**John Meyer**

```
 1        A.     Uh-huh.

 2        Q.     Correct?

 3        A.     Yes.

 4        Q.     Okay.  Did anyone contact you about this

 5   post of May 11, 2016?

 6        A.     Well, it looks like people responding, but

 7   no one contacted me directly about these bindings.

 8        Q.     Right.  So you had a -- you had a string

 9   of comments.

10        A.     Uh-huh.

11        Q.     But no one contacted you to follow up

12   about your request?

13        A.     Yes.

14        Q.     Okay.  What was the purpose of you posting

15   this on May 11, 2016, what were you looking for?  A

16   lawsuit or what?

17        A.     I don't remember.  But if -- again, I

18   asked Dynafit several times to issue a nationwide

19   recall notice so no one else gets hurt.  And I would

20   love to talk to other people who have these bindings

21   that would like to see a recall so that no one else

22   gets hurt.

23        Q.     At the time you asked Dynafit to issue a

24   nationwide recall --

25        A.     Uh-huh.
                                                        316
```

**John Meyer**

1      Q.      -- you did not know whether your heel or
2   your toe pieces had released causing your accident.
3   Correct?
4      A.      Correct.
5      Q.      Right.  And -- and just as you are
6   today --
7      A.      Uh-huh.
8      Q.      -- at that point in time back in 2016, you
9   did not know whether the binding caused your
10  accident.  Correct?
11     A.      I didn't know whether it was the binding
12  that caused my accident?  Well, when I was in the
13  hospital, I found this website, and it says these
14  guys are missing a plate.  And so when I had this ski
15  shop look at them and the bindings were moving on the
16  ski and it's missing a plate, the integrity of the
17  binding is at issue.  And so I'm assuming -- it's a
18  big assumption until we have an expert, I guess, or
19  there is a recall that the bindings were at least
20  partially responsible for my accident.
21     Q.      So your request that Dynafit issue a
22  nationwide recall --
23     A.      Uh-huh.
24     Q.      -- was based upon an assumption, a hunch.
25  Correct?
                                                        317

John Meyer

1     A.    No.   I mean this says right here that

2   strength of Dynafit Radical, Dynafit announces a

3   return program for early versions.   So you've got a

4   return program that hasn't been sent out to

5   everybody.   Nobody knows about it because it's

6   hidden.   It's not on the website.   It's nowhere.

7     Q.    And just so our record is clear, you're

8   referring to the top of Exhibit 33, the Wild Snow

9   link that you posted on your Facebook page on May 11,

10   2016.   Correct?

11     A.    Yes.

12     Q.    Which is a post to a blog on the Internet

13   that anyone can subscribe to or write a comment

14   within.   Correct?

15     A.    Correct.

16     Q.    And so do you know the foundation for the

17   comments within that blog?   Do you know what sort of

18   testing these people did?   Do you know what their

19   expertise is?

20     A.    No.   So -- no.   I don't know it

21   personally.

22     Q.    Do you know any of the people that

23   actually wrote comments in that blog?   Do you know

24   them personally?

25     A.    No.

318

**John Meyer**

1      Q.    Never laid eyes on any of these people?

2      A.    No.

3      Q.    Don't know whether they're 6 years old or

4    80 years old?

5      A.    No.

6      Q.    Do you know what their skiing experiences

7    are?

8      A.    No.  Well, not from -- other than what

9    they said in this.

10     Q.    Aside from their own representations, you

11   don't know.  Correct?

12     A.    No.

13     Q.    And likewise, you don't know what sort of

14   background they have in terms of technical expertise

15   with regard to Dynafit bindings?

16     A.    Correct.

17     Q.    Okay.  Let's go to Exhibit 28 really

18   briefly.  Do you recognize this e-mail dated May 8,

19   2016, sent at 9:16 p.m.?

20     A.    Yes.

21     Q.    Okay.  And who did you send this e-mail

22   to?

23     A.    Looks like Scott Knight.

24     Q.    And is it fair to characterize this as a

25   demand for settlement?

                                                      319

**John Meyer**

```
1        A.     Yes.
2        Q.     Okay.  And I think if I understood your
3   testimony earlier, this is you attempting to value
4   your life?
5        A.     Yes.
6        Q.     Okay.  What response did you get to this
7   demand?
8        A.     I didn't get a response.  And I think a
9   day later I told them, you know, you can just double
10  that number.  And then they responded saying your
11  skis and bindings are fine.  We're sending them back.
12       Q.     Okay.  Let's go ahead and just make that
13  an exhibit since we're on it.
14                          (Whereupon, Exhibit 52 was
15                           marked for identification.)
16  BY MR. CONDRA:
17       Q.     I hand you what has been marked Exhibit
18  52.  Do you recognize the e-mail that I just handed
19  you marked as Exhibit 52?
20       A.     It looks like an e-mail I sent.
21       Q.     Did you send this e-mail or did you not?
22       A.     Yes.
23       Q.     Okay.
24       A.     I think so.
25       Q.     And so on May 10, 2016, at 11:24, Drew
```

320

**John Meyer**

1    Saunders writes:  Understood, John.  Your gear is
2    still in the process of being tested, and I'll be in
3    touch about returning it as soon as possible."  Did I
4    read that correctly?
5        A.    Yes.
6        Q.    Okay.  And then is your response above the
7    one where you said double the numbers basically?
8        A.    Yes.
9        Q.    Okay.  And I just want to make sure that
10   we're talking about the same thing that you were just
11   talking about with respect to Exhibit 28.
12       A.    Yeah.  Because at that time -- they
13   started testing in Colorado, I believe, and then they
14   were sent to France.  And so I was just -- yeah.  I
15   was impatient to say the least.
16       Q.    Okay.
17       A.    Yeah.
18       Q.    So just so our record is clear --
19       A.    Uh-huh.
20       Q.    -- if we go back to Exhibit 28 --
21       A.    Uh-huh.
22       Q.    -- you made a demand on Sunday, May the
23   8th.  Correct?
24       A.    That was for Dynafit to put its phone
25   number on its website so that people can contact them

321

John Meyer

1    about their bindings, a new pair of shoes for every

2    ski patroller at Big Sky, a donation in the amount of

3    500,000 to Vermont Law School, a donation in the

4    amount of 500,000 to Cottonwood Environmental Law

5    Center, 1.1 million U.S. dollars to John Meyer.

6    Terms are nonnegotiable.  I will ask for an answer by

7    e-mail on Tuesday at 12:00 p.m.

8         Q.    Okay.

9         A.    So I didn't hear from them and then --

10   yeah.

11        Q.    And then on Tuesday, May the 10th, he told

12   you the gear was still in the process of being

13   tested.  Correct?

14        A.    Uh-huh.

15        Q.    That's in Exhibit 52.

16        A.    Uh-huh.

17        Q.    And then on the same day at 11:42 p.m.,

18   you told him the numbers needed to double.  Correct?

19        A.    Yes.

20        Q.    And you're getting frustrated at this

21   point.  Correct?

22        A.    Yeah.  I mean, this whole thing could have

23   been resolved if Dynafit had announced a nationwide

24   recall.

25        Q.    Right.  Based on your speculation about

322

**John Meyer**

```
 1   whether a binding might be defective.  Correct?
 2        A.   No.  You guys said they're defective among
 3   yourself.  Why else would you issue a return
 4   program?
 5        Q.   Well, I'm not --
 6        A.   If they're great, why would you issue a
 7   return program?
 8        Q.   I don't intend to answer any questions
 9   just so we're clear about that.
10        A.   Okay.
11        Q.   So based on the technical upgrade and your
12   speculation, you wanted Dynafit to -- to engage in a
13   nationwide recall.  Correct?
14        A.   Yeah.  I said I just don't want to see
15   anyone else get hurt.
16        Q.   Correct.  Do you intend to ask the jury
17   for the amounts set forth in Exhibit 28?
18        A.   Which one is Exhibit --
19        Q.   That's your e-mail with your demand that
20   you just read into the record.
21        A.   No.
22        Q.   Okay.
23        A.   No.
24        Q.   What do you intend to ask the jury for
25   with respect to Dynafit in terms of financial
```
                                                        323

**John Meyer**

1  compensation?

2      A.    Yeah.  So in the complaint it asks for

3  $50 million, and that's between Big Sky and Dynafit.

4      Q.    Okay.  So what portion of the $50 million

5  do you intend to tell the jury that Dynafit needs to

6  write the check for?

7      A.    I would let you guys decide that.  I think

8  the jury decides a number.

9      Q.    Okay.  Do you intend to make a suggested

10  apportionment?

11      A.    No, I don't.

12      Q.    Now, nothing in Exhibit 28 or 52 talks

13  about the bindings releasing and causing your

14  accident.  You're just talking about the technical

15  upgrade and assuming it causes your accident.  Is

16  that correct?

17      A.    That's correct.

18      Q.    And we're still operating under that

19  assumption as we sit here today?

20      A.    That the --

21      Q.    That the binding caused your accident.

22      A.    Yes.

23                    (Whereupon, Exhibit 53 was

24                     marked for identification.)

25                    MR. CONDRA:  You guys still good?

                                                    324

1              MR. McINTOSH:  Uh-huh.

2   BY MR. CONDRA:

3        Q.    I hand you what has been marked Exhibit

4   53.  Give you a minute to look at that.  Have you

5   ever seen the documents in Exhibit 53 before today?

6        A.    Yesterday very briefly I think you

7   submitted these as part of your discovery.

8        Q.    Okay.  What do you understand these

9   documents to represent?

10        A.    It says claim test report.

11        Q.    What do you understand the claim test

12   report to tell us?

13        A.    It says conclusion.  So the only issue

14   detected on the bindings is a damaged brake branch on

15   the left ski.  This damaged branch presents no

16   influence on the general functioning nor the general

17   safety of the binding for the user.

18        Q.    Go ahead and read that second bullet point

19   while you're at it.

20        A.    All the release -- "all of the release

21   values are consistent with the different adjustments

22   noticed on the bindings and within the requirements

23   of ISO 13992."

24        Q.    And go ahead and read the last -- the last

25   bullet point -- I'm not too worried about the third

325

**John Meyer**

```
 1   one -- into the record.
 2       A.    "At the -- at the exception of the
 3   presence of the original boots, there's nothing to
 4   show this ski binding system present any kind of
 5   defect."
 6       Q.    Okay.  Do you have any facts upon which
 7   you could dispute the conclusions in this report
 8   that's in front of you as Exhibit 53?
 9       A.    The video.
10       Q.    Just the video?  Is that it?
11       A.    Yes.
12       Q.    Okay.  Anything else?
13       A.    The -- the -- this here, document Exhibit
14   48.
15       Q.    Okay.  How do you expect to lay the
16   foundation to get Exhibit 48 in at trial?  As an
17   attorney I think I can ask you that question.
18       A.    Yeah.  I don't know.  I haven't -- I don't
19   try cases.
20       Q.    Okay.
21       A.    Uh-huh.
22       Q.    Have you independently had your bindings
23   tested before you separated them from the skis, that
24   is?  Did you -- have you independently had your
25   bindings tested either before or after receiving a
```

326

**John Meyer**

1 copy of this claim test report as Exhibit 53?

2     A.   Not before.  After I think I may have

3 brought them in to some guy and asked him.  And I

4 can't -- I asked somebody -- like I -- my -- I have a

5 friend named Steve.  What is Steve's last name?  It's

6 not Appel.  It's a different Steve, and we climb

7 together sometimes and ski.

8         And I said, hey, do you have a friend that

9 might be able to look at these, and he said yeah.  I

10 think I did bring them to his shop in northeast side

11 of Bozeman.  And I don't know if he tested them, what

12 he did.  I have no idea.  I don't even know if he

13 looked at them.

14     Q.   Do you know if he modified them?

15     A.   No.  I don't think so.  I mean, all this

16 would have happened after Dynafit sent them back to

17 me.

18     Q.   Right.  Do you know if this Steve --

19     A.   Uh-huh.

20     Q.   -- that you're referring to did anything

21 at all to or with your bindings?

22     A.   No, he did not.

23     Q.   You don't know?

24     A.   No.  Steve didn't do anything to my

25 bindings.

        327

**John Meyer**

```
 1        Q.    Okay.  What's Steve's last name?
 2        A.    If I can find my phone, I can -- I don't
 3   know.  But he -- he's the one that delivered the
 4   complaint in, which --
 5        Q.    Do you have your phone physically with you
 6   in your pocket?
 7        A.    It's out in my truck.
 8        Q.    Why don't we take a break and go get your
 9   phone if you don't mind --
10        A.    Yeah.
11        Q.    -- because I'd like to know his name.
12        A.    Okay.
13              THE VIDEOGRAPHER:  We're going off the
14   record.  It's 5:03.
15                         (Whereupon, a break was then
16                          taken.)
17              THE VIDEOGRAPHER:  We're back on the
18   record.  The time is 5:10.
19   BY MR. CONDRA:
20        Q.    All right.  Mr. Meyer, when we took our
21   short break, my understanding is that you were going
22   to go out to your car and retrieve your cell phone so
23   that you could provide for me the name of the person
24   who may or may not have tested your skis.
25        A.    Yep.
```

328

**John Meyer**

```
 1        Q.    Or your bindings.  Correct?
 2        A.    Yeah.
 3        Q.    What is the name of -- what is Steve's
 4   full name?
 5        A.    So it's Steve Hoffman, H-O-F-F-M-A-N.  His
 6   phone number is 208-724-1544.  And Steve is not a --
 7   he's just -- he said I might know somebody.  So he
 8   might have a phone number of a guy.  Like he didn't
 9   -- I don't -- I'm pretty sure he didn't do any
10   testing.  I know he didn't.
11        Q.    Okay.  Why did you give the bindings and
12   skis to Steve?
13        A.    I didn't.
14        Q.    I think I misunderstood your earlier
15   testimony.  What relationship -- what's Steve's
16   involvement with this case at all?
17        A.    He only delivered the summons and
18   complaint to Ian.
19        Q.    Okay.  Did you -- again, I may have just
20   misunderstood your testimony.
21        A.    Uh-huh.
22        Q.    I thought you testified that someone named
23   Steve -- that you gave your skis and bindings
24   postaccident --
25        A.    Uh-huh.
```

<span style="float:right">329</span>

**John Meyer**

```
 1        Q.     -- to someone named Steve.

 2        A.     Yeah.  Steve Appel.  So different Steves.

 3        Q.     Okay.

 4        A.     Yeah.  Different Steves.

 5        Q.     Okay.  Do you think Steve Appel tested

 6   your bindings and skis --

 7        A.     No.  I think he just took the video and --

 8   yeah.  That's it.

 9        Q.     And you believe that video to have been

10   taken postaccident?

11        A.     Yeah.  It was.

12        Q.     Okay.  Was -- were those skis and bindings

13   in Steve Appel's shop postaccident for any particular

14   reason, maintenance, core shop repair, anything of

15   that nature?

16        A.     No.  I thought that -- No.  I don't think

17   so.  Could have been, but I don't think so.

18        Q.     Why did you give them to him?

19        A.     I don't remember.  Why did I give them to

20   him?  I can't remember.  It was probably regarding

21   this lawsuit, so I may have asked him to look.  I

22   just can't remember.  Maybe their core shots and I

23   was going to keep skiing them.

24             Oh, so that's what it was.  I brought them

25   in.  Asked him about the warranty, anything -- did he
```

330

**John Meyer**

```
 1  know anything about that.
 2       Q.    How do you know Steve, Steve Appel?
 3       A.    I've known him for years.  We used to hang
 4  out in the same clique of friends.
 5       Q.    Okay.  So you used to hang out together?
 6       A.    Yeah.
 7       Q.    Did you ski together?
 8       A.    I don't think we ever did.
 9       Q.    Did you climb together?
10       A.    No.
11       Q.    Did you mountain bike together?
12       A.    No.
13       Q.    Did you drink together?
14       A.    Maybe if -- if -- we hung out in the same
15  group of friends.
16       Q.    Okay.  He is more than just a passing
17  acquaintance.  Is that fair?  He is a friend?
18       A.    I haven't hung out with him in years.
19  Like when I stopped drinking, I just -- I stopped
20  hanging out with all my old friends.
21       Q.    Refresh my memory.  Did you stop drinking
22  before or after this accident?
23       A.    About a year or year and a half before.
24       Q.    Okay.  But you were still going to Steve
25  Appel's shop for ski work, work on your skis and
```

**John Meyer**

```
 1    bindings, that sort of thing -- correct -- at the
 2    time of your accident?
 3         A.    The day before the accident I got my skis
 4    waxed and tuned at the ski shop in Missoula.
 5         Q.    Okay.  What ski shop in Missoula?
 6         A.    LB Snow.
 7         Q.    LB Snow?
 8         A.    Yeah.
 9         Q.    Let's go ahead and make that an exhibit
10    while we're on here.
11                        (Whereupon, Exhibit 54 was
12                        marked for identification.)
13              THE WITNESS:  Brad, can we go back to a
14    few questions back?
15    BY MR. CONDRA:
16         Q.    We can but let me just clear this up while
17    we're on this in the record.
18         A.    Okay.  Yeah.
19         Q.    I'm handing you -- I'm handing you what's
20    been marked Exhibit 54.  Can you tell me what that
21    is?  Can you tell the jury rather what that is?
22         A.    This is the receipt for the skis that were
23    waxed and tuned that I was riding the day of the
24    accident.
25         Q.    Okay.  Is that the tune that you just
                                                        332
```

**John Meyer**

1  testified to -- testified about that was performed at

2  LB Snow in Missoula?

3      A.    The day before the accident.

4      Q.    Okay.  And it looks like all they did was

5  a full tune and two base welds.  Correct?

6      A.    Yeah.  I think so.

7      Q.    Did they do any other work?

8      A.    I can't remember, because at the time I

9  brought another pair of skis in, have another pair of

10 DPS bindings mounted.  So they had my boots and all

11 that.  They had everything there.  So whether or not

12 they used the boots in the full tune, I just don't

13 know.

14     Q.    Okay.  Do you know whether LB Snow

15 adjusted your bindings at all on December the 9th,

16 2015?

17     A.    I can't remember.

18     Q.    Or maybe it was December 10th.  Which day

19 was it?  I can't tell from this -- this exhibit.

20     A.    Yeah.  I don't know that either.

21     Q.    Day before your accident?

22     A.    I picked them up, yeah.  So I think I

23 probably brought them in on the 9th, picked them up

24 the 10th maybe.

25     Q.    Okay.  Did you ever adjust the DIN

333

**John Meyer**

```
 1   settings on your bindings?
 2        A.     No.
 3        Q.     No?
 4        A.     No.
 5        Q.     So the DIN settings that you were skiing
 6   on the day of the accident would have been set by
 7   who?
 8        A.     In theory LB Snow.
 9        Q.     Okay.  Did they ask you what kind of skier
10   you were so that they knew what settings?
11        A.     Yeah.
12        Q.     Okay.
13        A.     And so I had another pair of skis that
14   were being mounted at the same time, like within a
15   day.  And so the other receipt I have somewhere says
16   type two skier --
17        Q.     Okay.
18        A.     -- on the receipt.
19        Q.     So you characterized yourself as a type
20   two skier when you asked LB Snow to set your bindings
21   for the skis you were using on the day of the
22   accident?
23        A.     I characterized the skis as type two for
24   the new skis that they were mounting.
25        Q.     Okay.
```

John Meyer

```
 1        A.    Yeah.
 2        Q.    What would you have characterized yourself
 3   as in terms of type one, two, or three skiers on the
 4   day of your accident?  How would you characterize
 5   your skiing ability?
 6        A.    So I consider one like beginner, two like
 7   intermediate, and three expert.  It's more between a
 8   two and a three.
 9        Q.    And do you understand that if you had
10   characterized yourself as a beginner --
11        A.    Uh-huh.
12        Q.    -- type one, they would have set your
13   bindings lower?
14        A.    Yeah.
15        Q.    And you understand if you had
16   characterized yourself as an expert --
17        A.    Uh-huh.
18        Q.    -- type three, they would have tightened
19   your bindings?
20        A.    Correct.
21        Q.    They would have released at higher values.
22   Correct?
23        A.    Yeah.
24        Q.    Okay.  And you understood that before your
25   accident?
```
335

**John Meyer**

```
 1        A.     Yes.
 2        Q.     Okay.  So I have a couple of cleanup
 3   items.
 4        A.     Can we go back to -- it's Exhibit 53 here.
 5        Q.     Sure.  Go ahead.
 6        A.     On the third bullet point, on the
 7   conclusion it says an interrogation remains regarding
 8   the different adjustments of the bindings; i.e.,
 9   frontal versus side release and between left and
10   right ski.  So they hadn't tested the different
11   adjustments front versus side to side.
12        Q.     Do you know that that's in fact what
13   that's referring to?
14        A.     No, I don't.
15        Q.     Okay.  And the person who wrote that
16   report would probably be the person most
17   knowledgeable regarding why they wrote that third
18   bullet point that you just read into the record.
19   Correct?
20        A.     Correct.
21        Q.     And that's exhibit -- what exhibit did you
22   just read that from?
23        A.     53.
24        Q.     Thank you.
25                            (Whereupon, Exhibit 55 was
```

**John Meyer**

```
 1                            marked for identification.)
 2    BY MR. CONDRA:
 3         Q.    You've just been handed Exhibit 55.
 4         A.    Okay.
 5         Q.    Just a couple of questions about this?
 6         A.    Yes.
 7         Q.    First, on or about what date did -- did
 8    you author this, this -- the document that's been
 9    presented to you as Exhibit 55?
10         A.    I believe so.
11         Q.    Okay.  On or about what date did you
12    author this document?
13         A.    It was probably -- I don't know the exact
14    date is the answer.
15         Q.    Why did you write this?
16         A.    It was in response, I believe, to one of
17    Big Sky's interrogatories or request for admission,
18    something like that.
19         Q.    So you believe that you generated the
20    document that we see in Exhibit 55 at some point
21    during this litigation?
22         A.    Yes.
23         Q.    Okay.  But you provided Big Sky a
24    typewritten document -- correct -- in response to
25    their requests?
                                                       337
```

**John Meyer**

```
 1        A.    No.  I provided them typewritten and these

 2   things.

 3        Q.    Okay.

 4        A.    And handwritten notes.

 5        Q.    Okay.  And so your understanding is that

 6   this document, Exhibit 55, was not drafted at some

 7   point in time while you were having conversations

 8   with Dynafit, but rather it was drafted during this

 9   litigation.  Correct?

10        A.    Yeah.  And -- yes.

11        Q.    Okay.  Thank you.

12        A.    Uh-huh.

13                        (Whereupon, Exhibit 56 was

14                         marked for identification.)

15   BY MR. CONDRA:

16        Q.    All right.  Handing you a stack of

17   photographs that have been previously produced in

18   this litigation as Big Sky 27 through Big Sky 38.

19   And I just marked those as Exhibit 56.

20        A.    Okay.

21        Q.    Have you seen -- take a moment with it.

22   And then the question will be have you seen the

23   documents -- or seen the photographs in Exhibit 56?

24        A.    These are my skis.

25        Q.    I'm sorry.  What was your answer?
```

**John Meyer**

```
 1        A.    Yes.  These are my skis.

 2        Q.    Okay.  So first of all, have you -- before

 3   today, have you seen the documents that are in

 4   Exhibit 56?

 5        A.    Yes.

 6        Q.    Okay.  And I did not ask you a question,

 7   but I believe I understood you to say that the

 8   documents in Exhibit 56 are pictures of your skis.

 9   Correct?

10        A.    Yes.

11        Q.    And do you understand whether these

12   pictures were taken close in time to your accident,

13   or do you have any idea about when these pictures

14   were taken at all?

15        A.    I don't know who took these photos.  I'm

16   guessing Big Sky took these photos.

17        Q.    Okay.

18        A.    So I guess I could speculate that somebody

19   at Big Sky took these photos.

20        Q.    Let's go at it this way.  If the testimony

21   in this case when we try it --

22        A.    Uh-huh.

23        Q.    -- is that these photographs were taken

24   within 24 hours --

25        A.    Yeah.
```

                                                       339

**John Meyer**

```
 1        Q.     -- of your accident, would you have any
 2   reason to dispute that?
 3        A.     No.
 4        Q.     Okay.  And if that was correct --
 5        A.     Uh-huh.
 6        Q.     -- that the photographs were taken within
 7   24 hours of your accident --
 8        A.     Uh-huh.
 9        Q.     -- then the condition we see these skis in
10   would be a true and accurate representation of the
11   condition of your skis at the time of your accident.
12   Is that fair?
13        A.     Yes.
14        Q.     Okay.  If we turn to the second page of
15   the exhibit, which is Big Sky 28 --
16        A.     Okay.
17        Q.     -- do you see any damage to any portion of
18   your ski, the binding, or the brake?
19        A.     It looks as though the -- the right brake
20   piece is missing.
21        Q.     Okay.  And in the picture -- how can you
22   tell me that that -- which ski and which brake in
23   this picture are you referring to?
24        A.     So the left ski in the photo, the left
25   brake.
```
                                                            340

**John Meyer**

```
 1        Q.    Okay.  How do you -- if I understood your
 2   testimony correctly, you believe that to be your
 3   right ski.
 4        A.    I think.
 5        Q.    Do you know?
 6        A.    I'm not 100 percent sure, but you can tell
 7   -- because I thought the skis were marked.  There's
 8   some -- how did I do that?  I always put the Black
 9   Diamond logo -- oh, it's marked on 33.  There's a
10   right on the -- next to the binding.
11        Q.    Okay.  Good.  And so if we look at Big Sky
12   33 contained within Exhibit 56, we see that it is in
13   fact your left ski that appears to have some damage
14   to the brake.
15        A.    Yeah.  On the right, yeah.
16        Q.    Let's -- let's be clear.
17        A.    Left ski, the right brake looks like it's
18   missing.
19        Q.    Correct.  Okay.  Thank you.
20        A.    Yeah.
21        Q.    And then if we turn to Big Sky 35, very
22   simple questions.  Are those the ski poles you were
23   using on the day of your accident?
24        A.    Yes.
25        Q.    Do you know what height you had those ski
```

341

John Meyer

```
 1   poles set to?

 2        A.    No.

 3        Q.    Okay.  Are those the boots in that picture

 4   that you were using on the day of your accident?

 5        A.    Yes.

 6        Q.    Okay.  And you still possess those boots?

 7        A.    Yes.

 8        Q.    Okay.  Do you still ski on those boots?

 9        A.    No.

10        Q.    Why not?

11        A.    I just -- the day before the accident when

12   I was picking up my skis, the guys talked about Scott

13   being the -- the precursor to Scott was Garmont, and

14   they had some issues with the tech pieces in the

15   toes.  And so that kind of raised that issue for me

16   and so I just -- considering it was the first

17   generation of ski boots, I was just -- and the old

18   ones, the Garmonts, had some issues, I just said I

19   don't want to -- I don't want to take any chances.

20        Q.    Okay.  So just to rephrase what I think

21   you told me --

22        A.    Uh-huh.

23        Q.    -- the Scott boots that you were skiing on

24   the date of your accident you understand to be a

25   later iteration of a Garmont boot.
```

John Meyer

```
 1        A.    Yes.

 2        Q.    Correct?

 3        A.    Yes.

 4        Q.    And you understand that the early Garmont

 5   boot had some issue with the toe pieces?

 6        A.    Yes.

 7        Q.    Correct?

 8        A.    Yes.

 9        Q.    Okay.  And so did you have some concern

10   with regard to how the Scott boots might work with

11   the Dynafit bindings?

12        A.    Yeah, I did.

13        Q.    Okay.  Have you endeavored to educate

14   yourself any further regarding that potential issue

15   in terms of the interface between the Scott boot and

16   the Dynafit bindings?

17        A.    I've poked around a little bit online just

18   to see what the -- how the Garmonts were upgraded

19   when Scott purchased Garmont or whatever.  But I

20   hadn't seen anything like anything technical in terms

21   of what they have done different.

22        Q.    Okay.  So I'm about done here.  The -- the

23   one thing that we, I think, have established today,

24   John, is that -- is that you still possess the skis

25   that you were skiing on the day of the accident.
```

343

John Meyer

1   Correct?

2        A.    Correct.

3        Q.    You still possess the bindings on the day

4   that you were -- that you were using.  Correct?

5        A.    Yes.

6        Q.    And you still possess the boots.  Correct?

7        A.    Yes.

8        Q.    Do you still possess the ski poles?

9        A.    One of them broke.

10       Q.    One of them broke?

11       A.    I do believe I still have them, yes.

12       Q.    Okay.  Have you reset the height of those

13   ski poles since you had your accident?

14       A.    Probably.

15       Q.    Probably have.  Okay.  You adjust them

16   when you're in the backcountry?

17       A.    Yeah.  Going -- sometimes when you go to

18   push down the whole thing just collapses into itself,

19   and it's never ending, you know.

20       Q.    What I'm going to ask you to do is to

21   retain possession of your skis --

22       A.    Uh-huh.

23       Q.    -- your boots, and the bindings that you

24   were using on the date of your accident.  Is that

25   fair?

