## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

JOHN MEYER,

    Plaintiff,

    vs.    Cause No. 18-CV-00002-BMM

BIG SKY RESORT,

    Defendant.

_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

EVI DIXON

_____

BE IT REMEMBERED, that the videotaped deposition upon oral examination of EVI DIXON, appearing at the instance of Defendant, was taken at the offices of Crowley Fleck, PLLP, 1915 South 19th Avenue, Bozeman, Montana, 59718, on the 24th day of January 2020, beginning at the hour of 8:59 a.m. pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

## Page 2

1             APPEARANCES

2

ATTORNEY APPEARING ON BEHALF OF THE
PLAINTIFF, JOHN MEYER:

3
4
    Ms. Breean Walas, Esq.
5    Walas Law Firm
    P.O. Box 4591
6    Bozeman, Montana 59772
    breean@walaslawfirm.com
7    (501) 246-1067
8
ATTORNEYS APPEARING ON BEHALF OF THE
9    DEFENDANT, BIG SKY RESORT:
10
    Mr. Ian McIntosh, Esq.
11    Mr. Mac Morris, Esq.
    CROWLEY FLECK PLLP
12    1915 South 19th Avenue
    P.O. Box 10969
13    Bozeman, MT 59719-0969
    imcintosh@crowleyfleck.com
14    wmorris@crowleyfleck.com
    (406) 556-1430
15
16
17    ALSO PRESENT:
18    Mike Unruh
19
20
21
22
23
24
25

## Page 3

1           I N D E X
2  EXAMINATION OF EVI DIXON BY      PAGE
3    Mr. Ian McIntosh, Esq.................5, 126
4    Ms. Breean Walas, Esq....................118
5  E X H I B I T S   R E F E R R E D   T O:
6  Exhibit 13......................................86
  Exhibit 25.................................47, 52
7  Exhibit 29................................88-89
  Exhibit 65....................................123
8
9  DEPOSITION EXHIBITS:
10  Exhibit 70   Evi Dixon Subpoena................13
11  Exhibit 71   NSAA, National Ski Areas
  Association, Collision
  Safety.........................77-78
12
13  Exhibit 72   Colored Photograph with
  green markings.................85-86
14  Exhibit 73   Affidavit of Evi Dixon........99, 122
15  Exhibit 74   Evi Dixon E-mail list............117
16
17
18
19
20
21
22
23
24
25

## Page 4

1    WHEREUPON, the following proceedings were had

2  and testimony taken, to-wit:

3

4          * * * * *

5

6    VIDEO TECHNICIAN:  This is the time and place

7  set for the deposition of Evi Dixon in the case of

8  John Meyer, plaintiff, versus Big Sky Resort,

9  defendant.  It is Cause Number 18-CV-0002 [sic],

10  dash, BMM in the United States District Court for

11  the district of Montana, Butte Division.

12    This video deposition is being held at

13  the offices of Crowley Fleck located at 1915

14  19th Avenue in Bozeman, Montana.

15    Today's date is January 24th, 2020.  The

16  time is 8:59 a.m.

17    The court reporter is Marla Jeske with

18  Bridger Court Reporting.  I'm Mark Brown, the

19  videographer.

20    Will the attorneys please now identify

21  themselves for the record.

22    MS. WALAS:  Breean Walas for the plaintiff.

23    MR. McINTOSH:  Ian McIntosh and Mac Morris

24  for defendant, Big Sky.

25    VIDEO TECHNICIAN:  Will the witness now

Page 5

1  please be sworn in.
2
3          EVI DIXON,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6
7          EXAMINATION
8  BY MR. McINTOSH:
9      Q.  Can you please state your name.
10     A.  It's Evi Dixon.
11     Q.  And what is your address, Ms. Dixon?
12     A.  3180 Curtis Lane, Manhattan, Montana,
13  59741.
14     Q.  And your telephone number?
15     A.  406 579-9694.
16     Q.  Have you ever had your deposition taken
17  before?
18     A.  No.
19     Q.  Just to make sure that we understand the
20  rules, I'm going to go through them.
21          We need to talk one at a time.  So even
22  if you know exactly what I'm going to ask you, you
23  need to let me finish the question before you start
24  answering so the court reporter can get a good
25  record.  Do you understand that?

Page 6

1      A.  I do.
2      Q.  And if you're answering a question and I
3  come in with the next question before you're done,
4  for example, you may pause, I might think you're
5  done, if you haven't finished your answer, will you
6  please let me know that you were not done?
7      A.  Yeah.
8      Q.  If I ask you a question and you do not
9  understand it, will you let me know?
10     A.  Yes.
11     Q.  Okay.  So if you answer a question
12  without letting me know that you do not understand
13  it, we can understand -- "we" being me and the jury
14  can understand that you did understand the
15  question, right?
16     A.  Okay.
17     Q.  Is that correct?
18     A.  Yes.
19     Q.  Will you agree not to answer a question
20  that you do not understand?
21     A.  Yes.
22     Q.  Is there any reason to believe today
23  that you cannot give accurate and truthful
24  testimony?
25     A.  Is there any reason?  No, there's no

Page 7

1  reason.
2      Q.  So you are prepared to give accurate and
3  truthful testimony today?
4      A.  Yes.
5      Q.  Tell me what you did, if anything, to
6  prepare for this deposition?
7      A.  Um, I met with Mr. Meyer a few times.
8  We wrote down that affidavit that you have and I
9  have a copy.  I went through the second report of
10  Mr. Petrozzi, Petrozzi.  I think that's it.
11     Q.  Did you meet with Ms. Walas to prepare
12  for --
13     A.  Yes, we met --
14     Q.  -- deposition?
15     A.  -- with Ms. Walas yesterday.
16     Q.  Why didn't you tell me that when I asked
17  you what you did to prepare for the deposition?
18     A.  I was focused on the previous times.
19     Q.  When did you first meet with Mr. Meyer?
20     A.  Generally or for that -- for his case?
21     Q.  For his case.
22     A.  Um, I don't remember the exact date,
23  November, end of November or middle of November.
24     Q.  Was that shortly after you were asked
25  not to return to ski patrol at Big Sky?

Page 8

1      A.  It was.
2      Q.  How soon after you were asked not to
3  return as a ski patroller at Big Sky, did you meet
4  with Mr. Meyer?
5      A.  Well, I don't remember the dates.  I
6  remember that I was told that I'm not going to be
7  coming -- being rehired before the refresher.  So
8  it was like two weeks before the refresher started,
9  very close.  And um, I was asking if I can still
10  attend the refresher and then I was told after two
11  inquiries or so, no.  And then after this, I think
12  it was after that that I met, but I have no
13  recollection of dates.
14     Q.  Did you contact Mr. Meyer and let him
15  know that you had been asked not to return to Big
16  Sky?
17     A.  We had a -- I contacted him because he
18  posted on Facebook about his twin boys and I'm a
19  craniosacral therapist.  I needed to make some
20  money, so I asked him if he would be -- I can treat
21  his babies and he agreed that I treat his babies
22  and himself and his wife and then we kind of talked
23  that I'm not returning to Big Sky.
24     Q.  So how soon after you were asked not to
25  return to Big Sky, did you agree to help Mr. Meyer

EVI DIXON

Page 9

1  in his lawsuit?
2      A.  Maybe two, three weeks.
3      Q.  And whose suggestion was it that you
4  help Mr. Meyer, your suggestion or his suggestion?
5      A.  I don't know.
6      Q.  What have you discussed with Mr. Meyer
7  about his accident and this lawsuit?
8      MS. WALAS:  Objection, privileged.
9      MR. McINTOSH:  How?  How is it privileged?
10     MS. WALAS:  When she met with him it was in
11  an attorney work product capacity and they were
12  meeting to make decisions on whether to move
13  forward with her becoming an expert or not in the
14  case.
15     MR. McINTOSH:  So are you going to instruct
16  third-party witness not to answer the question?
17     MS. WALAS:  Specific to that question, yes.
18  BY MR. McINTOSH:
19     Q.  Okay.  Ms. Dixon, does Ms. Walas
20  represent you personally?
21     A.  No.
22     Q.  She's not your attorney, correct?
23     A.  No.
24     Q.  And are you going to tell me what you
25  discussed with Mr. Meyer?

Page 10

1      A.  Can you repeat the question?
2      Q.  Yes.  My question is, what did you
3  discuss with Mr. Meyer?
4      A.  When I first met with him?
5      Q.  About this case.  What did you discuss
6  with Mr. Meyer about this case?  That's the
7  question I'm asking you.
8      A.  We discussed his accident and area of
9  the accident and about my general work, what I've
10  done in Big Sky.
11     Q.  And you relied on the information that
12  he told you to provide to form your opinions in
13  this case; is that right?
14     A.  I relied on -- did I rely on the -- what
15  is the question?
16     Q.  Did you rely on things that he told you
17  to form your opinions in this case?
18     A.  I don't remember what he told me.  I was
19  the accident investigator.  I knew what I -- I kind
20  of remembered the accident.  I remember -- I
21  actually remember his accident but I do not
22  remember exact the form of the accident
23  investigation and all the pictures and what was
24  written, all the statements and the measurements
25  because we have so many.

Page 11

1      Q.  So my question is, did you rely on any
2  information that Mr. Meyer provided to you to form
3  your opinions in this case?
4      A.  On some, yes.
5      Q.  Okay.  Can you tell me what Mr. Meyer
6  told you that you have relied on to form your
7  opinions in this case?
8      A.  We -- one of the first things that we
9  did, we looked at the picture of the -- of the
10  Highway run where the Loop Road is cutting through
11  between Highway and that Bermuda Triangle and we
12  together looked at this picture where the people
13  were standing on the catwalk, on the front, Loop
14  Road.
15     Q.  Is there anything else you reviewed to
16  form your opinions in this case other than that
17  picture?
18     A.  Not that I recount.
19     Q.  Okay.  So the only thing you relied on
20  to form your opinions in this case is the picture?
21     A.  That was for sure the main thing and I
22  don't think I had any other -- any other things
23  not -- that was the picture.
24     Q.  Did you review Mr. Meyer's deposition
25  transcript?

Page 12

1      A.  No.
2      Q.  Did you review the deposition of the
3  witness Tom McMakin?
4      A.  Yesterday I heard that he was here and
5  um, I -- Breean showed me my statement from the
6  accident investigation.
7      Q.  Okay.
8      A.  What I said -- what he said.
9      Q.  So my question was, did you review
10  Mr. McMakin's deposition?
11     A.  No.
12     Q.  Do you think it's important to review
13  the deposition of the -- deposition testimony of
14  the only witness to this accident?
15     A.  Yeah, but I don't have it.
16     Q.  So you agree that would be an important
17  thing to review and you have not reviewed it,
18  correct?
19     A.  I have not reviewed it.  I don't have
20  it.
21     Q.  You received a subpoena in December
22  asking you to produce certain documents, correct?
23     A.  Correct.
24  ///
25  ///

3 (Pages 9 to 12)

EVI DIXON

Page 13

1    (Whereupon, Deposition
2         Exhibit Number 70 was
3         marked for identification.)
4    BY MR. McINTOSH:
5         Q.  I'm going to hand you what I've marked
6    as Exhibit 70.  Do you agree that Exhibit 70 is a
7    copy of the subpoena that you were served with
8    asking you to produce certain documents?
9         A.  Yeah.
10        Q.  And you were asked to produce any and
11   all documents in your possession or control
12   regarding John Meyer's ski wreck on December 11,
13   2015, including, but not limited to, all reports,
14   notes and correspondence, including e-mails or
15   texts with any current or former Big Sky employees
16   and all correspondence, including e-mails or texts,
17   with Mr. Meyer or anyone acting on his behalf; is
18   that correct?
19        A.  Regarding his accident, yes.
20        Q.  And did you comply with the subpoena?
21        A.  I didn't have any messages with John
22   Meyer about his accident.
23        Q.  You've never had any correspondence with
24   Mr. Meyer about his accident?
25        A.  During -- during the time his lawsuit is

Page 14

1    going, no.
2         Q.  The subpoena is not limited to the time
3    that his lawsuit is going, is it?
4         A.  Ski wreck, it's limited to his time of a
5    ski wreck.  I didn't know John Meyer before his ski
6    accident.
7         Q.  Well, if you didn't know him before his
8    ski accident, you didn't have any correspondence
9    with him before December 11, 2015, right?
10        A.  Yeah, I didn't have any correspondence.
11        Q.  Right.  So have you had any
12   correspondence at any time with Mr. Meyer?
13        A.  Yes.
14        Q.  And you failed to produce that in
15   response to the subpoena, didn't you?
16        A.  Because I was reading out of it that it
17   should have been regarding his ski wreck.
18        Q.  So what correspondence have you had with
19   Mr. Meyer?
20        A.  Um, he called me after he came back to
21   Big Sky.  I went there in the morning when
22   Mr. Meyer and his girlfriend, Amanda, came to the
23   cafeteria where we had our morning meeting.  I
24   shook their hands and then sometimes later on we
25   became Facebook friends and he came out to look at

Page 15

1    my knitted stuff and take some pictures of my
2    alpacas.
3         Q.  And you had correspondence with
4    Mr. Meyer about all of those things?
5         A.  On the phone.
6         Q.  Did you have any written correspondence
7    either by e-mail, text, Facebook, any method with
8    Mr. Meyer?
9         A.  Probably thanking him for the pictures
10   he took for my alpacas.
11        Q.  Anything else?
12        A.  No.
13        Q.  Okay.  Did you have correspondence with
14   Mr. Meyer on Facebook?
15        A.  I did, yeah, on Facebook or on messenger
16   probably.  Because we were Facebook friends, I
17   might have commented on something under his post.
18        Q.  And you failed to produce that
19   correspondence in response to the subpoena?
20        A.  I don't know how -- whoops, sorry.  I
21   don't know how to find these correspondences.
22        Q.  Don't you just simply look on your
23   Facebook page?
24        A.  I looked but I couldn't find anything.
25        Q.  Did you read that you can be held in

Page 16

1    contempt for failing to comply with the subpoena?
2         A.  No.
3         Q.  You failed to read that?
4         A.  Yeah.
5         Q.  What other correspondence have you had
6    with Mr. Meyer?
7         A.  What other?  So there is phone call,
8    there is text message, there is messenger on
9    Facebook.  These might be the possibilities because
10   these are my main communication message systems.
11        Q.  What text messages have you had with
12   Mr. Meyer?
13        A.  I don't know.
14        Q.  You don't even know the subjects you've
15   corresponded with Mr. Meyer about?
16        A.  Well, the main subject that we had
17   corresponded was taking pictures of my alpacas and
18   wanting some knitted hats.  I think by now I've
19   probably made three hats also for the babies.
20        Q.  What about when in November when you
21   started speaking with Mr. Meyer about acting as an
22   expert witness for him, did you have correspondence
23   with him about that?
24        A.  When to meet?  Not about the accident on
25   messenger, as far as I recall but when, what time

4  (Pages 13 to 16)

EVI DIXON

Page 17

1  we will meet.
2      Q.  Okay.  So you had correspondence with
3  Mr. Meyer about when to meet to discuss you helping
4  him with his case, correct?
5      A.  Yes.
6      Q.  And you failed to produce that in
7  response to the subpoena, correct?
8      A.  Correct.
9      Q.  Why didn't you produce correspondence in
10  response to the subpoena?
11      A.  My focus was to bring all my evidence
12  that I had from Big Sky, and being an accident
13  investigator, so I delivered my laptop to you.  I
14  couldn't even log into the Big Sky laptop anymore.
15  That's all I had.
16         And I know that I have not done anything
17  since we talked, as you as lawyer for Big Sky, you
18  told me that I can't communicate with John Meyer,
19  and when I was still working in Big Sky and I
20  never had any communication with him during my
21  employment.
22      Q.  Okay.  And I'm going to move to strike
23  the portion of the answer that was privileged
24  information.  That was not what the question asked.
25         The subpoena asked you to produce,

Page 18

1  quote, "all correspondence, including e-mails or
2  texts with Mr. Meyer or anyone acting on his
3  behalf," correct?
4      A.  Correct.  I was thinking that it was
5  doing -- you know, regarding the lawsuit.
6      Q.  Have you had any correspondence with
7  anyone other than Mr. Meyer; in other words, anyone
8  acting on his behalf?
9      A.  With his wife?
10      Q.  And you haven't produced that
11  correspondence?
12      A.  Last week.  That was last week.
13      Q.  Okay.  Any other?  Have you had
14  correspondence with anyone else acting on
15  Mr. Meyer's behalf?
16      A.  No.
17      Q.  You've never had communications with
18  Ms. Walas?
19      A.  Yesterday, yes.
20      Q.  Okay.  Have you ever had communications
21  with Nadine Nadow, another attorney that was acting
22  on Mr. Meyer's behalf?
23      A.  I heard that she was trying to be
24  John's attorney and I think I had some letter that
25  I got sent to me.  I don't recall any verbal

Page 19

1  communications with her.
2      Q.  But she sent you a letter and you failed
3  to produce that letter in response to the subpoena,
4  correct?
5      A.  That might have been after that date.
6      Q.  Well, what day was the letter?
7      A.  I don't remember.
8      Q.  And you did not object to the subpoena,
9  correct?
10      A.  No, I'm really not court savvy and I
11  really don't know when to do what.  I tried my
12  best.
13      Q.  Well, the directions are right in the
14  subpoena on the third page, right?
15      A.  The little -- I usually don't read
16  little print.
17      Q.  So if it's little you don't read it?
18      A.  Rarely.
19      Q.  Doesn't it say right there "duties in
20  responding to a subpoena"?
21      A.  It probably does but I haven't read it.
22      Q.  Okay.  You had the opportunity to read
23  it though, correct?
24      A.  Of course.
25      Q.  And you could have of course worked with

Page 20

1  an attorney, Mr. Meyer, to object if you wanted to,
2  correct?
3      A.  Correct.
4      Q.  And you failed to do so, correct?
5      A.  Correct.
6      Q.  Did you send any bills to Mr. Meyer?
7      A.  No.
8      Q.  Bills for your time?
9      A.  No.
10      Q.  How much are you charging Mr. Meyer for
11  your time in this matter?
12      A.  Um, I get about $100 an hour.
13      Q.  And how much -- how many hours have you
14  spent in this case, on this case?
15      A.  About, probably six.
16      Q.  So have you been paid $600 by Mr. Meyer?
17      A.  Yes.
18      Q.  When were you paid $600 by Mr. Meyer?
19      A.  When?
20      Q.  Yes.
21      A.  After -- after we met.
22      Q.  Did you receive any sort of fee from
23  Mr. Meyer upfront?
24      A.  Yes, he gave me $500 as a disclaimer, I
25  think he called it.

5 (Pages 17 to 20)

EVI DIXON

Page 21

1    Q.  And do you receive any additional money
2  if Mr. Meyer were to succeed or receive a
3  settlement in this case?
4    A.  If -- am I going to receive something?
5    Q.  Additional money from Mr. Meyer.
6    A.  No.
7    Q.  Do you receive any sort of bonus if
8  Mr. Meyer wins this case?
9    A.  No, I don't think so.
10    Q.  Do you have a written contract with
11  Mr. Meyer?
12    A.  I think you showed me this
13  last -- yesterday.  I have some type of written up
14  but I don't know if it's called a contract.
15    Q.  But you have a written agreement with
16  Mr. Meyer?
17    A.  Something, yeah.
18    Q.  And then you failed to produce that
19  either with your expert report or in response to
20  the subpoena, correct?
21    A.  Correct.
22    Q.  Let's talk about your background a
23  little bit.
24    Tell me where you grew up?
25    A.  In Austria.

Page 22

1    Q.  Where in Austria?
2    A.  In Vienna.
3    Q.  And please describe for me your
4  educational background.
5    A.  I have high school and then I went to
6  Vienna University.  I studied P.E. and French and
7  then I changed subject to physical therapy, kind of
8  not physical therapy.  It was called recreation
9  rehabilitation and then I got a degree in tourism.
10    Q.  Do you have a college degree in tourism?
11    A.  Yes.
12    Q.  From where?
13    A.  From the University of Vienna.
14    Q.  Do you have any formal education after
15  the University of Vienna?
16    A.  Yes, I am constantly learning and
17  educating myself.
18    Q.  And I asked if you have any formal
19  education.
20    A.  What do you mean by --
21    Q.  So in other words, did you attend any
22  other schools or universities after the University
23  of Vienna?
24    A.  Yes.
25    Q.  Where?

Page 23

1    A.  Kinesiology schools and ortho --
2  craniosacral therapy schools, conferences for
3  mindset, which took some classes in anatomy in
4  Europe.
5    Q.  What year did you graduate from the
6  University of Vienna?
7    A.  1986.
8    Q.  Do you have any degrees after the
9  University of Vienna?
10    A.  We don't have the degrees system or we
11  didn't have the degrees system as we have here.  So
12  I have certificate for the tourism management.
13    Q.  Okay.  Do you have any additional
14  certificates after the certificate you received
15  from the University of Vienna?
16    A.  Yes, for my education in being a
17  therapist and counselor.
18    Q.  What type of therapist?
19    A.  Craniosacral osteopathy, craniosacral
20  therapy, AORT -- A-O-R-T, automatic osteopathic
21  reposition techniques, kinesiology, touch for
22  health, physio kinesiology, kinesiology against
23  allergies in a child work.  Anything else?  I can
24  keep going.
25    Q.  So it's your testimony under oath that

Page 24

1  you have a degree for every single one of those
2  things you just listed or a --
3    A.  No, certificate.
4    Q.  -- certificate for every one of those
5  things you just listed?
6    You need to let me finish.
7    A.  Yeah, sorry.  I'm sorry.
8    Q.  It's your testimony that you have a
9  certificate for every one of those things that you
10  just listed?
11    A.  Yes, I got it.
12    Q.  And what are those?  All those different
13  things.  For example, you started out talking about
14  craniosacral therapy, can you just explain what
15  that is?
16    A.  It's a method that helps people release
17  stress and gives, you know -- how should I -- I
18  don't know if I should tell you -- talk about
19  craniosacral therapy.  It's a method to help people
20  to feel better.
21    Q.  But what do you do?
22    A.  I work with my hands.
23    Q.  Do you like give them a scalp massage?
24    A.  It's not a massage.
25    Q.  Is it similar to a scalp massage?

6  (Pages 21 to 24)

EVI DIXON

Page 25

1 　　A. I hold -- yes, it's similar to Reiki but
2 it's not Reiki at all.
3 　　Q. And those other certificates that you
4 talked about, are they all just manipulating
5 different parts of the body?
6 　　A. No, it's not about manipulating.
7 　　Q. What is it then?
8 　　A. It's about helping the body release what
9 is blocking the central nervous system.
10 　　Q. So all those certificates you said you
11 had are all about helping release the body or
12 helping the body release the central nervous
13 system; is that right?
14 　　A. The ones that apply for the craniosacral
15 part, yes.
16 　　Q. And how do you do that? Specifically,
17 how do you help someone with your craniosacral
18 therapy?
19 　　A. I use my hands.
20 　　Q. On what?
21 　　A. On the body.
22 　　Q. What part of the body?
23 　　A. Any part of the body, mainly the
24 craniosacral system is the main system is the skull
25 and the spinal cord down to the sacrum, but then

Page 26

1 the -- I'm working with the rhythm of those
2 cerebral spinal fluid and it gets spread out
3 throughout the body so I can work even with the
4 little toe or with the knee or with the pelvis and
5 wherever my intention goes.
6 　　Q. I'm sorry, were you done?
7 　　A. Yes.
8 　　Q. What is the difference between what you
9 do and a scalp massage?
10 　　A. It's non-manipulative.
11 　　Q. What you do is non-manipulative?
12 　　A. Uh-huh.
13 　　Q. Is that a yes?
14 　　A. Yes.
15 　　Q. The other thing is you have to answer
16 out loud today.
17 　　A. Yes.
18 　　Q. What do you mean that what you do is
19 non-manipulative?
20 　　A. Because the system -- what we say the
21 craniosacral therapy is the most non-manipulative
22 method because it's not something that I do. I am
23 just following what's happening in the body and
24 that's how the body says ah, something, somebody is
25 holding my pain or my stress and all the cells I

Page 27

1 can finally release it, and so nothing that I do
2 will release stress in the body. It is just what
3 the patient's body is ready to let go.
4 　　Q. Do you -- when you're giving someone a
5 craniosacral treatment, do you rub their head with
6 your hands?
7 　　A. No.
8 　　Q. What do you do with your hands? Do you
9 touch their body?
10 　　A. Yes.
11 　　Q. So what do you do?
12 　　A. I just put my hands very, very slightly
13 on either the skull or on the occiput, on the back
14 of the skull, or I touch the chest or down at the
15 sacrum or the feet.
16 　　Q. And what do you do when you touch them?
17 　　A. I feel into the system and look for the
18 rhythm of the cranio -- of the cerebral spinal
19 fluid and watch the different body systems;
20 muscles, tendons, fluid, bones are doing
21 rhythm-wise.
22 　　Q. And to be clear, these are not medical
23 degrees you have, correct?
24 　　A. Correct.
25 　　Q. And you're not a chiropractor?

Page 28

1 　　A. Correct.
2 　　Q. Do you have any sort of license from the
3 state of Montana?
4 　　A. No.
5 　　Q. Where are all these certificates that
6 you listed, where are they from?
7 　　A. From the different teachers or
8 instructors.
9 　　Q. And are these just things that you
10 received online?
11 　　A. No.
12 　　Q. Where did you receive them from then?
13 　　A. From them, from the different
14 instructors.
15 　　Q. So you went and took different classes
16 for each one of those things that you listed?
17 　　A. Yes.
18 　　Q. Do you have actual certificates?
19 　　A. I have some, but with all the moving
20 that I did, I had to reduce a lot of stuff so I
21 don't have them all anymore.
22 　　Q. And are any of these practices that
23 you talked about, the craniosacral therapy and
24 the other things, are any of them licensed by
25 any -- any board that licenses health care provided

7 (Pages 25 to 28)

EVI DIXON

Page 29

1  to people in the United States?
2      A.  Um, I don't know.
3      Q.  So do you know if any board or
4  government agency recognizes any of these things
5  you do as being health care?
6      A.  I don't know.
7      Q.  Have you received any formal education
8  in the United States?
9      A.  My EMT.
10     Q.  Anything else?
11     A.  No.
12     Q.  Do you still have an EMT?
13     A.  Yeah.
14     Q.  What did you do to obtain an EMT?
15     A.  I first became a first responder by
16  doing -- taking classes with Steve Emerson and then
17  I upgraded to the EMT by repeating the whole cycle
18  again with Steve Emerson and Seth Barker.
19     Q.  Are you a United States citizen?
20     A.  No.
21     Q.  Do you have a green card?
22     A.  Yes.
23     Q.  When did you obtain a green card?
24     A.  I got the green card the first time I
25  came to the United States in -- so that was in '86.

