## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

JOHN MEYER,

    Plaintiff,

    vs.    Cause No. 18-CV-00002-BMM

BIG SKY RESORT,

    Defendant.

_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

EVI DIXON

_____

BE IT REMEMBERED, that the videotaped deposition upon oral examination of EVI DIXON, appearing at the instance of Defendant, was taken at the offices of Crowley Fleck, PLLP, 1915 South 19th Avenue, Bozeman, Montana, 59718, on the 9th day of March 2020, beginning at the hour of 10:01 a.m. pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

## Page 2

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFF, JOHN MEYER:

    Ms. Breean Walas, Esq.
    Walas Law Firm
    P.O. Box 4591
    Bozeman, Montana 59772
    breean@walaslawfirm.com
    (501) 246-1067

ATTORNEYS APPEARING ON BEHALF OF THE DEFENDANT, BIG SKY RESORT:

    Mr. Ian McIntosh, Esq.
    Mr. Mac Morris, Esq.
    CROWLEY FLECK PLLP
    1915 South 19th Avenue
    P.O. Box 10969
    Bozeman, MT 59719-0969
    imcintosh@crowleyfleck.com
    wmorris@crowleyfleck.com
    (406) 556-1430

ALSO PRESENT:
    Mike Unruh

## Page 3

I N D E X

EXAMINATION OF EVI DIXON BY       PAGE
    Mr. Ian McIntosh, Esq...................6, 94
    Ms. Breean Walas, Esq...................81

E X H I B I T S   R E F E R R E D   T O:
Exhibit 24..........................19
Exhibit 25..........................19
Exhibit 29.....................19, 68-69
Exhibit 70..........................29

DEPOSITION EXHIBITS:
Exhibit 89  E-mail between Evi Dixon
    and Ryan Ayres,
    October 6, 2019...................76
Exhibit 90  West's Montana Code Annotated
    MCA 45-7-201
    45-7-201.Perjury
    Currentness....................21-22
Exhibit 91  Packet of documents labeled
    E.Dixon001 through E.Dixon060...26-27,
    29, 31, 41-43, 46, 84, 88
Exhibit 92  Excerpt from John Meyer's
    deposition dated
    April 9, 2019..................38
Exhibit 93  E-mails between Evi Dixon
    and John Meyer Bates
    Numbered E.Dixon063 through
    E.Dixon068....41, 46, 57, 59, 60, 86
Exhibit 94  E-mails between Evi Dixon
    and John Meyer Bates
    Numbered E.Dixon069 through
    E.Dixon087.........61-63, 65, 69-71
Exhibit 95  Letter to Mr. Meyer from
    Ian McIntosh, dated
    December 27, 2017.................60
Exhibit 96  E-mails between Evi Dixon
    and John Meyer Bates
    Numbered E.Dixon088 through
    E.Dixon99.........................73

## Page 4

1    WHEREUPON, the following proceedings were had

2  and testimony taken, to-wit:

3

4    * * * * *

5

6    VIDEO TECHNICIAN:  This is the time and place

7  set for the video deposition of Evi Dixon in the

8  case of John Meyer, plaintiff, versus Big Sky

9  Resort, defendant.  It is Cause Number

10  18-CV-0002-BMM in the United States District Court

11  for the District of Montana, Butte Division.

12    This video deposition is being held at

13  the offices of Crowley Fleck, located at 1915 19th

14  Avenue in Bozeman, Montana.

15    Today's date is March 9th, 2020.  The

16  time is 10:01 a.m.  The court reporter is Marla

17  Jeske with Bridger Court Reporting.  I'm Mark

18  Brown, the videographer.

19    Will the attorneys now please identify

20  themselves for the record.

21    MS. WALAS:  Breean Walas for the plaintiff.

22    MR. McINTOSH:  Ian McIntosh and Mac Morris

23  for Defendant Big Sky Resort.

24    VIDEO TECHNICIAN:  Will the witness now

25  please be sworn in.

1          EVI DIXON,
2    called as a witness herein, having been first duly
3    sworn, was examined and testified as follows:
4
5        MS. WALAS:  The parties have agreed that the
6    second deposition of plaintiff's expert Evi Dixon
7    shall be taken at plaintiff's expense and is
8    limited to questioning regarding the documents
9    produced by Ms. Dixon since her first deposition
10   taken January 24th, 2020.
11       Those documents have been identified as
12   E.Dixon 1 to 99, and the documents produced today
13   prior to this deposition, E.Dixon 100 to 115.
14       MR. McINTOSH:  Thank you.  And, of course,
15   that's agreeable.  But as indicated in my e-mail,
16   some of the materials that were recently produced
17   touch on subjects that were already raised in the
18   first deposition and we would have asked
19   questions differently if we would have had the
20   questions -- or, excuse me, if we would have had
21   the documents during the first deposition.  So I
22   certainly don't intend to re-plow any ground from
23   the first deposition, but it may touch on subjects
24   of the first deposition.
25   ///

1              EXAMINATION
2    BY MR. McINTOSH:
3        Q.  Ms. Dixon, you were just sworn and you
4    said you would tell the truth, correct?
5        A.  Correct.
6        Q.  And you said you would tell the truth
7    the first time you were deposed on January 24,
8    2020; is that right?
9        A.  Yes.
10       Q.  But you lied repeatedly during your
11   deposition, didn't you?
12       A.  I don't think so.
13       Q.  You made false statements throughout
14   your first deposition, didn't you?
15       A.  No.
16       Q.  Well, you were repeatedly asked if you'd
17   had any communications with John Meyer and you said
18   under oath no, that you didn't; right?
19       A.  That I didn't have communication with
20   John Meyer?  I don't know what to say.  For this
21   case, during my employment in Big Sky.
22       Q.  No, that's not what you said.  You said
23   you hadn't had any communications with John Meyer
24   about anything other than pictures of your alpacas,
25   and that was false testimony under oath, wasn't it?

1        A.  I don't think I lied about it because I
2    did not have any communication about the case with
3    John Meyer, because you came to me and said I'm not
4    supposed to talk to him and I said no, I'm not
5    talking to him about the case.
6        Q.  I'm going to hand you a copy of your
7    prior deposition transcript.  Open to page 7.
8        A.  Okay.
9        Q.  You looking at page 7?
10       A.  Yep, page 25 to 28 page.
11       Q.  No.
12       A.  Page 7?
13       Q.  Page 7.
14       A.  So which number do you count, the first
15   or the second or the third?
16       Q.  Page 7 of the deposition transcript.
17       A.  Okay.
18       Q.  Page 7 of the deposition transcript.
19       A.  Yep.
20       Q.  This is the page number.
21       A.  Well, then you need to say the second.
22       Q.  At line 2 you were asked, "So are you
23   prepared to give accurate and truthful testimony
24   today?"  And you said "Yes," didn't you?
25       A.  "So you are prepared to give accurate,"

1    yep.
2        Q.  That's what you said.  So when we were
3    here previously, you testified that you were going
4    to tell the truth, right?
5        A.  Yes.
6        Q.  Look to page 13 of the deposition
7    transcript.
8        A.  Yep.  Which line?
9        Q.  Starting at line 20, you were asked,
10   "And did you comply with the subpoena?"  What was
11   your answer under oath?
12       A.  I said I didn't have any messages with
13   John about his accident.
14       Q.  That was a lie, wasn't it?
15       A.  Well, it was obviously not true
16   because -- yeah, it was after I did not get hired
17   by Big Sky Resort, then I had communications with
18   John Meyer and you guys had that.  John Meyer sent
19   that all to you.
20       Q.  No, we did not have it.  We asked you to
21   produce it with a subpoena and you failed to
22   produce it and then you lied about it in your
23   deposition, didn't you?
24       A.  I might not have understood what exactly
25   you mean.  I didn't lie on purpose.  I mean, I

Page 9

1  would have said -- if you asked me the question,
2  did you have any communication with John Meyer
3  starting in November, I would have said yes
4  because I --
5     Q.  The next question you were asked was,
6  "You've never had any correspondence with Mr. Meyer
7  about his accident," right?  That's what you were
8  asked on page 13, line 23; correct?
9     A.  Yep, yep.
10    Q.  And your answer was "During -- during
11 the time his lawsuit is going, no."  That was a
12 lie, wasn't it?
13    A.  I don't remember.
14    Q.  There's nothing to remember.
15    A.  Yeah, I know it sitting here, but I mean
16 for me it was -- I don't understand.  Because when
17 he hired me to be an expert witness, of course we
18 had communications.  But during my employment in
19 Big Sky, I did not have any communication with John
20 Meyer.  And in my opinion, because we had this talk
21 up in my office that -- when you came up to me and
22 said you are not supposed to talk to John Meyer, do
23 you remember that?  You said you're friends on
24 Facebook with John Meyer and you're not supposed to
25 talk with John Meyer, and I never did.

Page 10

1     Q.  You're lying again right now in this
2  deposition, aren't you, Ms. Dixon?
3     A.  I'm -- and then when he hired me as an
4  expert witness, yes, we had communication about his
5  accident.
6     Q.  Look at page 15, line 6 of your prior
7  deposition testimony.  I asked you, "Did you have
8  any written correspondence either by e-mail, text,
9  Facebook, any method with Mr. Meyer?"
10       Your answer was, "Probably thanking him
11 for the pictures he took of my alpacas."
12       And then I said, "Anything else?"
13       And your answer under oath was "No,"
14 wasn't it?
15    A.  Yep.  Again, with my consideration that
16 you were talking about during my employment with
17 Big Sky.
18    Q.  That is not what that question asked.
19 You lied under oath, didn't you?
20    A.  Yep, am I going to go to jail now?
21    Q.  So you admit that you lied under oath?
22    A.  Well, because my understanding was
23 something different.
24    Q.  When someone says to you "Anything
25 else," that's not a confusing question, is it?

Page 11

1     A.  To me it was because it was -- to me it
2  was clear that since I was hired as an expert
3  witness that we had communications about the
4  accident.
5     Q.  So why didn't you tell me that when you
6  were testifying under oath?
7     A.  I don't know why I didn't tell you that.
8     Q.  You didn't tell me that because you were
9  trying to cover up the truth, weren't you?
10    A.  No, I wasn't trying to cover up the
11 truth.
12    Q.  Because you didn't want to answer
13 questions about what you talked about with
14 Mr. Meyer, correct?
15    A.  No.
16    Q.  So why then did you lie under oath?
17    A.  I don't know.
18    Q.  You just lied for no reason?
19    A.  I didn't want to lie.  I had a totally
20 misunderstanding.
21    Q.  Did Mr. Meyer tell you not to tell me
22 about your conversations with him?
23    MS. WALAS:  Objection.
24    THE WITNESS:  No.
25 ///

Page 12

1  BY MR. McINTOSH:
2     Q.  So you just chose to not tell the truth
3  on your own?
4     MS. WALAS:  Objection.  This is beyond the
5  scope of the documents that have been produced.
6     THE WITNESS:  I --
7     MS. WALAS:  Wait, hold on.  This is beyond
8  the scope of the deposition.  I've given you some
9  leeway on this line of conversation but I think
10 we're getting beyond the scope of the deposition.
11    MR. McINTOSH:  It's not beyond it at all.
12 She was asked specifically about these things.  She
13 lied under oath and now you've produced the
14 documents that show that her testimony was a lie.
15    MS. WALAS:  And you can ask her about the
16 documents.  You've already covered this ground and
17 covered this topic, and I think you're getting
18 beyond the scope of the deposition at this point.
19    MR. McINTOSH:  If you want to instruct her
20 not to answer, go for it, otherwise I'm going to
21 keep asking the questions.
22    MS. WALAS:  On this ground, I think she's
23 already answered this question.  Again, this is
24 beyond the scope.  If you want to repeat the
25 question, and I'll see if that can be answered and

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 13

1  then I'll -- we'll go from there.
2  BY MR. McINTOSH:
3    Q.  Your first deposition you denied
4  having -- excuse me, you denied providing Mr. Meyer
5  with the e-mail addresses of all the ski
6  patrollers, didn't you?
7    A.  Because I didn't remember that.
8    Q.  So you did not admit to doing that until
9  we actually showed you the e-mail, right?
10    A.  Yeah, because then you showed me the
11  evidence and then I remembered it, but it was not
12  in my memory.
13    Q.  Turn to page 118 of your deposition
14  transcript.  Look at line 13, please.  Excuse me,
15  line 11, I'm sorry.  You were asked, "Is there any
16  other inaccurate or untruthful testimony that you
17  provided here today?"
18      And you said, "I don't think so," right?
19    A.  Yes, it says here.
20    Q.  That was not truthful testimony either,
21  was it?
22    A.  I don't know.
23    Q.  How many false statements did you make
24  during your first deposition?
25    A.  I don't know.  I did not intend to do

Page 14

1  any false statements because I'm an honest person
2  and I tried to honestly answer questions as much as
3  it allows my consciousness.
4    Q.  Do you think that your consciousness
5  allows you to disobey subpoenas?
6    A.  No.
7    Q.  Do you think your consciousness allows
8  you to not tell the truth under oath?
9    A.  I did not want to lie under oath.  I was
10  asked -- answering the questions as I understood
11  the questions and as I remembered what happened.
12    Q.  Go back to page 15 of your deposition,
13  look at line 6.  "Did you have any written
14  correspondence either by e-mail, text, Facebook,
15  any method with Mr. Meyer"?  Do you see that
16  question?
17    A.  Yeah, we were there.
18    Q.  That is a clear and direct question,
19  isn't it?
20    A.  For you it was.
21    Q.  And it was for you too because you
22  answered it.  You did not say "I don't understand
23  the question," did you?
24    A.  No.
25    Q.  You answered.  You said, "Probably

Page 15

1  thanking him for the pictures he took of my
2  alpacas," correct?
3    A.  Correct.
4    Q.  But in fact -- and then you were asked
5  "Anything else?"  And you said, "No," right?
6    A.  It's written here, yes.
7    Q.  And in fact in the month just -- the
8  month before your deposition, you'd had over 48
9  texts alone with Mr. Meyer; isn't that true?
10    A.  That's correct.  But as I already said,
11  in my opinion it was during my employment with Big
12  Sky.
13    Q.  This question doesn't limit it to your
14  employment with Big Sky.
15    A.  I understand that.  I understand that.
16  But it was in my opinion that it was like this.
17    Q.  So do you think that you can insert your
18  opinion about what the truth is?
19    A.  No.
20    Q.  So there's the truth and then there's
21  not the truth, right?
22    A.  Yep, you can say I lied.
23    Q.  And in fact, you had communications with
24  Mr. Meyer while you were still employed at Big Sky,
25  didn't you?

Page 16

1    A.  Yeah, they came to take pictures and
2  it's written in here.  He came.
3    Q.  You had communications with Mr. Meyer
4  about things other than him taking pictures, didn't
5  you, while you were employed at Big Sky?
6    A.  About craniosacral therapy.
7    Q.  And you didn't tell me about that when
8  you were directly asked about it under oath, did
9  you?
10    A.  I did say that somewhere.
11    Q.  And you didn't produce all of the texts,
12  e-mails, Facebook messages that you had with Meyer
13  even though you had been commanded to do so by
14  subpoena, right?
15    A.  Yes.
16    Q.  You were directly instructed to produce
17  all of your correspondence, including e-mails or
18  texts with Mr. Meyer or asking -- or anyone acting
19  on his behalf, and you failed to do that, didn't
20  you?
21    A.  Yes.
22    Q.  There's nothing ambiguous about that, is
23  there?
24    A.  Yes.
25    Q.  There's something ambiguous about all

EVI DIXON

Page 17

1 correspondence?  What's ambiguous about all
2 correspondence?
3      A.  No.
4      Q.  Do you agree that's clear, right?
5      A.  What is clear?
6      Q.  When you were directed to produce all of
7 your correspondence, that's clear?
8      A.  I did not produce it for the first and I
9 got the second subpoena and I worked with Breean
10 Walas and we put it all together now.
11      Q.  What did you discuss with Mr. Meyer
12 before your first deposition?
13      A.  Um, I don't know how to tell you that.
14 We discussed the accident.  I don't know if we
15 discussed the accident because I was the accident
16 investigator and he showed me the pictures that he
17 had from the accident investigation.  I can't
18 repeat every word we said.
19      Q.  What else did you discuss with Mr. Meyer
20 before your first deposition?
21      A.  We talked about all kinds of different
22 things.  Do you need all the subjects we talked
23 about or just concerning the accident or the
24 deposition or what?  I don't understand the
25 question.

Page 18

1      Q.  Ms. Dixon, it's a very clear question.
2 I asked you what you discussed with Mr. Meyer, do
3 you understand that?
4      A.  Yes, but do you want our whole
5 conversation?  I don't have a record of the
6 conversation.  I didn't --
7      Q.  I want everything that you can remember.
8 If I would have wanted to limit it, I would have
9 limited it.
10      A.  Okay.  So we discussed about
11 craniosacral therapy.  We discussed his babies.  We
12 discussed my new business.  We discussed knitting
13 him a hat.  I brought him another hat for his wife.
14 We had just normal conversations that friendly
15 people have with each other.
16           I was invited to one of his fundraisers
17 but I didn't talk to him there because he was busy.
18 I talked to somebody else in that.
19      Q.  What else?
20      A.  About the accident and what could
21 happen, how a deposition would be going because
22 I've never been at a deposition before.  What else?
23 He showed me pictures that he had.
24      Q.  Pictures of what?
25      A.  Of the Highway and the Loop Road and I

Page 19

1 got that report from Mr. Petrozzi.
2      Q.  What pictures of Highway and Loop Road
3 did Mr. Meyer show you?
4      A.  The one where the people standing on the
5 Loop Road, mainly.  That's what I remember.
6      Q.  Is it Exhibit 29?  You have the exhibits
7 right there in front of you.
8      A.  Where?  I should look through this?
9 That's mine?
10      Q.  Excuse me, not 29.  Exhibit 24.
11      A.  Is this the number here?  No, that was
12 not the picture.
13      Q.  Exhibit 25.
14      A.  This one.  I think it was this one.
15      Q.  Did you review any pictures other than
16 Exhibit 25 with Mr. Meyer prior to your deposition?
17      A.  Um, can I look at them?  I don't think I
18 looked at all these pictures.  No, I don't think
19 so.  Do I have to go through the whole -- of more
20 pictures?
21      Q.  It's a simple question.  Did you review
22 any pictures other than Exhibit 25 prior to your
23 deposition?
24      A.  I don't think there were any other
25 pictures there, but.  There could have been other

Page 20

1 pictures but, this was the main picture that I saw
2 and that we looked at and...
3      Q.  What did you discuss with Mr. Meyer
4 about his accident prior to your first deposition?
5      A.  We talked about who was the accident
6 investigator, who was first on scene, that I was
7 not on scene because I was sitting in my office and
8 we talked about --
9      Q.  You discussed with Mr. Meyer whether you
10 were on scene because it was his concern whether it
11 was your responsibility to mark this area, right?
12      A.  No.
13      Q.  He specifically asked you, was it your
14 responsibility to mark this area before the
15 accident, didn't he?
16      A.  Um, I don't think he asked me this way,
17 that if it was my responsibility to mark this area.
18 I don't remember that question.  But I know that
19 it's not my responsibility to mark areas.  That's
20 the responsibility for the supervisors and the
21 director and the manager and I -- it was not
22 my -- I didn't go out and mark areas unless I was
23 patrolling on the mountain and I saw something that
24 needed to be marked.
25      Q.  And when you were patrolling on the

5 (Pages 17 to 20)

EVI DIXON

---

Page 21

1    mountain, you did mark things that you thought
2    needed to be marked or you told someone else to
3    mark it, didn't you?
4        A.  I did not talk to somebody else to mark
5    it.
6        Q.  Well, you're making more false
7    statements under oath, aren't you, Ms. Dixon?
8        A.  No.
9        Q.  Didn't you specifically write to
10   Mr. Meyer that when you were out patrolling, if you
11   saw a hazard, you would mark it or you would tell a
12   supervisor to mark it?
13       A.  Well, I might have discussed with
14   a supervisor if we should mark it because he
15   is -- that's his job and I might have said, you
16   know, there's a trail merge sign missing, should we
17   go and mark it?  And then I usually went and marked
18   it because I wasn't out there that much.  So I was
19   happy to do some normal patrol work.
20       Q.  Mr. Meyer told you not to communicate
21   with me or anyone from my office, didn't he?
22       A.  I don't remember that he said that.
23           (Whereupon, Deposition
24            Exhibit Number 90 was
25            marked for identification.)

