DAVID GREGORY SMITH

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

---

JOHN MEYER,

    Plaintiff,

    vs.    Cause No. 18-CV-00002-BMM

BIG SKY RESORT,

    Defendant.

---

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF

DAVID GREGORY SMITH

---

BE IT REMEMBERED, that the videoconference deposition upon oral examination of DAVID GREGORY SMITH, appearing at the instance of Defendant, was taken via zoom through the offices of Crowley Fleck, PLLP, 1915 South 19th Avenue, Bozeman, Montana, 59718 on the 11th day of August 2020, beginning at the hour of 8:59 a.m. pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

## Page 2

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFF, JOHN MEYER:

    Ms. Breean Walas, Esq.
    Walas Law Firm
    P.O. Box 4591
    Bozeman, Montana 59772
    breean@walaslawfirm.com
    (501) 246-1067

ATTORNEY APPEARING ON BEHALF OF THE DEFENDANT, BIG SKY RESORT:

    Mr. Ian McIntosh, Esq.
    CROWLEY FLECK PLLP
    1915 South 19th Avenue
    P.O. Box 10969
    Bozeman, MT 59719-0969
    imcintosh@crowleyfleck.com
    (406) 556-1430

## Page 3

I N D E X

EXAMINATION OF DAVID GREGORY SMITH BY    PAGE

    Mr. Ian McIntosh, Esq..................4, 102

    Ms. Breean Walas, Esq................99, 103

DEPOSITION EXHIBITS:

Exhibit 97  Dr. Gregory Smith's

    Treatment notes of

    John Meyer........6-7, 11, 16, 56, 88

## Page 4

1    WHEREUPON, the following proceedings were had

2  and testimony taken, to-wit:

3

4    * * * * *

5

6    DAVID GREGORY SMITH,

7  called as a witness herein, having been first duly

8  sworn, was examined and testified as follows:

9

10    EXAMINATION

11  BY MR. McINTOSH:

12    **Q.  Can you please state your name.**

13  A. David Gregory Smith.

14    **Q.  And, Mr. Smith, what is your address?**

15  A. 1145 Meagher Avenue, Bozeman, Montana,

16  59718.

17    **Q.  And is that where you are located right**

18  **now?**

19  A. Yes.

20    **Q.  And is that your home address or your**

21  **business address?**

22  A. My home address.

23    **Q.  Is anyone there with you today?**

24  A. I have two dogs, and I have a husband in

25  the other office.

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

DAVID GREGORY SMITH

Page 5

1  Q.  Okay.  No one with you in the same room
2  though?
3  A.  No, I'm all alone.  Well, except my dog
4  Phyllis is sitting here on the couch.
5  Q.  And --
6  A.  She may bark, so I apologize in advance.
7  Q.  Not a problem.
8  Are you aware that this case is set for
9  a trial in Butte, Montana in October?
10  A.  I am.
11  Q.  And if the trial goes forward in Butte
12  in October, will you appear in person to testify?
13  A.  I'd be -- well, I think I would, if
14  we're okay with COVID.  I have an immune disease,
15  so I'm worried about that a bit.  I've been doing
16  all my work remotely with my patients.  So I guess
17  I would just have to see how comfortable I am with
18  the numbers at that time.
19  Q.  And your immune disease, is that the
20  reason you asked to conduct this deposition today
21  by Zoom instead of in person?
22  A.  Yes.
23  Q.  Did you meet with either Ms. Walas or
24  Mr. Meyer to prepare for your deposition?
25  A.  No.  I just met with Mr. Meyer as a

Page 6

1  patient, as I have been.
2  Q.  What do you have with you related to
3  either this lawsuit or your treatment of Mr. Meyer
4  right now?
5  A.  I have my case notes and I have the
6  exhibits that were sent to me a few minutes ago.  I
7  have additional notes.  I think those notes that
8  were attached are only until May, it looks like.
9  Let me just take a look.
10  Q.  Yes, Mr. Smith, that was our error.  A
11  replacement exhibit --
12  A.  Oh, okay.
13  Q.  -- with a third page should have been
14  sent to you.  Do you have that now?
15  A.  I do have that now, yes.  Thank you.
16  Q.  Okay.  So we are going to mark what has
17  been previously labeled as G.Smith012 through
18  G.Smith014 as Exhibit 97.
19  (Whereupon, Deposition
20  Exhibit Number 97 was
21  marked for identification.)
22  BY MR. McINTOSH:
23  Q.  And do you have what I've now referenced
24  as Exhibit 97 with you, Mr. Smith?
25  A.  Yes.  Notes through June 22nd.  Looks

Page 7

1  like those are the last notes.
2  Q.  And Exhibit 97, is that all of your
3  treatment notes or your counseling notes regarding
4  your counseling of Mr. Meyer?
5  A.  Yes.
6  Q.  Thank you.
7  A.  I don't tend to write a lot down.
8  Q.  I noticed that.
9  A.  I have a pretty good memory.  And since
10  he's paying out of pocket, it's not -- I'm not
11  necessarily constrained by insurance company's
12  requirements about notes.
13  Q.  Before we get into the Exhibit 97 in
14  more detail, let me ask you some just backup
15  questions.  Have you ever had your deposition taken
16  before?
17  A.  Yes.  One previous time in a sexual
18  abuse case.
19  Q.  When was that?
20  A.  I don't have that file in front of me.
21  That's a former client.  It's been at least two
22  years, probably three.
23  Q.  Do you know who took your deposition?
24  A.  I don't remember.  I have all that in a
25  file, but I don't have that particular file in

Page 8

1  front of me right now.
2  Q.  Do you recall the names of any of the
3  attorneys that were involved in that case?
4  A.  It's actually online.  I can look it up
5  if you want.
6  Q.  Sure.
7  A.  Let's see if I can.  Sorry for the wait.
8  That's not it.  I am in contact with that former
9  client, so I can text and ask, if that's something
10  that's really important.
11  Q.  I would just -- yeah, I'd like to
12  know -- if you've been deposed before, I'd like to
13  know who the -- who the attorneys are and if you
14  can -- if you have that information readily
15  available to you.
16  You said that was a sexual abuse case.
17  Can you -- is that the case involving the Helena
18  Catholic Diocese?
19  A.  No, it was not.  It was involving a
20  teacher in California.
21  Q.  Oh.
22  A.  My patient was a resident in Bozeman at
23  the time.
24  Q.  And is that the only time you have ever
25  testified, either in a deposition or in court?

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 9

1    A.  Yes.  I have never testified in court.
2        Q.  And you said you had your deposition
3    taken two to three years ago?
4        A.  Yeah.
5        Q.  What happened with that case, if you
6    know?
7        A.  The case was settled for -- I don't know
8    the amount.  It was an undisclosed amount.  My
9    fees --
10       Q.  I don't need to know the amount.
11       A.  -- were potentially paid by
12   the -- what's that?
13       Q.  I don't need to know the amount of the
14   settlement.
15       A.  Okay, sure.
16       Q.  Just to make sure we're on the same
17   page, I want to just go through the rules of a
18   deposition.
19       First of all, we need to talk one at a
20   time so that the court reporter can take down all
21   of our words.  And it's especially, of course,
22   important here today when we're talking by video.
23   And I will apologize in advance, I'm certain
24   there's going to be times today when you are
25   answering a question and I might not know that

Page 10

1    you're done, so I may interrupt you with another
2    question.  If I do that and you're not done, will
3    you please just let me know and -- let me know that
4    you are not done and I will let you answer your
5    question.  Does that make sense?
6        A.  Okay.  Absolutely.
7        Q.  We also need to -- the reverse is also
8    true, if you can please let me finish my question.
9    Even if you know exactly what I'm going to say,
10   please let me finish the question so we can get a
11   good clean record.  And you understand, of course,
12   that the court reporter is writing down everything
13   that each one of us says, right?
14       A.  I do.
15       Q.  After you were deposed before, did
16   you -- after the deposition, did you review your
17   transcript to check if there were any errors?
18       A.  I did.
19       Q.  So you understand the process how that
20   works, right?
21       A.  Yeah, I'm a bit familiar.  I'm trying to
22   remember.  But, yeah, I think it's pretty
23   straightforward, from what I recall.
24       Q.  Right.  And if I ask you a question that
25   you don't understand, will you please let me know

Page 11

1    that you do not understand the question?
2        A.  Absolutely.
3        Q.  And will you agree not to answer
4    questions that you do not understand?
5        A.  I do.
6        Q.  Thank you.
7        Do you have any reason to believe that
8    you can't give accurate and truthful testimony
9    today?
10       A.  Nope.  I do not.
11       Q.  Tell me what you did to prepare for this
12   deposition, if anything.
13       A.  I reviewed case notes and diagnostics
14   just to make sure that everything was clear and
15   accurate.
16       Q.  And the case notes that you reviewed,
17   are those the case notes contained in Exhibit 97?
18       A.  Yes, as well as July's case notes, which
19   I can forward if needed.
20       Q.  So just so I'm clear, so you have
21   additional treatment notes regarding your treatment
22   of Mr. Meyer that have not yet been produced?
23       A.  Yes.  The last notes that you have in
24   the exhibit were from June 22nd, and my notes go up
25   to yesterday -- or we had a session yesterday.

Page 12

1        Q.  Okay.  Can you please forward a copy of
2    those notes to us?
3        A.  Yes, I can.
4        Q.  Thank you.
5        A.  Let me find them.  They're all still
6    part of the same document, so I think -- yes, I
7    can.
8        Q.  Who are you e-mailing those new notes
9    to?
10       A.  I was going to ask where you would like
11   them.
12       Q.  Did you receive the e-mail from my
13   assistant, Jen Rockman?
14       A.  Yes.
15       Q.  If you could just reply to that and
16   include the updated notes.
17       A.  Okay.
18       Q.  And have you done that, Mr. Smith?
19       A.  Getting there.
20       Q.  Thank you.  Please let me know when
21   you've done that.
22       A.  Okay.  Attached and sent.
23       Q.  Thank you, sir.
24       A.  Uh-huh.
25       Q.  And tell me, after June 22nd of 2020,

3 (Pages 9 to 12)

DAVID GREGORY SMITH

Page 13

1    when else have you seen Mr. Meyer?
2        A. From my notes, it was -- I've seen him
3    on July 6th, July 13th, July 20th, July 27th,
4    July -- or August 7th and August 9th.
5        Q. In your meeting with Mr. Meyer
6    yesterday, did you discuss this deposition?
7        A. We did not.
8        Q. What did you discuss in your meeting
9    with Mr. Meyer yesterday?
10       A. It was a joint meeting with his wife
11   about communication. And both were trying to
12   navigate some of John's emotional difficulty
13   with feeling like he's making progress or feeling
14   like he's just spinning his wheels. So I was just
15   trying to give them both some tools to communicate
16   and to slow down so they could listen to each
17   other, and I basically helped facilitate a
18   conversation to help them both deal better and
19   more -- less stressfully with their new babies and
20   their financial issues.
21       Q. A few minutes ago when I asked you what
22   you had done to prepare for this deposition, you
23   said you reviewed case notes and you also said you
24   reviewed diagnostics; is that correct?
25       A. I did. I reviewed the DSM diagnosis for

Page 14

1    post-traumatic stress disorder.
2        Q. That is the diagnostics you were
3    referring to?
4        A. Yes. That's the diagnosis that I have
5    given Mr. Meyer.
6        Q. Did you ever meet with Ms. Walas before
7    your deposition?
8        A. No, I don't know who that is. Oh, I
9    guess is that Breean?
10       Q. Yes.
11       A. Okay. Okay. No, we've never -- this is
12   the first time we've spoken. I've -- we've
13   e-mailed.
14       Q. And how many e-mails do you have with
15   Ms. Walas?
16       A. Probably three or four, maybe. I don't
17   remember. We had a few when we were gathering
18   notes, case notes, and a couple yesterday I think.
19       Q. And what did your e-mails with Ms. Walas
20   yesterday discuss?
21       A. We discussed the process, who would be
22   sending me the link -- let me look again, and I'll
23   remind myself what that is -- regarding the
24   exhibits for today. That was -- that was it.
25   And also, we were trying to figure out how to do

Page 15

1    a -- pardon me, a test run this morning, and those
2    were the only topics.
3        Q. And the e-mail that you just sent to my
4    assistant that has your additional updated
5    treatment notes from July and August, the previous
6    documents have been Bates Stamped. Has that
7    additional page been Bates Stamped, to your
8    knowledge? Do you know what I mean?
9        A. I do not.
10       Q. Okay. It's the number at the bottom
11   that says G.Smith and, it says, for example on
12   the --
13       A. Okay.
14       Q. So does the new page have G.Smith on the
15   end of it, that you just e-mailed to us?
16       A. I don't think so.
17       Q. Okay. Well, we -- once we --
18       A. She didn't get it. If you don't mind,
19   one second. She's saying she can't open the
20   attachment.
21       Q. Okay.
22       A. So I'm re-sending this.
23       MS. WALAS: Ian?
24       MR. McINTOSH: Yes.
25       MS. WALAS: If we want to go off the record,

Page 16

1    I had difficulty printing the notes as well from
2    Greg. And what I ended up doing is printing it
3    from my phone and then scanning it.
4        MR. McINTOSH: Okay. Well, why don't we do
5    this --
6        THE WITNESS: I can also -- I can also
7    take -- make the last page of the notes and put it
8    in a body of an e-mail.
9        MR. McINTOSH: That's fine as well.
10       THE WITNESS: If it comes to that. Let's see
11   if she can get this one here.
12       MR. McINTOSH: Breean, if that doesn't work,
13   why don't we just -- why don't we just go for a
14   while, and I will either mark the last page of
15   notes as a new Exhibit 98 or we can just add it on
16   to what is Exhibit 97. But we can at least make
17   some progress first and then look through those in
18   a break in a little bit. Does that work?
19       MS. WALAS: That works for me.
20       MR. McINTOSH: Okay.
21   BY MR. McINTOSH:
22       Q. Okay. So, Mr. Smith, have you
23   produced -- assuming this e-mail goes through, have
24   you produced all of your notes regarding your
25   counseling sessions with Mr. Meyer?

4 (Pages 13 to 16)

DAVID GREGORY SMITH

Page 17

1    A. I have.
2    Q. And do you have -- do you have any other
3  notes -- any other documents in any form related to
4  your counseling sessions with Mr. Meyer?
5    A. I have an intake form, which he filled
6  out in 2018. And I haven't needed to update that
7  with new information since then; no medications to
8  update, a change of address I think, and that was
9  it.
10    Q. Can you produce the intake form to us as
11  well, Mr. Smith?
12    A. So I haven't been in my office, and I'm
13  moving files between both places. So I've kind of
14  transitioned to electronic notes, like dictating
15  them. So I don't have his file right here, but I
16  can find it.
17    Q. Okay. Will you --
18    A. His intake file.
19    Q. -- produce that intake form to us as
20  soon as you can find that, please?
21    A. Yes. And I think it's in my office, not
22  in my home.
23    Q. Okay.
24    A. I would have to go there and then scan
25  it so that I can deliver that to you.

Page 18

1    Q. Okay. And I understand that you can't
2  do that as we sit here today, but will you do that
3  after the deposition is complete?
4    A. I will.
5    Q. Thank you.
6    So other than this intake form and other
7  than the notes at your counseling sessions, do you
8  have any other documents related to your counseling
9  of Mr. Meyer?
10    A. I do not believe so.
11    Q. Do you have any e-mails with Mr. Meyer?
12    A. I only have e-mails with Mr. Meyer that
13  include Ms. Walas, I think. Let me do a search
14  real quick. I have two.
15    Q. And can you produce those to us as well,
16  Mr. Smith?
17    A. Uh-huh. One is concerning my affidavit,
18  and forward to -- my computer has decided to act
19  up. My apologies.
20    Q. No problem.
21    A. Something is happening. Sorry.
22    Q. That's all right.
23    A. I don't know what's happening. Hang on
24  one second. Jennifer's e-mail is not coming up and
25  I'm having some problems.

Page 19

1    Q. Would it help if I gave you the e-mail?
2    A. I'm trying to copy it. And then when I
3  copy it, a bunch of other stuff shows up. So I'm
4  not sure what that means, but...
5    Okay. I think I'm just going to have to
6  put it in manually. Hold on.
7    Q. Okay.
8    A. This is why I'm not a computer person.
9  I always have to ask my nephew for help. Could you
10  please give me her e-mail?
11    Q. Yes. It is jrockman, R-O-C-K-M-A-N, and
12  that's all one word --
13    A. I see it.
14    Q. Okay, good.
15    A. Got it, uh-huh. That's one. Okay.
16    Q. And --
17    A. Those are the only two I have in my
18  inbox.
19    Q. Okay. Just to make the record clear,
20  you said that you had several e-mails with -- I
21  believe they were joint e-mails with Ms. Walas and
22  also with Mr. Meyer. And have you now forwarded
23  both of those e-mails to my assistant?
24    A. I've forwarded the ones from John. Let
25  me do a search for the Breean e-mails. I'm trying

Page 20

1  to figure out how I can send them all at once. I'm
2  going to have to do them individually, I'm sorry.
3    Q. And to be clear, Mr. Smith, if you're
4  just having an e-mail about -- with Ms. Walas
5  about, you know, logistics, in other words, you
6  know, "Your deposition is set for 9:00 a.m., click
7  on this Zoom link," I don't need those. But --
8    A. Okay.
9    Q. -- if there's anything of any substance,
10  you know, either talking about your affidavit, your
11  treatment of Mr. Meyer, anything along those lines.
12  Do you have any --
13    A. No, it's mostly -- yeah, it's mostly
14  just scheduling and asking availability for a
15  deposition.
16    Q. Okay.
17    A. And trying to coordinate this morning.
18    Q. Okay.
19    A. And sending notes. And I sent notes to
20  Ms. Walas.
21    Q. Okay. Is there any commentary included
22  with the notes that you sent?
23    A. Not really. Just a small "Here's the
24  notes."
25    Q. Okay.

5 (Pages 17 to 20)

DAVID GREGORY SMITH

Page 21

1    A.  Nothing of substance, really.
2    Q.  Okay.  You qualified that a little bit
3  where you said "nothing of substance, really."
4  Does that mean there's something of substance
5  there?
6    A.  No.  I mean, I just kind of -- let me
7  just look at them.  We talked about virtual or
8  in-person deposition.  And as an immunocompromised
9  person, I have serious misgivings about being with
10  anyone in person, and that was fine.  I didn't get
11  a response, except it was an out-of-office reply.
12    Q.  Anything else?
13    A.  I can forward that.
14    Q.  That's okay.  I don't need you to
15  forward the out-of-office reply.
16    A.  I mean, if you want -- if you
17  want -- yeah.  I mean, it's -- it seems logistical.
18    Q.  Okay.
19    A.  I don't see any other commentary or
20  discussion.
21    Q.  Okay.  Have you had any communications
22  with Mr. Meyer's former attorney, a woman named
23  Ms. Nadine Nadow?
24    A.  I have not.
25    Q.  Okay.  Have you had communications that

Page 22

1  you haven't told us about, any type of
2  communications that you haven't told us about
3  with -- either with Mr. Meyer or with anyone
4  representing him?
5    A.  I don't believe so.  I think that's --
6    Q.  Okay.
7    A.  -- that's pretty much it.
8    Q.  Okay.  Sorry to follow up on this, but
9  you said "that's pretty much it."  Does that mean
10  there's anything else out there that you can
11  recall?
12    A.  It's Montana ranch-speak for "there's
13  nothing else."
14    Q.  Okay.
15    A.  Sorry.
16    Q.  I assumed that is what it was, but had
17  to make sure.
18    A.  No problem.
19    Q.  Have you reviewed any information about
20  Mr. Meyer's ski wreck, for example, pictures,
21  depositions, medical records, anything like that?
22    A.  I have not.
23    Q.  Okay.
24    A.  All of my information is based on client
25  interview.

Page 23

1    Q.  Okay.  So the only information you have
2  about Mr. Meyer's ski wreck, about his medical
3  treatment, about other medical diagnoses that he
4  has received, that is just information that
5  Mr. Meyer has provided to you?
6    A.  Yes.
7    Q.  And you have no idea if it's true or
8  false, correct?
9    A.  Correct.  I haven't corroborated, but
10  some of the -- well, all of the information remains
11  consistent, so I didn't have a reason to question.
12    Q.  Did you remove anything from your
13  counseling notes relating to Mr. Meyer before
14  producing them?
15    A.  No.
16    Q.  Okay.  Before we get into the actual
17  notes, let's talk a little bit about your
18  background.  Tell me a little bit about yourself.
19  Where did you grow up?
20    A.  I grew up in Twin Bridges, Montana.
21    Q.  And you graduated from high school
22  there?
23    A.  I did.  I graduated from high school and
24  I went to Carroll College in Helena.
25    Q.  And did you graduate from Carroll

Page 24

1  College?
2    A.  I did.
3    Q.  What year?
4    A.  1987.
5    Q.  And what was your degree in?
6    A.  My degree was in theology and -- I
7  double majored in theology and communications.
8    Q.  Tell me what you did after graduating
9  from Carroll College.
10    A.  I worked for the summer and then I went
11  to seminary in Rome, Italy.
12    Q.  What does that mean when you say you
13  went to seminary?  Is that just continuing your
14  education?
15    A.  Yes.  I was studying to be a Roman
16  Catholic priest.  And while there, I got two
17  further degrees in theology and was ordained a
18  priest in 1991.
19    Q.  And did you then go to work for the
20  Catholic church in Montana?
21    A.  I did.  I was assigned to the Cathedral
22  of Saint Helena, and I was also teaching at Carroll
23  College, teaching theology.
24    Q.  And how long did you continue in those
25  jobs?

6 (Pages 21 to 24)

DAVID GREGORY SMITH

Page 25

1      A.  I was briefly the pastor of our Lady of
2   the Valley in Helena Valley for less than a year in
3   1996/'97.  And then I took a leave of absence after
4   some depression issues related to my sexuality, and
5   moved to Seattle and stayed with a friend for a
6   while while I got my feet and got a job.  And the
7   Diocese paid for two years of counseling for me.
8   They wanted me back.  I think I'm a pretty good
9   priest, but I couldn't stand any longer not being
10  able to be honest about my sexuality with people.
11  It felt like I was being an agent of my own
12  depression if I stayed, so.
13         Through that time, I had a really great
14  therapist who was also a former priest and got me
15  very interested in doing therapy and counseling as
16  a profession.  And I went to Seattle University and
17  got my degree in mental health counseling in 2001,
18  and I practiced at Seattle Counseling Service from
19  2001 to 2006.
20      Q.  What is Seattle Counseling Service?
21      A.  Seattle Counseling Service is the oldest
22  counseling service in the United States for sexual
23  minorities, LGBTQ+ persons.
24      Q.  And what degree did you receive from
25  Seattle University?

