```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MONTANA
 2                          BUTTE DIVISION

 3   JOHN MEYER,                    )
                                    )
 4          Plaintiff,             )
                                    ) Cause No. 18-CV-02-BMM
 5   vs.                           )
                                    )
 6   BIG SKY RESORT,               )
                                    )
 7               Defendant.        )

 8

 9

10

11          *****************************************
                        ORAL DEPOSITION OF
12                      DAWN MARIE DIZNEY
                        SEPTEMBER 11, 2020
13          *****************************************

14

15

16

17        On the 11th of September 2020 at 10:00 a.m., the

18   oral deposition of the above-named witness was taken at

19   the instance of the Defendant before Lezley Cull,

20   Certified Shorthand Reporter in and for the State of

21   Texas, at the offices of Lexitas, 325 N. St. Paul

22   Street, Suite 1900, in the City of Dallas, County of

23   Dallas, State of Texas, pursuant to the Federal Rules of

24   Civil Procedure.

25
```

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:
          Ms. Breean Walas (via videoconference)
 4        WALAS LAW FIRM
          2800 Percy Machin Drive
 5        Suite 121
          North Little Rock, Arkansas 72114
 6        breean@walaslawfirm.com

 7

 8   FOR THE DEFENDANT:
          Mr. Mac Morris (via videoconference)
 9        CROWLEY FLECK
          1915 South 19th Avenue
10        Bozeman, Montana 59718
          406.556.1430
11        406.556.1430 (fax)
          wmorris@crowleyfleck.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2    WITNESS:                                      PAGE

3    DAWN MARIE DIZNEY
          Examination by Mr. Morris. . . . . . . . . . 4
4         Examination by Ms. Walas. . . . . . . . . 58

5

6
     DEPOSITION EXHIBITS                           PAGE
7
        Exhibit 132 - Subpoena. . . . . . . . . . . .13
8
        Exhibit 133 - Big Sky 1223. . . . . . . . . .50
9
        Exhibit 134 - Big Sky 1221. . . . . . . . . .51
10
        Exhibit 135 - Big Sky 1200 - 1201. . . . . . 53
11
        Exhibit 136 - Big Sky 1255 - 1257. . . . . . 59
12
        Exhibit 137 - Big Sky 1217 - 1218. . . . . . 64
13
        Exhibit 138 - Big Sky 1205 - 1213. . . . . . 69
14
        Exhibit 139 - Big Sky 1214 - 1216. . . . . . 70
15

16

17

18

19

20

21

22

23

24

25
```



```
1                    P R O C E E D I N G S

2                     DAWN MARIE DIZNEY,

3   having been first duly sworn, testified as follows:

4                       EXAMINATION

5   BY MR. MORRIS:

6       Q.   Could you please state your name and address

7   for the record.

8       A.   Dawn Marie Dizney.  2616 Clover Hill Court,

9   McKinney, Texas 75071.

10      Q.   And how long have you lived at that address in

11  McKinney?

12      A.   Since August of 2005.

13      Q.   And who -- does anybody live there with you?

14      A.   No, sir.

15      Q.   And where did you live before you moved to

16  that address in McKinney?

17      A.   Jacksonville, Florida.

18      Q.   And how long did you live in Jacksonville?

19      A.   Approximately seven years.

20      Q.   Have you ever given a deposition before today?

21      A.   No, sir.

22      Q.   Other than in a deposition, have you ever

23  testified under oath --

24      A.   No, sir.

25      Q.   -- for any reason?
```



1          A.    No, sir.

2          Q.    So anyway, you haven't given a deposition

3    before and you've never testified under oath before; is

4    that right?

5          A.    Correct.

6          Q.    And you're appearing here today pursuant to a

7    subpoena that we sent you?

8          A.    Correct.

9          Q.    So there's certain rules to the deposition.

10   And one of them is that it's sort of common in ordinary

11   discussions with people, we may sort of anticipate what

12   the other person is going to say or the question or

13   something like that and so we might talk over one

14   another a bit.  But for purposes of getting a clear

15   record today, the court reporter is going to need us

16   to -- if I have a question, will you please let me

17   finish my question before you answer?

18         A.    Yes, sir.

19         Q.    And I'll try to do the same.  If you're giving

20   an answer, I'll try to not interrupt you and let you

21   finish your answer before I jump in with another

22   question.  Okay?

23         A.    Great.

24         Q.    The other thing is that we'll have to give --

25   try to always give oral responses to the questions.  So

1  we can't just nod our head or shrug our shoulders, that

2  sort of thing.

3        Do you understand that?

4     A.   Yes, sir.

5     Q.   And the other thing about that is that very

6  frequently we say uh-huh or huh-uh or something like

7  that.  I might just clarify -- for purposes of the

8  transcript, I might just say is that a yes or is that a

9  no.  I'm just telling you that because I don't want you

10  to think I'm being rude.  But that's just for purposes

11  of the transcript.  Okay?

12     A.   Yes, sir.

13     Q.   And if any time today I ask you a question

14  that you find confusing or you don't understand for any

15  reason, will you please let me know?

16     A.   Absolutely.

17     Q.   Because if you don't let me know and you go

18  ahead and answer the question, I'm going to -- I'm going

19  to assume that you understood the question as phrased.

20        Is that fair?

21     A.   Yes, sir.

22     Q.   And throughout the course of today, if you

23  need to take a break for any reason at all, if you'd

24  just let me know, we can take a break.  This isn't a

25  marathon.  All right?



1       A.    Okay.

2       Q.    And the only exception to that is if I ask you

3  a question, I'm going to ask that you answer that

4  question before we go on a break, and then we can go on

5  a break.  Okay?

6       A.    Yes.

7       Q.    All right.  And sorry.  This is kind of a

8  little bit strange doing it via Zoom.  I'm not really

9  able to look you in the eye because I'm kind of looking

10 at the screen.  But we'll work our way through it.

11            So did you do anything to prepare for today's

12 deposition?

13      A.    I did not.

14      Q.    Did you review any of the documents in

15 preparation for your testimony today?

16      A.    I did not.

17      Q.    Did you talk to anyone at all in preparation

18 for your testimony today?

19      A.    I didn't talk per se.  I just got mainly

20 directions from my fiancé who just gave me a pep talk at

21 the end and said, go in there, you'll be fine, tell the

22 truth, that's all they want, have a good day, love you,

23 bye.

24      Q.    Okay.  All right.  And other than your fiancé,

25 have you spoken with anyone about today's deposition?

1        A.   I spoke with my father.  It was the day after

2    his deposition.  We didn't really get into things

3    because he was a little spun up.  So I kind of shut that

4    down and said, you know what, it's all good, you're

5    done, don't worry about it, go have a beer.

6        Q.   Okay.  So I take it maybe your husband has

7    given a deposition before; is that right?

8        A.   My fiancé.

9        Q.   I'm sorry.  Your fiancé.

10       A.   Honestly, I don't know if he has or not.  I

11   did not ask that question.

12       Q.   All right.  But he knows -- has he testified

13   in a trial or something like that before?

14       A.   I cannot say for sure.  He is in law

15   enforcement.  But we've never discussed that, anything

16   about him being in trials or anything in the past.

17       Q.   And did you talk to your brother, John, about

18   this deposition?

19       A.   I did not.

20       Q.   Did you talk to Breean, his attorney, about

21   the deposition?

22       A.   No.  I just received a text message from John

23   maybe two weeks ago saying that I was going to be called

24   as -- I don't know if you call it a witness for this --

25   for -- being served for the deposition.  And his lawyer

1   was on the message, but I was in the middle of driving.

2   I did not respond to the message at all.  I didn't feel

3   there was a need to respond.

4        Q.   Other than what you've just told me about, you

5   haven't done anything to prepare for your testimony

6   today; is that accurate?

7        A.   Accurate.

8        Q.   Where did you -- did you go to -- did you --

9   after you finished high school, did you go to college

10  anywhere?

11       A.   I did.

12       Q.   And where did you go?

13       A.   I went to Valparaiso University and I also

14  went to Indiana University Northwest.

15       Q.   And when did you graduate?

16       A.   I did not graduate.  I joined the military and

17  continued my studies at San Diego City College.  And I

18  did receive an associate's of political science.  And

19  then when I lived in Jacksonville, Florida, I did

20  continuing studies at the University of North Florida in

21  Jacksonville, but I did not graduate.  I have enough

22  credits to graduate, but I did not.

23       Q.   I thought you said you got an associate's

24  degree.

25       A.   Yes.  I'm sorry.  I do not have a bachelor's

1  degree.   I have an associate's degree from San Diego

2  City College.

3      Q.   And how long were you in the military?

4      A.   Just over a year.

5      Q.   Are you currently working?

6      A.   No.

7      Q.   When was the last time you were employed?

8      A.   July of 2018.

9      Q.   And what were you doing at that time for work?

10     A.   I worked for an IT staffing organization where

11 I was the director of global service delivery.

12     Q.   And what -- what were your duties in that job?

13     A.   I worked with clients to staff projects around

14 the world, IT personnel.

15     Q.   And why aren't you working currently?

16     A.   I'm retired.

17     Q.   Are you?

18     A.   I am.

19     Q.   You're actually -- I think your dad said

20 something about that.

21     A.   I am.

22     Q.   He said, I think she's retired, but I don't

23 really know.

24     A.   I think he doesn't like to believe that I am.

25 But I am retired, yes.



1      Q.   And do you anticipate going back to work at
2   all in the future?
3      A.   No.
4      Q.   And so did you have a position where you were
5   able to earn enough money that you feel like you don't
6   need to work anymore?
7      A.   Yes.  My last position that I left.
8      Q.   And how old are you?
9      A.   47.
10      Q.   I wish I could do that.
11           Have you -- have you ever worked at a ski
12   resort?
13      A.   I have not.
14      Q.   And are you a skier?
15      A.   I am not.
16      Q.   Have you ever skied at a ski resort?
17      A.   The only thing I can remember is when I was a
18   child growing up cross-country skiing.  But it wasn't at
19   a resort.  It was, like, one of the local parks.
20      Q.   My understanding is that you are John Meyer's
21   -- and I might refer to John Meyer today as John or
22   Mr. Meyer.  Is that all right?
23      A.   Yes.
24      Q.   And my understanding is that you are the older
25   sibling of John --



1      A.    Yes.

2      Q.    -- is that right?

3            And how much older are you than John?

4      A.    I am eight years older than John.

5      Q.    Are the two of you close?

6      A.    As close as you can be living across the

7  country and only seeing each other maybe once or twice a

8  year if you're lucky.

9      Q.    That was sort of my next question.

10           And how long has that been the case that

11 you've only really seen John once or twice a year?

12     A.    Oh, it's been a long time, pretty much since

13 he moved to Montana and went to school in Missoula.

14     Q.    Okay.  And have you guys kept in contact via

15 phone or email or anything like that?

16     A.    Yes.

17     Q.    And do y'all communicate pretty regularly?

18     A.    We talk maybe once a week or every two weeks.

19 Maybe a text here and there just checking in to say, Hi,

20 hope you're doing well, love you.

21     Q.    And have y'all always sort of maintained that

22 communication even though you're not living in the same

23 place?

24     A.    Yes.

25     Q.    Well, let's -- I -- I think that the court

Dawn Marie Dizney

1  reporter has printed off the subpoena that I sent to

2  you.

3          Do you have that in front of you?

4                  THE REPORTER:  She does now.

5      Q.   (BY MR. MORRIS)  Okay.  And let's mark --

6  well, actually, let me just ask you this.

7          This is the subpoena to produce documents that

8  my office sent to you, correct?

9      A.   Yes.

10     Q.   And you recognize it?

11     A.   Yes.

12                 MR. MORRIS:  Can we mark this document

13 as -- I think it's Deposition Exhibit 132.  Is that what

14 you have, as well, Breean?

15                 MS. WALAS:  I actually do not know, Mac.

16 I haven't -- I didn't double-check that beforehand, but

17 I can look.

18                 MR. MORRIS:  I'm pretty sure it is.

19 Let's mark it 132, please.

20                 MS. WALAS:  It is.

21                 (Exhibit No. 132 marked.)

22     Q.   (BY MR. MORRIS)  Ms. Dizney, will you turn to

23 the last page of Deposition Exhibit 132, please.

24     A.   Yes, sir.

25     Q.   Do you see at the top it says Exhibit A?

1    A.   Yes, sir.

2    Q.   And underneath that is a description of the

3  documents that you were required to produce pursuant to

4  the subpoena, right?

5    A.   Correct.

6    Q.   And essentially what the subpoena required you

7  to do is to produce all correspondence or documents of

8  any type relating or pertaining to John Meyer.  And then

9  that included several specific categories, right?

10    A.   Yes.

11    Q.   And it's limited to the period from

12  December 11th, 2010, to the present, right?

13    A.   Correct.

14    Q.   And did you comply fully with the subpoena?

15    A.   I did.

16    Q.   Did you discuss with anyone how to comply with

17  the subpoena?

18    A.   No, I did not.

19    Q.   You didn't talk to your brother about how to

20  go about complying with the subpoena?

21    A.   I did not.

22    Q.   And you didn't talk with Ms. Walas about that

23  either?

24    A.   No.

25    Q.   And my understanding is that you regularly

1  delete your text messages and emails --

2      A.   I do.

3      Q.   -- is that right?

4           Okay.  And you also fairly recently deleted

5  your Facebook account; is that right?

6      A.   Correct.

7      Q.   And so what you did is you produced to us in

8  response to the subpoena ten emails, correct?

9      A.   Yes.

10     Q.   And that included a LinkedIn post that was

11 about donating to Mr. Meyer's law firm, Cottonwood

12 Environmental Law Center, right?

13     A.   Correct.

14     Q.   And I may refer during this deposition to

15 Mr. Meyer's law firm as Cottonwood.  And if I do that,

16 will you understand that I'm referring to Cottonwood

17 Environmental Law Center?

18     A.   Yes.

19     Q.   In addition to the LinkedIn post, you also

20 produced six emails which have screen shots of some

21 Instagram posts, right?

22     A.   Correct.

23     Q.   And then you also produced a few bank records

24 and copies of checks showing donations that you've made

25 to your brother John's law firm, right?

1        A.    There was one that was a donation.   The rest

2    were -- was birthday money and one check was wedding

3    money.

4        Q.    All right.   And then you produced one email

5    from your father to you and your brother about

6    Mr. Meyer's ski wreck that's at issue in this case,

7    right?

8        A.    Correct.

9        Q.    Then you also produced an email summarizing

10   and sort of explaining your subpoena response, right?

11       A.    Correct.

12       Q.    And all of those documents that we just talked

13   about, they were all pulled from electronic sources like

14   computers or your phone; is that right?

15       A.    Correct.

16       Q.    And you didn't have any hard copies of any

17   documents that relate to Mr. Meyer, right?

18       A.    No.

19       Q.    No hard copies of any documents that would be

20   responsive to the subpoena?

21       A.    No.

22       Q.    No journals or journal entries or anything of

23   that sort, right?

24       A.    No, sir.

25       Q.    You did not produce any text messages --

LEXITAS

1      A.   No, sir.

2      Q.   -- with John or relating to John, right?

3      A.   No, sir.

4      Q.   And is that because you regularly delete your

5 text messages?

6      A.   Correct.

7      Q.   And if you didn't delete your text messages in

8 that way, do you think you would have some documents

9 that would be responsive to the subpoena, some text

10 messages?

11      A.   Perhaps.

12      Q.   So if you had communications with John via

13 text message, those would be responsive to the subpoena,

14 right?

15      A.   Correct.

16      Q.   And you have, like we've already discussed,

17 texted with John at some point in the last -- since

18 2010, right?

19      A.   Correct.

20      Q.   But you don't have those anymore, right?

21      A.   I do not.

22      Q.   And to the extent that you texted with other

23 people about John or the ski wreck, those have all been

24 deleted, too, right?

25      A.   Correct.



1       Q.    And how long has it been your practice to

2   regularly delete your text messages?

3       A.    Always.

4       Q.    Always.

5       A.    I'm OCD about clutter.

6       Q.    Right.   Okay.   Got it.

7             And have you communicated with John via text

8   message about his ski wreck?

9       A.    Can you clarify the time frame on that?

10      Q.    Well, I guess I'm just saying at any time

11  since December 11th, 2015, have you texted with John

12  about his ski wreck?

13      A.    Not that I can recall.

14      Q.    And have you texted with John at any time

15  since December 11, 2015, about his injuries that he

16  incurred or that he claims to have incurred in the ski

17  wreck?

18      A.    I may have asked questions like, how's your

19  arm doing, how are you doing, just general checking in

20  items.

21      Q.    And what about since December of 2017, have

22  you had communications with John about his injuries

23  since December of 2017 via text?

24      A.    Just checking in, how are you feeling, how is

25  your arm, how is your -- you know, how are your

1  injuries.  I mean, just sister check-ins, nothing

2  pertaining to a lawsuit or his accident specifically.

3       Q.   Sure.

4            But since -- just so the record's clear, you

5  guys have sort of talked about his injuries via text

6  since December of 2017, right?

7       A.   Correct.

8       Q.   Anything else that you recall discussing with

9  John via text other than sort of sibling check-ins on

10 his injuries that relates to the ski wreck or his

11 injuries?

12      A.   No.

13      Q.   And we also discussed that you deleted your

14 Facebook account.

15           So you didn't produce any documents from a

16 Facebook account that you used to have, right?

17      A.   Correct.

18      Q.   And do you believe that if you hadn't deleted

19 that, that there may be some posts or messages that you

20 had with John or other people about the ski wreck?

21      A.   Perhaps.  It was a long time ago.  I don't

22 archive messages anyway.

23      Q.   And I'm just asking -- just so you know, I'm

24 just asking you for your best recollection.

25      A.   Of course.

1      Q.   And do you recall ever talking with John

2   through Facebook Messenger about his ski wreck or the

3   injuries that he had?

4      A.   I do not recall speaking with him through

5   Messenger on any of that.

6      Q.   And did you ever make any posts about John's

7   ski wreck on Facebook?

8      A.   I made a post after the initial injury just

9   saying, please pray for my brother, something to that

10   regard, he had a ski accident.  But it wasn't detailed,

11   just a general, you know, please pray for my brother

12   type post.

13      Q.   Since December of 2017, have you talked with

14   John about his injuries on Facebook?

15      A.   No.

16      Q.   And you also regularly delete your email,

17   right?

18      A.   Correct.

19      Q.   And if you didn't delete your email, do you

20   think that there would be documents in there about John

21   or about his injuries, about his ski wreck, emails that

22   you had?

23      A.   I do not recall.

24      Q.   You don't have any recollection of ever

25   communicating with anyone via email about John's status,



1  his injuries, or his ski wreck; is that accurate?

2      A.   The only thing I can for sure say is that I

3  forwarded my dad's email to my younger brother, Ryan, to

4  my fiancé.  And that was it.

5      Q.   Okay.  Got it.

6           You did not produce any of John Meyer's

7  medical records or medical bills in response to the

8  subpoena, right?

9      A.   Correct.

10     Q.   And you've never had in your possession any of

11  John's medical records or medical bills, right?

12     A.   I have not.

13     Q.   And you're not familiar with John's medical

14  records or bills; true?

15     A.   True.  I am not.

16     Q.   And have you assisted John or his attorney in

17  any way with the production of his medical records or

18  medical bills to Big Sky Ski Resort?

19     A.   I have not.

20     Q.   And if there is an issue in this case about

21  certain medical records and bills being disclosed in an

22  untimely fashion, would you know anything about that

23  issue?

24     A.   No.

25          Mr. Morris, I'm sorry.  I'd like to go back.

1            The email that I forwarded was not to my

2   younger brother, it was to my son, the ski accident

3   email.  I'm sorry.  I was trying to recollect

4   everything.  It was to my fiancé and it was to my son.

5   My dad already had the younger brother on the email.

6       Q.   Got it.

7            So what you're saying is that one of the

8   emails you produced to us was an email from your father

9   right around the time of John's ski wreck, right?

10      A.   Correct.  And I forwarded it.

11      Q.   And you -- when you received that, you then

12  forwarded it on to your fiancé and your son, correct?

13      A.   Yes, correct.

14      Q.   And that's one email that you can think of

15  that would have been responsive to the subpoena, but

16  it's since been deleted, right?

17      A.   Correct.

18      Q.   Okay.

19      A.   I just wanted to make that correction for you.

20      Q.   Thanks.

21           And you can't think sort of specifically of

22  any other emails that would have been responsive to the

23  subpoena.

24           That's your testimony?

25      A.   Unfortunately, no.

 1      Q.   Okay.  Let me ask you this.

 2           Do you know anything about Mr. Meyer's --

 3  John Meyer's medical records related to his ski wreck

 4  that's at issue in this case?

 5      A.   I do not.

 6      Q.   Do you know anything about John Meyer's

 7  medical bills related to his ski wreck that's at issue

 8  in this case?

 9      A.   I do not.

10      Q.   To your knowledge, was -- was John -- growing

11  up or at any time, to your knowledge, was he ever

12  treated for any mental health conditions prior to

13  December 11th, 2015?

14      A.   Not to my knowledge.

15      Q.   To your knowledge, did he ever seek out mental

16  health counseling or any kind of mental help

17  professional for symptoms of anxiety?

18      A.   Not to my knowledge.

19      Q.   Or depression?

20      A.   Not to my knowledge.

21      Q.   Your father, Ron, testified that John has a

22  tendency to get in his own head.

23           Do you agree with that?

24      A.   Perhaps.

25      Q.   Why do you say that, perhaps?

LEXITAS

 1      A.   Everyone in our family overanalyzes

 2 everything.

 3      Q.   And your father also testified that he

 4 recalled John, when he was living in San Francisco and

 5 working with the Sierra Club, having kind of a rough

 6 past.

 7           Do you also recall that?

 8      A.   I do not.

 9      Q.   And you know that John has been sober for some

10 time, correct?

11      A.   Correct.

12      Q.   And has he ever talked to you about why he

13 wanted to make that change in his life?

14      A.   He did not.

15      Q.   Do you have any insight into why he wanted to

16 make that change?

17      A.   I do not.

18      Q.   Are you familiar with John's recreational

19 activities like mountain biking?

20      A.   I am.

21      Q.   And you know that he likes to rock climb, as

22 well?

23      A.   I do.

24      Q.   And obviously likes to ski?

25      A.   Yes.

1      Q.    Back country ski?

2      A.    Yes.

3      Q.    And he likes to climb mountains, right?

4      A.    Correct.

5      Q.    And he still does all those things, right?

6      A.    I'm not aware.

7      Q.    And have you ever -- I mean, you agree with me

8 that all those activities have inherent dangers and

9 risks, right?

10      A.    Correct.

11      Q.    And from your kind of relationship with John,

12 you know he enjoys taking risks in those activities,

13 right?

14      A.    Perhaps.

15      Q.    I mean, one of the reason why he likes it is

16 because he likes the risk and the challenge.

17           You agree with that, right?

18      A.    Honestly, I don't know why he does it.

19      Q.    Okay.  All right.  How would you characterize

20 John's financial status since he graduated college?

21      A.    I don't really know.  It's not something we

22 discuss regularly.  It's kind of taboo in the family to

23 talk about finances with each other.

24      Q.    Would you agree with me that he's struggled

25 financially?



