**TOM McMAKIN**

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MONTANA

3                   BUTTE DIVISION

4     _____

5     JOHN MEYER,

6              Plaintiff,

7          vs.              Cause No. 18-CV-00002-BMM

8     BIG SKY RESORT, INC.

9              Defendant.

10    _____

11      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

12                    TOM McMAKIN

13    _____

14      BE IT REMEMBERED, that the videotaped

15    deposition upon oral examination of TOM McMAKIN,

16    appearing at the instance of Defendant, was taken

17    at the offices of Crowley Fleck, PLLP, 1915 South

18    19th Avenue, Bozeman, Montana 59718 on the 21st day

19    of January 2020, beginning at the hour of 1:34 p.m.

20    pursuant to the Federal Rules of Civil Procedure,

21    before Marla Jeske, Court Reporter - Notary Public,

22    CSR.

23

24

25

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

```
 1                        APPEARANCES
 2
         ATTORNEY APPEARING ON BEHALF OF THE
 3       PLAINTIFF, JOHN MEYER:
 4
              Ms. Breean Walas, Esq.
 5            Walas Law Firm
              P.O. Box 4591
 6            Bozeman, Montana 59772
              breean@walaslawfirm.com
 7            (501) 246-1067
 8
         ATTORNEYS APPEARING ON BEHALF OF THE
 9       DEFENDANT, BIG SKY RESORT:
10
              Mr. Ian McIntosh, Esq.
11            Mr. Mac Morris, Esq.
              CROWLEY FLECK PLLP
12            1915 South 19th Avenue
              P.O. Box 10969
13            Bozeman, MT 59719-0969
              imcintosh@crowleyfleck.com
14            wmorris@crowleyfleck.com
              (406) 556-1430
15
16
17
18
19
20
21
22
23
24
25
```

2

**TOM McMAKIN**

```
 1                    I N D E X
 2  EXAMINATION OF TOM McMAKIN BY            PAGE
 3       Mr. Ian McIntosh, Esq..................5, 35
 4       Ms. Breean Walas, Esq.................19, 38
 5  E X H I B I T S   R E F E R R E D   T O:
 6  Exhibit 19................................35, 38
    Exhibit 24.........................8, 13-14, 19, 27
 7  Exhibit 25..................9-10, 13-14, 19-20, 27
    Exhibit 29.............................11, 13, 19
 8
 9  DEPOSITION EXHIBITS:
10  Exhibit 65    Colored Photograph..............20-21
11  Exhibit 66    Big Sky Ski Patrol
                  Witness Statement
12                dated 12/11/15..................22-23
13  Exhibit 67    Evi Dixon letter dated
                  Sunday, December 13, 2015.......25-26
14
    Exhibit 68    Colored Photograph..............36-37
15
    Exhibit 69    Colored Photograph..............36-37
16
17
18
19
20
21
22
23
24
25
```

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

# TOM McMAKIN

1      WHEREUPON, the following proceedings were had

2   and testimony taken, to-wit:

3

4                    *   *   *   *   *

5

6      VIDEO TECHNICIAN:  This is the time and

7   place set for the video deposition of Tom McMakin

8   in the case of John Meyer, plaintiff, versus Big

9   Sky Resort, defendant.  It is Cause Number

10   18-CV-00002-BMM in the United States District Court

11   for the District of Montana, Butte Division.

12           This video deposition is being held at

13   the offices of Crowley Fleck, located at 1915 19th

14   Avenue in Bozeman, Montana.

15           Today's date is January 21st, 2020.  The

16   time is 1:34 p.m.

17           The court reporter is Marla Jeske with

18   Bridger Court Reporting.  I'm Mark Brown, the

19   videographer.

20           Will the attorneys please now identify

21   themselves for the record.

22      MS. WALAS:  Breean Walas on behalf of the

23   plaintiff.

24      MR. McINTOSH:  Ian McIntosh for the

25   defendant, with Mac Morris.

**4**

**TOM McMAKIN**

1    VIDEO TECHNICIAN:  Will the witness now

2  please be sworn in.

3

4                    *   *   *   *   *

5

6                    TOM McMAKIN,

7  called as a witness herein, having been first duly

8  sworn, was examined and testified as follows:

9

10                   EXAMINATION

11  BY MR. McINTOSH:

12       Q.   Can you please state your name?

13       A.   Full name is Thomas Wilson McMakin, Tom

14  McMakin.

15       Q.   Mr. McMakin, where do you live?

16       A.   305 Evening Star Lane, Bozeman, Montana.

17       Q.   And, Mr. McMakin, what do you do for

18  work?

19       A.   I'm a CEO of a consulting firm called,

20  Profitable Ideas Exchange.

21       Q.   What does Profitable Ideas Exchange do?

22       A.   So we help large professional services

23  firms, like accounting firms and firms like Bain or

24  BCG or McKinsey, drive their business development

25  efforts.

**5**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1      Q.   Thank you.

2          And I understand that you were skiing at

3 the Big Sky Ski Resort on December 11, 2015; is

4 that correct?

