**BOB DIXON**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

_____

JOHN MEYER,

      Plaintiff,

   vs.          Cause No. 18-CV-0002-BMM

BIG SKY RESORT,

      Defendant.

_____

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

BOB DIXON

_____

BE IT REMEMBERED, that the videotaped deposition upon oral examination of BOB DIXON, appearing at the instance of Plaintiff, was taken at the offices of Crowley Fleck, PLLP, 1915 South 19th Avenue, Bozeman, Montana, 59718, on the 5th day of February 2020, beginning at the hour of 9:30 a.m., pursuant to the Federal Rules of Civil Procedure, before Marla Jeske, Court Reporter - Notary Public, CSR.

**BOB DIXON**

```
 1                    APPEARANCES
 2
        ATTORNEY APPEARING ON BEHALF OF THE
 3      PLAINTIFF, JOHN MEYER:
 4
            Ms. Breean Walas, Esq.
 5          Walas Law Firm
            P.O. Box 4591
 6          Bozeman, Montana 59772
            breean@walaslawfirm.com
 7          (501) 246-1067
 8
        ATTORNEY APPEARING ON BEHALF OF THE
 9      DEFENDANT, BIG SKY RESORT:
10
            Mr. Ian McIntosh, Esq.
11          CROWLEY FLECK PLLP
            1915 South 19th Avenue
12          P.O. Box 10969
            Bozeman, MT 59719-0969
13          imcintosh@crowleyfleck.com
            (406) 556-1430
14
15
16      ALSO PRESENT:
17          Mike Unruh
18
19
20
21
22
23
24
25
```

2

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

```
 1                    I N D E X
 2   EXAMINATION OF BOB DIXON BY            PAGE
 3        Ms. Breean Walas, Esq......................5
 4   E X H I B I T S   R E F E R R E D   T O:
 5   Exhibit 10.......................................16
     Exhibit 11...................................17, 20
 6   Exhibit 13...................................19, 22
     Exhibit 18.......................................21
 7   Exhibit 20.......................................23
     Exhibit 21.......................................24
 8   Exhibit 24.......................................25
     Exhibit 25...................................27, 32
 9   Exhibit 68.......................................29
10   DEPOSITION EXHIBITS:
11   Exhibit 75     Colored Photograph
                    with writing.......................32
12
     Exhibit 76     Colored Photograph
13                  with writing....................33-35
14   Exhibit 77     Document entitled "Patroller
                    Comments".......................39-40
15
     Exhibit 78     Document entitled "Big Sky
16                  Resort, Professional Ski
                    Patrol Manual, 2015"..........44, 50
17
18
19
20
21
22
23
24
25
```

**3**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1      WHEREUPON, the following proceedings were had

2  and testimony taken, to-wit:

3

4                  *   *   *   *   *

5

6      VIDEO TECHNICIAN:  This is the time and place

7  set for the video deposition of Bob Dixon in the

8  case of John Meyer, plaintiff, versus Big Sky

9  Resort, defendant.

10          It is Cause Number 18-CV-0002-BMM in the

11  United States District Court for the district of

12  Montana, Butte Division.

13          This video deposition is being held at

14  the offices of Crowley and Fleck located at 1915

15  19th Avenue in Bozeman, Montana.

16          Today's date is February 5th, 2020.  The

17  time is 9:33 a.m.  The court reporter is Marla

18  Jeske with Bridger Court Reporting.  I'm Mark

19  Brown, the videographer.

20          Will the attorneys please identify

21  themselves for the record.

22      MS. WALAS:  Breean Walas for the plaintiff.

23      MR. McINTOSH:  Ian McIntosh for the

24  defendant.

25          VIDEO TECHNICIAN:  Will the witness now

**4**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1   please be sworn in.

2

3                    *   *   *   *   *

4

5                    BOB DIXON,

6   called as a witness herein, having been first duly

7   sworn, was examined and testified as follows:

8

9                    EXAMINATION

10  BY MS. WALAS:

11      Q.   All right.  Good morning.  Do you

12  understand why you're here today?

13      A.   I do.

14      Q.   Okay.  And have you given a deposition

15  before?

16      A.   Yes.

17      Q.   How many have you given?

18      A.   Somewhere between five and ten.

19      Q.   And what -- was that in your employment

20  with Big Sky?

21      A.   Yes.

22      Q.   All of them?

23      A.   I think so, yes.

24      Q.   And what types of cases were they?

25      A.   Um, basically there was a suit about an

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

BOB DIXON

1  avalanche closure.  There was a suit involving
2  terrain analysis by a skier.  There was one about
3  skiing off the summit and the person walking across
4  a rock field to ski a patch of snow and hitting a
5  rock, those kind of things.
6      Q.   Okay.  And I'm just going to go over a
7  couple of the ground rules just to give you a
8  reminder.
9           You understand that all of your answers
10 need to be out loud so that she can take them down?
11     A.   Correct.
12     Q.   And is there anything going on that
13 would impair your ability to give truthful answers
14 today?
15     A.   No.
16     Q.   You haven't taken any drugs this
17 morning?
18     A.   Prilosec.
19     Q.   Okay.  Haven't had any drinks?
20     A.   No.
21     Q.   All right.
22     A.   Except Mountain Dew.
23     Q.   Well, you know, everybody needs a little
24 caffeine.
25     A.   Yes.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

 1     Q.   So if you need any breaks at any point,
 2   if I'm in the middle of a question, if you don't
 3   mind answering it and then we'll go ahead and take
 4   a break as you need it.
 5     A.   Okay.
 6     Q.   And do you agree to be honest with me
 7   today?
 8     A.   Yes.
 9     Q.   All right.  Now, what have you done to
10   prepare for your deposition?
11     A.   Um, basically went over the actual
12   accident investigation and pretty much just got my
13   memory back as to the incident.
14     Q.   Okay.  And we'll talk about the accident
15   incident report a little bit later but, first, I
16   just want to get some background information on
17   you.
18     A.   Uh-huh.
19     Q.   What's your full name?
20     A.   Robert Charles Dixon.
21     Q.   And have you gone by any other names?
22     A.   Basically, the ski patroller uses my
23   number 20 which I answer to quite easily.
24     Q.   Okay.
25     A.   They also call me Boss Hog, Red Duck

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1   Leader.  Basically, some people use my name that I

2   use for my pin name on my account, which is Cindy

3   or Sherri.  Okay?

4           Q.    Okay.  And is it okay if I call you Bob

5   today?

6           A.    Yes.

7           Q.    Okay.  And what's your marital status?

8           A.    Divorced.

9           Q.    Okay.  And does your ex live in the

10  area?

