**MIKE UNRUH**

1              UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MONTANA - BUTTE DIVISION

3    _____

4    JOHN MEYER,

5              Plaintiff,

6

7         vs.                  Cause No. 2:18-CV-0002-BMM

8

9    BIG SKY RESORT,

10

11             Defendant.

12   _____

13          DEPOSITION UPON ORAL EXAMINATION OF

14                     MIKE UNRUH

15   _____

16       BE IT REMEMBERED, that the videotaped

17   deposition upon oral examination of Mike Unruh,

18   appearing at the instance of Plaintiff was taken at

19   the law offices of Crowley Fleck PLLP, 1915 South

20   19th Avenue, Bozeman, Montana 59715, on Wednesday,

21   February 19, 2020, beginning at the hour of

22   8:56 a.m., pursuant to the Montana Rules of Civil

23   Procedure, before Kim Marchwick, RPR, CRR, Court

24   Reporter - Notary Public.

25

1

**MIKE UNRUH**

```
 1                        APPEARANCES
 2
          ATTORNEY APPEARING ON BEHALF OF THE
 3        PLAINTIFF, JOHN MEYER:
 4
              Breean Walas, Esq.
 5            WALAS LAW FIRM
              Post Office Box 4591
 6            Bozeman, Montana 59772
              breean@walaslawfirm
 7
 8        ATTORNEY APPEARING ON BEHALF OF THE
          DEFENDANT, BIG SKY RESORT:
 9
10            Ian McIntosh, Esq.
              CROWLEY FLECK PLLP
11            1915 South 19th Avenue
              Post Office Box 10969
12            Bozeman, Montana 59719-0969
              imcintosh@crowleyfleck.com
13
14   Also present:   Mac Morris, Esq.
                     Tom Marshall
15
16
17
18
19
20
21
22
23
24
25
```

2

**MIKE UNRUH**

1                      I N D E X
2  EXAMINATION OF MIKE UNRUH        BY            PAGE
3          Ms. Walas...........................5
4          Mr. McIntosh.......................44
5
6                  E X H I B I T S
7
8  Deposition Exhibit No. 84                      22
       Copy of Deposition Exhibit 25
9
   Deposition Exhibit No. 85                      30
10      Exhibit 13 with orange markings
11 Deposition Exhibit No. 86                      33
       Incident Report
12
   Deposition Exhibit No. 87                      35
13      Incident Report dated 3-6-11
14 Deposition Exhibit No. 88                      42
       Incident Report dated 3-20-15
15
16
17
18
19
20
21
22
23
24
25

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1          WHEREUPON, the following proceedings were had

2      and  testimony taken, to-wit:

3

4                      *   *   *   *   *

5

6          VIDEOGRAPHER:  Let the record show that this

7      is the time and place designated of the videotape

8      deposition of Mike Unruh in the matter of

9      John Meyer versus Big Sky Resort in the United

10     States District Court for the District of Montana,

11     Butte division, Cause No. 2 18 CV-0002-BMM.

12         The date today is February 19, 2020.  Time on

13     the monitor is 8:56 a.m.  My name is Wade Larson,

14     I'll be operating the camera today.  The court

15     reporter is Kim Marchwick.  And I now ask that

16     counsel voice identify themselves and state whom

17     they represent.

18         MS. WALAS:  Breann Walas for the Plaintiff.

19         MR. McINTOSH:  Ian McIntosh.  And with me

20     today is Mac Morris and Tom Marshall as the

21     corporate representative.

22         VIDEOGRAPHER:  Would the court reporter

23     please swear in the witness.

24                      MIKE UNRUH,

25     called as a witness by the Plaintiff, having been

**4**

**MIKE UNRUH**

1    first duly sworn, testified as follows:

2                          EXAMINATION

3    BY MS. WALAS:

4         Q.   Good morning.

5         A.   Good morning.

6         Q.   Will you go ahead and state your name

7    for the record.

8         A.   Mike Unruh.

9         Q.   Okay.  And where do you work?

10        A.   I work with Big Sky and Boyne Resorts.

11        Q.   Okay.  And what is your title at -- is

12   it just Big Sky and Boyne Resorts or is it two

13   separate entities?

14        A.   I now am Boyne Resorts, which

15   encompasses many different ski resorts.

16        Q.   Is Boyne within the, I guess, you said

17   "group"?

18        A.   Yes.

19        Q.   Okay.  And what is your title at Boyne

20   Mountains?

21        A.   With Boyne Resorts I am the Senior Vice

22   President of Mountain Operations.

23        Q.   And did you previously work at Big Sky

24   Resort?

25        A.   I did.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1        Q.   And what was your title there?

2        A.   The title I finished my tenure there was

3   Vice President of Mountain Operations.

4        Q.   And how long have you worked for either

5   Boyne Resorts or the Big Sky Resort?

6        A.   Since September of 2007.

7        Q.   And are you aware today that the

8   testimony you're giving is as a representative of

9   Big Sky?

10       A.   I am.

11       Q.   And are you giving any testimony today

12   on behalf of Boyne Resorts?

13       A.   No.

14        MR. McINTOSH:  Objection, vague.

15       Q.   (By Ms. Walas)  And are you aware that

16   you have been identified as a non-retained expert

17   in this case?

18       A.   I believe that's my understanding, yes;

19   corporate representative is my understanding.

20       Q.   Okay.  And I've handed you earlier what

21   was marked as Exhibit 79.  Are you familiar with

22   that document?

23       A.   Yes.

24       Q.   And that's the Second Amended 30(b)(6)

25   Deposition Notice?

**MIKE UNRUH**

1      A.    That's correct.

2      Q.    And would you agree that there is a list

3  of topics on page 2?

4      A.    Yes.

5      Q.    And that flows over into the next page?

6      A.    It does.

7      Q.    Going back to page 2, let's take a look

8  at them.  Are you prepared to discuss John Meyer's

9  ski wreck and injuries on December 11, 2015, at Big

10  Sky Resort?

11      A.    To the extent of the items which we have

12  not objected, yes.

13      Q.    And so you're aware that some objections

14  to that topic have been raised?

15      A.    I had attended several of the

16  depositions and, therefore, I'm aware that

17  objections have been raised.

18      Q.    Okay.  The main -- are you prepared to

19  discuss the maintenance operation and patrolling of

20  the trails and terrain in the Challenger area at

21  Big Sky Resort from December 1st to

22  December 11, 2015?

23      A.    Same answer as I have explained with

24  answer one, yes.

25      Q.    Okay.  And are you prepared to discuss

7

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  Topic 3 the maintenance of the trails and terrain

2  in the Bermuda Triangle of Big Sky Resort from

3  December 1 through 11 of 2015?

4       A.   Similar to answers one and two, yes.

5       Q.   And what's your understanding of what

6  the Bermuda Triangle is at Big Sky?

