IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

\* \* \*

JOHN MEYER,

     Plaintiff,

    vs.                CASE NO. 18-CV-02-BMM

BIG SKY RESORT,

     Defendant.

\* \* \*

     Remote deposition of RONALD MEYER,
Witness herein, called by the Defendant for
cross-examination pursuant to the Rules of Civil
Procedure, taken before me, Kathy S. Wysong, a
Notary Public in and for the State of Ohio, at the
offices of Britton & Associates, 201 Riverside
Drive, Suite 2B, Dayton, Ohio, on Wednesday,
August 26, 2020, at 10:59 a.m.

\* \* \*

Page 2

```
 1              EXAMINATIONS CONDUCTED      PAGE

 2    BY MR. MORRIS:.........................    6

 3    BY MS. WALAS:.........................  124

 4

 5                   EXHIBITS MARKED

 6    (Exhibit 118, subpoena, was marked

 7    for purposes of identification.)......   24

 8    (Exhibit 119, 5/11/16-5/12/16 e-mail

 9    exchange between Ronald Meyer and

10    John Meyer, was marked for purposes

11    of identification.)...................   48

12    (Exhibit 120, 4/4/16 e-mail from

13    Ronald Meyer to John Meyer, was

14    marked for purposes of

15    identification.)......................   78

16    (Exhibit 121, 4/4/16 e-mail from

17    Ronald Meyer to John Meyer, was

18    marked for purposes of

19    identification.)......................   80

20    (Exhibit 122, 3/9/18-3/11/15 e-mail

21    exchange between John Meyer, Ronald

22    Meyer, and Dawn Dizney, was marked

23    for purposes of identification.)......   82

24

25
```

1    (Exhibit 123, 12/14/15 e-mail

2    exchange between Ronald Meyer and

3    John Horning, was marked for

4    purposes of identification.)..........    88

5    (Exhibit 124, 12/9/19 e-mail

6    exchange between Ronald Meyer, John

7    Meyer, and Fidelity Charitable Fund,

8    was marked for purposes of

9    identification.)......................    98

10    (Exhibit 125, 1/6/19-1/8/19 e-mail

11    exchange between Ronald Meyer and

12    John Meyer, was marked for purposes

13    of identification.)...................    104

14    (Exhibit 126, 12/11/15 e-mail from

15    Ronald Meyer to Dawn Dizney and

16    others, was marked for purposes of

17    identification.)......................    114

18    (Exhibit 127, 5/21/19-5/22/19 e-mail

19    exchange between Ronald Meyer and

20    John Meyer, was marked for purposes

21    of identification.)...................    116

22    (Exhibit 128, Community Medical

23    Center physician progress note dated

24    1/10/16, was marked for purposes of

25    identification.)......................    139

Page 4

1    (Exhibit 129, e-mail with CAT scan

2    records attached, was marked for

3    purposes of identification.)..........   144

4    (Exhibit 130, Community Medical

5    Center pastoral care document dated

6    1/6/16, was marked for purposes of

7    identification.)......................   146

8    (Exhibit 131, twelve photos, was

9    marked for purposes of

10   identification.)......................   150

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES:

 2        On behalf of the Plaintiff:

 3            Walas Law Firm

 4        By:  Breean Walas (Video Conference)
               Attorney at Law
 5             P.O. Box 4591
               Bozeman, Montana  59772
 6             501-246-1067
               breean@walaslawfirm.com
 7
          On behalf of the Defendant:
 8
               Crowley Fleck PLLP
 9
          By:  William (Mac) Morris (Video Conference)
10             Attorney at Law
               1915 South 19th Avenue
11             P.O. Box 10969
               Bozeman, Montana  59719
12             406-556-1430
               wmorris@crowleyfleck.com
13
                         *   *   *
14

15

16

17

18

19

20

21

22

23

24

25
```

1                    RONALD MEYER

2   of lawful age, Witness herein, having been first

3   duly cautioned and sworn, as hereinafter

4   certified, was examined and said as follows:

5                    CROSS-EXAMINATION

6   BY MR. MORRIS:

7          Q.   Good morning, Mr. Meyer.  My name is

8   Mac Morris and I'm the attorney for Big Sky

9   Resort, and thank you for appearing for this

10  deposition today.  It's going to be a little

11  different than an ordinary deposition because

12  we're doing it by Zoom.  Can you hear me okay?

13         A.   Just fine.

14         Q.   Okay.  And can you please state your

15  name and address for the record?

16         A.   Sure.  Ronald Meyer, and the address

17  is 8563 Waynesboro Way, Waynesville, Ohio, 45068.

18         Q.   Thank you.  And we have two

19  Mr. Meyers in this case now, and would it be all

20  right if I called you Ron or would you prefer that

21  I call you Mr. Meyer?

22         A.   Ron is fine.

23         Q.   Okay.  And during the course of this

24  deposition, I might refer to your son John as

25  Mr. Meyer, but hopefully that will be clear, but

1    if there's any confusion about that, will you

2    please let me know?

3            A.    Absolutely.

4            Q.    Okay.  Who resides at the address

5    that you just gave me?

6            A.    I do and my girlfriend, Pam

7    Worthington.

8            Q.    Okay.  And how long have you lived

9    there?

10           A.    Since May 31st of 2015.

11           Q.    And where did you live before that?

12           A.    I'm sorry.  2005.  Sorry.  May 31st,

13   2005.

14           Q.    Okay.  Just missed a decade.  No

15   worries.

16           A.    Close.

17           Q.    Yeah.  Where did you live before you

18   lived at your current address?

19           A.    I moved from Michigan.

20           Q.    Where in Michigan were you?

21           A.    New Boston.  New Boston, Michigan.

22           Q.    And how long were you living at that

23   address?

24           A.    It was only a year or two.  For a

25   number of years I was working for Speedway and

Page 8

1   moved pretty frequently every year or two.

2          Q.   Got you.  And have you given a

3   deposition before?

4          A.   I have not.

5          Q.   Other than a deposition, have you

6   ever testified under oath in any proceeding or

7   other matter?

8          A.   I'm pretty sure I did.  Probably --

9   you know, I may have testified during some of the

10  proceedings regarding my wife's death.

11         Q.   Okay.  Understood.  And was there

12  a -- was there a lawsuit in connection with your

13  wife's death?

14         A.   There was.

15         Q.   Okay.  And when was that?

16         A.   She passed September 18th, 2005.

17         Q.   Okay.  And were you representing the

18  estate on her behalf in that lawsuit?

19         A.   I was.

20         Q.   Okay.  And you didn't have to give a

21  deposition in that lawsuit that you recall?

22         A.   I don't think so.  As I said, it's

23  been a number of years and I don't honestly

24  remember if there was a deposition or not.

25         Q.   Sure.  But you believe that you

Page 9

1    testified in some sort of proceeding in connection

2    with that, right?

3         A.   It would have been regarding a

4    settlement of some sort.

5         Q.   Okay.  Understood.  Were there any

6    other plaintiffs in that lawsuit other than

7    yourself on behalf of the estate?

8         A.   I don't believe so.

9         Q.   Today in this deposition you

10   understand that you're appearing here pursuant to

11   the subpoena that I sent to you?

12        A.   Correct.

13        Q.   And I understand that you did not

14   bring a copy of any of the documents that you

15   provided to our office pursuant to the subpoena,

16   right?

17        A.   I did not.  I was struggling, just as

18   you folks have struggled a little bit, the hard

19   drive of my laptop failed about ten days ago and

20   probably because of COVID-19 it seems like there's

21   a crazy run on any kind of computer equipment and

22   it took them forever to get me a new one and to

23   get that one set up.

24        Q.   Okay.  Understood.  Since you've

25   never had your deposition taken before, we'll go

1  over quickly here some of the sort of typical

2  rules associated with a deposition.

3             First of all, and you're doing a good

4  job with this, because there is a court reporter

5  taking down everything we're saying, all of your

6  responses today need to be oral.  You can't just

7  simply nod your head or shrug your shoulders.  You

8  understand that?

9       A.   I do.

10      Q.   And the other thing is, for purposes

11 of getting a clear record, you need to let me

12 finish my question before you start answering.  I

13 will work to let you finish your answer before I

14 start my next question.  Do you understand that?

15      A.   I do.

16      Q.   Okay.  And if at any time today I ask

17 you a question that you find confusing or that you

18 don't understand for some reason, will you

19 please --

20             (Technical difficulties.)

21             (Pause in proceedings.)

22 BY MR. MORRIS:

23      Q.   Mr. Meyer, before the interruption

24 there we were discussing the rules of depositions,

25 and I was asking you if at any time today I ask

Page 11

1   you a question that you find confusing or you

2   don't understand, will you please let me know so

3   that I can rephrase the question?

4           A.   I will.

5           Q.   Okay.  And if you don't correct me or

6   tell me that you find a question confusing, I'm

7   going to assume that you understood the question

8   as phrased.  Is that fair?

9           A.   Sure.

10          Q.   And today if you need a break at any

11  time, just let me know.  Okay?

12          A.   I will.

13          Q.   I may go on and on here, but if you

14  need a break, I'm going to depend on you typically

15  to let me know that.  All right?

16          A.   Yes.

17          Q.   Okay.  And the only exception to that

18  is if I ask you a question, I'd like you to answer

19  that question before we take a break.  Fair?

20          A.   Yes.

21          Q.   And you understand that you are under

22  oath today?

23          A.   I do.

24          Q.   Okay.  And did you do anything to

25  prepare for today's deposition?

