

COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS







(800) 528-3335

NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

JOHN MEYER,

     Plaintiff,

vs.                    Cause No. 18-CV-02-BMM

BIG SKY RESORT,

     Defendants.

_____

DEPOSITION BY ZOOM VIDEOCONFERENCE OF

TREVOR LOWELL

TAKEN ON
TUESDAY, AUGUST 25, 2020
11:15 A.M.

CAPITOL PLAZA CONFERENCE CENTER
100 STATE STREET, BOARDROOM 232
MONTPELIER, VERMONT 05602

**APPEARANCES**

**APPEARING ON BEHALF OF THE PLAINTIFF VIA ZOOM**

**VIDEOCONFERENCE:**

Breean Walas, Esquire

**Walas Law Firm**

P.O. Box 4591

Bozeman, Montana 59772

(501) 246-1067

breean@walaslawfirm.com


**APPEARING ON BEHALF OF THE DEFENDANT VIA ZOOM**

**VIDEOCONFERENCE:**

William Morris, Esquire

**Crowley Fleck, PLLP**

P.O. Box 10969

Bozeman, Montana 59719

(406) 556-1430

(406) 556-1433 Fax

wmorris@crowleyfleck.com

                          EXAMINATION INDEX

                                                        Page


EXAMINATION BY MR. MORRIS                                 6


EXAMINATION BY MS. WALAS                                 174


FURTHER EXAMINATION BY MR. MORRIS                        194

```
 1                        EXHIBITS

 2    Exhibit                                    Page

 3

 4     98      SUBPOENA                           32

 5

 6     99      TEXT MESSAGES                      40

 7

 8    100      TEXT MESSAGES                      44

 9

10    101      TEXT MESSAGES                      50

11

12    102      DOCUMENT                           56

13

14    103      EMAIL DATED- 03-30-2016           80

15

16    104      EMAIL DATED- 09-02-2016           82

17

18    105      TEXT MESSAGES                      86

19

20    106      TEXT MESSAGES                      89

21

22    107      EMAIL DATED- 08-06-2018           93

23

24    109      EMAIL DATED- 11-15-2018          110

25
```

```
 1                      EXHIBITS CONTINUED

 2   Exhibit                                          Page

 3

 4    110      EMAIL DATED- 12-13-2017               117

 5

 6    111      TEXT MESSAGES                         121

 7

 8    112      TEXT MESSAGES                         126

 9

10    113      TEXT MESSAGES                         130

11

12    114      TEXT MESSAGES                         133

13

14    115      EMAIL DATED- 12-15-2017               135

15

16    116      DOCUMENT                              160

17

18    117      DOCUMENT                              165

19

20

21

22

23

24

25
```

1          DEPOSITION BY ZOOM VIDEOCONFERENCE OF

2                      TREVOR LOWELL

3                         TAKEN ON

4               TUESDAY, AUGUST 25, 2020

5                       11:15 A.M.

6

7          **TREVOR LOWELL:**  Being first duly sworn by

8    a Notary Public to tell the truth, deposes and says

9    as follows:

10   **EXAMINATION**

11   **BY MR. MORRIS:**

12       **Q     Good morning, Mr. Lowell.  Will you please**

13   **state your name and address?**

14       A    My name is Trevor Lowell.  My address is

15   184 Elm Street, Apartment 3, Montpelier, Vermont

16   05602.

17       **Q     Thanks.  And my name is Mac Morris and I**

18   **represent Big Sky Resort in this matter.  And we're**

19   **here today in this deposition via Zoom and Breean**

20   **Walas is here as well.  You recognize that she is**

21   **here as well, Mr. Meyer's counsel?**

22       A    I do.

23       **Q     Okay.  And how long have you lived at your**

24   **current address?**

25       A    One year.

```
 1        Q     And who resides with you at that address?

 2        A     My wife and my child.

 3        Q     And have they lived with you the whole

 4  time that you have been at that address?

 5        A     Yes.

 6        Q     And where did you live before you moved to

 7  your current home?

 8        A     We lived in Missoula, Montana.

 9        Q     How long were you in Missoula for?

10        A     From September of 2015 until one year ago.

11        Q     Have you ever given a deposition before

12  today?

13        A     Never.

14        Q     Never you said?

15        A     Never.

16        Q     And other than in a deposition, have you

17  ever given or testified under oath in any proceeding

18  of any kind?

19        A     No.

20        Q     And you're here today, you understand,

21  appearing pursuant to a subpoena?

22        A     Yes.

23        Q     And did you -- did you bring anything with

24  you today other than your laptop?

25        A     I brought a mask.  I brought a work bag
```

     1   with a granola bar.  I brought a water bottle.  And

     2   I brought the subpoena documents that you hand-

     3   delivered to my address.

     4       **Q    Okay.  So since you've never given a**

     5   **deposition before, I'll just go over some sort of**

     6   **basic, the deposition with you.  And there's sort of**

     7   **some basic rules that we follow in depositions.**

     8           **And the first one is that today all your**

     9   **responses need to be oral, that is, you can't sort**

    10   **of just nod your head or shrug your shoulder or do**

    11   **that sort of thing.**

    12           **Do you understand that?**

    13       A    I do.

    14       **Q    And you're doing a great job with that.**

    15   **And the other thing is if you say uh-huh or huh-uh,**

    16   **I know what you mean, but for purposes of getting a**

    17   **clear record with the court reporter, I may ask you**

    18   **is that a yes or is that a no.  And I am not trying**

    19   **to be rude or anything, I'm just trying to get a**

    20   **clear record.**

    21           **Is that fair?**

    22       A    I understand.

    23       **Q    Okay.  And you are doing a good job with**

    24   **this one as well, but today we can't talk over one**

    25   **another. The court reporter needs to take everything**

1  down that we are saying.  So if you could, please,

2  would you agree to allow me to finish my question

3  before you begin answering?

4       A    Yes.

5       Q    And if I cut you off in the middle of your

6  answer, will you let me know?

7       A    Yes.

8       Q    And if you don't let me know that you

9  haven't finished your answer, I'm going to assume

10  that you have.

11           Is that fair?

12       A    I understand.

13       Q    Okay.  The other thing is if I ask you a

14  question that you find confusing or you don't

15  understand, can you please let me know that you

16  didn't understand the question?

17       A    Yes.

18       Q    And if you don't tell me that you

19  misunderstood the question, you understand that I'm

20  going to assume that you understood the question as

21  phrased?

22       A    Yes.

23       Q    And you obviously understand that you are

24  under oath today; right?

25       A    Yes.

1      Q      And so you've sworn, I know, to tell the

2    truth today?

3      A      Yes.

4      Q      And you will do that?

5      A      Yes.

6      Q      So I don't know how long we'll go today,

7    but if you need to take a break at anytime, please

8    just let me know and we can take a break.  If you

9    want to get coffee, or water, or just go to the

10   bathroom or whatever, will you let me know that?

11     A      Yes.

12     Q      Okay.  And the only thing I would say

13   about taking breaks is I'll typically want you to

14   answer any question if I have a question pending, if

15   you can answer that last pending question before you

16   take a break, I'll usually require you to do that.

17            Do you understand that?

18     A      I do.

19     Q      So it seems like you are already a pro at

20   depositions, but have you done anything to prepare

21   for today's deposition?

22     A      No.

23     Q      Okay.  Did you review any documents at all

24   to prepare for today's deposition?

25     A      I took a cursory glance at the link that

1  you shared last night and the files that were in

2  there, but I didn't spend really much time looking

3  at them since I produced all of them and I was

4  somewhat familiar with them.  So that is the only

5  real review of any substance that I've done.

6      **Q    Okay.  And did you talk with anybody about**

7  **today's deposition?**

8      A    When Breean was asking me if I would

9  testify I asked her sort of what was involved and

10  what was expected.  And she advised me to dress nice

11  and be honest, so.

12      **Q    Okay.  Anything else that you can -- so**

13  **you had a conversation with Breean about testifying;**

14  **is that right?**

15      A    Yeah, the request was made of me and I

16  reached out to ask not knowing what was involved in

17  the deposition process, what to expect.

18      **Q    Okay.  And was that initial conversation**

19  **about testifying at trial or was it about testifying**

20  **at a deposition like today?**

21      A    I believe the conversation started with

22  the general request to be a witness.  And I had

23  concerns about traveling.  I have a young five-month

24  old son and was not interested in having to get on a

25  plane and expose myself to certain health risks.

1  And so we talked about the process how the

2  deposition would come first. We could likely do that

3  via Zoom or teleconference.

4         And that the likelihood of me

5  participating in a jury trial would be a decision

6  that would be made after the deposition and that we

7  could more or less cross that bridge though me being

8  an in-person witness when that time came at a later

9  date.

10   **Q    Okay.  And when you spoke with Breean**

11  **about being a trial witness or being deposed, do you**

12  **recall anything that she spoke with you about as to**

13  **why she made that request?**

14   A    No, it was more about what to expect for

15  the process.

16   **Q    Okay.  Anything other than what to expect**

17  **in the process that you recall from your**

18  **conversations with Breean?**

19   A    No.

20   **Q    Okay.  And in terms of things that you**

21  **would expect from the process, have you pretty much**

22  **described everything to me that you recall about**

23  **that?**

24   A    Yes.

25   **Q    Was there anybody else present during your**

```
 1   conversations with Breean?

 2       A    No.

 3       Q    And how long did you talk with her for?

 4       A    I would say it was a five-minute

 5   conversation.

 6       Q    Have you talked with anyone else about

 7   either testifying at a deposition or at trial

 8   besides Ms. Walas?

 9       A    I have spoken with my wife about it.  I

10   spoke to my father about it.  More or less, you

11   know, that I was coming in to do this.  I have never

12   done it before so it was in the context of something

13   new and interesting in a world of monotony.

14       Q    I hear you.

15            And I'm sorry, do you mind if I call you

16   Trevor today or do you prefer if I called you Mr.

17   Lowell?

18       A    No, you may call me Trevor.

19       Q    Okay.  And you said you spoke with your

20   dad about this?

21       A    Yeah.

22       Q    And has he ever had his deposition taken

23   before?

24       A    I don't know that.

25       Q    Did he offer you any advice about the
```

1    deposition process or anything of that sort?

2        A    No.

3        Q    And did you tell him why you were being

4    deposed?

5        A    He's familiar with Mr. Meyer's accident

6    and so he knows that it is in the context of that

7    incident.

8        Q    Okay.  And anybody else besides your wife,

9    your dad and Ms. Walas that you have spoken to about

10   testifying or being deposed?

11       A    Mr. Meyer knows that I'm being deposed.  I

12   haven't had conversations with him about it.  I

13   think I -- I think I mentioned to him that I was

14   somewhat annoyed that I had to give up a workday to

15   be a witness in a deposition for him, but there

16   wasn't a conversation about, you know, what would be

17   said or he didn't provide any advice to me or

18   instruct me in any way.

19       Q    Okay.  When did that -- do you recall

20   actually a specific conversation where he asked you

21   to be a witness in this case?

22       A    The initial request came via text message.

23   And I believe I texted him back and I said I would

24   need more context or more information.  And that

25   then led to the conversation with Breean.

1    **Q    Okay.  And did you have a phone call with**

2    **Mr. Meyer following that conversation or that text**

3    **exchange?**

4        A    I had a phone call with Mr. Meyer and his

5    intern Kyle Kearns yesterday as part of being a

6    board member of Cottonwood Environmental Law Center,

7    so we were discussing --

8        **Q    Okay.**

9        A    -- board engagement and trying to recruit

10   new members, trying to strengthen the engagement and

11   the activity of the board.

12       **Q    Anything about testifying -- I'm sorry, I**

13   **should have been more clear.**

14           **Did you have a conversation with Mr. Meyer**

15   **about testifying in the trial in this case or being**

16   **deposed in this case after that initial text**

17   **exchange about you being a witness?**

18       A    No, the only conversation I've had since

19   is the one I described yesterday.

20       **Q    Okay.  And any other form of communication**

21   **with Mr. Meyer about testifying or being deposed in**

22   **this case other than that text exchange?**

23       A    No.

24       **Q    Can you tell me where did you go to high**

25   **school?**

1     A    I did my freshman year at Inter-Lakes High

2  School in Meredith, New Hampshire.  I did my

3  sophomore, junior and senior year as a day student

4  at New Hampton Preparatory School in New Hampton,

5  New Hampshire.

6     **Q    And that's obviously where you grew up was**

7  **in New Hampton in New Hampshire?**

8     A    I grew up in Center Harbor, New Hampshire

9  which is a town or two away from New Hampton.  So

10  the town next to Meredith.

11     **Q    And after high school did you -- you went**

12  **on and got a degree?**

13     A    Yes.

14     **Q    What did you get a degree in?**

15     A    I got a Bachelor of Arts in English.

16     **Q    Where did you attend school to get that**

17  **Bachelor of Arts?**

18     A    St. Lawrence University in Canton, New

19  York.

20     **Q    What year did you graduate?**

21     A    2008.

22     **Q    And what did you do after you graduated**

23  **from St. Lawrence?**

24     A    Immediately or what sort of time frame are

25  you --

1    **Q    Sure.  Did you go to anymore schooling**

2    **after getting your degree from St. Lawrence?**

3    A    Several years later I went to New York

4    University and received a Master's degree in food

5    studies.

6    **Q    Okay.  When did you get that degree?**

7    A    I graduated in 2015.

8    **Q    How long did it take you to get that**

9    **degree?**

10   A    It was a two-year.

11   **Q    So what did you do in terms of work or**

12   **otherwise between getting your degree from St.**

13   **Lawrence and starting your food studies master's**

14   **program?**

15   A    I worked as a carpenter.  I worked as a

16   goat milker.  I worked as a property manager for a

17   couple, so sort of like a private employee for them

18   helping them with their ranch.  I think that's it.

19   **Q    Obviously your favorite job was goat**

20   **milking?**

21   A    It was a good job, yeah.  Probably

22   familiar with Amaltheia Dairy in Belgrade?

23   **Q    Oh, yeah, is that right?**

24   A    Yeah, I milked goats for them for about a

25   year and a half.

1    **Q    Is that when you first moved to Montana to**

2    **Belgrade for the goat milking job?**

3    A    I moved to Montana in January of 2009 with

4    no job secured at the time.  That was the first job

5    that I secured.

6    **Q    Okay.  How long were you in Montana in**

7    **2009?**

8    A    I started graduate school in fall of 2013,

9    so I think we were there for four years.

10   **Q    Okay.  So, and where did you live in those**

11   **four years starting in 2009?**

12   A    I lived for a year on Olive Street in

13   downtown Bozeman.

14   **Q    Okay.**

15   A    And then the remainder of the two and a

16   half, three years we lived in South Cottonwood

17   Canyon.

18   **Q    Got you.  So in and around Bozeman for**

19   **four years?**

20   A    Yeah, within the town limits the entire

21   time.

22   **Q    Okay.  And while you were in Bozeman you**

23   **had the goat milking job and then what other jobs**

24   **did you have in Bozeman?  I'm sorry if I'm asking**

25   **the same question twice.**

 1     A     No, it's fine.  I realized there was

 2   another two.  I had the goat milking job initially.

 3   I then transitioned to work for a carpenter who is

 4   based in Bozeman.  Did residential construction with

 5   him for over a year.  I took a property maintenance

 6   position with a couple in Gallatin Gateway who had a

 7   horse property there.

 8             And I worked in Four Corners, there was a

 9   garden supply store.  So I worked retail there doing

10   typical retail activities, working behind the

11   counter, receiving product, stocking, inventory.

12             I was also an unpaid intern for what was

13   Zone 4 Magazine which is now I think defunct.

14             Changed it's name to Rocky Mountain

15   Gardening or something and then I'm not sure that

16   it's in existence anymore.

17     Q     Okay.  And what's your current job?

18     A     I'm the farm to institution program

19   manager for the Vermont Agency of Agriculture and

20   Markets.  And I work within the agricultural

21   development division.

22     Q     How long have you had that job?

23     A     One year.

24     Q     And what do you do?  What are your duties

25   in that job?

1     A    I'm on a typical non-Covid world I would

2  primarily be managing grant programs.  The state

3  allocates general fund money to a couple of

4  different programs targeted at promoting and

5  expanding farm to school activities at public and

6  private institutions as well as trying to work with

7  institutions such as hospitals, colleges and

8  universities, correctional facilities to connect

9  them with local agricultural producers in an effort

10  to promote and expand Vermont's agricultural

11  economy.

12     **Q    Are you also on the board of directors for**

13  **Cottonwood Environmental Law Center currently?**

14     A    I am.  I'm currently the Board Chair.

15     **Q    And how long have you been on the board of**

16  **Cottonwood Environmental Law?**

17     A    I don't know exactly.  I would guess three

18  years.

19     **Q    If I refer throughout this deposition to**

20  **Cottonwood or Cottonwood Law, will you know that I'm**

21  **referring to Cottonwood Environmental Law Center?**

22     A    Yes.

23     **Q    Can you tell me what you do as the Board**

24  **Chair for Cottonwood?**

25     A    I run the twice yearly board meetings

1  which are, you know, conference calls with the rest

2  of the board members and John.  I review contracts.

3  There was a marketing contract that we were looking

4  at last year. I review, and with the rest of the

5  board members, approve the budget.

6          We advise on cases as far as the more

7  broadly which cases would be of interest to an

8  organization. Sort of typical nonprofit board

9  participation.  Help recruit board members.

10     **Q     I'm sorry, go ahead.**

11     A     Help recruit new board members.  Speak

12 with potential board members about the organization

13 and roles and responsibilities of serving on the

14 board.

15     **Q     Have you ever been paid for any of that**

16 **work?**

17     A     No.

18     **Q     And so you don't consider yourself**

19 **employed at all by Cottonwood Law Center,**

20 **Environmental Law Center; right?**

21     A     No, it's a volunteer capacity position.

22     **Q     About how much time do you spend in a**

23 **given month with work in that capacity for**

24 **Cottonwood?**

25     A     Averaged out, I mean, some months it's

```
 1   none at all.  So average out over a year I would say

 2   two hours a month.

 3       Q    Okay.  And do you have any experience

 4   outside of Cottonwood as a board member on a sort of

 5   nonprofit?

 6       A    Yes.

 7       Q    Okay.  Can you tell me about that?

 8       A    I was on the board of the Community Food

 9   and Agriculture Coalition which is based in

10   Missoula, Montana.  I joined as a board member and

11   then I -- about a year and a half into my tenure was

12   elected Board Chair of that organization.  So I

13   chaired the board until I left Missoula -- a few

14   months before I left Missoula last year.

15           THE REPORTER:  Excuse me.  Someone is at

16   the door.  It's probably the documents that were

17   being copied.

18           (Discussion held off the record)

19           MR. MORRIS:  Back on the record.

20   BY MR. MORRIS:

21       Q    And the board -- the Community Food -- I'm

22   sorry, will you tell me that name again?

23       A    The Community Food and Agriculture

24   Coalition commonly referred to as CFAC.  That's

25   easier.
```

1      **Q    And what -- what sort of is its mission?**

2      A    It's a food systems nonprofit so it runs a

3 couple of different programs.  Generally federally

4 grant funded so they tend to shift depending on the

5 grants that they receive, but we had an arm of the

6 organization that was focused on food access.  So we

7 ran the double SNAP dollars program at a number of

8 Farmers' Markets throughout western Montana and

9 facilitated that.

10         There was a beginner farmer rancher

11 program that the organization ran, so that was a lot

12 of training.  There was just sort of general

13 promotion of local and sustainable agriculture food

14 systems.  So trying to connect people through events

15 and farm tours.

16         There were workshops that we hosted for

17 people interested in learning about how to garden.

18 They ran the Land Link program connecting folks

19 seeking agricultural land to those who may have it

20 or may be looking for the next generation to take

21 over.

22         Ran an employee farm handling program,

23 similar concept, trying to connect labor needs at

24 local farms and ranchers with people interested in

25 being employed and learning more agricultural

1  skills.

2      **Q     How long did you serve on the board of**

3  **that nonprofit?**

4      A     I believe about three years in total.

5      **Q     Okay.  Was it over the same course of time**

6  **that you were on the board with Cottonwood?**

7      A     There was maybe a year overlap.  I am not

8  exactly sure, but I started -- when I started on the

9  board of CFAC I was not on the board of Cottonwood.

10 I was asked by John to join the board of Cottonwood

11 maybe two years after I started with, on the board

12 of CFAC.

13     **Q     Got you.  And why did you leave or resign**

14 **or whatever from your board position with the**

15 **Community Food and Agriculture Coalition?**

16     A     It's a Missoula based nonprofit whose work

17 is focused in that community in the western Montana

18 community.  They have monthly in-person board

19 meetings.

20     **Q     I'm sorry, could you repeat that last**

21 **part?**

22     A     They have monthly in-person board

23 meetings. And the expectations of the board is that

24 you participate in a lot of events in the community.

25 You engage in fundraising with people in the

1  community.  You just, you know, there's an

2  expectation that you're a physical presence in many

3  different ways, so it just didn't make sense that I

4  would be moving to Vermont and would no longer be

5  able to participate physically in any of the

6  meetings, or the events or what have you.  So I

7  stepped down.

8       **Q    Were the demands on your time with that**

9  **nonprofit greater than those with Cottonwood?**

10      A    Yes.

11      **Q    About how many hours in a month did you**

12  **spend with Community Food and Agriculture Coalition**

13  **on average as a board member?**

14      A    I would say five to six is speculation,

15  but my best guess.

16      **Q    When you were in Missoula, what was your**

17  **job outside of the work that you were doing with the**

18  **nonprofit Cottonwood and Community Food?**

19      A    I was a sustainability director for the

20  University of Montana Dining.

21      **Q    And how long did you hold that job?**

22      A    My entire time I lived in Missoula.  I

23  moved there for the job.  And stepped down from the

24  position when I got the job in Vermont.

25      **Q    So was that about, what --**

```
 1        A     It would be September 2015 to late June of

 2   2019.

 3        Q     Have you ever worked at a ski resort?

 4        A     No.

 5        Q     And where did you meet Mr. Meyer first?

 6        A     I met John in South Cottonwood Canyon at

 7   Tina Deweese's residence.

 8        Q     Okay.  So back before you went to grad

 9   school?

10        A     Yes, and somewhere in 2009.

11        Q     And what was John doing in Bozeman at that

12   time?

13        A     He was running Cottonwood Environmental

14   Law.

15        Q     And did you just run into him at the

16   trail, is that what you're saying, or did you say at

17   a residence of your friend?

18        A     Yeah, I was working on -- I purchased a

19   piece of art from Tina and -- well, I exchanged my

20   labor for a piece of art from Tina.  So I was at her

21   house working off the value of the art work.  And

22   John was also there doing some work for them.  So we

23   were working alongside each other and that's how we

24   met.

25        Q     And Mr. Meyer was a practicing attorney at
```

1    that time?

2         A    Yes.

3         Q    And he was working at Cottonwood Law at

4    that time?

5         A    Yes.

6         Q    And did you guys hang out a good deal from

7    2009 to whenever you started your M.A. in food

8    study?

9         A    Yeah.  We met, like I said, in 2009.  We

10   climbed a few times together that summer.  And then

11   became good friends and remain good friends to this

12   day.

13        Q    And did you guys share just recreational

14   interest?  Is that sort of one of the basis of your

15   friendship?

16        A    That's accurate, yeah.

17        Q    And what all kind of recreational

18   activities did you do with Mr. Meyer?

19        A    As I mentioned, we climb together.  So

20   climbed in around Bozeman.  We took a trip in

21   September of 2009 and climbed the Grand Teton.  He

22   snowboarded at the time and I skied.  So we skied

23   and snowboarded together primarily in the

24   backcountry.  I don't believe he had a ski pass, so

25   I think most of that was in the backcountry in and

 1  around the Bozeman area.  Those are sort of the

 2  primary activities.

 3      Q    Okay.  And Mr. Meyer, did he have like a

 4  splitboard or something that he was using at that

 5  time to get into the backcountry?

 6      A    Yeah, initially we got a splitboard.  And

 7  then after substantial pressure from me, he

 8  eventually caved and picked up some skis and was --

 9      Q    Okay.

10      A    -- transitioned to that.  I don't know --

11  I can't remember sort of how long he splitboarded

12  for and when he started skiing, but...

13      Q    And backcountry skiing, that's where you -

14  - it's not lift service skiing; right?