                                                      344

**John Meyer**

```
 1        A.    Yes, sir.

 2        Q.    Do you also possess the screws that held

 3   the binding to the skis on the date of your accident?

 4        A.    If Dynafit didn't do anything like --

 5   yeah.  It should -- there should be the original ones

 6   unless you guys replaced them.

 7        Q.    Okay.  I'm going to ask you to -- to

 8   maintain possession of those as well.  Is that fair?

 9        A.    Yeah.

10        Q.    Because we may want to inspect them and

11   test them.

12        A.    Yeah.

13        Q.    Okay.  And I am going to ask you not to

14   modify any of that equipment that we just discussed.

15        A.    Okay.

16        Q.    Okay.

17        A.    If you want, I can give them to you on the

18   way out of town.

19        Q.    You know, I appreciate that offer.  I will

20   contact you at some point.

21        A.    Yeah.

22        Q.    But I don't want to take possession of

23   them myself.  I do appreciate the offer.

24        A.    Okay.

25              MR. CONDRA: Did you have any questions?
```

**John Meyer**

```
 1            MR. McINTOSH:  Just a couple of
 2   follow-ups.
 3            MR. CONDRA:  Okay.  So nothing further at
 4   this time.  I'll reserve my questions.
 5                      EXAMINATION
 6   BY MR. McINTOSH:
 7       Q.    Mr. Meyer, can you go back to Exhibits 21
 8   and 22, please?  And if you can get 21, 22, and 23
 9   all out in front of you there, please.
10            Do you have Exhibits 21, 22, and 23 in
11   front of you now, Mr. Meyer?
12       A.    Yes.
13       Q.    And from what I understand of your earlier
14   testimony, you were standing somewhere in the area
15   shown in Exhibits 21 and 22 when you had that
16   conversation you described earlier with the ski
17   patrollers and they told you the terrain was closed.
18   Is that right?
19       A.    I guess so.  I don't remember where
20   exactly we were at.
21       Q.    Okay.  But you do remember they told you
22   to go out to your left after you talked to them.
23   Correct?
24       A.    I thought they said, yeah, go out left.
25       Q.    Okay.  And then when you went out left,
```

346

**John Meyer**

```
 1    you believe it was the area shown in Exhibit 23.

 2    Right?

 3          A.    I don't remember.

 4          Q.    Well, if -- if the area would have been

 5    roped off as being closed as shown in Exhibits 21 and

 6    22 --

 7          A.    Uh-huh.

 8          Q.    -- then you wouldn't have skied below that

 9    rope.  Right?

10          A.    If the area was roped off, I wouldn't have

11    skied below -- wouldn't duck the rope, no.  So no.

12          Q.    So you would have gone down and then gone

13    to the left.  Right?

14          A.    Yeah.

15          Q.    So in other words, after the patroller

16    told you to go to the left --

17          A.    Uh-huh.

18          Q.    -- you skied the same path that you would

19    have skied if that closed area would have been roped

20    off.  Right?

21          A.    We may have gone -- I have no idea.  We

22    may have gone farther left -- obviously we went

23    farther left sooner.  I don't know.

24          Q.    Well, if the ski patroller testifies that

25    in order to -- you have to be near the rope line in
```

347

**John Meyer**

```
 1    order to make it to the left, would you dispute that?
 2         A.    I don't follow.
 3         Q.    If the ski patroller would have testified
 4    that you would have had to have been somewhere near
 5    the rope line in order to make it out to the left as
 6    shown in Exhibit 23, would you dispute that?
 7         A.    So this rope line may not have even been
 8    here.
 9         Q.    I understand that.
10         A.    Okay.
11         Q.    That's not -- that wasn't the question I
12    was asking.
13         A.    I'm just -- yeah.  I'm having a hard time
14    following you.
15         Q.    Okay.  So let me ask it this way.  So if
16    you're further downhill --
17         A.    Yeah.
18         Q.    -- than is shown in Exhibit 21 and 22,
19    okay --
20         A.    Okay.
21         Q.    -- are you following me?
22         A.    22, yeah.
23         Q.    Okay.  So let's -- let's -- let's pretend
24    like that rope is not there.
25         A.    Yeah.
```
                                                        348

**John Meyer**

```
 1        Q.    And you're further downhill.

 2        A.    Okay.

 3        Q.    All right?  If the ski patrol testifies

 4   that if you were further downhill you could not have

 5   been redirected out to the left as shown in Exhibit

 6   23, do you have any reason to dispute that?

 7        A.    No.

 8        Q.    Okay.  So then that means, then, that if

 9   the rope would have been up, you would have skied the

10   same path as you did on the date of your accident?

11        A.    I don't know.  Because if we had been able

12   to see the rope, we might have gone a different way.

13   I just don't know.

14        Q.    Okay.

15            MR. McINTOSH:  That's all I have.  Thank

16   you.  Although -- although we will reserve the right

17   to bring up your failure to respond to questions with

18   the court.

19            MR. CONDRA:  John, the last thing I'd say

20   is, the questions and answers that -- that you have

21   responded to -- the questions you responded to and

22   the answers you've given today have been typed up by

23   the court reporter.  You have the right to read the

24   deposition transcript and review your answers.  In

25   the alternative, you can also rely on the accuracy of
```

349

John Meyer

```
1    her transcript and the video that has been taken
2    today in which case you can waive the requirement for
3    signature.  The choice is entirely yours.
4                THE WITNESS:  Can you explain it one more
5    time so I can --
6                MR. CONDRA:  You're entitled to read your
7    deposition and review the answers for accuracy.
8                THE WITNESS:  Okay.
9                MR. CONDRA:  Or you're entitled to waive
10   the right to review --
11               THE WITNESS:  Okay.
12               MR. CONDRA:  -- that --
13               THE WITNESS:  Okay.
14               MR. CONDRA:  -- if you simply do not want
15   to go through it.
16               THE WITNESS:  Yeah.
17               MR. CONDRA:  That's a choice that you need
18   to make.
19               THE WITNESS:  Okay.  Can I review it now
20   or when can I review it?
21               MR. CONDRA:  It will be later when she
22   submits a transcript to you.  We can go off the
23   record and talk about it a little bit.
24               THE VIDEOGRAPHER:  We're going off the
25   record.  It's 5:31.
```
350

John Meyer

1                         (Whereupon, the deposition

2                          concluded at 5:31 p.m.)

3               Signature reserved.

4                    * * * * * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        351

**John Meyer**

1          DEPONENT'S CERTIFICATE

2

3      I, JOHN MEYER, the deponent in the foregoing

4  deposition, DO HEREBY CERTIFY, that I have read the

5  foregoing - 350 - pages of typewritten material and

6  that the same is, with any changes thereon made in

7  ink on the corrections sheet, and signed by me a

8  full, true and correct transcript of my oral

9  deposition given at the time and place hereinbefore

10 mentioned.

11

12

13                    _____

14                    JOHN MEYER

15

16      Subscribed and sworn to before me this

17 _____day of _____, 2018.

18

19

20                    _____

21                    PRINT NAME: _____

22                    Notary Public, State of  Montana

23                    Residing at: _____

24                    My commission expires: _____

25 DF - MEYER v. BIG SKY RESORT, DYNAFIT NORTH AMERICA
                                                    352

## $

**$1.1 (1)**
164:21
**$1.6 (1)**
165:8
**$120,000 (1)**
22:5
**$20 (2)**
60:22,24
**$32,000 (1)**
218:15
**$40,000 (1)**
22:6
**$50 (3)**
244:2;324:3,4
**$500,000 (1)**
164:14
**$6,000 (1)**
21:14

## [

**[sic] (2)**
243:16;266:5

## A

**ability (13)**
39:17;52:9,15;
57:16,21;67:13,23;
169:8;217:19,24;
230:5;248:18;335:5
**able (17)**
56:19;57:1;67:18;
88:22;166:19,20;
179:4,4;218:1;
225:17;230:21;
244:11;267:19;
286:25;297:15;
327:9;349:11
**above (22)**
93:1;95:17;107:6,
10;123:24;124:3;
128:22;134:10;
153:19;154:7,12,15,
21;155:4,7;178:14;
179:11;193:24;
228:1;315:4,7;321:6
**Absolutely (5)**
107:11;108:22;
132:23;225:17;
286:22
**accept (9)**
69:13,20;149:1;
160:8,18;251:2,13,
18,23
**acceptable (2)**
241:23;242:19
**accepted (1)**
300:8
**access (3)**

55:6,12;253:9
**accident (173)**
21:20;36:17;40:8,
9,14;43:14;45:3;
55:19,21;59:4,5,21,
22;96:9;98:24;
122:21;128:6;135:2,
5,7,17,19;137:21;
138:24;140:6,7,12,
24;141:1;146:12,18;
149:2;151:12;152:7,
10,13,16;154:8;
155:5,9,21;158:2;
173:7;177:9;184:19;
196:23;197:5;
198:20;199:8,9;
201:2;203:14;204:5,
10,21,23;205:1,4,6,
19,22;206:1,15;
207:1,2;212:19;
214:9,12,15;216:7,
13;221:20;222:5,14,
25;223:13,17;
224:22;229:20;
232:1,15,20;233:10,
18,19;234:6,13,23;
235:10,12,16;236:3,
5,13;241:11;251:14;
254:8;258:20;260:6;
269:21;270:1,7,16;
273:24;275:18;
278:25;279:3;280:3;
282:14,22;283:6,14,
20;284:4,22;286:8,
15;287:1;288:3,7,7,
15,20;289:12;293:5,
18,22;294:3;296:6,
21;297:20;298:10,
15;301:8,13,19,20;
302:2,5,12;303:12;
308:23;310:14;
317:2,10,12,20;
324:14,15,21;331:22;
332:2,3,24;333:3,21;
334:6,22;335:4,25;
339:12;340:1,7,11;
341:23;342:4,11,24;
343:25;344:13,24;
345:3;349:10
**accident/coma (1)**
315:11
**accidents (1)**
159:1
**account (11)**
34:3,16,20,22;
35:9;230:23,25;
231:4,5,8;243:8
**accountants (1)**
20:23
**accounts (2)**
231:6,9
**accuracy (2)**
349:25;350:7

**accurate (12)**
11:25;61:20;
176:11;261:8,9,9,13;
263:13;298:15;
299:8;300:1;340:10
**accurately (12)**
84:7;85:2,14;
87:19;97:4;98:23;
112:7;123:20;
124:13,20;127:4;
314:1
**accused (1)**
212:4
**acquaintance (1)**
331:17
**acquire (2)**
280:1,2
**across (8)**
50:21;83:25;87:23;
88:2;92:10;105:2,3,4
**act (1)**
141:10
**acting (1)**
257:11
**action (2)**
239:24;284:17
**actions (1)**
160:9
**activities (1)**
222:8
**activity (1)**
222:15
**actual (3)**
211:16;289:3;
307:22
**actually (37)**
18:16;35:5;36:19;
38:14;47:15;52:12,
18;55:18;56:23;69:2;
75:4;120:9;124:22;
126:13;133:5;142:1;
143:1;158:13;163:7;
166:9;185:8,9;204:4,
20;207:7;211:3;
214:11;225:11;
234:7,19;245:12;
290:6;300:1;307:16;
315:17,23;318:23
**Adam (1)**
254:16
**add (3)**
22:25;149:22;
313:13
**addicted (1)**
24:14
**addition (2)**
44:6;170:8
**additional (3)**
297:17;301:11;
303:21
**address (4)**
9:9,11,13;147:10
**addresses (3)**

147:16;259:7,17
**adequate (1)**
241:15
**adjust (2)**
333:25;344:15
**adjusted (1)**
333:15
**adjustments (3)**
325:21;336:8,11
**administer (1)**
9:1
**admission (1)**
337:17
**admit (3)**
152:3,7;208:6
**adults (1)**
15:16
**advancing (1)**
30:17
**advantage (1)**
169:5
**Advertising (1)**
246:1
**advised (1)**
289:11
**affect (1)**
217:24
**affected (2)**
182:20;230:1
**affects (3)**
182:7,16;217:19
**affidavit (9)**
141:19;143:7,11;
144:24;267:11,23;
268:11,13,20
**afford (2)**
212:23;214:7
**afternoon (3)**
266:23;272:18;
294:14
**again (43)**
19:11;28:17;30:4;
48:24;57:17;64:16;
66:21;68:6,16;69:17;
76:25;83:14;88:20;
94:5;107:5;109:11;
122:19;127:8;
128:20;129:10;
145:22;166:19;
176:17;184:2;
193:11;194:11;
196:1;221:24;222:4;
227:3;236:24;
237:13;245:14;
247:6;255:9;259:23;
267:11;275:1;278:3,
18;296:8;316:17;
329:19
**against (15)**
37:14;161:23;
219:7,20;220:1,7,10,
13;239:21;240:4;
243:16;285:3,15;

299:2;300:9
**ago (24)**
22:23;39:4;40:6;
42:1;58:24,24;61:25;
62:6,8;98:2,2,21;
103:18;119:17;
213:8,15;214:4,23,
25;215:1;247:12;
248:19;266:3,3;
280:9
**agree (64)**
11:21;51:16,21,24;
59:18;70:10;83:11,
15;85:7;87:18;93:19;
97:4;98:22;99:9;99:9;
100:13;106:14,17;
108:21;109:8,13;
111:22;112:6;
118:22;123:19;
124:15;126:15;
127:4;129:7;133:2;
135:15;141:15;
147:25;148:2;
152:22;154:14,20;
155:3;159:25;160:8,
12,15;164:25;170:1;
174:3;176:11;
177:24;178:2;182:7,
16,19;187:4;188:20;
196:16;217:18;
233:13;234:5;261:8;
286:14;297:24;
299:4;300:25;
307:14,14;308:11
**agreed (2)**
148:2;167:6
**ahead (16)**
86:21;140:4;
149:25;174:17;
178:14;179:9;
291:21;304:18;
307:24;313:14;
315:3;320:12;
325:18,24;332:9;
336:5
**ahold (2)**
247:14,17
**air (6)**
198:8,10,13,15;
277:13,16
**alcohol (7)**
23:6;24:4,5,10,11,
13;60:6
**alcoholic (3)**
23:23;24:3;223:5
**Alcoholism (1)**
23:24
**allegation (16)**
190:21,23;235:13;
237:8,12,13;238:3;
240:15,23;241:16;
242:2,17;247:3;
255:10;301:6;303:6

**allegations (6)**
231:16;236:11;
237:19;238:15;
299:3;300:20
**allege (6)**
187:19,25;188:4,5,
8;302:18
**alleged (3)**
188:5;234:12;
257:5
**allegedly (1)**
117:25
**alleging (1)**
187:17
**allow (2)**
293:10;294:4
**almost (1)**
47:16
**along (2)**
14:14;15:2
**alongside (1)**
156:6
**Alpine (13)**
48:10,13,16,18,21,
22;49:3,20;54:25;
55:15;63:19;64:1,4
**alternative (1)**
349:25
**although (3)**
187:2;349:16,16
**always (9)**
49:23;52:23,25;
66:7;67:17;275:10,
12;276:21;341:8
**Amanda (18)**
36:14;52:3;72:18;
73:14;76:5,15;77:17;
78:13;114:11,16;
118:11;119:5,22,23;
153:1;259:21,25;
271:3
**amazing (10)**
16:24;24:13;40:11;
41:3,12,15;55:6;
56:6;60:5;82:7
**amend (1)**
300:12
**amended (7)**
237:9;238:4;285:5;
299:11,17,24;300:6
**America (8)**
8:8,24;261:11;
262:1,20;264:1,22;
352:25
**among (1)**
323:2
**amount (3)**
75:18;322:2,4
**amounts (1)**
323:17
**anesthesiologist (1)**
221:6
**angle (10)**

86:17,19;95:25;
179:8,17;195:8,11;
274:15;275:9,11
**angles (1)**
179:23
**animal (1)**
234:19
**animals (3)**
15:15;60:4,4
**Annotated (2)**
68:24;69:10
**announced (1)**
322:23
**announces (1)**
318:2
**answered (7)**
94:15;109:10;
138:1,2;184:11;
188:24;256:2
**Anxiety (2)**
25:5,8
**anymore (7)**
46:21;55:9,11,23;
265:23;295:2;306:12
**anyplace (1)**
53:16
**apart (7)**
95:11;215:20;
222:21;294:8;295:1,
4,6
**aphrodisiac (1)**
15:6
**appear (2)**
176:25;299:25
**Appears (4)**
307:11,13,15;
341:13
**Appel (11)**
305:21,25;306:7;
309:13;312:6,7;
313:3;327:6;330:2,5;
331:2
**Appel's (2)**
330:13;331:25
**apply (2)**
17:24;33:21
**apportionment (1)**
324:10
**appreciate (3)**
300:22;345:19,23
**approach (2)**
58:20;179:6
**approaching (2)**
53:22;108:19
**appropriate (2)**
138:3,5
**approximately (13)**
26:6;40:4,18;54:3;
60:24;123:13;
249:23;250:3;
258:11;268:1;
279:21;283:17;
286:15

**approximation (1)**
214:3
**April (4)**
8:9;307:20;308:19;
311:14
**area (113)**
16:16,18;17:3,13;
45:24;47:24;51:24;
52:1;53:7;54:18;
65:15;84:15,18,19;
85:2,18,24,25;87:14,
20;95:6,9,10,11;96:9;
97:6;98:25;101:5;
103:1,1;108:19;
112:3,8,14;113:15,
18;114:4,20,22,24;
115:1,4;116:3,7,18;
117:11,23;118:8,9;
122:8;123:3,14;
129:16;131:16,20,23;
132:2,8,13,17;140:6,
17,23;141:14;145:3,
7;147:1,24;148:2,24;
153:2,4;156:15,18,
22,25;157:4,19;
158:11,13,20;173:7,
11;176:13;194:17;
231:21,24;232:4,6,9,
13,15,16,18,22,22;
223:17,17,18,20,22;
234:12,12;236:2;
239:8;253:1;268:4,
17;346:14;347:1,4,
10,19
**areas (6)**
41:18;42:24;43:15;
44:11;94:20;123:3
**Arizona (1)**
36:4
**arm (10)**
200:19;215:19;
216:1;220:20,21,22;
221:1,3;222:20,21
**around (11)**
41:9;51:8,10,11;
87:15;97:9;160:4;
273:8;308:1,3;
343:17
**arrested (2)**
23:8,17
**art (1)**
23:25
**article (7)**
259:22;260:6,11;
291:16;292:3;309:1;
315:25
**Ashley (14)**
235:2,14,23,25;
236:17,25;237:3,12;
238:2,15;241:17;
242:20;254:6;255:12
**aside (7)**
131:3;286:6;295:4;

296:24;303:22;
307:21;319:10
**aspects (1)**
291:13
**assert (1)**
159:23
**assets (1)**
21:12
**assistant (1)**
20:25
**Associates (1)**
38:3
**Association (7)**
31:19;32:6,13,16,
21,23;33:13
**assume (1)**
49:23
**assumed (1)**
49:23
**assuming (3)**
250:13;317:17;
324:15
**assumption (2)**
317:18,24;324:19
**athletic (2)**
120:17,22
**attached (2)**
277:22;278:5
**attempting (1)**
320:3
**attended (1)**
13:21
**attention (4)**
300:4;307:23;
313:11;314:22
**attorney (5)**
35:14;37:8;168:25;
169:12;326:17
**attorneys (4)**
8:17;35:11;37:15;
38:16
**August (2)**
225:5,12
**author (2)**
337:8,12
**authorization (1)**
27:12
**avalanche (1)**
64:23
**avalanches (1)**
99:15
**Avenue (1)**
8:11
**avoid (5)**
57:15,18;67:18;
153:10;246:22
**award (2)**
162:19;166:5
**aware (7)**
22:12,16;46:3;
48:2;144:1,23;
145:18;146:2;
266:10;267:22;

289:17
**awareness (2)**
226:7,9
**away (1)**
166:22
**awful (2)**
202:11;203:1
**awhile (2)**
61:19;284:23
**axes (1)**
58:18
**Ayres (8)**
141:18;142:8;
267:11,14,22,25;
268:10,13
**Ayres' (2)**
144:24;268:20

**B**

**baby (2)**
16:22;17:6
**bachelor (1)**
228:18
**back (80)**
14:23;18:24;28:19,
25;29:3;38:5;42:23;
43:12;46:12;49:12;
57:4;61:19,21;62:13,
19;63:3,6,16;66:21;
91:8;97:21;101:7;
115:1,6,19;128:14;
130:19,22;134:4,16;
136:14;139:14,17;
145:5;147:5;152:6;
164:4;174:24;175:2,
5;177:4;179:18;
186:12;195:3;
196:10,11,23;208:12;
210:5,6,18;220:22;
224:23;229:23;
236:9;249:4;252:20;
269:5;272:14;
283:16;284:1;
287:13;293:25;
294:9;295:2,11;
296:2,2;298:21;
304:17;310:10;
317:8;320:11;
321:20;327:16;
328:17;332:13,14;
336:4;346:7
**Backbone (1)**
269:19
**backcountry (32)**
43:6,8;44:9,11;
47:25;54:5,10,13;
55:6,13,16,24;56:8,
11,14,17,20;57:13,
14,19,24;58:2;59:2;
64:21;65:1,5;224:23;
225:1,3;230:17,20;
344:16

**background (5)**
12:8;38:14,15;
39:3;319:14
**backpack (2)**
121:1,5
**backside (2)**
102:25;174:13
**backwards (3)**
229:14,19,22
**bad (7)**
16:19;17:4,8;
58:22;182:1,2;
201:17
**badgers (1)**
60:4
**bag (2)**
14:18,21
**ballpark (1)**
121:16
**bank (6)**
34:2,5,6,16,19,22
**bankruptcy (1)**
169:17
**bar (6)**
15:6;18:17,18,19,
21;19:6
**Barely (1)**
104:19
**base (1)**
333:5
**based (8)**
32:21;302:14;
303:17,19;308:22;
317:24;322:25;
323:11
**basically (7)**
125:13;211:12;
263:17;270:25;
303:6;314:12;321:7
**basics (1)**
286:24
**basis (5)**
190:20,22;245:11,
12;309:5
**bathroom (5)**
129:24;130:2,5,8,
10
**batting (2)**
273:7;314:25
**beach (4)**
14:14,16,24;15:5
**bear (2)**
160:22;229:2
**Beartooth (3)**
214:12,14;221:13
**beat (2)**
308:1,3
**becomes (2)**
305:2,4
**beelining (1)**
45:22
**began (2)**
278:12;301:9

**beginner (6)**
100:6,11,20;
280:23;335:6,10
**beginning (7)**
8:19;28:12;30:1;
108:3;146:15;
165:10;218:14
**begins (2)**
307:15;311:17
**behind (3)**
52:19;176:14,17
**belabor (1)**
299:19
**belief (7)**
100:25;156:25;
157:5,11;294:23;
295:4,6
**below (13)**
67:19;73:25;
108:15,19;127:17;
133:25;200:10;
211:11;315:6,7,9;
347:8,11
**benefit (1)**
11:7
**Bennett (5)**
25:14,16,19,23;
26:2
**B-E-N-N-E-T-T (1)**
25:15
**Besides (5)**
145:2;158:12;
222:9;230:11;248:16
**best (2)**
195:13;307:8
**better (7)**
48:19,22;49:3;
64:1;167:18;202:11;
223:11
**beyond (3)**
95:7,11;294:23
**Big (137)**
8:8,22;29:5;36:8,
22,23;37:13;43:4,5,
18;44:7;45:1,4,10;
47:20,21;54:18;
60:15,23;61:8;65:15;
66:7,9;79:9;81:11;
83:13,17;84:4,24;
85:13;87:15;89:15;
122:20;131:10;
134:4,16;135:15;
136:20;137:5;138:6,
23;139:1;140:12,25;
141:6,10,12,13,21;
142:8,18;143:23;
144:24;145:19;
146:3;149:5,7,15;
150:2,24;153:11;
154:17;161:23;
162:15;166:15;
170:6,19;172:16;
175:13;176:3;211:1,

7;217:15;218:25;
221:12;234:2,23;
235:10,18;236:14;
239:4,8,21;240:12;
243:16,22;244:5,8;
245:13;246:4,21;
247:5,22;248:3,8,13;
250:1,11,18,25;
251:21;253:22;
254:2;255:18,20;
257:3;258:5,11,13,
17,17,20;259:25;
260:1,6;265:2,9;
266:8;267:8;269:11;
278:24;285:3;289:8;
299:2;317:18;322:2;
324:3;337:17,23;
338:18,18;339:16,19;
340:15;341:11,21;
352:25
**bike (3)**
47:4;225:16;
229:21;297:9;310:8;
331:11
**biking (7)**
46:19;221:23;
222:9;225:5,11;
226:11,16
**billboard (1)**
246:2
**Billings (14)**
219:3,5,7,12,14,20;
220:1,10,11,16,18;
221:4,8,10
**bills (1)**
21:15
**binding (38)**
193:2;281:21,25,
25;282:6,10;283:11;
287:3,24;288:1;
289:1,3,14;291:2,14;
292:11,16,17,24;
293:5,6,9,11,16,21;
296:9,11;310:3;
317:9,11,17;323:1;
324:21;325:17;
326:4;340:18;
341:10;345:3
**bindings (180)**
48:22;49:21,21,24;
50:5;152:18,20;
184:1;185:24,25;
186:2,4,5,8,14,16,17,
18,21;187:4,11,21;
188:14,20;189:7,10,
13,16,20,22,24;
190:3,12,17,24;
191:1,11,14,18;
192:7,9,21;193:4,8,
17,22;194:3,7,14,15;
241:3,10,12;253:3;
262:17;277:14,16;
278:15;279:2,17,22;

280:2,18,21,22,24;
281:3,5,8,15;282:4,7,
13,16;283:5,7,9,13,
15,19,19,22,24;
284:8,11,13,14,19,
20;285:9,10,13,19,
21;286:1;287:1,5,12;
288:6,20,23;289:18;
290:3,7,14,25;292:5;
293:24;294:4,20,23,
24;295:4,5,20;
296:18;298:7,24;
299:3;301:12,15;
304:21,25;305:11,18,
20,22;306:1;308:4,6,
7,20;309:6,10,15,17;
310:12,15,18,24;
312:2,7,11;313:2,6,6,
9;315:10,13;316:7,
20;317:15,19;
319:15;320:11;
322:1;324:13;
325:14,22;326:22,25;
327:21,25;329:1,11,
23;330:6,12;332:1;
333:10,15;334:1,20;
335:13,19;336:8;
343:11,16;344:3,23
**bindings' (4)**
262:10;263:3,16;
264:11
**biologist (1)**
16:8
**biology (3)**
14:2,12;15:13
**bit (6)**
54:15;95:7;195:20;
288:10;343:17;
350:23
**black (12)**
100:1;101:25;
102:7,10;119:14;
122:14;123:6,6;
124:3;281:6,20;
341:8
**blacklist (1)**
245:14
**Blackmore (2)**
44:22,23
**blame (9)**
59:15;135:2,5,18;
140:7;146:18;
169:24;172:23;234:9
**blaming (10)**
135:6,12,13,14;
140:23;146:11,13;
169:25;170:4,5
**blanket (1)**
83:19
**blanking (1)**
38:4
**blew (4)**
197:18,19,20;

198:2
**blind (25)**
146:25;149:12,22;
153:6;173:14,16,23,
24;174:1;175:24;
176:24;177:12,14,16,
21;178:1,4,25;
179:12,20;180:1,8;
183:3;185:7;194:17
**blog (4)**
304:2;318:12,17,
23
**blow (1)**
129:20
**blower (1)**
106:9
**blown (1)**
197:24
**blowup (1)**
82:4
**blue (3)**
78:5;208:18,18
**BlueCross (1)**
215:12
**BlueShield (1)**
215:12
**board (1)**
22:14
**boats (1)**
15:2
**body (3)**
198:2,14;274:4
**bombarding (1)**
216:9
**bombing (1)**
45:21
**bones (1)**
215:19
**boom (1)**
150:18
**boot (8)**
50:19;186:22;
298:13,14,18;342:25;
343:5,15
**booth (1)**
66:9
**boots (33)**
150:19;185:25;
186:1,6,17;197:17,
24;262:2,8,10,11,23;
263:6,11;274:10;
278:5;297:19,22,25;
298:4,9,20;326:3;
333:10,12;342:3,6,8,
17,23;343:10;344:6,
23
**boots' (4)**
262:16;263:3,16;
264:10
**border (1)**
39:12
**born (2)**
12:10,12

**both (11)**
33:2;90:21;121:22;
183:16;184:25;
193:25;198:17;
211:18;215:3;252:5;
297:5
**bothered (1)**
226:19
**bottom (18)**
96:20;99:7,10;
125:6;126:7;133:12;
202:9;203:23;250:9;
253:7;255:18;
261:17,19,19,21,23,
25;315:8
**bought (3)**
60:19;280:24;
290:7
**Boulder (3)**
306:1,14;312:3
**bow (1)**
234:17
**Bowl (13)**
42:5;43:6;53:2,11,
12,13;54:3,21,24;
89:14;101:17;
119:20;229:13
**Box (7)**
9:10;135:23;136:3;
279:11,13;283:23;
284:11
**Boyne (1)**
80:24
**Bozeman (12)**
8:11;9:10;23:6,13;
28:19,20;29:1,4;
32:22;59:24;214:19;
327:11
**Brackett (1)**
54:14
**Brad (6)**
8:23;163:10,15;
215:22;272:19;
332:13
**brain (10)**
201:17;216:17,22;
217:2,3,7,11,16,19,23
**brake (7)**
325:14;340:18,19,
22,25;341:14,17
**branch (2)**
325:14,15
**brand (1)**
315:12
**brand-new (3)**
279:10;281:14,23
**Brandon (1)**
8:14
**breached (3)**
241:14,22;242:18
**break (22)**
62:18,23;63:1;
130:17;139:9,12;

174:22;210:16;
249:2;268:22,24;
269:3;272:12;276:8,
9;283:5,12;302:1,5;
328:8,15,21
**breaks (1)**
15:1
**Bridger (26)**
43:19,19,25;44:1,2,
7,7;53:2,12,20;54:3,
15,21,23;55:12,14,
14;101:18;102:5,6;
119:20;122:24;
213:23;214:1,6;
229:13
**briefly (7)**
16:7;55:25;300:5;
304:4;313:11;
319:18;325:6
**briefs (1)**
35:6
**bring (5)**
15:12;37:17;42:17;
327:10;349:17
**broad (2)**
31:2,2
**broke (2)**
344:9,10
**broken (5)**
200:18,19;221:3;
302:6;315:17
**Brooks (2)**
44:17,20
**brother (2)**
22:5;64:18
**brought (5)**
283:7;327:3;
330:24;333:9,23
**BSAI (2)**
210:22,22
**bubble (1)**
134:10
**Buffalo (4)**
32:7,13,23,24
**build (3)**
120:16;171:18,18
**building (14)**
20:6;21:2;160:4,6;
180:11,14,19,20,24,
25;181:8,9,17;182:3
**buildings (4)**
160:3;181:21,23,
25
**bullet (4)**
325:18,25;336:6,
18
**bullshit (1)**
162:15
**bunch (2)**
44:21;214:21
**buried (1)**
181:14
**burn (1)**

16:19
**burned (2)**
16:18,20
**burned-out (1)**
16:22
**Burns (1)**
17:2
**bury (1)**
15:1
**burying (1)**
14:21
**bush (2)**
308:1,3
**busy (2)**
38:20;213:19
**Butte (1)**
8:6

**C**

**Cacking (1)**
207:15
**California-Hastings (1)**
18:11
**call (11)**
104:19;163:3;
195:1;206:2,4,6,8;
274:2;287:9,10;
314:7
**called (12)**
9:3;14:11;21:6;
31:18,21;41:15;45:8;
76:8;118:18;240:3;
269:19;287:11
**calling (1)**
216:10
**came (14)**
47:23;114:1;118:8;
129:14;131:22;
132:16;137:8;153:6;
275:25;305:10;
306:10,15;310:16;
312:16
**campaign (1)**
246:9
**Can (215)**
9:7;22:25;24:6;
34:1;37:18;38:5,23;
39:14,17;40:11,22;
48:24;49:7,9;50:10;
51:9,11;52:8,15;55:1,
3,4;56:4,5;57:2,4,17;
61:21;62:5,5,13,14,
18,18,19,23;69:2,17;
70:18;71:12;72:9;
75:5,12;76:19;79:11;
82:11;83:14;86:1,15;
87:22;90:18;94:5;
95:16,19,21;96:11,
16,21;97:17,21;98:3,
16,18;101:6;105:7,
11,14;107:19;108:20,
21;109:19;110:5;

115:14,15,16;116:15;
118:18;120:15,23;
122:14;123:6,22;
125:5;126:6,10,17;
128:20,24;130:1,2,5,
8,9;131:4,11,18;
133:15,17;135:18;
136:23;137:3;
138:11;139:2,21,21,
24;140:4;141:10;
144:7,7;150:19;
152:11;155:17;
162:9,15;165:18;
169:1;172:7;173:10,
18,22;174:13;
175:11;176:15,21;
178:6,10,15,17,21;
179:2,6;180:5;181:1,
8,10;185:18;186:9;
188:2;193:10;
194:11;201:23,25;
205:7;208:17;209:9,
11,14,18;214:3;
217:12;219:23;
222:16;223:20,24;
230:7;235:6,8,15;
237:21;238:7;242:3,
4,6,6,8;252:17,20;
253:9;262:17;
263:16,20;267:11;
275:3;278:2;280:10,
11;282:18;286:24;
292:20;293:4,23;
301:5,16;304:16;
307:21,24;313:11,13,
15;314:22;315:3;
318:13;320:9;
321:25;326:17;
328:2,2;332:13,16,
20,21;336:4;340:21;
341:6;345:17;346:7,
8;349:25;350:2,4,5,
19,20,22
**candidacy (1)**
244:17
**cans (4)**
60:17,19;61:1;
66:25
**capture (2)**
124:22;314:1
**car (1)**
328:22
**card (3)**
73:24;80:24;
218:18
**care (19)**
24:9;134:9;162:16;
170:11;172:20;
212:18;218:3,19;
219:1;220:8,13;
238:20;239:11;
242:18;243:18;
245:24;246:23;