Page 30

1  But I received a green card in '88 after I got
2  married for the first time and then I moved back to
3  Austria and relinquished my card.  And then when I
4  moved back in 2004, I requested my green card back.
5      Q.  Who was your first marriage to?
6      A.  Jim Sitton.
7      Q.  Can you spell the last name, please?
8      A.  S-I-T-T-O-N.
9      Q.  And did you have any children with
10  Mr. Sitton?
11     A.  Yes.
12     Q.  And what are the names of the children?
13     A.  Nikolas, N-I-K-O-L-A-S Sitton and
14  Marlene, M-A-R-L-E-N-E Sitton.
15     Q.  And do Nikolas and Marlene Sitton live
16  in Montana?
17     A.  They do.
18     Q.  Where do they live?
19     A.  Well, my daughter's residence is at my
20  house but she, right now, is in Arizona.
21     Q.  Is she returning to Montana?
22     A.  Yes.
23     Q.  When?
24     A.  Probably in April.
25     Q.  And what about Nikolas, where does he

Page 31

1  live?
2      A.  He lives with me.
3      Q.  So both of your children live with you?
4      A.  Well, at their address is with me.  My
5  son lives definitely with me.  He lives in my
6  house.
7      Q.  Okay.  So I guess I don't understand.
8  You said -- you said both of them have their
9  addresses with you, does that mean they live with
10  you or not?
11     A.  My son lives with me and my daughter is
12  out in Arizona traveling and so she needed -- she
13  needs an address and that's my home address.
14     Q.  And what are the ages of your children?
15     A.  29 and 31.  Nikolas is 31 and Marlene is
16  29.
17     Q.  Have you ever been charged with a crime?
18     A.  No.
19     Q.  Have you ever been arrested?
20     A.  No.
21     Q.  Are you a member of any organizations?
22     A.  No.
23     Q.  Do you hold any state licenses?
24     A.  My driver's license and my EMT license.
25     Q.  I'd like to talk about your background

Page 32

1  in the ski industry.
2          Before you started working as a ski
3  patroller for Big Sky, have you -- first of all,
4  have you ever worked at any ski area in the United
5  States other than Big Sky?
6      A.  No.
7      Q.  Have you ever worked at any ski area
8  anywhere in the world other than working at Big
9  Sky?
10     A.  Yes.
11     Q.  Where else?
12     A.  In Austria.
13     Q.  What did you do for a ski area in
14  Austria?
15     A.  I was working as a ski instructor and in
16  the summertime I was working in a ski area but they
17  didn't ski there, as a waitress for a friend of
18  mine.
19     Q.  Obviously your work as a waitress
20  doesn't have anything to do with your opinions in
21  this case, does it?
22     A.  No.
23     Q.  Where did you work as a ski instructor
24  in Austria?
25     A.  My most years were in Konigsleiten.  Do

8  (Pages 29 to 32)

EVI DIXON

Page 33

1    I need to spell it?
2        Q.  What years did you work as a ski
3    instructor in Austria?
4        A.  So I graduated from high school in 1976
5    and then I started to go to a university.  And
6    this would be college year I guess.  And in one
7    of my first winter vacations after I started
8    going -- after I started with my sports study, I
9    became a ski instructor.  I worked as a ski
10   instructor in Maria Alm for like two weeks in
11   December over the Christmas breaks and then in
12   February over the semester breaks and the Easter
13   breaks.  So we have longer -- we have like three
14   weeks Easter and one month semester and two weeks
15   over Christmas and that pretty much continued every
16   winter till I decided -- after my tourism degree, I
17   decided to do two full seasons in Austria.  I was
18   in Konigsleiten and that's when I met Toni
19   Sendlhofer.  I actually met him in the spring I
20   think.  Toni Sendlhofer, because he wanted to hire
21   me to come to Michigan to teach skiing in Boeing
22   Mountain and I never ended up there because I
23   never got his contract and so I ended up in Big Sky
24   and was teaching there in the season '86/'87,
25   '88 -- '87/'88.

Page 34

1        Q.  How many years did you work total or how
2    many ski seasons did you work total in Austria as a
3    ski instructor?
4        A.  How many full seasons, two.  But during
5    vacation time of my college, eight.
6        Q.  And you agree, don't you, that ski
7    patrollers, not ski instructors, place warnings and
8    signs on the ski mountain, correct?
9        A.  That's ski patrollers.
10       Q.  That's what I said.
11       A.  Yes.
12       Q.  So when you were working as a ski
13   instructor, part of your job was not to make
14   warning or put warnings up on the mountain,
15   correct?
16       A.  Correct.
17       Q.  That's not what ski instructors do,
18   right?
19       A.  No.
20       Q.  That's going to look bad on the
21   transcript later on.
22           Do ski instructors place warnings and
23   hazard signs on the mountain?
24       A.  No.
25       Q.  And you said you've never worked as a

Page 35

1    ski patroller at anyplace other than Big Sky,
2    correct?
3        A.  Correct.
4        Q.  So you don't know how ski
5    instructors -- excuse me, strike that.
6           So you do not know how ski patrollers at
7    resorts other than Big Sky determine when and where
8    to mark hazards, correct?
9        A.  I do not know that.
10       Q.  So you're not familiar with the industry
11   standards, correct?
12       A.  That is -- I don't know if I can say
13   correct because isn't Big Sky industry standard?
14       Q.  You don't know one way or the other, do
15   you?
16       A.  I don't know what to answer now.  Sorry.
17       Q.  Well, does Big Sky mark hazards and
18   place warnings like other ski resorts in the
19   industry or do they do it differently?
20       A.  I would say they do it the same way as
21   other ski areas in the industry.
22       Q.  And what is that based on?  What is that
23   answer based on?
24       A.  Based on people that come from exchange.
25   Ski patrollers, we do exchanges.  I went on one

Page 36

1    exchange to Steamboat.  We had talks during our
2    refresher where, for example, Mary Bozak or you
3    showed pictures of other ski areas and I saw fences
4    and trail merger signs and pretty similar to what
5    we do.
6        Q.  Well, to be clear, it's untrue that I've
7    ever showed you pictures of any other ski resort,
8    isn't it?
9        A.  It is untrue that -- you showed pictures
10   of other ski areas, I believe.
11       Q.  That's your testimony under oath, that I
12   showed you pictures of other ski areas?
13       A.  Well, probably not you, Mary did.  Mary
14   showed us pictures of other ski areas.
15       Q.  And again, move to strike the privileged
16   information.
17           Did Big Sky ever give you authority to
18   disclose privileged information that you received
19   as part of your job?
20       A.  Did Big Sky give me authority?  Didn't
21   or did give me authority, no.
22       Q.  They did not, did they?
23       A.  No.
24       Q.  And you know that the information
25   provided to you as part of your job is privileged

9  (Pages 33 to 36)

Page 37

1    under the attorney-client privilege, right?  You
2    were told that on a yearly basis?
3        A.  Yes.
4        Q.  And despite that, you're providing that
5    privileged, private information to Mr. Meyer and
6    his counsel, correct?
7        A.  Not during my employment.
8        Q.  So you think that after your employment
9    it just ends and you can talk about anything you
10   learned?
11       A.  I didn't talk about anything I learned.
12       Q.  You grew up skiing in Europe; is that
13   correct?
14       A.  That's correct, I grew up in Europe.
15       Q.  In Austria, specifically you grew up
16   skiing, correct?
17       A.  Yeah, that's where I started to learn
18   skiing.
19       Q.  And in Austria there are very few
20   hazards marked at ski areas; isn't that true?
21       A.  During my time as a kid and then as a
22   ski instructor there was -- yeah, there was less
23   marking in Austria than here.
24       Q.  In fact, there's no marking in Austria
25   on off-piste, correct?

Page 38

1        A.  There are avalanche danger signs
2    off-piste when it's an avalanche hill.
3        Q.  And that's it, right?
4        A.  As far as I recollect, yeah.
5        Q.  What does off-piste mean?
6        A.  Um, it's a slope that is not groomed,
7    um, that is never groomed, maybe not marked in
8    Austria, marked with these green -- green and
9    yellow or green and red balloons-types signs,
10   bubbles.
11       Q.  The Highway ski run at Big Sky resort is
12   off-piste, correct?
13       A.  I wouldn't call that off-piste.
14       Q.  You think that the Highway ski run at
15   Big Sky is on piste?
16       A.  Well, if piste -- if we weren't -- if I
17   use the word piste as a German word, then it is
18   off-piste.  Because a piste in German is more like
19   a groomed run.
20       Q.  Highway is never groomed, is it?
21       A.  No.
22       Q.  Isn't it true that where you grew up
23   skiers are expected to ski in control and take
24   personal responsibility?
25       A.  I believe that everybody should take

Page 39

1    responsibility.
2        Q.  And do you think that skiers in Montana
3    do not have to take personal responsibility?
4        A.  No.  No, I don't think that.
5        Q.  So you agree skiers in Montana need to
6    take responsibility for their actions?
7        A.  Yes.
8        Q.  And do you agree that skiers in Montana
9    need to ski in control?
10       A.  They should.
11       Q.  Well, they have an obligation to do so,
12   don't they?
13       A.  They do.
14       Q.  And what does it mean to ski in control
15   to you?
16       A.  To not ski faster than your own ability,
17   to be able to stop, and be able to avoid people or
18   trees.
19       Q.  Obstacles, correct?
20       A.  Yeah.
21       Q.  So you have an obligation in Montana to
22   ski within your abilities and so that you can stop
23   to avoid obstacles or people, correct?
24       A.  Correct.
25       Q.  And Mr. Meyer failed to ski in control

Page 40

1    in this case, didn't he?
2        A.  I don't know.
3        Q.  You've never looked into that?
4        A.  I didn't see him ski.
5        Q.  Well, have you done any investigation
6    into how he was skiing that day?
7        A.  We -- we've done the investigation of
8    the area where he came down and where he fell into
9    the Bermuda Triangle.
10       Q.  Mr. Meyer hit an obstacle, correct?
11       A.  Where he landed he hit the trunk.
12       Q.  He hit an obstacle that caused him to
13   wreck, correct?
14       A.  That could be the case, but it could be
15   not the case.
16       Q.  Well, what does the evidence in this
17   case establish?
18       A.  That he came down Highway and then he
19   hit the -- I think that he hit the Loop Road and
20   then he flew somehow because there's -- I don't
21   know, the witness, what he said.  I didn't see it.
22   He landed in with his head on the tree trunk.
23       Q.  How fast did the witness, Tom McMakin,
24   say Mr. Meyer was skiing down the Highway ski run?
25       A.  He was saying that he was bombing.  Was

EVI DIXON

Page 41

1  that the word, "bombing down"?
2  **Q.  Okay.  So you're aware that Mr. McMakin**
3  **testified that John Meyer was bombing down the**
4  **Highway run?**
5  A.  Yeah.  Breean told me that yesterday.
6  **Q.  And is that significant to you?**
7  A.  I don't understand the word "bombing."
8  But according to what Ms. Breean told me, bombing
9  in -- means that he skied in control.  I don't
10  know.  Bombing doesn't really bring the word in my
11  vocabulary.  I've never used the word "bombing."
12  **Q.  So when a witness testifies that a skier**
13  **is bombing a run and skiing very fast, you don't**
14  **know what that means?**
15  A.  No, I don't really know what it means.
16  **Q.  You don't know what the term "very fast"**
17  **means?**
18  A.  Very fast I know.
19  **Q.  And the witness, Tom McMakin, testified**
20  **that Mr. Meyer was skiing very fast and bombing the**
21  **run, didn't he?**
22  A.  Did he say "very fast"?
23  **Q.  You don't know one way or the other?**
24  A.  He was bombing down the run.
25  **Q.  And Ms. Walas told you that?**

Page 42

1  A.  Yeah.
2  **Q.  And it's your testimony that you don't**
3  **know what that means?**
4  A.  I said that the word "bombing" was never
5  in my vocabulary and I had to ask her what that
6  actually means and skiing in control was the
7  answer.
8  **Q.  So did Ms. Walas tell you that**
9  **Mr. McMakin testified that John Meyer was skiing**
10  **very fast?**
11  A.  I don't remember exact wording, how we
12  talked together.
13  **Q.  Has anyone told you that Mr. Meyer was**
14  **skiing very fast down the Highway run?**
15  A.  Actually, Mr. Meyer himself was saying
16  that he said in his deposition that he was skiing
17  fast.
18  **Q.  That wasn't my question.  My question**
19  **was, has anyone told you that Mr. Meyer was skiing**
20  **very fast?**
21  A.  Um, I am not sure about the word "very."
22  **Q.  Were you told that Amanda Eggert**
23  **testified that Mr. Meyer was skiing fast down the**
24  **Highway run?**
25  A.  She was saying that he was skiing fast

Page 43

1  but that she also didn't see the accident because
2  she was looking for her ski.
3  **Q.  Did you review her deposition testimony?**
4  A.  We talked.
5  **Q.  You talked to Ms. Eggert?**
6  A.  Uh-huh.
7  **Q.  Is that a yes?**
8  A.  Yes.
9  **Q.  And did you rely on what Ms. Eggert told**
10  **you to form your opinions in this case?**
11  A.  That was after we wrote the affidavit.
12  **Q.  Okay.  So you didn't rely on anything**
13  **that Ms. Eggert told you to form your opinions in**
14  **this case?**
15  A.  No.
16  **Q.  Do you agree that Mr. Meyer's speed as**
17  **he was skiing down the Highway run is relevant to**
18  **the cause of his accident?**
19  A.  Yes.
20  **Q.  Do you agree that Mr. Meyer has an**
21  **obligation to ski in control of his speed?**
22  A.  Yes.
23  **Q.  Do you agree that variations and**
24  **steepness in terrain are an inherent danger and**
25  **risk of skiing?**

Page 44

1  A.  Are an inherent danger, yes.
2  **Q.  Do you agree that catwalks are an**
3  **inherent danger and risk of skiing?**
4  A.  Yes.
5  **Q.  Do you agree that roads are an inherent**
6  **danger and risk of skiing?**
7  A.  Yes.
8  **Q.  Do you agree that the failure of a skier**
9  **to ski within the skier's ability is an inherent**
10  **danger and risk of skiing?**
11  A.  Yes.
12  **Q.  Do you agree that a skier has a duty to**
13  **ski at all times in a manner that avoids injury to**
14  **the skier and others?**
15  A.  Yes.
16  **Q.  Do you agree that a skier has a duty to**
17  **be aware of the inherent dangers and risks of**
18  **skiing?**
19  A.  Yes.
20  **Q.  Do you agree that a skier has an**
21  **obligation to ski safely within the limits of his**
22  **ability and his equipment so as to negotiate any**
23  **section of terrain or ski slope and trail safely**
24  **and without injury?**
25  A.  Yes.

11 (Pages 41 to 44)

EVI DIXON

Page 45

1    Q.  Do you agree a skier has an obligation
2  to maintain control of speed and course so as to
3  prevent injury to the skier or others?
4    A.  Yes.
5    Q.  Do you agree that Mr. Meyer failed to
6  ski within control of his course and speed so as to
7  prevent injury to himself?
8    A.  Yes.
9    Q.  Do you agree that Mr. Meyer's ski wreck
10  was caused by a variation of steepness or terrain?
11    A.  Yes.
12    Q.  Do you agree that Mr. Meyer's speed
13  contributed to the severity of his injury?
14    A.  No.
15    Q.  You do not think that Mr. Meyer's speed
16  contributed to the severity of his injury?
17    A.  That is now really difficult to say
18  because if we -- I don't know, physically probably
19  the faster you hit or hit a tree trunk, the faster
20  you must have gone before that.  So I would say the
21  answer is the opposite that I said before.
22    Q.  Okay.  So you do agree that Mr. Meyer's
23  speed contributed --
24    A.  Yeah.
25    Q.  -- to the severity of his injury?

Page 46

1    A.  Yes.
2    Q.  Do you agree that Big Sky cannot control
3  how fast Mr. Meyer chooses to ski?
4    A.  No, Big Sky can't control it.
5    Q.  So how do you believe that Mr. Meyer's
6  ski wreck occurred?  And give this -- I want you to
7  give this to me in as much detail as you can.
8    A.  How do I believe?
9    Q.  Yes.
10    A.  I believe he came down Highway skiing in
11  control, but fast, and he did not see the Loop Road
12  and went over the Loop Road and then -- the outer
13  edge of the Loop Road and probably flipped.
14  Because the way how he was ended -- how he ended up
15  on that piece of log, he must have flipped somehow
16  because he landed on his back with his head uphill
17  as far as I recall.
18    Q.  So you believe that Mr. Meyer didn't see
19  the Loop Road as he was skiing down Highway?
20    A.  I believe so.
21    Q.  The Loop Road was obvious to anyone
22  skiing down Highway, wasn't it?
23    A.  According to the photos, yes.
24    Q.  Okay.  So you agree that the photos of
25  the Highway run looking down the run at the Loop

Page 47

1  Road is obvious?
2    A.  According to the photos, yes.
3    Q.  Well, if the Loop Road is obvious in the
4  photos, how is it that you contend Mr. Meyer did
5  not see the Loop Road as he was skiing down the
6  Highway ski run?
7    A.  Because that's how a lot of accidents
8  happen, that you don't see that there is a change
9  in terrain and then all of the sudden you flip.  It
10  happened to me too.
11    Q.  I want to show you what has been
12  previously marked as Exhibit 25.  Please review
13  that document and let me know when you are done
14  reviewing it.
15    A.  Yeah, I know this picture.
16    Q.  You're familiar with Exhibit 25?
17    A.  Yes.
18    Q.  And that's the same as -- the same
19  picture as what you attached to your affidavit as
20  Exhibit A, correct?
21    A.  Yes.
22    Q.  And you agree that this is a photograph
23  of the Highway run looking down toward the Loop
24  Road, correct?
25    A.  Correct.

Page 48

1    Q.  How far up on the Highway ski run was
2  this photograph taken or, in other words, how far
3  is it from the Loop Road to where this photograph
4  was taken?
5    A.  I can't measure that.  It's hard to
6  measure but it's several, probably, hundred meters,
7  150 meters for sure.
8    Q.  Certainly from where this photograph is
9  taken, there's plenty of time for a skier to stop
10  before coming to the Loop Road, correct?
11    A.  Correct.
12    Q.  And the Loop Road is obvious in this
13  photograph, correct?
14    A.  Correct.
15    Q.  So how do you contend that a skier
16  skiing down Highway would not be able to see this
17  road?
18    A.  If he looked he probably saw the road.
19  Skiing, you don't look that far ahead.
20    Q.  Okay.  So you agree that if Mr. Meyer
21  would have looked downhill, the road would have
22  been obvious?
23    A.  Yes.
24    Q.  But you contend -- I just want to
25  understand what your opinion is.  You believe that

12 (Pages 45 to 48)

Page 49

1  he didn't see the road because he was not looking
2  downhill?
3       A.  Well, he obviously was looking downhill
4  because every skier skiing downhill looks downhill.
5  That doesn't mean looking is not seeing.
6       Q.  What does that mean?  I don't
7  understand.
8       A.  That if you look at something, I look at
9  Mr. Mark but I don't really see the picture behind
10  him.  Looking is not seeing, in my opinion.
11      Q.  So I'm struggling to understand your
12  answer there.  Do you believe that as Mr. Meyer was
13  skiing down the Highway run he saw the Loop Road?
14      A.  He looked down in the direction he was
15  skiing obviously because that's how skiers -- they
16  don't go ski like this (indicating).
17      Q.  Right.  As you're skiing you look ahead
18  of you, correct?
19      A.  Right, correct.
20      Q.  And as you're skiing the Highway run
21  you're skiing downhill, correct?
22      A.  Correct.
23      Q.  And if you're looking downhill as you
24  ski the Highway run, you can see the Loop Road,
25  correct?

Page 50

1       A.  You could.
2       Q.  So it's -- there's nothing preventing
3  you from looking and seeing it, correct?
4       A.  No, it depends on your mind I think if
5  you see.
6       Q.  Okay.  So doesn't Mr. Meyer as a skier
7  have an obligation to look and see what is in front
8  of him?
9       A.  Yes.
10      Q.  And if Mr. Meyer was fulfilling that
11  obligation on December 11th, he would have seen the
12  Loop Road, correct?
13      A.  He could have seen the Loop Road.
14      Q.  If he chose to look, right?
15      A.  If he chose to directly look or see the
16  Loop Road, correct.
17      Q.  Okay.  So is it your testimony though
18  that even though the Loop Road was obvious to
19  anyone skiing down the Highway run, is it your
20  testimony that Mr. Meyer didn't see it?
21      A.  Yes.
22      Q.  And why do you say that?
23      A.  Because I think if he would have seen
24  the Loop Road, we might have not had an accident
25  there.

Page 51

1       Q.  Do you agree that if a skier sees a cat
2  track in front of him or her, the skier has an
3  obligation to slow down before the cat track?
4       A.  Yes.
5       Q.  Do you agree that if a skier hits
6  something that the skier fails to see in front of
7  him, it is the skier's responsibility?
8       A.  Yes.
9       Q.  So, for example, if I'm skiing down the
10  run and there's a tree right in front of me but I'm
11  looking over to the side instead of looking at the
12  tree and then I hit the tree, that's my fault,
13  right?
14      A.  Yes.
15      Q.  So a skier has an obligation not to run
16  into plainly obvious obstacles, correct?
17      A.  Correct.
18      Q.  Did Mr. Meyer tell you that he could not
19  remember this incident for several months after it
20  occurred?
21      A.  I think he was in the coma for a few
22  weeks.  I don't know, maybe months or weeks, I have
23  no idea.  So of course he doesn't remember that
24  time.
25      Q.  And then did he tell you that even after

Page 52

1  he came out of the coma, he couldn't remember this
2  incident for some period of time?
3       A.  I don't recall that, that he -- that he
4  did -- that he told me that he doesn't remember, I
5  don't.
6       Q.  So you don't know whether there was a
7  gap in Mr. Meyer's memory or not?
8       A.  I don't recall any of the conversation
9  about memory or if he remembers or not.
10      Q.  Do you believe Mr. Meyer wrecked on
11  the -- on December 11, 2015 because of the
12  transition from the Highway onto the Loop Road or
13  because of the transition from the Loop Road into
14  the Bermuda Triangle area or something else?
15      A.  So when we discussed this photo --
16      Q.  And you're referring to Exhibit 25?
17      A.  Yes.
18      Q.  Okay.
19      A.  -- it looked like there was this drop
20  down between the Highway and the Loop Road
21  according to these people standing there, and you
22  can't see their legs.
23          Yesterday I looked at a different photo
24  and there was actually no transition, as I assume
25  when I wrote the affidavit.  And so possibly, it

13 (Pages 49 to 52)

EVI DIXON

Page 53

1  was that the outer edge that -- that caused this
2  accident --
3       Q.  The downhill?
4       A.  -- but I don't know.
5       Q.  Sorry, excuse me.  I'm sorry for
6  interrupting.
7       So just to clarify, you said in your
8  affidavit that there was an abrupt and significant
9  transition from Highway onto the Loop Road,
10  correct?
11      A.  Correct.
12      Q.  And you now -- now that you've reviewed
13  other photographs, you admit that that portion of
14  your affidavit is incorrect; is that right?
15      A.  That is true, yes.
16      Q.  Okay.  So you agree that there was not a
17  steep transition from Highway onto the Loop Road,
18  right?
19      A.  If we can certain -- if we can be
20  certain where he came down on that photo that I saw
21  yesterday, and he came down -- and if he came down
22  that way, then there was no road cut.
23      Q.  And what do you -- when you say there's
24  no road cut, you mean there's not a drop-off,
25  there's not a steep transition, correct?

Page 54

1       A.  Correct.
2       Q.  Okay.  Do you believe Mr. Meyer was
3  trying to jump off the downhill edge of the cat
4  track?
5       A.  Knowing Mr. Meyer now, I don't think he
6  is a jumper.
7       Q.  So is that no?
8       A.  No.
9       Q.  Did you know Mr. Meyer as of December
10  11, 2015?
11      A.  No.
12      Q.  So you didn't know what he was like on
13  that day, right?
14      A.  No, I didn't.
15      Q.  And he was skiing with his girlfriend at
16  the time, correct?
17      A.  Correct.
18      Q.  Do you believe he was trying to ski fast
19  to show off to her?
20      A.  I don't know if he wants to show off to
21  his girlfriend.
22      Q.  Are you aware that the witness,
23  Mr. McMakin, testified that Mr. Meyer -- it
24  appeared that Mr. Meyer was trying to jump off the
25  downhill edge of the cat track?

Page 55

1       A.  He said he was trying to jump off?  I
2  don't know.
3       Q.  You don't know one way or the other?
4       A.  No.
5       Q.  Whose witness testimony -- whose
6  testimony do you believe is more reliable, the
7  witness, Mr. McMakin, or Mr. Meyer?
8       A.  What's the question?  Who's -- who is
9  more reliable?
10      Q.  Correct.  Who has a more reliable
11  account of what happened here, Mr. Meyer who
12  couldn't remember the incident for months or
13  Mr. McMakin who witnessed the incident and has no
14  financial incentive in this case from ten feet
15  away?
16      A.  I don't know how much McMakin was paying
17  attention to skiers coming down since they were not
18  related I think.  They were not there together.  So
19  I don't know how exact his witness statement could
20  be.
21      Q.  Well, are you aware he testified that he
22  was watching Mr. Meyer ski down the run and ski
23  onto the Loop Road?
24      A.  I don't recall that he was -- how long
25  he was watching Mr. Meyer come down.  I thought he

Page 56

1  was just seeing the accident.  He was the first one
2  there.
3       Q.  Do you agree that if Mr. Meyer was
4  trying to jump off the downhill edge of the Loop
5  Road, that he is responsible for his injuries?
6       A.  If he intended to jump down the edge of
7  the Loop Road to the Bermuda Triangle, yes.
8       Q.  So just so we're clear, so if he was
9  trying to jump off the downhill edge of the Loop
10  Road, you agree that he's responsible for his
11  injuries?
12      A.  Yes.
13      Q.  Okay.  And can you think of -- other
14  than Mr. Meyer wanting to jump off the downhill
15  edge of the Loop Road, can you think of any reason
16  why he would not slow down as he approached the
17  Loop Road?
18      A.  The reason that he didn't see the Loop
19  Road.
20      Q.  Well, is it your testimony that he
21  didn't see it?
22      A.  You asked me of any other reason --
23      Q.  Okay.
24      A.  -- why he would and I said the other
25  reason could be that he did not see the Loop Road.