---

Page 22

1    BY MR. McINTOSH:
2        Q.  I'm going to hand you what I'm marking
3    as Exhibit 90.  Please review that.
4        A.  Are you trying to kill me with your eyes
5    or what?  What is this?
6        Q.  Please review Exhibit 90, Ms. Dixon, and
7    let me know when you're done.
8        A.  Yeah, so I'm going to get to jail or
9    what?
10       Q.  Have you reviewed Exhibit 90, Ms. Dixon?
11       A.  Um, as much as I could understand it.
12   My English is not good enough to understand this
13   whole document.  Sorry.
14       Q.  First of all, Ms. Dixon, you understand
15   that you've been sworn to tell the truth here
16   today, right?
17       A.  Yes.
18       Q.  And if you -- you understand that what
19   happens if you don't tell the truth here today?
20       A.  Well, I've got to go to jail.
21       Q.  And on Exhibit 90 under Section 1 it
22   says "A person commits the offense of perjury if in
23   any official proceeding the person knowingly makes
24   a false statement under oath."  Did I read that
25   correctly?

---

Page 23

1        MS. WALAS:  Objection, calls for a legal
2    conclusion.
3    BY MR. McINTOSH:
4        Q.  Did I read that correctly?
5        A.  Yeah.
6        Q.  And you knowingly made false statements
7    under oath in your first deposition, didn't you?
8        A.  Not knowingly.
9        Q.  Oh, so you agree you made false
10   statements but you contend it was unknowingly?
11       A.  As I said before -- and I know you said
12   I can't put my opinion in there but people are
13   asked -- answering questions from their conscious
14   thinking or from their feeling.  I am not a logical
15   person and I was under the thought that I -- you
16   asked me about during my employment because I was
17   not allowed to talk to Mr. Meyer during my Big Sky
18   employment and that's what I -- I didn't do that
19   concerning that.
20       Q.  Go back to page 15 of your deposition
21   transcript, page 6 -- or excuse me, page 15, line
22   6.  Excuse me.
23       A.  Yep.
24       Q.  And when you were asked did you have any
25   written correspondence either by e-mail, text,

---

Page 24

1    Facebook or any method with Mr. Meyer, that
2    question is not limited to your time while you were
3    employed at Big Sky, is it?
4        A.  No.
5        Q.  And then you were asked "Anything else,"
6    correct?
7        A.  Correct.
8        Q.  And that is not limited to your time at
9    Big Sky, is it?
10       A.  Correct.
11       Q.  And it's not limited to the topic of
12   Mr. Meyer's accident, is it?  Correct?
13       A.  Correct.
14       Q.  And in fact, the question was broader.
15   I specifically asked you about anything else other
16   than pictures of the alpacas, right?
17       A.  Correct.
18       Q.  So that means anything.  Anything means
19   anything, right?
20       A.  Uh-huh.
21       Q.  Is that a yes?
22       A.  Yes.
23       Q.  And you knowingly answered that question
24   falsely, didn't you?
25       A.  If you say it this way, yes, I did say

---

6 (Pages 21 to 24)

EVI DIXON

Page 25

1  it wrong but I didn't want to lie.  I wanted to
2  tell you what I knew and what -- what my truth is.
3  I am not a person who's lying.  I'm probably the
4  most honest person there is.  I'm surrounded by
5  liars, but I am the most honest person and I can
6  only tell you what I believe my truth is.
7      Q.  After your first deposition Ms. Walas
8  asked you to give -- to provide her with all of
9  your correspondence with Mr. Meyer, correct?
10     A.  Correct.
11     Q.  And did you do so?
12     A.  Yes.
13     Q.  And so as soon as Ms. Walas asked you to
14  provide your correspondence with Mr. Meyer, you did
15  that within -- how quickly, a matter of days,
16  right?
17     A.  Probably one day.
18     Q.  And yet, when we asked you to produce
19  all of your correspondence with Mr. Meyer with a
20  subpoena, you did not do that, did you?
21     A.  We've been there.  No, I didn't.
22     Q.  Because you were trying to intentionally
23  hide your correspondence with Mr. Meyer, weren't
24  you?
25     A.  No, I wasn't trying anything

Page 26

1  intentionally.
2      Q.  Why then, when I asked you to produce
3  your correspondence with Mr. Meyer, did you fail to
4  do so; yet, when Ms. Walas asked you to do the
5  exact same thing, you produced the correspondence
6  within 24 hours?
7      A.  I don't know.
8      Q.  There's no logical response, is there?
9      A.  No.
10         (Whereupon, Deposition
11         Exhibit Number 91 was
12         marked for identification.)
13  BY MR. McINTOSH:
14     Q.  I'm going to hand you what I've marked
15  as Exhibit 91.
16     A.  Yep, I read all through this.
17  MR. McINTOSH:  I have a copy for you.
18  THE WITNESS:  All the e-mails.
19  COURT REPORTER:  I think she has two.
20  MR. McINTOSH:  Oh, I'm sorry.  One is for
21  Ms. Walas and one is for Ms. Dixon.
22  MS. WALAS:  You said 91?
23  MR. McINTOSH:  Yes, but I took that first
24  page of that off.  The first page is just your
25  e-mail to me.

Page 27

1  MS. WALAS:  Is my e-mail, okay.
2  MR. McINTOSH:  So I took that off.
3  BY MR. McINTOSH:
4      Q.  Ms. Dixon, you now have before you
5  what's been marked as Exhibit 91; is that correct?
6      A.  Correct.
7      Q.  And these are all documents that you
8  produced to Ms. Walas shortly after your first
9  deposition, correct?
10     A.  Correct, uh-huh.
11     Q.  Is that a yes?
12     A.  Yes.
13     Q.  And these documents include e-mails,
14  texts, and Facebook messages with Mr. Meyer,
15  correct?
16     A.  Correct.
17     Q.  Look at the first page of Exhibit 91.
18  That is a letter that Mr. Meyer produced to me when
19  he previously provided me with the computer that
20  you had from Big Sky; is that right?
21     A.  Say that again, question?
22     Q.  Look at the first page.
23     A.  Uh-huh.
24     Q.  You're not looking at the first page,
25  are you?

Page 28

1      A.  Oh, here?
2      Q.  Yeah.  First page.  You're on the first
3  page?
4      A.  Yes.
5      Q.  That is a letter from John Meyer to me,
6  correct?
7      A.  Correct.
8      Q.  And that's the letter that Mr. Meyer
9  gave to me when he gave me your computer from Big
10 Sky, right?
11     A.  Okay.
12     Q.  Is that right?
13     A.  Yes, if you say so.
14     Q.  And did you -- well, first of all, you
15  still had your Big Sky computer in your possession
16  when you received the first subpoena; is that true?
17     A.  Yes.
18     Q.  And did you tell Mr. Meyer that all of
19  your correspondence with him was on that computer?
20     A.  I said this is the whole thing that I
21  have from Big Sky.  I don't have any other -- any
22  other documents from Big Sky.
23     Q.  Well, the subpoena didn't just ask for
24  documents from Big Sky, did it?
25     A.  Probably not.

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 29

1    Q.  Okay.  Look at Exhibit 70, which is
2  right in front of you.  Exhibit 70, right here.
3    A.  You mean here on the number?
4    Q.  Exhibit 70 is the first subpoena that we
5  served on you, correct?
6    A.  Uh-huh.
7    Q.  Is that right?
8    A.  Yep, I got that per e-mail.
9    Q.  And -- well, you didn't receive it by
10  e-mail, did you?  You were served with that
11  subpoena by a process server, right?
12    A.  I think I got it per e-mail but I'm
13  not -- I don't remember.
14    Q.  And you were specifically asked to
15  produce all correspondence, including e-mails or
16  texts with Mr. Meyer or anyone acting on his
17  behalf, right?
18    A.  Yeah.
19    Q.  Going back to Exhibit 91, do you have
20  that in front of you, first page of Exhibit 91?
21    A.  Yep.
22    Q.  That's the letter from Mr. Meyer, right?
23    A.  Yep.
24    Q.  And in the third paragraph there it
25  states -- Mr. Meyer states, Ms. Dixon has indicated

Page 30

1  that she does not have any documents other than
2  what I have produced, do you see that?
3    A.  Yep.
4    Q.  And that statement from Mr. Meyer was
5  false, wasn't it?
6    A.  Um, obviously false because we have
7  now all the other documents that I provided to
8  Ms. Walas.
9    Q.  Right.  And Mr. Meyer obviously knew he
10  was having communications with you, right?
11    A.  Yeah.
12    Q.  And despite that, Mr. Meyer assisted you
13  in providing a false response to the subpoena,
14  right?
15    A.  I don't know.  I mean we talked about it
16  and I -- I don't know.  I did not know that you
17  needed e-mails and text messages about taking
18  pictures of alpacas and craniosacral.  I did
19  not -- I was not aware about the huge thing about
20  relationships, personal relationships, that this
21  can be going to court.  I was not aware.  I am not
22  a law person.  So in my thoughts it was just about
23  what happened during the accident and the accident
24  investigation.  And this is what I provided to
25  Mr. Meyer because that was my computer and I was

Page 31

1  not aware that I had to report every little
2  photograph taken, communication or hand knitting
3  communication or craniosacral communication.  I
4  mean we are all human beings and we talk and I
5  wasn't aware that this is important.  I'm sorry.
6    Q.  So you think when it says all
7  correspondence, including e-mails or texts, to you
8  that's not clear?
9    A.  It wasn't clear to me.
10    Q.  But you were dealing -- we're
11  specifically talking about Exhibit 91 right here.
12  You were dealing with Mr. Meyer and he was helping
13  you respond to the subpoena, right?
14    A.  Yes, and we talked about it and he
15  said --
16    Q.  Please just answer the questions,
17  please.
18    A.  Sorry, sorry.
19    Q.  You were working with Mr. Meyer to
20  respond to the first subpoena that was served on
21  you, right?
22    A.  He sent me -- I don't think I was served
23  that subpoena.  He sent it to me per e-mail and
24  then I was asking him -- I remember, "Why don't I
25  get that in person?"

Page 32

1    And he said "I don't know."
2    And then I said, "I don't know what I
3  should bring."
4    And he said "Everything that you have
5  from Big Sky," and that's what I brought.  I
6  brought my laptop I had from Big Sky because
7  that was the only thing that I had.
8    Q.  Ms. Dixon, I want you to listen to the
9  question and then answer the question that's asked,
10  can you do that?
11    A.  Yeah, I hope so.
12    Q.  You were working with Mr. Meyer to
13  respond to the first subpoena that was served on
14  you, true?
15    A.  We had a brief conversation.
16    Q.  So the answer is yes?
17    A.  Yes.
18    Q.  And then you gave him what you thought
19  to be what you thought was responsive to the
20  subpoena, right?
21    A.  Right.
22    Q.  And Mr. Meyer though, he knew that he
23  was having texts and e-mails and Facebook messages
24  with you, right?
25    A.  I suppose.

8 (Pages 29 to 32)

EVI DIXON

Page 33

1     Q. And Mr. Meyer did not produce those in
2 response to the subpoena, did he?
3     A. I don't know if he did or not.
4     Q. Well, you know all he produced was your
5 computer?
6     A. It says right here, yes. Now I know,
7 but I didn't know before that if he -- if he
8 produced it. I don't know what he does and what
9 you guys talk.
10     Q. Well, Ms. Dixon, you do know that he
11 didn't produce all of your correspondence or else
12 we wouldn't be back here today asking you about all
13 these things for the first time, right?
14     A. Correct.
15     Q. Okay. So you know that he didn't
16 produce it in response to the first subpoena?
17     A. I didn't produce it. I can only say
18 what I didn't do. I don't know what he did.
19     Q. You know that he didn't produce his
20 correspondence with you in response to the first
21 subpoena?
22     A. Well, I just read that he just gave you
23 the laptop. You just told me that.
24     Q. And you knew that before day, right?
25     A. I didn't -- I don't know. I

Page 34

1 didn't -- it's not my concern what Mr. Meyer
2 produces and not produces because my concern was
3 now to find all my text messages.
4     Q. And you agree that Mr. Meyer's response
5 here, "Ms. Dixon has indicated that she does not
6 have any documents other than what I have already
7 produced," that is a false response to a subpoena,
8 isn't it?
9     A. You should tell him that.
10     Q. But you know it's false? The question
11 is to you, do you understand that?
12     A. Yes, it is not -- yeah, he only got my
13 laptop at that time, December 11th. And the
14 subpoena came when? I had to report the laptop by
15 December 13th.
16     Q. So you agree that Mr. Meyer submitted a
17 false subpoena response, right?
18     A. He didn't subpoena a false one. He just
19 gave what I gave him.
20     Q. He assisted you in providing a false
21 subpoena response, didn't he?
22     A. You make it happen as if we are trying
23 to lie. We talked about it and we said "what do I
24 need to bring?"
25     And he said "Everything that you have

Page 35

1 from Big Sky." That's what I have, that's what I
2 provided.
3     Q. Ms. --
4     A. We didn't -- he didn't -- I'm not done.
5 He did not tell --
6     Q. Ms. Dixon, you're not answering the
7 question. I'm asking you questions and instead of
8 answering the questions, you're just making
9 speeches about things you weren't asked about.
10     A. Because I can't answer this with yes or
11 no because it's not how it is. It's not that he
12 assisted me to lie or assisted me to not produce
13 it. That is not the case.
14     Q. So you're saying he did it on his own?
15 You're saying Mr. Meyer submitted a false response
16 on his own without any help from you?
17     MS. WALAS: Objection, calls for speculation.
18     THE WITNESS: I don't know. This is really
19 out of my -- I don't know what he's thinking. I
20 can only say what I am feeling or thinking and I
21 don't know. I can't say any answer to that.
22 Sorry.
23 BY MR. McINTOSH:
24     Q. What did you do to prepare for the
25 deposition today?

Page 36

1     A. We talked this morning and I read
2 through my deposition and -- pretty much, and my
3 e-mails and my text messages that I sent.
4     Q. Who did you -- you said "we" talked this
5 morning, who's "we"?
6     A. Breean and I.
7     Q. Did you speak with Mr. Meyer?
8     A. No.
9     Q. Have you spoken with Mr. Meyer from the
10 time of your first deposition until today?
11     A. Um, he asked me how I was doing after
12 the deposition and I said good, I'm exhausted. And
13 I don't know what else I said, and I can probably
14 find it in the deposition, and I wished him a happy
15 birthday yesterday.
16     Q. How did you talk to him yesterday?
17     A. I wished him a happy birthday via
18 Facebook I think.
19     Q. And you haven't submitted that
20 correspondence?
21     A. Um, did I give that to you? Yeah, I
22 think so.
23     Q. You understand you were subpoenaed and
24 you were asked to produce all correspondence,
25 including e-mails or texts with Mr. Meyer today at

9 (Pages 33 to 36)

EVI DIXON

Page 37

1    the time of your deposition, right?
2        A.  I showed Breean that last text that I
3    sent to him.
4        Q.  I don't believe that's been produced, am
5    I wrong?
6        MS. WALAS:  I don't believe it's covered
7    within the scope of the subpoena, a birthday, happy
8    birthday.
9    BY MR. McINTOSH:
10       Q.  It says all correspondence with
11   Mr. Meyer or anyone acting on his behalf.
12       A.  I can show you the message on my phone.
13       Q.  What else did you do to prepare for
14   today that you haven't told us about yet?
15       A.  I think I told you everything.
16       Q.  Do you have a lawyer, a personal lawyer?
17       A.  No.
18       Q.  Have you spoken with a criminal lawyer?
19       A.  No.
20       Q.  You are not a citizen, correct?
21       A.  Correct.
22       Q.  You are a citizen of what country?
23       A.  Austria.
24       Q.  Did you -- have you ever reviewed
25   Mr. Meyer's deposition transcript?

Page 38

1        A.  No.
2        Q.  So you formed your opinions in this case
3    without even reviewing Mr. Meyer's deposition
4    transcript?
5        A.  I don't think I ever saw it.
6        Q.  That wasn't the question I asked.
7        A.  I don't think I ever got it sent to me.
8    So no, I didn't.
9        (Whereupon, Deposition
10       Exhibit Number 92 was
11       marked for identification.)
12   BY MR. McINTOSH:
13       Q.  I'm going to hand you what has been
14   marked as Exhibit 91 [sic].
15       A.  That's the same number as the one
16   before?
17       Q.  I'm sorry, is it the same one?  92.
18       I'm going to hand you now what I've
19   correctly marked as Exhibit 92.  Have you ever seen
20   Exhibit 92 before?
21       A.  No, I don't remember.
22       Q.  Exhibit 92 is a portion of Mr. Meyer's
23   deposition.  And if you could look at page 270 of
24   that deposition transcript.
25       A.  Yeah.

Page 39

1        Q.  Are you looking at page 270?
2        A.  Yes.
3        Q.  And do you see line 4, Mr. Meyer was
4    asked --
5        A.  Yeah, I see.
6        Q.  -- "Did you know her -- do you still
7    communicate with Ms. Dixon?"  Do you see that
8    question?
9        A.  Yeah.
10       Q.  And Mr. Meyer answered "No," didn't he?
11       A.  That was April 9th, 2019.  Yes.
12       Q.  That was a -- that answer was a lie,
13   wasn't it?
14       A.  No.
15       Q.  It was a false statement, wasn't it?
16       A.  No, we did not communicate.
17       Q.  So it's your testimony that you were not
18   communicating in April of 2019 with Mr. Meyer?
19       A.  I don't think so.  Because I was still
20   an employee in Big Sky and I have had no
21   communication with him since we talked about that I
22   am not supposed to talk to him.
23       Q.  Ms. Dixon, that simply isn't true, is
24   it?  You were exchanging texts and e-mails with
25   Mr. Meyer in the months leading up to April 9,

Page 40

1    2019, weren't you?
2        A.  Before that.
3        Q.  Right.  Before April 9, 2019, you were
4    exchanging texts and e-mails with Mr. Meyer?
5        A.  I think it was before 2018 though.  I
6    don't remember when we talked in the office, but I
7    was looking through the texts that we had here and
8    I think it was October 2000 -- or not October.  I
9    don't know, 2018 or 2017.
10       Q.  Ms. Dixon, you're simply lying under
11   oath right now, aren't you?
12       A.  When you talked to me that I was not
13   supposed to talk to Mr. Meyer, I didn't talk to
14   Mr. Meyer.
15       Q.  Yes, you did.  You continued to interact
16   with him on texts, e-mails and in person, didn't
17   you?
18       A.  And you have these e-mails from me after
19   November 2019.
20       Q.  Ms. Dixon, isn't it true that just a few
21   months before Mr. Meyer testified under oath in
22   this case, he invited you to dinner at his house?
23       A.  I think that was 2016.
24       Q.  And isn't it just a few months before
25   Mr. Meyer was deposed in April of 2019, that you

10 (Pages 37 to 40)

EVI DIXON

Page 41

1   invited him to your house?
2       A.  I don't remember inviting him to my
3   house.
4       Q.  Let's look at Exhibit 93.
5       (Whereupon, Deposition
6           Exhibit Number 93 was
7           marked for identification.)
8   BY MR. McINTOSH:
9       Q.  First of all, you do agree that you
10  communicated with Mr. Meyer by text, right?
11      A.  Yes.
12      Q.  You communicated with him by Facebook
13  messages, right?
14      A.  Yeah.
15      Q.  You communicated with him by e-mail,
16  correct?
17      A.  Correct.
18      Q.  And you did all those things from your
19  telephone, correct?
20      A.  Or from my laptop.
21      Q.  And -- correct.  So if we look back at
22  Exhibit 91, that was the -- it starts with E.Dixon
23  001 and then a number of e-mails are produced in
24  there?
25      A.  Yes.