Page 26

1      A.  Master of Arts.
2      Q.  You do not have a Ph.D.?
3      A.  I do not.  But I've got two bachelor's
4   and two master's, so I think it kind of adds up.
5      Q.  I saw in your resume or curriculum vitae
6   that was produced to us earlier in this case some
7   sort of mention of a -- I'm probably going to
8   pronounce this incorrectly -- Gestalt?
9      A.  Oh, Gestalt theory.  Yeah.
10     Q.  Tell me what that is.
11     A.  Gestalt theory is the theoretical
12  orientation that came out of -- it's kind
13  of arrived around the time of -- a little after
14  Jung and Freud.  It's much more centered on the
15  whole person.  It is a theoretical orientation that
16  teaches mindfulness, and based on somatic
17  experience we believe that emotions originate in
18  the body, not in the brain.  And we have to do a
19  lot of somatic work, like, of the body to kind of
20  get people to have more awareness of what they're
21  really feeling and what those feelings mean.
22         And it's very present-oriented.  We try
23  not to go into the past or into the future.  The
24  client is expected to explain what's happening for
25  them right now, not necessarily what happened in

Page 27

1   the past.  I'm mostly interested in the experience
2   of the here and now.
3          It's primarily associated with a cycle
4   of awareness where people have an awareness of a
5   feeling, they either move to address the feeling or
6   not address the feeling.  If they address the
7   feeling, that's the beginning of another cycle.
8   Where, if we say hunger -- if I notice some hunger,
9   I may not want to address the feeling right now
10  because I can't.  But if I do, I go, I mobilize my
11  energy, I move towards food, I probably prepare the
12  food, I consume the food, and then I'm satisfied
13  and I move on to another sensation.
14     Q.  Okay, thank you.
15     A.  Uh-huh.
16     Q.  Did you move back to Montana in 2006?
17     A.  2007.
18     Q.  And why did you move back to Montana?
19     A.  I was diagnosed with HIV and I almost
20  died.  My parents wanted me home.
21     Q.  Where did you move to when you moved
22  back to Montana?
23     A.  I moved to Butte with my former pastor
24  who had a big house, and needed somebody to help
25  take care of him.  I didn't want to move back in

Page 28

1   with my parents for obvious reasons, or maybe not
2   so obvious, but...
3      Q.  I understand that you're now in a -- you
4   are a pastor again; is that correct?
5      A.  Yes.  I've been received into the
6   Episcopal Church as a priest, and I am an assisting
7   priest.  I don't have any administrative
8   responsibilities.  I just help out with Sunday
9   services and some teaching, spiritual direction for
10  parishioners.
11     Q.  This is a question that I should
12  probably know the answer to, but it's been a while
13  since I've gone to the Catholic Church.  What is
14  the difference between a priest and a pastor?
15     A.  A priest is a person, a pastor has a
16  role.  I guess that's the easiest way to say it.
17  So priests are pastors.  Generally, the word
18  "pastor" means "shepherd," right?  So in the Roman
19  Catholic Church, the Episcopal Church, the Russian
20  Orthodox Church, the Greek Orthodox Church
21  ministers are ordained as priests.  And pastors are
22  generally referred to in maybe more evangelical
23  traditions or the Methodist tradition, Lutheran
24  tradition.  I think they call themselves pastors.
25     Q.  Within any individual church, is the

7 (Pages 25 to 28)

DAVID GREGORY SMITH

Page 29

1 pastor in charge of sort of -- is he sort of the
2 head priest, the one that's in charge?
3     A.  Generally, in the Episcopal tradition we
4 call that person the rector.
5     Q.  You're aware, of course, that there have
6 been lawsuits against the Helena Catholic Diocese,
7 correct?
8     A.  Yes.
9     Q.  And have you been questioned by anyone
10 in any of those lawsuits?
11     A.  No.
12     Q.  So you have no involvement in any of
13 those?
14     A.  No, not at all.
15     Q.  You're not a medical doctor, correct?
16     A.  No, I'm not.
17     Q.  And is it true then that you cannot
18 diagnose patients?
19     A.  I'm able to give a psychological
20 diagnosis.  I cannot prescribe medications or
21 diagnose medical conditions.
22     Q.  And what do you mean when you say "a
23 psychological diagnosis"?
24     A.  Well, the treatment form for counseling
25 professionals is called the DSM, the Diagnostic

Page 30

1 Statistical criteria from the American Psychiatric
2 Association.  And every patient that I see has a
3 diagnosis from the DSM-5.  That was part of my
4 training, to diagnose -- at least diagnose
5 everybody with something.  And if they're coming to
6 see me, there's probably a good reason.  So I don't
7 usually have any problems.
8     Q.  You're not a psychologist, correct?
9     A.  Nope.
10     Q.  How do you characterize yourself; is it
11 as a counselor?
12     A.  Psychotherapist, counselor, sure.
13 Uh-huh.
14     Q.  Do you have any sort of criminal record?
15     A.  Speeding ticket once.
16     Q.  You list a number of different initials
17 behind your name on your resume, correct?
18     A.  Uh-huh.
19     Q.  Is that a "yes"?
20     A.  Yes.
21     Q.  I should have said that at the
22 beginning.  Even though we're talking by video, the
23 court reporter is taking down all of our words.  So
24 if you can please --
25     A.  Right.

Page 31

1     Q.  -- say "yes" or "no."
2     A.  Right.
3     Q.  Thank you, I appreciate that.
4         One of the initials you list behind your
5 name is "MA."  Does that simply mean master's, that
6 you have a master's?
7     A.  Master of Arts, yes.
8     Q.  You also list the initials "STL" behind
9 your name.  Is that -- is that something to do with
10 your theology degree?
11     A.  Yes.  That's a European degree.  It's a
12 master's in theology, sacred theology.  So, in
13 English, it would be licentiate in sacred theology.
14     Q.  Okay.  That abbreviation, STL, is not at
15 issue here in your counseling of Mr. Meyer, is it?
16     A.  No.  I --
17     Q.  Well -- go ahead.
18     A.  I use my e-mail for both of my jobs, so
19 that's why I list it.
20     Q.  Understood.  You also have listed behind
21 your name the initials "LMHC", is that right?
22     A.  That is Licensed Mental Health Counselor
23 in the state of Washington.  That should -- I'm no
24 longer practicing there, so that shouldn't still
25 apply.  That's a mistake to have left that there.

Page 32

1     Q.  Is that --
2     A.  It was.
3     Q.  I'm sorry, go ahead.
4     A.  I'm sorry.  That was my license and my
5 title in the state of Washington.  They had a
6 separate counseling category for those who simply
7 work with mental health versus family counseling or
8 addiction counseling or social work.  But we don't
9 have that designation here in the state of Montana.
10     Q.  Okay.  So just to be clear, the LMHC is
11 not a title that is recognized by the state of
12 Montana?
13     A.  No.  It's recognized by the state of
14 Washington.
15     Q.  Okay.  You also have listed behind your
16 name the initials "LCPC", is that correct?
17     A.  Yes.
18     Q.  What is that?
19     A.  State of Montana.  Uh-huh.  That's
20 Licensed Clinical Professional Counselor.  And that
21 would be the equivalent of -- it's much more broad
22 than Washington uses.  So that's -- mostly what
23 counselors are in the state of Montana, you're
24 either a marriage and family counselor, a licensed
25 addiction counselor, a social worker, or a Licensed

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

DAVID GREGORY SMITH

Page 33

1    Clinical Professional Counselor.
2         Q.  And what did you do to receive that
3    title or obtain that title?
4         A.  A graduate degree and at least 2,000
5    hours of client face-to-face time, and I believe
6    it was 3,000 -- or 300 hours of supervision.  I'd
7    have to look that up.  I'm not sure what the
8    requirements are, but...
9             I transferred my license from the state
10   of Washington to the state of Montana, and -- I'm
11   trying to remember.  I also had to take a national
12   exam.
13        Q.  Did you pass that?
14        A.  Yes.  I got one question wrong.
15        Q.  So the LCPC, is that the only license
16   that you have that is recognized by the state of
17   Montana?
18        A.  Yes.  And my driver's license, I
19   suppose.
20        Q.  Are you board certified?
21        A.  By the Board of Behavioral Health of the
22   state of Montana.  That's where my license comes
23   from.  Excuse me.
24        Q.  So there's no separate board
25   certification, for example, from a national group

Page 34

1    of national LCPCs; is that right?
2         A.  Yeah.  I didn't opt to do that.
3         Q.  So that is something that is out there,
4    but you do not have that certification?
5         A.  No, I didn't think it was that needed or
6    necessary.  It was an added expense and added years
7    of study, and the clock is ticking in my life, so.
8         Q.  As it is for all of us, I think.  So how
9    long have you been working as a LCPC on your own,
10   without any supervision?
11        A.  I guess as soon as I got my license
12   transferred from Washington to the state of
13   Montana.  And I believe -- I didn't start
14   practicing in the state of Montana for a while
15   because I was recovering, but I believe I got that
16   license in -- it doesn't tell me.  It actually was
17   quite a nightmare.  They lost my file like three
18   times, so I'm a little confused about the dates.
19        Q.  If you could just give me your best
20   estimate, that would be fine.
21        A.  I started practicing in Bozeman in 2008
22   or '09.
23        Q.  Thank you.
24        A.  And I practiced when I lived in Butte.
25        Q.  Why did you move from Butte to Bozeman?

Page 35

1         A.  I fell in love and bought a house.
2         Q.  Have you ever had a claim made against
3    you by a patient?
4         A.  No.
5         Q.  What type of counseling do you
6    specialize in, if any?
7         A.  Depression, anxiety and trauma, and
8    LGBTQ issues, including transgender counseling.
9         Q.  Let's now talk to -- let's transition
10   and start talking about your counseling with
11   Mr. Meyer, specifically.  Is it correct that you
12   first saw Mr. Meyer on June 8th of 2018?
13        A.  I believe so.  Hold on.  I was going to
14   pull those back up to make sure.  Yes.
15        Q.  And did you know Mr. Meyer before you
16   first counseled him?
17        A.  I did not.
18        Q.  Do you know how he came -- came to be
19   with you, to treat with you?
20        A.  Yes.  His AA sponsor is a friend who
21   suggested my services.
22        Q.  Who is that?
23        A.  Pete Harnden.
24        Q.  And you're aware that Mr. Meyer wrecked
25   while skiing and was injured in December of 2015?

Page 36

1         A.  Yes.
2         Q.  So the first time that you saw Mr. Meyer
3    was two and a half years after his ski wreck,
4    right?
5         A.  Yes.  Yeah.
6         Q.  And you never treated him before the
7    wreck?
8         A.  No.
9         Q.  Never met him before the wreck?
10        A.  No.
11        Q.  Did not know what he was like?
12        A.  No.
13        Q.  So you had -- and you still have no
14   baseline to measure against, correct?
15        A.  Just his word and the word of his now
16   wife, who occasionally accompanied him in
17   counseling sessions.
18        Q.  And his wife, have you ever met with his
19   wife independently without Mr. Meyer present?
20        A.  I don't think so, no.  I'm pretty sure
21   not, yeah.
22        Q.  And you've never spoken with any of his
23   doctors, right?
24        A.  No.
25        Q.  What did you discuss with Mr. Meyer on

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 37

1 June 8th of 2018?
2    A.  I asked him to just give me background
3 information.  When I do an intake, it's mostly
4 narrative.  But the form that he completed was
5 also -- he filled that out prior to our meeting.
6 And we just discussed what his needs are, and he
7 explained the skiing accident and possible
8 traumatic brain injury and difficulty processing.
9 And my notes say he was reporting insomnia,
10 depression, obsessive thinking, dissociation and
11 suicidal ideation -- simply thoughts, not
12 attempted.  And based on that narrative, the
13 patient satisfied all the criteria necessary for
14 post-traumatic stress disorder.
15    Q.  What did Mr. Meyer tell you about his
16 ski wreck when you first met with him in June of
17 2018?
18    A.  I didn't get a lot of details.  He said
19 he had some injury from the ski wreck.  I'm not a
20 skier.  He told me in the narrative what had
21 happened, that he was skiing and he had an accident
22 and somehow it was not marked properly where he
23 was, if it was out of bounds or not, and he felt as
24 if it should have been marked, and that he spent
25 significant time injured.  And I believe he was

Page 38

1 also incapacitated for some of that time, whether
2 it was in a coma or just hospitalized, I'm not
3 certain.  We didn't talk about that part very much.
4 It was mostly dealing with the after effects and
5 not trying to -- generally, I don't like to go over
6 those situations in order to not re-traumatize the
7 patient, but to just take that and move forward
8 with it.  So I didn't spend a lot of time on
9 details.  I really wanted to spend more time on how
10 he was experiencing the world after the accident
11 and what he needed in order to have a full life,
12 how I could help him overcome some of the
13 psychological questions and some of the cognition
14 issues that he apparently has.
15    Q.  Do you know if Mr. Meyer ever had
16 insomnia prior to December of 2015?
17    A.  He reported that he was usually a good
18 sleeper prior to that.
19    Q.  And other than what he told you, you
20 have no source of information, correct?
21    A.  I do not.
22    Q.  Do you know if Mr. Meyer ever had
23 depression prior to December of 2015?
24    A.  He didn't report having depression prior
25 to that.

Page 39

1    Q.  Do you know if Mr. Meyer ever had
2 obsessive thinking prior to December of 2015?
3    A.  I do not.
4    Q.  Do you know if Mr. Meyer ever had
5 dissociation prior to December of 2015?
6    A.  Patient reported no dissociative
7 tendencies prior to that.
8    Q.  And you don't know if what Mr. Meyer
9 reported to you is true or not, do you?
10    A.  I usually take my clients at their word.
11    Q.  I understand that.  But you don't know
12 if what he told you is true or not, do you?
13    A.  Actually, no.
14    Q.  Do you know if Mr. Meyer ever had
15 suicidal ideation before December of 2015?
16    A.  He reported not.
17    Q.  Do you know if Mr. Meyer ever described
18 himself as unmanageable prior to December of 2015?
19    A.  I do not.
20    Q.  And you've never spoke with any of
21 Mr. Meyer's family members?
22    A.  Other than his --
23    Q.  Other than his wife?
24    A.  Yes.  That is correct, I have not.
25    Q.  You've never spoken with his father, for

Page 40

1 example?
2    A.  No.
3    Q.  You've never spoken with any of his
4 friends?
5    A.  No.
6    Q.  Never spoke with any of his employers?
7    A.  I have not.
8    Q.  And did you conclude, when you first met
9 with Mr. Meyer on June 8th, that he had PTSD?
10    A.  I did.
11    Q.  And how did you reach that conclusion?
12    A.  I reached that conclusion with patient's
13 report of trauma and the symptoms that I observed
14 in the room with him, which were restlessness and
15 losing trains of thought while speaking, avoidance
16 of the traumatic event in speech, the report of
17 hypervigilance, which most trauma patients report
18 as being extra cautious in the world.  It's kind of
19 a hypothalamic response that the brain has when
20 someone goes through danger.  It's a lot more aware
21 of possible danger and can be overexcited in the
22 hypothalamic response.
23    Q.  Okay.  So just so I understand what
24 you're saying, part of the reason you concluded
25 Mr. Meyer has -- had PTSD or has PTSD is because

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 41

1    you believe he was hypervigilant; is that right?
2        A.  Yes.  There was -- there were -- there
3    were signs of hypervigilance, which were -- I guess
4    an easy way of explaining it would be making
5    something out of nothing, thinking one is in danger
6    when one is not in danger, or looking for danger in
7    a way that a person did not before the event.
8        Q.  Did Mr. Meyer report to you that he rock
9    climbs?
10       A.  I believe he did, yes.  I think we
11   discussed it in passing.
12       Q.  Did Mr. Meyer report to you that he
13   skis, both at a ski resort and in the back country?
14       A.  I don't think we talked about the back
15   country.  We talked about the skiing at the resort,
16   simply in light of the accident.
17       Q.  Well, did he report to you that he skis
18   at the resort and in the back country after
19   December of 2015?
20       A.  I don't believe so.  That doesn't sound
21   familiar to me, no.
22       Q.  You are not aware of that?
23       A.  I'm not aware of that.
24       Q.  That is not consistent with
25   hypervigilant behavior, is it?

Page 42

1        A.  What's that?  Not skiing?  I'm not
2    understanding the question.  Please repeat.
3        Q.  Mr. Meyer continuing to ski, both at the
4    ski resort and in the back country, is not
5    consistent with hypervigilance, is it?
6        A.  After the accident?
7        Q.  Yes.
8        A.  It depends.  Generally, no.
9        Q.  So is it correct to say that you reached
10   the conclusion that -- well, excuse me.  Strike
11   that.
12          The other characteristics that Mr. Meyer
13   had that led you to believe he has PTSD are the
14   restlessness, the losing his train of thought.  Did
15   Mr. Meyer have those characteristics prior to
16   December of 2015?
17       A.  I do not know.  He reported not.
18       Q.  What would you look at in someone's
19   background to determine -- to determine their
20   baseline?
21       A.  I generally will trust the client or the
22   patient in that event.  At the point I was working
23   with Mr. Meyer, I wasn't aware that I would be
24   deposed in a lawsuit or I probably would have been
25   more careful about checking with medical providers

Page 43

1    and diagnosticians.
2        Q.  Would it be important to, for example,
3    look at someone's past academic record?
4        A.  It could be.  But for what we were
5    discussing, I didn't find it necessary.  I knew the
6    client was a lawyer of the bar of Montana.
7        Q.  Well, and how is that relevant to you?
8        A.  That says to me that he's well educated.
9        Q.  Okay.  Does it matter to you, for
10   example, if he had previously failed the bar exam?
11       A.  I don't believe it to be relevant.
12       Q.  Why not?
13       A.  I don't know.  I guess it just never
14   came up, and I didn't find it something I wanted to
15   pursue, I guess.
16       Q.  Would someone's grades in college be
17   relevant?
18       A.  I'm not sure how, in this instance, if I
19   would be affected by knowing the grades in college
20   in my treatment.  I don't believe that would change
21   anything I would do in treatment, so I wouldn't
22   necessarily ask for that.
23       Q.  Okay.  Well, I mean, is it important to
24   know someone's baseline enough that -- if you want
25   to know how an incident affected someone, don't you

Page 44

1    need to know what their baseline is first?
2        A.  Yes.  It helps.  I usually trust the
3    client to report their baseline.
4        Q.  Okay.  So did you ask Mr. Meyer about
5    his grades in high school and college?
6        A.  I only asked about education once or
7    twice.  When Mr. Meyer spoke he was articulate, and
8    his knowledge about -- his cognition skills were
9    normal, but affected in a way that he would be
10   searching for words.  But on the whole, his
11   vocabulary, his knowledge, his intelligence seemed
12   to be intact.  He had some issues, but...
13          After 20 years, maybe I rely on my
14   intuition more than I ought, but...
15          I've dealt with hundreds of
16   post-traumatic stress disorder patients, and I
17   found him to be consistent with other patients that
18   I've treated with this disorder.
19       Q.  Okay.  So what I'm trying to get at
20   though, Mr. Smith, is that, I mean, you've said
21   that Mr. Meyer was articulate, he seemed
22   intelligent to you, but at the same time you say he
23   was affected.  And I assume you mean he was
24   affected by the December 2015 incident; is that
25   correct?

DAVID GREGORY SMITH

Page 45

1    A.  That's what he reported, yes.  And the
2  things that I wrote in my notes the first time were
3  the things that he reported.
4    Q.  Okay.  So my point is, though, if you
5  believe Mr. Meyer was articulate, intelligent, all
6  of those things you just described, how can you say
7  that he was affected without knowing what his
8  baseline is?
9    A.  I trusted the patient to provide that
10  baseline for me.  I didn't feel like I need to open
11  an investigation.  I usually go with what my
12  patients tell me.
13    Q.  Okay.  Is there anything else that you
14  recall discussing with Mr. Meyer on June 8th of
15  2018 that we have not discussed?
16    A.  We did talk about whether he was open to
17  medication for anxiety or depression.  We did not
18  explore that any further, but that was mentioned in
19  passing.  I usually ask that because some patients
20  will be open to taking medication and some are
21  resistant to taking medication, so it's generally a
22  question I ask in the first session.
23    Q.  And what did Mr. Meyer tell you about
24  taking medication?
25    A.  He said he didn't want to take

Page 46

1  medication.
2    Q.  And why did he say that to you?
3    A.  They're -- well, if I can speak freely
4  about this, there are people in the world who
5  simply hate medication, and he seems to be one of
6  them.  They don't want to have anything unnatural
7  in their bodies or -- a number of reasons.  It's
8  sometimes a hard sell for some folks.
9    Q.  I'm sorry.  Can you point to me where in
10  your record you have notes about discussing
11  medication?  Maybe I'm just missing it.
12    A.  The last sentence.
13    Q.  At the very end.  I see.
14    A.  Yes.  Yeah.
15    Q.  Okay.  And so you were then set to meet
16  with Mr. Meyer on June 15; is that correct?
17    A.  Yes.
18    Q.  And he canceled that meeting, correct?
19    A.  I canceled because I had to go help my
20  father, who had an accident.
21    Q.  Excuse me, I misread that.  Thank you.
22      So you next met with Mr. Meyer on June
23  29 of 2018?
24    A.  I did.
25    Q.  And what did you discuss with Mr. Meyer

Page 47

1  in that meeting?
2    A.  We mostly discussed his irrational fear
3  of being homeless.  And I explored with him on
4  purpose the adjustment to change, his ability to
5  adjust to change.  And we were talking about a lot
6  of skills about alleviating anxiety, such as deep
7  breathing or meditation.  He tended to have some
8  intrusive thoughts that would just kind of come in,
9  as he reported.  And so I was working with him,
10  just in a skill-based way, to address those
11  thoughts and anxieties, slowing down.
12    Q.  What do you mean when you say he had
13  "intrusive thoughts"?
14    A.  Like thoughts would stay in his brain
15  and be intrusive.  So it's almost like
16  perseveration, but they're very strong.  So
17  sometimes thoughts of -- for example, in the
18  session he talked about his thought of being
19  homeless and his fear about that, which would crop
20  up from time to time without a trigger.  An
21  intrusive thought is something that just comes in
22  without necessarily an association or a trigger.
23    Q.  Do you recall any other specific
24  examples of intrusive thoughts that Mr. Meyer told
25  you about?