```
 1        A.   I believe he has at times.

 2        Q.   And you've actually offered to give him money

 3  at times, as well, haven't you?

 4        A.   I have offered.

 5        Q.   I mean, you've supported him financially since

 6  he graduated college, right?

 7        A.   I have not.

 8        Q.   You paid for -- you've offered to pay for

 9  things like plane tickets on family vacations, right?

10        A.   I have.

11        Q.   And you've donated to his law firm a number of

12  times, correct?

13        A.   I have.

14        Q.   How many times have you donated to his law

15  firm?

16        A.   I cannot recall an exact amount.

17        Q.   And has it been your understanding that John's

18  law firm, Cottonwood, has struggled financially?

19        A.   I don't know.

20        Q.   So you produced in response to the subpoena I

21  think three checks, correct, that were made out to John?

22        A.   Correct.

23        Q.   And I think that that totaled -- there was one

24  in 2017, one in 2018, and one in 2020 that you produced.

25             Is that consistent with your memory?
```

1       A.   Yes.   There should have been -- there should

2  have been, I believe, the one from September of 2018

3  for -- that was his wedding.

4       Q.   That was just a wedding gift?

5       A.   Yes.

6       Q.   Some money for a wedding gift?

7       A.   Yes.

8       Q.   And then the other two were donations to his

9  law firm?

10      A.   No.   The other two checks were for his

11  birthday.   And then there is a donation to his law firm.

12  I believe it's $200 and a transaction fee maybe.   I also

13  did donate $1,000 to his law firm last fall.   I don't

14  remember the exact date.   It was when Patagonia was

15  doing the matching.   I don't have the receipt for that,

16  but it was $1,000.

17      Q.   And have you made other donations besides the

18  ones you just described to Cottonwood?

19      A.   I have.   I do not recall the exact dates.

20  Most of those were through a Facebook link.   And I don't

21  have a Facebook account anymore, so I don't have the

22  record of those.

23      Q.   And did you make donations to his law firm in

24  2015?

25      A.   I do not recall.



1     Q.   Do you know that your -- your father donated

2  about $30,000 to John's law firm in 2015?

3     A.   I had no idea.

4     Q.   Do you -- do you know whether or not your

5  brother, Ryan, has also donated to John's law firm?

6     A.   I do not know.

7     Q.   Do you believe he has?

8     A.   I do not know.

9     Q.   Do you recall in about October of 2015 when

10  John left Cottonwood or closed it down?

11     A.   I don't know if he ever closed it down.  If he

12  did, I wasn't privy to that.

13     Q.   You know he took a job with another

14  environmental law firm called WildEarth Guardians,

15  right?

16     A.   Correct.  I am aware of that.

17     Q.   And do you know why he did that?

18     A.   I do not know.

19     Q.   Did you support that job change?  Did he talk

20  to you about that job change?

21     A.   He told me he -- he took a job with WildEarth

22  Guardians, I believe.  And I was happy for him that he

23  would have a salary and healthcare benefits.

24     Q.   So that was for more security and better pay

25  than he was receiving at Cottonwood, right?



1      A.   I don't know what his status at Cottonwood

2   was.  I just knew it was a -- in my opinion, a more

3   stable job.

4      Q.   And did he -- did he talk to you about being

5   excited about those aspects of the job with Cottonwood?

6      A.   I'm sorry.  Can you clarify?  I don't

7   understand.

8      Q.   Yeah.

9           So did he talk to you about being excited to

10  have a regular salary and healthcare benefits with his

11  job at WildEarth Guardians?

12     A.   He -- I mean, he really didn't say.  He

13  basically just said he had taken a job with WildEarth

14  Guardians.  And I -- I mean, he didn't say he was

15  excited or anything like that.  He basically just told

16  me that he took a job with them.

17     Q.   And did he explain that that was going to be a

18  better situation for him and that's why he wanted to do

19  it?

20     A.   No.  He just told me that he took a job with

21  them.  I was surprised.

22     Q.   Did you know that he had a law partner at

23  Cottonwood named Purcie Bennett?

24     A.   I am aware of that.

25     Q.   And do you know what happened with



1    Purcie Bennett leaving Cottonwood law firm?

2         A.   I do not know why she left.

3         Q.   Have you ever talked to John about why he was

4    fired by WildEarth Guardians?

5         A.   I did not.

6         Q.   Did he get fired from WildEarth Guardians when

7    you were in Missoula visiting him?

8         A.   I don't know.

9         Q.   You do know that he was fired from WildEarth

10   Guardians, right?

11        A.   I didn't know the circumstance, no.  I didn't

12   know if he was fired, if he left.  I didn't know the

13   circumstance surrounding it.

14        Q.   He's never talked to you about that?

15        A.   I don't recall him saying anything about it.

16        Q.   So after he was fired by WildEarth, he started

17   Cottonwood back up, right?

18        A.   Okay.

19        Q.   He started working full time with Cottonwood,

20   right?

21        A.   Yes.

22        Q.   But since that time, you know that John has

23   pursued other lines of work besides working at

24   Cottonwood, right?

25        A.   I'm unaware.



1     Q.    You didn't know that he had run for Congress?

2     A.    Oh, yes.  I'm sorry.  Yes.  I didn't realize

3  you were classifying that as a job.  Yes.  I knew he had

4  done some political campaigning I guess you would call

5  it.

6     Q.    He did run for Congress twice.  You knew that?

7     A.    Yes.

8     Q.    And did you also know that he has attempted to

9  run for the Montana attorney general?

10    A.    He spoke about doing it.  I wasn't sure if he

11 was following through with it or not.

12    Q.    Did he ever talk to you about wanting to be a

13 law professor at the University of Montana?

14    A.    No.

15    Q.    Besides his work at Cottonwood, fair to say

16 that he's pursued other lines of work besides his

17 working at Cottonwood, right?

18    A.    Correct.

19    Q.    And do you believe that John has an interest

20 in these other jobs because Cottonwood was struggling

21 financially?

22    A.    Oh, I have no idea.

23    Q.    Is it your belief that Cottonwood is doing

24 today financially about as well as it has ever done?

25    A.    I honestly cannot answer that.  I don't know

1  about his financial affairs in that manner.

2      Q.   Did you visit John in the hospital following

3  his ski wreck on December 11th, 2015?

4      A.   The rehab facility.

5      Q.   So the one in Missoula?

6      A.   Correct.

7      Q.   And how long did you stay with him when you

8  visited him in Missoula?

9      A.   I believe we were there four days.  It was

10  over Christmas, I believe -- I don't recall the exact

11  dates, but it was over Christmas.  I believe it was four

12  days.

13      Q.   And is that the only time that you saw him was

14  around Christmas of 2015?

15      A.   That I -- for 2015, all I can recall seeing

16  him was at that time.

17      Q.   Did you go back and see him in January of

18  2016, as well?

19      A.   February of 2016 --

20      Q.   Okay.

21      A.   -- for a long weekend.

22      Q.   I'm sorry to cut you off.

23          You were there for a long weekend, you said?

24      A.   Correct.

25      Q.   And then were you there also in March of 2016?

```
 1        A.    No.

 2        Q.    So you remember visiting him in the rehab

 3   facility in Missoula around Christmas of 2015?