5      A.   Correct.

6      Q.   And did you witness a ski wreck

7 involving a person that you later learned was

8 John Meyer?

9      A.   I did.

10     Q.   Okay.  I want to talk to you in detail

11 about that ski wreck.  But before we get into the

12 details about the wreck, I want to back up and just

13 talk about what you were doing there and why you

14 were there that day --

15     A.   Sure.

16     Q.   -- okay?

17         So let's start with that.  Before we get

18 into any of the details, tell me what were you

19 doing at Big Sky on December 11, 2015?

20     A.   So we had -- I think at the time we had

21 about 30 people in the company, PIE, Profitable

22 Ideas Exchange, and we had taken them and their

23 spouses or partners on a ski day.

24     Q.   So you were skiing just with your

25 employees?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    A.   Correct.

2    Q.   And can you describe your ski abilities

3    at that time?

4    A.   Yeah, so I've been skiing -- I'm 58.

5    I've probably been skiing since I was five years

6    old.  But I'm not a double black diamond expert

7    skier.  I look good on tough blue square groomers

8    and I can get down anything, so somewhere in that

9    netherworld between high intermediate and low

10   expert.

11   Q.   Got it.  And how about the people you

12   were skiing with, how did your abilities compare to

13   them?

14   A.   You know, we broke up, because we

15   probably had 40 people there with partners, into

16   smaller groups and I was with a fast group.  So, I

17   mean we were all comparable.

18   Q.   Okay.  And sometime after 10:00 a.m. in

19   the morning, were you skiing the Challenger

20   chairlift area?

21   A.   Yes.

22   Q.   And do you remember what you skied?

23   Shortly before you witnessed John Meyer's ski

24   wreck, do you remember what ski run you skied?

25   A.   I don't.  I don't have very good

**TOM McMAKIN**

1    knowledge.  My recollection is that we skied out of

2    Moon Light Basin, the tented area there and we were

3    kind of skiing over to the Big Sky.  So the run in

4    question was kind of a -- kind of a northeastern

5    facing run, that's my recollection, moving toward

6    the Big Sky Resort, yeah.

7         Q.   Okay.  So you were moving towards the

8    Big Sky base area?

9         A.   Yeah, exactly.

10        Q.   Okay.  I'm going to hand you what has

11   previously been marked in this case as Exhibit

12   Number 24.

13        A.   Uh-huh.

14        Q.   Do you recognize what is shown in

15   Exhibit 24?

16        A.   Sure.  So as I look at this, behind me

17   is a steep slope and this is a traversing road that

18   roughly goes from the south to the north and in

19   front of that is a kind of ungroomed area and the

20   wide slope in the sort of more distant perspective

21   goes down to the base area.  And I know there's a

22   big -- I mean I knew afterwards because we went

23   down, there's a big ski patrol hut there.

24        Q.   And is the ski run that is shown in

25   Exhibit 24, is that the run you skied shortly

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    before you witnessed Mr. Meyer's ski wreck?

2         A.   Correct.  So as I'm looking at this,

3    directly behind me is the sort of steep slope and I

4    had come down that slope and rested on that

5    traversing road.  When I say "rested," I stopped

6    and I was waiting for the rest of our sort of

7    subset group to catch up with me.

8         Q.   Okay.  Let me show you another picture

9    taken just a little bit further downhill.  This is

10   a photograph that's been previously marked in this

11   case as Exhibit Number 25.

12        A.   Uh-huh.

13        Q.   And do you recognize what is shown in

14   Exhibit 25?

15        A.   Yeah.  So that's the traversing road.

16        Q.   The cat track that you see going from --

17        A.   Correct.

18        Q.   -- right to left of the --

19        A.   Yep.

20        Q.   -- photograph?

21             And do you agree that Exhibit 25 shows

22   the area that you skied shortly before you saw

23   Mr. Meyer's ski wreck?

24        A.   Correct.

25        Q.   And do I understand you to say from your

9

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1  earlier testimony that you skied down this -- down

2  this ski run and stopped on the cat track shown in

3  Exhibit 25?

4       A.   Correct.

5       Q.   Would you agree with me that you can see

6  the cat track in Exhibit 25?

7       A.   Correct, yes.

8       Q.   Would you agree with me that it's

9  obvious?

10       A.   Oh, yeah.  Yes.

11       Q.   And above that we see some trees and I

12  guess sort of stumps and things like that sticking

13  through the snow; is that right?

14       A.   I don't see stumps.  I see sort of low

15  trees, brush.

16       Q.   That's probably a better description,

17  thank you.  Thank you, Mr. Makin [sic] -- Mr.

18  McMakin.

19            And is that the type of thing that you

20  expect to see when you're skiing in early season

21  conditions?

22       A.   Yes.

23       Q.   And were you able to safely ski down the

24  run shown in Exhibit 25 onto the cat track?