11          A.    She does.

12          Q.    And what is her name?

13          A.    Evi Dixon.

14          Q.    Okay.  And do you have any children?

15          A.    No.

16          Q.    Where do you live?

17          A.    On Baxter over by La Tinga, Baxter Lane.

18          Q.    Is that in Bozeman?

19          A.    Uh-huh.

20          Q.    Okay.

21          MR. McINTOSH:  Say yes.  Just remember to say

22  yes instead of uh-huh.

23          THE WITNESS:  Okay.

24          MR. McINTOSH:  Or else Marla is going to get

25  mad at both of us.

8

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1        MS. WALAS:  Right.  And we all say uh-huh as

2   well, so it's a good reminder for all of us.

3        THE WITNESS:  Okay.

4   BY MS. WALAS:

5        Q.   Does anyone live with you at your

6   residence?

7        A.   No.

8        Q.   And what's your educational background

9   starting with high school?

10        A.   Went to high school in Colorado Springs,

11   then went to college, got a professional degree in

12   physics from MSU.

13        Q.   And when you say MSU, which one is that?

14        A.   It's Montana State University.

15        Q.   All right.  And you said that's a

16   professional degree in --

17        A.   Right.

18        Q.   -- physics?

19        A.   Yes.

20        Q.   What is a professional degree?

21        A.   It's basically four years and some

22   graduate courses but not quite a master's.

23        Q.   And any other post-graduate work?

24        A.   I worked in GIS but those are just

25   courses I took.  I didn't get a degree.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1          Q.   Okay.  And do you have a bachelor's
2     degree from Montana State?
3          A.   It's the same thing as professional.
4          Q.   Okay.  And let's talk a little bit about
5     your employment history.  What would you consider
6     your profession?
7          A.   Ski patrol.
8          Q.   And how long have you been a ski
9     patroller?
10         A.   40 years.
11         Q.   You're going to make me do some math.
12    So you started in about 1980?
13         A.   A little before that.
14         Q.   Okay.  And where was your first job as a
15    ski patroller?
16         A.   Park City.
17         Q.   And how long were you at Park City?
18         A.   One year.
19         Q.   Do you recall what your title was?
20         A.   Just a line ski patroller.
21         Q.   And where did you go after Park City?
22         A.   Park West.
23         Q.   And where's Park West?
24         A.   It's in Park City, now called The
25    Canyons.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    Q.   How long did you stay there?

2    A.   Two years.

3    Q.   And what did you do there?

4    A.   Line patrol.

5    Q.   After Park West, where did you go?

6    A.   Big Sky.

7    Q.   Okay.  So what year did you join Big

8  Sky?

9    A.   '82.

10   Q.   What -- before we go into your

11 employment at Big Sky, what were your duties as a

12 line patrol?

13   A.   Basically avalanche mitigation, medical

14 response, rope lines, things like that.

15   Q.   And when you joined Big Sky in '82, what

16 was your title, job title?

17   A.   When I joined them, was line patroller.

18   Q.   How long did you -- how long were you a

19 line patroller?

20   A.   Two months.

21   Q.   What did you do after line patrol?

22   A.   Assistant director.

23   Q.   Assistant director of what?

24   A.   Ski patrol.

25   Q.   Okay.  Didn't want to put you in the

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1  kitchen and be wrong.

2          So you were promoted to the assistant

3  director in '82?

4          A.    Yes.

5          Q.    Okay.  And how long were you the

6  assistant director of ski patrol?

7          A.    Ten years.

8          Q.    And what were your responsibilities and

9  duties as that assistant director?

10          A.    Pretty much the day-to-day operations,

11  direction for the pole patrol.  There was a small

12  volunteer patrol but they weren't under my

13  auspices.

14          Q.    And in '92, what was your -- what did

15  your role change to?

16          A.    Patrol director.

17          Q.    And what does a patrol director do?

18          A.    Basically supervises the day-to-day

19  operation of the ski patrol, also is in charge of

20  investigation, accident investigation, basically

21  human resource activities, dealing with the

22  management team of Big Sky.

23          Q.    Okay.  And how long were you the patrol

24  director?

25          A.    Let's see, I just retired last June so

**12**

**BOB DIXON**

1  that is -- if we can do the math.  It's probably 26

2  years about.

3          Q.   And why did you retire?

4          A.   I'm 70.

5          Q.   That's a pretty good reason.

6               Now, have you ever given testimony as an

7  expert witness?

8          A.   No.

9          Q.   Okay.  And how long have you been a

10  skier?

11          A.   Since I was four.

12          Q.   And what level of skier do you rate

13  yourself?

14          A.   An expert.

15          Q.   And do you recall -- strike that.

16               So I'm assuming, but I don't want to

17  make an assumption, are you knowledgeable about the

18  mountain at Big Sky?

19          A.   Yes.

20          Q.   Okay.  So if I talk to you about, you

21  know, the trails and the terrain and use names,

22  you'll have a general understanding of what I'm

23  talking about?

24          A.   Yes.

25          Q.   And if I show you pictures, do you feel

**13**

**BOB DIXON**

1  like you can recognize the ski areas on the

2  mountain?

3      A.   Yes.

4      MR. McINTOSH:  Objection, speculation.

5  BY MS. WALAS:

6      Q.   Okay.  How often are you on the mountain

7  as the ski patrol director?

8      A.    Pretty much every day.

9      Q.   Okay.  And do you go out and assist the

10  professional ski patrollers in their job?

11      A.   Yes.  I got an avalanche route that I do

12  every day.  We do avalanche control.  And yes, I'm

13  on the mountain.

14      Q.   Okay.  And how about skiing for fun, how

15  often do you go out on the mountain at Big Sky?

16      A.   This year I've been out ten times.

17      Q.   How about when you work there?

18      A.   None.

19      Q.   Did you say none?

20      A.   None.

21      Q.   Okay.  Now, at Big Sky are you familiar

22  with what's been referred to within this litigation

23  as the Bermuda Triangle?

24      A.   Yes.

25      Q.    Okay.  And why is it called the Bermuda

**14**

**BOB DIXON**

1    Triangle?

2         MR. McINTOSH:  Objection, foundation.

3             Go ahead.

4         THE WITNESS:  Basically, it's some ski

5    patroller decided to call it that.  I do not know

6    why.

7    BY MS. WALAS:

8         Q.   Can you tell me where the Bermuda

9    Triangle is on the mountain?

10        A.   It is below the Loop Road, below Highway

11   and above lower Morning Star.

12        Q.   And is it your understanding that

13   Mr. Meyer's ski wreck on December 11th, 2015,

14   occurred in the Bermuda Triangle area?

15        A.   Yes.

16        Q.   Okay.  And do you know if you can see

17   this Bermuda Triangle from any of the ski lifts?

18        A.   Yes.

19        Q.   Which one?

20        A.   Definitely Challenger, you can actually

21   see it from Swift Current.