7       A.   The Bermuda Triangle is a non-maintained

8  natural area that is generally confined by Lower

9  Morning Star, the area below Highway and St. Alfons

10  Trees.

11       Q.   And just to be clarify St. Alfons Trees,

12  those are just natural trees in the area or is that

13  the name of a trail?

14       A.   That's correct.

15       Q.   And looking at Topic 4 are you prepared

16  to discuss the visibility of the transition from

17  Highway to Loop Road from the Challenger ski lift

18  on December 11, 2015?

19       A.   I am.

20       Q.   And are you prepared to discuss Topic 5,

21  the accident investigation of John Meyer's

22  2011/2015 (sic) wreck including the incident report

23  that was produced by Big Sky?

24       A.   I am.

25       Q.   And Topic 6, are you prepared to discuss

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    prior skiing or snowboarding accidents in the
2    Highway, Loop Road, and Lower Morning Star section
3    of the mountain during the 2015 to '16 ski seasons
4    and the four seasons prior?
5        A.   I am.
6        Q.   And are you aware that incident reports
7    have been produced from after the 2015 ski wreck
8    that John Meyer had?
9        A.   Yes.
10       Q.   And are you prepared to discuss those
11   incident reports?
12       MR. McINTOSH:  Objection.  Beyond the scope
13   of the deposition notice.
14       THE WITNESS:  Those which have not been
15   previously been objected to, yes.
16       Q.   (By Ms. Walas)  And we're on No. 7, I
17   believe.  Are you prepared to discuss the factual
18   basis of the affirmative defenses raised in Big
19   Sky's Answer with the exception of the abuse of
20   process defense?
21       A.   Correct.
22       Q.   And are you prepared to discuss Topic 8
23   which covers Big Sky's corporate policies for
24   safety maintenance and operation of the trails
25   during the 2015-'16 ski season and the four seasons

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  prior?

2       A.   I am.

3       Q.   And Topic 9, are you prepared to discuss

4  Big Sky's corporate policies regarding ski patrol

5  and investigation team -- accident investigation

6  team training, reporting and operations for 2015 to

7  '16 and the four years prior?

8       MR. McINTOSH:  And I'll just object that, on

9  our topic, as we communicated in our objections

10 there may be privileged material that Mr. Unruh

11 will not be able to testify about.  But go ahead.

12      THE WITNESS:  Yes.  To the extent that it

13 does not delve into privileged information, yes.

14      Q.   (By Ms. Walas)  And to be clear on the

15 record your understanding of privileged information

16 covers what type of topic?

17      MR. McINTOSH:  Objection, calls for a legal

18 conclusion.

19      THE WITNESS:  My general understanding of

20 that as a lay person is conversations that Big Sky

21 has had with its legal representatives.

22      Q.   (By Ms. Walas)  And is -- what did you

23 do to prepare for your deposition today?

24      A.   I've reviewed documents that have been

25 produced in response to this, this 30(b)(6)

**MIKE UNRUH**

1  document.  Like I mentioned, I have been present at
2  all but one of the depositions, I believe.  And I
3  have generally followed along this case since it
4  occurred.
5       Q.   Okay.  And can you identify the
6  documents that you reviewed for today?
7       A.   Not in their entirety; but they include
8  the accident investigation, they include reviewing
9  the expert witness for Big Sky's product, it
10 includes the ski patrol manuals, some of the
11 accident cards that have been produced, things like
12 that.
13      Q.   And you said that you attended some
14 depositions; whose depositions did you attend?
15      A.   I have attended John Meyer's,
16 Amanda Eggert, Evi Dixon, Bob Dixon,
17 Taylor Middleton to the best of my recollection.
18      Q.   And are there any deposition transcripts
19 that you have reviewed that you weren't present at?
20      A.   Yes.
21      Q.   Which one was that?
22      A.   Mr. McMacken.
23      Q.   And did you review the deposition
24 transcripts for the ones that you attended in
25 preparation for today?

**11**

**MIKE UNRUH**

1        A.    Not immediately prior to this, but I
2   have reviewed parts of all of them.
3        Q.    And besides Big Sky's attorney have you
4   met with any Big Sky employees to prepare for your
5   deposition today?
6        A.    Not to prepare for the deposition, no.
7        Q.    Have you met with any -- again,
8   excluding Big Sky's attorneys, have you met with
9   any Big Sky employees to discuss this case?
10        A.    I have had conversations with different
11   leadership members of Big Sky as well as my direct
12   supervisors.
13        Q.    Can you identify by name the leadership
14   supervisors that you discussed this with?
15        A.    I had conversations regarding the case
16   with Taylor Middleton, Ryan Ayres, Dave Benes,
17   Stephen Kircher, Tom Marshall at a high level,
18   Rick Kelley with Boyne, and John McGregor with
19   Boyne.
20        Q.    And I believe you said you discussed
21   this case with your direct supervisors?
22        A.    That would be Steve Kircher,
23   Rick Kelley, John McGregor.
24        Q.    And have you ever met with John Meyer to
25   discuss his injuries?

**12**

**MIKE UNRUH**

1     A.   I have not; not personally.

2     Q.   And was John Meyer injured while skiing

3 at Big Sky?

4     A.   He was.

5     Q.   And what is Big Sky's understanding of

6 his injuries?

7     MR. McINTOSH:  Object on foundation.  Go

8 ahead.

9     THE WITNESS:  It's my understanding that

10 Mr. Meyer was skiing the Highway Trail off of

11 Challenger, which is an expert trial.  It's my

12 understanding that by his own admission he was

13 skiing fast as he, quote, "always does" and from

14 another witness that he was, quote, "bombing the

15 run" and that he failed to safely negotiate a

16 variation in terrain and fell becoming injured.

17     Q.   (By Ms. Walas) And where did

18 John Meyer's ski wreck occur on the mountain?

19     A.   His point of rest was Bermuda Triangle.

20     Q.   And is Big Sky aware of how Mr. Meyer

21 got to the Bermuda Triangle?

22     A.   Mr. Meyer states that he skied the

23 Highway Trail, and in order for him to have the

24 point of rest that he did that's the only logical

25 conclusion that aligns well with his testimony and

**13**

**MIKE UNRUH**

 1    that of witnesses in the case.

 2         Q.    And did Big Sky do an investigation into

 3    John Meyer's ski wreck?

 4         A.    Yes.

 5         Q.    And is that investigation part of Big

 6    Sky's normal course of operations?

 7          MR. McINTOSH:   Objection, calls for a legal

 8    conclusion.   Go ahead.