```
 1          A.    I spent a long time -- and I
 2   apologize for sending you e-mails one at a time,
 3   but as I said, a lot of difficulties with my
 4   computer so I happened to find all those messages
 5   in my phone and sent them one at a time.
 6               (Technical difficulties.)
 7               (Pause in proceedings.)
 8   BY MR. MORRIS:
 9          Q.    And I guess I want to be clear what
10   I'm asking.  Did you do anything to prepare to
11   give testimony today at today's deposition?  Aside
12   from what you did to respond to the document
13   subpoena, did you do anything to prepare to give
14   testimony today?
15          A.    I reviewed the e-mails that I sent.
16   You, I think, Monday afternoon had sent a request
17   suggesting that you needed -- if I had more
18   information regarding one of the e-mails so I
19   actually had spent a couple days camping in
20   Michigan and when I got home yesterday, I looked
21   for it.  But as far as rehearsing anything, I
22   would say no, there's been no rehearsal on my
23   part.
24          Q.    Okay.  Did you talk to anybody about
25   what a deposition is?
```

1          A.   I did not.

2          Q.   Okay.  Did you talk to John Meyer

3    about being deposed?

4          A.   I did talk to John last week about --

5    regarding this deposition, asked if he knew what

6    the format would be, and he did not.  I asked him

7    if he knew what you or Big Sky were looking for,

8    and he did not.  His only advice was be honest,

9    tell them the truth, so.

10         Q.   And did he tell you anything besides

11   what you've just described?

12         A.   No.

13         Q.   And did you talk to John's attorney,

14   Breean Walas, about today's deposition?

15         A.   No.

16         Q.   And so the only person that you spoke

17   with sort of to learn about the deposition process

18   or anything else related to this deposition was

19   your son John?

20         A.   Correct.

21         Q.   And how long was your call with John?

22         A.   The total length of the call I don't

23   remember.  Anything having to do with the

24   deposition, perhaps two minutes because, as I

25   said, he really didn't have any insight or know

1   anything regarding it or the format so he couldn't

2   tell me anything, and there we go.

3           Q.   And did you and John talk about this

4   case in any way on that call?

5           A.   Just as I said, regarding what may

6   transpire during the deposition.

7           Q.   Okay.  What else did you talk to John

8   about on that call besides this case or the

9   deposition?

10          A.   It seems to me a couple of things.

11  How were his sons doing, how was his wife, Amanda,

12  doing.  This probably sounds horrible.  He told me

13  that he was very busy working on a number of

14  cases, don't ask me any of the details because

15  most of it goes over my head and I can't do

16  anything about it anyway so don't tell him that

17  I'm not always paying attention.

18          Q.   You know there is a transcript of

19  this deposition, right?

20          A.   And that's okay because I don't care

21  if he laughs about it or what he says about it

22  because it doesn't matter.

23          Q.   Understood.  So what did John tell

24  you about how Amanda and the kids are doing?

25          A.   I don't remember anything specific.

Page 15

1   He told me that the little boys are starting to

2   stand up and climb on things.  They're not quite

3   walking but they're thinking about it.  I don't

4   remember anything specific about Amanda, just kind

5   of okay.  I think she might be, as she does, doing

6   some sort of writing.

7        Q.   And did he tell you how he is doing?

8   Other than about the cases that you guys may have

9   discussed, did he talk at all about how he's

10  generally doing?

11       A.   I think he's busy and probably a bit

12  stressed.

13       Q.   Okay.  And what led you to believe

14  that he's a bit stressed?

15       A.   Because he has probably more cases

16  going -- I thought he told me he's got ten things

17  going right now and he's trying to juggle all

18  those cases and what he's got going on.

19       Q.   Okay.  And did he talk to you about

20  sort of how the cases that he's working on are

21  going?

22       A.   He probably gave a bit of detail.

23  Again, as I had said a couple minutes ago, it's

24  not like I can do anything about his cases or his

25  situation so I have a tendency to let it roll over

1  the top of my head some.

2          Q.   If you could sort of summarize his

3  general feeling about the way those cases are

4  going.  Could you do that?

5          A.   I would say that his attitude was

6  mostly upbeat from the standpoint that he has a

7  lot going on.  I would also say that he thought it

8  would be good if some of those cases resolved or

9  those balls landed, for lack of a better term.

10          Q.   Understood.  And do you have a sense

11  of the nature of any of those cases that he was

12  talking with you about?

13          A.   One that he mentioned revolves around

14  a friend of his.  My understanding is that this

15  gentleman is -- or was attacked by an individual,

16  and I guess my two cents' worth was that that's

17  not in the environmental arena and probably a bit

18  out of his area of expertise and that he probably

19  should leave something like that alone.  I think

20  he felt -- I'm struggling for a word that --

21  because the gentleman is a friend, I think he felt

22  the need to help him out.  I know he's been

23  working on some cases for a number of years and

24  hoping to resolve those.  Others.

25          Q.   Okay.  And other than sort of the

1  case that you first described about this assault

2  or attack, what are those other cases that he's

3  been working on for a number of years?  Did he

4  talk to you at all about those?

5         A.   I'm sure they're all environmental --

6  at least to the best of my knowledge, all

7  environmentally related.

8         Q.   Right.  And do you -- do you know

9  anything about the nature of those environmental

10 cases in terms of what they're about?

11        A.   I really don't.

12        Q.   Okay.  And let's talk a little bit

13 about your background.  Where did you graduate --

14 did you go to college?

15        A.   I went for a couple of years.  I grew

16 up in the St. Louis area.  I went to community

17 college for a couple of years, kind of headed

18 toward civil engineering.  Then I went for a

19 couple years to a trade school thinking that I was

20 going to be a machinist.

21        Q.   And did you -- did you complete work

22 at the trade school to become a machinist?

23        A.   I did.  I never became a machinist

24 though.

25        Q.   Okay.  So did you get a degree of any

1  kind through that post high school education?

2         A.   Some sort of certificate from the --

3  I want to say it was North County Technical School

4  or something like that.

5         Q.   Okay.  And is that the sum of your

6  kind of degrees you got post high school?

7         A.   Correct.

8         Q.   And what did you -- are you currently

9  working?

10        A.   I retired at the end of 2014.

11        Q.   Okay.  And what job did you retire

12 from?

13        A.   I was working for an oil company by

14 the name of Speedway.  I worked for Speedway for

15 twenty years.

16        Q.   And what were your job duties with

17 Speedway?

18        A.   Actually, my favorite thing about

19 Speedway was that they let me do a variety of

20 different things.  I had worked -- well, I

21 could -- I'd probably have to prepare for this for

22 a long time because I worked in the field

23 overseeing stores for a few years.

24             I worked in their pricing department

25 having an area that I controlled the pricing --

1    the retail gasoline pricing for the stores.  I was

2    in the field calling on trucking companies for a

3    few years.  Was in Minnesota for a couple of years

4    as a region manager overseeing I want to say

5    ninety-six stores.  Was in their maintenance group

6    for a couple of years overseeing the maintenance

7    for about five hundred or so stores.  Was their

8    corporate maintenance and store support manager

9    for a couple of years.

10            Q.   So you don't have to give me a --

11            A.   Wait, Mac, because it didn't end

12    there.  Environmental remediation for a while.

13            Q.   Okay.

14            A.   Then spent eight years in their

15    purchasing group overseeing a group of folks that

16    we -- we would order all the equipment if a store

17    was being remodeled or rebuilt.  And that probably

18    is more than you wanted.

19            Q.   That's all right.  So what was your

20    job title when you retired?

21            A.   Manager of equipment.

22            Q.   Okay.  And did you hold that title

23    for a number of years or --

24            A.   I was in the purchasing group for

25    eight years.

1          Q.    Okay.

2          A.    And, yes, the whole time as that,

3    commodity manager for equipment.

4          Q.    Okay.  So my understanding is that

5    John Meyer is your adopted son; is that right?

6          A.    That's incorrect.

7          Q.    Okay.  I had seen an e-mail that John

8    had sent indicating that his mom was a single

9    mother until she met you, and so I guess that's

10   where that understanding came from.  Is that not

11   accurate?

12         A.    That's not accurate.  I adopted his

13   sister, Dawn, so his mother, Kollette, we probably

14   met in fall of 1978.  We married May of 1981.

15   Boy, I'm not sure exactly when I adopted Dawn.

16         Q.    Okay.  It's not true that John's mom

17   was a single mom, correct?

18         A.    She was married when she had Dawn.

19   At least to the best of my knowledge.  I wasn't

20   part of that.

21         Q.    Yeah.  Yeah.  So she had Dawn in a

22   prior marriage and then married you and the two of

23   you had John; is that right?

24         A.    Correct.  You know, let me, Mac, give

25   you a little clarification there because --

1        Q.    Sure.

2        A.    -- John was actually born before his

3    mom and I got married.  So if you want to call

4    that a single mom, I guess that is a single mom.

5    Sorry.

6        Q.    Okay.  Yeah, and I suppose if Dawn

7    was --

8        A.    But as far as John being adopted, he

9    was not adopted.

10        Q.    Right.  Okay.  So where did -- where

11    was John born then?

12        A.    In Valparaiso, Indiana.

13        Q.    Okay.  And at some point you all

14    moved to Dayton, Ohio; is that right?

15        A.    Well, his mom and I moved.  John had

16    been out in Montana for probably since he started

17    college.

18        Q.    Right.  But I understand that John

19    graduated from high school in Ohio?

20        A.    He did.

21        Q.    Okay.

22        A.    I actually lived in Ohio two times.

23        Q.    Oh.

24        A.    From like 19 --

25        Q.    You moved around quite a bit when

Page 22

1    John was young; is that right?

2         A.   We moved pretty frequently, job

3    related.

4         Q.   Okay.  And how many kids do you have?

5         A.   I have a total of three.

6         Q.   Okay.  And does that include Dawn?

7         A.   Yes.

8         Q.   Okay.  So Dawn is your oldest?

9         A.   Correct.

10        Q.   And then there's John.  He's the

11   middle?

12        A.   Right.

13        Q.   And then you have a younger son, is

14   that RC?

15        A.   Ryan.

16        Q.   Okay.

17        A.   Ryan Carson.  RC.

18        Q.   Okay.  And where do your children

19   live, other than John?

20        A.   Dawn is in McKinney, Texas.  And Ryan

21   just bought a home in Panama Beach, Florida.

22        Q.   Okay.  And what does Dawn do for a

23   living?

24        A.   She retired about two years ago.  I

25   guess I'm calling it retirement.

1          Q.   Okay.  Do you mean that she just --
2     how old is Dawn?

3          A.   She's forty-seven.

4          Q.   Okay.  Why were you just sort of
5     putting retired in quotes?

6          A.   She has talked about going back to
7     work.  She's never really told me what her
8     financial situation is.  I'm sure she made some
9     very good money while she worked as a technical
10    recruiter, but I don't think I would have worked
11    twenty hours a day and seven days a week to get
12    there, but that's not my call.

13         Q.   Understood.  And is Dawn married?

14         A.   She's not.  She was married.  Plans
15    to remarry in April.

16         Q.   And does she have kids?

17         A.   She has one.

18         Q.   Okay.  And what about Ryan, what does
19    he do for a living?

20         A.   Ryan is not working right now.

21         Q.   Okay.  How long has he not been
22    working?

23         A.   I think he got a severance package
24    from Uber in March.  Or that's when they
25    eliminated his position.  When exactly he got the

Page 24

1   severance package, I don't exactly know.

2        Q.   Okay.  And so was that his

3   employment -- his lone employment was as a driver

4   for Uber?

5        A.   No, he wasn't a driver for Uber.  He

6   was their --

7        Q.   I'm sorry.  That was an assumption on

8   my part.

9        A.   I think the title was people

10  scientist.  He worked in their corporate office.

11       Q.   I see.  And where was that?

12       A.   San Francisco.

13       Q.   And do you have in front of you

14  access to the exhibits that the court reporter

15  printed up?

16            (Exhibit 118, subpoena, was marked

17  for purposes of identification.)

18  BY MR. MORRIS:

19       Q.   Mr. Meyer, Deposition Exhibit 118 is

20  a true and correct copy of the subpoena to produce

21  documents that our office sent to you, correct?

22       A.   I'm assuming so.  If you want me to

23  compare the two, I certainly will do that.

24       Q.   Does it appear to you to be the same?

25       A.   It does.

1          Q.   Okay.  You don't have any reason,

2    looking at it now, to dispute that that's the same

3    subpoena that you were served with, correct?

4          A.   I don't have any reason to doubt

5    that.

6          Q.   Okay.  Can you turn to the last page

7    of that subpoena with the heading Exhibit A?

8          A.   I did.

9          Q.   And you've seen Exhibit A before

10   today, correct?

11         A.   I have.

12         Q.   And Exhibit A is a description of the

13   documents and the correspondence that you were

14   required to produce pursuant to the subpoena,

15   correct?

16         A.   Yes.

17         Q.   And in essence, what you were

18   required to produce as a response to the subpoena

19   was all correspondence with any person and all

20   documents relating to John Meyer from December

21   11th, 2010 to the present, and there's a list of

22   specific categories of documents that that was

23   requesting, true?

24         A.   Yes.

25         Q.   Okay.  And those specific categories

 1   include any document relating to John Meyer's ski

 2   wreck?

 3           A.   Yes.

 4           Q.   Injuries he suffered?

 5           A.   Yes.

 6           Q.   Mental or physical health or

 7   condition, financial condition, his activities,

 8   this lawsuit, or any cause alleged to be -- or

 9   believed to be responsible for John Meyer's

10   December 11th, 2015 ski wreck, right?

11           A.   Yes.

12           Q.   And did you comply fully with the

13   subpoena, the document subpoena, Deposition

14   Exhibit 118?

15           A.   Well, I assume I did by sending you,

16   Breean, Missy, John all the e-mail information I

17   had.

18           Q.   Okay.  Did you talk with anyone about

19   how you should go about complying with that

20   document subpoena?

21           A.   You briefly when I was sending all

22   those e-mails, you had called probably 10:00 a.m.

23   Friday saying hey, I could send you a link or

24   something, and I at that time said I probably have

25   ten or fifteen more e-mails, instead of dumping it

1   into some file folder, I'll just send them like

2   I've been sending them.

3          Q.   Right.  And other than that

4   conversation in terms of the mechanics of

5   delivering the documents, did you talk with anyone

6   about how you should comply with this subpoena?

7          A.   I did not.  I read in one of the

8   documents where it says please note, instead of

9   bringing these documents to the court reporter's

10  office, you can simply e-mail them to me at your

11  e-mail address.  This may be a more efficient way

12  for you to transmit the documents.

13         Q.   Right.  And I'm just asking you if

14  you talked to anyone.  So after you got the letter

15  from my office, the subpoena and so forth, and not

16  including the conversation that we had about how

17  to deliver, did you talk to anyone about how to

18  comply with the subpoena?

19         A.   I don't recall.

20         Q.   Okay.  Did you talk to your son John

21  Meyer about how you should go about complying with

22  the subpoena?

23         A.   I might have told him how I intended

24  to do it.  I don't specifically recall.

25         Q.   Okay.  Did you tell him that you had

Page 28

1   received the document subpoena that is Exhibit

2   118?

3           A.   The documentation here says that I

4   was served August 18th.  I wasn't home August

5   18th.  I arrived home August 19th.  I was in my

6   garage talking to John on the phone when somebody

7   pulled up into my driveway and served me the

8   papers.  He had just told me a couple minutes ago

9   you're probably going to get served some papers in

10  the mail, and while we were talking, I had told

11  him, wait a minute, somebody is here, and that's

12  when I got served.

13          Q.   Okay.  And so you said wait a minute,

14  someone is here, you were actually served with the

15  subpoena at that point; is that right?

16          A.   Correct.

17          Q.   Okay.  And was John on the phone when

18  you were served?

19          A.   Yes.

20          Q.   Okay.  And then did you tell him,

21  yeah, I just received -- I was just served with a

22  subpoena?

23          A.   I told him I just got some papers, I

24  guess it's what you're telling me I'm supposed to

25  get in the mail or is coming.

Page 29

1          Q.   Okay.  And what did he say in
2    response to that?
3          A.   I don't recall anything specifically.
4          Q.   Okay.
5          A.   I probably asked him what am I
6    supposed to do with this --
7          Q.   Right.
8          A.   -- and he said I don't know, answer
9    it.
10         Q.   He said I don't know, answer it, is
11   that the way you remember?
12         A.   I had not opened the envelope so I
13   don't exactly know and he didn't know what was
14   being requested, at least to my knowledge and --
15         Q.   Other than that initial sort of
16   conversation that occurred right when you were
17   served with the subpoena, did you have any other
18   conversations with him after that about the
19   subpoena?
20         A.   As I mentioned earlier, I asked do
21   you have any insight into the format of this or
22   what they're looking for.  His advice was I don't
23   exactly know, be honest, answer it to the best of
24   your ability.
25         Q.   Okay.  And did you actually open up

Page 30

1   the papers or go through the papers with John

2   right when you received them and tell him what was

3   being requested?

4          A.   No.

5          Q.   And did John tell you that you could

6   reach out to his attorney, Ms. Walas, about the

7   subpoena?

8          A.   No.

9          Q.   Okay.  And you didn't talk to

10  Ms. Walas about how you should go about complying

11  with the subpoena?

12         A.   I have not seen or Zoomed with

13  Ms. Walas before today.

14         Q.   Okay.  You've never spoken to

15  Ms. Walas before today?

16         A.   No.

17         Q.   Okay.  And did you talk about the

18  subpoena or this deposition with your wife?

19         A.   We are not married.

20         Q.   I'm sorry, your girlfriend.

21         A.   I did tell her that I have -- I'm

22  sure she wasn't around on Friday when I started

23  sending the e-mails.  I think she came in on the

24  tail end or arrived back at home.  I've not really

25  discussed what the e-mails said or what was in any

1  of them really.

2          Q.    Sure.  So the way that you went about

3  providing the documents to me and the court

4  reporter and Ms. Walas was you forwarded all of

5  them to us, correct?

6          A.    Correct.

7          Q.    And, you know, all of those documents

8  are true and correct copies of those e-mails that

9  you had with John, they're just simply forwarded

10  to us?

11          A.    Correct.

12          Q.    Okay.  And how did you go about

13  locating documents responsive to the subpoena?

14          A.    Well, normally I would have looked at

15  my computer, but since my hard drive had failed

16  and I brought it into Best Buy, I happened to look

17  at my phone.  I was actually very surprised to

18  see -- I usually delete things from my e-mail and

19  from my phone, and I happened to find all these in

20  my sent messages.

21          Q.    Okay.  So you looked on your phone?

22          A.    Correct.

23          Q.    And you said that your hard drive on

24  your computer had failed when you received the

25  subpoena; is that right?

1          A.   It was failing or failed.

2          Q.   Okay.  So when did you sort of

3    realize that the hard drive on your computer was

4    failing or failed?

5          A.   I'm sorry, was that a question?

6          Q.   Yeah.  When did you realize that the

7    hard drive on your computer was failing or failed?

8          A.   Probably around August 12th or 13th.

9    I bought a new computer from Best Buy on August

10   14th.

11         Q.   Okay.  And do you believe that your

12   response to the subpoena would be different had

13   your hard drive not failed on or around August

14   12th of 2020?

15         A.   I believe my response could have been

16   a bit more condensed if I would have been able to

17   find a way to lump all that information into a

18   file and sent it as a lump -- or a group rather

19   than one-offs.

20         Q.   Sure.  And I'm asking you -- I wasn't

21   really clear with my question.

22         A.   Was there any other information that

23   I --

24         Q.   Right.  Are there any documents that

25   you believe were lost that were responsive to the

1    subpoena, that was lost as a result of your hard

2    drive failure?

3          A.    I don't believe so.

4          Q.    Okay.  And why do you hold that

5    belief?

6          A.    Because I think that my phone had

7    everything that the laptop had --

8          Q.    Okay.

9          A.    -- in the sent messages.

10          Q.    And have you gone back since you

11    purchased a new computer to confirm that?

12          A.    I have not.

13          Q.    Okay.  And did you have any files on

14    your computer related to John or that would be

15    otherwise responsive to the subpoena that were not

16    in your e-mail?

17          A.    Not to my knowledge.

18          Q.    Okay.  Have you done anything to try

19    to recover anything that may have been lost on