15      A    Correct.

16      Q    So you have to travel into the forest and

17  basically climb up a mountain or a hillside --

18      A    Yep.

19      Q    -- on your own?

20      A    Yes.

21      Q    And you ski down, or for Mr. Meyer, he

22  snowboards down that mountain?

23      A    Yes.

24      Q    And there's no like avalanche control or

25  anything like that that anybody is responsible for

1  except for the skiers?

2      A    Correct.

3      Q    And there's no terrain marking or warning

4  on the terrain; right?

5      A    No, I would say your previous question

6  there is public resources about avalanche

7  conditions, but there's no markings about the

8  terrain.

9      Q    Sure.  And what you're talking about in

10  terms of public resources is basically avalanche

11  forecasting?

12     A    Yes.

13     Q    All right.  But in terms of the decision-

14  making process for where you go and what risk you

15  take, those are all on the skier?

16     A    Correct.

17     Q    And how do you avoid injuries to yourself

18  while you are skiing in the backcountry?

19     A    You take the necessary precautions in line

20  with your level of risk that you're comfortable

21  with.

22     Q    And do you have to accept -- do you have

23  to accept personal responsibility for your own

24  safety when you're in the backcountry skiing?

25     A    Yeah, if you're by yourself, I mean, I

1    think there's a group dynamic component too where

2    they're depending on the individuals in the group.

3    There's -- hopped in there is chair responsibility

4    for the group safety as well.

5        **Q    Sure.  So your buddy or your ski partner,**

6    **or whoever, may help you make decisions?**

7        A    Yeah, I think there needs to be consensus

8    on what that acceptable level of risk is and

9    discussion about what the perceived risks are.  And

10   there has to be some sort of consensus there between

11   the party members to decide where you're going to

12   go, and what you're going to ski and what risks

13   you're willing to take on.

14       **Q    Sure.  And ultimately you are responsible**

15   **for reading the terrain?**

16       A    Yes.

17       **Q    And you are responsible for navigating**

18   **that terrain on your own?**

19       A    Yes.

20       **Q    And adjusting your ski if you're skiing or**

21   **snowboarding according to the terrain; right?**

22       A    Correct.

23       **Q    Without any sort of markings and warnings**

24   **on the terrain about sort of what it looks like.**

25       A    Correct.

1      Q    Do you have in front of you the share file

2 link that I sent you earlier this morning?

3      A    Let me wake my computer back up.

4      Q    Well, actually let me just ask you this.

5           Do you have in front of you a stack of

6 documents --

7      A    Yes.

8      Q    -- that the court reporter just grabbed?

9      A    Yes.

10     Q    And what is the document that's on the top

11 of that stack?

12     A    The file name is IMG underscore 2074.png.

13     Q    Okay.  And is it just a stack of documents

14 that's not in a binder or anything like that; right?

15     A    No, they appear to be alternatingly

16 stacked oriented horizontally and vertically.

17     Q    Okay.  And on the bottom of that stack can

18 you tell me what that document is?

19     A    The number in the bottom right is Big Sky

20 946.

21     Q    Let's go back to the computer.  I don't

22 know how those are organized, unfortunately.  Can

23 you bring up that share file link that I sent you

24 this morning?

25     A    Yep.

```
 1         Q     And can you download those documents that
 2   I sent you?  Actually, let's just take a quick break
 3   and go off the record and let's kind of deal with
 4   this.
 5               (Recess taken)
 6               MR. MORRIS:  Back on the record.
 7   BY MR. MORRIS:
 8         Q     Trevor, we just took a quick break there.
 9   Thanks for your help in getting those exhibits
10   organized.  And I'd like to refer you to on the
11   share file link it's 002 SDT.  And that's the
12   subpoena to produce documents.
13         A     Okay.  We have it in front of us.
14         Q     Great.  And let's mark that Exhibit 98.
15               So Deposition Exhibit 98 is a true and
16   correct copy of the subpoena to produce documents
17   that I sent to you; correct?
18         A     Correct.
19         Q     And if you would turn to Exhibit A, it's
20   on the final page of Exhibit 98, please?
21         A     Okay.  I'm there.
22         Q     And you are familiar with Exhibit A?
23         A     Yes.
24         Q     And Exhibit A essentially requires you to
25   produce all of your communication, written
```

1  communication, of whatever kind or form between

2  yourself and Mr. Meyer or anyone acting on behalf of

3  Mr. Meyer from December 11, 2012, to the present;

4  correct?

5      A    Correct.

6      Q    And did you comply fully with the subpoena

7  and produce all of those documents that were

8  demanded?

9      A    Yes.

10     Q    And all the documents that you produced to

11 us, are they all true and correct copies of your

12 communications with Mr. Meyer?

13     A    Yes.

14     Q    And how did you go about locating

15 documents that were responsive to the subpoena, that

16 is, Deposition Exhibit 98?

17     A    For the email communications I have a

18 gmail account.  So I filtered my inbox and my sent

19 mail by those received by John or sent to John or

20 had John in the recipient line.  And then I exported

21 all of those into a folder and attached them to

22 several emails as email attachments.  And then sent

23 them to you all that way.

24         The text messages were a little trickier.

25 I was able to -- my personal laptop is synched with

1  my phone.  And so I figured out that going back, I

2  don't know, certain period about a year, my laptop

3  had all the messages saved in the iMessages program

4  or application. So I copy and pasted.  I highlighted

5  all of that, copy and pasted the entirety of what

6  was saved on the computer, what was available for

7  access there, into a Word document.

8          And then I went on to my phone and I made

9  multiple screen shots of all of the conversations

10 going back as far as I had record of.  I took those

11 screen shots.

12     Q    Okay.

13     A    Uploaded them as digital image files to a

14 Google Drive account and then shared that as a

15 folder with you all.

16     Q    Okay.  And did you look -- other than text

17 messages and emails, did you look for any other form

18 of communication, written communication, that you

19 had with Mr. Meyer that would be responsive to the

20 subpoena?

21     A    I believe I checked my Facebook Messenger

22 history and that was it.

23     Q    And you didn't find any Facebook

24 Messengers that you had that would be responsive to

25 the subpoena with Mr. Meyer.

```
 1       A    No.

 2       Q    And is that because you have never

 3  communicated with Mr. Meyer via Facebook Messenger

 4  from 2012 to the present?

 5       A    Yes.

 6       Q    Okay.  When you say yes, that's what you

 7  are meaning, you have not communicated with Mr.

 8  Meyer via Facebook Messenger; is that right?

 9       A    To the best of my knowledge and to the

10  records that I reviewed, I have never communicated

11  via Facebook Messenger with John.

12       Q    Okay.  And did you look on any other

13  platform besides Facebook?

14       A    No.

15       Q    Okay.  Do you have an Instagram account?

16       A    I do.

17       Q    And have you ever communicated with Mr.

18  Meyer via Instagram?

19       A    I've tagged him in posts before.  I've

20  never privately communicated with him on that

21  platform.

22       Q    Okay.  What about Twitter?

23       A    I do not have a Twitter account, no.

24       Q    You don't have a Twitter account?

25       A    Correct, I do not.
```

     Q    And your text messages, they go back to

November of 2016; right?

     A    Yes, correct.

     Q    And earlier text messages that you may

have had with Mr. Meyer are no longer available to

you; is that right?

     A    Correct.

     Q    And they weren't deleted or anything like

that to your knowledge; right?

     A    I have in the past gone through my

messages to try to create more memory on my phone.

I do not know with any confidence whether I've

deleted conversations with John.  I think it's when

I have done that my memory of that is sort of

sitting idly somewhere killing time and trying to

create more space on my phone and sort of randomly

going through messages and trying to figure out if,

you know, there were things that I didn't care to

keep a record of, so.

     Q    Okay.

     A    Possible that -- it's possible that --

     Q    I'm sorry.

     A    Yeah, it's possible that text messages

between he and I were at some point deleted that

way, but there was no conscious decision to go in

1  and specifically delete conversations between John

2  and myself.

3      **Q    Are you referring right now what you just**

4  **told me, are you referring primarily to or entirely**

5  **to text messages you may have had with Mr. Meyer**

6  **before November of 2016?**

7      A    I'm aware that there's a gap as well in

8  the text messages.  So that may explain that as

9  well, but whatever was saved on my phone.  I also

10  received a new phone maybe three years ago, two or

11  three years ago.  I don't know enough about how that

12  data transfers, how long iPhones maintain records

13  for things, but pursuant to the subpoena I

14  essentially opened the conversation and scrolled

15  back as far as there was record on my phone and

16  screen shot whatever wasn't captured on the computer

17  sync.

18      **Q    Okay.  In certain of the text messages**

19  **that you sent us, there's a reference to listserve**

20  **posts where Mr. Meyer wanted you to respond to**

21  **certain listserve posts that he had made or**

22  **otherwise commenting on a listserve post that he had**

23  **made.  You didn't produce any of those listserve**

24  **posts; correct?**

25      A    Correct, I'm smart enough not to get

1  involved with John's activity on the Bozone.  That's

2  not of interest to me.

3      Q    What do you mean by that?

4      A    John in the past, I think there's several

5  examples where he's sent emails to that listserve

6  where they I think have been controversial.  People

7  have responded, it's generated a lot of back and

8  forth discussion, different view points.  He said

9  things that I think have been in disagreement with

10  some other general opinions.  So I believe he's been

11  banned from the listserve in the past.

12      Q    Mr. Meyer's been banned from the Bozone or

13  listserve, is that what you're saying?

14      A    I don't know if he is currently banned.

15  I've heard that he was banned.  I don't know.

16      Q    Okay.  And that was for essentially

17  violating sort of the guidelines or rule of that

18  listserve is your understanding?

19      A    Yeah, there's a moderator who moderates

20  the listserve.  It's a pretty broad audience and

21  broad eligibility requirements for what can and

22  can't be posted.  So I think anybody who's banned

23  has been banned because they have violated whatever

24  those guidelines are.

25      Q    Does the moderator ban someone for just

1  like one post that violates the guidelines or does

2  it take more than one?

3      A    I don't know.  I think that would probably

4  depend on the context and the content of the post.

5      Q    And in terms of Mr. Meyer being banned, is

6  it your understanding that -- being banned is it

7  your understanding that he was banned because he had

8  multiple sort of instances where he violated the

9  guidelines or the rules for that listserve?

10     A    I don't know.

11     Q    And do you still have access to those

12  listserves?

13     A    Yeah, I still am prescribed to the Bozone

14  listserve.

15     Q    Have you ever posted in response to

16  anything that Mr. Meyer has posted on those

17  listserves?

18     A    Not to my recollection.

19     Q    Has he ever posted in response to anything

20  that you have posted?

21     A    No.

22     Q    And did you double check that listserve

23  for purposes of responding to the subpoena to see

24  whether or not there was some conversation between

25  you, Mr. Meyer?

1      A     When I filtered my inbox it captured

2   listserve conversations so long as the person who

3   sent that email was John or myself, so.

4      **Q     Okay.**

5      A     It wouldn't have filtered if he was just a

6   recipient, but it did filter out ones where, you

7   know, if I had written it it would have shown up.

8   If I had written it to John then it would have shown

9   up or responded directly to an email that he had

10  posted.

11     **Q     Got you.  Do you have in front of you Big**

12  **Sky 898?**

13          **MR. MORRIS:**  And, Breean, this is 005 on

14  the share file.

15     A     Yes.

16     **Q     And Big Sky 898, that's a true and correct**

17  **copy of a text message exchange that you had with**

18  **Mr. Meyer between September 30th, 2017, and October**

19  **3rd, 2017; correct?**

20     A     Correct.

21     **Q     Let's mark that as Deposition Exhibit 99,**

22  **please.**

23          **THE REPORTER:**  Okay.

24          **MR. MORRIS:**  Do we have it marked?

25          **THE REPORTER:**  Yes.

1      **MR. MORRIS:**  Thank you.

2  **BY MR. MORRIS:**

3      **Q     Deposition Exhibit 99, in this text**

4  **exchange on the left, the gray outside area that is**

5  **messages sent by Mr. Meyer; correct?**

6      A     Correct.

7      **Q     And on the right in blue those are**

8  **messages you sent to Mr. Meyer; right?**

9      A     Yeah, correct.  Just as a note, it's a

10  black and white copy, so.  What may be blue for you

11  is dark gray.

12      **Q     Sure.  In any event on the right-hand side**

13  **is your messages to Mr. Meyer; right?**

14      A     Correct.

15      **Q     Thanks.  And you and Mr. Meyer have**

16  **nicknames for each other.  And he sometimes refers**

17  **to you as Trevorpus; correct?**

18      A     That's correct, yeah.

19      **Q     Okay.**

20      A     Is that the first time that that's come up

21  in a deposition?

22      **Q     Well, you know, these things happen.**

23          **So that is a nickname that he gave you**

24  **based on some sort of climb that you guys did in the**

25  **Tetons; right?**

```
 1        A    Correct.

 2        Q    Okay.  And then you refer to him sometimes

 3   as Drizzle-Filth or something like that; is that

 4   right?

 5        A    I have.  I would say I don't really use

 6   that nickname with nearly the frequency that he

 7   refers to me as Trevorpus, so.

 8        Q    All right.  Thanks.  Fair enough.

 9             So about the middle of Deposition Exhibit

10   99, there is a text message from Mr. Meyer dated

11   October 2nd, 2017, at 8:21 p.m.  Do you see that?

12        A    I do.

13        Q    And Mr. Meyer is asking you to reply on

14   that Goals versus Tactics post.  Do you see that?

15        A    I do.

16        Q    Do you recall what Mr. Meyer's Goals

17   versus Tactics post was?

18        A    I do not.

19        Q    Okay.  Do you have any recollection at all

20   of what that post was about?

21        A    I don't.  I'm sorry.

22        Q    Okay.  You responded to Mr. Meyer's

23   request by saying that you'll have some time

24   tomorrow to send out a reply and that you had

25   something in mind; correct?
```

1      A    Yes.

2      Q    But you don't remember what that -- you

3  don't remember responding to that post.

4      A    I don't, no.

5      Q    And do you have a sense of what this was

6  posted on?  Would this be on the Bozone board's

7  listserve?

8      A    It's possible, yeah.

9      Q    What other listserve or posts would it be

10 on if not on the Bozone board?

11     A    It could have been a board communication,

12 Cottonwood board communication.

13     Q    Okay.  So the Cottonwood board submits

14 posts at times; is that right?

15     A    Yeah.  I mean, the language there I think

16 -- I don't think anybody's called it a post before.

17     Q    Okay.

18     A    Like internally there is not a language --

19 there's not a shared language internally among the

20 board of referring to emails as posts.

21     Q    Okay.  Could it be a Facebook post?

22     A    Yes.

23     Q    And do you have any recollection of a

24 Goals versus Tactics Facebook post that Mr. Meyer

25 made?

```
 1       A    I don't.

 2       Q    Did you look for that for purposes of

 3  responding to the subpoena?

 4       A    I did not specifically look for that post.

 5  I think I've described my efforts to review

 6  potential social media, Facebook specific, Facebook

 7  Messenger communications.

 8       Q    Can you please go through the Bozone

 9  boards and the Facebook posts from that time period

10  after this deposition and produce, if you have it,

11  anything related to the post that's referenced in

12  this text message?

13       A    Yes.  Left me make a note I guess.

14       Q    Okay.  Will you turn to Bates -- do you

15  have in front of you Big Sky 909 through 910?

16       A    Yes.

17            And let's mark that as Deposition Exhibit

18  100.

19            (Discussion held off the record)

20            MR. MORRIS:  Back on the record.

21  BY MR. MORRIS:

22       Q    So Deposition Exhibit 100 is additional

23  text messages exchanged between you and Mr. Meyer

24  and these are dated June 10, 2017, through looks

25  like June -- I'm sorry -- July 10, 2017, through
```

1  July 14, 2017; correct?

2      A    910 looks like it precedes 909.  910

3  starts June 13, 2017.  And then 909 would come after

4  chronologically which goes to July 14, 2017.

5      Q    Right.  Thank you for that.  Right.  So

6  910 is chronologically before 909; correct?

7      A    Correct.

8      Q    Okay.  And if you look at the bottom of

9  910. Do you see the text message where Mr. Meyer is

10  asking you to submit a declaration for net metering

11  case?

12      A    Yes.

13      Q    Okay.  And then at the very bottom of 910

14  there is a text message that runs out with give me a

15  shout when you have.  Do you see that?

16      A    Yes.

17      Q    Then if you go to 909, it doesn't look

18  like the entire text message has been captured;

19  right?

20      A    Yeah, potentially.  I mean, I don't know

21  that last text bubble could end with give me a shout

22  when you have and the next one could --

23      Q    Do you have your phone with you today?

24      A    I do.

25      Q    Are you able to pull that up?

Trevor Lowell - August 25, 2020 - NDT Assgn #34901-49

1    A    Yeah, if you give me a second.  Okay.  I

2  have it here.

3    **Q    Okay.  And are there text messages missing**

4  **between 910 and 909 that are shown on Deposition**

5  **Exhibit 100?**

6    A    The only -- no, the only thing that is

7  missing is that for some reason the screen shot cut

8  off the last word and the text bubble on 910.  That

9  text message reads on my phone:  Won't be much work.

10  Need an electronic signature.  Give me a shout when

11  you have a minute.  And then the following text

12  message appears at the top of 909.  Just tried.

13    **Q    All right.  Thank you.**

14        **So in these messages Mr. Meyer was asking**

15  **you to submit a declaration for this lawsuit about**

16  **net metering.  Do you recall that metering case?**

17    A    Yes.

18    **Q    Who is being sued, if you recall?**

19    A    I believe it was the Public Service

20  Commission, but I'm not positive.

21    **Q    Okay.  And was Mr. Meyer essentially**

22  **requesting that you be a representative plaintiff in**

23  **that lawsuit?**

24    A    That's my understanding.

25    **Q    And have you been a plaintiff in any other**

1  **lawsuits, representative capacity or otherwise,**

2  **other than that in that net metering case?**

3      A    I don't know.  There may be one more, but

4  I don't have a specific recollection of it.

5      **Q    And did you submit the declaration that**

6  **Mr. Meyer was requesting you to submit?**

7      A    I believe I did, yes.

8      **Q    Did you file other sworn statements with**

9  **the court in connection with that case?**

10     A    No, I think there was one document that he

11  shared with me digitally which I reviewed and

12  signed. And that was my involvement.

13     **Q    To your knowledge you have never been a**

14  **plaintiff in any other lawsuit; correct?**

15     A    Like I said, there may be one or more

16  others, but not that I can specifically remember.

17     **Q    Why do you not know if you were a**

18  **plaintiff in any other lawsuit?**

19     A    The way Cottonwood is structured, it's a

20  member organization.  And so John has often

21  undertaken lawsuits representing the members of

22  Cottonwood.  And I'm not an attorney, I guess I

23  should say that first, so forgive my bastardization

24  of how this process works, but my understanding is

25  that in order to file a suit you have to prove that

1  somebody has been harmed in some way or there's some

2  grievance that's been suffered.

3          And so as a membership organization John

4  has used that structure to say, you know, if you

5  pollute the environment you're harming the members

6  of Cottonwood. And so they would be the ones who are

7  suffering that grievance.  So the times he's asked

8  me to be -- to submit declaration has been in that

9  context.

10          So the Public Service Commission net

11  metering case, I was trying to increase the caps on

12  the amount of energy that individuals could sell

13  back into the grid. And I believe the argument there

14  was by them limiting that cap or by them providing a

15  cap, it's negatively impacting me as a Cottonwood

16  member because I can't then, you know, it limits my

17  ability to pursue solar electric generation at my

18  property if I had that desire.

19          So --

20      **Q      Okay.**

21      A      -- my lack of specific recall for a lot of

22  these things is because nothing has gone beyond

23  submitting a declaration like that.  So it just

24  doesn't really stand out to me as I didn't have to

25  present myself at trial or really be involved in the

1  process beyond that.

2      **Q    Do you have a personal stake in the net**

3  **metering case?**

4      A    Yes.

5      **Q    Okay.  What was that?**

6      A    Similar to what I described.  It's, you

7  know, I think that that --

8      **Q    Okay.  Let me just ask you this.**

9          **Did you have a solar panel or grid?**

10     A    No.

11     **Q    Okay.  Did you purchase one and want to**

12  **put it up?**

13     A    No.

14     **Q    Did you look into purchasing one?**

15     A    At the time of submitting the declaration?

16     **Q    Yeah.  Did you get an estimate from a**

17  **company for purchasing solar infrastructure --**

18     A    No.

19     **Q    -- for your home?**

20          **But you were a plaintiff in this lawsuit**

21  **about this issue, net metering?**

22     A    Yes.

23     **Q    And have you -- you said you may have been**

24  **a plaintiff in some other lawsuit; correct?**

25     A    I said that's a possibility, yeah.

```
 1        Q     And what other lawsuit do you think you

 2   may have been a plaintiff in?

 3        A     I don't recall.

 4        Q     You don't have any recollection of what

 5   other lawsuit that may be.

 6        A     No.

 7        Q     Okay.  And in this particular incident Mr.

 8   Meyer asked you to sign a declaration that was due

 9   that same day; correct?

10        A     Yes.

11        Q     And you gave that to him and he thanked

12   you for the quick turnaround and he filed it with

13   the court; correct?

14        A     Yes.

15        Q     Can you find in front of you Big Sky 888

16   through 887?

17              MR. MORRIS:  Is that number seven in the

18   share file?

19              MS. WALAS:  Yes.

20              MR. MORRIS:  Thank you.

21        A     Yes, I have it here.

22        Q     Great.  Let's mark that 101.  Deposition

23   Exhibit 101, please.  And Deposition Exhibit 101 is

24   a continuation of text messages that you had with

25   Mr. Meyer; correct?
```

```
 1        A    Correct.

 2        Q    And if you look on page 888, the text

 3   messages are dated December 18, 2017 -- I'm sorry.

 4   They begin December 12, 2017, and continue through

 5   December 18, 2017; right?

 6        A    Correct.

 7        Q    And then they jump on Big Sky 887 to

 8   January 14, 2019.

 9        A    Correct.

10        Q    And that's about a two-year gap in the

11   chronology there; correct?

12        A    Correct.

13        Q    And you sort of alluded to this earlier,

14   but --

15        A    It's about --

16        Q    I'm sorry.  Did I cut you off?

17        A    No, I'm just looking at this.  I mean,

18   it's about a year gap, right?

19        Q    Yeah, you're right.  It is about a year

20   gap. It's about a year and a month gap.  Thank you.

21             And you recall this is the way you

22   produced it to us?

23        A    Yes.

24        Q    And, in fact, before this deposition I

25   asked you about this gap; right, over email?
```

 1     A    Correct.

 2     Q    And you indicated to me that you had

 3   produced all of the text messages that you have with

 4   Mr. Meyer; right?

 5     A    Correct.  When you sent that follow-up

 6   email I went back into my phone and confirmed that

 7   that's all the records that I have.

 8     Q    Okay.  Do you know as you sit here today

 9   why there's this one year gap in your text messages

10   with Mr. Meyer between December 18, 2017, and

11   January 14, 2019?

12     A    I do not.

13     Q    Okay.  Do you recall deleting any text

14   messages in this time period?

15     A    I do not.

16     Q    You have no recollection of deleting them,

17   any text messages from this time period; is that

18   correct?

19     A    That's correct.  I mentioned earlier I

20   have in the past deleted message conversations on my

21   phone to create more space, so it is certainly a

22   possibility that when I've done that I may have

23   deleted conversations between John and myself.  But

24   I don't have specific recollection of going in to

25   delete this conversation.

1    Q    Would you delete for any particular

2  purpose? In other words, were you deleting

3  selectively your text messages or were you just

4  deleting wholesale when you've been doing this

5  deletion process?

6    A    No, the latter.  I mean, sort of

7  indiscriminately checking to see if there's

8  important information in the record of that

9  conversation that I wanted to keep, maybe photos or

10 videos that someone had sent me that I didn't want

11 to delete.  Those would be the considerations that I

12 would be making when looking at whether to delete or

13 not.

14   Q    Okay.  And you did delete messages prior

15 to December 12, 2017, until November 2016; correct?

16   A    Correct.

17   Q    And you didn't delete text messages post

18 January 2019; correct?  January 14; correct?

19   A    Not to my knowledge.

20   Q    Has anyone ever directed you to delete

21 certain text messages you had with Mr. Meyer?