249:23;250:3
**career (1)**
166:23
**careful (5)**
71:24;72:11;111:2,
5;278:1
**case (50)**
10:6;21:19;26:10;
30:10,19,20;31:18,
20,23;32:2,5,8,11;
33:11;34:11,13,21;
35:4;37:9,16;38:17,
18;98:16;135:12;
167:16;168:7,11,14,
19,21;187:17,19;
188:11;196:20;
199:1;209:19;220:7;
237:19,22;255:1;
260:20;284:20;
286:13,24;299:1;
301:6;302:22;
329:16;339:21;350:2
**cases (8)**
28:1;30:9;31:5,14,
16;33:17;141:25;
326:19
**Cat (167)**
36:24;50:21;51:2,
4,10,12,21,23,25;
52:1;86:2,12;87:23;
88:2,9,18;89:2,3;
90:18,21,23;91:5,16,
18,21;92:5,8,10,17,
25;93:1,1,4,14,16,17,
19,23;94:6,10;95:7,
12,14,16,18,20,22;
96:3;97:8,9;98:6,9,
14;104:15,19,21,25;
105:8,12,18;124:6;
125:5,14,22,22,25;
126:7,9,10,17,25;
127:8,14,17,19,21,
23;128:2,3,10,18,23;
129:4,15,18;130:24;
131:2,5,7;137:9,10;
146:9,24;149:13;
150:4,16,17,25;
151:18;152:18,24;
153:7,8,19;154:7,12,
13,15,21;155:2,4,7;
158:15;159:6;161:1,
10,15,19;173:18,22;
174:3,6,8;176:1,5,16,
22;177:18,25;178:4;
179:7;180:5;183:1,9,
12,13,16;184:4,15,
18,24;185:3,15;
194:19,23;195:5;
197:13,14;241:19;
251:8;267:4;274:18,
25;275:3,3,7,8,9;
276:1,14,16,24;
278:10,12,15,17;

296:23
**catch (1)**
91:22
**catwalk (1)**
51:21
**causally (1)**
288:15
**causative (3)**
289:12;303:9,9
**Cause (6)**
8:7;30:25;150:15;
185:6;192:24;303:12
**caused (30)**
150:6,9;152:7,10,
13,16;183:21;
184:19;185:2,8,9,23,
25;186:1,5,16,21;
189:21,22;193:3,8,
14,17,21,25;287:2;
288:20;317:9,12;
324:21
**causes (1)**
324:15
**causing (3)**
159:1;317:2;
324:13
**Caution (15)**
71:16,21;80:7;
81:23;82:6;91:12;
92:24;93:1,2;109:23;
110:6,17,24;111:22,
23
**cell (1)**
328:22
**Center (14)**
25:11;30:4,7,21,
24;31:7,21,24;32:12;
33:12,25;34:2;
164:15;322:5
**Centerville (4)**
12:17,19,20,23
**certain (2)**
188:18;282:11
**certainly (2)**
58:5;214:13
**certainty (1)**
277:21
**CERTIFICATE (1)**
352:1
**certified (3)**
302:20,25;304:8
**CERTIFY (1)**
352:4
**certiorari (2)**
30:12,17
**cetera (1)**
250:2
**chairlift (48)**
45:17;46:2,5;
54:25;55:10;76:5,7,
15,23;77:17;78:13;
79:9,15,20;80:6,18,
21;89:13,14,15;90:8,

12;93:21,24;94:11;
99:7,11;104:10;
105:23;107:17,22;
108:2,7,9,14;109:6;
110:22;111:6,11;
112:4;115:11,20,21;
116:10,17,21,25;
203:9
**chairlifts (1)**
67:6
**challenge (1)**
226:5
**Challenger (30)**
45:17;46:2;90:5,8,
12;93:20,24;94:11;
99:7,10;103:11;
104:10;105:22;
106:15;107:16,22;
108:2,6,9,14;109:6;
111:6,11;112:4;
115:11,21;239:8;
267:15;268:4,16
**chamber (1)**
214:21
**chance (3)**
141:23;144:15;
145:22
**chances (1)**
342:19
**changes (1)**
352:6
**changing (2)**
181:2,4
**characterize (2)**
319:24;335:4
**characterized (5)**
334:19,23;335:2,
10,16
**charged (4)**
22:17,19;221:8,10
**chase (1)**
17:11
**cheated (2)**
138:10,13
**check (1)**
324:6
**Chicago (2)**
12:14;250:1
**Chinese (1)**
136:19
**choice (4)**
46:16;251:13;
350:3,17
**chosen (1)**
59:20
**Christensen (1)**
220:7
**Chute (1)**
45:8
**Chutes (2)**
45:13,16
**circuit (2)**
30:11,14

**cited (3)**
23:3,11;125:13
**City (2)**
41:12;250:1
**claim (71)**
19:19;114:19;
116:3;145:9;146:1;
149:7;150:5,9,14;
152:16;155:21;
158:21;159:9,20,21;
172:18;185:6;
187:11;188:10,13;
189:7,13,16,18,20,
22;190:1,6,12,17;
191:13;192:19;
193:3,16,21;194:3,6,
17,18,21;195:4,11,
16,18,24;214:8;
215:16;216:5,12,16,
19;217:3,18;219:9,
10,20,25;220:10;
222:12,22,24;223:12,
16;229:25;232:6,15,
19;241:13;325:10,
11;327:1
**claimed (2)**
218:19,23
**claiming (4)**
154:3;201:1,9,12
**claims (5)**
150:7,11;219:7;
300:9;301:6
**clamps (1)**
50:12
**clarification (2)**
300:13,23
**clarify (1)**
273:17
**class (2)**
18:6;65:2
**clean (1)**
60:3
**cleanup (2)**
273:7;336:2
**clear (12)**
61:19;272:23;
279:2;281:19;
286:21;314:3,16;
318:7;321:18;323:9;
332:16;341:16
**clearly (6)**
77:24;98:9;125:5;
181:8;286:24;293:16
**Clements (1)**
8:14
**clerkship (2)**
10:1,3
**client (2)**
239:2;289:5
**clients (1)**
33:14
**cliff (2)**
194:20;195:1

**cliffs (2)**
56:10;194:24
**climb (9)**
58:19;215:19;
222:22;225:18;
227:20,24;229:21;
327:6;331:9
**climbed (2)**
42:22;227:3
**climbing (7)**
222:4,10,17,18;
227:5;230:13,17
**Clinic (14)**
219:3,5,8,12,14,20;
220:1,10,11,16,18;
221:5,7,10
**clique (1)**
331:4
**close (5)**
115:4;127:2;
131:11;229:2;339:12
**closed (44)**
47:24;112:14;
113:18,19,25;114:4,
24;116:3,4,8,8,18,18;
117:11,12,23;118:9;
129:16;131:16,20,20,
23;132:2,8,17;145:3,
7,7;231:21,24;232:2,
6,18,22,24;233:8,17,
18,20;234:12;236:2;
346:17;347:5,19
**closely (1)**
294:17
**closer (3)**
126:4;278:11,12
**close-up (5)**
70:10,19;80:4;
81:22;110:4
**closing (3)**
114:5,7,19
**clothes (1)**
21:16
**clue (6)**
201:6;202:12,19,
22;203:2,5
**coach (1)**
222:18
**Coast (1)**
42:18
**code (7)**
66:1,3;68:23;69:9;
146:17,19;251:17
**collapses (1)**
344:18
**collect (2)**
246:20;248:2
**college (2)**
13:6,8
**color (5)**
119:13,16,20;
120:13;171:16
**Colorado (1)**

321:13
**coma (9)**
47:5,7,9;182:6;
200:18;220:18,19,23;
271:12
**combat (1)**
226:7
**combative (2)**
217:1,5
**comfortable (2)**
100:1;219:13
**coming (10)**
34:21;98:12;
105:11,18;161:10;
274:23;275:2,6;
276:23;314:25
**comment (2)**
200:11;318:13
**comments (3)**
316:9;318:17,23
**Commission (4)**
31:24,25;33:10;
352:24
**commit (1)**
226:8
**committed (1)**
220:11
**common (5)**
51:2,5;63:23;64:7;
201:14
**communicate (1)**
270:5
**communications (1)**
209:22
**company (1)**
49:24
**compared (1)**
100:20
**compel (2)**
209:23,24
**compelled (1)**
243:22
**compensation (1)**
324:1
**competed (1)**
39:5
**competent (1)**
39:18
**complained (2)**
268:15;313:8
**complaining (5)**
220:20,20;221:1;
237:20;312:10
**complaint (27)**
36:7;189:19;
190:16;231:17,19;
234:22;235:5;237:9;
238:4,5;242:3,7,12;
285:2,6;299:1,6,11,
18,24;300:1,7,12;
301:21;324:2;328:4;
329:18
**complaints (1)**

22:13
**complete (3)**
38:8;155:6;298:24
**completely (5)**
23:1;46:25;230:4;
275:5;276:11
**comport (1)**
76:3
**comporting (1)**
152:12
**compromised (1)**
192:23
**computer (1)**
35:6
**concern (2)**
309:5;343:9
**concerned (6)**
219:17,22;245:13;
300:20;308:4,20
**concerns (1)**
308:22
**concluded (1)**
351:2
**conclusion (2)**
325:13;336:7
**conclusions (1)**
326:7
**condition (7)**
238:22;248:17;
294:4;295:24;296:4;
340:9,11
**conditions (37)**
71:17,22,25;72:12;
80:8;81:24;82:14;
83:12,13,16,22,24;
84:8;85:16;87:19;
97:5;98:23;104:12;
106:19;109:9;112:7;
123:20;124:18;
125:2;127:5;143:5;
176:12;236:22;
237:5,15,16;238:10,
16;240:17,25;
241:24;242:19
**Condra (31)**
8:23,25;163:17,25;
268:25;272:4,8,17,
19;280:13;291:25;
299:13,16;306:23;
307:3;320:16;
324:25;325:2;
328:19;332:15;
337:2;338:15;
345:25;346:3;
349:19;350:6,9,12,
14,17,21
**conduct (3)**
22:15;23:8,11
**confabulating (1)**
118:25
**confabulation (2)**
118:19;207:9,9,12
**confidence (4)**

55:20;228:22,24;
230:4
**confident (3)**
167:20,22;230:3
**confidential (1)**
247:20
**conflict (1)**
219:18
**confuse (1)**
273:10
**confusing (2)**
273:15,16
**Congress (1)**
244:17;246:10
**conjecture (2)**
293:12;303:18
**Conrad (1)**
17:1
**consciously (1)**
56:23
**consciousness (1)**
196:24
**conservation (1)**
14:11
**consider (1)**
335:6
**considering (2)**
313:8;342:16
**consistent (2)**
74:2;325:21
**constant (1)**
224:4
**constantly (1)**
216:9
**contact (9)**
247:23;248:1,8;
259:10;266:24;
315:13;316:4;
321:25;345:20
**contacted (5)**
248:14;310:9,11;
316:7,11
**contain (3)**
91:19,23;92:19
**contained (1)**
341:12
**contains (3)**
66:10;67:15;300:9
**contend (33)**
91:15;92:19,22;
96:2;107:1;137:20;
138:22;149:15;
157:3,15;159:13,14;
173:13;174:9;
175:23,25;176:24;
178:3;179:12,21;
180:1;186:24;
187:14,16;191:4,7;
193:25;216:23;
217:6;231:24;241:8;
248:17;296:5
**contention (1)**
187:10

**contest (1)**
277:5
**context (13)**
136:20;137:5;
138:6,25;161:18;
165:13,16,18;205:14;
206:24;257:2;
264:25;314:18
**continue (1)**
150:2
**contractors (3)**
20:18,20,22
**contribute (1)**
137:21
**contributed (7)**
135:16;138:23;
160:16;190:1,8,14,18
**control (5)**
57:23;66:7;67:17;
68:4,8
**conversation (9)**
117:21;135:25;
171:25;210:25;
261:10,15;314:1,19;
346:16
**conversations (1)**
338:7
**convinced (1)**
87:1
**Cooke (1)**
41:12
**copy (7)**
235:7,8;238:7;
242:6;299:17;300:1;
327:1
**core (2)**
330:14,22
**corner (2)**
87:15;96:20
**corporate (1)**
141:9
**corrected (1)**
164:6
**corrections (1)**
352:7
**correctly (8)**
151:15;191:19;
204:6;305:15;
311:25;312:3;321:4;
341:2
**Cosmos (1)**
297:21
**cost (2)**
60:21;169:12
**Costa (4)**
14:10;15:10,12,25
**costs (2)**
34:11,13
**Cottonwood (38)**
19:23,25;20:2,6,8,
14,17;21:3,8;25:10,
24;26:3;27:23;30:3,
7,21,23;31:7,9,11,21,

23;32:8,12;33:9,12,
25;34:2,7,11,24;35:7,
9,12,18,21;164:14;
322:4
**Cottonwood's (2)**
35:1,4
**Counsel (1)**
163:25
**count (1)**
18:12
**counterclaim (2)**
37:14;217:15
**country (1)**
229:23
**couple (11)**
30:9;32:1;64:9;
178:13;270:19;
271:7,23;308:10;
336:2;337:5;346:1
**course (8)**
68:4,8;167:15;
168:6,10,13;169:3;
261:1
**Court (25)**
8:6,13,14,25;11:6;
30:11,12,17,19;
62:13,18;63:15;
75:12;125:13,16;
127:3;148:6;162:19;
166:5;300:8,8,10,16;
349:18,23
**courts (1)**
272:5
**cover (4)**
14:22;15:1;84:17;
306:10
**covered (3)**
82:9,18;253:3
**covers (2)**
31:3;84:15
**cracked (1)**
221:4
**cramp-ons (1)**
58:19
**craniosacral (1)**
270:6
**crappy (1)**
42:18
**crawled (1)**
15:4
**credibility (1)**
143:2
**credit (1)**
218:18
**Creek (2)**
54:15,16
**crime (1)**
22:17
**crimes (1)**
22:19
**cross-country (1)**
230:19
**crowds (1)**

55:1
**Crowley (2)**
8:10;300:10
**crying (4)**
163:7;166:15;
221:2;313:20
**cum (1)**
18:9
**Current (18)**
75:1,22;76:5,15;
77:16;78:13;79:7,15,
20;80:6,17;81:2,3,9,
12;248:13;266:7;
267:7
**currently (4)**
20:11;31:13,16;
33:3
**cuss (1)**
314:4
**customers (1)**
256:8
**cut (7)**
11:13;16:15;17:2,
4,8;60:4;307:11

## D

**dad (1)**
60:3
**damage (6)**
69:14,15,21,22;
340:17;341:13
**damaged (3)**
293:21;325:14,15
**damages (1)**
244:3
**danger (1)**
69:15
**dangerous (5)**
159:1;237:5;
240:24;241:3,10
**dangers (1)**
69:23
**dark (1)**
123:23
**darker (1)**
124:4
**dash (1)**
39:25
**date (24)**
26:23,25;52:22;
165:4;172:5;199:24;
200:1;214:2,2;
221:25;254:21;
258:21;283:14;
284:4,21;287:1;
307:19;337:7,11,14;
342:24;344:24;
345:3;349:10
**dated (2)**
225:5;319:18
**day (61)**
13:4,4;16:17;

39:22;47:1;52:6;
65:2,20,22;72:13;
82:7;103:21;118:1;
133:23;134:9;137:8;
143:12;146:15;
151:12;154:17;
163:5;172:4,15;
199:6;202:10;
208:15;226:8;
227:23;234:1;
238:18,19;278:24;
279:3;280:2;282:14;
288:3,5,6;297:19;
298:10,14;301:12;
304:12;315:14;
320:9;322:17;332:3,
23;333:3,18,21;
334:6,15,21;335:4;
341:23;342:4,11;
343:25;344:3;352:17

**days (17)**
39:20,24;40:5,6,
18;53:22;54:2,9;
101:3,4,12;119:10;
220:24;226:6;227:3;
283:17;294:5

**day's (1)**
234:3

**day-to-day (1)**
31:4

**Dayton (2)**
12:14,15

**DC (1)**
250:1

**Deaconess (1)**
214:19

**dead (3)**
16:21;155:1;
168:16

**deal (1)**
47:20

**dealer (2)**
302:20;303:3

**dealers (3)**
302:25;303:1;
304:8

**death (1)**
196:11

**Deb (1)**
8:13

**deceiving (1)**
98:5

**December (142)**
25:8;40:15;41:5;
43:9,14;44:8,25;
45:12,24;46:2,5,8;
47:12,19,21;48:1,4,7;
50:5,20;52:4,8,13;
53:1,16,19;59:23;
60:7,11,16;64:12;
65:16,23;66:4,10,20;
67:9;70:2,12,16,25;
71:14;72:19;73:17;

74:25;76:6,10,24;
77:18;79:16;81:4,13;
83:13,17,23;84:8;
85:5,9,20;87:20;89:6,
16;90:8;97:5;98:24;
99:11,24;101:3,12;
103:11,23;104:13;
106:15;109:9,15;
110:8;111:7,11;
112:8;113:16;
118:24;123:21;
124:14,19;125:3;
127:6;132:5;137:22;
138:24;141:21;
142:10,20;143:5,9,
16,21,25;145:1,20;
146:1,5;147:15;
148:13,21;158:2;
176:12;191:1;192:8,
21;203:20,21,23;
212:18;216:7,14,20,
25;218:4;221:21;
222:5;239:7;249:18;
250:7;253:18;254:3,
22;256:1,20;257:8;
258:7;266:5;267:16;
268:2,4,14;269:15,
21;270:25;271:6;
299:7;333:15,18

**decide (7)**
158:3;201:24;
253:1;257:9,14;
300:11;324:7

**decided (3)**
17:10;275:21;
284:15

**decides (2)**
159:17;324:8

**decision (8)**
140:6,16,22;
141:14;146:9;
147:24;148:23;
159:18

**decisions (1)**
135:8

**deductible (1)**
221:11

**deep (1)**
106:9

**defect (4)**
286:25;288:14,19;
326:5

**defective (8)**
189:17;308:4,20;
309:6;310:13;
312:15;323:1,2

**defend (2)**
244:6,9

**defendant (3)**
241:13;242:17;
301:9

**defended (1)**
9:24

**define (2)**
24:3;156:3

**degree (3)**
14:1,2;166:18

**degrees (2)**
195:6,11

**deja (1)**
94:1

**delivered (2)**
328:3;329:17

**delve (1)**
292:8

**demand (11)**
162:24;164:10,13,
21;237:9;239:16,18;
319:25;320:7;
321:22;323:19

**demanded (2)**
164:17;166:7

**demanding (1)**
165:7

**demands (1)**
163:3

**demonstrate (1)**
289:5

**denied (1)**
209:24

**denies (1)**
294:19

**Denver (1)**
250:1

**deny (3)**
107:19;262:7,9

**depending (1)**
125:21

**depends (4)**
100:21,23;286:4,5

**depicts (10)**
84:8;85:2;87:19;
97:4;98:23;112:7;
123:20;124:13,20;
127:5

**deponent (1)**
352:3

**DEPONENT'S (1)**
352:1

**depose (5)**
145:22;228:19;
240:5,6;267:19

**deposed (2)**
268:12,21

**deposition (17)**
8:5,15,20;9:19;
10:2,6,12;36:6,15;
136:7;141:24;
312:19;349:24;
350:7;351:1;352:4,9

**depositions (3)**
9:22,24;98:16

**depression (2)**
25:3,8

**Describe (9)**
31:6;39:17;52:8,

15;55:24;56:2;
120:16;171:10;
225:14

**described (3)**
270:18;271:22;
346:16

**describing (1)**
115:9

**description (2)**
120:24;261:9

**design (8)**
186:7,14;289:15;
290:24,25;291:13;
292:5;296:5

**designed (3)**
282:11,14,17

**designer (1)**
25:2

**detail (4)**
73:24;80:24;
115:14;270:19

**detected (1)**
325:14

**determines (1)**
159:16

**Devil's (1)**
269:19

**DF (1)**
352:25

**diagnosed (1)**
25:7

**diamond (7)**
100:1;102:7,10;
122:14;281:6,20;
341:9

**diamonds (1)**
101:25

**difference (3)**
48:9;108:10,12

**differences (1)**
296:5

**different (29)**
10:18;23:2;65:7;
68:25;83:22;94:20;
95:25;108:8;124:17;
125:1,2;137:12;
177:1;179:17;
184:14;217:22,25;
248:20;262:12;
284:14;301:25;
325:21;327:6;330:2,
4;336:8,10;343:21;
349:12

**differently (9)**
28:18;41:17;65:8;
83:21;100:8;153:9;
190:25;218:2;309:16

**difficult (7)**
99:14,18;100:4;
101:21;102:2;
216:10,11

**dig (3)**
14:16,24;15:5

**DIN (2)**
333:25;334:5

**dinner (1)**
24:8

**direct (5)**
192:19;300:4;
307:23;313:11;
314:22

**direction (3)**
92:12,13;132:20

**directly (4)**
182:3;258:10;
312:1;316:7

**disagree (1)**
258:22

**disappear (1)**
298:20

**discharged (2)**
220:23;293:10

**disclosure (1)**
75:6

**discovery (34)**
36:8,22;74:10;
75:11;80:22,23;
83:10;96:14;104:8;
112:12;116:12;
132:18;144:8;150:2;
161:18;162:8;173:6;
197:8;205:15;
207:19,23;209:15,18;
215:23;259:20;
260:5;280:16;289:4,
7;292:8;294:13;
304:5;307:8;325:7

**discretion (2)**
159:11,14

**discuss (2)**
36:21;266:25

**discussed (3)**
37:1;304:9;345:14

**discussing (1)**
305:24

**discussion (1)**
131:17

**dishonest (1)**
210:7

**dismiss (4)**
148:15;209:19,20,
21

**dismissed (3)**
147:25;148:3,6

**dispute (43)**
66:19;68:17,20;
70:24;76:14,18,19,
19,21;77:14,15;78:2,
6;79:21;81:14;84:10;
89:9;107:23;110:10;
117:8;123:2,16,17;
142:16,17;143:9,13,
18;144:1,23;145:18;
146:3;200:6;267:18,
22;268:10,19;
290:19;326:7;340:2;

348:1,6;349:6

**disputing (1)**
77:8
**disqualified (1)**
219:17
**distances (2)**
234:18,20
**distinction (2)**
77:20;205:9
**District (3)**
8:6,6;30:10
**Division (1)**
8:7
**Dixon (6)**
259:1;266:11,20;
267:6;269:23;270:5
**docs (1)**
275:20
**doctor (15)**
204:19,22,25;
205:3,5,18,21;
206:13,14;212:24;
213:21,25;214:17,24,
25
**doctors (7)**
196:4;201:5;203:8;
204:9,11;214:5;
215:6
**document (11)**
208:11;223:19;
299:23;300:14;
301:1;326:13;337:8,
12,20,24;338:6
**documents (19)**
74:19;75:7,13;
132:18;144:9;
208:20,23;209:1,25;
210:3,11,22;211:18;
212:10;325:5,9;
338:23;339:3,8
**dollars (1)**
322:5
**dome (1)**
134:10
**donate (1)**
34:1
**donation (3)**
164:14;322:2,3
**done (9)**
48:15;75:15;153:9,
14;191:2;268:23;
272:4;343:21,22
**double (4)**
14:2;320:9;321:7;
322:18
**down (71)**
9:25;14:24;15:10;
16:16,21;17:2,4,9,11;
36:4;38:17,18;44:17,
18,20,21;47:2;50:13;
75:5;92:1,7;93:3,16,
17;96:18;107:16;
112:3;116:3,7;117:3;

123:13,22;126:6,25;
127:13;128:5,18;
129:4,17;131:22;
132:24;153:4;
161:11;200:10;
202:9;212:11;
215:24;223:18,22;
232:23,25;233:23;
237:5,17,20;238:18,
19;254:23;261:17;
274:18;276:8,10,22;
280:9;286:23;
307:24;309:8;
311:20,23;344:18;
347:12
**downhill (14)**
86:2,12;88:10;
90:20;91:19,24;
92:14;104:25;105:8;
127:17;159:7;
348:16;349:1,4
**DPS (1)**
333:10
**Dr (1)**
220:21
**drafted (3)**
300:25;338:6,8
**drafting (1)**
301:21
**dragged (1)**
228:11
**draw (7)**
128:5,12;132:24;
173:10;175:9,11,20
**draws (1)**
50:17
**Drew (1)**
320:25
**drink (1)**
331:13
**drinking (7)**
24:1,2,4,7,9;
331:19,21
**drive (10)**
15:2;197:23;
198:11;237:5,17,20;
238:17,19;239:4,8
**drop-off (6)**
194:18,19,22,25;
195:4,25
**drop-offs (1)**
194:24
**dropped (1)**
165:24
**drugs (6)**
24:14,19,21,24;
25:1;60:6
**drunk (1)**
223:6
**drunkenness (3)**
22:22,24;23:3
**duck (7)**
132:1,21;253:9,15,

17,18;347:11
**due (4)**
217:16;272:5;
294:15;296:18
**duly (1)**
9:3
**dump (1)**
205:16
**During (16)**
75:5;134:3,15;
217:17;226:20;
240:6;282:21;283:5;
293:22;302:1,5,11;
307:8;308:8;337:21;
338:8
**duties (3)**
66:13,16;69:6
**duty (8)**
67:12,22;68:4,7,
14;241:14,23;242:18
**Dynafit (86)**
8:8,24;49:23;
162:24;166:10,21;
189:20,22;190:17;
191:10;193:19;
241:3,10;261:10;
272:24;273:2,5;
279:4;283:15;284:1,
20;285:6,8,15,20;
286:25;287:5;
288:20;290:13;
292:5;294:19,24;
295:3,6,25;297:25;
298:4,13;301:7,9;
302:20;304:8;
305:10,17,20,22;
306:1,3,8,10,15;
308:4,7,20;309:6,16,
17;310:22;312:6,8,
11,11,13,23;313:1,9,
18;314:7;316:18,23;
317:21;318:2,2;
319:15;321:24;
322:23;323:12,25;
324:3,5;327:16;
338:8;343:11,16;
345:4;352:25
**Dynafit's (1)**
294:13

---

**E**

**earlier (13)**
21:19;64:10;
131:15;146:15;
179:18;224:8,12;
267:10;293:16;
320:3;329:14;
346:13,16
**Early (12)**
71:17,22,24;72:11;
80:8;81:24;82:6,14;
106:19;188:6;318:3;

343:4
**Earth (1)**
10:5
**easier (1)**
227:12
**easily (1)**
293:9
**East (1)**
42:18
**Eastern (2)**
75:4,25
**Ecology (1)**
14:11
**edge (5)**
90:20;275:10,12;
278:12,17
**educate (2)**
292:4;343:13
**eferring (1)**
289:11
**effect (5)**
117:22;118:4;
292:16,23;293:2
**Eggert (14)**
36:14,18;37:2;
52:3;72:18,23;76:6,
15;77:17;78:13;
153:1;259:21,25;
260:5
**Eggert's (1)**
73:14
**eggs (6)**
14:16,18,20,22,25;
15:5
**eight (1)**
270:16
**Either (13)**
58:8;88:9;90:19;
91:15;108:14;
122:21;131:20;
154:18;177:19;
271:4;287:22;
326:25;333:20
**either/or (1)**
193:23
**ejected (2)**
183:25;278:14
**elasticity (1)**
49:21
**electronically (1)**
203:22
**ellipsis (2)**
264:14,24
**else (62)**
8:18;27:12;29:16,
21;31:1,20,22;33:24;
36:9;37:4;38:23;
41:10;43:6;44:15,22;
45:19;54:16,18;
78:18;82:5;90:11,15;
109:24;111:4;
117:24;144:6;
147:19,21;166:12;

169:17;179:3;
208:17;213:19;
216:5,6;222:24;
223:12,15;230:6,16;
231:10;232:23;
233:2,4;237:2;
241:18;251:7;252:2;
253:3;254:7;265:16;
270:24;292:7,10;
295:5,12;304:9;
316:19,21;323:3,15;
326:12
**else's (1)**
181:18
**e-mail (47)**
142:21;143:15;
144:2,13,20;145:25;
147:9,16;157:17,22;
163:22;164:7;168:2;
170:7;235:1,14,22,
25;236:16,20,24;
237:3,12;238:2,15;
240:15;241:17;
242:20;254:6;
255:12;258:4,10;
259:16;266:22;
290:6;307:7,15,19;
308:17;311:13;
319:18,21;320:18,20,
21;322:7;323:19
**e-mails (8)**
147:8,14;240:15,
22;258:24;259:2;
305:24;309:20
**employed (2)**
31:8,10
**employee (1)**
134:8
**employees (11)**
20:8;134:8;162:20;
166:6;243:23;
247:22;248:8,14;
250:19;258:20;
290:13
**encounter (2)**
92:6;229:2
**encountered (1)**
236:1
**end (4)**
71:22;243:18;
304:12;307:16
**endeavored (1)**
343:13
**ending (1)**
344:19
**engage (2)**
222:9;323:12
**English (1)**
137:4
**enough (28)**
72:2;135:11;
136:20;137:6;138:7;
139:1;143:8,12,14,

21;147:23;148:1,13,
19;253:23;254:2,11,
12,17,17;255:11,11,
17,25;256:5;257:3;
268:3;282:16
**entails (1)**
238:16
**entire (7)**
63:20;134:4,17;
166:23;261:15;
283:10;288:1
**entirely (1)**
350:3
**entitled (2)**
350:6,9
**entity (1)**
141:9
**entrance (1)**
61:11
**Environmental (8)**
30:21,23;31:21,23;
32:12;33:12;164:15;
322:4
**equipment (10)**
51:7,9;68:14;
142:10,20;143:25;
145:1,20;146:5;
345:14
**essentially (4)**
50:12;65:10;97:10;
146:17
**established (2)**
308:19;343:23
**establishes (1)**
251:1
**estimate (7)**
40:23;129:1,6,8;
155:17;195:13;
283:18
**et (1)**
250:2
**ethical (1)**
22:13
**Ethos (2)**
21:6,7
**evacuate (1)**
156:12
**evacuations (1)**
156:4
**Evan (2)**
227:14,15
**Eve (1)**
22:23
**even (38)**
11:8;45:7;61:20;
87:4;97:11;121:4;
127:21;129:12;
131:3,3,3;142:22;
171:3;174:14;178:9;
193:20;198:20,25;
199:4;200:19,23;
207:1;209:21;
211:19;212:5;

218:21;225:11,19;
239:3,6;258:16;
267:3;271:10;
296:13;302:10;
308:8;327:12;348:7
**evening (2)**
23:7;60:7
**event (1)**
294:3
**events (1)**
39:6
**eventually (2)**
15:20;299:10
**Everybody (2)**
253:8;318:5
**everyone (2)**
173:8;253:14
**everywhere (2)**
44:24;54:19
**Evi (8)**
259:1;266:11,14,
19,25;267:6;269:23,
25
**E-V-I (1)**
266:14
**evidence (6)**
188:16;211:24;
286:13;290:19;
294:22;298:8
**evidently (4)**
183:2,4;212:11;
234:21
**exact (5)**
214:2;221:25;
296:3;298:14;337:13
**exactly (10)**
11:8;16:6;36:1;
114:3;131:2;191:5,8;
237:24;281:12;
346:20
**exam (2)**
18:18;19:6
**EXAMINATION (3)**
9:5;272:16;346:5
**examined (1)**
9:4
**example (5)**
20:25;35:8;42:6;
160:3;218:24
**Except (2)**
239:13;291:4
**exception (2)**
304:7;326:2
**exchange (3)**
18:11;60:17;61:5
**exchanged (1)**
61:1
**exclamation (4)**
71:16,21,22;
110:25
**excuse (14)**
41:4;42:8;55:3;
66:24;102:16;