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

EVI DIXON

Page 57

1      Q.  Understand.  I understand your
2  testimony.  Thank you.  Thank you for clarifying.
3      A.  Uh-huh.
4      Q.  Okay.  So the only reasons that
5  Mr. Meyer would not -- at least in your opinion,
6  would not have slowed down as he approached the
7  Loop Road on December 11, 2015, were that either he
8  wanted to jump off the downhill edge or two, he
9  didn't see the Loop Road; is that right?
10      A.  Yes.
11      Q.  Okay.  And you agree if he had been
12  looking ahead, he certainly could have seen the
13  Loop Road, right?
14      A.  Yes.
15      Q.  Let's talk about your training as a ski
16  patroller at Big Sky.  First of all --
17      MS. WALAS:  Ian, can with take a break before
18  we switch to this next subject?
19      MR. McINTOSH:  Of course.
20      MS. WALAS:  Thank you.
21      MR. McINTOSH:  Yeah, no problem.  We can go
22  off the record.
23      VIDEO TECHNICIAN:  This ends Disc Number 1.
24  We're off the record.  The time is 10:06.
25  ///

Page 58

1      (Whereupon, a brief
2          recess was taken.)
3      VIDEO TECHNICIAN:  This is the start of Disc
4  Number 2.  We're back on the record.  The time is
5  10:11.
6  BY MR. McINTOSH:
7      Q.  Ms. Dixon, we're back on the record.
8  You understand you're still understand oath,
9  correct?
10      A.  Correct.
11      Q.  Okay.  You know, at one point when we
12  were talking earlier today you said that -- you
13  said something about yes, it happened to me too, do
14  you remember saying that?
15      A.  Yes.
16      Q.  What were you referring to?
17      A.  That I think that I didn't see the
18  catwalk and flew over it.
19      Q.  This particular --
20      A.  No.
21      Q.  -- cat?
22      A.  No.
23      Q.  Okay.  So was this at Big Sky?
24      A.  No.
25      Q.  Where was it?

Page 59

1      A.  In Austria.
2      Q.  Okay.  So at some point in Austria you
3  were skiing down a run, didn't see a cat track, and
4  wrecked; is that right?
5      A.  Yeah.
6      Q.  Can you describe what happened in any
7  more detail?
8      A.  What happened to me?
9      Q.  Yes.
10      A.  I was bruised a little bit -- or not
11  bruised, sore, sore.  It's a long time ago.
12      Q.  Okay.
13      A.  I have no -- no injury from that or.
14      Q.  And did you accept responsibility for
15  that wreck?
16      A.  Yes.
17      Q.  You agree that was your fault?
18      A.  Yes.
19      Q.  Because you could have seen the cat
20  track but you didn't?
21      A.  I didn't see the cat track.  In Austria
22  you don't go out and blame ski areas or.
23      Q.  You take responsibility for your
24  actions, right?
25      A.  Uh-huh.

Page 60

1      Q.  Is that a yes?
2      A.  Yes.
3      Q.  Let's talk about your training as a ski
4  patroller.  First of all, you talked earlier about
5  you were married to -- I'm sorry, I forget his
6  name -- Mr. Sitton?
7      A.  Oh, yeah.  Jim Sitton.
8      Q.  Jim Sitton.  How long were you married
9  to Mr. Sitton?
10      A.  From '88 to '92 -- '94.
11      Q.  And have you been married a second time?
12      A.  Yes.
13      Q.  To who?
14      A.  To Bob Dixon.
15      Q.  And when were you and Bob Dixon married?
16      A.  In September 2005.
17      Q.  When did you start your relationship
18  with Bob Dixon?
19      A.  In February.
20      Q.  Of what year?
21      A.  2005.
22      Q.  Were you already working as a ski
23  patroller at Big Sky?
24      A.  No.
25      Q.  Okay.  How did you and Mr. Dixon meet?

EVI DIXON

Page 61

1    A.  Skiing.
2    Q.  At Big Sky?
3    A.  Yes.  So I knew Mr. Dixon from seeing
4  ski patrollers and the members when I was working
5  as a ski instructor in Big Sky.
6    Q.  Back in the '80s?
7    A.  Back in the '80s, early '90s.
8    Q.  Okay.
9    A.  And then when I came from Austria in
10  2004, I did not have my green card yet.  So that
11  winter of 2004/2005 I was skiing a lot and do you
12  want to know our romance story?
13    Q.  I want to know how the two of you met.
14  So if you consider that to be a romance story, I
15  guess so.
16    A.  Yeah.  And one of the former ski
17  patrollers said I should talk to Bob about tickets
18  and I didn't because I didn't want to beg for
19  tickets and I didn't know him that well.  But
20  he gave me tickets, somebody, somehow.  I don't
21  know, maybe it was his idea.  He gave me tickets
22  and so I wanted to thank him for that and we skied
23  a few runs together here and there.
24    Q.  And then you started dating?
25    A.  And then eventually we started dating.

Page 62

1    Q.  And when did you first get hired as a
2  ski patroller at Big Sky?
3    A.  2006.
4    Q.  Was it -- would it be the -- wait, what
5  time in 2006?
6    A.  No, we got married in 2005.  I'm not
7  sure, but I always thought that my first ski patrol
8  year was 2006.
9    Q.  But like the 2005/2006 season or
10  2006/2007 season?
11    A.  So I got my green card in the summer of
12  2005 before I married Bob.  So Bob was not my green
13  card maker.  And then I worked that winter in the
14  ski school behind the ski school desk.  So that was
15  2005/2006.  And then the next winter, in 2006 to
16  2007 I started as a ski patroller.
17    Q.  Okay.  Did Bob get you that job then as
18  a ski patroller?
19    A.  Yeah, he's my boss.
20    Q.  And are you and Bob Dixon still married?
21    A.  No.
22    Q.  When were you divorced?
23    A.  October of 2019, 15th of October.
24    Q.  And were you separated before you were
25  divorced?

Page 63

1    A.  Yeah, he's moved out 2015, lives in
2  Bozeman.  I live in Manhattan.
3    Q.  When in 2015 did Mr. Dixon move out?
4    A.  In June.
5    Q.  And did your separation have anything to
6  do with your work at Big Sky?
7    A.  Did my separation have anything to do
8  with my work in Big Sky?
9    Q.  Yeah.
10    A.  No.
11    Q.  Okay.  Your separation and your divorce
12  from Dixon have nothing to do with your work at Big
13  Sky; is that right?
14    A.  I don't understand the question.  I mean
15  this is my work and this is my relationship and
16  then there's the boss.  And, of course, it
17  somehow -- it was a situation that not lots of
18  people have to have a husband and a boss.
19    Q.  Right.  But what I'm understanding
20  you -- what I'm trying to ask you is if, for
21  example, we're going to get to trial in this case
22  and you're going to say that you got divorced from
23  Bob Dixon because of -- because he didn't give you
24  enough assignments at work or anything relating to
25  your work at Big Sky?

Page 64

1    A.  No, no.
2    Q.  Okay.  So you and Mr. Dixon separated
3  and got divorced for reasons other than your work
4  at Big Sky; is that right?
5    A.  Yes, yes.
6    Q.  Okay.  That's what I'm trying to ask.
7    What training have you received about
8  whether and when to mark hazards?
9    A.  By looking and experiencing when and
10  where hazards are marked, objects are marked and
11  high vizes and rope lines.  It wasn't a theoretical
12  training.  It's a practical, doing what was always
13  being done and following advices of supervisors and
14  directors.
15    Q.  And so actually -- and before we get
16  into this, I need to back up.
17    So you now agree that the transition
18  from Highway onto the Loop Road was not a steep and
19  significant transition as you previously said,
20  correct?
21    A.  I said that was not a drop-off, no road
22  cut.  Uh-huh.
23    Q.  Okay.  So do you still contend it was a
24  significant and abrupt transition?
25    A.  From black diamond to flat is pretty

16 (Pages 61 to 64)

Page 65

1  significant.
2      Q.  Okay.  But that wasn't my question.
3      Do you still contend the transition from
4  Highway onto the Loop Road was abrupt and
5  significant?
6      A.  What's contend mean in this case?
7  Sorry.
8      Q.  Is it your opinion?
9      A.  Is it my opinion that it was abrupt?
10     Q.  And significant?
11     A.  It was significant from steep to flat.
12  Abrupt, no.  Because if abrupt is this road cut
13  then, no.  But from steep to flat is pretty
14  significant.
15     Q.  So do you still contend that -- is it
16  still your opinion that the cat track below or the
17  Loop Road below Highway should have been marked on
18  December 11, 2015?
19     A.  I believe if it was somehow marked
20  Mr. Meyer might have seen or paid attention more.
21     Q.  Might, might have, correct?  That's what
22  you're saying?
23     A.  Yeah, because we can't see the future
24  what would happen.
25     Q.  Right.

Page 66

1      A.  Right.
2      Q.  But that's just your speculation, right?
3  Correct?
4      A.  Speculation, opinion.
5      Q.  Okay.  So it's your position that if
6  the road might have been marked or if -- excuse me,
7  strike that.
8      It's your opinion that if the road was
9  marked, Mr. Meyer might have seen the marking and
10  might have slowed down; is that correct?
11     A.  That -- we can say that's correct.
12     Q.  Okay.  My question though is a little
13  bit different.  My question is, is it your opinion,
14  do you believe that pursuant to ski industry
15  standards, the Loop Road should have been marked on
16  December 11, 2015?
17     A.  We could have put a slow sign above it
18  in this area.  This area has never been marked but
19  maybe a slow sign or a caution sign or a trails
20  merge sign might have avoided the accident.
21     Q.  I understand that.  But my question is,
22  is it your opinion that pursuant to industry
23  standards, the road should have been marked or are
24  you just saying you don't know one way or the
25  other?

Page 67

1      A.  It should have been marked because we
2  mark so many other things that -- like road
3  intersections, trail mergers.  I mean how many
4  pictures do I deliver -- did I deliver every winter
5  to you of all the markings and all the signs?  And
6  in my opinion, ski patrollers are -- we are trying
7  to avoid accidents by marking.
8      Q.  Okay.  But that wasn't exactly my
9  question.  My question was, is it your opinion that
10  pursuant to ski industry standards, the Loop Road
11  below Highway should have been marked on December
12  11, 2015?
13     A.  Should have and could have.
14     Q.  And why do you say that in your opinion
15  ski industry standard would have been to mark this
16  road?
17     A.  Why do I say this?  Because ski
18  patrollers are trying to avoid accidents and that's
19  why we are marking so many things.  It's a general
20  answer, but that's our duty as ski patrollers as we
21  are out there on the hill.
22     Q.  Well, you said specifically that you
23  were familiar with this -- in your affidavit you
24  said you're familiar with this area, correct?
25     A.  Yes, skied there many times.

Page 68

1      Q.  And you never marked this area prior to
2  December 11, 2015, did you?
3      A.  No.
4      Q.  You never put up a slow sign?
5      A.  I mainly wasn't working there.  I was
6  mainly working on the other side or in the Bowl.
7      Q.  But you have testified that you were
8  familiar with this area, right?
9      A.  As a skier, yes.
10     Q.  And you were married to the director of
11  ski patrol, right?
12     A.  For awhile, yeah.
13     Q.  So you certainly could have either
14  yourself put up a slow sign or some sort of other
15  marking above this Loop Road, right?
16     A.  Correct, if I had one.
17     Q.  Or you could have asked your husband,
18  the director of ski patrol, to put up a slow sign
19  before December 11, 2015, correct?
20     A.  I could have.
21     Q.  But you didn't think it was necessary,
22  right?
23     A.  Um, I don't think many things are
24  necessary to mark, mark little rocks with flags all
25  over Ambush.

17 (Pages 65 to 68)

EVI DIXON

Page 69

1    Q.  Before December 11, 2015, even though
2  you were familiar with this area, you never thought
3  it needed to be marked; isn't that true?
4    A.  I can only say that's true, but I don't
5  recall not thinking or thinking differently.
6    Q.  Isn't it true that you've been taught
7  that plainly visible obstacles do not need to be
8  marked?
9    A.  Like trees or lift towers?  Those are
10 plainly visible or snow guns, but we still mark
11 them.
12   Q.  You think trees are marked?
13   A.  No.  Trees, no.  Trees are not marked.
14   Q.  And trees are not marked because they're
15 plainly visible, right?
16   A.  Right.  But manmade objects we are
17 marking.
18   Q.  Well, that's not true, is it?
19   A.  It is.
20   Q.  Well, the road here was not marked, is
21 that -- are you contending that's a manmade object
22 or are you separating that?
23   A.  Well, we can say the cat track is a
24 manmade object.
25   Q.  And that was not marked, right?

Page 70

1    A.  It was not marked.
2    Q.  And that was -- you were never taught
3  that every man -- you've never been taught that
4  every manmade object at Big Sky needs to be marked,
5  were you?
6    A.  I was never told.  I was thinking more
7  about the boxes and snow guns.
8    Q.  Okay.  So objects?
9    A.  Yeah.
10   Q.  Okay.  Let's take a tree, for example,
11 you agree that trees do not need to be marked,
12 right?
13   A.  I agree.
14   Q.  And why is that?
15   A.  Because trees were there before us.
16   Q.  And a skier can see the tree, right?
17   A.  Yeah, yeah.
18   Q.  So if you're skiing down a run and
19 you're paying attention, you should be able to see
20 a tree in front of you, right?
21   A.  That's correct.
22   Q.  Even though you can't see 100 percent of
23 the tree as you're skiing down the run, right?
24   A.  Correct.
25   Q.  Like if I'm skiing down the run, I can

Page 71

1  see the uphill side of the tree but not the
2  downhill --
3    A.  Correct.
4    Q.  -- side, right?
5    A.  Correct.
6    Q.  And, let's say, I see a tree and take a
7  really sharp turn and then I run into the backside
8  of the tree as I'm skiing.  You're laughing because
9  you agree that would be my fault, right?
10   A.  Yeah, you would have to ski uphill.
11   Q.  And you can do that, right?
12   A.  Right.
13   Q.  But that would be an instance of someone
14 running into something that they couldn't see as
15 they're coming down the hill but it's still their
16 fault, right?
17   A.  That's the case, yes.
18   Q.  Same thing with the building.  Like, for
19 example, if you're skiing down the Silver Knife
20 run, you can see one side of the Summit Hotel,
21 right?
22   A.  Yeah.
23   Q.  And if you go around that building
24 really fast and then run into the side of the
25 building, that's your fault as a skier, right?

Page 72

1    A.  Yes.
2    Q.  And that building doesn't need to be
3  marked, does it?
4    A.  No.
5    Q.  Okay.  Because it's obvious, right?
6    A.  Yeah.
7    Q.  So you agree that things that are
8  obvious as you're looking down the hill do not need
9  to be marked?
10   A.  If you see it, it's obvious for each
11 person.
12   Q.  And if you can see it looking down the
13 hill, it doesn't need to be marked, right?
14   A.  We mark other road cuts that people can
15 see from the top and we have bamboos there.
16   Q.  So is it your -- it's not true that Big
17 Sky marks every road cut, is it?
18   A.  I think we try to mark every road cut.
19   Q.  Well -- and first of all, I realize when
20 I asked that question it was a bad question.  What
21 is a road cut?
22   A.  Where the -- a flat or road for skiers,
23 vehicles, Snowcats cross a hill and feels a
24 difference between the hill and the flat road.
25   Q.  That's a cat track, right?

18 (Pages 69 to 72)

EVI DIXON

Page 73

1    A.  The cat track is the road.
2    Q.  Right.  So do you understand the
3  difference between a cat track and a road cut?
4    A.  Yes.
5    Q.  What is the difference between a cat
6  track and a road cut?
7    A.  The road cut is the intersection between
8  the hill and the cat track.
9    Q.  Correct.  So, for example, these roads
10  or cat tracks are made by Snowcats, big machines
11  that go up and down the mountain, correct?
12    A.  Correct.
13    Q.  And they have a big --
14    A.  Tiller.
15    Q.  Yeah, a big tiller on the front and they
16  cut through the road, correct?  Or cut through the
17  snow, that's a better way to put it?
18    A.  Yeah.
19    Q.  Okay.  And it's Big Sky policy that if
20  that Snowcat, if it makes a cut, so in other words,
21  if it makes a vertical road cut that is a drop-off
22  to the road, that's a road cut, right?
23    A.  Correct.
24    Q.  So a vertical drop from the trail onto
25  the cat track, we can agree that's a road cut?

Page 74

1    A.  Correct.
2    Q.  Where that's straight up and down from
3  the run onto the cat track, right?
4    A.  Correct.
5    Q.  That did not exist in this case on the
6  Highway run on December 11, 2015, correct?
7    A.  That picture that I saw yesterday where
8  the guy stands there, if John Meyer went through
9  there, there was no road cut.
10    Q.  Okay.  And isn't it true that road
11  cuts -- in other words, vertical drops, are what
12  are marked by the Big Sky ski patrol?
13    A.  Those are marked.
14    Q.  And that did not exist on December 11,
15  2015, correct?
16    A.  Correct.
17    Q.  On this run?
18    A.  No.
19    Q.  So therefore, there was no obligation to
20  mark this run, right?
21    A.  Correct.
22    Q.  Do you remember being trained about the
23  Ride Another Day video?
24    A.  Yes.
25    Q.  And tell me -- describe for the jury

Page 75

1  what happened in the Ride Another Day video?
2    A.  It was a mother and a daughter skiing on
3  the slope and then the daughter fell, lost her skis
4  and another snowboarder came down, didn't see the
5  girl and hit the girl and both died.  And then the
6  story about -- so actually, he hit the mother too
7  and the mother was in a coma and then their story
8  of recovery and struggles and...
9    Q.  And you, a Big Sky ski patroller, you
10  watched the video about that incident, correct?
11    A.  Correct.
12    Q.  And then the people involved in the
13  accident actually came and spoke to the Big Sky ski
14  patrol, correct?
15    A.  Correct.
16    Q.  And they were emphasizing to you how
17  important it is for skiers to ski in control,
18  correct?
19    A.  Correct.
20    Q.  And to be able to stop so that they
21  don't hit obstacles or people below them, correct?
22    A.  Yeah.
23    Q.  And that's the skier's obligation, they
24  have to be able to stop so that they don't hit
25  people below them, right?

Page 76

1    A.  Correct.
2    Q.  And part of the other thing that you
3  were taught about the Ride Another Day video is
4  that on every run, every ski run, depending on your
5  perspective, there are potential blind spots,
6  right?
7    A.  Uh-huh.
8    Q.  Is that a yes?
9    A.  Yes.
10    Q.  So even one of the easiest runs at Big
11  Sky -- can we agree Mr. K is one of the easier runs
12  at Big Sky?
13    A.  Yes.
14    Q.  And Mr. K undulates.  I mean overall it
15  goes downhill but it undulates.  It goes up and
16  down a little bit as it goes downhill, correct?
17    A.  Yes.
18    Q.  So if you -- if you're skiing Mr. K
19  really fast and you're way uphill, you might not be
20  able to see someone that's downhill.  They might be
21  over a little bit of a undulation, correct?
22    A.  Yes, yes.
23    Q.  And you, as the skier, when you go over
24  that undulation, you have to be in control and be
25  able to stop so you don't hit an object or a

19 (Pages 73 to 76)

EVI DIXON

Page 77

1  person, correct?
2  A.  Correct.
3  Q.  And if you're skiing slower, then as
4  soon as you get up on that hill you can see
5  everything below you, right?
6  A.  Correct.
7  Q.  Okay.  And Mr. Meyer had those same
8  obligations as a skier, right?
9  A.  Correct.
10  (Whereupon, Deposition
11  Exhibit Number 71 was
12  marked for identification.)
13  BY MR. McINTOSH:
14  Q.  I'm going to hand you what I've marked
15  as Exhibit 71.  Do you recognize what is Exhibit
16  71?
17  A.  It says NSAA, National Ski Areas
18  Association, Collision Safety.
19  Q.  And then there's reference to the Ride
20  Another Day poster, correct?
21  A.  There's a poster right here, yeah.  And
22  then there's a text.  Should I read that?  And then
23  there's safety "Lids on Kids" and so forth.
24  Q.  And do you recognize this poster from
25  the training you received as a Big Sky ski

Page 78

1  patroller?
2  A.  We had cards.
3  Q.  You had cards that were just like what
4  is shown on Exhibit 71?
5  A.  Similar to it.  I don't know if it was
6  exactly but it was about the same issue, incident.
7  Q.  And then Exhibit 71 is a two-sided
8  document.  Look on the second page, please.
9  A.  Oh, it's a video link.
10  Q.  To the Ride Another Day video, correct?
11  A.  Correct.
12  Q.  And then below the video link is a list
13  of three actions every skier and rider can take to
14  help themselves and those around them safer on the
15  slopes?
16  A.  Yes.  Be ready, stay alert, and plan
17  ahead.
18  Q.  And was that information on the back of
19  these cards that you received as part of your
20  training as a ski patroller?
21  A.  Probably.  I don't recall it.
22  Q.  Okay.  And under Number 1, where it says
23  "Be Ready," it states -- and this is what you were
24  trained -- that skiers need to be ready to slow
25  down or avoid objects or other people at any time,

Page 79

1  correct?
2  A.  Correct.
3  Q.  You certainly agree with that, don't
4  you?
5  A.  Yes.
6  Q.  And under Number 3 it says under "Plan
7  Ahead," part of the things you were trained were
8  that skiers need to ease up at blind spots, do you
9  see that?
10  A.  Yeah, I see that.
11  Q.  And you agree with that, don't you?
12  A.  Yes.
13  Q.  And you were also trained that skiers
14  need to look out for spots on the run where traffic
15  merges or you can't see what's coming next, do you
16  see that?
17  A.  Yes.
18  Q.  You agree that skiers need to look out
19  for spots on a run where traffic merges or you
20  can't see what's coming next, don't you?
21  A.  They need to.  They don't do it always.
22  Q.  And if they don't do it, it's the
23  skier's fault, correct?
24  A.  Correct.
25  Q.  And the next sentence that you were

Page 80

1  trained on was that -- states that if the skier is
2  unfamiliar with the run, the skier should take it
3  easy the first time down and make a note of places
4  where you will want to slow down such as cat tracks
5  and rollers, correct?
6  A.  It stands like this, yes.  It says here.
7  Q.  And that's what you were trained, right?
8  A.  To make note of rollers and cat tracks,
9  no.  I don't recall that I go skiing to look at a
10  map to remember where the roller is and then after
11  that ski a run.  I don't do that.
12  Q.  Okay.  I don't think that's what it
13  says.  Doesn't it -- it says if you're unfamiliar
14  with the run, so as you're skiing down it if you're
15  unfamiliar with the run, you were taught to take it
16  easy the first time down, right?
17  A.  It's a good suggestion.
18  Q.  And you were taught that if you're
19  unfamiliar with the run, you should slow down at
20  places such as cat tracks and rollers, correct?
21  A.  You should slow down before rollers,
22  yes.
23  Q.  And do you agree that skiers should slow
24  down before cat tracks?
25  A.  Yeah.

20  (Pages 77 to 80)

EVI DIXON

Page 81

1    Q.  And that's what you were trained,
2  correct?
3    A.  Correct.
4    Q.  And if Mr. Meyer would have done that,
5  this accident would not have occurred, right?
6    A.  If he would have slowed down before the
7  cat track, no, it probably wouldn't have occurred.
8    Q.  And he certainly could have slowed down
9  before the cat track, correct?
10    A.  He could have slowed down anytime.
11    Q.  And it was his choice not to do so,
12  correct?
13    A.  Correct, he was skiing.
14    Q.  And if Mr. Meyer would have -- let's say
15  there would have been a child, maybe one of your
16  grandchildren below that cat track, if Mr. Meyer
17  would have run into that person, that would have
18  been his fault, correct?
19    A.  Correct.
20    Q.  You agree, don't you, that Mr. Meyer
21  should have slowed down before the cat track?
22    A.  He probably would have if he'd have seen
23  it.
24    Q.  And there was nothing preventing
25  Mr. Meyer from seeing the cat track, was there?

Page 82

1    A.  For him to look there was nothing
2  preventing according to this picture.
3    Q.  Well, do you agree that this picture was
4  taken under substantially similar conditions?
5    A.  My assumption, if he did not see the cat
6  track he might have come either somewhere else or
7  it was just for him to not see.
8    Q.  My question was, there was nothing
9  preventing Mr. Meyer from seeing the cat track, was
10  there?
11    A.  According to this picture, no, because
12  you can see the cat track from up here.
13    Q.  Well, but my question is, as Mr. Meyer
14  was skiing down the Highway run, there was
15  nothing -- on December 11, 2015, there was nothing
16  that prevented him from seeing the cat track,
17  correct?
18    A.  If he came down here, yes. But for
19  example, I don't know if he came through a dip or
20  where he's lower than the cat track, he might not
21  have seen it.
22    Q.  Okay.  Well, do you know where he came
23  down?
24    A.  No.
25    Q.  So you formed your opinions without

Page 83

1  knowing where he came down?
2    A.  Right.
3    Q.  Did you talk to him about where he came
4  down?
5    A.  Well, what I remember, this log is in
6  the picture and so I assume that he came down
7  somewhere above that log.
8    Q.  So I'm going to hand you a pen and I
9  want you to draw on this.  And we'll mark this as a
10  new exhibit.  I want you to draw where you believe
11  Mr. Meyer came down the Highway run on December 11,
12  2015.
13    A.  Where he could have come down.
14    Q.  Well, no, I want to know where you
15  believe he came down; in other words, where you
16  think he came down to form your opinions?
17    A.  So from here, somewhere here
18  (indicating).
19    MR. McINTOSH:  We need to get a better pen.
20  Let's pause for one second.
21    MS. WALAS:  Want to use the green Hi-Liter?
22    MR. McINTOSH:  What's that?
23    MS. WALAS:  Maybe use that green Hi-Liter.
24    Mr. McINTOSH:  Yeah, let's try this.  Try
25  this green Hi-Liter.  Thank you.