Page 42

1       Q.  For example, if you go to
2   exhibit -- let's see, I'm sorry.  Page E.Dixon,
3   E.Dixon 29.  Are you at page E.Dixon 29?
4       A.  Yep, I am.
5       Q.  That is an e-mail that you sent from
6   your laptop -- it's an e-mail exchange between you
7   and Steve Emerson about Mr. Meyer's ski wreck,
8   correct?
9       A.  Yep, 2016.
10      Q.  And are all these e-mails, in other
11  words, the ones that are in the format shown on
12  E.Dixon 29, are those all e-mails that you sent
13  from your laptop?
14      A.  Those -- you mean the one from Steve
15  Emerson to -- regarding John Meyer?  This one on
16  page 29?
17      Q.  Ms. Dixon, all of the ones -- all of the
18  e-mails in that format that is shown in Exhibit 91,
19  I'm asking you, are those all e-mails that you
20  sent --
21      A.  There's only one e-mail here.
22      Q.  Let me finish my question, Ms. Dixon.
23      A.  Uh-huh.
24      Q.  I'm asking if all the e-mails in that
25  format within Exhibit 91, which you have in front

Page 43

1   of you in your hands, are all of those e-mails
2   e-mails that you sent from your laptop?
3       A.  Or from my phone, yes.
4       Q.  Well, Ms. Dixon -- okay.  The e-mails
5   shown -- like, for example, look at the format of
6   the e-mail shown in Exhibit E.Dixon 21 -- or excuse
7   me, page E.Dixon 21.
8       A.  21?
9       Q.  Do you see that?  Yes.
10      A.  I'm on page 29.
11      Q.  Yes.  You can look at 21, you can look
12  at 22, 23, 24, every page from 29.  Do you see the
13  format that those e-mails are in?
14      A.  Yeah.
15      Q.  Then I want you to go back to page
16  E.Dixon 53.
17      A.  Back.  These are text messages or
18  Facebook messages.
19      Q.  Well, on page 53, those are messages to
20  an address john@cottonwoodlaw.org, correct?
21      A.  Yep, I didn't read it.  Yes.
22      Q.  Okay.  So this is a very simple
23  question, Ms. Dixon.  The e-mails that are shown in
24  the format that is on page E.Dixon 25.
25      A.  Yeah, that's e-mails.

Page 44

1       Q.  Those are different formats or
2   different -- they look different than the e-mails
3   sent on page E.Dixon 53, right?
4       A.  Correct.
5       Q.  And so the question is, are the ones
6   shown on E.Dixon 25, the ones in that format, were
7   those sent from your laptop?
8       A.  I have an iPhone and a laptop and I can
9   produce e-mails from the laptop and from my iPhone
10  and I don't remember if I sent them from my iPhone
11  or from my laptop, but probably from -- it looks
12  the same if I sent it from my phone or from my
13  laptop.
14      Q.  Well, it doesn't, does it?  Because if
15  we look at the ones on page 53, that's what it
16  looks like you sent from your phone, right?
17      A.  Well, those are screen shots.
18      Q.  Okay.  How did you obtain all those
19  screen shots?
20      A.  By taking screen shots.
21      Q.  Okay.  So do you contend that these
22  were sent on your laptop?  What we see on page
23  E.Dixon 53, do you contend those were sent from you
24  laptop or from your phone?
25      A.  Both.  Maybe from the phone or from the

11 (Pages 41 to 44)

Page 45

1   laptop.  Are you asking me if this was sent to you
2   from my phone or is it the communication made
3   between John and me by -- per phone or laptop?
4       Q.  Ms. Dixon, was page 53, E.Dixon 53, that
5   was not sent to me, was it?  It was not sent to me
6   by you, was it?
7       A.  This is all what I produced.
8       Q.  That wasn't the question, Ms. Dixon.
9   The question was, page E.Dixon 53, was that sent to
10  me by you?
11      A.  I did not send anything to you.  I sent
12  it to Ms. Walas.
13      Q.  Right.
14      A.  Right.
15      Q.  So the answer is no, right?
16      A.  The answer is no.
17      Q.  Okay.  There we go.  So obviously, I
18  wouldn't be asking you how page E.Dixon 53 was sent
19  to me by you, would I?  Because that never
20  happened, right?  Are you following along?
21      A.  I was asked in the subpoena, the first
22  subpoena, and I did not do it because I didn't
23  really understand what was going on.  I'm sorry,
24  I'm stupid.  But when Ms. Walas told me that I had
25  to produce all this, I sent this to her because all

Page 46

1   the subpoenas are not coming directly from you.  So
2   it's -- the communication went between Ms. Walas
3   and me.
4       Q.  I'm going to hand you what I've marked
5   as Exhibit 93.  Hopefully I have the numbers
6   correct.
7          Exhibit 93, these are your e-mail
8   communications with John Meyer using his address
9   john@cottonwoodlaw.org, correct?
10      A.  Correct.  These are text messages.
11      Q.  Well, they're text messages to his
12  e-mail address john@cottonwoodlaw.org, right?
13      A.  Yeah.
14      Q.  In exhibit -- excuse me, Exhibit 93,
15  these communications, you failed to produce these
16  in response to the first subpoena to you, didn't
17  you?
18      A.  Yes.
19      Q.  Can you go back to Exhibit 91.  Do you
20  still have that in front of you?
21      A.  Uh-huh.
22      Q.  Let's just start at page E.Dixon 2.
23  It's your e-mail with Steve Emerson.
24      A.  Yeah.
25      Q.  Those are e-mails about John Meyer's

Page 47

1   accident, right?
2       A.  Right, yes.
3       Q.  And you didn't produce those in response
4   to the first subpoena, did you?
5       A.  No, because I didn't remember that.
6       Q.  Go to page E.Dixon 11.
7       A.  Yep.
8       Q.  Well, first of all, starting on page 10,
9   go back just one page, this is an e-mail that you
10  sent to John Meyer with all of your thoughts about
11  the expert report of Mark Petrozzi, right?
12      A.  Correct.
13      Q.  You never issued a supplemental expert
14  report in this case, did you?
15      A.  What is that?
16      Q.  You don't know what it is?  Did you ever
17  issue some report that you signed other than the
18  affidavit that we were provided?
19      A.  Did I ever issue a report?  I don't
20  understand.
21      Q.  Do you know what the word "prepare"
22  means?
23      A.  Right, yes.
24      Q.  Did you ever prepare a report other than
25  the affidavit --

Page 48

1       A.  This one.
2       Q.  -- that Mr. Meyer prepared?
3       A.  I worked through this one here.
4       Q.  And you're looking at E.Dixon page 10?
5       A.  Yes.
6       Q.  And that was never produced to us until
7   last week, right?
8       A.  I don't know.
9       Q.  You didn't produce this in response to
10  the first subpoena, did you?
11      A.  No.
12      Q.  Go to page E.Dixon 11, and the first
13  paragraph there, review that to yourself.  It
14  starts out "From a logical point of view."  Let me
15  know when you're done with that paragraph.
16      A.  Yep.
17      Q.  And right there what you said is "Once
18  you get closer to the loop road the slope incline
19  decreases and there is a depression on skiers
20  right."  And then you say, "From that distance the
21  loop road is not visible."  Did I read that
22  correctly?
23      A.  That is correct, yep.
24      Q.  And you now know that -- that what you
25  wrote right there on page E.Dixon 11, what I just

12 (Pages 45 to 48)

EVI DIXON

Page 49

1  read, you know that is false, don't you?
2      A. It could be false, it could be true
3  because I have not stand -- stood there lately in
4  the last few years.
5      Q. Well, in fact someone recently sent you
6  pictures and you texted Mr. Meyer and said, "It's
7  not really what I wanted to see. The loop road is
8  still visible from up close." Isn't that true?
9      A. Yes.
10     Q. Okay. So what you wrote here that "From
11 that distance the loop road is not visible," that's
12 false, isn't it?
13     A. Yeah.
14     Q. Who sent you the pictures recently of
15 the area of Mr. Meyer's incident?
16     A. A friend of mine.
17     Q. Yeah. What's the friend's name?
18     A. Her name is Trina.
19     Q. Trina what?
20     A. I don't know.
21     Q. You don't know her last name?
22     A. No.
23     Q. What is Trina's phone number?
24     A. Um, she's a friend of mine and I really
25 don't want her to get in trouble, so I'm not going

Page 50

1  to tell you.
2      Q. Okay. Ms. Dixon, I'm asking you to
3  provide -- you have your phone here with you,
4  right?
5      A. Yeah.
6      Q. And you have Trina's number in your
7  phone, don't you?
8      A. Yeah.
9      Q. So will you give me her phone number,
10 please?
11     A. What's going to happen to her?
12     Q. Can you just please give me the phone
13 number, Ms. Dixon? And her last name when you look
14 it up.
15     A. I have not -- I don't have her last name
16 here on my phone. 231-215-1624.
17     Q. Can you say that again, please? 231 --
18     A. 231-215-1624.
19     Q. 1624. And do you have Trina's last
20 name?
21     A. No, it just says Trina.
22     Q. And you asked Trina to take pictures of
23 the area of Mr. Meyer's incident for you, correct?
24     A. Yeah.
25     Q. So you asked her to gather evidence that

Page 51

1  you were trying to rely on in this case for you,
2  right?
3      A. I wanted to see the area, how it looks
4  now in 2020.
5      Q. And when did Trina take these
6  photographs for you?
7      A. It was -- I think it was January.
8      Q. And do you have your communications with
9  Trina on your phone or in front of you?
10     A. No.
11     Q. What did you do with them?
12     A. I deleted the pictures.
13     Q. Why did you delete the pictures?
14     A. Because I just wanted to see the area,
15 and I sent one picture to Ms. Walas, and then the
16 rest I didn't really need because they were taken
17 in the wrong spot.
18     Q. Well, you didn't send it to Ms. Walas,
19 you sent it to Mr. Meyer, didn't you?
20     A. I don't remember. Probably to Ms. Meyer
21 because then I think we didn't -- I didn't have
22 your phone number yet or.
23     Q. How many pictures did Trina send to you
24 of the area of Mr. Meyer's accident scene?
25     A. The one that I wanted, it was one

Page 52

1  picture and then she took a few other pictures
2  where she wasn't certain where she should take it.
3      Q. How many pictures did Trina send you
4  from Big Sky Resort?
5      A. Maybe 10. I don't remember.
6      Q. And you deleted all of those but one?
7      A. They are now deleted. All of them are
8  deleted.
9      Q. Turn to page E.Dixon 15.
10     A. (Witness complies.)
11     Q. There's a thing that says P, and then
12 that is in bold, and then below that you write,
13 "Yes skiers are responsible for their own safety!"
14 Correct?
15     A. Correct.
16     Q. And you agree with that, don't you?
17     A. Yeah.
18     Q. That skiers are responsible for their
19 own safety, right?
20     A. Yeah.
21     Q. And on December 11, 2015, Mr. Meyer was
22 responsible for his own safety, right?
23     A. Uh-huh.
24     Q. Is that a yes?
25     A. Yes.

13 (Pages 49 to 52)

EVI DIXON

Page 53

1  Q.  Because he's the only one that can
2  control where he goes and how fast he skis, right?
3       A.  Yes.
4       Q.  Turn to page E.Dixon 18.
5       A.  (Witness complies.)
6       Q.  The first paragraph here you said, "When
7  I was out skiing I definitely did my job as a ski
8  patroller, marking hazards or obstacles or telling
9  supervisors and managers that there should be areas
10  marked," do you see that?
11      A.  No.
12      Q.  The very first paragraph at the top of
13  the page.
14      A.  Which page are we?
15      Q.  18.
16      A.  Do you mean before the time of the
17  incident, that paragraph?
18      Q.  Yes.  The last sentence in that
19  paragraph.
20      A.  When I was out skiing, yep, I see it.
21      Q.  So do you agree that when you were out
22  skiing, you definitely did your job as a ski
23  patroller, marking hazards or obstacles or telling
24  supervisors and managers that there should be areas
25  marked?

Page 54

1       A.  Yes, we talked about some areas that
2  should be marked.
3       Q.  And do you agree that you -- when you
4  were out skiing you did your job as a ski
5  patroller, marking hazards or obstacles?
6       A.  That is my job when I'm out skiing, yes.
7       Q.  You've never marked the area of
8  Mr. Meyer's accident before December 11, 2015, did
9  you?
10      A.  No, I barely really worked positions on
11  Challenger, so.  No, I didn't.
12      Q.  Go to page E.Dixon 19.
13      A.  (Witness complies.)
14      Q.  And there you write in the first
15  paragraph, "Yes from 200 feet above.  But the
16  question is did he" -- being Mr. Meyer -- or could
17  Mr. Meyer see it from 30 or 20 or 10 feet above.
18  That's what you wrote, right?
19      A.  Yes.
20      Q.  And you now know from the pictures that
21  Trina sent you, that Mr. Meyer could see the Loop
22  Road from 30 or 20 or 10 feet above, couldn't he?
23      A.  Possibly, yes.
24      Q.  Well, if he was looking he could have,
25  correct?

Page 55

1       A.  Correct.
2       Q.  Go to page E.Dixon 30.
3       A.  (Witness complies.)
4       Q.  That's an e-mail exchange between you
5  and Mr. Meyer and it's setting up a meeting between
6  you and Mr. Meyer the day before your deposition,
7  your first deposition, right?
8       A.  Yeah.
9       Q.  And you were specifically asked what you
10  did to prepare for your deposition, weren't you, in
11  your first deposition?
12      A.  I don't remember.
13      Q.  You had a meeting with Mr. Meyer less
14  than 24 hours before your first deposition, didn't
15  you?
16      A.  Yeah.
17      Q.  And so when you were asked what you did
18  to prepare for the deposition and you didn't
19  mention that meeting, that was a lie, wasn't it?
20      A.  Yep.
21      Q.  Did Mr. Meyer tell you not to
22  communicate with me or anyone at Big Sky?
23      A.  I don't think so.
24      Q.  Look at page E.Dixon 46.
25      A.  (Witness complies.)

Page 56

1       Q.  Page E.Dixon 46 are texts that you and
2  Mr. Meyer exchanged, correct?
3       A.  Yeah.
4       Q.  And in one of the texts shown on page
5  E.Dixon 46, Mr. Meyer told you "Please do not
6  communicate with Ian or anyone at Big Sky," didn't
7  he?
8       A.  I guess it says there, yes.
9       Q.  So back to my question.  Mr. Meyer told
10  you, Mr. Meyer told you do not communicate with Ian
11  or anyone at Big Sky, didn't he?
12      A.  I think it was because I asked why I
13  didn't get the subpoena or this document sent to
14  me.  I asked the question, "Why am I not getting
15  this document sent to me?"  And he said I don't
16  need to communicate with you because it all goes
17  through him or through Ms. Walas.  I don't know
18  what date.
19      Q.  So, Ms. Dixon, my question is, did
20  Mr. Meyer tell you "Please do not communicate with
21  Ian or anyone at Big Sky?"
22      A.  Yes.
23      Q.  Mr. Meyer doesn't -- he's not your
24  lawyer, is he?
25      A.  No.

14 (Pages 53 to 56)

EVI DIXON

Page 57

1    Q.  I want to look -- go back to Exhibit 93.
2    A.  (Witness complies.)
3    Q.  Exhibit 93, these are your e-mails with
4  Mr. Meyer at cottonwoodlaw.org, correct?
5    A.  Correct.
6    Q.  And do you know why these are in a
7  phone, they look like a phone format?
8    A.  He sent out a text message from his
9  e-mail that came to my text messenger on the phone.
10    Q.  And if you look at page -- the second
11  page of Exhibit 93, those are communications you
12  were having with Mr. Meyer on October 19, 2018;
13  correct?
14    A.  2018, yes.
15    Q.  You were employed with Big Sky in
16  October of 2018, weren't you?
17    A.  Yeah.
18    Q.  And the lawsuit Mr. Meyer filed against
19  Big Sky was pending in October of 2018, wasn't it?
20    A.  I guess.  I was not aware what the
21  lawsuit is going on or how it's going on because I
22  didn't really talk to him.
23    Q.  And Mr. Meyer texted you and said
24  that -- and texted you about what he claimed he was
25  going to do with the money if he received any money

Page 58

1  in the lawsuit, right?
2    A.  That's correct.
3    Q.  While the lawsuit was pending, right?
4    A.  Yeah, and that's where that e-mail came
5  from, when I sent out the e-mail addresses because
6  he said he's going to provide healthcare for
7  patrollers.
8    Q.  In response, you told him,
9  Mr. Meyer -- you told Mr. Meyer I am not allowed
10  to talk to you about this -- "this" was the
11  lawsuit -- anymore, right?
12    A.  Correct.
13    Q.  So that means you had been speaking with
14  Mr. Meyer about the lawsuit prior to October 19,
15  2018; right?
16    A.  I don't remember when or what I talked
17  with Mr. Meyer before that.
18    Q.  Well, you specifically used the
19  word -- I'm not allowed to talk to you about
20  this -- "anymore," right?
21    A.  I said that here, yes.
22    Q.  So "anymore" means you had been having
23  communications --
24    A.  No.
25    Q.  -- with him, right?

Page 59

1    A.  No.
2    Q.  What other communications had you had
3  with Mr. Meyer about this lawsuit while this case
4  was pending?
5    A.  Before this text message?
6    Q.  Yes.
7    A.  About the lawsuit?
8    Q.  Yes.
9    A.  This one e-mail where he wanted to have
10  the e-mail addresses from the patrollers to provide
11  them. I don't know what he wanted to do.  He told
12  me he wants to provide patrollers with healthcare
13  and I sent him the e-mail addresses and I said good
14  luck.
15    Q.  Go back a couple pages within Exhibit 93
16  to page E.Dixon 66.  Let me know when you're there.
17    A.  Yep.
18    Q.  Take a minute to review that.  Please
19  let me know when you're done.
20    A.  Yep.
21    Q.  This is a text exchange that you had
22  with Mr. Meyer in December of 2018, correct?
23    A.  Correct.
24    Q.  And you were employed by Big Sky in
25  December of 2018, correct?