Page 48

1    A.  There were a few statements that were
2  discussing about how he was worried about never
3  getting back to normal again.  That was the other
4  most intrusive thought, was "Will I ever be back to
5  normal?"  And, of course, we can't answer that
6  question.
7    Q.  Okay.  Any other intrusive thoughts that
8  you recall?  And you just told me about the
9  homelessness or the back to normal, anything else?
10    A.  Not that I recall.  But if I do recall,
11  I can mention them later.
12    Q.  Okay.  Your notes also indicate that you
13  discussed Mr. Meyer's memories of the accident; is
14  that correct?
15    A.  Yes.
16    Q.  What did you discuss about Mr. Meyer's
17  memories of the accident, the ski accident?
18    A.  I just asked him to tell me the story
19  and what he remembered and what he didn't remember.
20  And the recollection -- him telling the story was
21  really hard, so I didn't push.  I just kind of
22  wanted it to come out naturally.  He was -- during
23  the narrative, he was emotionally very vulnerable,
24  and I noticed signs of anxiety such as fidgeting
25  and nervousness, some sweating.  I didn't -- I

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

DAVID GREGORY SMITH

Page 49

1  didn't so much concentrate on the details of the
2  accident as I concentrated on his experience of the
3  accident, what he was feeling, and what he was
4  feeling as he was reporting it back to me.
5      Q.  Do you think it's important for you to
6  understand what actually happened in the accident?
7      A.  I think it is from the client's point of
8  view, yes.
9      Q.  Okay.  So only from the client's point
10 of view?
11     A.  Unless there are other reasons.  But I
12 didn't see any other reasons to investigate
13 further.
14     Q.  So what did Mr. Meyer tell you about his
15 memory of the accident when you met on June 29 of
16 2018?
17     A.  Again, I did not put details in my notes
18 because I -- I don't -- I didn't think they were
19 relevant at the time, and I don't recall entirely
20 the conversation.  It's simply the rough details of
21 skiing and having the accident.  But the details of
22 which --
23     Q.  Did Mr. -- sorry.
24     A.  -- were so clear.  Yes.
25     Q.  Did Mr. Meyer tell you that he believed

Page 50

1  his bindings pre-released?
2      A.  I don't believe so.
3      Q.  Did Mr. Meyer tell you --
4      A.  I just don't recall.
5      Q.  Did Mr. Meyer tell you he was skiing
6  fast?
7      A.  No.
8      Q.  Did Mr. Meyer tell you he was trying to
9  jump off the cat track?
10     A.  I don't recall that.
11     Q.  Did Mr. Meyer tell you if he was trying
12 to do a flip?
13     A.  No, he did not.
14     Q.  Did Mr. Meyer tell you whether he had
15 been warned of early season conditions?
16     A.  No, he did not.
17     Q.  Did you discuss with Mr. Meyer his
18 choice not to wear a helmet?
19     A.  No, we did not.
20     Q.  Have you ever discussed that with
21 Mr. Meyer?
22     A.  I have.  I mentioned it once, but we
23 didn't -- I'm trying to remember when that was.  I
24 did ask him if he was wearing a helmet at the time,
25 and he said no.  I didn't pursue that further.

Page 51

1      Q.  Is that the only discussion -- I'm
2  sorry.  Go ahead.
3      A.  I think I was done.  Sorry.  I can't
4  recall.  It just left my brain.
5      Q.  All right.  Understood.
6          Is that the only discussion you recall
7  ever having with Mr. Meyer about his choice not to
8  wear a helmet on the day of his ski wreck?
9      A.  Yes.  I thought it was helpful
10 information simply because of people's choice to
11 protect themselves or not to protect themselves is
12 sometimes relevant.
13     Q.  And how do you think that's relevant to
14 Mr. Meyer's condition?
15     A.  I think that he -- it told me that he's
16 sometimes a person who takes risks and he finds
17 those risks acceptable.  Other people would not.
18     Q.  Did Mr. Meyer tell you that he decided
19 not to wear a helmet because he saw that his
20 current -- now current wife was not wearing one?
21     A.  No, we did not discuss that.
22     Q.  Assuming that's true, what does that
23 tell you?
24     A.  I would have to speculate.  I don't know
25 if I feel comfortable doing that.

Page 52

1      Q.  Okay.  Did Mr. Meyer tell you -- either
2  on June 29th, or has he told you at any
3  time -- that he did not remember anything about his
4  ski wreck for close to six months?
5      A.  He did mention that.
6      Q.  And what did he tell you?  What did
7  Mr. Meyer tell you about his inability to remember
8  the accident for up to six months?
9      A.  We just explored it as a possible
10 traumatic brain injury.  I just noticed it.  I
11 was -- I was leaving that to his medical doctors.
12     Q.  What do you mean when you say you "just
13 noticed it"?
14     A.  I -- we -- we noted it.  I noted it.
15     Q.  Okay.  So how do we know that the story
16 Mr. Meyer tells now about what happened in his ski
17 accident -- I mean, if he couldn't even remember
18 what happened for six months, how do we know that
19 his memory about the incident now is accurate
20 versus mixed up with things that other people have
21 told him?
22     A.  Usually, when people lose memory, it
23 comes back in sporadic episodes.  And it seemed to
24 me that details continued to match and were
25 consistent.  I do not know whether he made them up

13 (Pages 49 to 52)

DAVID GREGORY SMITH

Page 53

1  or not or other people had influenced him.  Again,
2  I tend to trust my patient and work with their
3  beliefs.  And I don't see my profession,
4  necessarily, as something that needs to verify
5  scientifically all the claims made by patients,
6  so...
7      Q.  Okay.
8      A.  Yeah.
9      Q.  I completely understand that.  That's
10  not exactly the question I'm asking you though.  So
11  are you -- let me ask -- let me try this a
12  different way.
13      Basically, what you're telling
14  me -- tell me if this is right -- however, what
15  Mr. Meyer is telling you about the accident, you
16  don't care exactly if what he's telling you is
17  factually correct, you're just -- what concerns you
18  is what his memory of it is; is that right?
19      A.  Yes.
20      Q.  Okay.
21      A.  What was his experience, like emotional
22  and physical experience, yes.
23      Q.  Right.  Okay.  But, so the question I'm
24  asking you is a little -- I understand that, but
25  the question I'm asking you is a little bit

Page 54

1  different.  I mean, the question I'm asking, is
2  there any way for someone like you to know if what
3  he is telling you about the accident, whether it is
4  true or whether it has been influenced or changed
5  by what other people have told him?
6      A.  Again, I trust the client, so I cannot
7  be certain of that.
8      Q.  Okay.  Have you ever discussed with
9  Mr. Meyer about whose fault the ski wreck was?
10      A.  He believed the fault to be with the
11  resort.
12      Q.  And has he ever -- has he ever accepted
13  any personal responsibility for the ski wreck in
14  his discussions with you?
15      A.  Yes.
16      Q.  And what has he told you?
17      A.  That --
18      Q.  Sorry.  What had he told you when he
19  accepted some responsibility for the ski wreck?
20      A.  He just -- he didn't necessarily accept
21  responsibility for the wreck.  He wondered if he
22  should have gone out that day.  That was kind of
23  the background.  Regret, probably, is what I'm
24  talking about, whether he should have gone or
25  should not have gone.  He --

Page 55

1      Q.  Go ahead.
2      A.  He did not admit fault, or he did not
3  admit anything of that kind, if that's helpful.
4      Q.  Would that help?  In your professional
5  opinion, does that help someone's healing if they
6  are able to accept some fault for an incident?
7      A.  It could, if that is relevant.  It
8  wasn't that relevant to our work at the time.  We
9  were mostly concentrating on helping him alleviate
10  anxiety, and I wasn't necessarily as interested in
11  his -- I want to be clear, but I also want to be
12  concise.  I wasn't as interested in the past as I
13  was in current symptoms that the patient was
14  experiencing, which were trauma related and
15  consistent with trauma, such as anxiety and
16  hyperventilation sometimes, things like that.
17      Q.  Do you find that your patients have a
18  more difficult time moving on from an incident that
19  is their own fault versus someone else's fault?
20      A.  Again, it varies on every situation and
21  every individual.  People process trauma very
22  differently.  If it's -- if it's -- if someone is
23  delusional, if I notice something delusional about
24  their thinking, I will pursue it.  But I did not
25  notice anything delusional about his thinking.  His

Page 56

1  story remained consistent, his symptoms were
2  consistent, so I found no reason to explore that.
3      Q.  Okay.  Mr. Smith, I was just handed, a
4  few minutes ago, the remainder of your notes.  So
5  let's take a really short break, and I'm going to
6  review those notes for five minutes, and then we'll
7  get back on the record.  And we're going to correct
8  the record and replace the new -- make it a new
9  Exhibit 97, which will have all of your notes,
10  okay?
11      A.  All righty.
12      Q.  Okay.  So just give me five minutes or
13  so.  Thank you, sir.
14      A.  Uh-huh.
15      MS. WALAS:  Ian, will you forward me those as
16  well?
17      MR. McINTOSH:  Yes, I will.
18      MS. WALAS:  Thank you.
19      MR. McINTOSH:  Thank you.
20      (Whereupon, a brief
21      recess was taken.)
22  BY MR. McINTOSH:
23      Q.  Okay.  Mr. Smith, we're back on the
24  record.  You understand you're still under oath,
25  right?

14  (Pages 53 to 56)

DAVID GREGORY SMITH

Page 57

1    A. Yes.
2    Q. Okay. You next met with Mr. Meyer in a
3 counseling session on July 6th of 2018; is that
4 right?
5    A. Yes.
6    Q. And in that session, Mr. Meyer told you
7 that he, quote, "spaces out," is that right?
8    A. Yes.
9    Q. What did that mean to you?
10    A. He would lose train of thought or he
11 would just -- it's not unusual in trauma patients
12 for them to check out. It's a defense mechanism of
13 the brain. If something is too painful to look at,
14 your brain can kind of check out. So he reported
15 that happening occasionally, would just stare at
16 the wall for minutes at a time and not really be
17 thinking of anything or find himself staring into
18 space.
19    Q. Doesn't just about everybody do that at
20 some point or another?
21    A. Yes. But he reported that this seemed
22 to be increasing during this time or recently
23 around that time.
24    Q. Okay.
25    A. Or at least he reported noticing it

Page 58

1 more.
2    Q. Okay. Do you know how often he spaced
3 out before the December of 2015 ski wreck?
4    A. He reported not noticing that before the
5 wreck, other than just normal spacing out. If a
6 patient reports something to me, it's -- I usually
7 look at it as clinically significant. If they
8 don't mention it, I don't tend to pursue it unless
9 I feel like it's necessary for treatment. At this
10 stage of treatment, I was mostly concentrating on
11 addressing symptoms and not taking history, so.
12    Q. What would you look at to be evidence of
13 Mr. Meyer possibly spacing out prior to the
14 December 2015 ski wreck?
15    A. I don't understand the question.
16    Q. Well, is there any way to verify or to
17 see whether it's true that Mr. Meyer did not space
18 out before the December 2015 ski wreck?
19    A. No way to verify that, no.
20    Q. On July 6th, 2018, Mr. Meyer again
21 talked to you about his memory of the ski wreck; is
22 that right?
23    A. He did, yes.
24    Q. Did he tell you he -- I'm sorry. Go
25 ahead.

Page 59

1    A. We started in on details. I started
2 with some detail work in trying to get him to look
3 at the event without re-traumatizing himself. He
4 began to relate the incident, but he was visibly
5 getting very emotionally upset and I feared
6 re-traumatizing him, so I backed off. Just the
7 obvious symptoms of anxiety and sadness made me
8 believe that we should do this at a time when he
9 was less emotionally vulnerable.
10    Q. Did he tell you anything about the ski
11 wreck that you have not told us already here today?
12    A. I don't believe so. I don't recall.
13    Q. Okay. And even when you got into
14 details on June 6, 2018, Mr. Meyer did not tell you
15 that he had been skiing fast?
16    A. No.
17    Q. You said you do not ski?
18    A. I have, but I have not for 20 years. I
19 have a bad knee. Thanks, football.
20    Q. You met with Mr. Meyer on July 13 of
21 2018; is that right?
22    A. Yes.
23    Q. And in that meeting you were discussing
24 Mr. Meyer's anxiety around his upcoming wedding?
25    A. Yes.

Page 60

1    Q. That is obviously something that was not
2 caused by the December 2015 ski wreck; would you
3 agree with that?
4    A. The anxiety about his wedding, no.
5    Q. That might not look good on the record.
6 No, you do not agree or?
7    A. I'm sorry. Could you ask the question
8 again, please?
9    Q. Sure.
10       In your opinion, was Mr. Meyer's anxiety
11 regarding his upcoming wedding a result of the
12 December 2015 ski wreck?
13    A. I think his anxiety may have been
14 exacerbated by the ski wreck. He tended to feel
15 anxiety more acutely afterwards.
16       I apologize for the noise. My dogs hate
17 the UPS man.
18    Q. As do most, I think.
19       Mr. Meyer also expressed to you anxiety
20 about his lawsuit?
21    A. He did. He -- I'm trying to remember.
22 Mostly financial anxiety. But he also felt like it
23 was a matter of justice for him. That was kind of
24 important. And that anxiety is -- we discussed
25 whether or not it was useful for him to bring up

15 (Pages 57 to 60)

Page 61

1  the lawsuit in session, or if it was something that
2  we -- he should be talking about with the lawyers.
3  What I was mostly concentrating on was emotional
4  response, and I noted that his emotional response
5  on the 13th was seeing the world as very dangerous.
6  And so we discussed a possibly shifting that view.
7  Or is in trouble, that's common in a lot of trauma
8  patients.
9      Q.  What do you mean when you say see that
10  Mr. Meyer was seeing the world as very dangerous?
11     A.  He was seeing the world as not a kind
12  place, but a dangerous place in some ways.  Not
13  day to day to day, but I think his world view
14  was that the world needed help and that it does
15  have -- involve more risk than he reported having
16  before the accident, feeling of things involved
17  more risk for him.
18     Q.  Doesn't Mr. Meyer engage in a number of
19  high-risk activities?
20     A.  I know he's an outdoorsman.
21     Q.  So how is that consistent with -- for
22  example, if he engages in activities such as
23  mountain biking, rock climbing, skiing, how is that
24  consistent with viewing the world as a, quote,
25  "dangerous place"?

Page 62

1      A.  I need to clarify that it was more of an
2  emotionally dangerous place than a physically
3  dangerous place.  That's manifested through his
4  anxiety.  In fact, I encouraged him to do the
5  outdoor activities that he enjoyed as a way of
6  normalizing his life, getting back to an active
7  life.
8      Q.  And you agree that he's done that,
9  correct?
10     A.  I believe so.
11     Q.  You agree, wouldn't you, that Mr. Meyer
12  has a number of things in his life that cause him
13  stress other than the ski accident, correct?
14     A.  Yes.
15     Q.  For example, his wedding caused him
16  stress, correct?
17     A.  Yes.  Plans fell apart at the last
18  minute, that kind of thing.
19     Q.  His twins are now causing him stress,
20  correct?
21     A.  Correct.
22     Q.  His relationship with his wife is
23  causing him stress?
24     A.  Yes, but it's manageable.  That feels
25  manageable to me.

Page 63

1      Q.  Okay.  And, in fact, how they raise
2  their children is causing him stress, correct?
3      A.  There's philosophical differences and
4  also historical differences in the background of
5  both parents, and they are struggling to find the
6  common ground there, yes.
7      Q.  And Mr. Meyer's job is causing him
8  stress, correct?
9      A.  He reports that occasionally, yes.
10     Q.  And his finances are causing stress,
11  correct?
12     A.  He reports that, yes.
13     Q.  And his finances are -- the financial
14  stress he's facing are a result of his own
15  decisions, aren't they?
16     A.  I don't know the details for certain.
17     Q.  Okay.  Well, certainly he chose his own
18  job, right?
19     A.  I believe so.
20     Q.  And he could have chosen a different job
21  or could get a different job right now, whether
22  within or without the -- outside the field of legal
23  work, right?
24     A.  I suppose.  I've never heard him express
25  a desire for that, so I've never pursued that.

Page 64

1      Q.  But, for example, he could get a job
2  within the legal field that perhaps paid more and
3  paid on a more regular basis, correct?
4      A.  I believe he could.  I don't believe,
5  philosophically, he would be aligned with that.
6      Q.  What is your understanding of how he
7  gets compensated in his current job?
8      A.  You broke up.  I apologize, Ian.
9      Q.  No, no problem.
10         What is your understanding of about how
11  Mr. Meyer is compensated in his current job?
12     A.  We haven't talked about that very much.
13  I know that he is -- has employees that he has to
14  pay, and he has reported sometimes anxiety about
15  lack of payment from clients.  Knowing that these
16  people depended on him has caused him some stress.
17  That's what I can remember at this point.
18     Q.  Is it your understanding Mr. Meyer has
19  any clients other than his own law firm?
20     A.  It's not my understanding.  I think -- I
21  thought all of his clients -- I maybe made the
22  assumption that all of his clients came through his
23  law firm.  He has never explicitly pursued.
24     Q.  Right.  And I guess I'm asking a little
25  bit different question.  Is it your understanding

Page 65

1   that he has clients other than representing his own
2   law firm?
3       A.  I do not know that.
4       Q.  You met with Mr. Meyer and his current
5   wife, Amanda Eggert, on July 20th of 2018; is that
6   right?
7       A.  Yes.
8       Q.  And did you ask Ms. Eggert what happened
9   in the ski wreck?
10      A.  I did not.  I mostly -- I did not ask
11  for details, but I remember that she corroborated
12  things that Mr. Meyer and I had talked about
13  previously.  They both -- they both related the
14  same events, basically.  I saw no discrepancies,
15  let's say that.
16      Q.  What do you recall Ms. Eggert relaying
17  to you about the ski wreck?
18      A.  Again, I don't remember details.
19      Q.  Okay.
20      A.  The task at hand was helping them
21  communicate and get through anxiety that they were
22  experiencing, and some conflict.
23      Q.  Well, what other anxiety were Mr. Meyer
24  and Ms. Eggert experiencing when you met with them
25  on July 20th, 2018?

Page 66

1       A.  There was discussion of a member of
2   Ms. Eggert's family who was abusing substances, and
3   John felt like it was his duty to help and to
4   assist.  And I tried to talk him out of that
5   responsibility.  And, as someone who's worked with
6   people in sobriety for decades now, I realize you
7   can't tell somebody to get sober.  You can't tell
8   them how to live their life.  So I asked him to
9   resist the impulse to interfere in the life of that
10  family member.
11      Q.  And that was causing Mr. Meyer stress
12  because of their upcoming wedding?
13      A.  I believe it was causing him stress
14  because he didn't feel comfortable giving his
15  opinion, maybe.  I'm trying to remember.  Just give
16  me a second.
17          It was more of a problem-solving
18  exercise than it was really anything else.  And
19  what I remember is, again, mostly helping him
20  understand that, by taking on the responsibility
21  for someone else's sobriety, he's adding stress to
22  his own life.
23      Q.  What is moralizing?
24      A.  Moralizing is -- well, in this instance
25  it was, "She should stop doing this and she should

Page 67

1   listen to me because I have the answer," which is
2   true, but it hardly -- instead of it being a
3   philosophical thing done out of -- out of
4   principle, it was more out of morals.  This is the
5   right thing to do.  Does that make sense?
6       Q.  Not entirely.  But let me try to ask you
7   something different.
8           Is moralizing something that you see
9   Mr. Meyer doing on a regular basis?
10      A.  I do.
11      Q.  And how does Mr. Meyer moralize?
12      A.  From the beginning, Mr. Meyer has a
13  world view strongly influenced by the concept of
14  justice and sometimes very black-and-white thinking
15  about what's okay and what's not okay.  But for the
16  most part -- we're working on that.  That will
17  come later in the notes, I believe, about leaving
18  that black and white view of the world behind.  I
19  saw that it was causing him and still causes him
20  some anxiety to see the world that way, like "this
21  is what's right" and "this is what's wrong."
22  That's not how the world works.
23      Q.  You met with Mr. Meyer on August 3rd, of
24  2018; is that right?
25      A.  Yes.

Page 68

1       Q.  And in that meeting you discussed
2   Mr. Meyer's financial stresses?
3       A.  On the 3rd or the 10th?
4       Q.  Yeah.  I'm sorry, the 10th.
5       A.  I don't believe -- oh, the 10th.  Yes,
6   we did talk about financial considerations.  He was
7   paying out of pocket, was uninsured, and wanted to
8   take a break, which is not unusual.  I reiterated
9   that he had issues that needed to have therapy in
10  order to resolve them.  He understood, but it's not
11  unusual, after a few months, for patients to want
12  to take a break from therapy.  It can get very
13  intense.
14      Q.  And I apologize, Mr. Smith.  I did skip
15  over the 3rd.  Can you just tell me what you
16  discussed with Mr. Meyer on August 3rd of 2019?
17      A.  This session was not necessarily one
18  that was full of treatments.  It was -- it was a
19  lot of discussion about how he sees the world and
20  how -- I did some psychoeducation about how the
21  brain changes with trauma and how the brain
22  operates, especially the hypothalamic fight,
23  flight, or freeze response.  And we had discussed
24  neuroplasticity earlier, which is the brain's
25  ability to change and to grow and to heal.

17 (Pages 65 to 68)

DAVID GREGORY SMITH

Page 69

1        I remember on the 3rd -- I have a model
2   of a brain in my office, and so we kind of went
3   over all the neurological parts of the brain and
4   what it does, the physical parts of the brain.  And
5   a lot of it wasn't really relevant to therapeutic
6   notes.  It was more psychoeducational on his part,
7   his curiosity.  We didn't really work on issues
8   involving him directly.  It was mostly theoretical.
9        Q.  You agree, don't you, that Mr. Meyer has
10  the ability to recover from any PTSD he has, if
11  any, right?
12       A.  The likelihood is good.  I hesitate to
13  say that anybody is ever completely cured from
14  post-traumatic stress.  It's something that most
15  people will have to deal with for the rest of their
16  lives in some manner.
17       Q.  A minute ago you said you discussed with
18  Mr. Meyer how he sees the world.  How does
19  Mr. Meyer see the world?
20       A.  He sees the world in need of saving.
21       Q.  What does that mean?
22       A.  I guess from his environmental point of
23  view, the world is on a path to destruction in our
24  current setting, with environmental issues and with
25  climate change and society's inability to take care

Page 70

1   of its own.  And, again, that sense of justice is
2   very strong in him.
3        Q.  Did you ever discuss with Mr. Meyer his
4   abilities to do his job before December of 2015?
5        A.  Only when he recorded difficulty doing
6   things the way he used to do them, and that was
7   occasional.  But, again, we mostly concentrated on
8   his emotional responses and not necessarily his
9   work practices.
10       Q.  And what has Mr. Meyer told you about
11  how the injuries he suffered in December of 2015
12  affect him?
13       A.  I think it would be in my first notes on
14  the 8th of June, 2018.
15       Q.  So those are the things that we've
16  discussed already, the insomnia and depression?
17       A.  Insomnia, depression, anxieties,
18  hypervigilance, some cognition difficulties,
19  searching for words, losing train of thought.
20       Q.  I should have been more specific in my
21  question, apparently.
22       A.  I'm sorry.
23       Q.  No, no.  What has Mr. Meyer told you, if
24  anything, about how the injuries he suffered in
25  December 2015 impact his ability to do his job?