 4        A.    Correct.

 5        Q.    And then visiting him again for a long weekend

 6   in February of 2016 --

 7        A.    Correct.

 8        Q.    -- right?

 9        A.    Correct.

10        Q.    And did you visit him in Missoula at any time

11   after that?

12        A.    I do not recall.  I'm sorry.

13        Q.    And have you gone out and stayed or visited

14   with him in Big Sky, Montana?

15        A.    I went to Big Sky with him once.  Oh, my

16   goodness.  I want to say it was maybe 2009, but don't

17   quote me on that.  I had a friend visiting who was from

18   California and he took us there to go zip lining.

19        Q.    And since December 11th, 2015, have you gone

20   to Big Sky to visit John?

21        A.    Oh, I have not.

22        Q.    And have you visited John in Bozeman since

23   December 11th, 2015?

24        A.    Yes, I have.

25        Q.    How many times have you visited him in
```

LEXITAS

1  | Bozeman?

2  |     A.    2018, I was there in, I want to say, May and

3  | definitely September for his wedding.  I don't recall if

4  | I went out there in 2017 or not.  I'm sorry.

5  |     Q.    Okay.

6  |     A.    2019, I went out there in -- I believe it was

7  | November.  And I haven't been out there since.

8  |     Q.    On those times when you've visited John, how

9  | long did you stay in May of 2018?

10 |     A.    That was just a long weekend, like maybe four

11 | days.

12 |     Q.    What about September of 2018?

13 |     A.    The same, just a long weekend, like four days.

14 |     Q.    What about November of 2019?

15 |     A.    I believe that was just a long weekend, as

16 | well.

17 |     Q.    And have you -- has John come to visit you

18 | since December 11th, 2015?

19 |     A.    He has attempted to and I sent him home before

20 | he actually got to me.  And that was just because my

21 | home has been under a remodel and he was trying to

22 | surprise me.  And my fiancé let the cat out of the bag

23 | that he was coming.  And so I asked him, please do not

24 | come, my house is still under construction, I don't have

25 | anywhere for you to stay.  So yeah, he has not made it

LEXITAS

1  back there.

2      Q.   Have y'all had any sort of family vacations

3  outside of Montana or anything like that where y'all

4  have been around each other since December 11th, 2015,

5  outside of the ones you've told me about already?

6      A.   Oh, goodness.  We had Christmas at my dad's.

7  And I'm sorry.  The year escapes me.  I know I provided

8  photos from my Instagram.  I'm sorry.  The year does

9  escape me.  But we all got together at my dad's for a

10  long weekend.

11      Q.   Is that the only other time that you have seen

12  John in person that you can recall?

13      A.   Yes.

14      Q.   So how long were you in Missoula around

15  Christmas, December of 2015?

16      A.   Four days I believe it was.

17      Q.   And did you talk to John about his ski wreck

18  in December of 2015 when you were there?

19      A.   Not really John, but my dad.

20      Q.   And why didn't you talk to John?

21      A.   He was not in a -- I guess for lack of better

22  term, a good mental state.  He had memory loss.  He --

23  he didn't remember, I mean, little things.  He didn't

24  remember us being there, you know, one day to the next.

25      Q.   And at that time, could he remember anything

1  about his ski wreck?

2      A.   I don't recall us speaking anything about the

3  ski wreck.  He just kept complaining his arm hurt.

4      Q.   And did you talk -- you said you talked to

5  your dad, Ron, about the ski wreck; is that right?

6      A.   Of course, yes.

7      Q.   And what did your dad tell you about the ski

8  wreck?

9      A.   He basically regurgitated everything he sent

10  in the email, just what had happened or what they

11  thought had happened, that John was skiing and hit a Cat

12  Track.  I think that's what it's called.  And then it --

13  I guess he lost control at that point and hit a tree.

14  That's the only thing that I -- I was told that -- my

15  understanding of the accident.

16      Q.   And you think that your dad told you that?

17      A.   Yes.

18      Q.   Have you talked to Amanda Eggert about John's

19  ski wreck at all when you were in Missoula in December

20  of 2015?

21      A.   No, we didn't.  I only met her for a brief

22  time.  We were getting ready to leave and she was coming

23  to visit John.

24      Q.   And do you think that the things that your dad

25  told you about how the ski wreck occurred were things



1  that he had heard from Amanda Eggert?

2       A.   I do not know.

3       Q.   What other source of information do you think

4  your dad had about how the ski wreck occurred?

5       A.   I don't know how he got his information.

6       Q.   Was there anybody from Big Sky Ski Resort that

7  he talked to?

8       A.   I don't know.

9       Q.   And you know that Amanda Eggert was with John

10  at the time his ski wreck occurred, right?

11       A.   Yes.  I was told that.

12       Q.   And do you believe that she told your dad how

13  she thought the wreck occurred?

14       A.   I don't know.

15       Q.   When you were with John in February of 2016,

16  you said you were there for a long weekend?

17       A.   Correct.

18       Q.   And did the two of you talk about John's ski

19  wreck in -- when you were visiting him in February of

20  2016?

21       A.   Yes.

22       Q.   And what -- what did John tell you about his

23  ski wreck in February of 2016?

24       A.   He told me that he was skiing and he hit a Cat

25  Track that was iced over and lost control and was thrown

1    into a tree.

2         Q.    He told you that in February of 2016?

3         A.    Yes.

4         Q.    That's your testimony?

5         A.    Yes.

6         Q.    So between December of 2015 and February of

7    2016, you believe his memory of the accident had come

8    back or was he just telling you something that someone

9    else had told him?

10        A.    I do not know.

11        Q.    Do you agree with your dad that John doesn't

12   know how his ski wreck occurred?

13        A.    I do not know.

14        Q.    Did John tell you that his description of how

15   the wreck occurred was based on things that other people

16   had told him?

17        A.    That's a possibility.

18        Q.    And do you remember exactly when it was in

19   February of 2016 that you visited John?

20        A.    I do not recall the exact dates.  I'm sorry.

21        Q.    Was it about the middle of February?

22        A.    Maybe the middle to the end of February.  I

23   know Missoula was having a film festival and I went and

24   watched a film by myself at the film festival.  So I'm

25   sorry.  It was either middle or later February.

LEXITAS

David Marie Didney

1      Q.    Okay.  Understood.

2            Was it a good movie?

3      A.    It was.  Solar Power.

4      Q.    And you said that John told you that he hit a

5  Cat Track that was iced over; is that right?

6      A.    Correct.

7      Q.    And what did he say about the Cat Track being

8  iced over?  Did he say that is what caused him to lose

9  control?

10     A.    He just told me that he hit a Cat Track, it

11  was iced over, he lost control, and was flung into a

12  tree.

13     Q.    Did he tell you that he couldn't see the Cat

14  Track?

15     A.    He did not tell me that.

16     Q.    Did he mention anything in February of 2016

17  about his bindings malfunctioning?

18     A.    He didn't say anything about that to me.

19     Q.    Did you understand in February of 2016 that he

20  thought that his bindings had pre-released and caused

21  him to fall?

22     A.    I don't recall a conversation about his ski

23  bindings.

24     Q.    Have you ever talked to John at any time about

25  his belief that his ski bindings malfunctioned and



1  caused him to fall?

2      A.   He did make a comment to me several years back

3  that he wasn't sure if his bindings were bad on his skis

4  or not, he was going to take them in.  And when he said

5  in, I don't know where, to a ski shop maybe.  He was

6  going to take them in and have them examined.  That's

7  all.  I don't know much about skiing or anything, so I

8  just said okay.

9      Q.   Do you -- so when he told you that, he said

10 that at that time he was concerned that maybe his ski

11 bindings were defective and it caused his wreck; is that

12 accurate?

13     A.   He wasn't sure.  He was going to have the skis

14 checked.  He wasn't sure if that contributed to the

15 accident or not.

16     Q.   Right.

17          But he was concerned that they did?

18     A.   He wasn't sure.  That's why he had to have

19 them checked.

20     Q.   Sure.

21          But he was concerned that his ski bindings had

22 malfunctioned and caused the wreck, right?

23     A.   He wanted to rule out all possibilities.

24     Q.   And at that point, he hadn't made, in his own

25 mind, a decision about whether or not he believed his



1   ski bindings had malfunctioned, right?

2        A.   I don't know.

3        Q.   And did you talk with him about the results of

4   that inquiry about whether or not the ski bindings were

5   performing properly?

6        A.   You know, we never did, actually.

7        Q.   It came up that one time, he indicated that he

8   thought there could be a problem with his ski bindings,

9   and then it never came up again.

10        Is that your testimony?

11        A.   Correct.

12        Q.   You haven't had any discussions with John

13   since that one time about the issue of his ski bindings

14   in connection with his ski wreck at Big Sky?

15        A.   Not that I can recall, no.

16        Q.   And I just want to make sure that you're

17   mining your memory right now and that you don't, you

18   know, come to trial and suddenly have a different

19   memory.  So this is sort of like the one chance I get to

20   talk to you.

21        A.   Okay.

22        Q.   So your testimony is that to the best of your

23   recollection he never once said anything else to you

24   about the issue of his ski bindings in connection with

25   his wreck; true?

1        A.    Correct.

2        Q.    Okay.  And he's never told you that he

3   actually sued Dynafit, the manufacturer of his ski

4   bindings, and alleged that those bindings were defective

5   and caused his ski wreck; is that accurate?

6        A.    That is accurate.  I did not know that.

7        Q.    He's never told you that he was paid in a

8   settlement a monetary sum for his allegations about

9   his -- his ski bindings?

10        A.    No.  I was not aware of that.

11        Q.    Okay.  Since February of 2016, have you had --

12   have you told me everything that you can remember John

13   telling you about his ski wreck when he described it to

14   you in February of 2016?

15        A.    Yes.  He also did state that I guess it was --

16   honestly, I cannot tell you the date that he stated it.

17   But he stated that, apparently, there was an eyewitness

18   and he did not know that at the time.  This is just him

19   telling me this.  I don't know if there was an

20   eyewitness or not.  And this was a couple of years back,

21   I'd have to say, that he had mentioned that there was an

22   eyewitness.  And I was -- I was surprised because I

23   didn't know that.

24        Q.    So you're saying about two years ago, John

25   told you for the very first time that there was an



1  eyewitness to the wreck, right?

2       A.   Yes.  Don't hold me to a time frame because I

3  honestly do not recall the exact time frame.  But he did

4  mention to me that, apparently, there was an eyewitness.

5  And I -- that was the first I had heard of it.

6       Q.   Did he tell you anything about what the

7  eyewitness saw or described?

8       A.   No, he did not.

9       Q.   Has he talked to you at all about what the

10 eyewitness saw since that time?

11      A.   No.  We haven't spoken about the eyewitness at

12 all.

13      Q.   You've never talked to John about the

14 testimony that the eyewitness gave under oath in this

15 case; is that right?

16      A.   That is correct.

17      Q.   And that conversation took place a couple of

18 years approximately after this February of 2016

19 conversation; true?

20      A.   Approximately, yes.

21      Q.   And have you had -- other than the February --

22 and at that time when he told you about the eyewitness,

23 did he tell you anything about how -- did John tell you

24 anything else about how he believed his wreck had

25 occurred?



1        A.    No.

2        Q.    And other than the February 2016 conversation,

3  have you ever had any other conversations with John

4  about how he believed his wreck occurred?

5        A.    No.  It's not something we talked about

6  frequently.

7        Q.    So the only time that you've talked to John

8  about how John believed his wreck occurred was in

9  February of 2016; is that right?

10        A.    That's accurate.

11        Q.    And the only things that he told you at that

12  time was that he hit a Cat Track that was iced over,

13  lost control, and hit a tree, right?

14        A.    Correct.

15        Q.    John didn't tell you that he was skiing very

16  fast right prior to his wreck, did he?

17        A.    No, he did not.

18        Q.    And have you talked to anyone else about

19  John's wreck or how it occurred?

20        A.    My younger brother at the time that it

21  happened, my son, my fiancé.  They were with me at the

22  rehab facility.

23        Q.    And did you ever talk to Amanda Eggert about

24  John's wreck or how it occurred?

25        A.    I honestly cannot recall us having a

1   conversation about it.  The first time I met her was

2   briefly at the rehab facility.

3        Q.   Okay.  And when you were visiting John in May

4   of 2018, he never brought up the wreck, right?

5        A.   No.  We didn't talk about it.

6        Q.   Has John -- when you first saw John at the

7   rehab facility in Missoula, he couldn't remember the

8   wreck or describe it at all, correct?

9        A.   Correct.

10       Q.   And then your testimony is that in February of

11  2016 he described the wreck to you, right?

12       A.   Correct.

13       Q.   And do you know one way or another whether he

14  was telling you something from what he recollected or

15  whether he was telling you something from what other

16  people had told him?

17       A.   I do not know that.

18       Q.   And did you say -- did you ever ask him, do

19  you now remember the wreck?

20       A.   I never asked him that, no.

21       Q.   And you don't have an opinion one way or

22  another about whether or not John actually knows how his

23  wreck occurred, right?

24       A.   Correct.

25       Q.   Did you ever communicate with John in writing

1   about how his wreck occurred?

2       A.   I do not know.  We may have.  I -- it was so

3   long ago, I don't know.

4       Q.   Do you have -- you don't have any recollection

5   of the substance of any written communications about how

6   John's wreck occurred; true?

7       A.   No, no.  Sorry.

8       Q.   It is -- just for purposes of the record, I

9   want to make sure, that is true, you don't have a

10  recollection of the substance of any written

11  communications with John?

12      A.   I do not have recollection, no, sir.

13      Q.   Thank you.

14          Did John ever tell you that he wanted the

15  manufacturer of the ski bindings that he was skiing on

16  at the time of his wreck to issue a nationwide recall of

17  those bindings?

18      A.   I don't recall us having that conversation,

19  no.

20      Q.   Did he tell you that he had made a demand on

21  the manufacturer of his ski bindings for millions of

22  dollars to be paid to him?

23      A.   No, I do not recall having that conversation

24  either.

25      Q.   Do you think that John would make those kinds

1  of demands on the manufacturer of his ski bindings if he

2  did not have a sincere belief that the ski bindings

3  caused his wrecks and injuries?

4        A.   I don't know.

5        Q.   I mean, is John the kind of person who would

6  make multimillion dollar demands if he didn't believe

7  that they had done something wrong?

8        A.   I don't know.

9        Q.   I mean, you're his sister.  You've known him

10  all your life.

11            Do you think he would make a demand for

12  millions of dollars to be paid to him or his law firm if

13  he didn't believe that the company had done something

14  wrong that had harmed him?

15        A.   I honestly don't know.

16        Q.   So in other words, he could be the kind of

17  person that would make those types of demands without a

18  sincere belief that the company had done something

19  wrong?

20        A.   I don't know.

21        Q.   You don't know one way or another?

22        A.   Correct.

23        Q.   You told me that John never mentioned to you

24  anything about the Cat Track that was difficult to see

25  causing this wreck, right?



1       A.   I'm sorry.  Can you repeat the question?  You

2  kind of faded out.

3       Q.   I'm sorry.

4            You told me that John never told you that

5  there was a Cat Track that was difficult for him to see

6  that caused his wreck, correct?

7       A.   He never stated that to me, no.

8       Q.   Did anyone ever tell you that there was a Cat

9  Track that was difficult to see that caused John's

10 wreck?

11      A.   Not to my recollection, no.

12      Q.   Has John talked to you about a ski wreck that

13 he had in the summer of 2016?

14      A.   He mentioned that he had a wreck, but that --

15 that was -- that was it.  I mean, he just -- and I

16 remember getting upset and asking him if he was okay

17 and, you know, just the worried sister.

18      Q.   Did he tell you that he had fallen about 500

19 feet while back country skiing?

20      A.   Oh, no.  I didn't have that detail.

21      Q.   Did he talk to you about having broken ribs

22 from that ski wreck?

23      A.   I don't believe he told me about any injuries,

24 huh-uh.

25      Q.   He didn't tell you about how he had injured

David Marie Dizney

1   his knee in that ski wreck?

2       A.   No.  I don't recall us discussing any

3   injuries, just him saying that he had had a minor ski

4   wreck.

5       Q.   Has he talked to you about how since his ski

6   wreck in the summer of 2016 he's had breathing problems?

7       A.   No.  I wasn't aware of that.

8                MR. MORRIS:  Can we please show

9   Ms. Dizney the document that has the Bates Stamp Big Sky

10  1223.

11               THE REPORTER:  She has it before her.

12      Q.   (BY MR. MORRIS)  Ms. Dizney, what is the

13  document that's been placed in front of you with the

14  Bates Stamp Big Sky 1223?

15      A.   I don't have anything that says -- I'm sorry.

16  There's nothing --

17      Q.   The bottom right-hand corner.

18      A.   Oh, I'm sorry.  I was looking for the caption.

19  I'm sorry.

20           May you repeat the question?  I'm sorry about

21  that.

22      Q.   Sure.

23           What is this document that's been placed

24  before you?

25      A.   This is a photo of my brother when I was

1    visiting him in February.  This is -- I posted these

2    pictures later, so that's why the date stamp says March.

3    And this was -- I don't remember the exact name of the

4    mountain.  But it was when we went for a trail -- I

5    guess a trail walk, trail hike.

6         Q.   Sure.

7              MR. MORRIS:  Can we please mark this

8    Deposition Exhibit 133.

9              (Exhibit No. 133 marked.)

10             THE REPORTER:  It is marked and before

11   the witness.

12             MR. MORRIS:  Thank you.

13        Q.   (BY MR. MORRIS)  So Deposition Exhibit 133 is

14   a screen shot of an Instagram post that you made, right?

15        A.   Correct.

16        Q.   And it's dated March 8th, 2016?

17        A.   Correct.

18        Q.   And it has a picture of your brother,

19   John Meyer, right?

20        A.   Correct.

21        Q.   And this is from the time when you were

22   visiting John in February of 2016, correct?

23        A.   Correct.

24        Q.   And even though it's dated March 8th, 2016,

25   this is a photograph of a hike that -- or memorializing

1    a hike that you and John took in February of 2016 --

2          A.    Correct.

3          Q.    -- when you were in Missoula, right?

4          A.    Correct.

5          Q.    Okay.  Thank you.

6                And you said that it was a trail hike; is that

7    right?

8          A.    Yes.  It wasn't -- we -- it -- it was just an

9    easy hike into a trail that went to a hot spring.

10         Q.    And was it a natural hot spring?

11         A.    It was a natural hot spring, yes.  I'm sorry.

12   I don't recall the name of the trail.

13         Q.    Was it actually in Idaho?  Or did you guys

14   just drive up and over Lolo Pass to access this trail?

15         A.    I do not recall the exact name of it.  I'm

16   sorry.

17         Q.    That's okay.

18               But in any event, the two of you in February

19   went on this hike to go to this natural hot spring,

20   correct?

21         A.    Correct, yes.

22               MR. MORRIS:  And can we mark the document

23   Bates stamped Big Sky 1221 as Exhibit 134, please.

24               (Exhibit No. 134 marked.)

25               THE REPORTER:  It is marked and before

1    the witness.

2              MR. MORRIS:  Thank you.

3         Q.   (BY MR. MORRIS)  So Deposition Exhibit 134 is

4    an Instagram post that you made in February of 2016,

5    right?

6         A.   Correct.

7         Q.   And there is a picture there of John Meyer

8    sitting at a desk, right?

9         A.   Correct.

10        Q.   And this is from your time, as well, visiting

11   John in February of 2016, correct?

12        A.   Correct.

13        Q.   And where is -- where was John in this

14   picture, his apartment?

15        A.   No.  WildEarth Guardians' office where he

16   worked.

17        Q.   Okay.  So that picture was taken at his office

18   at WildEarth Guardians, right?

19        A.   Yes, sir.

20        Q.   And did you go and visit him at work while you

21   were there and take this picture?

22        A.   Yes, sir.

23        Q.   So was John working for WildEarth Guardians in

24   February of 2016?

25        A.   To my knowledge, yes.



1          MR. MORRIS:  Can we please mark the

2  document with the Bates Stamp Big Sky 1200 through 1201

3  as Deposition Exhibit 135.

4                    (Exhibit No. 135 marked.)

5          THE REPORTER:  It is marked and before

6  the witness.

7          MR. MORRIS:  Thank you.

8      Q.   (BY MR. MORRIS)  Deposition Exhibit 135 is an

9  email that you forwarded to me in response to the

10  subpoena we sent you, correct?

11     A.   Correct.

12     Q.   The email that you were forwarding was the one

13  that begins sort of towards the middle of the page from

14  your father, dated December 11th, 2015, right?

15     A.   Correct.

16     Q.   And this is the only email that you have

17  related to Mr. Meyer's ski wreck, correct?

18     A.   Correct.

19     Q.   And I think you said that you forwarded this

20  email on to your fiancé and your son, right?

21     A.   Correct.

22     Q.   And did you respond to this email?

23     A.   I don't recall responding in a written manner.

24     Q.   Okay.

25     A.   I believe I called my dad.



1    Q.    Have you had other outdoor sort of adventures

2  with John since his ski wreck?

3    A.    We went mountain biking in -- that was in May

4  of 2018.

5    Q.    Where did y'all go mountain biking?

6    A.    Unfortunately, I cannot tell you the name of

7  the hill.  It's -- it was in the Bozeman area.  It was a

8  mountain and it was pretty high.  I mean, it was -- for

9  me, it was pretty high up for my first time mountain

10  biking.

11    Q.    Okay.

12    A.    But yeah, mountain biking in May.  We really

13  don't do too many extreme sports with John.  That was

14  really the only -- the only thing.  It was more just he

15  worked a lot and we waited for him to get out of work

16  and then we would spend time together socializing, go

17  for walks, things like that.

18    Q.    Sure.

19          And why don't you do extreme sports with John?

20    A.    I'm old and I'm afraid that I -- that I will

21  not make it on some of the things.  I'm not as

22  adventurous as he is.

23    Q.    John and his wife, Amanda, recently had twins,

24  right?

25    A.    Yes.



David Marie Disney

1     Q.   And has John talked to you about -- about

2  being a dad?

3     A.   Yes.

4     Q.   And has he talked to you about not getting

5  enough sleep lately?

6     A.   Yeah, that's a common thing that he has said.

7     Q.   I mean, has it been -- have the twins been

8  really poor sleepers?

9     A.   Oh, I don't know that for a fact.

10     Q.   I mean, has he talked to you, you know,

11  repeatedly about the issues that the twins have had

12  sleeping and him not getting enough sleep?

13     A.   No.  It's more like friendly new dad banter,

14  are you getting much sleep?  No, I've got twins, are you

15  kidding me?  You know, just stuff like that, yeah.

16     Q.   Okay.  Are you aware of a counterclaim that

17  was filed by Big Sky Ski Resort against John in this

18  case?

19     A.   Yes.

20     Q.   And what's your understanding of that

21  counterclaim?

22     A.   Honestly, I was simply -- we were having a

23  conversation one day on the phone and he said that he

24  had sued Big Sky for the ski accident and that they had

25  a counterclaim back on it.  And I don't know a lot about

LEXITAS

1  legal stuff.  So he just said -- I asked, well, what

2  does that mean?  And he's like, it means I probably need

3  to get a lawyer.  But I mean, that was really the -- the

4  gist of it.

5      Q.   Okay.  And so you guys did have a conversation

6  about the fact that he had sued Big Sky, right?

7      A.   Yes.  It was just a passing -- like a passing

8  comment.  What have you been up to?  Oh, not much.  You

9  know, banter.  It wasn't something that he pointed out

10 and we had an in depth conversation surrounding it.

11     Q.   And did you say, why did you sue Big Sky or

12 anything of that nature?  Did you ask him why he had

13 sued Big Sky?

14     A.   I don't ask John why he does many things.  So

15 no.

16     Q.   What do you mean?  Why do you not ask him?

17     A.   John just marches to his own drum.  And I

18 don't question what he does and what he doesn't do.

19     Q.   And other than telling you that he thought he

20 should get a lawyer in response to being countersued,

21 did he talk to you at all otherwise about the

22 counterclaim filed by Big Sky?

23     A.   No, no.  There was no details or anything.

24 The comment he made about I should probably get a

25 lawyer, that was -- that was like kind of a funny in

1  jest type comment.  But he's always been very good about

2  keeping his private legal matters private.

3       Q.   Have you -- to your knowledge, has John been

4  stressed out about the lawsuit that he filed against

5  Big Sky?

6       A.   I honestly don't know.

7       Q.   And what about the countersuit that Big Sky

8  filed against him, to your knowledge, has John been

9  stressed out about that?

10      A.   I don't know.

11      Q.   Let's take a short break.  I might be through

12  with my questions.  But let's take a short break and

13  I'll go over my notes for a minute.  Okay?

14      A.   Okay.

15           MR. MORRIS:  We can go off the record.

16  Thank you.

17       (Break taken from 11:29 to 11:58 a.m.)

18      Q.   (BY MR. MORRIS)  Ms. Dizney, thank you for

19  your time.  That's all the questions that I have for you

20  at this time.  I think Ms. Walas is going to ask you

21  some questions and I may have some follow-up after that.

22           MR. MORRIS:  But otherwise, I will pass

23  the witness.

24           Thanks.

25           THE WITNESS:  Thank you.