25       A.   Yes.

10

**TOM McMAKIN**

1   Q.   You were able to safely make the
2   transition from the cat track onto the run?
3       A.   Hum.
4       Q.   In other words, you didn't wreck when
5   you skied onto the cat track, did you?
6       A.   Yeah, I just think you had it in
7   reverse.  I was able to successfully go down the
8   ski run to the cat track.
9       Q.   And were you skiing in control?
10      A.   Absolutely.
11      Q.   And you then stopped on the cat track?
12      A.   Correct.
13      Q.   Okay.  I want to show you one more
14  photograph.  This is a photograph that was
15  previously marked in this case as Exhibit Number
16  29.
17          Now looking at all of those photographs
18  that you have in front of you, did you stop on the
19  cat track in approximately the area where the
20  person is shown in Exhibit 29?
21      A.   Yes.
22      Q.   And when you stopped there, did you then
23  look back uphill to see the other skiers that you
24  were with?
25      A.   Yes, I was waiting for the rest of the

**11**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1   party to catch up.

2       Q.   Okay.  So you were skiing faster than

3   them or you got down to that area faster than they

4   did?

5       A.   Yeah.  I might have started first.

6       Q.   Okay.

7       A.   They might have been gaining on me, I

8   don't know.

9       Q.   And when you look back uphill, did you

10  see a person coming down that you eventually

11  learned was John Meyer?

12      A.   Yes.

13      Q.   And can you describe for me what you saw

14  when you saw Mr. Meyer skiing down the hill?

15      A.   You know what I told my wife, I said he

16  was -- there was a guy, he came around kind of the

17  high corner and he was bombing down the slope at

18  sort of like -- at a high speed.

19      Q.   Okay.  What do you mean "bombing down

20  the slope"?

21      A.   You know, when you ski -- you know, this

22  is sort of -- it's rough and it's hard to tell with

23  these pictures but it's -- you know, I have a

24  strong recollection that it was lightly moguled and

25  when you ski something like that, people like me

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1  tend to carve their way down through the moguls
2  and -- but when someone's bombing down, they're
3  taking the moguls all in their thighs, bumping
4  straight down with no curves at all.  So that's
5  what I mean by "bombing."
6      Q.  Okay.  And was Mr. Meyer skiing down the
7  run shown in Exhibits 24 and 25?
8      A.  Correct.
9      Q.  And did he ski down toward you when you
10 were standing on the cat track in the location of
11 the person shown in Exhibit 29?
12     A.  Correct.  He basically was following the
13 same path that I took to get to the cat track.
14     Q.  Okay.  And was he skiing faster than you
15 would expect someone who described themselves as an
16 intermediate skier to ski?
17     MS. WALAS:  Objection, foundation.
18     MR. McINTOSH:  Go ahead.
19     THE WITNESS:  I can go ahead?
20     MR. McINTOSH:  Yes.
21     THE WITNESS:  Absolutely faster than an
22 intermediate skier, sort of a -- I would have
23 characterized his skiing as the kind of skiing that
24 only someone that was a high expert would ski.
25 ///

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

```
 1    BY MR. McINTOSH:
 2         Q.    And did Mr. Meyer --
 3         A.    Very fast.
 4         Q.    Excuse me, very fast?
 5         A.    Yes.
 6         Q.    So you would agree that Mr. Meyer was
 7    skiing very fast?
 8         A.    Very fast.
 9         Q.    Faster than you skied the run?
10         A.    A lot faster than I skied the run, a lot
11    faster than anyone else skied the run that I saw.
12         Q.    And did Mr. Meyer slow down before he
13    reached the cat track that you were standing on?
14         A.    No.
15         Q.    And did Mr. Meyer -- well, did he safely
16    ski onto the cat track?
17         A.    He did.
18         Q.    Can you just describe for me what you
19    saw as Mr. Meyer transitioned from this run shown
20    in Exhibit 24 and 25 onto the cat track?
21         A.    So my impression in the split second
22    that this all transpired was that he was a high
23    expert skier.  He was sort of hotdogging down the
24    slope at a high rate of speed capitalizing on his
25    high ability to do that and that he was going to
```

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    use the cat track as a jump.

2        Q.    And why do you say he was -- why do you

3    say you thought he was going to use the cat track

4    as a jump?

5        A.    Because he didn't slow down at all and

6    it was -- it was obvious that the cat track was in

7    front of him, but more obvious was that there was a

8    drop-off on the other side.

9        Q.    The downhill side of the cat track?

10       A.    Yeah, exactly, exactly.  Into an

11   unplowed area -- or not unplowed, ungroomed area or

12   unskied area.

13       Q.    Okay.  Was there anything that would

14   have prevented Mr. Meyer from slowing down or

15   stopping on the cat track where you stopped?

16       A.    If he had been going at a lower rate of

17   speed, nothing would have prevented him.  But at

18   that speed, I'm not sure he could have stopped at

19   the last minute if he wanted to.

20       Q.    Okay.  So what happened after Mr. Meyer

21   safely transitioned onto the cat track?

22       A.    He was launched into the air and flipped

23   around.

24       Q.    And did it look to you like he was

25   trying to jump off the downhill edge of the cat

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1  track?

2      A.   It did.

3      Q.   And then what happened?

4      A.   So he landed on his back in deep snow.

5  And the reason I feel like I thought he was trying

6  to jump is because I thought that he failed to do

7  what he wanted to do, which was to jump

8  successfully and flip.  And I remember saying -- it

9  was a little uncharacteristic for me but I was like

10  "Whoa, dude, that was awesome.  Are you all right?"

11  Because I thought he was trying to execute a really

12  hard thing to do, which was flip off the cat track.

13      Q.   And did you go to Mr. Meyer's aid and

14  help him?