22        Q.   I'm going to go ahead and hand you the

23   binder of exhibits that have been introduced so far

24   so that you can use those for your reference.  And

25   I'll ask you to go ahead and turn to what's been

**15**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1  marked as Exhibit 10.

2       A.   (Witness complies.)

3       Q.   Now, have you seen this picture before?

4       A.   I believe so.

5       Q.   And can you identify where this is on

6  the mountain?

7       A.   This is -- let me take a good look at

8  this.  Yeah, this is right up above the soup shack

9  coming off the Jay Walk.

10      Q.   And would this be considered a

11 transition point on the mountain?

12      MR. McINTOSH:  Objection, vague.

13      THE WITNESS:  Yeah.  Define "transition

14 point."

15 BY MS. WALAS:

16      Q.   Is this an area where more than one

17 trail come together?

18      A.   Yes.

19      Q.   And there's some what I would call

20 fences on there.

21      A.   Right.

22      Q.   And do you know what the purpose of

23 those fences are?

24      A.   To collect snow.

25      Q.   To collect snow?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1              Do they have anything to do with

2    directing skiers?

3         A.   No.

4         Q.   Okay.  And do you have any idea when

5    this picture was taken?

6         A.   I do not.

7         Q.   And you said that it was above the soup

8    shack in coming off the Jay Walk?

9         A.   Right.

10        Q.   For those of us that are unfamiliar with

11   Big Sky, are there any specific trail names right

12   there?

13        A.   You're on the Jay Walk.

14        Q.   You're on the Jay Walk, okay.

15        A.   Yes.

16        Q.   And if you'll go ahead and turn to

17   Exhibit 11.

18        A.   (Witness complies.)

19        Q.   And have you seen this photo before?

20        A.   Not that I recall.

21        Q.   Looking at the photo are you familiar

22   with the area that it depicts?

23        A.   Yes.

24        Q.   Okay.  And what is that area?

25        A.   Um, you're at the intersection of Mr. K

                                                      **17**

**BOB DIXON**

1   and the lower Morning Star Road, catwalk.

2        Q.   And what is the skill level for that

3   lower Morning Star catwalk?

4        A.   Green.

5        Q.   And do you see where the skiers are in

6   that photo?

7        A.   Yes.

8        Q.   And what's the trail name of what I

9   would consider the uphill slope above them?

10        A.   Right above them?

11        Q.   Yes.

12        A.   That is not a trail.

13        Q.   What is that?

14        A.   It's just an open snow field.

15        Q.   Okay.  Is that an open skiing area?

16        A.   Not until we get enough snow.  But

17   basically it's just kind of off -- off the trail a

18   bit.

19        Q.   And the part of the trail that the

20   skiers are on, did you say that was the lower

21   Morning Star cat track?

22        A.   Yes.

23        Q.   Okay.  And the signs that are on the

24   part of the slope above the skiers, what is the

25   purpose of those signs?

**18**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1        A.   Are you referring to the orange sign?

2        Q.   Yes.

3        A.   That is to close that when we're doing

4   avalanche mitigation, to close it.

5        Q.   And there's another sign that's yellow,

6   what is that sign's purpose?

7        A.   Basically to caution you that there may

8   be obstacles, rocks.  It's early season conditions.

9        Q.   Okay.  And when you say early season

10  conditions, what does that mean to you?

11       A.   Thin snow pack.

12       Q.   Did you say thin snow pack?

13       A.   Yes.

14       Q.   Okay.  And where does this lower Morning

15  Star cat track lead to?

16       A.   To lower Morning Star.

17       Q.   If you'll go ahead and turn to Exhibit

18  13.

19       A.   (Witness complies.)

20       Q.   And have you seen this photo before?

21       A.   Possibly.  I've seen some similar, not

22  this one.

23       Q.   And are you familiar with the area that

24  is depicted?

25       A.   Yes.

**19**

**BOB DIXON**

1      Q.   Okay.  And what is that showing in that
2  picture?
3      A.   At the top of lower Morning Star you're
4  looking on the right side at Bermuda Triangle,
5  you're looking at the Loop cat track and then
6  you're looking at Highway on the left side of the
7  photo.
8      Q.   And so when you say "Highway on the left
9  side of the photo," that would be the steeper --
10      A.   Uh-huh.
11      Q.   --  part of the hill?
12      A.   Yeah.  It's everything above the cat
13  track.
14      Q.   And then this cat track that you're
15  discussing here, is that the same cat track that
16  was the lower Morning Star cat track in the
17  previous exhibit that we talked about, Exhibit 11?
18      A.   It does continue across, yes.
19      Q.   And I just forgot what the top trail was
20  on the left.  What's the name of that trail again?
21      A.   Highway.
22      Q.   Highway.  And what skill level is
23  Highway?
24      A.   Black diamond.
25      Q.   And so Highway crosses over the cat

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    track and then continues down?

2         A.    To the Bermuda Triangle.

3         Q.    Okay.  And what's the skill level after

4    you cross over the cat track?

5         A.    Um, it's basically continuation of

6    Highway.  So it would be black diamond.

7         Q.    Now, do you know if this area has ever

8    been marked with any safety signs by the ski

9    patrollers?

10        MR. McINTOSH:  Objection; vague, foundation.

11        THE WITNESS:  Yeah, more details.  Which area

12   are you talking there?

13   BY MS. WALAS:

14        Q.    So looking at this picture, the Bermuda

15   Triangle there, has that area, the Bermuda Triangle

16   itself, ever been marked with safety signage or

17   anything that the ski patrollers used to advise

18   skiers of hazards?

19        MR. McINTOSH:  Same objections.

20        THE WITNESS:  Um, no.

21   BY MS. WALAS:

22        Q.    And go ahead and turn to Exhibit 18.

23        A.    (Witness complies.)

24        Q.    Where is this on the mountain?

25        A.    This is the top of Challenger.

21

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1     Q.    Okay.  And I forgot to ask you
2  beforehand, that you're familiar with what's
3  depicted in this photo?
4     A.    Yes.
5     Q.    Okay.  And what's the purpose of those
6  ropes that we see in the photo?
7     A.    It's basically a closure.
8     Q.    And what's the purpose of the closure?
9     A.    The closure is to keep people from
10 hiking up into the terrain above it.
11    Q.    And was that closed due to early season
12 conditions?
13    A.    Yes.
14    Q.    So similar to the first photo we looked
15 at, it may change on another later date when you
16 get more snow up there?
17    A.    Correct.
18    Q.    Okay.  And do you know if this photo and
19 the previous photo Exhibit 13, do you know when
20 those were taken?
21    A.    No, not really.
22    Q.    Now you said that's the top of Highway,
23 correct?
24    A.    Yes.
25    Q.    And --

**22**

**BOB DIXON**

1        MR. McINTOSH:  I'm sorry, I got

2   to -- misstates his testimony.