 9          THE WITNESS:   Generally speaking when Big Sky

10    identifies a serious incident that may have more

11    serious injuries, yes an accident investigation

12    will be performed.

13         Q.    (By Ms. Walas)   And did Big Sky prepare

14    an incident report for John Meyer's ski wreck?

15         A.    The incident report and the accident

16    investigation are somewhat synonymous.

17         Q.    And can you see the transition from

18    Highway to Loop Road where this ski wreck occurred

19    from the Challenger ski lift?

20         A.    Absolutely; it's open and obvious.

21         Q.    And where is the Challenger ski lift

22    from -- in relation to where this wreck occurred?

23         A.    Can you define your question a little

24    bit more?

25         Q.    We might come back to it.

**14**

**MIKE UNRUH**

1        A.   Okay.

2        Q.   How does Big Sky describe the transition

3  from Upper Highway to the Loop Road?

4        MR. McINTOSH:  Objection, vague.  Go ahead.

5        THE WITNESS:  It is a non-abrupt transition

6  not unlike multiple transitioned contained within

7  the trail above it.

8        Q.   (By Ms. Walas)  And you said you

9  attended Amanda Eggert's deposition?

10        A.   I did.

11        Q.   And are you aware that she described the

12  transition from Upper Highway to the Loop Road as

13  abrupt?

14        MR. McINTOSH:  Objection.  One, testimony

15  speaks for itself; two, it's hearsay.

16        THE WITNESS:  I don't specifically recall

17  that, no.

18        Q.   (By Ms. Walas)  And the transition to

19  the Loop Road can you see that from Upper Highway?

20        A.   Define "upper highway" please; there is

21  no trail named "upper highway".

22        Q.   Throughout the litigation people have

23  been referring to the part above Loop Road as Upper

24  Highway, but for purposes of clarification can you

25  see the transition from the Highway Trail to Loop

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

# MIKE UNRUH

1  Road?

2       MR. McINTOSH:  I'm going to object to the

3  extent that it misstates the record.  Go ahead.

4       THE WITNESS:  You can see the transition onto

5  the trail from above.

6       Q.   (By Ms. Walas)  Okay.  Now, are you

7  aware that some photos have been produced in this

8  case by Big Sky?

9       A.   I am.

10       Q.   And do you know who took the photos that

11  were produced?

12       MR. McINTOSH:  Objection, compound.

13       THE WITNESS:  Can you restate your question?

14       Q.   (By Ms. Walas)  Do you know who took the

15  photos?

16       MR. McINTOSH:  Same objection.

17       THE WITNESS:  Which photos?

18       Q.   (By Ms. Walas) The photos that Big Sky

19  has produced in this litigation that you testified

20  you know have been produced.

21       MR. McINTOSH:  Same objection, compound.

22       THE WITNESS:  Many photos have been produced,

23  and those photos have been taken by more than one

24  individual.

25       Q.   (By Ms. Walas)  Okay.  Do you know if

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  the photos that were produced were all taken by Big
2  Sky employees?
3          A.   I believe that's correct.
4          Q.   Okay.  I'm going to hand you what's been
5  previously marked as Exhibit 12, and are you
6  familiar with this photo?
7          A.   I'm familiar with the location.
8          Q.   And where is that location?
9          A.   This appears to be on what I would call
10 Lower Morning Star Road above the natural halfpipe.
11         Q.   Did you say halfpipe?
12         A.   Above the natural halfpipe.
13         Q.   Okay.  And do you know who took this
14 Photo No. 12?
15         A.   Not with certainty, no.
16         Q.   Do you know when that photo was taken?
17         A.   I believe that this is a photo that I
18 personally took the following day.
19         Q.   Okay.
20         A.   But, again, I can't with absolute
21 certainty tell you unless you showed me when this
22 was produced.
23         Q.   Okay.  And what did you say the name of
24 this trail was in the photo?
25         A.   I personally would call this Lower

**17**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

 1    Morning -- or excuse me Lower Morning Star Road.
 2        Q.    Okay.  And when you say "Lower Morning
 3    Star Road" are you referring to this flat area that
 4    looks to go across the mountain?
 5        A.    That's correct.
 6        Q.    Okay.  And to what I would consider the
 7    left or uphill from that trail, what is the name of
 8    that area of the mountain or trail?
 9        A.    That area is not named.
10        Q.    It's not named.  Okay.  Is it considered
11    part of Morning Star or Lower Morning Star?
12        A.    Not in my opinion, no.
13        Q.    And at the end of Lower Morning Star
14    what's the name of that area of the mountain?
15        MR. McINTOSH:  Objection, vague.
16        THE WITNESS:  Yeah, can you...
17        Q.    (By Ms. Walas) If you look at the photo
18    the trail seems to go across the mountain, correct?
19        A.    The cat track goes across the mountain,
20    correct.
21        Q.    Okay.  Is that cat track Lower Morning
22    Star?
23        A.    That's my name that I would use for it,
24    correct.
25        Q.    Okay.  And it looks like in the photo

                                                      **18**

**MIKE UNRUH**

1    that it goes into the side of another trail.   Does

2    that have a -- does trail at the end of that in the

3    photo have a name?

4          MR. McINTOSH:   Objection, misstates the

5    evidence.

6           THE WITNESS:   I do not understand your

7    question.

8          Q.   (By Ms. Walas)   Okay.   Where does Lower

9    Morning Star lead to?

10         A.   Lower Morning -- can you -- I'm not sure

11   the question there is -- Lower Morning Star as a

12   trail itself is not in my opinion visible in this

13   picture.

14         Q.   So I -- my understanding is that you

15   identified that cat track as Lower Morning Star; is

16   that correct?

17         A.   Road.

18         Q.   Morning Star Road.   Okay.   Lower Morning

19   Star Road is different than Lower Morning Star

20   Trail?

21         A.   Correct.

22         Q.   Okay.   Can you just explain the

23   difference to me.

24         A.   They're two different trails.

25         Q.   What's the purpose of Lower Morning Star

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1   Road?

2        A.   To --

3        MR. McINTOSH:  Objection, vague.  Go ahead.

4        Q.   (By Ms. Walas)  I'll rephrase that.

5        A.   Yeah, please.

6        Q.   What is Lower Morning Star Road used

7   for?

8        MR. McINTOSH:  Also vague.

9        THE WITNESS:  Yeah, can you -- it has

10  multiple uses.

11       Q.   (By Ms. Walas)  Okay.  So what are those

12  multiple uses?

13       A.   Skiers can use it to traverse the

14  mountain from one area to the next, snow cats and

15  other equipment can also use it to traverse the

16  mountain.

17       Q.   And is Lower Morning Star Road -- where

18  does that -- what area of the mountain does that

19  lead you to?