20    your hard drive that failed?

21          A.    When I brought the computer to Best

22    Buy, I had bought some time last year an external

23    hard drive, I brought that along with also, gave

24    them the failing computer and that external hard

25    drive.  I think they did a backup and were able to

1    save whatever they saved to that external hard

2    drive that they could then download to the new

3    computer.

4            Q.   Okay.  So were documents actually

5    lost on the hard drive?

6            A.   I have no clue.

7            Q.   Fair enough.  Did you -- other than

8    looking in your e-mails on your phone, did you do

9    anything else to search for documents responsive

10   to the subpoena?

11           A.   As I had mentioned earlier, when I

12   got home yesterday from camping, I looked around

13   through a file cabinet that I have at home, looked

14   around on my desk and could not find anything

15   pursuant to your request regarding the whatever it

16   was, the notebook in the hospital.

17           Q.   Right.  And do you -- do you have a

18   phone where you can send text messages?

19           A.   I do.

20           Q.   And do you ever send text messages?

21           A.   I do.

22           Q.   Have you ever sent a text message to

23   anyone -- to John?

24           A.   I have.

25           Q.   Okay.  Why did you not produce any of

1  your text messages with John Meyer?

2          A.   When you and I talked last, I told

3  you I think I have one text message.  I typically

4  periodically delete my text messages and had at

5  that time told you you guys are more than welcome

6  to look at my phone.  If you want, I'll read you

7  those text messages.  You can look at the text

8  message, I could care less.

9          Q.   Okay.  So you have one text message

10 on your phone with John; is that your testimony?

11         A.   I believe so.

12         Q.   Okay.  When did that text message --

13 when did you guys send text messages?

14         A.   On Sunday, August 16th, at 2:20 p.m.

15 I posted a -- or I sent a picture of me standing

16 at Mammoth Cave National Park and sent that to my

17 daughter Dawn, son John, son Ryan, and said

18 working on national parks.

19         Q.   Okay.  And is that the only text

20 message that you have with John from 2010 to the

21 present?

22         A.   I told you a minute ago I delete them

23 pretty frequently.  That's the only one I have or

24 I can find.  If someone can do that, they are more

25 than welcome to.

1          Q.   Okay.  And what about text messages

2    with anyone else about John or about his ski wreck

3    or any of his injuries, did you search for those?

4          A.   I would not have any clue where to

5    look for those.

6          Q.   Why not?

7          A.   Do you know how to look for them in

8    my phone?

9          Q.   So why don't you know how to search

10   for text messages that may be responsive to the

11   subpoena?

12         A.   I don't know how to do that.

13         Q.   Okay.  Do you have a belief about who

14   you may have corresponded via text message about

15   the topic of John Meyer, his ski wreck, his

16   injuries, or that sort of thing?

17         A.   Do I think I sent text messages

18   regarding?

19         Q.   Right, and do you have an idea of who

20   you may have sent text messages to about John?

21         A.   I would guess that I've sent text

22   messages to both of his siblings, probably to my

23   girlfriend Pam, probably to his aunts and uncles.

24   I have no clue who else I might have sent a text

25   message to.

1          Q.   And those individuals that you just

2    listed, did you search your phone for text

3    messages with those individuals that would be

4    responsive to the subpoena?

5          A.   I did not.  I don't know how to.

6          Q.   So if you open up a text conversation

7    with, for instance, Dawn, you can see the last

8    text message that you sent to her, correct?

9          A.   Yes.

10         Q.   And you can see the last texts that

11   she sent to you, right?

12         A.   Right.

13         Q.   And you can actually scroll up and

14   down and see your conversations with her, right?

15         A.   If you don't delete them.

16         Q.   Well, the ones that aren't deleted?

17         A.   Correct.

18         Q.   And you can see the history of your

19   conversation with her to the extent that you

20   haven't deleted conversations with her, right?

21         A.   Yes.  I just said I only have one so

22   I'm not sure where you're going with it.

23         Q.   No.  I'm not -- I want you to think

24   about how you could have responded to the

25   subpoena, and what we're discussing is you could

Page 38

1    have looked in your text message history with, for

2    instance, Dawn, right?

3              A.   If I had any history in my phone, I

4    could have, would have.

5              Q.   Do you have your phone with you?

6              A.   I do.

7              Q.   And do you have any text messages

8    with Dawn?

9              A.   I just told you I sent a text message

10   to John, Ryan, and Dawn.

11             Q.   All right.  Do you have any other

12   text messages with Dawn?

13             A.   Not to my knowledge.

14             Q.   Okay.  Can you look on your phone?

15             A.   I am.

16             Q.   And do you have any text messages

17   with Dawn looking at your phone right now?

18             A.   The one I just told you about from

19   Sunday, August 16th, 2:20 p.m.

20             Q.   Okay.  So your testimony is that you

21   have no other text messages with your daughter

22   Dawn other than the one that you already

23   described?

24             A.   What I'm telling you is that could

25   there be history in my phone?  Absolutely there

Page 39

1    could be.  Do I know how to get to it?  I do not.

2    I frequently delete text messages.  The only

3    string I have is the one that I said started

4    August 16th, 2:20 p.m.

5           Q.   So if you were to send right now Dawn

6    a text message, it would pull up your entire

7    conversation history, to the extent it hasn't been

8    deleted, with Dawn, right?

9           A.   It would.

10          Q.   Right.  But you didn't look at

11   that --

12          A.   I did.  I just told you.  The only

13   one I have that I haven't --

14          Q.   Hang on.  You need to let me finish

15   my question.  Okay?

16               You didn't look for any text messages

17   with Dawn for purposes of responding to the

18   subpoena, true?

19          A.   False.

20          Q.   Okay.  You're telling me now you did,

21   in fact, look through your phone for text messages

22   that would be responsive to the subpoena?

23          A.   I did.

24          Q.   Other than the one that you've

25   already described?

1          A.   I did look.

2          Q.   Okay.  And did you also look for text

3    messages with your girlfriend that would be

4    responsive to the subpoena?

5          A.   I did not because I knew there would

6    not be any there.

7          Q.   Well, you just told me that you

8    believed you had texted with your girlfriend about

9    Mr. Meyer.

10          A.   Are we referring, Mac, to December

11    11th, 2015, a text then, or a text that I have in

12    my phone now?

13          Q.   We're referring to documents that

14    would be responsive to the subpoena which would

15    include any documents or correspondence from

16    December 11th, 2010 to the present relating to

17    John Meyer, his accident, his injuries, the

18    alleged cause of his accident, the lawsuit that we

19    are currently here for today, Mr. Meyer's

20    activities.  Do you understand now?

21          A.   I don't.  Sorry.

22          Q.   Okay.

23          A.   Tell me exactly what you're looking

24    for.

25          Q.   I've already sent you a subpoena.

1  You've told me that you understood it, and you

2  told me that you fully complied with it, but

3  you're now telling me that you didn't search your

4  text messages.  Right?

5          A.   Sorry, Mac, I'm still confused what

6  you're looking for.

7          Q.   Right.  So if you need assistance

8  complying with the subpoena, which is a document

9  that commands you by law to provide responsive

10  documents, you can get an attorney for that,

11  right?

12          A.   I don't know.

13          Q.   Okay.  And you could have talked to

14  John about that, he's an attorney, right?

15          A.   Yes.

16          Q.   And John actually has an attorney in

17  this case, right?

18          A.   He does.

19          Q.   And you could have talked to

20  Ms. Walas about complying with the subpoena?

21          A.   I guess I could have.

22          Q.   Right.  So let me ask you this, have

23  you ever communicated with John on Facebook?

24          A.   I have probably wished him a happy

25  birthday or something like that.

Page 42

1          Q.    So yes, you have?

2          A.    Yes.

3          Q.    Okay.  Did you look in your Facebook

4    Messenger history for any documents that may be

5    responsive to the subpoena?

6          A.    I did not.

7          Q.    Okay.  So look at Exhibit A, please.

8    So the first sentence reads, for the period of

9    December 11th, 2010 to present, any and all

10   correspondence or documents of any type, including

11   but not limited to, electronic mail, text

12   messages, Facebook or other social media

13   correspondence or communications, and attachments

14   or enclosures included with any such

15   correspondence or communications with any person

16   or entity, relating or pertaining to John Meyer.

17   Do you see that?

18         A.    I do.

19         Q.    Okay.  And so it specifically informs

20   you that you need to produce text messages, right?

21         A.    It does.

22         Q.    And Facebook or other social media

23   correspondence or communications, right?

24         A.    Right.

25         Q.    So you admit to me that you did not

Page 43

1    search for either of those things?

2              A.   I did not look --

3              Q.   Okay.

4              A.   -- through my Facebook account.  As

5    we conversed last Friday, I'm really not much of a

6    Facebooker so if there's anything there, I don't

7    know how to get to it.

8                   The text messages, I frequently

9    delete text messages.  If there's a way to go back

10   to December 11th, 2010, I guess I'm not able to do

11   that or understand how to do that, so.  If you're

12   trying to say that I was remiss --

13             Q.   Okay.  Here's what I think we're

14   going to do, Mr. Meyer.  Will you agree to search

15   through your text messages with people who you

16   believe you've communicated with about John and

17   produce those text messages to us after this

18   deposition?

19             A.   Mac, I don't know how to --

20             Q.   Okay.

21             A.   -- go back to something that I don't

22   believe is there.

23             Q.   You know how to look at your text

24   message history with people you believe you

25   communicated with about John, right?

Page 44

1         A.   Is -- let me ask you this question,

2    does a text message --

3         Q.   No, this is not the place for you to

4    ask --

5         A.   I thought you couldn't interrupt me

6    since I can't interrupt you.  Is that fair?

7         Q.   We're just wasting time.  Go ahead.

8         A.   Me or you?

9         Q.   Let me just --

10             MR. MORRIS:  Can you please read my

11   question back to Mr. Meyer, please?

12             (Record read.)

13   BY MR. MORRIS:

14        Q.   Can you please answer that question,

15   Mr. Meyer?

16        A.   Let me answer the question this way.

17   I'll read to you the people that I have

18   sent/received text messages from that are still

19   showing up in my phone.

20        Q.   Okay.

21        A.   Pam Worthington.

22        Q.   Okay.

23        A.   Terry, Mitch, Mike regarding playing

24   golf tomorrow.  My son Ryan.  My children Dawn,

25   John, and Ryan.  My friend Marshall.  My Best Buy

Page 45

1  order.  Ryan Meyer and his fiancee Adrian Palmer.

2  Amanda Eggert and her mom Cindy.  Preston who has

3  an Airbnb --

4        Q.   Okay.

5        A.   -- and from Orbitz.

6        Q.   All right.  So other than that, you

7  don't have any text messages with any people, you

8  believe, on your phone; is that what you're

9  telling me?

10       A.   Correct.

11       Q.   Okay.  And have you talked to anybody

12  about how to find text messages with other

13  individuals?

14       A.   No, because I didn't believe I could

15  go back after I've deleted a text message, that I

16  could go back and find that history.

17       Q.   In any event, you've already told me

18  that you believe you've communicated with Pam

19  Worthington about John Meyer, right?

20       A.   Yes.

21       Q.   And you believe you communicated with

22  Ryan, your son, about John Meyer, correct?

23       A.   Correct.

24       Q.   And you likely have communicated with

25  Amanda about John, right?

Page 46

1          A.    Correct.

2          Q.    And Dawn?

3          A.    Correct.

4          Q.    Okay.  So what I just want you to do

5     is go through the text messages that you have with

6     those individuals you believe you've communicated

7     with about John and search them for any documents

8     that may be responsive to the subpoena?  Can you

9     do that?

10          A.    I will.

11          Q.    And I also want you to look in your

12    Facebook Messenger history, posts, whatever, and

13    search for any documents that may be responsive to

14    this subpoena.  Can you do that?

15          A.    I will.

16          Q.    And do you have any physical files,

17    journal entries, or other things that may be

18    responsive to the subpoena?

19          A.    I do not.

20          Q.    Okay.  And how do you know that?

21          A.    I've looked.

22          Q.    All right.

23          A.    Could I have missed something?

24    Certainly.

25          Q.    I'm sorry, what did you say?

1          A.   I said is it possible to miss

2     something?  Certainly.

3          Q.   Sure.  But you searched?

4          A.   I did.

5          Q.   And you didn't find anything that

6     would be responsive to the subpoena?

7          A.   Correct.

8          Q.   Okay.  And you don't feel like

9     there's anywhere else you need to search in order

10    to sort of assure yourself that you've searched

11    where those documents likely would be; is that

12    accurate?

13         A.   That's accurate.

14         Q.   Okay.  And you don't have in your

15    possession any medical records or bills associated

16    with John Meyer's December 11th, 2015 ski wreck,

17    true?

18         A.   Correct.

19         Q.   If you had those, you would have

20    provided them pursuant to the subpoena, correct?

21         A.   That's correct.

22         Q.   And you don't have in your possession

23    any medical records or bills associated with any

24    injuries that John Meyer may have suffered in his

25    December 11th, 2015 ski wreck, true?

 1          A.    That's true.

 2          Q.    Okay.  And you've already alluded to

 3  this, but you looked for some notes that you took

 4  related to John's December 11th, 2015 ski wreck

 5  and some insurance details that you had written,

 6  right?

 7          A.    Correct.  That's regarding the e-mail

 8  that you sent --

 9          Q.    Correct.

10          A.    -- and that I responded to.

11          Q.    You looked for that, right?

12          A.    I did.

13          Q.    And to the best of your knowledge,

14  you don't have --

15          A.    I do not.

16          Q.    -- that?

17          A.    I do not have that.

18          Q.    Okay.

19                (Exhibit 119, 5/11/16-5/12/16 e-mail

20  exchange between Ronald Meyer and John Meyer, was

21  marked for purposes of identification.)

22                (Pause in proceedings.)

23                THE WITNESS:  Can I make a statement

24  before we get going?

25  BY MR. MORRIS:

1          Q.    Sure.

2          A.    I just wanted to apologize, I kind of

3   lost my temper there and I apologize for that.  I

4   thought that I complied with what you were

5   requesting and answered the questions to the best

6   of my ability so if as I lost my temper a bit

7   there, I apologize for that.

8          Q.    That's okay.  I just wanted to get a

9   clear understanding of what you did to try to

10  comply with the subpoena, and it sounds like there

11  may be some text messages that may still be

12  responsive to the subpoena and that you're going

13  to look for that and produce those if you have

14  anything; is that accurate?

15         A.    Yes.  I think I probably have to go

16  to like the Best Buy Geek Squad or something,

17  perhaps they can do some additional research, or

18  if there's an alternative that you folks suggest,

19  I'm certainly willing to do that.  I'm trying to

20  the best of my ability and perhaps limited

21  technical knowledge provide you with everything

22  that you guys have requested.

23         Q.    Understood.  And just to be clear,

24  Mr. Meyer, we talked about this before, but the

25  subpoena specifically requested and required you

1   to look for text messages and Facebook or other

2   social media communications, right?

3       A.   To the best of my knowledge I did

4   comply with your request.

5       Q.   Right.  And I'm just asking, you've

6   read Exhibit A and it specifically calls out and

7   requires you to look for responsive text messages,

8   Facebook communications, or other documents, true?

9       A.   Well, I feel like we've covered this

10  ground.  I just read to you any text messages that

11  I have there.  If there's a way to go back into

12  history, I don't know how to do that.  If there's

13  a way to go back into my Facebook history, I don't

14  know how to do that either, so.

15      Q.   How often do you delete your text

16  messages?

17      A.   I don't have any set schedule.  When

18  I feel like I've got too much or something has

19  gone on too long, I will delete it.

20      Q.   When was the last time you deleted

21  text messages with John?

22      A.   I have absolutely no clue.  Can you

23  tell me or can someone tell me how to do that, how

24  to look?

25      Q.   I'm just asking for your best

1  recollection.

2          A.   I have absolutely no clue.

3          Q.   Okay.  Did you have text exchanges

4  with John about his injuries that he claims to

5  have suffered in the December 11th, 2015 ski

6  wreck?

7          A.   Do I know absolutely for certain one

8  way or the other?  I do not.

9          Q.   I'm sorry.  My question is, do you

10  recall having text conversations with John about

11  his ski wreck or the injuries he suffered in the

12  December 11th, 2015 ski wreck?

13          A.   Once again, do I recall anything

14  specifically?  I do not.

15          Q.   What about more generally?

16          A.   I could say maybe and mean maybe.

17          Q.   Would you expect that since his

18  accident, at some point the two of you exchanged

19  text messages about the subject of his ski wreck?

20          A.   I would say once again maybe or

21  there's a possibility.

22          Q.   Okay.  What about with any other

23  person?

24          A.   Again, maybe.  Possibly.

25          Q.   You have no real memory one way or

1    the other about --

2              MS. WALAS:  Mac, I'm getting horrible

3    feedback.  Somebody is bouncing.

4              MR. MORRIS:  I kind of can hear your

5    feedback, but I don't know what's changed on my

6    end.  Let's go off the record for a second.

7              (Off-the-record discussion.)

8              MR. MORRIS:  Can you read back my

9    last question, please?

10             (Record read.)

11   BY MR. MORRIS:

12        Q.   So you just told me -- my

13   understanding is that you don't have any memory

14   one way or the other of ever texting with any

15   person about John Meyer's ski wreck, true?

16        A.   I don't remember any specific

17   e-mails.  Again --

18        Q.   I'm asking about text messages, to be

19   clear.

20        A.   I'm sorry.  If you want me to say

21   probably, maybe, possibly, all three of those.

22        Q.   Okay.  To be clear, I don't want you

23   to say one thing or another.  I'm just asking

24   whether or not you have --

25             (Technical difficulties.)

1                  (Record read.)

2    BY MR. MORRIS:

3         Q.   -- a memory of any such text

4    messages?

5         A.   I'm pretty sure that I sent something

6    to Pam, and I wouldn't be surprised that I sent

7    something to my kids, my other two kids.

8         Q.   Okay.  All right.  So I think that

9    you have in front of you Deposition Exhibit 119,

10   correct?

11        A.   I do.

12        Q.   And Deposition Exhibit 119 is an

13   e-mail exchange between you and John Meyer in May

14   of 2016, right?

15        A.   Correct.

16        Q.   And it indicates that you wrote some

17   pretty detailed notes and put them in a book for

18   John at his apartment in Missoula, correct?

19        A.   Correct.

20        Q.   And what was the substance of those

21   notes?  Can you tell me about those?

22        A.   Well, as I read it, it says I wrote

23   pretty detailed notes and put them in the book for

24   you that was in the drawer of the little dresser

25   that was right outside of your bedroom door in the

Page 54

1    apartment in Missoula.

2           Q.   Yeah, I know what the e-mail says.

3    I'm just asking do you recall what those notes are

4    that you're referring to in that e-mail?

5           A.   Nothing specifically.  I would guess

6    it was anything related to the situation for

7    doctors and hospital and whatever.  Something

8    specific you're looking for?

9           Q.   No.  I'm asking you for what you

10   recall about these notes that are referenced in

11   Deposition Exhibit 119.

12          A.   I don't recall anything specifically.

13          Q.   But you believe based on this e-mail

14   chain that they related to John Meyer's ski wreck

15   and his hospital stay in Billings and perhaps in

16   Missoula as well; is that right?

17          A.   Correct.

18          Q.   And you left those notes in John

19   Meyer's possession, right?

20          A.   Well, not exactly in his possession,

21   in, as I said, the drawer of the little dresser

22   right outside of his bedroom door.

23          Q.   Okay.  So things that are in John

24   Meyer's apartment in his drawers, you don't

25   believe that's in his possession?

Page 55

1       A.   I guess you could get a little
2  technical, in his possession.  Like this is in my
3  possession right now (indicating).  Is this phone
4  in my possession?  I don't know.
5       Q.   So you don't --
6       A.   Did I hand it to him?  I did not hand
7  it to him.
8       Q.   So only if something is in somebody's
9  hand is it in their possession, is that the way
10 you interpret that?
11      A.   I guess I interpreted your question
12 was it in John's possession.
13      Q.   Right.  And so you're trying to get
14 clarity on what I meant by in his possession, is
15 that what's going on?