22   A    No.

23   Q    Or asked you to?

24   A    No.

25   Q    And you know, Trevor, that December 15,

 1  2017, was about the time that Mr. Meyer filed the

 2  lawsuit for which we are here today, don't you?

 3      A    I was not aware of that, no.

 4      Q    You don't know that?

 5      A    I didn't know when he filed it, no.

 6      Q    Okay.  Do you recall being copied on an

 7  email to Taylor Middleton by Mr. Meyer informing

 8  Taylor Middleton of Big Sky Resort that he was going

 9  to file a lawsuit?

10      A    I don't recall it.  It may have happened.

11      Q    Okay.  You don't have any recollection of

12  that.

13      A    No.

14      Q    Okay.  Do you recall that you did, in

15  fact, have text messages with Mr. Meyer between

16  December 18, 2017, and January 14, 2019?

17      A    Yes.

18      Q    And it's your testimony that those

19  messages have been deleted by you; correct?

20      A    No.  I mean, that would be my best guess

21  is the reason that they are no longer -- well, I

22  guess my best guess is that that gap exists because

23  I deleted those conversations in an attempt to

24  create more space on my phone.

25           It's also possible that those text

1   messages, we didn't communicate for that block of

2   time.  I would say that's much less likely.

3       **Q    And have you ever given your phone to Mr.**

4   **Meyer?**

5       A    No.

6       **Q    Okay.  So it's not your testimony that Mr.**

7   **Meyer deleted these text messages, it would have**

8   **been you?**

9       A    It would have been me, yes.

10      **Q    Okay.  And do you recall discussing in**

11  **text messages with Mr. Meyer his lawsuit against Big**

12  **Sky between December 12 -- I'm sorry, December 18,**

13  **2017, and January 14, 2019?**

14      A    I don't have a specific memory of that.  I

15  know generally I've texted with John about the

16  lawsuit, but I couldn't say that I have a specific

17  recollection of those conversations.  I have a

18  knowledge that we have communicated about that in

19  that time frame, but that's as far as I would say.

20      **Q    Okay.  And just so I'm clear, in response**

21  **to the email that I sent you concerning this gap,**

22  **you looked at your phone and you confirmed for**

23  **yourself that there were no text messages in that**

24  **time period with Mr. Meyer; correct?**

25      A    Correct.  I was relatively annoyed about

1 having to produce all of the documents and not

2 having an efficient way to do so, so when I finally

3 put them all up and got the file sizes correct, I

4 was pretty excited to be done with that.

5          I received your email and was frustrated

6 that I may have missed something.  So return to the

7 phone and confirmed that, in fact, there was that

8 gap in that communication.

9      **Q     Okay.  Can you look at Big Sky 918 to 946,**

10 **please?**

11      A     Yes.

12      **Q     And let's mark Big Sky 918 to 946**

13 **Deposition Exhibit 102.**

14      A     Okay.  It's marked.

15      **Q     Okay.  And, Mr. Lowell, before we go on to**

16 **Deposition Exhibit 102, let me just ask you one**

17 **final question about this gap in your text messages.**

18      **Do you know when you deleted these text**

19 **messages?**

20      A     No.  I have recollection of, you know,

21 several instances casually waiting for a bus or

22 something where I've gone through my phone to try to

23 create more space. So I don't have a specific --

24      **Q     Okay.**

25      A     -- recollection, no.

1    **Q    Okay.  So moving on to Deposition Exhibit**

2    **102.  That's a continuation of text messages that you**

3    **had with Mr. Meyer; correct?**

4        A    Correct.

5    **Q    And the reason that the format is**

6    **different for these text messages as opposed to the**

7    **other ones that we talked about today is because you**

8    **used a program on your computer to generate this**

9    **word -- as a Word document; is that right?**

10       A    Correct, I copy and pasted it from the

11   iMessages program on my Apple laptop which is

12   synched with my phone.  So these are all the

13   messages that were saved on that program.

14   **Q    Okay.  And unfortunately we can't see the**

15   **date or the time of any of these messages; right?**

16       A    Correct.

17   **Q    And do you have a way that you can use**

18   **that program that would show us the date or the time**

19   **that these messages were transpired?**

20       A    Not that I'm currently aware of.  I think

21   the best way to get that information is to use the

22   same process for the other text messages.  So screen

23   shot them, send them as image files.

24   **Q    When did you learn that you were named as**

25   **a witness in this case?  I think we already talked**

1  **about it, Mr. Meyer communicated with you, but when**

2  **was that, do you recall?**

3      A    I think that was probably late July of

4  this year I received a text message from him.

5      **Q    And do you intend to attend trial in this**

6  **case in Butte about the week of October 26, 2020?**

7      A    I have not made a final decision about

8  that. My understanding is that there would be a

9  discussion.  I do not have a desire to get onto a

10  plane given the global pandemic that is happening.

11  And so if it's possible to avoid that that would be

12  my preference above all.

13      **Q    Okay.  And do you have an understanding of**

14  **why you were named as a witness in this case?**

15      A    My understanding is that I'm somebody who

16  has known John for a long time both before and after

17  his ski injury.  And so I could speak to, you know,

18  his character, any impacts that I've observed

19  resulting from the injury.  I was in the hospital a

20  few days after it happened so, and I'm a close

21  friend of his.

22      **Q    Anything else?**

23      A    No.

24      **Q    Do you know anything about Mr. Meyer's**

25  **medical records related to his ski accident?**

1     A     I know certain facts about what happened

2   to him.  What, you know, some of the injuries he

3   sustained. As I said, I was in the hospital visiting

4   him soon after the accident occurred so have spoken

5   with his father at the time about the injuries.  I

6   was living in Missoula when he was transferred to

7   the Community Hospital there for rehab and PT and

8   continuing care.  So I was visiting him there.  So,

9   yes, I would say I do.

10     **Q     Okay.  Have you been apprised during the**

11   **course of this litigation of what medical record Mr.**

12   **Meyer has produced and when he has produced them?**

13     A     No.

14     **Q     And you don't have possession of any**

15   **medical record for Mr. Meyer relating to his ski**

16   **accident; correct?**

17     A     Correct.

18     **Q     You haven't provided to Mr. Meyer any**

19   **medical records for purposes of producing those to**

20   **Big Sky Resort in this litigation; right?**

21     A     I have not.

22     **Q     And same question with respect to medical**

23   **bills.  Have you been apprised of what medical bills**

24   **Mr. Meyer has produced when during the course of**

25   **this litigation?**

```
 1        A    No.

 2        Q    You don't have possession of any of his

 3   medical bills; correct?

 4        A    No.

 5        Q    And you didn't assist Mr. Meyer in any

 6   capacity with producing his medical bills; right?

 7        A    No.

 8        Q    And do you know anything about Mr. Meyer's

 9   medical bills that you could testify to from your

10   personal knowledge at trial?

11        A    I know that they were substantial and that

12   it caused a lot of financial harm and difficulties

13   for him and his family because of the amount of --

14        Q    Okay.

15        A    -- cost of treatment and...

16        Q    And how do you know that his medical bills

17   were substantial?

18        A    He told me.

19        Q    Okay.  Any other source of information for

20   that?

21        A    Just general knowledge of the American

22   healthcare system.

23        Q    And you are not an expert in medical

24   billing; right?

25        A    No.
```

1    **Q    And do you have an understanding of Mr.**

2    **Meyer's health insurance coverage that he had in**

3    **place at the time of his ski accident?**

4        A    Not an in-depth understanding.  I knew

5    that he was covered under the firm he was working

6    for at the time, but that's about as deep as my

7    understanding goes.

8        **Q    Okay.  You don't know at what rate his**

9    **insurance paid something or didn't pay something and**

10   **that sort of thing; correct?**

11       A    Correct.

12       **Q    So in terms of the financial impact of the**

13   **medical bills we just spoke of, how do you know**

14   **about that?**

15       A    As I mentioned earlier in a conversation

16   with John and his father he's told me.

17       **Q    Okay.  Any other source of that**

18   **information about that financial impact other than**

19   **things that Mr. Meyer or his father have told you?**

20       A    No.

21       **Q    Do you consider John Meyer to be your best**

22   **friend?**

23       A    I consider him to be one of my best

24   friends, yes.

25       **Q    Okay.  And you visited, like you just**

1  said, Mr. Meyer in the hospital after his ski

2  accident that we're here for today in this case;

3  right?

4      A    Correct.

5      Q    And how long did you visit Mr. Meyer after

6  that, when he was in the hospital?

7      A    I believe he stayed maybe two nights, two

8  or three nights in the Billings area.  And then

9  would, you know, come several times a day to his

10  hospital room, meet with him, staying at a nearby

11  hotel.

12      Q    And do you remember when that was?

13      A    It was fairly soon after his accident.

14  When I arrived at the hospital he was still

15  intubated and, yeah, in very serious condition.  So

16  I don't know exactly how many days transpired

17  between when I arrived to visit him and when his

18  accident was, but it was maybe -- maybe three or

19  four days after the accident happened.  I was in New

20  Hampshire at the time of the accident.

21      Q    Okay.  So you flew out to Billings?

22      A    Yep, I was living in Missoula.  I had

23  returned to New Hampshire for my then girlfriend's

24  30th birthday party.  Received a phone call from

25  Tina Deweese while I was in New Hampshire informing

1  me of the accident.  And then I left the next day on

2  a plane to return to Missoula.  Drove to Bozeman,

3  picked up Tina and got a room at the hotel next to

4  the hospital.

5      **Q    Okay.  And what did Tina Deweese tell you**

6  **had happened?**

7      A    I would not trust my, you know, direct

8  recollection of this, but the conversation was that

9  John had had an accident while skiing with Amanda at

10  Big Sky; that he had been Life Flighted to Billings

11  and was in the ICU and was unconscious in a coma.

12      **Q    Anything else that you recall from that**

13  **conversation about what she told you happened in the**

14  **ski accident?**

15      A    No, I think I captured it there.  There

16  was probably some discussion about my travel plans

17  and how I may link up with her to visit him at the

18  hospital, but her understanding of the accident at

19  that point was just that he was in serious condition

20  and was either at Billings ICU or on his way and

21  that the accident had occurred at Big Sky Resort and

22  he was skiing with Amanda, his now wife.

23      **Q    Okay.  I'm sorry, did I cut you off?**

24      A    Amanda, his now wife, for context.

25      **Q    Right.  Got it.  And did you see Amanda**

1   when you were in Billings visiting Mr. Meyer?

2       A    I did.

3       Q    And did you have -- did you talk with her

4   at all about what had happened?

5       A    I'm sure, yeah.  I don't, again, I don't

6   have specific recollection of that conversation.  We

7   were -- spent several hours with her and she was

8   there in the hospital room most of the time with

9   him, but I don't have recollection of specific

10  details.

11      Q    You don't remember what she told you about

12  how the wreck occurred?

13      A    I remember she told me that she didn't

14  really see it.  I think that she came around and saw

15  him prostrate on the ground basically, but she

16  didn't have a visual recollection or actually see

17  exactly what happened.

18      Q    Okay.  But she told you she didn't see it.

19  Did she tell you anything else about how Mr. Meyer's

20  wreck occurred?

21      A    No.

22      Q    Did she tell you that Mr. Meyer was skiing

23  fast that day?

24      A    No.

25      Q    She didn't mention that?

```
 1      A    No.

 2      Q    Did she tell you of her belief that Mr.

 3  Meyer had lost control uphill of a cat track and

 4  then tumbled over it?

 5      A    No.

 6      Q    Did she mention anything to you about the

 7  cat track at the base of the Highway run being

 8  difficult to see on that day?

 9      A    Not that I recall.

10      Q    Did you talk with Ron Meyer, John's

11  father, while you were in Billings?

12      A    Yes.

13      Q    And do you recall any discussions with him

14  about how Mr. Meyer's ski wreck occurred?

15      A    Not specifically.  Again, I would wager

16  that there were conversations about sort of what he

17  knew, but I don't have specific recollection of

18  details that we discussed.

19      Q    Okay.  And with Mr. Meyer, were you able

20  to speak with Mr. Meyer himself in Billings when you

21  were visiting Mr. Meyer in the hospital?

22      A    There was very limited communication.  I

23  mean, the first time that he was conscious in the

24  room with me he recognized me, but, you know,

25  couldn't -- couldn't really talk very well.  Seemed
```

```
 1   to be very confused.  So, no, I mean, there was --

 2   there was some small exchanges, but really nothing

 3   of substance, because he wasn't really able to

 4   communicate that well.

 5        Q    Do you recall any discussion with anyone

 6   while you were in Billings of any witnesses to Mr.

 7   Meyer's ski wreck?

 8        A    No.

 9        Q    Okay.  And I think you had said this

10   already, but you were living in Missoula at the time

11   of Mr. Meyer's ski wreck; right?

12        A    Correct.

13        Q    And Meyer was also living in Missoula; is

14   that right?

15        A    Yeah, he had recently moved there is my

16   memory.

17        Q    Okay.

18        A    He had taken a job with a law firm in

19   Missoula and had moved into an apartment downtown.

20        Q    Okay.  And before taking that job in

21   Missoula, he was living in Bozeman; right?

22        A    Yes.

23        Q    And he was living in a yurt; is that

24   right?

25        A    John has lived in a yurt in the past for
```

1  substantial amount of time.  I don't have an exact

2  recollection of sort of when he was in a yurt and

3  when he was in other -- living in other places.

4      **Q    Is it your understanding that Mr. Meyer**

5  **lived in the yurt until the time that he moved to**

6  **Missoula?**

7      A    Again, I'm not certain.  That sounds

8  right, but I am not certain.

9      **Q    Okay.  And did you visit with Mr. Meyer at**

10  **his apartment in Missoula after he was released from**

11  **the hospital in Billings?**

12     A    He was released from the hospital in

13  Billings and transferred to the hospital in

14  Missoula.  I visited him at the hospital in

15  Missoula.  And then visited him once he moved out of

16  that hospital into the apartment, back into his

17  apartment that he had rented prior to the accident.

18     **Q    Okay.  When did you visit him in the**

19  **hospital in Missoula, do you recall?  Several times?**

20     A    Yeah, maybe three or four times.

21     **Q    And did you speak with Mr. Meyer in the**

22  **hospital in Missoula?**

23     A    Yes.

24     **Q    And what did he tell you about how his ski**

25  **wreck had occurred when you visited him in the**

1  **hospital in Missoula, if anything?**

2       A    I don't remember a conversations specific

3  to that.  You know, he was in a lot of pain and so

4  we talked a lot about at the time they didn't know

5  that he had also broken his arm.  So I remember him

6  discussing how much his arm hurt and talking about,

7  you know, basically his condition and what was --

8  how he was doing, how he was feeling.

9            His father was there quite often too.  So

10  I would meet with John and often sort of step

11  outside and talk to his dad.  John was very tired

12  and often, you know, couldn't sustain conversations

13  for long periods of time.  Couldn't sustain a lot of

14  activity and so they were often pretty brief

15  conversations.

16            He also was struggling to verbalize and to

17  vocalize a lot of things.  So I think it was just

18  generally difficult.  So the conversations were

19  pretty brief, how are you?  How is it going today?

20  You know, what hurts?  That type of thing.

21       **Q    Okay.  And did you talk with Breean -- I'm**

22  **sorry.  Did you talk with Amanda Eggert in Missoula**

23  **about how Mr. Meyer's ski wreck occurred?**

24       A    It's possible, yeah.  I would think that I

25  would be curious as to sort of what she knew.  So I

1  know at some point, you know, soon after the

2  accident whether it was in Missoula or Billings,

3  that I probably asked her what she knew of the

4  accident.

5      Q    What did she tell you?  Have you already

6  gone over what all she told you?

7      A    I have, yeah.

8      Q    Did she tell you Mr. Meyer did not

9  remember his ski wreck?

10     A    I don't know.  I don't know that.

11     Q    Did Mr. Meyer ever tell you that he didn't

12  remember how his ski wreck occurred?

13     A    I recall him talking at different points

14  about how the post-accident, his struggle to sort

15  of, you know, remember things and place things

16  chronologically, but I don't know specifically if he

17  said I don't remember the accident.  I think he had

18  memory of many aspects of it.  It seemed to be in

19  conversation he could talk about, you know, seeing

20  the -- yeah, I guess I don't -- I would say I don't

21  know specifically.

22     Q    So as I understand your testimony, at a

23  certain point Mr. Meyer talked to you about how he

24  believed the ski wreck occurred; correct?

25     A    Yeah.

1    Q    Okay.  And he also told you at a certain

2  point that he didn't remember certain parts of the

3  day and the chronology of things; correct?

4    A    Yeah, I would say more broadly that he was

5  struggling just with general memory recall and with

6  cognitive function.

7    Q    Did he tell you that he couldn't remember

8  part -- the day on which his ski wreck occurred?

9    A    I don't know that he specifically said

10  that.

11    Q    He never, never told you that.

12    A    I don't know that he specifically said

13  that.

14    Q    That you recall?

15    A    Yeah, I mean, what we talked about was

16  sort of his general cognitive abilities and the

17  impact of the accident on that.  And part of that --

18    Q    Okay.

19    A    -- discussion at different times was

20  memory recall.

21    Q    Okay.  And when was the first time Mr.

22  Meyer spoke to you about how he believed his ski

23  wreck occurred?

24    A    I don't know.  I think that, you know, the

25  immediate time after the accident he was pretty

1  messed up and so not communicating very well.  So I

2  think, you know, probably his recollection of it,

3  that conversation, that he had came, you know, after

4  he was out of the Missoula hospital and a little

5  more able to communicate effectively and a little

6  more stable physically.

7      **Q    Okay.  So do you have a specific**

8  **recollection of that or are you just sort of trying**

9  **to place it in your own mind?**

10     A    I don't have a specific recollection.  I

11  recall not having a firm understanding of how the

12  accident happened for a while afterwards.

13     **Q    Okay.**

14     A    And then I don't know when specific

15  conversations may have happened between he and I, or

16  Amanda and I or his father, but I think those

17  details, you know, what I recall is those details

18  sort of getting filled in over time through

19  conversations with Amanda and through conversations

20  with John.

21     **Q    Okay.  And I think what you are telling me**

22  **is that you don't believe that any conversations**

23  **with Mr. Meyer about the nature or about how his ski**

24  **wreck occurred when he was in the hospital in**

25  **Missoula?**

     1        A     Not that I can specifically recall, no.

     2        **Q     It would have been at a certain time after**

     3   **that; right?**

     4        A     That's my guess, yes.

     5        **Q     And do you recall ever asking him, John,**

     6   **what happened, how did this ski wreck occur,**

     7   **something of that sort?**

     8        A     I think it's very likely, yeah.  I don't

     9   remember a specific recollection of that, but...

    10        **Q     Okay.  And in a general way do you recall**

    11   **what he told you when you asked him that question or**

    12   **question to that effect?**

    13        A     I remember the detail, the cat track.  I

    14   remember the detail of Amanda not seeing the actual

    15   accident occur.  And her coming upon him after the

    16   fact. I remember the details of him being Life

    17   Flighted.  He felt like the ski patrol saved his

    18   life.  Yeah, that's what I recall.

    19        **Q     Okay.  You first said the detail of the**

    20   **cat track.  What did he tell you about a cat track?**

    21        A     I don't know if it was John or if it was

    22   Amanda.  I just remember that I think that he --

    23   that that was somehow either what he hit, or what

    24   propelled him into the air or was a terrain feature

    25   that was -- played a prominent role in his accident.

     Q    Okay.  And to your recollection you don't

know whether or not John told you that or Amanda

told you something about a terrain feature; is that

right?

     A    Yeah, it would be one or the other.  It

could likely be both.

     Q    Okay.  But you don't have -- okay.  So it

sounds like the details of this description of how

the accident or the ski wreck occurred were never

super clear to you or at least you don't have a

memory of them being described to you in a super

clear way; is that right?

     A    That's accurate.

     Q    Okay.  So Mr. Meyer moved to Amanda

Eggert's place south of Big Sky in March of 2016;

right?

     A    That sounds correct, yeah.

     Q    And do you know why he moved from Missoula

to Amanda Eggert's place south of Big Sky?

     A    I think there was some -- couple of

factors involved.  He lost his position at the firm

where he was working prior to the accident.  He was

in a relationship that was developing and going well

with Amanda.  So I think he wanted to be, you know,

to be closer to her and live with her that I think

1    is the primary reason that the decision was made.

2        **Q    Okay.  He lost his position with WildEarth**

3    **Guardians; is that right --**

4        A    Yes.

5        **Q    -- in March of 2016?**

6        A    Yes.

7        **Q    And what did Mr. Meyer tell you about him**

8    **losing his position with WildEarth Guardians?**

9        A    The only thing I recall or know is that he

10   started with them pretty soon not -- not too far

11   before when he got in his accident.  So he came on

12   and then had his accident and then was obviously out

13   on leave because he wasn't able to work anymore as a

14   result of that.

15            He was covered, I think, by the insurance

16   that they had or some partially covered, I'm not

17   sure.  My recollection is that there was some

18   tension around whether he would be able to return to

19   work in full capacity, what that time frame would

20   be, how long the organization would support him on

21   medical leave.

22            And then I'm not sure how all those

23   different factors came together but those were the

24   underlying issues that I was aware of.

25       **Q    And he told you all of those things were**

1  factored into him being let go by WildEarth

2  Guardians?

3      A    Yeah, those are the details that I

4  remember about his leaving that organization or

5  being fired.  I'm actually not even sure if the

6  decision was to fire him, or to let him go or he

7  left on his own accord.  I couldn't speak to that.

8      Q    You don't know whether or not he was fired

9  or whether he resigned?

10     A    Correct.

11     Q    Did Mr. Meyer ever tell you he was fired

12 because WildEarth Guardians and his supervisor found

13 him to be unmanageable?

14     A    I don't have any recollection of that, no.

15     Q    He never told you that?

16     A    No.

17     Q    Okay.  And so you don't know whether he

18 was fired, you don't really know why that separation

19 occurred; right?

20     A    I was aware of the details that I just

21 spoke about.

22     Q    Okay.

23     A    And I was aware of a general growing

24 tension between him and WildEarth Guardians, but

25 that was about it.

1      Q    Okay.  What do you know about a growing

2  tension between Mr. Meyer and WildEarth Guardians?

3      A    What I previously stated, that he was a

4  new employee who then became -- was on leave and

5  unable to do his job because of an accident.  And

6  while he was recovering there was discussions about

7  what his future with the organization would look

8  like, what he had the ability to do professionally

9  given his cognitive and physical issues.  And that

10 that was sort of an ongoing discussion that seemed

11 to me from my vantage point was creating some

12 challenges for him and the organization.

13     Q    Sure.  Did you ever talk with anyone at

14 WildEarth Guardians about why Mr. Meyer was

15 separated from that position?

16     A    No.

17     Q    Have you ever found Mr. Meyer difficult to

18 manage?

19     A    To manage?

20     Q    Sure.

21     A    I don't.

22     Q    Yeah.  You worked with him at Cottonwood;

23 right?

24     A    Yeah.

25     Q    Have you ever found his style to be sort

1 of difficult to manage?

2    A    I would say that I think -- I don't find

3 him difficult to manage.  I think he's very willing

4 to, you know, to work with the board, to receive

5 feedback, to adjust his goals and deliverables and

6 outcomes and all those things per conversations and

7 per board consensus. So no, I mean, as far as -- I

8 think that word manage I would say no.

9    Q    Okay.  Find him to be a nonconformer?

10    A    How would you define -- again, I guess he

11 is somebody who has a reputation for being

12 nonconforming, sure.  The man has lived in a yurt

13 for several years off the grid.  He's, yeah, I think

14 that's accurate.

15    Q    And outspoken?

16    A    Certainly, yeah.

17    Q    And can sometimes rub people the wrong way

18 with his outspoken views; right?

19    A    Yeah, I think he is very blunt.  He speaks

20 his mind and he doesn't hesitate to offer his

21 opinion about things.

22    Q    That's actually a point of pride for Mr.

23 Meyer that if he can sort of stir up conversation or

24 controversy about a certain issue, he feels like

25 he's leading?

 1      A    I think he is interested in having honest

 2  conversations and speaking directly to issues.