109:15;135:13;
148:12;164:2;
185:24;186:16;
203:19;216:17;
301:20
**Exhibit (293)**
26:10,11,18;61:14,
15;65:12;67:15;70:6,
10,10,18;73:9,10;
79:1,5,6,25;80:4,12,
16;81:1,9,18,21,23;
83:3,7,8,15,22;84:2,
7;86:1;87:7,8,11,16,
19,23;88:19;89:2,4,
13,21,25;90:1,11,19,
21,25;91:3,5,8,18,21;
92:2,13,23;93:4,8,20,
24;94:7,10,24,25;
95:3,8,13;96:4,13;
98:22;99:2,6,6;103:6,
10;104:1,5,6,15;
105:25;106:4,5,12;
108:25;109:4,14;
110:1;111:15,19,20;
112:17,18;113:2,3;
117:6;122:4,8,8,18;
123:3,8,12,12,14,19;
124:2,13,18;125:2,6,
24,25;126:6,16,20,
21;127:4,9,16;128:5,
19;129:3;132:4,25;
133:8,12,13,20;
134:14;142:2,6;
147:5;151:11;159:3,
4;160:24;161:16,22;
162:18;163:12,13,22;
164:1,7;167:16,17,
25;170:7;172:25;
173:4;175:5,10,24;
176:7,10,11;177:1,4,
5,9,13,17,22,25;
178:5,6,15;179:12,
21;196:7,8;199:12,
13,17;201:21;202:3,
6,7,9;203:15,19;
224:16,19,25;225:2,
4,8,20,23;226:3,10,
13,17,22,25;228:3,6,
9,13,16,25;229:5,8;
242:25;243:4,4,5,7,7;
244:20,22;249:10,12,
15;253:6;257:25;
258:1,4,25;261:2,6,
20,23;264:19;291:21,
23;292:1;299:14,18;
300:14;303:22,25;
304:9;306:20,21,24;
307:1,4,5,7,21,23;
308:25;313:12;
314:21,22;315:1,3,
25;318:8;319:17;
320:13,14,17,19;
321:11,20;322:15;

323:17,18;324:12,23;
325:3,5;326:8,13,16;
327:1;332:9,11,20;
333:19;336:4,21,21,
25;337:3,9,20;338:6,
13,19,23;339:4,8;
340:15;341:12;
347:1;348:6,18;
349:5
**Exhibits (9)**
113:7;117:12;
123:4;131:16;
306:18;346:7,10,15;
347:5
**exist (8)**
71:17,22,25;72:12;
80:8;81:24;82:15;
180:2
**existed (15)**
83:17,23;85:20;
87:20;97:5;98:23;
104:13;109:9;112:7;
123:20;124:14,18;
125:3;127:5;176:12
**exists (3)**
179:21;212:14;
286:25
**expect (8)**
100:8,9,19;102:3,9,
19;158:16;326:15
**expected (4)**
236:22;237:15;
238:10;240:17
**expensive (1)**
244:5
**experience (3)**
63:22;185:18,19
**experienced (1)**
64:3
**experiences (1)**
319:6
**Experiment (2)**
31:22;32:10
**Expert (27)**
99:21,22,24;100:9,
10,14,20;156:14,16;
190:9,10;193:18;
257:12,12,15,17;
289:10,14;290:21,22;
304:13,19,20;305:5;
317:18;335:7,16
**expertise (6)**
156:1,17,21;291:9;
318:19;319:14
**Experts (5)**
99:14,18;100:4;
101:21;293:14
**expires (1)**
352:24
**explain (6)**
119:4;175:11;
179:19;217:12;
301:5;350:4

**explained (3)**
230:11;240:9;
291:10
**explaining (1)**
222:19
**Explore (3)**
166:15;260:1,6
**exposed (8)**
72:2;82:8,18;86:2;
104:24;105:4;
106:11,21
**extent (4)**
69:14,22;251:21;
277:6
**extra (2)**
221:9;287:14
**extraordinary (1)**
285:22
**extremely (1)**
216:11
**extremity (1)**
286:7
**eye (1)**
115:16
**eyes (1)**
319:1

## F

**Fabritz (1)**
8:13
**face (2)**
58:21;228:11
**Facebook (35)**
26:15;27:3,10,13,
16;41:1;58:23;
199:16;201:22;
202:7;203:5;224:6,
13,20;225:4,23;
226:10;227:1;228:6,
16;229:8;231:7,12,
14;243:8,9,10,15;
244:15,16;246:15,19;
248:15;249:16;318:9
**facial (1)**
171:12
**fact (17)**
119:4;124:23;
134:22;156:10;
190:20,22;206:25;
212:4;241:19;254:8;
288:6;289:18;
303:15;305:4;
308:23;336:12;
341:13
**factor (1)**
289:12
**facts (23)**
142:15,17;143:9,
13,18;144:23;145:17,
24;146:2;212:13;
241:15;242:1,9,16;
247:2;254:1;255:9;

267:18,22;268:9,19;
305:25;326:6
**failing (1)**
242:18
**failure (2)**
272:5;349:17
**fair (12)**
83:18;84:15;
272:24;273:18;
277:9;300:13,22;
319:24;331:17;
340:12;344:25;345:8
**fall (13)**
13:6;18:23;19:7;
185:9;193:5,6,7,8,14,
17,21;194:1;253:10
**false (1)**
142:1
**familiar (2)**
41:14;67:25
**familiarity (1)**
10:11
**family (1)**
22:4
**far (10)**
55:1;88:11,20;
128:17;129:1,3;
180:15;233:12,15;
234:14
**farther (3)**
93:17;347:22,23
**fast (9)**
52:23,25;133:3;
151:13,22;152:8;
155:14;161:2;182:7
**fault (12)**
59:19;140:13;
160:13,22;181:18;
234:3,7;262:10,16;
263:3,16;264:11
**favorite (2)**
54:23;101:20
**fawn (2)**
16:22;17:6
**February (3)**
229:10,12;248:10
**fee (2)**
34:15;169:14
**feel (6)**
94:1;224:3,3;
230:20;283:21;
313:23
**feeling (4)**
45:22;224:1,5,5
**feels (2)**
215:19;222:20
**feet (7)**
72:14;82:3;183:17;
184:25;195:21,22;
277:22
**fell (1)**
58:21
**felt (3)**

27:25;166:20;
313:25
**female (5)**
115:18;118:2,5,10,
13
**females (1)**
120:7
**Femberson (1)**
197:9
**fence (11)**
106:25;107:1,2,3,4,
6,7,8;151:18;160:4,
23
**fences (10)**
142:10,19;143:24;
144:25;145:20;
146:4;234:25;
235:12,21;236:15
**few (8)**
44:4,23;122:23;
220:23;247:12;
269:8;299:20;332:14
**field (5)**
16:8;102:6;285:21,
24;286:3
**figure (2)**
124:11;311:4
**figured (1)**
285:11
**file (6)**
135:2;163:5;169:1,
8,16;266:24
**filed (24)**
37:13;168:15;
170:10;172:19;
209:22;210:1,3;
211:19;212:5;
239:24;243:21;
260:14;266:17,20;
267:1;285:2,5,14;
299:2,6,10;300:1,7,
19
**filing (4)**
34:15;161:23;
169:14;244:1
**fill (1)**
273:13
**Fin (1)**
41:15
**final (1)**
264:18
**finally (1)**
221:2
**financial (1)**
323:25
**find (3)**
54:19;210:11;
328:2
**fine (7)**
223:1,10;230:12;
250:13;290:8,10;
320:11
**finger (1)**

88:7
**finish (12)**
11:4,9;30:10;94:9;
129:25;140:20;
144:16;148:16;
167:4,7,7;189:3
**finished (2)**
11:12,14
**fired (8)**
29:6,9,17;30:4;
246:22;247:5;248:4,
5
**firm (9)**
10:1,4;162:25;
165:8;166:8;219:13;
239:22;249:22;250:1
**first (65)**
9:3;30:1;32:2;
34:6;41:10,10,11,18;
52:6,22;63:7;64:10;
70:23;84:22;90:13;
94:14,15;109:10;
134:14;196:14;
199:21;204:2;
221:20,23;227:3,11,
12,13,25;231:23;
237:8;238:4;249:21;
250:14;253:7,11;
254:25;261:19,21,23;
264:19;266:13;
269:9;275:20;
276:15,15,21,22,24;
279:17;280:21;
287:6,8,12,19,23;
289:24;291:5;299:1,
22;307:4;315:4;
337:7;339:2;342:16
**Fisher (1)**
8:14
**fitting (1)**
50:18
**five (12)**
22:23;24:6;39:4,
20;40:6;42:1;82:3;
185:11;203:6,13;
252:13;283:21
**five-plus (1)**
25:21
**flat (2)**
47:1;276:16
**Fleck (2)**
8:11;300:10
**flip (8)**
196:10,24;198:4;
277:19,20;278:6,13,
16
**flippant (1)**
20:1
**flips (1)**
196:11
**flying (2)**
277:13,16
**focus (2)**

65:2;311:13
**follow (2)**
316:11;348:2
**followed (1)**
296:7
**following (3)**
8:1;348:14,21
**follows (1)**
9:4
**follow-ups (1)**
346:2
**food (3)**
60:17,19;61:1
**foot (3)**
119:22;120:2;
195:18
**foregoing (2)**
352:3,5
**Forest (7)**
16:4,15;17:11;
30:18,22;31:19;32:3
**forests (1)**
17:4
**forgot (3)**
46:24,25;201:11
**forgotten (1)**
64:18
**form (5)**
259:5,8,13;279:7;
280:1
**former (2)**
248:13;266:8
**forth (2)**
268:20;323:17
**Fortunately (1)**
286:9
**forum (3)**
133:6,14,21
**forward (4)**
148:9;162:17;
274:10;296:19
**forwarded (1)**
259:5,7
**found (6)**
15:14;16:14;41:1;
118:8;221:5;317:13
**Foundation (5)**
32:7,14,24;318:16;
326:16
**foundations (1)**
33:23
**four (9)**
15:18;23:1,21,22;
25:25;60:8;72:13;
98:21;120:2
**fractured (1)**
201:16
**France (1)**
321:14
**free (3)**
50:2;56:2;73:2
**Friday (2)**
70:11,16

**friend (11)**
245:3,4;247:4,7;
279:6;280:4,5,7;
327:5,8;331:17
**friends (6)**
24:8;38:21;269:20;
331:4,15,20
**front (18)**
50:13;61:6;67:2;
75:14;113:6;128:15;
147:6;151:18;161:1;
167:20;175:7;220:6;
238:5;267:12;326:8;
336:11;346:9,11
**frontal (1)**
336:9
**fruitful (1)**
37:13
**frustrated (1)**
322:20
**fuck (14)**
115:16;120:3;
121:14;262:4,10,17;
263:3,16,21,22;
264:1,8;314:7,12
**fucking (1)**
223:6
**full (4)**
329:4;333:5,12;
352:8
**full-time (2)**
31:8;247:6
**fully (6)**
215:13,16;216:6,
16,19,21
**fun (6)**
55:22;102:15,17,
17;165:9;204:4
**function (1)**
295:5
**functioning (1)**
325:16
**fund (2)**
21:17;33:20
**fundraising (2)**
27:20;28:2
**funds (4)**
33:24;34:10,21,24
**further (8)**
95:7;115:19;272:3;
343:14;346:3;
348:16;349:1,4

---

## G

**gal (2)**
29:15;120:4
**Gallatin (7)**
31:19;32:3,6,13,15,
16;33:13
**game (1)**
277:6
**games (1)**

**Big Sky Resort; Dynafit North Ameria**

311:6

**gap (2)**
107:8,12

**gaps (1)**
273:13

**Garmont (4)**
342:13,25;343:4,
19

**Garmonts (2)**
342:18;343:18

**gate (1)**
55:4

**gates (6)**
142:9,19;143:24;
144:25;145:19;146:4

**gave (14)**
73:6;74:15;127:12;
145:6;162:7;172:6;
204:14;209:25;
211:25;259:2;270:9;
293:24;296:2;329:23

**gear (20)**
48:6,10,10,12,13,
14,16,17,19,21;49:3,
4;50:9;63:20;64:1,2,
4;227:23;321:1;
322:12

**geez (1)**
44:22

**Gene (1)**
197:9

**general (4)**
10:11;30:18;
325:16,16

**generally (1)**
36:2

**generated (1)**
337:19

**generation (6)**
287:6,8;291:5,7,8;
342:17

**generations (1)**
287:6

**Geological (1)**
21:6

**gets (5)**
165:9;166:13;
202:11;316:19,22

**gift (1)**
24:13

**given (18)**
37:10,11,13;38:18;
74:13;75:14;135:10;
208:20,24;209:1;
213:5;217:1;284:1;
298:5,6;303:15;
349:22;352:9

**gives (1)**
146:16

**giving (11)**
74:19;103:13;
137:15;205:24;
212:4;305:19,21;

306:7;309:22;
312:13,18

**Glacier (2)**
229:1,2

**glad (1)**
200:16

**God (4)**
199:5;206:16;
208:15;223:6

**goes (2)**
44:18;143:1

**good (16)**
14:7;17:9;27:25;
45:22;52:11,17;
208:16;234:18,20;
266:23;272:18;
280:14;283:22;
315:14;324:25;
341:11

**governing (1)**
22:14

**GPA (2)**
14:6;18:12

**grabbed (1)**
14:21

**graduate (4)**
12:16;13:23;14:4;
17:20

**graduated (4)**
12:23;13:2;15:24;
18:9

**graduating (2)**
14:8;18:12

**grant (1)**
300:11

**grants (1)**
33:21

**Gravelly (1)**
46:25

**Gray (3)**
58:11,14,15

**great (2)**
102:23;323:6

**Greendefense@gmailcom (1)**
147:18

**grew (1)**
12:9;41:19,25,25

**grizzled (1)**
229:2

**groomed (1)**
65:8

**ground (1)**
165:24

**group (1)**
331:15

**grow (1)**
12:11

**guarantee (1)**
168:20

**Guardians (9)**
26:6,21;27:19;
28:4;29:6,10,13;30:5,
8

**guess (20)**
15:24;28:11;47:23;
85:12;93:12;123:1;
158:3;160:2;195:2,
15;198:21;203:11;
209:4;244:10;
283:12;284:23;
313:5;317:18;
339:18;346:19

**guessing (18)**
25:21;26:16;30:2;
40:19;66:15;67:4;
93:13;196:1;276:20,
20,22;277:1,5;
281:17;288:5;294:8;
309:13;339:16

**guy (12)**
37:25;114:24;
123:24;124:3;
162:14;171:15;
175:22;201:15;
223:6;263:22;327:3;
329:8

**guys (39)**
47:24;58:10;74:20;
117:13;141:11;
166:11;169:15;
178:8;213:20;
226:20;228:19;
238:18;239:12;
240:2;245:13;
261:16;285:12;
287:10,19;288:4;
293:23;294:7;
295:10;296:1;298:7;
303:19;304:16,20;
309:18,20;310:5,9,
11;317:14;323:2;
324:7,25;342:12;
345:6

**guy's (2)**
37:24;38:4;127:21;
207:15

**gym (1)**
222:19

**H**

**habitat (1)**
17:9

**hair (3)**
120:13;171:12,16

**half (11)**
14:24;18:17;23:1,
22,25;30:2;60:8;
221:4,4;248:19;
331:23

**halfway (2)**
225:19;278:15

**Halloween (2)**
22:23;23:7

**hand (30)**
26:9;61:13;65:11;

73:8;80:15;87:6;
89:24;106:3;110:4;
111:18;112:16;
113:1,2;123:11;
126:19;133:11;
163:12;164:4;
176:10;199:11;
203:18;210:21;
224:19;243:3;261:5;
306:18,20,24;320:17;
325:3

**handed (9)**
70:9;91:3;94:23;
201:21;202:6;
244:20;299:23;
320:18;337:3

**handing (18)**
79:4;80:3;81:21;
83:6;99:5;103:9;
104:4;109:3;122:7;
142:5;173:3;243:6;
257:24;292:1;
299:17;332:19,19;
338:16

**handle (2)**
31:5;288:4

**handled (1)**
288:4

**handling (2)**
31:14,17

**hands (3)**
165:20,22;212:6

**handwritten (1)**
338:4

**hang (2)**
331:3,5

**hanging (1)**
331:20

**happen (3)**
205:16;236:3;
247:14

**happened (21)**
183:8,12;197:14;
200:16;201:6,10,18;
202:13,20,22;203:3,
5;207:7,15;208:20;
212:12;230:15;
271:10,11,22;327:16

**happens (1)**
182:25

**harassing (1)**
239:1

**hard (8)**
48:23;49:1;150:19;
183:24;197:23;
198:12;225:16;
348:13

**harm (2)**
241:2,9

**Harned (8)**
247:10,11;265:15,
21,24;267:7;269:10,
17

**H-A-R-N-E-D (1)**
247:10

**hazard (1)**
92:23;102:12,14;
109:13;160:13

**hazardous (2)**
253:24;254:2

**hazards (13)**
56:8,24,25;57:9;
72:1;100:10,13;
101:23;102:1,10;
234:25;235:21;
236:16

**head (8)**
38:24;118:18;
201:14,16;270:7,11,
13,13

**headed (2)**
44:16;116:25

**header (1)**
315:5

**heads (1)**
44:20

**Headwaters (1)**
46:4

**health (24)**
134:9;162:16,20;
166:6;170:10;
172:20;212:17;
214:19;215:9,10,11;
218:3,19;219:1;
220:8,13;238:20;
239:11;243:18,23;
245:24;246:23;
249:23;250:3

**hear (4)**
277:7;288:12;
310:10;322:9

**heard (1)**
12:5

**hearing (4)**
116:13;217:17;
220:6;289:24

**heat (1)**
238:17

**heated (7)**
134:10;142:23;
162:15;238:21;
245:23;252:25;
267:15

**heavily (2)**
100:5;101:23

**heavy (4)**
120:15;121:12;
171:19;284:17

**heck (2)**
9:14;214:20

**heel (12)**
282:19;283:3;
291:13;293:3;
296:14;297:3;302:4,
5,10,15;315:17;317:1

**height (2)**

341:25;344:12
**held (1)**
345:2
**helicopter (3)**
200:20,24;201:3
**hell (5)**
37:24;38:3;53:10;
54:17;114:21
**Hello (2)**
311:17,19
**helmet (23)**
46:7,10,13,16,17,
20;47:1,4,13,16,17,
18;54:20;119:12,13,
17,20;121:17,20;
171:17,21,23;271:4
**helmets (3)**
121:19,21,23
**help (5)**
214:13;250:4;
274:20;311:9;312:5
**helped (2)**
156:4,12
**helping (1)**
94:21
**HEREBY (1)**
352:4
**hereinbefore (1)**
352:9
**hey (8)**
47:24;125:14;
240:4,5;287:12;
310:8,12;327:8
**hidden (8)**
125:11,12;126:1;
128:2,3;174:6,9;
318:6
**high (10)**
12:16,17,23;13:3;
15:8,11,12,14;50:2;
182:19
**higher (2)**
103:1;335:21
**highlight (2)**
134:11;203:24
**highlighted (2)**
134:13;238:8
**highlighting (1)**
134:15
**highway (26)**
44:17,18;124:13,
19;126:5,16,25;
128:9,10;129:11,12,
15;130:24;132:25;
176:4,15,22,23;
177:25;178:4;183:1,
16;184:15;194:19,
22;195:4
**hike (1)**
55:8
**hiking (1)**
16:17
**hill (3)**

160:10;233:23;
276:22
**hire (3)**
190:9;244:8;
293:14
**hired (1)**
247:6
**history (1)**
25:3
**hit (27)**
59:8,11;92:8;
129:18;137:9;150:5,
9,15,17;151:19;
153:7;154:13;155:2;
161:1;176:1;180:24;
197:13,14;207:14;
229:17,23;276:1,15,
15,15,21,23
**hitting (7)**
131:7;150:22;
151:1,5,9,10;229:13
**Hoffman (1)**
329:5
**H-O-F-F-M-A-N (1)**
329:5
**Hold (8)**
19:3;148:16,16;
149:16;166:25;
251:11,11;264:15
**holding (1)**
245:22
**honest (1)**
208:17
**honesty (1)**
207:21
**honeymoon (3)**
226:12,20;240:6
**hope (1)**
286:1
**horrible (2)**
224:5,5
**horse (1)**
201:16
**hospital (9)**
118:17;200:19;
218:14;220:18,25;
221:1;306:4,5;
317:13
**hour (7)**
155:21,23,25;
182:11,12,15;248:19
**hours (3)**
75:20;339:24;
340:7
**house (4)**
21:10;59:23;
201:15;312:12
**huge (5)**
14:17;41:12;102:6;
119:22;129:18
**huh (1)**
221:3
**Huh-uh (3)**

17:14;45:25;274:6
**humor (1)**
234:4
**hump (1)**
102:22
**hunch (1)**
317:24
**hundred (3)**
178:13;233:9;
234:11
**hundreds (1)**
179:8
**hung (2)**
331:14,18
**hunt (1)**
60:3
**hunter (1)**
234:17
**hurt (11)**
57:10;166:13;
182:4,12,14;214:11;
221:18;228:21;
316:19,22;323:15
**hurts (4)**
215:18,19;216:6;
220:22
**Hyalite (1)**
54:16
**hypothetical (1)**
159:23

## I

**Ian (5)**
8:21;94:21;174:16;
300:9;329:18
**ice (6)**
42:19,22;58:18;
59:10,11,12
**icy (2)**
58:20;240:24
**Idaho (1)**
44:19
**idea (17)**
91:7;117:14;
128:25;143:8;182:1,
2;191:17;198:16,18;
243:9;264:23;267:2;
277:18;291:2;
327:12;339:13;
347:21
**identification (56)**
26:12;61:16;70:7;
73:11;79:2;80:1,13;
81:19;83:4;87:9;
89:22;91:1;95:1;
99:3;103:7;104:2;
106:1;109:1;110:2;
111:16;112:19;
113:4;122:5;123:9;
126:22;133:9;142:3;
163:14;173:1;176:8;
196:9;199:14;202:4;

203:16;224:17;
225:9,21;226:14,23;
228:4,14;229:6;
243:1;244:23;
249:13;258:2;261:3;
291:24;299:15;
306:22;307:2;
320:15;324:24;
332:12;337:1;338:14
**identified (2)**
288:15,19
**identify (1)**
8:17
**ie (1)**
336:8
**immediately (6)**
18:22;153:2;
166:14;305:10;
315:7,9
**impact (1)**
230:5
**impacted (2)**
230:5;287:24
**impaired (1)**
216:24
**impairment (1)**
216:13
**impairs (1)**
217:4,7;248:18
**impatient (1)**
321:15
**important (1)**
170:8
**importantly (1)**
315:14
**impression (2)**
289:21,22
**improving (1)**
223:8
**inadequate (1)**
268:15
**inbounds (7)**
47:22;48:19;49:25;
64:1,5;101:5,13
**incident (4)**
182:8,17,21;
229:25
**include (2)**
120:6;300:12
**includes (1)**
163:22
**incorrect (2)**
85:23;191:14
**incorrectly (5)**
191:18,19;192:25
**incredible (2)**
14:13;58:10
**independently (2)**
326:22,24
**Indiana (1)**
12:13
**indicate (2)**
100:4;102:1

**individually (1)**
106:24
**individuals (2)**
34:1;314:7
**industry (1)**
63:20
**inferring (1)**
271:16
**influence (1)**
325:16
**info (1)**
247:19
**information (1)**
292:4
**informed (5)**
145:7;234:23;
235:11,20;236:14
**informing (1)**
258:19
**inherent (3)**
69:15,23;99:16
**initial (3)**
75:5;164:12;289:7
**injured (12)**
58:1;59:1;111:8,
12;115:13,22;
155:24;214:8;
233:11;286:14;
315:12
**injuries (16)**
58:6;118:18;
135:17;189:21,23;
190:2,8,14,18;
201:14;215:14;
216:24;218:7;
275:17;286:7;296:6
**injuring (5)**
56:20;57:1,15,18;
64:21
**injury (24)**
38:1;59:7;68:5,9;
69:13,14,21,22;
89:16;112:13;
201:17;216:17,20,22;
217:2,4,7,11,16,19,
23;275:18,23;287:2
**ink (1)**
352:7
**inside (1)**
16:22
**inspect (1)**
345:10
**installed (1)**
301:11
**instance (1)**
58:4
**instant (1)**
55:5
**instructions (2)**
279:13,15
**insurance (1)**
21:8;22:10;34:8;
162:20;166:6;215:9,

10,11;243:23;246:23
**insured (1)**
    218:3
**integrity (9)**
    189:24;190:3;
    192:23;287:3,24;
    288:22;296:8,10;
    317:16
**intend (6)**
    299:19;323:8,16,
    24;324:5,9
**interest (3)**
    218:20,23;219:18
**interesting (1)**
    23:24
**interface (1)**
    343:15
**intermediate (1)**
    335:7
**International (1)**
    14:12
**Internet (6)**
    133:6,14,21;
    160:24;168:4;318:12
**internship (1)**
    14:10
**interpreted (1)**
    146:19
**interrogation (1)**
    336:7
**interrogatories (1)**
    337:17
**interrupt (2)**
    181:5;206:16
**interrupting (1)**
    140:19
**Interstate (1)**
    34:6
**into (57)**
    44:17,18;47:5,7,9,
    23;77:6;112:14;
    113:15;114:22;
    115:1;118:8;129:19;
    131:2,19;132:1,19;
    140:11;145:6;
    149:13;150:19;
    160:12;180:14,21;
    181:1,17;182:6;
    186:7;197:12,16,17,
    23;198:12,15;220:17,
    23;223:3;227:24;
    231:25;232:19;
    241:11;254:8;
    271:12;274:10;
    283:7;292:8;294:1;
    307:25;308:12,23;
    310:14;315:5,10;
    323:20;326:1;
    336:18;344:18
**involved (2)**
    25:24;26:3
**involvement (1)**
    329:16

**irresponsible (1)**
    250:20
**irritable (1)**
    217:5
**ISO (1)**
    325:23
**issue (23)**
    75:11;164:19,24;
    166:12;226:9;
    261:16;283:25;
    284:20;285:14;
    287:4,5;313:18,21;
    316:18,23;317:17,21;
    323:3,6;325:13;
    342:15;343:5,14
**issued (3)**
    301:14;302:25;
    304:20
**issues (2)**
    342:14,18
**issuing (1)**
    301:10
**items (2)**
    304:8;336:3
**iteration (1)**
    342:25

**J**

**January (6)**
    199:22;200:23;
    201:2,10,12;300:2
**Jeff (3)**
    280:8,8,10
**job (11)**
    14:13;15:17,25;
    27:18,19;28:1,3,16,
    21;36:3;251:2
**jobs (2)**
    16:1;250:19
**jog (1)**
    312:5
**John (23)**
    8:5,7;9:2,8;27:6;
    165:1;200:15;
    224:12;240:4,5;
    241:1,8;291:1;311:1,
    17,19;315:4;321:1;
    322:5;343:24;
    349:19;352:3,14
**John@cottonwoodlaworg (1)**
    147:10
**joined (1)**
    26:21
**judge (11)**
    10:20;136:1;
    185:18;201:24;
    206:2,4,6,8;209:21;
    217:14;220:6
**jump (8)**
    196:2,5,23;197:2,6,
    10,11,12
**jumping (1)**

273:8
**jumps (3)**
    229:13,17,22
**jury (19)**
    10:20;55:24;78:14;
    140:9;146:24;
    149:11,11;158:3;
    209:4;225:14;237:9;
    257:9,14;277:7;
    323:16,24;324:5,8;
    332:21
**Justice (2)**
    10:5;38:3

**K**

**Keaton (1)**
    35:16
**keep (9)**
    40:10;54:14;
    137:15;149:16;
    185:13;207:19;
    240:1;252:12;330:23
**keeping (1)**
    272:22
**kept (2)**
    47:1;247:19
**kicked (1)**
    201:15
**kidding (1)**
    59:6
**kidnapping (1)**
    23:18
**killed (2)**
    21:20;234:19
**kind (12)**
    49:5;52:18;55:18;
    65:7;69:14,21;121:1;
    171:21;208:16;
    326:4;334:9;342:15
**knee (15)**
    212:23;213:22,25;
    214:6,8,11,24;215:6,
    18,18;216:1;221:18;
    286:7,10,14
**knees (4)**
    177:2;178:9;179:3;
    180:4
**knew (7)**
    243:21;244:5,8,11;
    258:13;285:13;
    334:10
**Knight (2)**
    307:17;319:23
**knowledge (1)**
    309:4
**knowledgeable (1)**
    336:17
**known (2)**
    8:24;331:3
**knows (3)**
    253:8,14;318:5

273:8
**L**

**label (3)**
    104:22;312:2,6
**labeled (1)**
    104:21
**lack (6)**
    149:9,21;152:17;
    157:6;253:2;293:8
**laid (2)**
    14:20;319:1
**Lake (2)**
    54:15;229:1
**Lamar (1)**
    245:25
**last (37)**
    18:10;40:7;91:22;
    94:17;97:17;122:20;
    151:12;168:2,10;
    188:24,25;198:7,12;
    203:8;212:25;213:9,
    21,24;214:17;245:19,
    21;254:25;264:13;
    270:19;280:8,10,11;
    290:5;304:5,17;
    311:23;315:15;
    325:24,24;327:5;
    328:1;349:19
**late (1)**
    106:20
**later (6)**
    201:7,11;220:24;
    320:9;342:25;350:21
**laude (1)**
    18:10
**law (57)**
    10:1,4;15:20,23;
    16:1;17:11,17,22,23,
    24;19:23,25;20:2;
    24:1;25:11,12,13,16,
    24;26:3;27:24;30:4,
    7,21,23;31:7,21,23;
    32:12;33:12,25;34:2;
    42:6,16,21;66:11;
    67:9,20,25;69:3;
    162:25;164:15;
    165:8;166:7,18;
    217:20,24;218:1;
    219:13;229:24;
    239:22;248:18;
    249:22;250:1;260:2;
    322:3,4
**lawsuit (34)**
    21:23;22:3,4;33:8;
    34:25;135:2;147:25;
    148:3,5,9,15;161:23;
    162:17;169:1;188:4;
    220:13;240:3;
    243:21,22;244:1,6,
    12;260:14;265:3,12;
    266:9,12,17,19,24;
    267:1;285:14;

316:16;330:21
**lawsuits (4)**
    33:16,20;168:16;
    169:6
**lawyer (6)**
    18:15;19:16;20:13;
    31:6,8;244:13
**lawyering (1)**
    41:2
**lawyers (3)**
    22:14;31:10;244:9
**lay (2)**
    14:16;326:15
**laying (1)**
    14:18
**LB (5)**
    332:6,7;333:2,14;
    334:8,20
**lead (2)**
    27:9;227:20
**leading (1)**
    184:18
**leads (2)**
    122:25;149:12
**learn (2)**
    15:13;39:10
**Learned (1)**
    281:2
**learning (1)**
    281:1
**least (7)**
    37:19;52:13;64:19;
    129:7;204:8;233:14,
    16;253:23;294:5;
    313:19;317:19;
    321:15
**leaving (2)**
    231:20,20
**led (4)**
    152:17;227:13,14,
    17
**left (47)**
    27:7;73:15;88:16;
    90:22;91:9;98:14;
    114:25;115:25;
    116:21,23,23,25;
    122:2,9;123:3;
    129:19,20;131:24;
    150:19;175:21;
    183:13,24;197:17,24;
    198:12;233:6;
    274:17,18;276:23;
    297:12,16;325:15;
    336:9;340:24,24;
    341:13,17;346:22,24,
    25;347:13,16,22,23;
    348:1,5;349:5
**left-hand (5)**
    92:2;93:4;275:14;
    276:5,13
**legal (3)**
    20:22;69:13,20
**length (4)**