Page 84

1    MS. WALAS:  Yeah.
2    MR. McINTOSH:  Let's see if this works and
3  then if it doesn't, we'll --
4    THE WITNESS:  So Highway run in my --
5    MR. McINTOSH:  Okay.  Are we still on the
6  record?  Okay, sorry.  Okay, go ahead.  I'm sorry,
7  Ms. Dixon, go ahead.
8    THE WITNESS:  I don't know if this tree is
9  already part of that voided area of zucchini patch,
10  but the Highway run is pretty wide so he -- when he
11  landed here, he probably came down somewhere in
12  that picture thing.  So I would say he probably
13  came down this way.  So this would be the area
14  probably where he skied and then he came down
15  somewhere here.  I don't know how his skiing is, if
16  it's short turn or long turn.  He could have come
17  down like this or he could have come down like
18  this.  He could have come down like that.
19    MR. McINTOSH:  Okay.  So --
20    THE WITNESS:  In turns.
21  BY MR. McINTOSH:
22    Q.  Okay.  So based on your drawings, is it
23  fair to say you don't know where Mr. Meyer came
24  down on December 11, 2015?
25    A.  I don't know.

21 (Pages 81 to 84)

EVI DIXON

Page 85

1      Q.   And is it fair to say then that where
2   Mr. Meyer came down the Highway run on December 11,
3   2015 is irrelevant to your opinions in this case?
4      A.   Where he came down is irrelevant?
5      Q.   To your opinions.
6      A.   To which opinions?
7      Q.   Any of your opinions.
8      A.   It's -- I think it is -- it would be
9   necessary to know if he came through that dip or if
10  he came like this here, I don't know.  We have a
11  picture of the area.  I think it's just right above
12  the log and it's a very small area.  We have no
13  picture of the side of the cat track, looking down
14  the cat track, so.
15     Q.   Well, we do, don't we?  We do have
16  pictures of looking down the cat track?
17     A.   I have not seen one and I was actually
18  thinking that we should have gotten a picture that
19  day of going down the cat track from that side.
20     Q.   I'm going to hand you what was -- first
21  of all, before we move onto that, I'm going to mark
22  your drawing as Exhibit 72.
23     A.   Yeah, 72.
24  ///
25  ///

Page 86

1       (Whereupon, Deposition
2       Exhibit Number 72 was
3       marked for identification.)
4   BY MR. McINTOSH:
5      Q.   So just for the record, Ms. Dixon,
6   Exhibit 72 is your drawing --
7      A.   Yeah.
8      Q.   -- on the Highway run; is that correct?
9      A.   It's my artwork.
10     Q.   And you do not know where Mr. Meyer came
11  down the run that day, correct?
12     A.   No.  Correct.
13     Q.   Okay.  So next I'm going to show you
14  what has been previously marked as Exhibit 13.  And
15  you recognize Exhibit 13 as a photograph taken from
16  the side of the transition -- or excuse me, the
17  variation in terrain from Highway onto the Loop
18  Road cat track, correct?
19     A.   From higher up the Loop Road in an angle
20  to where the Loop Road is running, correct.
21     Q.   So this is a picture taken from the side
22  of the area of Mr. Meyer's accident, right?
23     A.   In an angle, not how I would have taken
24  a picture.
25     Q.   But you agree that this is a picture

Page 87

1   taken from the side of the area of Mr. Meyer's
2   accident, right?
3      A.   Yes, side of the accident area.
4      Q.   And you agree that there is not a steep
5   and significant transition anywhere shown in this
6   photograph from Highway onto the Loop Road,
7   correct?
8      A.   I think there's a significant transition
9   between the Highway and the Loop Road because the
10  Highway is here.  This area, I would say, is blue
11  and then the Loop Road is flat, so it's a
12  significant transition.  I don't know how else I
13  would call significant transition.
14     Q.   Well, what angle does a transition have
15  to be for you to contend it's significant?
16     A.   Um, what angle?  From flat to a
17  different angle than 180 degrees.
18     Q.   Okay.
19     A.   Maybe, I mean flat to 175 is not
20  significant but I would say from an angle of 30
21  degree to flat is pretty significant.
22     Q.   And what was the angle of Highway onto
23  the Loop Road where Mr. Meyer skied it on December
24  11, 2015?
25     A.   I don't know.  I don't have -- I don't

Page 88

1   have any measurements from there.
2      Q.   Well, we actually have a photograph,
3   don't we, of where Mr. Meyer skied from Highway
4   onto Loop Road?
5      A.   I don't know.  Is there a track of
6   Mr. Meyer's ski where he came down on here?  There
7   are some tracks but do we know which one is
8   Mr. Meyer's track?
9      Q.   I'm going to hand you what's been
10  previously marked as Exhibit 29.  Exhibit 29 is a
11  photograph of the area of where Mr. Meyer skied
12  from Highway onto the Loop Road, correct?
13     A.   It's looking down onto the area of
14  where the -- where he ended up on the log.
15  We -- on --
16     Q.   And we don't -- sorry, go ahead.
17     A.   -- this photo we still don't know where
18  exactly he came from.
19     Q.   Well, he went through this area shown in
20  Exhibit 29, didn't he?
21     A.   He must have, yeah, because he ended up
22  on that log.
23     Q.   Okay.  So you agree that Mr. Meyer skied
24  from Highway onto the Loop Road in the area shown
25  in Exhibit 29, right?

22 (Pages 85 to 88)

EVI DIXON

Page 89

1    A. Yeah.
2    Q. And that area shown in Exhibit 29 is not
3  a steep and significant transition --
4    A. No.
5    Q. -- from Highway onto Loop Road, is it?
6    A. No.
7    Q. So therefore, this area did not need to
8  be marked, did it?
9    A. This looks much flatter than it is
10 according to this other picture, but it's not a
11 road cut there. So we didn't mark it because
12 there's no road cut.
13   Q. And that's the industry standard, isn't
14 it?
15   A. Yeah, as far as I know.
16   Q. I'm sorry, can we take another quick
17 break?
18   A. Yeah.
19   Q. I promise not to drink any more coffee.
20   VIDEO TECHNICIAN: This ends Disc Number 2.
21 We're off the record. The time is 10:49.
22   (Whereupon, a brief
23      recess was taken.)
24   VIDEO TECHNICIAN: Okay. This is the start
25 of Disc 3. We're back on the record. The time is

Page 90

1  10:53.
2  BY MR. McINTOSH:
3    Q. Ms. Dixon, do you understand you're
4  still under oath?
5    A. Yes.
6    Q. I want to talk to you about your
7  responsibilities on the accident investigation
8  team. Do you understand what the accident
9  investigation team was?
10   A. My people that took pictures and worked
11 the accident investigation.
12   Q. And that was sometimes referred to as
13 the AI team, correct?
14   A. Correct.
15   Q. What did you believe your
16 responsibilities were as a supervisor of the
17 accident investigation team?
18   A. I did all kinds of stuff, but my main
19 thing was to make sure that we collect files,
20 photos, measurements. I went through peoples'
21 statements. I talked to people when we -- when
22 they came in to write their statements. I taught
23 my team how we do accident investigations. When I
24 was out on the hill I did the same as my team. But
25 at the end, I made sure that all the forms and

Page 91

1  everything that we needed was in the files.
2    Q. Okay. So is it fair to say that your
3  job as the accident investigation supervisor was to
4  make sure the investigation was complete?
5    A. Yes.
6    Q. That was your primary responsibility?
7    A. As the supervisor, yes.
8    Q. Correct. And, for example, you did
9  not -- well, strike that.
10     As an accident investigation supervisor,
11 was it part of your job responsibilities to go to
12 an accident scene after an accident has occurred
13 and determine whether or not any operational
14 changes need to be made?
15   A. Um, I did not -- many times I did not go
16 to the accident itself unless I was the accident
17 investigator.
18   Q. Okay. But my question is a little bit
19 different. You agree, don't you, that it was not
20 part of your job to go out to an accident scene
21 after --
22   A. Yeah.
23   Q. -- the accident occurred to assess the
24 scene and then determine whether changes should be
25 made?

Page 92

1    A. No.
2    Q. That was not your job?
3    A. No, that was not my job.
4    Q. Okay. You were, however, told as part
5  of your job on a yearly basis that if you ever had
6  concerns about an accident, you were told to bring
7  those concerns or bring your opinions about what
8  happened to your supervisors, right?
9    A. Um, I don't think I was told but I did
10 it. I don't think I got specific training about
11 that, if you -- then that.
12   Q. Weren't you specifically told every year
13 by Mike Unruh and other people that if you believed
14 Big Sky screwed up, that after an incident you were
15 supposed to go and tell your supervisors that?
16   A. That Big Sky screwed up?
17   Q. Yes.
18   A. It's general that we talk about things
19 to not screw up as Big Sky, make sure that people
20 are safe.
21   Q. Right. But everybody makes mistakes,
22 every organization makes mistakes, and you were
23 always taught as part of your training that if you
24 thought Big Sky made a mistake that led to someone
25 being injured, you were supposed to go and tell

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 93

1  your supervisors that, weren't you?
2      A.  If I was aware of this, that we should
3  have, could have, yes.
4      Q.  And you never went to any of your
5  supervisors and said anything should have been done
6  differently in relation to Mr. Meyer's accident,
7  did you?
8      A.  I don't recall that specific, if I did
9  or not.
10      Q.  Well, you never -- after Mr. Meyer's
11  accident, you never told someone that this area
12  should have been marked, did you?
13      A.  No.  In my years of accident
14  investigation, I am not telling supervisors to mark
15  this.  We talk about things need to be marked or
16  certain things like road cuts or obstacles or.
17      Q.  Isn't it true that your last few years
18  as a ski patroller you were primarily working as a
19  dispatcher?
20      A.  No.
21      Q.  What were you doing your last few years
22  as a ski patroller?
23      A.  I was the accident investigation
24  supervisor.
25      Q.  And when you were the accident

Page 94

1  investigation supervisors -- supervisor, how much
2  of your time were you actually spending on skis out
3  on the mountain?
4      A.  Um, the last year or two, very little
5  because of all the other responsibilities I took
6  on.
7      Q.  When was the last time that you had as
8  part of your job actually identifying and marking
9  hazards?
10      A.  Last winter.
11      Q.  Okay.  How do you characterize your
12  departure from Big Sky?
13      A.  Abrupt.
14      Q.  Okay.  And so if someone asks you why
15  are you no longer working at Big Sky, what do you
16  tell them?
17      A.  I wasn't rehired.
18      Q.  And isn't it true that you posted some
19  Facebook videos about being not rehired?
20      A.  I am -- I have an online business and I
21  am part of my story and I did -- I'm making live
22  videos and part of my story is that I'm not rehired
23  from the company and that I'm now doing my online
24  business.
25      Q.  What is your online business?

Page 95

1      A.  It's network marketing.
2      Q.  What is network marketing?
3      A.  It's also called in this case social
4  retail.  We are selling products to people that are
5  in need of certain products.
6      Q.  So what type of products do you sell
7  on -- through your network marketing?
8      A.  Health and wellness products.
9      Q.  What type of health and wellness
10  products do you sell?
11      A.  The main product is collagen, liquid
12  collagen and weight loss products and then a whole
13  series of different vitamins and enzymes and
14  probiotics and chemically free cleaning products.
15      Q.  Other than the amounts that you are
16  being paid by Mr. Meyer to testify in this case,
17  what is your current monthly income?
18      A.  My current monthly income is about $100.
19      Q.  100?
20      A.  From the company.  Yeah, because I just
21  started out.
22      Q.  Okay.  So other than earning
23  approximately $100 from your network marketing and
24  other than this case, do you have any other sources
25  of income right now?

Page 96

1      A.  Yeah.
2      Q.  What?
3      A.  I have a rental condo and I get the rent
4  and I have -- my son is paying rent.
5      Q.  Anything else?
6      A.  I will start working at the Outpost
7  Hotel in Belgrade part time and if somebody -- a
8  friend of mine or people that I know want a
9  craniosacral session, I do give them a craniosacral
10  session.
11      Q.  How much did Meyer pay you for
12  craniosacral sessions?
13      A.  I think he paid my full fee.
14      Q.  Which is what?
15      A.  $100.
16      Q.  You said you're going to start working
17  at the Outpost Hotel in Belgrade?
18      A.  Yeah.
19      Q.  When?
20      A.  Today.
21      Q.  Okay.  So we need to hurry up and get
22  done.  You should have told me that earlier.
23      A.  No.  Doesn't matter.
24      Q.  Why have you not obtained another job in
25  the ski industry, for example as a ski patroller at

Page 97

1    Bridger Bowl?
2        A.  Because I didn't want to.
3        Q.  Why?
4        A.  Because I was starting my online
5    business in the end of October and I'm working this
6    full time and I didn't want to.  I just -- it
7    wasn't in my plan to be a ski patroller in Bridger
8    Bowl.
9        Q.  Did you apply for any jobs at Bridger
10   Bowl?
11       A.  No.
12       Q.  Okay.  Have you applied for any jobs
13   anywhere in the ski industry since --
14       A.  No.
15       Q.  -- you left Big Sky?
16       A.  No.
17       Q.  Is this network marketing that you're
18   talking about, is this multitiered sales?
19       A.  Multilevel marketing.
20       Q.  Multilevel marketing?
21       A.  Yes.
22       Q.  And is that -- that's a system where you
23   get paid more depending on the greater number of
24   people you get below you, correct?
25       A.  Um, that -- how it should happen, yes.

Page 98

1        Q.  Yeah.  So in other words --
2        A.  It's a residual income stream.
3        Q.  Isn't that a pyramid scheme?
4        A.  No.
5        Q.  What's the difference between multilevel
6    marketing and a pyramid scheme?
7        A.  Pyramid scheme is if there are no
8    product involved.
9        Q.  There are no products involved?
10       A.  If there are no products involved.
11       Q.  Okay.
12       A.  It's like sending money.
13       Q.  So the only difference between what
14   you're doing and a pyramid scheme is that there are
15   products involved; is that right?
16       A.  If there is product involved, it's like
17   a business like any other business; Walmart,
18   Target, knitting, wool, yarn business.
19       Q.  Have you ever acted as an expert witness
20   in any other case?
21       A.  No.
22       Q.  Your -- the affidavit that you submitted
23   with your expert report, let's mark that as an
24   exhibit.
25   ///

Page 99

1            (Whereupon, Deposition
2            Exhibit Number 73 was
3            marked for identification.)
4    BY MR. McINTOSH:
5        Q.  And Ms. Dixon, I've now handed you what
6    I've marked as Exhibit 73; is that correct?
7        A.  Correct.
8        Q.  And Exhibit 73 is the affidavit that you
9    signed in this case; is that correct?
10       A.  Correct.
11       Q.  And how was this affidavit prepared?  In
12   other words, did you prepare it?
13       A.  With John Meyer.
14       Q.  And how did the two of you prepare it?
15   Well, first of all, you prepared it together; is
16   that correct?
17       A.  Yes.
18       Q.  And how did the two of you prepare it?
19       A.  We talked and he asked me questions and
20   I answered.
21       Q.  Were you sitting there together at your
22   computer or at his computer or how did that work?
23   Were you on your phone?
24       A.  I was at his office and I did not have
25   my computer.  So I think he typed it into his

Page 100

1    computer.
2        Q.  So would you agree that Mr. Meyer
3    prepared this affidavit?
4        A.  He asked me the questions and I answered
5    the questions, but he was doing the actual typing.
6        Q.  So he prepared it based on questions
7    that he was asking you?
8        A.  Yeah.
9        Q.  Okay.  And did he specifically ask you
10   about the privileged information that is in
11   paragraph 7 and 8?
12       A.  So what's the question?  On 7 it is that
13   you and Mr. Taylor Middleton came to talk to us.
14       Q.  Okay, I'm going to move to strike.
15           Ms. Dixon, the question was, did
16   Mr. Meyer specifically ask you about the privileged
17   information that is in paragraphs 7 and 8?
18       A.  I don't remember how he asked me the
19   questions.
20       Q.  But Mr. Meyer was asking you
21   specifically about information that Big Sky's
22   attorney provided to you; is that right?
23       A.  How we got trained was the question I
24   think.
25       Q.  And then he asked you specifically about

25 (Pages 97 to 100)

Page 101

1  information Big Sky's attorney provided to you; is
2  that right?
3      A.  I don't know if he asked me and how he
4  asked me.  I think that the training that we are
5  getting every year during the refresher, from
6  you is pretty much the only training we ever get
7  from outside.
8      Q.  So Mr. Meyer was asking you specifically
9  about things that I told you and others at Big Sky;
10  is that right?
11      A.  No, I don't think he asked me that
12  specifically.  Because he asked me about the
13  training, how -- I don't remember the exact
14  question he asked me but we talked about the
15  training that we receive from Big Sky or other
16  areas to become accident investigators.
17      Q.  In paragraph 11 you stated that as
18  supervisor of the accident investigation team you,
19  quote, signed off, end quote, on accident
20  investigations; is that right?
21      A.  Yeah, it says here "signed off."
22      Q.  What does that mean that you "signed
23  off" on accident investigations?
24      A.  It kind of is a short expression of what
25  I did with and during my job.  By looking at all

Page 102

1  the forms, if people -- if we need more forms or
2  photos or if the patroller's statement was how we
3  needed it and if the EMS card was included and all
4  these little files that needed to be in the
5  accident investigation, that it's there.
6      Q.  So when you say you "signed off" on
7  accident investigation reports, you're just saying
8  you were making sure that the accident
9  investigation was complete?
10      A.  Yeah.
11      Q.  Do you mean anything else other than
12  that?
13      A.  No, that's correct.
14      Q.  In paragraph 13 you said -- or this
15  affidavit that you signed says that "To the best of
16  my knowledge, Big Sky Resort did not have an
17  independent risk manager."  Do you see that?
18      A.  Yeah.
19      Q.  What is an independent risk manager?
20      A.  A person that goes around as a risk
21  assessor to make sure that the area is safe and
22  he's not working as a ski patroller but as an
23  independent risk manager.
24      Q.  What does that mean to you, an
25  independent -- specifically there, what does the

Page 103

1  word independent mean, the term independent risk
2  manager?
3      A.  In that case?  That he's not a ski
4  patroller, that his only job is risk managing and
5  maybe coming from -- it's not always -- I think
6  there's -- we didn't have one.  In my opinion, we
7  didn't have an independent risk manager.  But I'm
8  sure and I've heard that there are people going
9  around different sky areas being the risk manager,
10  going to different ski areas and making sure
11  that...
12      Q.  Can you name one Montana sky resort that
13  has a quote, "independent risk manager"?
14      A.  No, I can't.
15      Q.  In fact there aren't any, are there?
16      A.  I don't know.  In Montana specifically?
17      Q.  You have no idea?
18      A.  We talk -- Bob and I talked many times
19  about the position of risk manager.
20      Q.  But do you claim you were the risk
21  manager?
22      A.  No.
23      Q.  How do you contend that Big Sky's
24  alleged -- the fact that Big Sky allegedly didn't
25  have an independent risk manager, how do you

Page 104

1  believe that is relevant to Mr. Meyer's ski wreck?
2      A.  Um, how do I believe it's relevant?
3  It's relevant I think to danger and markings and
4  accidents that happen.
5      Q.  How does that make any sense?  I don't
6  understand the answer.
7      A.  I don't understand the question.  But
8  the risk manager has a job to make sure that the
9  people that are guests of the ski areas are safe
10  and...
11      Q.  What do you base that on?  Where in the
12  industry, in the ski industry -- do you believe it
13  is industry standard to have an independent risk
14  manager?
15      A.  Some areas I think they do, yeah.
16      Q.  My question was, do you believe it is
17  industry standard to have a quote, "independent
18  risk manager"?
19      A.  Obviously, you don't have to have an
20  independent risk manager because otherwise Big Sky
21  would have had one.
22      Q.  And it's not standard in the industry to
23  have an independent risk manager, is it?
24      A.  Obviously not.
25      Q.  And you were familiar with the area of

Page 105

1   Mr. Meyer's accident and you never recommended that
2   it be marked before December 11, 2015, right?
3       A.  I already said that I wasn't there
4   working on Challenger.
5       Q.  Right.
6       A.  Yeah.
7       Q.  But you were familiar with the area and
8   you never recommended that it be marked, did you?
9       A.  I didn't.
10      Q.  And so is it somehow your opinion that
11  an independent risk manager would have done a
12  better job than you would have done?
13      A.  It depends on the risk manager and it
14  depends on my quality of my job.
15      Q.  Right.  You don't know one way or the
16  other, right?
17      A.  No.
18      Q.  Do you take any responsibility for
19  Mr. Meyer's accident?
20      A.  Do I personally?
21      Q.  Yes.
22      A.  No.
23      Q.  Why not?
24      A.  Because I was not out there skiing that
25  day.

Page 106

1       Q.  Were you even working that day?
2       A.  I've been working that day in my office.
3       Q.  So you were working on December 11, 2015
4   in your office?
5       A.  Uh-huh.
6       Q.  Is that a yes?
7       A.  That is a yes.
8       Q.  Okay.  And were you working December 10,
9   2015?
10      A.  I don't remember what day of my four day
11  cycle was December 11th.
12      Q.  Okay.
13      A.  I could have.
14      Q.  There's certainly nothing that prevented
15  you from recommending that this area be marked
16  before December 11, 2015, was there?
17      A.  It was not in my jurisdiction to tell
18  people or supervisors or ski patrol directors what
19  to mark and what not to mark.  That is not my job.
20  That wasn't my --
21      Q.  That wasn't my question.
22          There was nothing that prevented you
23  from either marking this area yourself or telling
24  your husband, the director of ski patrol, that the
25  area should be marked?

Page 107

1       A.  Before the accident?
2       Q.  Correct.
3       A.  No, nothing preventing me.
4       Q.  Okay.  So then if you could have put up
5   a sign and that might have prevented Mr. Meyer's
6   accident, do you take any responsibility, any
7   personal responsibility for it?
8       A.  Not to tell it?  No, it's not my
9   responsibility.
10      Q.  Well, whose responsibility do you think
11  it was, if it wasn't yours?  If it wasn't the
12  supervisor of the accident investigation team,
13  whose responsibility do you think it was?
14      A.  The supervisors on the hill.
15      Q.  Okay.  Who's that?
16      A.  That one --
17      Q.  Who specifically --
18      A.  -- Challenger supervisor maybe.
19      Q.  Who specifically do you think should
20  have said that this area should be marked?
21      A.  It's the patrollers, the ski patrollers.
22      Q.  Who?  I mean you know them all, right?
23      A.  Yeah.
24      Q.  You worked there for ten years?
25      A.  More.

Page 108

1       Q.  So who do you think specifically within
2   the ski patrol should have said this area should
3   have been marked?
4       A.  Who?  You want a name?
5       Q.  Yes.
6       A.  Ryan Ayres maybe.
7       Q.  Okay.  So I just want to make clear.
8   You -- on the record today, are you -- is it your
9   testimony that Ryan Ayres is responsible for
10  Mr. Meyer's accident?
11      A.  You said I should mention any name.  I
12  don't know who was posting up there.
13      Q.  No, I didn't just say mention any name.
14      A.  You said mention a person's name.
15      Q.  No.  No, Ms. Dixon, you must have
16  misunderstood.
17          I want to know who you contend within
18  the Big Sky ski patrol should have marked this
19  area?
20      A.  That sounds like a different question
21  now.
22      Q.  Actually, just strike that.
23          You agree that nothing prevented you
24  from doing it, right?
25      A.  I agree.

27 (Pages 105 to 108)

EVI DIXON

Page 109

1    Q.  In paragraph 15 of your affidavit, can
2  you review that to yourself, please?
3    A.  Yeah, that came up in the other
4  statement from Mr. Petrozzi a lot about the green
5  and blue and the difficult.
6    Q.  Let me just ask the question --
7    A.  Okay.
8    Q.  -- before you start testifying.
9    First of all, you said because the area,
10  the bottom of the Highway run, is not groomed it is
11  blue in difficulty?
12    A.  That's what I said.
13    Q.  What does that mean?
14    A.  That is -- what does it mean?  Is that
15  from the angle of the steepness or the difficulty
16  of the run, in this specific area, if that would
17  have been the whole run, it would have been a blue
18  run.
19    Q.  The Highway run is designated as a black
20  diamond on the Big Sky trail map, correct?
21    A.  Correct.
22    Q.  It's designated on a black diamond above
23  the run, correct?
24    A.  Correct.
25    Q.  There's actually a black diamond on a

Page 110

1  tree right above Highway, correct?
2    A.  Correct.
3    Q.  Was there any facts or any information
4  that would have suggested to Mr. Meyer that the
5  resort, Big Sky, contends that this is a blue run?
6    A.  No.
7    Q.  Okay.  So -- and do you believe that
8  skiers can ski out of control on blue runs but not
9  black runs?
10    A.  They can be out of control anywhere.
11    Q.  But a skier has an obligation to stay in
12  control on --
13    A.  Anywhere.
14    Q.  -- either a blue, green or black run,
15  right?
16    A.  Yeah.
17    Q.  And if a skier does not stay in control
18  on either a blue, black or green run, that's the
19  skier's fault, correct?
20    A.  Correct.
21    Q.  So how is this relevant, this statement
22  you have that it is your opinion that because this
23  area is not groomed it is blue in difficulty?  How
24  is that relevant?
25    A.  I don't know how it is relevant.  The

Page 111

1  question might have been how steep was the -- is
2  the Highway run there.
3    Q.  So your opinion that the bottom part of
4  the Highway run is blue in difficulty, that doesn't
5  have any relevance to your opinions in this case at
6  least, right?
7    A.  Well, if I said that, it has something
8  to do with my opinion.
9    Q.  Okay.  So how is your opinion that this
10  small area is blue in difficulty?  How in your
11  opinion is that relevant to Mr. Meyer's ski wreck?
12    A.  Could be because of his speed, how fast
13  he's going.
14    Q.  I don't want to know could be.  I want
15  to know how it is relevant to your opinions in this
16  case?
17    A.  It is -- I don't know.  I don't know the
18  answer to that.  Sorry.
19    Q.  Okay.  When you left Big Sky or your
20  employment at Big Sky, you still had a computer
21  with you; is that correct?
22    A.  Yes.
23    Q.  You did not return the computer when
24  your employment ended, did you?
25    A.  No.