Page 60

1    A.  Yeah.
2    Q.  And you were a supervisor at Big Sky in
3  December of 2018, correct?
4    A.  Correct.
5    (Whereupon, Deposition
6    Exhibit Number 95 was
7    marked for identification.)
8  BY MR. McINTOSH:
9    Q.  I'm going to hand you what I've marked
10  as Exhibit 95.  Please take a minute to review
11  Exhibit Number 95 and let me know when you're done.
12    A.  Yeah.
13    Q.  Do you agree that Exhibit 95 is a letter
14  to Mr. Meyer?
15    A.  Yes.
16    Q.  And what's the date of the letter?
17    A.  December 27.
18    Q.  What year?
19    A.  2017.
20    Q.  Yeah.  So that's one year before the
21  text exchange that we were just looking at within
22  Exhibit 93, right?
23    A.  Yeah.
24    Q.  And in that letter to Mr. Meyer he was
25  instructed to discontinue all communications with

15 (Pages 57 to 60)

EVI DIXON

Page 61

1 employees of Big Sky resort, correct?
2 A. Correct.
3     Q. And in December of 2018, Mr. Dixon was
4 inviting you over to his house for a drink and some
5 appetizers, correct?
6 A. Correct.
7     Q. And these texts right here, about going
8 over to Mr. Meyer's house for a drink and some
9 appetizers, demonstrate that your first deposition
10 testimony when you said you didn't have any texts
11 with Mr. Meyer about anything other than alpacas,
12 this shows that that was false testimony, doesn't
13 it?
14 A. Correct.
15     (Whereupon, Deposition
16     Exhibit Number 94 was
17     marked for identification.)
18 MR. McINTOSH: I'm going to next hand you
19 what I've marked as Exhibit 94.
20 MS. WALAS: Oh, what was -- are we just going
21 out of order?
22 THE WITNESS: 95, you have this? 95, 93, 94.
23 BY MR. McINTOSH:
24     Q. Okay. So you now have in front of you
25 Exhibit 94?

Page 62

1 A. Yep.
2     Q. And Exhibit 94, these are your texts,
3 the texts between you and Mr. Meyer, correct?
4 A. Correct.
5     Q. And these are blown up versions so we
6 can actually read them, correct?
7 A. Yeah.
8     Q. And you did not produce these in
9 response to the first subpoena, right?
10 A. We already said that.
11     Q. So you agree that you did not produce --
12 A. Yes.
13     Q. -- these in response to the subpoena?
14     Go to page E.Dixon 77, and let me know
15 when you're done reviewing that page, please.
16 MS. WALAS: Did you say 77?
17 MR. McINTOSH: Yes.
18 THE WITNESS: Yep, I'm there.
19 BY MR. McINTOSH:
20     Q. Exhibit -- or excuse me, page E.Dixon 77
21 within Exhibit 94, these are texts between you and
22 Mr. Dixon [sic] less than one month before your
23 first deposition, correct?
24 A. Mr. Meyer.
25     Q. Excuse me, I'm sorry, Mr. Meyer.

Page 63

1 A. When was the first deposition?
2     Q. January 24.
3 A. 24, and this was?
4     Q. December.
5 A. December. Because it was postponed I
6 think. Was the first deposition postponed?
7     Q. So my question is, page E.Dixon 77
8 within Exhibit 94, these are text messages between
9 you and Mr. Meyer less than one month before your
10 deposition in January of 2020, correct?
11 A. Right.
12     Q. And in fact, if you just go back through
13 the next few pages starting at E.Dixon 77, then
14 keep going through -- through page E.Dixon 83, keep
15 going through E.Dixon 85, all the way up through
16 E.Dixon 86, those are all your texts with Mr. Meyer
17 in the month before your first deposition, right?
18 A. Yeah.
19     Q. In fact, you sent at least 48 texts back
20 and forth between you and Mr. Meyer in the single
21 month before your first deposition, didn't you?
22 A. Correct.
23     Q. And none of those texts are about
24 pictures of your alpaca, are they?
25 A. No.

Page 64

1     Q. So when you were asked on page 15 of
2 your deposition, "Did you have any written
3 correspondence either by e-mail, text, Facebook,
4 any method with Mr. Meyer," you answered "Probably
5 thanking him for the pictures he took of my
6 alpacas."
7     You were then asked "Anything else?"
8 And you said "No," didn't you?
9 A. Yeah, because I was -- had the opinion
10 that it was during my employment.
11     Q. That was false testimony under oath,
12 wasn't it?
13 A. I don't know if I can say it was false.
14 That makes me sound like I'm a liar. I'm not a
15 liar.
16     Q. Well, you provided false deposition
17 testimony, didn't you?
18 A. Not from my own truth.
19     Q. The questions that we just looked at on
20 page 15 of your deposition didn't say, did you have
21 any written correspondence with Mr. Meyer while you
22 were employed by Big Sky, did it?
23 A. You asked me that before and I clarified
24 that my whole feeling and my truth was that it was
25 asked something else. And yes, if you put it this

16 (Pages 61 to 64)

Page 65

1  way, then yes, I wasn't aware that this was all
2  important.  I am not a legal expert.
3      Q.  Do you think you need to be a legal
4  expert to answer a question that says "Anything
5  else"?
6      A.  Yeah.
7      Q.  What's confusing about that, when
8  somebody says "Anything else"?  How does that
9  confuse you?
10     A.  It was not clear to me that anything
11 that John Meyer and I talked about after he hired
12 me as an expert witness, that I had to provide all
13 this.  It was only my understanding that -- because
14 that was the focus that I'm not talking to him
15 during my employment and I was certain that I
16 didn't talk to him during my employment about his
17 case.
18     Q.  Look at page 82 of -- excuse me, page
19 E.Dixon 82 within Exhibit 94.
20     A.  (Witness complies.)
21     Q.  That is the photograph that Trina sent
22 to you, correct?
23     A.  Yeah.
24     Q.  And you sent that photograph to
25 Mr. Meyer on -- when, January 20 of 2020; is that

Page 66

1  correct?  Excuse me, January 13 of 2020; is that
2  right?
3      A.  Correct.
4      Q.  And you said -- when you sent the
5  picture to Mr. Meyer, you said "It's not really
6  what I wanted to see," right?
7      A.  Correct.
8      Q.  Because the picture did not support your
9  theory, did it?
10     A.  Correct.
11     Q.  In fact, the picture shows that the Loop
12 Road is still visible from up close, right?
13     A.  Yeah, that was in January 2020.
14     Q.  And you sent a number of --  you
15 specifically told Mr. Meyer that a number of
16 pictures were taken, right?
17     A.  Correct.
18     Q.  You said this picture is one of many,
19 right?
20     A.  Correct.
21     Q.  Did Mr. Meyer tell you he had an
22 obligation to produce any pictures?
23     A.  That he was supposed to produce any
24 pictures?
25     Q.  Did Mr. Meyer tell you he had an

Page 67

1  obligation to produce any pictures of the accident
2  scene that he had?
3      A.  No.
4      Q.  Did Mr. Meyer tell you not to delete any
5  of the photographs?
6      A.  No.
7      Q.  And these pictures show that if
8  Mr. Meyer was looking ahead of him, even just two
9  turns ahead of him, he should have seen the Loop
10 Road, right?
11     A.  If he came down this way, yes.
12     Q.  This picture shows that this accident,
13 Mr. Meyer's incident where he claimed that he went
14 onto the cat track, was entirely his fault, doesn't
15 it?
16     A.  Well, this picture was taken in 2020.
17     Q.  Okay.  So if the scene of the -- strike
18 that.
19         So if you can see the Loop Road from up
20 close at the time of Mr. Meyer's accident, that
21 means that the incident was entirely Mr. Meyer's
22 fault, doesn't it?
23     A.  According to this picture in 2020.  But
24 the picture that he had from 2015, that probably
25 one of my accident investigators took, looked

Page 68

1  different.  Snow conditions change.
2      Q.  Look at Exhibit 29 in front of you.
3  Ms. Dixon, do you have Exhibit 29 in front of you?
4      A.  Yeah.
5      Q.  And Exhibit 29 is a photograph taken on
6  December 11, 2015; right?
7      A.  Yeah.
8      Q.  And that's taken shortly after
9  Mr. Meyer's accident, correct?
10     A.  Correct.
11     Q.  And this photograph shows, just like the
12 photograph that Trina sent you, that the Loop Road
13 is visible from up close, correct?
14     A.  Yeah.
15     Q.  And so Mr. Meyer, if he came down
16 anywhere in the area shown in Exhibit 29, his ski
17 wreck was entirely his fault; isn't that true?
18     A.  I would say so, yes.
19     Q.  And in fact, you know looking at Exhibit
20 29, that is where Mr. Meyer came down because
21 you can see your log where he ended up, right?
22     A.  Correct.
23     Q.  And so to get to the log shown in
24 Exhibit 29, he had to have come down from Highway
25 somewhere within Exhibit 29, correct?

17 (Pages 65 to 68)

EVI DIXON

Page 69

1       A.  Yeah.
2       Q.  Go to page 83 of Exhibit 94, please.
3   Let me know when you're there.  Take your time
4   reviewing it, please.
5       A.  Yeah.
6       Q.  And here you are texting back and forth
7   with Mr. Meyer about the witness that was recently
8   deposed in this case, Tom McMakin, right?
9       A.  Yeah.
10      Q.  And -- well, first of all, you never
11  reviewed Mr. Meyer's deposition transcript, right?
12      A.  I don't think I ever saw it.
13      Q.  Okay.  So you don't know what he said
14  about his accident and about how it occurred in his
15  deposition, do you?
16      A.  I don't know what he said.  I don't.
17      Q.  Right.  I mean, you didn't review the
18  transcript --
19      A.  Yeah.
20      Q.  -- so you don't know what he said?
21      A.  Right.
22      Q.  But here Mr. Meyer, in his text to you,
23  is texting you and telling you how he claims his
24  incident occurred, right, at the bottom of page 83
25  and the top of page 84?

Page 70

1       A.  Yep.
2       Q.  And then Mr. Meyer says "We'll see what
3   the witness says," correct?
4       A.  Yeah.
5       Q.  And that's on page E.Dixon 84 within
6   Exhibit 94, right?
7       A.  Yeah.
8       Q.  And then he says "Not over text," do you
9   see that?
10      A.  Yeah.
11      Q.  Why did Mr. Meyer want to make a written
12  record of his communications with you?
13      MS. WALAS:  Objection, calls for speculation.
14      THE WITNESS:  I have no idea.  I can't be in
15  his mind.
16  BY MR. McINTOSH:
17      Q.  What did you discuss with Mr. Meyer
18  after he said to you "Not over text"?
19      A.  I don't remember.
20      Q.  Well, what did you discuss with him
21  about the photograph that you sent him that shows
22  the Loop Road is visible from immediately above it?
23      A.  I just sent him the photo.  We haven't
24  talked in several weeks on the phone.  I even sent
25  the photo and he didn't respond.  So no, we haven't

Page 71

1   talked.
2       Q.  Go to page E.Dixon 85 within Exhibit 94.
3       A.  (Witness complies.)
4       Q.  Are you there?
5       A.  Yeah.
6       Q.  And have you reviewed page E.Dixon 85?
7       A.  Um, yep.
8       Q.  And these are text messages you had with
9   Mr. Meyer just days before your deposition on
10  January 24, 2020; right?
11      A.  Correct.
12      Q.  So when you were testifying on January
13  24, 2020, you knew that you had had text messages
14  with Mr. Meyer within the past couple days,
15  correct?
16      A.  Correct.
17      Q.  96.
18      MS. WALAS:  Ian, can we go ahead and take a
19  break?
20      MR. McINTOSH:  Sure, seeing how much I
21  screwed up the numbers.
22      VIDEO TECHNICIAN:  This ends Disc Number 1.
23  We're off the record.  The time is 11:25.
24      (Whereupon, a brief
25      recess was taken.)

Page 72

1       VIDEO TECHNICIAN:  This starts Disc Number 2.
2   We're back on the record.  The time is 11:31.
3   BY MR. McINTOSH:
4       Q.  Ms. Dixon, we're back under oath and do
5   you understand that you are sworn to tell the truth
6   here?
7       A.  Yep.
8       Q.  During a break were you in the restroom
9   with Ms. Walas?
10      A.  Yes.
11      Q.  And what did you discuss?
12      A.  I asked her if I'm going to go to
13  prison.
14      Q.  Anything else?
15      A.  What if I'm going to start crying.
16      Q.  Anything else?
17      A.  How I'm doing.
18      Q.  And what did she say in response to all
19  those questions?
20      A.  Answering the best that you can.
21      Q.  What did she say in response to your
22  question about am I going to go to prison?
23      A.  No.
24      Q.  Anything else that you discussed with
25  Ms. Walas during the break?

18  (Pages 69 to 72)

EVI DIXON

Page 73

1      A.  No.
2         (Whereupon, Deposition
3         Exhibit Number 96 was
4         marked for identification.)
5    BY MR. McINTOSH:
6      Q.  Exhibit 96 that has been placed in front
7    of you, those are your Facebook messages with
8    Mr. Meyer; is that right?
9      A.  Looks like it, yep.
10     Q.  And within 96 are numerous messages you
11   had with Mr. Meyer while you were employed by Big
12   Sky, right?
13     A.  Yes.
14     Q.  And in fact, as we see in Exhibit 96, in
15   January of 2019, Mr. Meyer was asking to stop by
16   your place, right?
17     A.  Um, yes.
18     Q.  If we look at page E.Dixon 94, we see a
19   text from Mr. Meyer saying "I hope you're well
20   today, are you around"?
21     A.  Yeah.
22     Q.  And this is in January of 2019, right?
23     A.  Correct.
24     Q.  When you were employed by Big Sky,
25   correct?

Page 74

1      A.  Correct.
2      Q.  While you were a supervisor at Big Sky,
3    right?
4      A.  Yeah.
5      Q.  And this is also just a couple months
6    before Mr. Meyer was deposed in April of 2019,
7    right?
8      A.  I don't know.
9      Q.  Well, if he was deposed in April of
10   2019, then this is just a couple months before,
11   right?
12     A.  It's January 14.  I don't know when his
13   deposition was.
14     Q.  And did Mr. Meyer stop by your place in
15   January of 2019?
16     A.  I don't remember.
17     Q.  When did your employment with Big Sky
18   end?
19     A.  Well, it's a seasonal employment that
20   ends in April after the season.
21     Q.  When were you asked or informed that you
22   would not be asked to come back?
23     A.  Two weeks before the refresher.
24     Q.  In the fall of 2000- --
25     A.  '19.

Page 75

1      Q.  -- '19?
2      A.  (Witness nods head.)
3      Q.  And what did you believe was the reason
4    you were being asked not to come back to work at
5    Big Sky?
6      A.  What did I believe?
7      Q.  Yes.
8      A.  Because of my divorce from Bob and
9    everything that happened before that.
10     Q.  And in fact, you posted some derogatory
11   e-mails on a public Facebook page, correct?
12     A.  E-mails?
13     Q.  You posted on a public Facebook page,
14   you posted --
15     A.  Yes.
16     Q.  -- some derogatory things, didn't you?
17     A.  What's "derogatory" mean?
18     Q.  Mean, bad.
19     A.  No, it wasn't mean or bad.  It was the
20   truth.
21     Q.  What did you say on the Facebook post
22   that you made?
23     A.  I said about all the lies that I had to
24   suffer through and all what Bob didn't tell me
25   about his manhood, I don't know.  Do I have to

Page 76

1    really say that here?  I mean there's Bob's boss
2    sitting here.
3      Q.  Well, I want to know what you posted and
4    why you believe your employment at Big Sky
5    terminated?
6      A.  Because of that Facebook post.
7         (Whereupon, Deposition
8         Exhibit Number 89 was
9         marked for identification.)
10   BY MR. McINTOSH:
11     Q.  I'm going to hand you what I've marked
12   as Exhibit 89.  Let me know when you're done
13   reviewing Exhibit 89, please.
14     A.  Yeah.
15     Q.  Are you done reviewing it?
16     A.  Yeah.
17     Q.  Exhibit 89 is an e-mail exchange between
18   you and Ryan Ayres, correct?
19     A.  It's my e-mail that I sent to him and
20   underneath is -- that he told me that I'm not being
21   rehired.
22     Q.  Okay.  So do you agree that Exhibit 89
23   is the e-mail exchange between you and Mr. Ayres
24   when you were talking about your employment at Big
25   Sky ending?

19 (Pages 73 to 76)

EVI DIXON

Page 77

1    A. Yeah.
2    Q. So does that seem like the correct date
3  to you when your employment ended, October 6, 2019?
4    A. Yeah.
5    Q. And then you told Mr. Ayres that I know
6  it's because of the post I did in June, right?
7    A. Yep.
8    Q. And what was the post you did in June?
9    A. The one that I just mentioned before.
10    Q. And what did you say in that post?
11    A. That's what I just said.
12    Q. What sort of insults?  How were you
13  being insulted?
14    A. Because somebody -- several people asked
15  me if I'm a lesbian.
16    Q. And you took that to be an insult?
17    A. Yes.
18    Q. Did you share your user name and
19  password when you gave Mr. Meyer your Big Sky
20  laptop computer?
21    A. No.
22    Q. Did you share your user name and
23  password with anyone?
24    A. No.
25    Q. Did you ever e-mail Mr. Meyer from your

Page 78

1  Big Sky laptop?
2    A. I don't remember.  Probably when I sent
3  him the yellow card.  That must have come from the
4  Big Sky laptop.
5    Q. Do you recall any other e-mails with
6  Mr. Meyer other than e-mailing him the yellow card?
7    A. I don't recall any other e-mails, no.
8    Q. Have you used any other e-mail address
9  or e-mail addresses when communicating with
10  Mr. Meyer?
11    A. I have my own e-mail addresses, a little
12  Apple tech and gmail.
13    Q. What are your e-mail addresses?
14    A. Evidixon@littleappletech.com and
15  evidixon@gmail.com.
16    Q. Did you say evidixon@littleappletech.com
17  and evidixon@gmail.com?
18    A. Correct.
19    Q. Are those the only e-mail addresses you
20  have used?
21    A. Well, then I had Big Sky's e-mail
22  address, edixon@bigskyresort.com. I can't get to
23  that anymore.
24    Q. When did you stop being able to use your
25  edixon@bigsky e-mail address?

Page 79

1    A. April 2019.
2    Q. Earlier in this case you said that you
3  were, quote, "surrounded by liars." Who were you
4  referring to when you said that?
5    A. Earlier in this case?
6    Q. Earlier in the deposition today.
7    A. Uh-huh. I was actually referring to
8  Bob.
9    Q. Anyone else?
10    A. Yeah. My granddaughter's mother. There
11  was lots of lying around me.
12    Q. Do you believe Mr. Meyer has been
13  truthful in his dealings with you?
14    A. I hope so.
15    Q. Do you believe he's been truthful about
16  his ski wreck?
17    A. I have to believe that. But you never
18  know who is not truthful and who, I mean. You have
19  to discover that time by time.
20    Q. Let's take a short break and then I
21  think I'm probably done.
22    VIDEO TECHNICIAN:  We are now going off the
23  record. The time is 11:41.
24      (Whereupon, a brief
25      recess was taken.)