Page 71

1        A.  He recorded that it takes him longer to
2   do things after the accident.  He's not as
3   efficient.  He feels frustrated more, impatient
4   more often than he was before the accident, he
5   reports.
6        Q.  Anything else that you can recall?
7        A.  I don't recall right now.
8        Q.  In your opinion, is Mr. Meyer -- or
9   strike that.
10       In your opinion, has Mr. Meyer's
11  injuries, have they materially impaired his ability
12  to do his job as a lawyer?
13       A.  From his report, I would say it's
14  created difficulty.  We've never talked
15  specifically about whether or not he feels impaired
16  by it or whether it's just bothersome.
17       Q.  And so my question though is what is
18  your opinion?
19       A.  Based on his report, that it does have
20  some significant impairment to his job, for him to
21  do his job.
22       Q.  Okay.
23       A.  Grammar.  Apologies.
24       Q.  So let me just see if I understood what
25  you said.  Is it correct that it is your opinion

Page 72

1   that the injuries Mr. Meyer suffered in December of
2   2015 materially impair his ability to be a lawyer?
3        A.  I don't know that.  I cannot speculate
4   about that.  I know that he has some difficulty
5   performing tasks after the accident.  I don't know
6   whether it impairs him from being a lawyer.  I
7   would have to do more psychological testing for
8   that.  I mean, that would be -- that would be
9   something I would have a clinical psychologist look
10  at.
11       Q.  Do you recommend that?
12       A.  I don't know.  I don't think it could
13  hurt.
14       Q.  But do you recommend --
15       A.  He hasn't reported --
16       Q.  I'm sorry.  Go ahead.
17       A.  He hasn't reported any symptoms that I
18  felt severe enough to recommend that at this point.
19       Q.  Do you agree that Mr. Meyer experiences
20  stress because of the field of law that he chose?
21       A.  Yes.
22       Q.  And, for example, he could have chosen a
23  field of law where he received a regular paycheck
24  or was working for someone else, correct?
25       A.  He could have.  He -- his passion is

18 (Pages 69 to 72)

DAVID GREGORY SMITH

Page 73

1   what drives him.  It's not financial, in my
2   opinion.
3        Q.  I understand that.  But as a result of
4   that passion, he may feel more financial stress,
5   right?
6        A.  Yes.
7        Q.  And he had that passion before December
8   2015 and after, correct?
9        A.  I would say yes.
10       Q.  And that passion that you're describing
11  is his feeling that he described to you that he
12  needs to save the world, correct?
13       A.  Help save the world.  I think he's -- he
14  doesn't feel like he's doing it alone.  There's no
15  paranoia there or anything.
16       Q.  Right.  But my point is though, is that
17  his feeling or his passion that he needs to help
18  save the world is at least contributing to the
19  financial stress he is experiencing, right?
20       A.  Yes.  As someone who's worked in
21  nonprofits, it's a pretty familiar feeling.
22       Excuse me for a second.  My allergies
23  are acting up.  I apologize.
24       Q.  No problem.  I'm having the same issue.
25       So after August of 2000 -- August 10 of

Page 74

1   2018, you did not see Mr. Meyer again until March
2   of 2019; is that right?
3        A.  After July -- yes.  I'm just looking at
4   the notes.  It was not a full meeting.  I forgot to
5   put that in the notes.  This was -- instead of the
6   usual 50-minute meeting, was a 30-minute meeting.
7   So it was shorter.  It was a shorter session.
8        Q.  The session on August 10 was shorter?
9        A.  The session on -- okay, I'm confused.
10  What number are you looking at?  That might help.
11       Q.  Well, I'm trying to figure out, you did
12  not see Mr. Meyer between August 10 of 2018 and --
13       A.  Oh, yes.  Sorry.  I was in the wrong
14  place.  Yes, I did not see him.
15       Q.  Okay.  And which session was shorter,
16  which session was 30 minutes instead of 50?
17       A.  Session 11.
18       Q.  That's the session on March 4 of 2020?
19       A.  Yes, March of this year.
20       Q.  Okay.  So you saw Mr. Meyer a total of
21  seven times in 2018, right?
22       A.  Yes.
23       Q.  You saw him twice in 2019, correct?
24       A.  Yes.
25       Q.  And then in March of 2019, he asked you

Page 75

1   to help with this lawsuit, correct?
2        A.  March of 2020.
3        Q.  Excuse me.  I apologize if I misspoke.
4   March of 2020, Mr. Meyer asked you to help him with
5   this lawsuit, right?
6        A.  He asked if I would -- if I would be
7   open to testifying and sharing my notes.  And I
8   said if you -- if he wished it, I have no problem
9   with that.
10       Q.  Okay.  And since Mr. Meyer asked you to
11  assist in this lawsuit, he's been seeing you much
12  more often, hasn't he?
13       A.  Yes.
14       Q.  Let's back up to your treatment in 2019,
15  the two sessions you had with Mr. Meyer.  What did
16  you discuss with Mr. Meyer on March 8 of 2019?
17       A.  We talked about stress that he was
18  feeling, the fact that the twins were born so
19  quickly after the marriage, a lot sooner than they
20  had anticipated starting a family, the stress of
21  overload.  And I gave him some recommendations
22  about meditation and breathing techniques and
23  mindfulness, time alone in helping him ground,
24  constantly reminding himself to slow down more.
25       Q.  Anything else?

Page 76

1        A.  I remember just letting him vent for a
2   while about all the frustrations that he was
3   having.  I don't necessarily remember details.
4   But I often do this with patients just so they can
5   get it out, and then we can go back to discuss
6   things that we both find relevant.  And that
7   mostly -- that mostly involved calming exercises
8   and ways to de-stress himself.
9        Q.  Is it your understanding that neither
10  Mr. Meyer nor his wife had health insurance?
11       A.  If they did, it was insurance I couldn't
12  take.  I don't recall.  We agreed to just pay in
13  cash.
14       Q.  What does it mean when Mr. Meyer said
15  that -- said to you that "life is closing in too
16  fast"?
17       A.  It was mostly centered around his
18  family, having -- suddenly being a husband
19  and a father of twins and trying to work,
20  balancing -- work/life balance.  I think -- my
21  impression was that he was overwhelmed.
22       Q.  By what?
23       A.  By family and work, the situation of the
24  twins happening very quickly, unexpected
25  expenditures with two babies instead of one.

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

DAVID GREGORY SMITH

Page 77

1  Dealing with child care, learning how to care for a
2  child, the stress of not really knowing how to do
3  that, mostly relying on his wife to take the lead
4  in the care of the children.
5      Q.  And then Mr. Meyer called you on July 12
6  of 2019 for help dealing with the stress of
7  marriage; is that right?
8      A.  Yes.  He asked if he could come in, and
9  so I agreed.  We noticed some new things, that he
10 was spending more time searching for words, losing
11 train of thought, which is generally a condition of
12 stress.  In trauma, those symptoms can be
13 exacerbated by stress of any kind not related to
14 the trauma.  And I mostly -- I mostly recommended
15 intensive therapy once a week, at least once a week
16 to deal with that, and maybe occupational therapy
17 if he needed to maybe get some -- some help in
18 addressing his work issues.  I was simply there for
19 emotional issues, not physical or occupational
20 issues, necessarily.
21     Q.  Has Mr. Meyer followed your
22 recommendation to have any occupational therapy?
23     A.  I followed up once with him after that
24 and he said it was too expensive, just in passing.
25     Q.  Do you know if he had insurance that

Page 78

1  would pay for it --
2      A.  I do not.
3      Q.  -- occupational therapy?  You don't
4  know?
5      A.  I don't know.
6      Q.  Mr. Meyer first asked you to help with
7  his lawsuit in March of this year, of 2020,
8  correct?
9      A.  Yes.  He asked me to be available to
10 provide treatment notes and maybe testimony.
11     Q.  And prior to him asking you to provide
12 testimony in this case, you had counseled Mr. Meyer
13 a total of nine times, correct?
14     A.  Yes.
15     Q.  And since Mr. Meyer --
16     A.  Well, ten -- ten times, sorry.
17     Q.  Well, it was actually nine, wasn't it,
18 because you canceled on June 15 of 2018?
19     A.  Thank you.  You're right.
20     Q.  Since Mr. Meyer asked you to assist with
21 this lawsuit, how many times have you counseled
22 him?
23     A.  So that looks like 14.
24     Q.  And it's been four months -- five
25 months, I guess, it is now?  Five months since

Page 79

1  Mr. Meyer asked you to assist with this lawsuit,
2  right?
3      A.  Correct.
4      Q.  Okay.  So in nearly two years before
5  Mr. Meyer asked you to assist in the lawsuit, you
6  saw him nine times, correct?
7      A.  Yes.
8      Q.  And then he asked you to assist in a
9  lawsuit, and in five months you've seen him 14
10 times, correct?
11     A.  Yes.
12     Q.  Does that tell you anything?
13     A.  It tells me that he's serious and
14 interested in working on his issues.  If you're
15 asking whether I think he's trying to appear
16 impaired by seeing me more often, I don't believe
17 so.  Excuse me.
18     Q.  When you first spoke with Mr. Meyer
19 about assisting with his lawsuit, what did you
20 discuss?
21     A.  We discussed me providing treatment
22 notes and possibly testimony.  I think that was the
23 day we had -- did the retainer agreement, which
24 allowed him to forego payment until the lawsuit was
25 settled.  In my opinion, easing that financial

Page 80

1  burden was the reason that we were able to be more
2  engaged after.
3      Q.  Okay.  I just want to be clear about
4  something you just said.  So from March 4 of 2020
5  through the present, you have not been charging
6  Mr. Meyer; is that correct?
7      A.  I have not collected any money from
8  Mr. Meyer, no.
9      Q.  And if he settles this lawsuit or
10 obtains a judgment, then you will get paid for all
11 of your time seeing Mr. Meyer, correct?
12     A.  I believe so, yes.
13     Q.  And if Mr. Meyer does not receive a
14 settlement or does not receive a judgment, you will
15 not be paid; is that correct?
16     A.  We discussed having a payment plan that
17 could be stretched out over months in order to pay
18 me back.  I would not expect a lump sum.
19     Q.  Okay.  So, Mr. Smith, you have a
20 financial interest in this lawsuit, don't you?
21     A.  I will get paid whether or not this
22 lawsuit is settled or not.
23     Q.  Well, you hope you will get paid, right?
24     A.  I believe I will get paid.
25     Q.  But if there's a settlement or judgment,

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

Page 81

1  you will be paid sooner, correct?
2      A.  I suppose.  I'm not certain how that
3  works, but I'll take your word for it.
4      Q.  And you would receive a lump sum instead
5  of installment payments over time, correct?
6      A.  If that's the agreement of the
7  settlement, I suppose.
8      Q.  Do you see any problems with that,
9  Mr. Smith?
10     A.  I, personally, do not.  I have had
11 clients in the past who have been unable to pay or
12 who I've had to send to collections.  I have had to
13 write off some expenses of therapy for unpaid
14 sessions.  I've taken financial hits occasionally
15 for that reason.  It's part of the risk of doing
16 this business.  I'm much more interested in helping
17 people than I am in having money.
18     Q.  Right.  But before Mr. Meyer asked you
19 to assist with this lawsuit, he was just paying you
20 as he went each time he saw you, correct?
21     A.  Correct.
22     Q.  And then he asked you to assist with the
23 lawsuit, and you agreed not to charge him anymore,
24 correct?
25     A.  Correct.  I also take several pro bono

Page 82

1  patients every week.  I'm seeing two -- three
2  people right now who are not paying me.
3      Q.  Correct.  But Mr. Meyer is not one of
4  your pro bono clients, is he?
5      A.  I haven't had any payment yet, so I'm
6  considering him a pro bono client until that
7  happens.
8      Q.  Well, you have had payment for him.  He
9  paid you for the first nine sessions that you met
10 with him, right?
11     A.  Yes.  But then, I guess, in my mind, I
12 changed his status to pro bono unless I get paid,
13 and that's a risk I was willing to take.
14     Q.  And you're hoping that there will be
15 some sort of judgment in his favor or settlement in
16 his favor so that you will get paid, right?
17     A.  I would like to be paid, but I don't
18 necessarily -- I'm not counting on it.  It's not
19 something I'm planning for, since it's up in the
20 air.
21     Q.  What are the primary issues you are
22 addressing in your meeting, your current meetings
23 with Mr. Meyer?
24     A.  Excuse me.  We're mostly exploring how
25 he sees the world and how he can change some of

Page 83

1  that instead of moving from black -- into
2  black-and-white thinking so often to be able to be
3  more comfortable with doubt and being able to slow
4  down.  Like, he's a pretty quick thinker.  Like,
5  he -- his emotions tend to overwhelm him quickly
6  at times.  And I'm mostly helping him and his
7  wife -- I'm helping him work on communications with
8  his wife and family, not -- giving him some style
9  type tips and techniques about how not to have a
10 conversation or how not to be unclear.  Spending a
11 lot of time talking about his self identity, how he
12 sees himself in the world, how he is looking at his
13 place in the world, and his new identity -- his
14 relatively new identity as a husband and father,
15 dealing with things happening not in a way he would
16 like, which is what we call resiliency, being able
17 to come back from a disappointment or what might be
18 seen as failure.
19     My work with John in the last few months
20 has mostly been about helping ground him in a
21 reality that is much more subtle than he would like
22 it to be.
23     Q.  What did that mean?
24     A.  Again, I would say it's trying to turn
25 the world into color instead of just black and

Page 84

1  white.  And a lot of times, when I'm working with
2  people, it's important to manage expectations.  And
3  if people are having realistic expectations, they
4  usually do very well.  If people are having
5  unrealistic expectations, they may not do so well.
6  And John is learning a bit more how to be more
7  subtle in that, especially in his work life and in
8  his home life.  Those are mostly the two things we
9  discuss.  And his emotional -- and his emotional
10 state of anxiety or just feeling frustrated,
11 sometimes angry.
12     Q.  Are you all done?
13     A.  Yes.
14     Q.  You said a number of different times now
15 that Mr. Meyer sees the world in black and white
16 and you're trying to get him to see the shades of
17 gray and see the other colors, correct?
18     A.  Yes.  I mean, he has some of that -- I
19 wouldn't say he's completely inept in that ability,
20 but it does cause him some significant distress,
21 the black-and-white thinking.
22     Q.  And the black-and-white thinking is
23 certainly something that Mr. Meyer had before
24 December of 2015, right?
25     A.  I would assume so, but I do not know

Page 85

1    that for sure.
2        Q.   Okay.  So you just gave me a long list
3    of things that you're seeing Mr. Meyer for now.  I
4    just want to see if I've -- you gave me a big list
5    or a big narrative, and I want to see if I'm
6    missing anything.
7            You said you're discussing with him how
8    he sees the world, right?
9        A.   Yes.  Yes.  And that's a pretty --
10       Q.   And you're dealing with -- go ahead.
11       A.   That's a common starting place that I
12   have with patients.  So, generally, I need to
13   explore that in order to see what causes them pain,
14   distress, anxiety, et cetera.
15       Q.   You're dealing with -- you're counseling
16   Mr. Meyer on marriage issues now, correct?
17       A.   Correct.
18       Q.   And you're -- associated with that,
19   you're dealing with him on communication skills,
20   both with his wife and others, right?
21       A.   Yes.  And philosophical skills about
22   what -- what does this loving relationship mean?
23   What does it -- how would you define it?  And doing
24   some psychoeducation about that also.  Just basic
25   relationship education.

Page 86

1        Q.   You're also dealing with Mr. Meyer about
2    just slowing down, correct?
3        A.   Yes.
4        Q.   And then you said you're dealing with
5    Mr. Meyer about how he sees himself in the world,
6    both as a husband and a father, right?
7        A.   Yes, right.
8        Q.   And then you also mentioned counseling
9    him on his seeing the world in black and white,
10   right?
11       A.   Yes.
12       Q.   Is there anything -- if we were just
13   creating a list, is there anything that I'm
14   missing?
15       A.   Managing anxiety.  Managing discomfort.
16       Q.   So aren't all of those things issues
17   that Mr. Meyer had -- oh, sorry.  It just blacked
18   out.  Can you see me?
19       A.   Yes.
20       Q.   Okay.  I apologize.  For some reason,
21   you just blacked out and I couldn't see you there
22   for a minute.  Let me start my questioning again.
23          All of the things that we just
24   discussed, so all of the things that you are seeing
25   Mr. Meyer for now or counseling him for now, aren't

Page 87

1    all of those things preexisting issues that just
2    existed as part of his personality prior to
3    December of 2015?
4        A.   I would assume that, but I do not know
5    that for certain.  I've never asked that question.
6    But in terms of personality, those things rarely
7    change, but they can be exacerbated by trauma.
8        Q.   And do you have any evidence to suggest
9    that those things have been exacerbated by trauma
10   in this instance?
11       A.   I'm relying on the report of the
12   patient, and the patient believes them to be
13   exacerbated by trauma, and I see no reason to
14   disagree.
15       Q.   So if you believe all of these
16   preexisting issues that Mr. Meyer had have been
17   exacerbated by the trauma, can you quantify how
18   much they've been exacerbated, in your opinion?
19       A.   I would be very reluctant to do that.
20   I -- again, it was not really the focus of our work
21   together.  I was dealing with what was presented
22   and relying on the report of the client.  And the
23   things that were presented were worthy of being
24   treated, so I treated them as best I could.
25       Q.   And are you now meeting with Mr. Meyer

Page 88

1    on a weekly basis?
2        A.   Yes.
3        Q.   And do you plan to continue to do so
4    through the end of this lawsuit, through the time
5    of trial?
6        A.   I assume so.
7        Q.   Have you ever discussed with Mr. Meyer
8    what he would do with the proceeds of this lawsuit
9    if he prevails?
10       A.   I have not.
11       Q.   Is there anything else that you believe
12   is important about your counseling of Mr. Meyer
13   that we have not discussed yet today?
14       A.   I don't believe so.
15       Q.   And I assume that all of your notes that
16   are contained in Exhibit 97 are true and accurate
17   to the best of your ability, correct?
18       A.   Yes.  I do dictate my notes, so there
19   are some spelling errors and a couple of
20   mispronounced words, it looks like.  But other than
21   that, yes.
22       Q.   Speaking of that, on note Number 22 from
23   7/27 of this year, in the middle of that you
24   mention Connie.  Do you see that?
25       A.   Yes.  That's an error.  I'm trying to

Page 89

1 reconstruct that sentence. I think that's an
2 erroneous word.
3     Q. Do you know what it's supposed to be?
4     A. I believe it is "and he seemed."
5 "Connie" probably was "and he." "And he."
6     Q. Okay.
7     A. And you can start the "and" after
8 "Connie." I should have proofed that. I
9 apologize.
10     Q. No problem. Sir, can you just give me
11 about five, maybe ten minutes at the most to go
12 over my notes just to see if there are any other
13 questions that I have for you?
14     A. Sure. I'm free all day.
15     Q. Okay. Well, I'm not going to take up
16 all day. Let me go over my notes and see if I have
17 anything else. Thank you very much.
18     MS. WALAS: Ian, can you forward me the
19 e-mails that were forwarded to Jennifer as well?
20     MR. McINTOSH: Yeah, of course. I haven't
21 seen them yet, but --
22     MS. WALAS: Okay.
23     MR. McINTOSH: -- as soon as I see them, I
24 will forward them to you.
25     MS. WALAS: Okay. Perfect. Thank you.

Page 90

1     MR. McINTOSH: All right. Thank you.
2     (Whereupon, a brief
3     recess was taken.)
4 BY MR. McINTOSH:
5     Q. Mr. Smith, the e-mails -- you just
6 forwarded several e-mails from Mr. Meyer to us; is
7 that correct?
8     A. Yes. Some time ago, but yes.
9     Q. One of the e-mails you sent to us was an
10 e-mail that John Meyer sent to you -- I assume it's
11 to you. Is the e-mail dgsma@outlook.com; is that
12 you?
13     A. Yes.
14     Q. And Mr. Meyer submitted an e-mail to you
15 dated Friday, November 15, 2019, at 3:54 p.m.,
16 correct?
17     A. November? Yes.
18     Q. What is your understanding of why
19 Mr. Meyer sent that e-mail to you?
20     A. With the affidavit attached? I don't
21 recall the reason. There have been maybe -- for
22 backgrounds.
23     Q. You had not seen Mr. Meyer in four
24 months in November of 2019, correct?
25     A. Yeah. I'm a little puzzled.

Page 91

1     Q. Did Mr. Meyer tell you that the
2 affidavit that he submitted to you, that the person
3 that submitted it later admitted that parts of it
4 were false?
5     A. No, he did not.
6     Q. Is that important to you?
7     A. Again, I -- it wasn't relevant to our
8 treatment and our work together.
9     Q. Right. That's what I'm trying to figure
10 out. I mean, numerous times today you told me the
11 details of the accident to -- tell me if I'm
12 summarizing this incorrectly. You told me that the
13 details of the accident are really not that
14 important to you so -- is that right?
15     A. Yes. The traumatic events from the
16 patient's point of view is what's important in
17 treatment.
18     Q. So why -- and if Mr. Meyer has already
19 told you about that, why is he then forwarding this
20 e-mail to you in November of 2019?
21     A. I do not remember.
22     Q. And then the next time you met with
23 Mr. Meyer, he asked you to assist with the lawsuit,
24 right?
25     A. Yes. And there are no other e-mails.

Page 92

1 Let me just check one other thing. Yeah, I do not
2 recall.
3     Q. Was Mr. Meyer trying to shape your
4 belief about what happened in the ski accident?
5     A. I don't believe so. Every -- everything
6 here is -- this is all familiar. I don't see that
7 any of this would be new information. But I didn't
8 check it for veracity. I don't know if it's true
9 or not.
10     Q. If a client is trying to convince you
11 that what he is telling you about the underlying
12 incident or the underlying trauma is true, does
13 that cause you any concerns?
14     A. I'm not sure if I understand. Could you
15 please repeat that?
16     Q. Sure. If a client feels the need to
17 convince you that he is right about what happened
18 with the underlying incident, does that cause you
19 any concerns?
20     A. It would if it were obviously
21 delusional. Again, I mostly take my patients at
22 their word and treat the symptoms that I see in
23 front of me.
24     Q. Other than PTSD, how, in your opinion,
25 has the 2015 ski wreck impacted Mr. Meyer?