```
 1                     EXAMINATION

 2   BY MS. WALAS:

 3        Q.    Hi, Ms. Dizney.  Can you hear me at a good

 4   level?

 5        A.    Yes.

 6        Q.    Okay.  And I wanted to get started real quick.

 7              Do you recall answering some questions about

 8   responding to a subpoena?

 9        A.    Yes.

10        Q.    And there's a stack of documents that's near

11   you now.  Can you take a look at that and let me know if

12   those are the documents that you produced in response to

13   that subpoena.  And those have been Bates stamped

14   Big Sky 1200 to 1257.

15        A.    Yes, ma'am.

16        Q.    And go ahead and just flip through that and

17   just make sure that that is everything that you have

18   produced.

19        A.    (Witness complies.)

20              Yes, ma'am, everything's here.

21        Q.    And what I'm going to do is I'm going to -- am

22   I getting kickback?  Is that what I was hearing?  I'm

23   going to turn my volume down.  I might be getting my own

24   kickback.

25              Ms. Dizney, I'm going to go ahead and refer to
```

1  the Bates stamp number on those pages we just went

2  through during the course of this questioning.  We'll go

3  ahead and pull some pages out.

4          Now, if I recall earlier from your testimony,

5  you said that you sent Mr. Meyer an email in response to

6  the subpoena, as well; is that correct?

7      A.   No.

8      Q.   Will you go ahead and pull out what's been

9  marked as Big Sky 1255 to 1257.  It's in the back of

10  that packet.

11      A.   (Witness complies.)

12          Oh, I sent Mr. Morris an email, yes, in

13  regards to the subpoena.

14      Q.   Okay.

15          MS. WALAS:  And we'll go ahead and mark

16  that as Depo Exhibit 136, Bates stamp 1255 to 1257.

17          THE REPORTER:  Okay.

18          (Exhibit No. 136 marked.)

19      A.   I apologize.  I thought you said the email

20  sent to Mr. Meyer.

21      Q.   (BY MR. MORRIS)  I probably did.

22      A.   Yes, I did send this email to Mr. Morris.

23      Q.   What was the purpose of that email?

24      A.   This email was just a breakdown to let

25  Mr. Morris know what I had and what I no longer had in

1    reference to what I was being asked to provide for the

2    deposition today.

3        Q.   Okay.  And I think it's No. 1 on kind of that

4    list, you reference something called caringbridge.org.

5            Do you recall that?

6        A.   Yes, ma'am.

7        Q.   And what is caringbridge.org?

8        A.   It was a site where you could put things up, I

9    guess like -- it was kind of like an update site.  I

10   don't remember specifically.  I apologize.  Someone had

11   passed it along to me because a lot of people were

12   asking me for updates on my brother after his accident.

13   A lot of people were reaching out to me, his friends

14   that I did not know.  And so that was kind of passed

15   along like, hey, you might want to set something up on

16   this site just so you can post updates so that you don't

17   have to keep responding to people individually.

18       Q.   So you used that site to sort of track John's

19   progress after the wreck?

20       A.   Yes.

21       Q.   Now, you were obviously aware that John was in

22   a ski wreck, correct?

23       A.   Correct.

24       Q.   And how did you learn of the wreck?

25       A.   My dad contacted me and told me about the



David Marie Disney

```
 1   wreck.  I honestly cannot recall if I received the email

 2   first or if he called me first.

 3       Q.   What did you do in response to that

 4   notification?

 5       A.   I forwarded the email to my fiancé and to my

 6   son so that they knew what was going on.  And I freaked

 7   out a little bit.  And then I believe that I called my

 8   dad.

 9       Q.   And when you refer to that email, is that

10   Deposition Exhibit 135?

11       A.   Yes, 135.

12       Q.   And that email from your dad, does that kind

13   of describe John's condition?

14       A.   Yes, ma'am.

15       Q.   And what was, you know, John's condition when

16   you first learned of his wreck?

17              MR. MORRIS:  Objection; foundation.

18       Q.   (BY MS. WALAS)  You can answer when he

19   objects.  Sorry.  I don't think either of us explained

20   that.  If there's an objection, you can then answer the

21   question unless someone directs you not to.

22       A.   Okay.  I'm sorry.

23              MS. WALAS:  Could you go ahead and read

24   back the question.

25                   (Record read.)
```



1        MR. MORRIS:  Same objection.

2     A.   I thought -- I mean, I thought he was dying

3  personally, in my opinion.  When I had the information

4  he was bleeding from the brain, he was in a coma, I

5  wanted to get on a plane and go out there immediately.

6  And my dad refused to let either myself or my younger

7  brother come and see John in that condition.

8     Q.   (BY MS. WALAS)  Okay.  So you said you wanted

9  to get on a plane immediately, but your dad wouldn't let

10  you because he didn't want you to see John's condition.

11        When did you get out there to see John?

12     A.   We flew in on December 24th.  And I basically

13  had told my dad, I'm coming whether you like it or not.

14  And we got on a plane and we went.

15     Q.   So you spent Christmas 2015 in Montana?

16     A.   Correct.

17     Q.   And where was John at that time?

18     A.   He was in a rehab facility in Missoula.  I

19  don't remember the name of it.  He was transported on

20  the 24th by my dad from Billings to the rehab facility

21  in Missoula.

22     Q.   So were you ever at the hospital in Billings?

23     A.   No, ma'am.  My dad would not allow me to come.

24     Q.   And so the first time you saw John was at the

25  rehab facility in Missoula?

LEXITAS

David Marie Disney

```
 1        A.    Yes, ma'am.