15      A.   So I looked at him and I said that

16  and then -- and he didn't answer.  And so then I

17  kind of got off the cat track and started to

18  traverse the unskied area, the deeper snow and I

19  probably -- I didn't go very far, five feet or so,

20  and then I could see that he was on his back and

21  his arms were wide open and he was shaking and it

22  looked like something was coming out of his mouth.

23  And I was like, oh, my God, he's in deep trouble,

24  deep, deep trouble, and that's when I saw the log.

25  He basically flipped and landed on a log.  And I

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

```
1   immediately thought well, he's broken his neck.
2   Shall I just continue?
3           And so I remember -- I mean I remember
4   this very clearly, there were some younger people.
5   I can't call them kids, right?  I'm like anybody
6   younger -- I'm 58, so younger than I am, people,
7   sort of a mass on the cat track, maybe 12 people or
8   so.  And this shows my age.  I said, "Someone ski
9   down and get ski patrol."
10          And then some kid said "Or, dude, we
11  could just call them on the cell phone."
12          And I was like, "Right.  You're right.
13  That is what you could do.  That would be better."
14      Q.   So someone called ski patrol?
15      A.   I assume.  Ski patrol was there very
16  quickly.
17      Q.   Very quickly?
18      A.   Very quickly.
19      Q.   And when Mr. Meyer tried to -- or based
20  on what you thought he was trying to do, tried to
21  jump off that downhill edge of the cat track, how
22  far away were you?
23      A.   That's a good question.  Probably 10
24  feet.
25          Q.   And based on what you saw and what you
```

**17**

**TOM McMAKIN**

1   observed from 10 feet away, what did you conclude

2   was the cause of Mr. Meyer's ski wreck?

3        A.   His failure to execute the jump off

4   of this track or -- you know, I felt like

5   there's -- there was a change.  So you had this

6   sort of skied area, so that's one kind of

7   topography, and then you have the track, so you hit

8   the track, but it's quite -- it's quite packed

9   down.  It has a kind of accelerating kind of

10  function that it plays and then on the other side

11  of it it got rough again.  And I thought he hit

12  that roughness on the far side of the track and

13  that that flipped him over.  But it's conjecture on

14  my part.  But that's what it felt like.

15            Anyway, if you ski, you know that a

16  change in the quality of the snow from fast and

17  slick to rough and unskied and icy and choppy can

18  trip you up.

19       Q.   And did you believe Mr. Meyer's speed he

20  was skiing at contributed to his ski wreck?

21       A.   Absolutely.

22       Q.   Mr. McMakin, I believe that's all the

23  questions I have.  If we could just go off the

24  record for a few minutes while I check my notes.

25       A.   You bet.

                                                      **18**

**TOM McMAKIN**

1      Q.   Thank you.

2      A.   Yeah.

3      VIDEO TECHNICIAN:  We're now off the record.

4  The time is 1:50.

5           (Whereupon, a brief

6            recess was taken.)

7      VIDEO TECHNICIAN:  We're now back on the

8  record.  The time is 1:51.

9      MR. McINTOSH:  Mr. McMakin, thank you for

10  your time.  Thank you for coming in today.  I have

11  no further questions at this time.

12     THE WITNESS:  Thanks.

13                    EXAMINATION

14  BY MS. WALAS:

15     Q.   All right.  Mr. McMakin, I want to

16  follow up on a couple of things that you were asked

17  about and then also some other further questions I

18  might have.

19          You were asked about Exhibit 24.

20     A.   Which one is that?

21     Q.   Which would be the one that has this

22  little guy over here in the corner.

23     A.   Oh, this guy.  I got it.

24     Q.   Yep.  And 25, which would be the one

25  that you have three guys?

**19**

**TOM McMAKIN**

1     A.   Yep.
2     Q.   Okay.  Where were you standing on the
3  cat track in relation to Mr. Meyer's wreck?
4     A.   You know, to be honest, I don't recall
5  but roughly where those three people are.
6     Q.   Okay.  And that's on Exhibit 25?
7     A.   Yeah.
8     Q.   Okay.  And where did Mr. Meyer wreck?
9     A.   In the snow field above in the picture
10  of the three people.
11     Q.   Above the picture of the three people?
12     A.   Yeah.
13     Q.   So if you were -- I'm going to go ahead
14  and give you this blue pen.
15     A.   Uh-huh.
16     Q.   And if you'll go ahead and mark that,
17  I'm going to make this Depo Exhibit 1.
18     MR. McINTOSH:  No.
19     MS. WALAS:  Do you guys roll over?
20     MR. McINTOSH:  Yep.
21     MS. WALAS:  Okay.  What number are we on?
22     MR. McINTOSH:  65.
23     MS. WALAS:  65, okay.  So this will be
24  Exhibit 65.
25  ///

20

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1              (Whereupon, Deposition
2               Exhibit Number 65 was
3               marked for identification.)
4         THE WITNESS:  So roughly there.
5    BY MS. WALAS:
6         Q.   Roughly there?
7         A.   Yeah.
8         Q.   Okay.  And if you don't mind, will you
9    circle that just to make it clear?
10        A.   Uh-huh.
11        Q.   Perfect.
12             And then using that same picture, can
13   you recall where you were?
14        A.   You know, I'm saying roughly here.  I
15   was to the -- so I know I was to the left.  So if
16   it happened over here, that wouldn't surprise me.
17        Q.   Okay.
18        A.    But I was roughly to the left of
19   something that happened down here.  But I don't
20   really recall.
21        Q.   Okay.  And when you were coming down the
22   hill, did you see the rocks that Mr. Meyer hit?
23        MR. McINTOSH:  Objection, assumes facts not
24   in evidence.  Counsel's testifying.
25        MS. WALAS:  You can go ahead and answer.