3            Go ahead.

4   BY MS. WALAS:

5        Q.    So on Exhibit 18 where is that at?

6        A.    It's at the top of Challenger.

7        Q.    Top of Challenger.  Sorry, I struggle to

8   keep the trail names straight.

9            And is that right where you get off the

10  chairlift?

11       A.    Yes.

12       Q.    Okay.  If you'll turn to Exhibit 20.

13       A.    (Witness complies.)

14       Q.    And are you familiar with the area

15  depicted in this photo?

16       A.    Yes.

17       Q.    And where is that on the mountain?

18       A.    That is Country Club.

19       Q.    And where's Country Club in relation to

20  Highway?

21       A.    It is over on the skier's right up

22  Highway.

23       Q.    And do you have to take Country Club to

24  get to Highway from the Challenger lift?

25       A.    No, not necessarily.

**BOB DIXON**

1    Q.   And there's -- it looks like there's
2  some ropes and signs again in this photo, whose
3  decision is it to put those up?
4    A.   Supervisor.
5    Q.   You as the supervisor?
6    A.   No, each hill has a supervisor.
7    Q.   Okay.  And so there would be a specific
8  supervisor assigned to an area on the hill?
9    A.   Uh-huh.
10   Q.   Okay.  Do you know who was assigned to
11 the Challenger area on December 11th, 2015?
12   A.   Not for sure.
13   Q.   Okay.  If you'll go ahead and turn to
14 the next exhibit, Exhibit 21.
15   A.   (Witness complies.)
16   Q.   And what area of the mountain is this?
17   A.   This is the skier's left of Country Club
18 and is the traverse above the LRT area.
19   Q.   And where's this in relation to Highway?
20   A.   It is to the skier's right of Highway.
21   Q.   In looking at this photo, are there any
22 warnings that have been put up for skiers?
23   A.   All I see is the bamboo fence and that's
24 closure.
25   Q.   And what's the purpose of the bamboo

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    fence?

2          A.    To close that area.

3          Q.    Is it to keep skiers safe?

4          A.    Yes.

5          MR. McINTOSH:  Objection, foundation.

6                Go ahead.

7          THE WITNESS:  Yes.

8    BY MS. WALAS:

9          Q.    Why would a i patroller close an area?

10         A.    Cliff bands exposed down there below it.

11         Q.    And is that to keep skiers away from the

12   cliff bands?

13         A.    Uh-huh, yes.

14         Q.    All right.  If I can ask you to turn to

15   Exhibit 24.

16         A.    (Witness complies.)

17         Q.    And are you familiar with this photo?

18         A.    Yes, I am.

19         Q.    And do you know when this photo was

20   taken?

21         A.    I do not.

22         Q.    And what area of the mountain is this?

23         A.    This is lower Highway.

24         Q.    And from the vantage point of the

25   photographer, where they're standing, can you see

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    the angle of the transition to the cat track in

2    this photo?

3         MR. McINTOSH:  Objection, vague.

4         THE WITNESS:  Um, yes.

5    BY MS. WALAS:

6         Q.   And can you describe that angle to me?

7         MR. McINTOSH:  Same objection.

8         THE WITNESS:  Um, it looks to me to be pretty

9    much a smooth transition.

10   BY MS. WALAS:

11        Q.   And have you skied this lower Highway

12   before?

13        A.   Oh, yes.

14        Q.   I had to ask because, you know, you said

15   you never went skiing for fun when you were working

16   there.

17             Now, do you know how far away from the

18   cat track this picture was taken?

19        A.   That would be speculation.

20        Q.   Okay.  Do you know why this photo was

21   taken?

22        A.   I would assume to show the terrain and

23   the vantage point from the skier, uphill skier.

24        Q.   But you personally were not involved in

25   taking this photo?

**BOB DIXON**

1          A.    No.

2          Q.    What's the skier level of this trail?

3          A.    Black diamond.

4          Q.    And there's a lot of brush in the photo,

5    correct?

6          A.    Correct.

7          Q.    And are those -- is that brush an area

8    that you would consider a hazard?

9          A.    Um, not really.  That brush gives away

10   quite easily when you're skiing through it.

11         Q.    And how steep is lower Highway?

12         A.    Again, I don't have those figures here.

13         Q.    If you'll go ahead and turn to Exhibit

14   25.

15         A.    (Witness complies.)

16         Q.    And are you familiar with this picture?

17         A.    Yes.

18         Q.    And where is this photo on the mountain?

19         A.    It is lower Highway.

20         Q.    And do you see the three people standing

21   on the cat track?

22         A.    I do.

23         Q.    And do you see a drop-off from where the

24   skiers are standing?

25         MR. McINTOSH:  Objection, vague.

**BOB DIXON**

1      MS. WALAS:  I'll go ahead and rephrase that.
2  That was a horrible question.
3  BY MS. WALAS:
4      Q.   Do you see where the skiers are at the
5  uphill part of the cat track?  Do you see that
6  area?
7      A.   Yes.
8      Q.   And does it appear that there's a
9  drop-off at the point where they're standing on
10  that uphill transition?
11      A.   No, there does not.
12      Q.   Can you see the lower legs of the skier
13  closest to the uphill portion?
14      A.   I can see most of it, yes.
15      Q.   And there aren't any safety warnings
16  that have been put up in this area, correct?
17      A.   At this time?
18      Q.   Yes, at this time.
19      A.   No.
20      Q.   And do we know -- do you know, not we.
21  Do you know when this picture was taken?
22      A.   I do not.
23      Q.   Do you know if it's representative of
24  the mountain on December 11th, 2015?
25      A.   I can't say for sure since I don't know

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    when it's taken.

2        Q.   And did you go out to Mr. Meyer's -- the

3    location of Mr. Meyer's ski wreck on December 11th?

4        A.   The following day.

5        Q.   The following day?

6        A.   Yeah.

7        Q.   And if you'll go ahead and turn to

8    what's been marked as Exhibit 68, which I believe

9    we have the original in here.

10       A.   (Witness complies.)

11       Q.   Now are you familiar with this photo?

12       A.   I am not.

13       Q.   You are not.  Okay.  Well, then we will

14    just not talk about that one.

15       A.   Okay.

16       Q.   Now looking at where that skier is

17    standing.

18       A.   In 68?

19       Q.   In 68, yeah.  Are you familiar with that

20    area of the mountain?

21       A.   Yes.

22       Q.   Okay.  And would you consider that the

23    downhill transition from Loop Road to the rest of

24    Highway?

25       MR. McINTOSH:  I'm sorry.  Objection, vague.

**BOB DIXON**

1          THE WITNESS:  Say that again.

2     BY MS. WALAS:

3          Q.   Looking at where the skier is standing,

4     what would you -- how would you describe that

5     location where he is standing or she?