20       A.   Can you be more specific there?

21       Q.   I'm trying to figure out where Lower

22  Morning Star Road goes from this photo?

23       A.   The most basic answer is it goes

24  downhill or towards the north, and it traverses

25  Lower Morning Star, and then eventually traverses

20

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    across the bottom of Highway Trail.

2         Q.    Okay.  And is Lower Morning Star Road

3    that we see in this photo, is that the same as Loop

4    Road?

5         A.    It can sometimes be referred to as the

6    same.  In my venacular, no.

7         Q.    I have what has been marked as Exhibit

8    25.  And are you familiar with this photograph?

9         A.    I am.

10        Q.    And do you know who took the photo?

11        A.    I believe this is also a photo that I

12   took the day after Mr. Meyer's incident.

13        Q.    And where on the mountain is this photo

14   that -- strike that.  That's a horrible question.

15             Describe the area shown in this photo.

16        A.    This photo was taken while standing on

17   the Highway Trail looking downhill.

18        Q.    And do you recall how far up the hill

19   you were from the Loop Road when you took this

20   photo?

21        A.    I did not measure it.

22        Q.    And looking at Exhibit 25 on the right

23   side of the photo, is there a difference in the

24   elevation of the terrain?

25        A.    Can you define your answer -- or your

21

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    question a little more?  This is obviously a
2    downward slope so there's an elevation change the
3    whole distance.
4         Q.   Okay.  Over here to the -- on the right
5    side of the photo, there appears to be a -- what I
6    would describe as a bowl where the trail goes down.
7    Do you see that on the photo?
8         A.   I see that, yes.
9         Q.   And what part of the trail is that on,
10   the bowl area?
11        A.   I would call that the skier's right side
12   of Highway.
13        Q.   But it's still on Highway?
14        A.   I would call it on Highway, yes.
15        Q.   I'm going to show you what I'll mark as
16   84.
17             (Whereupon, Deposition Exhibit No. 84
18   was marked for identification.)
19        MR. McINTOSH:  So it's just a copy of 25.
20        MS. WALAS:  (Nod of head.)
21        MR. McINTOSH:  Got it.  Thank you.
22        Q.   (By Ms. Walas)  Here is 84, and
23   comparing that to number 25 is it the same photo?
24        A.   The print looks different, meaning the
25   color looks darker, but everything within the

                                                        **22**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    picture appears to be the same.

2         Q.    And in Exhibit 84, is that the area of

3    the mountain where John Meyer's wreck occurred?

4         A.    Can you be more specific in your

5    question?  What part of the picture?

6         Q.    What area of the mountain did

7    John Meyer's ski wreck take place in?

8         A.    Mr. Meyer can't articulate exactly where

9    he crashed, but his point of rest was in the

10   Bermuda Triangle visible in this picture, and the

11   witness, Mr. McMacken, has stated that he was

12   bombing down Highway.

13        Q.    Okay.

14        A.    Both of which are in this picture.

15        Q.    Okay.  And I'm going to hand you that

16   orange marker.  On Exhibit 84 can you mark the

17   route that Big Sky believes Mr. Meyer took while he

18   was skiing Highway into his point of rest?

19        MR. McINTOSH:  Objection; speculation,

20   foundation, lack of personal knowledge.

21        THE WITNESS:  I can't.  I believe I can mark

22   his point of rest.

23        Q.    (By Ms. Walas)  Okay.  So Big Sky has no

24   knowledge of how John Meyer skied down Highway?

25        MR. McINTOSH:  Objection; misstates the prior

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  testimony.

2      THE WITNESS:  Big Sky has knowledge from

3  witnesses, and that is our understanding of how he

4  came to his point of rest.

5      Q.   (By Ms. Walas) Does Big Sky know the

6  route that John Meyer skied on the day of his

7  accident after he got off the Challenger lift?

8      A.   Which time?  He rode the lift multiple

9  times.

10      Q.   Does Big Sky know the route that

11  John Meyer took after getting off the Challenger

12  lift immediately before his ski wreck?

13      MR. McINTOSH:  Objection; vague, foundation.

14      THE WITNESS:  Can you restate the question?

15      Q.   (By Ms. Walas) Does Big Sky know the

16  route that John Meyer took off the Challenger ski

17  lift until his point of rest after his ski wreck?

18      MR. McINTOSH:  Same objection.

19      THE WITNESS:  From witness testimony

20  Amanda Eggert, Mr. McMacken, and Mr. Meyer, it's my

21  understanding that he skied Highway then came to

22  rest in Bermuda Triangle.

23      Q.   (By Ms. Walas) Okay.  And can you mark

24  the point of rest after John Meyer's ski wreck on

25  that photo?

24

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1        A.    I can generally mark it.  I'm not sure I
2   can mark it with pinpoint accuracy in this picture.
3        Q.    Will you circle what Big Sky understands
4   to be John Meyer's point of rest.
5        A.    It doesn't show well in this picture
6   from this distance, so that's difficult, and I'm
7   not sure I can do it with enough accuracy in this
8   picture to feel comfortable with doing so.  If you
9   have a closer picture I'd be happy to do that.
10        Q.    We'll just leave that blank then for
11   now.
12        A.    Okay.
13        Q.    Now, looking at Exhibit 25, how would
14   you describe the terrain in that area of the
15   mountain?
16        A.    Which part of the picture would you like
17   me to describe.
18        Q.    The entire photograph?
19        MR. McINTOSH:  Objection; too broad.  Go
20   ahead.
21        THE WITNESS:  Well, directly below the
22   photographer is the Highway Trail with clear and
23   obvious or at least seasoned conditions
24   characterized by vegetation popping up through the
25   snow, some unconsolidated snow, some small -- some

25

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    moguls, Lower Morning Star Road or the cat track
2    plainly and obviously crossing the trail.
3         Below that is the Bermuda Triangle again with
4    trees exposed, vegetation, and different natural
5    conditions and then beyond that still is Lower
6    Morning Star Trail.  There are three skiers clearly
7    obvious on the Lower Morning Star Road or the Loop
8    Road as some people call it, and there are three
9    skiers clearly obvious on Lower Morning Star Trail
10   itself.
11        Q.   (By Ms. Walas) And is the cat track or
12   road that we see in Exhibit 25 the Lower Morning
13   Star Road that you were discussing in Exhibit 12?
14        A.   It is a continuation of that, yes.
15        Q.   And I believe you identified three
16   skiers on the Loop Road in No. 25?
17        A.   Correct.
18        Q.   And looking at where those skiers are
19   standing, does it appear to be a drop off from the
20   top of Upper Highway to the Loop Road?
21        A.   There is an obvious variation in
22   terrain.  I would not characterize it as a drop
23   off.
24        Q.   And Deposition Exhibit 25, is that
25   representative of how the terrain was on

                                                      26

**MIKE UNRUH**

1  December 11, 2015?

2      A.   Yes.

3      Q.   And is the -- No. 12 representative of

4  the terrain on December 11, 2015?