16      A.   We could read it again and I'll tell
17 you again that it says I left it in the drawer of
18 the little dresser.
19      Q.   Right.  And so you left it in John's
20 possession, right?
21      A.   I left it in the little drawer of the
22 dresser.  If you're calling that possession, then
23 that's in his possession.
24      Q.   Okay.  But you don't have a belief
25 either way about whether or not that is in his

Page 56

1    possession if it's in a drawer in his apartment?

2           A.   I don't even know if he ever saw it

3    or got it.

4           Q.   Okay.  Did John ever tell you whether

5    or not he had found those notes?

6           A.   I don't remember.

7           Q.   Okay.  You specifically indicated in

8    this e-mail that you hope you still have those

9    notes, right?

10          A.   That's what I said.

11          Q.   Why did you hope he still had those

12   notes?

13          A.   Because it seemed important to him

14   and me at the time.

15          Q.   Okay.  What about those notes would

16   be important to him or to you at the time?

17          A.   Let me ask you a question.  Have you

18   ever had any kind of accident and needed to go

19   back and refer to the details?

20          Q.   Will you just please answer the

21   question that I just asked you?

22          A.   I thought it might be important to

23   him to have the details surrounding the hospital,

24   doctors, so on and so forth.

25          Q.   Right.  Because that's what those

Page 57

1    notes were about?

2           A.   Correct.

3           Q.   And you don't know whether or not

4    John found those notes?

5           A.   I don't know.

6           Q.   He never told you one way or the

7    other?

8           A.   If he did, I don't remember.

9           Q.   Okay.  Mr. Meyer, when did you learn

10   that you may be named as a witness in this

11   lawsuit?

12          A.   I would guess a couple months ago

13   John had mentioned that I may be a witness in this

14   lawsuit.

15          Q.   Okay.  So what do you mean you guess

16   a couple of months ago?

17          A.   I don't recall anything specifically,

18   date or time.

19          Q.   Okay.  You just mean you estimate

20   that it was about two months ago when you first

21   were told you may be a witness in this case; is

22   that right?

23          A.   Correct.

24          Q.   And who informed you of that?

25          A.   John.

Page 58

1          Q.   And you obviously were with John

2    right after his ski wreck, right?

3          A.   He had the accident, as I recall, on

4    December 11th and on the 12th I flew out to

5    Billings.

6          Q.   Right.  And you stayed in the

7    hospital with John beginning about December 12th,

8    2015?

9          A.   I got a hotel nearby and a few nights

10   I stayed in the hotel, a few nights I stayed in

11   the hospital, a combination of both.

12         Q.   Okay.  And so the things that you

13   know about this -- that are relevant to this case

14   are about -- I mean, that was obvious to you from

15   the beginning of this case, wasn't it?

16         A.   What was obvious?

17         Q.   That you knew about his hospital

18   stay, for instance?

19         A.   Yes.

20         Q.   And you knew about the treatment that

21   he received, for instance?

22         A.   I knew about the treatment, yes.

23         Q.   Yeah.  To the extent that you

24   understood those things, you knew about it?

25         A.   I don't understand the question.

1          Q.    Right.  To the extent that you

2    understood what treatment John was getting, you

3    knew about that treatment?

4          A.    I knew he was getting treatment in

5    the hospital, yes.

6          Q.    Right.  And John knew you knew?

7          A.    After the fact he knew that I knew.

8          Q.    Sure.  So after he was -- after he

9    saw you for the first time in the hospital, he

10   knew that you knew about the treatment he was

11   getting at the hospital, right?

12         A.    I don't know that for the first three

13   weeks or so after the accident John knew which way

14   was up, and I say that because I recall him

15   probably three weeks after the accident, I

16   remember arriving at the hospital and -- I'm

17   sorry, I arrived at the rehab facility in Missoula

18   and commenting you're up awfully early, and his

19   comment was that -- something along the lines of

20   yeah, I was confused.  He for, I'm going to guess,

21   three weeks after the accident couldn't tell what

22   time it was.  He would look at a clock and almost

23   everything was backwards so he had no clue.  When

24   exactly it became clear that I knew and that he

25   knew he was getting some treatment, I can't tell

Page 60

1    you.

2            Q.   Sure.

3            A.   He would look at the clock and think

4    it would be 7:40 in the morning, and I'm not

5    talking about a digital clock, I'm talking about

6    an analog clock, and he would look at the hands on

7    the clock and he couldn't tell me what time it was

8    for the longest time.  So when exactly it became

9    clear, I can't tell you.

10           Q.   Do you know that John filed the

11   complaint, the document that started this lawsuit,

12   in December of 2015?

13           A.   I have no clue when he filed the

14   lawsuit.

15           Q.   So as of December 2015, do you

16   believe that John Meyer knew that you were there

17   with him in the hospital both in Billings and in

18   Missoula?

19           A.   Let me back you up.  You said

20   December of 2015?

21           Q.   I'm sorry.  I misspoke.  I should

22   have said December of 2017.

23           A.   Oh, okay.

24           Q.   My question is, as of December of

25   2017, do you believe that John Meyer knew that you

Page 61

1    were with him in the hospital?

2         A.   I do, yes.  Two years later I believe

3    that a lot of the -- some of the, to what extent,

4    the brain injury had cleared up, yeah, I believe

5    that he knew certainly more of what was going on

6    then.

7         Q.   Okay.  And have you recently provided

8    to John any medical records related to his ski

9    accident?

10        A.   I don't recall any -- sending

11   anything other than this e-mail communication.

12   I'll take a guess that whatever notes I referred

13   to later on where I said should I mail the little

14   bit of stuff that I made notes on after the

15   Billings hospital, I would guess at some point in

16   time I probably sent that to him because -- and I

17   say that because I don't have it.

18        Q.   Okay.  So you think that the notes

19   that are referred to in Deposition Exhibit 119 you

20   sent to John?

21        A.   That would be my guess.  Do I know

22   anything specifically?  I do not.

23        Q.   Right.  But this e-mail is in May of

24   2016, right?

25        A.   Correct.

Page 62

1          Q.   And so since the lawsuit that was
2     initiated in December of 2017, have you sent John
3     any medical bills?
4          A.   I don't recall sending any to him.
5          Q.   Okay.  And since December of 2017,
6     have you sent John any medical records related to
7     his ski wreck?
8          A.   I don't recall sending him anything.
9          Q.   And have you been recently involved
10    in assisting John with producing documents in this
11    case to Big Sky?
12         A.   I have not.
13         Q.   Okay.  Have you ever been involved
14    with assisting John or his attorneys with his
15    producing medical records or medical bills to Big
16    Sky?
17         A.   There's nothing that I recall.
18         Q.   Okay.  And you didn't produce to us
19    in response to this subpoena any e-mails that
20    would suggest that you have recently sent to John
21    or his counsel information about medical records
22    or medical bills that he may have incurred in
23    connection with his December 11, 2015 ski wreck,
24    true?
25         A.   Mac, ask me that question again.  I'm

Page 63

1    not sure I follow what you're asking for.

2         Q.   Sure.  So you produced a number of

3    e-mails in response to the subpoena that we sent

4    you, correct?

5         A.   Correct.

6         Q.   And you've reviewed those e-mails

7    when you sent them to us?

8         A.   Did I look hard at all of them?  No.

9    I thought I'm just going to send you everything I

10   have that included John in any kind of

11   communication.

12        Q.   Sure.  And in any of those e-mails

13   did you notice an e-mail that would suggest that

14   you've recently assisted John with locating

15   medical records or medical bills?

16        A.   No, I don't remember --

17        Q.   When I say recently, I mean since the

18   lawsuit started.

19        A.   Sorry.  When was the last time I sent

20   him anything medical record related, I have

21   absolutely no clue.  I think it might be back to

22   this, but I absolutely can't tell you a hundred

23   percent one way or the other.

24        Q.   Okay.  And do you know anything about

25   John's medical bills related to the ski accident

Page 64

1    at issue in this case?

2         A.   What can I recall?  I think he told

3    me that he received a bill for being airlifted off

4    of the mountain for forty-four thousand dollars it

5    seems to me.

6              I remember having conversation with

7    him about -- I think that he had UnitedHealthcare,

8    not positive of that, I think that he had

9    UnitedHealthcare as an insurance provider and that

10   it seemed a bit unfair that the accident occurred

11   in 2015 -- yes, 2015 and that they looked for a

12   deductible of X number of dollars for 2015 and

13   because his care and treatment extended into 2016,

14   that they were looking for a deductible in the

15   same amount, and I want to say six thousand

16   dollars, and that didn't seem fair that it rolled

17   into another calendar year when it was the same

18   accident.

19        Q.   Okay.  Have you told me everything

20   that you know as you sit here today about

21   Mr. Meyer's medical bills?

22        A.   Am I withholding anything?  I am not.

23   Could there be something in my memory that I'm not

24   recalling at this ten seconds?  That's certainly a

25   possibility.

Page 65

1          Q.   Okay.  And if anything else comes to

2    mind during the course of this deposition, will

3    you let me know?

4          A.   Sure.

5          Q.   Okay.  And with regard to the medical

6    bill associated with his life flight from Big Sky

7    to Billings, what you told me about that is

8    information that was relayed to you by John, true?

9          A.   Correct.

10          Q.   Okay.  And what you told me with

11    respect to the deductible amounts and

12    UnitedHealthcare, that is also information that

13    was also relayed to you by John --

14          A.   Yes.

15          Q.   -- correct?

16          A.   Yes.

17          Q.   And do you know anything about the

18    timing in which John has produced to Big Sky

19    medical bills or medical records?

20          A.   I do not.

21          Q.   Okay.  So if there was an issue in

22    this case about certain medical records or medical

23    bills being disclosed to Big Sky late, you

24    wouldn't be able to comment on that, correct?

25               MS. WALAS:  Objection.  Calls for a

Page 66

1   legal conclusion.  The witness is not an attorney.

2   BY MR. MORRIS:

3         Q.   Mr. Meyer, you can still answer my

4   question if you understood it.

5              THE WITNESS:  Breean, do you want me

6   to or not?

7              MS. WALAS:  I'm not your attorney.

8   You can answer.

9              THE WITNESS:  Mac, restate the

10  question.

11  BY MR. MORRIS:

12        Q.   So if in this case there was an issue

13  about certain medical bills or records being

14  disclosed to Big Sky in an untimely fashion, would

15  you have any knowledge about that?

16        A.   I do not.

17        Q.   Okay.  John graduated from

18  Centerville High School in Dayton; is that right?

19        A.   In Centerville, Ohio, yes.

20        Q.   Okay.  And what kind of a student was

21  John in high school?

22        A.   Smart enough, maybe sometimes a

23  little lazy and I thought perhaps with the wrong

24  crowd from time to time.

25        Q.   And what kind of grades did he get in

Page 67

1   high school?

2          A.   Probably Bs and Cs.

3          Q.   And then he went on and attended for

4   a year Wright State University; is that accurate?

5          A.   Correct.

6          Q.   And he -- and how was his experience

7   as a student at Wright State University, to your

8   recollection?

9          A.   He did not really care for it.  He

10  was living at home.  It wasn't great.

11         Q.   Okay.  And then he transferred after

12  a year to the University of Montana in Missoula,

13  right?

14         A.   Right.

15         Q.   And Mr. Meyer has testified in this

16  case that he did not do well at U of M.  Is that

17  your recollection as well?

18         A.   I would say he really didn't apply

19  himself.

20         Q.   I'm sorry, you said he did not apply

21  himself really?

22         A.   I don't think he applied himself

23  there.

24         Q.   Okay.  He also -- do you recall John

25  having some sort of legal troubles in college,

Page 68

1    getting arrested and that sort of thing?

2          A.   I think that John had gone to New

3    Orleans.  I'm going back twenty years now.  I

4    believe that he was arrested, pardon my French

5    here, I think he peed on some building, got

6    arrested, and, here, I'll make you chuckle, he

7    called looking to be bailed out of jail and I said

8    no, just leave him there.

9          Q.   Well, that's what any good dad would

10   do.

11         A.   In my opinion, that was the right

12   thing to do.

13         Q.   For sure.  That's what my dad would

14   have done.

15              And do you recall him being arrested

16   for public drunkenness as well?

17         A.   I do not.

18              MS. WALAS:  Mac, I'm going to go

19   ahead and object to the line of questioning.  The

20   judge has ruled this inadmissible.  You can go

21   ahead and continue and he can answer.  I just want

22   to get an objection on the record.

23              MR. MORRIS:  For sure.

24   BY MR. MORRIS:

25         Q.   You don't recall that you said?

1          A.   I do not.

2          Q.   Okay.  Do you recall -- outside of

3   peeing on the building in New Orleans, do you

4   recall him ever being arrested for any reason?

5          A.   That's the only incident I recall.

6          Q.   Okay.  And was John ever treated for

7   any mental health conditions before December 11th,

8   2015, that you're aware of?

9          A.   I don't have any specific knowledge

10  so I can't say I know he went for whatever.

11         Q.   Okay.  And what do you know sort of

12  more generally?

13         A.   I know that he has seen therapists or

14  counselors.  When that began, how often, I can't

15  help you.

16         Q.   Okay.  And I'm specifically referring

17  to before December 11th, 2015.  Did you understand

18  that?

19         A.   I understood that.  I don't exactly

20  know the first time he went.  I have no clue how

21  often he's been.

22         Q.   Okay.  And -- but you -- you believe

23  that he has at some time in his young adult life

24  seen counselors --

25         A.   Correct.

Page 70

1        Q.    -- or mental health therapists of

2   some kind?

3        A.    Yes.

4        Q.    And do you have any sense of why he

5   would see a counselor or mental health therapist?

6        A.    I think that John can sometimes get

7   inside of his own head, probably as we all do,

8   talking some stuff to ourselves, and I think he

9   may listen to some of that stuff more often than

10  some others of us who choose to ignore or realize

11  that we're just talking BS to ourselves.

12       Q.    Understood.  And did John ever talk

13  to you about, you know, feeling like he's getting

14  in his own head or that sort of thing before

15  December 11th, 2015?

16       A.    Do I realize that he had some

17  challenges and was inside of his head?  Certainly.

18       Q.    Sure.  And I guess my question is,

19  did he ever talk to you about that?

20       A.    Well, I recall he was doing some sort

21  of stint for -- gosh, I'm struggling to remember

22  the name of the -- I guess it's the Sierra Club

23  that's based out in San Francisco and he was

24  struggling to find a place to live, struggling

25  with the gig with them, and being a little upset

1   about the whole thing.

2        Q.   Sure.  And when was that, do you

3   recall?

4        A.   I have no clue.

5        Q.   Would that have been after he

6   graduated from the University of Montana?

7        A.   It would seem to me, yes.

8        Q.   Okay.  And when he was out in San

9   Francisco, as you just described it, you think he

10  may have at that time talked to you about getting

11  into his own head and seeing a counselor of some

12  kind about that issue?

13       A.   I don't know if he saw a counselor

14  regarding that or not.

15       Q.   Okay.

16       A.   No clue.

17       Q.   Sure.  And in terms of when you think

18  he saw a mental health therapist or counselor, do

19  you have sort of a time when that was?

20       A.   I do not.

21       Q.   Okay.  So John is fond of engaging in

22  a wide variety of outdoor recreational activities,

23  right?

24       A.   Correct.

25       Q.   And he sort of had that interest for

Page 72

1    a long time --

2            A.   Yes.

3            Q.   -- correct?

4            A.   Yes.

5            Q.   Okay.  So did he sort of develop

6    those interests after he moved to Montana?

7            A.   John has always been very outdoorsy.

8    I recall going archery, bow hunting with him when

9    he was twelve, thirteen years old.

10           Q.   So you took him deer hunting?

11           A.   Yes.

12           Q.   Okay.  And then currently John likes

13   to mountain bike, correct?

14           A.   I'm sure he likes all kinds of

15   outdoor things.

16           Q.   Do you know about his recreational

17   activity mountain biking?  Do you know about his

18   mountain biking at all, his interest in that?

19           A.   I'm sure that he has mentioned that

20   he likes mountain biking.

21           Q.   And rock climbing?

22           A.   Yes.

23           Q.   Obviously skiing?

24           A.   Yes.

25           Q.   Back country skiing?

1          A.    Yes.

2          Q.    Mountain climbing?

3          A.    Yes.

4          Q.    Okay.  And as a father, were you ever

5    worried about John engaging in those recreational

6    activities?

7          A.    Yes.

8          Q.    Okay.  Because all of them have

9    inherent dangers and risks, would you agree?

10         A.    I agree to the standpoint that they

11   all have dangers, but I was at danger driving my

12   truck up here to come and talk to you guys.  So do

13   I indulge in the same activities as him?  Not all

14   of those things, but I would say that if you're

15   looking to build a case that he likes outdoor

16   activities, I'd agree with that.  If you're

17   looking to build a case that they're a little

18   riskier, that's probably true as well.  But if you

19   drove to work today, you probably risked yourself

20   a little bit as well, so.

21         Q.    Sure.  But, you know, people have to

22   drive to work and that sort of thing, they don't

23   necessarily have to climb up a mountain or a

24   cliff, correct?

25         A.    Right, but they also don't have to go

Page 74

1    fishing or boating and risk that as well, so.

2         Q.   And in your experience, John has sort

3    of enjoyed that element of risk in the

4    recreational activities that he chooses to engage

5    in?

6         A.   Well, I think that's an interesting

7    question, Mac, because I know that he loves and

8    enjoys the outdoors so what part of it thrills him

9    or excites him, I don't know.

10        Q.   Okay.  How would you characterize

11   John's financial status since he graduated

12   college?

13        A.   John has never seemed to be on the

14   plenty of money side.  He's always been more

15   about -- I feel like he's always been more

16   concerned about making sure that the air, the

17   water, the environment was protected than he was

18   about having a whole bunch of money.

19        Q.   Sure.  And have you supported John

20   financially since he graduated college?

21        A.   Can you be more specific with that

22   question?

23        Q.   Sure.  Yeah.  Did you help pay for

24   John's law school, for instance?

25        A.   I recall paying for a semester of

Page 75

1    Vermont law school.  Have I helped him

2    financially?  Absolutely.

3           Q.   Okay.  And since he graduated law

4    school, you've also continued to help him

5    financially, true?

6           A.   Well, you guys saw the e-mails and

7    you know that I have supported him.

8           Q.   Right.  So that is true?

9           A.   Correct.

10          Q.   Okay.  Do you recall John failing the

11   bar exam the first time that he took it?

12          A.   I think that he did.

13          Q.   Did you -- do you recall that or do

14   you recall anything -- any reaction you had to

15   that?

16          A.   Well, first of all, I'm pretty sure

17   that he did fail it.  That he took it -- I don't

18   know, hell, you might know the answer, how many

19   times he took it before he passed it.  I guess my

20   reaction would have been as it would be today that

21   if he failed it, he should continue trying to pass

22   the bar exam if that's what he wanted to do.

23          Q.   Okay.  What did John do for work

24   after he graduated law school?

25          A.   Well, I guess all I recall is him

Page 76

1   starting Cottonwood Environmental Law.

2        Q.   And did you ever meet John's law

3   partner, Purcie Bennett, who he started Cottonwood

4   Environmental Law Center with?

5        A.   I don't remember meeting Purcie.

6        Q.   Okay.  Did John ever talk to you

7   about Purcie?

8        A.   I knew that -- as you now mention

9   Purcie, I do remember him talking about Purcie.  I

10  don't think they got along real well or that they

11  were on the same page.

12       Q.   Okay.  And what did he tell you about

13  not getting along with Purcie?

14       A.   I don't recall specifically what the

15  issue was or what he or she had issues regarding.

16       Q.   Okay.  And do you recall that she

17  left Cottonwood Law Center about three or four

18  years after it was formed?

19       A.   I do not know exactly what time frame

20  so if you tell me three or four years and you have

21  specific information, then I'll say okay, I agree

22  with you; but as far as specific time frame, I do

23  not know.

24       Q.   But more generally, you recall at a

25  specific time she left Cottonwood Law Center,

 1   right?

 2           A.   Correct.

 3           Q.   And did John ever talk to you about

 4   why she left?

 5           A.   I thought we just covered that.  I

 6   don't know specifically what their issue was.

 7           Q.   Okay.  Did he tell you that after

 8   Purcie left, that sort of laid a greater burden on

 9   him in terms of operating and running Cottonwood