 3      **Q    Okay.  Did Mr. Meyer ever tell you that he**

 4  **blamed his firing by WildEarth Guardians on his ski**

 5  **wreck?**

 6      A    I don't have a memory of him explicitly

 7  saying that.  I think that was something I

 8  understood, you know, in the hypothetical if he had

 9  not had a ski accident that it wouldn't, you know,

10  the following events wouldn't have led to him being

11  fired from that organization.

12      **Q    So that's just sort of your sort of**

13  **interpretation of the event; Mr. Meyer never told**

14  **you that; right?**

15      A    He never explicitly said that.  I think we

16  had conversations about the challenges that the ski

17  accident had on his position at the organization.

18  So it's, you know, I would deduce from all those

19  conversations and the reality of the situation that

20  the ski accident had a relatively direct impact on

21  his employment there.

22      **Q    Sure.  Again, that's just you sort of**

23  **deducting based on information that was provided to**

24  **you about Mr. Meyer; right?**

25      A    Correct.

1    **Q    Okay.  I think we talked earlier that Mr.**

2  **Meyer was fired from WildEarth Guardians in March of**

3  **2016; right?**

4    A    Yeah, I don't -- that sounds right.  I

5  trust that date.  It sounds about right.

6    **Q    Okay.  And do you know that Mr. Meyer was**

7  **actually backcountry skiing again in March of 2016;**

8  **right?**

9    A    I know that he returned to the sport that

10  same winter, yeah.

11    **Q    Right.  In March.**

12    A    Yeah, that sounds right.

13    **Q    And he was skiing in the Pioneer**

14  **Mountains? Do you recall he was skiing backcountry**

15  **skiing in the Pioneer Mountains in March of 2016.**

16    A    The memory that I have that confirms that

17  he was skiing again was I think he took a trip with

18  Amanda to the Beartooths at some point.  So I don't

19  have a specific memory of his trip to the Pioneers,

20  but...

21    **Q    Okay.  Will you look at Big Sky 823**

22  **through 824?**

23    **MR. MORRIS:  And, Breean, this is file 34.**

24  **BY MR. MORRIS:**

25    **Q    And, Trevor, this is probably -- this**

         1   could very well could be towards the back of your

         2   file.  It's an email with a Bate stamp Big Sky 823

         3   on the front.

         4       A    Okay.  I have it here.

         5       Q    Let's mark that as Deposition Exhibit 103.

         6            And Deposition Exhibit 103 is a true and

         7   correct copy of an email exchange with Mr. Meyer and

         8   including you dated March 30th, 2016; correct?

         9       A    Correct.

        10       Q    And does that refresh your recollection

        11   about Mr. Meyer's backcountry skiing in March of

        12   2016 in the Pioneer Mountains?

        13       A    Yes, he says here, got out backcountry

        14   skiing last weekend in the Pioneers.  So good to be

        15   back in it.

        16       Q    Right.  And he also was responding at the

        17   bottom of the page there to an email from Kelly

        18   Nokes at WildEarth Guardians; right?

        19       A    Yeah.

        20       Q    He's volunteering to help do the station

        21   take-out in April 2016; correct?

        22       A    Yes.

        23       Q    And as part of that wolverine monitoring

        24   station take-out, they were also going to go and ski

        25   on the South Bowl; correct?

 1     A     Looks like there is discussion of

 2 hopefully being able to take a few turns on the

 3 South Bowl.

 4     Q     Correct.  And Mr. Meyer in March of 2016

 5 was already keen on engaging in both of those

 6 activities; right?

 7     A     Yes.

 8     Q     So you are not contending that in March of

 9 2016 Mr. Meyer was physically unable to tend to his

10 job with WildEarth Guardians, are you?

11     A     No.

12     Q     And I think you just spoke about this, but

13 in the summer of 2016 Mr. Meyer was also skiing what

14 he just mentioned in the Beartooth Mountains;

15 correct?

16     A     Yeah, I remember him telling me about that

17 trip.

18     Q     Right.  Can you locate Big Sky 748?  I

19 guess it's 748 through 749.

20         MR. MORRIS:  And, Breean, this is number

21 nine, file number nine in the shared file.

22     A     Is it an email or text message?

23     Q     Yeah, it's another email.  It's dated

24 September 2nd, 2016.  The subject of the email is D-

25 filth.  Big Sky email 748 to 749.

 1          What we can do is bring it up on the share

 2  file.

 3      A    Document nine?

 4      Q    Correct.

 5      A    Okay.  I have it brought up here.

 6      Q    Okay.  It's got the Bate stamp on it, Big

 7  Sky 748 through 749; correct?

 8      A    Yeah.

 9      Q    Okay.  And we will mark that Deposition

10  Exhibit 104.  We might not physically mark that now,

11  but we'll have the court reporter mark it later.

12          I'm going to refer to it as Deposition

13  Exhibit 104.

14      A    Okay.

15      Q    And Deposition Exhibit 104 is a true and

16  correct copy of an email exchange dated September

17  2nd, 2016, between Mr. Meyer and yourself; correct?

18      A    Correct.

19      Q    Mr. Meyer in September of 2016 is

20  informing you that he is training for climbing;

21  right?

22      A    Yeah, he says training for climbing.

23  Managed a whopping two pull-ups yesterday.

24      Q    Right.  And what he is saying is that he's

25  training for rock climbing; correct?

```
 1        A    I would assume that.  We've also

 2   mountaineered together, so one could argue

 3   semantically --

 4        Q    Okay.

 5        A    -- I guess you could train for --

 6        Q    Sure.  So it could have been technical

 7   rock climbing with gear and ropes, that sort of

 8   thing, or it could be mountaineering.  In other

 9   words, bagging high mountain peaks and that sort of

10   thing; correct?

11        A    Yes.

12        Q    And he is also telling you about -- he is

13   saying he can't remember if he told you that he fell

14   when he was skiing in the Beartooths; right?

15        A    Yes.

16        Q    And this ski accident that he had in the

17   Beartooths he told you that he had fell about 500

18   feet in that fall; correct?

19        A    Yes, that's what he said in that email.

20        Q    And he broke his ribs; right?

21        A    Yes.

22        Q    And he messed up his knee pretty bad he

23   told you; right?

24        A    Yes.

25        Q    Did you guys talk about that fall in the
```

1  Beartooths outside of this email exchange that you

2  recall?

3      A    It's possible.  I don't have a specific

4  recollection of it.

5      Q    Have you ever taken a fall while skiing in

6  the backcountry that was 500 feet?

7      A    I have not, no.

8      Q    That's a pretty significant ski wreck, is

9  it not?

10     A    Yeah, I mean, I think depending on the

11  fall. People have fallen and slidden 500 feet and

12  come to a gentle stop, but...

13     Q    Sure.  But if you break your ribs and you

14  mess up your knee in a 500-foot fall, do you agree

15  with me that that's a serious fall; right?

16     A    Yes.

17     Q    Did Mr. Meyer ever tell you where in the

18  Beartooth Mountains that he was skiing when he had

19  this fall?

20     A    No.

21     Q    And this is about ten months after the ski

22  wreck that he had at Big Sky; correct?

23     A    Correct.

24     Q    Mr. Meyer also texted with you about this

25  ski wreck and informed you that in this fall in the

1  Beartooth he had damaged his lungs.  Do you recall

2  that?

3       A    Is it documented?  Could you point me to

4  it? I don't have a specific memory of that text, but

5  I don't --

6       Q    Okay.

7       A    -- deny that --

8       Q    Sure.  Do you recall him telling you,

9  without looking at any document, that he had

10 experienced breathing trouble ever since the fall

11 that he took in the Beartooth?

12      A    I certainly remember him talking about

13 breathing difficulties.  That was an issue, we had

14 gone out, I think, on a mountain bike ride at some

15 point. And he was -- he was prior to the accident

16 was a very physically fit person and it was always a

17 struggle for me to keep up with him.  And it was

18 something that we had talked about and I experienced

19 personally is that after the accident he had a lot

20 of issues breathing.  I think he had mentioned COPD

21 or something at some point.

22      Q    Right.  And when you are saying the

23 accident, you are talking about the ski wreck that

24 he had in the Beartooth in the summer of 2016;

25 right?

```
 1      A    I don't -- no, I mean, I'm talking about I

 2  think generally his accident at Big Sky was my

 3  understanding.

 4      Q    Okay.  Okay.  Well, let's do this then.

 5  Let's look at Big Sky 906 which is, if you can find

 6  it in front of you that would be great.  But if you

 7  can't we'll pull it up on the share file.  This is a

 8  text exchange.

 9      A    Yeah, I have it here.

10      Q    Okay.  Let's mark that Deposition Exhibit

11  105.

12          And here also, Trevor, will you pull up on

13  that share file the document that's marked 010 and

14  it's IMG 2092.

15      A    It's another text message?

16      Q    Correct.

17          MS. WALAS:  Will you repeat that number,

18  Mac?

19          I didn't catch the last part of it.

20          MR. MORRIS:  Sure.  It's file number ten,

21  but it's an image file as opposed to a PDF.  And

22  it's IMG underscored 2092.

23      A    I have it here.

24      Q    Okay.  And in Deposition Exhibit 105 Mr.

25  Meyer is telling you that I have been having
```

 1   breathing trouble since that ski accident last

 2   summer; correct?

 3        A    Yes.

 4        Q    Right.  And what he is saying there is

 5   that he is associating his skiing accident, his

 6   breathing troubles, with the skiing accident in the

 7   summer; right?

 8        A    Yes.

 9        Q    Right.  And not the ski wreck that he had

10   at Big Sky Resort; correct?

11        A    I think it's a fair assumption if he's

12   specifically saying last summer and his Big Sky

13   accident happened in December, then, yeah.

14        Q    Right.  And if you would look now at that

15   image that you have open on your computer there,

16   that file number ten image 2092.  Do you have that

17   open?

18        A    I do.

19        Q    Is that the continuation of the texting

20   exchange that you had with Mr. Meyer that

21   represented Deposition Exhibit 105; right?

22        A    It appears to be, yeah.

23        Q    Right.  And this is where Mr. Meyer is

24   telling you that his doctors told him that he had

25   symptoms, they are similar to COPD; correct?

```
 1       A    Yes.

 2       Q    That was in -- and this text exchanged

 3  occurred in or around August of 2017; right?

 4       A    Yes.

 5       Q    In addition to skiing in the Pioneer

 6  Mountains in March of 2016 and then skiing in the

 7  Beartooth Mountains in the summer of 2016, Mr. Meyer

 8  was skiing in the winter of 2016 as well, wasn't he?

 9       A    Can you repeat that?

10       Q    Mr. Meyer was skiing in the winter of

11  2016. Do you recall that?

12       A    Wasn't that when the Pioneer trip was

13  discussed?

14       Q    The Pioneer trip was in March of 2016.

15  I'm now referring to the winter of 2016/17 and Mr.

16  Meyer skiing in that winter.

17       A    So the following ski season?

18       Q    Correct.

19       A    Okay.  Yeah, I believe, yeah.  That sounds

20  true.

21       Q    Do you know that he had purchased a pass

22  to the Snowbowl Ski Resort in Missoula for that

23  winter?

24       A    Yeah, I believe so.

25       Q    And did you and Mr. Meyer ski at Snowbowl
```

1   in the winter of 2016 together?

2      A    Yeah, I would assume so.  My hesitation is

3   the chronology of everything.  I think that's

4   accurate though, yeah.

5      Q    Okay.  Well, and do you recall that he

6   bought an annual ski pass at Snowbowl that year?

7      A    Yeah, it sounds right.

8      Q    Okay.  In May of 2017 do you recall skiing

9   with Mr. Meyer in Glacier National Park backcountry

10  skiing?

11     A    Yep, we took a trip up there as a sort of

12  bachelor party, he and I.  He was getting married

13  and so we went up and skied one of the glaciers.

14     Q    Okay.  And I think you're probably

15  referring to 2018, and I'm focused on the summer or

16  spring of 2017.  Do you recall a trip with Mr. Meyer

17  in Glacier in the spring or early summer of 2017?

18     A    I don't.  If you have something to point

19  out it might help.

20     Q    Sure.  Will you bring up, if you can in

21  front of you, Big Sky 913.

22     A    Okay.

23     Q    Let's mark this as Deposition Exhibit 106.

24          And Deposition Exhibit 106 is a true and

25  correct copy of a text exchange that you had with

1  **Mr. Meyer in May of 2017; correct?**

2      A    Correct.

3      **Q    And Mr. Meyer is asking you do you want to**

4  **ski with him on May 24 up in the Glacier; right?**

5      A    Correct.

6      **Q    And do you recall now going on a trip with**

7  **him to Glacier to ski in May of 2017?**

8      A    I don't.  I don't -- I'm not sure that

9  that trip ever happened.

10     **Q    Okay.  In any event, Mr. Meyer was at**

11 **least keen on doing that and inviting you to go**

12 **backcountry skiing in Glacier in May of 2017?**

13     A    Yes, that was his -- he asked if I would

14 be interested in doing that.

15     **Q    Right.  And did you and Mr. Meyer take a**

16 **trip into the Bob Marshall Wilderness in September**

17 **of 2017 for backpacking?**

18     A    No, that trip was part of my bachelor

19 party. It was a plan to do a multi-day backtrack

20 trip with John and other members of my wedding

21 party.  That was a pretty tough fire year and we had

22 planned to do it in the Bob.  We had to cancel those

23 plans.  We moved it to a trip in the Mission

24 Mountains.  We had to cancel those plans.  We moved

25 it to a trip in the Cabinet Mountains and at that

1    point John couldn't attend.

2        **Q    Okay.**

3        A    So there were several of us who ended up

4    going camping in the Cabinets, but John wasn't able

5    to come.

6        **Q    Okay.  Can you tell me about the plan that**

7    **you had made for backpacking in the Bob Marshall**

8    **Wilderness in September of 2017?  Was that a four-**

9    **day backpacking trip?**

10       A    Yeah, it sounds right.  It would have been

11   three or four days.  I think I had looked at

12   initially doing a loop route in the Scapegoat

13   section of the Bob Marshall, hiking along sort of

14   different river corridors and fishing along the way.

15       **Q    Okay.  And do you know about how many**

16   **miles you all were planning to hike and backpack**

17   **during those four days?**

18       A    It was probably between 30 and 45.

19       **Q    Okay.  Mr. Meyer never expressed to you**

20   **any reservation about doing that as a result of any**

21   **injury he suffered; correct?**

22       A    No.

23       **Q    You said something a moment ago about Mr.**

24   **Meyer's bachelor party.  Do you recall that**

25   **testimony?**

1     A     Yes.

2     Q     **And that was in August of 2018, do you**

3 **recall that?**

4     A     Yeah, that sounds accurate.

5     Q     **What did you and Mr. Meyer do for his**

6 **bachelor party in August of 2018?**

7     A     He met me in Missoula.  And we drove up

8 together to Whitefish and we rode a loop trail.  We

9 rode the Reid Divide Trail on mountain bikes.  After

10 we did that we camped outside of Glacier just at a -

11 - on some Cora service land, sort of pulled off and

12 I slept in the truck.  He slept on the ground.

13         And we woke up the next morning and we

14 hiked up to the Salamander Glacier with skis.  And

15 we -- he skied probably the bottom third of that.  I

16 skied the entire thing and then we hiked out.  And

17 then we returned that same day to Missoula.

18     Q     **Okay.  Was it just the two of you?**

19     A     Yeah.

20     Q     **And how much elevation gain did you guys**

21 **get for skiing the south -- I'm sorry, was it**

22 **Salamander Glacier?**

23     A     Yeah, I don't know.  We started at the, I

24 believe, the Mini Glacier Trailheads there.  And

25 then I don't -- I'd have to look it up.

1      Q    Okay.  And you guys were also mountain

2  biking on that trip; correct?

3      A    Correct, the day before we mountain biked.

4      Q    And how many miles did -- was your

5  mountain bike, do you recall?

6      A    It was a several-hour trip, so I would

7  guess, you know, somewhere between 10 and 20 miles.

8      Q    Okay.  Can you pull up Big Sky 575.  And

9  this is an email exchange between you and Mr. Meyer

10 with the subject, bachelor party contact list.

11         (Discussion held off the record)

12         MR. MORRIS:  This is a good point as far

13 as I'm concerned.  We can stop here and go off.

14         Thank you.

15         (Lunch recess)

16         MR. MORRIS:  Back on the record.

17 BY MR. MORRIS:

18     Q    Before the lunch break, Trevor, we were

19 going to talk about Deposition Exhibit 107.  Do you

20 have that in front of you?

21     A    Is that Big Sky 575?

22     Q    Correct.

23         MR. MORRIS:  And was that actually marked?

24         THE REPORTER:  No, but I have the sticker

25 ready.

BY MR. MORRIS:

    Q    So, Trevor, do you understand that even though we took a break and had lunch you are still under oath; right?

    A    Yes.

    Q    So Deposition Exhibit 107 is an email exchange between you and Mr. -- I'm sorry, between you and Mr. Meyer in August 6, 2018; correct?

    A    Yes.

    Q    And the subject is bachelor party contact list; right?

    A    Yes.

    Q    And Mr. Meyer is providing you with some names of people that he wanted to invite to his bachelor party; right?

    A    Correct, names and phone numbers.

    Q    Right.  And he indicates there that given the short notice I think we will be lucky to have four of us including you and I; right?

    A    Correct.

    Q    In fact, you testified earlier that it was only you and Mr. Meyer who went on this trip to Glacier National Park for Mr. Meyer's bachelor party; right?

    A    Correct.

 1     Q    And so the bachelor party was really the

 2  subject of last minute planning; is that accurate?

 3     A    Yeah, I guess that's accurate.

 4     Q    Okay.  And as of August 6, 2018, the plan

 5  for this bachelor party weren't even finalized;

 6  right?

 7     A    Correct.

 8     Q    And you and Mr. Meyer weren't sure if

 9  anyone else would attend it other than you and him;

10  right?

11     A    That's what he's indicating in this email

12  is that it's short notice and so it may be difficult

13  to have others commit.

14     Q    Right.  And were you even sure that the

15  bachelor party would go forward at all at this time?

16     A    I can't really speak to my mindset going

17  back. I think there was --

18     Q    Okay.

19     A    -- some conversations about what it would

20  look like.  There was some attempt to contact a lot

21  of folks and see what their capacity was.  The plans

22  kept evolving until we realized that it wasn't

23  possible to pull everybody together.  And so John

24  and I made the decision to go for the weekend trip

25  up to Glacier.

 1      Q    Okay.  So, in other words, like you just

 2  said, the plans of this bachelor party were sort of

 3  constantly evolving, in fact, revolving even after

 4  this August 6 email that he sent; right?

 5      A    Correct.

 6      Q    And you and Mr. Meyer also planned in June

 7  of 2019 to climb Mount Rainier in Washington; right?

 8      A    Yeah, there were other people that were

 9  part of that plan and part of that trip.  I did not

10  end up attending that.

11      Q    Right.  But Mr. Meyer was a part of that

12  trip that actually did go on it; correct?

13      A    They did go.  They did not attempt to

14  climb Mount Rainier.

15      Q    They were stormed off?

16      A    That's my understanding, yeah.

17      Q    Right.  But in any event it was Mr.

18  Meyer's plan as early as June 2019 to summit Mount

19  Rainier; correct?

20      A    That was the goal of that trip initially,

21  yes.

22      Q    Right.  And camp at high elevation?

23      A    Yeah, I believe that there was a plan to

24  camp. I forget which -- I think the Emmons Glacier

25  Route, which I'm not terribly familiar with, but a

1    typical trip would be two days up, one day down.

2        **Q    Did that involve some skiing on the**

3    **glaciers as well typically, was that part of the**

4    **plan?**

5        A    That was discussed as part of the plan,

6    yeah. I don't know where -- if that idea got dropped

7    or if it was still the plan by the time they got

8    stormed off, I'm not sure.

9        **Q    Mr. Meyer has often told you that he**

10   **recently ran a marathon; correct?**

11       A    That sounds familiar.  I don't know if you

12   can point to some communication.

13       **Q    Sure.  Do you recall him telling you that**

14   **he was going to run the Devil's Backbone Marathon?**

15       A    Yeah, I think I remember it from looking

16   through these documents seeing that.

17       **Q    Okay.  Okay.  And do you know anything**

18   **about the Devil's Backbone Marathon?**

19       A    I believe it's considered an ultramarathon

20   wherein that sort of category of events that

21   involves running along the ridge of the Hyalite

22   Range.  I think that's accurate.

23       **Q    Right.  So in order to do the Devil's**

24   **Backbone Marathon, that's more than 26 miles; right?**

25       A    I don't know, but that sounds correct.

1       Q    And it's on a trail?

2       A    Yes.

3       Q    It's mountains; right?

4       A    Yes.

5       Q    Have you ever skied the Banana Couloir on

6  Ross Peak?

7       A    No.

8       Q    Are you -- do you recall Mr. Meyer

9  informing you that he recently skied on Ross Peak at

10  the Bridger Range?

11      A    Yes.

12      Q    And that specifically he skied the Banana

13  Couloir.

14      A    That's what he told me.

15      Q    So prior to Mr. Meyer's job with WildEarth

16  Guardians he was working for Cottonwood

17  Environmental Law Center; right?

18      A    Yes.

19      Q    And he held that position from around

20  2010; is that your recollection?

21      A    I don't know.  I would -- my recollection

22  is when I met John he was in that position which

23  would have been the summer of --

24      Q    Okay.

25      A    -- 2009, but that may or may not be

```
 1   accurate.  That's just my -- I think the entire time

 2   I've known John he's been involved with Cottonwood.

 3       Q    Okay.  And did you ever meet his law

 4   partner at that time Percy Bennett?

 5       A    I may have met her once or twice.

 6       Q    Excuse me.

 7            (Telephonic interruption)

 8       Q    Sorry about that.  Go ahead.

 9       A    Yeah.  I mean, the name is familiar.  I

10   likely met her once or twice.  I don't have a strong

11   memory of that.

12       Q    And you understood at that time from

13   around 2010 when he took -- to about 2014 Percy

14   Bennett was his law partner at Cottonwood; right?

15       A    I understood that she was an attorney

16   working for Cottonwood alongside John.

17       Q    Okay.  Do you know when she left

18   Cottonwood?

19       A    I couldn't, no.

20       Q    Okay.  Did Mr. Meyer ever tell you

21   anything about Percy Bennett leaving Cottonwood?

22       A    I'm sure.  I don't have a specific

23   recollection of him telling me anything.

24       Q    Do you have a general recollection?

25       A    My general recollection is that she was
```

```
 1   working for Cottonwood as a staff attorney and then

 2   was no longer at some point.

 3       Q    Do you recall him telling you anything

 4   about a rift in their relationship?

 5       A    No, not specifically.

 6       Q    What about more generally?

 7       A    I don't have a specific memory of that.

 8       Q    Okay.  Right.  But do you have a general

 9   memory?

10       A    No.

11       Q    Do you have a recollection of Mr. Meyer

12   struggling with the work at Cottonwood after Percy

13   Bennett left the firm?

14       A    No.

15       Q    So after Percy Bennett left do you have

16   any recollection of Mr. Meyer expressing to you that

17   he was encountering difficulty with Cottonwood?

18       A    What sort of difficulties?

19       Q    Running it, organizing it, getting

20   donations, getting cases going, anything of the

21   sort.

22       A    My recollection and awareness is that

23   Cottonwood has always struggled as a nonprofit for a

24   variety of reasons.  There hasn't ever really been a

25   lot of capital reserves.  There hasn't, yeah.
```

```
 1         So I can't say I have any specific

 2  recollection of that being associated with Percy

 3  Bennett leaving Cottonwood.  I just know that

 4  generally over the years the nonprofit has faced

 5  several challenges.

 6      Q    Right.  And that occurred, you know, even

 7  before Percy Bennett left; is that your

 8  understanding, that the nonprofit was struggling?

 9      A    Yeah, I don't know that I have that level

10  of detail.  You know, my involvement --

11      Q    Okay.

12      A    -- with the board is more recent and

13  that's really one I've had more exposure to the

14  financials and the finer details of the

15  organization.  I just know through conversations

16  with John and through our friendship that it's been

17  a challenge to maintain the organization for a

18  number of reasons.

19      Q    Sure.  And what did he tell you about why

20  he wanted to shut down Cottonwood Law temporarily

21  and take the job and move to Missoula for WildEarth

22  Guardians?

23      A    I think it was appealing to him because it

24  was working for an established organization where he

25  wouldn't have to handle a lot of challenges of being
```

1 an executive director of a nonprofit while also

2 trying to manage all of the legal work associated

3 with Cottonwood's operations.