195:10,20,22;
301:25

**less (11)**
15:15;40:7,8,19,
22;55:1;100:5,13,19;
129:9;182:12

**lessons (2)**
39:11,14

**letter (4)**
29:18,19;258:16,
19

**lever (1)**
308:9

**Leverich (2)**
225:6,14

**lewd (2)**
23:8,11

**Lewis (1)**
200:11

**liability (5)**
38:1,22;189:18;
251:23;253:10

**liar (3)**
199:1;209:7;
216:10

**lie (1)**
52:18

**lied (1)**
208:7

**life (8)**
22:10;134:5,18,24;
166:17,23;169:22;
320:4

**lift (20)**
54:25;55:2,15;
56:5;60:16;61:2,5;
70:11,15;72:21;
75:22;79:8;90:5;
103:11;134:9;170:9;
172:1,2;267:15;
268:16

**lifts (4)**
142:23;162:16;
238:21;245:23

**light (1)**
50:1

**lightheaded (1)**
230:15

**Lights (2)**
281:12,18

**likely (4)**
15:16;173:9;
305:12;306:13

**likewise (1)**
319:13

**limited (2)**
75:18;315:1

**limits (3)**
67:12,23;68:14

**line (9)**
45:10,22;112:21;
113:11,14;168:10;
347:25;348:5,7

**lines (3)**
15:3;264:13;
311:23

**link (3)**
315:24,24;318:9

**list (8)**
37:17,17;38:6,7,
11;54:14;62:9;
229:17

**listed (1)**
70:5

**litigation (7)**
211:19;212:5;
218:20;283:25;
337:21;338:9,18

**little (10)**
95:7;195:20,23;
202:11;230:14;
268:24;271:5;
288:10;343:17;
350:23

**live (5)**
28:15;29:1,1;
239:4,8

**lived (2)**
12:12,14

**lives (2)**
238:19,20

**living (2)**
60:10;290:25

**LLC (4)**
8:24;272:20,24;
301:9

**loaded (1)**
79:15

**loans (1)**
21:14

**local (5)**
15:6;74:3,4;
302:19;305:11

**located (1)**
19:25

**location (3)**
20:3;28:5;178:1

**Lochsa (1)**
44:21

**lock (3)**
50:8,14,15

**locked (1)**
50:4

**locks (1)**
50:12

**log (1)**
17:3

**logo (1)**
341:9

**logs (1)**
105:5

**long (12)**
13:14;15:17;24:1;
25:19;28:15;167:12,
12;255:18,20;280:18,
20;283:11

**look (35)**
14:15;15:3;56:24;
86:14;91:25;96:5;
107:8;119:9;121:8;
125:15;159:3;171:9;
172:7;179:11,11;
192:9;193:19;
201:24;208:18;
287:25,25;291:4,5;
292:2;293:5,6;310:8,
23;313:5;315:20;
317:15;325:4;327:9;
330:21;341:11

**looked (19)**
36:8;46:13,13;
65:15;79:15;81:2,3,
12;86:25;89:5;96:14;
99:10;105:21;
106:15;123:4;
224:12;294:16;
304:4;327:13

**Looker's (2)**
55:4;116:23

**looking (26)**
16:17;17:6;31:4,5;
65:20;70:18;86:15;
106:18;107:16;
123:13;125:24;
126:6,25;127:13,16;
131:1;175:5;178:23;
210:5,6;248:8;
254:15;261:25;
271:2,3;316:15

**Lookout (7)**
39:12;43:6,16,24;
44:7,14,15

**looks (28)**
79:8;83:19;91:10;
106:6;112:25;123:5,
12;124:5;145:14;
173:8;200:3,5;225:2;
226:2;245:23;
246:16;248:9,12;
258:6;315:9,21,22;
316:6;319:23;
320:20;333:4;
340:19;341:17

**lose (7)**
143:3;167:16;
168:6,10,13,19;
169:11

**losing (1)**
169:12

**Lost (7)**
39:13;159:4;
166:17,18;168:17;
196:24;230:4

**lot (13)**
46:12;52:19;
100:21;101:18;
106:11,21;166:15;
169:16;182:12;
200:16;202:11;

286:3;288:8

**loud (3)**
10:23;11:1;133:17

**Louis (1)**
12:13

**love (3)**
41:2;101:19;
316:20

**Lowell (2)**
64:15,17

**L-O-W-E-L-L (1)**
64:17

**lower (4)**
72:13;103:2;286:7;
335:13

**lungs (5)**
212:24;214:18,25;
215:6;216:8

## M

**Mac (2)**
8:21;208:1

**magna (1)**
18:9

**mail (5)**
305:22,25;306:2,2,
7

**mailed (1)**
306:14

**main (2)**
61:11;222:11

**maintain (6)**
57:23;68:4,8;
146:20;149:12;345:8

**maintained (8)**
147:1;149:6,8,15,
17,21;251:22,25

**maintaining (1)**
257:6

**maintenance (1)**
330:14

**majority (1)**
120:6

**makes (5)**
135:8;207:14;
252:25;293:8;314:15

**making (5)**
61:4;118:16;
120:10;188:10;
207:19

**male (2)**
115:17;121:7

**malpractice (5)**
19:20;219:9,11;
220:12;221:9

**man (8)**
114:15,16,17,19;
171:4,6;230:19;
271:8

**manner (1)**
146:21

**manufacturer (1)**

191:16

**many (26)**
39:14,20;40:5;
41:4;45:5;46:1;54:2;
55:6;63:21;100:10;
101:3,4,12,23,23;
102:1;111:10;116:6;
119:10;239:3;
255:16,25;256:19;
257:7,10;283:17

**marijuana (1)**
24:23

**mark (29)**
26:10;56:10,13,16;
91:16;92:22;93:2;
102:10;107:2;135:9;
140:6,16,23;141:14;
146:9;147:24;148:2;
158:4;159:17;
234:25;235:12,21;
236:15;245:24;
250:12;251:12;
253:23;254:2;297:12

**marked (143)**
26:12;56:8,25;
57:9;59:6,13,14;
61:16;65:12;70:7,9;
73:8,11;79:2,4;80:1,
3,13,15;81:19;83:4,6;
86:12,14;87:7,9;
88:9;89:4,22,25;
90:19,21;91:1;94:23;
95:1,17,19;96:23;
99:3,5;100:5,10,14;
101:24;102:1,3,5,7,
19;103:7,9;104:2,4;
105:8;106:1,4,23;
107:13;109:1,3;
110:2;111:16,18,19;
112:16,19;113:4,19,
21;122:5,7;123:9,11;
126:20,22;133:9,11;
142:3,5;148:24;
156:15,18,22;157:1,
4,19;158:11,14,22,
24;159:10;160:1;
163:14;173:1,3;
176:8;196:9;199:11,
14;202:4;203:16,18;
224:17;225:9,21;
226:14,17,23;228:4,
14;229:6;232:2,22;
233:7,20;243:1,4,6;
244:23;249:13;
257:18,25;258:2;
261:3,5;291:24;
292:1;299:15,18;
306:22;307:2;
320:15,17,19;324:24;
325:3;332:12,20;
337:1;338:14,19;
341:7,9

**markers (2)**

151:18;161:1
**marking (13)**
  61:13;90:23;92:5,
  8,20;105:11,14,15,
  16;122:14;248:24;
  252:1,4
**markings (11)**
  88:13,17,18;89:1;
  91:19,23;92:14,17,
  18;100:19;105:18
**massage (3)**
  270:6,11,14
**Material (2)**
  217:12;352:5
**materially (4)**
  217:6,7,9;248:18
**matter (8)**
  62:15;155:19;
  179:25;239:10;
  256:5,7;292:9;
  304:12
**mattered (1)**
  155:13
**max (3)**
  218:11,12;221:10
**may (38)**
  10:19;44:23;67:10;
  70:4;82:17;91:17;
  108:15;114:6;
  150:20;151:3,5;
  165:4,5;202:19;
  203:4;286:14;
  292:11;302:6;
  304:19,19;309:24;
  315:11;316:5,15;
  318:9;319:18;
  320:25;321:22;
  322:11;327:2;
  328:24,24;329:19;
  330:21;345:10;
  347:21,22;348:7
**Maybe (53)**
  25:25;39:4;40:14;
  44:3;45:6,6,15;46:6;
  49:16;54:4,4;64:4;
  67:7;69:1;82:20,22;
  111:13;117:13;
  119:7;135:11;
  141:17;147:20;
  159:19;162:14,21;
  172:7;185:17;187:2,
  8;188:12;189:15;
  195:9,23;197:7;
  198:4,6;214:4;
  271:11,11;275:20;
  279:23;281:12,17;
  283:21;284:24,24;
  285:1;309:19;311:8;
  330:22;331:14;
  333:18,24
**MCA (1)**
  69:4
**McINTOSH (105)**

8:21,21;9:6;26:13;
47:11;49:11,17;57:4,
11;58:25;61:23;
62:22;63:5,15;64:6;
70:8;73:13;79:3;
80:2,14;81:20;83:5;
86:10;87:10;89:23;
91:2;95:2;97:17,23;
99:4;101:7,14;103:8;
104:3;106:2;109:2;
110:3;111:17;
112:20;113:5;122:6;
123:10;126:23;
130:14,21;133:10;
136:13,22;139:8,16;
142:4;149:18,20;
152:21;163:19;
164:2,3;172:10,14;
173:2;174:17,19;
175:1;176:9;193:15;
196:13;199:15;
202:5;203:17;208:1,
3;210:12,20;215:25;
224:18;225:10,22;
226:15,24;228:5,15;
229:7;230:22;
238:25;242:21,23;
243:2;244:24;
248:23;249:6,14;
252:20;253:5;258:3;
261:4;266:14,18;
268:22;269:7;272:3;
300:10;325:1;346:1,
6;349:15
**McMakin (6)**
  210:24,25;211:10,
  14,25;212:15
**McMakin's (2)**
  211:2;212:10
**McMillen (1)**
  29:14
**mean (64)**
  21:16;40:24;41:6;
  50:8;58:19;59:8,20;
  64:22;71:20;72:1,4,7,
  7,15;74:9;78:4;82:7;
  84:12,14;88:11;
  92:11;95:24;99:20;
  100:18;102:5;106:7,
  9;110:15,21;111:1;
  122:25;137:7;138:8;
  152:5;156:4;158:14;
  161:4,4,6;169:21;
  178:25;180:22;
  197:19,21,22;207:20;
  209:4;216:9;217:13;
  218:23;219:16;
  227:20;230:10;
  233:3;251:24;
  253:15;273:4;
  280:20;285:11;
  288:25;310:21;
  318:1;322:22;327:15

**meaning (1)**
  106:10
**means (23)**
  49:22;71:24;72:11,
  12;78:3,4;80:9;
  82:17;102:2;111:2;
  136:20;137:8;138:9;
  153:25;161:8;
  197:23;202:11;
  203:1;217:8,10;
  227:22;273:7;349:8
**meant (1)**
  101:22
**measuring (2)**
  234:18,20
**mechanism (1)**
  282:7
**media (6)**
  73:20;74:1;209:20,
  20;231:6,8
**medical (8)**
  21:15;196:16,19;
  203:19;219:9,11;
  220:12;221:9
**meet (1)**
  72:18
**meeting (1)**
  46:11
**meetings (2)**
  24:5,12
**mellow (2)**
  47:1;55:16
**memorable (1)**
  59:3
**memory (16)**
  131:18;194:7,12;
  271:1,5;274:7;
  276:10,10;277:5,6;
  278:8,9;296:21;
  306:6;312:5;331:21
**mend (1)**
  200:16
**mental (4)**
  216:12,20,24;
  248:17
**Mentally (1)**
  216:8
**mentioned (5)**
  23:20;33:15;216:1;
  231:7;352:10
**merits (1)**
  220:17
**met (5)**
  73:17;134:4,16;
  269:25;272:19
**Meyer (121)**
  8:5,7;9:2,8,9,17;
  27:6;63:6;74:17,22;
  75:8,16,21;94:4,18;
  98:15;108:13;
  116:14;124:1,8;
  125:17,24;126:5;
  127:23;128:4;

129:21;130:22;
135:24;136:2,5,24;
137:12,17;138:8,12,
15,18;139:3,17,22,
25;140:5;141:3;
144:10,16,18;147:4;
151:8;154:11,19,24;
156:21;157:8;
159:20;162:10;
163:20;164:6;165:1,
11,17,25;175:2;
177:20;180:17;
181:5;183:11;
187:11;188:2;
191:13;196:17;
205:3,7,17,18;
206:11;207:18;
209:19;210:4,21;
224:12;231:2,7;
234:24;235:11,20;
236:14;239:1;240:7;
241:2,8;242:5;243:3,
5,11;244:15;249:7;
252:8,11,14,19;
257:8,22;263:19,25;
267:12;268:23;
269:8;270:18;
271:15;272:18;
291:1;301:12;
302:18;315:4;322:5;
328:20;346:7,11;
352:3,14,25
**Meyerformontanacom (1)**
  147:20
**Meyer's (1)**
  305:12
**middle (11)**
  29:15;86:21;95:13,
  14;98:9,12;104:17;
  109:14,21;254:9;
  255:21
**Middleton (3)**
  172:6,13;244:2
**Midwest (1)**
  12:10
**might (33)**
  23:9;41:2;67:24;
  78:20;81:15;82:8;
  84:17;91:6,6;95:25;
  98:6;111:9;118:24;
  163:3;167:16;168:6,
  10,13,18;169:11;
  196:18;198:22;
  232:21;268:23,24;
  281:11;285:8;323:1;
  327:9;329:7,8;
  343:10;349:12
**Mike (3)**
  8:22;103:14;
  238:24
**mile (4)**
  14:24,24;128:21,
  22

**miles (6)**
  155:21,22,25;
  182:11,12,15
**military (1)**
  13:10
**million (14)**
  162:24;164:17,21,
  25;165:8;166:7;
  239:13,17,19;240:11;
  244:2;322:5;324:3,4
**mind (9)**
  129:23,23;170:10;
  172:19;174:16;
  248:21;281:24;
  313:4;328:9
**mind's (1)**
  115:16
**minor (1)**
  22:20
**minute (6)**
  43:9;261:6;272:9;
  294:1;306:17;325:4
**miss (1)**
  215:24
**missed (3)**
  18:17;64:9;125:15
**missing (9)**
  127:20;163:2;
  291:6;301:22;
  303:15;317:14,16;
  340:20;341:18
**Mission (1)**
  58:16
**Missions (3)**
  58:9,10;59:9
**Missoula (20)**
  13:21;15:9;22:21;
  28:7,8,10,16,19,20;
  29:4,5;41:9;60:10;
  64:18;220:25;221:1,
  7;332:4,5;333:2
**misspoke (1)**
  269:9
**misunderstanding (2)**
  212:7,9
**misunderstood (2)**
  329:14,20
**Moab (2)**
  226:19;280:9
**modified (6)**
  294:19,24,25;
  295:9,14;327:14
**modify (3)**
  294:23;297:22;
  345:14
**mogul (5)**
  102:6,12,14,21,25
**moguls (5)**
  48:22,25;102:3,11,
  20
**moment (3)**
  149:16;292:2;
  306:25;338:21

**moments (1)**
273:23
**money (17)**
15:11;35:1;42:19;
162:19;166:5,21;
215:8;217:12,12;
218:6,16,17,25;
219:1;239:15;240:1;
256:3
**Montana (31)**
8:6,11;9:10;13:22,
24;14:9;15:9;17:25;
18:24;19:6;42:23;
43:1,12;66:11;67:9,
20,25;68:23;69:3,9,
18;75:25;146:17,19;
231:2,8;243:11;
244:15;251:17;
260:2;352:22
**Montana-Idaho (1)**
39:12
**Montanans (1)**
243:18
**month (4)**
213:2,8,15;280:9
**months (10)**
15:18,18;199:7;
203:6,13;206:25;
207:2;247:12;
270:16,16
**Moonlight (1)**
45:23
**Moot (1)**
305:3
**more (44)**
37:19;40:25;41:2;
49:21;50:18;55:15;
63:24,24;72:1;75:13;
82:8,17,21;100:19;
102:2;105:2;117:25;
120:23;143:1;150:1;
195:20,23;203:13;
214:24;215:1,6;
235:15;242:15;
251:6;253:9;256:6;
268:3;269:8;284:24;
292:20;293:4,9;
294:11;300:19;
306:13;315:13;
331:16;335:7;350:4
**Morris (5)**
8:21;206:2,4,6,8
**most (18)**
16:23;35:14;40:11;
41:3;56:6;59:3;
99:13,17;100:3;
101:21;120:17,20;
173:9;195:20;213:2,
17;305:12;336:16
**mother (2)**
21:20;22:10
**motion (7)**
209:23,24;293:17;

296:18;297:2,17;
300:11
**motions (1)**
300:9
**motor (3)**
223:1,10;230:12
**Mount (2)**
41:11;281:4
**mountain (21)**
41:12;46:19;47:3,
4;51:8,10,12;56:4;
83:19,25;84:1;
221:23;222:9;225:5,
11,16;226:11,16;
229:21;260:2;331:11
**mountaineer (1)**
50:2
**Mountains (2)**
46:25;58:16
**mounted (6)**
280:19;281:8,15,
22;333:10;334:14
**mounting (1)**
334:24
**move (22)**
18:24;28:8,10,19,
24;29:3;147:2;
162:17;167:13;
198:2;201:19;
226:21;228:20;
231:23;240:7;
252:18;255:5;293:9;
295:2,2,11,17
**moved (10)**
12:13;13:21;28:20;
29:5;42:23;43:1,12;
280:9;283:10;295:10
**movement (3)**
193:3,16;198:14
**moves (1)**
295:13
**Moving (12)**
38:24;99:15;
188:22;192:10,15;
193:1,2;194:16,16;
283:9;293:7;317:15
**Mu (7)**
136:17,19;137:1,
23;138:3;256:21,24
**M-U (1)**
136:19
**much (27)**
15:15;21:16;31:3;
40:11,22,25;42:19;
43:7;44:9;54:19;
55:15;60:21;65:6,7,
19;101:19;105:2,3;
115:14;119:24;
166:21;167:18;
204:3;213:5;218:10;
230:2;256:3
**Multitask (1)**
223:14

**must (18)**
28:11;50:23,25;
51:1;60:22;109:11;
121:15;123:7;
132:12;176:13;
218:22;227:13;
259:18;266:21,22;
279:14;294:25;295:9
**myself (14)**
24:3,10,11;42:17;
57:10;58:3;123:23;
152:12;239:15,19;
264:8;298:5,6;
345:23

# N

**nailed (1)**
58:21
**name (31)**
9:7,8;25:14;29:14;
35:16;37:24;38:2,4;
39:11;60:2;64:15,19;
73:14;114:14;245:5,
19,21;247:8;266:13;
272:19;280:8,8,10,
11;327:5;328:1,11,
23;329:3,4;352:21
**named (7)**
90:1;200:10,15;
265:15;327:5;
329:22;330:1
**names (3)**
37:20;246:20;
248:2
**naming (1)**
285:6
**National (1)**
229:3
**nationwide (11)**
163:5;164:19,24;
166:12;261:16;
313:18;316:18,24;
317:22;322:23;
323:13
**nature (1)**
330:15
**navigate (1)**
102:21
**navigated (2)**
152:23;155:11
**Naw (1)**
153:24
**near (7)**
59:24;108:6;
233:22;250:9;253:6;
347:25;348:4
**nearly (2)**
223:1;228:21
**necessarily (8)**
100:7,12,15;
101:25;152:5,25;
182:18;217:21

**necessary (3)**
51:7;206:9;291:12
**neck (2)**
275:19,23
**need (29)**
10:22,23;11:6,7;
17:2,3;46:15;56:25;
57:9;114:25;145:5;
148:24;158:21,24;
160:1,3;166:11,11,
14;180:13,20;
186:12;250:19;
251:1;256:6;312:19;
313:24;314:21;
350:17
**needed (1)**
322:18
**needs (1)**
324:5
**negative (1)**
230:4
**negatively (2)**
230:1,5
**negligence (1)**
160:15
**negligent (1)**
257:6
**negligently (5)**
149:6,8,15;251:22,
25
**neighbor (1)**
227:8
**nervous (2)**
223:25,25
**nest (5)**
14:21,23,25,25;
15:5
**nests (1)**
14:17
**Nettles (11)**
235:2,14,23,25;
236:17,25;237:3,12;
241:17;242:20;254:6
**Nettles' (6)**
238:2,15;240:14,
15,22;255:12
**network (4)**
218:12,13;221:7,8
**new (16)**
11:13;14:25;22:22,
22;23:13,14;74:19;
250:1;277:7;279:8;
281:7,13;284:16,18;
322:1;334:24
**newspaper (2)**
73:5,7
**newspapers (1)**
74:4
**next (20)**
13:6;80:15;88:15;
89:24;106:3;109:3;
126:19;129:20;
151:17;161:21,21;

**necessary (3)**
167:14,15;170:7;
188:23;243:3;256:2;
310:14;313:6;341:10
**night (3)**
59:24;304:5;
306:11
**nine (1)**
255:4
**ninth (2)**
30:11,14
**nobody (3)**
84:19;255:6;318:5
**nonattorney (1)**
169:6
**noncertified (2)**
303:1,2
**None (2)**
46:3;153:22
**nonnegotiable (1)**
322:6
**nonprofit (2)**
32:21;33:1
**nonresponsive (1)**
201:19
**nor (1)**
325:16
**normally (1)**
47:13
**North (13)**
8:8,24;9:15,15;
20:4;54:15,18;
261:10;262:1,20;
264:1,22;352:25
**northeast (1)**
327:10
**Northern (2)**
281:11,18
**northwest (1)**
12:12
**Notary (1)**
352:22
**notes (6)**
163:7;210:24;
261:9;268:24;
313:25;338:4
**notice (14)**
8:16;29:18;163:5;
164:20,24;166:12;
190:24;287:11;
302:25;303:5;304:5,
7,22;316:19
**noticed (1)**
325:22
**notices (2)**
301:10,14
**noticing (1)**
8:19
**notification (1)**
66:11
**November (3)**
133:22;134:2;
165:6
**nowhere (1)**

318:6

**Number (15)**
8:7;9:17;26:10;
89:25;167:18;
219:14,15;242:21;
257:22;294:5;
320:10;321:25;
324:8;329:6,8

**numbered (1)**
210:22

**numbers (4)**
120:5;196:1;321:7;
322:18

**numerous (2)**
199:7;201:5

---

**O**

**oath (17)**
9:1;10:14;63:8;
74:17;75:9,19;98:18;
116:15,16;138:20;
139:18;154:6;175:3;
249:8;256:17;
271:25;273:20

**Objection (1)**
228:20

**objective (1)**
56:24

**objects (1)**
67:18

**obstacle (1)**
93:8

**obstacles (6)**
72:16;82:21;91:13;
110:6,25;111:23

**obstructionist (1)**
205:9

**obtain (1)**
60:16

**obtained (1)**
292:4

**obtaining (1)**
305:12

**obvious (27)**
86:18;92:9,13;
106:18;108:18,23;
110:12,14,19;125:8,
9,10,14,20,20,23;
127:9,13,16,18,19,23,
25;159:25;174:4;
178:7;181:22

**obviously (4)**
110:16;126:6,17;
347:22

**occur (8)**
59:4,5,7;111:25;
176:2;177:10;285:8;
298:12

**occurred (4)**
131:9;155:22;
216:24;232:16

**ocean (2)**

14:23;15:2

**October (6)**
26:6,6,23;27:1;
28:12,12

**odd (2)**
57:2;313:7

**off (44)**
11:13;52:21;55:2;
62:12,24;110:22;
112:3;115:10,20,21;
116:9,17,21,24;
130:12,15;139:9,10;
174:19,20;180:15;
196:2,4;197:1,6,10,
11;210:12,14;
229:22;233:5;249:1;
269:1;272:8,10;
283:23;293:10;
307:11;328:13;
347:5,10,20;350:22,
24

**offer (3)**
164:12;345:19,23

**offers (2)**
163:3;219:15

**offhand (2)**
33:18;162:11

**office (2)**
20:4;231:2

**offices (1)**
8:10

**Ohio (4)**
12:14,15,20,20

**old (7)**
23:16;171:7;227:8;
319:3,4;331:20;
342:17

**once (10)**
43:4,5;64:19;
75:15;94:16;111:14;
122:20;313:17,19,20

**one (105)**
11:7;13:15,15,18;
16:17;17:10;18:18;
23:5;25:10;26:18;
27:14,17;30:10,11;
37:25;38:8,9;42:13;
45:7,8,10;46:15,23;
58:8;59:3;61:22,24;
76:12;77:11,13;
79:18;81:6;84:13,14,
17,17;89:11;90:6;
92:23;109:17,20,20,
21;114:9,12;117:25;
127:2;133:21,24;
149:9,16;158:20;
160:21;161:17,21;
162:14;166:12;
167:24;170:8;172:7;
180:1;181:12;
188:24;196:16,19;
198:17;210:23,24;
219:14;224:8;

225:23;226:25;
227:2,9,25;228:21;
229:8,17;231:1,3;
235:15;243:17;
269:10;270:8;287:8;
292:20;293:1;297:5;
300:7;316:7,11,19,
21;321:7;323:18;
326:1;328:3;335:3,6,
12;337:16;343:23;
344:9,10;350:4

**one-foot (1)**
194:25

**ones (8)**
37:23;96:19;
202:12;224:11;
229:18;290:9;
342:18;345:5

**online (5)**
291:15;303:20,21;
304:2;343:17

**only (40)**
20:13;24:2;31:6,8;
39:19;40:13;41:16,
20;94:16;99:14,18;
100:4;101:21;
115:15,15;141:10;
143:25;145:17;
146:2;153:14;
168:11,22;169:12;
175:17;179:7;
204:10;220:11;
221:9;224:8;235:13,
22;236:16;238:2,16;
245:15,17;251:18;
297:2;325:13;329:17

**onto (31)**
93:4;95:17,22,22;
96:3;105:12,18;
128:10;129:15;
130:24;131:5;
132:22;133:21;
146:18;152:23;
176:5,15,22;177:25;
183:1,15,16;184:4,
15,24;185:3,15;
194:19,22;195:4;
274:18

**open (13)**
46:12;91:9,10;
92:20,22,22;115:1;
172:16;232:9,13,16,
21;267:11

**operating (1)**
324:18

**operations (2)**
31:4;156:2

**operator (1)**
8:14

**opinion (6)**
158:9,18;159:23;
162:3,3;257:20

**opportunity (3)**

116:14;138:18;
294:12

**oral (1)**
352:8

**orally (1)**
11:2

**order (6)**
167:17,18;259:13;
347:25;348:1,5

**ordered (2)**
34:17;300:17

**organization (1)**
14:11

**organizations (1)**
33:3

**original (2)**
326:3;345:5

**Orleans (3)**
22:22;23:13,14

**Orthopedic (3)**
213:23;214:1,6

**others (3)**
32:1;43:20;201:6

**out (90)**
10:19,22;11:1;
14:22;34:16,19,22;
37:25;48:11;52:19;
66:13;86:24;87:5;
98:8,12;111:3;118:3,
3,6,6,9;120:5;122:1;
124:11;129:17,20;
133:17;141:17,22;
142:9,19,22;143:19,
20,24;144:25;145:3,
8,19;146:4;150:20;
157:24;161:17;
165:16;168:11,22;
185:10;197:18,19,20,
24;198:2;205:14;
218:12;220:19,23;
222:6;232:9;234:24;
235:11,21;236:15,21;
237:14;238:9;
240:16;256:4;
261:18;264:24;
270:8;287:21;304:6;
306:5;311:4;312:1;
318:4;328:7,22;
331:4,5,14,18,20;
345:18;346:9,22,24,
25;348:5;349:5

**Outlaw (3)**
259:22;260:2,3

**outline (1)**
62:10

**out-of-bounds (1)**
113:15

**out-of-pocket (4)**
218:7,11,12;
221:11

**outside (1)**
278:16

**over (53)**

15:9;41:9;54:17;
71:5,6,11;72:20;
86:4;88:22;90:14;
94:2;98:7;122:1;
129:17;131:6;137:8;
146:25;150:16,17,18;
152:23;153:6;
155:25;158:14,14;
175:15,25;183:2,6;
184:6;185:9;196:23;
221:10;233:23;
240:18;252:6,9;
268:25;274:2,10,14,
16,23;275:2,6,15;
276:1,23;278:1;
285:20,24;286:3;
290:6

**overall (1)**
18:13

**overlooking (1)**
41:12

**overwhelming (1)**
125:9

**owe (6)**
21:13;168:12;
169:18;218:15,16,17

**own (13)**
20:6;21:10,12,16;
156:24;157:4,10;
158:9;209:22;
244:12;246:12,14;
319:10

**owned (1)**
35:6;260:1;280:21

**owner (1)**
260:2

**owns (2)**
21:2;260:2

---

**P**

**page (44)**
26:15;27:3,10,13,
16;36:23;41:1;58:23;
199:16;201:22;
202:7,10;207:24,25;
224:6,9,10;226:10;
227:1;231:7;243:7,8,
9,10,15;244:15,16;
246:15,19;249:16,21;
250:9;253:6,7;254:9,
10;255:16;261:19,
23;264:19;307:15,
16;318:9;340:14

**pages (3)**
216:2,2;352:5

**paid (7)**
15:10,11;20:18;
33:5,19;164:21;
165:8

**pain (1)**
220:22

**pair (12)**

56:3;279:17;
280:21;281:6;
283:19;284:14,18;
290:7;322:1;333:9,9;
334:13
**panel (1)**
219:11
**paragraph (34)**
142:8,12,18;
151:12;204:2;
231:19;234:22;
235:4;236:11,19;
237:8;238:4;240:23;
241:1,5,13;267:14,
23,25;268:10,13,20;
300:5;301:3,8;
302:14,18;304:15;
305:8;307:24;
308:11;311:21,24;
315:4
**paralegal (1)**
20:25
**parallel (1)**
274:14
**paranoia (2)**
224:3,4
**paranoid (2)**
298:19;306:12
**Park (1)**
229:3
**parking (2)**
46:12;166:15
**part (29)**
18:18;69:24;91:22;
126:2,3,4;127:20;
128:3;134:3,7;
163:22;165:9;
173:24;174:7,8,10,
11;175:13;181:12;
199:21;205:23,24;
220:14;237:18,22;
243:22;246:9;
304:21;325:7
**partially (1)**
317:20
**participate (1)**
10:2
**participation (1)**
240:4
**particular (3)**
37:25;186:22;
330:13
**particularly (1)**
314:4
**partly (3)**
140:12,25;184:19
**partner (2)**
25:12,13
**partners (1)**
64:11
**parts (4)**
301:11,11,16,17
**part-time (1)**

31:10
**party (2)**
8:19;228:18
**pass (27)**
18:17;19:9;39:13;
42:12;43:24;44:1,2,
15,15;53:2,6,10,13,
15,19,20;72:23;73:1,
20,24;74:1;80:24;
101:17,17;214:12,14;
221:13
**passed (4)**
18:19,21;19:12;
116:7
**passes (3)**
73:6;172:6,7
**passing (1)**
331:16
**past (13)**
20:10,21;144:8;
246:21;248:3,4,6,8;
265:1,4,5,13;267:8
**path (12)**
116:2;124:5;128:5,
12;132:24;173:10;
175:9,11,16,20;
347:18;349:10
**patience (1)**
94:22
**patient (1)**
211:12
**patrol (71)**
36:23;100:23;
118:8;131:22;
132:16,19;134:4,17;
135:7,14,16;137:20;
138:22;140:5,7,14,
22,23;141:4,5;142:9,
18;144:25;145:19;
146:3,7,8,8,11,14;
147:23;148:1,10,23;
150:24;153:5;156:2;
159:12,15,16;170:4;
172:23;175:14;
211:2,6,7,13,15;
232:7;233:5;234:24;
235:11,20;236:15;
241:14,22,23;242:19;
247:4;250:12,25;
251:9,11;254:11,16,
24;255:10;256:4,6;
258:5;349:3
**patroller (52)**
47:23;114:1,2,13,
18;118:2,5,23;119:6,
9,11;121:7;142:21,
25;143:11;144:2,14,
21;145:9,23,25;
156:5,8;157:17,18,
22,24;158:12;
162:13;170:9,15,18;
171:1,3;172:18;
207:13;211:16;