Page 112

1    Q.  Didn't you agree to return all Big Sky
2  property when your employment ended as part of the
3  Big Sky handbook?
4    A.  No.  With Mr. Tom Hawk, he allowed me to
5  keep that laptop because, not last summer but the
6  summers before I needed to get access to some
7  questions regarding accident investigation.  So I
8  kept the laptop over the summers.
9    Q.  But as soon as your employment ended,
10  you had an obligation to return that to Big Sky,
11  didn't you?
12    A.  Which I did.  I returned -- I gave the
13  laptop according to your subpoena --
14    Q.  Right.
15    A.  -- to Mr. Meyer.  That's all I had.
16    Q.  So in order for Big Sky to get the
17  computer back, it had to serve you with a subpoena,
18  right?
19    A.  No, I would have returned the computer
20  anyways.
21    Q.  Well, why didn't you?  Why didn't you --
22    A.  Because --
23    Q.  -- return it before you received the
24  subpoena?
25    A.  Because there was nobody there to

28 (Pages 109 to 112)

Page 113

1  return.
2      Q.  Do you have any other Big Sky property
3  that you have kept since your employment ended?
4      A.  No.
5      Q.  Jackets, anything like that?
6      A.  No.
7      Q.  Did you tell Mr. Meyer before his
8  accident on December 11, 2015 that it was your
9  opinion that this area is blue in difficulty?
10     A.  Did I tell him that before his accident?
11     Q.  Yes.
12     A.  I didn't know him before his accident.
13     Q.  So the answer is you did not tell him
14  that, right?
15     A.  No.
16     Q.  Have you spoken with any other ski
17  patrollers about Mr. Meyer's accident?
18     A.  Since when?
19     Q.  At any time.
20     A.  Since the accident?
21     Q.  Yes.
22     A.  Yes.
23     Q.  Who?
24     A.  My accident investigation team, Bob
25  Dixon, Mike Unruh.

Page 114

1      Q.  And that was all in connection with
2  Mr. Meyer coming up and wanting to speak to the ski
3  patrol and thank them for saving his life, correct?
4      A.  In connection with?
5      Q.  Yes.
6      A.  No, it was in connection with his
7  accident, not his speaking to the patrollers.
8      Q.  Okay.  Did you provide Mr. Meyer with
9  the e-mail addresses of the entire ski patrol?
10     A.  No.
11     Q.  Are you aware that Mr. Meyer testified
12  under oath that you did?
13     A.  We discussed that, but I didn't.
14     Q.  Did you tell him that his testimony on
15  that point was incorrect?
16     A.  He said "you provided me the e-mails"
17  and I said "I didn't."
18     Q.  Who did then, if you know?
19     A.  I don't know.
20     Q.  Okay.
21     A.  But I know that there was somebody else
22  that he was talked to right when we heard that he's
23  suing and I don't know who.  But I didn't.
24     Q.  Have you discussed -- have you ever
25  discussed the fact that you're working or helping

Page 115

1  Mr. Meyer in this lawsuit with any other ski
2  patrollers?
3      A.  No.
4      Q.  You have not told any other ski
5  patrollers --
6      A.  No.
7      Q.  -- that you're helping Mr. Meyer?
8      A.  No.
9      Q.  Are you in contact with any Big Sky ski
10  patrollers right now?
11     A.  Well, officially, I'm not allowed to
12  talk to any Big Sky employees according to
13  Mr. Middleton.  I have personal connections who ask
14  me how I am doing and I tell them how I'm doing.
15     Q.  But you've not discussed this case --
16     A.  No.
17     Q.  -- or your help -- helping Mr. Meyer
18  with any ski patrollers recently?
19     A.  No.
20     Q.  Have you deleted any posts from your
21  Facebook page recently?
22     A.  Yeah, I delete posts from my Facebook
23  page -- from my page on my profile.  I have only a
24  profile these days.  I saw that you have my
25  Facebook page, but that's not active.  I make posts

Page 116

1  and I delete and I...
2      Q.  Did you delete any posts because you
3  didn't want us to ask you about them?
4      A.  No.
5      Q.  Have you said anything negative about
6  Big Sky since your employment ended?
7      A.  I said it was not nice to send me a two
8  liner e-mail not -- that I'm not getting rehired
9  without any reason and without any -- any reason.
10     Q.  Who did you tell that to?
11     A.  In a live video.
12     Q.  Have you -- I'm sorry, were you done?
13     A.  Yeah.
14     Q.  Have you said anything else negative
15  about Big Sky since your employment ended?
16     A.  No.
17     Q.  Could you just give me a few minutes to
18  review my notes and then we may be done?  I'm
19  assuming you don't have any questions?
20     MS. WALAS:  I'll have a few follow-up.
21     MR. McINTOSH:  Okay.
22     VIDEO TECHNICIAN:  Do you want to go off the
23  record?
24     MR. McINTOSH:  Yes, please.
25     VIDEO TECHNICIAN:  We are now off the record.

EVI DIXON

Page 117

1   The time is 11:26.
2        (Whereupon, a brief
3            recess was taken.)
4        VIDEO TECHNICIAN:  We're now back on the
5   record.  The time is 11:32.
6   BY MR. McINTOSH:
7        Q.  Ms. Dixon, you understand you're still
8   under oath, don't you?
9        A.  I am.
10       Q.  Ms. Dixon, you just testified that you
11   didn't -- did not provide John Meyer with the
12   e-mail addresses of the ski patrol, correct?
13       A.  Yeah, yes.
14       (Whereupon, Deposition
15            Exhibit Number 74 was
16            marked for identification.)
17   BY MS. BREEAN:
18       Q.  I want to hand you what I've marked as
19   Exhibit 74.  That is an e-mail between you and John
20   Meyer, correct?
21       A.  Yeah.
22       Q.  And the title of the e-mail is "Email
23   list," right?
24       A.  Yeah.
25       Q.  And that is the e-mail in which you

Page 118

1   provided John Meyer the --
2        A.  Oh.
3        Q.  -- e-mail addresses of the Big Sky ski
4   patrol, right?
5        A.  It looks like it.  Don't recall it,
6   yeah.  But that is it.
7        Q.  Is there any -- so you agree your
8   testimony that you just provided a few minutes ago
9   was inaccurate, right?
10       A.  Yeah.
11       Q.  Is there any other inaccurate or
12   untruthful testimony that you provided here today?
13       A.  I don't think so.
14       Q.  That is all the questions I have for
15   right now.  I'll let Ms. Walas ask some questions.
16       A.  Okay.
17
18            EXAMINATION
19   BY MS. WALAS:
20       Q.  All right.  Just a few follow-up
21   questions.
22       You were just asked about this Exhibit
23   Number 74 and had you forgotten that you had sent
24   this e-mail to Mr. Meyer?
25       A.  Yeah.

Page 119

1        Q.  And your testimony earlier was not
2   intentionally untruthful?
3        A.  It was --
4        MR. McINTOSH:  Objection, leading.
5        THE WITNESS:  -- not -- no, I'm not lying.
6   BY MS. WALAS:
7        Q.  Now, you were asked some questions about
8   your work experience, correct?
9        A.  Correct.
10       Q.  And one of those questions was in regard
11   to your current online multilevel marketing
12   business, correct?
13       A.  Yeah.
14       Q.  And does that business have any
15   relationship to the opinions you're giving in this
16   case?
17       A.  No.
18       Q.  Okay.  And you were also asked about
19   your craniosacral therapy practice?
20       A.  Yeah.
21       Q.  And does that have anything to do with
22   your opinions in this case?
23       A.  No.
24       Q.  Now in giving the opinions in this case,
25   are you relying on your experience as Big Sky's

Page 120

1   former accident investigator?
2        A.  Yeah.
3        Q.  And are you relying on your experience
4   as a ski patroller?
5        A.  Yes.
6        Q.  And are you relying on your experience
7   as a ski instructor?
8        MR. McINTOSH:  Objection, asked and answered
9   and leading.
10       MS. WALAS:  You can answer.
11       THE WITNESS:  Yeah.  I think every life
12   stream that you go through you collect experiences.
13   BY MS. WALAS:
14       Q.  And you were asked questions about
15   whether you could have gone in at any point prior
16   to Mr. Meyer's accident and put up signs or
17   otherwise marked the area where the incident
18   occurred?
19       A.  I was asked that, yes.
20       Q.  Okay.  And was that your responsibility
21   as a Big Sky employee, to put up those signs?
22       A.  Not directly.  I have -- I have put up
23   signs out of my own authority.  Mainly because I'm
24   not out there that much, I am not the one that puts
25   out signs.

30 (Pages 117 to 120)

EVI DIXON

Page 121

1    Q.   Okay.  And on December 11th, 2015, who
2  was responsible for marking the Challenger area?
3    A.   The supervisor of the Challenger patrol
4  and Challenger side of the...
5    Q.   And do you recall who that was that day?
6    A.   No, I don't remember.
7    Q.   Who trains you as an accident
8  investigator?
9    A.   More or less myself, besides the
10  training that we get at the refresher.  We
11  had -- there was a -- I don't think there actually
12  was anything written besides some of the rules when
13  we're doing accident investigation, so out of my
14  experience looking at former accident
15  investigations and growing with my job.
16    Q.   And you've testified and mentioned the
17  refresher multiple times, what is the refresher?
18    A.   It's the beginning of the season before
19  we open the ski area and before we do the setup
20  where we do medical training and avalanche
21  trainings and those safety training, many things
22  indoors.  We have talks from doctors and we have
23  training stations and talks from our lawyer and
24  Mary from the insurance company talked to us a few
25  times.

Page 122

1    Q.   And do you recall any of the people who
2  provided that training by name?
3    A.   That training, I already named Mary
4  Bozak and Ian McIntosh.  Medical trainings, I know
5  a few of the doctors who were talking for our
6  medical training.
7    Q.   And looking at Exhibit 73, paragraph 7,
8  is this in reference to that refresher training?
9    A.   Yeah.
10    Q.   And also looking at that same Exhibit
11  73, you were asked about paragraph 13.
12    A.   Uh-huh.
13    Q.   Would an independent risk manager's job
14  in your opinion have been to spot-check the
15  mountain for safety hazards?
16    MR. McINTOSH:  Objection, foundation.
17    THE WITNESS:  Uh-huh.  I believe that's what
18  they should be doing.  If I were a risk manager, I
19  would spot detect.
20  BY MS. WALAS:
21    Q.   Now, were you ever in charge of marking
22  the Challenger area?
23    A.   No.
24    Q.   Did you ever -- strike that.
25    Were you ever assigned to the Challenger

Page 123

1  area as a ski patroller?
2    A.   Yes, many years ago.
3    Q.   Do you have an idea what year that was?
4    A.   Maybe 2008, 2009.
5    Q.   And it was your testimony that in your
6  opinion the transition from black to flat was
7  significant here?
8    MR. McINTOSH:  Objection, misstates her
9  testimony.
10    MS. WALAS:  I'll rephrase the question.
11  BY MS. WALAS:
12    Q.   Is it your opinion that the transition
13  from Highway to the road was significant?
14    MR. McINTOSH:  Objection, asked and answered.
15    MS. WALAS:  You can answer.
16    THE WITNESS:  Yes, it's significant.
17  BY MS. WALAS:
18    Q.   Okay.  And in your opinion should that
19  transition have been marked?
20    MR. McINTOSH:  Objection, asked and answered.
21    MS. WALAS:  You can answer.
22    MR. McINTOSH:  And leading.
23    Go ahead.
24    THE WITNESS:  If it would have been marked it
25  could have avoided an accident there.

Page 124

1  BY MS. WALAS:
2    Q.   And you were asked questions about where
3  Mr. Meyer came down the mountain, correct?
4    A.   Yes.
5    Q.   And I'm going to show you what has
6  been marked as Exhibit 65, and this is from
7  Mr. McMakin's deposition testimony.  And he had
8  marked this as where he believes Mr. Meyer came
9  down.
10    A.   Right here where it says 7?
11    Q.   Yes, where he has circled, that was
12  where -- we asked him to mark.
13    A.   Okay.
14    Q.   And looking at this picture, is that the
15  same picture that you relied on in forming your
16  opinions for the affidavit?
17    A.   Yes.
18    Q.   And is that the transition that you were
19  referencing in your affidavit?
20    A.   Correct, this transition here that
21  is -- looks like according to these people that it
22  was a road cut.
23    Q.   Okay.  And I believe you testified that
24  the trail merges were something that were marked?
25    A.   You said what?

Page 125

1      Q.  Did you -- I'm recalling that you
2  testified that trail merges were something that was
3  marked at Big Sky?
4      A.  Yes, we have trail merger signs where
5  trails come together, roads and runs and -- yeah.
6      Q.  Is this intersection of Highway and the
7  Loop Road considered a trail merge?
8      A.  Yes, it's two trails merging together.
9  It's an intersection.  Sorry, but intersections in
10  my opinion are like this and trail mergers are also
11  like this and where two runs come together, but it
12  could be a flat angle too.
13      Q.  So to clarify, in your opinion
14  what -- how would you describe the meeting of
15  these -- of Highway and Loop Road?
16      A.  A transition, an inter -- a transition.
17      Q.  Okay.  And you were also asked about
18  bombing down the hill, do you recall that?
19      A.  Uh-huh.
20      Q.  That line of questioning?
21      A.  Yes.
22      Q.  And you testified about a conversation
23  that you and I had where I described to you what
24  Mr. McMakin described as bombing?
25      A.  Uh-huh, yes.

Page 126

1      Q.  And do you recall me telling you that
2  Mr. McMakin said that to him bombing meant taking
3  the moguls in his thighs under control?
4      A.  Yes.
5      Q.  Okay.  And did that influence your
6  testimony that you gave today in any way?
7      A.  No.
8      MS. WALAS:  I don't think I have any more
9  follow-up at this time.
10      MR. McINTOSH:  Just a couple of real quick
11  questions, Ms. Dixon.
12             RE-EXAMINATION
13  BY MR. McINTOSH:
14      Q.  Ms. Dixon, do you know when -- if there
15  are opinions in an accident investigation, do you
16  know when those opinions would or would not be
17  admissible in court?
18      A.  I don't understand the question.
19      Q.  Well, if somebody -- you are an accident
20  supervisor, correct?
21      A.  Uh-huh.
22      Q.  Accident investigation supervisor,
23  right?
24      A.  Yeah.
25      Q.  And let's say a ski patroller at Big Sky

Page 127

1  wrote in the accident investigation "in my opinion
2  this accident was the fault of the skier," okay,
3  you with me so far?
4      A.  Yeah, we don't write that.
5      Q.  My question is, if somebody did write
6  that, do you know when that opinion would or would
7  not be admissible into court?
8      MS. WALAS:  Objection, calls for a legal
9  conclusion.
10      THE WITNESS:  I don't understand the
11  question.  I mean an opinion is a subject that
12  court looking for that's not in the accident
13  investigation.
14  BY MR. McINTOSH:
15      Q.  Do you know why opinions are not
16  supposed to be in the accident investigation?
17      A.  Yes.
18      Q.  Okay.  Well, why do you think opinions
19  are not supposed to be in the accident
20  investigation?
21      A.  Because we are working for Big Sky.
22      Q.  But you don't know when opinions are or
23  are not admissible in court, do you?
24      MS. WALAS:  Same objection, calls for a legal
25  conclusion.

Page 128

1      MR. McINTOSH:  I will stipulate that that
2  calls for a legal conclusion.  That's the entire
3  point of this line of questioning.
4  BY MR. McINTOSH:
5      Q.  Do you know when an opinion is or is not
6  admissible in court?
7      A.  No, I don't.  I'm not a lawyer.
8      Q.  Right, right.  Exactly.  So you don't
9  know what's admissible in court because you're not
10  a lawyer --
11      A.  Right.
12      Q.  -- right?
13      So do you think maybe that's why you
14  were instructed not to put opinions in the accident
15  investigation?  Did that ever occur to you?
16      A.  That you can't use it in court?  Or that
17  any other lawyer cannot use it in court?  We are
18  not writing opinions in the accident investigation
19  because we do not want to harm Big Sky.  That's
20  what my and Bob's explanation to me was.
21      Q.  So now you're saying that that's what
22  Bob Dixon told you?
23      A.  Yeah, when we talked.
24      Q.  That's what you believe?  That's what
25  you believe is the reason why you didn't put

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 129

1  opinions in there?
2      A.  The main reason.  Because the legal
3  outline I don't -- I can't tell you.  I'm not a
4  lawyer.
5      Q.  Right.
6      A.  Yeah.
7      Q.  So you don't know when an opinion would
8  or would not be admissible?
9      A.  No.
10      Q.  Right.  If opinions were admissible,
11  wouldn't it make sense for me to instruct the ski
12  patrollers to every time just say "this was the
13  skier's fault"?
14      A.  Well, that would be stupid.  I wouldn't
15  have had a job as accident investigator.  Like I
16  wouldn't have had a job in Austria either.
17      Q.  Mr. Meyer's accident investigation,
18  other than speaking with Mr. McMakin two days
19  afterwards, you did not actually do any of the
20  accident investigation, did you?
21      A.  No, there was an accident investigator
22  out there.
23      Q.  Right.  So you didn't -- you didn't go
24  to the scene and take measurements?
25      A.  No.

Page 130

1      Q.  You didn't take any of the photographs?
2      A.  I don't think so.
3      Q.  Did you at any time after Mr. Meyer's
4  accident go and actually inspect the scene?
5      A.  I believe so.
6      Q.  When?
7      A.  After the accident.
8      Q.  When?  When after the accident?  I mean
9  today is after the accident, right?
10      A.  Yeah.  But right after it happened, like
11  maybe a day or two afterwards.  I don't remember.
12  But I'm sure I went there to see what happened.
13      Q.  And did you take any measurements?
14      A.  No.
15      Q.  Did you make any notes of your alleged
16  inspection?
17      A.  No.
18      Q.  Were the conditions the same?
19      A.  Can't say that because I was not
20  there on the day --
21      Q.  Right.
22      A.  -- of the accident.
23      Q.  You don't know one way or the other,
24  right?
25      A.  I don't know about the conditions of the

Page 131

1  accident because I wasn't there.  I can only read
2  what the people were telling me or listen to and
3  the grooming, the weather report and...
4      Q.  Right.  So you can look at the
5  photographs to determine what the conditions
6  are -- were on that day just like anyone else can,
7  right?
8      A.  Yeah.
9      MR. McINTOSH:  I think that's all the
10  questions I have.
11      MS. WALAS:  I don't think I have any
12  follow-up.
13      MR. McINTOSH:  That's all.
14      MS. WALAS:  Cool.
15      VIDEO TECHNICIAN:  Okay.  This now ends the
16  deposition.  The time is 11:51.
17      (Whereupon, an off-
18      the-record-discussion
19      then took place.)
20  BY MR. McINTOSH:
21      Q.  Ms. Dixon, we're back on the record and
22  you understand you're still under oath, correct?
23      A.  Yeah.  Do I need this on?
24      Q.  No.  I just want to make clear that you
25  have been given an opportunity to read and sign

Page 132

1  your deposition transcript and you are declining
2  that; is that right?
3      A.  Yes.
4      Q.  Okay.  So if there's a mistake in the
5  deposition transcript, you're not going to come
6  into court and say that there was a mistake, right?
7  You're just going to rely on what was typed by the
8  court reporter?
9      A.  Yeah, I have to now.
10      Q.  Okay.  That's all.  Thank you.
11
12      (Whereupon, the taking
13      of this videotaped deposition
14      was concluded at 11:51 a.m.)
15
16
17      SIGNATURE WAIVED
18
19
20      * * * * * * * *
21
22
23
24
25

33 (Pages 129 to 132)

EVI DIXON

Page 133

```
 1              C E R T I F I C A T E
 2    STATE OF MONTANA   )
 3                       ) ss.
 4    COUNTY OF GALLATIN  )
 5          I, Marla Jeske, Court Reporter - Notary
 6    Public, CSR, in and for the County of Gallatin,
 7    State of Montana, do hereby certify:
 8          That the witness in the foregoing
 9    deposition was by me first duly sworn to testify
10    the truth, the whole truth and nothing but the
11    truth in the foregoing cause; that the deposition
12    was then taken before me at the time and place
13    herein named; that the deposition was reported by
14    me in shorthand and later transcribed into
15    typewriting under my direction, and the foregoing
16    pages contain a true record of the testimony of the
17    witness, all done to the best of my skill and
18    ability.
19          IN WITNESS WHEREOF, I have hereunto set
20    my hand and affixed my notarial seal this ____ day
21    of _____, 2020.
22    _____
23          Notary Public for the State of Montana
24          residing at: Bozeman
25          My commission expires: February 04, 2023
```

34 (Page 133)

**A**

**A-O-R-T** 23:20
**a.m** 1:20 4:16
  132:14
**abilities** 39:22
**ability** 39:16
  44:9,22 133:18
**able** 39:17,17
  48:16 70:19
  75:20,24 76:20
  76:25
**abrupt** 53:8
  64:24 65:4,9
  65:12,12 94:13
**accept** 59:14
**access** 112:6
**accident** 9:7
  10:8,9,19,20
  10:21,22 12:6
  12:14 13:19,22
  13:24 14:6,8
  16:24 17:12
  43:1,18 50:24
  53:2 56:1
  66:20 75:13
  81:5 86:22
  87:2,3 90:7,8
  90:11,17,23
  91:3,10,12,12
  91:16,16,20,23
  92:6 93:6,11
  93:13,23,25
  101:16,18,19
  101:23 102:5,7
  102:8 105:1,19
  107:1,6,12
  108:10 112:7
  113:8,10,12,17
  113:20,24
  114:7 120:1,16
  121:7,13,14
  123:25 126:15
  126:19,22
  127:1,2,12,16
  127:19 128:14

  128:18 129:15
  129:17,20,21
  130:4,7,8,9,22
  131:1
**accidents** 47:7
  67:7,18 104:4
**account** 55:11
**accurate** 6:23
  7:2
**acted** 98:19
**acting** 13:17
  16:21 18:2,8
  18:14,21
**actions** 39:6
  59:24 78:13
**active** 115:25
**actual** 28:18
  100:5
**additional** 21:1
  21:5 23:13
**address** 5:11
  31:4,13,13
**addresses** 31:9
  114:9 117:12
  118:3
**admissible**
  126:17 127:7
  127:23 128:6,9
  129:8,10
**admit** 53:13
**advices** 64:13
**affidavit** 3:14
  7:8 43:11
  47:19 52:25
  53:8,14 67:23
  98:22 99:8,11
  100:3 102:15
  109:1 124:16
  124:19
**affixed** 133:20
**agency** 29:4
**ages** 31:14
**ago** 59:11 118:8
  123:2
**agree** 6:19 8:25
  12:16 13:6

  34:6 39:5,8
  43:16,20,23
  44:2,5,8,12,16
  44:20 45:1,5,9
  45:12,22 46:2
  46:24 47:22
  48:20 51:1,5
  53:16 56:3,10
  57:11 59:17
  64:17 70:11,13
  71:9 72:7
  73:25 76:11
  79:3,11,18
  80:23 81:20
  82:3 86:25
  87:4 88:23
  91:19 100:2
  108:23,25
  112:1 118:7
**agreed** 8:21
**agreement**
  21:15
**ah** 26:24
**ahead** 48:19
  49:17 57:12
  78:17 79:7
  84:6,7 88:16
  123:23
**AI** 90:13
**alert** 78:16
**alleged** 103:24
  130:15
**allegedly** 103:24
**allergies** 23:23
**allowed** 112:4
  115:11
**Alm** 33:10
**alpacas** 15:2,10
  16:17
**Amanda** 14:22
  42:22
**Ambush** 68:25
**amounts** 95:15
**anatomy** 23:3
**angle** 86:19,23
  87:14,16,17,20

  87:22 109:15
  125:12
**answer** 6:5,11
  6:19 9:16
  17:23 26:15
  35:16,23 42:7
  45:21 49:12
  67:20 104:6
  111:18 113:13
  120:10 123:15
  123:21
**answered** 99:20
  100:4 120:8
  123:14,20
**answering** 5:24
  6:2
**anymore** 17:14
  28:21
**anyplace** 35:1
**anytime** 81:10
**anyways** 112:20
**AORT** 23:20
**APPEARAN...**
  2:1
**appeared** 54:24
**appearing** 1:16
  2:2,8
**applied** 97:12
**apply** 25:14 97:9
**approached**
  56:16 57:6
**approximately**
  95:23
**April** 30:24
**area** 10:8 32:4,7
  32:13,16 40:8
  52:14 66:18,18
  67:24 68:1,8
  69:2 84:9,13
  85:11,12 86:22
  87:1,3,10
  88:11,13,19,24
  89:2,7 93:11
  102:21 104:25
  105:7 106:15
  106:23,25

  107:20 108:2
  108:19 109:9
  109:16 110:23
  111:10 113:9
  120:17 121:2
  121:19 122:22
  123:1
**areas** 3:10 35:21
  36:3,10,12,14
  37:20 59:22
  77:17 101:16
  103:9,10 104:9
  104:15
**Arizona** 30:20
  31:12
**arrested** 31:19
**artwork** 86:9
**asked** 7:16,24
  8:2,15,20,24
  13:10 17:24,25
  22:18 56:22
  68:17 72:20
  99:19 100:4,18
  100:25 101:3,4
  101:11,12,14
  118:22 119:7
  119:18 120:8
  120:14,19
  122:11 123:14
  123:20 124:2
  124:12 125:17
**asking** 8:9 10:7
  12:22 13:8
  100:7,20 101:8
**asks** 94:14
**assess** 91:23
**assessor** 102:21
**assigned** 122:25
**assignments**
  63:24
**Association** 3:11
  77:18
**assume** 52:24
  83:6
**assuming**
  116:19

assumption 82:5
attached 47:19
attend 8:10
  22:21
attention 55:17
  65:20 70:19
attorney 2:2
  9:11,22 18:21
  18:24 20:1
  100:22 101:1
attorney-client
  37:1
attorneys 2:8
  4:20
Austria 21:25
  22:1 30:3
  32:12,14,24
  33:3,17 34:2
  37:15,19,23,24
  38:8 59:1,2,21
  61:9 129:16
authority 36:17
  36:20,21
  120:23
automatic 23:20
avalanche 38:1
  38:2 121:20
Avenue 1:18
  2:12 4:14
avoid 39:17,23
  67:7,18 78:25
avoided 66:20
  123:25
avoids 44:13
aware 41:2
  44:17 54:22
  55:21 93:2
  114:11
awhile 68:12
Ayres 108:6,9