Page 80

1    VIDEO TECHNICIAN:  We're now back on the
2  record. The time is 11:44.
3  BY MR. McINTOSH:
4    Q. Ms. Dixon, just a couple more questions.
5      First of all, do you understand you are
6  still under oath?
7    A. I do.
8    Q. And what does that mean to you to be
9  under oath?
10    A. Answer as truthfully as I can get.
11    Q. The Big Sky laptop that you gave to
12  Mr. Meyer to provide to us when you received the
13  first subpoena, do you recall doing that?
14    A. Yeah.
15    Q. Why did you still have that laptop?
16    A. Because I always kept it over the summer
17  because I was always asked a question throughout
18  the summer.
19    Q. Did you delete anything from the Big Sky
20  laptop that Mr. Meyer produced?
21    A. No, I don't think so.
22    Q. What do you mean you don't think so?
23    A. I might have. I mean, I went through my
24  e-mail addresses during the seasons and deleted
25  e-mails because they always kept telling me e-mails

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

EVI DIXON

Page 81

1  are full and delete some.  So I might have deleted
2  some e-mails that I got, but I don't think so.
3       Q.  Did you intentionally delete your
4  e-mails with Mr. Meyer from that laptop?
5       A.  Well, as I said, I don't remember
6  anything, deleting any specific e-mails.  I just
7  created more space in the outbox or inbox.
8       Q.  So you don't remember one way or another
9  whether you deleted your e-mails with Mr. Meyer?
10      A.  Definitely not last summer because I
11  didn't get access to my -- I didn't even open my
12  computer up, so I never tried if I could still
13  access it.
14      Q.  Had you deleted e-mails with Mr. Meyer
15  before last summer, before the summer of 2019?
16      A.  I don't think so.  I don't know.  I
17  don't know.
18      Q.  That's all the questions I have right
19  now.  Thank you.
20      A.  Uh-huh.
21
22          EXAMINATION
23  BY MS. WALAS:
24      Q.  I'm just going to ask a few follow-up,
25  Ms. Dixon.

Page 82

1          You were asked about lying in your
2  previous deposition, do you remember that?
3       A.  I was asked about lying?
4       Q.  Yes.
5       A.  Yes, uh-huh.
6       Q.  Okay.  And have you knowingly made
7  any false statements during your January 24th
8  deposition?
9       A.  No.
10      Q.  Have you made any knowingly false
11  statements today?
12      A.  No.
13      Q.  Have you tried to hide anything when
14  giving testimony in this case?
15      A.  No.
16      Q.  Have you tried to hide anything when
17  responding to subpoenas in this case?
18      A.  No.
19      Q.  Have you done your best in answering
20  your questions when giving testimony?
21      A.  Yes.
22      Q.  Or have you done your best at answering
23  questions?
24      A.  I hope so.  I believe so.
25      Q.  And have you understood questions that

Page 83

1  were asked of you while giving deposition testimony
2  in this case?
3       A.  I think I understood them all.  If I
4  didn't, I guess I was asked again.
5       Q.  And when answering a question, is it
6  subject to your understanding of the question how
7  you give an answer?
8       MR. McINTOSH:  Objection, leading.
9       THE WITNESS:  Yes.
10  BY MS. WALAS:
11      Q.  And prior to your first deposition,
12  January 24th, you received a subpoena, correct?
13      A.  Yeah.
14      Q.  And did you understand what you were
15  supposed to produce after you got that subpoena?
16      A.  Possibly not, because I didn't produce
17  what I was supposed to produce but I -- I thought
18  it was concerning during my employment.  I -- and I
19  didn't take it too serious I guess.  I'm not a
20  legal person.
21      Q.  Okay.  And after your first deposition
22  on January 24th, did you understand better what you
23  were supposed to have produced?
24      A.  Yeah.
25      Q.  And is that why you were able to produce

Page 84

1  more documentation after that deposition?
2       A.  Yes.
3       Q.  Okay.  And you were shown Exhibit 91, if
4  you want to grab that.
5       A.  Yeah.
6       Q.  And you were asked about E.Dixon 1, a
7  letter from Mr. Meyer, correct?
8       A.  Correct.
9       Q.  And what's the date of that letter?
10      A.  December 11, 2019.
11      Q.  Okay.  And the Exhibit 91 in front of
12  you, if you can take a look at that and do you know
13  if any of the documents produced in there are from
14  before December 11th, 2019?
15      A.  Um, I don't think so.
16      MR. McINTOSH:  I'm going to object.  The
17  records speak for themselves.
18      THE WITNESS:  I think it's all after.  Yes,
19  this is December, February, yeah.  No.  Um, we are
20  going back to the e-mails here, January.  August
21  3rd, 2016 is one, a governor letter, a letter from
22  John Meyer to the governor.
23  BY MS. WALAS:
24      Q.  And which Bates Stamp Number is that?
25      A.  That is E.Dixon 32 continuing on 33 and

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 85

1  we're back to after this December 11th, again,
2  February, in February.  I think we -- besides this
3  one is before and everything else is after.
4      Q.  Okay.  So following up, everything
5  produced after your first deposition appears to be
6  correspondence dated after December 11th, except
7  for E.Dixon 32 to, I believe you said, 36?
8      A.  Uh-huh.
9      Q.  And if you'll go ahead and take a look
10  at E.Dixon 32 and that e-mail exchange from August
11  4th, 2016.
12      A.  Uh-huh.  That wasn't to me.  It
13  was -- it says "Dear Governor Bullock."
14      Q.  So in your opinion, did this e-mail
15  exchange have anything to do with the lawsuit?
16      MR. McINTOSH:  Objection, calls for opinion.
17      THE WITNESS:  No, he's writing about his
18  mother and women's wages.  I don't even remember
19  that e-mail.
20  BY MS. WALAS:
21      Q.  Okay.  So that e-mail hasn't influenced
22  any of the opinions you have given in this case or
23  the testimony you've given?
24      A.  No.
25      Q.  Okay.  Would you go ahead and take a

Page 86

1  look at Exhibit 93 that you were given.
2      A.  Okay.
3      Q.  And what are these screen shots of?
4      A.  These are text messages.
5      Q.  Okay.  And looking at E.Dixon 63 on
6  Exhibit 93, how did this text message string begin?
7      A.  It says, "Evi, John Meyer here.
8  Elections are tomorrow and I'm running for
9  congress.  Please vote.  Big hug!"
10      Q.  And did you respond to that text
11  message?
12      A.  I said, "I can't.  I am Austrian.  I
13  will vote energetically."
14      Q.  Okay.  And did you and Mr. Meyer
15  continue to have a conversation after that?
16      A.  The next one is in October 2018.  That
17  was several months later.
18      Q.  Okay.  And you were asked about some
19  exchanges on the next page, E.Dixon 64, correct?
20      A.  Yeah.  I was asked for a new hat.
21      Q.  Okay.  And when Mr. Meyer brought up the
22  lawsuit, what did you tell him?
23      A.  "I got the order from Big Sky lawyer:  I
24  am not allowed to talk to you about this anymore!
25  Sorry!"

Page 87

1      Q.  And you were asked about some text
2  messages on E.Dixon 66 from December of 2018?
3      A.  Uh-huh.
4      Q.  Do you recall that questioning?
5      A.  Yeah.
6      Q.  Okay.  And did you go to the party
7  Mr. Meyer invited you to?
8      A.  If that was the get-together in the
9  canyon at their old house, then yes, I was there.
10      Q.  Do you recall if -- when that party was
11  at the house in the old canyon?
12      A.  It was -- well, according to these text
13  messages, some appetizers, December -- in December
14  2018.
15      Q.  Okay.  And if you turn to the next page
16  E.Dixon 67.
17      A.  Yeah.
18      Q.  What did you tell him at the top of that
19  page?
20      A.  "I got home just now and still have to
21  feed my alpacas.  Then up at 4 am again tomorrow
22  morning.  Hopefully some other time.  Have a great
23  evening!"
24      Q.  Okay.  So looking at that text message,
25  it appears that you didn't go to their home in

Page 88

1  December of 2018 but there may have been another
2  instance?
3      MR. McINTOSH:  Objection, leading and
4  hearsay.
5      THE WITNESS:  Yeah, I was at their home once
6  and just had dinner with another -- there was
7  another person there and then Amanda and John.
8  BY MS. WALAS:
9      Q.  Okay.  And you were asked about recent
10  photos taken by Trina, correct?
11      A.  Yeah.
12      Q.  And when were those photos taken?
13      A.  In January --
14      Q.  Of?
15      A.  -- 2020.
16      Q.  Okay.  And did the photo you got in 2020
17  look the same as the photo you had seen from 2015
18  that you based your affidavit on?
19      A.  The one that we -- I based the affidavit
20  on looked different than the one from Trina.
21      Q.  Okay.  If you'll go ahead and go to
22  Exhibit 91, page E.Dixon 15.
23      A.  Uh-huh.  Uh-huh.
24      Q.  Do you recall being asked about the
25  first section starting with "It was the duty of

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 89

1    Mr. Meyer"?
2       A.  Yeah.
3       Q.  And you were asked to read what you had
4    written underneath the bold print, correct?
5       A.  Uh-huh.
6       Q.  And what portion of that were you asked
7    about?
8       A.  Oh, I don't know if I read this or had
9    to read this but, Ian asked me if I think that
10   Mr. Meyer's responsible for his own -- for his own
11   fall or accident, I don't know.
12      Q.  And what did you say?
13      MR. McINTOSH:  Objection.  The document
14   speaks for itself, hearsay.
15   BY MS. WALAS:
16      Q.  Well, you wrote this document, correct?
17      A.  So the bold print is from the Mr. P,
18   Petrozzi or however you say his name, and I wrote
19   underneath.
20      Q.  Okay.  And what did you write?
21      MR. McINTOSH:  Objection.  Hold on.
22   Objection; undisclosed expert opinion, hearsay, and
23   the document speaks for itself.
24      MS. WALAS:  You can answer.
25      THE WITNESS:  So I can read?  Should I read

Page 90

1    what I said?  "Yes skiers are responsible for their
2    own safety!  Not repeating the statement of 'what
3    was there to be seen' et cetera.  If he would have
4    seen the cat track he would not have been fallen
5    over it.  It is not the case that Mr. Meyer was
6    skiing totally out of control or sliding down the
7    slope.  He was just skiing and probably did not see
8    the cat track."
9       Q.  Okay.  And when you were asked about
10   that earlier in your deposition, you were only
11   asked about the first part of your statement there,
12   correct?
13      A.  Uh-huh, yes.
14      Q.  Okay.  Go ahead and turn to what's been
15   marked -- what's E.Dixon 19 in that same document.
16      A.  (Witness complies.)
17      Q.  And do you recall being asked questions
18   about the statement you made at the top of that
19   page about 200 feet above?
20      A.  (Witness shakes head.)
21      Q.  You don't recall being asked about that?
22      A.  No.
23      Q.  Okay.  If you'd go ahead and turn to
24   E.Dixon 30, do you recall being asked about a
25   meeting set up before your deposition?

Page 91

1       A.  Yes.
2       Q.  And do you know -- who did you meet with
3    the day before your deposition?
4       A.  With you.
5       Q.  Okay.  And do you know if I asked
6    Mr. Meyer to set up that meeting for me?
7       A.  Yes.
8       Q.  Now you were asked if you've reviewed
9    Mr. Meyer's deposition testimony, correct?
10      A.  Yeah.
11      Q.  And you have not, correct?
12      A.  Yeah.
13      Q.  Have you had any conversations with
14   Mr. Meyer about this accident and what he recalls
15   happened?
16      A.  Before my first deposition?
17      Q.  Yes.
18      A.  Yeah.
19      Q.  And did those conversations with
20   Mr. Meyer influence the opinions you gave in this
21   case?
22      A.  No.
23      Q.  And you were also asked about your
24   employment with Big Sky ending?
25      A.  Yeah.

Page 92

1       Q.  And what was your reasoning again that
2    you believe that your employment ended with Big
3    Sky?
4       A.  Because I posted on Facebook about what
5    my husband did to me.
6       Q.  Okay.  And were you hurt by what
7    happened in your marriage with Bob?
8       A.  Very.
9       Q.  And was that post reflective of that?
10      A.  I posted it because I was tired of lying
11   for him, and as soon as I knew all the lies, which
12   was early in our marriage, I was already working in
13   Big Sky and I covered it up for him out of respect
14   to him and it hurt.
15      Q.  And if I remember correctly from your
16   first deposition, have you and Bob reconciled in
17   terms of are on a friendly basis?
18      A.  Well, I'm a friendly person so I'm
19   talking to him as a normal human being.  We
20   still -- we got divorced in October and there's
21   still some paperwork that needed to be exchanged
22   and I have a granddaughter that he loves.  It's his
23   step granddaughter and so we went out for dinner
24   the other day.  I think we are pretty civil.
25      Q.  Okay.  And so your divorce with Bob,

23 (Pages 89 to 92)

EVI DIXON

Page 93

1    does that influence your testimony here?
2        A. No, I can -- no.
3        Q. And did not being rehired at Big Sky
4    influence the conclusions and opinions you gave in
5    this case?
6        A. No.
7        Q. And I believe you were asked at the very
8    beginning of your deposition about Facebook
9    messages and text messages and things such as that
10   and you mentioned a birthday message?
11       A. Yeah.
12       Q. And you said you have that on your
13   phone?
14       A. Yeah.
15       Q. And if you'll go ahead -- and since it
16   wasn't produced, we'll go ahead and read it into
17   the record.
18       MR. McINTOSH: Okay.
19       THE WITNESS: I said, "Happy Birthday, John.
20   Hope you will be celebrated.  How are you?"
21   BY MS. WALAS:
22       Q. And did he respond?
23       A. He did respond.  He says, "Hi Evi.
24   Thank you for the Birthday wishes.  I'm doing well.
25   The babies ensure [sic], I don't get much sleep.

Page 94

1    But if that is my biggest complaint, I'm in good
2    shape.  Let's chat tomorrow afternoon.  Don't
3    forget you can never go wrong with the truth."
4        Q. And have you spoken to Mr. Meyer since
5    you had that conversation?
6        A. No.
7        MS. WALAS:  I don't have anything further.
8        RE-EXAMINATION
9    BY MR. McINTOSH:
10       Q. Ms. Dixon, are those all your
11   communications with Mr. Meyer that you've sent
12   recently?
13       A. On my phone?
14       Q. Yes.
15       A. That I sent since October 20, 2019,
16   there is one and then the next one is a happy
17   birthday message.
18       Q. Can I review those to make sure they've
19   all been produced?
20       A. Sure.
21       Q. And what you're showing me are your
22   messages with Mr. Meyer on Facebook, correct?
23       A. Those are on Facebook, yes.
24       Q. How many communications did you have
25   with Mr. Meyer, whether by text, e-mail or

Page 95

1    Facebook, between the date of his accident in
2    December of 2015 and December of 2019?
3        A. I don't know.  Let's count them.
4        Q. Hundreds?
5        A. Well, I have not counted the messages.
6        Q. And have you produced all of
7    your -- have you now produced all of your text
8    messages with Mr. Meyer?
9        A. Yes.
10       Q. Have you now produced all of your
11   e-mails with Mr. Meyer?
12       A. Yes.
13       Q. And when you responded to the subpoena,
14   the first subpoena that you received, you were
15   working with Mr. Meyer and he was helping you
16   respond, right?
17       A. We had communication.
18       Q. About the subpoena, right?
19       A. Yeah, uh-huh.
20       Q. And he's a lawyer, right?
21       A. Yeah.
22       MR. McINTOSH:  That's all I have.  Thank you,
23   Ms. Dixon.
24       THE WITNESS:  Uh-huh.
25       MS. WALAS:  I don't have anything else.  I

Page 96

1    just shook my head.
2        VIDEO TECHNICIAN:  This now ends the
3    deposition.  The time is 12:06 p.m.
4
5        (Whereupon, the taking
6        of this videotaped deposition
7        was concluded at 12:06 p.m.)
8
9
10       SIGNATURE WAIVED
11
12
13       * * * * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

EVI DIXON

Page 97

```
 1              C E R T I F I C A T E
 2    STATE OF MONTANA   )
 3                       ) ss.
 4    COUNTY OF GALLATIN  )
 5            I, Marla Jeske, Court Reporter - Notary
 6    Public, CSR, in and for the County of Gallatin,
 7    State of Montana, do hereby certify:
 8            That the witness in the foregoing
 9    deposition was by me first duly sworn to testify
10    the truth, the whole truth and nothing but the
11    truth in the foregoing cause; that the deposition
12    was then taken before me at the time and place
13    herein named; that the deposition was reported by
14    me in shorthand and later transcribed into
15    typewriting under my direction, and the foregoing
16    pages contain a true record of the testimony of the
17    witness, all done to the best of my skill and
18    ability.
19            IN WITNESS WHEREOF, I have hereunto set
20    my hand and affixed my notarial seal this ____ day
21    of _____, 2020.
22    _____
23            Notary Public for the State of Montana
24            residing at: Bozeman
25            My commission expires: February 04, 2023
```

**A**

**a.m** 1:20 4:16
**ability** 97:18
**able** 78:24 83:25
**access** 81:11,13
**accident** 8:13
9:7 10:5 11:4
17:14,15,15,17
17:23 18:20
20:4,5,15
24:12 30:23,23
47:1 51:24
54:8 67:1,12
67:20,25 68:9
69:14 89:11
91:14 95:1
**accurate** 7:23,25
**acting** 16:18
29:16 37:11
**address** 43:20
46:8,12 78:8
78:22,25
**addresses** 13:5
58:5 59:10,13
78:9,11,13,19
80:24
**admit** 10:21
13:8
**affidavit** 47:18
47:25 88:18,19
**affixed** 97:20
**afternoon** 94:2
**agree** 17:4 23:9
34:4,16 41:9
52:16 53:21
54:3 60:13
62:11 76:22
**agreeable** 5:15
**agreed** 5:5
**ahead** 67:8,9
71:18 85:9,25
88:21 90:14,23
93:15,16
**allowed** 23:17
58:9,19 86:24

**allows** 14:3,5,7
**alpaca** 63:24
**alpacas** 6:24
10:11 15:2
24:16 30:18
61:11 64:6
87:21
**Amanda** 88:7
**ambiguous**
16:22,25 17:1
**Annotated** 3:10
**answer** 8:11
9:10 10:10,13
11:12 12:20
14:2 31:16
32:9,16 35:10
35:21 39:12
45:15,16 65:4
80:10 83:7
89:24
**answered** 12:23
12:25 14:22,25
24:23 39:10
64:4
**answering** 14:10
23:13 35:6,8
72:20 82:19,22
83:5
**anymore** 58:11
58:20,22 78:23
86:24
**APPEARAN...**
2:1
**appearing** 1:16
2:2,8
**appears** 85:5
87:25
**appetizers** 61:5
61:9 87:13
**Apple** 78:12
**April** 3:15 39:11
39:18,25 40:3
40:25 74:6,9
74:20 79:1
**area** 20:11,14,17
49:15 50:23

51:3,14,24
54:7 68:16
**areas** 20:19,22
53:9,24 54:1
**asked** 5:18 6:16
7:22 8:9,20 9:1
9:5,8 10:7,18
12:12 13:15
14:10 15:4
16:8 18:2
20:13,16 23:13
23:16,24 24:5
24:15 25:8,13
25:18 26:2,4
29:14 32:9
35:9 36:11,24
38:6 39:4
45:21 50:22,25
55:9,17 56:12
56:14 64:1,7
64:23,25 72:12
74:21,22 75:4
77:14 80:17
82:1,3 83:1,4
84:6 86:18,20
87:1 88:9,24
89:3,6,9 90:9
90:11,17,21,24
91:5,8,23 93:7
**asking** 12:21
16:18 31:24
33:12 35:7
42:19,24 45:1
45:18 50:2
73:15
**assisted** 30:12
34:20 35:12,12
**ATTORNEY**
2:2
**attorneys** 2:8
4:19
**August** 84:20
85:10
**Austria** 37:23
**Austrian** 86:12
**Avenue** 1:18