DAVID GREGORY SMITH

Page 93

1      A. I believe it's affected his physical
2 health, his range of motion. Psychologically, I
3 think it has made him prone to anxiety and
4 depression. I believe it has made him
5 hypervigilant. I think all of the things that I
6 noted in the intake notes of -- in Note Number 1
7 would imply again --
8      Q. Okay.
9      A. -- there's insomnia -- I mean, you know,
10 there's insomnia, irritable behavior that was
11 reported to be more extreme than normal.
12      Q. Okay. So let me go through these. The
13 first thing you said was physical health, correct?
14      A. Yes. He reported having surgery and not
15 being able to do the things that he used to do as
16 easily.
17      Q. And you're not treating Mr. Meyer for
18 his physical health, are you?
19      A. I am not.
20      Q. And so how the ski accident affected him
21 physically is not within your area of expertise, is
22 it?
23      A. It is if it affects someone's
24 psychological condition or mood or... For example,
25 physical illnesses, if someone is living with a

Page 94

1 chronic illness, that can exacerbate feelings of
2 depression or anxiety, for example. So physical
3 health and mental health are very much intertwined.
4 I do a lot of body sensation work, but I'm not a
5 medical doctor.
6      Q. Right. But, for example, if Mr. Meyer
7 told you that he hurt his knee in the 2015 ski
8 accident when, in fact, he hurt it in a separate
9 ski accident six months later, you're not qualified
10 to determine which accident really caused the knee
11 accident, are you?
12      A. No.
13      Q. So Mr. Meyer could be reporting symptoms
14 to you, telling you things that happens to him
15 physically that, according to him in the 2015 ski
16 accident, and you don't know whether those things
17 are true or not; is that right?
18      A. You broke up on me. Could you repeat
19 the question? Sorry.
20      Q. Yeah. No problem.
21      A. My internet isn't so great today.
22      Q. Okay. So Mr. Meyer could be telling you
23 that he was physically impacted by the 2015 ski
24 accident, and you don't know if what he's telling
25 you is true or false, do you?

Page 95

1      MR. McINTOSH: Marla, can you hear me?
2      THE COURT REPORTER: I can hear you.
3      THE WITNESS: Okay, you're back.
4 BY MR. McINTOSH:
5      Q. Okay. Marla, could you read that
6 question back to Mr. Smith?
7      THE COURT REPORTER: Sure.
8          (Whereupon, the last
9          question was read back.)
10      THE WITNESS: No.
11 BY MR. McINTOSH:
12      Q. So, for example, physically how
13 Mr. Meyer's range of motion was impacted, you don't
14 know if what he's telling you is true or false,
15 correct?
16      A. Can you repeat the question? I'm having
17 screen freeze again. Apologies.
18      MR. McINTOSH: I see that. We seem to be
19 having technical difficulties here. Marla, did you
20 get that question?
21      THE COURT REPORTER: Yes.
22      MR. McINTOSH: Could you read that back to
23 Mr. Smith, please?
24      THE COURT REPORTER: Sure.
25 ///

Page 96

1          (Whereupon, the last
2          question was read back.)
3      THE WITNESS: Okay. So I heard nothing. I
4 apologize. One more time?
5      THE COURT REPORTER: Sure.
6      MR. McINTOSH: Could we -- Marla, would it
7 help if we like hung up and called back in or
8 clicked on the link again or something?
9      THE COURT REPORTER: So my feeling is that
10 it's Mr. Smith's WiFi, just because he is the one
11 that's freezing up. I don't know if it's -- if
12 you've used this before. So if he would like to
13 reconnect, that might help. But I don't think the
14 other three of us need to.
15      MR. McINTOSH: Okay. Mr Smith, just to give
16 us -- I really don't have very much at all. I just
17 have a few more questions that I want to ask, but
18 we seem to be having some serious problems here.
19 Could you try to hang up and then click on the link
20 again?
21      Okay, I guess he heard that. No, maybe
22 not. Did you hear me, Mr. Smith?
23      THE WITNESS: No, I got kicked off. So,
24 let's assume -- let's assume nothing.
25      MR. McINTOSH: Right. So could you hang up

24 (Pages 93 to 96)

DAVID GREGORY SMITH

Page 97

1    or disconnect from this link and then try to
2    connect again and see if it's any better?
3         THE WITNESS:  It seems to be working now
4    fine.
5         MR. McINTOSH:  Okay.
6         THE WITNESS:  Okay, maybe not.
7         MR. McINTOSH:  Okay.
8         THE WITNESS:  Okay, I can leave and come
9    back.  Hold on.
10        MR. McINTOSH:  Let's try that.
11        THE WITNESS:  Okay.
12             (Whereupon, there was a brief
13             pause in the proceedings.)
14   BY MR. McINTOSH:
15        Q.  Is this any better?
16        A.  Yeah.  Should be fine.
17        Q.  Okay, let's try again.
18             So, Mr. Smith, Mr. Meyer's issues about
19   the alleged impact on his physical range of motion,
20   you don't know whether those are true or false, do
21   you?
22        A.  I have no proof.
23        Q.  Okay.  And, in fact, that's
24   not -- you're not a doctor that diagnoses those
25   type of issues, are you?

Page 98

1         A.  No.
2         Q.  You said that, in your opinion, this ski
3    wreck has caused Mr. Meyer anxiety, correct?
4         A.  Yes.
5         Q.  But you don't know how much anxiety he
6    was experiencing before the ski wreck, do you?
7         A.  I do not.
8         Q.  You said that this has caused him
9    depression, in your opinion, right?
10        A.  Yes.
11        Q.  And you don't know how much depression,
12   if any, Mr. Meyer suffered before December of 2015?
13        A.  Other than his word, no.
14        Q.  Same thing regarding hypervigilance, you
15   don't know if he was hypervigilant before December
16   of 2015, correct?
17        A.  No proof.  Just patient report, yes.
18        Q.  Okay.  But you, for example, haven't
19   reviewed his prior -- you could have reviewed his
20   prior medical records, and you haven't done so,
21   right?
22        A.  I didn't find it necessary.  But yes, I
23   could have.
24        Q.  Okay.  Irritable behavior, that's
25   another thing you mentioned.  Do you know how often

Page 99

1    Mr. Meyer had irritable behavior prior to this
2    incident?
3         A.  I do not.
4         Q.  Mr. Smith, I believe that's all the
5    questions I have.  If you can please just send us
6    that intake form; will you do that?
7         A.  I will do that.  I think -- I'm pretty
8    sure I can get it to you today.
9         Q.  Okay, thank you.
10        A.  Yes.
11        MR. McINTOSH:  So that's all the questions I
12   have for right now.
13             Breean, did you have any?
14        MS. WALAS:  I'm going to just ask a few
15   follow-up.  It won't take very long.
16        MR. McINTOSH:  Good luck.
17        MS. WALAS:  All right.
18
19             EXAMINATION
20   BY MS. WALAS:
21        Q.  Mr. Smith, you were asked about a
22   November 15th e-mail; do you recall that?
23        A.  Yes.
24        Q.  And did you forward another e-mail dated
25   November 5th, 2019?

Page 100

1         A.  I have to look.  November -- could you
2    repeat the date, please?
3         Q.  November 5th.
4         A.  I'm not seeing it.  Maybe I'm
5    technologically disadvantaged.  Is it something
6    that I sent to you earlier?  I'm having a hard time
7    with my e-mail.
8         Q.  Earlier today you forwarded two e-mails
9    from Mr. Meyer to --
10        A.  Oh, yes, yes.  Got it.
11        Q.  Okay.  I'm just trying to confirm which
12   e-mails were sent.
13        A.  11/5 and 11/15 of 2019.
14        Q.  Okay.
15        A.  Two separate e-mails.
16        Q.  And the November 5th e-mail, what was
17   that regarding?
18        A.  It was an affidavit as an expert for the
19   court or as a professional.
20        Q.  Okay.  So that would be the affidavit
21   you provided with a copy of your treatment notes
22   related to the November 5th e-mail?
23        A.  Yes.
24        Q.  OKAY.
25        MS. WALAS:  Ian, do we want to go ahead and

25 (Pages 97 to 100)

DAVID GREGORY SMITH

Page 101

1  make these two e-mails we got forwarded Exhibit 98,
2  so they're in the record?
3      MR. McINTOSH:  I don't think it's necessary.
4  But if you want to, have at it.
5      MS. WALAS:  Okay.  I don't think it's
6  necessary, either.  I just didn't know, because we
7  discussed it, if you wanted to put it in the
8  record.
9      MR. McINTOSH:  I'm fine.
10     MS. WALAS:  Okay.
11 BY MS. WALAS:
12     Q.  Also, following up -- is it common in
13 your profession to base a diagnosis off of a client
14 interview?
15     A.  It is.
16     Q.  Okay.  And do you do that regularly with
17 your patients?
18     A.  I do.  And I would add for insurance
19 purposes, every patient has to have a diagnosis.
20     Q.  And what is your current diagnosis of
21 John?
22     A.  Post-traumatic stress disorder --
23     Q.  And -- sorry, go ahead.
24     A.  No.  All the other features are included
25 in the description in the DSM, which include

Page 102

1  anxiety and possible depression and the other
2  things that we've spoken about today.
3      Q.  So the list that you went through with
4  Mr. McIntosh, do you relate all of that back to the
5  PTSD?
6      A.  I would.  It makes sense.  I don't see
7  any reason to not.
8      MS. WALAS:  Okay.  Those are the only
9  follow-ups that I had.
10     THE WITNESS:  Okay.
11
12          RE-EXAMINATION
13 BY MR. McINTOSH:
14     Q.  Mr. Smith, just a couple questions.
15 First of all, the affidavit that we were just
16 talking about that was sent to you by e-mail dated
17 November 5, 2019, who prepared that affidavit?
18     A.  I think Mr. Meyer did.
19     Q.  Okay.  You did not do it?
20     A.  I did not.
21     MR. McINTOSH:  I think that's all the
22 questions I have.  Thank you for your time today.
23 I appreciate it.
24     THE WITNESS:  Yeah.  Good to see you.
25     MS. WALAS:  I've got one follow-up, just to

Page 103

1  that question.
2
3          RE-EXAMINATION
4  BY MS. WALAS:
5      Q.  Did you review and sign that affidavit?
6      A.  I did.
7      Q.  And did you agree with its contents?
8      A.  I did.
9      MS. WALAS:  I have nothing further.
10     MR. McINTOSH:  Nothing.  Thank you,
11 Mr. Smith.  I appreciate your time.
12     THE WITNESS:  Not at all.  Have a good day.
13     MS. WALAS:  Thank you everyone.
14     MR. McINTOSH:  Bye.
15
16     (Whereupon, the taking of this
17      videoconference deposition was
18      concluded at 11:56 a.m.)
19
20     SIGNATURE RESERVED
21
22
23     * * * * * * * *
24
25

Page 104

1      DEPONENT'S CERTIFICATE
2  PAGE     LINE          CORRECTION
3
4
5
6
7
8
9
10
11
12
13
14     I, DAVID GREGORY SMITH, the deponent in
15 the foregoing deposition, DO HEREBY CERTIFY, that I
16 have read the foregoing -104- pages of typewritten
17 material and that the same is, with any corrections
18 thereon made in ink on the correction sheet and
19 signed by me, a full, true and correct transcript
20 of my oral deposition given at the time and place
21 hereinbefore mentioned.
22     DATED this_____day of_____, 2020.
23
24     _____
25          DAVID GREGORY SMITH

26 (Pages 101 to 104)

DAVID  GREGORY  SMITH

Page 105

```
 1              C E R T I F I C A T E
 2    STATE OF MONTANA    )
 3                        )  ss.
 4    COUNTY OF GALLATIN   )
 5          I, Marla Jeske, Court Reporter - Notary
 6    Public, CSR, in and for the County of Gallatin,
 7    State of Montana, do hereby certify:
 8          That the witness in the foregoing
 9    deposition was by me first duly sworn to testify
10    the truth, the whole truth and nothing but the
11    truth in the foregoing cause; that the deposition
12    was then taken before me at the time and place
13    herein named; that the deposition was reported by
14    me in shorthand and later transcribed into
15    typewriting under my direction, and the foregoing
16    pages contain a true record of the testimony of the
17    witness, all done to the best of my skill and
18    ability.
19          IN WITNESS WHEREOF, I have hereunto set
20    my hand and affixed my notarial seal this ____ day
21    of _____, 2020.
22    _____
23          Notary Public for the State of Montana
24          residing at: Bozeman
25          My commission expires: February 04, 2023
```

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

DAVID GREGORY SMITH

Page 106

**A**

**a.m** 1:20 20:6
  103:18
**AA** 35:20
**abbreviation**
  31:14
**abilities** 70:4
**ability** 47:4
  68:25 69:10
  70:25 71:11
  72:2 84:19
  88:17 105:18
**able** 25:10 29:19
  55:6 80:1 83:2
  83:3,16 93:15
**absence** 25:3
**Absolutely** 10:6
  11:2
**abuse** 7:18 8:16
**abusing** 66:2
**academic** 43:3
**accept** 54:20
  55:6
**acceptable**
  51:17
**accepted** 54:12
  54:19
**accident** 37:7,21
  38:10 41:16
  42:6 46:20
  48:13,17,17
  49:2,3,6,15,21
  52:8,17 53:15
  54:3 61:16
  62:13 71:2,4
  72:5 91:11,13
  92:4 93:20
  94:8,9,10,11
  94:16,24
**accompanied**
  36:16
**accurate** 11:8,15
  52:19 88:16
**act** 18:18
**acting** 73:23

**active** 62:6
**activities** 61:19
  61:22 62:5
**actual** 23:16
**acutely** 60:15
**add** 16:15
  101:18
**added** 34:6,6
**addiction** 32:8
  32:25
**adding** 66:21
**additional** 6:7
  11:21 15:4,7
**address** 4:14,20
  4:21,22 17:8
  27:5,6,6,9
  47:10
**addressing**
  58:11 77:18
  82:22
**adds** 26:4
**adjust** 47:5
**adjustment** 47:4
**administrative**
  28:7
**admit** 55:2,3
**admitted** 91:3
**advance** 5:6
  9:23
**affect** 70:12
**affidavit** 18:17
  20:10 90:20
  91:2 100:18,20
  102:15,17
  103:5
**affixed** 105:20
**agent** 25:11
**ago** 6:6 9:3
  13:21 56:4
  69:17 90:8
**agree** 11:3 60:3
  60:6 62:8,11
  69:9 72:19
  103:7
**agreed** 76:12
  77:9 81:23

**agreement**
  79:23 81:6
**ahead** 31:17
  32:3 51:2 55:1
  58:25 72:16
  85:10 100:25
  101:23
**air** 82:20
**aligned** 64:5
**alleged** 97:19
**allergies** 73:22
**alleviate** 55:9
**alleviating** 47:6
**allowed** 79:24
**Amanda** 65:5
**American** 30:1
**amount** 9:8,8,10
  9:13
**angry** 84:11
**answer** 10:4
  11:3 28:12
  48:5 67:1
**answering** 9:25
**anticipated**
  75:20
**anxieties** 47:11
  70:17
**anxiety** 35:7
  45:17 47:6
  48:24 55:10,15
  59:7,24 60:4
  60:10,13,15,19
  60:22,24 62:4
  64:14 65:21,23
  67:20 84:10
  85:14 86:15
  93:3 94:2 98:3
  98:5 102:1
**anybody** 69:13
**anymore** 81:23
**apart** 62:17
**apologies** 18:19
  71:23 95:17
**apologize** 5:6
  9:23 60:16
  64:8 68:14

  73:23 75:3
  86:20 89:9
  96:4
**apparently**
  38:14 70:21
**appear** 5:12
  79:15
**APPEARAN...**
  2:1
**appearing** 1:16
  2:2,8
**apply** 31:25
**appreciate** 31:3
  102:23 103:11
**area** 93:21
**arrived** 26:13
**articulate** 44:7
  44:21 45:5
**Arts** 26:1 31:7
**asked** 5:20
  13:21 37:2
  44:6 48:18
  66:8 74:25
  75:4,6,10 77:8
  78:6,9,20 79:1
  79:5,8 81:18
  81:22 87:5
  91:23 99:21
**asking** 20:14
  53:10,24,25
  54:1 64:24
  78:11 79:15
**assigned** 24:21
**assist** 66:4 75:11
  78:20 79:1,5,8
  81:19,22 91:23
**assistant** 12:13
  15:4 19:23
**assisting** 28:6
  79:19
**associated** 27:3
  85:18
**association** 30:2
  47:22
**assume** 44:23
  84:25 87:4

  88:6,15 90:10
  96:24,24
**assumed** 22:16
**assuming** 16:23
  51:22
**assumption**
  64:22
**attached** 6:8
  12:22 90:20
**attachment**
  15:20
**attempted** 37:12
**attorney** 2:2,8
  21:22
**attorneys** 8:3,13
**August** 1:19
  13:4,4 15:5
  67:23 68:16
  73:25,25 74:8
  74:12
**availability**
  20:14
**available** 8:15
  78:9
**Avenue** 1:18
  2:11 4:15
**avoidance** 40:15
**aware** 5:8 29:5
  35:24 40:20
  41:22,23 42:23
**awareness** 26:20
  27:4,4

**B**

**babies** 13:19
  76:25
**bachelor's** 26:3
**back** 25:8 27:16
  27:18,22,25
  35:14 41:13,14
  41:18 42:4
  48:3,4,9 49:4
  52:23 56:7,23
  62:6 75:14
  76:5 80:18
  83:17 95:3,6,9

95:22 96:2,7
97:9 102:4
**backed** 59:6
**background**
23:18 37:2
42:19 54:23
63:4
**backgrounds**
90:22
**backup** 7:14
**bad** 59:19
**balance** 76:20
**balancing** 76:20
**bar** 43:6,10
**bark** 5:6
**base** 101:13
**based** 22:24
26:16 37:12
71:19
**baseline** 36:14
42:20 43:24
44:1,3 45:8,10
**basic** 85:24
**basically** 13:17
53:13 65:14
**basis** 64:3 67:9
88:1
**Bates** 15:6,7
**began** 59:4
**beginning** 1:20
27:7 30:22
67:12
**BEHALF** 2:2,8
**behavior** 41:25
93:10 98:24
99:1
**Behavioral**
33:21
**belief** 92:4
**beliefs** 53:3
**believe** 11:7
18:10 19:21
22:5 26:17
33:5 34:13,15
35:13 37:25
41:1,10,20

42:13 43:11,20
45:5 50:2 59:8
59:12 62:10
63:19 64:4,4
66:13 67:17
68:5 79:16
80:12,24 87:15
88:11,14 89:4
92:5 93:1,4
99:4
**believed** 49:25
54:10
**believes** 87:12
**best** 34:19 87:24
88:17 105:17
**better** 13:18
97:2,15
**big** 1:8 2:9 27:24
85:4,5
**biking** 61:23
**bindings** 50:1
**bit** 5:15 10:21
16:18 21:2
23:17,18 53:25
64:25 84:6
**black** 67:18 83:1
83:25 84:15
86:9
**black-and-wh...**
67:14 83:2
84:21,22
**blacked** 86:17
86:21
**board** 33:20,21
33:24
**bodies** 46:7
**body** 16:8 26:18
26:19 94:4
**bono** 81:25 82:4
82:6,12
**born** 75:18
**bothersome**
71:16
**bottom** 15:10
**bought** 35:1
**bounds** 37:23

**Box** 2:5,12
**Bozeman** 1:18
2:6,12 4:15
8:22 34:21,25
105:24
**brain** 26:18 37:8
40:19 47:14
51:4 52:10
57:13,14 68:21
68:21 69:2,3,4
**brain's** 68:24
**break** 16:18
56:5 68:8,12
**breathing** 47:7
75:22
**Breean** 2:4 3:4
14:9 16:12
19:25 99:13
**breean@wala...**
2:6
**Bridges** 23:20
**brief** 56:20 90:2
97:12
**briefly** 25:1
**bring** 60:25
**broad** 32:21
**broke** 64:8
94:18
**bunch** 19:3
**burden** 80:1
**business** 4:21
81:16
**Butte** 1:3 5:9,11
27:23 34:24,25
**Bye** 103:14

---
**C**
---
**C** 105:1,1
**California** 8:20
**call** 28:24 29:4
83:16
**called** 4:7 29:25
77:5 96:7
**calming** 76:7
**canceled** 46:18
46:19 78:18

**care** 27:25 53:16
69:25 77:1,1,4
**careful** 42:25
**Carroll** 23:24,25
24:9,22
**case** 5:8 6:5 7:18
8:3,16,17 9:5,7
11:13,16,17,18
13:23 14:18
26:6 78:12
**cash** 76:13
**cat** 50:9
**category** 32:6
**Cathedral** 24:21
**Catholic** 8:18
24:16,20 28:13
28:19 29:6
**cause** 1:7 62:12
84:20 92:13,18
105:11
**caused** 60:2
62:15 64:16
94:10 98:3,8
**causes** 67:19
85:13
**causing** 62:19
62:23 63:2,7
63:10 66:11,13
67:19
**cautious** 40:18
**centered** 26:14
76:17
**certain** 9:23
38:3 54:7
63:16 81:2
87:5
**certainly** 63:17
84:23
**CERTIFICA...**
104:1
**certification**
33:25 34:4
**certified** 33:20
**certify** 104:15
105:7
**cetera** 85:14

**change** 17:8
43:20 47:4,5
68:25 69:25
82:25 87:7
**changed** 54:4
82:12
**changes** 68:21
**characteristics**
42:12,15
**characterize**
30:10
**charge** 29:1,2
81:23
**charging** 80:5
**check** 10:17
57:12,14 92:1
92:8
**checking** 42:25
**child** 77:1,2
**children** 63:2
77:4
**choice** 50:18
51:7,10
**chose** 63:17
72:20
**chosen** 63:20
72:22
**chronic** 94:1
**church** 24:20
28:6,13,19,19
28:20,20,25
**Civil** 1:21
**claim** 35:2
**claims** 53:5
**clarify** 62:1
**clean** 10:11
**clear** 11:14,20
19:19 20:3
32:10 49:24
55:11 80:3
**click** 20:6 96:19
**clicked** 96:8
**client** 7:21 8:9
22:24 26:24
33:5 42:21
43:6 44:3 54:6