 2        Q.    And what did John look like when you got

 3  there?

 4        A.    Like he had been through hell.  I'm sorry.

 5  Like he had been through hell and back.  He was -- I

 6  believe when we walked in, he was sleeping.  And he --

 7  he was in a really bad way.  I mean, he was -- he just

 8  didn't even look like himself.

 9        Q.    And now this might not have been the first

10  thing on your mind.

11              But did you take any photos when you got there

12  to, you know, commemorate Christmas?

13        A.    No, ma'am, not when we first got there.

14        Q.    Okay.  Did you take any photos while you were

15  there visiting John at the rehab facility?

16        A.    Yes, ma'am.

17        Q.    Do you -- I believe you said you posted some

18  photos on Instagram.

19              Do you know if any of those photos were part

20  of the Instagram post?

21        A.    Yes, ma'am.  They're part of the exhibit.

22        Q.    They're part of that big stack?

23        A.    Yes, ma'am, they're in here.

24        Q.    Okay.

25        A.    Would you like me to pull them out?
```



1        Q.   If you would, please, pull out the photos from

2   that -- from that rehab facility visit.

3        A.   Big Sky 1217, Big Sky 1218.  I didn't take

4   that one.  My dad took that one.  I'll just go through

5   and make sure there's not any more.

6             Those are the only two.

7        Q.   Okay.

8             MS. WALAS:  So we'll go ahead and make

9   Big Sky 1217 to 1218 Depo Exhibit 137.

10             THE REPORTER:  Okay.

11             (Exhibit No. 137 marked.)

12        Q.   (BY MR. MORRIS)  And Ms. Dizney, these -- the

13   photos that are in Deposition Exhibit 137, these are the

14   photos that you took when you first visited John after

15   his wreck?

16        A.   Yes, ma'am, in the rehab facility.

17        Q.   In the rehab facility.

18             And do you recall if you took any other photos

19   while you were there with him?

20        A.   I do not recall.

21        Q.   Do these photos capture all of what John

22   looked like when you saw him in the rehab facility?

23             MR. MORRIS:  Objection; vague.  And I'm

24   going to object to this line of questioning on the

25   grounds that it's been excluded pursuant to the Court's

1  order.

2      Q.   (BY MS. WALAS)  Did you understand my

3  question?

4      A.   No.

5      Q.   Okay.

6      A.   Sorry.

7      Q.   I'll just try to rephrase it since it didn't

8  make sense the first time.

9           We're talking about Deposition Exhibit 137.

10  And those are photos you took of John at the rehab

11  facility?

12      A.   Yes, ma'am.

13           MR. MORRIS:  I'm going to object that

14  Big Sky 1218 clearly wasn't taken by Ms. Dizney.

15      Q.   (BY MS. WALAS)  Ms. Dizney --

16      A.   Yes.

17      Q.   -- did you understand the question that I had

18  asked?

19      A.   I thought you had asked do these pictures

20  represent what John looked like when -- after the

21  accident when I got there.

22           MS. WALAS:  Court reporter, will you go

23  ahead and read back my question right before

24  Mr. Morris's objection.

25              (Record read.)

1        Q.   (BY MS. WALAS)  And to clarify, those are the

2  photos you have of John from the rehab facility,

3  correct?

4        A.   Yes, ma'am.

5        Q.   And I mistakenly referred to earlier that you

6  took them.

7             But those are the photos that you have of John

8  from the rehab facility?

9        A.   Yes, ma'am.  I specifically took Big Sky 1217.

10  That's a selfie.  I specifically took that one.

11       Q.   Okay.  And now earlier when you were

12  describing seeing John for the first time in the rehab

13  facility, do these pictures reflect that first initial

14  visit with him?

15       A.   Yes, ma'am.

16       Q.   And describe your visit with John in the rehab

17  facility.

18             MR. MORRIS:  I'm going to object to this

19  line of questioning that it has been excluded pursuant

20  to the Court's order.

21       Q.   (BY MS. WALAS)  You can answer.

22       A.   I can answer?

23       Q.   Yes.

24             THE WITNESS:  Can you please repeat the

25  question?

1                    (Record read.)

2        A.   It was heartbreaking.  He didn't know -- at

3  first, it didn't seem like he really knew who we were.

4  We would talk to him and you could tell his memory was

5  off just because he didn't remember things.  He -- you

6  could tell he was struggling to kind of put who we were

7  together.  He couldn't tell time.  He had a very

8  difficult time feeding himself.  He could barely put

9  puzzles together that were -- that the therapist would

10  normally give, like, a kindergartner, a wood block

11  puzzle, he could barely put those together.  And he kept

12  complaining that his left arm was hurting extremely bad.

13        Q.   (BY MS. WALAS)  And after that trip, when is

14  the next time you saw John?

15        A.   I believe -- oh, it was in February of 2016.

16  I went to visit him for a long weekend.

17        Q.   And is that when y'all went on that walk to

18  the hot spring --

19        A.   Yes, ma'am.

20        Q.   -- that you talked about in Depo Exhibit 133?

21        A.   Yes, ma'am.

22        Q.   Talk about John on that -- on that walk.

23             MR. MORRIS:  Again, I'll object that this

24  line of questioning has been excluded pursuant to the

25  Court's order.



1      Q.   (BY MS. WALAS)   Ms. Dizney, go ahead and

2   describe John on that walk.

3      A.   He was much better than he was in December in

4   the rehab facility from a physical standpoint.   In my

5   opinion, his mental capacity was -- was not the same as

6   before his accident.   He was a little slower in his

7   processing responses.   His speech was almost like he was

8   drunk.   He was -- it was like he would slur some words.

9   Physically, he looked better.   But mentally, I could

10  tell he wasn't back to himself 100 percent.

11     Q.   And can you give an example of what you mean

12  by mentally he wasn't back 100 percent.

13          MR. MORRIS:   Same objection to the --

14  that I made to the previous question.   This has been

15  excluded pursuant to the Court's order.

16     A.   It's hard to describe.   He just -- I guess

17  knowing him all my life, he just wasn't himself.   He

18  just wasn't 100 percent.   And I apologize.   I don't know

19  how to really -- to really say that.

20     Q.   (BY MS. WALAS)   Now, before the wreck, when

21  was the last time you had seen him?

22     A.   Before the wreck, I believe it was in 2014, we

23  had gone to Seattle.   And I'm not sure if I saw him

24  again in 2014 or not.

25     Q.   And if -- do you recall if you produced

1   pictures from that Seattle trip?

2       A.   The Seattle trip, yes.

3       Q.   And you're ahead of me.  Will you go ahead and

4   pull those out.

5       A.   Yes, ma'am.

6            There was also a family trip we took to Belize

7   in May of 2015.  Those pictures are in here, as well, if

8   you need me to pull those out.

9       Q.   That would be great.  Go ahead and pull those

10  out, as well.

11      A.   Okay.  The Seattle photos -- let me put them

12  in order for you.

13           Okay.  The Seattle photos are Big Sky 1205

14  through Big Sky 1213.

15           MS. WALAS:  And so we'll go ahead and

16  make Big Sky 1205 through 1213 Depo Exhibit 138.

17           THE REPORTER:  Okay.

18           (Exhibit No. 138 marked.)

19      Q.   (BY MS. WALAS)  Let me go ahead and ask the

20  question so the record is clear first.

21           And can you identify the photos that are from

22  your Belize trip.

23      A.   Big Sky 1214 through Big Sky 1216.

24           MS. WALAS:  We will make Depo Exhibit 139

25  Big Sky 1214 to Big Sky 1216 the Belize photos.

```
 1                      THE REPORTER:  Okay.

 2                      (Exhibit No. 139 marked.)

 3        Q.   (BY MS. WALAS)  And when was your trip to

 4   Belize?

 5        A.   That was in May of 2015.

 6        Q.   And when was the trip to Seattle?

 7        A.   That was in, I believe, May of 2014.

 8        Q.   So did you see John any time between Belize

 9   and when you saw him in Missoula at the rehab facility?

10                      THE WITNESS:  I'm sorry.  Can you repeat

11   that?

12                      (Record read.)

13        A.   No, ma'am.

14        Q.   (BY MS. WALAS)  And so Belize was the last

15   time you were with John prior to his ski wreck?

16        A.   Yes, ma'am.

17        Q.   Describe John on that trip.

18                      MR. MORRIS:  I object that this question

19   and any response to it are in violation of the Court's

20   order.

21        Q.   (BY MS. WALAS)  Do you recall the question?

22        A.   Can you please repeat the question?  I'm

23   sorry.

24                      MS. WALAS:  Court reporter, will you go

25   ahead and read that back for me, please.
```

Dawn Marie Bidney

```
 1                      And Mac, I'll note your objection to it.

 2                      (Record read.)

 3      A.    Fun-loving --

 4                 MR. MORRIS:   Same objection.

 5      A.    Fun-loving, pleasing as always.  Just he

 6 worked -- actually worked quite a bit while we were

 7 there.  Just his normal upbeat outgoing self.

 8      Q.    (BY MS. WALAS)  Compare that to your trip that

 9 is identified in Deposition Exhibit 133.

10                 MR. MORRIS:   Same objection.

11      A.    It was quite different.  He was not his

12 upbeat, fun self.  He was still working a lot.  Even

13 though I was there visiting him, he was back in the

14 office working.  But he was slower paced.  His speech

15 was slurred at times.  His whole demeanor, his whole

16 personality was different.

17      Q.    (BY MS. WALAS)  Now, you were asked about

18 giving John some money in various forms.

19           Do you recall that?

20      A.    Yes, ma'am.

21      Q.    And have you paid for -- I believe you

22 testified you paid for a trip for John?

23      A.    I didn't pay for trips.  I've offered, like,

24 my dad to pay for plane tickets and stuff.  But my dad

25 usually takes care of the expenses for John.
```

**LEXITAS**

 1        Q.    And why would you offer?

 2        A.    Because I -- it's just who I am.  I -- I

 3   always want to take care of my family.  And if I don't

 4   feel that they can provide the funds, you know, to go

 5   someplace like Belize, you know, I don't want them to

 6   miss out.

 7        Q.    And is that why you send him birthday gifts?

 8        A.    Yes.  I do that with my younger brother, as

 9   well.

10        Q.    And why did you make donations to Cottonwood?

11        A.    Because I believe in the causes that John is

12   supporting.

13        Q.    And are you on the Cottonwood board?

14        A.    I am not.

15        Q.    And are you involved in operating Cottonwood?

16        A.    Not at all.

17        Q.    And I believe you testified that you're OCD;

18   is that correct?

19        A.    I am.

20        Q.    Is John like you in that way?

21        A.    I really can't answer that.

22        Q.    Do you think John's organized?

23        A.    No.

24        Q.    How's John's memory?

25        A.    I don't know.  Sometimes I -- I can -- I have

1  to -- like, I'll ask him about something from the

2  family, family related, and he won't remember.  And then

3  I'll have to kind of keep going and then something will

4  jog his memory.  But it's -- that's mainly been since

5  the accident, in my opinion.

6                MR. MORRIS:  I'm going to move to strike

7  the portion of the testimony that violates the Court's

8  order.

9       Q.   (BY MS. WALAS)  Now, do you know what goes on

10  in John's head?

11      A.   I do not.

12      Q.   So when you were asked questions about what

13  John was thinking, you have no way of knowing that?

14      A.   No, ma'am, I do not.

15      Q.   Or why John does anything?

16      A.   No, I have no idea.

17      Q.   And do you recall being asked about John's

18  medical records?

19      A.   Yes, ma'am.

20      Q.   And do you know what John's injuries were from

21  the wreck?

22      A.   The only items I know is what my father had

23  put in the email, as well as they found an additional

24  injury at the rehab facility of a broken left arm.

25      Q.   And when you were visiting at the rehab

1   facility, did you -- was John in a cast?

2       A.   No, ma'am.  He --

3               MR. MORRIS:  Object to the -- I'm sorry.

4   Let me make my objection.

5               I object to the question and the answer

6   because it violates the Court's order.

7               Go ahead.

8       A.   His arm was not in a cast.  He just kept

9   complaining that it hurt consistently.  After a couple

10  of days, we finally mentioned it to one of the nurses,

11  you know, he keeps holding his arm and saying it hurts,

12  can we please have somebody check it.  They took him

13  down for an x-ray and came back and said sure enough,

14  it's broken.

15      Q.   (BY MS. WALAS)  Okay.  And you were asked

16  about John's medical bills.

17              Do you recall that?

18      A.   Yes, ma'am.

19      Q.   And do you know if John incurred any expenses

20  related to the injuries that he sustained in his wreck?

21              MR. MORRIS:  Objection; speculation,

22  foundation, asked and answered.

23              You can answer.

24      A.   I only know that he said he's had hospital

25  bills.  I don't know specifics or details or breakdowns

 1  of anything.

 2      Q.   (BY MS. WALAS)  And have you altered the

 3  recollection of the events and the things you have

 4  testified about today because you're John's sister?

 5              MR. MORRIS:  Objection; leading.

 6      A.   Yes.  Maybe I didn't understand the -- I'm

 7  sorry.

 8      Q.   (BY MS. WALAS)  I'll go ahead and ask it

 9  again.

10          Did you alter your recollection of the events

11  and things you testified about today because you're

12  John's sister?

13      A.   Oh, absolutely not.  I'm sorry.  You were hard

14  to hear before.  I was straining.  No.  I'm telling the

15  truth on everything.

16      Q.   I don't have any further questions at this

17  time.  Mr. Morris may.

18      A.   Yes, ma'am.

19      Q.   I'm passing you to Mr. Morris.  I'm moving

20  away from the mic for some reason.

21      A.   You've been hard to hear.  I apologize.

22              MR. MORRIS:  I don't have any further

23  questions either.

24              Thank you so much for your time,

25  Ms. Dizney.  I appreciate it.