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

**TOM McMAKIN**

1    MR. McINTOSH:  You can answer.

2    THE WITNESS:  I don't know.  So I mean I know

3 that I saw -- I know that I saw the ungroomed area

4 that he crashed in that had early season stuff in

5 it, trees and bushes and rocks and whatnot.  But

6 the rocks that he hit, I don't know.  I don't know

7 that I -- it registered on my consciousness.  I

8 mean I know that I was looking at it when I went

9 down the slope and stopped.

10 BY MS. WALAS:

11    Q.   And do you recall giving statements to

12 Big Sky?

13    A.   Yes, I do.

14    Q.   Okay.  And do you recall in that

15 statement what you told them?

16    A.   I do not specifically, no.

17    Q.   Would it be helpful to see these?

18    A.   Yeah, that would be super.  Yeah.  I

19 mean they asked questions not -- so dissimilar to

20 what you all are asking right now, mainly what

21 happened.

22    MS. WALAS:  I apologize, I did not bring

23 copies.  This will be 66.  Go ahead and mark this

24 as Exhibit 66.

25 ///

22

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1           (Whereupon, Deposition

2            Exhibit Number 66 was

3            marked for identification.)

4       MS. WALAS:  We can go off the record real

5   quick.

6       VIDEO TECHNICIAN:  We're now off the record.

7   The time is 1:55.

8           (Whereupon, an off-

9            the-record-discussion

10           then took place.)

11      VIDEO TECHNICIAN:  We're back on the record.

12  The time is 1:56.

13  BY MS. WALAS:

14      Q.   So I've given you what is Exhibit 66 and

15  is that your witness statement?

16      A.   Yes.

17      Q.   Now is there anything in this witness

18  statement that you would change or add to?

19      A.   So let's read it aloud because I'm not

20  sure I can read it.  "Tom was standing" -- what's

21  the next word there?

22      Q.   I believe it's "below."

23      A.   "Below the patient to his right.

24  Patient came down from" -- so that first sentence,

25  "Tom was standing below the patient to his right."

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1   So directions are a funny thing.  So I was on the
2   cat.  So first of all, "his" -- it's unclear
3   whether "his" refers to patient or me.  But I'll
4   tell you what I know, which is that I was standing
5   on the cat track and I was -- I was stopped, my
6   skis were together, I was facing more toward the
7   south than to the right of the cat track.  I was
8   facing that direction.  And my head was turned
9   uphill to my right and the skier came down the
10  slope to my right.  I'm not sure if that first
11  sentence says that or not, but that's what
12  happened.
13          So the second sentence says "Patient
14  came down from highway."  So I don't know what
15  highway refers to.  Is that the cat track?  Because
16  he came down from the slope above the cat track and
17  hit rocks as he was about to jump off of Morning
18  Star Road, Loop Road.  "Both skis ejected and he
19  rotated head first and landed on a log with the
20  back of his head and neck.  He was unconscious the
21  entire time but was breathing.  He did not move,
22  eyes did not open.  Breathing through nose only."
23  Does that sound like what it says?
24      Q.   I mean I think you've read it back
25  accurately.

**24**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1           Is there anything in there that you
2    disagree with?
3         MR. McINTOSH:  Objection, vague.
4         MS. WALAS:  I'll restate it.
5    BY MS. WALAS:
6         Q.   Do you recall this being an accurate
7    representation of what you told the Big Sky ski
8    patrol that day?
9         A.   Yes.
10        Q.   And do you recall calling Big Sky back a
11   couple days later to give a follow-up statement?
12        A.   Yes.  Did I?  I don't recall that, no.
13        Q.   Okay.
14        A.   No, I called back later and asked if the
15   patient was okay.
16        Q.   Okay.
17        A.   Because it flipped me out.  I thought
18   the guy was dead.  I really did.  Because they
19   choppered him off to Billings and a couple -- and I
20   didn't see anything in the newspaper.  And so a
21   couple days later I called back and I said, "What
22   happened to that guy?"
23             (Whereupon, Deposition
24              Exhibit Number 67 was
25              marked for identification.)

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    BY MS. WALAS:

2         Q.    Okay.  I have what I've marked as

3    Exhibit 67.  Do you recall who you spoke to when

4    you called back at Big Sky?

5         A.    No.

6         Q.    Okay.  Do you recall if it was male or

7    female?

8         A.    I don't recall.

9         Q.    Okay.  I'll go ahead and give you

10   Exhibit 67 and let you take a look at that and I'll

11   ask you some questions on that.

12        A.    Yes.

13        Q.    Now do you recall telling this person at

14   Big Sky that Mr. Meyer hits rocks after the cat

15   track?