6          A.   The person standing on the cat track.

7          Q.   Okay.  And immediately after the cat

8     track does it continue to go downhill?

9          A.   The cat track itself or where -- below

10    the skier?

11         Q.   Below the skier, does it transition back

12    into a steep slope?

13         A.   It transitions into a slope, yes.

14         Q.   But you would not consider that a steep

15    slope?

16         A.   Not particularly, no.

17         Q.   And do you know if any photos were taken

18    during the investigation of a skier standing on the

19    other side of the cat track closer to where it goes

20    uphill on Highway?

21         A.   I don't recall that.

22         Q.   And from your knowledge of this area,

23    how would you describe the transition from upper

24    Highway to the cat track?

25         A.   Mellow.

30

**BOB DIXON**

1      Q.   What do you mean by "mellow"?

2      A.   Um, very gentle.

3      Q.   And is that across the entire cat track

4  from the transition from upper Highway to the cat

5  track?  And what I mean by "across" is like the

6  full length of the cat track.

7      A.   I'd call that gentle.  Excuse me,

8  gentle.

9      Q.   Okay.  And are you aware of any photos

10 taken of the approach from upper Highway to the

11 Loop Road?

12     A.   Um, I believe I've seen some pictures of

13 that.

14     Q.   And was that part of the accident

15 investigation?

16     A.   Yes.

17     Q.   And do you know if any videos have been

18 taken of that approach or this transition area from

19 Highway to the cat track?

20     A.   I do not recall any.

21     Q.   As part of your responsibilities as the

22 supervisor of the accident investigation team, do

23 you know if videos are taken during accident

24 investigations?

25     A.   Rarely.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

BOB DIXON

1        Q.    What would be an occasion for taking a
2   video?
3        MR. McINTOSH:  Objection, speculation.
4        THE WITNESS:  On maybe two occasions we did a
5   video just to show how somebody approached an area,
6   an accident site.
7        MS. WALAS:  Okay.
8             (Whereupon, Deposition
9              Exhibit Number 75 was
10             marked for identification.)
11   BY MS. WALAS:
12        Q.    I'm going to hand you what I've marked
13   as Exhibit 75.  And are you familiar with this
14   area?
15        A.    Yes.
16        Q.    Okay.  And would you agree that
17   the -- that this picture is similar to Exhibit 25?
18   You can take the time to compare them.
19        A.    Yeah.  I don't want to rip these.
20             I'd say the light, just the shade is a
21   little bit different.
22        Q.    Okay.  And if you'll go ahead and take
23   this red marker, and can you identify on Exhibit 75
24   where the Bermuda Triangle is?
25        A.    (Witness complies.)

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1          Q.    Thank you.

2                In looking at this photo, do you know

3      where Mr. Meyer --

4          A.    Where he landed?

5          Q.    -- wrecked?  Where he landed, yes.

6          A.    No, I do not know exactly.

7          Q.    And do you know the path that Mr. Meyer

8      took down Highway to the cat track?

9          A.    I do not.

10         Q.    And can you show me where the Challenger

11     ski lift is in this photo?

12         A.    It's way uphill.

13         Q.    It's way uphill?

14         A.    Yeah.  It's way back up here

15     (indicating).

16         Q.    Okay.  So if you'll make a little X when

17     you -- because you're pointing over your shoulder.

18     And will you make a little X of where the -- with

19     an arrow pointing towards where the Challenger lift

20     is?

21         A.    Like that.

22               (Whereupon, Deposition

23                Exhibit Number 76 was

24                marked for identification.)

25     ///

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

```
 1    BY MS. WALAS:
 2         Q.   And I'm going to hand you what I've
 3    marked as Exhibit 76.  And are you familiar with
 4    this area?
 5         A.   I am.
 6         Q.   And where is this on the mountain?
 7         A.   Lower Highway.
 8         Q.   Okay.  And are there any elevation
 9    changes that you can see in this photo?
10         A.   Define elevation changes.
11         Q.   Are there any places where it slopes
12    down and then up slopes again?
13         A.   There is this little bit of depression
14    right there on this skier's right.
15         Q.   Will you mark that for me, please?
16         A.   (Witness complies.)
17         Q.   And from your knowledge of the mountain,
18    if a skier is in that depression can they see the
19    Loop Road?
20         MR. McINTOSH:  Objection, speculation.
21         THE WITNESS:  It depends on snow cover, how
22    much fills in that or not.  I would say honestly
23    most of the time, if not all the time, yes.
24    BY MS. WALAS:
25         Q.   Okay.  And looking at Exhibit 76, do you
```

**34**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1   know when this photo was taken?

2        A.   I do not.

3        Q.   Okay.  And do you know if it's

4   representative of December 11, 2015?

5        A.   I cannot -- that would be speculation.

6        Q.   Okay.  And so if the pictures that we've

7   looked at besides the picture that was date

8   stamped, do you know if these pictures are

9   representative of the transition from Morning Star

10  to Loop Road on December 11, 2015?

11       A.   Since I do not know when they were

12  taken, I can't.  That'd be speculation.

13       Q.   Okay.  Let's go ahead and take a break

14  real quick.

15       A.   Okay.

16       VIDEO TECHNICIAN:  This ends Disc Number 1.

17  We're off the record.  The time is 10:13.

18            (Whereupon, a brief

19             recess was taken.)

20       VIDEO TECHNICIAN:  This starts Disc Number 2.

21  We're back on the record.  The time is 10:21.

22  BY MS. WALAS:

23       Q.   Bob, before we move on, I want to take a

24  look back at Exhibit 76.

25       A.   Okay.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1       Q.   And I'm going to hand you a -- wait, let
2   me see which one it is.
3       A.   76 is --
4       Q.   75, my apologies.  And I've given you a
5   green marker and I believe earlier you testified
6   that you could see the Bermuda Triangle from the
7   Swift Current lift as well?
8       A.   Yes.
9       Q.   Okay.  If you'll mark with an X and an
10  arrow where the Swift Current lift is in relation
11  to Bermuda Triangle.  Is that working?
12      A.   Sort of.
13      MR. McINTOSH:  He could just use the red,
14  couldn't he?
15      THE WITNESS:  Yeah, the red is --
16      MS. WALAS:  Yeah, go ahead and just use the
17  red and put a SC near it.  I thought that was a
18  Hi-Liter, apparently it's a crayon.
19  BY MS. WALAS:
20      Q.   SC by the X, please.
21      A.   Okay, SC.
22      Q.   All right, thank you.
23      A.   Uh-huh.
24      Q.   So I'd like to talk to you a little bit
25  about the accident investigation process.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

```
 1              Now you said as the director of the ski
 2    patrol, you're the supervisor of the accident
 3    investigation; is that correct?
 4         A.   I am the overall director of it.
 5         Q.   Okay.
 6         A.   There is a supervisor.
 7         Q.   Okay.  And so as the overall director,
 8    what are your duties with respect to the accident
 9    investigation?
10         A.   To make sure that it occurs, then to
11    review the findings once the investigators have
12    summarized the incident and to make sure they have
13    the tools to investigate and make sure they are
14    educated properly on how to do an investigation.
15         Q.   Okay.  And so the accident investigation
16    team does the investigation?
17         A.   Correct.
18         Q.   And then you are given the report to
19    review?
20         A.   Yes.
21         Q.   And then what do you do with the report?
22         A.   Then I pass it on to Mike Unruh and to
23    Ian McIntosh.
24         Q.   Okay.  And do you sign off on the
25    accident report?  Like, do you have to sign them or
```

37

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1   make any indication that you've reviewed them?