5      A.   Yes.

6      Q.   And do you know if the Loop Road was

7  groomed after Mr. Meyer's December 11, 2015 ski

8  wreck?

9      MR. McINTOSH:  Objection.  Vague as to time.

10      THE WITNESS:  Yes, can you be more specific,

11  please.

12      Q.   (By Ms. Walas) Do you know if the Loop

13  Road was groomed between December 11th, the date of

14  the wreck, and the next day when you took these

15  photos?

16      A.   I do not know.

17      Q.   And do you know if the transition from

18  Highway to the Loop Road was changed between

19  December 11th when the wreck occurred and December

20  12th when you took the photos?

21      A.   Can you define "changed" for me, please.

22      Q.   Were any modifications made by Big Sky?

23      A.   Not that I'm aware of, no.

24      Q.   Any maintenance done on that transition

25  by Big Sky during that time?

27

**MIKE UNRUH**

1       A.   No.

2       Q.   And is Highway a groomed trail?

3       A.   No.

4       Q.   And is there a reason that it's not

5  groomed?

6       A.   Highway's an off-pieced trail, and we

7  choose not to groom many different expert trails.

8       Q.   I'm going to hand you what's been marked

9  as Exhibit 76, and you said you were present at

10 Bob Dixon's deposition, correct?

11      A.   I was.

12      Q.   And do you recall during that deposition

13 when I had had Mr. Dixon mark an area of Highway

14 that appeared to go into that bowl that we

15 discussed earlier?

16      A.   I vaguely recall that deposition.

17      Q.   Okay.  And is that bowl area marked on

18 76?

19      A.   Yes.

20      Q.   Okay.  And would you agree that the part

21 that is circled on Exhibit 76, the part of the

22 mountain is a change in elevation from coming --

23 from Highway?

24      A.   Again, by definition it's downhill so

25 it's a change in elevation.

28

**MIKE UNRUH**

1    Q.   And if you were skiing that Highway into
2  the area that is circled there, how do you
3  transition out of that bowl on the mountain?
4       MR. McINTOSH:  Objection to the
5  characterization.  Go ahead.
6       THE WITNESS:  I'm not following your
7  question, I'm sorry.
8    Q.   (By Ms. Walas)  Okay.  If a skier is
9  coming down Highway and goes through the area that
10  is circled on 76 --
11    A.   Um-hum.
12    Q.   -- do they have to go back uphill to get
13  to the Loop Road?
14    A.   I don't believe so, no.
15    Q.   Okay.  I'm going to hand you what's been
16  previously marked as Exhibit 13, and are you
17  familiar with this photo?
18    A.   I believe so, yes.
19    Q.   Do you know when it was taken?
20    A.   I believe this was also a picture that I
21  took the following morning.
22    Q.   Okay.  And where were you standing when
23  you took this photo?
24    A.   This is on Lower Morning Star Road,
25  skiers leftish of Lower Morning Star itself above

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    the Bermuda Triangle and just prior to reaching the

2    bottom of Highway Trail.

3         Q.   Okay.  And looking at Exhibit 13 on the

4    left side of the photo, there -- is there what

5    appears to be a kind of a lip on this left side

6    here?

7         A.   Can you be more specific?  I do not see

8    anything I would characterize as a lip.

9         Q.   Okay.  Comparing it to -- I believe you

10   have it, 76.  There, the area that is circled,

11   comparing 76 to 13, can you see the area that Bob

12   circled in Exhibit 13?

13        A.   From a different angle, yes.

14        Q.   Okay.  And I'm going to hand you what

15   I'll mark as Exhibit 85.

16             (Whereupon, Deposition Exhibit No. 85

17   was marked for identification.)

18        Q.   (By Ms. Walas)  And is this the same

19   photo as Exhibit 13?

20        A.   It appears to be.

21        Q.   Okay.  And taking that orange marker,

22   can you circle or mark the area that is the

23   different angle of what was circled in 76?

24        A.   Again, I'm really trying to follow your

25   question, and I need a little more clarity on it.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1   What is it you are asking me to mark?

2        Q.   I believe you said Exhibit 13, which is

3   a duplicate of 87, showed a different angle from

4   this area, from 76?

5        A.   I meant that it's taken from a different

6   angle or perspective.

7        Q.   Okay.  So can you see the part that was

8   circled in 76 in Exhibit 13?

9        A.   Yes.

10       Q.   Okay.  Now, can you mark the area that

11  you can see in 76 in 85.

12       A.   Mark generally that area. (Witness

13  complied.)

14       Q.   Okay.  Let me see this a moment.  Okay.

15  And so the area that you've just circled in orange,

16  is that the area where you come out of the circled

17  area in 76?

18       MR. McINTOSH:  Objection.  Vague,

19  speculation.

20       THE WITNESS:  Generally speaking I would say

21  yes.

22       Q.   (By Ms. Walas) Okay.  And can you tell

23  me again where you were standing when you took that

24  photo in 85?

25       A.   Skiing, standing above the skier's left

31

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  side of Highway, above the Bermuda Triangle, and

2  just prior to reaching skier's right side of

3  Highway.

4      Q.   And is it your understanding that that

5  is the area, general area where this ski wreck

6  occurred?

7      A.   This is quite a ways away, from my

8  understanding, of Mr. Meyer's incident and point of

9  rest.

10     Q.   Okay.  On 85 can you see where

11  Mr. Meyer's point of rest is?

12     A.   Generally speaking I believe so, yes.

13     Q.   Can you mark that with an X?

14     A.   (Witness complied.)  It's actually -- so

15  long as we are saying the intersection of my two

16  lines.

17     Q.   Okay.

18     A.   Yes.

19     Q.   I believe you said the beginning of your

20  deposition that you reviewed the incident reports

21  that were produced in this case in response to the

22  30(b)(6) Notice; is that correct?

23     A.   Yes.

24     Q.   Okay.  And is Big Sky aware of other ski

25  or snowboarding wrecks that have occurred in the

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    areas where John Meyer's accident took place?

2          MR. McINTOSH:  Objection.  Vague as to time.

3          THE WITNESS:  Can you restate your question,

4    please.

5          Q.   (By Ms. Walas)  Does Big Sky know of any

6    other ski wrecks in the area where John Meyer's

7    wreck took place?

8          A.   I'm aware of the ones which we produced.

9          Q.   Okay.  And I have what I'll mark as

10   Exhibit 86.

11          (Whereupon, Deposition Exhibit No. 86

12   was marked for identification.)