10   Environmental Law Center?

11           A.   Well, he probably did.  That stands

12   to reason to me.

13           Q.   And do you recall conversations about

14   that issue?

15           A.   I do not.

16           Q.   So if you can go back in your memory

17   to 2015.  Do you remember how John and Cottonwood

18   Law Center were doing in 2015 prior to this ski

19   wreck that's at issue in this case?

20           A.   I don't recall specifically.  I have

21   no general or specific information.

22           Q.   Okay.  Is it fair to say that at that

23   time John's sort of financial status was the same

24   as you've already described it where he was more

25   focused on other priorities besides money?

Page 78

 1          A.   You're asking me to speak for him and

 2   I can't say what his priorities were focused on.

 3   As I mentioned already, he never seemed to be

 4   really concerned about the financial side of the

 5   business.

 6          Q.   Okay.  Can you find in front of you a

 7   document with the Bates stamp Big Sky 947?

 8               (Exhibit 120, 4/4/16 e-mail from

 9   Ronald Meyer to John Meyer, was marked for

10   purposes of identification.)

11   BY MR. MORRIS:

12          Q.   Mr. Meyer, the court reporter has put

13   in front of you Deposition Exhibit 120 which

14   should have the Bates stamp at the bottom Big Sky

15   947.  Is that accurate?

16          A.   Yes.

17          Q.   And can you take a second just to

18   review that and let me know when you're done?

19          A.   Okay.

20          Q.   So Deposition Exhibit 120 is one of

21   the e-mails that you provided to us pursuant to

22   the subpoena, correct?

23          A.   I'm sorry, Mac, you broke up a little

24   bit there and I didn't understand the question.

25          Q.   No problem.  Deposition Exhibit 120

Page 79

1    is one of the e-mails that you provided in

2    response to the subpoena, correct?

3           A.   Correct.

4           Q.   And it's an e-mail exchange between

5    you and John Meyer dated April 4th, 2016, with the

6    subject thirty thousand dollar contribution, true?

7           A.   Correct.

8           Q.   Okay.  What -- and you're asking John

9    to send you a document regarding the thirty

10   thousand dollars because you have an appointment

11   for taxes on Tuesday; is that right?

12          A.   Correct.

13          Q.   Okay.  And can you tell me, did you

14   make a donation of thirty thousand dollars to

15   Cottonwood Environmental Law Center?

16          A.   I did.

17          Q.   And is that what this e-mail is

18   about?

19          A.   Yes.

20          Q.   And when did you make that donation?

21          A.   The exact day?

22          Q.   No.  Was it before April 4th, 2016?

23          A.   Yes.

24          Q.   And do you have a sense of when it

25   was other than knowing it was before April 4th,

Page 80

1    2016?

2           A.   My guess, and it's only a guess,

3    would be within the couple weeks prior to that.

4           Q.   Okay.  If you can look at Big Sky

5    948.

6                MR. MORRIS:  If we can get that

7    document in front of the witness, please.

8                (Exhibit 121, 4/4/16 e-mail from

9    Ronald Meyer to John Meyer, was marked for

10   purposes of identification.)

11   BY MR. MORRIS:

12          Q.   Is that marked Deposition Exhibit

13   121?

14          A.   It is.

15          Q.   It has the Bates stamp Big Sky 948 at

16   the bottom, correct?

17          A.   Yes.

18          Q.   Deposition 121 is an e-mail also on

19   May 12th, 2016 -- I'm sorry.  Just a second.

20               I'm sorry.  Let me start over.

21   Deposition Exhibit 121 is an e-mail that you

22   provided in response to the subpoena, right?

23          A.   Right.

24          Q.   And it has the subject thirty

25   thousand dollars, correct?

Page 81

1          A.   Right.

2          Q.   It's also dated April 4th, 2016.

3    Just like the prior e-mail that we just reviewed,

4    Deposition Exhibit 120, right?

5          A.   Correct.

6          Q.   And do you see where it says date was

7    September 17, 2015?

8          A.   I do.

9          Q.   And what is that referring to?

10         A.   So that apparently I'm incorrect, I

11   did not send him the thirty thousand dollar

12   contribution a couple weeks before.  I sent it to

13   him September of 2015.

14         Q.   Okay.  And that's what you're

15   informing John in this e-mail is the date that you

16   provided a thirty thousand dollar contribution to

17   Cottonwood Environmental Law Center, right?

18         A.   Yes.

19         Q.   Okay.  But to be clear, Cottonwood

20   Environmental Law Center is a nonprofit

21   organization?

22         A.   Correct.

23         Q.   And the reason why it's referred to

24   as a contribution and that you needed information

25   from John about that for purposes of taxes is

Page 82

1   that's a tax deductible donation, right?

2          A.   I'm sure that there are some

3   allowances for charitable contributions.

4          Q.   Right.  And that's at least why you

5   needed that document from John to at least explore

6   the possibility that it would be a charitable

7   contribution?

8          A.   Correct.

9               MR. MORRIS:  Can we show the witness

10  a document that's Bates stamped Big Sky 960 to

11  963.

12              (Exhibit 122, 3/9/18-3/11/15 e-mail

13  exchange between John Meyer, Ronald Meyer, and

14  Dawn Dizney, was marked for purposes of

15  identification.)

16  BY MR. MORRIS:

17         Q.   Mr. Meyer, you now have before you

18  Deposition Exhibit 122.  Can you just take a

19  moment to review that and let me know when you're

20  done?

21         A.   Okay.

22         Q.   So Deposition Exhibit 122 is another

23  e-mail that you provided to us in response to the

24  subpoena, right?

25         A.   Correct.

1          Q.   And it's a true and correct copy of

2    an e-mail exchange that you had with John and

3    other members of your family in March of 2015,

4    correct?

5          A.   Correct.

6          Q.   And the subject of the e-mail is

7    Belize -- or the e-mail chain?

8          A.   Correct.

9          Q.   And John, if you turn to the final

10   page, is the person who started this e-mail chain

11   it looks like?

12         A.   Where it starts from John Meyer --

13         Q.   Right.

14         A.   -- dated March 9th, 2015?

15         Q.   Right.  Okay.  And so this e-mail

16   chain is about a family trip that you were

17   planning and organizing in 2015, right?

18         A.   Correct.

19         Q.   And John wrote to you in March of

20   2015 to say that he had just received a dentist

21   bill of two thousand dollars and that he could

22   only find a flight that was eight hundred dollars

23   or more and so he wouldn't be going on the Belize

24   trip after all, right?

25         A.   Yeah, that part is correct.  Mac,

Page 84

1    what I'm not sure of is, is this the first e-mail

2    in the chain or is it somewhere in the middle of?

3         Q.   Right.  You know, I don't know

4    either.  I'll just tell you that this is the

5    entirety of the e-mail chain that we received from

6    you.

7         A.   Okay.

8         Q.   So if there are earlier e-mails in

9    this chain, you would know better than me.

10        A.   You're going back more than five

11   years so I don't know if this picks up in the

12   middle or after a phone call or where; but, yeah,

13   the things that you've stated, he said yep, I just

14   got a two thousand dollar dentist bill and the

15   plane fare is eight hundred bucks, correct.

16        Q.   Okay.  So because of financial

17   issues, he's telling you he's not going to be able

18   to go, right?

19        A.   Correct.

20        Q.   And his sister, Dawn, responded to

21   that e-mail and told him that -- told John that

22   she would help split the ticket, right?  The cost

23   of the plane ticket.

24        A.   Yes.

25        Q.   And you responded and told John that

Page 85

1    you had already offered to pay the plane ticket

2    for his birthday and that you had actually sent

3    him a check that day and he could do with that

4    money whatever he wanted, right?

5           A.   Correct.

6           Q.   You also responded to his complaint

7    about needing braces, right?

8           A.   I did.

9           Q.   And you reminded him that you had

10   already offered to help pay for the braces years

11   ago and he had declined that offer?

12          A.   Correct.

13          Q.   And if you look in the first e-mail,

14   John says that he doesn't smile because of his

15   teeth.  Do you see that?

16          A.   I don't see it right this second but

17   I did see it.

18          Q.   Right.  Was that your recollection,

19   that John was anxious about smiling because of his

20   teeth?

21          A.   I don't recall that specifically.

22          Q.   Did you end up paying for John's

23   airfare for that trip?

24          A.   I did.  At least that's my

25   recollection.

1          Q.   I'm sorry?

2          A.   I said my recollection is that I paid

3    for the airfare.

4          Q.   All right.  In October of 2015, do

5    you recall John shutting down Cottonwood Law

6    Center and taking a job with WildEarth Guardians

7    in Missoula?

8          A.   I don't believe that he shut down

9    Cottonwood Environmental Law.  He did take a job

10   with WildEarth Guardians.  Exactly when, if you

11   say October 2015, okay.

12         Q.   Okay.  Do you recall it was sometime

13   in the fall of 2015?

14         A.   Yes.

15         Q.   Okay.  And your understanding is that

16   was just a part-time job and he was also running

17   Cottonwood as well?

18         A.   I think he was attempting to do both

19   for a while.

20         Q.   Okay.  And why do you think he took

21   the job with WildEarth Guardians?

22         A.   I do not exactly know.

23         Q.   Did you support his decision to do

24   that?

25         A.   I did.

Page 87

1          Q.   Why did you support it?

2          A.   I guess I tried to be supportive of

3     him emotionally, financially, career-wise.  I

4     don't know what's best for him so if he thought

5     that was his best move at the time, then good on

6     him.

7          Q.   And do you recall what John's salary

8     at WildEarth Guardians was?

9          A.   I do not.

10         Q.   Okay.  Do you recall him discussing

11    with you that that would be an improvement

12    financially for him?

13         A.   I don't know what his financial

14    situation was or what his income was so whether it

15    was better or not, I can't answer.

16         Q.   Sure.  And you don't recall any

17    conversations with him on that issue?

18         A.   Well, what I'm pretty certain of is

19    that he has worked a few cases, probably won a few

20    cases.  I think that as a nonprofit law

21    organization, he's pretty dependent upon

22    charitable contributions.  I think that there's

23    probably some grants that are involved.  And I

24    believe that your financial situation in that

25    situation can be improved upon or go backwards

Page 88

1   based upon your willingness to ask for charitable

2   contributions or work toward grants.

3          Q.   Okay.  And was John not keen on

4   getting grants or charitable contributions?

5          A.   I think, and, again, this is me

6   speaking for him, I don't think he liked asking

7   people for money.

8          Q.   Okay.  And that's based on sort of

9   your conversations with him, right?

10         A.   Probably both then -- then and now.

11         Q.   After John's ski wreck on December

12  11th, 2015, some of his coworkers in WildEarth

13  Guardians came to the hospital in Billings, right?

14         A.   Correct.

15         Q.   And you appreciated that they did

16  that for him, right?

17         A.   I did.  I'm sure that I had written

18  or spoken to I think his name was John Horning at

19  WildEarth Guardians.

20              MR. MORRIS:  Can we show the witness

21  the document with the Bates stamp Big Sky 1062 to

22  1063?

23              (Exhibit 123, 12/14/15 e-mail

24  exchange between Ronald Meyer and John Horning,

25  was marked for purposes of identification.)

Page 89

1    BY MR. MORRIS:

2         Q.   And it's marked Deposition Exhibit

3    123?

4         A.   Yes.

5         Q.   Mr. Meyer, can you just take a moment

6    to review Deposition Exhibit 123 and let me know

7    when you're done?

8         A.   Okay.

9         Q.   Deposition Exhibit 123 is another

10   e-mail that you produced to us in response to the

11   subpoena, right?

12        A.   Correct.

13        Q.   And it's an e-mail exchange between

14   you and John Horning from December of 20 --

15   December 14, 2015, right?

16        A.   Correct.

17        Q.   And John Horning is an individual at

18   WildEarth Guardians -- or was with WildEarth

19   Guardians at the time?

20        A.   Correct.

21        Q.   And in this e-mail you are thanking

22   John and complimenting John's coworkers Bethany

23   and Sarah for coming to visit John at the

24   hospital, right?

25        A.   Right.

Page 90

1          Q.    And you described them in this e-mail

2     as impressive and you actually say that they are

3     angels, right?

4          A.    Right.

5          Q.    And Mr. Horning responded and said

6     that both Bethany and Sarah are models and leaders

7     in how to be compassionate and caring, right?

8          A.    Right.

9          Q.    And that was your experience as well,

10    that the people at WildEarth Guardians that you

11    interacted with were compassionate and caring?

12         A.    Correct.

13         Q.    And specifically compassionate and

14    caring toward John, right?

15         A.    Yes.

16         Q.    Okay.  Now, in March of 2016 you

17    recall John was fired by WildEarth Guardians,

18    true?

19         A.    If you say March of 2016, I believe

20    that.

21         Q.    Okay.  Did John tell you about being

22    fired by WildEarth Guardians --

23         A.    Yes.

24         Q.    -- when that occurred?  He did?  And

25    what did he tell you about being fired by

1  WildEarth Guardians?

2          A.   Well, I guess it was a little unclear

3  to me whether or not he was fired or he chose to

4  leave them.  If you're going to ask me the details

5  surrounding it, I don't know.

6          Q.   Okay.  So he never made it clear to

7  you whether or not he actually just resigned from

8  WildEarth Guardians?

9          A.   I don't know if he resigned or if

10  they terminated him.

11          Q.   Right.

12          A.   Oh, you know what, I guess as I think

13  about it, he probably did say he was terminated,

14  and the reason I say that is because I think

15  somewhere in one of the other e-mails I suggested

16  then you might have some opportunity to pursue

17  unemployment or -- yeah, unemployment

18  compensation.

19          Q.   Right.  And did he tell you why he

20  was fired by WildEarth Guardians?

21          A.   I don't recall anything specifically.

22          Q.   I'm sorry, I interrupted you.  Could

23  you say that again?

24          A.   I don't recall what any specific

25  violation was, or if he even told me what one was.

Page 92

1        Q.   Okay.  Did he ever tell you that he
2   was fired by WildEarth Guardians because they
3   found him to be unmanageable?
4        A.   Not that I recall.
5        Q.   Okay.  And was there an issue with
6   John both being an employee of WildEarth Guardians
7   on the one hand and trying to run his own
8   Cottonwood Environmental Law Center at the same
9   time?
10        A.   I have no knowledge of that being a
11   problem.
12        Q.   Okay.  So you know -- did you know
13   that in March of 2016 when John was fired by
14   WildEarth Guardians he was already skiing again in
15   the back country?
16        A.   I don't know anything about him
17   skiing again in the back country.
18        Q.   Did John ever tell you about a ski
19   accident that he had while back country skiing in
20   the summer of 2016?
21        A.   I think that he did say that he and a
22   buddy of his were skiing and that he did have
23   another crash.
24        Q.   What did he tell you about that
25   crash?

Page 93

1          A.   I think he got a little dinged up.

2          Q.   Did he tell you that he broke some

3     ribs in the crash?

4          A.   I don't recall that being part of the

5     conversation.

6          Q.   Did he tell you that he had injured

7     his knee?

8          A.   I think I remember that his knee was

9     dinged up, yes.

10         Q.   Okay.  Has he ever talked to you

11    about suffering breathing problems as a result of

12    that skiing accident in the summer of 2016?

13         A.   I don't recall anything specifically

14    regarding that.

15         Q.   Okay.

16              MS. WALAS:  Mac, would this be a good

17    time to take a break?

18              MR. MORRIS:  Sure.

19              (Pause in proceedings.)

20    BY MR. MORRIS:

21         Q.   Mr. Meyer, we're back from a lunch

22    break, and you recognize that you're still under

23    oath?

24         A.   I do.

25         Q.   And over the lunch break did you

Page 94

1   review any documents or do anything or talk to

2   anyone about the deposition?

3          A.   I called my girlfriend and told her

4   that you guys are abusing me and I don't know how

5   much longer it would go on.

6          Q.   Are you being sarcastic about us

7   abusing you?

8          A.   What I find interesting, and probably

9   naive on my part, is that your job or Crowley &

10  Fleck, their job is to find everything that they

11  think John did wrong or inappropriately or that

12  you can find fault with, and I have to say, I find

13  that interesting partly because as a parent, it's

14  like, you know what, you want to take care of your

15  kids and protect them, and so it bothers me a bit

16  to have you go after things that he's said or done

17  or mistakes that he's made.  And I guess it's

18  Breean's job, whenever it comes time, to point out

19  things that --

20          I think of kayaking with John in

21  Alaska in Arctic National Wildlife Refuge and him

22  picking up all the trash and bottles and stuff

23  that he can find.

24          I think of the time he told me about

25  finding -- when he was out back country skiing,

Page 95

1    finding a skier upside down, I think they call it

2    a tree well when somebody gets inside of a tree

3    because they had an accident or a tumble, and they

4    rescued him because he couldn't get out of that.

5              I think of him telling me about pro

6    bono work that he has done for the homeless and

7    battered women in a shelter.

8              So I just find it interesting that --

9    and I understand that, you know, it's kind of like

10   me buying a car, I want to buy it for the cheapest

11   price possible, if you're selling it, you want to

12   sell it for the most, so I understand that we're

13   on different sides.

14        Q.   Okay.

15        A.   Ultimately what I'm going to do is

16   tell you the truth about things.

17        Q.   Right.  And just to be clear, I just

18   want to make sure that we're all on the same page

19   here, you know, because sarcasm and that sort of

20   thing rarely shows up well on a cold deposition

21   transcript.  You're not suggesting that my

22   questioning in any way today has been abusive in

23   any way, correct?

24        A.   Not abusive.

25        Q.   Okay.  And what you're -- what you

Page 96

1    were just describing to me is that you're sort of

2    coming to the understanding that in this lawsuit,

3    there are sort of two parties on opposite sides of

4    the beat and I'm not asking you questions about

5    things that you believe are positive attributes of

6    John?

7              A.   Correct.

8              Q.   Okay.  So you said that you were

9    speaking with -- you spoke over the break with

10   your girlfriend about this deposition, right?

11             A.   Correct.

12             Q.   And did you speak with anybody else

13   besides your girlfriend?

14             A.   I did not.

15             Q.   Okay.  And did you look at any

16   documents or anything else for -- to clarify your

17   recollection of things that I've asked you about

18   today or to prepare for the testimony that you're

19   giving now?

20             A.   I scribbled down what exhibit

21   referred to what e-mail.

22             Q.   I see.  So you were just sort of

23   keeping track of what the deposition exhibits are

24   that I've asked you about today?

25             A.   Correct.

1          Q.   Okay.  Anything else that you did?

2          A.   No.  Got lunch.

3          Q.   Right.  What I meant was anything

4    else that you did to kind of prepare for your

5    testimony?

6          A.   As I mentioned, I thought about the

7    line of questioning that you're interested not in

8    any positive things, only about the negative

9    things.

10         Q.   Okay.  And so you just thought about

11   those things, right?

12         A.   Correct.

13         Q.   Okay.  Before the break we had marked

14   an e-mail as Deposition Exhibit 121.  Can you take

15   a look at that again?

16         A.   Okay.

17         Q.   Okay.  Other than this thirty

18   thousand dollar contribution that you made to

19   Cottonwood Law Center, have you made other

20   contributions of this size to Cottonwood Law

21   Center since that time?

22         A.   No.

23         Q.   And was there any sort of an

24   agreement about how John was to utilize the funds

25   that you gave him that are referred to in

Page 98

1    Deposition Exhibit 121?

2            A.    Not that I recall.

3            Q.    Okay.  Can you please take a look at

4    the document with the Bates stamp Big Sky 997

5    through 1000?

6                  MR. MORRIS:  Let's mark that as 124.

7                  (Exhibit 124, 12/9/19 e-mail exchange

8    between Ronald Meyer, John Meyer, and Fidelity

9    Charitable Fund, was marked for purposes of

10   identification.)

11   BY MR. MORRIS:

12           Q.    Mr. Meyer, will you please review

13   Deposition Exhibit 124 and tell me when you've

14   finished?

15           A.    Okay.

16           Q.    Okay.  So Deposition Exhibit 124 is

17   another e-mail you produced to us pursuant to the

18   subpoena, right?

19           A.    Correct.

20           Q.    Or e-mailed to me.  And it's from

21   December of 2019.  The subject of this e-mail is

22   contribution confirmation -- or this e-mail

23   exchange, correct?

24           A.    I'm seeing -- oh, maybe that's when

25   you guys printed it.  Okay, I do see December 9th,

Page 99

1   2019.

2          Q.   Right.  And this e-mail chain is

3   concerning other contributions that you made to

4   Cottonwood Law Center in 2019, correct?

5          A.   Correct.

6          Q.   And it's actually about two different

7   contributions that you made to Cottonwood Law

8   Center, right?

9          A.   I don't remember if it was two

10  different ones or not.

11         Q.   Okay.  So this e-mail chain concerns

12  a donation that you made to Cottonwood Law Center

13  through a link on Patagonia, right?

14         A.   Right.