4         So the idea that he could go to the

5 office, he could be a salaried or hourly employee

6 who'd get benefits and he could, you know, have all

7 those structures in place in a formalized work

8 environment I think was something that was appealing

9 to him.

10    **Q    John Meyer testified in this case that he**

11 **is a recovering alcoholic and that he was for a time**

12 **addicted to recreational drugs.**

13        **MS. WALAS:**  Objection; the judge has ruled

14 this is inadmissible at trial.

15        **MR. MORRIS:**  Okay.

16 **BY MR. MORRIS:**

17    **Q    And do you know anything about Mr. Meyer's**

18 **alcohol or drug addiction?**

19    A    I know that John has been sober for

20 several years.  He is very committed to the AA

21 community.  He is very serious about his sobriety.

22        When I first met John he was drinking.  He

23 was, you know, he didn't appear to have a drinking

24 problem, but I think that that's a subjective

25 judgment especially for a lot of people in their mid

 1  20s and 30s that live in mountain towns.

 2         So I didn't know John.  I didn't flag him

 3  as an alcoholic as I knew him personally, but he's

 4  been very committed and very proud of his sobriety

 5  and the community that he's sort of been engaged

 6  with through that.

 7     **Q    Okay.  And do you know anything, other**

 8  **than what you told me about his drinking, do you**

 9  **know anything about his drug abuse?**

10        **MS. WALAS:**  Objection; same judge's ruling

11  as being inadmissible.

12     **Q    You can answer.**

13     A    I can or I have to?  I mean...

14     **Q    Yeah, I mean, you have to answer.  There**

15  **has been an objection to the relevance of this, but**

16  **the question is:  Do you know anything about Mr.**

17  **Meyer's drug abuse?**

18     A    What I know about John's drug use, when I

19  met him he didn't do any drugs besides drink

20  alcohol.  He has told me stories about his college

21  years at the University of Montana as an

22  undergraduate.  And I, you know, he used to smoke a

23  lot of marijuana and ingest hallucinogenic mushrooms

24  and that's about all I know.

25     **Q    Okay.  And you've never witnessed him**

```
 1  smoke marijuana?

 2       A    No, no, I haven't.

 3       Q    Okay.  You've never witnessed him take

 4  psychedelic mushrooms, for instance --

 5       A    No.

 6       Q    -- or any other psychedelic drug?

 7       A    No.

 8       Q    Did Mr. Meyer ever explain to you what the

 9  catalyst for him joining AA was?

10            MS. WALAS:  Can I have a continuing

11  objection on this line, Mac?

12            MR. MORRIS:  For sure.

13            MS. WALAS:  All right.

14       A    I don't know what the catalyst was.  I

15  don't know if he just got to a point where he wanted

16  to take it on and, but, yeah, I don't know.

17       Q    Okay.  And do you know when Mr. Meyer

18  started taking to get to sober and committing

19  himself to sobriety?

20       A    I don't have an exact date.  I know he has

21  been sober for, I think, five years or more, but I'm

22  not certain.

23       Q    Okay.  Do you know if that decision had

24  anything to do with struggles with Cottonwood?

25       A    I don't know.
```

1     **Q    He never talked to you about that.**

2     A    No.  My knowledge of John's decision to

3 pursue sobriety, I think, was more based in

4 relationship issues and lifestyle issues.  So he was

5 someone really focused on fitness, on mental and

6 physical health.  He, you know, had a number of

7 girlfriends over the years and I think that his

8 drinking was undermining his health goals and was

9 complicating his relationship goals.  I never heard

10 him talk about drinking impacting his ability to run

11 or work for Cottonwood.

12     **Q    Okay.  So we touched on this, but**

13 **Cottonwood has to your knowledge always been a**

14 **nonprofit organization; right?**

15     A    Yes.

16     **Q    And the way it operates is through**

17 **donation and it gets funding from attorney fee**

18 **awards that Mr. Meyer may get in lawsuits against**

19 **the government; is that right?**

20     A    Yes, that's been the primary source of

21 revenue for the organization.  At least in the years

22 that I've been involved.

23     **Q    There have been certain grants that the**

24 **organization has gotten; correct?**

25     A    Yes.

 1      Q     And how many grants can you recall

 2 Cottonwood getting since your time on the board?

 3      A     This is a guess.  I would say maybe five,

 4 but I'm not -- I'm not certain.

 5      Q     Okay.  Do you know about -- what would you

 6 estimate the sum total of those grants that

 7 Cottonwood has received, the dollar amount to be?

 8      A     My recollection is they have been

 9 relatively small dollar grants, a few thousand

10 dollars.  There may have been one for $10,000.  But

11 as I mentioned earlier, the bulk of the

12 organization's revenue has come from attorney fees.

13      Q     Right.  Look at Big Sky 252.

14           MR. MORRIS:  And, Breean, this is 18, file

15 number 18.

16 BY MR. MORRIS:

17      Q     Are you able to locate Big Sky 252 through

18 253?

19      A     Remarkably it's right in front of me,

20 right on top here.

21      Q     Perfect.  Okay.  Let's mark Big Sky 252

22 through 253 as Deposition 108.

23           Is this an email that you wrote from John

24 Meyer's Cottonwoodlaw.org email account?

25      A     No, I did not write this.

1        Q    Okay.  So you see the first line where it

2   says -- the first two lines it says, Hi Joel, Trevor

3   Lowell here.  Do you see that?

4        A    I do.

5        Q    Okay.  But you didn't write this email;

6   right?

7        A    No.

8        Q    Okay.  Is this an email that Mr. Meyer was

9   ghost writing for you to send to Joel, a person

10  named Joel?

11       A    Joel is a current Cottonwood board member.

12  We've been in discussions on and off ever since I

13  have been on the board about trying to formalize and

14  strengthen the board and engage them more in the

15  organization.  John recently contacted me about that

16  effort.  He has an intern working for him who has

17  some interest in helping out in that area.  So he

18  had asked if we could sort of pick up that work

19  again.  And I said that, you know, I had limited

20  capacity but I would be happy to talk about it and

21  talk through some ideas.

22            He suggested that we send Joel a letter to

23  try to prod him about engaging more with the

24  Cottonwood board.  And I said, well, it would be

25  better if it came from me so why don't you draft

1  something and send it to me and I'll review it.

2       So that's what this email is here is a

3  draft of the communication that John has created and

4  sent to me.

5       Q   Okay.  And do you agree with John's

6  statement in this email that the Cottonwood

7  organization has always struggled on the financial

8  side of things?

9       A   Yes.

10      Q   And it's your understanding that

11 Cottonwood in August of 2020 didn't have enough

12 money to rent a place for its operations.

13      A   Yes.

14      Q   And that its bank account was actually

15 down to $116.81.

16      A   That's what's communicated here, yeah.

17 That's how I received that knowledge.

18      Q   And that's -- okay.  And that's your

19 understanding in August of 2020 the amount that was

20 in Cottonwood's bank account; correct?

21      A   Yes, per this email communication.

22      Q   Okay.  You alluded earlier to the fact

23 that the majority of the money that comes into

24 Cottonwood for operational funds is received from

25 attorney fee awards and suits against the

1  government; correct?

2      A    Yeah, attorney fee awards.  Primarily, I

3  think most have been against the government, yeah.

4      Q    And that's because Cottonwood typically,

5  like you mentioned earlier, sued environmental

6  causes, Forest Service, Fish and Wildlife Service,

7  Park Service or a state government entity of some

8  kind; correct?

9      A    Yes.

10      Q    All right.  And in certain times in 2017

11  the attorney fee awards were outtaking donations by

12  such a degree that it was a threat to Cottonwood

13  status as a nonprofit public interest entity under

14  IRS regulations; right?

15      A    Yeah, I remember that.

16      Q    In fact, Cottonwood's accountant concluded

17  that Cottonwood had passed the public interest test.

18  Do you recall that?

19      A    Yes.

20      Q    And that was because Cottonwood was unable

21  to obtain any significant donations; right?

22      A    I forget the exact -- it was a sort of

23  complicated tax classification where involves, you

24  know, how different types of revenue came into the

25  organization and also looking backwards at previous

1  years.

2         I don't remember exactly sort of how that

3  determination was made, but that concern was

4  flagged, I believe, by the accountant.  It was

5  brought to the board's attention and then it was

6  resolved, but I couldn't tell you exactly how that

7  resolution came about or why, why that concern was

8  placated.

9      **Q    Can you find Big Sky 569 to 570 in front**

10 **of you?**

11     A    Yep.

12     **Q    Let's mark that as Deposition Exhibit 109,**

13 **please.  And Deposition Exhibit 109 is a true and**

14 **correct copy of an email exchange between several**

15 **people including yourself and Mr. Meyer regarding**

16 **this public interest test issue that came up in**

17 **November of 2018; correct?**

18     A    Yes.

19     **Q    And one of the points that's being raised**

20 **by John Bonine, do you know Mr. Bonine?**

21     A    I do.

22     **Q    And he is concerned that Cottonwood has**

23 **not been carefully monitoring its donations versus**

24 **its attorney fee awards; right?**

25     A    Yeah, he's raised that question here.

1          **Q    And that lack of monitoring has led to**

2    **this situation where Cottonwood's nonprofit status**

3    **was actually threatened under IRS guidelines;**

4    **correct?**

5          A    Can you rephrase that?

6          **Q    Right.  Cottonwood's failure to sort of**

7    **monitor this issue and recognize the problem under**

8    **IRS guidelines is something that Mr. Bonine felt**

9    **should be carefully monitored; correct?**

10         A    I think Mr. Bonine is raising a question

11   about whether or not there is adequate monitoring of

12   Cottonwood's donations and the details involved with

13   the public interest status by the IRS.

14         **Q    Right.  And did you agree with Mr. Bonine**

15   **that those issues were not being carefully monitored**

16   **to avoid this outcome?**

17         A    My understanding was that, and my

18   recollection was that, no one on the board had much

19   knowledge about the IRS public interest test as it

20   pertains to nonprofits.  So this was flagged and

21   then we reviewed what we needed to do to remedy the

22   situation.

23              Part of that conversation was these

24   concerns about monitoring this primarily to go

25   forward to make sure that now that we're aware what

1  the public interest test is we can do what we need

2  to do to continue to meet that.

3      **Q     Right.  But as of November 2018, that**

4  **wasn't something that Cottonwood was keeping an eye**

5  **on; right?**

6      A     Yeah, that's accurate.

7      **Q     Do you know that Meyer's father has**

8  **donated sums of money to Cottonwood?**

9      A     I didn't know that specifically, no.

10     **Q     Okay.  You have never been told by Mr.**

11 **Meyer or anybody else that Ronald Meyer or Ron Meyer**

12 **was making contributions and donations to**

13 **Cottonwood?**

14     A     No.

15     **Q     Okay.  Do you know that Mr. Meyer was --**

16 **had donated money and was planning to donate money**

17 **to keep Cottonwood operational; right?**

18     A     Yes.

19     **Q     In fact, you had concerns with that**

20 **practice, did you not?**

21     A     Yes, I raised concerns about us not having

22 a conflict of interest policy in place as part of

23 our organizational bylaws.  It seemed on my research

24 in looking at that that was pretty standard

25 especially if you are going to start transferring

1  funds from an organization's staff to its operating

2  budget.

3      **Q    Right.  And not just the staff, but the**

4  **director of the nonprofit, Mr. Meyer, was donating**

5  **funds as the director to Cottonwood; correct?**

6      A    That was his intent, yeah.  That was when

7  I brought up the conflict of interest issue I was,

8  prior to that, had recently been made aware by the

9  accountant that John had planned to donate this sum

10  of money.

11          So my concern was that we create a

12  conflict of interest policy that put that in place

13  before we pursued any donations from John in that

14  fashion.

15      **Q    And he's not only the director, he was**

16  **also, like you said, a salaried employee of**

17  **Cottonwood; correct?**

18      A    Yes.

19      **Q    And that was the issue is to have the**

20  **director making a quote/unquote donation to a**

21  **nonprofit that he is also an employee of; right?**

22      A    Correct.

23      **Q    And you mentioned this I think earlier,**

24  **but Cottonwood was struggling financially to the**

25  **degree that it couldn't afford directors and**

1  operators insurance, or D&O insurance; right?

2      A    Yes.

3      Q    Directors and officers.  I'm sorry.

4      A    Yeah.

5      Q    Is that right?

6      A    Yes.

7      Q    That was something that you wanted

8  Cottonwood to use funds for; right?

9      A    I was on the board at CFAC at the time and

10  we had recently had a discussion about directors and

11  officers insurance.  So it was something that I

12  became aware of and then reviewed Cottonwood's

13  policies and realized we didn't have it.

14          It's my understanding that it's pretty

15  standard policy for any nonprofit so it seemed like

16  something that the organization should pursue.  And

17  we even solicited a few quotes, I believe, from some

18  insurance agents about what that would cost.

19      Q    But you didn't actually purchase that;

20  correct?

21      A    Correct.  At the time there was not funds

22  enough to purchase a policy.  The quote came back, I

23  think, much higher than we thought and there wasn't

24  the money in the operating budget to purchase it.

25      Q    Right.  In addition to Cottonwood's

1  **financial struggles, fair to say that Cottonwood has**

2  **also struggled to recruit and retain board members**

3  **and other members; correct?**

4      A    I would agree with that statement as it

5  relates to recruitment.  The board as it exists now

6  has been stable throughout my tenure.  I think I'm

7  the most recent board member, so.

8      **Q    Okay.  What about Michael Willing?**

9      A    Mike has been a board member who hasn't

10  really been that active.  He has been one of the

11  ones that, you know, we have our twice yearly board

12  calls.  I haven't -- I can't recall him actually

13  even participating in those, so I'm not sure if he's

14  officially stepped down or not.

15      **Q    So he may be a board member in name, but**

16  **he doesn't participate in any of the biannual board**

17  **meetings; right?**

18      A    Correct.

19      **Q    Do you recall a time when Mr. Meyer**

20  **declared his board membership effectively over**

21  **because he was no longer responding or**

22  **participating?**

23      A    It sounds, yeah, possible.  I don't have -

24  - again, I don't remember specifically that

25  conversation, but...

1      Q     That's consistent with your recollection

2   of Mr. Willing's participation; right?

3      A     Yeah.   Again, I don't know the status of

4   his participation as it exists right now.   I recall

5   many conversations about board members that are

6   engaged at different levels.   It's been an ongoing

7   discussion since I joined the board about trying to

8   get people to be more active and be more clear about

9   the expectations and make sure that they actually

10  participate and play the role that is expected of

11  them.

12     Q     Okay.   And it's just been a constant

13  struggle to get that through an active participation

14  that it's required and expected; correct?

15     A     It's been a challenge, yes.

16     Q     And do you recall what happened with a

17  gentleman named Joshua Seckinger?

18     A     Josh was working for Cottonwood doing sort

19  of, I think, primarily marketing work and some

20  potential donor outreach.   And then he was no longer

21  -- I think he and John parted ways and Josh stopped

22  working for the organization.

23     Q     Okay.   And do you recall if he was fired

24  by Mr. Meyer?

25     A     I recall John having some issues with

1  Josh's output.  And some concerns that he wasn't

2  doing what he said he was going to do and that it

3  wasn't worth the investment to keep him on.

4       **Q    What about Keatan Williams?  Do you recall**

5  **what happened with his relationship with Cottonwood?**

6       A    Keatan was brought on as a staff attorney

7  to try to share some of the load.  I don't know why

8  he left or if he was fired, why he was fired.  I

9  don't know the details of that.

10      **Q    Okay.  Can you find in front of you Big**

11 **Sky 588?**

12      A    Yes.

13      **Q    Let's mark Big Sky 588 as Deposition**

14 **Exhibit 110, please.  Deposition Exhibit 110 is an**

15 **email exchange authored by John Meyer to you and**

16 **other board members of Cottonwood; is that right?**

17      A    Correct.

18      **Q    And Mr. Meyer explained to you and the**

19 **other board members that Mr. Williams left because**

20 **John had made him uncomfortable by being outspoken**

21 **in his public criticism of numerous groups; right?**

22      A    Correct.

23      **Q    And he is also referring to some**

24 **inflammatory public remarks that Mr. Meyer made;**

25 **right?**

1    A    John is referring -- he is offering

2  examples of some of the inflammatory remarks, if the

3  board would like to review that in the context of

4  why Keatan decided to leave.

5    **Q    So Mr. Meyer's communications with others**

6  **was sort of causing a disruption in Cottonwood;**

7  **correct?**

8    A    It appears that it caused this disruption,

9  yeah.

10   **Q    Yeah.  And that was fairly typical of Mr.**

11 **Meyer's behavior, wasn't it?**

12   A    What, that he was outspoken?

13   **Q    Correct.**

14   A    Yes, as I stated before I think that he's

15 blunt, he's outspoken.  Those are all accurate

16 statements.

17   **Q    Okay.  And that had a tendency to alienate**

18 **people like it did Mr. Williams; correct?**

19   A    I would say certain people don't respond

20 positively to that.  So, yes, there's a history.

21   **Q    Outside of Mr. Meyer's work as the**

22 **director and attorney for Cottonwood Law, he's**

23 **consistently had other aspirations.  Would you agree**

24 **with that?**

25   A    Can you be more specific?

```
 1       Q    Sure.  I mean, he left Cottonwood Law and

 2  cut it down to -- started employment with WildEarth

 3  Guardians; right?

 4       A    Yes.

 5       Q    And then he came back after that, after he

 6  was fired from his job with WildEarth Guardians;

 7  right?

 8       A    Yes.

 9       Q    And that would have been in the spring of

10  2016 when he started Cottonwood back up; correct?

11       A    That sounds right, yes.

12       Q    But by December of 2016 Mr. Meyer was

13  planning to run for congress; correct?

14            MS. WALAS:  Objection; the Court's order

15  on this line of questioning is inadmissible.

16            Are you okay with continuing through this

17  whole thing?

18            MR. MORRIS:  Sure.

19       A    Yes, he ran for congress.

20       Q    Right.  But what I'm asking you is by

21  December of 2016 he had been thinking of leaving

22  Cottonwood and running and being a political figure;

23  correct?

24       A    I can't confirm the chronology with that

25  level of specificity.  I trust that that's accurate.
```

1  But, yeah, he had aspirations to run for congress.

2  He did run for congress and I think part of that

3  decision was depending on how it worked out was, you

4  know, putting Cottonwood -- either closing it or

5  putting it aside.

6  **Q     Do you recall a text message that Mr.**

7  **Meyer sent you informing you in December of 2016**

8  **that he was going to reach out to the democratic**

9  **party and try to secure their endorsement for Mr.**

10 **Zinke?**

11     A    I don't recall that specific text message.

12 I don't have any reason to believe it didn't happen,

13 but...

14 **Q     Right.  So was that consistent with your**

15 **sort of recollection and time line in December of**

16 **2016 Mr. Meyer was already starting to look**

17 **elsewhere besides Cottonwood for employment?**

18     A    I don't know that I would characterize it

19 that way.  I think he had aspirations to work in the

20 government to try to take his passion for the issues

21 that he cares about and try to find a new way to

22 affect change.

23 **Q     And is it your understanding that Mr.**

24 **Meyer could be a congressman in the U.S. House of**

25 **Representatives and also sue on a regular basis the**

 1  Forest Service, the U.S. Fish and Wildlife Service

 2  and other federal agencies?

 3      A    I would assume that that's not kosher.

 4      Q    And then do you recall in August of 2017

 5  Mr. Meyer communicating to you that he wanted to

 6  apply to be a law professor at the University of

 7  Montana?

 8      A    Yes.

 9      Q    Will you take a look at Big Sky 903,

10  please? Let's mark that as Deposition Exhibit 111.

11          Deposition Exhibit 111 is a true and

12  correct copy of an email exchange that you had with

13  Mr. Meyer in August of 2017; correct?

14      A    Correct.

15      Q    And Mr. Meyer in the middle on August 25th

16  is informing you he wants to apply for a law

17  professor job at UM; right?

18      A    Yes.

19      Q    And do you know if he -- if Mr. Meyer made

20  that application?

21      A    I remember him moving forward with the

22  process.  I don't know if the application was

23  submitted or where it ended.  But it was a serious

24  interest of his and he pursued it.

25      Q    Okay.  And was it your understanding that

1   he wanted to take this job with the University of

2   Montana and shut down Cottonwood as a result?

3       A    I don't know that we ever covered that in

4   our discussions about it.

5       Q    Okay.  Do you recall that in March of 2018

6   Mr. Meyer announced to you and other members of the

7   board of Cottonwood that he was going to run for

8   congress?

9       A    Yes.

10      Q    Can you pull up Big Sky 858 to 869?

11      A    Okay.

12      Q    And do you recall Mr. Meyer requesting

13  that his salary at Cottonwood be set at $75,000 a

14  year plus benefits?

15      A    Yeah, he is requesting that in this email.

16      Q    Right.  And do you have a recollection of

17  him doing that?

18      A    Yes.

19      Q    And do you know whether or not the board

20  approved of that request?

21      A    I don't -- I don't remember.  I don't

22  remember that level of detail.  I think we had

23  approved the budget for that year, so I would assume

24  that if we approved the budget we would have

25  approved that request. I don't remember anybody

1  arguing against the salary request.

2      Q    Okay.  And how would that salary request

3  be paid for?

4      A    It would be paid for out of the

5  organization's budget.

6      Q    Okay.  Do you believe that Mr. Meyer's

7  aspiration and interest in these other positions was

8  driven by Cottonwood's challenges, financial and

9  otherwise?

10      A    I would agree that that was a factor in

11  his interest in these other positions.  I think

12  primarily John has always been focused on having the

13  largest impact about the issues he is passionate

14  about.  I think that's the primary driving factor.

15  I would certainly agree that part of that decision

16  was the issues that Cottonwood has.

17      Q    Mr. Meyer has communicated with you

18  consistently about his financial struggle with

19  Cottonwood; correct?

20      A    Yes.

21      Q    And he has told you that at times he needs

22  to settle cases with the government so that he can

23  pay his bills; right?

24      A    Yes, he's expressed to me -- I mean,

25  knowing that that's how most of the funding, the

```
 1   revenue for the organization works, he has expressed

 2   to me at certain times that he's anxious about

 3   settling cases because he knows that's when there'll

 4   be some more revenue.

 5        Q    Right.  Because the donation in getting --

 6   obtaining donations was never something that

 7   Cottonwood was consistently able to do; right?

 8        A    Not to the amount needed to fund the

 9   organization.  I mean, I think donations

10   consistently come in, it's just not substantial

11   enough to keep Cottonwood operating without the

12   other forms of revenue.

13        Q    Are you familiar with the Complaint that

14   Mr. Meyer filed in this lawsuit?

15        A    I mean, I'm familiar that there is a

16   lawsuit. I'm familiar that the issue here is that he

17   was injured while skiing at Big Sky Resort.  And

18   that my understanding is that he feels like the area

19   wasn't marked correctly and that contributed to the

20   accident.

21        Q    Right.  Let me just clarify my question a

22   little bit.

23             Do you know what a Complaint is as that

24   term is used in the law?

25        A    I couldn't define it, no.
```

1      **Q    Okay.  But do you have a general sense of**

2   **what a Complaint is?**

3      A    I mean, generally, yeah.  As far as the

4   exact legal term and how that fits in the legal

5   process, no.