234:23;235:2,10,18;
236:1,14,20;255:3;
265:22,25;268:15;
322:2;347:15,24;
348:3
**patrollers (40)**
114:10,23;117:18,
25;120:18,20;122:1;
156:6;162:22;165:7;
168:12;169:19,23;
170:2;236:21;237:5,
15,20;238:10;239:3,
6;240:16;252:25;
254:12,17;255:11;
256:6;258:11,25;
259:10;265:2,4,7,13;
266:8,23;267:8;
268:2,3;346:17
**patrollers' (1)**
150:3
**patroller's (4)**
119:17,20;176:14,
19
**patrolling (1)**
254:25
**patrol's (1)**
212:11
**pay (6)**
15:12;34:11,25;
42:19;162:21;218:6
**paying (3)**
21:13;34:13;
218:17
**Peak (2)**
58:12,14
**Peaks (1)**
54:17
**pee (2)**
174:16;248:21
**peel (1)**
150:20
**people (34)**
20:22;55:7;64:11;
67:18;118:18;
125:19;141:10;
156:13;159:2;178:8;
199:7;201:14;204:5,
10,21,24;205:4,20;
206:1;207:14;223:5;
246:20;248:3;
249:24;250:3;
301:14;312:10;
313:8;316:6,20;
318:18,22;319:1;
321:25
**people's (1)**
238:20
**per (2)**
39:20;88:17
**percent (8)**
111:13;180:13,20;
181:1,9,10;277:4;
341:6

**perform (1)**
191:18
**performed (3)**
191:5,8;333:1
**Perhaps (1)**
212:8
**period (1)**
25:17
**permanent (1)**
246:23
**permission (16)**
191:12;263:9,12;
305:13,18,20,22;
306:7;309:19,22;
310:16;312:13,18,24;
313:1,3
**perpendicular (1)**
275:8
**person (14)**
60:5;93:7;143:4,4,
7;156:17,21;200:10,
15;208:16;263:25;
328:23;336:15,16
**personal (14)**
27:14,17;34:16,19,
22;38:1;156:25;
157:5,10;158:9,18;
160:9;224:10;257:20
**personally (9)**
21:10;141:12,12;
162:25;164:18,22;
192:5;318:21,24
**person's (3)**
177:2;179:3;180:4
**Peter (9)**
247:8,9;248:16;
265:15,21,24;267:6;
269:10,17
**petitioned (1)**
30:19
**phone (9)**
9:17;166:10;
321:24;328:2,5,9,22;
329:6,8
**phonetically (1)**
220:21
**photo (31)**
26:17;29:15;80:21,
23,23;83:20;84:13,
14,17;85:24;88:16;
95:25;97:3;98:5,13;
104:17;105:16;
108:1,20;110:16,16;
123:5,23;125:15;
128:24;131:1,4;
161:17;177:3;180:9;
340:24
**photograph (42)**
26:14;65:14;80:17,
20;83:7;84:7,25;
85:3,14;86:21;87:18,
23,24;88:14;90:2,24;
96:21;98:10;103:10;

104:7,10;106:18;
107:20,21;108:4,15;
109:5,22;110:4;
112:22;126:24;
127:14;128:18,22;
129:4;173:4,13;
176:11;178:16,18,22,
23
**photographs (8)**
96:12;113:12;
226:17;227:18;
338:17,23;339:23;
340:6
**photos (10)**
85:8;96:6;117:14;
126:12;161:18;
227:7,9;339:15,16,19
**physical (6)**
9:11,13;20:3;28:5;
241:2,9
**physically (1)**
328:5
**picked (4)**
306:16;312:12,16,
23;333:22,23
**picking (2)**
61:5;342:12
**picks (1)**
313:9
**picture (15)**
27:7;83:11;88:5;
173:17;243:16;
244:25;245:2,25;
246:17;315:7,16,23;
340:21,23;342:3
**pictured (1)**
79:5
**pictures (4)**
227:4;339:8,12,13
**piece (11)**
50:10,14;207:12;
208:19;296:14;
297:3;302:5,10,11;
315:17;340:20
**pieces (4)**
302:15;317:2;
342:14;343:5
**pile (1)**
167:22
**pins (2)**
50:13,17
**pitch (6)**
227:13,13,14,17,
21;230:14
**place (4)**
39:12;233:2,4;
352:9
**placed (1)**
249:10
**plainly (4)**
106:18;108:18;
160:13;181:22
**Plaintiff (1)**

241:1

**plan (1)**
75:7

**planning (1)**
220:4

**plant (1)**
16:18

**plants (2)**
16:10,15

**plate (31)**
222:19;283:10;
287:8,13,14,16,18,20,
21,23;288:24,25;
289:1,3,5,11;290:8;
291:6,6,7,8,11;293:8;
295:13,14;296:8,10;
301:22;303:16;
317:14,16

**play (3)**
288:23;293:17;
294:11

**playing (1)**
311:6

**pleadings (1)**
189:14

**please (82)**
9:7;11:9,14;49:5,8,
12;51:19;55:25;57:5;
63:14,16;72:10;
75:16,19;82:12;94:3,
9;97:18,25;98:3,18;
101:8;103:16,19;
116:15;124:7;
125:17;128:14;
134:12;135:21;
136:10,13,23;137:3;
138:11,15;139:22;
147:5;151:8;152:11;
154:10,24;162:10;
167:4,6;177:4;181:5;
183:11;186:9;
192:18;193:11;
194:10;205:8;206:3,
5,10,16;207:10;
209:11;219:19,23;
235:15;237:21;
239:1;242:4,8;
247:14;250:3,4;
252:7,11,14,18,20;
261:6;266:23;
313:12;314:23;
315:5,13;346:8,9

**plug (1)**
227:24

**pm (6)**
133:22,23;319:19;
322:7,17;351:2

**PO (1)**
9:10

**poach (1)**
15:16

**poachers (1)**
15:2

**poaching (1)**
15:7

**pocket (1)**
328:6

**point (27)**
10:19;18:17;28:24;
71:17,21,22;110:18,
25;163:18;204:8;
206:10;275:7;
277:11,15;284:25;
299:19;305:3;
308:18;317:8;
322:21;325:18,25;
336:6,18;337:20;
338:7;345:20

**pointed (7)**
86:24;87:5;98:8;
114:25;122:1,9;
132:17

**pointing (3)**
90:4;96:19;132:20

**points (1)**
282:11

**poked (1)**
343:17

**poles (4)**
341:22;342:1;
344:8,13

**political (1)**
231:5

**poor (8)**
236:22;237:15,16;
238:10,16,22;240:17;
274:21

**popping (1)**
111:3

**population (1)**
120:6

**portion (6)**
92:2;93:3;201:19;
302:4;324:4;340:17

**portions (1)**
217:15

**position (5)**
140:10,11;148:7,8;
292:11

**positioning (1)**
274:4

**positive (2)**
277:23,25

**possess (8)**
284:3;298:9;342:6;
343:24;344:3,6,8;
345:2

**possession (4)**
22:21;344:21;
345:8,22

**possible (4)**
58:5;118:16;310:1;
321:3

**possibly (3)**
115:14;182:22,24

**post (34)**

27:13,15,16;41:1;
86:20;133:24,25;
168:4;199:16,22,24;
200:8;201:22;
202:10;224:13,25;
225:4;228:6,16;
247:13;248:15;
249:16,21;250:17;
253:7,8,22;254:10,
15;255:18,20,23;
316:5;318:12

**postaccident (4)**
294:6;329:24;
330:10,13

**posted (15)**
66:20;70:24;81:13;
133:20;202:17;
224:13,20;243:15;
246:1;248:10;
249:18;303:19;
315:16,24;318:9

**posting (7)**
41:1;65:25;67:8;
69:9;160:25;203:4;
316:14

**postings (2)**
303:21,22

**posts (10)**
133:12,13,21;
147:9;224:9,11;
225:24;227:1;229:9;
304:2

**potential (2)**
252:24;343:14

**potentially (15)**
144:9;150:1;179:2;
180:22,24;182:9;
187:15,23,24;188:1,
9;193:18;292:25;
293:1;301:24

**pow (1)**
106:9

**powder (7)**
65:3,5,8,9;72:14;
82:4,7

**practice (7)**
18:15;166:19;
217:20,24;218:1;
229:24;248:18

**practicing (3)**
18:22;25:16,20

**pray (5)**
199:5;208:15,15,
16,16

**precursor (1)**
342:13

**prematurely (9)**
187:14,22;188:8,
14,21;189:8;194:4,8,
14

**prepare (3)**
36:5,11;260:13

**prepared (1)**

150:24

**prerelease (1)**
188:9

**prereleased (2)**
188:6,11

**presence (1)**
326:3

**present (6)**
8:10,19;109:14;
265:1,5;326:4

**presented (1)**
337:9

**presents (1)**
325:15

**press (4)**
260:13,16,19,25

**pressing (1)**
274:10

**pressure (2)**
50:18;282:17

**pretend (1)**
348:23

**pretty (18)**
18:8;31:3;52:10,
17;54:19;58:22;
105:2,3;140:11;
167:22;178:7;
182:14;201:13,17;
213:5;285:22;
308:17;329:9

**prevent (2)**
68:5,9

**prevented (5)**
154:7;155:5,9;
296:6;301:18

**previously (7)**
35:11;80:9;83:10;
272:19;273:2;
296:25;338:17

**price (1)**
166:16

**PRINT (1)**
352:21

**Prior (16)**
23:23;41:5;44:7,
25;45:3,12,24;46:2,5;
47:12;50:20;53:1;
66:4;89:15;268:14;
293:17

**private (1)**
34:1

**pro (7)**
210:10,10;259:5,7,
13;279:7;280:1

**Probably (47)**
22:18;27:2,5;
33:17;45:6;51:9;
58:4;61:25;64:4;
68:11,16;73:3,4;
88:11;91:14;93:12;
97:3;103:13;107:7,9;
119:14;121:13,18;
151:16;160:5;

150:24

**prerelease (1)**
188:9

**prereleased (2)**
188:6,11

**presence (1)**
326:3

**present (6)**
8:10,19;109:14;
265:1,5;326:4

**presented (1)**
337:9

**presents (1)**
325:15

**press (4)**
260:13,16,19,25

**pressing (1)**
274:10

**pressure (2)**
50:18;282:17

**pretend (1)**
348:23

**pretty (18)**
18:8;31:3;52:10,
17;54:19;58:22;
105:2,3;140:11;
167:22;178:7;
182:14;201:13,17;
213:5;285:22;
308:17;329:9

**prevent (2)**
68:5,9

**prevented (5)**
154:7;155:5,9;
296:6;301:18

**previously (7)**
35:11;80:9;83:10;
272:19;273:2;
296:25;338:17

**price (1)**
166:16

**PRINT (1)**
352:21

172:17;182:23;
194:5;206:9;221:5;
222:3,6;225:13;
227:2,19;233:15;
243:9;244:4;285:7;
307:18;308:13;
330:20;333:23;
336:16;337:13;
344:14,15

**problem (5)**
137:17;174:15;
178:10;207:20;
228:23

**proceed (1)**
244:12

**proceedings (1)**
8:1

**proceeds (2)**
22:2,11

**process (3)**
114:6;321:2;
322:12

**produce (1)**
260:25

**produced (14)**
196:20;207:19,23;
209:9,10;213:3,7,9,
17;260:24;289:4,7;
307:8;338:17

**producing (2)**
74:20;213:19

**product (2)**
38:1;189:18

**professional (8)**
142:24;170:17,21,
25;265:21,24;266:1;
268:1

**program (5)**
301:10;318:3,4;
323:4,7

**Project (1)**
14:11

**promise (1)**
12:6

**promote (1)**
244:16

**propane (1)**
267:15

**properly (1)**
257:8

**protect (4)**
255:17;256:1,20;
282:15

**protective (1)**
282:7

**prove (3)**
208:17;209:9,14

**provide (19)**
40:22;75:6;118:21;
120:23;162:15;
165:18;209:12;
235:8;239:11;
243:23;250:12,18;

253:23;260:16;
262:11;263:6;282:7;
298:4;328:23
**provided (17)**
36:8;74:8;80:22;
83:10;85:8;96:6,15;
125:16;127:3;
132:18;211:18;
212:1;215:23;
260:19;289:9;
337:23;338:1
**providers (1)**
212:18
**providing (1)**
126:12
**PSC (1)**
33:9
**psychedelic (2)**
24:24;25:1
**psychologist (3)**
212:22;213:1,18
**psychologist's (1)**
213:7
**public (14)**
22:22,24;23:3,10,
11;31:24,25;33:10;
133:5,13,21;231:2;
240:4;352:22
**publication (2)**
74:4;259:24
**pull (1)**
50:10
**pulled (2)**
14:22;308:9
**pulling (1)**
222:21
**purchase (4)**
279:5,21;281:10;
284:18
**purchased (4)**
279:8;281:13,21;
343:19
**Purcie (5)**
25:14,16,19,23;
26:2
**P-U-R-C-I-E (1)**
25:14
**pure (1)**
59:12
**purpose (4)**
107:1;273:10;
281:24;316:14
**purposely (1)**
206:18
**purposes (3)**
272:22;281:25;
282:2
**purse (1)**
165:19
**pursuant (1)**
8:15
**push (3)**
197:16,17;344:18

**pushing (1)**
129:19
**push-up (1)**
226:5
**put (30)**
14:18,25;55:4;
56:3;58:23;75:13;
88:7;91:16;92:18;
104:8;160:4;162:19;
165:20,22;166:16,22;
214:20;238:18;
253:22;254:12,18;
284:14;287:13,13,20;
290:9;291:6;307:21;
321:24;341:8
**puts (1)**
50:18

## Q

**quantify (1)**
101:18
**quarter (1)**
14:24;128:21,22,
25
**quick (1)**
174:16
**quid (2)**
210:10,10
**quietly (1)**
301:9
**quite (13)**
25:22;54:15;61:19;
62:3;78:7;101:11;
112:25;114:21;
115:3,4;234:15;
238:22;295:17
**quo (2)**
210:10,11
**quote (4)**
71:21,23;243:17,
18

## R

**raccoons (1)**
60:4
**race (1)**
269:18
**raced (1)**
39:8
**Radical (1)**
279:4;318:2
**rail (2)**
229:14,18
**rails (1)**
229:23
**raise (7)**
33:24;75:12;
162:21;226:6,7,8;
272:5
**raised (2)**
34:10;342:15

**ran (6)**
42:22;47:23;118:6;
131:2;143:19;145:8
**random (1)**
284:23
**range (1)**
57:16
**rank (1)**
18:6
**rare (3)**
16:10,11,17
**rates (2)**
70:11,15
**rather (4)**
10:24;273:13;
332:21;338:8
**reached (2)**
116:17;312:1
**read (70)**
36:7;49:11,14;
57:4,7;63:16,16,18;
64:2;66:3,15;67:24;
68:10,16,19,22;70:1;
71:3,8,11,13;88:21,
23;97:20;101:7,10;
109:19,25;110:5;
133:15,17;136:13,16;
145:5;150:23;
151:15;186:12;
193:10,13;204:6;
230:9;235:9,15;
238:6;242:6;252:23;
255:23;279:15;
291:15,15;305:13,15;
307:25;308:12;
309:14,16;311:24,25;
312:3,10;315:4;
321:4;323:20;
325:18,24;336:18,22;
349:23;350:6;352:4
**reading (2)**
67:8;197:8
**real (3)**
60:3;174:16;
263:24
**realize (4)**
58:21;97:8;98:1;
169:14
**realized (1)**
36:25
**really (24)**
10:13;16:18;27:25;
35:2;36:19;40:10;
45:22;55:19,20;
56:22;75:25;84:13;
124:16;156:3;
161:19;223:4;
226:19;271:10;
276:17;277:1;
285:11;294:16;
314:2;319:17
**reapply (1)**
247:6

**reason (13)**
11:24;17:10;
116:20;175:13,17;
179:7;245:16,17;
277:17;298:3;
330:14;340:2;349:6
**reasonable (5)**
146:21;149:11;
158:4;242:18;313:4
**reasonably (1)**
147:1
**reasons (2)**
38:19;175:19
**recall (38)**
29:21,24;38:23;
39:15;58:6;61:4;
67:8;73:1;79:14;
81:1,8;131:17,19;
163:5;164:20,24;
166:12;173:5;
190:23;191:20;
192:1;213:10;
260:22,23;261:16;
274:1;287:10,17;
308:5;313:18,22;
316:19,21,24;317:19,
22;322:24;323:13
**recalled (1)**
315:11
**receipt (3)**
332:22;334:15,18
**receive (8)**
22:2;65:4;134:8;
162:6;218:24;
254:11,17;255:11
**received (4)**
22:6;64:20;73:2;
295:25
**receiving (2)**
246:23;326:25
**recent (3)**
35:14;213:18;
260:5
**recently (3)**
215:6;259:19,21
**recipient (1)**
307:22
**reckless (1)**
250:20
**recognize (34)**
65:14;79:5;80:16,
19,21;83:7,9;87:11,
14;91:4;95:3,6,9,10,
10;96:8,13;99:6;
103:10;104:5,7,9,12;
106:4;109:4;111:19;
112:2;168:18;
169:11;173:4;
249:15;299:22;
319:18;320:18
**recollection (2)**
76:3;116:11
**reconnaissance (1)**

46:24
**record (60)**
49:14;57:7;62:12,
14,25;63:4,6,18;74:5,
7;97:20;101:10;
130:13,16,20,23;
136:16;139:9,11,15,
17,21,24;174:21,25;
175:2;193:13;
203:20;208:7;
210:12,15,19;211:22;
230:9;249:1,5;
252:23;258:23;
269:2,6;272:8,11,15,
22;279:2;286:21;
307:25;308:12;
314:4;315:5;318:7;
321:18;323:20;
326:1;328:14,18;
332:17;336:18;
350:23,25
**recording (3)**
63:10;139:20;
140:18
**records (8)**
172:8;196:17,19;
213:3,8,9,14,18
**recovered (4)**
215:13,17;216:17,
19
**recovering (1)**
223:4
**recovers (1)**
216:21
**recovery (2)**
24:4,12
**recreational (5)**
24:14,19;222:8,15;
230:11
**red (5)**
78:5;119:11,11;
226:18,18
**redirected (1)**
349:5
**redo (1)**
152:6
**refer (1)**
272:23
**reference (2)**
220:22;275:7
**referred (1)**
273:2
**referring (16)**
145:4;235:1;
236:24;237:2;289:6;
291:19;292:3;
303:23;308:6;309:9;
310:3,18;318:8;
327:20;336:13;
340:23
**reflect (1)**
163:8
**refresh (2)**

131:18;331:21
**refuse (1)**
  245:18
**refused (2)**
  297:24;298:12
**refusing (5)**
  130:6;137:24;
  240:13;245:8;298:3
**regard (4)**
  293:22;297:22;
  319:15;343:10
**regarding (10)**
  22:14;261:9;
  268:16;292:5;299:3;
  301:7;330:20;336:7,
  17;343:14
**regardless (2)**
  256:3;295:22
**regularly (2)**
  47:18;64:11
**rehab (1)**
  212:23
**rehired (3)**
  246:22;248:4,5
**related (5)**
  265:3,12;266:9;
  288:15;302:15
**relationship (1)**
  329:15
**relative (3)**
  198:21;25;274:4
**relatively (4)**
  120:22;171:20;
  229:1;272:23
**release (30)**
  185:23,25;186:1,6,
  16,17,22;194:7,14;
  197:25;198:17;
  260:13,16,19,25;
  277:14,16;282:11,15,
  17,19;285:20;286:2;
  292:16,23;293:2;
  296:19;325:20,20;
  336:9
**released (22)**
  186:25;187:2,3,5,
  12,14,21;188:8,14,
  21;189:7,11,14;
  194:3;277:17;
  282:21;296:14,18;
  302:11,11;317:2;
  335:21
**releasing (2)**
  308:8;324:13
**rely (1)**
  349:25
**relying (20)**
  156:24;157:3,13;
  158:8,19;235:13,22,
  24;236:16;237:7,11;
  238:3,14;240:14,22;
  241:15;242:1,17;
  255:10;304:10

**remains (1)**
  336:7
**remember (223)**
  16:25;17:6;18:8;
  23:10;33:18;36:1,2;
  37:20,23;38:2;40:25;
  45:7,11,18,19,20,20,
  21;46:11;49:18,19;
  58:4;61:20;62:2;
  63:25;65:19,20;66:5,
  21;67:7,10,11;71:1,1;
  72:9;76:4,7,9,11,12,
  17,20,25;77:3,7,10,
  11,13,19,24,25;
  78:15,21,23;79:17,
  18,19,20;80:22,25;
  81:5,6,10,16;89:10,
  11,12,15,18,19,20;
  90:9,14;93:22;94:16;
  99:12;103:17,20,22,
  24;106:16;109:16,17,
  18;110:7,9,11;112:5,
  10,11;113:17;114:3,
  14,23;115:10,21,24;
  116:1,2,6,10,16;
  117:7,9,10,17,20,24;
  118:23;119:5,7,16,
  18;120:9,11,14,20;
  121:4,6,9,11,14,15,
  18;122:12,13,17,22,
  22;128:7,8;131:6,21;
  132:6;150:21,22,23;
  151:1,5,9,10;162:12;
  171:13,22;172:3,24;
  175:21;183:5,6;
  194:7;197:7,8;198:1,
  5,6,7,9,11,13;199:8;
  200:19,24;201:1,13,
  18;204:5,9,20,22,25;
  205:4,5,19,21,25;
  206:14;207:1,3;
  208:10;211:21;
  221:22,25;222:1;
  242:10;246:8;
  259:11;260:18;
  265:20;266:21;
  267:4;270:15,17;
  271:2;274:8,9,12,13;
  276:16,17;279:16;
  280:4,11;281:12,17;
  295:16;296:23;
  297:6;305:19,21;
  309:22,24;310:6;
  312:13,18;316:17;
  330:19,20,22;333:8,
  17;346:19,21;347:3
**remembered (6)**
  114:12;116:13;
  201:9,13;203:8;
  259:21
**remembering (2)**
  271:9,21
**remembers (1)**

201:17
**remounted (1)**
  284:12
**rent (4)**
  20:6,7;21:10,11
**rents (1)**
  21:3
**reorient (1)**
  123:22
**repair (1)**
  330:14
**repeat (3)**
  49:9;101:6;230:7
**rephrase (4)**
  57:2;257:4;273:17;
  342:20
**replace (1)**
  301:16
**replaced (3)**
  301:10,18;345:6
**reply (1)**
  254:15
**report (8)**
  36:23;80:24;
  207:16;325:10,12;
  326:7;327:1;336:16
**reported (1)**
  211:15
**reporter (26)**
  8:13,25;16:11,13;
  47:6,8;58:13,15;
  62:13,19;63:15;86:7,
  9;136:18;149:17,19;
  152:19;172:9,12;
  242:22,24;266:13,15;
  280:6;299:12;349:23
**reporter's (1)**
  11:7
**Reporting (1)**
  8:15
**represent (12)**
  8:18;33:2,8,11,15;
  37:9;75:3,24;166:4;
  169:1;272:20;325:9
**representation (2)**
  33:5;340:10
**representations (1)**
  319:10
**represented (3)**
  258:14,17,18
**representing (4)**
  32:5,11;37:16;
  219:14
**represents (2)**
  85:14,25
**Republic (1)**
  41:11
**request (4)**
  280:16;316:12;
  317:21;337:17
**requested (12)**
  49:13;57:6;63:17;
  97:19;101:9;136:15;

162:24;164:14;
  193:12;230:8;
  252:22;297:25
**requests (1)**
  337:25
**required (2)**
  136:11;138:20
**requirement (1)**
  350:2
**requirements (1)**
  325:22
**reread (2)**
  97:17;252:21
**research (1)**
  48:16
**reserve (3)**
  272:3;346:4;
  349:16
**reserved (1)**
  351:3
**reset (1)**
  344:12
**Residing (1)**
  352:23
**resolved (1)**
  322:23
**Resort (38)**
  8:8,22;61:9;65:15;
  135:13;140:12,25;
  141:6,12;146:13,20,
  21;149:5,8,11;
  153:11;156:11,12;
  170:6;176:3;234:23;
  235:10,18;236:14,21;
  237:14;238:9;
  240:16;243:16,16;
  246:21;251:21,23;
  256:4;257:4,5,6;
  352:25
**resorts (7)**
  43:2;51:2,4,5;
  80:24;251:19;256:7
**resources (1)**
  35:3
**respect (7)**
  273:23;275:17;
  285:19;292:15;
  301:3;321:11;323:25
**respond (2)**
  162:13;349:17
**responded (4)**
  200:11;220:21;
  236:20;320:10;
  349:21,21
**responding (1)**
  316:6
**response (16)**
  20:1;36:22;118:21;
  138:4,5;210:3;
  215:23;256:3;
  259:20;262:4,25;
  320:6,8;321:6;
  337:16,24

**responses (7)**
  112:13;162:4,6;
  260:5;292:8;294:13,
  18
**responsibility (14)**
  66:1,3;69:13,21;
  146:20;149:1;160:9,
  18;250:14;251:2,14,
  18;256:8;257:5
**responsible (4)**
  140:25;184:19;
  220:13;317:20
**responsive (1)**
  147:3
**rest (1)**
  54:5
**result (9)**
  21:23;212:18;
  216:13;218:7;
  233:22;241:2,9,12;
  293:10
**results (3)**
  69:15,22;298:15
**retain (3)**
  37:8;290:21;
  344:21
**retained (1)**
  156:16
**retake (1)**
  18:18
**retest (1)**
  285:9
**retrieve (1)**
  328:22
**return (6)**
  301:10;312:1;
  318:3,4;323:3,7
**returning (1)**
  321:3
**review (9)**
  261:6;268:24;
  294:13,18;349:24;
  350:7,10,19,20
**reviewed (1)**
  305:24
**revisit (2)**
  61:22;63:13
**ribs (1)**
  200:18
**Rica (3)**
  14:10;15:10,25
**Rican (1)**
  15:12
**ride (8)**
  55:10;56:5;200:20,
  24;201:3;225:16;
  229:18;232:25
**Ridge (1)**
  55:8
**ridiculous (1)**
  242:14
**riding (7)**
  100:1;105:22;

107:16;108:2,14;
203:9;332:23
**right (203)**
10:15;14:17,20;
16:22;17:12;20:2;
22:9;23:21;27:7;
28:22;29:3;31:12;
39:25;46:13;51:3,5,
25;52:13;55:3,3,4;
60:11;62:3;63:13;
66:16;67:2,5;69:2;
73:20,22,23;74:21;
80:7;82:24;84:11,14;
85:25;86:9,18;88:15;
90:22;91:12;92:10;
93:6,13;96:5,20,25;
98:13;108:19;
109:12,21;110:15,19;
112:24;114:21;
115:20,25;120:18;
124:11;125:8,11;
130:25;132:17,20;
133:3,4;135:17;
137:10,19;140:24;
141:10;143:23;
146:5;151:2;154:4,
13;159:6,7;160:4,6;
161:13;162:17;
165:1;169:2,7,13;
170:8;173:18,23;
175:22;176:14,17,17;
178:1,7,14,19,23,24;
179:16;180:3,6,9;
181:22,24;182:5,13,
23;184:5,16,16;
185:20;190:9;200:2,
12,24;202:15,20,23,
21,24;207:1,9;208:7;
209:3,5,13,24;211:3,
17;212:6,17;215:7;
220:18;221:4,4,14;
225:12;228:1;232:9,
11,16;233:11,14,25;
234:2,13,15;237:24;
238:9,22;239:14;
240:5;244:13;
247:23;250:23;
255:21;257:13;
264:24;270:20;
271:1,7,12;272:18;
274:1;287:21;291:1;
297:13,16;298:21;
306:13,13;308:24;
316:8;317:5;318:1;
322:25;327:18;
328:20;336:10;
338:16;340:19;
341:3,10,15,17;
346:18;347:2,9,13,
20;349:3,16,23;
350:10

**right-hand (11)**
26:19;86:4,8;
93:15,17;96:16,20;
105:1,3,5;112:21
**ringers (1)**
168:16
**risk (1)**
238:19
**risks (3)**
69:15,23;99:16
**road (1)**
240:24
**rock (17)**
150:5,9,15,15;
151:1,6,9,10;222:4,9;
227:4,11,24,24;
229:21;230:16;
285:20
**rocks (34)**
36:24;56:13;82:8,
17;86:2,11;96:16,21,
23;97:3;104:24;
105:4,5,7;106:11,21,
23;107:2,12;108:16,
21;150:4,20,22,25;
152:18;153:7;
175:15,15;177:2,18;
207:14;226:18,18
**rode (2)**
134:9;170:9
**roll (1)**
125:12
**rollover (50)**
129:18;131:6;
137:9;146:25;
149:12,12,22;150:16;
152:17;155:25;
158:5,15;160:6;
173:14,16;174:1,13,
14;175:24,25;
176:24;177:12,16,21;
178:12,25;179:10,13,
20;180:1,8;183:6,22;
184:17,22;185:4,5;
194:18;233:24;
274:2,11,14,18,23;
275:2,6,15;276:1,23;
278:11
**room (1)**
223:3
**rope (21)**
112:21;113:11,14;
132:1,4,6,9,11,22;
228:1;253:9,17,18;
347:9,11,25;348:5,7,
24;349:9,12
**roped (3)**
347:5,10,19
**ropes (1)**
253:15
**roughly (1)**
54:9
**route (4)**

41:16;90:7,10;
227:12
**row (2)**
225:18;252:13
**Roxy's (1)**
60:19
**rude (1)**
286:20
**ruined (1)**
153:23
**run (53)**
15:4;65:8;95:17,
19,22,22;96:3;
105:12,15,18;117:18;
118:3,3,6,9;122:23;
123:12;124:14;
126:7,25;128:5,9;
129:11,13,15;130:24;
131:4;132:25;
141:17,22;142:9,19,
22;143:20,24;
144:25;145:12,19;
146:4;161:11;176:4,
15,21,23;180:14,21;
181:1,17;182:25;
183:16;184:4;256:4;
269:19
**running (5)**
27:23;30:3,7;
132:19;231:2
**runs (13)**
50:21,21;54:23;
90:1;160:12;234:24;
235:11,20;236:15,21;
237:14;238:9;240:16
**Ryan (3)**
141:18,24;267:11

## S

**safely (5)**
64:20;65:5,6;
102:21;152:22
**safer (1)**
64:4
**safety (9)**
142:10,19,22;
143:25;145:1,20;
146:4;275:12;325:17
**sales (1)**
60:23
**Salewa (15)**
8:23;218:25;
261:10;262:1,16,20;
263:25;264:22;
272:20,23;273:4;
301:9,14,17;311:11
**Salewa's (1)**
259:20
**salvage (1)**
17:3
**same (47)**
51:22;80:4;89:7;

91:5;92:16,18;93:14;
94:15,18;95:11;
113:1;123:5,7,13;
133:23;134:9;
135:25;137:14,15;
153:1;163:10,16;
179:15;184:6;
185:13,14;203:7;
216:8;230:18;
232:25,25;252:12,16,
17;260:1;278:3;
290:7;296:3;307:16;
321:10;322:17;
331:4,14;334:14;
347:18;349:10;352:6
**Sara (1)**
29:14
**Sara's (1)**
64:18
**sat (2)**
10:2,9
**satisfactory (1)**
103:14
**Saunders (1)**
321:1
**save (1)**
238:20
**saved (1)**
169:22
**saving (3)**
134:5,17,24
**saw (14)**
52:16;82:2;107:3,
6;205:16;207:14,17;
212:25;213:21,24;
214:17,24,25;280:9
**saying (50)**
10:24;17:2;41:1;
63:25;77:5;84:21;
92:24;102:10;
107:24;108:1,8;
114:25;118:23;
120:19,21;124:9,11;
132:13;142:22;
143:7,12;157:18;
174:1;207:11;209:2,
19;258:17;262:9,15,
15;263:2,5,15,18,20,
21,22,23;264:5,6,8,
10;270:9;271:13;
283:11;287:11,19;
293:8;311:3;320:10
**scared (2)**
196:11;230:18
**scene (1)**
31:3
**Schlasman's (2)**
55:10,22
**school (21)**
12:16,17,24;13:3;
15:8,12,13,15,20,23;
16:1;17:11,17,22,23,
24;24:1;42:6,16,21;