        B
B 3:5
babies 8:21,21
  16:19
back 14:20

27:13 30:2,4,4
  46:16 58:4,7
  61:6,7 64:16
  78:18 89:25
  112:17 117:4
  131:21
background
  21:22 22:4
  31:25
backside 71:7
bad 34:20 72:20
balloons-types
  38:9
bamboos 72:15
Barker 29:18
base 104:11
based 35:22,23
  35:24 84:22
  100:6
basis 37:2 92:5
becoming 9:13
beg 61:18
beginning 1:19
  124:16,19,24
behalf 2:2,8
  13:17 18:3,8
  18:15,22
Belgrade 96:7
  96:17
believe 6:22
  36:10 38:25
  46:5,8,10,18
  46:20 48:25
  49:12 52:10
  54:2,18 55:6
  65:19 66:14
  83:10,15 90:15
  104:1,2,12,16
  110:7 122:17
  124:23 128:24
  128:25 130:5
believed 92:13
believes 124:8
Bermuda 11:11
  40:9 52:14
  56:7

best 19:12
  102:15 133:17
better 24:20
  73:17 83:19
  105:12
big 1:8 2:9 4:8
  4:24 7:25 8:3
  8:15,23,25
  10:10 13:15
  14:21 17:12,14
  17:17,19 32:3
  32:5,8 33:23
  35:1,7,13,17
  36:17,20 38:11
  38:15 46:2,4
  57:16 58:23
  60:23 61:2,5
  62:2 63:6,8,12
  63:25 64:4
  70:4 72:16
  73:10,13,15,19
  74:12 75:9,13
  76:10,12 77:25
  92:14,16,19,24
  94:12,15 97:15
  100:21 101:1,9
  101:15 102:16
  103:23,24
  104:20 108:18
  109:20 110:5
  111:19,20
  112:1,3,10,16
  113:2 115:9,12
  116:6,15 118:3
  119:25 120:21
  125:3 126:25
  127:21 128:19
bills 20:6,8
bit 21:23 59:10
  66:13 76:16,21
  91:18
black 64:25
  109:19,22,25
  110:9,14,18
  123:6
blame 59:22

blind 76:5 79:8
blocking 25:9
blue 87:10 109:5
  109:11,17
  110:5,8,14,18
  110:23 111:4
  111:10 113:9
BMM 4:10
board 28:25
  29:3
Bob 60:14,15,18
  61:17 62:12,12
  62:17,20 63:23
  103:18 113:24
  128:22
Bob's 128:20
body 25:5,8,11
  25:12,21,22,23
  26:3,23,24
  27:2,3,9,19
Boeing 33:21
bombing 40:25
  41:1,3,7,8,10
  41:11,13,20,24
  42:4 125:18,24
  126:2
bones 27:20
bonus 21:7
boss 62:19 63:16
  63:18
bottom 109:10
  111:3
Bowl 68:6 97:1
  97:8,10
Box 2:5,12
boxes 70:7
boys 8:18
Bozak 36:2
  122:4
Bozeman 1:18
  2:6,13 4:14
  63:2 133:24
break 57:17
  89:17
breaks 33:11,12
  33:13

Breean 2:4 3:4
  4:22 12:5 41:5
  41:8 117:17
breean@wala...
  2:6
Bridger 4:18
  97:1,7,9
brief 58:1 89:22
  117:2
bring 17:11
  41:10 92:6,7
Brown 4:18
bruised 59:10
  59:11
bubbles 38:10
building 71:18
  71:23,25 72:2
business 94:20
  94:24,25 97:5
  98:17,17,18
  119:12,14
Butte 1:3 4:11

        C
C 133:1,1
cafeteria 14:23
call 16:7 38:13
  87:13
called 5:4 14:20
  20:25 21:14
  22:8 95:3
calls 127:8,24
  128:2
capacity 9:11
card 29:21,23
  29:24 30:1,3,4
  61:10 62:11,13
  102:3
cards 78:2,3,19
care 28:25 29:5
case 4:7 7:20,21
  9:14 10:5,6,13
  10:17 11:3,7
  11:16,20 17:4
  20:14,14 21:3
  21:8 32:21

40:1,14,15,17
43:10,14 55:14
63:21 65:6
71:17 74:5
85:3 95:3,16
95:24 98:20
99:9 103:3
111:5,16
115:15 119:16
119:22,24
**cat** 51:1,3 54:3
54:25 58:21
59:3,19,21
65:16 69:23
72:25 73:1,3,5
73:8,10,25
74:3 80:4,8,20
80:24 81:7,9
81:16,21,25
82:5,9,12,16
82:20 85:13,14
85:16,19 86:18
**catwalk** 11:13
58:18
**catwalks** 44:2
**cause** 1:7 4:9
43:18 133:11
**caused** 40:12
45:10 53:1
**caution** 66:19
**cells** 26:25
**central** 25:9,12
**cerebral** 26:2
27:18
**certain** 12:22
13:8 53:19,20
93:16 95:5
**certainly** 48:8
57:12 68:13
79:3 81:8
106:14
**certificate** 23:12
23:14 24:3,4,9
**certificates**
23:14 25:3,10
28:5,18

**certify** 133:7
**Challenger**
105:4 107:18
121:2,3,4
122:22,25
**change** 47:8
**changed** 22:7
**changes** 91:14
91:24
**characterize**
94:11
**charge** 122:21
**charged** 31:17
**charging** 20:10
**chemically**
95:14
**chest** 27:14
**child** 23:23
81:15
**children** 30:9,12
31:3,14
**chiropractor**
27:25
**choice** 81:11
**chooses** 46:3
**chose** 50:14,15
**Christmas**
33:11,15
**circled** 124:11
**citizen** 29:19
**Civil** 1:20
**claim** 103:20
**clarify** 53:7
125:13
**clarifying** 57:2
**classes** 23:3
28:15 29:16
**cleaning** 95:14
**clear** 27:22 36:6
56:8 108:7
131:24
**close** 8:9
**coffee** 89:19
**collagen** 95:11
95:12
**collect** 90:19

120:12
**college** 22:10
33:6 34:5
**Collision** 3:11
77:18
**Colored** 3:12
**coma** 51:21 52:1
75:7
**come** 6:3 33:21
35:24 55:25
82:6 83:13
84:16,17,18
125:5,11 132:5
**coming** 8:7
48:10 55:17
71:15 79:15,20
103:5 114:2
**commented**
15:17
**commission**
133:25
**communicate**
17:18
**communication**
16:10 17:20
**communicatio...**
18:17,20 19:1
**company** 94:23
95:20 121:24
**complete** 91:4
102:9
**comply** 13:20
16:1
**computer** 99:22
99:22,25 100:1
111:20,23
112:17,19
**concerns** 92:6,7
**concluded**
132:14
**conclusion**
127:9,25 128:2
**conditions** 82:4
130:18,25
131:5
**condo** 96:3

**conferences**
23:2
**connection**
114:1,4,6
**connections**
115:13
**consider** 61:14
**considered**
125:7
**constantly** 22:16
**contact** 8:14
115:9
**contacted** 8:17
**contain** 133:16
**contempt** 16:1
**contend** 47:4
48:15,24 64:23
65:3,6,15
87:15 103:23
108:17
**contending**
69:21
**contends** 110:5
**continued** 33:15
**contract** 21:10
21:14 33:23
**contributed**
45:13,16,23
76:21 77:1,2,6
77:9,20 78:10
78:11 79:1,2
79:23,24 80:5
80:20 81:2,3,9
81:12,13,18,19
82:17 86:8,11
86:12,18,20
87:7 88:12
90:13,14 91:8
97:24 99:6,7,9
99:10,16
102:13 107:2
109:20,21,23
109:24 110:1,2
110:19,20
111:21 114:3
117:12,20
119:8,9,12

19:4,9,23 20:2
20:3,4,5 21:20
21:21 27:23,24
28:1 34:8,15
34:16 35:2,3,8
35:11,13 37:6
37:13,14,16,25
38:12 39:19,23
39:24 40:10,13
47:20,24,25
48:10,11,13,14
49:18,19,21,22
49:25 50:3,12
50:16 51:16,17
53:10,11,25
54:1,16,17
55:10 58:9,10
64:20 65:21
66:3,10,11
67:24 68:16,19
70:21,24 71:3
71:5 73:9,11
73:12,16,23
74:1,4,6,15,16
74:21 75:10,11
75:14,15,18,19
75:21 76:1,16
76:21 77:1,2,6
77:9,20 78:10
78:11 79:1,2
79:23,24 80:5
80:20 81:2,3,9
81:12,13,18,19
82:17 86:8,11
86:12,18,20
87:7 88:12
90:13,14 91:8
97:24 99:6,7,9
99:10,16
102:13 107:2
109:20,21,23
109:24 110:1,2
110:19,20
111:21 114:3
117:12,20
119:8,9,12

124:3,20
126:20 131:22
**corresponded**
16:15,17
**correspondence**
13:14,16,23
14:8,10,12,18
15:3,6,13,19
16:5,22 17:2,9
18:1,6,11,14
**corresponden...**
15:21
**counsel** 37:6
**counselor** 23:17
**County** 133:4,6
**couple** 126:10
**course** 19:24,25
45:2,6 51:23
57:19 63:16
**court** 1:1,21
4:10,17,18
5:24 19:10
126:17 127:7
127:12,23
128:6,9,16,17
132:6,8 133:5
**cranio** 27:18
**craniosacral**
8:19 23:2,19
23:19 24:14,19
25:14,17,24
26:21 27:5
28:23 96:9,9
96:12 119:19
**crime** 31:17
**cross** 72:23
**Crowley** 1:17
2:11 4:13
**CSR** 1:22 133:6
**current** 13:15
95:17,18
119:11
**Curtis** 5:12
**cut** 53:22,24
64:22 65:12
72:17,18,21

73:3,6,7,16,16
73:20,21,22,25
74:9 89:11,12
124:22
**cuts** 72:14 74:11
93:16
**cutting** 11:10
**cycle** 29:17
106:11

— D —

**D** 3:1,5
**danger** 38:1
43:24 44:1,3,6
44:10 104:3
**dangers** 44:17
**dash** 4:10
**date** 4:15 7:22
19:5
**dates** 8:5,13
**dating** 61:24,25
**daughter** 31:11
75:2,3
**daughter's**
30:19
**day** 1:19 19:6
40:6 54:13
74:23 75:1
76:3 77:20
78:10 85:19
86:11 105:25
106:1,2,10,10
121:5 130:11
130:20 131:6
133:20
**days** 115:24
129:18
**December** 12:21
13:12 14:9
33:11 50:11
52:11 54:9
57:7 65:18
66:16 67:11
68:2,19 69:1
74:6,14 82:15
83:11 84:24

85:2 87:23
105:2 106:3,8
106:11,16
113:8 121:1
**decided** 33:16
33:17
**decisions** 9:12
**declining** 132:1
**defendant** 1:9
1:16 2:9 4:9,24
**definitely** 31:5
**degree** 22:9,10
24:1 33:16
87:21
**degrees** 23:8,10
23:11 27:23
87:17
**delete** 115:22
116:1,2
**deleted** 115:20
**deliver** 67:4,4
**delivered** 17:13
**departure** 94:12
**depending** 76:4
97:23
**depends** 50:4
105:13,14
**deposition** 1:11
1:15 3:8 4:7,12
5:16 7:6,14,17
11:24 12:2,10
12:13,13 13:1
42:16 43:3
77:10 86:1
99:1 117:14
124:7 131:16
132:1,5,13
133:9,11,13
**describe** 22:3
59:6 74:25
125:14
**described**
125:23,24
**designated**
109:19,22
**desk** 62:14

**despite** 37:4
**detail** 46:7 59:7
**detect** 122:19
**determine** 35:7
91:13,24 131:5
**diamond** 64:25
109:20,22,25
**died** 75:5
**difference** 26:8
72:24 73:3,5
98:5,13
**different** 24:12
25:5 27:19
28:7,13,15
52:23 66:13
87:17 91:19
95:13 103:9,10
108:20
**differently**
35:19 69:5
93:6
**difficult** 45:17
109:5
**difficulty** 109:11
109:15 110:23
111:4,10 113:9
**dip** 82:19 85:9
**direction** 49:14
133:15
**directions** 19:13
**directly** 50:15
120:22
**director** 68:10
68:18 106:24
**directors** 64:14
106:18
**Disc** 57:23 58:3
89:20,25
**disclaimer**
20:24
**disclose** 36:18
**discuss** 10:3,5
17:3
**discussed** 9:6,25
10:8 52:15
114:13,24,25

115:15
**dispatcher**
93:19
**district** 1:1,2
4:10,11
**Division** 1:3
4:11
**divorce** 63:11
**divorced** 62:22
62:25 63:22
64:3
**Dixon** 1:12,15
3:2,9,14,15 4:7
5:3,10,11 9:19
58:7 60:14,15
60:18,25 61:3
62:20 63:3,12
63:23 64:2
84:7 86:5 90:3
99:5 100:15
108:15 113:25
117:7,10
126:11,14
128:22 131:21
**doctors** 121:22
122:5
**document** 47:13
78:8
**documents**
12:22 13:8,11
**doing** 18:5 27:20
29:16 64:12
93:21 94:23
98:14 100:5
108:24 115:14
115:14 121:13
122:18
**downhill** 48:21
49:2,3,4,4,21
49:23 53:3
54:3,25 56:4,9
56:14 57:8
71:2 76:15,16
76:20
**draw** 83:9,10
**drawing** 85:22

86:6
**drawings** 84:22
**drink** 89:19
**driver's** 31:24
**drop** 52:19
73:24
**drop-off** 53:24
64:21 73:21
**drops** 74:11
**duly** 5:4 133:9
**duties** 19:19
**duty** 44:12,16
67:20

**E**
**E** 3:1,5,5,5,5
133:1,1
**e-mail** 3:15 15:7
114:9 116:8
117:12,19,22
117:25 118:3
118:24
**e-mails** 13:14,16
18:1 114:16
**earlier** 58:12
60:4 96:22
119:1
**early** 61:7
**earning** 95:22
**ease** 79:8
**easier** 76:11
**easiest** 76:10
**Easter** 33:12,14
**easy** 80:3,16
**edge** 46:13 53:1
54:3,25 56:4,6
56:9,15 57:8
**educating** 22:17
**education** 22:14
22:19 23:16
29:7
**educational**
22:4
**Eggert** 42:22
43:5,9,13
**eight** 34:5

**either** 15:7
21:19 27:13
57:7 68:13
82:6 106:23
110:14,18
129:16
**Email** 117:22
**Emerson** 29:16
29:18
**emphasizing**
75:16
**employee**
120:21
**employees** 13:15
115:12
**employment**
17:21 37:7,8
111:20,24
112:2,9 113:3
116:6,15
**EMS** 102:3
**EMT** 29:9,12,14
29:17 31:24
**ended** 33:22,23
46:14,14 88:14
88:21 111:24
112:2,9 113:3
116:6,15
**ends** 37:9 57:23
89:20 131:15
**entire** 114:9
128:2
**enzymes** 95:13
**equipment**
44:22
**Esq** 2:4,10,11
3:3,4
**establish** 40:17
**Europe** 23:4
37:12,14
**eventually** 61:25
**everybody**
38:25 92:21
**Evi** 1:12,15 3:2
3:9,14,15 4:7
5:3,10

**evidence** 17:11
40:16
**exact** 7:22 10:22
42:11 55:19
101:13
**exactly** 5:22
67:8 78:6
88:18 128:8
**examination**
1:11,15 3:2 5:7
118:18
**examined** 5:5
**example** 6:4
24:13 36:2
51:9 63:21
70:10 71:19
73:9 82:19
91:8 96:25
**exchange** 35:24
36:1
**exchanges** 35:25
**excuse** 35:5 53:5
66:6 86:16
**exhibit** 3:6,6,7,7
3:9,10,12,14
3:15 13:2,6,6
47:12,16,20
52:16 77:11,15
77:15 78:4,7
83:10 85:22
86:2,6,14,15
88:10,10,20,25
89:2 98:24
99:2,6,8
117:15,19
118:22 122:7
122:10 124:6
**EXHIBITS** 3:8
**exist** 74:5,14
**expected** 38:23
**experience**
119:8,25 120:3
120:6 121:14
**experiences**
120:12
**experiencing**

64:9
**expert** 9:13
16:22 21:19
98:19,23
**expires** 133:25
**explain** 24:14
**explanation**
128:20
**expression**
101:24

**F**
**F** 3:5 133:1
**Facebook** 8:18
14:25 15:7,14
15:15,16,23
16:9 94:19
115:21,22,25
**fact** 37:24
103:15,24
114:25
**facts** 110:3
**failed** 14:14
15:18 16:3
17:6 19:2 20:4
21:18 39:25
45:5
**failing** 16:1
**fails** 51:6
**failure** 44:8
**fair** 84:23 85:1
91:2
**familiar** 35:10
47:16 67:23,24
68:8 69:2
104:25 105:7
**far** 16:25 38:4
46:17 48:1,2
48:19 89:15
127:3
**fast** 40:23 41:13
41:16,18,20,22
42:10,14,17,20
42:23,25 46:3
46:11 54:18
71:24 76:19

111:12
**faster** 39:16
45:19,19
**fault** 51:12
59:17 71:9,16
71:25 79:23
81:18 110:19
127:2 129:13
**February** 33:12
60:19 133:25
**Federal** 1:20
**fee** 20:22 96:13
**feel** 24:20 27:17
**feels** 72:23
**feet** 27:15 55:14
**fell** 40:8 75:3
**fences** 36:3
**files** 90:19 91:1
102:4
**finally** 27:1
**financial** 55:14
**find** 15:21,24
**finish** 5:23 24:6
**finished** 6:5
**Firm** 2:5
**first** 5:4 7:19
10:4 11:8
29:15,15,24
30:2,5 32:3
33:7 56:1
57:16 60:4
62:1,7 72:19
80:3,16 85:20
99:15 109:9
133:9
**flags** 68:24
**flat** 64:25 65:11
65:13 72:22,24
87:11,16,19,21
123:6 125:12
**flatter** 89:9
**Fleck** 1:17 2:11
4:13
**flew** 40:20 58:18
**flip** 47:9
**flipped** 46:13,15

| | | | | |
|---|---|---|---|---|
| **fluid** 26:2 27:19<br>27:20 | **G** | 96:16 100:14<br>103:8,10 | 65:24 97:25<br>104:4 | 49:13,20,24<br>50:19 52:12,20 |
| **focus** 17:11 | **Gallatin** 133:4,6 | 111:13 124:5 | **happened** 47:10 | 53:9,17 64:18 |
| **focused** 7:18 | **gap** 52:7 | 132:5,7 | 55:11 58:13 | 65:4,17 67:11 |
| **follow-up** | **general** 10:9 | **good** 5:24 80:17 | 59:6,8 75:1 | 74:6 82:14 |
| 116:20 118:20 | 67:19 92:18 | **gotten** 85:18 | 92:8 130:10,12 | 83:11 84:4,10 |
| 126:9 131:12 | **Generally** 7:20 | **government** | **happening** | 85:2 86:8,17 |
| **following** 4:1 | **German** 38:17 | 29:4 | 26:23 | 87:6,9,10,22 |
| 26:23 64:13 | 38:18 | **graduate** 23:5 | **hard** 48:5 | 88:3,12,24 |
| **follows** 5:5 | **getting** 101:5 | **graduated** 33:4 | **harm** 128:19 | 89:5 109:10,19 |
| **foregoing** 133:8 | 116:8 | **grandchildren** | **hats** 16:18,19 | 110:1 111:2,4 |
| 133:11,15 | **girl** 75:5,5 | 81:16 | **Hawk** 112:4 | 123:13 125:6 |
| **forget** 60:5 | **girlfriend** 14:22 | **greater** 97:23 | **hazard** 34:23 | 125:15 |
| **forgotten** | 54:15,21 | **green** 3:13 29:21 | **hazards** 35:8,17 | **hill** 38:2 67:21 |
| 118:23 | **give** 6:23 7:2 | 29:23,24 30:1 | 37:20 64:8,10 | 71:15 72:8,13 |
| **form** 10:12,17 | 24:23 36:17,20 | 30:4 38:8,8,9 | 94:9 122:15 | 72:23,24 73:8 |
| 10:22 11:2,6 | 36:21 46:6,7 | 61:10 62:11,12 | **head** 27:5 40:22 | 77:4 90:24 |
| 11:16,20 43:10 | 63:23 96:9 | 83:21,23,25 | 46:16 | 107:14 125:18 |
| 43:13 83:16 | 116:17 | 109:4 110:14 | **health** 23:22 | **hire** 33:20 |
| **formal** 22:14,18 | **given** 131:25 | 110:18 | 28:25 29:5 | **hired** 62:1 |
| 29:7 | **gives** 24:17 | **grew** 21:24 | 95:8,9 | **hit** 40:10,11,12 |
| **formed** 82:25 | **giving** 27:4 | 37:12,14,15 | **heard** 12:4 | 40:19,19 45:19 |
| **former** 13:15 | 119:15,24 | 38:22 | 18:23 103:8 | 45:19 51:12 |
| 61:16 120:1 | **go** 5:20 27:3 | **groomed** 38:6,7 | 114:22 | 75:5,6,21,24 |
| 121:14 | 33:5 49:16 | 38:19,20 | **held** 4:12 15:25 | 76:25 |
| **forming** 124:15 | 57:21 59:22 | 109:10 110:23 | **help** 8:25 9:4 | **hits** 51:5 |
| **forms** 90:25 | 71:23 73:11 | **grooming** 131:3 | 24:19 25:17 | **hold** 25:1 31:23 |
| 102:1,1 | 76:23 80:9 | **growing** 121:15 | 78:14 115:17 | **holding** 26:25 |
| **forth** 77:23 | 84:6,7 88:16 | **guess** 31:7 33:6 | **helping** 17:3 | **home** 31:13 |
| **forward** 9:13 | 91:11,15,20 | 61:15 | 25:8,11,12 | **Hotel** 71:20 96:7 |
| **foundation** | 92:15,25 | **guests** 104:9 | 114:25 115:7 | 96:17 |
| 122:16 | 116:22 120:12 | **guns** 69:10 70:7 | 115:17 | **hour** 1:19 20:12 |
| **four** 106:10 | 123:23 129:23 | **guy** 74:8 | **helps** 24:16 | **hours** 20:13 |
| **free** 95:14 | 130:4 | | **hereunto** 133:19 | **house** 30:20 |
| **French** 22:6 | **goes** 26:5 76:15 | **H** | **Hi-Liter** 83:21 | 31:6 |
| **friend** 32:17 | 76:15,16 | **H** 3:5 | 83:23,25 | **hundred** 48:6 |
| 96:8 | 102:20 | **hand** 13:5 77:14 | **high** 22:5 33:4 | **hurry** 96:21 |
| **friends** 14:25 | **going** 5:20,22 | 83:8 85:20 | 64:11 | **husband** 63:18 |
| 15:16 | 8:6 9:15,24 | 88:9 117:18 | **higher** 86:19 | 68:17 106:24 |
| **front** 11:13 50:7 | 13:5 14:1,3 | 133:20 | **Highway** 11:10 | |
| 51:2,6,10 | 17:22 21:4 | **handbook** 112:3 | 11:11 38:11,14 | **I** |
| 70:20 73:15 | 23:24 33:8 | **handed** 99:5 | 38:20 40:18,24 | **Ian** 2:10 3:3 |
| **fulfilling** 50:10 | 34:20 63:21,22 | **hands** 14:24 | 41:4 42:14,24 | 4:23 57:17 |
| **full** 33:17 34:4 | 77:14 83:8 | 24:22 25:19 | 43:17 46:10,19 | 122:4 |
| 96:13 97:6 | 85:19,20,21 | 27:6,8,12 | 46:22,25 47:6 | **idea** 51:23 61:21 |
| **future** 65:23 | 86:13 88:9 | **happen** 47:8 | 47:23 48:1,16 | 103:17 123:3 |

identification
13:3 77:12
86:3 99:3
117:16
identify 4:20
identifying 94:8
imcintosh@cr...
2:13
important 12:12
12:16 75:17
inaccurate
118:9,11
incentive 55:14
incident 51:19
52:2 55:12,13
75:10 78:6
92:14 120:17
included 102:3
including 13:13
13:14,16 18:1
income 95:17,18
95:25 98:2
incorrect 53:14
114:15
independent
102:17,19,23
102:25 103:1,1
103:7,13,25
104:13,17,20
104:23 105:11
122:13
indicating 49:16
83:18
indoors 121:22
industry 32:1
35:10,13,19,21
66:14,22 67:10
67:15 89:13
96:25 97:13
104:12,12,13
104:17,22
influence 126:5
information
10:11 11:2
17:24 36:16,18
36:24 37:5

78:18 100:10
100:17,21
101:1 110:3
inherent 43:24
44:1,3,5,9,17
injured 92:25
injuries 56:5,11
injury 44:13,24
45:3,7,13,16
45:25 59:13
inquiries 8:11
inspect 130:4
inspection
130:16
instance 1:16
71:13
instruct 9:15
129:11
instructed
128:14
instructor 32:15
32:23 33:3,9
33:10 34:3,13
37:22 61:5
120:7
instructors 28:8
28:14 34:7,17
34:22 35:5
insurance
121:24
intended 56:6
intention 26:5
intentionally
119:2
inter 125:16
interrupting
53:6
intersection
73:7 125:6,9
intersections
67:3 125:9
investigation
10:23 12:6
40:5,7 90:7,9
90:11,17 91:3
91:4,10 93:14

93:23 94:1
101:18 102:5,7
102:9 107:12
112:7 113:24
121:13 126:15
126:22 127:1
127:13,16,20
128:15,18
129:17,20
investigations
90:23 101:20
101:23 121:15
investigator
10:19 17:13
91:17 120:1
121:8 129:15
129:21
investigators
101:16
involved 75:12
98:8,9,10,15
98:16
irrelevant 85:3
85:4
issue 78:6

_____
J
_____
Jackets 113:5
January 1:19
4:15
Jeske 1:21 4:17
133:5
Jim 30:6 60:7,8
job 34:13 36:19
36:25 62:17
91:3,11,20
92:2,3,5 94:8
96:24 101:25
103:4 104:8
105:12,14
106:19 121:15
122:13 129:15
129:16
jobs 97:9,12
John 1:5 2:3 4:8
13:12,21 14:5

17:18 41:3
42:9 74:8
99:13 117:11
117:19 118:1
John's 18:24
jump 54:3,24
55:1 56:4,6,9
56:14 57:8
jumper 54:6
June 63:4
jurisdiction
106:17
jury 6:13 74:25

_____
K
_____
K 76:11,14,18
keep 23:24
112:5
kept 112:8 113:3
kid 37:21
Kids 77:23
kind 8:22 10:19
22:7 101:24
kinds 90:18
kinesiology 23:1
23:21,22,22
knee 26:4
knew 10:19 61:3
Knife 71:19
knitted 15:1
16:18
knitting 98:18
know 5:22 6:6,9
6:12 8:15 9:5
14:5,7 15:20
15:21 16:13,14
17:16 18:5
19:11 21:14
24:17,18 29:2
29:3,6 35:4,6,9
35:12,14,16
36:24 40:2,21
41:10,14,15,16
41:18,23 42:3
45:18 47:13,15
51:22 52:6