2:12 4:14
**aware** 30:19,21
31:1,5 57:20
65:1
**Ayres** 3:8 76:18
76:23 77:5

**B**

**B** 3:4
**babies** 18:11
93:25
**back** 14:12
23:20 29:19
33:12 41:21
43:15,17 46:19
47:9 56:9 57:1
59:15 63:12,19
69:6 72:2,4
74:22 75:4
80:1 84:20
85:1
**bad** 75:18,19
**barely** 54:10
**based** 88:18,19
**basis** 92:17
**Bates** 3:17,19,24
84:24
**beginning** 1:19
93:8
**behalf** 2:2,8
16:19 29:17
37:11
**beings** 31:4
**believe** 25:6
37:4,6 75:3,6
76:4 79:12,15
79:17 82:24
85:7 92:2 93:7
**best** 72:20 82:19
82:22 97:17
**better** 83:22
**beyond** 12:4,7
12:10,11,18,24
**Big** 1:18 2:9 4:8
4:23 6:21 8:17
9:19 10:17

15:11,14,24
16:5 23:17
24:3,9 27:20
28:9,15,21,22
28:24 32:5,6
35:1 39:20
52:4 55:22
56:6,11,21
57:15,19 59:24
60:2 61:1
64:22 73:11,24
74:2,17 75:5
76:4,24 77:19
78:1,4,21
80:11,19 86:9
86:23 91:24
92:2,13 93:3
**biggest** 94:1
**birthday** 36:15
36:17 37:7,8
93:10,19,24
94:17
**blown** 62:5
**Bob** 75:8,24
79:8 92:7,16
92:25
**Bob's** 76:1
**bold** 52:12 89:4
89:17
**boss** 76:1
**bottom** 69:24
**Box** 2:5,12
**Bozeman** 1:18
2:6,13 4:14
97:24
**break** 71:19
72:8,25 79:20
**Breean** 2:4 3:3
4:21 17:9 36:6
37:2
**breean@wala...**
2:6
**Bridger** 4:17
**brief** 32:15
71:24 79:24
**bring** 32:3 34:24

**broader** 24:14
**brought** 18:13
 32:5,6 86:21
**Brown** 4:18
**Bullock** 85:13
**business** 18:12
**busy** 18:17
**Butte** 1:3 4:11

**C**

**C** 97:1,1
**called** 5:2
**calls** 23:1 35:17
 70:13 85:16
**canyon** 87:9,11
**card** 78:3,6
**case** 4:8 6:21 7:2
 7:5 35:13 38:2
 40:22 47:14
 51:1 59:3
 65:17 69:8
 79:2,5 82:14
 82:17 83:2
 85:22 90:5
 91:21 93:5
**cat** 67:14 90:4,8
**cause** 1:7 4:9
 97:11
**celebrated**
 93:20
**certain** 52:2
 65:15
**certainly** 5:22
**certify** 97:7
**cetera** 90:3
**Challenger**
 54:11
**change** 68:1
**chat** 94:2
**chose** 12:2
**citizen** 37:20,22
**civil** 1:20 92:24
**claimed** 57:24
 67:13
**claims** 69:23
**clarified** 64:23

**clear** 11:2 14:18
 17:4,5,7 18:1
 31:8,9 65:10
**close** 49:8 66:12
 67:20 68:13
**closer** 48:18
**Code** 3:10
**come** 68:24
 74:22 75:4
 78:3
**coming** 46:1
**commanded**
 16:13
**commission**
 97:25
**commits** 22:22
**communicate**
 21:20 39:7,16
 55:22 56:6,10
 56:16,20
**communicated**
 41:10,12,15
**communicating**
 39:18 78:9
**communication**
 6:19 7:2 9:2,19
 10:4 31:2,3,3
 39:21 45:2
 46:2 95:17
**communicatio...**
 6:17,23 8:17
 9:18 11:3
 15:23 16:3
 30:10 46:8,15
 51:8 57:11
 58:23 59:2
 60:25 70:12
 94:11,24
**complaint** 94:1
**complies** 52:10
 53:5 54:13
 55:3,25 57:2
 65:20 71:3
 90:16
**comply** 8:10
**computer** 27:19

 28:9,15,19
 30:25 33:5
 77:20 81:12
**concern** 20:10
 34:1,2
**concerning**
 17:23 23:19
 83:18
**concluded** 96:7
**conclusion** 23:2
**conclusions** 93:4
**conditions** 68:1
**confuse** 65:9
**confusing** 10:25
 65:7
**congress** 86:9
**conscious** 23:13
**consciousness**
 14:3,4,7
**consideration**
 10:15
**contain** 97:16
**contend** 23:10
 44:21,23
**continue** 86:15
**continued** 40:15
**continuing**
 84:25
**control** 53:2
 90:6
**conversation**
 12:9 18:5,6
 32:15 86:15
 94:5
**conversations**
 11:22 18:14
 91:13,19
**copy** 7:6 26:17
**correct** 6:4,5 9:8
 11:14 15:2,3
 15:10 24:6,7
 24:10,12,13,17
 25:9,10 27:5,6
 27:9,10,15,16
 28:6,7 29:5
 33:14 37:20,21

 41:16,17,19,21
 42:8 43:20
 44:4 46:6,9,10
 47:12 48:23
 50:23 52:14,15
 54:25 55:1
 56:2 57:4,5,13
 58:2,12 59:22
 59:23,25 60:3
 60:4 61:1,2,5,6
 61:14 62:3,4,6
 62:23 63:10,22
 65:22 66:1,3,7
 66:10,17,20
 68:9,10,13,22
 68:25 70:3
 71:11,15,16
 73:23,25 74:1
 75:11 76:18
 77:2 78:18
 83:12 84:7,8
 86:19 88:10
 89:4,16 90:12
 91:9,11 94:22
**correctly** 22:25
 23:4 38:19
 48:22 92:15
**correspondence**
 9:6 10:8 14:14
 16:17 17:1,2,7
 23:25 25:9,14
 25:19,23 26:3
 26:5 28:19
 29:15 31:7
 33:11,20 36:20
 36:24 37:10
 64:3,21 85:6
**cottonwoodla...**
 57:4
**count** 7:14 95:3
**counted** 95:5
**country** 37:22
**County** 97:4,6
**couple** 59:15
 71:14 74:5,10
 80:4

**course** 5:14 9:17
**court** 1:1,21
 4:10,16,17
 26:19 30:21
 97:5
**cover** 11:9,10
**covered** 12:16
 12:17 37:6
 92:13
**craniosacral**
 16:6 18:11
 30:18 31:3
**created** 81:7
**criminal** 37:18
**Crowley** 1:17
 2:11 4:13
**crying** 72:15
**CSR** 1:22 97:6
**Currentness**
 3:11

**D**

**D** 3:1,4
**date** 4:15 56:18
 60:16 77:2
 84:9 95:1
**dated** 3:8,15,22
 85:6
**day** 1:19 25:17
 33:24 55:6
 91:3 92:24
 97:20
**days** 25:15 71:9
 71:14
**dealing** 31:10,12
**dealings** 79:13
**Dear** 85:13
**December** 3:22
 34:13,15 52:21
 54:8 59:22,25
 60:3,17 61:3
 63:4,5 68:6
 84:10,14,19
 85:1,6 87:2,13
 87:13 88:1
 95:2,2

decreases 48:19
defendant 1:9
  1:16 2:9 4:9,23
definitely 53:7
  53:22 81:10
delete 51:13
  67:4 80:19
  81:1,3
deleted 51:12
  52:6,7,8 80:24
  81:1,9,14
deleting 81:6
demonstrate
  61:9
denied 13:3,4
deposed 6:7
  40:25 69:8
  74:6,9
deposition 1:11
  1:15 3:7,15 4:7
  4:12 5:6,9,13
  5:18,21,23,24
  6:11,14 7:7,16
  7:18 8:6,23
  10:2,7 12:8,10
  12:18 13:3,13
  13:24 14:12
  15:8 17:12,20
  17:24 18:21,22
  19:16,23 20:4
  21:23 23:7,20
  25:7 26:10
  27:9 35:25
  36:2,10,12,14
  37:1,25 38:3,9
  38:23,24 41:5
  55:6,7,10,11
  55:14,18 60:5
  61:9,15 62:23
  63:1,6,10,17
  63:21 64:2,16
  64:20 69:11,15
  71:9 73:2
  74:13 76:7
  79:6 82:2,8
  83:1,11,21

84:1 85:5
90:10,25 91:3
91:9,16 92:16
93:8 96:3,6
97:9,11,13
depression
  48:19
derogatory
  75:10,16,17
despite 30:12
different 10:23
  17:21 44:1,2,2
  68:1 88:20
differently 5:19
dinner 40:22
  88:6 92:23
direct 14:18
directed 17:6
direction 97:15
directly 16:8,16
  46:1
director 20:21
Disc 71:22 72:1
discontinue
  60:25
discover 79:19
discuss 17:11,19
  20:3 70:17,20
  72:11
discussed 17:14
  17:15 18:2,10
  18:11,12,12
  20:9 21:13
  72:24
disobey 14:5
distance 48:20
  49:11
District 1:1,2
  4:10,11
Division 1:3
  4:11
divorce 75:8
  92:25
divorced 92:20
Dixon 1:12,15
  3:2,8,16,19,23

4:7 5:1,6,9 6:3
10:2 18:1 21:7
22:6,10,14
26:21 27:4
29:25 32:8
33:10 34:5
35:6 39:7,23
40:10,20 42:17
42:22 43:4,23
45:4,8 50:2,13
56:19 61:3
62:22 68:3
72:4 80:4
81:25 94:10
95:23
document 22:13
  56:13,15 89:13
  89:16,23 90:15
documentation
  84:1
documents 3:12
  5:8,11,12,21
  12:5,14,16
  27:7,13 28:22
  28:24 30:1,7
  34:6 84:13
doing 13:8 36:11
  72:17 80:13
  93:24
drink 61:4,8
duly 5:2 97:9
duty 88:25

———— E ————
E 3:1,4,4,4,4
  97:1,1
e-mail 3:8 5:15
  10:8 13:5,9
  14:14 23:25
  26:25 27:1
  29:8,10,12
  31:23 41:15
  42:5,6,21 43:6
  46:7,12,23
  47:9 55:4 57:9
  58:4,5 59:9,10

59:13 64:3
76:17,19,23
77:25 78:8,9
78:11,13,19,21
78:25 80:24
85:10,14,19,21
94:25
e-mailing 78:6
e-mails 3:16,19
  3:23 16:12,17
  26:18 27:13
  29:15 30:17
  31:7 32:23
  36:3,25 39:24
  40:4,16,18
  41:23 42:10,12
  42:18,19,24
  43:1,2,4,13,23
  43:25 44:2,9
  46:25 57:3
  75:11,12 78:5
  78:7 80:25,25
  81:2,4,6,9,14
  84:20 95:11
E.Dixon 5:12,13
  41:22 42:2,3,3
  42:12 43:6,7
  43:16,24 44:3
  44:6,23 45:4,9
  45:18 46:22
  47:6 48:4,12
  48:25 52:9
  53:4 54:12
  55:2,24 56:1,5
  59:16 62:14,20
  63:7,13,14,15
  63:16 65:19
  70:5 71:2,6
  73:18 84:6,25
  85:7,10 86:5
  86:19 87:2,16
  88:22 90:15,24
E.Dixon001
  3:13
E.Dixon060
  3:13

E.Dixon063
  3:17
E.Dixon068
  3:18
E.Dixon069
  3:20
E.Dixon087
  3:20
E.Dixon088
  3:24
E.Dixon99 3:25
earlier 79:2,5,6
  90:10
early 92:12
edixon@bigsky
  78:25
edixon@bigsk...
  78:22
either 10:8
  13:20 14:14
  23:25 64:3
Elections 86:8
Emerson 42:7
  42:15 46:23
employed 15:24
  16:5 24:3
  57:15 59:24
  64:22 73:11,24
employee 39:20
employees 61:1
employment
  6:21 9:18
  10:16 15:11,14
  23:16,18 64:10
  65:15,16 74:17
  74:19 76:4,24
  77:3 83:18
  91:24 92:2
ended 68:21
  77:3 92:2
ends 71:22
  74:20 96:2
energetically
  86:13
English 22:12
ensure 93:25

entirely 67:14
67:21 68:17
Esq 2:4,10,11
3:3,3
et 90:3
evening 87:23
Evi 1:12,15 3:2
3:8,16,19,23
4:7 5:1,6 86:7
93:23
evidence 13:11
50:25
evidixon@gm...
78:15,17
evidixon@littl...
78:14,16
exact 26:5
exactly 8:24
examination
1:11,15 3:2 6:1
81:22
examined 5:3
example 42:1
43:5
Excerpt 3:14
exchange 42:6
55:4 59:21
60:21 76:17,23
85:10,15
exchanged 56:2
92:21
exchanges 86:19
exchanging
39:24 40:4
excuse 5:20 13:4
13:14 19:10
23:21,22 43:6
46:14 62:20,25
65:18 66:1
exhausted 36:12
exhibit 3:5,5,6,6
3:8,10,12,14
3:16,19,21,23
19:6,10,13,16
19:22 21:24
22:3,6,10,21

26:11,15 27:5
27:17 29:1,2,4
29:19,20 31:11
38:10,14,19,20
38:22 41:4,6
41:22 42:2,18
42:25 43:6
46:5,7,14,14
46:19 57:1,3
57:11 59:15
60:6,10,11,13
60:22 61:16,19
61:25 62:2,20
62:21 63:8
65:19 68:2,3,5
68:16,19,24,25
69:2 70:6 71:2
73:3,6,14 76:8
76:12,13,17,22
84:3,11 86:1,6
88:22
exhibits 3:7 19:6
expense 5:7
expert 5:6 9:17
10:4 11:2
47:11,13 65:2
65:4,12 89:22
expires 97:25
eyes 22:4

─────────
**F**
F 3:4 97:1
Facebook 9:24
10:9 14:14
16:12 24:1
27:14 32:23
36:18 41:12
43:18 64:3
73:7 75:11,13
75:21 76:6
92:4 93:8
94:22,23 95:1
fact 15:4,7,23
24:14 49:5
63:12,19 66:11
68:19 73:14

75:10
fail 26:3
failed 8:21 16:19
46:15
fall 74:24 89:11
fallen 90:4
false 6:13,25
13:23 14:1
21:6 22:24
23:6,9 30:5,6
30:13 34:7,10
34:17,18,20
35:15 39:15
49:1,2,12
61:12 64:11,13
64:16 82:7,10
falsely 24:24
fast 53:2
fault 67:14,22
68:17
February 84:19
85:2,2 97:25
Federal 1:20
feed 87:21
feeling 23:14
35:20 64:24
feet 54:15,17,22
90:19
filed 57:18
find 34:3 36:14
finish 42:22
Firm 2:5
first 5:2,9,18,21
5:23,24 6:7,14
7:14 13:3,24
17:8,12,20
20:4,6 22:14
23:7 25:7
26:23,24 27:8
27:17,22,24
28:2,2,14,16
29:4,20 31:20
32:13 33:13,16
33:20 36:10
41:9 45:21
46:16 47:4,8

48:10,12 53:6
53:12 54:14
55:7,11,14
61:9 62:9,23
63:1,6,17,21
69:10 80:5,13
83:11,21 85:5
88:25 90:11
91:16 92:16
95:14 97:9
Fleck 1:17 2:11
4:13
focus 65:14
follow-up 81:24
following 4:1
45:20 85:4
follows 5:3
foregoing 97:8
97:11,15
forget 94:3
format 42:11,18
42:25 43:5,13
43:24 44:6
57:7
formats 44:1
formed 38:2
forth 63:20 69:6
friend 49:16,24
friend's 49:17
friendly 18:14
92:17,18
friends 9:23
front 19:7 29:2
29:20 42:25
46:20 51:9
61:24 68:2,3
73:6 84:11
full 81:1
fundraisers
18:16
further 94:7

─────────
**G**
Gallatin 97:4,6
gather 50:25
get-together

87:8
getting 12:10,17
56:14
give 7:23,25
25:8 36:21
50:9,12 83:7
given 12:8 85:22
85:23 86:1
giving 82:14,20
83:1
gmail 78:12
go 10:20 12:20
13:1 14:12
19:19 20:22
21:17 22:20
23:20 42:1
43:15 45:17
46:19 47:6,9
48:12 54:12
52:2 57:1
59:15 62:14
63:12 69:2
71:2,18 72:12
72:22 85:9,25
87:6,25 88:21
88:21 90:14,23
93:15,16 94:3
goes 53:2 56:16
going 7:6 8:3
9:11 10:20
12:20 18:21
22:2,8 26:14
29:19 30:21
38:13,18 45:23
46:4 49:25
50:11 57:21,21
57:25 58:6
60:9 61:7,18
61:20 63:14,15
72:12,15,22
76:11 79:22
81:24 84:16,20
good 22:12
36:12 59:13
94:1
governor 84:21

84:22 85:13
**grab** 84:4
**granddaughter**
92:22,23
**granddaughte...**
79:10
**great** 87:22
**ground** 5:22
12:16,22
**guess** 56:8 57:20
83:4,19
**guys** 8:18 33:9

**H**

**H** 3:4
**hand** 7:6 22:2
26:14 31:2
38:13,18 46:4
60:9 61:18
76:11 97:20
**hands** 43:1
**happen** 18:21
34:22 50:11
**happened** 14:11
30:23 45:20
75:9 91:15
92:7
**happens** 22:19
**happy** 21:19
36:14,17 37:7
93:19 94:16
**hat** 18:13,13
86:20
**hazard** 21:11
**hazards** 53:8,23
54:5
**head** 75:2 90:20
96:1
**healthcare** 58:6
59:12
**hearsay** 88:4
89:14,22
**held** 4:12
**help** 35:16
**helping** 31:12
95:15

**hereunto** 97:19
**Hi** 93:23
**hide** 25:23 82:13
82:16
**Highway** 18:25
19:2 68:24
**hired** 8:16 9:17
10:3 11:2
65:11
**hold** 12:7 89:21
**home** 87:20,25
88:5
**honest** 14:1 25:4
25:5
**honestly** 14:2
**hope** 32:11
73:19 79:14
82:24 93:20
**Hopefully** 46:5
87:22
**hour** 1:19
**hours** 26:6
55:14
**house** 40:22
41:1,3 61:4,8
87:9,11
**hug** 86:9
**huge** 30:19
**human** 31:4
92:19
**Hundreds** 95:4
**hurt** 92:6,14
**husband** 92:5

**I**

**Ian** 2:10 3:3,22
4:22 56:6,10
56:21 71:18
89:9
**idea** 70:14
**identification**
21:25 26:12
38:11 41:7
60:7 61:17
73:4 76:9
**identified** 5:11

**identify** 4:19
**imcintosh@cr...**
2:13
**immediately**
70:22
**important** 31:5
65:2
**inaccurate**
13:16
**inbox** 81:7
**incident** 49:15
50:23 53:17
67:13,21 69:24
**incline** 48:18
**include** 27:13
**including** 16:17
29:15 31:7
36:25
**indicated** 5:15
29:25 34:5
**influence** 91:20
93:1,4
**influenced**
85:21
**informed** 74:21
**insert** 15:17
**instance** 1:16
88:2
**instruct** 12:19
**instructed** 16:16
60:25
**insult** 77:16
**insulted** 77:13
**insults** 77:12
**intend** 5:22
13:25
**intentionally**
25:22 26:1
81:3
**interact** 40:15
**investigation**
17:17 30:24
**investigator**
17:16 20:6
**investigators**
67:25