82:6 87:22
92:10,16
101:13
**client's** 49:7,9
**clients** 39:10
64:15,19,21,22
65:1 81:11
82:4
**climate** 69:25
**climbing** 61:23
**climbs** 41:9
**clinical** 32:20
33:1 72:9
**clinically** 58:7
**clock** 34:7
**close** 52:4
**closing** 76:15
**cognition** 38:13
44:8 70:18
**collected** 80:7
**collections**
81:12
**college** 23:24
24:1,9,23
43:16,19 44:5
**color** 83:25
**colors** 84:17
**coma** 38:2
**come** 47:8 48:22
67:17 77:8
83:17 97:8
**comes** 16:10
33:22 47:21
52:23
**comfortable**
5:17 51:25
66:14 83:3
**coming** 18:24
30:5
**commentary**
20:21 21:19
**commission**
105:25
**common** 61:7
63:6 85:11
101:12

**communicate**
13:15 65:21
**communication**
13:11 85:19
**communicatio...**
21:21,25 22:2
24:7 83:7
**company's** 7:11
**compensated**
64:7,11
**complete** 18:3
**completed** 37:4
**completely** 53:9
69:13 84:19
**computer** 18:18
19:8
**concentrate**
49:1
**concentrated**
49:2 70:7
**concentrating**
55:9 58:10
61:3
**concept** 67:13
**concerning**
18:17
**concerns** 53:17
92:13,19
**concise** 55:12
**conclude** 40:8
**concluded** 40:24
103:18
**conclusion**
40:11,12 42:10
**condition** 51:14
77:11 93:24
**conditions** 29:21
50:15
**conduct** 5:20
**confirm** 100:11
**conflict** 65:22
**confused** 34:18
74:9
**connect** 97:2
**Connie** 88:24
89:5,8

**considerations**
68:6
**considering**
82:6
**consistent** 23:11
41:24 42:5
44:17 52:25
55:15 56:1,2
61:21,24
**constantly** 75:24
**constrained**
7:11
**consume** 27:12
**contact** 8:8
**contain** 105:16
**contained** 11:17
88:16
**contents** 103:7
**continue** 24:24
88:3
**continued** 52:24
**continuing**
24:13 42:3
**contributing**
73:18
**conversation**
13:18 49:20
83:10
**convince** 92:10
92:17
**coordinate**
20:17
**copy** 12:1 19:2,3
100:21
**correct** 13:24
23:8,9 28:4
29:7,15 30:8
30:17 32:16
35:11 36:14
38:20 39:24
42:9 44:25
46:16,18 48:14
53:17 56:7
62:9,13,16,20
62:21 63:2,8
63:11 64:3

71:25 72:24
73:8,12 74:23
75:1 78:8,13
79:3,6,10 80:6
80:11,15 81:1
81:20,21,24,25
82:3 84:17
85:16,17 86:2
88:17 90:7,16
90:24 93:13
95:15 98:3,16
104:19
**correction** 104:2
104:18
**corrections**
104:17
**corroborated**
23:9 65:11
**couch** 5:4
**counseled** 35:16
78:12,21
**counseling** 7:3,4
16:25 17:4
18:7,8 23:13
25:7,15,17,18
25:20,21,22
29:24 31:15
32:6,7,8 35:5,8
35:10 36:17
57:3 85:15
86:8,25 88:12
**counselor** 30:11
30:12 31:22
32:20,24,25
33:1
**counselors**
32:23
**counting** 82:18
**country** 41:13
41:15,18 42:4
**County** 105:4,6
**couple** 14:18
88:19 102:14
**course** 9:21
10:11 29:5
48:5 89:20

**court** 1:1,22
8:25 9:1,20
10:12 30:23
95:2,7,21,24
96:5,9 100:19
105:5
**COVID** 5:14
**created** 71:14
**creating** 86:13
**criminal** 30:14
**criteria** 30:1
37:13
**crop** 47:19
**Crowley** 1:17
2:11
**CSR** 1:22 105:6
**cured** 69:13
**curiosity** 69:7
**current** 51:20
51:20 55:13
64:7,11 65:4
69:24 82:22
101:20
**curriculum** 26:5
**cycle** 27:3,7

---

**D**

**D** 3:1
**danger** 40:20,21
41:5,6,6
**dangerous** 61:5
61:10,12,25
62:2,3
**date** 100:2
**dated** 90:15
99:24 102:16
104:22
**dates** 34:18
**David** 1:12,15
3:2 4:6,13
104:14,25
**day** 1:19 51:8
54:22 61:13,13
61:13 79:23
89:14,16
103:12 104:22

105:20
de-stress 76:8
deal 13:18 69:15
  77:16
dealing 38:4
  77:1,6 83:15
  85:10,15,19
  86:1,4 87:21
dealt 44:15
decades 66:6
December 35:25
  38:16,23 39:2
  39:5,15,18
  41:19 42:16
  44:24 58:3,14
  58:18 60:2,12
  70:4,11,25
  72:1 73:7
  84:24 87:3
  98:12,15
decided 18:18
  51:18
decisions 63:15
deep 47:6
Defendant 1:9
  1:16 2:9
defense 57:12
define 85:23
degree 24:5,6
  25:17,24 31:10
  31:11 33:4
degrees 24:17
deliver 17:25
delusional 55:23
  55:23,25 92:21
depended 64:16
depends 42:8
deponent
  104:14
DEPONENT'S
  104:1
deposed 8:12
  10:15 42:24
deposition 1:11
  1:15 3:5 5:20
  5:24 6:19 7:15

7:23 8:25 9:2
  9:18 10:16
  11:12 13:6,22
  14:7 18:3 20:6
  20:15 21:8
  103:17 104:15
  104:20 105:9
  105:11,13
depositions
  22:21
depression 25:4
  25:12 35:7
  37:10 38:23,24
  45:17 70:16,17
  93:4 94:2 98:9
  98:11 102:1
described 39:17
  45:6 73:11
describing
  73:10
description
  101:25
designation 32:9
desire 63:25
destruction
  69:23
detail 7:14 59:2
details 37:18
  38:9 49:1,17
  49:20,21 52:24
  59:1,14 63:16
  65:11,18 76:3
  91:11,13
determine 42:19
  42:19 94:10
dgsma@outlo...
  90:11
diagnose 29:18
  29:21 30:4,4
diagnosed 27:19
diagnoses 23:3
  97:24
diagnosis 13:25
  14:4 29:20,23
  30:3 101:13,19
  101:20

Diagnostic
  29:25
diagnosticians
  43:1
diagnostics
  11:13 13:24
  14:2
dictate 88:18
dictating 17:14
died 27:20
difference 28:14
differences 63:3
  63:4
different 30:16
  53:12 54:1
  63:20,21 64:25
  67:7 84:14
differently
  55:22
difficult 55:18
difficulties
  70:18 95:19
difficulty 13:12
  16:1 37:8 70:5
  71:14 72:4
Diocese 8:18
  25:7 29:6
direction 28:9
  105:15
directly 69:8
disadvantaged
  100:5
disagree 87:14
disappointment
  83:17
discomfort
  86:15
disconnect 97:1
discrepancies
  65:14
discuss 13:6,8
  14:20 36:25
  46:25 48:16
  50:17 51:21
  70:3 75:16
  76:5 79:20

84:9
discussed 14:21
  37:6 41:11
  45:15 47:2
  48:13 50:20
  54:8 60:24
  61:6 68:1,16
  68:23 69:17
  70:16 79:21
  80:16 86:24
  88:7,13 101:7
discussing 43:5
  45:14 46:10
  48:2 59:23
  85:7
discussion 21:20
  51:1,6 66:1
  68:19
discussions
  54:14
disease 5:14,19
disorder 14:1
  37:14 44:16,18
  101:22
dissociation
  37:10 39:5
dissociative 39:6
distress 84:20
  85:14
DISTRICT 1:1
  1:2
DIVISION 1:3
doctor 29:15
  94:5 97:24
doctors 36:23
  52:11
document 12:6
documents 15:6
  17:3 18:8
dog 5:3
dogs 4:24 60:16
doing 5:15 16:2
  25:15 51:25
  66:25 67:9
  70:5 73:14
  81:15 85:23

double 24:7
doubt 83:3
Dr 3:6
driver's 33:18
drives 73:1
DSM 13:25
  29:25 101:25
DSM-5 30:3
duly 4:7 105:9
duty 66:3

——— E ———
E 3:1 105:1,1
e-mail 12:12
  15:3 16:8,23
  18:24 19:1,10
  20:4 31:18
  90:10,11,14,19
  91:20 99:22,24
  100:7,16,22
  102:16
e-mailed 14:13
  15:15
e-mailing 12:8
e-mails 14:14,19
  18:11,12 19:20
  19:21,23,25
  89:19 90:5,6,9
  91:25 100:8,12
  100:15 101:1
earlier 26:6
  68:24 100:6,8
early 50:15
easiest 28:16
easily 93:16
easing 79:25
easy 41:4
educated 43:8
education 24:14
  44:6 85:25
effects 38:4
efficient 71:3
Eggert 65:5,8,16
  65:24
Eggert's 66:2
either 5:23 6:3

8:25 16:14
20:10 22:3
27:5 32:24
52:1 101:6
**electronic** 17:14
**else's** 55:19
66:21
**emotional** 13:12
53:21 61:3,4
70:8 77:19
84:9,9
**emotionally**
48:23 59:5,9
62:2
**emotions** 26:17
83:5
**employees** 64:13
**employers** 40:6
**encouraged**
62:4
**ended** 16:2
**energy** 27:11
**engage** 61:18
**engaged** 80:2
**engages** 61:22
**English** 31:13
**enjoyed** 62:5
**entirely** 49:19
67:6
**environmental**
69:22,24
**Episcopal** 28:6
28:19 29:3
**episodes** 52:23
**equivalent**
32:21
**erroneous** 89:2
**error** 6:10 88:25
**errors** 10:17
88:19
**especially** 9:21
68:22 84:7
**Esq** 2:4,10 3:3,4
**estimate** 34:20
**et** 85:14
**European** 31:11

**evangelical**
28:22
**event** 40:16 41:7
42:22 59:3
**events** 65:14
91:15
**everybody** 30:5
57:19
**evidence** 58:12
87:8
**exacerbate** 94:1
**exacerbated**
60:14 77:13
87:7,9,13,17
87:18
**exactly** 10:9
53:10,16
**exam** 33:12
43:10
**examination**
1:11,15 3:2
4:10 99:19
**examined** 4:8
**example** 15:11
22:20 33:25
40:1 43:2,10
47:17 61:22
62:15 64:1
72:22 93:24
94:2,6 95:12
98:18
**examples** 47:24
**excuse** 33:23
42:10 46:21
73:22 75:3
79:17 82:24
**exercise** 66:18
**exercises** 76:7
**exhibit** 3:6 6:11
6:18,20,24 7:2
7:13 11:17,24
16:15,16 56:9
88:16 101:1
**exhibits** 3:5 6:6
14:24
**existed** 87:2

**expect** 80:18
**expectations**
84:2,3,5
**expected** 26:24
**expenditures**
76:25
**expense** 34:6
**expenses** 81:13
**expensive** 77:24
**experience**
26:17 27:1
49:2 53:21,22
**experiences**
72:19
**experiencing**
38:10 55:14
65:22,24 73:19
98:6
**expert** 100:18
**expertise** 93:21
**expires** 105:25
**explain** 26:24
**explained** 37:7
**explaining** 41:4
**explicitly** 64:23
**explore** 45:18
56:2 85:13
**explored** 47:3
52:9
**exploring** 82:24
**express** 63:24
**expressed** 60:19
**extra** 40:18
**extreme** 93:11

------

**F**

**F** 105:1
**face-to-face**
33:5
**facilitate** 13:17
**facing** 63:14
**fact** 62:4 63:1
75:18 94:8
97:23
**factually** 53:17
**failed** 43:10

**failure** 83:18
**false** 23:8 91:4
94:25 95:14
97:20
**familiar** 10:21
41:21 73:21
92:6
**family** 32:7,24
39:21 66:2,10
75:20 76:18,23
83:8
**fast** 50:6 59:15
76:16
**father** 39:25
46:20 76:19
83:14 86:6
**fault** 54:9,10
55:2,6,19,19
**favor** 82:15,16
**fear** 47:2,19
**feared** 59:5
**features** 101:24
**February**
105:25
**Federal** 1:21
**feel** 45:10 51:25
58:9 60:14
66:14 73:4,14
**feeling** 13:13,13
26:21 27:5,5,6
27:7,9 49:3,4
61:16 73:11,17
73:21 75:18
84:10 96:9
**feelings** 26:21
94:1
**feels** 62:24 71:3
71:15 92:16
**fees** 9:9
**feet** 25:6
**fell** 35:1 62:17
**felt** 25:11 37:23
60:22 66:3
72:18
**fidgeting** 48:24
**field** 63:22 64:2

72:20,23
**fight** 68:22
**figure** 14:25
20:1 74:11
91:9
**file** 7:20,25,25
17:15,18 34:17
**files** 17:13
**filled** 17:5 37:5
**finances** 63:10
63:13
**financial** 13:20
60:22 63:13
68:2,6 73:1,4
73:19 79:25
80:20 81:14
**find** 12:5 17:16
17:20 43:5,14
55:17 57:17
63:5 76:6
98:22
**finds** 51:16
**fine** 16:9 21:10
34:20 97:4,16
101:9
**finish** 10:8,10
**firm** 2:5 64:19
64:23 65:2
**first** 4:7 9:19
14:12 16:17
35:12,16 36:2
37:16 40:8
44:1 45:2,22
70:13 78:6
79:18 82:9
93:13 102:15
105:9
**five** 56:6,12
78:24,25 79:9
89:11
**Fleck** 1:18 2:11
**flight** 68:23
**flip** 50:12
**focus** 87:20
**folks** 46:8
**follow** 22:8

DAVID GREGORY SMITH

**follow-up** 99:15
102:25
**follow-ups**
102:9
**followed** 77:21
77:23
**following** 4:1
101:12
**follows** 4:8
**food** 27:11,12,12
**football** 59:19
**forego** 79:24
**foregoing**
104:15,16
105:8,11,15
**forgot** 74:4
**form** 17:3,5,10
17:19 18:6
29:24 37:4
99:6
**former** 7:21 8:8
21:22 25:14
27:23
**forward** 5:11
11:19 12:1
18:18 21:13,15
38:7 56:15
89:18,24 99:24
**forwarded**
19:22,24 89:19
90:6 100:8
101:1
**forwarding**
91:19
**found** 44:17
56:2
**four** 14:16 78:24
90:23
**free** 89:14
**freely** 46:3
**freeze** 68:23
95:17
**freezing** 96:11
**Freud** 26:14
**Friday** 90:15
**friend** 25:5

35:20
**friends** 40:4
**front** 7:20 8:1
92:23
**frustrated** 71:3
84:10
**frustrations**
76:2
**full** 38:11 68:18
74:4 104:19
**further** 24:17
45:18 49:13
50:25 103:9
**future** 26:23

--- **G** ---

**G.Smith** 15:11
15:14
**G.Smith012**
6:17
**G.Smith014**
6:18
**Gallatin** 105:4,6
**gathering** 14:17
**generally** 28:17
28:22 29:3
38:5 42:8,21
45:21 77:11
85:12
**Gestalt** 26:8,9
26:11
**getting** 12:19
48:3 59:5 62:6
**give** 11:8 13:15
19:10 29:19
34:19 37:2
56:12 66:15
89:10 96:15
**given** 14:5
104:20
**giving** 66:14
83:8
**go** 9:17 11:24
15:25 16:13
17:24 24:19
26:23 27:10

31:17 32:3
38:5 45:11
46:19 51:2
55:1 58:24
72:16 76:5
85:10 89:11,16
93:12 100:25
101:23
**goes** 5:11 16:23
40:20
**going** 6:16 9:24
10:9 12:10
19:5 20:2 26:7
35:13 56:5,7
89:15 99:14
**good** 7:9 10:11
19:14 25:8
30:6 38:17
60:5 69:12
99:16 102:24
103:12
**grades** 43:16,19
44:5
**graduate** 23:25
33:4
**graduated** 23:21
23:23
**graduating** 24:8
**Grammar** 71:23
**gray** 84:17
**great** 25:13
94:21
**Greek** 28:20
**Greg** 16:2
**Gregory** 1:12,15
3:2,6 4:6,13
104:14,25
**grew** 23:20
**ground** 63:6
75:23 83:20
**group** 33:25
**grow** 23:19
68:25
**guess** 5:16 14:9
28:16 34:11
41:3 43:13,15

64:24 69:22
78:25 82:11
96:21

--- **H** ---

**half** 36:3
**hand** 65:20
105:20
**handed** 56:3
**hang** 18:23
96:19,25
**happened** 9:5
26:25 37:21
49:6 52:16,18
65:8 92:4,17
**happening**
18:21,23 26:24
57:15 76:24
83:15
**happens** 82:7
94:14
**hard** 46:8 48:21
100:6
**Harnden** 35:23
**hate** 46:5 60:16
**head** 29:2
**heal** 68:25
**healing** 55:5
**health** 25:17
31:22 32:7
33:21 76:10
93:2,13,18
94:3,3
**hear** 95:1,2
96:22
**heard** 63:24
96:3,21
**Helena** 8:17
23:24 24:22
25:2 29:6
**helmet** 50:18,24
51:8,19
**help** 13:18 19:1
19:9 27:24
28:8 38:12
46:19 55:4,5

61:14 66:3
73:13,17 74:10
75:1,4 77:6,17
78:6 96:7,13
**helped** 13:17
**helpful** 51:9
55:3
**helping** 55:9
65:20 66:19
75:23 81:16
83:6,7,20
**helps** 44:2
**hereinbefore**
104:21
**hereunto** 105:19
**hesitate** 69:12
**high** 23:21,23
44:5
**high-risk** 61:19
**historical** 63:4
**history** 58:11
**hits** 81:14
**HIV** 27:19
**Hold** 19:6 35:13
97:9
**home** 4:20,22
17:22 27:20
84:8
**homeless** 47:3
47:19
**homelessness**
48:9
**honest** 25:10
**hope** 80:23
**hoping** 82:14
**hospitalized**
38:2
**hour** 1:20
**hours** 33:5,6
**house** 27:24
35:1
**hundreds** 44:15
**hung** 96:7
**hunger** 27:8,8
**hurt** 72:13 94:7
94:8

DAVID GREGORY SMITH

Page 112

**husband** 4:24
76:18 83:14
86:6
**hyperventilati...**
55:16
**hypervigilance**
40:17 41:3
42:5 70:18
98:14
**hypervigilant**
41:1,25 93:5
98:15
**hypothalamic**
40:19,22 68:22

**I**

**Ian** 2:10 3:3
15:23 56:15
64:8 89:18
100:25
**idea** 23:7
**ideation** 37:11
39:15
**identification**
6:21
**identity** 83:11
83:13,14
**illness** 94:1
**illnesses** 93:25
**imcintosh@cr...**
2:13
**immune** 5:14,19
**immunocomp...**
21:8
**impact** 70:25
97:19
**impacted** 92:25
94:23 95:13
**impair** 72:2
**impaired** 71:11
71:15 79:16
**impairment**
71:20
**impairs** 72:6
**impatient** 71:3
**imply** 93:7

**important** 8:10
9:22 43:2,23
49:5 60:24
84:2 88:12
91:6,14,16
**impression**
76:21
**impulse** 66:9
**in-person** 21:8
**inability** 52:7
69:25
**inbox** 19:18
**incapacitated**
38:1
**incident** 43:25
44:24 52:19
55:6,18 59:4
92:12,18 99:2
**include** 12:16
18:13 101:25
**included** 20:21
101:24
**including** 35:8
**incorrectly** 26:8
91:12
**increasing** 57:22
**independently**
36:19
**indicate** 48:12
**individual** 28:25
55:21
**individually**
20:2
**inept** 84:19
**influenced** 53:1
54:4 67:13
**information**
8:14 17:7
22:19,24 23:1
23:4,10 37:3
38:20 51:10
92:7
**initials** 30:16
31:4,8,21
32:16
**injured** 35:25

37:25
**injuries** 70:11
70:24 71:11
72:1
**injury** 37:8,19
52:10
**ink** 104:18
**insomnia** 37:9
38:16 70:16,17
93:9,10
**installment** 81:5
**instance** 1:16
43:18 66:24
87:10
**insurance** 7:11
76:10,11 77:25
101:18
**intact** 44:12
**intake** 17:5,10
17:18,19 18:6
37:3 93:6 99:6
**intelligence**
44:11
**intelligent** 44:22
45:5
**intense** 68:13
**intensive** 77:15
**interest** 80:20
**interested** 25:15
27:1 55:10,12
79:14 81:16
**interfere** 66:9
**internet** 94:21
**interrupt** 10:1
**intertwined**
94:3
**interview** 22:25
101:14
**intrusive** 47:8
47:13,15,21,24
48:4,7
**intuition** 44:14
**investigate**
49:12
**investigation**
45:11

**involve** 61:15
**involved** 8:3
61:16 76:7
**involvement**
29:12
**involving** 8:17
8:19 69:8
**irrational** 47:2
**irritable** 93:10
98:24 99:1
**issue** 31:15
73:24
**issues** 13:20
25:4 35:8
38:14 44:12
68:9 69:7,24
77:18,19,20
79:14 82:21
85:16 86:16
87:1,16 97:18
97:25
**Italy** 24:11

**J**

**Jen** 12:13
**Jennifer** 89:19
**Jennifer's** 18:24
**Jeske** 1:22 105:5
**job** 25:6 63:7,18
63:20,21 64:1
64:7,11 70:4
70:25 71:12,20
71:21
**jobs** 24:25 31:18
**John** 1:5 2:3 3:7
19:24 66:3
83:19 84:6
90:10 101:21
**John's** 13:12
**joint** 13:10
19:21
**jrockman** 19:11
**judgment** 80:10
80:14,25 82:15
**July** 13:3,3,3,3,4
15:5 57:3

58:20 59:20
65:5,25 74:3
77:5
**July's** 11:18
**jump** 50:9
**June** 6:25 11:24
12:25 35:12
37:1,16 40:9
45:14 46:16,22
49:15 52:2
59:14 70:14
78:18
**Jung** 26:14
**justice** 60:23
67:14 70:1

**K**

**kicked** 96:23
**kind** 17:13 21:6
26:4,12,19
40:18 47:8
48:21 54:22
55:3 57:14
60:23 61:11
62:18 69:2
77:13
**knee** 59:19 94:7
94:10
**knew** 43:5
**know** 7:23 8:12
8:13 9:6,7,10
9:13,25 10:3,3
10:9,25 12:20
14:8 15:8
18:23 20:5,6
20:10 28:12
35:15,18 36:11
38:15,22 39:1
39:4,8,11,14
39:17 42:17
43:13,24,25
44:1 51:24
52:15,18,25
54:2 58:2
61:20 63:16
64:13 65:3