```
 1                    THE WITNESS:  Thank you, guys.  If you
 2   need anything else, feel free to reach out.  I just --
 3   I'm here to provide whatever I can.
 4                    MR. MORRIS:  Thank you.
 5                    MS. WALAS:  Thank you.
 6                    You have the option to read and sign your
 7   deposition.  What that means is you can -- she'll type
 8   up everything she's done today and she can send it to
 9   you and you can sign it -- review it and sign it and
10   make -- if there's something minor or something to
11   change or you can waive that.  That is up to you.
12                    THE WITNESS:  Okay.  Thank you very much.
13   I appreciate the time for you both.
14                    THE REPORTER:  Okay.  What would you like
15   to do?
16                    THE WITNESS:  Oh, I need to make a
17   decision?
18                    THE REPORTER:  Yes.
19                    THE WITNESS:  Okay.
20                    No.  Everything I've said is -- I don't
21   need to review it.  It's true statements.  I don't need
22   to -- I can just sign and -- or waive or whatever.
23                    THE REPORTER:  Okay.  We are off the
24   record.
25                    (Deposition concluded at 12:38 p.m.)
```



```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MONTANA
 2                       BUTTE DIVISION

 3   JOHN MEYER,                    )
                                    )
 4        Plaintiff,                )
                                    ) Cause No. 18-CV-02-BMM
 5   vs.                            )
                                    )
 6   BIG SKY RESORT,                )
                                    )
 7             Defendant.           )

 8
                      REPORTER'S CERTIFICATION
 9            DEPOSITION OF DAWN MARIE DIZNEY
                     SEPTEMBER 11, 2020
10

11            I, Lezley Cull, Certified Shorthand Reporter

12   in and for the State of Texas, hereby certify to the

13   following:

14            That the witness, DAWN MARIE DIZNEY, was duly

15   sworn by the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by

17   the witness;

18            That examination and signature of the witness

19   to the deposition transcript was waived by the witness

20   and agreement of the parties at the time of the

21   deposition;