16        A.    Yes.

17        Q.    Okay.  So this is an accurate

18   representation of the statement that you made to

19   Big Sky?

20        A.    Correct.

21        Q.    Okay.  Now these rocks or log or this

22   area where Mr. Meyer wrecked, was it marked in any

23   way?

24        A.    So let's --

25        MR. McINTOSH:  Objection, vague.

                                                          **26**

## TOM McMAKIN

 1      THE WITNESS:  So let's be clear.  So he's
 2  coming down the ski slope, he hits the track, the
 3  snow is rough.  On the downside of that lip, my
 4  recollection is there was exposed gravel on the
 5  downside of the lip.  He flipped and he landed on a
 6  tree.  So you're using -- you're saying where he
 7  crashed.  So there are two different elements of
 8  the crash, where the crash was initiated and where
 9  it ended.
10      MS. WALAS:  Okay.
11      THE WITNESS:  So there wasn't a log on the
12  road.  But my recollection is that on this track,
13  on the downhill side there was a lip of icy
14  granular snow and then it was bare on the downhill
15  side there.  There was gravel.
16  BY MS. WALAS:
17      Q.   Okay.  And in looking --
18      A.   Early season conditions.
19      Q.   And in looking at these pictures, can
20  you see the gravel that you're speaking of --
21      A.   No.
22      Q.   -- in either Exhibit 25 or 24 from
23  above?
24      A.   No.
25      Q.   Okay.  And is the gravel that you're

**TOM McMAKIN**

1  talking about now, are those the rocks that you're
2  referring to in this statement?

3       A.    Correct.

4       Q.    Okay.  And so at that gravel were there
5  any warning signs --

6       A.    No.

7       Q.    -- posted?

8             And were there any -- were there any
9  signs in the area at all identifying the cat track
10 or the road?

11      A.    I don't recall.  Lots of signs saying
12 early season conditions.

13      Q.    Okay.

14      A.    But I don't recall whether there was a
15 specific sign on the cat track.  I just don't
16 recall anything.  My recollection is that there
17 wasn't, but I don't recall.

18      Q.    And do you recall if there was a
19 chairlift in the area?

20      A.    So that's a good question.  I don't -- I
21 don't ski this very much and so I don't -- I don't
22 have a good memory of that.

23      Q.    Okay.

24      A.    It seemed like there was a chairlift up
25 here to the right but that's the vaguest of

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

TOM McMAKIN

1    possible memories.
2        Q.   Okay.  So you're unclear if there was a
3    chairlift or not?
4        A.   Yeah, I am unclear.
5        Q.   And what do you consider early ski
6    conditions?  You've been throwing that term around
7    and I just want to make sure that we're on the same
8    page when you're talking about early ski
9    conditions.
10       A.   So patchy snow with obstacles.  So thin
11   cover bleeding through to tree stumps and rocks
12   that you have to ski around or they'll trip you up.
13       Q.   Okay.  And you said something earlier in
14   your testimony that you -- you stopped on the cat
15   track or road.  I know everybody that skis refers
16   to them as different things.  So when I say cat
17   track and road I mean the same thing.
18            Now you had planned to stop there,
19   correct?
20       A.   Yes.
21       Q.   And with that knowledge, had you slowed
22   down prior to getting there?
23       A.   Yeah.
24       Q.   Okay.  And when you normally ski, if
25   you're not going to stop -- be stopping to wait for

29

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1   people on the cat track, do you just keep at your

2   speed and just keep going down?

3          MR. McINTOSH:  Objection, vague.

4          THE WITNESS:  I think sometimes, yes, and

5   sometimes, no.  That's the fun of skiing, right?

6          MS. WALAS:  Okay.

7          THE WITNESS:  But I might have skied down and

8   just -- so you couldn't go straight on, right?

9   That's not an option.  It was not -- that was not

10  open.  But I could have -- and it's downhill so the

11  option is to take the cat track over left a little

12  left and then ski down over to this broader area.

13  And so I could imagine being by myself or with my

14  son and just skiing onto that cat track and sliding

15  parallel on the cat track and moving forward

16  because it's flat and you might want to keep your

17  speed going.  But I can imagine stopping too and

18  it's in the moment.

19  BY MS. WALAS:

20         Q.   Okay.  And on December 11th you don't

21  know what Mr. Meyer's intentions were as he was

22  going down the hill?

23         A.   No.  No way I could know.

24         Q.   And so when you testified that he was

25  getting ready to jump, that's just your guessing as

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1  to what he was doing?

2      A.   Yeah.  It's just conjecture based on the

3  fact that it was -- he hadn't slowed down.  He

4  wasn't turning.  He was going straight down the

5  hill at a high rate of speed.

6      Q.   Okay.  And do you know Mr. Meyer's

7  skiing ability?

8      A.   I have no idea.

9      Q.   And --

10     A.   He's a pretty good skier.  I guess I do

11  know a little bit, right?  I saw him for five

12  seconds ski down a difficult run at a high rate of

13  speed and he was -- he knows what he's doing.  He's

14  got strong legs and he was hitting those moguls

15  hard.

16     Q.   Now besides the call back and the ski

17  patroller that day at Big Sky, have you spoken to

18  anyone else from Big Sky?