2        A.   No.

3        Q.   Okay.  And are the ski patrollers or the

4   investigators, are they required to sign any of the

5   notes they generate as part of the accident

6   investigation?

7        A.   Yes.

8        Q.   And how does that signature work?

9        A.   It's just -- you know, they got a

10  document, they write it or we do have a

11  computerized document.  And there is actually a

12  device that they can sign on the computer.

13       Q.   Okay.  And do they also date it?

14       A.   Yes.

15       Q.   And are the ski patroller

16  investigators -- is that the correct term to use

17  for the people as part of the accident

18  investigation team?

19       A.   Yes.

20       Q.   Okay.  Now, do they render opinions

21  about the cause of the ski wreck?

22       A.   No.

23       Q.   Do you render opinions about the cause

24  of the ski wreck as the director?

25       A.   No.

38

**BOB DIXON**

1        Q.   And did you review the accident report
2    for Mr. Meyer's December 11th, 2015 wreck prior to
3    your preparation for the depo today?
4        A.   Yes.
5        Q.   Okay.  And did you do that as part of
6    your function as the director of the ski patrol?
7        A.   Yes.
8             (Whereupon, Deposition
9              Exhibit Number 77 was
10             marked for identification.)
11   BY MS. WALAS:
12       Q.   I'm going to hand you what I've marked
13   as Exhibit 77.  And I apologize for it not being in
14   color.  But I printed it and it cut things off in
15   the color version, so.
16            Now is Exhibit 77 the accident report
17   for Mr. Meyer's depo -- or not depo, Mr. Meyer's
18   ski accident?
19       A.   No, it is not.  It is not.
20       Q.   That is not the one for John Meyer's ski
21   wreck?
22       A.   This is -- at least the top page is
23   patroller comments.
24       Q.   And what are the -- what's the purpose
25   of the patroller comments?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

BOB DIXON

1       A.   Just to get basically a view of what
2   they saw and a description of the scene and what
3   they did.
4       Q.   And looking at Exhibit 77, is there an
5   accident report contained in there?
6       MR. McINTOSH:   Objection, vague.
7       MS. WALAS:   I'll rephrase it.
8   BY MS. WALAS:
9       Q.   Can you identify in Exhibit 77 the
10  accident investigation report?
11      A.   Um, this whole document -- okay.   This
12  whole document is the accident investigation
13  report.
14      Q.   Okay.
15      A.   So -- and there is medical in here.
16      Q.   And you said there's medical in here?
17      A.   Yep.
18      Q.   Okay.
19      A.   Yes, sorry.
20      Q.   And if you'll go ahead and look
21  at -- it's page 16.
22      A.   (Witness complies.)
23      Q.   And can you identify what this page is?
24      A.   Looks to be a statement from Amanda Cox.
25      Q.   And who's Amanda Cox?

**40**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

BOB DIXON

```
 1          A.    She is a line ski patroller.
 2          Q.    And was she part of the accident
 3    investigation team?
 4          A.    No.
 5          Q.    Did -- strike that.
 6                If you know, why would this statement be
 7    included in the accident investigation report?
 8          A.    Because line patrollers were involved in
 9    the scene or in the area at that time.
10          Q.    Okay.  And do statements like these need
11    to be signed?
12          A.    Yes.
13          Q.    Okay.  And is this -- is Amanda's
14    name -- do you consider that a signature for
15    purposes of the accident investigation report at
16    Big Sky?
17          MR. McINTOSH:  Objection, vague.
18          THE WITNESS:  Um, that's hard to say.  I
19    don't -- I don't know.
20    BY MS. WALAS:
21          Q.    Well, if you'll go ahead and go to the
22    next page, exhibit -- or page 17.
23          A.    Yes.
24          Q.    What does this page represent?
25          A.    A statement from Jason Vander Weit.
```

**41**

**BOB DIXON**

1       Q.   And do you consider this statement
2  signed?
3       A.   I do.
4       Q.   And in your review of an accident
5  investigation report, have you ever sent any
6  statements back to obtain a signature?
7       A.   I don't recall doing that because that
8  is -- I don't recall doing it, no.
9       Q.   And looking at page 16, and as your
10 capacity of the reviewer of these before setting
11 them up, do you accept Ms. Cox's statement as being
12 signed for purposes of the investigation?
13      MR. McINTOSH:  Objection, vague.
14      THE WITNESS:  Again, that's not something
15 that I'm an expert on, whether it's signed or not.
16 BY MS. WALAS:
17      Q.   And will you go ahead and read the last
18 line of Ms. Cox's statement out loud?
19      A.   Being -- excuse me.  "Being that the
20 visibility was clear, there was no issue seeing the
21 transition from Highway to Lower Morning Star via
22 the Loop Road."
23      Q.   And do you consider that an opinion
24 being made by Ms. Cox?
25      MR. McINTOSH:  Objection, vague.

BRIDGER COURT REPORTERS, INC.
(406) 582-0668

**BOB DIXON**

1        THE WITNESS:  Again, I'm not an expert on

2    making those kind of judgments.

3    BY MS. WALAS:

4        Q.    Well, as the director of the ski patrol,

5    you said that the ski patrollers are not allowed

6    to --

7        A.    Right.

8        Q.    -- express opinions, correct?

9        A.    Correct.

10       Q.    And when you receive a statement, if it

11   contains something that you considered to be an

12   opinion, would you visit with that ski patroller

13   and have them redo the report?

14       A.    No, because once they have written the

15   report, that's their report.  I'm not going to tell

16   them what to say.

17       Q.    Okay.  Now, as the director of ski

18   patrol, are you aware of any other wrecks that have

19   occurred from -- at the transition point from

20   lower -- or from upper Highway to the cat track?

21       A.    No.

22       Q.    Are you aware of any ski wrecks that

23   have occurred in the Bermuda Triangle area itself?