13          Q.   (By Ms. Walas)  And looking at that, is

14   that one of the incident reports that you have

15   reviewed?

16          MR. McINTOSH:  Objection.  Beyond the scope

17   of the deposition notice.

18          THE WITNESS:  Can you restate your question

19   now after I've looked at this?

20          Q.   (By Ms. Walas)  Have you seen this

21   incident report before today?

22          A.   I believe so, yes.

23          Q.   And did you review it in preparation for

24   your deposition?

25          A.   I believe so.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1      Q.   And on the incident report it notes that

2   the wreck took place on the bottom of Highway and

3   fell to Morning Star Road; is that correct?

4         MR. McINTOSH:  Objection.  Beyond the scope.

5         THE WITNESS:  That is what it says.

6      Q.   (By Ms. Walas) Okay.  And is the

7   transition from Highway to Morning Star Road, is

8   that a change in the level of the skier level to --

9   strike that.

10         What is the identification of Highway

11   with respect to skier level?

12      A.   It's a black diamond trail.

13      Q.   Okay.  And -- what's the level for

14   Morning Star Road?

15      A.   It's a green circle.

16      Q.   And so when Highway crosses over Morning

17   Star Road is that a transition from a black to a

18   green?

19      A.   By trail designation, yes.

20      Q.   Okay.  Now, have you ever heard of that

21   transition from Highway to Loop Road being referred

22   to as a knuckle?

23      A.   I believe we produced one incident that

24   does have the word "knuckle" in it.

25      Q.   And do you know what that knuckle

34

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

## MIKE UNRUH

1   references?

2       A.   I do not.

3       Q.   Okay.  I have what I'll marked as 87.

4          (Whereupon, Deposition Exhibit No. 87

5   was marked for identification.)

6       Q.   (By Ms. Walas)  And have you had a

7   chance to take a look at that?

8       A.   I've seen this one, yes.

9       Q.   Okay.  And what's the date of that

10  incident report, Deposition 87?

11      A.   3-6-11.

12      Q.   And that was before Mr. Meyer's ski

13  wreck, correct?

14      A.   Yes.

15      Q.   And do you know where on the mountain

16  this wreck took place?

17     MR. McINTOSH:  Objection.  Beyond the scope

18  of the deposition.

19     THE WITNESS:  Description of specific

20  locations lists Bermuda Triangle; however, the

21  description of the incident says, "Followed my

22  son -- followed my son and something backwards

23  couple feet downhill, fell backwards."

24      So this could have been the short answer

25  is -- I'm reading the document as you are, it says

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  it happened in the Bermuda Triangle, and it sounds
2  like someone ended up losing control and perhaps
3  skiing slash falling backwards.
4      Q.   (By Ms. Walas) Okay.  And did
5  Mr. Meyer's ski wreck occur in the Bermuda Triangle
6  area?
7      A.   His point of rest was the Bermuda
8  Triangle.  It's my understanding he is unable to
9  tell us where he wrecked.  Mr. McMacken has
10 testified that he was hotdogging and appeared to be
11 trying to jump off of lower Morning Star Road.
12     Q.   Okay.  And based on this incident report
13 Big Sky was aware of a wreck that had occurred in
14 the Bermuda Triangle prior to Mr. Meyer's incident,
15 correct?
16     MR. McINTOSH:  Objection, beyond the scope of
17 the deposition.
18     THE WITNESS:  Can you restate your question
19 for me, please.
20     Q.   (By Ms. Walas) Big Sky was aware that a
21 ski wreck had occurred in the Bermuda Triangle
22 prior to Mr. Meyer's wreck?
23     MR. McINTOSH:  Objection.  Beyond the scope
24 of the deposition.
25     THE WITNESS:  On 3-6-11 this incident

**MIKE UNRUH**

1    statement says that someone -- looks like "skied

2    backwards a couple of feet downhill and fell

3    backwards in the Bermuda Triangle."

4        Q.   (By Ms. Walas) And this wreck occurred

5    on March 6, 2011, correct?

6        MR. McINTOSH:  Objection.  Beyond the scope

7    of the deposition.

8        THE WITNESS:  The date of the incident is

9    3-6-11.

10       Q.   (By Ms. Walas) Okay.  And would that

11   fall in the 2011 to 2012 ski season?

12       A.   Yes.

13       Q.   And you said that you were prepared to

14   talk about Topic 6 on Deposition 79?

15       A.   I did.

16       Q.   And would the 2011 to 2012 ski season

17   fall within that scope of that topic?

18       A.   Yes.

19       Q.   Okay.  So going back, the March 6, 2011

20   incident report is a ski wreck that occurred prior

21   to Mr. Meyer's wreck?

22       MR. McINTOSH:  Objection, misstates the

23   evidence, and it's beyond the scope of the

24   deposition notice.

25       THE WITNESS:  This incident happened on

**MIKE UNRUH**

1    3-6-11.

2         Q.    (By Ms. Walas) Okay.  In the Bermuda

3    Triangle area --

4          MR. McINTOSH:  Objection.

5         Q.    (By Ms. Walas) -- which is within the

6    Highway Loop Road and Lower Morning Star of the

7    mountain?

8          MR. McINTOSH:  Objection.  Mistakes the

9    evidence and is beyond the scope of the deposition

10   notice.

11          THE WITNESS:  Can you restate your question,

12   please.

13         Q.    (By Ms. Walas) Is the Bermuda Triangle

14   located in the area of the mountain near

15   Highway/Loop Road and Lower Morning section?

16         A.    The Bermuda Triangle is a large area

17   located within that description that you just said.

18         Q.    Okay.  And you were prepared today to

19   talk about prior ski accidents in that section of

20   the mountain which took place in 2011 to 2012?

21         A.    Correct.

22          MR. McINTOSH:  Objection.  Vague as to time.

23          When you get a chance can we take a restroom

24   break?

25           MS. WALAS:  Sure.  We can take it now if you

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    want.

2         MR. McINTOSH:  That's fine.  Thank you.

3         VIDEOGRAPHER:  We'll go off the record.  The

4    time is 9:51.

5         (Whereupon, a recess was had from 9:51 a.m.

6    until 9:59 a.m.)

7         VIDEOGRAPHER:  Okay.  We're back on the

8    record.  The time is 9:59.

9         THE WITNESS:  Ms. Walas, if I may, I did not

10   answer correctly.  You asked me about an incident

11   that occurred 3-6-11, and you asked me if that was

12   part of the '11-'12 ski season.

13        Q.   (By Ms. Walas)  Okay.

14        A.   And I misspoke; '10-'11 would have been

15   the ski season that this occurred in.

16        Q.   Okay.

17             (Whereupon, Deposition Exhibit No. 88

18   was marked for identification.)