15         Q.   And it also refers to a Fidelity

16  charitable contribution, right?

17         A.   Right.

18         Q.   Okay.  And -- so there's two

19  contributions that are being discussed in this

20  e-mail chain, right?

21         A.   It looks that way.

22         Q.   Okay.  Do you see on the page that's

23  Bates stamped Big Sky 999 the e-mail at the top of

24  the page that you wrote to John on December 9th,

25  2019, at 8:30 a.m.?

1               THE WITNESS:  Kathy, I don't see that

2    number.

3    BY MR. MORRIS:

4          Q.   It actually begins at the bottom of

5    the page of 998.

6          A.   I'm sorry, what was the question?

7          Q.   I'm just trying to get you oriented,

8    the e-mail that starts at the bottom of the page

9    on Big Sky 998.

10         A.   998 or 9?

11         Q.   It begins on 998.

12         A.   Okay.

13         Q.   Do you see that e-mail that you sent

14   to John?

15         A.   Tell me again the time.

16         Q.   It's the e-mail at the bottom of the

17   page that's Bates labeled Big Sky 998.

18         A.   8:30 a.m.

19         Q.   The time is 8:30 a.m.

20         A.   Okay.

21         Q.   Okay.  So you're indicating in that

22   e-mail to John that you had made a contribution

23   through the Patagonia Facebook page to Cottonwood,

24   right?

25         A.   I think that's in a different e-mail

Page 101

1    unless I am confused.

2         Q.   Do you see -- I'm sorry.  Do you see

3    a reference in that e-mail that's discussing your

4    intent to contribute to Cottonwood through

5    Patagonia Facebook or a link so that you could do

6    that?

7         A.   Well, maybe I can clear up the

8    confusion on my part and yours.  John had, to the

9    best of my knowledge, orchestrated a deal with

10   Patagonia that they would match contributions that

11   he received.  In order for the contribution to be

12   matched by Patagonia, you had to use their link,

13   and I think that I instead of giving him one

14   dollar amount thought well, I'll give him a

15   contribution through the Patagonia link and I'll

16   give him a contribution through the Fidelity

17   Charitable whatever it's called, the donor-advised

18   fund.

19        Q.   Okay.

20        A.   Does that make sense?

21        Q.   Yeah.  So you gave Cottonwood two

22   contributions, right?

23        A.   Correct.

24        Q.   And there was one through Patagonia

25   that you wanted to give him so that he could

Page 102

1    achieve the match that Patagonia had offered?

2         A.   Correct.

3         Q.   And then there was a separate one

4    that came through the Fidelity Charitable Fund,

5    right?

6         A.   Right.

7         Q.   And that one was significantly more

8    than what you gave through the Patagonia link?

9         A.   That's not my understanding.

10        Q.   Okay.  If you see -- if you look on

11   to the page that's Bates labeled Big Sky 999, do

12   you see the sentence that begins unfortunately?

13        A.   I do.

14        Q.   Okay.  Does that refresh your

15   recollection about the contribution that you made

16   through the Fidelity Charitable Fund being

17   significantly more than the one you made through

18   Patagonia?

19        A.   Are you looking for a specific dollar

20   amount?

21        Q.   Do you recall the specific dollar

22   amount?

23        A.   I don't.

24        Q.   Okay.  But you do --

25        A.   So if one was --

1          Q.   Now after having read that sentence,

2     the one through the Fidelity Charitable Fund was

3     significantly more than the one you made through

4     Patagonia, right?

5          A.   That is correct.  So if one was five

6     hundred and the other was a thousand, I don't

7     recall what the number is, but that's what I was

8     referencing.

9          Q.   Okay.  And do you have a ballpark

10    estimate of how much money you donated to

11    Cottonwood in December of 2019?

12         A.   I do not.

13         Q.   You couldn't say whether it was

14    thirty thousand dollars --

15         A.   I'm positive it wasn't thirty

16    thousand.  We already discussed that.  I've given

17    him thirty thousand one time.

18         Q.   Okay.  So you know that it was less

19    than thirty thousand, right?

20         A.   It was probably a thousand, maybe

21    two.

22         Q.   Maybe two thousand dollars you said?

23         A.   Maybe.

24         Q.   Can you go to the document that is

25    Bates stamped 1048, please, and we'll mark that as

Page 104

1    Deposition Exhibit 125?

2              (Exhibit 125, 1/6/19-1/8/19 e-mail

3    exchange between Ronald Meyer and John Meyer, was

4    marked for purposes of identification.)

5    BY MR. MORRIS:

6         Q.   And after you review that will you

7    let me know?

8         A.   I have reviewed it.

9         Q.   Okay.  So Deposition Exhibit 125 is

10   an e-mail exchange between you and John in January

11   of 2019, right?

12        A.   Correct.

13        Q.   And John had sent to you an IRS

14   letter about a donation that you had made to

15   Cottonwood?

16        A.   Correct.

17        Q.   And that's what this e-mail chain is

18   about, right?

19        A.   Yes.

20        Q.   So you had made a donation to

21   Cottonwood in 2018?

22        A.   Is there something that you're

23   referring to specifically for this one?

24        Q.   So do you recall making a donation to

25   Cottonwood Environmental Law Center in 2018?

1          A.    I don't recall anything specifically.

2    According to the letter -- or I'm sorry, the

3    e-mail here, I'm asking him for a document that

4    states that I've contributed.

5          Q.    Right.  So based on that, you would

6    agree with me that it appears that you did donate

7    to Cottonwood in 2018, right?

8          A.    Yes.

9          Q.    And can you tell me, do you have an

10   estimate of the total amount of money that you've

11   donated to Cottonwood Environmental Law Center

12   since it was formed?

13         A.    I don't want to hazard a guess.

14         Q.    Okay.  Do you know whether other of

15   John's family members, like his siblings, have

16   also donated to Cottonwood Environmental Law

17   Center?

18         A.    I'm sure they have.

19         Q.    And when you made the thirty thousand

20   dollar donation to Cottonwood Environmental Law

21   Center, you'll agree with me that was a

22   significant contribution, right?

23         A.    Yes.

24         Q.    And what was your understanding of

25   the purpose of that contribution?

1          A.   His purpose or my purpose?

2          Q.   His purpose.   John's purpose.

3          A.   If you're asking me do I know what he

4    did with the money, I do not.

5          Q.   Did he ask you to make a significant

6    contribution like that to Cottonwood?

7          A.   He did not.

8          Q.   Okay.  You just wanted to do that and

9    did; is that right?

10         A.   I retired in -- at Christmas of 2014.

11   The company I worked for has, my opinion, a kind

12   of strange policy and so anything you contribute

13   into a deferred compensation program, they send

14   you a check for everything that you've

15   contributed, and so on my part, there was a bit of

16   a windfall so he received -- or Cottonwood

17   received a large donation.

18         Q.   What do you recall regarding the

19   Fidelity Charitable Fund of grant money that you

20   gave to John, if anything?

21         A.   I don't understand the question.

22         Q.   Right.  So what is the Fidelity

23   Charitable Fund through which you donated money to

24   Cottonwood?

25         A.   What is it?

1          Q.    Yes.

2          A.    It's called a donor-advised fund, and

3    you can put stocks, bonds, money into that

4    donor-advised fund and then tell or suggest

5    contributions go to anybody that you want to.

6    They will review and approve typically.

7          Q.    Okay.  So they have to review it to

8    make sure that it's a charitable or a nonprofit

9    organization?

10         A.    That's my understanding, but I don't

11   know all of their rules.

12         Q.    Okay.  Mr. Meyer, what do you know

13   about how John's ski wreck on December 11th, 2015

14   occurred?

15         A.    What do I know about it?  Only things

16   that have been related to me.

17               (Technical difficulties.)

18               (Record read.)

19   BY MR. MORRIS:

20         Q.    And did you talk to Amanda Eggert

21   about how John's ski wreck on December 11th, 2015

22   occurred?

23         A.    I did speak to Amanda.

24         Q.    Okay.  And what did Amanda tell you

25   about how the ski wreck occurred?

1          A.   As I recall, Amanda and John started

2     off down the hill about the same time.  I believe

3     that Amanda lost a ski somewhere and that John

4     continued down the hill, and when she got to the

5     site of the accident, John had crashed and I don't

6     exactly know what or how that happened.

7          Q.   Okay.  And the things that you've

8     just told me are things that Amanda relayed to

9     you?

10         A.   Yes.

11         Q.   Okay.  Did Amanda tell you that John

12    was skiing fast on December 11th, 2015, prior to

13    his ski wreck?

14         A.   I don't recall that being a part of

15    the conversation.

16         Q.   Okay.  Did she tell you that John had

17    lost control?

18         A.   If she did, I don't recall that.  And

19    I think -- well, again, I don't know how she would

20    know that unless that it happened earlier on top

21    of the hill.

22         Q.   Right.  But what I'm asking is, did

23    she tell you that she believed John had lost

24    control uphill of the road or Cat track prior to

25    his wreck?

1         A.    I don't remember if she told me that

2    then or if through other conversations how the Cat

3    track information -- how I heard about it.

4         Q.    Okay.  And I just want to know if at

5    any time Amanda told you that she believed John

6    had lost control uphill of a road or a Cat track?

7         A.    I don't recall that.

8         Q.    Have you described to me everything

9    that you recall Amanda telling you about how

10   John's wreck occurred?

11        A.    What I recall from almost five years

12   ago was that it was a Friday afternoon, it seems

13   to me, like 2:30 in the afternoon.  Amanda had

14   called me, said that she and John were skiing.

15   Either at that time or some other time that she

16   had lost a ski and fallen, that John continued

17   down the hill.  When she arrived at the scene of

18   the accident, I think that there were already some

19   other people there.  I don't know that I know

20   anything else regarding that or that she said

21   anything about it additionally.

22        Q.    Okay.  So outside of that initial

23   call with Amanda, did you have occasion to have

24   other discussions with her about how she believed

25   John's ski wreck occurred?

1          A.    I probably chatted with her a couple

2    of times.   I don't recall any other details

3    surrounding the incident other than what I have

4    just related.

5          Q.    Can you repeat the last part of your

6    answer there?   You broke up.

7               (Record read.)

8    BY MR. MORRIS:

9          Q.    So other than Amanda telling you that

10   she lost her ski and that John then continued

11   down, you don't recall her telling you anything

12   else about how the wreck occurred, right?

13         A.    I don't.

14         Q.    Okay.

15         A.    Somewhere through the whole thing

16   somebody had said something about and I am

17   certainly not a skier, I thought something about a

18   Cat track, and I understand that's equipment that

19   they use to groom the trails or to groom the

20   mountain or whatever.

21         Q.    What you were just saying was that at

22   some point along the way somebody else besides

23   Amanda has talked with you about a Cat track?

24         A.    I don't know who told me about it.

25         Q.    But somebody talked to you about a

Page 111

1   Cat track; is that what you're telling me?

2        A.   Somebody told me that they thought

3   there was a Cat track involved.

4        Q.   Okay.  And what did they tell you

5   about a Cat track being involved, this person that

6   you can't recall?

7        A.   Well, my understanding of a Cat track

8   is that they use a piece of equipment to groom the

9   mountain or groom the trails and I'm guessing

10  because I don't know, that it's -- the Cat stands

11  for Caterpillar, a heavy-duty piece of equipment

12  that they use to groom the trails.

13       Q.   Right.  What I'm asking you is who --

14  I know you can't remember who told you about the

15  Cat track, but what was the substance of what they

16  described the Cat track being involved with

17  Mr. Meyer's wreck was?

18       A.   I guess as I think of a Caterpillar

19  and I think of the treads on that piece of

20  equipment, it typically chews up the dirt, the

21  snow, the road and makes it rough so I'm guessing,

22  because I was not there, guessing that the

23  Caterpillar was not grooming any trails, it was

24  driving somewhere, perhaps to the trails, and so

25  it left a rough, if you will, a rough set of

Page 112

1  snow -- or area of snow.

2          Q.   Okay.   Just so I'm clear, Mr. Meyer,

3  I'm trying to get out what other people told you

4  about how Mr. Meyer wrecked.   If you could limit

5  your responses to that subject, we could move on.

6  So did someone tell you that the Cat track was

7  somehow involved in Mr. Meyer's ski wreck?

8          A.   I had heard from someone that there

9  were some Cat tracks.

10          Q.   Anything else about that issue?

11          A.   No.

12          Q.   Okay.   And in your conversations with

13  Amanda, she never indicated to you that there was

14  a Cat track that was hard to see?

15          A.   I don't recall that being part of the

16  conversation.

17          Q.   All right.

18          A.   Is it possible?   Sure.

19          Q.   You have no recollection of her

20  saying anything like that?

21          A.   I just told you that someone told me

22  that they thought there was a Cat track there.

23          Q.   Right.   And you have no recollection

24  of Amanda telling you that there was a Cat track

25  that was hard to see that was involved in

1   Mr. Meyer's wreck, true?

2          A.   Are you -- if you're asking me to

3   state unequivocally that Amanda told me that, I

4   can't do that.

5          Q.   No, I'm not.  I'm not.  I'm asking

6   you for your recollection.

7          A.   Someone told me there was a Cat

8   track, whether it was Amanda, anybody else I might

9   have spoken to that afternoon, I have no clue.  My

10  son was just in a skiing accident and so I

11  probably wasn't the absolute best that I could be

12  that day.

13         Q.   Okay.  Can you please read --

14  actually, let me just ask it one more time because

15  I don't think that I've gotten a clear answer to

16  my question; and my question is, you do not have a

17  recollection of Amanda Eggert or anyone else

18  telling you that there was a Cat track that was

19  difficult to see that was involved in Mr. Meyer's

20  ski wreck, correct?

21         A.   Whether or not somebody said it was

22  difficult to see or not, I don't remember that

23  part of it.

24         Q.   So the answer to my question is no?

25         A.   The answer to your question is -- I

Page 114

1   almost feel like you're not listening, that you

2   don't want the answer that I keep giving you.

3          Q.   The answer to my question about

4   whether someone told you that a Cat track that was

5   difficult to see was involved in Mr. Meyer's wreck

6   is no?  You have no recollection of that, right?

7          A.   I don't recall someone saying that

8   the Cat track was difficult to see.  I recall

9   someone saying there was a Cat track.

10         Q.   Okay.  Thank you.

11              MR. MORRIS:  If we could show

12  Mr. Meyer the document with the Bates label Big

13  Sky 1071 through 1072.  Can we have that marked as

14  Deposition Exhibit 126?

15              (Exhibit 126, 12/11/15 e-mail from

16  Ronald Meyer to Dawn Dizney and others, was marked

17  for purposes of identification.)

18  BY MR. MORRIS:

19         Q.   Mr. Meyer, if you could please review

20  that document and tell me when you're finished.

21         A.   Okay.

22         Q.   Okay.  Deposition Exhibit 126 is an

23  e-mail that you sent to Dawn Dizney, Ryan Meyer,

24  and Pam Worthington on December 11, 2015 with the

25  subject matter John, correct?

Page 115

1          A.   Correct.

2          Q.   Okay.  And that is the day that John

3     was involved in the ski wreck that's at issue in

4     this case, right?

5          A.   Correct.

6          Q.   And you were telling Dawn, Ryan, and

7     Pam that you believe John lost control while

8     skiing and that he was not wearing a helmet,

9     right?

10         A.   Correct.

11         Q.   And that statement was based on

12    something that someone told you with how the wreck

13    occurred, correct?

14         A.   Correct.

15         Q.   And you believe the person who told

16    you that was Amanda Eggert, right?

17         A.   I'm sorry, what is the question?

18         Q.   And you believe the person who told

19    you that John had lost control was Amanda Eggert,

20    right?

21         A.   Yes.

22         Q.   So when you first spoke with John

23    after his ski wreck on December 11th, 2015, he

24    didn't remember the ski wreck, did he?

25         A.   He did not.

1          Q.   And, in fact, he didn't remember

2    details from that day, right?

3          A.   That's my recollection.

4          Q.   Okay.  And has John since you first

5    spoke about the accident ever told you how he

6    believed his wreck occurred?

7          A.   I don't think he knows.

8          Q.   Has John ever told you about the

9    testimony of the eyewitness of the ski wreck?

10         A.   No.

11         Q.   I didn't get your answer if you

12   responded.

13         A.   No.  I didn't know there was an

14   eyewitness.

15         Q.   Okay.  And have you ever seen any

16   pictures of the run that John was on prior to his

17   wreck?

18         A.   No.

19         Q.   Okay.

20              MR. MORRIS:  If you could please mark

21   the document Bates labeled Big Sky 996 as

22   Deposition Exhibit 127.

23              (Exhibit 127, 5/21/19-5/22/19 e-mail

24   exchange between Ronald Meyer and John Meyer, was

25   marked for purposes of identification.)

Page 117

1    BY MR. MORRIS:

2         Q.   Mr. Meyer, before we go on to

3    Deposition Exhibit 127, I forgot to ask you, are

4    you a skier?

5         A.   No.

6         Q.   And you've never skied at Big Sky

7    Resort, right?

8         A.   Correct.

9         Q.   Okay.  So Deposition Exhibit 127 is

10   another e-mail that you forwarded to us in

11   response to the subpoena, right?

12        A.   Correct.

13        Q.   And it contains a true and correct

14   copy of an e-mail exchange between you and John

15   Meyer on May 22nd, 2019, with the subject

16   contribution acknowledgment, right?

17        A.   Yes.

18        Q.   Okay.  And in the lower e-mail on

19   Deposition Exhibit 127 John is thanking you and --

20   for a contribution, correct?

21        A.   Correct.

22        Q.   He's also informing you that he asked

23   UnitedHealthcare for five million dollars to

24   settle his lawsuit against UnitedHealth, right?

25        A.   Right.

1          Q.   And that he'll be asking for more

2   than ten million dollars from Big Sky Resort to

3   settle that lawsuit, right?

4          A.   Right.

5          Q.   And then he asked for 2.2 million

6   dollars to settle on his binding lawsuit as well,

7   right?

8          A.   Correct.

9          Q.   And all of these lawsuits stem from

10  John Meyer's ski wreck at Big Sky on December 11,

11  2015, right?

12         A.   As far as I know.

13         Q.   All right.  And John had blamed his

14  ski wreck on his Dynafit bindings, right?

15         A.   I wasn't involved in the lawsuit

16  so -- I do see he's saying I asked Dynafit for 2.2

17  million to settle on the binding lawsuit.

18         Q.   Right.  And you know that John sued

19  the manufacturer of the bindings that he was

20  skiing on on December 11th, 2015, because he

21  believed that those bindings were defective,

22  right?

23         A.   He did tell me that.

24         Q.   That's what that reference is to,

25  that binding lawsuit, right?

1          A.    Right.

2          Q.    And he also was suing

3    UnitedHealthcare because he believed that it had

4    improperly handled his insurance coverage that was

5    provided to him for the medical bills incurred

6    related to this ski wreck, right?

7          A.    That's my understanding.

8          Q.    And then he also sued Big Sky because

9    he blamed Big Sky for his ski wreck as well,

10   right?

11         A.    I have not seen the lawsuit so that

12   would be a great assumption.

13         Q.    You understand that John is blaming

14   Big Sky Resort for his ski wreck, right?

15         A.    I think he believes that they have

16   some involvement.

17         Q.    Okay.  And in total, as represented

18   in Deposition Exhibit 127, John is seeking 17.2

19   million dollars related to his ski wreck on

20   December 11th, 2015, right?

21         A.    That's what he's stating, yes.

22         Q.    And do you have an understanding of

23   why John wrote this e-mail to you and provided you

24   with this information?

25         A.    Absolutely no clue.

1          Q.   Okay.  Deposition Exhibit 127, is

2    this a complete e-mail chain or is some of it

3    missing, do you know?

4          A.   I don't think it's missing, but if

5    you want me to swear to that, I can't -- won't.

6          Q.   If you don't know, you don't know.

7          A.   I don't.

8          Q.   That's fine.  So do you recall being

9    sent this e-mail from John?

10         A.   I do.

11         Q.   Okay.

12         A.   I do.

13         Q.   And was this, from your perspective,

14   kind of out of the blue that he would sort of tell

15   you all these things, what he was asking for in

16   these three lawsuits?

17         A.   Well, to me it makes a little sense,

18   going back to the contribution acknowledgment, if

19   he's saying hey, I received your contribution, it

20   kind of ties into hey, by the way, I'm asking

21   these folks for these dollar amounts.

22         Q.   Right.  So he's indicating to you

23   that, you know, after I get through these other

24   lawsuits, Cottonwood will be on good financial

25   footing?

Page 121

1          A.   You're asking me to get inside of his
2     head and determine what he was thinking and I
3     can't do that.
4          Q.   I understand that, but that is how
5     you understood the reason for him informing you of
6     this when he did in this e-mail with the subject
7     contribution acknowledgment, right?
8          A.   I don't know if I would go that --
9     because I would kind of say it's oh, by the way,
10    here's what I'm working on or here's what I'm
11    trying to do.
12         Q.   Okay.  And as you sit here today, do