6      **Q    Sure.  But generally speaking do you**

7   **understand that a Complaint is a document that is**

8   **filed with a court that initiates a legal action.**

9   **Do you understand that?**

10     A    Yeah.

11     **Q    Okay.  And Mr. Meyer spoke to you about**

12  **his plan to sue Big Sky as early as July of 2017,**

13  **did he not?**

14     A    That sounds right, yeah.

15     **Q    Yeah.  And that was when he was living**

16  **outside of Big Sky with Amanda Eggert; correct?**

17     A    Yes.

18     **Q    And fair to say that Mr. Meyer resented**

19  **the direction that the town of Big Sky was headed in**

20  **before filing his lawsuit?**

21     A    I would say John had some issues with what

22  aspects of Big Sky and Big Sky community

23  represented, specifically as it relates to

24  significant amounts of wealth and power structures

25  that are involved with, you know, powerful wealthy

```
 1  people and powerful wealthy organizations, exerting

 2  influence over certain things and primarily

 3  environmental policy.

 4       Q    Can you look at Big Sky 909, please?

 5       A    Okay.

 6       Q    Let's mark that Deposition Exhibit 112.

 7            MS. WALAS:  What share file is that?

 8            MR. MORRIS:  It's 25.

 9            MS. WALAS:  I'm sorry, I also missed the

10  deposition exhibit number.

11            MR. MORRIS:  112.

12            MS. WALAS:  Thanks.

13  BY MR. MORRIS:

14       Q    Is Deposition Exhibit 112 a true and

15  correct copy of some text message exchange between

16  you and Mr. Meyer in July of 2017; correct?

17       A    Correct.

18       Q    And this is around the time that you had

19  just signed a declaration that would assist to be a

20  plaintiff in a lawsuit concerning net metering;

21  correct?

22       A    That sounds accurate, yeah.

23       Q    And Mr. Meyer's telling you, he says in

24  this text message exchange, next up:  Big Stye;

25  correct?
```

1      A     Correct.

2      Q     And he's referring to Big Sky Resort in

3  this text message; correct?

4      A     Yes, I assume so.

5            MS. WALAS:  Mac, let me go ahead and

6  interrupt and object to this line of questioning on

7  the grounds that the Court has dismissed the abuse

8  of process claim and you can go ahead and continue.

9            MR. MORRIS:  Okay.

10 BY MR. MORRIS:

11     Q     And he is also referring to Big Sky as Pig

12 Stye; correct?

13     A     He refers to it at Big Stye, Pig Sky, Pig

14 Stye and then Big Sky.

15     Q     And you knew what he was referring to when

16 he told you, next up, Big Stye; right?

17     A     As far as him referring to the resort?

18     Q     As far as him referring to suing Big Sky

19 Ski Resort for injuries he claimed were the result

20 of Big Sky's negligence.

21     A     I don't know at this time if I was aware

22 of his plans to sue.

23     Q     Okay.  And you didn't respond in this text

24 exchange what are you talking about; right?

25     A     No, I didn't respond to -- I responded --

1  well, I didn't respond.  He brought up a totally

2  different subject after that and I responded to

3  that.

4      **Q    So is it fair to say that you and John had**

5  **discussed his interest in suing Big Sky over a ski**

6  **wreck at this time?**

7      A    I can't say that we had, no.

8      **Q    Okay.  Did you know at this time that Mr.**

9  **Meyer was blaming Big Sky for his ski wreck?**

10     A    Yes, I think he -- I mean, we had talked

11  about what had happened and he had discussed, you

12  know, some of his frustrations.  So I think it was

13  clear to me that he had that sentiment, yeah.

14     **Q    Okay.  Do you know that before Mr. Meyer**

15  **filed the lawsuit against Big Sky, that he had**

16  **blamed Dynafit bindings for his ski wreck at Big**

17  **Sky?**

18         **MS. WALAS:**  Objection; based on the

19  Court's order this line of questioning is not going

20  to be admissible at trial.

21     **Q    You can go ahead and answer.**

22     A    Repeat the question, please.

23     **Q    Do you know that before Mr. Meyer filed**

24  **his lawsuit against Big Sky blaming Big Sky for his**

25  **wreck, that he had blamed Dynafit, his Dynafit**

1  bindings for his ski wreck?

2      A    I had conversations with John at some

3  point about his Dynafit binding being -- having

4  malfunctioned. I remember conversations because he

5  was talking about purchasing new skis and new gear.

6  And he felt like his -- the binding that he had used

7  that day, there was a lot of play in the boot.  So I

8  don't know exactly when it came up, but I knew that

9  that was something that he talked about as being an

10  issue and being a factor in the accident.

11      **Q    And did he tell you that he believed the**

12  **Dynafit binder had prereleased and caused his**

13  **accident?**

14      A    I don't know that we got into that level

15  of detail.  I just knew he had issues with the

16  binding and thought that was a potential factor.

17      **Q    Okay.  Did he tell you that he believed**

18  **the binding was defective?**

19      A    Yes.

20      **Q    And that those defects were the reason why**

21  **he fell at Big Sky?**

22      A    He discussed the binding being defective

23  and that being a factor in his accident.

24      **Q    Right.  Take a look at Big Sky 916,**

25  **please. Actually it's 915 through 916.**

1    A    Okay.

2    Q    Unfortunately, I think there's two copies

3 of 916.  If we can mark Big Sky 915 through 916

4 Deposition Exhibit Number 113.  We only need one

5 copy of 916.

6         Okay.  So Deposition Exhibit 113 is a true

7 and correct copy of a text exchange that you had

8 with Mr. Meyer that -- around December 30th of --

9 I'm sorry, December 7th through December 30th of

10 2016; correct?

11    A    Yes.

12    Q    And Big Sky 916, do you see the text

13 message at the bottom of that page that is cut off?

14    A    Yep.

15    Q    Okay.  And then if you run on to 915,

16 that's the continuation of that text message;

17 correct?

18    A    Correct.

19    Q    And on Big Sky 916 at the bottom Mr.

20 Meyer's telling you he is scared of riding the skis

21 he crashed on; correct?

22    A    Correct.

23    Q    And you responded that that was a

24 reasonable fear and asked whether both the DPS skis

25 that he owns and his other skis were mounted with

1  Dynafit bindings; correct?

2      A    Correct.

3      Q    Mr. Meyer had told you at this time that

4  he believed that the Dynafit bindings had

5  malfunctioned and caused his wreck; correct?

6      A    Because he had concerns that they were a

7  factor in his accident.

8      Q    Right.  And we talked earlier that your

9  pre November 2016 text messages with Mr. Meyer are

10  no longer -- you're no longer able to access those;

11  correct?

12      A    Correct.

13      Q    And do you recall whether or not you and

14  Mr. Meyer discussed his belief that the Dynafit

15  bindings were to blame for his ski accident in

16  November -- pre November 2016 --

17      A    I don't recall.

18      Q    Did Mr. Meyer tell you that he had sent

19  Dynafit a multimillion dollar demand because he was

20  blaming Dynafit for his ski accident?

21      A    No.

22      Q    Did he tell you that he has demanded that

23  Dynafit issue a nationwide recall of those bindings?

24      A    We did discuss that, yeah.

25      Q    Okay.  And he actually made a demand on

1   Dynafit in May of 2016 for that recall.  Do you

2   remember that?

3       A    Not with that level of specificity.  I

4   remember talking to him about his desire to have

5   that binding recalled, yes.

6       Q    That was because he believed that those

7   bindings were defective; right?

8       A    Yes.

9       Q    Had caused his accident.

10      A    And were a factor in his accident.

11      Q    He didn't want anybody else to suffer a

12  fall like he did as a result of the Dynafit bindings

13  prerelease; right?

14      A    I assume that was part of his motivation,

15  yes.

16      Q    Okay.  We have previously marked an

17  exhibit in this case.  It's Exhibit 28.  If you can

18  bring that up on the share file, Trevor.  It's tab

19  27.

20      A    Okay.

21      Q    Have you ever seen this email that Mr.

22  Meyer sent to Scott Knight at Salewa USA which is a

23  company owns Dynafit binding?

24      A    No.

25      Q    You weren't aware that Mr. Meyer was

1  asking Dynafit to make a donation to Cottonwood

2  Environmental lawsuit in the amount of -- Law Center

3  in the amount of $500,000?

4      A    No.

5      Q    Okay.  He never told you anything about

6  this demand?

7      A    No.

8      Q    Other than -- other than the issue about

9  the recall?

10     A    That's what we discussed regarding the

11  binding.

12     Q    Can you bring up Big Sky 888 through 889?

13          MS. WALAS:  What share file is that one?

14          MR. MORRIS:  It's 32.

15          MS. WALAS:  Thank you.

16     A    888 through what?

17     Q    889.

18     A    I have 888.

19     Q    Okay.  Let's mark Big Sky 888 through 889

20  as Deposition Exhibit 114.

21          MS. WALAS:  Mac, I'm struggling to find

22  that one in what you sent me.  I'm only showing a

23  single 888.

24          MR. MORRIS:  Okay.

25          THE WITNESS:  I had to go to the full text

```
 1  message file to find 889.

 2           MS. WALAS:  Oh, here it is.  It is in 32.

 3  It just kind of opened when I opened my --

 4           MR. MORRIS:  Okay.

 5           MS. WALAS:  There is a single 888 though

 6  as well.

 7           MR. MORRIS:  Yep.

 8  BY MR. MORRIS:

 9      Q    Okay.  So Deposition Exhibit 114, do we

10  have it marked?

11      A    Yes.

12      Q    And that's a true and correct copy of a

13  text exchange that you had with Meyer -- Mr. Meyer

14  in -- ranging from November 20th, 2017, to December

15  18, 2017; correct?

16      A    Correct.

17      Q    I want to direct your attention to the

18  text exchange on Big Sky 889 that was sent by Mr.

19  Meyer on December 12, 2017.  Do you see that?

20      A    Yes.

21      Q    Mr. Meyer is asking you to help him

22  characterize his skiing ability at the time of his

23  ski wreck at Big Sky; correct?

24      A    Correct.

25      Q    And you responded on that same day that he
```

 1 was an immediate skier; correct?

 2      A    Yes.

 3      Q    And that was -- okay.  So you knew that he

 4 was going to file this lawsuit at that time;

 5 correct?

 6      A    Yes.

 7      Q    Right.  Okay.  Can you bring up Big Sky

 8 580, please?  It's actually Big Sky 580 through 587.

 9           MS. WALAS:  What share file is it?

10           MR. MORRIS:  It's 29.

11 BY MR. MORRIS:

12      Q    Let's mark Big Sky 580 through 587 as

13 Deposition Exhibit 115.

14           Deposition Exhibit 115 is a true and

15 correct copy of an email between Mr. Meyer and

16 Taylor Middleton on December 15, 2017; correct?

17      A    Yes.

18      Q    It also contains an attachment which is

19 the Complaint Mr. Meyer filed to initiate this

20 action; right?

21      A    That's the other document, yeah.

22      Q    So you produced this document to us in

23 response to the subpoena; correct?

24      A    Yeah, I believe so.

25      Q    Right.  And so were you blind copied on

1  **Mr. Meyer's email to Mr. Middleton?**

2      A    I would assume so.  I mean, again, I

3  exported all those emails in one big batch, so I

4  didn't look through these.  So if the filter pulled

5  this out my guess is that I was somewhere on the

6  communication.

7      **Q    Okay.  Do you recall this email being sent**

8  **by Mr. Meyer to Mr. Middleton?**

9      A    I don't have a specific recollection of

10  it.  I don't argue that it was sent or that I was

11  copied on it.

12      **Q    Okay.  Do you know who Taylor Middleton**

13  **is?**

14      A    I don't.

15      **Q    Okay.  Did you know who Taylor Middleton**

16  **was when this email was sent?**

17      A    I don't know who he is now and I didn't

18  know who he was then.

19      **Q    Did Mr. Meyer ever talk to you at all**

20  **about his conversations with Taylor Middleton?**

21      A    No.

22      **Q    Okay.  So were you surprised when you**

23  **received this email?  I mean, did you know -- let me**

24  **ask that. Were you surprised when you received this**

25  **email?**

1    A    It's difficult for me to recall my

2  reaction. I think that prior to this email I knew

3  that John was interested in some sort of legal

4  action relating to his accident and the resort.  And

5  so I didn't have a large level of detail about what

6  his hope was, but I would say it probably didn't

7  come out of left field for me, but lots of things

8  that John does sometimes is out of the normal

9  operations of day to day life, so...

10    Q    **What do you mean by that?**

11    A    I mean that he's, you know, he does bold

12  and outspoken things.  And so I've known John for a

13  long time.  I think that his personality surprises a

14  lot of people.  I've gotten a little more used to

15  it, I guess.

16    Q    **Okay.  And did you think that his filing**

17  **of this lawsuit was sort of consistent with Mr.**

18  **Meyer's unconventional approach?**

19    A    I don't know.  I think that it made sense

20  to me given the conversations that we had been

21  having about his accident and what he planned to do.

22  So I think it's not unconventional to sue a ski

23  area.  So, yeah.

24    Q    **Okay.  And do you see on the first page of**

25  **Deposition Exhibit 115, the reference at the bottom**

1  it says, there's also talk of a healthcare rally

2  tomorrow? Do you see that?

3       A    Yeah.

4       Q    And do you know what Mr. Meyer was

5  referring to?

6       A    I don't know what he was referring to.  He

7  had talked with me about his interest in retaining

8  or getting health insurance for Big Sky's ski patrol

9  and that being related to this effort.

10      Q    Okay.  And did you attend a healthcare

11  rally with Mr. Meyer --

12      A    No.

13      Q    -- at Big Sky?

14           Will you turn on the Complaint to

15  paragraph 37?

16      A    Okay.

17      Q    Did you read this Complaint when you

18  received this email back in 2017?

19      A    I honestly couldn't say.  It's likely I

20  did, but I don't know.

21      Q    Mr. Meyer is alleging that he continues to

22  experience substantial psychological pain and

23  suffering in his Complaint.  Do you see that?

24      A    I do.

25      Q    And is that consistent with your

1  **experience and interactions with Mr. Meyer around**

2  **this time?**

3     A    My experience with John and his, you know,

4  issues resulting from the traumatic brain injury is

5  that he had a number of physical and cognitive

6  things that continued to affect him.

7          He, you know, I think that was very clear

8  to me, it was very clear from visiting him in the

9  hospital and continues to be clear today that that

10 accident and the TBI he suffered as a result has had

11 serious impacts on his cognitive abilities and I

12 think that's, you know, the primary issue.

13    **Q    Sure.  I'm not asking about psychological**

14 **pain and suffering.  I'm asking, was it your**

15 **impression Mr. Meyer in December of 2017, that he**

16 **was under substantial psychological pain and**

17 **suffering?**

18    A    Sure.  I mean, I'm not a mental health

19 professional, but, yeah, John, was very distraught

20 at times.  He was, you know, making public posts on

21 the internet and breaking down and crying on

22 Facebook live feeds.  He was emotionally just really

23 raw and sensitive in a way that I had not known him

24 to be.

25          So I don't know that I was -- I wasn't

1  seeing John consistently, but to the extent that I

2  was in touch with him and spending time with him, he

3  seemed to be, you know, struggling mentally with a

4  lot of things related to the accident.

5       Q    So take a look at Big Sky 888 again.  I

6  think we've already marked that as Deposition

7  Exhibit 114.

8       A    Yep.

9       Q    So this text exchange on Big Sky 888 is

10 two days after Mr. Meyer sent this email to Mr.

11 Middleton and referred to a Complaint in this case;

12 correct?

13      A    Yes.

14      Q    On December 17, 2017, Mr. Meyer's telling

15 you that he just had an awesome day of skiing in

16 Hyalite that day; correct?

17      A    Correct.

18      Q    So you said earlier that for a period of

19 time Mr. Meyer didn't remember his wreck or didn't

20 communicate thinking about remembering his ski

21 wreck; correct?

22      A    I think what I said was that John had

23 discussed with me that memory recall was, and his

24 ability to sort of place events chronologically, was

25 one of the symptoms he was suffering after the

1  accident.

2  **Q    Sure.  So he couldn't remember the ski**

3  **wreck in any detail for a while; correct?**

4  A    I feel like I answered that before.  What

5  I remember is him struggling with memory recall and

6  placing things chronologically.

7  **Q    Uh-huh.  And then you said later you had**

8  **discussions with him and then you understood why he**

9  **wanted to sue Big Sky; right?**

10  A    He, yeah, we had discussions about his

11  desire to sue, his desire to get health insurance

12  for the ski patrol, his frustration that the resort

13  could afford to install expensive capital

14  investments, but couldn't pay for health insurance

15  for their staff.

16      And so my understanding was that he was

17  interested in pursuing a lawsuit against Big Sky and

18  that was one of his goals.

19  **Q    Right.  And so his goal was really to get**

20  **healthcare for Big Sky ski patrollers; right?**

21  A    I think that was one of his desired

22  outcomes, yeah.  I think he also wanted -- he had

23  talked about there not being enough safety

24  equipment.  So the ability to -- he had told me he

25  had conversations with patrollers that there wasn't

1  enough safety equipment to properly mark hazards on

2  the hill.  And that they had known that the area

3  where he was injured was an actual, you know,

4  someplace where others had been injured.

5          And so I think another goal for him was to

6  make sure they had the equipment necessary to do

7  their job and that they were marking hazards as they

8  needed to.

9      **Q    So he wanted to get equipment for Big Sky**

10 **ski patrol and he wanted to get health insurance for**

11 **Big Sky ski patrol; is that right?**

12     A    Yeah, I would say both of those were

13 interest of his, yeah.

14     **Q    Right.  When did he tell you that other**

15 **people had wrecked in the same location that he had?**

16     A    I don't know.  It's very difficult for me

17 to sort of -- we've had lots of conversations about

18 this over the span of three years, so I couldn't

19 tell you exactly.

20     **Q    Sure.  And you believe that that was after**

21 **he filed this lawsuit, don't you?**

22     A    I believe that his -- will you rephrase

23 that?

24     **Q    Sure.  You believe that his assertion that**

25 **other people had wrecked in the same location is**

 1   something that he communicated to you after he filed

 2   this lawsuit; right?

 3        A    I think that's right, yeah.

 4        Q    Right.  And so when he filed this lawsuit

 5   his goal was to get healthcare for the Big Sky ski

 6   patrol and to get equipment for Big Sky ski patrol;

 7   right?

 8        A    I think that was -- whether that was the

 9   impetus for filing the lawsuit or not, I think that

10   that was what he interested in doing with the

11   settlement funds.  And he thought --

12        Q    Sure.

13        A    -- that instead of suing the resort and

14   taking a large personal cut then going away and

15   being happy with that, that he could sort of use

16   this opportunity to right this wrong.  He thought it

17   was egregious that the ski patrol didn't have health

18   insurance.

19        Q    Okay.  And that was the wrong that he was

20   interested in righting; is that correct?

21        A    I think that was one of the desired

22   outcomes --

23        Q    Right.

24        A    -- that he was interested in.

25        Q    Yep.  And he never communicated to you

1  that he thought it was wrong that this cat track

2  where he alleged he wrecked wasn't marked; is that

3  right?

4      A    No, he did.  I think he was -- that was a

5  relevant factor as well.  Like he felt like it

6  should have been marked and --

7      Q    Okay.

8      A    -- that was one of the issues that he was

9  interested in.

10     Q    When did he tell you that he felt like the

11 cat track should have been marked?

12     A    Again, we had several conversations where

13 a lot of information came up.  He shared emails from

14 ski patrollers that he had talking about not having

15 enough materials, so I couldn't place it distinctly

16 in a time line, but I know --

17     Q    Sure.

18     A    -- that that was part of the -- the

19 narrative was that the area wasn't marked and he

20 felt it should be.  It seemed that the other

21 patrollers on staff who also felt that it should

22 have been marked.

23     Q    What did he tell you about why he thought

24 this cat track should have been marked?

25     A    I don't know that we got into that level

1  of detail.  I mean, I think he just felt like it was

2  a significant terrain variation in a place that may

3  not be obvious or clearly had a history of causing

4  other issues and accidents, so...

5      **Q     Yeah, but you just told me that this**

6  **history of, this assertion that it had a history of**

7  **causing other accidents is something that he**

8  **communicated to you after he filed the lawsuit.  I**

9  **want to go to the time before he filed the lawsuit.**

10 **Okay?**

11     A     Sure.

12     **Q     Right.  And before he filed the lawsuit,**

13 **what did he communicate to you about why he thought**

14 **this cat track should be marked?**

15     A     Again, I don't know that I have that clear

16 of a time line where I could say these are what we

17 talked about prior to lawsuit and this is --

18     **Q     No, no, no.  I'm asking you what he told**

19 **you about why he thought the cat track should be**

20 **marked.**

21     A     Before he filed the lawsuit.

22     **Q     Correct.**

23     A     Right.  And what I'm saying is that I

24 don't have that distinct memory of chronology of

25 events.  And so for me to comment on this I'm

 1  commenting more generally on multiple communications

 2  we've had over multiple years about this accident,

 3  about the lawsuit. Very difficult for me to say

 4  these are what we talked about prior to him filing

 5  the lawsuit and this is what we talked about after.

 6      **Q    Okay.  But you do know that he told you**

 7  **after he filed the lawsuit only that he believed**

 8  **other people had wrecked in this location.  You know**

 9  **that much; right?**

10      A    I think so, yeah.  I mean, again, this is

11  all part of the --

12      **Q    Right.  Did he ever tell you that he**

13  **couldn't see the cat track that he wrecked on, he**

14  **allegedly wrecked on?**

15      A    I don't recall that.

16      **Q    Okay.  So did he ever draw a connection**

17  **between his own wreck and the lack of marking of the**

18  **cat track, or was he just speaking -- do you**

19  **understand my question?  Did he ever communicate to**

20  **you and draw a connection between his own wreck and**

21  **the lack of marking of the cat track?**

22      A    Yes.

23      **Q    Okay.  He did communicate that to you.**

24      A    Yes, I remember that part of our multiple

25  conversations about this.

     Q    Right.  And that's opposed to him just
sort of generally wanting ski patrol to have more
equipment so that they could mark places like this
for other people. Do you see the distinction I'm
drawing?

     A    Not really.  I mean, I think that he -- I
mean, you're talking about a couple of different
things. So his desire to get health insurance for
ski patrol is related to this.  His desire to get
the mountain properly marked and be safe for others
relate to this. I think he also had a desire to
prove wrongdoing and so, you know, that's a factor
here too.

          So he had -- he felt, my understanding, he
felt that that area wasn't properly marked and that
the patrol was aware of that and that it had caused
issues and potentially then a factor in other
accidents on the mountain.  And he felt that that
was sort of foundational to his accident.

     Q    Right.  And what I'm getting at is he
never communicated to you that he wrecked because
the cat track was not marked; right?

     A    No, I wouldn't say that's -- I think that
was part of his issue, part of what he was claiming
was that.

1      **Q    Okay.  Did he tell you about that?**

2      A    He told me that the terrain, that Big Sky

3  ski patrol didn't have enough materials to mark

4  certain places --

5      **Q    Okay.**

6      A    -- and that --

7      **Q    Let me just make sure you understand my**

8  **question.**

9           **What did he tell you about his wreck in**

10  **connection with the markings?  I don't want to hear**

11  **about, you know, somebody else and needing to mark**

12  **generally.  I want to focus specifically on what he**

13  **told you about his wreck in connection with the**

14  **markings.**

15           **Do you understand that?**

16      A    Yeah.

17      **Q    Okay.  So can you speak to that?  What did**

18  **he tell you about why he wrecked?**

19      A    He told me that the area wasn't properly

20  marked.

21      **Q    Okay.  So he told you that.  He said, I**

22  **wrecked because the area wasn't properly marked.**

23  **That's what he told you, that's your testimony?**

24      A    Yes.  In multiple conversations over many

25  years, part of those conversations, part of this

 1  narrative, was that the hill wasn't properly marked

 2  and that played a role in his ski accident.

 3      **Q    Okay.  And also Dynafit bindings played a**

 4  **role in his accident; correct?  He told you that as**

 5  **well.**

 6      A    Yeah.

 7      **Q    Okay.  Did you ever break that down for**

 8  **him and say, John, was it the marking or was it the**

 9  **Dynafit? I mean, did you ever press him on that**

10  **issue?**

11      A    No.

12      **Q    Why not?**

13      A    I don't know.

14      **Q    You just simply support his goal of**

15  **getting healthcare for the ski patrol and didn't**

16  **question whether or not, in fact, his wreck was due**

17  **to the lack of markings?**

18      A    I don't think that I have been involved at

19  the level that you may think I have been.