322:3
**Scott (10)**
297:21;307:17;
311:14;319:23;
342:12,13,23;343:10,
15,19
**scottknight@salewacom (2)**
163:23;164:8
**scree (3)**
285:21,24;286:3
**screws (4)**
291:12;301:25;
302:1;345:2
**scroll (1)**
254:22
**se (1)**
88:17
**sea (3)**
14:12,15;15:13
**season (16)**
39:25;41:11;53:23;
54:13;71:17,22,24;
72:11,23;73:1;80:8;
81:24;82:6,14;
106:19,20
**seasonal (7)**
134:8;170:16,22,
24;171:2,5;243:23
**seasonally (1)**
16:5
**seasons (1)**
42:13
**season's (1)**
53:15
**second (24)**
23:5;32:8;65:2;
133:25;151:11;
162:3;227:14;250:9,
17;253:21;287:6,15,
22,23;291:8;299:10,
17,24;300:6;309:8;
311:20,24;325:18;
340:14
**seconds (3)**
270:19;271:7,23
**Section (2)**
69:3;195:25
**sections (1)**
134:13
**secure (1)**
243:18
**seeing (7)**
79:19;81:8;132:6;
208:10;212:17;
214:5;215:5
**seek (1)**
244:2
**seem (3)**
47:20;116:20;
182:2
**seems (10)**
63:19,23,23;64:8;
110:20;178:20;

182:1;295:14;
304:22;313:7
**self-conscious (1)**
223:4
**sell (1)**
15:5
**selling (1)**
49:24
**semester (3)**
13:15;18:10,11
**senator (1)**
17:1
**send (13)**
262:2,8,22;280:14;
287:12;291:6;
301:16;309:17,18;
312:2,7;319:21;
320:21
**sender (1)**
307:11
**senders (1)**
307:22
**sending (1)**
320:11
**sense (11)**
63:22,23;64:7;
102:8;115:3;217:11;
224:4;234:4;310:17;
314:14,15
**sent (27)**
147:8;163:23;
245:25;258:4,7,16,
19;266:22;283:15;
294:9,14;295:10;
304:6,7;307:13,16;
308:6;309:10,15;
310:3,19;312:6;
318:4;319:19;
320:20;321:14;
327:16
**sentence (16)**
151:15,17;167:15;
168:2;238:8;250:14,
17;253:8,11,21;
309:9,14,16;310:2,
25;311:2
**sentences (2)**
250:23;264:19
**separate (6)**
231:4;239:24;
240:2,11;284:13,19
**separated (4)**
283:24;285:10;
295:20;326:23
**separating (1)**
215:20
**September (1)**
226:4
**sequence (10)**
277:12,15;278:5;
282:22;283:6;
293:22;296:22;
302:2,5,12

**serious (2)**
47:2;140:12
**seriously (1)**
215:20
**Service (15)**
16:4,15;17:11;
30:18,22;31:20,24,
25;32:3;33:10;
302:24,24;303:5,8,11
**set (9)**
268:20;283:18;
284:8;312:1;323:17;
334:6,20;335:12;
342:1
**Settergren (1)**
220:21
**setting (1)**
131:3
**settings (3)**
334:1,5,10
**settled (1)**
22:4
**settlement (8)**
162:19,23;164:10,
13;166:5;219:15;
239:11;319:25
**seven (1)**
75:20
**several (12)**
134:13;163:4;
164:23;168:16;
183:7;190:15;194:9;
200:18;233:9;
234:11;261:14;
316:18
**severity (3)**
182:8,17,20
**shack (4)**
103:11,21;238:17;
267:15
**shacks (1)**
252:25
**shadow (1)**
123:24
**shake (1)**
223:3
**shaken (1)**
55:20
**shaking (2)**
288:1;293:6
**shaky (1)**
223:2
**shall (2)**
69:13,20
**share (1)**
313:24
**Sheep (3)**
31:22;32:9,10
**sheet (1)**
352:7
**shift (1)**
146:17
**shifting (1)**

302:7
**shins (2)**
197:17;274:9
**shit (1)**
111:2
**shoes (1)**
322:1
**shop (14)**
283:8;302:19;
304:23,23;305:11;
306:11;310:15;
317:15;327:10;
330:13,14;331:25;
332:4,5
**shore (1)**
15:3
**short (7)**
62:22;120:12;
121:10,15;139:9;
268:22;328:21
**shorter (2)**
119:23,24
**shortly (3)**
26:20;112:13;
115:13
**shot (2)**
58:17;233:1
**shots (1)**
330:22
**show (14)**
52:21;84:13;90:24;
93:23;96:7,12;
113:14;144:7;
173:15;179:12,25;
196:7;208:6;326:4
**showed (1)**
283:8
**showing (1)**
108:6
**shown (70)**
80:5,25;81:9,22;
83:8,15;84:2;85:2,
18;87:11,16,18;
88:19;89:2,13;90:10,
18;91:4,18;92:2,13;
93:3,8,20;94:6,10;
95:3,8,12;96:3,13;
104:5,15;106:4;
111:20;113:11;
117:5,12;122:18;
123:2,14;125:2,25;
126:6,16;127:14;
128:18;131:16;
132:4,25;133:12,20,
25;159:3;161:20;
177:12,15,16,22,25;
178:5,6;227:17;
258:25;346:15;
347:1,5;348:6,18;
349:5
**shows (7)**
83:12;109:8;
173:13;174:1;

192:10,15,16
**side (35)**
26:19;38:24,24;
50:13;61:9;67:4;
86:2,5,7,8,9,12;
88:10,16;90:22,22;
91:19,24;92:15;93:4,
15,17;96:16;104:25;
105:1,3,6,8,13;
112:22;115:2;
327:10;336:9,11,11
**sign (57)**
65:20,21,25;66:6,
9;67:5,15;68:3,7,10,
11,13,16,19,21,25;
69:18;70:5,11,19,23;
80:7;81:8,13,22,23;
82:2,23;86:20;87:2;
88:21;90:4;91:9,12;
92:23;93:1,8;99:7,10,
13;100:3;102:7,10;
103:21,22;109:13,14,
19;110:5,7,12,14,17,
19,24;111:23;245:22
**signage (1)**
158:17
**signature (2)**
350:3;351:3
**signed (6)**
203:22,25;211:10;
241:20;269:18;352:7
**significant (2)**
301:6;302:22
**signs (72)**
56:10,13,16;79:11,
19,21;80:4,5;88:16,
22,23;89:3;115:3;
116:7;117:5;118:3,4,
6,6,9;135:11;141:17,
22;142:9,19,22;
143:7,8,12,14,19,20,
21,24;144:25;145:8,
19;146:4,15;147:23;
148:1,13,19;149:9,
22;152:17;157:6,16,
25;161:8;234:24;
235:11,21;236:15,21;
237:14;238:9;
240:16;253:2,23;
254:2,11,12,17,18;
255:11,17,25;256:5,
5,19;257:7
**similar (3)**
81:3;83:12,16
**simple (9)**
138:16;144:10;
188:3;192:19;
237:25;262:18;
263:24;271:19;
341:22
**simply (10)**
91:9;107:16;
148:23;154:24;

155:12;242:16;
250:20;251:12;
309:15;350:14
**single (1)**
288:5
**sister (1)**
22:5
**sit (12)**
144:11;145:24;
188:13;216:3;
223:20,24;267:21;
268:9;288:21;
289:17;303:14;
324:19
**site (1)**
128:6
**sitting (4)**
24:8;62:3;115:24;
293:21
**situation (1)**
159:23
**six (10)**
22:23;39:4,20;
40:6;42:1,1;119:22;
195:22;206:25;
207:2;270:16
**six-foot (1)**
121:16
**ski (329)**
17:13;36:23;39:8,
10,25;40:10,14;41:5,
9,10,18;42:15,19,20;
43:15;44:13,22;45:3,
23;46:7;48:3,3,10,13,
16,18;49:25;50:1,1,
21,24;51:2,4,5,24;
52:1,23,25;53:7,8,9,
19,22;54:13,20;55:2,
18,21;56:19;57:1,14;
58:7;63:20,20;64:11,
21;65:1,2,7,9;66:7;
67:12,22;68:14;
72:19;73:17;78:19,
22;90:1;93:23;94:6,
10;95:19,22;96:3;
100:23;101:5;102:5;
103:14,20;105:12,15,
18;107:7,9;111:6,11;
112:3;114:1,2,10,13,
18,22;117:5,18,25;
118:8,23;119:5,9,11,
16,19;121:7;122:1,
23,24;123:12;124:5,
14;126:25;128:5,9;
131:4;132:25;134:4,
17;135:6,12,14,16,
17,18;137:20;
138:22;140:5,7,14,
22,23;141:3,5;142:9,
18,21,23,25;143:11;
144:2,14,21,25;
145:9,12,19;146:3,7,
8,8,11,13;147:23;

148:1,10,23;150:2,
18,24;152:18,19;
153:1,5;156:1,5,6,8,
10,12;158:14;159:5,
11,15,16;160:9,16,
19;161:11;162:13,15,
21;165:7;168:12;
169:19,23;170:1,4,9,
15;172:18,23;
175:14;176:14,19;
181:20,23,24;182:2;
187:21;195:20,22;
197:10;207:13;
211:1,5,7,12,15;
212:11,19;214:15;
215:14;218:8;
221:12,20;229:18,22,
22,22,23;230:3,5,19,
20;232:7;233:5,10,
18;234:23,24;235:2,
10,11,18,20;236:1,
14,15,19;238:21;
239:3,6;241:11,14,
22,23;242:19;
245:14;247:4;
250:12,12,25;251:3,
9,11,18;252:24;
254:8;255:3,10;
256:4,6;257:4,5;
258:5,11,25;259:10;
265:2,7;266:8;267:8,
15;268:1,3,15,16;
275:13,13;276:14;
281:1,2,25,25;282:1,
3,5;283:7,16;285:19;
289:1,14;294:5;
297:9,16;299:3;
301:11;302:19;
305:11;310:8;
315:10,12;317:14,16;
322:2;325:15;326:4;
327:7;331:7,25;
332:4,5;336:10;
340:18,22,24;341:3,
13,17,22,25;342:8,
17;344:8,13;346:16;
347:24;348:3;349:3

**skied (76)**
39:24;40:5,7,8,25;
41:8,8,9,18;43:2,4,7;
44:8,19,21,21,23;
45:1,4,10,23;46:1,4;
50:20;52:3;54:14,15,
16;64:17;90:13;
93:19;94:16;101:4,
13;110:10;111:10;
112:13;113:15;
119:10;122:20;
124:10;130:24;
131:4,19;132:11;
145:6;150:16;
153:17;173:11;
175:10,15,25;182:25;

183:2;231:25;
232:13;233:9,13,14,
16,21,23,23;234:11,
14;278:24;283:13,
18;285:20,24;296:3;
347:8,11,18,19;349:9

**skier (23)**
39:18;52:11,17;
66:13,17;69:6,12,20;
99:22,25;123:14;
126:5;146:18,19;
160:12;251:17;
280:23;282:8,15;
293:10;334:9,16,20

**skiers (11)**
66:6;88:15,15;
99:21;124:5;125:21;
132:19;159:6;160:8;
251:18;335:3

**skier's (4)**
55:3;114:25;
116:23;160:13

**skiing (122)**
38:13,15;39:2,3,5,
17,20,21;40:6,17;
41:2,7,21;42:25;
43:8;44:6;45:21;
47:13,22,25;48:19,
22,25;52:6,9,12,19;
53:22;54:12;55:21,
25;56:11,17;57:16,
18,21,24;58:2,11;
60:15;64:1,4,10,25;
65:3,5,6;66:4;68:1;
69:16,23;76:9;89:15;
92:1,7,10,12;93:3;
100:9;101:19;106:6,
8,10;107:4;110:7;
123:24;129:11;
131:22;133:2;137:8;
151:13,21;152:3,8,
24;155:8;156:17;
161:2;178:8;180:10,
19,25;181:7;182:7,
20;183:6;196:22;
200:17;214:11,14;
221:13;222:9;
224:23;225:1,3;
228:10,23,25;229:13,
14;230:2,13,17,17;
232:21;234:2;271:7;
275:11;277:12;
280:22;282:4;284:4,
21;286:15;287:1;
298:10;319:6;
330:23;334:5;335:5;
342:23;343:25

**skills (3)**
223:1,10;230:12

**skin (1)**
60:4

**skins (2)**
55:5;56:3

**skis (91)**
89:14;116:25;
125:21;127:21;
129:19,19;176:14,19;
177:2;178:9,10;
179:5,7;183:16,25;
184:25;185:10,16,23;
197:25;198:12,17;
204:12;245:12;
263:9;274:5,13;
275:8;277:19,22;
278:4;280:19,22;
281:4,7,16;283:23,
25;284:3,9,12,13,15,
16,18,21;285:9,10;
288:2,4,4;295:21;
297:5,12;298:7,20,
21;302:19;304:23;
305:11;309:18,22;
310:7;312:2,7;313:7;
320:11;326:23;
328:24;329:12,23;
330:6,12;331:25;
332:3,22;333:9;
334:13,21,23,24;
338:24;339:1,8;
340:9,11;341:7;
342:12;343:24;
344:21;345:3

**skull (1)**
201:16

**Sky (129)**
8:8,22;29:5;36:8,
22,23;37:13;43:4,5,
18;44:7;45:1,4,10;
47:21;54:18;60:15,
23;61:9;65:15;66:7,
10;78:5,5;79:9;
81:11;83:13,17;84:4,
24;85:13;87:15;
89:15;122:20;
131:10;134:4,16;
135:16;138:23;
140:12,25;141:6,10,
12,13,21;142:9,18;
143:24;144:24;
145:19;146:3;149:5,
8,15;150:2,24;
153:11;154:17;
161:23;162:15;
166:15;170:6,19;
172:16;175:14;
176:3;208:18,18;
211:1,7;218:25;
221:13;234:2,23;
235:10,18;236:14;
239:4,8,21;240:12;
243:16,22;244:5,8;
245:13;246:4,21;
247:5,23;248:3,8,13;
250:11,18,25;251:21;
253:22;254:2;258:5,
11,13,17,17,20;

259:25;260:1,7;
265:2,9;266:8;267:8;
269:11;278:24;
285:3;289:8;299:2;
322:2;324:3;337:23;
338:18,18;339:16,19;
340:15;341:11,21;
352:25

**Sky's (2)**
217:15;337:17

**slap (1)**
240:3

**slept (1)**
59:23

**slope (2)**
92:1,7

**slow (4)**
9:25;75:5;123:22;
155:19

**slower (6)**
152:4,24;153:17;
155:8,12;216:15

**slowly (1)**
177:5

**small (2)**
84:17;226:8

**smooth (1)**
178:11

**Sno-Cat (2)**
51:13,18

**Sno-Cats (1)**
51:11

**snow (28)**
41:16;42:5,18;
43:6;48:23;49:1;
53:10,13;56:6;72:2;
82:9,18;99:16;
101:17;102:22;
111:3;181:14;
200:17;291:16;
309:1;315:25;318:8;
332:6,7;333:2,14;
334:8,20

**snowboard (17)**
42:5,15,17,20;
43:15;50:24;53:9;
58:7,9;64:24;204:4,
12,23;205:1,6,22;
206:15

**snowboarded (5)**
42:1;43:5;45:4,13;
101:5

**snowboarding (7)**
41:20,23;42:25;
45:7;58:11;59:9;
64:25

**sober (3)**
23:1,21;60:8

**social (2)**
231:6,8

**socks (1)**
103:17

**soft (1)**

190:23

**sold (1)**
38:22

**sole (2)**
309:5;314:2

**solely (2)**
299:2;302:15

**soliciting (1)**
247:22

**solid (1)**
189:24

**somebody (5)**
85:24;216:9;327:4;
329:7;339:18

**someone (18)**
59:15;81:11;84:4,
24;85:13;92:1;93:3;
108:2,18;126:15;
141:13;146:8;181:3;
197:6;247:14;
315:12;329:22;330:1

**someone's (3)**
59:23;181:18;
312:12

**someplace (1)**
167:23

**sometime (2)**
30:1;214:23

**sometimes (6)**
20:1;46:19;122:23;
223:2;327:7;344:17

**Somewhere (5)**
120:2;226:19;
334:15;346:14;348:4

**soon (4)**
116:24;129:25;
130:9;321:3

**Sooner (3)**
224:24;225:12;
347:23

**sorry (13)**
18:20;38:5;64:16;
86:9;107:5;136:18;
149:16;164:2;
242:23;243:5;259:6;
310:6;338:25

**sort (14)**
22:24;75:11;83:18;
190:23;214:20;
219:18;277:19;
287:9,16;304:5,20;
318:17;319:13;332:1

**sorts (1)**
286:5

**sound (1)**
299:7

**sounds (3)**
101:15;301:24;
312:19

**sources (1)**
248:2

**South (2)**
8:11;44:16

**Spanish (2)**
14:3;54:17
**speak (2)**
36:11,14
**speaking (2)**
143:5;264:21
**Specific (6)**
43:2;58:4;92:5;
158:20;288:14,19
**specifically (2)**
259:15,16
**speculate (1)**
339:18
**speculation (4)**
293:13;303:17;
322:25;323:12
**speech (1)**
242:13
**speeches (1)**
166:1
**speed (6)**
57:23;68:4,8;
182:16,19;286:5
**speedometer (1)**
155:16
**spells (1)**
66:13
**spend (1)**
227:23
**spicy (3)**
106:6,7,10
**spoke (1)**
117:18
**spoken (8)**
37:6,15;257:17;
265:1;266:7,11;
267:7;289:10
**spots (2)**
16:23;17:7
**spring (2)**
134:3,16
**St (1)**
12:13
**stack (1)**
338:16
**staff (2)**
20:16,18
**stand (2)**
211:22;258:23
**standing (9)**
96:25;97:2;108:13,
14;126:5,16;159:6;
211:11;346:14
**stands (1)**
37:25
**start (20)**
13:6,8,12;14:17;
15:23;24:5,10;27:18;
30:3;39:3;41:22;
112:3,3;115:9;
165:10;175:18;
219:21;221:23;
222:4,16

**started (22)**
14:21;16:1;17:17;
18:21;25:10,25;26:5;
38:8,9;40:5,13;
48:11;63:20;66:22;
163:6;166:14;200:1;
261:15;278:5,16;
313:20;321:13
**starting (5)**
97:7;98:1;246:20;
248:2;307:4
**starts (1)**
311:14
**state (11)**
9:7;13:9,12,14,17;
22:14;66:11;67:9,20;
69:3;352:22
**statement (21)**
142:16,18;143:23;
144:24;145:18,25;
146:3;150:3,24;
175:14;208:7;209:9,
12;210:24;211:2,3,5,
6,8,25;212:14
**statements (2)**
210:23;211:14
**States (16)**
8:5;67:19,22;
70:11;71:16;75:21;
81:23;99:13;111:23;
120:7;142:8;164:25;
196:22;204:3;
267:14;268:14
**stating (1)**
236:20
**Station (2)**
31:22;32:10
**status (4)**
219:10,19,24,25
**statute (3)**
69:9,12,25
**stay (9)**
67:17;129:18,20;
150:18;183:13,24;
197:23;275:10,12
**stayed (1)**
201:15
**steep (10)**
95:23;96:1,2,6,7,
12;98:7;137:11;
158:4;225:15
**stereotype (1)**
83:19
**Steve (38)**
245:5,6;305:21,25;
306:7,14;308:6;
309:10,12,13,15,20,
20,21;310:3,7,18;
312:2,6,7,16;313:3,5;
327:5,6,18,24;329:5,
6,12,23;330:1,2,5,13;
331:2,2,24
**Steves (2)**

330:2,4
**Steve's (6)**
306:11;312:19;
327:5;328:1;329:3,
15
**still (56)**
16:23;21:13;29:19;
37:8;63:7;87:1;
139:18;155:21;
162:16;168:17;
175:3,7;182:14;
183:16;184:25;
185:16;199:1;
200:25;212:17;
214:5;215:9,18;
216:6,24;217:2,4;
218:1,16,17,17;
229:23;243:12,13;
249:7;270:4;273:20;
277:20;278:4;
280:23;284:3;
295:22;297:10;
298:9;300:11;321:2;
322:12;324:18,25;
331:24;342:6,8;
343:24;344:3,6,8,11
**stop (13)**
13:17;25:23;35:17,
20;49:5;67:18;155:1,
6;210:4,4;221:2;
239:1;331:21
**stopped (9)**
26:2;153:19;
154:12,15,21,23;
155:4;331:19,19
**stopping (3)**
15:7;154:7;225:18
**store (1)**
287:21
**stories (1)**
246:20
**story (2)**
310:12;312:14
**straight (6)**
58:18;86:21;
194:19,22,24;195:4
**strategic (1)**
240:3
**strength (1)**
318:2
**stressful (1)**
27:23
**stricken (1)**
201:25
**strike (20)**
37:6;99:23;110:13;
127:15;142:16;
147:2;148:12;167:2,
13;191:24;201:19,
23;203:14;216:18;
226:21;228:20;
240:7;255:5;303:10;
309:4

**string (1)**
316:8
**struggling (1)**
61:20
**student (1)**
21:14
**students (5)**
15:9,11,12,13,15
**stuff (6)**
74:10,14;205:16;
219:22;230:11;267:5
**subject (8)**
289:18;290:3,16,
22;291:2;292:9,12;
304:25
**sublet (2)**
21:4,5
**submit (3)**
259:22;260:6,11
**submits (2)**
143:11;350:22
**submitted (3)**
35:5;141:25;325:7
**subscribe (1)**
318:13
**Subscribed (1)**
352:16
**substantially (4)**
81:2;83:12,16;
190:17
**subtle (1)**
179:5
**suburbs (2)**
12:13,14
**sudden (2)**
298:20;312:16
**sue (2)**
141:5;169:15
**sued (7)**
19:19;141:5,11,12;
219:3,5;220:1
**suffer (1)**
217:2
**suffered (4)**
216:12,20;241:2,9
**sufficient (1)**
92:20
**suggest (6)**
142:15;188:16;
211:24;212:14;
254:1;294:22
**suggested (1)**
324:9
**suicide (1)**
226:8
**suing (1)**
240:2
**suit (4)**
170:10;172:19;
239:24;240:3
**suited (1)**
48:19
**sum (1)**

309:3
**summer (10)**
18:25,25;19:4;
214:12,15;221:12,13;
222:1,2,6
**Summit (2)**
297:9;310:7
**summons (1)**
329:17
**sun (2)**
87:24;88:5
**Sunday (1)**
321:22
**super (1)**
58:20
**supervisor (1)**
29:12
**supplement (1)**
210:2
**supplied (1)**
291:16
**supplies (1)**
241:15
**supply (4)**
241:14,23;242:19;
297:25
**support (2)**
242:17;247:2
**supports (2)**
292:11;295:6
**suppose (3)**
158:17,25;290:24
**supposed (6)**
75:6;103:20;191:5,
8,9;234:18
**supposedly (1)**
290:10
**Supreme (2)**
30:12,17
**Sure (48)**
11:16;24:18;25:22;
26:25;37:22;38:12;
44:3;49:10;51:6;
59:20;61:19;71:15;
72:17;82:6,20;84:18;
85:6;111:13;114:8;
115:5,7;123:15;
125:10;126:13,18;
130:14;133:16;
141:17;164:5;
174:17;175:12;
186:23;188:15;
196:21;205:17;
276:10;277:4,5;
278:7;279:14;
282:12;286:21;
308:17;313:5;321:9;
329:9;336:5;341:6
**surprise (2)**
275:5;290:2
**surprised (1)**
274:16
**survey (1)**

16:10
**sustain (2)**
  275:18;286:7
**swear (2)**
  94:2;153:25
**Swift (15)**
  75:1,22;76:5,15;
  77:16;78:12;79:7,14,
  20;80:5,17;81:2,3,9,
  12
**swimming (1)**
  229:1
**sworn (2)**
  9:3;352:16
**system (1)**
  326:4

**T**

**table (1)**
  24:8
**tails (1)**
  276:15
**talk (18)**
  11:7;12:8;36:17;
  38:13;59:22;132:19;
  141:24;144:15;
  209:17,18;219:16;
  220:7;258:20;
  266:19;267:4;278:1;
  316:20;350:23
**talked (16)**
  36:22;38:2,3,4,16;
  53:11;171:10;265:4;
  266:16;267:2,3;
  276:9;290:5;309:21;
  342:12;346:22
**talking (30)**
  87:25;123:25;
  131:15;157:21,22;
  180:16,18;209:19,20;
  219:13,21;225:5;
  226:3,4;227:23;
  228:9,25;229:12;
  237:4,6,7;251:25;
  252:1,3;283:9,10;
  297:2;321:10,11;
  324:14
**talks (3)**
  36:23;313:17;
  324:12
**tall (8)**
  119:21;120:2,4,12;
  121:10,13;171:14,15
**Talley (2)**
  254:16;255:16
**taught (1)**
  60:3
**tax (1)**
  60:23
**Taylor (5)**
  172:6,10,11,12;
  244:1

**tech (14)**
  48:6,9,12,14,17;
  49:3,21,24;50:4,9,18;
  64:2;279:17;342:14
**technical (16)**
  289:19;290:3,16;
  291:2,9;292:12,15,
  21;302:15;304:21,
  22;305:1;319:14;
  323:11;324:14;
  343:20
**telephone (4)**
  163:4;164:24;
  166:10;210:25
**telling (27)**
  75:24;108:11;
  122:17;132:16;
  154:4;179:14;
  185:14,19;198:19,22,
  24;199:3;203:7;
  204:9,11,19;207:5;
  208:13,21,25;263:17;
  264:6,7;271:25;
  276:25;278:18;
  314:12
**tells (2)**
  82:23;204:4
**ten (2)**
  24:7;54:4
**tent (3)**
  66:23,25;72:20
**tents (1)**
  61:7
**term (2)**
  23:24
**terminated (1)**
  29:25
**termination (1)**
  29:18
**terms (12)**
  34:15;158:20;
  169:8;222:15;
  230:13,16;319:14;
  322:6;323:25;335:3;
  343:15,20
**terrain (29)**
  56:17;100:5,6,9,10,
  11,14,20,20;102:2,
  18;122:19;135:9,11;
  149:6,8,15,18,21;
  152:23;155:12;
  184:18;193:22;
  250:12;251:22,25;
  253:24;254:3;346:17
**terribly (4)**
  96:5;120:11,12;
  121:15
**test (5)**
  298:15;325:10,11;
  327:1;345:11
**tested (10)**
  293:24;295:1;
  321:2;322:13;

326:23,25;327:11;
  328:24;330:5;336:10
**testified (8)**
  9:4;141:18;275:25;
  296:25;329:22;
  333:1,1;348:3
**testifies (5)**
  146:7,8;250:25;
  347:24;349:3
**testify (5)**
  116:15,15;163:17;
  290:13;293:15
**testifying (1)**
  292:9
**testimony (18)**
  8:2;11:25;101:22;
  121:25;125:25;
  128:1;132:21;154:6;
  181:19;290:23;
  304:13;313:16;
  320:3;329:15,20;
  339:20;341:2;346:14
**testing (10)**
  262:2,8,23;285:12;
  294:7;298:1;305:11;
  318:18;321:13;
  329:10
**tests (1)**
  214:21
**thanked (3)**
  134:5,17,24
**Thanks (1)**
  174:18
**them- (1)**
  306:2
**then- (1)**
  181:9
**theory (5)**
  218:15;237:4,6;
  253:15;334:8
**thereabouts (2)**
  23:22;27:2
**thereafter (1)**
  18:22
**thereon (1)**
  352:6
**Theses (1)**
  304:2
**thin (4)**
  120:15;121:12;
  171:19,20
**thinking (6)**
  16:25;24:5,10;
  61:18;216:15;271:3
**third (10)**
  88:5;162:3;287:7,
  18,20;291:7;307:24;
  325:25;336:6,17
**Thornton (2)**
  60:2;201:14
**though (20)**
  38:7;51:16;58:6;
  62:1;71:4;94:19;

106:17,25;133:2;
  142:22;172:4;
  175:23;199:4;
  234:12,15;258:16;
  280:12;290:23;
  296:13;340:19
**thought (27)**
  17:7;18:9;46:14;
  84:22;114:11,17,24,
  25;115:1;116:9;
  117:1;118:2,7;162:7,
  14;166:17,18;
  188:22;275:20;
  277:17;278:14;
  298:5,6;329:22;
  330:16;341:7;346:24
**threatened (2)**
  16:10,12
**Three (20)**
  15:18,18;25:25;
  33:15;39:16;40:14;
  45:2,6;97:21;98:2;
  119:17;159:6;
  195:21;222:11;
  268:14;287:5;335:3,
  7,8,18
**three-dimensional (1)**
  124:24
**throughout (2)**
  42:6,10
**throwing (1)**
  120:5
**Thursday (1)**
  220:7
**ticket (21)**
  60:17;61:2,5,6;
  65:15,21,22;66:9,23,
  23;67:1,2;70:21,24;
  71:2,5,8,9;72:21;
  146:16
**tightened (1)**
  335:18
**tighter (3)**
  50:14,16,18
**times (19)**
  23:2;44:23;45:2,5;
  46:1;59:1;111:10;
  122:23;137:15;
  163:4;164:23;183:7;
  185:11;190:15;
  194:9;225:18;
  252:13;261:14;
  316:18
**timing (1)**
  270:8
**Tina (1)**
  172:9
**tiny (1)**
  229:18
**tips (3)**
  276:14,21,23

17
**TLTs (1)**
  279:4
**Today (36)**
  8:9,22;10:18;12:1,
  4;36:16;72:14;74:17;
  144:11;145:24;
  188:13;198:23;
  207:5,11;208:13;
  216:3;217:2;223:21,
  24;267:21;268:9;
  272:19,23;276:9;
  284:9;288:21;
  289:17;293:21;
  303:14;317:6;
  324:19;325:5;339:3;
  343:23;349:22;350:2
**toe (12)**
  50:4,8,10,13;
  282:19,24;293:3;
  296:14;302:11;
  308:8;317:2;343:5
**toes (2)**
  308:8;342:15
**together (9)**
  124:12;207:13;
  208:19;327:7;331:5,
  7,9,11,13
**told (56)**
  36:16;38:17;48:18,
  21,25;49:15,20;74:3;
  80:9;114:1,19;
  116:12;122:9;
  129:13,16;132:8;
  145:2,9;156:14,18,
  21;172:18;173:8;
  185:11,11;190:15;
  194:9;204:5,10,21,
  22,24,25;205:4,5,20,
  21;206:14;232:7;
  233:5;236:2;244:1;
  245:20;247:5,5;
  257:18;262:4;263:8;
  314:6;320:9;322:11,
  18;342:21;346:17,
  21;347:16
**Tom (8)**
  60:2;201:14;
  210:24,25;211:10,11,
  12,14
**tomorrow (1)**
  39:22
**took (42)**
  18:16;19:2,6,11;
  34:15,19;39:11;
  45:17;85:24;90:7;
  108:20;110:16,16;
  116:2;117:14;
  175:14;191:11;
  193:19;227:9,12;
  263:7,9;275:5;283:8,
  15,22;293:24;294:8;
  295:1,6;296:2;297:8;