53:4 54:9,12
54:20 55:2,3
55:16,19 58:11
61:12,13,19,21
66:24 78:5
82:19,22 83:14
84:8,15,23,25
85:9,10 86:10
87:12,25 88:5
88:7,17 89:15
96:8 101:3
103:16 105:15
107:22 108:12
108:17 110:25
111:14,15,17
111:17 113:12
114:18,19,21
114:23 122:4
126:14,16
127:6,15,22
128:5,9 129:7
130:23,25
knowing 54:5
83:1
knowledge
102:16
Konigsleiten
32:25 33:18

_____
L
_____
landed 40:11,22
46:16 84:11
Lane 5:12
laptop 17:13,14
112:5,8,13
laughing 71:8
Law 2:5
lawsuit 9:1,7
13:25 14:3
18:5 115:1
lawyer 17:17
121:23 128:7
128:10,17
129:4
leading 119:4
120:9 123:22

**learn** 37:17
**learned** 37:10
  37:11
**learning** 22:16
**led** 92:24
**left** 97:15 111:19
**legal** 127:8,24
  128:2 129:2
**legs** 52:22
**let's** 21:22 57:15
  60:3 70:10
  71:6 81:14
  83:20,24 84:2
  98:23 126:25
**letter** 18:24 19:2
  19:3,6
**letting** 6:12
**license** 28:2
  31:24,24
**licensed** 28:24
**licenses** 28:25
  31:23
**Lids** 77:23
**life** 114:3 120:11
**lift** 69:9
**limited** 13:13
  14:2,4
**limits** 44:21
**line** 125:20
  128:3
**liner** 116:8
**lines** 64:11
**link** 78:9,12
**liquid** 95:11
**list** 3:15 78:12
  117:23
**listed** 24:2,5,10
  28:6,16
**listen** 131:2
**little** 19:15,16
  19:17 21:23
  26:4 59:10
  66:12 68:24
  76:16,21 91:18
  94:4 102:4
**live** 30:15,18

31:1,3,9 63:2
  94:21 116:11
**lives** 31:2,5,5,11
  63:1
**located** 4:13
**log** 17:14 46:15
  83:5,7 85:12
  88:14,22
**long** 55:24 59:11
  60:8 84:16
**longer** 33:13
  94:15
**look** 14:25 15:22
  27:17 34:20
  48:19 49:8,8
  49:17 50:7,14
  50:15 78:8
  79:14,18 80:9
  82:1 131:4
**looked** 11:9,12
  15:24 40:3
  48:18,21 49:14
  52:19,23
**looking** 43:2
  46:25 47:23
  49:1,3,5,10,23
  50:3 51:11,11
  57:12 64:9
  72:8,12 85:13
  85:16 88:13
  101:25 121:14
  122:7,10
  124:14 127:12
**looks** 49:4 89:9
  118:5 124:21
**Loop** 11:10,13
  40:19 46:11,12
  46:13,19,21,25
  47:3,5,23 48:3
  48:10,12 49:13
  49:24 50:12,13
  50:16,18,24
  52:12,13,20
  53:9,17 55:23
  56:4,7,9,15,17
  56:18,25 57:7

57:9,13 64:18
  65:4,17 66:15
  67:10 68:15
  86:17,19,20
  87:6,9,11,23
  88:4,12,24
  89:5 125:7,15
**loss** 95:12
**lost** 75:3
**lot** 28:20 47:7
  61:11 109:4
**lots** 63:17
**loud** 26:16
**lower** 82:20
**lying** 119:5

**— M —**

**M-A-R-L-E-N...**
  30:14
**Mac** 2:11 4:23
**machines** 73:10
**main** 11:21
  16:10,16 25:24
  90:18 95:11
  129:2
**maintain** 45:2
**maker** 62:13
**making** 94:21
  102:8 103:10
**man** 70:3
**management**
  23:12
**manager** 102:17
  102:19,23
  103:2,7,9,13
  103:19,21,25
  104:8,14,18,20
  104:23 105:11
  105:13 122:18
**manager's**
  122:13
**managing** 103:4
**Manhattan** 5:12
  63:2
**manipulating**
  25:4,6

**manmade** 69:16
  69:21,24 70:4
**manner** 44:13
**map** 80:10
  109:20
**Maria** 33:10
**mark** 4:18 35:8
  35:17 49:9
  64:8 67:2,15
  68:24,24 69:10
  72:14,18 74:20
  83:9 85:21
  89:11 93:14
  98:23 106:19
  106:19 124:12
**marked** 13:3,5
  37:20 38:7,8
  47:12 64:10,10
  65:17,19 66:6
  66:9,15,18,23
  67:1,11 68:1
  69:3,8,12,13
  69:14,20,25
  70:1,4,11 72:3
  72:9,13 74:12
  74:13 77:12,14
  86:3,14 88:10
  89:8 93:12,15
  99:3,6 105:2,8
  106:15,25
  107:20 108:3
  108:18 117:16
  117:18 120:17
  123:19,21
  124:6,8,24
  125:3
**marketing** 95:1
  95:2,7,23
  97:17,19,20
  98:6 119:11
**marking** 37:23
  37:24 66:9
  67:7,19 68:15
  69:17 94:8
  106:23 121:2
  122:21

**markings** 3:13
  67:5 104:3
**marks** 72:17
**Marla** 1:21 4:17
  133:5
**Marlene** 30:14
  30:15 31:15
**marriage** 30:5
**married** 30:2
  60:5,8,11,15
  62:6,12,20
  68:10
**Mary** 36:2,13,13
  121:24 122:3
**massage** 24:23
  24:24,25 26:9
**matter** 20:11
  96:23
**McIntosh** 2:10
  3:3 4:23,23 5:8
  9:9,15,18 13:4
  57:19,21 58:6
  77:13 83:19,22
  83:24 84:2,5
  84:19,21 86:4
  90:2 99:4
  116:21,24
  117:6 119:4
  120:8 122:4,16
  123:8,14,20,22
  126:10,13
  127:14 128:1,4
  131:9,13,20
**McMakin** 12:3
  40:23 41:2,19
  42:9 54:23
  55:7,13,16
  125:24 126:2
  129:18
**McMakin's**
  12:10 124:7
**mean** 22:20
  26:18 31:9
  38:5 39:14
  49:5,6 53:24
  63:14 65:6

67:3 76:14
87:19 101:22
102:11,24
103:1 107:22
109:13,14
127:11 130:8
**means** 41:9,14
41:15,17 42:3
42:6
**meant** 126:2
**measure** 48:5,6
**measurements**
10:24 88:1
90:20 129:24
130:13
**medical** 27:22
121:20 122:4,6
**meet** 7:11,19 8:3
16:24 17:1,3
60:25
**meeting** 9:12
14:23 125:14
**member** 31:21
**members** 61:4
**memory** 52:7,9
**mention** 108:11
108:13,14
**mentioned**
121:16
**merge** 66:20
125:7
**merger** 36:4
125:4
**mergers** 67:3
125:10
**merges** 79:15,19
124:24 125:2
**merging** 125:8
**message** 16:8,10
**messages** 13:21
16:11
**messenger**
15:15 16:8,25
**met** 7:7,13 8:12
9:10 10:4
20:21 33:18,19

61:13
**meters** 48:6,7
**method** 15:7
24:16,19 26:22
**Meyer** 1:5 2:3
4:8 7:7,19 8:4
8:14,25 9:4,6
9:25 10:3,6
11:2,5 13:17
13:22,24 14:5
14:12,19,22
15:4,8,14 16:6
16:12,15,21
17:3,18 18:2,7
20:1,6,10,16
20:18,23 21:2
21:5,8,11,16
37:5 39:25
40:10,24 41:3
41:20 42:9,13
42:15,19,23
43:20 45:5
46:3,18 47:4
48:20 49:12
50:6,10,20
51:18 52:10
54:2,5,9,23,24
55:7,11,22,25
56:3,14 57:5
65:20 66:9
74:8 77:7 81:4
81:14,16,20,25
82:9,13 83:11
84:23 85:2
86:10 87:23
88:3,11,23
95:16 96:11
99:13 100:2,16
100:20 101:8
110:4 112:15
113:7 114:2,8
114:11 115:1,7
115:17 117:11
117:20 118:1
118:24 124:3,8
**Meyer's** 11:24

13:12 18:15,22
43:16 45:9,12
45:15,22 46:5
52:7 86:22
87:1 88:6,8
93:6,10 104:1
105:1,19 107:5
108:10 111:11
113:17 120:16
129:17 130:3
**Michigan** 33:21
**middle** 7:23
**Middleton**
100:13 115:13
**Mike** 2:18 92:13
113:25
**mind** 50:4
**mindset** 23:3
**mine** 32:18 96:8
**minutes** 116:17
118:8
**misstates** 123:8
**mistake** 92:24
132:4,6
**mistakes** 92:21
92:22
**misunderstood**
108:16
**moguls** 126:3
**money** 8:20 21:1
21:5 98:12
**Montana** 1:2,18
2:6 4:11,14
5:12 28:3
30:16,21 39:2
39:5,8,21
103:12,16
133:2,7,23
**month** 33:14
**monthly** 95:17
95:18
**months** 51:19,22
55:12
**morning** 14:21
14:23
**Morris** 2:11

4:23
**mother** 75:2,6,7
**mountain** 33:22
34:8,14,23
73:11 94:3
122:15 124:3
**move** 9:12 17:22
36:15 63:3
85:21 100:14
**moved** 30:2,4
63:1
**moving** 28:19
**MT** 2:13
**multilevel** 97:19
97:20 98:5
119:11
**multiple** 121:17
**multitiered**
97:18
**muscles** 27:20

────────

**N**

**N** 3:1
**N-I-K-O-L-A-S**
30:13
**Nadine** 18:21
**Nadow** 18:21
**name** 5:9 30:7
60:6 103:12
108:4,11,13,14
122:2
**named** 122:3
133:13
**names** 30:12
**National** 3:10
77:17
**necessary** 68:21
68:24 85:9
**need** 5:21,23
24:6 33:1 39:5
39:9 64:16
69:7 70:11
72:2,8,13
78:24 79:8,14
79:18,21 83:19
89:7 91:14

93:15 95:5
96:21 102:1
131:23
**needed** 8:19
31:12 69:3
91:1 102:3,4
112:6
**needs** 31:13 70:4
**negative** 116:5
116:14
**negotiate** 44:22
**nervous** 25:9,12
**network** 95:1,2
95:7,23 97:17
**never** 13:23
17:20 18:17
33:22,23 34:25
38:7,20 40:3
41:11 42:4
66:18 68:1,4
69:2 70:2,3,6
93:4,10,11
105:1,8
**new** 83:10
**nice** 116:7
**Nikolas** 30:13
30:15,25 31:15
**non-manipula...**
26:10,11,19,21
**notarial** 133:20
**Notary** 1:22
133:5,23
**note** 80:3,8
**notes** 13:14
116:18 130:15
**November** 7:23
7:23,23 16:20
**NSAA** 3:10
77:17
**number** 4:9 5:14
13:2 57:23
58:4 77:11
78:22 79:6
86:2 89:20
97:23 99:2
117:15 118:23

## O

**O** 3:5
**oath** 23:25 36:11
  58:8 90:4
  114:12 117:8
  131:22
**object** 19:8 20:1
  69:21,24 70:4
  76:25
**objection** 9:8
  119:4 120:8
  122:16 123:8
  123:14,20
  127:8,24
**objects** 64:10
  69:16 70:8
  78:25
**obligation** 39:11
  39:21 43:21
  44:21 45:1
  50:7,11 51:3
  51:15 74:19
  75:23 110:11
  112:10
**obligations** 77:8
**obstacle** 40:10
  40:12
**obstacles** 39:19
  39:23 51:16
  69:7 75:21
  93:16
**obtain** 29:14,23
**obtained** 96:24
**obvious** 46:21
  47:1,3 48:12
  48:22 50:18
  51:16 72:5,8
  72:10
**obviously** 32:19
  49:3,15 104:19
  104:24
**occiput** 27:13
**occur** 128:15
**occurred** 46:6
  51:20 81:5,7

91:12,23
  120:18
**October** 62:23
  62:23 97:5
**off-** 131:17
**off-piste** 37:25
  38:2,5,12,13
  38:18
**office** 99:24
  106:2,4
**offices** 1:17 4:13
**officially** 115:11
**Oh** 60:7 78:9
  118:2
**okay** 6:11,16
  9:19 11:5,19
  12:7 15:13
  17:2,22 18:13
  18:20 19:22
  23:13 31:7
  41:2 43:12
  45:22 46:24
  48:20 50:6,17
  52:18 53:16
  54:2 56:13,23
  57:4,11 58:11
  58:23 59:2,12
  60:25 61:8
  62:17 63:11
  64:2,6,23 65:2
  66:5,12 67:8
  70:8,10 72:5
  73:19 74:10
  77:7 78:22
  80:12 82:22
  84:5,6,6,19,22
  86:13 87:18
  88:23 89:24
  91:2,18 92:4
  94:11,14 95:22
  96:21 97:12
  98:11 100:9,14
  106:8,12 107:4
  107:15 108:7
  109:7 110:7
  111:9,19 114:8

114:20 116:21
  118:16 119:18
  120:20 121:1
  123:18 124:13
  124:23 125:17
  126:5 127:2,18
  131:15 132:4
  132:10
**ones** 25:14
**online** 28:10
  94:20,23,25
  97:4 119:11
**open** 121:19
**operational**
  91:13
**opinion** 48:25
  49:10 57:5
  65:8,9,16 66:4
  66:8,13,22
  67:6,9,14
  103:6 105:10
  110:22 111:3,8
  111:9,11 113:9
  122:14 123:6
  123:12,18
  125:10,13
  127:1,6,11
  128:5 129:7
**opinions** 10:12
  10:17 11:3,7
  11:16,20 32:20
  43:10,13 82:25
  83:16 85:3,5,6
  85:7 92:7
  111:5,15
  119:15,22,24
  124:16 126:15
  126:16 127:15
  127:18,22
  128:14,18
  129:1,10
**opportunity**
  19:22 131:25
**opposite** 45:21
**oral** 1:11,15
**order** 112:16

**organization**
  92:22
**organizations**
  31:21
**ortho** 23:1
**osteopathic**
  23:20
**osteopathy**
  23:19
**outer** 46:12 53:1
**outline** 129:3
**Outpost** 96:6,17
**outside** 101:7
**overall** 76:14

## P

**P.E** 22:6
**P.O** 2:5,12
**page** 3:2 15:23
  19:14 78:8
  115:21,23,23
  115:25
**pages** 133:16
**paid** 20:16,18
  65:20 95:16
  96:13 97:23
**pain** 26:25
**paragraph**
  100:11 101:17
  102:14 109:1
  122:7,11
**paragraphs**
  100:17
**part** 25:15,22,23
  34:13 36:19,25
  76:2 78:19
  79:7 84:9
  91:11,20 92:4
  92:23 94:8,21
  94:22 96:7
  111:3 112:2
**particular** 58:19
**parts** 25:5
**patch** 84:9
**patient's** 27:3
**patrol** 7:25 62:7

68:11,18 74:12
  75:14 106:18
  106:24 108:2
  108:18 114:3,9
  117:12 118:4
  121:3
**patroller** 8:3
  32:3 35:1
  57:16 60:4,23
  62:2,16,18
  75:9 78:1,20
  93:18,22 96:25
  97:7 102:22
  103:4 120:4
  123:1 126:25
**patroller's**
  102:2
**patrollers** 34:7,9
  35:6,25 61:4
  61:17 67:6,18
  67:20 107:21
  107:21 113:17
  114:7 115:2,5
  115:10,18
  129:12
**pause** 6:4 83:20
**pay** 96:11
**paying** 55:16
  70:19 96:4
**pelvis** 26:4
**pen** 83:8,19
**people** 11:12
  24:16,19 29:1
  35:24 39:17,23
  52:21 63:18
  72:14 75:12,21
  75:25 78:25
  90:10,21 92:13
  92:19 95:4
  96:8 97:24
  102:1 103:8
  104:9 106:18
  122:1 124:21
  131:2
**peoples'** 90:20
**percent** 70:22

period 52:2
person 72:11
  77:1 81:17
  102:20
person's 108:14
personal 38:24
  39:3 107:7
  115:13
personally 9:20
  105:20
perspective 76:5
Petrozzi 7:10,10
  109:4
phone 15:5 16:7
  99:23
photo 52:15,23
  53:20 88:17
photograph
  3:12 47:22
  48:2,3,8,13
  86:15 87:6
  88:2,11
photographs
  53:13 130:1
  131:5
photos 46:23,24
  47:2,4 90:20
  102:2
physical 22:7,8
physically 45:18
physio 23:22
picture 11:9,12
  11:17,20,23
  47:15,19 49:9
  74:7 82:2,3,11
  83:6 84:12
  85:11,13,18
  86:21,24,25
  89:10 124:14
  124:15
pictures 10:23
  15:1,9 16:17
  36:3,7,9,12,14
  67:4 85:16
  90:10
piece 46:15

piste 38:15,16
  38:17,18
place 4:6 34:7
  34:22 35:18
  131:19 133:12
places 80:3,20
plainly 51:16
  69:7,10,15
plaintiff 1:6 2:3
  4:8,22
plan 78:16 79:6
  97:7
please 4:20 5:1,9
  6:6 22:3 30:7
  47:12 78:8
  109:2 116:24
plenty 48:9
PLLP 1:17 2:11
point 58:11 59:2
  114:15 120:15
  128:3
policy 73:19
portion 17:23
  53:13
position 66:5
  103:19
possession 13:11
possibilities
  16:9
possibly 52:25
post 15:17
posted 8:18
  94:18
poster 77:20,21
  77:24
posting 108:12
posts 115:20,22
  115:25 116:2
potential 76:5
practical 64:12
practice 119:19
practices 28:22
prepare 7:6,11
  7:17 99:12,14
  99:18
prepared 7:2

99:11,15 100:3
  100:6
PRESENT 2:17
pretty 33:15
  36:4 64:25
  65:13 84:10
  87:21 101:6
prevent 45:3,7
prevented 82:16
  106:14,22
  107:5 108:23
preventing 50:2
  81:24 82:2,9
  107:3
previous 7:18
previously
  47:12 64:19
  86:14 88:10
primarily 93:18
primary 91:6
print 19:16
prior 68:1
  120:15
private 37:5
privilege 37:1
privileged 9:8,9
  17:23 36:15,18
  36:25 37:5
  100:10,16
probably 15:9
  15:16 16:19
  19:21 20:15
  30:24 36:13
  45:18 46:13
  48:6,18 78:21
  81:7,22 84:11
  84:12,14
probiotics 95:14
problem 57:21
Procedure 1:17
proceedings 4:1
produce 12:22
  13:8,10 14:14
  15:18 17:6,9
  17:25 19:3
  21:18

produced 18:10
product 9:11
  95:11 98:8,16
products 95:4,5
  95:6,8,10,12
  95:14 98:9,10
  98:15
profile 115:23
  115:24
promise 89:19
property 112:2
  113:2
provide 10:12
  114:8 117:11
provided 11:2
  28:25 36:25
  100:22 101:1
  114:16 118:1,8
  118:12 122:2
providing 37:4
Public 1:22
  133:6,23
pursuant 1:20
  66:14,22 67:10
put 27:12 34:14
  66:17 68:4,14
  68:18 73:17
  107:4 120:16
  120:21,22
  128:14,25
puts 120:24
pyramid 98:3,6
  98:7,14

Q

quality 105:14
question 5:23
  6:2,3,8,11,15
  6:19 9:16,17
  10:1,2,7,15
  11:1 12:9
  17:24 42:18,18
  55:8 63:14
  65:2 66:12,13
  66:21 67:9,9
  72:20,20 82:8

82:13 91:18
  100:12,15,23
  101:14 104:7
  104:16 106:21
  108:20 109:6
  111:1 123:10
  126:18 127:5
  127:11
questioning
  125:20 128:3
questions 99:19
  100:4,5,6,19
  112:7 116:19
  118:14,15,21
  119:7,10
  120:14 124:2
  126:11 131:10
quick 89:16
  126:10
quote 18:1
  101:19,19
  103:13 104:17

R

R 3:5,5,5 133:1
Rarely 19:18
RE-EXAMIN...
  126:12
read 15:25 16:3
  19:15,17,21,22
  77:22 131:1,25
reading 14:16
ready 27:3
  78:16,23,24
real 126:10
realize 72:19
really 19:10,11
  41:10,15 45:17
  49:9 71:7,24
  76:19
reason 6:22,25
  7:1 56:15,18
  56:22,25 116:9
  116:9 128:25
  129:2
reasons 57:4

64:3
**recall** 16:25
18:25 46:17
52:3,8 55:24
69:5 78:21
80:9 93:8
118:5 121:5
122:1 125:18
126:1
**recalling** 125:1
**receive** 20:22
21:1,2,4,7
28:12 101:15
**received** 12:21
23:14 28:10
29:7 30:1
36:18 64:7
77:25 78:19
112:23
**recess** 58:2
89:23 117:3
**recognize** 77:15
77:24 86:15
**recognizes** 29:4
**recollect** 38:4
**recollection**
8:13
**recommended**
105:1,8
**recommending**
106:15
**record** 4:21 5:25
57:22,24 58:4
58:7 84:6 86:5
89:21,25 108:8
116:23,25
117:5 131:21
133:16
**recount** 11:18
**recovery** 75:8
**recreation** 22:8
**red** 38:9
**reduce** 28:20
**reference** 77:19
122:8
**referencing**

124:19
**referred** 90:12
**referring** 52:16
58:16
**refresher** 8:7,8
8:10 36:2
101:5 121:10
121:17,17
122:8
**regard** 119:10
**regarding** 13:12
13:19 14:17
18:5 112:7
**rehabilitation**
22:9
**rehired** 8:7
94:17,19,22
116:8
**Reiki** 25:1,2
**related** 55:18
**relating** 63:24
**relation** 93:6
**relationship**
60:17 63:15
119:15
**release** 24:16
25:8,11,12
27:1,2
**relevance** 111:5
**relevant** 43:17
104:1,2,3
110:21,24,25
111:11,15
**reliable** 55:6,9
55:10
**relied** 10:11,14
11:6,19 124:15
**relinquished**
30:3
**rely** 10:14,16
11:1 43:9,12
132:7
**relying** 119:25
120:3,6
**remember** 7:22
8:5,6 10:18,20

10:21,22 19:7
42:11 51:19,23
52:1,4 55:12
58:14 74:22
80:10 83:5
100:18 101:13
106:10 121:6
130:11
**remembered**
1:14 10:20
**remembers** 52:9
**rent** 96:3,4
**rental** 96:3
**repeat** 10:1
**repeating** 29:17
**rephrase** 123:10
**report** 7:9 21:19
98:23 131:3
**reported** 133:13
**reporter** 1:21
4:17 5:24
132:8 133:5
**Reporting** 4:18
**reports** 13:13
102:7
**reposition** 23:21
**represent** 9:20
**requested** 30:4
**residence** 30:19
**residing** 133:24
**residual** 98:2
**resort** 1:8 2:9
4:8 36:7 38:11
102:16 103:12
110:5
**resorts** 35:7,18
**responder** 29:15
**responding**
19:20
**response** 14:15
15:19 17:7,10
19:3 21:19
**responsibilities**
90:7,16 91:11
94:5
**responsibility**

38:24 39:1,3,6
51:7 59:14,23
91:6 105:18
107:6,7,9,10
107:13 120:20
**responsible** 56:5
56:10 108:9
121:2
**retail** 95:4
**return** 7:25 8:3
8:15,25 111:23
112:1,10,23
113:1
**returned** 112:12
112:19
**returning** 8:23
30:21
**review** 11:24
12:2,9,12,17
43:3 47:12
109:2 116:18
**reviewed** 11:15
12:17,19 53:12
**reviewing** 47:14
**rhythm** 26:1
27:18
**rhythm-wise**
27:21
**Ride** 74:23 75:1
76:3 77:19
78:10
**rider** 78:13
**right** 6:15 10:13
14:9,11 19:13
19:14,19 25:13
30:20 34:18
37:1 38:3
49:17,19 50:14
51:10,13 53:14
53:18 54:13
57:9,13 59:4
59:24 63:13,19
64:4 65:25
66:1,2 68:8,11
68:15,22 69:15
69:16,25 70:12

70:16,20,23
71:4,9,11,12
71:16,21,25
72:5,13,25
73:2,22 74:3
74:20 75:25
76:6 77:5,8,21
80:7,16 81:5
83:2 85:11
86:22 87:2
88:25 92:8,21
95:25 98:15
100:22 101:2
101:10,20
105:2,5,15,16
107:22 108:24
110:1,15 111:6
112:14,18
113:14 114:22
115:10 117:23
118:4,9,15,20
124:10 126:23
128:8,8,11,12
129:5,10,23
130:9,10,21,24
131:4,7 132:2
132:6
**risk** 43:25 44:3
44:6,10 102:17
102:19,20,23
103:1,4,7,9,13
103:19,20,25
104:8,13,18,20
104:23 105:11
105:13 122:13
122:18
**risks** 44:17
**road** 11:10,14
40:19 46:11,12
46:13,19,21
47:1,3,5,24
48:3,10,12,17
48:18,21 49:1
49:13,24 50:12
50:13,16,18,24
52:12,13,20

53:9,17,22,24
55:23 56:5,7
56:10,15,17,19
56:25 57:7,9
57:13 64:18,21
65:4,12,17
66:6,8,15,23
67:2,10,16
68:15 69:20
72:14,17,18,21
72:22,24 73:1
73:3,6,7,16,21
73:22,22,25
74:9,10 86:18
86:19,20 87:6
87:9,11,23
88:4,12,24
89:5,11,12
93:16 123:13
124:22 125:7
125:15
**roads** 44:5 73:9
125:5
**rocks** 68:24
**roller** 80:10
**rollers** 80:5,8,20
80:21
**romance** 61:12
61:14
**rope** 64:11
**rub** 27:5
**rules** 1:20 5:20
121:12
**run** 11:10 38:11
38:14,19 40:24
41:4,13,21,24
42:14,24 43:17
46:25,25 47:6
47:23 48:1
49:13,20,24
50:19 51:10,15
55:22 59:3
70:18,23,25
71:7,20,24
74:3,6,17,20
76:4,4 79:14

79:19 80:2,11
80:14,15,19
81:17 82:14
83:11 84:4,10
85:2 86:8,11
109:10,16,17
109:18,19,23
110:5,14,18
111:2,4
**running** 71:14
86:20
**runs** 61:23
76:10,11 110:8
110:9 125:5,11
**Ryan** 108:6,9