**invited** 18:16
40:22 41:1
87:7
**inviting** 41:2
61:4
**iPhone** 44:8,9
44:10
**issue** 47:17,19
**issued** 47:13

**J**

**jail** 10:20 22:8
22:20
**January** 5:10
6:7 51:7 63:2
63:10 65:25
66:1,13 71:10
71:12 73:15,22
74:12,15 82:7
83:12,22 84:20
88:13
**Jeske** 1:21 4:17
97:5
**job** 21:15 53:7
53:22 54:4,6
**John** 1:5 2:3
3:14,17,19,24
4:8 6:17,20,23
7:3 8:13,18,18
9:2,19,22,24
9:25 28:5
42:15 45:3
46:8,25 47:10
65:11 84:22
86:7 88:7
93:19
**john@cotton...**
43:20 46:9,12
**June** 77:6,8

**K**

**keep** 12:21
63:14,14
**kept** 80:16,25
**kill** 22:4
**kinds** 17:21

**knew** 25:2 30:9
32:22 33:24
71:13 92:11
**knitting** 18:12
31:2
**know** 6:20 9:15
11:7,17 13:22
13:25 17:13,14
20:18 21:16
22:7 23:11
26:7 30:15,16
30:16 32:1,2
33:3,4,6,7,8,10
33:15,18,19,25
34:10 35:18,19
35:21 36:13
39:6 40:9
47:16,21 48:8
48:15,24 49:1
49:20,21 54:20
56:17 57:6
59:11,16,19
60:11 62:14
64:13 68:19
69:3,13,16,20
74:8,12 75:25
76:3,12 77:5
79:18 81:16,17
84:12 89:8,11
91:2,5 95:3
**knowingly**
22:23 23:6,8
24:23 82:6,10

**L**

**labeled** 3:12
**laptop** 32:6
33:23 34:13,14
41:20 42:6,13
43:2 44:7,8,9
44:11,13,22,24
45:1,3 77:20
78:1,4 80:11
80:15,20 81:4
**lately** 49:3
**law** 2:5 30:22

| | | | |
|---|---|---|---|
| **lawsuit** 9:11 | **look** 8:6 10:6 | 20:14,17,19,22 | 79:18 80:8,22 | 27:14,18 28:5 |

lawsuit 9:11
  57:18,21 58:1
  58:3,11,14
  59:3,7 85:15
  86:22
lawyer 37:16,16
  37:18 56:24
  86:23 95:20
leading 39:25
  83:8 88:3
leeway 12:9
legal 23:1 65:2,3
  83:20
lesbian 77:15
let's 41:4 42:2
  46:22 79:20
  94:2 95:3
letter 3:21 27:18
  28:5,8 29:22
  60:13,16,24
  84:7,9,21,21
liar 64:14,15
liars 25:5 79:3
lie 8:14,25 9:12
  11:16,19 12:14
  14:9 25:1
  34:23 35:12
  39:12 55:19
lied 6:10 7:1
  8:22 10:19,21
  11:18 12:13
  15:22
lies 75:23 92:11
limit 15:13 18:8
limited 5:8 18:9
  24:2,8,11
line 7:22 8:8,9
  9:8 10:6 12:9
  13:14,15 14:13
  23:21 39:3
listen 32:8
little 31:1 78:11
located 4:13
log 68:21,23
logical 23:14
  26:8 48:14

look 8:6 10:6
  13:14 14:13
  19:8,17 27:17
  27:22 29:1
  38:23 41:4,21
  43:5,11,11
  44:2,15 50:13
  55:24 57:1,7
  57:10 65:18
  68:2 73:18
  84:12 85:9
  86:1 88:17
looked 19:18
  20:2 64:19
  67:25 88:20
looking 7:9
  27:24 39:1
  40:7 48:4
  54:24 60:21
  67:8 68:19
  86:5 87:24
looks 44:11,16
  51:3 73:9
loop 18:25 19:2
  19:5 48:18,21
  49:7,11 54:21
  66:11 67:9,19
  68:12 70:22
lots 79:11
loves 92:22
luck 59:14
lying 10:1 25:3
  40:10 79:11
  82:1,3 92:10

— M —
Mac 2:11 4:22
main 20:1
making 21:6
  35:8
manager 20:21
managers 53:9
  53:24
manhood 75:25
March 1:19 4:15
mark 4:17 20:11

20:14,17,19,22
21:1,3,4,11,12
21:14,17 47:11
marked 20:24
  21:2,17,25
  26:12,14 27:5
  38:11,14,19
  41:7 46:4
  53:10,25 54:2
  54:7 60:7,9
  61:17,19 73:4
  76:9,11 90:15
marking 22:2
  53:8,23 54:5
Marla 1:21 4:16
  97:5
marriage 92:7
  92:12
materials 5:16
matter 25:15
MCA 3:10
McIntosh 2:10
  3:3,22 4:22,22
  5:14 6:2 12:1
  12:11,19 13:2
  22:1 23:3
  26:13,17,20,23
  27:2,3 35:23
  37:9 38:12
  41:8 60:8
  61:18,23 62:17
  62:19 70:16
  71:20 72:3
  73:5 76:10
  80:3 83:8
  84:16 85:16
  88:3 89:13,21
  93:18 94:9
  95:22
McMakin 69:8
mean 8:25,25
  9:15 29:3
  30:15 31:4
  42:14 53:16
  69:17 75:17,18
  75:19 76:1

79:18 80:8,22
  80:23
means 24:18,18
  47:22 58:13,22
  67:21
meet 91:2
meeting 55:5,13
  55:19 90:25
  91:6
memory 13:12
mention 55:19
mentioned 77:9
  93:10
merge 21:16
message 37:12
  57:8 59:5 86:6
  86:11 87:24
  93:10 94:17
messages 8:12
  16:12 27:14
  30:17 32:23
  34:3 36:3
  41:13 43:17,18
  43:19 46:10,11
  63:8 71:8,13
  73:7,10 86:4
  87:2,13 93:9,9
  94:22 95:5,8
messenger 57:9
method 10:9
  14:15 24:1
  64:4
Meyer 1:5 2:3
  3:17,19,21,24
  4:8 6:17,20,23
  7:3 8:18,18 9:2
  9:6,20,22,24
  9:25 10:9
  11:14,21 13:4
  14:15 15:9,24
  16:3,12,18
  17:11,19 18:2
  19:3,16 20:3,9
  21:10,20 23:17
  24:1 25:9,14
  25:19,23 26:3

27:14,18 28:5
  28:8,18 29:16
  29:22,25 30:4
  30:9,12,25
  31:12,19 32:12
  32:22 33:1
  34:1,16 35:15
  36:7,9,25
  37:11 39:3,10
  39:18,25 40:4
  40:13,14,21,25
  41:10 42:15
  46:8 47:10
  48:2 49:6
  51:19,20 52:21
  54:16,17,21
  55:5,6,13,21
  56:2,5,9,10,20
  56:23 57:4,12
  57:18,23 58:9
  58:9,14,17
  59:3,22 60:14
  60:24 61:11
  62:3,24,25
  63:9,16,20
  64:4,21 65:11
  65:25 66:5,15
  66:21,25 67:4
  67:8 68:15,20
  69:7,22 70:2
  70:11,17 71:9
  71:14 73:8,11
  73:15,19 74:6
  74:14 77:19,25
  78:6,10 79:12
  80:12,20 81:4
  81:9,14 84:7
  84:22 86:7,14
  86:21 87:7
  89:1 90:5 91:6
  91:14,20 94:4
  94:11,22,25
  95:8,11,15
Meyer's 3:14
  24:12 34:4
  37:25 38:3,22

42:7 46:25
49:15 50:23
51:24 54:8
61:8 67:13,20
67:21 68:9
69:11 89:10
91:9
**Mike** 2:18
**mind** 70:15
**mine** 19:9 49:16
49:24
**minute** 59:18
60:10
**missing** 21:16
**misunderstan...**
11:20
**money** 57:25,25
**Montana** 1:2,18
2:6 3:10 4:11
4:14 97:2,7,23
**month** 15:7,8
62:22 63:9,17
63:21
**months** 39:25
40:21,24 74:5
74:10 86:17
**morning** 36:1,5
87:22
**Morris** 2:11
4:22
**mother** 79:10
85:18
**mountain** 20:23
21:1
**MT** 2:13

**N**

**N** 3:1
**name** 49:17,18
49:21 50:13,15
50:20 77:18,22
89:18
**named** 97:13
**need** 7:21 17:22
34:24 51:16
56:16 65:3

**needed** 20:24
21:2 30:17
92:21
**never** 9:6,25
18:22 45:19
47:13 48:6
54:7 69:10
79:17 81:12
94:3
**new** 18:12 86:20
**nods** 75:2
**normal** 18:14
21:19 92:19
**notarial** 97:20
**Notary** 1:22
97:5,23
**November** 9:3
40:19
**number** 4:9 7:14
7:20 19:11
21:24 26:11
29:3 38:10,15
41:6,23 49:23
50:6,9,13
51:22 60:6,11
61:16 66:14,15
71:22 72:1
73:3 76:8
84:24
**Numbered** 3:17
3:20,24
**numbers** 46:5
71:21
**numerous** 73:10

**O**

**O** 3:4
**oath** 6:18,25
8:11 10:13,19
10:21 11:6,16
12:13 14:8,9
16:8 21:7
22:24 23:7
40:11,21 64:11
72:4 80:6,9
**object** 84:16

**Objection** 11:23
12:4 23:1
35:17 70:13
83:8 85:16
88:3 89:13,21
89:22
**obligation** 66:22
67:1
**obstacles** 53:8
53:23 54:5
**obtain** 44:18
**obviously** 8:15
30:6,9 45:17
**occurred** 69:14
69:24
**October** 3:9
40:8,8 57:12
57:16,19 58:14
77:3 86:16
92:20 94:15
**offense** 22:22
**office** 9:21 20:7
21:21 40:6
**offices** 1:17 4:13
**official** 22:23
**Oh** 23:9 26:20
28:1 61:20
89:8
**okay** 7:8,17
18:10 27:1
28:11 29:1
33:15 43:4,22
44:18,21 45:17
49:10 50:2
61:24 67:17
69:13 76:22
82:6 83:21
84:3,11 85:4
85:21,25 86:2
86:5,14,18,21
87:6,15,24
88:9,16,21
89:20 90:9,14
90:23 91:5
92:6,25 93:18
**old** 87:9,11

**once** 48:17 88:5
**ones** 42:11,17
44:5,6,15
**open** 7:7 81:11
**opinion** 9:20
15:11,16,18
23:12 64:9
85:14,16 89:22
**opinions** 38:2
85:22 91:20
93:4
**oral** 1:11,15
**order** 61:21
86:23
**outbox** 81:7

**P**

**P** 52:11 89:17
**p.m** 96:3,7
**P.O** 2:5,12
**Packet** 3:12
**page** 3:2 7:7,9
7:10,10,12,13
7:16,18,20 8:6
9:8 10:6 13:13
14:12 23:20,21
23:21 26:24,24
27:17,22,24
28:2,3 29:20
38:23 39:1
42:2,3,16 43:7
43:10,12,15,19
43:24 44:3,15
44:22 45:4,9
45:18 46:22
47:6,8,9 48:4
48:12,25 52:9
53:4,13,14
54:12 55:2,24
56:1,4 57:10
57:11 59:16
62:14,15,20
63:7,14 64:1
64:20 65:18,18
69:2,24,25
70:5 71:2,6

73:18 75:11,13
86:19 87:15,19
88:22 90:19
**pages** 59:15
63:13 97:16
**paperwork**
92:21
**paragraph**
29:24 48:13,15
53:6,12,17,19
54:15
**part** 90:11
**parties** 5:5
**party** 87:6,10
**password** 77:19
77:23
**patrol** 21:19
**patroller** 53:8
53:23 54:5
**patrollers** 13:6
58:7 59:10,12
**patrolling** 20:23
20:25 21:10
**pending** 57:19
58:3 59:4
**people** 18:15
19:4 23:12
77:14
**perjury** 22:22
**person** 14:1
22:22,23 23:15
25:3,4,5 30:22
31:25 40:16
83:20 88:7
92:18
**personal** 30:20
37:16
**Petrozzi** 19:1
47:11 89:18
**phone** 37:12
43:3 44:12,16
44:24,25 45:2
45:3 49:23
50:3,7,9,12,16
51:9,22 57:7,7
57:9 70:24

93:13 94:13
**photo** 70:23,25
88:16,17
**photograph**
31:2 65:21,24
68:5,11,12
70:21
**photographs**
51:6 67:5
**photos** 88:10,12
**picture** 19:12
20:1 51:15
52:1 66:5,8,11
66:18 67:12,16
67:23,24
**pictures** 6:24
10:11 15:1
16:1,4 17:16
18:23,24 19:2
19:15,18,20,22
19:25 20:1
24:16 30:18
49:6,14 50:22
51:12,13,23
52:1,3 54:20
63:24 64:5
66:16,22,24
67:1,7
**place** 4:6 73:16
74:14 97:12
**placed** 73:6
**plaintiff** 1:6 2:3
4:8,21
**plaintiff's** 5:6,7
**please** 4:19,25
13:14 22:3,6
31:16,17 50:10
50:12,17 56:5
56:20 59:18
60:10 62:15
69:2,4 76:13
86:9
**PLLP** 1:17 2:11
**point** 12:18
48:14
**portion** 38:22

89:6
**positions** 54:10
**possession** 28:15
**Possibly** 54:23
83:16
**post** 75:21 76:6
77:6,8,10 92:9
**posted** 75:10,13
75:14 76:3
92:4,10
**postponed** 63:5
63:6
**prepare** 35:24
37:13 47:21,24
55:10,18
**prepared** 7:23
7:25 48:2
**PRESENT** 2:17
**pretty** 36:2
92:24
**previous** 82:2
**previously** 8:3
27:19
**print** 89:4,17
**prior** 5:13 7:7
10:6 19:16,22
20:4 58:14
83:11
**prison** 72:13,22
**probably** 10:10
14:25 25:3,17
28:25 36:13
44:11 51:20
64:4 67:24
78:2 79:21
90:7
**Procedure** 1:21
**proceeding**
22:23
**proceedings** 4:1
**process** 29:11
**produce** 8:21,22
16:11,16 17:6
17:8 25:18
26:2 29:15
33:1,11,16,17

33:19 35:12
36:24 44:9
45:25 46:15
47:3 48:9 62:8
62:11 66:22,23
67:1 83:15,16
83:17,25
**produced** 5:9,12
5:16 12:5,13
26:5 27:8,18
30:2 33:4,8
34:7 37:4
41:23 45:7
48:6 80:20
83:23 84:13
85:5 93:16
94:19 95:6,7
95:10
**produces** 34:2,2
**provide** 25:8,14
50:3 58:6
59:10,12 65:12
80:12
**provided** 13:17
27:19 30:7,24
35:2 47:18
64:16
**providing** 13:4
30:13 34:20
**public** 1:22
75:11,13 97:6
97:23
**purpose** 8:25
**pursuant** 1:20
**put** 17:10 23:12
64:25

_____

**Q**

**question** 9:1,5
10:18,25 12:23
12:25 14:16,18
14:23 15:13
17:25 18:1
19:21 20:18
24:2,14,23
27:21 32:9,9

34:10 35:7
38:6 39:8
42:22 43:23
44:5 45:8,9
54:16 56:9,14
56:19 63:7
65:4 72:22
80:17 83:5,6
**questioning** 5:8
87:4
**questions** 5:19
5:20 11:13
12:21 14:2,10
14:11 23:13
31:16 35:7,8
64:19 72:19
80:4 81:18
82:20,23,25
90:17
**quickly** 25:15
**quote** 79:3

_____

**R**

**R** 3:4,4,4 97:1
**raised** 5:17
**RE-EXAMIN...**
94:8
**re-plow** 5:22
**read** 22:24 23:4
26:16 33:22
36:1 43:21
48:21 49:1
62:6 89:3,8,9
89:25,25 93:16
**really** 35:18
45:23 49:7,24
51:16 54:10
57:22 66:5
76:1
**reason** 11:18
75:3
**reasoning** 92:1
**recall** 78:5,7
80:13 87:4,10
88:24 90:17,21
90:24

**recalls** 91:14
**receive** 29:9
**received** 28:16
57:25 80:12
83:12 95:14
**recess** 71:25
79:25
**reconciled** 92:16
**record** 4:20 18:5
70:12 71:23
72:2 79:23
80:2 93:17
97:16
**records** 84:17
**referring** 79:4,7
**reflective** 92:9
**refresher** 74:23
**regarding** 5:8
42:15
**rehired** 76:21
93:3
**relationships**
30:20,20
**rely** 51:1
**remember** 9:13
9:14,23 13:7
18:7 19:5
20:18 21:22
29:13 31:24
38:21 40:6
41:2 44:10
47:5 51:20
52:5 55:12
58:16 70:19
74:16 78:2
81:5,8 82:2
85:18 92:15
**remembered**
1:14 13:11
14:11
**repeat** 12:24
17:18
**repeatedly** 6:10
6:16
**repeating** 90:2
**report** 19:1 31:1

34:14 47:11,14
47:17,19,24
**reported** 97:13
**reporter** 1:21
4:16 26:19
97:5
**Reporting** 4:17
**residing** 97:24
**resort** 1:8 2:9
4:9,23 8:17
52:4 61:1
**respect** 92:13
**respond** 31:13
31:20 32:13
70:25 86:10
93:22,23 95:16
**responded**
95:13
**responding**
82:17
**response** 26:8
30:13 33:2,16
33:20 34:4,7
34:17,21 35:15
46:16 47:3
48:9 58:8 62:9
62:13 72:18,21
**responsibility**
20:11,14,17,19
20:20
**responsible**
52:13,18,22
89:10 90:1
**responsive**
32:19
**rest** 51:16
**restroom** 72:8
**review** 19:15,21
22:3,6 48:13
59:18 60:10
69:17 94:18
**reviewed** 22:10
37:24 69:11
71:6 91:8
**reviewing** 38:3
62:15 69:4

76:13,15
**right** 6:8,18 8:4
9:7 10:1 13:9
13:18 15:5,21
16:14 17:4
19:7 20:11
22:16 24:16,19
25:16 27:20
28:10,12 29:2
29:2,7,11,17
29:22 30:9,10
30:14 31:11,13
31:21 32:20,21
32:24 33:6,13
33:24 34:17
37:1 40:3,11
41:10,13 44:3
44:16 45:13,14
45:15,20 46:12
47:1,2,11,23
48:7,17,20,25
50:4 51:2
52:19,22 53:2
54:18 55:7
58:1,3,11,15
58:20,25 60:22
61:7 62:9
63:11,17 66:2
66:6,12,16,19
67:10 68:6,21
69:8,11,17,21
69:24 70:6
71:10 73:8,12
73:16,22 74:3
74:7,11 77:6
81:18 95:16,18
95:20
**road** 18:25 19:2
19:5 48:18,21
49:7,11 54:22
66:12 67:10,19
68:12 70:22
**Rules** 1:20
**running** 86:8
**Ryan** 3:8 76:18

## S

**S** 3:4
**safety** 52:13,19
52:22 90:2
**saw** 20:1,23
21:11 38:5
69:12
**saying** 35:14,15
73:19
**says** 10:24 13:19
22:22 31:6
33:6 37:10
50:21 52:11
56:8 65:4,8
70:2,3,8 85:13
86:7 93:23
**scene** 20:6,7,10
51:24 67:2,17
**scope** 12:5,8,10
12:18,24 37:7
**screen** 44:17,19
44:20 86:3
**screwed** 71:21
**seal** 97:20
**season** 74:20
**seasonal** 74:19
**seasons** 80:24
**second** 5:6 7:15
7:21 17:9
57:10
**section** 22:21
88:25
**see** 12:25 14:15
30:2 39:3,5,7
42:2 43:9,12
44:22 49:7
51:3,14 53:10
53:20 54:17,21
66:6 67:19
68:21 70:2,9
73:14,18 90:7
**seeing** 71:20
**seen** 38:19 67:9
88:17 90:4
**seen'** 90:3