72:3,4,5,12
77:25 78:4,5
84:25 87:4
89:3 92:8 93:9
94:16,24 95:14
96:11 97:20
98:5,11,15,25
101:6
**knowing** 43:19
45:7 64:15
77:2
**knowledge** 15:8
44:8,11

**L**

**labeled** 6:17
**lack** 64:15
**Lady** 25:1
**law** 2:5 64:19,23
65:2 72:20,23
**lawsuit** 6:3
42:24 60:20
61:1 75:1,5,11
78:7,21 79:1,5
79:9,19,24
80:9,20,22
81:19,23 88:4
88:8 91:23
**lawsuits** 29:6,10
**lawyer** 43:6
71:12 72:2,6
**lawyers** 61:2
**LCPC** 32:16
33:15 34:9
**LCPCs** 34:1
**lead** 77:3
**learning** 77:1
84:6
**leave** 25:3 97:8
**leaving** 52:11
67:17
**led** 42:13
**left** 31:25 51:4
**legal** 63:22 64:2
**let's** 8:7 16:10
23:17 35:9,9

56:5 65:15
75:14 96:24,24
97:10,17
**letting** 76:1
**LGBTQ** 25:23
35:8
**license** 32:4 33:9
33:15,18,22
34:11,16
**licensed** 31:22
32:20,24,25
**licentiate** 31:13
**life** 34:7 38:11
62:6,7,12 66:8
66:9,22 76:15
84:7,8
**light** 41:16
**likelihood** 69:12
**LINE** 104:2
**lines** 20:11
**link** 14:22 20:7
96:8,19 97:1
**list** 30:16 31:4,8
31:19 85:2,4
86:13 102:3
**listed** 31:20
32:15
**listen** 13:16 67:1
**little** 16:18 21:2
23:17,18 26:13
34:18 53:24,25
64:24 90:25
**live** 66:8
**lived** 34:24
**lives** 69:16
**living** 93:25
**LMHC** 31:21
32:10
**located** 4:17
**logistical** 21:17
**logistics** 20:5
**long** 24:24 34:9
85:2 99:15
**longer** 25:9
31:24 71:1
**look** 6:9 8:4

14:22 16:17
21:7 33:7
42:18 43:3
57:13 58:7,12
59:2 60:5 72:9
100:1
**looking** 41:6
74:3,10 83:12
**looks** 6:8,25
78:23 88:20
**lose** 52:22 57:10
**losing** 40:15
42:14 70:19
77:10
**lost** 34:17
**lot** 7:7 26:19
37:18 38:8
40:20 47:5
61:7 68:19
69:5 75:19
83:11 84:1
94:4
**love** 35:1
**loving** 85:22
**luck** 99:16
**lump** 80:18 81:4
**Lutheran** 28:23

**M**

**MA** 31:5
**majored** 24:7
**making** 13:13
41:4
**man** 60:17
**manage** 84:2
**manageable**
62:24,25
**Managing** 86:15
86:15
**manifested** 62:3
**manner** 69:16
**manually** 19:6
**March** 74:1,18
74:19,25 75:2
75:4,16 78:7
80:4

**mark** 6:16 16:14
**marked** 6:21
37:22,24
**Marla** 1:21 95:1
95:5,19 96:6
105:5
**marriage** 32:24
75:19 77:7
85:16
**Master** 26:1
31:7
**master's** 26:4
31:5,6,12
**match** 52:24
**material** 104:17
**materially** 71:11
72:2
**matter** 43:9
60:23
**McIntosh** 2:10
3:3 4:11 6:22
15:24 16:4,9
16:12,20,21
56:17,19,22
89:20,23 90:1
90:4 95:1,4,11
95:18,22 96:6
96:15,25 97:5
97:7,10,14
99:11,16 101:3
101:9 102:4,13
102:21 103:10
103:14
**Meagher** 4:15
**mean** 15:8 21:4
21:6,16,17
22:9 24:12
26:21 29:22
31:5 43:23
44:20,23 47:12
52:12,17 54:1
57:9 61:9
69:21 72:8
76:14 83:23
84:18 85:22
91:10 93:7

**means** 19:4
28:18
**measure** 36:14
**mechanism**
57:12
**medical** 22:21
23:2,3 29:15
29:21 42:25
52:11 94:5
98:20
**medication**
45:17,20,21,24
46:1,5,11
**medications**
17:7 29:20
**meditation** 47:7
75:22
**meet** 5:23 14:6
46:15
**meeting** 13:5,8
13:10 37:5
46:18 47:1
59:23 68:1
74:4,6,6 82:22
87:25
**meetings** 82:22
**member** 66:1,10
**members** 39:21
**memories** 48:13
48:17
**memory** 7:9
49:15 52:19,22
53:18 58:21
**mental** 25:17
31:22 32:7
94:3
**mention** 26:7
48:11 52:5
58:8 88:24
**mentioned**
45:18 50:22
86:8 98:25
104:21
**met** 5:25 36:9,18
37:16 40:8
46:22 49:15

57:2 59:20
65:4,24 67:23
82:9 91:22
**Methodist** 28:23
**Meyer** 1:5 2:3
3:7 5:24,25 6:3
7:4 11:22 13:1
13:5,9 14:5
16:25 17:4
18:9,11,12
19:22 20:11
22:3 23:5,13
31:15 35:11,12
35:15,24 36:2
36:19,25 37:15
38:15,22 39:1
39:4,8,14,17
40:9,25 41:8
41:12 42:3,12
42:15,23 44:4
44:7,21 45:5
45:14,23 46:16
46:22,25 47:24
49:14,25 50:3
50:5,8,11,14
50:17,21 51:7
51:18 52:1,7
52:16 53:15
54:9 57:2,6
58:13,17,20
59:14,20 60:19
61:10,18 62:11
64:11,18 65:4
65:12,23 66:11
67:9,11,12,23
68:16 69:9,18
69:19 70:3,10
70:23 71:8
72:1,19 74:1
74:12,20 75:4
75:10,15,16
76:10,14 77:5
77:21 78:6,12
78:15,20 79:1
79:5,18 80:6,8
80:11,13 81:18

82:3,23 84:15
84:23 85:3,16
86:1,5,17,25
87:16,25 88:7
88:12 90:6,10
90:14,19,23
91:1,18,23
92:3,25 93:17
94:6,13,22
98:3,12 99:1
100:9 102:18
**Meyer's** 21:22
22:20 23:2
39:21 48:13,16
51:14 59:24
60:10 63:7
68:2 71:10
95:13 97:18
**middle** 88:23
**mind** 15:18
82:11
**mindfulness**
26:16 75:23
**ministers** 28:21
**minorities** 25:23
**minute** 62:18
69:17 86:22
**minutes** 6:6
13:21 56:4,6
56:12 57:16
74:16 89:11
**misgivings** 21:9
**mispronounced**
88:20
**misread** 46:21
**missing** 46:11
85:6 86:14
**misspoke** 75:3
**mistake** 31:25
**mixed** 52:20
**mobilize** 27:10
**model** 69:1
**money** 80:7
81:17
**Montana** 1:2,19
2:6 4:15 5:9

22:12 23:20
24:20 27:16,18
27:22 32:9,12
32:19,23 33:10
33:17,22 34:13
34:14 43:6
105:2,7,23
**months** 52:4,8
52:18 68:11
78:24,25,25
79:9 80:17
83:19 90:24
94:9
**mood** 93:24
**moralize** 67:11
**moralizing**
66:23,24 67:8
**morals** 67:4
**morning** 15:1
20:17
**motion** 93:2
95:13 97:19
**mountain** 61:23
**move** 27:5,11,13
27:16,18,21,25
34:25 38:7
**moved** 25:5
27:21,23
**moving** 17:13
55:18 83:1
**MT** 2:12

———————
**N**

**N** 3:1
**Nadine** 21:23
**Nadow** 21:23
**name** 4:12 30:17
31:5,9,21
32:16
**named** 21:22
105:13
**names** 8:2
**narrative** 37:4
37:12,20 48:23
85:5
**national** 33:11

33:25 34:1
**naturally** 48:22
**navigate** 13:12
**nearly** 79:4
**necessarily** 7:11
26:25 43:22
47:22 53:4
54:20 55:10
68:17 70:8
76:3 77:20
82:18
**necessary** 34:6
37:13 43:5
58:9 98:22
101:3,6
**need** 9:10,13,19
10:7 20:7
21:14 44:1
45:10 62:1
69:20 85:12
92:16 96:14
**needed** 11:19
17:6 27:24
34:5 38:11
61:14 68:9
77:17
**needs** 37:6 53:4
73:12,17
**neither** 76:9
**nephew** 19:9
**nervousness**
48:25
**neurological**
69:3
**neuroplasticity**
68:24
**never** 9:1 14:11
36:6,9,22
39:20,25 40:3
40:6 43:13
48:2 63:24,25
64:23 71:14
87:5
**new** 12:8 13:19
15:14 16:15
17:7 56:8,8

77:9 83:13,14
92:7
**nightmare**
34:17
**nine** 78:13,17
79:6 82:9
**noise** 60:16
**nonprofits**
73:21
**Nope** 11:10 30:9
**normal** 44:9
48:3,5,9 58:5
93:11
**normalizing**
62:6
**notarial** 105:20
**Notary** 1:22
105:5,23
**note** 88:22 93:6
**noted** 52:14,14
61:4 93:6
**notes** 3:6 6:5,7,7
6:25 7:1,3,3,12
11:13,16,17,18
11:21,23,24
12:2,8,16 13:2
13:23 14:18,18
15:5 16:1,7,15
16:24 17:3,14
18:7 20:19,19
20:22,24 23:13
23:17 37:9
45:2 46:10
48:12 49:17
56:4,6,9 67:17
69:6 70:13
74:4,5 75:7
78:10 79:22
88:15,18 89:12
89:16 93:6
100:21
**notice** 27:8
55:23,25
**noticed** 7:8
48:24 52:10,13
77:9

DAVID GREGORY SMITH

Page 115

noticing 57:25
58:4
**November**
90:15,17,24
91:20 99:22,25
100:1,3,16,22
102:17
**number** 6:20
15:10 30:16
46:7 61:18
62:12 74:10
84:14 88:22
93:6
**numbers** 5:18
**numerous** 91:10

_____
**O**
**oath** 56:24
**observed** 40:13
**obsessive** 37:10
39:2
**obtain** 33:3
**obtains** 80:10
**obvious** 28:1,2
59:7
**obviously** 60:1
92:20
**occasional** 70:7
**occasionally**
36:16 57:15
63:9 81:14
**occupational**
77:16,19,22
78:3
**October** 5:9,12
**office** 4:25 17:12
17:21 69:2
**offices** 1:17
**oh** 6:12 8:21
14:8 26:9 68:5
74:13 86:17
100:10
**okay** 5:1,14 6:12
6:16 9:15 10:6
12:1,17,22
14:11,11 15:10

15:13,17,21
16:4,20,22
17:17,23 18:1
19:5,7,14,15
19:19 20:8,16
20:18,21,25
21:2,14,18,21
21:25 22:6,8
22:14,23 23:1
23:16 27:14
31:14 32:10,15
40:23 43:9,23
44:4,19 45:4
45:13 46:15
48:7,12 49:9
52:1,15 53:7
53:20,23 54:8
56:3,10,12,23
57:2,24 58:2
59:13 63:1,17
65:19 67:15,15
71:22 74:9,15
74:20 75:10
79:4 80:3,19
85:2 86:20
89:6,15,22,25
93:8,12 94:22
95:3,5 96:3,15
96:21 97:5,6,7
97:8,11,17,23
98:18,24 99:9
100:11,14,20
100:24 101:5
101:10,16
102:8,10,19
**oldest** 25:21
**once** 15:17 20:1
30:15 44:6
50:22 77:15,15
77:23
**ones** 19:24
**online** 8:4
**open** 15:19
45:10,16,20
75:7
**operates** 68:22

**opinion** 55:5
60:10 66:15
71:8,10,18,25
73:2 79:25
87:18 92:24
98:2,9
**opt** 34:2
**oral** 1:11,15
104:20
**ordained** 24:17
28:21
**order** 38:6,11
68:10 80:17
85:13
**orientation**
26:12,15
**originate** 26:17
**Orthodox** 28:20
28:20
**ought** 44:14
**out-of-office**
21:11,15
**outdoor** 62:5
**outdoorsman**
61:20
**outside** 63:22
**overcome** 38:12
**overexcited**
40:21
**overload** 75:21
**overwhelm** 83:5
**overwhelmed**
76:21

_____
**P**
**p.m** 90:15
**P.O** 2:5,12
**page** 3:2 6:13
9:17 15:7,14
16:7,14 104:2
**pages** 104:16
105:16
**paid** 9:11 25:7
64:2,3 80:10
80:15,21,23,24
81:1 82:9,12

82:16,17
**pain** 85:13
**painful** 57:13
**paranoia** 73:15
**pardon** 15:1
**parents** 27:20
28:1 63:5
**parishioners**
28:10
**part** 12:6 30:3
38:3 40:24
67:16 69:6
81:15 87:2
**particular** 7:25
**parts** 69:3,4
91:3
**pass** 33:13
**passing** 41:11
45:19 77:24
**passion** 72:25
73:4,7,10,17
**pastor** 25:1
27:23 28:4,14
28:15,18 29:1
**pastors** 28:17,21
28:24
**path** 69:23
**patient** 6:1 8:22
30:2 35:3
37:13 38:7
39:6 42:22
45:9 53:2
55:13 58:6
87:12,12 98:17
101:19
**patient's** 40:12
91:16
**patients** 5:16
29:18 40:17
44:16,17 45:12
45:19 53:5
55:17 57:11
61:8 68:11
76:4 82:1
85:12 92:21
101:17

**pause** 97:13
**pay** 64:14 76:12
78:1 80:17
81:11
**paycheck** 72:23
**paying** 7:10 68:7
81:19 82:2
**payment** 64:15
79:24 80:16
82:5,8
**payments** 81:5
**people** 25:10
26:20 27:4
46:4 51:17
52:20,22 53:1
54:5 55:21
64:16 66:6
69:15 81:17
82:2 84:2,3,4
**people's** 51:10
**Perfect** 89:25
**performing** 72:5
**perseveration**
47:16
**person** 5:12,21
19:8 21:9,10
26:15 28:15
29:4 41:7
51:16 91:2
**personal** 54:13
**personality** 87:2
87:6
**personally**
81:10
**persons** 25:23
**Pete** 35:23
**Ph.D** 26:2
**philosophical**
63:3 67:3
85:21
**philosophically**
64:5
**phone** 16:3
**Phyllis** 5:4
**physical** 53:22
69:4 77:19

DAVID GREGORY SMITH

93:1,13,18,25
94:2 97:19
**physically** 62:2
93:21 94:15,23
95:12
**pictures** 22:20
**place** 61:12,12
61:25 62:2,3
74:14 83:13
85:11 104:20
105:12
**places** 17:13
**Plaintiff** 1:6 2:3
**plan** 80:16 88:3
**planning** 82:19
**Plans** 62:17
**please** 4:12 10:3
10:8,10,25
12:1,20 17:20
19:10 30:24
42:2 60:8
92:15 95:23
99:5 100:2
**PLLP** 1:18 2:11
**pocket** 7:10 68:7
**point** 42:22 45:4
46:9 49:7,9
57:20 64:17
69:22 72:18
73:16 91:16
**possible** 37:7
40:21 52:9
102:1
**possibly** 58:13
61:6 79:22
**post-traumatic**
14:1 37:14
44:16 69:14
101:22
**potentially** 9:11
**practiced** 25:18
34:24
**practices** 70:9
**practicing** 31:24
34:14,21
**pre-released**

50:1
**preexisting** 87:1
87:16
**prepare** 5:24
11:11 13:22
27:11
**prepared**
102:17
**prescribe** 29:20
**present** 36:19
80:5
**present-orient...**
26:22
**presented** 87:21
87:23
**pretty** 7:9 10:22
22:7,9 25:8
36:20 73:21
83:4 85:9 99:7
**prevails** 88:9
**previous** 7:17
15:5
**previously** 6:17
43:10 65:13
**priest** 24:16,18
25:9,14 28:6,7
28:14,15 29:2
**priests** 28:17,21
**primarily** 27:3
**primary** 82:21
**principle** 67:4
**printing** 16:1,2
**prior** 37:5 38:16
38:18,23,24
39:2,5,7,18
42:15 58:13
78:11 87:2
98:19,20 99:1
**pro** 81:25 82:4,6
82:12
**probably** 7:22
14:16 26:7
27:11 28:12
30:6 42:24
54:23 89:5
**problem** 5:7

18:20 22:18
64:9 73:24
75:8 89:10
94:20
**problem-solvi...**
66:17
**problems** 18:25
30:7 81:8
96:18
**Procedure** 1:21
**proceedings** 4:1
97:13
**proceeds** 88:8
**process** 10:19
14:21 55:21
**processing** 37:8
**produce** 17:10
17:19 18:15
**produced** 11:22
16:23,24 26:6
**producing** 23:14
**profession** 25:16
53:3 101:13
**professional**
32:20 33:1
55:4 100:19
**professionals**
29:25
**progress** 13:13
16:17
**prone** 93:3
**pronounce** 26:8
**proof** 97:22
98:17
**proofed** 89:8
**properly** 37:22
**protect** 51:11,11
**provide** 45:9
78:10,11
**provided** 23:5
100:21
**providers** 42:25
**providing** 79:21
**Psychiatric** 30:1
**psychoeducati...**
68:20 85:24

**psychoeducati...**
69:6
**psychological**
29:19,23 38:13
72:7 93:24
**Psychologically**
93:2
**psychologist**
30:8 72:9
**Psychotherapist**
30:12
**PTSD** 40:9,25
40:25 42:13
69:10 92:24
102:5
**Public** 1:22
105:6,23
**pull** 35:14
**purpose** 47:4
**purposes** 101:19
**pursuant** 1:20
**pursue** 43:15
50:25 55:24
58:8
**pursued** 63:25
64:23
**push** 48:21
**put** 16:7 19:6
49:17 74:5
101:7
**puzzled** 90:25

**Q**
**qualified** 21:2
94:9
**quantify** 87:17
**question** 9:25
10:2,5,8,10,24
11:1 23:11
28:11 33:14
42:2 45:22
48:6 53:10,23
53:25 54:1
58:15 60:7
64:25 70:21
71:17 87:5

94:19 95:6,9
95:16,20 96:2
103:1
**questioned** 29:9
**questioning**
86:22
**questions** 7:15
11:4 38:13
89:13 96:17
99:5,11 102:14
102:22
**quick** 18:14 83:4
**quickly** 75:19
76:24 83:5
**quite** 34:17
**quote** 57:7 61:24

**R**
**R** 105:1
**R-O-C-K-M-...**
19:11
**raise** 63:1
**ranch-speak**
22:12
**range** 93:2
95:13 97:19
**rarely** 87:6
**RE-EXAMIN...**
102:12 103:3
**re-sending**
15:22
**re-traumatize**
38:6
**re-traumatizing**
59:3,6
**reach** 40:11
**reached** 40:12
42:9
**read** 95:5,9,22
96:2 104:16
**readily** 8:14
**real** 18:14
**realistic** 84:3
**reality** 83:21
**realize** 66:6
**really** 8:10

20:23 21:1,3
25:13 26:21
38:9 48:21
56:5 57:16
66:18 69:5,7
77:2 87:20
91:13 94:10
96:16
**reason** 5:20 11:7
23:11 30:6
40:24 56:2
80:1 81:15
86:20 87:13
90:21 102:7
**reasons** 28:1
46:7 49:11,12
**recall** 8:2 10:23
22:11 45:14
47:23 48:8,10
48:10 49:19
50:4,10 51:4,6
59:12 65:16
71:6,7 76:12
90:21 92:2
99:22
**receive** 12:12
25:24 33:2
80:13,14 81:4
**received** 23:4
28:5 72:23
**recess** 56:21
90:3
**recognized**
32:11,13 33:16
**recollection**
48:20
**recommend**
72:11,14,18
**recommendat...**
77:22
**recommendat...**
75:21
**recommended**
77:14
**reconnect** 96:13
**reconstruct** 89:1

**record** 10:11
15:25 19:19
30:14 43:3
46:10 56:7,8
56:24 60:5
101:2,8 105:16
**recorded** 70:5
71:1
**records** 22:21
98:20
**recover** 69:10
**recovering**
34:15
**rector** 29:4
**referenced** 6:23
**referred** 28:22
**referring** 14:3
**regarding** 7:3
11:21 14:23
16:24 60:11
98:14 100:17
**Regret** 54:23
**regular** 64:3
67:9 72:23
**regularly**
101:16
**reiterated** 68:8
**relate** 59:4
102:4
**related** 6:2 17:3
18:8 25:4
55:14 65:13
77:13 100:22
**relating** 23:13
**relationship**
62:22 85:22,25
**relatively** 83:14
**relaying** 65:16
**relevant** 43:7,11
43:17 49:19
51:12,13 55:7
55:8 69:5 76:6
91:7
**reluctant** 87:19
**rely** 44:13
**relying** 77:3

87:11,22
**remainder** 56:4
**remained** 56:1
**remains** 23:10
**remember** 7:24
10:22 14:17
33:11 48:19
50:23 52:3,7
52:17 60:21
64:17 65:11,18
66:15,19 69:1
76:1,3 91:21
**remembered**
1:14 48:19
**remind** 14:23
**reminding**
75:24
**remotely** 5:16
**remove** 23:12
**repeat** 42:2
92:15 94:18
95:16 100:2
**replace** 56:8
**replacement**
6:11
**reply** 12:15
21:11,15
**report** 38:24
40:13,16,17
41:8,12,17
44:3 71:13,19
87:11,22 98:17
**reported** 38:17
39:6,9,16
42:17 45:1,3
47:9 57:14,21
57:25 58:4
61:15 64:14
72:15,17 93:11
93:14 105:13
**reporter** 1:22
9:20 10:12
30:23 95:2,7
95:21,24 96:5
96:9 105:5
**reporting** 37:9

49:4 94:13
**reports** 58:6
63:9,12 71:5
**representing**
22:4 65:1
**requirements**
7:12 33:8
**RESERVED**
103:20
**resident** 8:22
**residing** 105:24
**resiliency** 83:16
**resist** 66:9
**resistant** 45:21
**resolve** 68:10
**resort** 1:8 2:9
41:13,15,18
42:4 54:11
**response** 21:11
40:19,22 61:4
61:4 68:23
**responses** 70:8
**responsibilities**
28:8
**responsibility**
54:13,19,21
66:5,20
**rest** 69:15
**restlessness**
40:14 42:14
**result** 60:11
63:14 73:3
**resume** 26:5
30:17
**retainer** 79:23
**reverse** 10:7
**review** 10:16
56:6 103:5
**reviewed** 11:13
11:16 13:23,24
13:25 22:19
98:19,19
**right** 4:17 6:4
8:1 10:13,20
10:24 17:15
18:22 26:25