22            That the original deposition was delivered to

23   Mr. Mac Morris;

24            That the amount of time used by each party at

25   the deposition is as follows:
```



1              Mr. Mac Morris, 1:28

2              Ms. Breean Walas, 0:40

3              That $_____ is the deposition officer's

4    charges to the DEFENDANT for preparing the original

5    deposition transcript and ay copies of exhibits;

6              That pursuant to information given to the

7    deposition officer at the time said testimony was taken,

8    the following includes all parties of record:

9              Ms. Breean Walas, Attorney for Plaintiff

10             Mr. Mac Morris, Attorney for Defendant

11             That a copy of this certificate was served on

12   all parties shown herein on _____ and filed with

13   the Clerk pursuant to Rule 203.3.

14             I further certify that I am neither counsel

15   for, related to, nor employed by any of the parties or

16   attorneys in the action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19             Certified to by me this 30th day of September

20   2020.

21   _____
     Lezley Cull, Texas CSR 5528
22   Expiration Date: 04/30/22
     Lexitas, Firm Registration #459
23   325 N. St. Paul
     Suite 1900
24   Dallas, Texas 75201
     214-373-4977

25



## Exhibits

**Dizney Exh 132**  3:7 13:13,21,23

**Dizney Exh 133**  3:8 50:8, 9,13 67:20 71:9

**Dizney Exh 134**  3:9 51:23,24 52:3

**Dizney Exh 135**  3:10 53:3,4,8 61:10

**Dizney Exh 136**  3:11 59:16,18

**Dizney Exh 137**  3:12 64:9,11,13 65:9

**Dizney Exh 138**  3:13 69:16,18

**Dizney Exh 139**  3:14 69:24 70:2

---

### $

**$1,000**  27:13,16

**$200**  27:12

**$30,000**  28:2

---

### 1

**1**  60:3

**100**  68:10,12,18

**11**  18:15

**11:29**  57:17

**11:58**  57:17

**11th**  14:12 18:11 23:13 32:3 33:19,23 34:18 35:4 53:14

**1200**  53:2 58:14

**1201**  53:2

**1205**  69:13,16

**1213**  69:14,16

**1214**  69:23,25

**1216**  69:23,25

**1217**  64:3,9 66:9

**1218**  64:3,9 65:14

**1221**  51:23

**1223**  49:10,14

**1255**  59:9,16

**1257**  58:14 59:9,16

**12:38**  76:25

**132**  13:13,19,21,23

**133**  50:8,9,13 67:20 71:9

**134**  51:23,24 52:3

**135**  53:3,4,8 61:10,11

**136**  59:16,18

**137**  64:9,11,13 65:9

**138**  69:16,18

**139**  69:24 70:2

---

### 2

**2005**  4:12

**2009**  33:16

**2010**  14:12 17:18

**2014**  68:22,24 70:7

**2015**  18:11,15 23:13 27:24 28:2,9 32:3,14,15 33:3, 19,23 34:18 35:4,15,18 36:20 38:6 53:14 62:15 69:7 70:5

**2016**  32:18,19,25 33:6 37:15,20,23 38:2,7,19 39:16,19 42:11,14 43:18 44:2,9 45:11 48:13 49:6 50:16,22,24 51:1 52:4,11, 24 67:15

**2017**  18:21,23 19:6 20:13

26:24 34:4

**2018**  10:8 26:24 27:2 34:2, 9,12 45:4 54:4

**2019**  34:6,14

**2020**  26:24

**24th**  62:12,20

**2616**  4:8

---

### 4

**47**  11:9

---

### 5

**500**  48:18

---

### 7

**75071**  4:9

---

### 8

**8th**  50:16,24

---

### A

**a.m.**  57:17

**absolutely**  6:16 75:13

**access**  51:14

**accident**  19:2 20:10 22:2 36:15 38:7 40:15 55:24 60:12 65:21 68:6 73:5

**account**  15:5 19:14,16 27:21

**accurate**  9:6,7 21:1 40:12 42:5,6 44:10

**activities**  24:19 25:8,12

**addition**  15:19

**additional**  73:23

LEXITAS

**address** 4:6,10,16

**adventures** 54:1

**adventurous** 54:22

**affairs** 32:1

**afraid** 54:20

**agree** 23:23 25:7,17,24
38:11

**ahead** 6:18 58:16,25 59:3,
8,15 61:23 64:8 65:23
68:1 69:3,9,15,19 70:25
74:7 75:8

**allegations** 42:8

**alleged** 42:4

**alter** 75:10

**altered** 75:2

**Amanda** 36:18 37:1,9
44:23 54:23

**amount** 26:16

**answering** 58:7

**anticipate** 5:11 11:1

**anxiety** 23:17

**anymore** 11:6 17:20 27:21

**apartment** 52:14

**apologize** 59:19 60:10
68:18 75:21

**apparently** 42:17 43:4

**appearing** 5:6

**approximately** 4:19
43:18,20

**archive** 19:22

**area** 54:7

**arm** 18:19,25 36:3 67:12
73:24 74:8,11

**aspects** 29:5

**assisted** 21:16

**associate's** 9:18,23 10:1

**assume** 6:19

**attempted** 31:8 34:19

**attorney** 8:20 21:16 31:9

**August** 4:12

**aware** 25:6 28:16 29:24
42:10 49:7 55:16 60:21

**B**

**bachelor's** 9:25

**back** 11:1 21:25 25:1
30:17 32:17 35:1 38:8
40:2 42:20 48:19 55:25
59:9 61:24 63:5 65:23
68:10,12 70:25 71:13
74:13

**bad** 40:3 63:7 67:12

**bag** 34:22

**bank** 15:23

**banter** 55:13 56:9

**barely** 67:8,11

**based** 38:15

**basically** 29:13,15 36:9
62:12

**Bates** 49:9,14 51:23 53:2
58:13 59:1,16

**beer** 8:5

**begins** 53:13

**belief** 31:23 39:25 47:2,18

**believed** 40:25 43:24
44:4,8

**Belize** 69:6,22,25 70:4,8,
14 72:5

**benefits** 28:23 29:10

**Bennett** 29:23 30:1

**big** 21:18 33:14,15,20
37:6 41:14 49:9,14 51:23
53:2 55:17,24 56:6,11,13,

22 57:5,7 58:14 59:9
63:22 64:3,9 65:14 66:9
69:13,14,16,23,25

**biking** 24:19 54:3,5,10,12

**Billings** 62:20,22

**bills** 21:7,11,14,18,21
23:7 74:16,25

**bindings** 39:17,20,23,25
40:3,11,21 41:1,4,8,13,24
42:4,9 46:15,17,21 47:1,2

**birthday** 16:2 27:11 72:7

**bit** 5:14 7:8 61:7 71:6

**bleeding** 62:4

**block** 67:10

**board** 72:13

**bottom** 49:17

**Bozeman** 33:22 34:1 54:7

**brain** 62:4

**break** 6:23,24 7:4,5 57:11,
12,17

**breakdown** 59:24

**breakdowns** 74:25

**breathing** 49:6

**Breean** 8:20 13:14

**briefly** 45:2

**broken** 48:21 73:24 74:14

**brother** 8:17 14:19 15:25
16:5 20:9,11 21:3 22:2,5
28:5 44:20 49:25 50:18
60:12 62:7 72:8

**brought** 45:4

**bye** 7:23

**C**

**California** 33:18

**call** 8:24 31:4



**called** 8:23 28:14 36:12
53:25 60:4 61:2,7

**campaigning** 31:4

**capacity** 68:5

**caption** 49:18

**capture** 64:21

**care** 71:25 72:3

**caringbridge.org** 60:7

**caringbridge.org.** 60:4

**case** 12:10 16:6 21:20
23:4,8 43:15 55:18

**cast** 74:1,8

**cat** 34:22 36:11 37:24
39:5,7,10,13 44:12 47:24
48:5,8

**categories** 14:9

**caused** 39:8,20 40:1,11,
22 42:5 47:3 48:6,9

**causing** 47:25

**Center** 15:12,17

**challenge** 25:16

**chance** 41:19

**change** 24:13,16 28:19,20
76:11

**characterize** 25:19

**check** 16:2 74:12

**check-ins** 19:1,9

**checked** 40:14,19

**checking** 12:19 18:19,24

**checks** 15:24 26:21 27:10

**child** 11:18

**Christmas** 32:10,11,14
33:3 35:6,15 62:15 63:12

**circumstance** 30:11,13

**City** 9:17 10:2

**claims** 18:16

**clarify** 6:7 18:9 29:6 66:1

**classifying** 31:3

**clear** 5:14 19:4 69:20

**clients** 10:13

**climb** 24:21 25:3

**close** 12:5,6

**closed** 28:10,11

**Clover** 4:8

**Club** 24:5

**clutter** 18:5

**college** 9:9,17 10:2 25:20
26:6

**coma** 62:4

**commemorate** 63:12

**comment** 40:2 56:8,24
57:1

**common** 5:10 55:6

**communicate** 12:17
45:25

**communicated** 18:7

**communicating** 20:25

**communication** 12:22

**communications** 17:12
18:22 46:5,11

**company** 47:13,18

**Compare** 71:8

**complaining** 36:3 67:12
74:9

**complies** 58:19 59:11

**comply** 14:14,16

**complying** 14:20

**computers** 16:14

**concerned** 40:10,17,21

**concluded** 76:25

**condition** 61:13,15 62:7,
10

**conditions** 23:12

**confusing** 6:14

**Congress** 31:1,6

**connection** 41:14,24

**consistent** 26:25

**consistently** 74:9

**construction** 34:24

**contact** 12:14

**contacted** 60:25

**continued** 9:17

**continuing** 9:20

**contributed** 40:14

**control** 36:13 37:25 39:9,
11 44:13

**conversation** 39:22
43:17,19 44:2 45:1 46:18,
23 55:23 56:5,10

**conversations** 44:3

**copies** 15:24 16:16,19

**corner** 49:17

**correct** 5:5,8 13:8 14:5,13
15:6,8,13,22 16:8,11,15
17:6,15,19,25 19:7,17
20:18 21:9 22:10,12,13,
17 24:10,11 25:4,10
26:12,21,22 28:16 31:18
32:6,24 33:4,7,9 37:17
39:6 41:11 42:1 43:16
44:14 45:8,9,12,24 47:22
48:6 50:15,17,20,22,23
51:2,4,20,21 52:6,9,11,12
53:10,11,15,17,18,21
59:6 60:22,23 62:16 66:3
72:18

**correction** 22:19

**correspondence** 14:7



**Cottonwood** 15:11,15,16
26:18 27:18 28:10,25
29:1,5,23 30:1,17,19,24
31:15,17,20,23 72:10,13,
15

**counseling** 23:16

**counterclaim** 55:16,21,25
56:22

**countersued** 56:20

**countersuit** 57:7

**country** 12:7 25:1 48:19

**couple** 42:20 43:17 74:9

**court** 4:8 5:15 12:25 65:22
70:24

**Court's** 64:25 66:20 67:25
68:15 70:19 73:7 74:6

**credits** 9:22

**cross-country** 11:18

**cut** 32:22

## D

**dad** 10:19 22:5 35:19
36:5,7,16,24 37:4,12
38:11 53:25 55:2,13
60:25 61:8,12 62:6,9,13,
20,23 64:4 71:24

**dad's** 21:3 35:6,9

**dangers** 25:8

**date** 27:14 42:16 50:2

**dated** 50:16,24 53:14

**dates** 27:19 32:11 38:20

**Dawn** 4:2,8

**day** 7:22 8:1 35:24 55:23

**days** 32:9,12 34:11,13
35:16 74:10

**December** 14:12 18:11,
15,21,23 19:6 20:13
23:13 32:3 33:19,23

34:18 35:4,15,18 36:19
38:6 53:14 62:12 68:3

**decision** 40:25 76:17

**defective** 40:11 42:4

**degree** 9:24 10:1

**delete** 15:1 17:4,7 18:2
20:16,19

**deleted** 15:4 17:24 19:13,
18 22:16

**delivery** 10:11

**demand** 46:20 47:11

**demands** 47:1,6,17

**demeanor** 71:15

**Depo** 59:16 64:9 67:20
69:16,24

**deposition** 4:20,22 5:2,9
7:12,25 8:2,7,18,21,25
13:13,23 15:14 50:8,13
52:3 53:3,8 60:2 61:10
64:13 65:9 71:9 76:7,25

**depression** 23:19

**depth** 56:10

**describe** 45:8 61:13 66:16
68:2,16 70:17

**describing** 66:12

**description** 14:2 38:14

**desk** 52:8

**detail** 48:20

**detailed** 20:10

**details** 56:23 74:25

**Diego** 9:17 10:1

**difficult** 47:24 48:5,9 67:8

**directions** 7:20

**director** 10:11

**directs** 61:21

**disclosed** 21:21

**discuss** 14:16 25:22

**discussed** 8:15 17:16
19:13

**discussing** 19:8 49:2

**discussions** 5:11 41:12

**Dizney** 4:2,8 13:22 49:9,
12 57:18 58:3,25 64:12
65:14,15 68:1 75:25

**document** 13:12 49:9,13,
23 51:22 53:2

**documents** 7:14 13:7
14:3,7 16:12,17,19 17:8
19:15 20:20 58:10,12

**dollar** 47:6

**dollars** 46:22 47:12

**donate** 27:13

**donated** 26:11,14 28:1,5

**donating** 15:11

**donation** 16:1 27:11

**donations** 15:24 27:8,17,
23 72:10

**double-check** 13:16

**drive** 51:14

**driving** 9:1

**drum** 56:17

**drunk** 68:8

**duly** 4:3

**duties** 10:12

**dying** 62:2

**Dynafit** 42:3

## E

**earlier** 59:4 66:5,11

**earn** 11:5

**easy** 51:9



**Eggert** 36:18 37:1,9 44:23

**electronic** 16:13

**email** 12:15 16:4,9 20:16, 19,25 21:3 22:1,3,5,8,14 36:10 53:9,12,16,20,22 59:5,12,19,22,23,24 61:1, 5,9,12 73:23

**emails** 15:1,8,20 20:21 22:8,22

**employed** 10:7

**end** 7:21 38:22

**enforcement** 8:15

**enjoys** 25:12

**entries** 16:22

**environmental** 15:12,17 28:14

**escape** 35:9

**escapes** 35:7

**essentially** 14:6

**event** 51:18

**events** 75:3,10

**everything's** 58:20

**exact** 26:16 27:14,19 32:10 38:20 43:3 50:3 51:15

**EXAMINATION** 4:4 58:1

**examined** 40:6

**exception** 7:2

**excited** 29:5,9,15

**excluded** 64:25 66:19 67:24 68:15

**exhibit** 13:13,21,23,25 50:8,9,13 51:23,24 52:3 53:3,4,8 59:16,18 61:10 63:21 64:9,11,13 65:9 67:20 69:16,18,24 70:2 71:9

**expenses** 71:25 74:19

**explain** 29:17

**explained** 61:19

**explaining** 16:10

**extent** 17:22

**extreme** 54:13,19

**extremely** 67:12

**eye** 7:9

**eyewitness** 42:17,20,22 43:1,4,7,10,11,14,22

---

## F

**Facebook** 15:5 19:14,16 20:2,7,14 27:20,21

**facility** 32:4 33:3 44:22 45:2,7 62:18,20,25 63:15 64:2,16,17,22 65:11 66:2, 8,13,17 68:4 70:9 73:24 74:1

**fact** 55:9 56:6

**faded** 48:2

**fair** 6:20 31:15

**fairly** 15:4

**fall** 27:13 39:21 40:1

**fallen** 48:18

**familiar** 21:13 24:18

**family** 24:1 25:22 26:9 35:2 69:6 72:3 73:2

**fashion** 21:22

**fast** 44:16

**father** 8:1 16:5 22:8 23:21 24:3 28:1 53:14 73:22

**February** 32:19 33:6 37:15,19,23 38:2,6,19,21, 22,25 39:16,19 42:11,14 43:18,21 44:2,9 45:10 50:1,22 51:1,18 52:4,11,

**24** 67:15

**fee** 27:12

**feeding** 67:8

**feel** 9:2 11:5 72:4 76:2

**feeling** 18:24

**feet** 48:19

**festival** 38:23,24

**fiancé** 7:20,24 8:8,9 21:4 22:4,12 34:22 44:21 53:20 61:5

**filed** 55:17 56:22 57:4,8

**film** 38:23,24

**finally** 74:10

**finances** 25:23

**financial** 25:20 32:1

**financially** 25:25 26:5,18 31:21,24

**find** 6:14

**fine** 7:21

**finish** 5:17,21

**finished** 9:9

**fired** 30:4,6,9,12,16

**firm** 15:11,15,25 26:11,15, 18 27:9,11,13,23 28:2,5, 14 30:1 47:12

**flew** 62:12

**flip** 58:16

**Florida** 4:17 9:19,20

**flung** 39:11

**follow-up** 57:21

**forms** 71:18

**forwarded** 21:3 22:1,10, 12 53:9,19 61:5

**forwarding** 53:12

**found** 73:23



**foundation** 61:17 74:22

**frame** 18:9 43:2,3

**Francisco** 24:4

**freaked** 61:6

**free** 76:2

**frequently** 6:6 44:6

**friend** 33:17

**friendly** 55:13

**friends** 60:13

**front** 13:3 49:13

**full** 30:19

**fully** 14:14

**fun** 71:12

**Fun-loving** 71:3,5

**funds** 72:4

**funny** 56:25

**future** 11:2

---

**G**

**gave** 7:20 43:14

**general** 18:19 20:11 31:9

**gift** 27:4,6

**gifts** 72:7

**gist** 56:4

**give** 5:24,25 26:2 67:10
   68:11

**giving** 5:19 71:18

**global** 10:11

**good** 7:22 8:4 35:22 39:2
   57:1 58:3

**goodness** 33:16 35:6

**graduate** 9:15,16,21,22

**graduated** 25:20 26:6

**great** 5:23 69:9

**grounds** 64:25

**growing** 11:18 23:10

**Guardians** 28:14,22
   29:11,14 30:4,6,10 52:18,
   23

**Guardians'** 52:15

**guess** 18:10 31:4 35:21
   36:13 42:15 50:5 60:9
   68:16

**guys** 12:14 19:5 51:13
   56:5 76:1

---

**H**

**happened** 29:25 36:10,11
   44:21

**happy** 28:22

**hard** 16:16,19 68:16
   75:13,21

**harmed** 47:14

**head** 6:1 23:22 73:10

**health** 23:12,16

**healthcare** 28:23 29:10

**hear** 58:3 75:14,21

**heard** 37:1 43:5

**hearing** 58:22

**heartbreaking** 67:2

**hell** 63:4,5

**hey** 60:15

**high** 9:9 54:8,9

**hike** 50:5,25 51:1,6,9,19

**hill** 4:8 54:7

**hit** 36:11,13 37:24 39:4,10
   44:12,13

**hold** 43:2

**holding** 74:11

**home** 34:19,21

**honestly** 8:10 25:18 31:25
   42:16 43:3 44:25 47:15
   55:22 57:6 61:1

**hope** 12:20

**hospital** 32:2 62:22 74:24

**hot** 51:9,10,11,19 67:18

**house** 34:24

**how's** 18:18 72:24

**huh-uh** 6:6 48:24

**hurt** 36:3 74:9

**hurting** 67:12

**hurts** 74:11

**husband** 8:6

---

**I**

**iced** 37:25 39:5,8,11
   44:12

**Idaho** 51:13

**idea** 28:3 31:22 73:16

**identified** 71:9

**identify** 69:21

**immediately** 62:5,9

**included** 14:9 15:10

**incurred** 18:16 74:19

**Indiana** 9:14

**individually** 60:17

**information** 37:3,5 62:3

**inherent** 25:8

**initial** 20:8 66:13

**injured** 48:25

**injuries** 18:15,22 19:1,5,
   10,11 20:3,14,21 21:1
   47:3 48:23 49:3 73:20
   74:20

**injury** 20:8 73:24



**inquiry** 41:4

**insight** 24:15

**Instagram** 15:21 35:8 50:14 52:4 63:18,20

**interest** 31:19

**interrupt** 5:20

**involved** 72:15

**issue** 16:6 21:20,23 23:4, 7 41:13,24 46:16

**issues** 55:11

**items** 18:20 73:22

---

**J**

**Jacksonville** 4:17,18 9:19,21

**January** 32:17

**jest** 57:1

**job** 10:12 28:13,19,20,21 29:3,5,11,13,16,20 31:3

**jobs** 31:20

**jog** 73:4

**John** 8:17,22 11:20,21,25 12:3,4,11 14:8 17:2,12, 17,23 18:7,11,14,22 19:9, 20 20:1,14,20 21:6,16 23:3,6,10,21 24:4,9 25:11 26:21 28:10 30:3,22 31:19 32:2 33:20,22 34:8, 17 35:12,17,19,20 36:11, 23 37:9,15,22 38:11,14, 19 39:4,24 41:12 42:12, 24 43:13,23 44:3,7,8,15 45:3,6,22,25 46:11,14,25 47:5,23 48:4,12 50:19,22 51:1 52:7,11,13,23 54:2, 13,19,23 55:1,17 56:14, 17 57:3,8 60:21 62:7,11, 17,24 63:2,15 64:14,21 65:10,20 66:2,7,12,16 67:14,22 68:2 70:8,15,17

**John's** 15:25 20:6,25 21:11,13 22:9 24:18 25:20 26:17 28:2,5 36:18 37:18 44:19,24 46:6 48:9 60:18 61:13,15 62:10 72:22,24 73:10,17,20 74:16 75:4,12

**joined** 9:16

**journal** 16:22

**journals** 16:22

**July** 10:8

**jump** 5:21

---