19     A.   Like I said, I had this recollection of

20  calling and asking if he was okay.

21     Q.   The day of the wreck, did you talk to

22  any of the ski patrollers around?

23     A.   So when they -- there were quite a

24  number of ski patrollers that came on the scene.  I

25  might have said a few words like "Can I help?"  I

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1  think I took his skis.  Like his skis had been

2  ejected and I was like, "Can I take them over to

3  the toboggan?"  And they said that would be

4  helpful.  I was trying to be helpful.  And then

5  they asked me to -- so they put him in the toboggan

6  and took him over on this broad slope and went

7  down.  And they asked me to ski behind them and

8  meet them at the ski patrol hut where I then made a

9  statement.  So yes, I guess I do.

10      Q.   And you said there were a lot of ski

11  patrollers around.  Do you recall any of the ski

12  patrollers saying anything about the area that you

13  were standing in, like make any comments that just

14  stuck out in your mind?

15      A.   No.  They seemed very focused on the

16  quality of care.  And there was clearly a senior

17  person, whether it was a doctor or, I don't know, a

18  senior medical person that -- my recollection is

19  that they felt lucky that that person was there and

20  available and on the scene and he seemed like he

21  was giving the orders.  And they were just like

22  focused on getting this guy immobilized on the

23  toboggan down the hill as quickly as possible.

24      Q.   And have you spoken to Big Sky's counsel

25  about this case?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1          A.    Yes.

2          Q.    Okay.  How many times have you spoken

3     with him?

4          MR. McINTOSH:  Objection, relevance.

5          THE WITNESS:  Less than seven and more than

6     two.  I mean, so I think you spoke to me on the

7     phone, you had me do an affidavit, we -- the

8     plaintiff scheduled the deposition, the deposition

9     didn't happen, the deposition got rescheduled.

10    There was -- we've had some contact but really one

11    substantive time, is my recollection about what

12    happened.

13         MS. WALAS:  Okay.

14         THE WITNESS:  Yeah.  The rest seemed like

15    scheduling and the kind of comedy of errors around

16    scheduling and representation.

17    BY MS. WALAS:

18         Q.    Okay.  And when you say "substantive"

19    conversation, is that in relation to the affidavit

20    you prepared?

21         A.    Correct.

22         Q.    And the facts that you put in that

23    affidavit, that was -- those were your facts,

24    correct?

25         A.    Yes.

33

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

```
 1        Q.   Okay.  And nothing that your discussions
 2   with counsel that have -- have they influenced your
 3   testimony?
 4        A.   No.
 5        Q.   Okay.  And this is more of just a
 6   practical question.  We're videotaping your
 7   deposition today I'm presuming because of the trial
 8   will be in Great Falls.  Would it be a hardship for
 9   you to get to Great Falls in July to testify live?
10        A.   Define hardship.
11        Q.   That's up to the court to define
12   hardship, but.
13        A.   I can get to Great Falls.
14        Q.   You can?
15        A.   It's not convenient --
16        Q.   Okay.
17        A.   -- right?  It's a day of my life.
18        MS. WALAS:  If we can go off the record real
19   quick, I might be all done.
20        VIDEO TECHNICIAN:  We're now off the record.
21   The time is 2:10.
22             (Whereupon, a brief
23              recess was taken.)
24        VIDEO TECHNICIAN:  We're back on the record.
25   The time is 2:10.
```

**34**

**TOM McMAKIN**

1     MS. WALAS:  I don't have any further
2  questions at this time.  Thank you.
3     THE WITNESS:  Thank you.
4              RE-EXAMINATION
5  BY MR. McINTOSH:
6     Q.  Mr. McMakin, just a few follow-up
7  questions.
8        First of all, you said you recalled on
9  December 11, 2015 when you skied in Big Sky, you
10  said you saw lots of signs that said early season
11  conditions.  Do you remember saying that?
12     A.  I do remember saying that, yes.
13     Q.  Do you also recall seeing -- I'm going
14  to show you what's been previously marked as
15  Exhibit 19, and do you see the sign shown in
16  Exhibit 19?
17     A.  I see the sign in this picture, yes.
18     Q.  And can you read that that sign states
19  "Caution, Unmarked Hazards"?
20     A.  Yes.
21     Q.  And do you recall seeing signs that said
22  "Caution, Unmarked Hazards" on December 11, 2015?
23     A.  I do, but I couldn't locate where this
24  sign is.
25     Q.  You were asked by counsel a number of

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    questions about the rocks below the cat track, do
2    you recall those questions?
3          A.   I do recall.
4          MR. McINTOSH:  And we're on number 68; is
5    that correct?
6          MS. WALAS:  Yes.
7               (Whereupon, Deposition
8                Exhibit Numbers 68 & 69
9                were marked for identification.)
10   BY MR. McINTOSH:
11         Q.   Mr. McMakin, I'm going to hand you two
12   photographs that I've marked as Exhibits 68 and 69.
13   Please take a minute to review those.
14         A.   (Witness complies.)
15         MS. WALAS:  The one with the person is 68.
16         THE WITNESS:  Okay.
17   BY MR. McINTOSH:
18         Q.   And do you recognize what is shown in
19   Exhibits 68 and 69?
20         A.   So I'm going to ask you some questions.
21   So this is the cat track; is that correct?
22         Q.   Correct.
23         A.   And is this -- this is not the cat
24   track, this is below it.  The cat track is up here
25   where the packed snow is?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    Q.   And you're referring now to Exhibit 69?