24       A.    Not that I recall.

25       Q.    Are you aware of -- and again, in your

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    capacity as the director of the ski patrol, are you

2    aware of any incidents or wrecks that have occurred

3    on the mountain itself in a transition from a black

4    diamond to a cat track?

5           A.    Not right off the top of my head.

6           Q.    Now, as the ski patrol director, are you

7    familiar with the Big Sky Resort Professional Ski

8    Patrol Manual?

9           A.    Yes.

10          Q.    And was a manual -- was that manual in

11   effect on December 11, 2015?

12          A.    It should have a date on the top of it.

13          Q.    And I'll have what I've marked as

14   Exhibit 78.

15                (Whereupon, Deposition

16                 Exhibit Number 78 was

17                 marked for identification.)

18   BY MS. WALAS:

19          Q.    Is that the ski patrol manual that was

20   in effect on December 11th, 2015?

21          A.    Yes.

22          Q.    And what's the purpose of this manual?

23          A.    Basically a job description and what the

24   ski patrol does as part of their duties.

25          Q.    And did you write this?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1        A.   I contributed, yes.

2        Q.   Who else wrote it with you?

3        A.   Ody Larsen, Tom Anderson way back when.

4   It's been an evolving document.

5        Q.   Okay.  Do you all revisit it every year

6   and make updates?

7        A.   We do.

8        Q.   Or if there are no updates to be made

9   you just put a new date on it?

10       A.   If there's no updates, but that's rare.

11       Q.   Okay.  And you're familiar with its

12   contents, correct?

13       A.   Yes.

14       Q.   And do you personally use this manual to

15   train the Big Sky ski patrollers?

16       A.   We do.

17       Q.   And let's look at your job description

18   as the ski patrol director.  I think it starts on

19   page 3.

20       A.   (Witness complies.)

21       Q.   And what is your primary job description

22   as the director?

23       A.   My primary?  Because it involves all

24   these different aspects as listed.

25       Q.   Okay.  If you'll take a look at page 4

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    on the top.

2         A.   (Witness complies.)

3         Q.   What does the phrase "Duties Include

4    (with safety first)" mean to you as the director?

5         A.   It means basically with safety for our

6    guests and for our patrollers.

7         Q.   And so would you consider safety to be

8    your primary objective as the director of ski

9    patrol?

10        MR. McINTOSH:  Objection, vague.

11        THE WITNESS:  It is one of the primary

12   objectives.

13   BY MS. WALAS:

14        Q.   And looking at this, would it be safe to

15   say that you kind of have a hand in all the things

16   that the ski patrol does?

17        A.   Definitely.

18        Q.   And looking at the bullet point

19   "Mountain Signage," and that's on page 3.

20        A.   Okay.

21        Q.   What is mountain signage?

22        A.   That involves everything from the trail

23   signs to basically the like trails merge signs,

24   things like that; basically, anything to give

25   information to our guests.

**46**

**BOB DIXON**

1      Q.   Okay.  Would that include hazard signs?

2      A.   Yes.

3      Q.   Does that include those ropes and the

4   posts we were looking at in some of the photos

5   earlier?

6      A.   Yes.

7      Q.   Okay.  And the barriers that get put up?

8      A.   Correct.

9      Q.   Okay.  And so what do you

10  specifically do as the director with respect to the

11  sign -- mountain signage?

12      MR. McINTOSH:  Objection; vague, too broad.

13      MS. WALAS:  You can answer, if you know.

14      THE WITNESS:  I basically am on the ski hill

15  looking to make sure the signage is there.  I deem

16  it necessary, make sure it's up straight, looks

17  good and is doing its job.

18  BY MS. WALAS:

19      Q.   And correct me if I'm wrong but, earlier

20  you testified that there's a supervisor for each

21  area of the mountain?

22      A.   Correct.

23      Q.   And is the supervisor in charge for

24  the -- in charge of putting up the signs in that

25  specific area?

47

**BOB DIXON**

1       A.   The line patrollers also put signs up

2 and things like that.  They do have other judgments

3 also taken into consideration but, the supervisor

4 is overall responsible.

5       Q.   Okay.  And do you follow up or do spot

6 checks on the areas to see where the signs are and

7 to make sure that it's safe?

8       A.   Yes.

9       Q.   Okay.  And if you saw something that you

10 felt should be marked, would you put a sign up

11 there?

12       A.   If I had one available or I would call

13 the supervisor to do it.

14       Q.   Okay.  And when you say "call the

15 supervisor," do you guys use walkies or cell

16 phones?

17       A.   We use phones and radios.

18       Q.   Okay.  Now, as part of your duties as

19 the ski patrol director, are you responsible for

20 ensuring that the preseason ordering and

21 maintenance of all the ski patrol materials has

22 been taken care of?

23       A.   Yes.

24       Q.   Okay.  And what does that entail?

25       A.   That means that we have all the supplies

**48**

**BOB DIXON**

1  we need for when we open and for the winter.  That

2  can be anything from explosives to signage to rope

3  to whatever, just make sure we have the materials

4  to do our job.

5       Q.   Okay.  And at the end of the season

6  you're responsible for removing and storing and

7  inventorying all those materials?

8       A.   Correct.

9       Q.   And during the course of the season, do

10  you ever need to order more signs?

11       A.   Yes.

12       Q.   Okay.  And do you know if you had to do

13  that in 2015?

14       A.   I do not recall.

15       Q.   And have you ever run out of safety

16  signs during a season?

17       A.   We have never run out of warning signs,

18  no.

19       Q.   Have you run out of fencing?

20       A.   No.

21       Q.   Or rope?

22       A.   No.

23       Q.   Or any other sort of safety material?

24       A.   No.

25       Q.   And who was the mountain maintenance

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

BOB DIXON

1   supervisor on December 11th, 2015?

2       A.   The mountain maintenance supervisor?

3       Q.   Yes.

4       MR. McINTOSH:  Objection, vague.

5       THE WITNESS:  Yeah, we -- I mean we basically

6   had supervisor's and director's office.  We don't

7   have a maintenance supervisor.

8   BY MS. WALAS:

9       Q.   Okay.  If you'll turn to page 10 of

10  Exhibit 78.

11      A.   That basically mountain maintenance

12  supervisor is an assistant director.

13      Q.   Is an assistant director?

14      A.   Yes.

15      Q.   And so who was the assistant director of

16  the ski patrol on December 11th, 2015?

17      A.   There's two of them.  Dave Benes and

18  Jim Humphries.

19      Q.   And what was Dave's last name?

20      A.   Benes.

21      Q.   Benes with a B?

22      A.   Yeah.

23      Q.   Okay.  And so the mountain maintenance

24  supervisor that's described here on page 10, those

25  duties were assigned to the assistant director?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1          A.    Yes.

2          Q.    Okay.  Now as the ski patrol director,

3    do you believe that safety matters for all skiers

4    regardless of ski level?