19        Q.   (By Ms. Walas)  Have what I've marked as

20   88.  And is this a Big Sky incident report?

21        A.   Yes.

22        Q.   And have you seen this report before?

23        A.   Yes.

24        Q.   And what's the date of this report?

25        A.   3-20-2015.

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    Q.   What ski season does that fall in?

2    A.   That would be the '14-'15 ski season.

3    Q.   Okay.  And where on the mountain did

4  this incident take place?

5        MR. McINTOSH:  Objection, vague.

6        THE WITNESS:  Description of specific

7  location listed as Morning Star Road.

8    Q.   (By Ms. Walas)  And Morning Star Road is

9  in the area where Mr. Meyer's ski wreck occurred?

10       MR. McINTOSH:  Objection.  Mistakes the

11  evidence.

12       THE WITNESS:  I would not characterize that.

13  I would say that Morning Star Road is many hundreds

14  of yards long, and this does not clearly state

15  where on that road the incident occurred.

16   Q.   (By Ms. Walas)  Do we know or does Big

17  Sky know where this incident occurred on Morning

18  Star Road?

19   A.   It is not indicated on there and we do

20  not know.

21   Q.   And do you know how the wreck referenced

22  on March 20, 2015, came about?

23   A.   The description of the incident states,

24  "Tried to stop quickly, put right hand out to catch

25  her fall."

**40**

**MIKE UNRUH**

 1      Q.   And have you reviewed Mr. -- the Big
 2  Sky's incident report for Mr. Meyer's wreck?
 3      A.   I have.
 4      Q.   And the incident reports that we have
 5  been talking about today, are those something that
 6  Big Sky regularly prepares?
 7      A.   Can you state your question again.
 8      Q.   The incident reports that we have just
 9  been discussing during your deposition, does Big
10  Sky regularly prepare those?
11      A.   Yes.
12      Q.   Okay.  And is there a policy that says
13  you have to prepare those?
14       MR. McINTOSH:  Objection.  Vague.
15      Q.   (By Ms. Walas)  Does Big Sky have a
16  policy that requires the preparation of incident
17  reports after a wreck?
18      A.   Big Sky patrollers will fill out similar
19  incident cards when they have patient contact.
20      Q.   Okay.  And are there any written rules
21  that ski patrollers are supposed to follow in the
22  performance of their job?
23      A.   Yes.
24      Q.   And are you aware of a manual that Big
25  Sky has to assist ski patrollers in performing

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    their job?

2         A.   I am.

3         Q.   I have what's previously marked as 78.

4    I'm just going to paperclip it together since it's

5    not stapled, and you can use it as you need.

6              Are you familiar with this document?

7         A.   I am.

8         Q.   Okay.  And can you identify it for the

9    record?

10        A.   Big Sky Ski Resort Professional Ski

11   Patrol Manual, 2015.

12        Q.   And what's Big Sky's reason for having

13   this manual?

14        A.   It serves as a guideline to our ski

15   patrollers.

16        Q.   And does it set the policy for the ski

17   patrollers?

18        A.   Again, it serves as a guideline for the

19   patrollers.

20        Q.   And was this manual in effect on the

21   date of John Meyer's ski wreck?

22        A.   Yes.

23        Q.   Okay.  And what are the responsibilities

24   of the mountain maintenance supervisor?

25        A.   Would you like me to read it?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1    Q.    Sure.

2    A.    "Mountain maintenance supervisor.

3  Mountain maintenance manager is up to date on

4  company policies, maintains slow signs, hanging

5  signs, build signs, shuttle bamboo to stations, and

6  help out with miscellaneous projects, i.e.,

7  unfinished projects, skier codes, tower and post

8  pads.  Period.

9          "The mountain maintenance manager will

10 work in coordination with the hill supervisors to

11 ensure prompt completion of all tasks.  Period.

12 They will all encourage quality training sessions.

13 Period.  The most important aspect of this job is

14 an eye for detail."

15   Q.    And is a mountain maintenance manager

16 the same as supervisor?

17   A.    Yes.

18   Q.    And why is "an eye for detail" the most

19 important aspect of the job?

20    MR. McINTOSH:  Objection.  Foundation.

21 Vague.

22    THE WITNESS:  Could you be more specific with

23 your question?

24   Q.    (By Ms. Walas) You read that the

25 mountain maintenance supervisor, "the most

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  important aspect of this job is an eye for detail,"

2  correct?

3       A.   I did.

4       Q.   And so why is an eye for detail the most

5  important aspect of the job?

6        MR. McINTOSH:  Same objections.

7        THE WITNESS:  It allows this individual to

8  help the rest of our patrollers be thorough in

9  their jobs.

10      Q.   (By Ms. Walas) Is it because the safety

11  of skiers is important to Big Sky?

12      A.   That's one of them, yes.

13      Q.   And who was the mountain maintenance

14  supervisor on December 11, 2015?

15      A.   I have not reviewed that information;

16  I'm sorry, I don't know.

17      Q.   Okay.  Do you know if this position was

18  filled on the date of Mr. Meyer's ski wreck?

19      A.   Again, I'm not prepared -- I don't --

20  for that answer.  I don't know for sure.

21      Q.   Okay.  And do you know what the

22  objective is or what Big Sky's objective is for its

23  ski patrol?

24      A.   Can you be more specific with your

25  question?  They have many.

**MIKE UNRUH**

1       Q.   Okay.  Look at page 2 of 76 -- of
2  Deposition Exhibit 76, and at the bottom of that
3  page it references an objective of the Big Sky ski
4  patrol.  Do you see where that is in the last --
5  second to last line?
6       A.   I do.
7       Q.   And can you identify what Big Sky's
8  objective is for its ski patrol from the manual.
9       A.   Listed here it says, "The objective of
10  the Big Sky Ski Patrol at the Big Sky Ski Resort
11  area -- or excuse me -- at Big Sky ski area is to
12  provide for the safe operation of facilities at the
13  ski area and provide an exceptional guest
14  experience."
15            That simply means that the overall
16  duties of ski patrol encompass trying to provide a
17  reasonably safe operation in an inherently risky
18  activity of skiing.  And it's one that our ski
19  patrol has to work in conjunction and rely upon our
20  guests to also manage their own experience.
21       Q.   Are signs something that the Big Sky
22  uses to warn skiers of dangerous areas of the
23  mountain?
24       A.   They are.
25       Q.   And are those signs consistent with this

**45**

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  objective of safety?

2          A.    They are.

3           MR. McINTOSH:  Objection, vague.

4          Q.    (By Ms. Walas) And do you know if there

5  have been any other policies that Big Sky has had

6  in place before Mr. Meyer's wreck besides this

7  manual?

8          MR. McINTOSH:  Objection.  Vague and

9  misstates the evidence.