13    you know what happened with the UnitedHealthcare
14    case?
15         A.   I do not.
16         Q.   Do you know whether or not that's
17    been resolved?
18         A.   I don't know.
19         Q.   And do you know whether or not John's
20    lawsuit against Dynafit has been resolved?
21         A.   I think it has.  I have no knowledge
22    of the details.  But, again, I'm not even positive
23    of that.
24         Q.   All right.  Do you believe that John
25    has an issue with accepting personal

1    responsibility for this ski accident?

2            A.   I don't know if he does or not.

3            Q.   Okay.  You agree that a skier has the

4    responsibility to control his course speed at a

5    ski resort, do you not?

6            A.   I stated earlier I'm not a skier so I

7    don't know what their responsibilities or duties

8    are.

9            Q.   Okay.  You are aware of a

10   counterclaim filed by Big Sky against John Meyer?

11           A.   He had told me that there has been a

12   counterclaim.

13           Q.   What did John tell you about that?

14           A.   That there was a counterclaim.

15   Again, I don't know any of the details what the

16   counterclaim was for or about.

17           Q.   He just simply told you that there

18   was a counterclaim made by Big Sky against him; is

19   that right?

20           A.   Right.

21           Q.   Okay.  And what's your understanding

22   of why John Meyer has sued Big Sky Resort?

23                MS. WALAS:  Objection.  Calls for

24   speculation.

25                THE WITNESS:  And I'll answer that.

1    Again, you are asking me what John was thinking,

2    and I can't get inside of his head or really

3    answer for him.  I'm guessing he thinks that --

4    why else would you file a lawsuit unless you

5    thought Big Sky did something incorrect or wrong?

6    BY MR. MORRIS:

7             Q.   Has John ever told you why he sued

8    Big Sky?

9             A.   I don't think so.

10            Q.   You don't have any recollection of

11   any conversations with him about why he's suing

12   Big Sky?

13            A.   Nothing I recall.

14            Q.   Okay.  Other than telling you that

15   there was a counterclaim, has John had any

16   conversations with you about Big Sky's

17   counterclaim against John?

18            A.   I recall him telling me that there

19   was a counterclaim.  I have no knowledge of any

20   specifics.

21            Q.   Okay.  And has he talked to you about

22   how the counterclaim has affected him?

23            A.   No.  I don't know that it's had any

24   effect.  I don't know anything about it.

25            Q.   Okay.

Page 124

1           MR. MORRIS:  Mr. Meyer, that's all

2    the questions I have for you at this time.  I

3    think that Breean will have some questions for

4    you, but that's all I have right now so thank you.

5           MS. WALAS:  I do have a few

6    questions.  Can we go ahead and take like a ten --

7    let's say fifteen-minute break, that way I might

8    be able to narrow them down a little bit.

9           MR. MORRIS:  All right.  Sounds good.

10          (Pause in proceedings.)

11           CROSS-EXAMINATION

12   BY MS. WALAS:

13        Q.   Ron, we're back on the record and

14   you're aware that you're still under oath?

15        A.   I am.  Sorry, I said I am.

16        Q.   I know and then a giant

17   eighteen-wheeler passed by and I just had to wait

18   a second to talk just a little bit longer.

19           Now, I want to ask you a question

20   that might seem off the wall to start with but I

21   don't think we got this on the record yet, but you

22   are aware that John was in a ski wreck at Big Sky,

23   correct?

24        A.   Right.

25        Q.   And when was that ski wreck?

Page 125

1          A.    December 11, 2015.

2          Q.    Okay.  And when was the last time you

3    saw John before the ski wreck on December 11th,

4    2015?

5          A.    I would guess, and I apologize, my

6    guess would be in Belize, like May 5th to the 9th,

7    or something like that, of 2015.

8          Q.    And is that the Belize trip that you

9    were speaking to Mr. Morris about?

10         A.    Correct.

11         Q.    Okay.  And describe John on that

12   trip.

13         A.    Well, I thought he had fun.  You

14   know, I -- and I apologize because some dates five

15   years later run together.  I think that he had

16   pretty recently stopped drinking any alcohol, and

17   I think that was probably challenging, interesting

18   if any of us had a beer around the pool or out to

19   eat, but I guess I would say generally he seemed

20   okay, good.

21         Q.    And what sort of activities or things

22   did you and John do on that trip?

23         A.    Well, you guys have probably looked

24   at the e-mail, you might know better than I what I

25   had planned.  We did a snorkeling adventure.  I

Page 126

1  remember my girlfriend Pam, Dawn, John swimming

2  with the sharks at the end of that adventure.  We

3  did a tubing adventure where with a guide we went

4  through an underground river floating on the tube

5  on your back with a headlamp.  With the guide

6  they, not me, they jumped off of a, I don't know,

7  some sort of -- it certainly wasn't a cliff but

8  jumped into some large pool.  Those are the things

9  I recall off the top of my head.

10       Q.   And you said not me on the cliff

11  jumping part.  Do you consider yourself to be more

12  cautious when it comes to outdoor recreation

13  activities than John?

14            MR. MORRIS:  Objection.  Misstates

15  the testimony.

16  BY MS. WALAS:

17       Q.   Taking away the cliff part, the

18  jumping part you were discussing.

19       A.   Yeah, and it's probably, I didn't

20  know because I didn't do it, a twenty or thirty

21  feet jump into a large pool of water.  They

22  followed the guide and did it.  And would I

23  consider myself to be more cautious?  Absolutely.

24  If any of you guys were sixty-seven years old,

25  you'd find that you're not going to do a whole lot

Page 127

1  of cliff jumping. I did attempt a little bit of

2  the Appalachian trail this year, and he was

3  supposed to go but he said I'm too busy and I've

4  got too many other things to do, so.

5      Q. Okay. And going back to that Belize

6  trip, is there anything that the two of you did,

7  just you and John?

8      A. I don't recall anything.

9      Q. And where was John working at the

10 time of that trip?

11     A. I think he was doing Cottonwood Law.

12     Q. So he hadn't yet started the job at

13 WildEarth?

14     A. I'm pretty sure that -- as Mac

15 stated, that would have been like October of 2015

16 when he started that job.

17     Q. Okay. Now, how did you find out

18 about John's ski wreck?

19     A. Amanda Eggert called me 2:30 or so

20 the afternoon of December 11th.

21     Q. And just to clarify because I know

22 we're in different time zones, was that 2:30 --

23     A. 2:30 my time.

24     Q. -- Ohio time?

25     A. So 2:30 eastern time.

Page 128

1          Q.   And what would that be mountain time?

2          A.   I think you guys are two hours

3     different so I'm showing it's like ten to 4:00.

4     Are you guys ten to 2:00?  I'm guessing that would

5     have been --

6          Q.   You broke up.

7          A.   I'm guessing that would have been

8     12:30 mountain time.

9               MS. WALAS:  The court reporter, were

10    you able to get his entire answer.  He broke up a

11    little bit on my end.

12              THE NOTARY:  Yes.

13    BY MS. WALAS:

14         Q.   All right.  Tell me about that call.

15         A.   As I said, my guess was that it was

16    2:30 eastern time, making it 12:30 mountain time.

17    She indicated that she and John were at Big Sky,

18    had started down the mountain, that -- well, first

19    of all, I had no clue who she was because I never

20    heard of her before, I had never spoken to her

21    before.  So there was a little bit of getting to

22    know who and what she was to him and what they

23    were doing.

24              It sounds like they had started down

25    the hill.  As I indicated, I think she lost a ski

Page 129

1   or something and he had gone down ahead of her.

2   When she got to the site, there were some other

3   people at the site of the accident.

4          Q.   And do you have Deposition Exhibit

5   126 in front of you?

6          A.   I do.

7          Q.   And do you recall writing this

8   e-mail?

9          A.   I do.

10         Q.   How long after speaking to Amanda did

11   you write this e-mail?

12         A.   I'm going to guess five and a half

13   hours just based upon the time because I see that

14   it says 8:06 p.m. and I thought she called around

15   2:30 that afternoon.

16         Q.   And what were you thinking as John's

17   dad as you were writing that e-mail?

18         A.   I guess I was just trying to bring

19   his sister, brother, and Pam into the loop

20   regarding what had happened.  I don't know if I

21   had sent something attached.  No.  Just trying to

22   bring everybody into the loop.

23         Q.   And besides writing this e-mail, what

24   did you do after you got that call?

25         A.   Well, I see here the contact at Big

1   Sky, this Steve Emerson, I'm pretty sure I spoke

2   with Steve Emerson.  I don't know if I talked to

3   Tina Deweese or not.  I made arrangements to fly

4   out to Billings.  I guess I also spoke to this

5   Dr. Ron Winters.  I don't honestly recall that.

6           Q.   Now, did you know that John was going

7   skiing that day?

8           A.   I did not.

9           Q.   And I think you said -- did you say

10  you booked a flight?

11          A.   That day?

12          Q.   Yes.

13          A.   It was one of those e-mails that's in

14  that.  Probably number seventy-seven dated

15  itinerary Cincinnati is my guess, but I'm not sure

16  of that.

17          Q.   But you did fly out to Billings to

18  see John?

19          A.   Saturday morning I drove down to

20  Cincinnati, Ryan at the time was living in

21  Cincinnati, left my vehicle at his place and he

22  drove me to the airport and I flew to Billings the

23  12th.

24          Q.   Okay.  And -- so you arrived -- did

25  you arrive at the hospital on the 12th?

Page 131

1          A.   Yes.

2          Q.   And what did you do when you got to

3    the hospital?

4          A.   Found John in his room.  And I -- go

5    ahead.

6          Q.   So you found John in his room.  Where

7    was his room at?

8          A.   I do not recall the room number.  I'm

9    going to guess, and it's only my guess, that he

10   was in some sort of intensive care unit -- yeah,

11   I'm pretty sure he was in an intensive care room.

12   I know intubated and in bed, so.

13         Q.   Did you get to see John when you got

14   to the hospital?

15         A.   I did.

16         Q.   And what did you see?

17         A.   As I had just mentioned, I saw that

18   John was intubated.  You know, I don't -- I think

19   that there was a bandage on his head.  He had the

20   compression stockings on, hooked up to a number of

21   IVs.

22              MR. MORRIS:  I have him frozen and

23   silent.  The last thing I heard he was hooked up

24   to an IV.  Was that the end of his testimony?

25              THE NOTARY:  Yes.

Page 132

1    BY MS. WALAS:

2         Q.   Now, were you able to talk to John?

3         A.   No, no, not for a number of days.

4         Q.   Were you able to speak to anyone at

5    the hospital about John?

6         A.   I'm sure that I spoke to some doctors

7    and some nurses.  I think that Bethany Cotton, one

8    of the attorneys at WildEarth Guardians, had

9    already gotten there and was there in the room.

10        Q.   And is there anything that you

11   learned at that initial visit about John's wreck

12   itself?

13        A.   I probably learned a bit about some

14   of the injuries.  That there was a traumatic brain

15   injury.  That his, it seems to me, left clavicle

16   was broken.  That he had some bruised or broken

17   ribs.

18        Q.   And what did you do next -- strike

19   that.  That's really broad.

20             What did you do next in relation to

21   being with John while he was in the hospital?

22        A.   You know, I had -- I rented a motel

23   room.  Whether or not I spent that first night

24   with him or in the motel, I have no clue.  I think

25   I asked the hotel to reserve a room for me a

1   number of nights and over the next few nights,

2   some nights I spent at the hotel and some nights I

3   just spent in the hospital.

4          Q.   How many days was John in the ICU?

5          A.   Sorry.  I don't exactly know how many

6   days he was in the ICU.  I know he was in the

7   Billings Clinic from the afternoon of the 11th

8   when he arrived until December 24th.  On the 23rd

9   Amanda had brought his vehicle -- again, sorry.

10  Amanda had brought his vehicle over on the 23rd

11  and I -- they released John from Billings Clinic

12  on December 24th and I drove him from Billings

13  over to Missoula to the physical therapy or rehab

14  hospital facility.

15         Q.   And while John was at the hospital in

16  Billings, how often did you see him?

17         A.   Every day.  My typical routine would

18  be to arrive at 7:00, 8:00 o'clock in the morning

19  and leave 7:00 or 8:00 o'clock at night.

20         Q.   Were you involved in the medical

21  decisions for John?

22         A.   I don't recall making any real

23  medical decisions for him.

24         Q.   Was John in a coma while he was in

25  the hospital at Billings?

Page 134

1          A.   My understanding is that he was when

2     he first arrived.

3          Q.   Do you know when John woke up from

4     the coma?

5          A.   I do not.

6          Q.   Did John recognize you at any point

7     while he was in the Billings Hospital?

8          A.   Yes, at some point, and I don't know

9     that I would hazard a guess how many days he had

10    been in there before he did.

11         Q.   How did you know that he recognized

12    you?

13         A.   He called me dad.

14         Q.   That's a pretty good sign.  Did he

15    say anything besides dad?

16         A.   Early on he was not very coherent.

17    He struggled to get his bearings.

18         Q.   Okay.  And you said he was

19    transferred to a rehab facility?

20         A.   Well, like 10:00 o'clock in the

21    morning on the 24th of December, 2015 Billings

22    Clinic released him.  There was a facility in

23    Missoula where his apartment was at and so I drove

24    him pretty well across Montana to get him to that

25    facility.  I think they told me I had to be there

Page 135

1   by 4:00 o'clock or something in the afternoon or

2   they couldn't take him until sometime after

3   Christmas.

4          Q.   So you mentioned Christmas.  How did

5   you spend Christmas 2015?

6          A.   In the hospital.  I'm sorry, at the

7   Missoula rehab facility.

8          Q.   And so who was all there?  Was it

9   just you and John?

10         A.   I don't -- our plans, it seems to me,

11  was that for Christmas of 2015 the kids were

12  supposed to be -- my kids were all supposed to be

13  coming up to the house and celebrating Christmas

14  at my house in Ohio.  I'm thinking that in that

15  mix of e-mails there was probably some sort of

16  confirmation that I had booked a ticket for John

17  and I think that his sister Dawn was flying in and

18  Ryan was just going to drive up from Cincinnati

19  and because of the incident, as I said, I flew out

20  to Missoula.  I believe that Dawn paid some sort

21  of penalty and -- well, I know that she flew out

22  to Missoula to the rehab facility.  When exactly

23  she arrived, I'm sorry, I don't remember.

24         Q.   So just to clarify, for sure it was

25  just you and -- for sure you and John spent

Page 136

1   Christmas 2015 together in the rehab facility; is

2   that correct?

3           A.   I am positive of that.

4           Q.   And you don't know if Dawn had got

5   there yet?

6           A.   I think it was another day or so

7   before she got there, but I'm not positive.

8           Q.   Did Ryan make it out to the hospital?

9           A.   He did not.

10          Q.   And do you know if Amanda was with

11  you all on Christmas?

12          A.   I do not remember.

13          Q.   Any of John's other friends?

14          A.   Whether it was Christmas Day or not,

15  or Christmas Eve, I don't remember.  It seems to

16  me that one of Amanda's -- maybe her twin sister

17  actually worked at that or a nearby facility and I

18  think that one of his friends stopped in.

19          Q.   Now, did you -- what did you guys do

20  for the day?

21          A.   Well, I don't recall anything

22  specific.  He was doing all kinds of therapies so

23  they were teaching him how to walk, how to be safe

24  in the kitchen.  And I apologize, I don't remember

25  exactly what they call it, there was like three

1   different kinds of rehabilitation processes -- or

2   therapies that went on.

3        Q.   Okay.  Would you just -- how would

4   you describe the day itself?  Was there a festive

5   spirit with it being Christmas?

6        A.   I don't recall any festive spirit.

7   Sorry.

8        Q.   What was the spirit -- sorry, I can't

9   think of another way to describe, you know, the

10  feel or mood of the room.  You know, what was the

11  spirit of John's room on Christmas with you?

12       A.   I don't remember doing anything

13  special for him or getting him anything.  He was

14  still struggling to figure out who he was and

15  where he was and what we are doing.

16       Q.   And was that -- tell me how that

17  compares to Christmas the year before, Christmas

18  of 2014?

19       A.   Well, that was a pretty happy time

20  for me because December 24th of 2014 was my last

21  day working and so that was a pretty upbeat day

22  for me.

23       Q.   All right.  So a little bit different

24  way to have Christmas in 2015 than 2014?

25       A.   Absolutely.

1          Q.   Okay.  I want to talk a little bit

2   about the rehab facility you mentioned in

3   Missoula.  How long was John there?

4          A.   You know, exactly I don't recall.  I

5   do remember getting him there by 4:00 o'clock on

6   the 24th of December.  My guess, and it's only a

7   guess, would be an additional two weeks or so.

8          Q.   Okay.  And can you describe that

9   rehab facility for me?

10         A.   You know, I was okay with -- the room

11  was nice.  The nurses and the physical therapists

12  were all pleasant.  They would typically schedule

13  like a.m. sessions and p.m. sessions.  Most of the

14  time, if I could, I would go to those where they

15  would teach him or have him walk up steps or down

16  steps.  It seems to me they taught him -- they had

17  like a little kitchen that they taught him how to

18  turn on a -- like a burner on a stove.  Boy, I'm

19  sorry, because they -- it seems to me they also

20  worked with him on some speech things as well to

21  make sure that he spoke better and understood what

22  people were saying.

23         Q.   So you were present during John's

24  rehabilitation sessions?

25         A.   A lot of it, yes.

1          Q.   Did you participate in those

2     sessions?

3          A.   Not typically.  I was usually just an

4     observer.

5          Q.   Okay.  Did you ever have any

6     discussions with any of John's therapists?

7          A.   I'm sure some.  How is he doing and

8     what does he need to work on and how can he get

9     better.

10              MS. WALAS:  Okay.  I'm going to go

11     ahead and ask the court reporter to hand you

12     what's marked JM7388 at the bottom.  This says

13     Community Medical Center at the top of that

14     document to help you identify it.

15              (Exhibit 128, Community Medical

16     Center physician progress note dated 1/10/16, was

17     marked for purposes of identification.)

18     BY MS. WALAS:

19          Q.   Now, Ron, have you had a chance to

20     look at Depo Exhibit 128?

21          A.   I have not, that I recall.

22          Q.   Let me clarify that.  Have you had a

23     chance to look at it right now?

24          A.   I am doing it right now.  Sorry.

25          Q.   And have you seen it before right

Page 140

1   now?

2          A.   Give me a minute and I'll be able to

3   tell you a little better.  Breean, I apologize, I

4   do not really recall seeing the document.  Might I

5   have?  Perhaps.

6          Q.   Okay.  So looking at Deposition

7   Exhibit 128, is Community Medical Center the rehab

8   facility in Missoula?

9          A.   Yes.

10         Q.   And do you remember meeting with a

11  Dr. William Hahnstadt there?

12         A.   Reading the context of the message,

13  it appears as though he interviewed John, but I

14  don't actually recall Dr. Hahnstadt.

15         Q.   Okay.  Do you recall -- you don't

16  recall your meeting with him at all?

17         A.   I don't recall anything specific

18  regarding this.

19         Q.   And so you don't know what you

20  discussed with him that day?

21         A.   I could not say for certain.  What

22  I -- Breean, what I find interesting is that it

23  says patient seen alone in a.m., and when I look a

24  little higher in the note it says -- I don't know

25  how he could have -- does this got a date on it

Page 141

1   and I'm missing it?

2          Q.   The date, to refresh your

3   recollection about this meeting, the date is

4   located in the right column under the physician

5   progress note, there's a service date and time

6   header on the left and then the date is on the

7   right.

8          A.   So the date 12 --

9          Q.   Do you see that?

10         A.   The date 12/24.

11         Q.   No, a little bit lower there's a

12  date -- service date and time of January 10, 2016.

13  Does that refresh --

14         A.   Okay.  So this was --

15         Q.   -- your recollection of your meeting

16  with Mr. Hahnstadt?  Can you let me finish my

17  question, please?

18         A.   Sorry.

19         Q.   Does the date of January 10th, 2016,

20  refresh your recollection about meeting with

21  Dr. Hahnstadt?

22             MS. WALAS:  Objection.  Foundation.

23             THE WITNESS:  Well, I'm sorry, I was

24  a little confused because it -- could -- would

25  Dr. Hahnstadt been one of his doctors?  I'm sure

Page 142

1    because the document indicates that.  I do not

2    recall anything specific about this particular

3    incident.

4    BY MS. WALAS:

5           Q.    All right.  While John was in the

6    rehabilitation facility in Missoula, how often did

7    you visit him?

8           A.    Every day.

9           Q.    And on those daily visits how often

10   did you speak with his medical care providers?

11          A.    Probably almost every day also.

12          Q.    Now, at any point during your time at

13   the rehab facility did you have any discussions

14   about the costs John was incurring?

15          A.    I'm sure that I did.

16          Q.    Who would those discussions have been

17   with?

18                MR. MORRIS:  Objection.  Foundation.

19                THE WITNESS:  I'm sorry, I don't

20   recall anybody specifically that I had

21   conversations with.

22   BY MS. WALAS:

23          Q.    Now, when John was at the hospital