20      **Q    Okay.**

21      A    Like John --

22      **Q    And you are telling me that he told you**

23  **that this -- the fact that it occurred because of**

24  **the lack of marking; right?**

25      A    That was part of the narrative, yes.

1    **Q    Okay.  Just part of the narrative.  Not**
2    **necessarily the cause of his accident; right?**
3         A    As you mention, the Dynafit issue was
4    another part of the narrative.
5         **Q    Okay.  The other part was that he simply**
6    **wanted to achieve something to pay back what he**
7    **viewed as debt that he owed to ski patrol for saving**
8    **his life; right?**
9         A    Right.  I wouldn't say that had anything
10   to do with his accident.  I would say that had
11   something to do with his motivation.
12        **Q    Right.  Okay.  Have you told me everything**
13   **you know about this narrative that you understand**
14   **with respect to the cause of John Meyer's accident**
15   **at Big Sky?**
16        A    Yes.
17        **Q    Okay.  And did Mr. Meyer ever tell you**
18   **about the testimony of the eyewitness to the ski**
19   **accident?**
20        A    No.
21        **Q    Okay.  Did he ever communicate to you that**
22   **he was skiing very fast down the ski run at Big Sky**
23   **before his accident?**
24        A    No.
25        **Q    Okay.  He never told you that.**

```
 1        A     No.

 2        Q     Did Amanda Eggert ever tell you that she

 3   believed he lost control uphill of the cat track

 4   where Mr. Meyer blames for his accident?

 5        A     Not that I recall.

 6        Q     Okay.  But you are unaware as you sit here

 7   today that the only eyewitness to Mr. Meyer's ski

 8   wreck has testified Mr. Meyer saw the cat track;

 9   right?

10        A     I was -- I am unaware or was unaware that

11   there was an eyewitness at all.

12        Q     Okay.  So you didn't even know there was

13   an eyewitness.

14        A     No.

15        Q     Mr. Meyer never told you that the

16   eyewitness testified that Mr. Meyer was trying to

17   jump off the downhill lift of the cat track; is that

18   right?

19        A     That's correct.

20        Q     Okay.  And so everything that you know

21   about this wreck is based on things that Mr. Meyer

22   has selectively chosen to tell you about his ski

23   wreck; right?

24        A     I would add conversations with Amanda and

25   his father as well.
```

```
 1        Q    Okay.  And they didn't see the ski wreck;

 2  right?

 3        A    Not to my knowledge, no.

 4        Q    Right.  Mr. Meyer liked to ski fast in

 5  your experience?

 6        A    No, as I stated, he is an immediate skier.

 7  He switched from splitboarding to skiing when I knew

 8  him. And he was competent, you know, able to move

 9  through a lot of terrain but was pretty cautious.

10        Q    Have you ever skied at Big Sky Resort?

11        A    I have, yeah.

12        Q    Okay.  Have you ever skied the Highway

13  Road?

14        A    I've only skied a handful of times.  I

15  wouldn't be able to say if I've skied a certain

16  trail.

17        Q    Okay.  Do you recall the cat track or road

18  at the base of the Highway Run that takes you back

19  to the Challenger lift?

20        A    No.

21        Q    So nothing -- when was the last time you

22  skied at Big Sky Resort?

23        A    Probably 2010, maybe.

24        Q    Okay.  And you skied the Highway Run in

25  2010.
```

1      A    I don't know.  I don't know the mountain

2  well enough to --

3      Q    Okay.  Let me ask you this.

4           Is it your understanding that Mr. Meyer

5  had sort of an epiphany about the details of how his

6  wreck occurred sometime after he got out of the

7  hospital?

8      A    I've never discussed with him an epiphany,

9  no.

10     Q    What's your understanding of how the

11  details of the ski wreck, if they did, come back to

12  him?  How did they come back to him, slowly, over

13  time or how?

14     A    I assumed it was sort of over time.

15     Q    Okay.

16     A    You know, talking to Amanda and talking to

17  other people, I think he was in -- potentially in

18  contact with some of the patrollers that were on the

19  scene, but my assumption was that it was over time.

20     Q    Right.  That's an assumption, right, that

21  you are sort of guessing; correct?

22     A    Correct.

23     Q    And what you are telling me is that you

24  believe that he pieced it together based on things

25  he learned from other people; is that right?

 1       A    I am telling you that I am making an

 2  assumption that I think he came to understand what

 3  happened to him over time and that understanding was

 4  likely influenced by other people that had knowledge

 5  of the accident.

 6       **Q    Right.  So his -- his version of events is**

 7  **influenced by what other people have told him;**

 8  **correct?**

 9       A    That's my assumption.

10       **Q    Right.  Have you ever fallen at a ski**

11  **resort?**

12       A    Yes.

13       **Q    Have you ever sued a ski resort in**

14  **connection with any fall you have taken at a ski**

15  **resort?**

16       A    No.

17       **Q    And you accepted personal responsibility**

18  **for any falls you have ever taken at a ski resort;**

19  **right?**

20       A    Yes.

21       **Q    Just like you do in the backcountry;**

22  **correct?**

23       A    Yes.

24       **Q    And you agree with me whether you are in**

25  **the backcountry or you are at a ski resort, you need**

1   to control your speed.

2       A    Yes.

3       Q    And you need to control your course;

4   correct?

5       A    Yes.

6       Q    And be aware of the terrain that's in

7   front of you; correct?

8       A    Yes.

9       Q    And ski with a level of caution that's

10  appropriate under the conditions; correct?

11      A    Correct.

12      Q    Have you ever seen photographs of the area

13  where Mr. Meyer wrecked?

14      A    No.

15      Q    Okay.  Mr. Myers never showed you any

16  photograph of the Highway Run; correct?

17      A    Correct.

18      Q    And you don't know whether or not the cat

19  track that Mr. Meyer's blamed for his wreck is

20  visible, or obscured or otherwise; right?

21      A    I have none of that knowledge.

22      Q    Okay.  Mr. Meyer liked to do jumps in your

23  experience?

24      A    No, again, he was pretty cautious.

25      Q    Okay.  Never seen him jump on the skis; is

1  **that right?**

2      A    I don't think I said that.  You asked if

3  he liked to do jumps.

4      **Q    Jump --**

5      A    It's very likely I've seen him jump on his

6  skis, yes.

7      **Q    Okay.  Where have you seen him jump?**

8      A    I could not provide a specific example.

9  I've spent many, many hours skiing with John and,

10 yeah.

11     **Q    More than one occasion?**

12     A    Has he jumped on more than one occasion?

13     **Q    With you, yeah.**

14     A    I do not have a strong memory of him.  I'm

15 more so saying that it's within the realm of

16 possibilities that he has jumped while I've been

17 skiing with him, but I do not have a specific memory

18 of anytime when he has jumped.

19     **Q    Okay.  Do you know any Big Sky Resort**

20 **employees?**

21     A    No.

22     **Q    Okay.  Do you know E.B. Dixon?**

23     A    No.

24     **Q    Are you aware of Mr. Meyer's relationship**

25 **with E.B. Dixon?**

```
 1        A     No.

 2        Q     Okay.  Can you look at Big Sky 925,

 3   please?

 4             MS. WALAS:  Mac, can we take a break right

 5   now?  My battery is about to die.

 6             MR. MORRIS:  Ten minutes.  Let's take ten

 7   minutes.

 8             MS. WALAS:  Sounds good.

 9             (Recess taken)

10             MR. MORRIS:  Back on the record.

11   BY MR. MORRIS:

12        Q     Mr. Lowell, you understand that you are

13   still under oath; correct?

14        A     Correct.

15        Q     Okay.  So before we took that break I

16   think you had told me that you were not especially

17   involved with this case; is that right?

18        A     Correct.

19        Q     Okay.  And you did email with Mr. Meyer

20   pretty frequently and ask him how things were going

21   with the Big Sky case; correct?

22        A     Yes.

23        Q     Okay.  Why were you repeatedly asking Mr.

24   Meyer about this case?

25        A     It was a prominent event in his life and
```

1  he is a close friend of mine and so I knew that it

2  was something that was occupying a lot of his

3  attention and time.  And as a friend it seemed a

4  relevant thing to be interested in.

5      **Q    Okay.  Any other reason?**

6      A    No.

7      **Q    I think recently you asked him where**

8  **things are at with your political aspirations and**

9  **the Big Sky case.  Why did you ask him about those**

10 **two things?**

11     A    I think the same reason.  I mean, they're

12 both big prominent aspects of his life, events,

13 things that he's thinking about and dealing with.

14 And so when we check in we tend to start with the

15 bigger issues and just see how things are going.

16     **Q    Sure.  And has Mr. Meyer ever communicated**

17 **to you that Big Sky filed a counterclaim against**

18 **him?**

19     A    He did mention that, yes.

20     **Q    Right.  And what did he tell you about**

21 **that?**

22     A    Essentially that.  That they were suing

23 him. I think, if I recall, the grounds of the suit

24 was that his lawsuit was improper because it was an

25 attempt to gain notoriety and enhance his political

```
 1  aspirations.

 2      Q    Right.  And did he tell you that?

 3      A    I believe he did -- well, he told me

 4  that's what the suit was about.  He didn't tell me

 5  that that was his --

 6      Q    Sure.  Sure.  And what did you say in

 7  response when he told you that?

 8      A    I don't remember.  I think it was more of

 9  a unidirectional conversation about that.  I wasn't

10  providing any guidance or advice, I was just staying

11  updated with his activities.

12      Q    Okay.  And did Mr. Meyer express to you

13  that the counterclaim has caused him a lot of

14  heartburn, stress, anxiety and that sort of thing?

15      A    I would characterize it as the entire --

16  the entire thing has caused him a lot of heartburn,

17  stress and anxiety.

18      Q    What do you mean by the entire thing?

19      A    I mean, everything from the accident to

20  his suit against Big Sky to the countersuit, all of

21  it has been a source of anxiety and heartburn and

22  strife, I guess.

23      Q    Okay.  And is that typical with lawsuits

24  that Mr. Meyer filed against the government and

25  other lawsuits that he has filed, did he experience
```

1   a lot of stress, heartburn and anxiety about those

2   or is this more stressful for him than other

3   lawsuits?

4       A    My observation is that it would be more

5   stressful.

6       Q    Okay.  And do you know why?

7       A    I think because he is personally involved.

8       Q    And Mr. Meyer's also been stressed out

9   about not having enough money of late, has he not?

10      A    John's been stressed out about his

11  financial situation ever since I've known him.

12      Q    Okay.  So will you look at Big Sky 925?

13          MR. MORRIS:  And, Breean, I think this is

14  Tab 20.

15  BY MR. MORRIS:

16      Q    Do you have that in front of you?

17      A    I do.

18      Q    I don't believe we marked this, so let's

19  mark this Deposition Exhibit 116, please.

20          Deposition Exhibit 116 is a portion of a

21  text exchange, or it's a text exchange that you had

22  with Mr. Meyer; correct?

23      A    Correct.

24      Q    This is a portion that comes from that

25  program that you discussed earlier so that's why it

1    looks different?

2        A    Correct.  This was copy and pasted off my

3    laptop.

4        Q    And on these, we can't see the dates that

5    these texts were exchanged, but do you have a sense

6    in reviewing this of when these texts would have

7    occurred or did occur?

8        A    I think it was last winter.

9        Q    Okay.

10       A    Late fall, early winter is my guess.

11       Q    Okay.  And there is a reference in the

12   middle to discuss the 2020 budget and the loan

13   agreement between Cottonwood and Mr. Meyer.  Do you

14   see that?

15       A    Is it that Paula suggested we draft a loan

16   agreement?

17       Q    It's part of the exchange that starts, Mr.

18   Meyer writes, thanks boss, SNAFU.  Do you see that?

19       A    Yes.

20       Q    Okay.  And then a couple of lines down

21   there is a reference to setting up a board call to

22   discuss the 2020 budget.  Do you see that?

23       A    Yes.

24       Q    Okay.  Would that have been in the winter,

25   November, something like that, in 2019 likely?

```
 1        A    Yeah, again my recollection probably late,
 2   late in the calendar year, early in 2020.
 3        Q    Of 2019; right?
 4        A    Well, if it was the 2020 budget -- no, I
 5   think that's true.  I think it would have been late
 6   2019, early 2020.
 7        Q    Right.  If it helps, at the top it says,
 8   Ems due March 6.
 9        A    Yeah, our child was due in March, so.
10        Q    Okay.  Of 2020; right?
11        A    Yeah.
12        Q    Okay.  All right.  So that would place us
13   in 2019.  And do you see in that same exchange where
14   it says, front page above the fold today?  Do you
15   see that?
16        A    Yep.
17        Q    Where Mr. Meyer's writing that to you, he
18   actually says it twice in a row?
19        A    Yes.
20        Q    Do you recall what Mr. Meyer's referring
21   to there?
22        A    I think it was a Bozeman Chronicle news
23   article.  I think he was on the front page.  I don't
24   remember for what.
25        Q    Okay.
```

 1       A     Gotten some press recently for the

 2   Gallatin River work that Cottonwood is doing.

 3       **Q     Okay.**

 4       A     But it was in reference to that article.

 5       **Q     I'm sorry, what was that?**

 6       A     It was in reference, I think, to a front

 7   page article in the Chronicle around that time.

 8       **Q     It wasn't about this lawsuit; correct?**

 9       A     I don't know.  I don't believe so, but I'm

10   not sure.

11       **Q     Okay.  And then if you go down a little**

12   **bit from that you have a message to him reads,**

13   **congrats on the front page press.  Do you see that?**

14       A     Yeah.

15       **Q     And then -- I'm sorry.  Okay.**

16            **Then down a little bit you -- I'm sorry.**

17   **After you say congrats on the front page press you**

18   **say, curious to know if there has been any activity**

19   **coming out of that.**

20            **Do you know what you are referring to**

21   **there?**

22       A     I'm likely referring to whether

23   Cottonwood's gotten any positive attention for that

24   and then, you know, therefore, maybe potential

25   donations or interest in the organization.  You

1  know, if he was on the front page of the local

2  newspaper, I would hope that people would see that

3  and maybe be excited about the work the organization

4  was going and then maybe generate some general

5  interest about the organization.

6      Q    Okay.  And then Mr. Meyer responds to your

7  **text message and says, lots of people saying good**

8  **job and stick it to Big Sky.  Do you see that?**

9      A    I do, yeah.

10     **Q    And is he referring there to sticking it**

11 **to the city of Big Sky, people are encouraging him**

12 **for suing the city of Big Sky?**

13     A    My -- I think this is about the watershed

14 issue, the Gallatin River issue.

15     **Q    Okay.**

16     A    That would make sense to me.  I remember

17 him getting some press for his work to try and stop

18 the city from getting a new and different type of

19 wastewater permit that would allow them to discharge

20 wastewater into the Gallatin in a different way.

21 And so my assumption here is that that article ran

22 in the local press.  He was excited about it.  I was

23 asking about whether that's driven any interest in

24 the organization on a whole.  And that he is

25 responding no donations, but, you know, people are

1  excited about his work, that was highlighted.

2      Q   Right.  And in terms of people encouraging

3  him to stick it to Big Sky, is that -- is he saying

4  that they want to stick it to Big Sky Resort in

5  addition to the city?

6      A   I couldn't speculate on that.  I don't

7  know.

8      Q   Okay.  In your experience does Mr. Meyer

9  have sort of an axe to grind with the city of Big

10 Sky and the Big Sky Resort in general?

11     A   I think his axe is -- I think he has a lot

12 of axe to grind.  I think Big Sky falls under that

13 umbrella, but it does so in the context of the

14 development of the area, the disproportionate amount

15 of wealth concentrated in the area, the amount of

16 power that often comes with that wealth.

17     Q   Okay.  Can you look at Big Sky 946.

18     A   Okay.

19     Q   Let's mark Big Sky 946 as Deposition

20 Exhibit 117.  Do you have that in front of you?

21     A   I do.

22     Q   Okay.  Deposition Exhibit 117 is a true

23 and correct copy of an additional text exchange that

24 you had with Mr. Meyer; correct?

25     A   Correct.

1    **Q     This occurred recently; is that right?**

2    A     Yes.

3    **Q     In fact, it occurred after you were named**

4    **as a witness or identified as a potential witness in**

5    **this lawsuit?**

6    A     Yes.

7    **Q     And after you told Mr. Meyer about the**

8    **deposition and document subpoena that Big Sky had**

9    **served on you; is that right?**

10   A     Yes.

11   **Q     Right.  And so when Mr. Meyer sent you**

12   **this text message he knew about the document**

13   **subpoena that had been served; correct?**

14   A     Yeah, I had communicated to him, as I had

15   said earlier, that I was annoyed about having to

16   produce all of those documents, so he was aware of

17   that.

18   **Q     Right.  He actually cautioned you to hold**

19   **off on complying with the subpoena until Ms. Walas**

20   **talked to you about whether or not she actually**

21   **wanted to call you as a witness; right?**

22   A     I, I, I think so.  I mean, my memory was

23   that he texted me to ask if I was interested in --

24   would be willing to be a witness.  I texted him back

25   saying I didn't know what was involved with that and

1  would need more information.  He said that his

2  attorney would contact me.

3        I had a brief conversation with Breean

4  about what was expected, what the possibilities were

5  for having to travel, having to be present at a jury

6  trial, what the process would look like.  And then

7  we were texting later about something and I

8  commented about being frustrated about having to

9  screen shot all of these text messages and compile

10  all of them.  And that's, I think, somewhere around

11  where the response starts on this page.

12     Q    Okay.  Let me do this.  Do you have the

13  large document that contains all the text messages

14  in front of you?

15     A    The Word document or the -- I have all of

16  them here.

17     Q    Sure, the Word document.  That's fine.

18     A    Yep.

19     Q    If you turn to Big Sky 952, please.

20     A    Okay.

21     Q    This is -- at the bottom of Big Sky 942 is

22  that conversation that you were trying to describe

23  to me; correct?

24     A    Correct, yeah.

25     Q    And can you read into the record the

1   bottom text message that Mr. Meyer sent to you?

2       A    On 952?

3       Q    Yeah.

4       A    John wrote, Big Sky is a bunch of greedy

5   shitheads that would rather make everyone's life

6   difficult rather than own up to the fact that they

7   were negligent.  Two other people were injured in

8   the same place.  I think they are asking that you

9   not be included as a witness.  Let me ask the

10  attorney if you are included before you have to do a

11  bunch of mundane shit for nothing.

12      Q    Right.  And you had referred earlier to

13  this, Mr. Meyer communicating to you his assertion

14  that other people were injured in the same place.

15           Do you recall that testimony?

16      A    Yes.

17      Q    And is this text message the basis for

18  that testimony?

19      A    This is part of where I heard that from

20  him, yeah, one place where I have.  I wouldn't say

21  it's the only.

22      Q    Okay.  But he had repeated his assertion

23  to you at other times.

24      A    Yes.

25      Q    Okay.  And that was after this lawsuit was

```
 1  filed; right?

 2       A    I think so, yeah.

 3       Q    Right.  And so after you received the

 4  subpoena, Mr. Meyer told you to hold off so you

 5  didn't have to do, quote, a bunch of mundane shit

 6  for nothing; right?

 7       A    Correct.

 8       Q    Right.  And then the next thing that

 9  happened you actually sent him a screen shot of the

10  subpoena; correct?

11       A    Correct.

12       Q    And so Mr. Meyer knew when he sent the

13  text message on Deposition Exhibit 117 about the

14  subpoena and what was being requested; right?

15       A    I would assume so if you read that screen

16  shot.

17       Q    Right.  And if he read your text message

18  --

19       A    Right.

20       Q    -- informed him that you were going to

21  have to send all text messages; right?

22       A    Correct.

23       Q    So Mr. Meyer knew or should have known

24  that this text message that is shown on Exhibit 117

25  would be produced by you pursuant to the subpoena;
```

 1   correct?

 2       A     Yeah, that's a fair assumption.

 3       Q     **Right.  And these insults and sort of**

 4   **description of physical violence that Mr. Meyer's**

 5   **fantasizing about, he knew that Big Sky's attorneys**

 6   **would receive that information; right?**

 7       A     Right.  As I previously stated, that's a

 8   fair assumption that he knew that this would be part

 9   of the subpoena production.

10       Q     **Right.  In fact, in this text message he's**

11   **telling you or asking you to communicate these**

12   **threats to Big Sky and its attorneys; right?**

13       A     Yeah, he says please be sure to tell them.

14       Q     **Right.  Right.  So he is actually saying**

15   **please be sure to tell the Pig Stye attorneys that**

16   **I'm going to use the jury award against them to**

17   **unionize their whole fucking ski patrol after this**

18   **case is over; right?**

19       A     That's the beginning of it, yeah.  He goes

20   on from there.

21       Q     **Okay.  And so he wanted you to communicate**

22   **a threat to Big Sky's attorney against Big Sky;**

23   **correct?**

24       A     I mean, this is what he sent to me.  I'm

25   not sure if he expected me to actually follow

 1  through or he is being facetious.

 2      Q    Sure.  And in the threat that he is

 3  communicating and asking you to communicate to me

 4  and the other Big Sky attorney is that he wants to

 5  do something that's disruptive of Big Sky's

 6  operations; correct?

 7      A    I mean, that specifically, he says he

 8  wants to unionize the ski patrol.  I don't think

 9  he's --

10      Q    Right.

11      A    -- characterizing that as disruptive, he's

12  just saying that that's what his goal is.

13      Q    Sure.  And so what he wants to do is

14  unionize the whole ski patrol because he believes

15  that that would -- that that would disrupt Big Sky's

16  operation, that would disincentivize Big Sky from

17  defending itself in this lawsuit; correct?

18      A    I think that's speculation.  I think he's

19  just saying one of his goals is to unionize the ski

20  patrol.

21      Q    He also is communicating to you that he

22  wants you to tell Ian McIntosh about his daydreams

23  of tearing the skin off of Ian McIntosh's face with

24  his bare fingers; right?

25      A    Yeah, he says, I was having daydreams --

1  he says, please tell that douche bag Ian McIntosh

2  that I started seeing a psychologist because I was

3  having daydreams about tearing the skin off his face

4  with my bare fingers.

5      **Q    Right.  So he wanted you to tell Ian about**

6  **these daydreams that he was having of physically**

7  **harming Ian McIntosh; right?**

8      A    He wanted me to tell Ian that he needed to

9  start seeing a psychologist because he was having

10  those daydreams.

11      **Q    Okay.  Mr. Meyer communicated to you in**

12  **this fashion about a sort of vendetta that he has**

13  **against Big Sky and/or its attorneys as a result of**

14  **this lawsuit?**

15      A    I would say John has communicated a

16  dislike for Big Sky and Big Sky's attorneys for the

17  stress and anxiety that this process has caused.

18      **Q    Sure.  And the stress and anxiety that**

19  **this process has caused, what are you referring to**

20  **when you're saying this process?**

21      A    Again, I would say, you know, both of the

22  lawsuits, the one he has brought, the countersuit

23  against him, and then all of the, you know,

24  testifying and character questioning and all the

25  things involved with, you know, being sued.

```
 1      Q    Sure.  And you understand that Mr. Meyer

 2  is the one that initiated this lawsuit; right?

 3      A    Of course, yeah.

 4      Q    Right.  And did Mr. Meyer ever tell you

 5  that he wanted to buy a billboard on the way to Big

 6  Sky that would disparage Big Sky?

 7      A    No.

 8      Q    Let me take a really short break.  I'm

 9  just going to review my notes.  I think I'm done,

10  but I just want to double check.  So if we can take

11  a real quick break and go off the record.

12           (Recess taken)

13           MR. MORRIS:  Back on the record.

14  BY MR. MORRIS:

15      Q    Trevor, that's all the questions I have.

16  Thanks so much for your time.  And I appreciate

17  that. And you have the opportunity to get a copy of

18  the transcript and review it for any corrections you

19  want to make or you can waive that opportunity.  And

20  just say whatever the transcript says, I'm good

21  with.  So you understand that you have that right?

22      A    I do.

23      Q    Okay.  And do you want to read and sign

24  and make any corrections necessary or do you just

25  want to waive that right today?
```

```
 1       A     I would like to read and sign.

 2       Q     Okay.  All right.

 3             MR. MORRIS:  And I will reserve any other

 4    questions for trial and thanks again.

 5             MS. WALAS:  I'm going to ask some follow-

 6    up questions.

 7             MR. MORRIS:  Okay, sorry.

 8             MS. WALAS:  That's okay.  We got that

 9    squared away.

10    EXAMINATION

11    BY MS. WALAS:

12       Q     Trevor, I'm going to ask some follow-up

13    questions and just confirm like every other break

14    you still understand you are under oath?

15       A     Yes.

16       Q     Okay And you guys covered a few things

17    here today.  And I think at the beginning you said

18    what your understanding was of what you were here to

19    testify about today; is that correct?

20       A     Yeah, my understanding is just of someone

21    who has known John for a long time, both before and

22    after the accident, and so I could provide context

23    about who he is as a person, his personality, the

24    impacts that the accident may have had on him

25    physically and mentally.
```

```
 1       Q    Okay.  How long did you say you have known

 2  John?

 3       A    We met in the summer of 2009, so 11 years.

 4       Q    Okay.  And you met farming?

 5       A    We met just peeling fence rails actually

 6  is what we were doing.

 7       Q    That's right.  That's right.

 8            And tell me what John was like back then

 9  when you met him.

10       A    John was just like a super energetic, sort

11  of live wire kind of guy.  Had a ton of enthusiasm

12  and energy for life.  He was really into climbing

13  and hunting and just was sort of, you know, extreme

14  in a lot of those pursuits.

15            I remember him wanting to try to kill his

16  own deer with a knife at one point.  He thought he

17  could hide in the tree and drop down on it in a

18  bunny suit.

19            But, yeah, I mean, he was really engaging.

20  And he liked to have -- I think I was attracted to

21  him because he liked to have meaningful

22  conversations.  He was a deep thinker.

23            And so we bonded over the physical

24  interest in climbing and recreational opportunities,

25  but I think what's really made the relationship last
```

1  is that I appreciate his mind a lot in him as a

2  conversationalist.