305:10,17;306:11;
310:7,9;328:20;
330:7;339:15,16,19
**tools (3)**
250:19;251:1,12
**top (23)**
70:16;73:14;80:17,
20;81:1,3,9,12;87:24;
88:3;106:14;108:6;
109:5;126:16;
134:15;170:8;
199:22;230:14;
283:9;295:13,14;
315:3;318:8
**total (3)**
101:3,4;309:3
**totally (3)**
161:17;240:1;
262:12
**touch (1)**
321:3
**touching (1)**
15:15
**tough (1)**
295:19
**tour (1)**
55:5
**tours (1)**
308:8
**toward (1)**
166:6
**towards (16)**
18:12;90:4;107:4,
7;122:9,10;162:20;
180:19,25;181:8,23,
24;182:3;202:9;
261:17;278:16
**to-wit (1)**
8:2
**town (3)**
10:1,4;345:18
**Tracey (2)**
200:10,15
**track (160)**
36:24;40:10;51:21,
23;86:3,12;87:23;
88:2,9,18;89:2,3;
90:18,21,23;91:5,16,
18,21;92:5,8,10,17,
25;93:1,1,5,14,16,18,
20,23;94:6,10;95:7,
12,14,16,18,20,22;
96:3;97:8,9;98:6,9,
14;104:19,21,25;
105:8,12,19;124:6;
125:6,14,22,22,25;
126:7,9,10,17,25;
127:8,14,17,19,21,
24;128:2,3,10,18,23;
129:4,15,18;130:24;
131:2,5,7;137:9,10;
146:9,24;149:13;
150:4,16,17,25;

151:18;152:18,24;
153:7,8,20;154:7,13,
13,15,21;155:2,4,7;
158:15;159:6;161:1,
10,15,19;173:18,22;
174:3,6,8;176:1,5,16,
22;177:18,25;178:4;
179:7;180:5;183:1,9,
12,14,16;184:5,16,
18,24;185:3,15;
194:19,23;195:5;
197:13,15;241:19;
251:8;267:5;274:19,
25;275:3,3,7,8,9;
276:1,14,16,24;
278:11,12,15,17;
296:23
**tracks (8)**
50:21;51:2,4,10,12,
25;52:2;104:15
**trade (1)**
66:25
**trail (3)**
39:13,13;250:2
**trails (1)**
278:24
**trained (1)**
65:1
**training (4)**
64:20,23;65:4;
268:16
**transcript (5)**
34:17;349:24;
350:1,22;352:8
**transition (15)**
95:21,23;96:3;
137:11;176:15,21;
177:3,24;178:4,11;
179:5;183:23;185:3;
252:3,4
**transitioned (1)**
128:10
**transitioning (1)**
95:17
**transitions (1)**
253:2
**treated (2)**
153:5;246:22
**tree (4)**
16:20,22;122:15;
159:1
**trees (9)**
16:16;17:3,5,9;
158:21,24;159:3,5,9
**Trevor (2)**
64:15,17
**trial (5)**
10:19;77:6;78:10;
249:23;326:16
**tribe (1)**
36:4
**trick (1)**
178:20

**tried (15)**
63:24;129:18;
183:13;197:16,16,23;
209:19;222:6,7;
226:20;228:19;
229:18,18;246:1;
270:7
**trimester (2)**
13:16,18
**triple (1)**
89:14
**trouble (2)**
30:25;230:13
**truck (5)**
21:13,14;46:12;
271:2;328:7
**true (9)**
56:23;119:2,3;
199:4;208:25;209:2;
299:25;340:10;352:8
**trust (1)**
21:17
**trusted (2)**
63:24,24
**truth (10)**
154:1,4;198:20,21,
22,24,25;199:5;
208:14;271:24
**truthful (1)**
11:25
**try (13)**
17:12;40:10;137:3,
12;150:18;196:2;
222:20;223:3;
242:13;275:10,12;
326:19;339:21
**trying (36)**
30:9;37:8;52:21;
78:7,9;97:13,15;
98:20;115:4;123:22;
124:9,10,11;135:23;
136:3;137:14;
146:17;183:24;
184:12;186:10;
197:9;198:11;
206:18,24;208:19;
237:24;249:22;
259:12;263:4,24;
269:19;274:16,17,17;
286:20;311:4
**Tuesday (3)**
311:14;322:7,11
**tune (3)**
332:25;333:5,12
**tuned (5)**
288:2;302:19;
304:23;332:4,23
**turkey (1)**
234:10
**turkey-for-a-ticket (3)**
234:1,3,5
**turkey's (1)**
234:7

**turn (14)**
183:13,24;197:16,
17,24;268:25;274:17,
18;275:14;276:5,14,
23;340:14;341:21
**turned (3)**
38:17,18;197:12
**turning (3)**
129:19;150:19;
198:12
**turns (1)**
44:17
**turtle (3)**
14:12,19;15:13
**turtles (2)**
14:15;15:3
**twice (4)**
43:5,5;122:21;
313:20
**twisting (1)**
296:18
**Twitter (6)**
230:23,25;231:4,8,
14;243:8
**two (43)**
23:2;24:6;36:21;
42:13;45:2,6,6;
50:13;88:15;103:18;
113:11;114:10,11,23;
133:12,20;145:17,24;
146:2;149:9,14,14;
155:20,22,25;178:8;
182:11,15;210:21;
219:15;225:18;
250:22;264:13,18;
306:18;311:23;
333:5;334:16,20,23;
335:3,6,8
**two-dimensional (2)**
124:21,24
**type (9)**
20:20;24:21;25:1;
334:16,19,23;335:3,
12,18
**typed (5)**
35:6;261:18;
264:12,18;349:22
**typewritten (3)**
337:24;338:1;
352:5

---

## U

**ultimately (4)**
16:16;17:10;140:8;
146:23
**unable (1)**
217:15
**under (23)**
10:14;63:7;69:3;
74:17,25;75:9,19;
98:18;116:15,15;
132:12;138:20;

139:18;154:6;175:3;
199:21;249:8;
256:16;271:25;
273:20;289:21;
306:10;324:18
**undergrad (1)**
42:10
**Undergraduate (1)**
24:20
**underneath (3)**
14:18;91:11;160:7
**understood (5)**
320:2;321:1;
335:24;339:7;341:1
**unhelmeted (1)**
196:22
**United (7)**
8:5;120:7;218:3,
19;219:1;220:8,13
**University (7)**
13:9,22,23;14:9;
17:25;18:6,10
**unless (8)**
86:23;160:5,5;
180:8,8;304:16,16;
345:6
**unmanageable (3)**
29:11,17,22
**unmarked (12)**
72:16;82:21;91:13;
93:7;110:6,25;
111:23;152:18;
231:20,24;241:19;
251:8
**unpack (1)**
288:10
**unreasonably (2)**
241:3,10
**Unruh (1)**
8:22
**unscrewed (3)**
315:19,21,22
**up (91)**
12:9,11;14:16;
15:4,5,5;20:2;30:10,
19;37:10,11;41:19,
25,25,25;44:22;
45:17;50:10;55:5,15;
56:4;58:9,11,18,19,
24;61:5;62:16;88:6;
103:21,23;104:10;
105:22;107:3,9;
115:6,19;118:16,19;
120:10;132:4,9,11,
12;148:6;158:3;
159:11,14;170:9;
172:8;184:18;
199:22;200:18;
202:12;203:2;
206:25;207:2,8,20;
209:4;218:15;
225:19;227:11,21,24,
25;228:1;253:22;

254:12,18;257:9,14;
267:11;269:18;
288:3;306:16;308:9;
312:1,12,16,24;
313:10;314:25;
316:11;332:16;
333:22,23;342:12;
349:9,17,22
**upgrade (19)**
289:19;290:4,17;
291:3;292:12,15,21;
302:15,24,25;303:6,
9,12;304:21,22,24;
305:1;323:11;324:15
**upgraded (1)**
343:18
**uphill (7)**
88:10;90:19;91:19,
24;92:14;105:12;
115:2
**upon (8)**
292:16,23;293:2;
302:14;304:10;
308:22;317:24;326:6
**upper (2)**
27:7;73:23
**upright (1)**
150:18
**UPS (2)**
312:1,6
**upset (1)**
151:7
**upturn (1)**
144:9
**urinating (2)**
23:10,11
**USA (6)**
8:23;272:20,24;
273:4;301:9,14
**usage (2)**
73:24;80:24
**USD (1)**
164:25
**use (9)**
35:8;55:12,14;
60:6;75:7;227:22,23;
264:21;280:1
**used (19)**
46:22;55:21;
147:14;172:7;223:2;
225:17;228:22,25;
230:12,18,21;244:16;
247:4;295:17;
298:14;303:2;331:3,
5;333:12
**user (1)**
325:17
**using (24)**
24:19,21,24;34:10,
24;35:1,3;63:22;
241:2,9,12;275:7;
279:3;280:2;282:14;
297:19;301:12;

315:10,12;334:21;
341:23;342:4;344:4,
24
**usual (1)**
24:22

## V

**value (2)**
166:22;320:3
**values (5)**
292:16,23;293:3;
325:21;335:21
**vantage (2)**
110:12,18
**variables (1)**
286:4
**variation (4)**
102:18;152:23;
155:12;193:22
**variations (1)**
56:16
**Various (2)**
33:23;38:15
**Vermont (4)**
17:23;18:7;42:15;
322:3
**version (9)**
212:12;287:12,15,
18,20,21,22,23;307:8
**versions (1)**
318:3
**versus (13)**
8:8;30:22;31:19,
21,24;32:3,8;33:9;
49:3;65:8;239:4;
336:9,11
**veterans (1)**
226:7
**vets (2)**
226:6,7
**video (19)**
8:4,14;192:10,15,
16;193:1;283:8;
288:1;293:6;297:6,7,
8,16;310:9;326:9,10;
330:7,9;350:1
**VIDEOGRAPHER (22)**
8:4,25;62:24;63:3;
130:12,15,19;139:10,
14;174:20,24;210:14,
18;248:25;249:4;
269:1,5;272:10,14;
328:13,17;350:24
**visible (2)**
98:9;160:13
**visualize (2)**
274:25;275:3
**voiding (1)**
58:22
**voluntary (2)**
192:1;287:17
**volunteer (15)**

142:24;143:1;
144:2,14,21;145:25;
162:13;170:17,21;
171:1,2;191:20;
235:2;265:22,25
**voted (1)**
244:18
**vu (1)**
94:1

## W

**Wait (1)**
51:18
**waiting (1)**
300:11
**waive (2)**
350:2,9
**wake (2)**
202:12;203:2
**walk (9)**
14:14,23;56:4,5;
67:5;71:12;223:3;
276:13,18
**walked (1)**
71:11
**Wallace (3)**
9:15,15;20:5
**warn (2)**
82:1;257:8
**warned (2)**
67:11;71:21
**warning (14)**
67:16;71:4,8,14;
79:11;81:8,13,22,23;
82:23;86:20;87:1;
116:6;117:5
**warnings (1)**
70:2
**warns (6)**
66:6;68:3,7,13;
69:12,18
**warranty (4)**
310:13,23;312:14;
330:25
**waste (2)**
17:8;242:14
**watched (1)**
52:12
**water (3)**
228:10,12;229:21
**waxed (3)**
288:3;332:4,23
**way (43)**
15:6;56:1;58:20;
76:12;77:11,13;
79:18;81:6;88:6;
89:11;109:17;
122:18;131:23;
132:17;136:5;137:3,
12,18;138:2;139:6;
153:14;162:17;
184:14;194:16;

226:8;230:21;
240:21;243:17;
246:4;265:2,11;
283:11;286:6;
290:11;293:1,25;
294:20;295:5,17;
339:20;345:18;
348:15;349:12
**ways (3)**
112:25;149:14;
234:15
**wear (9)**
46:16;47:3,4,16,
18;54:20;121:19,21;
271:4
**wearing (13)**
46:7,10,14;103:18;
119:11;121:1,4,17,
20,22;171:17,21,23
**wears (1)**
119:11
**website (4)**
291:5;317:13;
318:6;321:25
**wedding (1)**
240:5
**week (1)**
290:5
**weeks (1)**
103:18
**weird (2)**
57:8;224:1
**welcome (1)**
79:7
**welds (1)**
333:5
**weren't (4)**
47:25;191:9;
211:19;212:3
**west (1)**
44:20
**Western (1)**
38:2
**Westlaw (1)**
35:9
**What's (21)**
52:24;96:13;103:9;
104:5;108:10;109:3;
118:18;124:17;
125:12;167:21;
186:13;188:19,25;
195:22;303:9;
310:12;312:14,15;
328:1;329:15;332:19
**whatsoever (1)**
160:22
**WHEREUPON (76)**
8:1;26:11;49:13;
57:6;61:15;63:1,17;
70:6;73:10;79:1,25;
80:12;81:18;83:3;
87:8;89:21;90:25;
94:25;97:19;99:2;

101:9;103:6;104:1;
105:25;108:25;
110:1;111:15;
112:18;113:3;122:4;
123:8;126:21;
130:17;133:8;
136:15;139:12;
142:2;163:13;
172:25;174:22;
176:7;193:12;196:8;
199:13;202:3;
203:15;210:16;
224:16;225:8,20;
226:13,22;228:3,13;
229:5;230:8;242:25;
244:22;249:2,12;
252:22;258:1;261:2;
269:3;272:12;
291:23;299:14;
306:21;307:1;
320:14;324:23;
328:15;332:11;
336:25;338:13;351:1
**wherever (2)**
56:2,5
**white (2)**
123:6,7
**whole (25)**
52:19;55:18;83:19,
25;84:1,13,15,19;
124:22;126:9;
127:10,20;133:15;
146:13;166:18;
181:4;193:2;206:24;
227:23;252:3;
283:22;293:6,9;
322:22;344:18
**Who's (1)**
247:7
**whose (1)**
201:15
**wife (6)**
46:11;118:11;
119:5;138:9,13;
259:20
**wild (6)**
50:3;195:15;
291:16;308:25;
315:24;318:8
**WildEarth (9)**
26:5;21;27:19;
28:3;29:6,9,12;30:4,8
**Wildlife (6)**
31:19;32:3,6,13,
16;33:13
**Williams (3)**
35:16,17,20
**willing (5)**
38:10;249:22;
250:2;262:8,22
**win (3)**
143:2;168:21;
198:25

**window (11)**
  61:6;65:21;66:23;
  67:3;70:24;71:2,8,9;
  79:12;80:5;146:16
**windows (1)**
  70:21
**winning (1)**
  28:1
**wish (1)**
  21:18
**withdraw (1)**
  205:15
**withheld (3)**
  144:8;209:14,18
**withhold (1)**
  205:15
**within (13)**
  57:16,21;67:12,23;
  68:14;224:22;
  318:14,17;325:22;
  334:14;339:24;
  340:6;341:12
**without (17)**
  24:1,2,7;46:20;
  51:10,12;56:20;57:1;
  64:21;153:2;191:11;
  193:20;225:18;
  263:9,11;305:12,18
**witness (49)**
  9:3;16:12,14;47:7,
  9;49:15;57:8;58:14,
  16;61:17;63:19;
  73:12;86:8;97:21;
  101:11;136:17,19;
  150:3,7,11,12,24;
  152:20;163:15;
  172:11,13;174:18;
  175:14;193:10,14;
  196:10;207:13;
  211:7;215:22;
  230:10;238:24;
  248:21,24;252:24;
  266:16;272:7;280:7;
  332:13;350:4,8,11,
  13,16,19
**woke (1)**
  200:18
**Wolf (3)**
  58:11,14,15
**woman (7)**
  114:15,17,19,24;
  115:2;145:2;171:4
**won (3)**
  30:10,13;200:17
**wonder (1)**
  207:15
**word (3)**
  78:2;217:9;311:6
**words (5)**
  76:4;182:10;
  264:21;314:10;
  347:15
**wore (2)**

  47:13,16
**work (16)**
  35:4;36:4;114:22;
  156:8;205:12;221:7;
  236:22;237:15;
  238:10;240:17;
  265:23;266:4;
  331:25,25;333:7;
  343:10
**worked (14)**
  16:4;17:13;74:3;
  156:5,6,10;170:19;
  171:5;246:21;248:3;
  259:25;269:11,13;
  270:8
**working (20)**
  10:7;19:16,22;
  26:5;30:8,12,16;
  35:12,15,17,20;73:5,
  6;239:7;241:23;
  242:19;243:17;
  268:2,3;269:14
**works (6)**
  10:12;20:13,16;
  115:5;136:5;202:1
**world (1)**
  38:5
**worried (2)**
  200:17;325:25
**worse (1)**
  169:16
**wreck (24)**
  50:5;59:19;78:23;
  111:7;150:6,10,15;
  160:16,19;169:24;
  170:5;172:23;
  182:10;183:19,21;
  184:16,22;185:2,6,9;
  215:14;218:8;
  221:12;251:3
**wrecked (17)**
  55:19;58:1,3;
  152:4;154:16,18,22;
  155:15;173:11;
  183:23;189:10;
  197:2,3,6;270:19;
  271:7,23
**wrecking (3)**
  153:2,10;182:12
**Wright (4)**
  13:9,12,14,17
**writ (1)**
  30:16
**write (6)**
  211:12;308:14,19;
  318:13;324:6;337:15
**writes (1)**
  321:1
**written (3)**
  215:24;223:18,22
**wrong (10)**
  138:23;142:1;
  170:2;185:24;

  186:13;192:8,11,15,
  21;193:4
**wrote (25)**
  133:5;190:16;
  200:21;211:13,17;
  212:11;250:5,11,15,
  18,22;253:10;254:19,
  21;256:10;308:11,15,
  17;310:2,4,18;
  311:15;318:23;
  336:15,17

**X**

**X-ray (1)**
  221:3

**Y**

**yards (10)**
  55:2,3;129:7;
  178:13;179:9;
  195:16;233:9,14,16;
  234:11
**year (28)**
  12:25;13:4,4,12;
  14:4;15:23;22:7;
  23:15,25;24:6;30:2;
  39:20;40:18;53:20;
  54:10;214:4,23,25;
  215:1;224:22;
  229:10;254:25;
  270:16;279:21;
  284:24;286:15;
  331:23,23
**years (34)**
  22:23;23:1,16,21;
  24:6,7,7;25:21,25;
  39:4,20;40:6,14;
  41:16;42:1;44:4;
  58:24,24;60:9;63:22;
  90:14;94:17;119:17;
  122:20;255:4;266:3,
  3;268:14;269:11,12;
  319:3,4;331:3,18
**Year's (1)**
  22:22
**yell (1)**
  192:17
**yellow (2)**
  109:20,21
**Yellowstone (3)**
  32:7,13,24
**Yep (15)**
  25:18;73:16;74:1;
  75:2;112:23;134:1,1,
  1;142:14;165:5;
  169:20;202:8;
  228:11;298:25;
  328:25
**yesterday (2)**
  294:14;325:6
**York (1)**

  250:1

**Z**

**Zealots (2)**
  281:6,20

**0**

**009 (1)**
  311:11

**1**

**1 (4)**
  26:10,11,18;
  249:22
**1,000 (2)**
  249:24;250:3
**1.1 (4)**
  162:24;164:17,25;
  322:5
**1.6 (1)**
  166:7
**1:21 (1)**
  139:15
**1:58 (1)**
  174:21
**10 (24)**
  58:24;60:7,11;
  61:25;62:6,7,13,19;
  87:7,8,12,19,23;
  88:19;89:2,4,13;
  90:14;94:17;122:20;
  137:14;218:13;
  269:12;320:25
**10:00 (1)**
  172:17
**10:51 (1)**
  78:23
**10:55 (1)**
  62:25
**100 (14)**
  55:2,3;63:21;
  111:13;129:7;
  180:13,20;181:9;
  195:16;233:14,16;
  258:11;277:4;341:6
**10th (3)**
  322:11;333:18,24
**11 (142)**
  25:8;41:5;43:14;
  44:8,25;45:12,24;
  46:2,5,8;47:12,19,21;
  48:1,4,7;50:5,20;
  52:4,8,13;53:1,16,19;
  60:16;64:12;65:16,
  23;66:4,10,20;67:9;
  70:2,12,16,25;71:14;
  72:19;73:17;74:25;
  76:6,10,24;77:18;
  79:16;81:4,13;83:17,
  23;84:8;85:5,9,20;

  87:20;89:6,16,21,25;
  90:1,8,11,19,21;91:8;
  92:17,17,24;93:8,13,
  14;97:5;98:24;99:11,
  24;101:3;103:11,23;
  104:13;106:15;
  109:9,15;110:8;
  111:7,11;112:8;
  113:16;118:24;
  123:21;124:14,19;
  125:3;127:6;132:5;
  137:22;138:24;
  141:21;142:10,20;
  143:5,9,16,21,25;
  145:1,20;146:1,5;
  147:15;148:13,21;
  158:2;176:12;191:1;
  192:8,21;202:19;
  203:4;212:18;216:7,
  14,20,25;218:4;
  221:21;222:5;239:7;
  253:18;254:3;256:1,
  20;257:8;267:16;
  268:2,4,14;269:15,
  21;270:25;271:6;
  316:5,15;318:9
**11:02 (1)**
  63:4
**11:24 (1)**
  320:25
**11:30 (2)**
  75:1,22
**11:42 (1)**
  322:17
**113 (1)**
  307:15
**11th (3)**
  59:23;83:13;
  101:12
**12 (22)**
  44:3;61:25;90:25;
  91:3,5,18,21;92:2,13,
  17,18,23,24;93:4,12,
  20,24;94:7,10;95:8,
  11;279:25
**12:00 (2)**
  172:17;322:7
**12:16 (1)**
  130:16
**12:25 (1)**
  130:20
**12:30 (2)**
  133:22;134:2
**12:36 (1)**
  139:11
**13 (19)**
  94:24,25;95:4,13,
  14;96:4,13;98:23;
  177:4,6,9,13,17,22;
  178:1,5;179:12,14,21
**13992 (1)**
  325:23
**14 (7)**

44:3;99:2,6,6;
234:22;235:4;236:11
**15 (8)**
37:19;58:24;103:6,
10;258:7;266:3,5;
269:11
**1500-foot (1)**
58:17
**15th (1)**
299:7
**16 (5)**
26:23;104:1,5,6,16
**17 (7)**
22:20;105:25;
106:4,5,12;133:22;
134:2
**18 (4)**
108:25;109:4,14;
210:22
**18-CV-00002-BMM (1)**
8:7
**19 (4)**
39:25;110:1;117:6;
311:14
**191 (8)**
237:5,17,21;
238:18,19;239:4,9;
240:24
**1915 (1)**
8:11
**1999 (2)**
13:1,13
**19th (1)**
8:11

---

**2**

**2 (8)**
61:14,15;65:12;
67:15;70:18;239:17,
19;240:11
**2,000- (1)**
58:17
**2.6 (1)**
14:7
**2.7 (1)**
14:7
**2:02 (1)**
174:25
**2:37 (1)**
210:15
**2:44 (1)**
210:19
**2:55 (2)**
133:23,24
**20 (11)**
22:21;23:16;60:19;
111:15,19,20;117:6;
182:12;266:3;
269:11,12
**200 (1)**
63:21
**2000 (2)**

15:24;22:23
**2003 (1)**
14:5
**2006 (3)**
15:24;17:17;45:15
**2009 (10)**
17:20;18:15,24,25;
19:5,7;22:9;42:24;
43:1,10
**2010 (9)**
18:19,21;19:11,17,
23;22:9;25:11;42:24;
43:1
**2011 (2)**
266:5;279:23
**2013 (1)**
44:3
**2015 (134)**
25:8;26:7,23;
28:13;40:15;41:5;
43:14;44:8,25;45:12,
24;46:2,5,8;47:12,19,
21;48:1,4,7;50:6,20;
52:4,8,13;53:1,16,19;
59:23;60:11,16;
64:12;65:16,23;66:4,
10,20;67:9;70:2,12,
16,25;71:14;72:19,
23;73:18;74:25;76:6,
10,24;79:16;81:4,13;
83:13,17,23;84:8;
85:5,9,20;87:20;89:6,
16;90:8;97:5;98:24;
99:11,24;101:4;
103:11,23;104:13;
106:15;109:9,15;
110:8;111:7,12;
112:8;113:16;
118:24;123:21;
124:14,19;125:3;
127:6;132:5;137:22;
138:24;141:21;
142:11,20;143:5,9,
16,21,25;145:1,21;
146:1,5;147:15;
148:14,21;158:2;
176:12;191:1;192:8,
22;203:20,23;
212:18;216:7,14,20,
25;218:4,13;221:21;
222:5;239:7;253:19;
254:3;256:1;257:8;
267:16;268:2,4,15;
269:15,21;270:25;
271:6;333:16
**2016 (28)**
29:8,24;134:3,16;
165:4;199:22;
200:23;201:2,10;
202:19;203:4;
218:13,14;221:14;
222:2,7;225:5,12;
226:4;307:20;

308:19;311:14;
316:5,15;317:8;
318:10;319:19;
320:25
**2017 (8)**
35:19;133:22;
134:2;165:6;210:2;
258:7;285:1;299:7
**2018 (9)**
35:19;39:25;
109:15;249:18;
250:7;254:22;
256:20;284:25;
352:17
**2018-2019 (1)**
53:22
**2019 (3)**
8:9;248:10;300:2
**208-724-1544 (1)**
329:6
**21 (13)**
112:17,18;113:7;
117:12;123:4;
131:16;203:23;
346:7,8,10,15;347:5;
348:18
**21st (2)**
203:20,21
**21-year-old (1)**
254:24
**22 (16)**
113:2,3,7;117:12;
123:4;131:16;132:4;
226:6,7;346:8,8,10,
15;347:6;348:18,22
**22-day (1)**
226:5
**22nd (2)**
307:20;308:19
**23 (15)**
122:4,8,8,18;123:3,
14,23;124:2,10,12;
346:8,10;347:1;
348:6;349:6
**23-2-736 (1)**
68:24;69:4
**24 (18)**
123:8,12,12,19;
124:10,12,13,18;
125:2,6,24,25;126:6,
17;128:14,19;
339:24;340:7
**25 (17)**
36:23;126:20,21;
127:4,9,16;128:6;
129:3;132:25;159:3,
4;161:16;177:1;
178:6,15;179:15;
210:22
**26 (14)**
36:23;133:8,12,13,
20;147:5;151:11;
160:24;161:22;

162:18;167:16,25;
170:7;210:23
**27 (10)**
142:2,6;163:12,22;
167:18;235:3;
236:19;237:8;238:4;
338:18
**28 (15)**
163:13;164:1,2,7;
167:17;199:22;
200:23;201:2,10;
319:17;321:11,20;
323:17;324:12;
340:15
**28th (1)**
201:12
**29 (8)**
172:25;173:4;
175:5,24;300:5;
301:3,8;302:14
**2C-B (1)**
25:2

---

**3**

**3 (4)**
70:6,10,10;300:14
**3.6 (1)**
239:13
**3:25 (1)**
249:1
**3:27 (1)**
249:5
**3:48 (1)**
269:2
**3:59 (1)**
269:6
**30 (4)**
176:7,10,11;
302:18
**30-ish (1)**
171:8
**31 (2)**
196:7,8
**32 (3)**
199:12,13,17
**33 (11)**
201:21;202:3,6,9;
241:1,5;314:22;
315:3;318:8;341:9,
12
**34 (2)**
203:15,19
**35 (5)**
224:16,19,25;
225:2;341:21
**350 (1)**
352:5
**36 (2)**
225:4,8
**37 (5)**
225:20,23;226:3;
304:15;305:8

**38 (5)**
22:8;226:10,13,17;
338:18
**39 (3)**
22:8;226:22,25
**3rd (1)**
300:2

---

**4**

**4 (7)**
73:9,10;142:8,12,
18;231:19;253:6
**4:01 (1)**
272:11
**4:03 (1)**
272:15
**40 (4)**
54:9;228:3,6,9
**40,000 (1)**
22:8
**400 (1)**
9:15
**406 (1)**
9:18
**41 (3)**
228:13,16,25
**412 (1)**
9:10
**415 (1)**
9:15
**42 (5)**
229:5,8;242:22,24;
243:4
**43 (4)**
242:25;243:5,7,7
**44 (2)**
244:20,22
**45 (7)**
195:9,11;249:11,
12,15;253:6;257:23
**45- (1)**
195:25
**46 (4)**
257:25;258:1,4,25
**47 (8)**
261:2,6,20,24;
264:19;313:12,17;
314:21
**48 (9)**
291:23;292:2;
303:22,25;304:9;
308:25;315:25;
326:14,16
**49 (3)**
299:12,14,18

---

**5**

**5 (6)**
21:14;79:1,5,6;
267:14,23
**5:03 (1)**

328:14
**5:10 (1)**
  328:18
**5:31 (2)**
  350:25;351:2
**50 (10)**
  39:22,24;40:18;
  53:22;63:21;268:1;
  306:20,21;307:5,7
**500,000 (3)**
  162:25;322:3,4
**51 (5)**
  241:13;306:24;
  307:1,4,23
**5'10 (1)**
  171:15
**5'11 (1)**
  171:15
**52 (5)**
  320:14,18,19;
  322:15;324:12
**53 (7)**
  324:23;325:4,5;
  326:8;327:1;336:4,
  23
**54 (3)**
  300:14;332:11,20
**5'4 (2)**
  120:4,10
**546-0149 (1)**
  9:18
**55 (5)**
  336:25;337:3,9,20;
  338:6
**56 (6)**
  338:13,19,23;
  339:4,8;341:12
**5'9 (2)**
  120:4,10
**59718 (1)**
  8:12
**59771 (1)**
  9:10
**5-MeO-EiPT (1)**
  25:2

---

**6**

**6 (8)**
  79:25;80:4;250:7;
  254:9,22;267:25;
  268:10;319:3
**6,000 (1)**
  218:12
**60 (2)**
  195:9,11
**60-degree (1)**
  195:25
**6-foot (1)**
  195:24
**6th (1)**
  249:18

---

**7**

**7 (9)**
  45:15;80:12,16;
  81:1,9,23;255:16;
  268:13,20

---

**8**

**8 (5)**
  81:18,21;165:4;
  225:12;319:18
**80 (1)**
  319:4
**8th (3)**
  165:5;225:5;
  321:23

---

**9**

**9 (10)**
  83:3,7,8,16,22;
  84:2,7;86:1;87:16;
  248:10
**9:16 (1)**
  319:19
**9:30 (9)**
  75:4,25;76:10,15,
  23;77:17;78:13,19,22
**9:59 (1)**
  8:10
**90 (2)**
  195:6,7
**95 (2)**
  181:1,10
**9th (3)**
  8:9;333:15,23

**John Meyer**

```
 1              DEPONENT'S CERTIFICATE

 2

 3      I, JOHN MEYER, the deponent in the foregoing

 4   deposition, DO HEREBY CERTIFY, that I have read the

 5   foregoing - 350 - pages of typewritten material and

 6   that the same is, with any changes thereon made in

 7   ink on the corrections sheet, and signed by me a

 8   full, true and correct transcript of my oral

 9   deposition given at the time and place hereinbefore

10   mentioned.

11       NO CORRECTIONS

12            JM

13                    _____

14                    JOHN MEYER

15

16           Subscribed and sworn to before me this

17   ____ day of ____MAY____, 2018.

18

19

20

21   PRINT NAME: _____

22   Notary Public, State of  Montana

23   Residing at: _____

24   My commission expires:  _____

25   DF - MEYER v. BIG SKY RESORT, DYNAFIT NORTH AMERICA
                                                      352
```

JOHANNA MERSEN
NOTARY PUBLIC for the
State of Montana
Residing at
Bozeman, Montana
My Commission Expires
October 15, 2020
SEAL

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT 59715, (406) 587-9016**



EXHIBIT
tabbies®
74