───────────
**S**

**S** 3:5
**S-I-T-T-O-N**
30:8
**sacrum** 25:25
27:15
**safe** 92:20
102:21 104:9
**safely** 44:21,23
**safer** 78:14
**safety** 3:11
77:18,23
121:21 122:15
**sales** 97:18
**saving** 114:3
**savvy** 19:10
**saw** 36:3 48:18
49:13 53:20
74:7 115:24
**saying** 40:25
42:15,25 58:14
65:22 66:24
102:7 128:21
**says** 26:24 77:17
78:22 79:6
80:6,13,13
101:21 102:15
124:10
**scalp** 24:23,25
26:9

**scene** 91:12,20
91:24 129:24
130:4
**scheme** 98:3,6,7
98:14
**school** 22:5 33:4
62:14,14
**schools** 22:22
23:1,2
**screw** 92:19
**screwed** 92:14
92:16
**seal** 133:20
**season** 33:24
62:9,10 121:18
**seasons** 33:17
34:2,4
**second** 7:9 60:11
78:8 83:20
**section** 44:23
**see** 40:4,21 43:1
46:11,18 47:5
47:8 48:16
49:1,9,24 50:5
50:7,15,20
51:6 52:22
56:18,21,25
57:9 58:17
59:3,21 65:23
70:16,19,22
71:1,6,14,20
72:10,12,15
75:4 76:20
77:4 79:9,10
79:15,16,20
82:5,7,12 84:2
102:17 130:12
**seeing** 49:5,10
50:3 56:1 61:3
81:25 82:9,16
**seen** 50:11,13,23
57:12 59:19
65:20 66:9
81:22 82:21
85:17
**sees** 51:1

**sell** 95:6,10
**selling** 95:4
**semester** 33:12
33:14
**send** 20:6 116:7
**sending** 98:12
**Sendlhofer**
33:19,20
**sense** 104:5
129:11
**sent** 18:25 19:2
118:23
**sentence** 79:25
**separated** 62:24
64:2
**separating**
69:22
**separation** 63:5
63:7,11
**September**
60:16
**series** 95:13
**serve** 112:17
**served** 13:7
**session** 96:9,10
**sessions** 96:12
**set** 4:7 133:19
**Seth** 29:18
**settlement** 21:3
**setup** 121:19
**severity** 45:13
45:16,25
**sharp** 71:7
**shook** 14:24
**short** 84:16
101:24
**shorthand**
133:14
**shortly** 7:24
**show** 47:11
54:19,20 86:13
124:5
**showed** 12:5
21:12 36:3,7,9
36:12,14
**shown** 78:4 87:5

88:19,24 89:2
**sic** 4:9
**side** 51:11 68:6
71:1,4,20,24
85:13,19 86:16
86:21 87:1,3
121:4
**sign** 66:17,19,19
66:20 68:4,14
68:18 107:5
131:25
**SIGNATURE**
132:17
**signed** 99:9
101:19,21,22
102:6,15
**significant** 41:6
53:8 64:19,24
65:1,5,10,11
65:14 87:5,8
87:12,13,15,20
87:21 89:3
123:7,13,16
**signs** 34:8,23
36:4 38:1,9
67:5 120:16,21
120:23,25
125:4
**Silver** 71:19
**similar** 24:25
25:1 36:4 78:5
82:4
**simply** 15:22
**single** 24:1
**sitting** 99:21
**Sitton** 30:6,10
30:13,14,15
60:6,7,8,9
**situation** 63:17
**six** 20:15
**ski** 3:10 7:25 8:3
13:12 14:4,5,5
14:8,17 32:1,2
32:4,7,13,15
32:16,17,23
33:2,9,9 34:2,3

34:6,7,8,9,12
34:17,22 35:1
35:4,6,18,21
35:25 36:3,7
36:10,12,14
37:20,22 38:11
38:14,23 39:9
39:14,16,22,25
40:4,24 43:2
43:21 44:9,13
44:21,23 45:6
45:9 46:3,6
47:6 48:1
49:16,24 54:18
55:22,22 57:15
59:22 60:3,22
61:4,5,16 62:2
62:7,14,14,16
62:18 66:14
67:6,10,15,17
67:20 68:11,18
71:10 74:12
75:9,13,17
76:4 77:17,25
78:20 80:11
88:6 93:18,22
96:25,25 97:7
97:13 102:22
103:3,10 104:1
104:9,12
106:18,24
107:21 108:2
108:18 110:8
111:11 113:16
114:2,9 115:1
115:4,9,18
117:12 118:3
120:4,7 121:19
123:1 126:25
129:11
**skied** 41:9 61:22
67:25 84:14
87:23 88:3,11
88:23
**skier** 41:12 44:8
44:12,14,16,20

45:1,3 48:9,15
49:4 50:6 51:1
51:2,5,6,15
68:9 70:16
71:25 76:23
77:8 78:13
80:1,2 110:11
110:17 127:2
**skier's** 44:9 51:7
75:23 79:23
110:19 129:13
**skiers** 38:23
39:2,5,8 49:15
55:17 72:22
75:17 78:24
79:8,13,18
80:23 110:8
**skiing** 33:21
37:12,16,18
40:6,24 41:13
41:20 42:6,9
42:14,16,19,23
42:25 43:17,25
44:3,6,10,18
46:10,19,22
47:5 48:16,19
49:4,13,15,17
49:20,21 50:19
51:9 54:15
59:3 61:1,11
70:18,23,25
71:8,19 75:2
76:18 77:3
80:9,14 81:13
82:14 84:15
105:24
**skill** 133:17
**skis** 75:3 94:2
**skull** 25:24
27:13,14
**sky** 1:8 2:9 4:8
4:24 7:25 8:3
8:16,23,25
10:10 13:15
14:21 17:12,14
17:17,19 32:3

32:5,9 33:23
35:1,7,13,17
36:17,20 38:11
38:15 46:2,4
57:16 58:23
60:23 61:2,5
62:2 63:6,8,13
63:25 64:4
70:4 72:17
73:19 74:12
75:9,13 76:11
76:12 77:25
92:14,16,19,24
94:12,15 97:15
101:9,15
102:16 103:9
103:12,24
104:20 108:18
109:20 110:5
111:19,20
112:1,3,10,16
113:2 115:9,12
116:6,15 118:3
120:21 125:3
126:25 127:21
128:19
**Sky's** 100:21
101:1 103:23
119:25
**slightly** 27:12
**slope** 38:6 44:23
75:3
**slopes** 78:15
**slow** 51:3 56:16
66:17,19 68:4
68:14,18 78:24
80:4,19,21,23
**slowed** 57:6
66:10 81:6,8
81:10,21
**slower** 77:3
**small** 85:12
111:10
**snow** 69:10 70:7
73:17
**snowboarder**

75:4
**Snowcat** 73:20
**Snowcats** 72:23
73:10
**social** 95:3
**somebody** 26:24
61:20 96:7
114:21 126:19
127:5
**son** 31:5,11 96:4
**soon** 8:2,24 77:4
112:9
**sore** 59:11,11
**sorry** 15:20 24:7
24:7 26:6
35:16 53:5,5
60:5 65:7 84:6
84:6 88:16
89:16 111:18
116:12 125:9
**sort** 20:22 21:7
28:2 68:14
**sounds** 108:20
**sources** 95:24
**South** 1:17 2:12
**speak** 114:2
**speaking** 16:21
114:7 129:18
**specific** 9:17
92:10 93:8
109:16
**specifically**
25:16 37:15
67:22 92:12
100:9,16,21,25
101:8,12
102:25 103:16
107:17,19
108:1
**speculation** 66:2
66:4
**speed** 43:16,21
45:2,6,12,15
45:23 111:12
**spell** 30:7 33:1
**spending** 94:2

**spent** 20:14
**spinal** 25:25
26:2 27:18
**spoke** 75:13
**spoken** 113:16
**sports** 33:8
**spot** 122:19
**spot-check**
122:14
**spots** 76:5 79:8
79:14,19
**spread** 26:2
**spring** 33:19
**ss** 133:3
**standard** 35:13
67:15 89:13
104:13,17,22
**standards** 35:11
66:15,23 67:10
**standing** 11:13
52:21
**stands** 74:8 80:6
**start** 5:23 58:3
60:17 89:24
96:6,16 109:8
**started** 8:8
16:21 24:13
32:3 33:5,7,8
37:17 61:24,25
62:16 95:21
**starting** 97:4
**state** 5:9 28:3
31:23 133:2,7
133:23
**stated** 101:17
**statement** 12:5
55:19 102:2
109:4 110:21
**statements**
10:24 90:21,22
**states** 1:1 4:10
29:1,8,19,25
32:5 78:23
80:1
**stations** 121:23
**stay** 78:16

110:11,17
**Steamboat** 36:1
**steep** 53:17,25
64:18 65:11,13
87:4 89:3
111:1
**steepness** 43:24
45:10 109:15
**Steve** 29:16,18
**stipulate** 128:1
**stop** 39:17,22
48:9 75:20,24
76:25
**story** 61:12,14
75:6,7 94:21
94:22
**straight** 74:2
**stream** 98:2
120:12
**stress** 24:17
26:25 27:2
**strike** 17:22
35:5 36:15
66:7 91:9
100:14 108:22
122:24
**struggles** 75:8
**struggling** 49:11
**studied** 22:6
**study** 33:8
**stuff** 15:1 28:20
90:18
**stupid** 129:14
**subject** 16:16
22:7 57:18
127:11
**subjects** 16:14
**submitted** 98:22
**subpoena** 3:9
12:21 13:7,20
14:2,15 15:19
16:1 17:7,10
17:25 19:3,8
19:14,20 21:20
112:13,17,24
**substantially**

82:4
**succeed** 21:2
**sudden** 47:9
**suggested** 110:4
**suggestion** 9:3,4
9:4 80:17
**suing** 114:23
**summer** 62:11
112:5
**summers** 112:6
112:8
**summertime**
32:16
**Summit** 71:20
**supervisor**
90:16 91:3,7
91:10 93:24
94:1 101:18
107:12,18
121:3 126:20
126:22
**supervisors**
64:13 92:8,15
93:1,5,14 94:1
106:18 107:14
**supposed** 92:15
92:25 127:16
127:19
**sure** 5:19 11:21
42:21 48:7
62:7 90:19,25
91:4 92:19
102:8,21 103:8
103:10 104:8
130:12
**switch** 57:18
**sworn** 5:1,5
133:9
**system** 23:10,11
25:9,13,24,24
26:20 27:17
97:22
**systems** 16:10
27:19

_____ **T** _____

**T** 3:5,5 133:1,1
**take** 15:1 38:23
38:25 39:3,6
57:17 59:23
70:10 71:6
78:13 80:2,15
89:16 105:18
107:6 129:24
130:1,13
**taken** 1:16 4:2
5:16 48:2,4,9
58:2 82:4
86:15,21,23
87:1 89:23
117:3 133:12
**talk** 5:21 21:22
24:18 31:25
37:9,11 57:15
60:3 61:17
83:3 90:6
92:18 93:15
100:13 103:18
115:12
**talked** 8:22
17:17 25:4
28:23 42:12
43:4,5 60:4
90:21 99:19
101:14 103:18
114:22 121:24
128:23
**talking** 24:13
58:12 97:18
122:5
**talks** 36:1
121:22,23
**Target** 98:18
**taught** 69:6 70:2
70:3 76:3
80:15,18 90:22
92:23
**Taylor** 100:13
**teach** 33:21
**teachers** 28:7
**teaching** 33:24
**team** 90:8,9,13

90:17,23,24
101:18 107:12
113:24
**TECHNICIAN**
4:6,25 57:23
58:3 89:20,24
116:22,25
117:4 131:15
**techniques**
23:21
**telephone** 5:14
**tell** 7:5,16 9:24
11:5 21:24
24:18 42:8
51:18,25 74:25
92:15,25 94:16
106:17 107:8
113:7,10,13
114:14 115:14
116:10 129:3
**telling** 93:14
106:23 126:1
131:2
**ten** 55:14 107:24
**tendons** 27:20
**term** 41:16
103:1
**terrain** 43:24
44:23 45:10
47:9 86:17
**testified** 5:5 41:3
41:19 42:9,23
54:23 55:21
68:7 114:11
117:10 121:16
124:23 125:2
125:22
**testifies** 41:12
**testify** 95:16
133:9
**testifying** 109:8
**testimony** 4:2
6:24 7:3 12:13
23:25 24:8
36:11 42:2
43:3 50:17,20

55:5,6 56:20
57:2 108:9
114:14 118:8
118:12 119:1
123:5,9 124:7
126:6 133:16
**text** 15:7 16:8,11
77:22
**texts** 13:15,16
18:2
**thank** 57:2,2,20
61:22 83:25
114:3 132:10
**thanking** 15:9
**the-record-dis...**
131:18
**theoretical**
64:11
**therapist** 8:19
23:17,18
**therapy** 22:7,8
23:2,20 24:14
24:19 25:18
26:21 28:23
119:19
**thighs** 126:3
**thing** 11:19,21
12:17 26:15
71:18 76:2
84:12 90:19
**things** 10:16
11:8,22 15:4
24:2,5,9,13
28:9,16,24
29:4 67:2,19
68:23 72:7
79:7 92:18
93:15,16 101:9
121:21
**think** 6:4 7:10
8:11 11:22
12:12 16:18
18:24 20:25
21:9,12 33:20
37:8 38:14
39:2,4 40:19

45:15 50:4,23
51:21 54:5
55:18 56:13,15
58:17 68:21,23
69:12 72:18
80:12 83:16
85:8,11 87:8
92:9,10 96:13
99:25 100:24
101:4,11 103:5
104:3,15
107:10,13,19
108:1 118:13
120:11 121:11
126:8 127:18
128:13 130:2
131:9,11
**thinking** 18:4
  69:5,5 70:6
  85:18
**third** 19:14
**third-party** 9:16
**thought** 55:25
  62:7 69:2
  92:24
**three** 9:2 16:19
  33:13 78:13
**tickets** 61:17,19
  61:20,21
**till** 33:16
**tiller** 73:14,15
**time** 4:6,16 5:21
  13:25 14:2,4
  14:12 16:25
  20:8,11 29:24
  30:2 34:5
  37:21 48:9
  51:24 52:2
  54:16 57:24
  58:4 59:11
  60:11 62:5
  78:25 80:3,16
  89:21,25 94:2
  94:7 96:7 97:6
  113:19 117:1,5
  126:9 129:12

130:3 131:16
  133:12
**times** 7:7,18
  44:13 67:25
  91:15 103:18
  121:17,25
**title** 117:22
**to-wit** 4:2
**today** 6:22 7:3
  26:16 58:12
  96:20 108:8
  118:12 126:6
  130:9
**Today's** 4:15
**toe** 26:4
**told** 8:6,10
  10:12,16,18
  11:6 17:18
  37:2 41:5,8,25
  42:13,19,22
  43:9,13 52:4
  70:6 92:4,6,9
  92:12 93:11
  96:22 101:9
  115:4 128:22
**Tom** 12:3 40:23
  41:19 112:4
**Toni** 33:18,20
**top** 72:15
**total** 34:1,2
**touch** 23:21 27:9
  27:14,16
**tourism** 22:9,10
  23:12 33:16
**towers** 69:9
**track** 51:2,3
  54:4,25 59:3
  59:20,21 65:16
  69:23 72:25
  73:1,3,6,8,25
  74:3 81:7,9,16
  81:21,25 82:6
  82:9,12,16,20
  85:13,14,16,19
  86:18 88:5,8
**tracks** 73:10

80:4,8,20,24
  88:7
**traffic** 79:14,19
**trail** 36:4 44:23
  67:3 73:24
  109:20 124:24
  125:2,4,7,10
**trails** 66:19
  125:5,8
**trained** 74:22
  78:24 79:7,13
  80:1,7 81:1
  100:23
**training** 57:15
  60:3 64:7,12
  77:25 78:20
  92:10,23 101:4
  101:6,13,15
  121:10,20,21
  121:23 122:2,3
  122:6,8
**trainings** 121:21
  122:4
**trains** 121:7
**transcribed**
  133:14
**transcript** 11:25
  34:21 132:1,5
**transition** 52:12
  52:13,24 53:9
  53:17,25 64:17
  64:19,24 65:3
  86:16 87:5,8
  87:12,13,14
  89:3 123:6,12
  123:19 124:18
  124:20 125:16
  125:16
**traveling** 31:12
**treat** 8:20,21
**treatment** 27:5
**tree** 40:22 45:19
  51:10,12,12
  70:10,16,20,23
  71:1,6,8 84:8
  110:1

**trees** 39:18 69:9
  69:12,13,13,14
  70:11,15
**trial** 63:21
**Triangle** 11:11
  40:9 52:14
  56:7
**tried** 19:11
**true** 37:20 38:22
  53:15 69:3,4,6
  69:18 72:16
  74:10 93:17
  94:18 133:16
**trunk** 40:11,22
  45:19
**truth** 133:10,10
  133:11
**truthful** 6:23 7:3
**try** 72:18 83:24
  83:24
**trying** 18:23
  54:3,18,24
  55:1 56:4,9
  63:20 64:6
  67:6,18
**turn** 71:7 84:16
  84:16
**turns** 84:20
**twin** 8:18
**two** 8:8,10 9:2
  33:10,14,17
  34:4 57:8
  61:13 94:4
  99:14,18 116:7
  125:8,11
  129:18 130:11
**two-sided** 78:7
**type** 21:13 23:18
  95:6,9
**typed** 99:25
  132:7
**typewriting**
  133:15
**typing** 100:5

———————
U
———————

**Uh-huh** 26:12
  43:6 57:3
  59:25 64:22
  76:7 106:5
  122:12,17
  125:19,25
  126:21
**um** 7:7,22 8:9
  12:5 14:20
  20:12 29:2
  38:6,7 42:21
  68:23 87:16
  91:15 92:9
  94:4 97:25
  104:2
**understand** 5:19
  5:25 6:9,12,13
  6:14,14,20
  31:7 41:7
  48:25 49:7,11
  57:1,1 58:8,8
  63:14 66:21
  73:2 90:3,8
  104:6,7 117:7
  126:18 127:10
  131:22
**understanding**
  63:19
**undulates** 76:14
  76:15
**undulation**
  76:21,24
**unfamiliar** 80:2
  80:13,15,19
**United** 1:1 4:10
  29:1,8,19,25
  32:4
**universities**
  22:22
**university** 22:6
  22:13,15,22
  23:6,9,15 33:5
**Unruh** 2:18
  92:13 113:25
**untrue** 36:6,9
**untruthful**

EVI DIXON

Page 150

118:12 119:2
upfront 20:23
upgraded 29:17
uphill 46:16
  71:1,10 76:19
use 25:19 38:17
  83:21,23
  128:16,17
usually 19:15

**V**

vacation 34:5
vacations 33:7
variation 45:10
  86:17
variations 43:23
vehicles 72:23
verbal 18:25
versus 4:8
vertical 73:21
  73:24 74:11
video 4:6,12,25
  57:23 58:3
  74:23 75:1,10
  76:3 78:9,10
  78:12 89:20,24
  116:11,22,25
  117:4 131:15
videographer
  4:19
videos 94:19,22
videotaped 1:11
  1:14 132:13
Vienna 22:2,6
  22:13,15,23
  23:6,9,15
visible 69:7,10
  69:15
vitamins 95:13
vizes 64:11
vocabulary
  41:11 42:5
voided 84:9
vs 1:7

**W**

wait 62:4
waitress 32:17
  32:19
WAIVED
  132:17
Walas 2:4,5 3:4
  4:22,22 7:11
  7:15 9:8,10,17
  9:19 18:18
  41:25 42:8
  57:17,20 83:21
  83:23 84:1
  116:20 118:15
  118:19 119:6
  120:10,13
  122:20 123:10
  123:11,15,17
  123:21 124:1
  126:8 127:8,24
  131:11,14
Walmart 98:17
want 46:6 47:11
  48:24 61:12,13
  61:18 80:4
  83:9,10,14,21
  90:6 96:8 97:2
  97:6 108:4,7
  108:17 111:14
  111:14 116:3
  116:22 117:18
  128:19 131:24
wanted 20:1
  33:20 57:8
  61:22
wanting 16:18
  56:14 114:2
wants 54:20
warning 34:14
warnings 34:7
  34:14,22 35:18
wasn't 42:18
  46:22 64:11
  65:2 67:8 68:5
  94:17 97:7
  105:3 106:20
  106:21 107:11

107:11 131:1
watch 27:19
watched 75:10
watching 55:22
  55:25
way 35:14,20
  41:23 46:14
  53:22 55:3
  66:24 73:17
  76:19 84:13
  105:15 126:6
  130:23
we'll 83:9 84:3
we're 56:8 57:24
  58:4,7 63:21
  89:21,25 117:4
  121:13 131:21
we've 40:7
weather 131:3
week 18:12,12
weeks 8:8 9:2
  33:10,14,14
  51:22,22
weight 95:12
wellness 95:8,9
went 7:9 14:21
  22:5 28:15
  35:25 46:12
  74:8 88:19
  90:20 93:4
  130:12
weren't 38:16
  92:12 93:1
WHEREOF
  133:19
whoops 15:20
wide 84:10
wife 8:22 18:9
wins 21:8
winter 33:7,16
  61:11 62:13,15
  67:4 94:10
witness 4:25 5:4
  9:16 12:3,14
  16:22 40:21,23
  41:12,19 54:22

55:5,7,19 84:4
  84:8,20 98:19
  119:5 120:11
  122:17 123:16
  123:24 127:10
  133:8,17,19
witnessed 55:13
wmorris@cro...
  2:14
wool 98:18
word 38:17,17
  41:1,7,10,11
  42:4,21 103:1
wording 42:11
words 18:7
  22:21 48:2
  73:20 74:11
  83:15 98:1
  99:12
work 9:11 10:9
  23:23 24:22
  26:3 32:19,23
  33:2 34:1,2
  63:6,8,12,15
  63:24,25 64:3
  99:22 119:8
worked 19:25
  32:4,7 33:9
  34:25 62:13
  90:10 107:24
working 17:19
  26:1 32:2,8,15
  32:16 34:12
  60:22 61:4
  68:5,6 93:18
  94:15 96:6,16
  97:5 102:22
  105:4 106:1,2
  106:3,8 114:25
  127:21
works 84:2
world 32:8
wouldn't 38:13
  81:7 129:11,14
  129:16
wreck 13:12

14:4,5,17
  40:13 45:9
  46:6 59:15
  104:1 111:11
wrecked 52:10
  59:4
write 90:22
  127:4,5
writing 128:18
written 10:24
  15:6 21:10,13
  21:15 121:12
wrote 7:8 43:11
  52:25 127:1

**X**

X 3:1,5

**Y**

yarn 98:18
yeah 6:7 12:15
  13:9 14:10
  15:15 16:4
  21:17 24:7
  29:13 37:17,22
  38:4 39:20
  41:5 42:1
  45:24 47:15
  57:21 59:5
  60:7 61:16
  62:19 63:1,9
  65:23 68:12
  70:9,17,17
  71:10,22 72:6
  73:15,18 75:22
  77:21 79:10
  80:25 83:24
  84:1 85:23
  86:7 88:21
  89:1,15,18
  91:22 95:20
  96:1,18 98:1
  100:8 101:21
  102:10,18
  104:15 105:6
  107:23 109:3

110:16 115:22
116:13 117:13
117:21,24
118:6,10,25
119:13,20
120:2,11 122:9
125:5 126:24
127:4 128:23
129:6 130:10
131:8,23 132:9
**year** 23:5 33:6
60:20 62:8
92:12 94:4
101:5 123:3
**yearly** 37:2 92:5
**years** 32:25 33:2
34:1 93:13,17
93:21 107:24
123:2
**yellow** 38:9
**yesterday** 7:15
12:4 18:19
21:13 41:5
52:23 53:21
74:7

**Z**

**zucchini** 84:9

**0**

**04** 133:25

**1**

**1** 57:23 78:22
**10** 106:8
**10:06** 57:24
**10:11** 58:5
**10:49** 89:21
**10:53** 90:1
**100** 20:12 70:22
95:18,19,23
96:15
**10969** 2:12
**11** 13:12 14:9
52:11 54:10
57:7 65:18

66:16 67:12
68:2,19 69:1
74:6,14 82:15
83:11 84:24
85:2 87:24
101:17 105:2
106:3,16 113:8
**11:26** 117:1
**11:32** 117:5
**11:51** 131:16
132:14
**117** 3:15
**118** 3:4
**11th** 50:11
106:11 121:1
**122** 3:14
**123** 3:7
**126** 3:3
**13** 3:6,9 86:14
86:15 102:14
122:11
**15** 109:1
**150** 48:7
**15th** 62:23
**175** 87:19
**18-CV-00002-...**
1:7
**18-CV-0002** 4:9
**180** 87:17
**1915** 1:17 2:12
4:13
**1976** 33:4
**1986** 23:7
**19th** 1:18 2:12
4:14

**2**

**2** 58:4 89:20
**2004** 30:4 61:10
**2004/2005** 61:11
**2005** 60:16,21
62:6,12
**2005/2006** 62:9
62:15
**2006** 62:3,5,8,15
**2006/2007** 62:10

**2007** 62:16
**2008** 123:4
**2009** 123:4
**2015** 13:13 14:9
52:11 54:10
57:7 63:1,3
65:18 66:16
67:12 68:2,19
69:1 74:6,15
82:15 83:12
84:24 85:3
87:24 105:2
106:3,9,16
113:8 121:1
**2019** 62:23
**2020** 1:19 4:15
133:21
**2023** 133:25
**246-1067** 2:7
**24th** 1:18 4:15
**25** 3:6 47:12,16
52:16
**29** 3:7 31:15,16
88:10,10,20,25
89:2

**3**

**3** 79:6 89:25
**30** 87:20
**31** 31:15,15
**3180** 5:12

**4**

**406** 2:14 5:15
**4591** 2:5
**47** 3:6

**5**

**5** 3:3
**500** 20:24
**501** 2:7
**52** 3:6
**556-1430** 2:14
**579-9694** 5:15
**59718** 1:18
**59719-0969** 2:13

**59741** 5:13
**59772** 2:6

**6**

**600** 20:16,18
**65** 3:7 124:6

**7**

**7** 100:11,12,17
122:7 124:10
**70** 3:9 13:2,6,6
**71** 3:10 77:11,15
77:16 78:4,7
**72** 3:12 85:22,23
86:2,6
**73** 3:14 99:2,6,8
122:7,11
**74** 3:15 117:15
117:19 118:23
**77-78** 3:11

**8**

**8** 100:11,17
**8:59** 1:19 4:16
**80s** 61:6,7
**85-86** 3:13
**86** 3:6 29:25
**86/'87** 33:24
**87/'88** 33:25
**88** 30:1 33:25
60:10
**88-89** 3:7

**9**

**90s** 61:7
**92** 60:10
**94** 60:10
**99** 3:14