**send** 45:11
51:18,23 52:3
**sent** 8:18 31:22
31:23 36:3
37:3 38:7 42:5
42:12,20 43:2
44:3,7,10,12
44:16,22,23
45:1,5,5,9,11
45:18,25 47:10
49:5,14 51:15
51:19 54:21
56:13,15 57:8
58:5 59:13
63:19 65:21,24
66:4,14 68:12
70:21,23,24
76:19 78:2
94:11,15
**sentence** 53:18
**serious** 83:19
**served** 29:5,10
31:20,22 32:13
**server** 29:11
**set** 4:7 90:25
91:6 97:19
**setting** 55:5
**shakes** 90:20
**shape** 94:2
**share** 77:18,22
**shook** 96:1
**short** 79:20
**shorthand** 97:14
**shortly** 27:8
68:8
**shots** 44:17,19
44:20 86:3
**show** 12:14 19:3
37:12 67:7
**showed** 13:9,10
17:16 18:23
37:2
**showing** 94:21
**shown** 42:11,18
43:5,6,23 44:6
56:4 68:16,23

84:3
**shows** 61:12
66:11 67:12
68:11 70:21
**sic** 38:14 62:22
93:25
**sign** 21:16
**SIGNATURE**
96:10
**signed** 47:17
**simple** 19:21
43:22
**simply** 39:23
40:10
**single** 63:20
**sitting** 9:15 20:7
76:2
**ski** 13:5 42:7
53:7,22 54:4
68:16 79:16
**skiers** 48:19
52:13,18 90:1
**skiing** 53:7,20
53:22 54:4,6
90:6,7
**skill** 97:17
**skis** 53:2
**Sky** 1:8 2:9 4:8
4:23 6:21 8:17
9:19 10:17
15:12,14,24
16:5 23:17
24:3,9 27:20
28:10,15,21,22
28:24 32:5,6
35:1 39:20
52:4 55:22
56:6,11,21
57:15,19 59:24
60:2 61:1
64:22 73:12,24
74:2,17 75:5
76:4,25 77:19
78:1,4 80:11
80:19 86:23
91:24 92:3,13

93:3
**Sky's** 78:21
**sleep** 93:25
**sliding** 90:6
**slope** 48:18 90:7
**Snow** 68:1
**somebody** 18:18
  21:4 65:8
  77:14
**soon** 25:13
  92:11
**sorry** 13:15
  22:13 26:20
  31:5,18,18
  35:22 38:17
  42:2 45:23
  62:25 86:25
**sort** 77:12
**sound** 64:14
**South** 1:17 2:12
**space** 81:7
**speak** 36:7
  84:17
**speaking** 58:13
**speaks** 89:14,23
**specific** 81:6
**specifically**
  12:12 20:13
  21:9 24:15
  29:14 31:11
  55:9 58:18
  66:15
**speculation**
  35:17 70:13
**speeches** 35:9
**spoken** 36:9
  37:18 94:4
**spot** 51:17
**ss** 97:3
**Stamp** 84:24
**stand** 49:3
**standing** 19:4
**start** 46:22
  72:15
**starting** 8:9 9:3
  47:8 63:13

88:25
**starts** 41:22
  48:14 72:1
**State** 97:2,7,23
**statement** 22:24
  30:4 39:15
  90:2,11,18
**statements** 6:13
  13:23 14:1
  21:7 23:6,10
  82:7,11
**states** 1:1 4:10
  29:25,25
**step** 92:23
**Steve** 42:7,14
  46:23
**stood** 49:3
**stop** 73:15 74:14
  78:24
**strike** 67:17
**string** 86:6
**stupid** 45:24
**subject** 83:6
**subjects** 5:17,23
  17:22
**submitted** 34:16
  35:15 36:19
**subpoena** 8:10
  8:21 16:14
  17:9 25:20
  28:16,23 29:4
  29:11 30:13
  31:13,20,23
  32:13,20 33:2
  33:16,21 34:7
  34:14,17,18,21
  37:7 45:21,22
  46:16 47:4
  48:10 56:13
  62:9,13 80:13
  83:12,15 95:13
  95:14,18
**subpoenaed**
  36:23
**subpoenas** 14:5
  46:1 82:17

**suffer** 75:24
**summer** 80:16
  80:18 81:10,15
  81:15
**supervisor**
  21:12,14 60:2
  74:2
**supervisors**
  20:20 53:9,24
**supplemental**
  47:13
**support** 66:8
**suppose** 32:25
**supposed** 7:4
  9:22,24 39:22
  40:13 66:23
  83:15,17,23
**sure** 71:20 94:18
  94:20
**surrounded**
  25:4 79:3
**sworn** 4:25 5:3
  6:3 22:15 72:5
  97:9

      **T**

**T** 3:4,4 97:1,1
**take** 16:1 50:22
  51:5 52:2
  59:18 60:10
  69:3 71:18
  79:20 83:19
  84:12 85:9,25
**taken** 1:16 4:2
  5:7,10 31:2
  51:16 66:16
  67:16 68:5,8
  71:25 79:25
  88:10,12 97:12
**talk** 7:4 9:20,22
  9:25 18:17
  21:4 23:17
  31:4 33:9
  36:16 39:22
  40:13,13 57:22
  58:10,19 65:16

86:24
**talked** 11:13
  17:21,22 18:18
  20:5,8 30:15
  31:14 34:23
  36:1,4 39:21
  40:6,12 54:1
  58:16 65:11
  70:24 71:1
**talking** 7:5
  10:16 31:11
  65:14 76:24
  92:19
**tech** 78:12
**TECHNICIAN**
  4:6,24 71:22
  72:1 79:22
  80:1 96:2
**telephone** 41:19
**tell** 6:4,6 8:4
  11:5,7,8,21,21
  12:2 14:8 16:7
  17:13 21:11
  22:15,19 25:2
  25:6 28:18
  34:9 35:5 50:1
  55:21 56:20
  66:21,25 67:4
  72:5 75:24
  86:22 87:18
**telling** 53:8,23
  69:23 80:25
**terminated** 76:5
**terms** 92:17
**testified** 5:3 8:3
  40:21
**testify** 97:9
**testifying** 11:6
  71:12
**testimony** 4:2
  6:25 7:23 10:7
  12:14 13:16,20
  39:17 61:10,12
  64:11,17 82:14
  82:20 83:1
  85:23 91:9

93:1 97:16
**text** 10:8 14:14
  23:25 30:17
  34:3 36:3 37:2
  41:10 43:17
  46:10,11 57:8
  57:9 59:5,21
  60:21 63:8
  64:3 69:22
  70:8,18 71:8
  71:13 73:19
  86:4,6,10 87:1
  87:12,24 93:9
  94:25 95:7
**texted** 49:6
  57:23,24
**texting** 69:6,23
**texts** 15:9 16:11
  16:18 27:14
  29:16 31:7
  32:23 36:25
  39:24 40:4,7
  40:16 56:1,4
  61:7,10 62:2,3
  62:21 63:16,19
  63:23
**Thank** 5:14
  81:19 93:24
  95:22
**thanking** 10:10
  15:1 64:5
**theory** 66:9
**therapy** 16:6
  18:11
**thing** 26:5 28:20
  30:19 32:7
  52:11
**things** 12:12
  16:4 17:22
  21:1 33:13
  35:9 41:18
  75:16 93:9
**think** 6:12 7:1
  12:9,17,22
  13:18 14:4,7
  15:17 19:14,17

19:18,24 20:16
26:19 29:12
31:6,22 36:18
36:22 37:15
38:5,7 39:19
40:5,8,23 51:7
51:21 55:23
56:12 63:6
65:3 69:12
79:21 80:21,22
81:2,16 83:3
84:15,18 85:2
89:9 92:24
**thinking** 23:14
35:19,20
**third** 7:15 29:24
**thought** 21:1
23:15 32:18,19
83:17
**thoughts** 30:22
47:10
**time** 4:6,16 6:7
9:11 24:2,8
33:13 34:13
36:10 37:1
53:16 67:20
69:3 71:23
72:2 79:19,19
79:23 80:2
87:22 96:3
97:12
**tired** 92:10
**to-wit** 4:2
**today** 5:12 7:24
13:17 22:16,19
33:12 35:25
36:10,25 37:14
73:20 79:6
82:11
**Today's** 4:15
**told** 21:2,20
33:23 37:14,15
45:24 56:5,9
56:10 58:8,9
59:11 66:15
76:20 77:5

**Tom** 69:8
**tomorrow** 86:8
87:21 94:2
**top** 53:12 69:25
87:18 90:18
**topic** 12:17
24:11
**totally** 11:19
90:6
**touch** 5:17,23
**track** 67:14 90:4
90:8
**trail** 21:16
**transcribed**
97:14
**transcript** 7:7
7:16,18 8:7
13:14 23:21
37:25 38:4,24
69:11,18
**tried** 14:2 81:12
82:13,16
**Trina** 49:18,19
50:21,22 51:5
51:9,23 52:3
54:21 65:21
68:12 88:10,20
**Trina's** 49:23
50:6,19
**trouble** 49:25
**true** 8:15 15:9
28:16 32:14
39:23 40:20
49:2,8 68:17
97:16
**truth** 6:4,6 8:4
11:9,11 12:2
14:8 15:18,20
15:21 22:15,19
25:2,6 64:18
64:24 72:5
75:20 94:3
97:10,10,11
**truthful** 7:23
13:20 79:13,15
79:18

**truthfully** 80:10
**trying** 11:9,10
22:4 25:22,25
34:22 51:1
**turn** 13:13 52:9
53:4 87:15
90:14,23
**turns** 67:9
**two** 26:19 67:8
74:23
**typewriting**
97:15

___

**U**

**uh-huh** 24:20
27:10,23 29:6
42:23 46:21
52:23 79:7
81:20 82:5
85:8,12 87:3
88:23,23 89:5
90:13 95:19,24
**Um** 17:13 19:17
20:16 22:11
30:6 36:11,21
49:24 71:7
73:17 84:15,19
**underneath**
76:20 89:4,19
**understand** 9:16
14:22 15:15,15
17:24 18:3
22:11,12,14,18
34:11 36:23
45:23 47:20
72:5 80:5
83:14,22
**understanding**
10:22 65:13
83:6
**understood** 8:24
14:10 82:25
83:3
**undisclosed**
89:22
**United** 1:1 4:10

**unknowingly**
23:10
**Unruh** 2:18
**untruthful**
13:16
**use** 78:24
**user** 77:18,22
**usually** 21:17

___

**V**

**versions** 62:5
**versus** 4:8
**video** 4:6,7,12
4:24 71:22
72:1 79:22
80:1 96:2
**videographer**
4:18
**videotaped** 1:11
1:14 96:6
**view** 48:14
**visible** 48:21
49:8,11 66:12
68:13 70:22
**vote** 86:9,13
**vs** 1:7

___

**W**

**wages** 85:18
**Wait** 12:7
**WAIVED** 96:10
**Walas** 2:4,5 3:3
4:21,21 5:5
11:23 12:4,7
12:15,22 17:10
23:1 25:7,13
26:4,21,22
27:1,8 30:8
35:17 37:6
45:12,24 46:2
51:15,18 56:17
61:20 62:16
70:13 71:18
72:9,25 81:23
83:10 84:23
85:20 88:8

89:15,24 93:21
94:7 95:25
**want** 11:12,19
12:19,24 14:9
18:4,7 25:1
32:8 43:15
49:25 57:1
70:11 76:3
84:4
**wanted** 18:8
25:1 49:7 51:3
51:14,25 59:9
59:11 66:6
**wants** 59:12
**wasn't** 6:25 8:14
9:12 10:14
11:10 21:18
25:25 30:5
31:5,9 38:6
39:13,15 45:8
52:2 55:19
57:19 64:12
65:1 75:19
85:12 93:16
**way** 20:16 24:25
63:15 65:1
67:11 81:8
**we'll** 13:1 70:2
93:16
**we're** 12:10
31:10 71:23
72:2,4 80:1
85:1
**We've** 25:21
**week** 48:7
**weeks** 70:24
74:23
**went** 21:17 46:2
67:13 80:23
92:23
**weren't** 11:9
25:23 35:9
40:1 55:10
57:16
**West's** 3:10
**WHEREOF**

97:19
**wife** 18:13
**wished** 36:14,17
**wishes** 93:24
**witness** 4:24 5:2
9:17 10:4 11:3
11:24 12:6
26:18 35:18
52:10 53:5
54:13 55:3,25
57:2 61:22
62:18 65:12,20
69:7 70:3,14
71:3 75:2 83:9
84:18 85:17
88:5 89:25
90:16,20 93:19
95:24 97:8,17
97:19
**wmorris@cro...**
2:14
**women's** 85:18
**word** 17:18
47:21 58:19
**words** 42:11
**work** 21:19 75:4
**worked** 17:9
48:3 54:10
**working** 31:19
32:12 92:12
95:15
**wouldn't** 33:12
45:18
**wreck** 42:7
68:17 79:16
**write** 21:9 52:12
54:14 89:20
**writing** 85:17
**written** 10:8
14:13 15:6
16:2 23:25
64:2,21 70:11
89:4
**wrong** 25:1 37:5
51:17 94:3
**wrote** 48:25

49:10 54:18
89:16,18

--------

**X**

**X** 3:1,4

--------

**Y**

**yeah** 8:16 9:15
13:10 14:17
16:1 22:8 23:5
28:2 29:18
30:11 32:11
34:12 36:21
38:25 39:5,9
41:14 43:14,25
46:13,24 49:13
49:17 50:5,8
50:24 52:17,20
55:8,16 56:3
57:17 58:4
60:1,12,20,23
62:7 63:18
64:9 65:6,23
66:13 68:4,7
68:14 69:1,5,9
69:19 70:4,7
70:10 71:5
73:21 74:4
76:14,16 77:1
77:4 79:10
80:14 83:13,24
84:5,19 86:20
87:5,17 88:5
88:11 89:2
91:10,12,18,25
93:11,14 95:19
95:21
**year** 60:18,20
**years** 49:4
**yellow** 78:3,6
**yep** 7:10,19 8:1
8:8 9:9,9 10:15
10:20 15:22
23:23 26:16
29:8,21,23
30:3 42:4,9

43:21 47:7
48:16,23 53:20
55:20 59:17,20
62:1,18 70:1
71:7 72:7 73:9
77:7
**yesterday** 36:15
36:16

--------

**Z**

--------

**0**

**001** 41:23
**04** 97:25

--------

**1**

**1** 5:12 22:21
71:22 84:6
**10** 47:8 48:4
52:5 54:17,22
**10:01** 1:19 4:16
**100** 5:13
**10969** 2:12
**11** 13:15 47:6
48:12,25 52:21
54:8 68:6
84:10
**11:25** 71:23
**11:31** 72:2
**11:41** 79:23
**11:44** 80:2
**115** 5:13
**118** 13:13
**11th** 34:13 84:14
85:1,6
**12:06** 96:3,7
**13** 8:6 9:8 13:14
66:1
**13th** 34:15
**14** 74:12
**15** 10:6 14:12
23:20,21 52:9
64:1,20 88:22
**1624** 50:19
**18** 53:4,15
**18-CV-00002-...**

1:7
**18-CV-0002-B...**
4:10
**19** 3:5,5,6 54:12
57:12 58:14
74:25 75:1
90:15
**1915** 1:17 2:12
4:13
**19th** 1:18 2:12
4:13

--------

**2**

**2** 7:22 46:22
72:1
**20** 8:9 54:17,22
65:25 94:15
**200** 54:15 90:19
**2000** 40:8
**2000-** 74:24
**2015** 52:21 54:8
67:24 68:6
88:17 95:2
**2016** 40:23 42:9
84:21 85:11
**2017** 3:22 40:9
60:19
**2018** 40:5,9
57:12,14,16,19
58:15 59:22,25
60:3 61:3
86:16 87:2,14
88:1
**2019** 3:9,15
39:11,18 40:1
40:3,19,25
73:15,22 74:6
74:10,15 77:3
79:1 81:15
84:10,14 94:15
95:2
**2020** 1:19 4:15
5:10 6:8 51:4
63:10 65:25
66:1,13 67:16
67:23 71:10,13

88:15,16 97:21
**2023** 97:25
**21** 43:6,7,8,11
**21-22** 3:11
**22** 43:12
**23** 9:8 43:12
**231** 50:17
**231-215-1624**
50:16,18
**24** 3:5 6:7 19:10
26:6 43:12
55:14 63:2,3
71:10,13
**246-1067** 2:7
**24th** 5:10 82:7
83:12,22
**25** 3:5 7:10
19:13,16,22
43:24 44:6
**26-27** 3:13
**27** 3:22 60:17
**270** 38:23 39:1
**28** 7:10
**29** 3:6,6,13 19:6
19:10 42:3,3
42:12,16 43:10
43:12 68:2,3,5
68:16,20,24,25

--------

**3**

**30** 54:17,22 55:2
90:24
**31** 3:13
**32** 84:25 85:7,10
**33** 84:25
**36** 85:7
**38** 3:15
**3rd** 84:21

--------

**4**

**4** 39:3 87:21
**406** 2:14
**41** 3:18
**41-43** 3:13
**45-7-201** 3:10
**45-7-201.Perj...**

3:11
**4591** 2:5
**46** 3:13,18 55:24
  56:1,5
**48** 15:8 63:19
**4th** 85:11

___

**5**

**501** 2:7
**53** 43:16,19 44:3
  44:15,23 45:4
  45:4,9,18
**556-1430** 2:14
**57** 3:18
**59** 3:18
**59718** 1:18
**59719-0969** 2:13
**59772** 2:6

___

**6**

**6** 3:3,9 10:6
  14:13 23:21,22
  77:3
**60** 3:18,22
**61-63** 3:20
**63** 86:5
**64** 86:19
**65** 3:20
**66** 59:16 87:2
**67** 87:16
**68-69** 3:6
**69-71** 3:20

___

**7**

**7** 7:7,9,12,13,16
  7:18
**70** 3:6 29:1,2,4
**73** 3:25
**76** 3:9
**77** 62:14,16,20
  63:7,13

___

**8**

**81** 3:3
**82** 65:18,19
**83** 63:14 69:2,24

**84** 3:13 69:25
  70:5
**85** 63:15 71:2,6
**86** 3:18 63:16
**88** 3:13
**89** 3:8 76:8,12
  76:13,17,22

___

**9**

**9** 3:15 39:25
  40:3
**90** 3:10 21:24
  22:3,6,10,21
**91** 3:12 26:11,15
  26:22 27:5,17
  29:19,20 31:11
  38:14 41:22
  42:18,25 46:19
  84:3,11 88:22
**92** 3:14 38:10,17
  38:19,20,22
**93** 3:16 41:4,6
  46:5,7,14 57:1
  57:3,11 59:15
  60:22 61:22
  86:1,6
**94** 3:3,19 61:16
  61:19,22,25
  62:2,21 63:8
  65:19 69:2
  70:6 71:2
  73:18
**95** 3:21 60:6,10
  60:11,13 61:22
  61:22
**96** 3:23 71:17
  73:3,6,10,14
**99** 5:12
**9th** 1:18 4:15
  39:11