27:9 28:18
30:25 31:2,21
34:1 36:4,23
41:1 51:5
53:14,18,23
56:25 57:4,7
58:22 59:21
63:18,21,23
64:24 65:6
67:5,21,24
69:11 71:7
73:5,16,19
74:2,21 75:5
77:7 78:19
79:2 80:23
81:5,18 82:2
82:10,16 84:24
85:8,20 86:6,7
86:10 90:1
91:9,14,24
92:17 94:6,17
96:25 98:9,21
99:12,17
**righty** 56:11
**risk** 61:15,17
81:15 82:13
**risks** 51:16,17
**rock** 41:8 61:23
**Rockman** 12:13
**role** 28:16
**Roman** 24:15
28:18
**Rome** 24:11
**room** 5:1 40:14
**rough** 49:20
**rules** 1:21 9:17
**run** 15:1
**Russian** 28:19

**S**

**sacred** 31:12,13
**sadness** 59:7
**Saint** 24:22
**satisfied** 27:12
37:13
**save** 73:12,13,18

saving 69:20
saw 26:5 35:12
  36:2 51:19
  65:14 67:19
  74:20,23 79:6
  81:20
saying 15:19
  40:24
says 10:13 15:11
  15:11 43:8
scan 17:24
scanning 16:3
scheduling
  20:14
school 23:21,23
  44:5
scientifically
  53:5
screen 95:17
seal 105:20
search 18:13
  19:25
searching 44:10
  70:19 77:10
season 50:15
Seattle 25:5,16
  25:18,20,21,25
second 15:19
  18:24 66:16
  73:22
see 5:17 8:7
  16:10 19:13
  21:19 30:2,6
  46:13 49:12
  53:3 58:17
  61:9 67:8,20
  69:19 71:24
  74:1,12,14
  81:8 84:16,17
  85:4,5,13
  86:18,21 87:13
  88:24 89:12,16
  89:23 92:6,22
  95:18 97:2
  102:6,24
seeing 61:5,10

61:11 75:11
  79:16 80:11
  82:1 85:3 86:9
  86:24 100:4
seen 13:1,2 79:9
  83:18 89:21
  90:23
sees 68:19 69:18
  69:20 82:25
  83:12 84:15
  85:8 86:5
self 83:11
sell 46:8
seminary 24:11
  24:13
send 20:1 81:12
  99:5
sending 14:22
  20:19
sensation 27:13
  94:4
sense 10:5 67:5
  70:1 102:6
sent 6:6,14
  12:22 15:3
  20:19,22 90:9
  90:10,19 100:6
  100:12 102:16
sentence 46:12
  89:1
separate 32:6
  33:24 94:8
  100:15
serious 21:9
  79:13 96:18
service 25:18,20
  25:21,22
services 28:9
  35:21
session 11:25
  45:22 47:18
  57:3,6 61:1
  68:17 74:7,8,9
  74:15,16,17,18
sessions 16:25
  17:4 18:7

36:17 75:15
  81:14 82:9
set 5:8 20:6
  46:15 105:19
setting 69:24
settled 9:7 79:25
  80:22
settlement 9:14
  80:14,25 81:7
  82:15
settles 80:9
seven 74:21
severe 72:18
sexual 7:17 8:16
  25:22
sexuality 25:4
  25:10
shades 84:16
shape 92:3
sharing 75:7
sheet 104:18
shepherd 28:18
shifting 61:6
short 56:5
shorter 74:7,7,8
  74:15
shorthand
  105:14
shows 19:3
sign 103:5
SIGNATURE
  103:20
signed 104:19
significant
  37:25 58:7
  71:20 84:20
signs 41:3 48:24
simply 31:5 32:6
  37:11 41:16
  46:5 49:20
  51:10 77:18
sir 12:23 56:13
  89:10
sit 18:2
sitting 5:4
situation 55:20

76:23
situations 38:6
six 52:4,8,18
  94:9
ski 22:20 23:2
  36:3 37:16,19
  41:13 42:3,4
  48:17 51:8
  52:4,16 54:9
  54:13,19 58:3
  58:14,18,21
  59:10,17 60:2
  60:12,14 62:13
  65:9,17 92:4
  92:25 93:20
  94:7,9,15,23
  98:2,6
skier 37:20
skiing 35:25
  37:7,21 41:15
  42:1 49:21
  50:5 59:15
  61:23
skill 105:17
skill-based
  47:10
skills 44:8 47:6
  85:19,21
skip 68:14
skis 41:13,17
SKY 1:8 2:9
sleeper 38:18
slow 13:16 75:24
  83:3
slowing 47:11
  86:2
small 20:23
Smith 1:12,16
  3:2 4:6,13,14
  6:10,24 12:18
  16:22 17:11
  18:16 20:3
  44:20 56:3,23
  68:14 80:19
  81:9 90:5 95:6
  95:23 96:15,22

97:18 99:4,21
  102:14 103:11
  104:14,25
Smith's 3:6
  96:10
sober 66:7
sobriety 66:6,21
social 32:8,25
society's 69:25
somatic 26:16
  26:19
somebody 27:24
  66:7
someone's 42:18
  43:3,16,24
  55:5 93:23
soon 17:20
  34:11 89:23
sooner 75:19
  81:1
sorry 8:7 18:21
  20:2 22:8,15
  32:3,4 46:9
  49:23 51:2,3
  54:18 58:24
  60:7 68:4
  70:22 72:16
  74:13 78:16
  86:17 94:19
  101:23
sort 26:7 29:1,1
  30:14 82:15
sound 41:20
source 38:20
South 1:18 2:11
space 57:18
  58:17
spaced 58:2
spaces 57:7
spacing 58:5,13
speak 46:3
speaking 40:15
  88:22
specialize 35:6
specific 47:23
  70:20

specifically
  35:11 71:15
speculate 51:24
  72:3
speech 40:16
Speeding 30:15
spelling 88:19
spend 38:8,9
spending 77:10
  83:10
spent 37:24
spinning 13:14
spiritual 28:9
spoke 39:20
  40:6 44:7
  79:18
spoken 14:12
  36:22 39:25
  40:3 102:2
sponsor 35:20
sporadic 52:23
ss 105:3
stage 58:10
Stamped 15:6,7
stand 25:9
stare 57:15
staring 57:17
start 34:13
  35:10 86:22
  89:7
started 34:21
  59:1,1
starting 75:20
  85:11
state 4:12 31:23
  32:5,9,11,13
  32:19,23 33:9
  33:10,16,22
  34:12,14 84:10
  105:2,7,23
statements 48:1
States 1:1 25:22
Statistical 30:1
status 82:12
stay 47:14
stayed 25:5,12

STL 31:8,14
stop 66:25
story 48:18,20
  52:15 56:1
straightforward
  10:23
stress 14:1 37:14
  44:16 62:13,16
  62:19,23 63:2
  63:8,10,14
  64:16 66:11,13
  66:21 69:14
  72:20 73:4,19
  75:17,20 77:2
  77:6,12,13
  101:22
stresses 68:2
stressfully 13:19
stretched 80:17
strike 42:10
  71:9
strong 47:16
  70:2
strongly 67:13
struggling 63:5
study 34:7
studying 24:15
stuff 19:3
style 83:8
submitted 90:14
  91:2,3
substance 20:9
  21:1,3,4
substances 66:2
subtle 83:21
  84:7
suddenly 76:18
suffered 70:11
  70:24 72:1
  98:12
suggest 87:8
suggested 35:21
suicidal 37:11
  39:15
sum 80:18 81:4
summarizing

91:12
summer 24:10
Sunday 28:8
supervision 33:6
  34:10
suppose 33:19
  63:24 81:2,7
supposed 89:3
sure 8:6 9:15,16
  11:14 19:4
  22:17 30:12
  33:7 35:14
  36:20 43:18
  60:9 85:1
  89:14 92:14,16
  95:7,24 96:5
  99:8
surgery 93:14
sweating 48:25
sworn 4:8 105:9
symptoms 40:13
  55:13 56:1
  58:11 59:7
  72:17 77:12
  92:22 94:13

——————————
T
——————————
T 105:1,1
take 6:9 9:20
  16:7 27:25
  33:11 38:7
  39:10 45:25
  56:5 68:8,12
  69:25 76:12
  77:3 81:3,25
  82:13 89:15
  92:21 99:15
taken 1:17 4:2
  7:15 9:3 56:21
  81:14 90:3
  105:12
takes 51:16 71:1
talk 9:19 23:17
  35:9 38:3
  45:16 66:4
  68:6

talked 21:7
  41:14,15 47:18
  58:21 64:12
  65:12 71:14
  75:17
talking 9:22
  20:10 30:22
  35:10 47:5
  54:24 61:2
  83:11 102:16
task 65:20
tasks 72:5
teacher 8:20
teaches 26:16
teaching 24:22
  24:23 28:9
technical 95:19
techniques
  75:22 83:9
technologically
  100:5
tell 11:11 12:25
  23:18 24:8
  26:10 34:16
  37:15 45:12,23
  48:18 49:14,25
  50:3,5,8,11,14
  51:18,23 52:1
  52:6,7 53:14
  58:24 59:10,14
  66:7,7 68:15
  79:12 91:1,11
telling 48:20
  53:13,15,16
  54:3 92:11
  94:14,22,24
  95:14
tells 52:16 79:13
ten 78:16,16
  89:11
tend 7:7 53:2
  58:8 83:5
tended 47:7
  60:14
tendencies 39:7
terms 87:6

test 15:1
testified 4:8 8:25
  9:1
testify 5:12
  105:9
testifying 75:7
testimony 4:2
  11:8 78:10,12
  79:22 105:16
testing 72:7
text 8:9
thank 6:15 7:6
  11:6 12:4,20
  12:23 18:5
  27:14 31:3
  34:23 46:21
  56:13,18,19
  78:19 89:17,25
  90:1 99:9
  102:22 103:10
  103:13
Thanks 59:19
theology 24:6,7
  24:17,23 31:10
  31:12,12,13
theoretical
  26:11,15 69:8
theory 26:9,11
therapeutic 69:5
therapist 25:14
therapy 25:15
  68:9,12 77:15
  77:16,22 78:3
  81:13
thereon 104:18
thing 62:18 67:3
  67:5 92:1
  93:13 98:14,25
things 45:2,3,6
  52:20 55:16
  61:16 62:12
  65:12 70:6,15
  71:2 76:6 77:9
  83:15 84:8
  85:3 86:16,23
  86:24 87:1,6,9

DAVID GREGORY SMITH

Page 120

87:23 93:5,15
94:14,16 102:2
**think** 5:13 6:7
10:22 12:6
14:18 15:16
17:8,21 18:13
19:5 22:5 25:8
26:4 28:24
34:5,8 36:20
41:10,14 49:5
49:7,18 51:3
51:13,15 60:13
60:18 61:13
64:20 70:13
72:12 73:13
76:20 79:15,22
89:1 93:3,5
96:13 99:7
101:3,5 102:18
102:21
**thinker** 83:4
**thinking** 37:10
39:2 41:5
55:24,25 57:17
67:14 83:2
84:21,22
**third** 6:13
**thought** 40:15
42:14 47:18,21
48:4 51:9
57:10 64:21
70:19 77:11
**thoughts** 37:11
47:8,11,13,14
47:17,24 48:7
**three** 7:22 9:3
14:16 34:17
82:1 96:14
**ticket** 30:15
**ticking** 34:7
**time** 5:18 7:17
8:23,24 9:20
14:12 25:13
26:13 33:5
36:2 37:25
38:1,8,9 44:22

45:2 47:20,20
49:19 50:24
52:3 55:8,18
57:16,22,23
59:8 75:23
77:10 80:11
81:5,20 83:11
88:4 90:8
91:22 96:4
100:6 102:22
103:11 104:20
105:12
**times** 9:24 34:18
74:21 78:13,16
78:21 79:6,10
83:6 84:1,14
91:10
**tips** 83:9
**title** 32:5,11
33:3,3
**to-wit** 4:2
**today** 4:23 5:20
9:22,24 11:9
14:24 18:2
59:11 88:13
91:10 94:21
99:8 100:8
102:2,22
**told** 22:1,2
37:20 38:19
39:12 47:24
48:8 51:15
52:2,21 54:5
54:16,18 57:6
59:11 70:10,23
91:10,12,19
94:7
**tools** 13:15
**topics** 15:2
**total** 74:20
78:13
**track** 50:9
**tradition** 28:23
28:24 29:3
**traditions** 28:23
**train** 42:14

57:10 70:19
77:11
**training** 30:4
**trains** 40:15
**transcribed**
105:14
**transcript** 10:17
104:19
**transferred** 33:9
34:12
**transgender**
35:8
**transition** 35:9
**transitioned**
17:14
**trauma** 35:7
40:13,17 55:14
55:15,21 57:11
61:7 68:21
77:12,14 87:7
87:9,13,17
92:12
**traumatic** 37:8
40:16 52:10
91:15
**treat** 35:19
92:22
**treated** 36:6
44:18 87:24,24
**treating** 93:17
**treatment** 3:6
6:3 7:3 11:21
11:21 15:5
20:11 23:3
29:24 43:20,21
58:9,10 75:14
78:10 79:21
91:8,17 100:21
**treatments**
68:18
**trial** 5:9,11 88:5
**tried** 66:4
**trigger** 47:20,22
**trouble** 61:7
**true** 10:8 23:7
29:17 39:9,12

51:22 54:4
58:17 67:2
88:16 92:8,12
94:17,25 95:14
97:20 104:19
105:16
**trust** 42:21 44:2
53:2 54:6
**trusted** 45:9
**truth** 105:10,10
105:11
**truthful** 11:8
**try** 26:22 53:11
67:6 96:19
97:1,10,17
**trying** 10:21
13:11,15 14:25
19:2,25 20:17
33:11 38:5
44:19 50:8,11
50:23 59:2
60:21 66:15
74:11 76:19
79:15 83:24
84:16 88:25
91:9 92:3,10
100:11
**turn** 83:24
**twice** 44:7 74:23
**Twin** 23:20
**twins** 62:19
75:18 76:19,24
**two** 4:24 7:21
9:3 18:14
19:17 24:16
25:7 26:3,4
36:3 75:15
76:25 79:4
82:1 84:8
100:8,15 101:1
**type** 22:1 35:5
83:9 97:25
**typewriting**
105:15
**typewritten**
104:16

**U**

**uh-huh** 12:24
18:17 19:15
27:15 30:13,18
32:19 56:14
**unable** 81:11
**unclear** 83:10
**underlying**
92:11,12,18
**understand**
10:11,19,25
11:1,4 18:1
28:3 39:11
40:23 49:6
53:9,24 56:24
58:15 66:20
73:3 92:14
**understanding**
42:2 64:6,10
64:18,20,25
76:9 90:18
**understood**
31:20 51:5
68:10 71:24
**undisclosed** 9:8
**unexpected**
76:24
**uninsured** 68:7
**United** 1:1 25:22
**University**
25:16,25
**unmanageable**
39:18
**unnatural** 46:6
**unpaid** 81:13
**unrealistic** 84:5
**unusual** 57:11
68:8,11
**upcoming** 59:24
60:11 66:12
**update** 17:6,8
**updated** 12:16
15:4
**UPS** 60:17
**upset** 59:5

DAVID GREGORY SMITH

Page 121

use 31:18
useful 60:25
uses 32:22
usual 74:6
usually 30:7
  38:17 39:10
  44:2 45:11,19
  52:22 58:6
  84:4

**V**

Valley 25:2,2
varies 55:20
vent 76:1
veracity 92:8
verify 53:4
  58:16,19
versus 32:7
  52:20 55:19
video 9:22 30:22
videoconference
  1:11,14 103:17
view 49:8,10
  61:6,13 67:13
  67:18 69:23
  91:16
viewing 61:24
virtual 21:7
visibly 59:4
vitae 26:5
vocabulary
  44:11
vs 1:7
vulnerable
  48:23 59:9

**W**

wait 8:7
Walas 2:4,5 3:4
  5:23 14:6,15
  14:19 15:23,25
  16:19 18:13
  19:21 20:4,20
  56:15,18 89:18
  89:22,25 99:14
  99:17,20

100:25 101:5
101:10,11
102:8,25 103:4
103:9,13
wall 57:16
want 8:5 9:17
  15:25 21:16,17
  27:9,25 43:24
  45:25 46:6
  55:11,11 68:11
  80:3 85:4,5
  96:17 100:25
  101:4
wanted 25:8
  27:20 38:9
  43:14 48:22
  68:7 101:7
warned 50:15
Washington
  31:23 32:5,14
  32:22 33:10
  34:12
wasn't 42:23
  55:8,10,12
  69:5 78:17
  91:7
way 28:16 41:4
  41:7 44:9
  47:10 53:12
  54:2 58:16,19
  62:5 67:20
  70:6 83:15
ways 61:12 76:8
we'll 56:6
we're 5:14 9:16
  9:22 30:22
  56:7,23 67:16
  82:24
we've 14:11,12
  14:12 70:15
  71:14 102:2
wear 50:18 51:8
  51:19
wearing 50:24
  51:20
wedding 59:24

60:4,11 62:15
66:12
week 77:15,15
  82:1
weekly 88:1
went 23:24
  24:10,13 25:16
  69:2 81:20
  102:3
wheels 13:14
WHEREOF
  105:19
white 67:18 84:1
  84:15 86:9
wife 13:10 36:16
  36:18,19 39:23
  51:20 62:22
  65:5 76:10
  77:3 83:7,8
  85:20
WiFi 96:10
willing 82:13
wished 75:8
witness 4:7 16:6
  16:10 95:3,10
  96:3,23 97:3,6
  97:8,11 102:10
  102:24 103:12
  105:8,17,19
woman 21:22
wondered 54:21
word 19:12
  28:17 36:15,15
  39:10 81:3
  89:2 92:22
  98:13
words 9:21 20:5
  30:23 44:10
  70:19 77:10
  88:20
work 5:16 16:12
  16:18 24:19
  26:19 32:7,8
  53:2 55:8 59:2
  63:23 69:7
  70:9 76:19,23

77:18 83:7,19
84:7 87:20
91:8 94:4
work/life 76:20
worked 24:10
  66:5 73:20
worker 32:25
working 34:9
  42:22 47:9
  67:16 72:24
  79:14 84:1
  97:3
works 10:20
  16:19 67:22
  81:3
world 38:10
  40:18 46:4
  61:5,10,11,13
  61:14,24 67:13
  67:18,20,22
  68:19 69:18,19
  69:20,23 73:12
  73:13,18 82:25
  83:12,13,25
  84:15 85:8
  86:5,9
worried 5:15
  48:2
worthy 87:23
wouldn't 43:21
  62:11 84:19
wreck 22:20
  23:2 36:3,7,9
  37:16,19 51:8
  52:4 54:9,13
  54:19,21 58:3
  58:5,14,18,21
  59:11 60:2,12
  60:14 65:9,17
  92:25 98:3,6
wrecked 35:24
write 7:7 81:13
writing 10:12
wrong 33:14
  67:21 74:13
wrote 45:2

**X**

X 3:1

**Y**

yeah 8:11 9:4
  10:21,22 20:13
  21:17 26:9
  34:2 36:5,21
  46:14 53:8
  68:4 89:20
  90:25 92:1
  94:20 97:16
  102:24
year 24:3 25:2
  74:19 78:7
  88:23
years 7:22 9:3
  25:7 34:6 36:3
  44:13 59:18
  79:4
yesterday 11:25
  11:25 13:6,9
  14:18,20

**Z**

zoom 1:17 5:21
  20:7

**0**

04 105:25
09 34:22

**1**

1 93:6
10 73:25 74:8,12
102 3:3
103 3:4
104- 104:16
10969 2:12
10th 68:3,4,5
11 3:7 74:17
11/15 100:13
11/5 100:13
11:56 103:18
1145 4:15
11th 1:19

DAVID GREGORY SMITH

**12** 77:5
**13** 59:20
**13th** 13:3 61:5
**14** 78:23 79:9
**15** 46:16 78:18
　90:15
**15th** 99:22
**16** 3:7
**18-CV-00002-...**
　1:7
**1915** 1:18 2:11
**1987** 24:4
**1991** 24:18
**1996/'97** 25:3
**19th** 1:18 2:11

---
**2**
---

**2,000** 33:4
**20** 44:13 59:18
**2000** 73:25
**2001** 25:17,19
**2006** 25:19
　27:16
**2007** 27:17
**2008** 34:21
**2015** 35:25
　38:16,23 39:2
　39:5,15,18
　41:19 42:16
　44:24 58:3,14
　58:18 60:2,12
　70:4,11,25
　72:2 73:8
　84:24 87:3
　92:25 94:7,15
　94:23 98:12,16
**2018** 17:6 35:12
　37:1,17 45:15
　46:23 49:16
　57:3 58:20
　59:14,21 65:5
　65:25 67:24
　70:14 74:1,12
　74:21 78:18
**2019** 68:16 74:2
　74:23,25 75:14

75:16 77:6
90:15,24 91:20
99:25 100:13
102:17
**2020** 1:19 12:25
　74:18 75:2,4
　78:7 80:4
　104:22 105:21
**2023** 105:25
**20th** 13:3 65:5
　65:25
**22** 88:22
**22nd** 6:25 11:24
　12:25
**246-1067** 2:7
**27th** 13:3
**29** 46:23 49:15
**29th** 52:2

---
**3**
---

**3,000** 33:6
**3:54** 90:15
**30** 74:16
**30-minute** 74:6
**300** 33:6
**3rd** 67:23 68:3
　68:15,16 69:1

---
**4**
---

**4** 3:3 74:18 80:4
**406** 2:13
**4591** 2:5

---
**5**
---

**5** 102:17
**50** 74:16
**50-minute** 74:6
**501** 2:7
**556-1430** 2:13
**56** 3:7
**59718** 1:19 4:16
**59719-0969** 2:12
**59772** 2:6
**5th** 99:25 100:3
　100:16,22

---
**6**
---

**6** 59:14
**6-7** 3:7
**6th** 13:3 57:3
　58:20

---
**7**
---

**7/27** 88:23
**7th** 13:4

---
**8**
---

**8** 75:16
**8:59** 1:20
**88** 3:7
**8th** 35:12 37:1
　40:9 45:14
　70:14

---
**9**
---

**9:00** 20:6
**97** 3:6 6:18,20
　6:24 7:2,13
　11:17 16:16
　56:9 88:16
**98** 16:15 101:1
**99** 3:4
**9th** 13:4