**K**

**keeping** 57:2

**kickback** 58:22,24

**kidding** 55:15

**kind** 7:7,9 8:3 23:16 24:5 25:11,22 47:5,16 48:2 56:25 60:3,9,14 61:12 67:6 73:3

**kindergartner** 67:10

**kinds** 46:25

**knee** 49:1

**knew** 29:2 31:3,6 61:6 67:3

**knowing** 68:17 73:13

**knowledge** 23:10,11,14, 15,18,20 52:25 57:3,8

---

**L**

**lack** 35:21

**law** 8:14 15:11,12,15,17, 25 26:11,14,18 27:9,11, 13,23 28:2,5,14 29:22 30:1 31:13 47:12

**lawsuit** 19:2 57:4

**lawyer** 8:25 56:3,20,25

**leading** 75:5

**learn** 60:24

**learned** 61:16

**leave** 36:22

**leaving** 30:1

**left** 11:7 28:10 30:2,12 67:12 73:24

**legal** 56:1 57:2

**level** 58:4

**life** 24:13 47:10 68:17

**likes** 24:21,24 25:3,15,16

**limited** 14:11

**lines** 30:23 31:16

**lining** 33:18

**link** 27:20

**Linkedin** 15:10,19

**list** 60:4

**live** 4:13,15,18

**lived** 4:10 9:19

**living** 12:6,22 24:4

**local** 11:19

**Lolo** 51:14

**long** 4:10,18 10:3 12:10, 12 18:1 19:21 32:7,21,23 33:5 34:9,10,13,15 35:10, 14 37:16 46:3 67:16

**longer** 59:25

**looked** 64:22 65:20 68:9

**lose** 39:8

**loss** 35:22

**lost** 36:13 37:25 39:11 44:13

**lot** 54:15 55:25 60:11,13



71:12

**love** 7:22 12:20

**lucky** 12:8

___

**M**

**Mac** 13:15 71:1

**made** 15:24 20:8 26:21
27:17 34:25 40:24 46:20
50:14 52:4 56:24 68:14

**maintained** 12:21

**make** 20:6 22:19 24:13,16
27:23 40:2 41:16 46:9,25
47:6,11,17 54:21 58:17
64:5,8 65:8 69:16,24
72:10 74:4 76:10,16

**malfunctioned** 39:25
40:22 41:1

**malfunctioning** 39:17

**manner** 32:1 53:23

**manufacturer** 42:3 46:15,
21 47:1

**marathon** 6:25

**March** 32:25 50:2,16,24

**marches** 56:17

**Marie** 4:2,8

**mark** 13:5,12,19 50:7
51:22 53:1 59:15

**marked** 13:21 50:9,10
51:24,25 53:4,5 59:9,18
64:11 69:18 70:2

**matching** 27:15

**matters** 57:2

**Mckinney** 4:9,11,16

**means** 56:2 76:7

**medical** 21:7,11,13,17,18,
21 23:3,7 73:18 74:16

**memorializing** 50:25

**memory** 26:25 35:22 38:7
41:17,19 67:4 72:24 73:4

**mental** 23:12,15,16 35:22
68:5

**mentally** 68:9,12

**mention** 39:16 43:4

**mentioned** 42:21 47:23
48:14 74:10

**message** 8:22 9:1,2 17:13
18:8

**messages** 15:1 16:25
17:5,7,10 18:2 19:19,22

**Messenger** 20:2,5

**met** 36:21 45:1

**Meyer** 11:21,22 14:8
16:17 50:19 52:7 59:5,20

**Meyer's** 11:20 15:11,15
16:6 21:6 23:2,3,6 53:17

**mic** 75:20

**middle** 9:1 38:21,22,25
53:13

**military** 9:16 10:3

**millions** 46:21 47:12

**mind** 40:25 63:10

**mining** 41:17

**minor** 49:3 76:10

**minute** 57:13

**Missoula** 12:13 30:7 32:5,
8 33:3,10 35:14 36:19
38:23 45:7 51:3 62:18,21,
25 70:9

**mistakenly** 66:5

**monetary** 42:8

**money** 11:5 16:2,3 26:2
27:6 71:18

**Montana** 12:13 31:9,13
33:14 35:3 62:15

**Morris** 4:5 13:5,12,18,22
21:25 49:8,12 50:7,12,13
51:22 52:2,3 53:1,7,8
57:15,18,22 59:12,21,22,
25 61:17 62:1 64:12,23
65:13 66:18 67:23 68:13
70:18 71:4,10 73:6 74:3,
21 75:5,17,19,22 76:4

**Morris's** 65:24

**mountain** 24:19 50:4
54:3,5,8,9,12

**mountains** 25:3

**move** 73:6

**moved** 4:15 12:13

**movie** 39:2

**moving** 75:19

**multimillion** 47:6

___

**N**

**named** 29:23

**nationwide** 46:16

**natural** 51:10,11,19

**nature** 56:12

**nod** 6:1

**normal** 71:7

**North** 9:20

**Northwest** 9:14

**note** 71:1

**notes** 57:13

**notification** 61:4

**November** 34:7,14

**number** 26:11 59:1

**nurses** 74:10

___

**O**

**oath** 4:23 5:3 43:14



**object** 64:24 65:13 66:18 67:23 70:18 74:3,5

**objection** 61:17,20 62:1 64:23 65:24 68:13 71:1,4, 10 74:4,21 75:5

**objects** 61:19

**occurred** 36:25 37:4,10, 13 38:12,15 43:25 44:4,8, 19,24 45:23 46:1,6

**OCD** 18:5 72:17

**October** 28:9

**offer** 72:1

**offered** 26:2,4,8 71:23

**office** 13:8 52:15,17 71:14

**older** 11:24 12:3,4

**operating** 72:15

**opinion** 29:2 45:21 62:3 68:5 73:5

**option** 76:6

**oral** 5:25

**order** 65:1 66:20 67:25 68:15 69:12 70:20 73:8 74:6

**ordinary** 5:10

**organization** 10:10

**organized** 72:22

**outdoor** 54:1

**outgoing** 71:7

**overanalyzes** 24:1

---

**P**

**p.m.** 76:25

**paced** 71:14

**packet** 59:10

**pages** 59:1,3

**paid** 26:8 42:7 46:22

47:12 71:21,22

**parks** 11:19

**part** 63:19,21,22

**partner** 29:22

**pass** 51:14 57:22

**passed** 60:11,14

**passing** 56:7 75:19

**past** 8:16 24:6

**Patagonia** 27:14

**pay** 26:8 28:24 71:23,24

**people** 5:11 17:23 19:20 38:15 45:16 60:11,13,17

**pep** 7:20

**percent** 68:10,12,18

**performing** 41:5

**period** 14:11

**person** 5:12 35:12 47:5,17

**personality** 71:16

**personally** 62:3

**personnel** 10:14

**pertaining** 14:8 19:2

**phone** 12:15 16:14 55:23

**photo** 49:25

**photograph** 50:25

**photos** 35:8 63:11,14,18, 19 64:1,13,14,18,21 65:10 66:2,7 69:11,13,21, 25

**phrased** 6:19

**physical** 68:4

**Physically** 68:9

**picture** 50:18 52:7,14,17, 21

**pictures** 50:2 65:19 66:13 69:1,7

**place** 12:23 43:17

**plane** 26:9 62:5,9,14 71:24

**pleasing** 71:5

**point** 17:17 36:13 40:24

**pointed** 56:9

**political** 9:18 31:4

**poor** 55:8

**portion** 73:7

**position** 11:4,7

**possession** 21:10

**possibilities** 40:23

**possibility** 38:17

**post** 15:10,19 20:8,12 50:14 52:4 60:16 63:20

**posted** 50:1 63:17

**posts** 15:21 19:19 20:6

**Power** 39:3

**practice** 18:1

**pray** 20:9,11

**pre-released** 39:20

**preparation** 7:15,17

**prepare** 7:11 9:5

**present** 14:12

**pretty** 12:12,17 13:18 54:8,9

**previous** 68:14

**printed** 13:1

**prior** 23:12 44:16 70:15

**private** 57:2

**privy** 28:12

**problem** 41:8

**problems** 49:6

**processing** 68:7



**produce** 13:7 14:3,7
16:25 19:15 21:6

**produced** 15:7,20,23
16:4,9 22:8 26:20,24
58:12,18 68:25

**production** 21:17

**professional** 23:17

**professor** 31:13

**progress** 60:19

**projects** 10:13

**properly** 41:5

**provide** 60:1 72:4 76:3

**provided** 35:7

**pull** 59:3,8 63:25 64:1
69:4,8,9

**pulled** 16:13

**Purcie** 29:23 30:1

**purpose** 59:23

**purposes** 5:14 6:7,10
46:8

**pursuant** 5:6 14:3 64:25
66:19 67:24 68:15

**pursued** 30:23 31:16

**put** 60:8 67:6,8,11 69:11
73:23

**puzzle** 67:11

**puzzles** 67:9

---

**Q**

**question** 5:12,16,17,22
6:13,18,19 7:3,4 8:11
12:9 48:1 49:20 56:18
61:21,24 65:3,17,23
66:25 68:14 69:20 70:18,
21,22 74:5

**questioning** 59:2 64:24
66:19 67:24

**questions** 5:25 18:18
57:12,19,21 58:7 73:12
75:16,23

**quick** 58:6

**quote** 33:17

---

**R**

**reach** 76:2

**reaching** 60:13

**read** 61:23,25 65:23,25
67:1 70:12,25 71:2 76:6

**ready** 36:22

**real** 58:6

**realize** 31:2

**reason** 4:25 6:15,23 25:15
75:20

**recall** 18:13 19:8 20:1,4,
23 24:7 26:16 27:19,25
28:9 30:15 32:10,15
33:12 34:3 35:12 36:2
38:20 39:22 41:15 43:3
44:25 46:16,18,23 49:2
51:12,15 53:23 58:7 59:4
60:5 61:1 64:18,20 68:25
70:21 71:19 73:17 74:17

**recalled** 24:4

**receipt** 27:15

**receive** 9:18

**received** 8:22 22:11 61:1

**receiving** 28:25

**recently** 15:4 54:23

**recognize** 13:10

**recollect** 22:3

**recollected** 45:14

**recollection** 19:24 20:24
41:23 46:4,10,12 48:11
75:3,10

**record** 4:7 5:15 27:22
46:8 57:15 61:25 65:25
67:1 69:20 70:12 71:2
76:24

**record's** 19:4

**records** 15:23 21:7,11,14,
17,21 23:3 73:18

**recreational** 24:18

**refer** 11:21 15:14 58:25
61:9

**reference** 60:1,4

**referred** 66:5

**referring** 15:16

**reflect** 66:13

**refused** 62:6

**regard** 20:10

**regular** 29:10

**regularly** 12:17 14:25
17:4 18:2 20:16 25:22

**regurgitated** 36:9

**rehab** 32:4 33:2 44:22
45:2,7 62:18,20,25 63:15
64:2,16,17,22 65:10 66:2,
8,12,16 68:4 70:9 73:24,
25

**relate** 16:17

**related** 23:3,7 53:17 73:2
74:20

**relates** 19:10

**relating** 14:8 17:2

**relationship** 25:11

**remember** 11:17 27:14
33:2 35:23,24,25 38:18
42:12 45:7,19 48:16 50:3
60:10 62:19 67:5 73:2

**remodel** 34:21

**repeat** 48:1 49:20 66:24
70:10,22



**repeatedly** 55:11

**rephrase** 65:7

**reporter** 5:15 13:1,4 49:11
50:10 51:25 53:5 59:17
64:10 65:22 69:17 70:1,
24 76:14,18,23

**represent** 65:20

**required** 14:3,6

**resort** 11:12,16,19 21:18
37:6 55:17

**respond** 9:2,3 53:22

**responding** 53:23 58:8
60:17

**response** 15:8 16:10 21:7
26:20 53:9 56:20 58:12
59:5 61:3 70:19

**responses** 5:25 68:7

**responsive** 16:20 17:9,13
22:15,22

**rest** 16:1

**results** 41:3

**retired** 10:16,22,25

**review** 7:14 76:9,21

**ribs** 48:21

**right-hand** 49:17

**risk** 25:16

**risks** 25:9,12

**rock** 24:21

**Ron** 23:21 36:5

**rough** 24:5

**rude** 6:10

**rule** 40:23

**rules** 5:9

**run** 31:1,6,9

**Ryan** 21:3 28:5

---

**S**

**salary** 28:23 29:10

**San** 9:17 10:1 24:4

**school** 9:9 12:13

**science** 9:18

**screen** 7:10 15:20 50:14

**Seattle** 68:23 69:1,2,11,13
70:6

**security** 28:24

**seek** 23:15

**selfie** 66:10

**send** 59:22 72:7 76:8

**sense** 65:8

**September** 27:2 34:3,12

**served** 8:25

**service** 10:11

**set** 60:15

**settlement** 42:8

**she'll** 76:7

**shop** 40:5

**short** 57:11,12

**shot** 50:14

**shots** 15:20

**shoulders** 6:1

**show** 49:8

**showing** 15:24

**shrug** 6:1

**shut** 8:3

**sibling** 11:25 19:9

**Sierra** 24:5

**sign** 76:6,9,22

**simply** 55:22

---

**sincere** 47:2,18

**sir** 4:14,21,24 5:1,18 6:4,
12,21 13:24 14:1 16:24
17:1,3 46:12 52:19,22

**sister** 19:1 47:9 48:17
75:4,12

**site** 60:8,9,16,18

**sitting** 52:8

**situation** 29:18

**ski** 11:11,16 16:6 17:23
18:8,12,16 19:10,20 20:2,
7,10,21 21:1,18 22:2,9
23:3,7 24:24 25:1 32:3
35:17 36:1,3,5,7,19,25
37:4,6,10,18,23 38:12
39:22,25 40:5,10,21 41:1,
4,8,13,14,24 42:3,5,9,13
46:15,21 47:1,2 48:12,22
49:1,3,5 53:17 54:2
55:17,24 60:22 70:15

**skied** 11:16

**skier** 11:14

**skiing** 11:18 36:11 37:24
40:7 44:15 46:15 48:19

**skis** 40:3,13

**Sky** 21:18 33:14,15,20
37:6 41:14 49:9,14 51:23
53:2 55:17,24 56:6,11,13,
22 57:5,7 58:14 59:9
64:3,9 65:14 66:9 69:13,
14,16,23,25

**sleep** 55:5,12,14

**sleepers** 55:8

**sleeping** 55:12 63:6

**slower** 68:6 71:14

**slur** 68:8

**slurred** 71:15

**sober** 24:9

**socializing** 54:16

LEXITAS

**Solar** 39:3

**someplace** 72:5

**son** 22:2,4,12 44:21 53:20 61:6

**sort** 5:10,11 6:2 12:9,21 16:10,23 19:5,9 22:21 35:2 41:19 53:13 54:1 60:18

**source** 37:3

**sources** 16:13

**speaking** 20:4 36:2

**specific** 14:9

**specifically** 19:2 22:21 60:10 66:9,10

**specifics** 74:25

**speculation** 74:21

**speech** 68:7 71:14

**spend** 54:16

**spent** 62:15

**spoke** 8:1 31:10

**spoken** 7:25 43:11

**sports** 54:13,19

**spring** 51:9,10,11,19 67:18

**spun** 8:3

**stable** 29:3

**stack** 58:10 63:22

**staff** 10:13

**staffing** 10:10

**stamp** 49:9,14 50:2 53:2 59:1,16

**stamped** 51:23 58:13

**standpoint** 68:4

**started** 30:16,19 58:6

**state** 4:6 35:22 42:15

**stated** 42:16,17 48:7

**statements** 76:21

**status** 20:25 25:20 29:1

**stay** 32:7 34:9,25

**stayed** 33:13

**straining** 75:14

**strange** 7:8

**stressed** 57:4,9

**strike** 73:6

**struggled** 25:24 26:18

**struggling** 31:20 67:6

**studies** 9:17,20

**stuff** 55:15 56:1 71:24

**subpoena** 5:7 13:1,7 14:4, 6,14,17,20 15:8 16:10,20 17:9,13 21:8 22:15,23 26:20 53:10 58:8,13 59:6, 13

**substance** 46:5,10

**suddenly** 41:18

**sue** 56:11

**sued** 42:3 55:24 56:6,13

**sum** 42:8

**summarizing** 16:9

**summer** 48:13 49:6

**support** 28:19

**supported** 26:5

**supporting** 72:12

**surprise** 34:22

**surprised** 29:21 42:22

**surrounding** 30:13 56:10

**sustained** 74:20

**sworn** 4:3

**symptoms** 23:17

## T

**taboo** 25:22

**takes** 71:25

**taking** 25:12

**talk** 5:13 7:17,19,20 8:17, 20 12:18 14:19,22 25:23 28:19 29:4,9 31:12 35:17, 20 36:4 37:18 41:3,20 44:23 45:5 48:21 56:21 67:4,22

**talked** 16:12 19:5 20:13 24:12 30:3,14 36:4,18 37:7 39:24 43:9,13 44:5, 7,18 48:12 49:5 55:1,4,10 67:20

**talking** 20:1 65:9

**telling** 6:9 38:8 42:13,19 45:14,15 56:19 75:14

**ten** 15:8

**tendency** 23:22

**term** 35:22

**testified** 4:3,23 5:3 8:12 23:21 24:3 71:22 72:17 75:4,11

**testimony** 7:15,18 9:5 22:24 38:4 41:10,22 43:14 45:10 59:4 73:7

**Texas** 4:9

**text** 8:22 12:19 15:1 16:25 17:5,7,9,13 18:2,7,23 19:5,9

**texted** 17:17,22 18:11,14

**therapist** 67:9

**thing** 5:24 6:2,5 11:17 21:2 36:14 54:14 55:6 63:10

**things** 8:2 25:5 26:9 35:23 36:24,25 38:15 44:11



54:17,21 56:14 60:8 67:5
75:3,11

**thinking** 73:13

**thought** 9:23 36:11 37:13
39:20 41:8 56:19 59:19
62:2 65:19

**thrown** 37:25

**tickets** 26:9 71:24

**time** 6:13 10:7,9 12:12
18:9,10,14 19:21 22:9
23:11 24:10 30:19,22
32:13,16 33:10 35:11,25
36:22 37:10 39:24 40:10
41:7,13 42:18,25 43:2,3,
10,22 44:7,12,20 45:1
46:16 50:21 52:10 54:9,
16 57:19,20 62:17,24
65:8 66:12 67:7,8,14
68:21 70:8,15 75:17,24
76:13

**times** 26:1,3,12,14 33:25
34:8 71:15

**today** 4:20 5:6,15 6:13,22
7:15,18 9:6 11:21 31:24
60:2 75:4,11 76:8

**today's** 7:11,25

**told** 9:4 28:21 29:15,20
35:5 36:14,16,25 37:11,
12,24 38:2,9,16 39:4,10
40:9 42:2,7,12,25 43:22
44:11 45:16 47:23 48:4,
23 60:25 62:13

**top** 13:25

**totaled** 26:23

**track** 36:12 37:25 39:5,7,
10,14 44:12 47:24 48:5,9
60:18

**trail** 50:4,5 51:6,9,12,14

**transaction** 27:12

**transcript** 6:8,11

**transported** 62:19

**treated** 23:12

**tree** 36:13 38:1 39:12
44:13

**trial** 8:13 41:18

**trials** 8:16

**trip** 67:13 69:1,2,6,22
70:3,6,17 71:8,22

**trips** 71:23

**true** 21:14,15 41:25 43:19
46:6,9 76:21

**truth** 7:22 75:15

**turn** 13:22 58:23

**twins** 54:23 55:7,11,14

**type** 14:8 20:12 57:1 76:7

**types** 47:17

## U

**uh-huh** 6:6

**unaware** 30:25

**underneath** 14:2

**understand** 6:3,14 15:16
29:7 39:19 65:2,17 75:6

**understanding** 11:20,24
14:25 26:17 36:15 55:20

**understood** 6:19 39:1

**University** 9:13,14,20
31:13

**untimely** 21:22

**upbeat** 71:7,12

**update** 60:9

**updates** 60:12,16

**upset** 48:16

## V

**vacations** 26:9 35:2

**vague** 64:23

**Valparaiso** 9:13

**violates** 73:7 74:6

**violation** 70:19

**visit** 32:2 33:10,20 34:17
36:23 52:20 64:2 66:14,
16 67:16

**visited** 32:8 33:13,22,25
34:8 38:19 64:14

**visiting** 30:7 33:2,5,17
37:19 45:3 50:1,22 52:10
63:15 71:13 73:25

**volume** 58:23

## W

**waited** 54:15

**waive** 76:11,22

**Walas** 13:15,20 14:22
57:20 58:2 59:15 61:18,
23 62:8 64:8 65:2,15,22
66:1,21 67:13 68:1,20
69:15,19,24 70:3,14,21,
24 71:8,17 73:9 74:15
75:2,8 76:5

**walk** 50:5 67:17,22 68:2

**walked** 63:6

**walks** 54:17

**wanted** 22:19 24:13,15
29:18 40:23 46:14 58:6
62:5,8

**wanting** 31:12

**watched** 38:24

**wedding** 16:2 27:3,4,6
34:3

LEXITAS

**week** 12:18

**weekend** 32:21,23 33:5 34:10,13,15 35:10 37:16 67:16

**weeks** 8:23 12:18

**wife** 54:23

**Wildearth** 28:14,21 29:11, 13 30:4,6,9,16 52:15,18, 23

**wood** 67:10

**words** 47:16 68:8

**work** 7:10 10:9 11:1,6 30:23 31:15,16 52:20 54:15

**worked** 10:10,13 11:11 52:16 54:15 71:6

**working** 10:5,15 24:5 30:19,23 31:17 52:23 71:12,14

**world** 10:14

**worried** 48:17

**worry** 8:5

**wreck** 16:6 17:23 18:8,12, 17 19:10,20 20:2,7,21 21:1 22:9 23:3,7 32:3 35:17 36:1,3,5,8,19,25 37:4,10,13,19,23 38:12, 15 40:11,22 41:14,25 42:5,13 43:1,24 44:4,8, 16,19,24 45:4,8,11,19,23 46:1,6,16 47:25 48:6,10, 12,14,22 49:1,4,6 53:17 54:2 60:19,22,24 61:1,16 64:15 68:20,22 70:15 73:21 74:20

**wrecks** 47:3

**writing** 45:25

**written** 46:5,10 53:23

**wrong** 47:7,14,19

## X

**x-ray** 74:13

## Y

**y'all** 12:17,21 35:2,3 54:5 67:17

**year** 10:4 12:8,11 35:7,8

**years** 4:19 12:4 40:2 42:20,24 43:18

**younger** 21:3 22:2,5 44:20 62:6 72:8

## Z

**zip** 33:18

**Zoom** 7:8

888-893-3767
www.lexitaslegal.com