2    A.   Correct.

3    Q.   Yes.

4    A.   And you're looking over the edge of it,

5    yes.  So what was your question?

6    Q.   My question was, do you recognize what's

7    shown in Exhibits 68 and 69?

8    A.   I have located them in my brain.  These

9    were not -- so the left, 69, might have been my

10   perspective.  But 68 was not my perspective.  My

11   perspective was more of the person that's pictured

12   standing on the cat track.

13   Q.   Okay.  In picture 68?

14   A.   Correct.

15   Q.   Okay.  So would you agree with me that

16   Exhibit 68 is a sideways view of the rocks below

17   the cat track?

18   A.   Correct, looking uphill.

19   Q.   And Exhibit 69 is a photograph looking

20   downhill at the rocks, correct?

21   A.   Correct, sort of more eastward.

22   Q.   And in both photographs 68 and 69 you

23   can clearly see the rocks, correct?

24   A.   Correct.

25   Q.   And are these -- the rocks shown in

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1    Exhibits 68 and 69, are those the rocks that you

2    believe Mr. Meyer hit as you thought he was trying

3    to jump off the cat track?

4         A.   Yes.

5         Q.   And earlier you were asked a question

6    about what was going through Mr. Meyer's mind when

7    he came down and went by you.  And, of course, you

8    don't know what was going through his mind, do you?

9         A.   Right.  No, I do not.

10         Q.   But from what you observed, did it look

11    to you like he was trying to jump off the downhill

12    edge of the cat track?

13         A.   Yes, that's what I said earlier.  I

14    believe that he was going straight down the hill at

15    a high rate and he saw the cat track and he was

16    going to jump off that lip.

17         Q.   Thank you, Mr. McMakin.  That's all the

18    follow-up questions I have.

19         A.   Okay.

20         MS. WALAS:  I just have one, maybe two.

21                    RE-EXAMINATION

22    BY MS. WALAS:

23         Q.   You were asked about Exhibit 19 about

24    that sign?

25         A.   Yes.

                                                        **38**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1       Q.   Do you see that sign in any of the
2   pictures that you have been testifying about?
3       A.   I do not.
4       Q.   That's it.  That's all I have.  Thank
5   you.
6       A.   Cool.  Thank you both.
7       Q.   Thank you.
8       A.   Onward and upward.
9       VIDEO TECHNICIAN:  This now ends the
10  deposition.  The time is 2:15.
11
12              (Whereupon, the taking
13               of this videotaped deposition
14               was concluded at 2:15 p.m.)
15
16
17          SIGNATURE RESERVED
18
19
20          *   *   *   *   *   *   *   *
21
22
23
24
25

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

```
 1                    DEPONENT'S CERTIFICATE
 2      PAGE            LINE            CORRECTION
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14              I, TOM McMAKIN, the deponent in the
15      foregoing deposition, DO HEREBY CERTIFY, that I
16      have read the foregoing -40- pages of typewritten
17      material and that the same is, with any corrections
18      thereon made in ink on the correction sheet and
19      signed by me, a full, true and correct transcript
20      of my oral deposition given at the time and place
21      hereinbefore mentioned.
22              DATED this_____day of_____, 2020.
23
24                       _____
25                               TOM McMAKIN
```

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**TOM McMAKIN**

1                   C E R T I F I C A T E

2     STATE OF MONTANA       )

3                            )  ss.

4     COUNTY OF GALLATIN     )

5              I, Marla Jeske, Court Reporter - Notary

6     Public, CSR, in and for the County of Gallatin,

7     State of Montana, do hereby certify:

8              That the witness in the foregoing

9     deposition was by me first duly sworn to testify

10    the truth, the whole truth and nothing but the

11    truth in the foregoing cause; that the deposition

12    was then taken before me at the time and place

13    herein named; that the deposition was reported by

14    me in shorthand and later transcribed into

15    typewriting under my direction, and the foregoing

16    pages contain a true record of the testimony of the

17    witness, all done to the best of my skill and

18    ability.

19             IN WITNESS WHEREOF, I have hereunto set

20    my hand and affixed my notarial seal this _____ day

21    of _____, 2020.

22           _____

23           Notary Public for the State of Montana

24           residing at: Bozeman

25           My commission expires: February 04, 2023

**41**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

TOM McMAKIN

Page 40

```
 1                        DEPONENT'S CERTIFICATE
 2     PAGE             LINE              CORRECTION
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14            I, TOM McMAKIN, the deponent in the
15     foregoing deposition, DO HEREBY CERTIFY, that I
16     have read the foregoing -40- pages of typewritten
17     material and that the same is, with any corrections
18     thereon made in ink on the correction sheet and
19     signed by me, a full, true and correct transcript
20     of my oral deposition given at the time and place
21     hereinbefore mentioned.
22            DATED this    5th    day of  February        , 2020.
23
24
25                                        TOM McMAKIN
```

BRIDGER COURT REPORTERS, INC.
(406) 582-0668