5          MR. McINTOSH:  Objection; vague, contrary to

6    Montana law, calls for a legal conclusion.

7          THE WITNESS:  Repeat that, please.

8    BY MS. WALAS:

9          Q.    As the ski patroller director, do you

10   believe that safety matters for all skiers

11   regardless of ski level?

12         MR. McINTOSH:  Same objections.

13             Go ahead.

14         THE WITNESS:  I think safety matters for

15   sure.

16   BY MS. WALAS:

17         Q.    And do black diamond trails get the same

18   level of review for the need of safety warnings as

19   intermediate trails?

20         MR. McINTOSH:  Objection, vague.

21         THE WITNESS:  Do they get the same review?

22         MS. WALAS:  Yes.

23         THE WITNESS:  Yes.

24   BY MS. WALAS:

25         Q.    And do you look at black diamond trails

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1    the same as beginner trails in marking for safety?

2        A.    No.

3        Q.    What's the difference between marking a

4    beginner trail and a black diamond trail?

5        MR. McINTOSH:  Objection, too broad.

6        THE WITNESS:  Yeah, that's kind of vague.

7    But there is a difference based on the skier's

8    capabilities.

9    BY MS. WALAS:

10       Q.    So what makes a trail a black diamond?

11       A.    There is no definition directly.  NSAA

12   has not put out a definition.  It's just a judgment

13   call with experience.

14       Q.    As the director of ski patrol, do you

15   have a say or play a role in assigning a skill

16   level to the different trails?

17       A.    I do.

18       Q.    Okay.  And were you involved in marking

19   the ski level for Highway?

20       A.    Yes.

21       Q.    Do you recall when it was made a black

22   diamond?

23       A.    Probably like when Challenger was -- the

24   Challenger lift was built.

25       Q.    Do you recall what year that was?

**52**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1        A.    '88.

2        Q.    And is lower Highway -- what skill level

3    is that?

4        A.    Lower Highway, it's all black diamond.

5        Q.    It's all black diamond.  And what skill

6    level is the cat track?

7        A.    The cat track is actually green.

8        Q.    Okay.  And let me clarify that.  The

9    Morning Star cat track.

10       A.    Right, the one that's going underneath.

11   That's green.

12       Q.    Okay.  And what are the characteristics

13   of a cat track?

14       A.    Relatively flat most of the time and

15   it's a track because it's designated for CATS to

16   use for grooming.

17       Q.    And Loop Road was a cat track, correct?

18       A.    Correct.

19       Q.    And it's flat?

20       A.    Relatively flat.

21       Q.    Okay.  And do you agree that Highway is

22   a steep trail?

23       MR. McINTOSH:  Objection, vague as to

24   location.

25       THE WITNESS:  Yeah, what part of Highway are

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1   you talking about?  It varies.

2   BY MS. WALAS:

3       Q.   Okay.  Well, let's break it down.  So

4   there's upper Highway?

5       A.   Right.

6       Q.   And on a -- how would you describe the

7   steepness of upper Highway?

8       A.   Um, it's black diamond.  It's moderately

9   steep maybe.

10      Q.   And how about the lower Highway, how

11  would you describe the steepness there?

12      A.   It's moderate.

13      Q.   And would you agree that the transition

14  from Highway -- strike that.

15           When you're coming down from upper

16  Highway it's -- and you approach the cat track?

17      A.   Uh-huh.

18      Q.   Describe how the terrain moves or

19  transitions?

20      A.   The transition was very smooth from

21  lower Highway onto the cat track.  It was pretty

22  much just a continuous transition.

23      Q.   And do rocks get flagged with safety

24  signs?

25           MR. McINTOSH:  Objection, vague.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1           THE WITNESS:  There's basically caution signs

2      warning that there are rocks all over that

3      mountain.

4      BY MS. WALAS:

5           Q.   And for purposes of warning skiers about

6      hazards on the mountain, is that a judgment call

7      made by the ski patrollers?

8           A.   Yes.

9           Q.   We can go off the record real quick.

10          VIDEO TECHNICIAN:  We are off the record.

11     The time is 10:47.

12               (Whereupon, a brief

13                recess was taken.)

14          VIDEO TECHNICIAN:  We're back on the record.

15     The time is 10:48.

16          MS. WALAS:  I have no further questions

17     for you at this time.  I'll go ahead and let

18     Mr. McIntosh ask you some.

19          MR. McINTOSH:  We will reserve our questions

20     until trial.

21          THE WITNESS:  All right.

22          MR. McINTOSH:  Thank you, Mr. Dixon.

23          THE WITNESS:  Thank you.

24          MS. WALAS:  Thank you.  Thanks for coming in

25     today.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**BOB DIXON**

1          THE WITNESS:  No problem.

2          VIDEO TECHNICIAN:  This now ends the

3     deposition.  The time is 10:48.

4

5                    (Whereupon, the taking

6                     of this videotaped deposition

7                     was concluded at 10:48 a.m.)

8

9

10                 SIGNATURE RESERVED

11

12

13               *   *   *   *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

Page 57

1                    DEPONENT'S CERTIFICATE

2     PAGE              LINE              CORRECTION

3     *12*              *11*              *pro patrol*

4     *23*              *21*              *upper Highway*

5

6

7

8

9

10

11

12

13

14              I, BOB DIXON, the deponent in the

15     foregoing deposition, DO HEREBY CERTIFY, that I

16     have read the foregoing -57- pages of typewritten

17     material and that the same is, with any corrections

18     thereon made in ink on the correction sheet and

19     signed by me, a full, true and correct transcript

20     of my oral deposition given at the time and place

21     hereinbefore mentioned.

22              DATED this ___*19*___ day of ___*March*___, 2020.

23

24                         _____

25                              BOB DIXON

**BOB DIXON**

1               C E R T I F I C A T E

2    STATE OF MONTANA        )

3                            )  ss.

4    COUNTY OF GALLATIN    )

5            I, Marla Jeske, Court Reporter - Notary

6    Public, CSR, in and for the County of Gallatin,

7    State of Montana, do hereby certify:

8            That the witness in the foregoing

9    deposition was by me first duly sworn to testify

10   the truth, the whole truth and nothing but the

11   truth in the foregoing cause; that the deposition

12   was then taken before me at the time and place

13   herein named; that the deposition was reported by

14   me in shorthand and later transcribed into

15   typewriting under my direction, and the foregoing

16   pages contain a true record of the testimony of the

17   witness, all done to the best of my skill and

18   ability.

19           IN WITNESS WHEREOF, I have hereunto set

20   my hand and affixed my notarial seal this _____ day

21   of _____, 2020.

22           _____

23           Notary Public for the State of Montana

24           residing at: Bozeman

25           My commission expires: February 04, 2023

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**