10          THE WITNESS:  Can you be more specific or...

11          Q.    (By Ms. Walas)  Do you know how long the

12  manual, that 2015 manual, was in place before

13  Mr. Meyer's wreck?

14          A.    It would have been in place prior to

15  that season.

16          Q.    Okay.  Do you know if that manual was

17  the manual being used in the 2014 to '15 ski

18  season?

19          A.    Likely and possibly with edits.

20          Q.    Okay.  And do ski patrollers play a role

21  in maintaining the mountain?

22          A.    Can you be more specific with your

23  question?

24          Q.    We talked about the mountain maintenance

25  supervisor's role.

46

**MIKE UNRUH**

1    A.    Um-hum.

2    Q.    Does the ski patroller, do the ski

3  patrollers do anything to assist the mountain

4  maintenance supervisor in maintaining the mountain?

5    A.    They do, yes.

6    Q.    What do the ski patrollers do?

7     MR. McINTOSH:  Objection, vague.

8     THE WITNESS:  Can you be more specific?  They

9  perform many different duties.

10    Q.    (By Ms. Walas)  What do the ski

11  patrollers do in relation to maintaining the

12  mountain?

13    A.    Maintaining the mountain they do a

14  myriad of things to include avalanche mitigation,

15  terrain evaluation, and opening and closing of

16  trails, marking of those trails, et cetera.

17    Q.    And on December 11, 2015, do you know if

18  any warning signs were posted in the area that

19  we've been discussing today, Highway, Morning Star

20  Road, warning skiers of any dangerous areas?

21    A.    Yes.  There have been many pictures

22  produced showing warning signs at the bottom of the

23  lift, the top of the lifts, along Morning Star

24  Road, et cetera.

25    Q.    Okay.  And look at, I believe it's 13,

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  are there any warning signs posted in that photo?

2       A.   There is a sign at the far end of the

3  Lower Morning Star Road, skiers left, bottom of

4  Highway.

5       Q.   And looking at 85, are there any warning

6  signs posted in that photo?

7       A.   The same sign I described is in this

8  picture as well.

9       Q.   Will you -- on 85 will you please put a

10  little square around the sign.

11       A.   (Witness complied.)

12       Q.   And let's take a look at that.  And that

13  sign is after -- is past where Mr. Meyer came to

14  rest, correct?

15       A.   It is further along on the cat track.

16       Q.   Okay.

17       A.   And the skier's left.

18       Q.   And looking at 76, are there any warning

19  signs posted in that photo?

20       A.   There are no signs there as all of the

21  obstacles and hazards are plainly obvious and

22  visible, therefore, signs are not needed.

23       Q.   And looking at 85, can you identify what

24  the warning sign says?

25       A.   Not from the picture.  It's my

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1  recollection from operations that that is a flip

2  sign that opens and closes that road for various

3  reasons at various times.

4       Q.   And was that road open on

5  December 11, 2015?

6       A.   It was.

7       Q.   Okay.

8        MS. WALAS:  I'll go ahead and pass the

9  witness now.

10       MR. McINTOSH:  Why don't we take a break.

11  Thank you.

12       VIDEOGRAPHER:  We're going off the record.

13  The time is 10:16.

14       (Whereupon, a recess was had from 10:16 a.m.

15  until 10:23 a.m.)

16       VIDEOGRAPHER:  And we're back on the record.

17  The time is 10:23.

18                  CROSS-EXAMINATION

19  BY MR. McINTOSH:

20       Q.   Mr. Unruh, just a couple quick follow-up

21  questions.  Do you have in front of you Exhibit 88?

22       A.   I do.

23       Q.   And Exhibit 88 is an incident report

24  from incident that occurred on March 20, 2015; is

25  that correct?

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

**MIKE UNRUH**

1      A.   It is.

2      Q.   And do you believe that incident

3   occurred in the same area as Mr. Meyer's ski wreck

4   on December 11, 2015?

5      A.   I do not.

6      Q.   And why do you not believe -- why do you

7   believe that this is a different location?

8      A.   Mr. Meyer's point of rest was in the

9   Bermuda Triangle.  This states Morning Star Road.

10  Had this incident been in that same area as

11  Mr. Meyer's I would have expected it to reference

12  the Bermuda Triangle and/or the bottom of Highway.

13      As it states "Morning Star Road" I'm

14  inclined to believe that this is farther up on that

15  road somewhere closer to the top of Lower Morning

16  Star Trial itself.

17      Q.   That's all the questions I have.

18      MR. McINTOSH:  Thank you.

19      MS. WALAS:  I don't have anything further.

20      THE WITNESS:  All right.  Thanks, everyone.

21      VIDEOGRAPHER:  That concludes the deposition.

22  The time is 10:24.

23      MR. McINTOSH:  And he will read and sign as

24  well.

25  (Whereupon, the deposition concluded at 10:25 a.m.)

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**

MIKE UNRUH

| | | |
|---|---|---|
| 1 | | DEPONENT'S CERTIFICATE |

PAGE        LINE        CORRECTION

25          23          early season conditions

28          6           off piste

I, MIKE UNRUH, the deponent in the foregoing

deposition, DO HEREBY CERTIFY, that I have read the

foregoing 50 pages of typewritten material and that

the same is, with any corrections thereon made in

ink on the correction sheet and signed by me, a

full, true and correct transcript of my oral

deposition given at the time and place hereinbefore

mentioned.

DATED this *10* day of *March*, 2020.

_____

MIKE UNRUH

**MIKE UNRUH**

```
 1                C E R T I F I C A T E
 2   STATE OF MONTANA      )
 3                         )  Ss.
 4   COUNTY OF GALLATIN    )
 5           I, Kim Marchwick, Certified Court
 6   Reporter and Notary Public, in and for the County
 7   of Gallatin, State of Montana, do hereby certify:
 8           That the witness in the foregoing
 9   deposition was by me first duly sworn to testify
10   the truth, the whole truth, and nothing but the
11   truth in the foregoing cause; that the deposition
12   was then taken before me at the time and place
13   herein named; that the deposition was reported by
14   me in shorthand and later transcribed into
15   typewriting under my direction, and the foregoing
16   pages contain a true record of the testimony of the
17   witness, all done to the best of my skill and
18   ability.
19           IN WITNESS WHEREOF, I have hereunto set
20   my hand and affixed my notarial seal this 27th day
21   of February, 2020.
22                   /s/ Kim Marchwick 2.27.2020
23           _____
             Kim Marchwick, RPR, CRR
24           Notary Public for the State of Montana
             residing at:  Bozeman
25           My commission expires:  January 18, 2023
```

**BRIDGER COURT REPORTERS, INC.**
**(406) 582-0668**