24   previously when you were there, did you have any

25   discussions with anyone at the hospital about the

Page 143

1    costs John was incurring?

2        A.    Again, I'm sure that I did, but I

3    don't recall anybody or anything specific.

4        Q.    Now, have you had any discussions

5    with John about the costs he incurred related to

6    the ski wreck?

7        A.    I specifically recall talking to him

8    about the cost of the CareFlight.  I think that

9    the folks that provided the CareFlight had called

10   me a few times looking for reimbursement for the

11   CareFlight.  Details surrounding that, I don't

12   have any.

13       Q.    And you said you got a call about the

14   CareFlight.  Did you make any payment in response

15   to that call?

16       A.    I don't recall paying them any of

17   that.

18       Q.    Okay.  Now, have you ever looked at

19   any of John's medical bills?

20       A.    I'm sure that I have seen some of

21   those.  As mentioned earlier when Mac was

22   questioning, I had kept some kind of notebook and

23   had some kind of information in that notebook.

24   Specific details, I don't have any.

25       Q.    And you testified earlier that you

Page 144

1    have produced e-mails in response to a subpoena;

2    is that correct?

3            A.    Correct.

4            Q.    And I'm going to ask the court

5    reporter to hand you what's labeled as e-mail 36.

6                 MS. WALAS:  Will you mark that as

7    Exhibit 129?

8                 (Exhibit 129, e-mail with CAT scan

9    records attached, was marked for purposes of

10   identification.)

11   BY MS. WALAS:

12           Q.    All right, Ron, you have depo Exhibit

13   129 in front of you right now?

14           A.    I do.

15           Q.    And can you identify what that is?

16           A.    If I can read it, it says reason for

17   exam, two-week follow-up, intracranial TBI.  It

18   seems to me it was a follow-up where they're

19   comparing John's head injuries two weeks later --

20   or two weeks after the accident.

21           Q.    Let me narrow that question.  Is that

22   e-mail one of the documents that you produced in

23   this case?

24           A.    It is.

25           Q.    Okay.  And what is that e-mail --

Page 145

1    what is the topic of that e-mail?

2         A.   They're following up regarding the CT

3    scan of John's head.

4         Q.   And is that a medical record that you

5    found in your e-mail when you were looking for

6    responsive documents?

7         A.   It is.

8         Q.   And do you recall reviewing that

9    record previously?

10        A.   Reviewing it with you folks today or

11   looking at it before?

12        Q.   Looking at it when you received --

13   when you got it.  Like looking at it prior to

14   right now.

15        A.   I do remember reviewing it.  I would

16   also admit that I'm out of my league when it comes

17   to knowing what the heck they're talking about

18   with a CT head contrast.

19        Q.   Okay.  I'm going to -- do you recall

20   meeting with any pastors while John was in the

21   hospital?

22        A.   That almost sparks a memory, but I

23   don't recall a pastor exactly.  Sorry.

24        Q.   I'll ask the court reporter to hand

25   you what's marked JM7304 and we'll go ahead and

Page 146

1    mark that as Depo Exhibit 130.

2                    (Exhibit 130, Community Medical

3    Center pastoral care document dated 1/6/16, was

4    marked for purposes of identification.)

5    BY MS. WALAS:

6           Q.   Now, do you have that Depo Exhibit

7    130 in front of you?

8           A.   I do.

9           Q.   And does that refresh your

10   recollection about a pastor while John was in the

11   hospital?

12                   MR. MORRIS:  I'm going to object.

13   The question assumes facts.  Foundation.

14                   THE WITNESS:  John saw a lot of

15   folks, I saw a lot of folks there.  I don't

16   specifically recall a pastor.

17   BY MS. WALAS:

18          Q.   So you just remember that you met

19   with a lot of people and had a lot of discussions?

20          A.   Absolutely.

21          Q.   Okay.  Am I remembering this

22   correctly that you moved to Montana?

23          A.   I did not move to Montana.  I spent

24   December 12th of 2015 until something like January

25   26th of 2016 in Montana.  Forty-two days it seems

Page 147

1    to me.

2         Q.   Okay.  And where did you stay during

3    that time?

4         A.   The first couple weeks either in a

5    hotel or in John's room.  When I transferred him

6    to Missoula from Billings, you know, I don't

7    remember the first day or two.  Eventually I was

8    able to catch up to his landlord and get some

9    information and figure out keys and codes to get

10   into the apartment that he had there.

11        Q.   And did you ever stay in John's

12   apartment in Missoula?

13        A.   Yes.  I stayed there probably from

14   like the 26th of December until January 26th, the

15   following year.

16        Q.   Is that how your notebook ended up

17   there?

18        A.   Yeah.  Absolutely.

19        Q.   Now, speaking of notebooks, has John

20   ever shared his writings or musings with you?

21        A.   I've seen some of his stuff but very

22   little of his stuff.

23        Q.   Have you ever seen what appears to be

24   entitled Wilderness?

25        A.   I don't recall that.

Page 148

1          Q.   If I showed you Wilderness, would you

2    recognize it?

3               MR. MORRIS:  Objection.  Vague.

4               MS. WALAS:  I'll rephrase that.

5    BY MS. WALAS:

6          Q.   If I showed you the document that I

7    am talking about, which I've identified as

8    Wilderness, do you think that would refresh your

9    recollection on whether you've seen it before?

10              MR. MORRIS:  Speculation.

11              THE WITNESS:  I can't say for sure.

12   BY MS. WALAS:

13         Q.   Now, do you remember if any of the

14   doctors ever told you whether John would walk

15   again?

16         A.   I don't recall having that specific

17   conversation.

18         Q.   Do you recall ever having that

19   conversation with John?

20         A.   I do not.

21         Q.   Has John ever thought he was not

22   going to walk again?

23              MR. MORRIS:  Objection.  Calls for

24   speculation.

25              MS. WALAS:  I actually would agree

1   with Mac on that and I'll withdraw the question.

2            THE WITNESS:  That's fine.

3   BY MS. WALAS:

4        Q.   Now, while John was in the hospital

5   and the rehab facility, who was the responsible

6   person for making decisions regarding his medical

7   care?

8        A.   I'm sure some of that -- I thought I

9   saw a name that rang a little familiar to me.

10  This Dr. Manolitsis I thought was kind of his key

11  guy, and something unusual about him, like he was

12  on loan from another facility or something is what

13  I recall.  If you're asking if I made any

14  decisions regarding his care, I'm sure that I made

15  some of them.  Nothing specifically, again, that I

16  recall.

17       Q.   You don't know whether you were kind

18  of designated as the person to make the decisions

19  when John was unresponsive or unable to make his

20  own decisions?

21       A.   I'm sure that I did some power of

22  attorney things.  I don't know if that was

23  regarding any of his student loans or something at

24  the hospital.  Sorry.

25       Q.   Okay.  And since we're talking about

the hospital, did you -- did you take any pictures of John while he was in the hospital?

A. I did. I was a little slow. I didn't get any on the first couple of days. I want to say one of the e-mails is titled something like day three and he's laying in the hospital bed and there's a picture of him.

Q. Okay. So you gave us the photos that you took as part of your subpoena document production?

A. Correct.

Q. All right. I'm going to ask the court reporter to show you all those photos, that thing that came in last, e-mails thirty-five to forty-seven, and mark that as Deposition Exhibit 131, please?

(Exhibit 131, twelve photos, was marked for purposes of identification.)

BY MS. WALAS:

Q. Do you have that in front of you?

A. I have quite a few pictures in front of me.

Q. Okay. And are those the pictures that you produced -- I'm sorry. Strike that.

Are those the pictures that you took

of John while he was in the hospital?

A. Yes.

Q. Are any of those pictures that you took while he was in the rehab facility?

A. The -- a couple of these -- well -- the first two photos that I have are him laying in bed, intubated, hooked up to some IVs and monitors and stuff. The third photo I have is of his left clavicle. That would also be in the Billings Clinic. I think this one said something about sitting up in a chair, and that was the first time he was out of bed and in a chair. The next --

Q. All right, Ron, let me interrupt you real quick because I believe that the pictures might have gotten mixed up a little bit from how they were sent. So when you're identifying the photo, is there an e-mail tag at the top, like an e-mail number?

A. Okay. The first -- or one of the photos is titled three days after accident. It's dated 5/11/16.

Q. Okay. And those e-mails -- you took the photos attached to the e-mails that you produced --

A. I did.

1          Q.   -- is that correct?

2          A.   That's correct.

3          Q.   And are the pictures in front of you

4    accurate representations of the photos that you

5    took?

6          A.   Yes.

7          Q.   Okay.  Thank you.  Now, I want to --

8    speaking of the subpoena response, now, you were

9    asked a lot of questions about the subpoena

10   production.  I believe that was Exhibit Number

11   118?

12         A.   Yes.

13         Q.   Okay.  And, now, did you make your

14   best efforts to respond to this subpoena?

15              MR. MORRIS:  Objection to leading.

16              THE WITNESS:  I made my best effort

17   to send everything that I had.

18   BY MS. WALAS:

19         Q.   Now, you were asked a lot of

20   questions about text messages, and before I get

21   into that I just want to ask, and I think you said

22   it earlier, how old are you?

23         A.   Sixty-seven.

24         Q.   Okay.  And are you a big texter?

25         A.   I am not a big texter.  I am not a

Page 153

1   big techy.

2          Q.   Okay.  If you're like my mom, you

3   would prefer me to call her -- or you would prefer

4   a call than a text, is that an accurate

5   representation?

6                MR. MORRIS:  Objection.  Leading.

7                THE WITNESS:  I'll do either way.

8   Either way is fine.

9   BY MS. WALAS:

10         Q.   Okay.  So when we're talking about

11  text messages, I think you said, and please

12  correct me if I've written this down wrong, you

13  put quote, I regularly delete text messages from

14  my phone.  Is that an accurate reflection of your

15  testimony?

16         A.   Yes.

17         Q.   And when did you kind of start that

18  process?

19         A.   Exactly I don't know.  When I get

20  what I consider too much or too long of a string,

21  I will delete it.

22         Q.   And you talked a little bit about

23  John always being outdoorsy.  Do you recall that?

24         A.   I do.

25         Q.   And I think you mentioned a bow

Page 154

1   hunting story?

2        A.   One of my first recollections of John

3   and outdoorsy would be we were living in Indiana

4   and we'd bow hunt.  But our adventures have always

5   been, particularly since his mom passed away,

6   outdoorsy with canoe trips and kayak trips to

7   Alaska and backpacking through Glacier National

8   Park a couple times, Yellowstone, Olympic National

9   Park, Iceland.  So, yeah, a lot of outdoorsy

10  stuff.  Oh, elk hunting with him in Montana.

11       Q.   So you and John do a lot of outdoor

12  things together?

13       A.   We have.  Since, as you have already

14  identified, I'm not so young anymore.  The

15  adventures are not nearly as aggressive as they

16  used to be.

17       Q.   Now, do the adventures not being as

18  aggressive have anything to do with John's wreck?

19       A.   I would say they're more with me.

20       Q.   Okay.  And I think you said that --

21  go ahead and strike that.

22            Go ahead and grab Depo Exhibit 123.

23  And take a look at the second page of that that's

24  identified Big Sky 1063.  Now, do you recall

25  discussing this e-mail earlier?

Page 155

1          A.   I do.

2          Q.   And what's the date on that e-mail?

3          A.   December 14th, 2015.

4          Q.   And who authored it?

5          A.   I did.

6          Q.   Okay.  And what sort of topics did

7    you cover in that e-mail?

8          A.   Thanking John Horning at WildEarth

9    Guardians for allowing his boss Sarah McMillan and

10   one of his compadres, Bethany Cotton, on them

11   being around and supportive.

12         Q.   And do you mention anything else in

13   that e-mail?

14         A.   There's a last sentence, today John

15   will probably have the breathing equipment removed

16   and as he awakens will really begin to feel the

17   injuries.

18         Q.   And does that accurately describe

19   John's condition on December 14th, 2015 when you

20   wrote that e-mail?

21         A.   Well, I wanted to make sure that John

22   Horning at WildEarth realized that I appreciated

23   the -- particularly Sarah and Bethany being

24   around.  I have no clue what John felt because I

25   think -- I'm sure three days in he didn't have a

1   clue where he was or what was going on.

2         Q.   Okay.  Let me rephrase -- maybe

3   reclarify a little bit.  You said today John will

4   probably have the breathing equipment removed and

5   as he awakens will really begin to feel the

6   injuries, and my question is, does that -- is that

7   sentence an accurate reflection of John's

8   condition that day, December 14th, 2015?

9             MR. MORRIS:  Objection.  Foundation.

10            THE WITNESS:  I don't think that --

11   again, that John had any clue where he was or what

12   was going on on December 14th.  So in answer to

13   your question, I'd say no, it's probably not a

14   reflection of John's situation on that day.

15   BY MS. WALAS:

16        Q.   What did you base this statement on?

17        A.   Perhaps more hope than facts.

18        Q.   Now, how would you describe John

19   since the accident?

20            MR. MORRIS:  Objection.  Vague.

21   BY MS. WALAS:

22        Q.   How would you describe John

23   physically since the accident?

24            MR. MORRIS:  Objection.  Vague as to

25   time.

1           THE WITNESS:  I think that John --

2  you know, I'm not positive that the plate in his

3  left clavicle has ever been removed.  I don't know

4  that one way or the other.  I think he realizes at

5  age thirty-nine he's not as able to do some of the

6  things that he was doing in the past or to the

7  same degree.  Again, I'm guessing because I don't

8  honestly know.  And I'm not sure if I've answered

9  your question.

10  BY MS. WALAS:

11          Q.   You're fine.  So how often have you

12  seen John since you left Missoula I believe it was

13  in January 2016.  Is that when you left?

14          A.   I left January of 2016.  I think I

15  saw him --

16          Q.   Okay.  How often have you seen John

17  since you left Missoula in January of 2016?

18          A.   Once, maybe twice per year.

19          Q.   So would this be more or less than

20  before December 11th of 2015?

21          A.   Probably about the same.  We would

22  typically every year do somewhat of a, as I

23  described, a mancation where we canoe, kayak,

24  hunt, backpack.

25          Q.   Okay.  So how has this ski wreck

1   affected John on those vacations or mancations, I

2   think that's what they were called, mancations,

3   how has the wreck affected John on those

4   mancations?

5          MR. MORRIS:  Objection.  Speculation.

6   BY MS. WALAS:

7          Q.   Let me go ahead and rephrase it.

8   What have you observed about John on those

9   mancations?

10         A.   Yeah, I guess as I had indicated

11  before, I think that I have -- well, first of all,

12  let me say I enjoyed the heck out of the

13  mancations and adventures.  There are some

14  incredible memories and stories that go along with

15  those adventures.

16              But I've realized over the last

17  couple years that I can't row the canoe or the

18  kayak like I used to and I can't carry the

19  thirty-five or forty pounds all day long anymore

20  so I have kind of asked for them to not be what

21  I'd call death marches on some of them.  If you're

22  asking physically, I don't know that I've seen a

23  whole lot, but then he is much more capable of

24  carrying a pack all day long.  Hell, I've seen him

25  carry a hundred pounds up that damn Almont in

1   Missoula.

2              What I've felt more is his --

3   probably his -- I'm struggling a little bit for

4   terminology.  I don't believe that John is as

5   sharp as he used to be intelligence-wise.

6              He's, particularly shortly after the

7   accident, crazy emotional, crying about stuff.  I

8   remember his Vermont law professor, mentor,

9   friend, Attorney John Tuholske calling me and

10  telling me that maybe John shouldn't be in court

11  because he's up there and crying about stuff, and

12  that's not how you want to be in court when you're

13  the attorney.  I remember his friends telling me

14  about him crying.  I know his sister has told me

15  more than a few times that she doesn't think he's

16  the same guy.

17             So physically, I don't know, I'm not

18  an expert on what he could or couldn't do before.

19  Mentally, he's not as strong as he was.

20       Q.   Okay.  And what has your testimony

21  been based on today?

22             MR. MORRIS:  Objection.  Vague.

23             THE WITNESS:  Some on my personal

24  observations.  Some on, as I had mentioned, Jack

25  Tuholske, I thought a mentor, a friend, a law

Page 160

1  professor, and based upon his observations and a

2  number of different people.

3  BY MS. WALAS:

4       Q.  And did you alter your testimony

5  today because you're John's dad?

6            MR. MORRIS:  Objection.  Leading.

7            THE WITNESS:  I have tried to provide

8  you folks with everything I possibly could.  Do I

9  want John to do well?  Absolutely.  Am I going to

10 lie to you?  Nope, sorry.

11 BY MS. WALAS:

12      Q.  I'm sorry, you cut out for a second

13 there and you said am I going to lie to you and

14 then I didn't hear the answer to that.

15           MS. WALAS:  Could the court reporter

16 read that back?

17           (Record read.)

18           MS. WALAS:  Okay.  I don't have any

19 further questions then.  Mac, I have about thirty

20 minutes on my battery so if we need to take a

21 short break to plug in, I appreciate that.

22           MR. MORRIS:  You know what, I don't

23 have any follow-up questions for you, Mr. Meyer.

24 Thanks so much for your time.

25           THE WITNESS:  May I ask a question?

Page 161

1                 MR. MORRIS:  Sure.

2                 MS. WALAS:  Mac, do you want this on

3      the record?

4                 MR. MORRIS:  I don't care either.

5                 THE WITNESS:  Correct me if I'm

6      wrong, you folks are still looking for me to go

7      and see if I can find using like the Geek Squad or

8      somebody with text messages or Facebook?

9                 MR. MORRIS:  Right.

10                MS. WALAS:  My understanding of that

11     was that you were going to look through your phone

12     and see if there was anything else responsive.  I

13     didn't believe that he had to go so far as to go

14     to the Geek Squad to have data pulled off the

15     phone.

16                MR. MORRIS:  Yes, Mr. Meyer, I would

17     just ask you to look through your text messages

18     and your Facebook communications and fully comply

19     with the subpoena's requirement to produce

20     documents.

21                THE WITNESS:  I will do that.

22                MR. MORRIS:  Thank you.

23                MS. WALAS:  Thank you.

24                MR. MORRIS:  Before we go off the

25     record, I just wanted to say that you have the

Page 162

1    option and the right to get a transcript of

2    today's deposition, read that, and then make any

3    corrections that you think are necessary.  And you

4    also can waive that and simply allow the

5    transcript to stand for what it is.  And I wanted

6    to ask you do you want to read and sign, as we

7    say, the transcript or are you going to waive

8    that?

9                    THE WITNESS:  Do you need that answer

10   right this second?

11                   MS. WALAS:  I mean, I'd say with that

12   hesitation, just do the read and sign.

13                   MR. MORRIS:  Yeah.

14                   THE WITNESS:  That's fine.  I'll do

15   that.

16                   (Thereupon, the deposition was

17   concluded at 4:59 p.m.)

18

19

20

21

22

23

24

25

Page 163

1          I, RONALD MEYER, do hereby certify that

2     the foregoing is a true and accurate transcription

3     of my testimony.

4

5

6          _Ronald_ _ _Meyer_ _ _ _

7

8          Dated _ _9/25/2020_ _ _ _ _ _

9

10

11                         KIMBERLY LOCKE
                           Notary Public, State of Ohio
12                         My Commission Expires
                           March 18, 2023
13

14

15

16

17

18

19

20

21

22

23

24

25

1        PLEASE USE THIS ERRATA SHEET TO
MAKE ANY AND ALL CORRECTIONS, BY LISTING THE PAGE
2   NUMBER, LINE NUMBER AND THEN A BRIEF DESCRIPTION OF
THE ERROR.  PLEASE DO NOT MAKE ANY MARKS OR
3   CORRECTIONS ON THE TRANSCRIPT.  IF NEEDED USE THE
BACK OF THIS SHEET.  UPON COMPLETION PLEASE SIGN
4   AND DATE THIS SHEET AT THE BOTTOM.  THANK YOU.

5   PAGE 2, LINE 20  DATE IS INCORRECT
6   S/B  3/9/15 - 3/11/15

7   PAGE 44, LINE 25  MARSHAL'S NAME
8   ONLY HAS 1 L

9   PAGE 45, LINE 1  ADRIENNE HAS
10  THIS SPELLING

11  PAGE 158, LINE 25  CARRY A HUNDRED
12  POUNDS UP THAT DAMN "M"

13

14

15

16

17

18

19

20

21

22

Ronald Meyer
9/25/2020

23

24   SIGNATURE: _Ronald Meyer_ DATE: _9/25/2020_

25

WWW.BRITTONANDASSOCIATES.COM
DAYTON - (937) 228-3370  CINCINNATI - (513) 651-3370

Page 164

1    STATE OF OHIO           )

2    COUNTY OF MONTGOMERY )    SS: CERTIFICATE

3         I, Kathy S. Wysong, a Notary Public within

4    and for the State of Ohio, duly commissioned and

5    qualified,

6         DO HEREBY CERTIFY that the above-named,

7    RONALD MEYER, was by me first duly sworn to

8    testify the truth, the whole truth and nothing but

9    the truth; that said testimony was reduced to

10   writing by me stenographically in the presence of

11   the witness and thereafter reduced to typewriting.

12        I FURTHER CERTIFY that I am not a relative

13   or attorney of either party nor in any manner

14   interested in the event of this action; I am not

15   under a contract as defined in Civil Rule 28(D).

16        IN WITNESS WHEREOF, I have hereunto set my

17   hand and seal of office at Dayton, Ohio, on

18   this 4th day of September 2020.

19

20                    _/s/ Kathy W. Wysong
                      KATHY S. WYSONG, RPR
21                    NOTARY PUBLIC, STATE OF OHIO
                      My commission expires 12-25-2023
22

23

24

25