3          **MR. MORRIS:**  Trevor, what did you say, he

4  lived with a. --

5          **THE WITNESS:**  He lived with?

6          **MR. MORRIS:**  I didn't hear that.  I was

7  trying to get clarity.  I'm sorry to interrupt,

8  Breean.

9          Did you say he lived with a tree maker?

10         **THE WITNESS:**  No.  I was explaining that

11  he was sort of extreme in a lot of his pursuits.

12         **MR. MORRIS:**  Okay.  All right.  Sorry, I

13  must have been -- go ahead, Breean.  I'm sorry.

14  **BY MS. WALAS:**

15     **Q    So you said your attraction to him was**

16  **both the physical and the mental.  You know, you**

17  **guys just really sort of connected on a lot of**

18  **levels.**

19         **Is that kind of a good summary of when you**

20  **first met?**

21     A    Yeah, yeah.  He was pushing me to do, like

22  to climb.  I had never tried climbing before and he

23  was someone who knew how to track climb.  And so he

24  was really eager to teach me that and sort of show

25  me how to do that.

 1          But I think what I realized and what I,

 2   you know, started really to real appreciate about

 3   him was not only was he a great and sort of

 4   adventure buddy in a lot of ways because he had

 5   these skills, and his knowledge and his fitness, but

 6   he was also was a dynamic person who is really

 7   interesting to talk to, well-educated, you know,

 8   thoughtful, interesting conversationalist.

 9       **Q     And you talked a lot about what you**

10   **learned about John's wreck on December 11, 2015.**

11   **And I just want to confirm that your knowledge is**

12   **from his father, Amanda and John?**

13       A    Yeah.

14       **Q     Did you speak to any of the doctors when**

15   **you were in the hospital or the rehab facility?**

16       A    I think any conversations I had with them

17   was just more about his present condition at the

18   time, not about sort of his accident in any way, but

19   wondering, you know, what was going on with him,

20   what their prognosis was going forward, what they

21   thought he would -- how he thought he would recover,

22   trying to help him communicate.

23          So I remember distinctly the broken arm

24   was really frustrating to him because he had been

25   complaining about the broken arm for a while and

1  then they finally decided to x-ray it and they

2  confirmed, oh, yeah, you snapped your arm as well so

3  he had -- but, you know, no conversations with him

4  about, you know, his accident or what had happened

5  that way.  More just his sort of physical, medical

6  situation.

7      **Q     And I believe you mentioned that, you**

8  **know, you knew that he had incurred some medicals**

9  **bills related to those injuries?**

10     A     (No audible response.)

11     **Q     Okay.  And do you have any idea how much**

12 **he incurred in medical bills?**

13          **MR. MORRIS:**  Objection; asked and

14 answered.

15     A    I just knew it was substantial.  I don't

16 know the dollar figure.  I think he had thrown out,

17 you know, six-figure dollar figures about total

18 cost.

19     **Q     Okay.  Do you know anything else about how**

20 **the wreck has affected John financially?**

21     A     No.  I mean, I just know that it was, you

22 know, he incurred a lot of debt and he had some

23 issues with insurance covering certain aspects of

24 it.  So, yeah, I think that's all.

25     **Q     And you testified that you visited him in**

1   the hospital.  Describe what John looked like that

2   first day when you arrived.

3       A    I mean, pretty startling.  He was

4   intubated. He was -- I think he was asleep when I

5   got there. Hooked up to all the different wires and

6   bells and whistles.  He had blood -- dried blood

7   still on the side of his face.  His whole arm was

8   sort of wrapped up.  He was pretty bruised and

9   battered and, you know, eventually he sort of woke

10  up.

11          And, again, we were there in and out for

12  like two or three days, so certain conversations

13  with him eventually when he would sort of like come

14  to or be awake.  And he just, you know, he tried to

15  stand at one point because he had to go pee and it

16  took like three or four of us to get behind him and

17  he was super unsteady. That was pretty consistent

18  for weeks.

19          And I think the most sort of startling

20  thing was just like he -- you could tell like he

21  recognized me.  He was like, but he was --

22  cognitively, he just wasn't firing like he normally

23  would be.  I mean, he could -- it was sort of like

24  talking to someone who has Alzheimer's, or dementia

25  or something.

```
 1              It was like he would come into these brief

 2    moments of clarity where he could be sort of like,

 3    okay, I understand what's going on.  And then, you

 4    know, he would fade from that and just sort of be in

 5    and out that way.

 6              So I was excited that he knew who I was.

 7    He gave me a big smile, but I would be talking to

 8    his father in the room or something and look over

 9    and he was clearly just sort of like, you know,

10    really mentally affected by it.

11        Q    Okay.  You used the word cognitively, that

12    John was cognitively affected, you could tell when

13    you saw him.

14              How would you -- how would you explain how

15    John has cognitively changed since the wreck?

16        A    He doesn't seem to have like the same

17    sharpness about him.  I mean, he doesn't have the

18    same sharpness about him.  He'll sometimes forget

19    that we had conversations or he'll misplace details

20    of conversations we've had.  He'll misplace -- like

21    I have a -- when I first met John I had a different

22    partner and we had a dog together.  I'm now married

23    and my wife and I have a dog.  And he'll often sort

24    of swap the dog names even though he's known that I

25    haven't had that dog for a long time.
```

1          His speech has been really slow, you know,

2     especially at first, but still to this day.  It's

3     not even -- talk the same way that he used to.  And

4     he has talked to me about that and I've, you know,

5     just witnessed it that he's -- he struggles to sort

6     of match his mouth I think with his thoughts

7     sometimes.  And he's -- he can't get it out the way

8     he wants to get it out the way he normally used to.

9     It's been really frustrating for him that way.

10          And I think there's this like emotional

11    rawness to him that was really startling.  I mean,

12    he's always been someone who has been in touch with

13    his emotions, but he's also been a fairly stoic

14    dude.  And, you know, I would say some of these

15    instances where he just -- like he came and visited

16    my wife and I in Missoula when he was running for

17    congress.  And he was telling us about a speech he

18    wanted to make.  And he just started, just bawling,

19    just break down and crying. And it really wasn't

20    about -- it didn't seem like a story or a situation

21    that would be upsetting to anybody.

22          And the same is a true like he would just

23    sort of laugh maniacally sometimes about stuff.

24    And, you know, just things that I -- behaviors I

25    hadn't seen from him before.  But he seemed to be

1  like, not out of control emotionally, but not in as

2  strong control as he used to.  Like it would sort of

3  overtake him.  All of sudden he would be so sad,

4  he'd just be like weeping or crying.  Or sometimes

5  he would find something funny that might be like a

6  chuckle kind of response to everybody else, but it

7  was like a hysterical laughter kind of response for

8  him.

9      **Q    Have those changes impacted your**

10  **relationship with him?**

11      A    Yeah, I mean, they've impacted mine,

12  they've impacted Amanda's, I know.  Like Amanda

13  called me a few months after he was out of rehab and

14  was talking to me about, you know, what I had seen

15  in changes.  And she wanted to learn more about what

16  John was like prior to his injury to see if what she

17  was seeing was, you know, resultant of the injury.

18          So, I mean, we remain really good friends

19  and I don't think it's undermined our friendship in

20  any way, but it's certainly changed the dynamic in a

21  lot of ways.

22      **Q    Now I'm going to follow up on a few things**

23  **that you testified about during your deposition, so**

24  **it might seem like I'm jumping around a little bit.**

25  **I'll try to give a little bit of a pause as I switch**

1  subjects so if you need to grab an exhibit or

2  anything.

3          So the first thing I want to touch on is

4  you were asked a lot about backcountry skiing.

5          Do you recall that?

6  A    Yeah.

7  Q    And when you're backcountry skiing, you

8  know there aren't going to be signs; is that

9  correct?

10  A    Yeah.

11  Q    And what's the difference between, say,

12  that backcountry skiing and skiing at a recert?

13  A    I think there's an expectation at a resort

14  that there is a lot more infrastructure and effort

15  and support put into guiding skiers, helping them

16  make safe decisions, making sure everybody is, you

17  know, skiing on safe terrain.  There's personnel.

18  There's safety resources.  There's trees wrapped in

19  foam pads.  There are signs telling you where to go.

20          You know, so with backcountry skiing there

21  is none of that.  There is the assumption that you

22  are out in the woods and you are by yourself and you

23  need to be self-sufficient.  I don't think that

24  self-sufficiency expectation is true when you're in

25  a resort.

 1     Q    And would you say that you ski backcountry

 2  different than you ski at a resort?

 3     A    Yeah, absolutely.  I mean, I think knowing

 4  -- knowing that there's a professional ski patrol

 5  staff there if something does go wrong makes a lot

 6  of people -- influences a lot of the decisions on

 7  how they ski.  It influences decisions on how I ski

 8  in a resort.

 9          I mean, if I'm in the backcountry and have

10  a minor, you know, break my binding or have some

11  minor injury, that's way more calamitous than

12  something at a resort.  So I'm infinitely more

13  cautious when backcountry skiing than when I'm on a

14  resort.

15     Q    And do you recall Deposition Exhibit 98?

16          I think that was the subpoena.

17     A    Yeah.

18     Q    And when you were talking about the

19  documents, I believe you -- kind of talking about

20  the Bozone lister.

21     A    Yeah.

22     Q    And about John being banned from that

23  lister; is that correct?

24     A    Yeah.

25     Q    And do you know if that was -- he was

1  banned because of matters related to this lawsuit?

2      A    I don't know.  I don't -- yeah, I don't

3  know.

4      Q    And you were asked about being the

5  plaintiff in a net metering case?

6      A    Yeah.

7      Q    And I think I might have just missed it,

8  but were you actually the named plaintiff?

9      A    I don't -- I don't think so.  The only

10  action that I took is he shared the one document

11  with me and asked if I would be willing to be named.

12  And I agreed and signed it, but nothing further

13  happened on my end.

14      Q    Okay.  If you will go ahead and grab

15  Deposition Exhibit 101.

16      A    Okay.

17      Q    And in the middle of that text exchange

18  there's a -- it looks like there's a text from John

19  about taking lessons.  Do you see that?

20      A    Yep.

21      Q    And do you know what type of ski lessons

22  he was -- or what type of lessons he was talking

23  about?

24      A    He was, I believe he was taking lessons at

25  Bridger Bowl to improve his skiing, so.

1    **Q    And when you read that he was doing that**

2    **to get back some confidence, what did you interpret**

3    **that to mean?**

4         MR. MORRIS:  Objection; speculation.

5    A    I interpreted it to mean that he was

6    trying to get back to where he was so that he could

7    ski the way he had and recreate the way he had.  He

8    was very frustrated by the setbacks caused his

9    inability to do what he used to be able to do at the

10   same level.

11   **Q    And you might have just asked this, but**

12   **what's the basis for that understanding of what he**

13   **meant by that, getting back confidence?**

14   A    John -- we had multiple conversations

15   after his accident, you know, just about his

16   limitations.  And he prior to the accident was very

17   fit, very active, very capable.  Was able to do a

18   lot of things in the backcountry and climbing and

19   running and biking that he just wasn't able to do

20   after his accident.

21        So he had, you know, he was trying over

22   time to build back his fitness, to build back his

23   balance, to build back his confidence because, you

24   know, it's a huge part of what makes him tick and

25   what's important to him is being able to do those

Trevor Lowell - August 25, 2020 - NDT Assgn #34991-1

 1  things.

 2      Q    Okay.  You mentioned fitness.  And do you

 3  recall testifying about some pull-up references John

 4  made?

 5      A    Yes.

 6      Q    And I think how many pull-ups was he able

 7  to do?

 8      A    I think he said two.

 9      Q    Do you know if that was -- he was limited

10  by anything to do with the ski wreck?

11          MR. MORRIS:  Objection; speculation.

12      A    That was my assumption, yeah.

13      Q    What type of injuries did he have in the

14  ski wreck?

15          MR. MORRIS:  Objection; speculation.

16      A    He broke his forearm.  He broke his

17  scapula in several places.  I believe he cracked or

18  broke some ribs, punctured a lung.  He had a

19  traumatic brain injury.  I believe he dislodged the

20  cartilage from his ear.

21      Q    And you know all that because you visited

22  him in the hospital?

23      A    Yeah, I mean, I was there in the ICU

24  talking with doctors and nurses about his condition

25  and what happened, talking to his father who was

```
 1  managing his care.
 2      Q    And you were asked about some text
 3  messages.  And did you delete any text messages to
 4  hide anything?
 5      A    No.
 6      Q    And when you deleted those text messages
 7  did you have any idea you were going to need them
 8  for litigation?
 9      A    No.
10      Q    And you talked a little about working with
11  John at Cottonwood.  And I was wondering if, had
12  John always been a last minute planner?
13      A    Yeah.  Yeah, he is not --
14      Q    So that's --
15      A    That's part of his personality, yeah.  I
16  think he doesn't follow a lot of social norms and I
17  think planning is one of those.
18      Q    And do you think it's worse since the
19  wreck?
20          MR. MORRIS:  Objection; leading,
21  foundation.
22      Q    I can rephrase it.
23          Do you think it's different since he has
24  had the wreck?
25          MR. MORRIS:  Objection; foundation and
```

leading.

A     I think that -- I don't know.  I don't

know that I could speak to that.  I think he's

always been that way in a big respect.  I don't

think that it's had a noticeable affect on his

ability to plan things as much as it has on his

ability to think and to do the physical things that

he wants to do.

**Q     Now would you consider John to be**

**stubborn?**

A     Yeah, I think stubborn is a word, but I

want to add that he -- what a lot of people miss

about John is that he is also reasonable.  He's

blunt and he's outspoken and he speaks his mind.  He

doesn't mince words.  But if you are willing to have

a conversation with him he will give up ground if he

thinks that you have a reasonable argument.  He's

not so stubborn in that he's just, you know, single

minded in all these ways.  He is intelligent and

thoughtful.  He's just, I think, has a rough

exterior that a lot of people don't have patience

for to really get underneath.

**Q     Now you were asked a little bit about**

**John's sobriety.  And do you know if his sobriety**

**has been affected by the wreck?**

1    A    Not to my knowledge, no.  I think it's

2  been -- the community that he's built around

3  sobriety and AA has been a positive element in his

4  life.

5    **Q    And what about Cottonwood?  You're Chair**

6  **of the board; correct?**

7    A    Correct.

8    **Q    And would you agree with me that your role**

9  **is to kind of look out for the organization as a**

10  **whole?**

11    A    Yeah, I mean, Board Chair -- the board in

12  general is -- his role is, as you described, the

13  Board Chair, is obviously a really critical part of

14  the board. So, yeah, I would say that that's

15  accurate.

16    **Q    And what does that look like to you?**

17    **MR. MORRIS:**  Objection.

18    A    It looks like trying to -- trying to make

19  Cottonwood resilient and strong and successful.  So,

20  you know, we spend a lot of time trying to tell the

21  story of Cottonwood, trying to figure out ways that

22  we can fund raise money, plan events, approving

23  budget, looking at compliance issues as testified

24  today.  I mean, a lot of things, conflict of

25  interest and directors and officers concerns.  So

1  just making sure that the organization is stable and

2  strong, but also in compliance with all the laws and

3  regulations that pertain to it.

4      Q    And so that would involve asking

5  questions?

6      A    Yes.

7      Q    And raising concerns?

8      A    Yes.

9      Q    And I believe you said you all have

10 discussions about decisions that you are going to be

11 making?

12     A    Yes.

13     Q    And you kind of described John as you know

14 him and something that I wanted to ask you, do you

15 consider John to be a kind of a go-big or go-home

16 kind of guy?

17     A    Yeah, I think John's really visionary.

18 And he is constantly sort of shooting for the stars

19 in that way.  I mean, I think that that's something

20 I've struggled with him, a very rationale realistic

21 person. And John has a lot of really big ideas.  And

22 so, yeah, I would say that's accurate.

23     Q    Okay.  I think that you said that before

24 his wreck he kind of out paced you on outdoor

25 activities and you had to keep up?

 1    A     **(No audible response.)**

 2    Q     **And how has that changed since the wreck?**

 3    A     Yeah, I mean, it was -- his nickname with

 4 some of our friends in Bozeman was Iron John.  I

 5 mean, he would go out.  He was very proud of the

 6 fact that on a lot of the outings we did I worked

 7 myself to a point of exhaustion where I actually

 8 threw up on several occasions and he thought that

 9 was hilarious.  And he would sort of laugh at me in

10 my struggling to keep up.

11        You know, ever since his accident and we

12 started recreating again he's much, much slower.  He

13 has, you know, new pains and physical restrictions,

14 but I think it's that fitness piece is just not

15 there as well his breathing has been a big issue.

16        It's one of the reasons I chose not to go

17 on the Rainier trip with them because I had concerns

18 we would, you know, put all this time, money and

19 effort in to trying to make a good faith effort to

20 summit Rainier knowing that likely John wouldn't be

21 able to because of his fitness and his breathing

22 issues.

23        I did a trip with him.  We went and skied

24 Lolo Peak in Missoula which is a pretty reasonable

25 backcountry trip and he was just sort of dragging

1  ass the whole time.  So I went from, you know,

2  chasing him in the mountains to him trying to chase

3  me, so yeah.

4      **Q     And has your testimony today been based on**

5  **your personal knowledge and observations during the**

6  **time that you've been around John?**

7          MR. MORRIS:  Objection; vague, too vague.

8      A    Yes.

9          MR. MORRIS:  And leading.

10     **Q     And has your testimony today been based on**

11 **your personal observations and discussions with**

12 **John?**

13         MR. MORRIS:  Objection; vague and leading.

14     A    Yes.

15     **Q     Did you do any independent research into**

16 **this lawsuit today or any other matter before**

17 **testifying?**

18     A    No.

19     **Q     And did anything John told you, including**

20 **the text messages Mr. Morris asked you about,**

21 **influence your testimony today?**

22     A    No.

23         MR. MORRIS:  Objection; vague and leading.

24     **Q     And has your relationship with John**

25 **influenced your testimony today?**

1            **MR. MORRIS:**  Objection; vague and leading.

2      A    No.  I mean, I think my willingness to be

3  a witness is because I care about him as a friend,

4  so I guess to that extent.

5      **Q    And is everything you have said today been**

6  **to the best of your recollection?**

7      A    Yes.

8            **MS. WALAS:**  I'll pass the witness.

9  **FURTHER EXAMINATION**

10  **BY MR. MORRIS:**

11      **Q    Trevor, just a couple of follow-ups.**

12            **Ms. Walas was asking you about the**

13  **difference between skiing at a ski resort and skiing**

14  **in the backcountry.**

15            **Do you recall that?**

16      A    Yes.

17      **Q    And I think you said you're infinitely**

18  **more careful in the backcountry than you are at a**

19  **ski resort?**

20      A    Yes, personally I am.

21      **Q    And you think you have an obligation to**

22  **ski carefully when you are at a ski resort?**

23      A    Yes.

24      **Q    And to ski in a manner that avoids injury**

25  **to yourself?**

```
 1       A     Yeah, I think the primary obligation is to

 2  maintain control so as not to hurt others.

 3       Q     Right.  And do you also have a

 4  responsibility to yourself to avoid skiing in a way

 5  that you avoid injury to yourself?

 6       A     Yeah, I would say both in the backcountry

 7  and on a resort.

 8       Q     Right.  And at the ski resort you have a

 9  heightened duty to ski carefully because there are

10  other people around; right?

11       A     You have that additional responsibility,

12  yes. I mean, there are often other people in the

13  backcountry depending on the situation.

14       Q     Sure.  But on a typical day at a ski

15  resort there's more people on the hill around you

16  than there are in the backcountry; right?

17       A     Yes.

18       Q     You have to look out for obstacles and

19  terrain so that you don't run into somebody else on

20  the ski resort.

21       A     Yeah, I mean, I think those are two

22  separate things.  You have to look out for obstacles

23  and terrain so you don't injure yourself.  I think

24  you have to also look out for other people so you

25  don't injure them.
```

```
 1      Q    I'm sorry.  Were you finished with your

 2 answer?

 3      A    Yes.

 4      Q    Okay.  So if there was a blind spot on a

 5 piece of terrain at the ski resort, you would need

 6 to approach that cautiously because you wouldn't

 7 know whether or not there was somebody in that blind

 8 spot that you could run into; right?

 9      A    Correct.

10      Q    Right.  And that's an obligation that you

11 have on the ski resort that is heightened as

12 compared to in the backcountry.

13      A    Yeah, I would agree with that.

14      Q    Okay.  That's all the questions I have.

15      MS. WALAS:  I don't have anything further.

16           Trevor, thank you for your time today.

17      THE REPORTER:  Are you ordering this

18 transcript?

19      MR. MORRIS:  Yes, I am.  Thank you.

20      MS. WALAS:  I would like an electronic

21 version, please.

22      MR. MORRIS:  Electronic is fine for me as

23 well.

24           (The deposition was concluded at

25 approximately 5:45 p.m.)
```

1                CORRECTION SHEET

2  Deposition of: Trevor Lowell      Date: 8/25/20

3  Regarding:   Meyer vs. Big Sky Resort

4  Reporter:    Slinn

5  _____

6  Please make all corrections, changes or clarifications

7  to your testimony on this sheet, showing page and line

8  number.  If there are no changes, write "none" across

9  the page.  Sign this sheet on the line provided.

10 Page    Line    Reason for Change

11 176    22 & 23  "tried climbing" & "track climb" are typos. It should be "trad"

12 152    6        "immediate" is a typo, it should be "intermediate"

13 135    1        "immediate" should be "intermediate"

14 _____  _____    _____

15 _____  _____    _____

16 _____  _____    _____

17 _____  _____    _____

18 _____  _____    _____

19 _____  _____    _____

20 _____  _____    _____

21 _____  _____    _____

22 _____  _____    _____

23 _____  _____    _____

24         Signature_____

25              Trevor Lowell

DECLARATION

Deposition of: Trevor Lowell        Date: 8/25/20

Regarding:    Meyer vs. Big Sky Resort

Reporter:     Slinn

_____

I declare under penalty of perjury the following to

be true:

I have read my deposition and the same is true and

accurate save and except for any corrections as made

by me on the Correction Page herein.

Signed at _____, _____

on the _____4th_____ day of ____October____, 2020.

Signature _____Trev Lowell_____

Trevor Lowell

1                          <u>CERTIFICATE</u>

2              I, Deborah J. Slinn, Certified Shorthand

3      Reporter, certify:

4              That the foregoing proceedings were reported

5      stenographically by me at the time and place

6      herein set forth;

7              That the foregoing is a true and correct

8      transcript of my shorthand notes so taken to the best of

9      my ability;

10             That the witness was sworn by me as a Notary

11     Public for the State of Vermont;

12             That I am not a relative or employee of any

13     attorney of the parties nor financially interested in

14     the action.

15             The certification of this transcript does not

16     apply to any reproduction of the same by any means

17     unless under the direct control and/or direction of the

18

19

20

21     _____

22     Deborah J. Slinn
       Notary Commission No. 0011571
23

24

25     My commission expires January 31, 2021.